## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EXIDE HOLDINGS, INC., *et al.*,<br><br>                    Debtors.[1] | Chapter 11<br><br>Case No. 20-11157 (CSS)<br><br>Jointly Administered |
| CALIFORNIA DEPARTMENT OF<br>TOXIC SUBSTANCES CONTROL,<br><br>                    Appellant,<br><br>    v.<br><br>EXIDE HOLDINGS, INC., *et al.*,<br><br>                    Appellees. | On Appeal from the U.S.<br>Bankruptcy Court for the<br>District of Delaware<br><br>Civil Action No.<br>1:20-cv-01402-RGA |

---

### APPELLANT'S AMENDED BRIEF
### IN SUPPORT OF APPEAL FROM BANKRUPTCY COURT
### ORDER CONFIRMING DEBTORS' PLAN OF REORGANIZATION

---

**O'MELVENY & MYERS LLP**
Nancy A. Mitchell
Matthew L. Hinker (No. 5348)
7 Times Square
New York, NY 10036
Tel:    (212) 326-2000
Fax:    (212) 326-2061
Email:  nmitchell@omm.com
        mhinker@omm.com

**CHIPMAN BROWN CICERO & COLE, LLP**
Paul D. Brown (No. 3903)
Gregory E. Stuhlman (No. 4765)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:   (302) 295-0191
Email: brown@chipmanbrown.com
        stuhlman@chipmanbrown.com

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

**O'MELVENY & MYERS LLP**
Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Tel:     (202) 383-5300
Fax:     (202) 383-5414
Email:  pfriedman@omm.com

**CALIFORNIA DEPARTMENT OF
JUSTICE OFFICE OF THE
ATTORNEY GENERAL**
Xavier Becerra
ATTORNEY GENERAL OF CALIFORNIA
Edward H. Ochoa
SENIOR ASSISTANT ATTORNEY GENERAL
Anthony A. Austin
Heather C. Leslie
DEPUTY ATTORNEYS GENERAL
1300 I Street, Suite 125
Sacramento, CA 95814
Tel:     (916) 210-7245
Email:  anthony.austin@doj.ca.gov
            heather.leslie@doj.ca.gov

*Counsel to Appellant
California Department of Toxic Substances Control*

December 23, 2020

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF JURISDICTION AND STANDARD OF REVIEW ................6

STATEMENT OF ISSUES ...........................................................................10

STATEMENT OF THE CASE.......................................................................11

    A.    Exide's History at the Vernon Plant. ...............................11

    B.    The Chapter 11 Cases.........................................................14

    C.    The Mediation and Plan Process.......................................16

    D.    DTSC's Objection to Confirmation and Confirmation of Plan. ........19

SUMMARY OF THE ARGUMENT ...............................................................21

ARGUMENT ...............................................................................................23

    I.    THE BANKRUPTCY COURT ERRED IN AUTHORIZING THE VERNON PLANT'S ABANDONMENT. ...............................23

        A.    The Bankruptcy Court Misinterpreted *Midlantic*. ...................25

        B.    The Bankruptcy Court's Authorization of Abandonment is Factually Unsupported. ...........................................29

    II.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE PLAN WAS PROPOSED IN GOOD FAITH. .........................35

        A.    The Plan Is Inconsistent with the Bankruptcy Code's Objectives. .................................................................37

        B.    The Plan Includes Coercive and Intentionally Punitive Provisions.......................................................37

    III.    THE BANKRUPTCY COURT ERRED BY APPROVING THE OVERBROAD RELEASE AND INJUNCTION PROVISIONS. ..............................................................39

        A.    The Bankruptcy Court Inappropriately Approved Non-Consensual Releases. ...................................................39

        B.    The Bankruptcy Court Erred in Approving Overly Broad Exide Releases. ...................................................46

i

**TABLE OF CONTENTS**
**(continued)**

Page

C.   The Bankruptcy Court Erred in Approving the Plan's Injunction Provisions, Which Are Overly Broad and Impermissibly Operate as a Discharge of Exide and Third Parties..................................................................48

IV.   THE PLAN FAILS TO PROVIDE THE SAME TREATMENT FOR EACH CLAIM OR INTEREST WITHIN A PARTICULAR CLASS IN VIOLATION OF BANKRUPTCY CODE SECTION 1123(a)(4)...........................................................51

V.   THIS APPEAL IS NOT EQUITABLY MOOT. ................................56

A.   Equitable Mootness Should Not Be Applied Where Critical Public Policy Issues Are at Stake. .............................57

1.   The Merits of the Appeal Should Be Heard to Address Critical Issues of Public Health, Safety and Welfare....................................................................57

2.   Failure to Consider the Merits of this Appeal Would Promote Unlawful Plan Provisions Without Any Meaningful Appellate Review...............................59

B.   Exide Cannot Overcome the Strong Presumption Against Applying Equitable Mootness in this Case..............................61

1.   The Relief Sought Would Not "Fatally Scramble" the Plan. .........................................................................62

2.   The Relief Sought Would Not Harm Third Parties Who Justifiably Relied on the Confirmation Order. ......64

CONCLUSION......................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azar v. Thgh Liquidating LLC (In re Thgh Liquidating LLC)*,
  No. 19-11689 (JTD), 2020 WL 5409002 (D. Del. Sept. 9, 2020)......................40

*Fenicle v. Energy Future Holdings Corp. (In re Energy Future Holdings Corp.)*,
  No. 15-cv-1183-RGA, 2016 WL 5402186 (D. Del. Sept. 26, 2016) ..................6

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
  203 F.3d 203 (3d Cir. 2000)................................................................44, 45

*In re Abbotts Dairies of Pa, Inc.*,
  788 F.2d 143 (3d Cir. 1986)..............................................................39

*In re Allied Nevada Gold Corp.*,
  725 Fed.Appx. 144 (3d Cir. 2018)......................................................64

*In re Am. Capital Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)..............................................................40

*In re Am. Classic Voyages, Co.*,
  298 B.R. 222 (D. Del. 2003) ...........................................................10

*In re Am. Tissue, Inc.*,
  No. 01-10370-KG, 2015 WL 1516973 (D. Del. Mar. 31, 2015)........................10

*In re Bigler LP*,
  442 B.R. 537 (Bankr. S.D. Tex. 2010) ...............................................55

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004)................................................7, 8, 39, 58

*In re Cont'l Airlines*,
  91 F.3d 553 (3d Cir. 1996)..........................................................10, 64

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) .........................................................59

*In re Emerge Energy Servs. LP*,
  Case No. 19-11563 (KBO), 2019 WL 7634308
  (Bankr. D. Del. Dec. 5, 2019)..........................................................51

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Erie Lackawanna Ry. Co.*,
  803 F.2d 881 (6th Cir. 1986) ..............................................................................46

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ....................................................................52

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001),
  *appeal dismissed by*, 280 B.R. 339 (D. Del. 2002) ......................................40, 45

*In re Global Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011)................................................................................55

*In re LandSource Communities Dev., LLC*,
  612 B.R. 484 (D. Del. 2020)................................................................................10

*In re Medford Crossings North, LLC*,
  No. 07-25115, 2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011)........................48

*In re Millennium Lab Holdings II, LLC*,
  591 B.R. 559 (D. Del. 2018)...........................................................................9, 11

*In re Millennium Lab Holdings II, LLC*,
  945 F.3d 126 (3d Cir. 2019)...........................................................44, 69, 70, 71

*In re Nickels Midway Pier, LLC*,
  2010 WL 2034542 (Bankr. D.N.J. May 21, 2010).............................................46

*In re One2One Commc'ns, LLC*,
  805 F.3d 428 (3d Cir. 2015)..........................................................................72, 73

*In re Pacific Lumber Co.*,
  584 F.3d 229 (5th Cir. 2009) ..........................................................72, 73, 74, 75

*In re Philadelphia Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012)..........................................................................67, 72

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)...............................................................................12

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re S&W Enterprise*,
  37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................................58

*In re SemCrude, L.P.*,
  428 B.R. 590 (D. Del. 2010) .............................................................................10

*In re Semcrude, L.P.*,
  728 F.3d 314 (3d Cir. 2013).......................................................................passim

*In re Sharon Steel Corp.*,
  871 F.2d 1217 (3d Cir. 1989) ........................................................................7, 8

*In re Transwest Resort Props., Inc.*,
  801 F.3d 1161 (9th Cir. 2015) ...................................................................74, 75

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015).......................................................................passim

*In re Unidigital, Inc.*,
  262 B.R. 283 (Bankr. D. Del. 2001).................................................................29

*In re W.R. Grace & Co.*,
  412 B.R. 657 (D. Del. 2009).............................................................................65

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012)...............................................................................61

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013)..............................................................................59

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011).......................................................45, 50, 52

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999)..........................................................41, 52

*Kane v. Johns-Mansville Corp.*,
  843 F.2d 636 (2d Cir. 1988)..............................................................................58

v

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
   188 F.3d 116 (3d Cir. 1999)...............................................................7, 8

*Matter of Penn Cent. Trasp. Co.*,
   944 F.2d 164 (3d Cir. 1991).....................................................................46

*Maytag Corp. v. Navistar Intern. Transp. Corp.*,
   219 F.3d 587 (7th Cir. 2000) ..................................................................47

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991).......................................................................9

*Meridian Bank v. Alten*,
   958 F.2d 1226 (3d Cir. 1992) ....................................................................9

*Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*,
   474 U.S. 494 (1986)..........................................................................passim

*N.L.R. v. Bildisco & Bildisco*,
   465 U.S. 513 (1984)..................................................................................65

*Nordhoff Inv., Inc. v. Zenith Elecs. Corp.*,
   258 F.3d 180 (3d Cir. 2001)......................................................................72

*State of NJ v. Atkinson (In re St. Lawrence Corp.)*,
   248 B.R. 734 (D.N.J. 2000) ......................................................................29

*The Official Committee of Equity Security Holders of Finova Grp. v. The Finova
   Grp. Inc. (In re The Finova Grp., Inc.)*,
   393 B.R. 64 (D. Del. 2008)..........................................................................9

*Universal Minerals, Inc. v. C.A. Hughes & Co.*,
   669 F.2d 98 (3d Cir. 1981)..........................................................................8

**Statutes**

11 U.S.C. § 1123(a)(4)......................................................................................54

11 U.S.C. § 1129(a)(1)......................................................................................54

vi

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

11 U.S.C. § 362(b)(4) ..........................................................................61

11 U.S.C. § 524(e) ...............................................................................42

Cal. Health & Safety Code §§ 25100 *et seq.* ........................................1

Cal. Health & Safety Code §§ 25300 *et seq.* ........................................1

Cal. Health & Safety Code §§ 58000 *et seq.*.........................................1

Appellant California Department of Toxic Substances Control ("<u>DTSC</u>") respectfully submits this brief in support of its appeal from the *Order Confirming Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, dated October 16, 2020 [Bankr. D.I. 998] (A-1217)[1] (the "<u>Confirmation Order</u>") entered by the United States Bankruptcy Court for the District of Delaware, Hon. Christopher S. Sontchi (the "<u>Bankruptcy Court</u>"), confirming the *Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, dated October 14, 2020 [Bankr. D.I. 998-2] (A-1276) (the "<u>Plan</u>").[2]

## PRELIMINARY STATEMENT

DTSC is a California regulatory agency with authority to protect California's people and environment from harmful effects of toxic substances by restoring contaminated resources, enforcing hazardous waste laws, reducing hazardous waste generation, and encouraging the manufacture of chemically safer products. *See, e.g.*, Cal. Health & Safety Code §§ 25100 *et seq*. (the California Hazardous Waste Control Law or "<u>HWCL</u>"), 25300 *et seq.*, 58000 *et seq*.  DTSC implements and

---

[1] Citations to pages of Appellant's Appendix are referenced as "A-__" with parallel citations to the Bankruptcy Court docket referenced as "Bankr. D.I. __."

[2] Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the Plan or, in the case of citations, the Appendix. Unless stated otherwise, all internal citations, quotations, and alterations in the original are omitted, and all emphasis is added.

enforces the HWCL, as well as laws concerning the cleanup of releases or threatened releases of hazardous substances.

Debtor Exide Technologies, LLC ("Exide Technologies" and collectively with related Debtors Exide Holdings, Inc., Exide Delaware LLC, Dixie Metals Company, and Refined Metals Corporation, "Exide") owned and operated a battery recycling facility in Vernon, California (the "Vernon Plant"). For several decades, the Vernon Plant discharged lead and other powerful neurotoxins into six southeast Los Angeles communities, contaminating schools, parks, and thousands of homes in working-class, primarily Latino, neighborhoods.

Although the Vernon Plant ceased operations in 2015, the property remains highly contaminated, requiring constant monitoring and containment to assure that hazardous substances are not released into the environment. *See* Cope Decl. ¶¶ 5–6 (A-0893), 19–20 (A-0898). The unrebutted evidence at the Confirmation Hearing demonstrated that, at the time the Confirmation Order was entered: (i) a temporary tent-like structure susceptible to tearing and damage from both heat and wind provided the only barrier preventing the release of the highly-contaminated remains of the main processing building, (ii) the Vernon Plant required daily physical inspections, drone flights, dust suppression, and monitoring of ground-water equipment, (iii) constant monitoring was required to avoid further release of toxic dust offsite, and contamination of the water system, and (iv) the Vernon Plant posed

2

a risk to surrounding communities. *See* Oct. 15, 2020 Hrg. Tr. (Eric Fraske), at 140:2–16 (A-1505), 141:1–144:20 (A-1506), 146:10–147:5 (A-1511), 148:2–151:11 (A-1513), 152:18–153:8 (A-1517); *id.* (Dr. Gina Solomon), at 240:10–244:21, (A-1605); *id.* (Grant Cope), at 178:3–181:20 (A-1543); Cope Decl. ¶¶ 29–39 (A-0901).

Despite the undisputed identifiable threat to public health and safety the Vernon Plant posed, the Bankruptcy Court authorized the Vernon Plant's abandonment rather than requiring Exide and its creditors to first remedy such threat. *See* Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 179:18–23 (A-1833). In doing so, the Bankruptcy Court misinterpreted and misapplied the Supreme Court's holding in *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986). In *Midlantic*, the Supreme Court sought to reconcile the competing mandates of federal bankruptcy laws and environmental laws by constraining a debtor's right to abandon property where, as here, debtors fail to remedy an imminent and identifiable harm and seek to abandon the property in violation of state law. *Id.* at 506. Here, the Bankruptcy Court erroneously disregarded *Midlantic*'s clear directive in authorizing the Vernon Plant's abandonment.

Abandonment was a lynchpin of the Plan. It allowed Exide's secured creditors (who are also Exide's controlling equity holders) to strip away the estate's remaining valuable assets and obtain non-consensual third-party releases without requiring

Exide to remedy the imminent and identifiable harm the Vernon Plant posed. *See* Plan §§ 10.5, 10.6 (A-1343). This result is contrary to the Bankruptcy Code and inconsistent with the Supreme Court's *Midlantic* holding.

The Bankruptcy Court's approval of the Plan's improper abandonment provisions left DTSC with a Hobson's choice: either accept the intolerable abandonment of the Vernon Plant, or agree to the Vernon Plant's transfer to a woefully underfunded Vernon Environmental Trust. *See* Plan § 4.8(b)(i) (A-1308). Rather than forcing that fictitious "choice" on DTSC, the Bankruptcy Court should have compelled Exide to meet its statutory obligations to remedy the imminent and identifiable environmental harms posed by the Plant. The Court instead left DTSC and the citizens of California with the burden and enormous expense of cleaning up Exide's mess. Moreover, the Bankruptcy Court provided a road map for other polluters to use the Bankruptcy Code as a means to avoid environmental liability, even where there is a substantial risk to the public.

The Bankruptcy Court further erred in approving the Plan because it: (i) improperly approved the non-consensual releases in Section 10.6 (the "Non-Consensual Releases") contrary to the Third Circuit's clear guidance on such releases; (ii) included extensive and overly broad releases by Exide in favor of parties that provided little or no contribution to the Plan; (iii) included improper and

4

overly broad injunctions and discharges; and (iv) did not provide equal treatment for each claim in Class 8.

Exide's objective in its Chapter 11 Cases was explicit: "liquidate or abandon any assets that [it is] not able to sell to third party purchasers." Disclosure Statement, at 4 (A-0600). Exide, of course, could not sell the Vernon Plant because it came with substantial remediation obligations. While abandonment of unmarketable property can be an acceptable remedy in bankruptcy, it is impermissible when abandonment necessarily means foisting severe health and environmental harms on the public at large. So it is here. The Confirmation Order approving the Vernon Plant's abandonment cannot stand.

This appeal should not be dismissed as equitably moot. Although DTSC does not dispute that the Plan has been substantially consummated, modifying the Confirmation Order would not "fatally scramble" the Plan or harm third parties who justifiably relied on it. Because the Plan is not a reorganization but rather a liquidation of Exide's assets, there have been no dramatic changes to the lender or equity base that cannot be undone after the Effective Date. And the Plan transactions—such as the Europe/ROW Sale Transaction and funding of various trusts related to the Global Settlement—could remain intact because narrower relief is possible that would redress DTSC's concerns. This relief could include (a) narrowing or eliminating the Plan's overly broad releases and injunctions

5

applicable to DTSC, and (b) determining that *Midlantic* requires additional funding to clean up the Vernon Plant before abandonment would be appropriate. Moreover, because the Bankruptcy Court had no power to approve the unlawful Plan provisions identified by DTSC, those provisions are not valid and constitute ill-gotten benefits on which non-debtor third parties could not justifiably rely. In addition, because the Effective Date occurred only 10 days after the Bankruptcy Court entered the Confirmation Order—and DTSC made every effort to obtain a stay pending appeal—the merits of this appeal should be heard to prevent debtors from pushing the limits of the Bankruptcy Code's confirmation provisions without meaningful appellate review.

## STATEMENT OF JURISDICTION
## AND STANDARD OF REVIEW

This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1) to review the Bankruptcy Court's final orders, such as the Confirmation Order. *See Fenicle v. Energy Future Holdings Corp. (In re Energy Future Holdings Corp.)*, 2016 WL 5402186, at \*2 (D. Del. Sept. 26, 2016) ("A Bankruptcy Court order confirming a plan is a final order immediately appealable as of right under § 158(a)(1)."); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.19 (3d Cir. 2004).

In so doing, the Court reviews the Bankruptcy Court's legal determinations *de novo*. *See In re Combustion Eng'g, Inc.*, 391 F.3d at 214 n.19; *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 188 F.3d 116, 122 (3d Cir.

1999). A *de novo* review involves "a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir. 1989).

Findings of fact, however, are reviewed for clear error. *See In re Combustion Eng'g, Inc.*, 391 F.3d at 214 n.19; *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d at 122. The case law distinguishes between three types of facts: (i) basic facts; (ii) inferred facts; and (iii) ultimate facts. *See In re Sharon Steel Corp.*, 871 F.2d at 1223 (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102-03 (3d Cir. 1981)). "Basic facts are the historical and narrative events presented for the court's consideration." *Id*. "Inferred factual conclusions are drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the basic facts." *Id*. Courts apply the clearly erroneous standard to both basic and inferred facts. *See id.*

In contrast, "an ultimate fact is a legal concept with a factual component and is usually expressed in the language of a standard enunciated by case-law rule or by statute." *Id*. Because ultimate facts involve mixed questions of law and fact, this Court "must accept the Bankruptcy Court's finding of historical or narrative facts unless clearly erroneous, but exercises plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *The Official Committee of Equity Security Holders of Finova Grp. v. The*

7

*Finova Grp. Inc.* (*In re The Finova Grp., Inc.*), 393 B.R. 64, 68 (D. Del. 2008) (quoting *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991)). In other words, the Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 570 (D. Del. 2018) ("*Millennium I*") (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992)).

Where a decision involves the discretionary balancing of equitable and prudential factors, the Bankruptcy Court's determination is reviewed for abuse of discretion. *See In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996). An abuse of discretion exists whenever a judicial action is "arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used." *In re Am. Tissue, Inc.*, 2015 WL 1516973, at \*2 (D. Del. Mar. 31, 2015) (quoting *In re Am. Classic Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003)). A discretionary ruling thus must be reversed if "there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of relevant facts." *In re LandSource Communities Dev., LLC*, 612 B.R. 484, 493 (D. Del. 2020) (quoting *In re SemCrude, L.P.*, 428 B.R. 590, 593 (D. Del. 2010)).

Because the Confirmation Order—which inappropriately authorized the Vernon Plant's abandonment, approved a bad-faith Plan, and granted inappropriate and non-consensual third-party releases and injunctions—turns on interspersed

8

issues of law, fact, and prudential factors, each issue involves a different standard of review, as follows:

- *Abandonment:* The authorization of the Vernon Plant's abandonment is a mixed question of law and fact. The legal question as to the Bankruptcy Court's application of the *Midlantic* standard is reviewed *de novo*. The factual findings are reviewed for clear error.

- *Non-Consensual Releases:* After applying the *Continental* factors, the Bankruptcy Court approved non-consensual, third-party releases. That determination is reviewed for abuse of discretion, but related factual determinations are reviewed for clear error. *See Millennium I*, 591 B.R. at 586. (applying clear error standards to factual findings in reviewing application of the *Continental* factors).

- *Exide's Releases and Injunctions:* The releases and injunction provisions in the Plan and Confirmation Order turn on questions of law and the application of law to facts; they are reviewed *de novo*.

- *Good Faith:* The Confirmation Order includes factual determinations as to Exide's "good faith" in proposing the Plan, which are reviewed for clear error. *See In re PWS Holding Corp.*, 228 F.3d 224, 242-43 (3d Cir. 2000) (applying the clear error standard in reviewing the

bankruptcy court's good faith determinations under 11 U.S.C. § 1129(a)(3)).

- ***Equitable Mootness:*** In determining equitable mootness, the Court must assume that DTSC will prevail on the merits. *See In re Tribune Media Co.*, 799 F.3d 272, 281 (3d Cir. 2015). Exide bears the burden of proof to rebut the strong presumption in favor of hearing this appeal by showing that dismissal is warranted based on the relevant factors. *See In re Semcrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013).

## STATEMENT OF ISSUES

1.  Whether the Bankruptcy Court erred in authorizing the Vernon Plant's abandonment by misapplying *Midlantic*.

2.  Whether the Bankruptcy Court erred in authorizing the abandonment of a contaminated property that is in an unstable condition and requires active containment efforts and monitoring to avoid imminent and immediate harm to the surrounding area.

3.  Whether the Bankruptcy Court erred in holding that the Plan was proposed in good faith despite including coercive provisions specifically engineered to force DTSC to accept the terms of a settlement it previously rejected.

4.  Whether in this corporate liquidation the Bankruptcy Court erred by (i) approving the extraordinary release of non-debtors' claims against other non-debtors without the releasors' consent and without consideration from each of the Released Parties, (ii) unnecessarily approving broad releases by Exide in favor of parties that provided little or no contribution to the Plan, and (iii) approving the overly broad injunction provision in the Plan.

5.  Whether the Bankruptcy Court erred in concluding that the Plan provides equal treatment for each claim in a class where the allocation of consideration is not distributed on a pro-rata basis and the releases are broader for certain parties within the class.

10

6.      Whether this appeal is equitably moot in circumstances where DTSC exercised diligence in moving to appeal and sought to stay consummation and effectiveness of the Plan pending appeal, and Exide is capable of providing the relief sought.

## STATEMENT OF THE CASE

### A.      Exide's History at the Vernon Plant.

Exide's businesses involved the operation of a range of stored electrical energy products and services for industrial and transportation applications, including the production and recycling of lead-acid and lithium-ion batteries.

Prior to the Commencement Date, Exide Technologies operated the Vernon Plant. During its operation, the Vernon Plant discharged lead and other powerful neurotoxins into six southeast Los Angeles communities. The Vernon Plant is no longer operating but remains highly contaminated and, in its current state is an ongoing daily risk to those same neighborhoods. The testimony offered by both Exide and DTSC at the Confirmation Hearing established that the contamination at the Vernon Plant—in particular loose lead dust—posed a significant danger to public health and the environment. *See* Oct. 15, 2020 Hrg. Tr. (Eric Fraske), at 152:18–153:8 (A-1517); *id.* (Dr. Gina Solomon), at 240:10–244:21 (A-1605).

Exide did not contest its responsibility for the contamination at the Vernon Plant. Nor could it, since Exide Technologies admitted, as part of a March 11, 2015 non-prosecution agreement (the "Non-Prosecution Agreement") with the United States Attorney's Office for the Central District of California, to felony violations of

11

hazardous waste laws, acknowledged responsibility for its criminal conduct, and further admitted the Vernon Plant produced a host of hazardous wastes, including lead, cadmium, arsenic, and volatile organic compounds. *See* NPA Appx. 1, at 1 (A-1111). The Non-Prosecution Agreement required Exide Technologies to immediately cease operations and begin closing the Vernon Plant, including demolition and cleanup of the site. *See* NPA, ¶ 8–11 (A-1105). The evidence at the Confirmation Hearing clearly demonstrated that Exide failed to meet those obligations.

In late 2017, Exide began the Vernon Plant's Phase 1 Closure. To facilitate this process, Exide erected a full enclosure unit ("FEU"), a tent-like temporary enclosure comprised of scaffolding and plastic sheeting, around the Vernon Plant's main operation building to allow the decontamination and deconstruction of that building. The testimony offered at the Confirmation Hearing demonstrated that without the FEU, and its associated air-pollution-control devices and monitoring equipment, there would be a significant risk of releases and migration of dust containing extremely high levels of lead and other hazardous materials. The cost to rent and operate the FEU is between $750,000 and $800,000 per month. *See* Oct. 15, 2020 Hrg. Tr. (Grant Cope), at 214:16–215:4 (A-1679). The FEU requires constant monitoring and maintenance and is susceptible to damage from punctures and tears. Evidence at the Confirmation Hearing clearly demonstrated that the FEU is not a

12

permanent solution to the danger posed by the Vernon Plant. *See id.* (Eric Fraske), at 140:2–16 (A-1505), 141:1–144:20 (A-1506), 146:10–147:5 (A-1511), 148:2–151:11 (A-1513).

The unrebutted testimony at the Confirmation Hearing estimated that the aggregate cost to put the Vernon Plant in a safe and stable condition is approximately ***$72 million***. *See* Myers Decl. ¶ 2 (A-0907).[3]

It is undisputed that the Vernon Plant is dangerous and that exposure to the dust—temporarily and perilously enclosed by the FEU—is dangerous. *See* Supplemental Ruling, at 2 (A-1364). It is also inarguable that absent the continued monitoring and maintenance of the FEU and other mitigation efforts undertaken by Exide's contractors, the Vernon Plant presents an imminent and identifiable danger to the communities surrounding the site. *See id.*; Oct. 15, 2020 Hrg. Tr. (Grant Cope), at 178:3–181:20 (A-1543); Cope Decl. ¶ 29–39 (A-0901).

---

[3] The Confirmation Hearing record is replete with evidence of Exide's attempts to evade their responsibilities for environmental cleanup and to leave the site protected only by a temporary and unstable solution. Most recently, Exide used the COVID-19 pandemic as an excuse. On March 21, 2020, Exide cited the COVID-19 pandemic as a reason to discontinue all active closure work, claiming a *force majeure*. *See* Messing Decl. ¶ 21 (A-1100). The assertion that COVID-19 somehow justified suspending efforts to clean up a toxic waste site in the middle of a community was improper. Nonetheless, from that point forward, Exide continued only the minimum tasks necessary to prevent additional releases at the Vernon Plant. *See* Fraske Decl. ¶¶ 8–10 (A-1183). Meanwhile, the FEU and other equipment at the Vernon Plant have continued to degrade.

13

**B.     The Chapter 11 Cases.**

On May 19, 2020 (the "Commencement Date"), the various Exide entities each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

It was clear from the outset of the Chapter 11 Cases that Exide would not emerge as a reorganized business, and instead sought to liquidate its estates. *See* Disclosure Statement, at 4 (A-0600). In fact, the outcome of the Chapter 11 Cases was preordained. In the months leading up to the Commencement Date, Exide and an ad hoc group of noteholders (the "Ad Hoc Group") negotiated and executed a restructuring support agreement (the "RSA"). *See* A-0055. Following the Commencement Date, the Ad Hoc Group held, in the aggregate, approximately (i) 100% of the Superpriority and Exchange Priority Notes, (ii) 85.35% of the First Lien Notes, and (iii) over 80% of the equity interests in Holdings. *See* First Day Decl. ¶ 11 (A-0005). Pursuant to the RSA, the Ad Hoc Group submitted a binding credit bid for the Europe/ROW Assets.[4] *See* Notice of Qualified Bids (A-0198).

On July 23, 2020, Exide announced that the Ad Hoc Group's bid was the Successful Bid. *See* Notice of Successful Bidders (A-0303). The Europe/ROW Sale Transaction was incorporated into the Plan.

---

[4] The "Europe/ROW Assets" consist of Exide's European and ROW operations ("Exide Europe/ROW"), including (i) the Exide Europe/ROW transportation business segment, (ii) the Exide Europe/ROW industrial business segment, (iii) the Exide Europe/ROW recycling business segment.

14

To expedite Exide's stated goal of liquidating its valuable assets for the Ad Hoc Group's benefit and foisting contaminated properties back onto various states, Exide, on the Commencement Date, filed the NPP Settlement Procedures Motion. *See* A-0133. By the NPP Settlement Procedures Motion, Exide sought to establish procedures to (i) continue the sale process without the distraction and cost of litigation, (ii) engage in good-faith negotiations with the various governmental regulatory agencies and sureties—including mediation, if necessary—to obtain an agreed upon solution for the orderly transition of any NPPs that Exide was unable to sell and any related issues, and (iii) proceed on an expedited timeline for the contested abandonment of the remaining NPPs if the settlement negotiations and mediation were unsuccessful. *See id.* On June 9, 2020, the Bankruptcy Court granted the NPP Settlement Procedures Motion. *See* NPP Settlement Procedures Order (A-0183).

Following the Commencement Date, Exide sold the Americas Assets[5] to a third-party. On August 6, 2020, the Bankruptcy Court approved the transaction. *See* Purchase and Sale Order (A-0312).

---

[5] The "Americas Assets" consisted of Exide's North American operations ("Exide Americas"), including (i) the Exide Americas industrial energy business segment, (ii) the Exide Americas transportation business segment, (iii) the Exide Americas recycling business segment, and (iv) any operating facilities located in any of the foregoing business segments.

15

**C.**     **The Mediation and Plan Process.**

Pursuant to the Settlement Procedures Order, Exide, the Settling Governmental Authorities, DTSC, the Frisco Governmental Authorities, the Environmental Sureties, the Creditors Committee, and the Ad Hoc Group engaged in good-faith and arm's-length negotiations to resolve the issues related to the Chapter 11 Cases. In early July 2020, Exide, attorneys representing the Settling Governmental Authorities, and counsel for DTSC engaged in a global mediation process.

On July 28, 2020, the mediators filed the Mediators' Final Certificate of Completion (A-0305) and on July 29, 2020, the Mediators filed the Mediators' Revised Certificate of Completion (A-0309). The Mediators' Revised Certificate of Completion announced that persons representing the Global Settlement Parties and counsel for DTSC had accepted the Mediators' Proposal (as defined therein) and agreed to "recommend [the Mediators' Proposal] and commit to pursuing approvals [from those with authority] pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable." *Id.* ¶ 4 (A-0310).

All of the parties understood the Mediators' Proposal was subject to definitive documentation and approval of the parties with authority for certain of the Settling Governmental Authorities, including, among others, decision-makers at DTSC and its parent agency, the Secretary of the California Environmental Protection Agency.

16

Rather than wait for those approvals, Exide filed the *Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* [Bankr. D.I. 742] (A-0517) (the "Initial Plan") and the Disclosure Statement (A-0589) on August 14, 2020.

The Initial Plan contained provisions evidencing the tentative agreement and providing that Exide would not proceed with or amend the Initial Plan without approval of the DTSC and the other governmental authorities. Section 12.4(a) explicitly and unambiguously prevented Exide from amending the definition of "Settling Governmental Authorities" without the consent of each of the governmental authorities listed on a schedule; that scheduled included DTSC. *See* A-0584. In addition, DTSC and the other governmental authorities took other steps to assure that their rights were preserved in the event the settlement was not completed, as evidenced by the negotiation of a clawback in the Americas Sale Order and the multiple extensions of the Challenge Period. *See* Orders Approving Challenge Deadline Extensions (A-0702; A-0713; A-0723; A-0812; A-0822).

DTSC, Exide, and other Global Settlement Parties engaged in significant negotiation of the settlement documents. Ultimately, DTSC rejected the settlement on September 15, 2020.

On September 23, 2020, Exide hastily, and in direct contravention of the Initial Plan's express terms, amended the Initial Plan into the *Second Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Bankr. D.I. 871]

17

(A-0733) (the "Second Amended Plan"), and requested an expeditious confirmation hearing from the Bankruptcy Court. The Second Amended Plan materially altered a number of provisions that required the consent of the Settling Governmental Authorities and altogether *eliminated* DTSC from the definition of the Settling Governmental Authorities. *See* Second Amended Plan § 1.181 (A-0752) and Schedule 1 (A-0807).

The Second Amended Plan included provisions intentionally targeted at DTSC. Specifically, the Second Amended Plan revised Section 4.8(b), which addressed Allowed Environmental NPP Claims, to include new subsections that provided disparate treatment for Environmental NPP Claims not held by the Global Settlement Parties. DTSC was the only Environmental NPP Claims holder that was not a Global Settlement Party.

These provisions conditioned the treatment of DTSC's claims on two events: (i) Bankruptcy Court approval of the Non-Consensual Releases (the "Payment Condition"); and (ii) agreement between DTSC and the Vernon Environmental Trustee to, among other things, grant covenants not to sue to certain parties (the "Vernon Trust Condition"). These conditions created three possible scenarios for DTSC:

- *Scenario 1:* If both the Payment Condition and Vernon Trust Condition were satisfied, DTSC received beneficial interests in the Vernon

18

Environmental Trust, which would be funded with $2.5 million and limited causes of action.

- **Scenario 2:** If only the Payment Condition were satisfied, the Plan deemed the Vernon Plant abandoned to Exide Technologies and provided a $2.5 million payment to the Vernon Standby Trust, a legacy trust established pursuant to Exide's 2013 chapter 11 cases.

- **Scenario 3:** If the Payment Condition was not satisfied, the Plan deemed the Vernon Plant abandoned to Exide Technologies and provided no distribution to DTSC.

Exide did not (a) file a motion seeking abandonment or setting forth its case in support of abandonment, (b) provide evidence in support of confirmation of the Plan (until the eve of the Confirmation Hearing), or (c) modify its Disclosure Statement to reflect material changes to the Initial Plan.

## D.   DTSC's Objection to Confirmation and Confirmation of Plan.

As required by the Bankruptcy Court's schedule, on October 7, 2020—a mere two weeks after Exide filed the Second Amended Plan—DTSC filed its *Preliminary Objection to Confirmation of Second Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Bankr. D.I. 917] (A-0831) (the "Confirmation Objection"). The Bankruptcy Court required DTSC to file the Confirmation Objection despite the fact that discovery was incomplete. On that same

19

day, DTSC requested an adjournment of the hearing on Plan confirmation (the "Confirmation Hearing") to allow discovery to be completed. On October 9, 2020, the Bankruptcy Court denied DTSC's motion.

On the eve of the Confirmation Hearing, Exide filed the *Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 977] (the "Plan"). This amendment altered, but failed to address the impropriety of, the Non-Consensual Releases and maintained the coercive Payment Condition and Vernon Trust Condition. The Confirmation Hearing was held on October 15–16, 2020, and concluded with the Bankruptcy Court rendering a bench ruling approving the Plan and entering the Confirmation Order. *See* A-1217. The Bankruptcy Court also partially granted DTSC's motion for a stay pending appeal of the Confirmation Order made during the Confirmation Hearing, *see* Oct. 16, 2020 Hrg. Tr. 42:5–44:8 (A-1696), 167:5–8 (A-1821), but only for seven days until October 23, 2020. *See id.* (Court Ruling) at 185:4–7 (A-1839).

On October 18, 2020—only two days after the Confirmation Order's entry—DTSC filed a notice of appeal from the Confirmation Order and a motion to stay the Confirmation Order pending that appeal's adjudication. *See* Notice of Appeal (A-1358); *Motion for Stay Pending Appeal,* dated October 18, 2020 [D.I. 4]. On October 19, 2020, the Bankruptcy Court issued a letter to clarify and supplement its bench ruling. *See* Supplemental Ruling (A-1363). On October 22, 2020, the Court denied

DTSC's stay motion. *See* Oct. 22, 2020 Hrg. Tr. 66:13-15 (A-1944). On October 26, 2020 (the "<u>Effective Date</u>"), the Plan was substantially consummated and became effective. *See* Notice of Effective Date [Bankr. D.I. 1039].

## SUMMARY OF THE ARGUMENT

1.      Confirmation of the Plan was impermissible; the Bankruptcy Court disregarded well-recognized limitations on a trustee's ability to abandon property and erred in authorizing the Vernon Plant's abandonment based on a misapplication of the Supreme Court's direction in *Midlantic*. Absent authorization to abandon the Vernon Plant, the Plan was not confirmable. Abandonment is forbidden here because the undisputed record demonstrates that the Vernon Plant poses an imminent and identifiable harm to the public health and safety of surrounding communities. Under *Midlantic*, "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." 474 U.S. at 507. Nevertheless, the Bankruptcy Court confirmed the Plan and authorized abandonment in part because "[g]overnments exist to serve and protect their citizens." Supplemental Ruling, at 1 (A-1363).

2.      In addition, the Bankruptcy Court erred in holding that the Plan was proposed in good faith and not by means forbidden by law as required by Bankruptcy Code Section 1129(a)(3). The proposal and solicitation of the Initial Plan was premised on all parties agreeing to the proposed settlement. Following DTSC's

21

rejection of that settlement, the Initial Plan was improperly amended and resulted in a Plan intentionally designed to force an unacceptable settlement on DTSC while avoiding the well-recognized purposes of the Bankruptcy Code. Because the Plan does not fairly achieve a result consistent with the Bankruptcy Code's objectives and purposes, the Plan was not proposed in good faith.

3.      The Bankruptcy Court further erred in confirming the Plan because, while the Plan provided for Exide's liquidation, it also contained extensive and impermissible provisions designed to insulate non-debtors. Specifically, the Bankruptcy Court erred by approving the Exide releases and the Non-Consensual Releases, as well as the overly broad injunction provisions under Sections 10.3(b)–(d) of the Plan, which result in a *de facto* discharge of Exide and various third parties. Approval of the Non-Consensual Releases was improper because (i) the releases are unnecessary as Exide is not emerging as a reorganized business, (ii) Exide offered no evidence of extraordinary circumstances warranting the releases, (iii) none of the Released Parties (other than the Transferred Entities) provided any financial contributions in exchange for the releases, and (iv) the Plan does not include a provision allowing DTSC to opt out of the releases.

4.      The Bankruptcy Court erred in approving a Plan that violated Section 1123(a)(4) by treating DTSC differently and less favorably than other members of Class 8. The unfavorable treatment includes disparate allocations of cash

22

consideration that are disproportional to the total liabilities associated with all Non-Performing Properties, and forcing DTSC and other California state agencies to provide broader releases than the Settling Governmental Authorities.

5.     This appeal is not equitably moot and the Court should hear the merits because DTSC timely sought a stay pending appeal from both the Bankruptcy Court and this Court prior to the Effective Date, and any appeal of those stay decisions would have been fruitless given that the Plan was substantially consummated 10 days after the Confirmation Order was entered.  Equitable mootness does not apply here, despite the Plan having been substantially consummated, because:  (i) the remedies available to redress DTSC's concerns with the Confirmation Order—including relief that would narrow or eliminate the offensive Plan releases, and a determination that *Midlantic* requires additional funding to clean up the Vernon Plant before abandonment—would not "fatally scramble" the Plan; and (b) the Plan imposes several unlawful provisions on which third-party beneficiaries could not justifiably rely.

**ARGUMENT**

## I.    THE BANKRUPTCY COURT ERRED IN AUTHORIZING THE VERNON PLANT'S ABANDONMENT.

The Plan required the Bankruptcy Court to authorize the abandonment of the Vernon Plant. Absent that authorization, the Plan was not executable. Despite evidence unequivocally establishing that the Vernon Plant presents an imminent and

identifiable risk to the public health and safety of thousands of individuals in southeast Los Angeles County, the Bankruptcy Court approved the abandonment of the Vernon Plant. That approval was contrary to controlling precedent.

In *Midlantic*, the Supreme Court held that when Congress enacted Bankruptcy Code Section 554(a) to authorize the abandonment of property, it incorporated preexisting "well-recognized restrictions on a trustee's abandonment power," which courts had applied "to protect legitimate state or federal interests" in the safe use of property. 474 U.S. at 501. And in codifying this qualified abandonment power, Congress also incorporated "the established corollary that a trustee could not exercise [its] abandonment power in violation of certain state and federal laws." *Id.* at 501-02. Section 554(a) forbids abandonment "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* at 507. Because the Vernon Plant's abandonment would unambiguously violate specific state public health and environment laws, *Midlantic* conclusively precludes confirmation of a Plan that functionally requires abandonment.

The Bankruptcy Court's approval of the Vernon Plant's abandonment rests on a profound misreading of *Midlantic*. According to the Bankruptcy Court, *Midlantic* is an essentially meaningless "gloss on abandonment" that it "[p]ersonally" views as mere "judicial policy making and legislation." Oct. 16, 2020 Hrg. Tr. (Court Ruling),

24

at 173:6–17 (A-1827). That view of *Midlantic* is demonstrably incorrect. Properly understood, *Midlantic* forbids the Vernon Plant's abandonment in violation of state law and thus precludes confirmation of the Plan.

### A.     The Bankruptcy Court Misinterpreted *Midlantic*.

The Bankruptcy Court misapplied *Midlantic* in determining abandonment was permitted. Allowing a debtor to abandon property because government agencies exist and will take action to address threats to public health and safety is contrary to the Supreme Court's clear directive.

The *Midlantic* decision was an attempt to balance bankruptcy law with environmental law, allowing abandonment even if some friction results with environmental state regulations. But abandonment is still prohibited where:

> "(1) an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety;
>
> (2) abandonment of the property will violate a state statute or regulation;
>
> (3) the statute or regulation being violated is reasonably designed to protect the public health and safety from imminent and identifiable harm caused by identified hazards; and
>
> (4) compliance with the statute or regulation would not be so onerous as to interfere with the bankruptcy administration itself."

*State of NJ v. Atkinson (In re St. Lawrence Corp.)*, 248 B.R. 734, 739 (D.N.J. 2000)

(citing *Midlantic*); *see also, In re Unidigital, Inc.*, 262 B.R. 283, 286–87 (Bankr. D.

Del. 2001) ("Since the *Midlantic* decision, the majority of courts have read the exception to abandonment narrowly by disallowing abandonment *only where there is an imminent and identifiable harm to the public health or safety* … [and] the debtor must be attempting to abandon property in contravention of state or local laws or regulations designed to protect the public."). If these conditions are met, the "state law or regulation is not preempted by section 554 of the Bankruptcy Code." *In re St. Lawrence Corp.,* 248 B.R. at 740.

The Bankruptcy Court's abandonment analysis focused exclusively on the first factor, which should have been easily satisfied: DTSC submitted uncontested evidence establishing that lead contamination at the Vernon Plant presents a grave public health risk. *See* Oct. 15, 2020 Hrg. Tr. (Grant Cope), at 180:14-17 (A-1545) ("If it's not treated, then it could be releasing hazardous waste in violation of law, but, more important, in a way that could threaten public health").[6]

The Bankruptcy Court, however, framed the question as whether an imminent and identifiable threat to public health or safety would exist *if the Bankruptcy Court authorized abandonment and DTSC then took action to mitigate the threat. See* Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 175:16-18 (A-1829) (stating that the "question

---

[6] DTSC submitted uncontested evidence at the Confirmation Hearing clearly demonstrating that abandonment of the Vernon Plant would violate state statutes and regulations reasonably designed to protect the public health and safety from imminent and identifiable harm caused by the identified hazards at the Vernon Plant.

is whether there's an imminent identifiable threat *if I allow abandonment*"). The Bankruptcy Court concluded that abandonment would create no harm because *state regulators* would intervene and prevent lead contamination harms from (further) manifesting themselves.

According to the Court, the Vernon Plant currently "is constantly monitored, and … the dangerous polluted areas are contained." Supplemental Ruling, at 2 (A-1364). Further—and crucial to the Bankruptcy Court's decision—the contractors needed to perform the critical containment work remained "ready, willing, and able to continue their work, *provided they are paid*," and, after abandonment, government regulators would expeditiously enter into contracts with and begin making payments to those contractors to avoid the public health risk. *Id*. The Bankruptcy Court thus found that the Vernon Plant's abandonment would not present an imminent risk of harm to public health because "[g]overnments exist to serve and protect their citizens" and safety regulators would address the risk. Supplemental Ruling, at 1 (A-1363). The Bankruptcy Court concluded that if abandonment actually causes harm, it is not because the property is a risk, but because government regulators did not act to avoid the risk. *See* Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 179:8–23 (A-1833) ("You know, at the end of the day California considers this to be dangerous, considers this to be extremely important . . . but if they're unable to transfer this property in the next two weeks, it's because of their own bureaucracy or their own

27

inability to act; it's not because of anything the debtors have done . . . so for that reason, I think the key fact that I find, this is why the abandonment will be approved is there's no identifiable imminent threat to the public safety or to health of human's general safety.").

The Bankruptcy Court's analysis misconstrues *Midlantic*'s first factor, which addresses whether the *property itself*—in a static state—presents an imminent and identifiable risk of harm to public health and safety. *See supra* at 28. Neither *Midlantic* nor any other decision holds that an identifiable risk can be ignored merely because a government regulator could intervene post-abandonment to address the harm and preserve public health and safety. To the contrary, in *Midlantic* itself, the Supreme Court held that abandonment was improper even though state regulators expected to—and did—intervene upon abandonment to decontaminate the facility. 474 U.S. at 498 (finding abandonment improper where "[i]t became necessary for New York to decontaminate the facility . . . at a cost of $2.5 million."). Any other conclusion would prove far too much, because government action to protect public health and safety is almost *always* available—it is the most essential function of government, after all. If the availability of government action to forestall harms from a property means the property presents no risk of such harms, then *Midlantic* is essentially a dead letter. By contrast, the decision makes perfect sense if its

28

"identifiable and imminent harm" factor is satisfied when the *property itself* presents such a risk.

Allowing debtors to abandon dangerous property that presents an imminent and identifiable harm to public health and safety simply because a state government exists and regulators could take action to protect the state's citizens is entirely inconsistent with *Midlantic*, ignores longstanding restrictions on a trustee's power to abandon property in violation of state health and safety laws, and sets a dangerous precedent elevating the monetary interests of debtors and creditors over the much broader interest in public health and safety.

## B.    The Bankruptcy Court's Authorization of Abandonment is Factually Unsupported.

In authorizing the Vernon Plant's abandonment, the Bankruptcy Court compounded its misapplication of *Midlantic* with factual conclusions unsupported, and in many cases contradicted, by the evidence.

The Bankruptcy Court initially found that the Vernon Plant's abandonment would not present an "identifiable imminent threat" on the curious basis that "the entire property is not sort of a seething, glowing, toxic lead situation," as if deadly toxic threats exist only when they are visible to the naked eye. Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 178:3–5 (A-1832). To similar effect, the Court asserted that lead is "not volatile . . . there's no danger of fire" and "there's no evidence that it's going to explode into flame." *Id.* at 178:7–13 (A-1832). The Bankruptcy Court

29

eventually acknowledged that even invisible toxic material could be harmful, conceding that lead dust at the Vernon Property "will cause long-term health effects [that] are bad," but it dismissed those effects because "the bad nature of the health effects depends on how much you get over time, and it takes dosages over time to accumulate." *Id.* at 178:15–20 (A-1832). The Bankruptcy Court believed that "only if you're in the tent [ ] do you have to be in a respirator and Tyvek suit[,] [o]therwise, people are walking the exterior of the site without respirators, people are operating sprayers on site to spray the ground, to keep everything settled." *Id.* at 177:21–178:3 (A-1831). As a result, the Bankruptcy Court concluded, "I don't think any of that indicates there's an imminent immediate harm that is to the general public if [the Vernon Plant] is abandoned." *Id.* at 178:21–24 (A-1832).

The Bankruptcy Court soon realized its initial findings were indefensible. In a supplemental ruling issued the next morning, the Bankruptcy Court sought to "clarify" its findings by largely contradicting them. Supplemental Ruling, at 1 (A-1363). The Bankruptcy Court's supplemental ruling now found "no question that the Vernon site is dangerous and exposure to lead is highly dangerous." *Id.* at 2 (A-1364). The Court instead sought to shift focus away from the live risk presented by the property itself. "The issue is not whether the lead at Vernon is dangerous," the Bankruptcy Court now asserted, "it is." *Id*. Instead, the Bankruptcy Court now

emphasized, the risk is under control because "the site is constantly monitored, and the dangerous polluted areas are contained." *Id.*

But the Supplemental Ruling still ignored that, even if public health risk are currently being managed by the debtor, a court cannot simply dismiss those risks because *after* abandonment government regulators are likely to assume management responsibilities. The focus under *Midlantic* should be on the property itself.

Further, and in any event, the evidentiary record does not establish that existing containment efforts thus far have eliminated the risk. Contrary to the Court's findings, the record shows that (i) even lead contamination "contained" at low levels has serious adverse health effects, (ii) the Vernon Plant's most highly polluted areas were only contained by a temporary structure that experienced several failures during the Chapter 11 Cases, and (iii) the areas outside of the FEU contained high concentrations of lead and required daily maintenance to prevent further migration of those chemicals into the neighborhood and water supplies.

*First*, the Bankruptcy Court's initial finding that the Vernon Plant is not a public health risk because it is not "glowing" or about to "explode into flame" were clearly erroneous. In fact, the lead at present levels at the site poses major health risks. Dr. Gina Solomon's testimony at the hearing was clear and uncontested: even low levels of lead exposure have serious health effects, and even trace amounts of lead are toxic to the human body, causing increased blood pressure, triggering

31

cardiovascular and kidney disease, and impairing neurologic function. *See* Solomon Decl. ¶¶ 13, 19-20 (A-1194); Oct. 15, 2020 Hrg. Tr. (Dr. Gina Solomon), at 241:7–242:19 (A-1606). Lead's negative effects on children and prenatal mothers are severe, with even relatively low levels of exposure causing genetic damage that can result in spontaneous abortion, low birth weight, reduced growth, and impaired physical and social development (including intellectual deficits, diminished academic abilities, attention deficit disorders, and behavioral problems). *See* Solomon Decl. ¶¶ 16, 21 (A-1195); Oct. 15, 2020 Hrg. Tr. (Dr. Gina Solomon), at 242:24–244:17 (A-1607).

Nowhere does *Midlantic* or any other decision suggest that such severe health harms from a toxic substance can be ignored so long as it not volatile and likely to burst into flame. To the contrary, *Midllantic* itself expressly recognizes that "contamination of water supplies" and risk of "injury, genetic damage, or death through personal contact"—exactly the problems lead dust creates—are sufficient to preclude abandonment. *Midlantic*, 474 U.S. at 499 n.3.

*Second*, the Bankruptcy Court erred in finding that the Vernon Plant presents no health risk because "the polluted areas are contained." Supplemental Ruling, at 2 (A-1364). The only "containment" measure is the FEU, and unrebutted testimony demonstrated that the FEU is merely a temporary and highly unstable solution. The FEU is a multi-story, tent-like structure consisting of scaffolding, trusses, and a

polyethylene barrier that surrounds the remnants of the building where most of the battery recycling took place that protects the surrounding area. *See* Oct. 15, 2020 Hrg. Tr. (Eric Fraske), at 139:6–20 (A-1504). The FEU must be inspected daily physically and by drone flight to locate and repair tears that occur frequently and that, if left unrepaired, could result in leakage to the surrounding area. *See id.* at 141:1–19 (A-1506). Mr. Fraske, Exide's resident engineer, testified that, on a weekly basis, on-site staff have identified issues with the FEU seams coming loose and needing to be re-taped or reinforced. *See id.* at 141:20–144:20 (A-1506). There have also been several major tears in the FEU that required more serious repairs and resulted in DTSC and the South Coast Air Quality Management District issuing violations. *See id.* at 142:3–14 (A-1507). The FEU's undisputed shortcomings contradict the Bankruptcy Court's conclusion that the Vernon Plant presents no imminent danger because that the "dangerous polluted areas are contained." Supplemental Ruling, at 2 (A-1364).

*Third*, the Bankruptcy Court clearly erred in holding that areas outside the FEU are safe. The Bankruptcy Court relied solely on testimony that workers could access the rest of the Vernon Plant site without specialized protective gear. But undisputed testimony showed that such unprotected access is possible only because of the temporary safety measures currently in place, in particular dust suppression and air monitoring—safety measures that would cease immediately upon

abandonment. *See* Oct. 15, 2020 Hrg. Tr. (Eric Fraske), at 157:5–162:12 (A-1522).

In addition, the unrebutted testimony clearly demonstrated the dangers of the areas

of the Vernon Plant's non-FEU areas. Mr. Fraske testified that the surface dust on

the site must be washed down with water *twice daily* to prevent fugitive dust

containing lead, arsenic, or other toxic substances from blowing off the property and

into the community. *See id.* at 148:7–15, 149:20–150:1 (A-1513). Without on-site

employees to spray the dust, turn on the water treatment system, and inspect the

system daily, the overflow from the on-site collecting pool would enter the

surrounding sidewalks and streets and eventually make its way into the Los Angeles

River. *See id.* at 150:19–151:11 (A-1515).

What is more, even with these efforts, lead-contaminated dust has been

identified on the sidewalks surrounding the Vernon Plant, indicating that even on-

site vigilance and regular maintenance of the FEU is insufficient to contain the

harmful neurotoxins in and around the Vernon Plant. *See id.* at 151:12–156:2 (A-

1516). Undisputed evidence established that dust collected from seven locations at

the Vernon Plant—*outside the FEU*—showed lead levels up to 150 times higher than

the DTSC's screening level for lead at industrial sites. *See id.* at 152:18–153:8 (A-

1517). Worse, Mr. Fraske testified that those samples were collected from locations

at the Vernon Plant that are not secured and can be accessed by construction workers

or others at the site. *See id.* at 154:23–155:5 (A-1519). He also testified that workers

34

entering those locations could disrupt the dust and that if they were not wearing a respirator, there is a high likelihood they would inhale heavily contaminated lead dust. *See id.* at 155:6–156:2 (A-1520). The dangers of lead contamination, in short, pervade the site, including areas outside the FEU.

The record thus shows, without ambiguity, that the Vernon Plant presents an imminent danger to public health and safety—a danger that would be exacerbated by abandonment. The prospect that regulators would intervene after abandonment to address that danger has no bearing under *Midlantic*. What matters is that the property itself present a serious risk, which makes abandonment illegal under state law, thereby triggering the long-recognized restrictions on abandonment reaffirmed in *Midlantic*.

## II.   THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE PLAN WAS PROPOSED IN GOOD FAITH.

The Bankruptcy Court erred by holding that the Plan was proposed and solicited in good faith. *See* Confirmation Order ¶¶ E and F (A-1219). Section 1129(a)(3) of the Bankruptcy Code requires a debtor to show that the plan has been proposed in good faith and not by any means forbidden by law. A plan is proposed in good faith *only* if it will "*fairly* achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g*, 391 F.3d 190, 247 (3d Cir. 2004); *see also In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986) ("For purposes of determining good faith under section 1129(a)(3) … the

35

important point of inquiry is the plan itself and whether such a plan will *fairly* achieve a result consistent with the objectives and purposes of the Bankruptcy Code). "[T]he Bankruptcy Code's objectives include: giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012). In addition, courts have held that section 1129(a)(3) requires that a plan "(1) fosters a result consistent with the Code's objectives, (2) the plan has been proposed with honesty and good intentions … and (3) there was fundamental fairness in dealing with the creditors." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001). Finally, "good faith is to be determined by the totality of the circumstances." *Azar v. Thgh Liquidating LLC (In re Thgh Liquidating LLC)*, 2020 WL 5409002, at *6 (D. Del. Sept. 9, 2020).

Exide's lack of good faith is evidenced by the Plan's coercive provisions, which were engineered to compel DTSC to elect treatment under the Plan identical to the terms of a settlement DTSC previously rejected. Exide's hurried proposal of a Plan contingent on the abandonment of a property that presented clear imminent and identifiable threats to the public safety and designed to coerce action from DTSC is not a plan proposed in good faith.

36

In considering the totality of the circumstances, it is clear that the Plan was not proposed with "honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999). As a result, the Plan fails to satisfy the requirements of Section 1129(a)(3) and the Bankruptcy Court clearly erred in confirming the Plan.

## A.   The Plan Is Inconsistent with the Bankruptcy Code's Objectives.

The Plan does not satisfy Section 1123(a)(3)'s requirements because it is inconsistent with the Bankruptcy Code's objectives. The Plan does not provide Exide a fresh start in life; it authorizes the liquidation of Exide's assets. The Plan does not discourage Exide's misconduct; it sanctions the impermissible Vernon Plant abandonment, absolves Exide and numerous third-parties from untold causes of action, and improperly compels DTSC to acquiesce to the terms of a rejected settlement. While the Plan provides for the expeditious liquidation and distribution of Exide's assets to its creditors, the Plan does so by allowing secured creditors to obtain valuable releases and injunctions without providing for the environmental clean-up necessary to protect public health and safety.

## B.   The Plan Includes Coercive and Intentionally Punitive Provisions.

The facts are clear:  Exide hoped to resolve the Chapter 11 Cases through a global settlement; when that global settlement failed, Exide quickly (and

37

impermissibly) amended the Plan to include provisions engineered to force DTSC to accept the very settlement it rejected.[7] These coercive and discriminatory provisions evidence Exide's lack of good faith and clearly demonstrate a lack of honest and good intentions in effecting a reorganization consistent with the Bankruptcy Code's purposes.

The Plan provides that the treatment of DTSC's Claims is conditioned in the first instance on the Bankruptcy Court finding that the Non-Consensual Releases are valid; a condition outside DTSC's control. Exide undoubtedly included that provision to force DTSC to accept (or at least not contest) the Non-Consensual Releases. This type of coercive provision is evidence of Exide's bad faith and clearly demonstrates Exide's efforts to confirm a Plan contrary to the Bankruptcy Code's objectives.

After the Bankruptcy Court approved the Non-Consensual Releases, the Plan then impermissibly forced DTSC to choose between two unacceptable options: (i) allow the Vernon Plant to be abandoned (with the unacceptable health consequences for California citizens), or (ii) provide certain parties covenants not to

---

[7] Although Exide's counsel claimed at the Confirmation Hearing that the Plan was "not a scheme . . . that the debtors dreamed up overnight with the noteholders and just imposed on parties," Oct. 16, 2020 Hrg. Tr. at 56:18-20 (A-1710), he also admitted that "California never approved [the settlement]" and argued that the settlement structure should be imposed on DTSC through the Plan because "somebody over there [at DTSC] thought it made some sense when we were going through this process." Oct. 16, 2020 Hrg. Tr. at 57:7-16 (A-1711).

sue and transfer the site to the Vernon Trust (ultimately placing the financial burden of stabilizing the Vernon Plant on California taxpayers). Keenly aware of the risks and danger that would result from abandonment and the favorable forum in which it was trying its case, Exide (and other parties) weaponized abandonment following DTSC's rejection of the proposed settlement in an effort to compel DTSC to take action. This clearly demonstrates that the Plan was not proposed with honest and good intentions and lacks fundamental fairness in dealing with creditors.

The Bankruptcy Court thus erred in approving a Plan that sought to compel DTSC to accept the terms of a settlement through coercive and improper means.

## III.  THE BANKRUPTCY COURT ERRED BY APPROVING THE OVERBROAD RELEASE AND INJUNCTION PROVISIONS.

The Plan contains overbroad releases, injunctions, and discharge provisions that the Bankruptcy Court should not have approved. The Plan purports to provide various third parties with releases from (i) claims held by other third parties, and (ii) claims held by Exide. Both are impermissible and warrant reversal of the Confirmation Order. In addition, the injunctions are overbroad and provide a *de facto* discharge of liability, in direct contravention of Bankruptcy Code Section 1141.

### A.  The Bankruptcy Court Inappropriately Approved Non-Consensual Releases.

The Bankruptcy Court erred in finding that the Non-Consensual Releases were justified. Bankruptcy Code Section 524(e) provides that any "discharge of a

debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e); *see also Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) (discharge of debtor does not relieve non-debtors of liabilities). Although the Third Circuit has not barred non-consensual third-party releases, it has recognized that debtors seeking such releases must meet "exacting standards," and courts approving such releases must "do so with caution." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) ("*Millennium II*"). Specifically, debtors seeking non-consensual third-party releases must prove both "fairness" and "necessity to the reorganization," and the Bankruptcy Court must make specific factual findings supporting such conclusions. *Continental*, 203 F.3d at 214.

Further, "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied . . . the broader context of the *Continental* discussion" provides that such releases should only be approved in the "context of extraordinary cases." *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608; *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 351 (Bankr. D. Del. 2011) ("While the Third Circuit has not barred third party releases, it has recognized that they are the exception, not the rule.") (citing *In re Cont'l Airlines*, 203 F.3d 212).

Here, the Bankruptcy Court justified the Non-Consensual Releases as necessary by suggesting that the Plan was some sort of a "hybrid" reorganization/liquidation plan. In doing so, the Bankruptcy Court seemed to be trying to avoid the obvious conclusion that where the debtors are liquidating, non-consensual third-party releases are, by definition, not necessary for reorganization because there is no reorganization. *See In re Wash. Mut.*, 442 B.R. at 352 (citing, e.g., *In re Nickels Midway Pier, LLC*, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010)).

But the Bankruptcy Court's attempt to characterize the plan as a "hybrid" is contrary to law.  In the Third Circuit, courts must look to the plan and the stated intentions of the debtor when determining whether a plan effects a liquidation or a reorganization. *See Matter of Penn Cent. Trasp. Co.*, 944 F.2d 164, 169 (3d Cir. 1991) (noting that the plan stated the debtor would continue in existence and did not provide for liquidation, and the debtor represented to the IRS under oath that it had no intention to liquidate in determining the proceeding was a reorganization); *see also In re Erie Lackawanna Ry. Co.*, 803 F.2d 881, 884 (6th Cir. 1986) (relying on debtor's characterization of the plan as a liquidating plan in finding it effected a liquidation). Exide's own statements indicate its clear intention to liquidate rather than reorganize. *See* Oct. 16, 2020 Hrg. Tr. 45:21–46:2 (A-1699) ("the reality that must be accepted, Your Honor, that the debtors are liquidating. Period, full stop.

41

There will be no more Exide very soon, one way or another, Your Honor. And let me be clear about this."). Those statements are consistent with the general meaning of a liquidation, as articulated by the Seventh Circuit: "Liquidation in or out of bankruptcy means the end of a corporation's existence," including where "a firm may sell its assets as a going concern, then distribute the proceeds to its creditors . . . and dissolve." *Maytag Corp. v. Navistar Intern. Transp. Corp.*, 219 F.3d 587, 591 (7th Cir. 2000). This is precisely what Exide did here. Exide is not emerging as a reorganized business. The Plan results in the sale of all Exide's operating businesses, the transfer or abandonment of all contaminated property, and the wind-down of the remaining entities. And this was always Exide's expressed intent since the beginning of its Chapter 11 Cases. *See* Disclosure Statement, at 24 (A-0620) ("the Debtors did not commence these Chapter 11 Cases with the intent to pursue a recapitalization transaction and emerge from the Chapter 11 Cases as a reorganized business. On the contrary . . . the Debtors' intent was to liquidate").

Even if the Plan were somehow a reorganization plan, the Non-Consensual Releases would still be improper because the Plan provides DTSC with inadequate consideration given the potential value of DTSC's claims against the Consenting Creditors. While the Bankruptcy Court believed that "[t]here is also a lot of value being provided in exchange for receipt of the releases," Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 181:18-20 (A-1835), DTSC will actually receive only approximately

$2.59 million under the Plan—the same amount that DTSC *rejected* under Exide's proposed settlement—while being restrained from pursuing claims against the Consenting Creditors that DTSC believes to be worth in excess of $100 million. *See* Cope Decl. ¶ 42 (A-0906) ("DTSC estimates that future closure and on-site corrective action costs at the Vernon Plant to complete all phases of the Closure Plan will total approximately $145 million[.]"). That *de minimis* consideration is not nearly sufficient to justify imposing the Non-Consensual Releases on DTSC and preventing California from pursuing claims against those individuals and entities responsible for bankrolling and profiting from Exide's devastating environmental harm. *See In re Medford Crossings North, LLC*, 2011 WL 182815, at *19 (Bankr. D.N.J. Jan. 20, 2011) ("Despite the legitimate goals of the Plan and the necessity of the Member Contributions to fund it, this Court cannot ignore the fact that there is inadequate consideration" because "the parties that would be restrained from proceeding against the Third Party Releasees are receiving little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees.").

The Ad Hoc Group and Exide engineered the approximately $2.59 million payment to DTSC to flow through numerous parties in a transparent effort to "legitimize" the improper releases. The payment comes from the Transferred Entities and is funded by a loan from the Consenting Creditors to the Transferred

43

Entities. It was clear error for the Bankruptcy Court to conclude that this *de facto* purchase of a release was sufficient to justify the Non-Consensual Releases of numerous third parties.

The Bankruptcy Court exacerbated its error by ignoring the Third Circuit's statements in *Continental* that non-consensual, third-party releases should be approved only in extraordinary cases. There is nothing extraordinary about this liquidation case in which Exide is selling its European/ROW business, winding down its U.S. operations, and setting aside a paltry $10 million to address environmental claims. There are dozens, if not hundreds, of industrial companies that have gone through analogous bankruptcy proceedings. Indeed, the Bankruptcy Court itself did not identify anything particularly extraordinary about this case. Instead, the Bankruptcy Court made clear that it does not view *Continental* as establishing a particularly demanding standard for granting non-consensual releases, observing that "if you were to look at cases nationwide, [non-consensual, third-party releases] are extraordinary," but "[w]hen you look at cases in Delaware, somehow they don't feel so extraordinary, because . . . it happens so often" and "the fact is we get extraordinary cases, and this is an extraordinary case . . . ." Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 181:3-11 (A-1835). But the Bankruptcy Court's *ipse dixit* does not make it so.

44

The Bankruptcy Court also ignored the Third Circuit's admonition in *Continental* that the approval of non-consensual third-party releases must be based on specific factual findings. The uncontroverted evidence demonstrated that Exide's claims investigation was limited in scope and ***did not include environmental claims***. *See* Oct. 15, 2020 Hrg. Tr. (Harvey Tepner), at 112:14–19 (A-1477) ("The subcommittee did not investigate whether the debtors had environmental claims against the consenting creditors; is that correct? A. We did not do that specific investigation."). Absent any investigation of potential environmental claims against the Consenting Creditors—who were among the beneficiaries of the third-party releases—neither Exide nor the Bankruptcy Court had any basis to conclude that the Non-Consensual Releases were fair or that DTSC received adequate consideration.

Finally, courts in the Third Circuit have held that if the *Continental* standard is not satisfied, "any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases." *In re Wash. Mut.*, 442 B.R. at 355; *see also In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (holding that, absent the satisfaction of the *Continental* standard, a third-party release is only enforceable against those who affirmatively consent). Because Exide has not satisfied *Continental*, the Plan must offer DTSC and all other similarly situated

creditors the option to opt out of the Non-Consensual Releases. The Plan fails to do so and was thus improperly confirmed.

**B.    The Bankruptcy Court Erred in Approving Overly Broad Exide Releases.**

Under Section 10.5 of the Plan, the Bankruptcy Court authorized extremely broad releases to, among other entities, (i) Exide, (ii) each of the Consenting Creditors, (iii) the Europe/ROW Purchaser, (iv) the Transferred Entities, (v) each of the DIP Lenders and the DIP Agent, (vi) the Creditors' Committee, and (vii) all of the Related Parties of each of the foregoing entities. *See* Plan § 10.5 (A-1343). The Bankruptcy Court summarily found that these releases were "an essential component of the Plan and appropriate" because, among other reasons, Exide and the Creditors' Committee investigated relevant claims, all other parties in interest (other than DTSC) consented to the releases, and the releases otherwise confer substantial benefits on Exide's estates. Confirmation Order ¶ I(i) (A-1220).

The Bankruptcy Court's findings, however, are contrary to the testimony presented at the Confirmation Hearing and an abuse of discretion of the factors considered in determining the fairness of a debtor's release of non-debtor parties. "Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *In re Wash. Mut., Inc.*, 442 B.R. at 345. Courts in the Third Circuit consider five factors in determining whether a debtor's release of

46

a non-debtor is appropriate under a plan: (i) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (ii) a substantial contribution to the plan by the non-debtor; (iii) the necessity of the release to the reorganization; (iv) the overwhelming acceptance of the plan and release by creditors and interest holders; and (v) the payment of all or substantially all of the claims of the creditors and interest holders under the plan. *See In re Wash. Mut.*, 442 B.R. at 346; *In re Zenith Elecs. Corp.*, 241 B.R. at 110; *In re Exide Techs.*, 303 B.R. 48, 71-72 (Bankr. D. Del. 2003).

Despite the Bankruptcy Court's conclusory findings, Exide failed to demonstrate that the releases in Section 10.5 satisfy any of these factors. First, permitting DTSC to pursue environmental claims against the Released Parties would not deplete the estate's resources. Second, none of the Released Parties provided a "substantial contribution" to the Plan. Rather, a limited subset provided *de minimis* consideration ($2.5 million[8]) in a transparent attempt to purchase releases that would shield them from liability well in excess of their contributions, while ***the other Released Parties provided no contribution at all***. Third, although the Bankruptcy Court found that the releases were necessary to the reorganization—including consummation of the Global Settlement, *see* Confirmation Order ¶ I(i) (A-1220)—

---

[8] The other $7.5 million provided by a subset of Release Parties was contributed in exchange for voluntary releases from the Settling Governmental Authorities.

the facts showed that the Global Settlement was part of Exide's liquidation strategy; not its reorganization. Fourth, there was no overwhelming acceptance of the Plan. The only classes that voted to accept the Plan are controlled by the Consenting Creditors. All other classes—including the Environmental NPP Claims and the General Unsecured Claims—were deemed to reject the Plan. Finally, the Plan's meager distribution to General Unsecured Claims and Environmental NPP Claims does not come close to payment of all or substantially all of the claims of Exide's creditors and interest holders—specifically, DTSC will only receive approximately $2.6 million on account of its claims that exceed $100 million.

In light of the foregoing, the Bankruptcy Court erred in granting the Releases by Exide in Section 10.5, which warrants reversal of the Confirmation Order.

## C.     The Bankruptcy Court Erred in Approving the Plan's Injunction Provisions, Which Are Overly Broad and Impermissibly Operate as a Discharge of Exide and Third Parties.

The Confirmation Order makes no factual findings regarding the propriety of the Plan's injunction provisions under Section 10.3. The Bankruptcy Court simply approved them. *See* Confirmation Order ¶ 54 (A-1266). In the context of a liquidating Plan, however, the injunction provisions amount to an impermissible discharge that the Bankruptcy Court should have denied.

Bankruptcy Code Section 1141(d)(3) bars the discharge of a debtor that liquidates substantially all property of its estate, does not engage in business after

consummation of a Chapter 11 plan, and would be denied a discharge under Bankruptcy Code Section 727(a). Through the Chapter 11 Cases, Exide sold substantially all of its assets, sought the confirmation of a liquidating plan and, following the Effective Date, ceased conducting business. In these circumstances, Exide is not allowed a discharge.

Exide improperly effected a discharge through the Plan's overly broad injunction provisions in Sections 10.3(b)-(d). This sort of injunction is "inappropriate as applied to the Debtors because a liquidating Chapter 11 plan may not provide for the discharge of the debtor." *In re Bigler LP*, 442 B.R. 537, 545 (Bankr. S.D. Tex. 2010); *see also In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (*en banc*) (explaining that suit injunctions must be "both necessary to the reorganization and fair").

Section 10.3's injunction provisions are unfairly broad. Section 10.3(b) provides that *any entity that held Claims* against Exide (*along with any affiliate of the entity that held such Claims*) *are permanently enjoined* with respect to any Claim or Cause of Action that is treated by the Plan from, among other things, (i) *commencing or continuing any action against* or that affects Exide, the Wind-Down Estates, the GUC Trust, *the Consenting Creditors, the Transferred Entities or the property of any such entity*, (ii) *enforcing, collecting or otherwise recovering* against Exide, the Wind-Down Estates, the Trustees, *the Consenting Creditors, the*

*Europe/ROW Purchaser, and the Transferred Entities*, or the property of such entities, or (iii) acting or proceeding in any manner, in any place, that does not conform to or comply with the provisions of the Plan. *See* Plan § 10.3(b) (A-1342).

This injunction would result in the discharge of Exide, the Wind-Down Estates, the Trustees, Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC from any Claim, Interest, or Cause of Action that was or that could be treated by the Plan. *See* Plan § 10.3(b) (A-1342). The injunction's scope is far too broad:  it not only effectuates an improper discharge of Exide, but also impermissibly seeks to insulate non-debtor third parties not entitled to such protection.

The injunctions are neither necessary to the reorganization nor fair, and therefore, should not have been approved. The record is devoid of evidence demonstrating either the "necessity" or "fairness" of the injunction provision.[9] Instead, Exide argued that the "Injunction Provision is also necessary to the distribution scheme in the [Plan]. This is a liquidating plan. In order for assets to be distributed pursuant to the Plan, the assets of the Debtors estates must be protected

---

[9] Exide submitted testimony as to the releases, but that testimony does not address the injunctions contained in the Plan.

against an attempt by a creditor to obtain more than its entitlement under the Plan."
Confirmation Brief ¶ 125 (A-0984).

Even if the injunctions were necessary for the Plan's distribution scheme, that fact would not itself establish that the injunction provision is fair or appropriate. In fact, the provision is not fair or appropriate; it is the product of Exide's secured creditors (who are also controlling equity holders) leveraging their position to demand, and thereby compel Exide to argue the necessity of, overly broad injunctive provisions.

## IV.   THE PLAN FAILS TO PROVIDE THE SAME TREATMENT FOR EACH CLAIM OR INTEREST WITHIN A PARTICULAR CLASS IN VIOLATION OF BANKRUPTCY CODE SECTION 1123(a)(4).

The Bankruptcy Court erred in approving a Plan that violated Section 1129(a)(1) of the Bankruptcy Code. Rather than include specific findings on Section 1129(a) in the Confirmation Order, the Bankruptcy Court merely stated that, other than the abandonment and Non-Consensual Releases issues, "all the rest of the [1129(a) factors] are not challenged, they're all clearly in place." Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 183:15–22 (A-1837). The Bankruptcy Court relied on Exide's confirmation brief to "find all those factors are satisfied," but did not specify the basis for its conclusory determination. *Id.* at 183:22–184:1 (A-1837). This summary statement is insufficient to dispel DTSC's clearly articulated objections in the Confirmation Objection.

Bankruptcy Code Section 1129(a)(1) provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(1). The phrase "applicable provisions" includes Bankruptcy Code Sections 1122 and 1123, which govern the classification of claims and interests and the contents of a plan of reorganization. *See, e.g., Kane v. Johns-Mansville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988); *In re S&W Enterprise*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [Section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.").

The Plan fails to satisfy the requirements of Section 1123(a)(4), which mandates that a chapter 11 plan:

> provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. § 1123(a)(4).

The tenet of equality of treatment codified in Section 1123(a)(4) is a critical component of the Bankruptcy Code. *See In re Combustion Eng'g, Inc.*, 391 F.3d at 239 ("Equality of distribution among distribution among creditors is a central policy of the Bankruptcy Code."). While Section 1123(a)(4) does not require precise equality—only approximate equality—differences in the distributions and other procedural variations that produce a substantive difference in the opportunity to

recover violate Section 1123(a)(4). *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013); *In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002) (holding that a difference in the procedural protections offered to certain claimants violated Section 1123(a)(4) because some claimants were "accorded far more effective recovery rights" than others).

The Plan clearly—by design—failed to satisfy Section 1123(a)(4). The Plan provides different and less favorable treatment to members of Class 8 based on whether such claim holder is a Global Settlement Party. In one scenario, DTSC receives nothing while all other Class 8 Claims receive their share of the Environmental Global Settlement Payment ($7.4 million) and any residual value in the Environmental Response Trust. In all other scenarios, the Plan allocates approximately 25.8% of the total consideration provided for the benefit of Environmental NPP Claims to the Vernon Plant and the other 74.2% to the other Non-Performing Properties. Exide admits that this allocation was not based upon a pro rata distribution of Class 8 claims, *see* Oct. 15, 2020 Hrg. Tr. (Roy Messing), at 58:19-23 (A-1423) ("Q. You can't tell me if that $2.6 million . . . is the equivalent of DTSC's pro rata share of distributions in its class, can you? A. No, I can't."), even though by Exide's own calculation the cost to remediate the Vernon Plant amounts to approximately 44% of the total liabilities associated with all Non-Performing

Properties.[10] Exide stipulated in connection with the Confirmation Hearing that the allocation to Claims within Class 8 was based on an allocation developed by the United States Department of Justice, not the amount of such Claims. *See* DTSC's Rule 30(b)(6) Notice ¶ 4 (A-1214) ("Debtors had no role in establishing, and did not know the basis for, the Plan's allocation of funding for Debtors' environmental liabilities at the Non-Performing Properties (as defined in the Plan), including the allocation for the Vernon Non-Performing Property."). There is no basis for the Plan to impose an allocation on creditors within a Class because Exide abdicated the allocation of recoveries to a creditor.

Exide argued that DTSC was offered the same treatment opportunity as all other Class 8 creditors: "[A]ccept the Global Settlement and its benefits or reject it and the Debtors will seek to abandon the applicable NPP location." *See* Confirmation Brief ¶ 198 (A-1014). While parties are free to compromise their claims and accept less favorable treatment under a plan, Section 1129(a)(4) prevents debtors from providing more favorable treatment to a subset of a class of creditors. The assertion that the Plan offered DTSC the opportunity to participate in the Environmental NPP Trust, and therefore DTSC's treatment "is of its own making"

---

[10] At filing, Exide estimated it would spend a total of $200 million on remediation at the Non-Performing Properties over the next five years, including $88 million (or 44%) at the Vernon Plant. *See* First Day Decl. ¶¶ 72, 74 (A-0029).

is clearly wrong. Confirmation Brief ¶ 203 (A-1016). The Bankruptcy Court's reliance on this inaccurate (at best) or misleading (at worst) assertion to confirm the Plan is a clear factual error that this Court must reverse.

Exide also incorrectly stated the law in arguing that the Bankruptcy Code contains "no requirement … that a settlement payment or substantial contribution made by a third party to resolve a unique dispute be offered in equal or pro-rated amounts for similarly situated creditors." Confirmation Brief ¶ 200 (A-1015). The Third Circuit made clear that equal treatment among creditors means that "all class members' claims must be of 'equal value' through the application of the same pro rata distribution or payment percentage procedures to all claims." *In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012). Here, DTSC will not receive equal treatment from the Global Settlement Payments allocated to Class 8 because the distributions will not be pro rata among all Class 8 members, as Exide admitted at the Confirmation Hearing. This misapplication of law and facts justifies a reversal of the Confirmation Order.

Finally, the releases in the Plan treat California differently. The Non-Consensual Releases expressly apply to "all California state governmental agencies that . . . have jurisdiction regarding the enforcement of Environmental Laws." Plan § 10.6(f) (A-1343). This seemingly includes (i) health care agencies ("Environmental Laws" includes laws regarding "human health"), (ii) regional

hybrid state-and-local agencies, or (iii) police and other pure law enforcement agencies whose jurisdictions include environmental Claims. Exide's justification for adding this broader release is that California "is unique in that environmental authority is more widely dispersed across multiple state agencies . . . [such that] another agency with similar or overlapping jurisdiction could bring the very actions that the releases aimed to prohibit." Confirmation Brief ¶ 205 (A-1017). While other states' agencies identified themselves as the agencies with *principal* responsibility for regulating the Non-Performing Properties, none claim to be the *only* agency that regulates the Non-Performing Properties. The Bankruptcy Court, therefore, should at the very least have tailored the releases to be consistent; it did not. As a result, the Plan clearly fails the mandate of Section 1123(a)(4).

## V.   THIS APPEAL IS NOT EQUITABLY MOOT.

It is well-established that "[f]ollowing confirmation of a reorganization plan by a bankruptcy court, an aggrieved party has the statutory right to appeal the court's rulings." *Semcrude*, 728 F.3d at 320. "Once there is an appeal, there is a virtually unflagging obligation of federal courts to exercise the jurisdiction conferred on them." *Id*. Here, DTSC seeks the Court's review of the Confirmation Order, which the Court is obligated to hear absent exceptional circumstances.

Despite DTSC's properly noticed appeal, Exide has indicated that it intends to move to dismiss this appeal based on equitable mootness. *See* Proposed

Scheduling Order, dated December 9, 2020 [D.I. 40]. Equitable mootness is "a judge-made abstention doctrine that allows a court to avoid hearing the merits of a bankruptcy appeal because implementing the requested relief would cause havoc." *Semcrude*, 728 F.3d at 317. Because refusing to entertain the merits of an appeal "should be the rare exception and not the rule," *id.* at 321, "[t]he party seeking to invoke the doctrine bears the burden of overcoming the strong presumption that appeals from confirmation orders of reorganization plans—even those not only approved by confirmation but implemented thereafter . . . —need to be decided." *Tribune*, 799 F.3d at 277–78. Because of the critical public policy issues at stake here and Exide's inability to overcome the strong presumption against abstention, the Court should hear the merits of this appeal and deny any dismissal based on equitable mootness.

> **A. Equitable Mootness Should Not Be Applied Where Critical Public Policy Issues Are at Stake.**
>
> > 1. *The Merits of the Appeal Should Be Heard to Address Critical Issues of Public Health, Safety and Welfare.*

The Third Circuit has consistently held that "equitable mootness is a *narrow doctrine* by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal." *In re Allied Nevada Gold Corp.*, 725 Fed.Appx. 144, 149 (3d Cir. 2018) (internal citation omitted). Given its limited purpose, courts apply the equitable mootness doctrine "with a scalpel rather than an axe," such that "a court

57

may fashion whatever relief is practicable instead of declining review simply because full relief is not available." *Tribune*, 799 F.3d at 278; *see also In re Cont'l Airlines*, 91 F.3d at 571 (Alito, J. dissenting) (noting that equitable mootness is "a federal common law rule designed to promote certain policies of Chapter 11 of the Bankruptcy Code[.]"). Because of "its judge-made origin, coupled with the responsibility of federal courts to exercise their jurisdictional mandate," the Third Circuit has admonished courts "to proceed most carefully before dismissing an appeal as equitably moot." *Semcrude*, 728 F.3d at 318. Given the public health, safety and welfare of thousands of California's citizens implicated here, DTSC's appeal must not be dismissed as equitably moot.

While the fundamental purpose of reorganization is to prevent a debtor from liquidating, "[t]he Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization," *N.L.R. v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984), and "Congress has repeatedly expressed its legislative determination that the trustee is not to have *carte blanche* to ignore nonbankruptcy law." *Midlantic*, 474 U.S. at 502. While the Bankruptcy Code promotes a public policy "favoring the finality of bankruptcy decisions," *Semcrude*, 728 F.3d at 317, it also recognizes exceptions when issues of public health, safety, and welfare are involved. *See, e.g.*, 11 U.S.C. § 362(b)(4) (providing an explicit exception to the automatic stay when a

governmental unit exercises its "police or regulatory power"); *see also In re W.R. Grace & Co.*, 412 B.R. 657, 663 (D. Del. 2009) (finding that governmental actions taken for the "protection of public health and safety or welfare" are exercises of "police or regulatory power").

Environmental creditors and regulators, such as DTSC, rely on well-recognized limitations on a debtor's ability to take action. The Bankruptcy Court's failure to yield to, or even seriously consider, those limitations are a substantial aspect of this appeal. Denying an environmental creditor a fair review of a Bankruptcy Court's myopic focus on a debtor's reorganization, while disregarding critical non-bankruptcy law and well-recognized limitations set forth in the Bankruptcy Code, will upend the carefully constructed balance of competing public policy interests constructed by Congress. Therefore, the narrow doctrine of equitable mootness should not prevent an examination of the Bankruptcy Court's failure to recognize the limitations of its power to authorize the Vernon Plant's abandonment or to otherwise approve the Plan.

> 2. *Failure to Consider the Merits of this Appeal Would Promote Unlawful Plan Provisions Without Any Meaningful Appellate Review.*

As the Third Circuit has recognized, "[p]reserving the finality of plan confirmation to encourage parties to move forward with plan execution justifies forbearing the exercise of jurisdiction only where precluding the appeal will prevent

a perverse outcome." *Semcrude*, 728 F.3d at 326. A successful appeal here, far from producing a "perverse outcome," will only ensure that Exide and its creditors do not benefit from Plan provisions to which they are not lawfully entitled and could never have obtained without DTSC's consent. It will also ensure that future debtors do not employ Exide's coercive tactics in violation of the Bankruptcy Code's good faith requirements. Accordingly, any finality interests raised by Exide cannot justify this Court declining to hear the merits of DTSC's appeal.

In addition, the limited time between the Confirmation Order's entry and the Effective Date militates in favor of hearing the merits of this appeal despite the fact that DTSC was not able to obtain a stay pending appeal. The Third Circuit has repeatedly held that "neither the Bankruptcy Code nor any other statute predicates the ability to appeal a bankruptcy court's ruling on obtaining a stay." *See, e.g.,* *Semcrude*, 728 F.3d at 322-23 (holding that appeal from confirmation order was not equitably moot even though the appellant never even sought a stay); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 169 (3d Cir. 2012) (holding that where, as here, the relief requested by the appellant does not threaten the existence of a consummated plan, failure to obtain a stay does not weigh heavily in favor of equitable mootness finding). And where a stay is offered on the condition of posting bond, a court will only find equitable mootness "not unfair" where the objector "effectively chose to risk a finding of equitable mootness and implicitly decided that

an appeal with a stay conditioned on any reasonable bond amount was not worth it."
*Tribune*, 799 F.3d at 282.

That is not the case here. DTSC sought a stay of the Confirmation Order from the Bankruptcy Court at the Confirmation Hearing, which was denied on the record. Two days later, DTSC sought a stay of the Confirmation Order from this Court, which was also denied. Given that there were only 10 days between the Confirmation Order's entry (October 16) and the Effective Date (October 26), DTSC made every effort to seek stay relief. And, a bond was never at issue. Under these circumstances, appealing either court's refusal to grant a stay would have been a fruitless exercise— and Exide knows it. Therefore, as a matter of public policy, this Court should hear the merits of this appeal because dismissal would rubber stamp Exide's coercive tactic of ramming an unlawful Plan through the confirmation process without any meaningful opportunity for appellate review. Such a result would encourage future debtors to follow Exide's improper blueprint. For these reasons, this appeal should not be dismissed as equitably moot.

### B.    Exide Cannot Overcome the Strong Presumption Against Applying Equitable Mootness in this Case.

In determining whether an appeal is equitably moot, the Court must undertake a two-part inquiry: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have

justifiably relied on plan confirmation." *Millennium II*, 945 F.3d at 140 (quoting *Tribune*, 799 F.3d at 278). DTSC does not dispute that the Plan has been substantially consummated: since becoming effective on October 26, 2020, many of the transactions contemplated thereunder have been completed. But substantial consummation alone is not sufficient to warrant a finding of equitable mootness. In cases "where relief would neither fatally scramble the plan nor significantly harm the interests of third parties who have justifiably relied on plan confirmation, there is no reason to dismiss as equitably moot an appeal of a confirmation order for a plan now substantially consummated." *Tribune*, 799 F.3d at 278. Moreover, Exide cannot merely speculate as to potential harms, but must demonstrate that "granting relief on appeal [would] be almost certain to produce a perverse outcome—chaos in the bankruptcy court from a plan in tatters and/or significant injury to third parties." *Semcrude*, 728 F.3d at 320. (internal citation omitted). Exide cannot meet this burden.

### 1.   *The Relief Sought Would Not "Fatally Scramble" the Plan.*

In determining whether the relief sought by an appellant would fatally scramble a plan, courts generally "look to whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse." *Semcrude*, 728 F.3d at 321. The primary reason for avoiding a plan's "collapse" in the context of equitable mootness is to preserve the debtor's ability to

survive as a going concern. For example, in *Tribune*, the Third Circuit found that the appeal would fatally scramble the plan because it "would knock the props out from under the authorization for every transaction that has taken place" and "returning to the drawing board would at a minimum drastically diminish the value of new equity's investment" in the restructured company. *Tribune*, 799 F.3d at 281. Similarly, in *Millennium*, the Third Circuit found that the challenged provisions of the plan "served as the cornerstone of the reorganization and, hence, of Millennium's corporate survival." *Millennium II*, 945 F.3d at 141 (further finding the provisions to be "essential to obtain the payment that allowed Millennium's survival"), 143 (noting that undoing the plan's releases would also undo "the very payment on which Millennium's viability as a going concern depended").

But this is not a reorganization case. The Plan's substantial consummation will not result in Exide continuing its business as a going concern. Rather, as discussed above, the Plan is a liquidation of Exide's assets. *See supra* at 45-47. As such, undoing the Plan here will not collapse a value-maximizing reorganization; there would be no scrambling of a "lender and equity base [that] has changed dramatically" or unwinding of substantial commercial transactions with hundreds of new counterparties. *Millennium II*, 945 F.3d at 141.

Even if modifying the Confirmation Order would change the specific terms of the Plan, it would not "fatally scramble" it. As discussed above, Exide improperly

63

used the Plan to impose the Global Settlement on DTSC, including improper releases and other unfair treatment. *See supra* at 42-57. But all the lawful, unchallenged portions of the Plan could be implemented without undoing the Plan transactions, including the Europe/ROW Sale Transaction and the Global Settlement. Thus, the remedy here does not have to "fatally scramble" the Plan because narrower relief is possible that would redress DTSC's concerns. This narrow relief could include (a) determining that the Plan's improper releases and injunctions were too broad and must be narrowed or eliminated, and (b) determining that *Midlantic* requires additional funding to address the contamination at the Vernon Plant before abandonment would have been appropriate. In both cases, this Court or the Bankruptcy Court could fashion a remedy that reallocates value from the Transferred Entities or Consenting Creditors to the satisfaction of environmental claims so that the Plan can be brought into compliance with applicable Bankruptcy Code provisions and bankruptcy law principles.

> 2.   *The Relief Sought Would Not Harm Third Parties Who Justifiably Relied on the Confirmation Order.*

Equitable mootness is "limited in scope and cautiously applied" in this Circuit, in part, because of the doctrine's potential for abuse by plan proponents seeking to ram illegal plan provisions through the confirmation process. *See Philadelphia Newspapers*, 690 F.3d at 170 n.12 (noting then-Judge Alito's warning that an expansive equitable mootness doctrine "can easily be used as a weapon to

prevent any appellate review of bankruptcy court orders confirming reorganization plans") (quoting *Nordhoff Inv., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (Alito, J., concurring)); *see also In re One2One Commc'ns, LLC*, 805 F.3d 428, 453 (3d Cir. 2015) (Krause, J., concurring) ("Equitable mootness should protect legitimate expectation of parties to bankruptcy cases but should not be a shield for sharp or unauthorized practices.") (quoting *In re Pacific Lumber Co.*, 584 F.3d 229, 244 n.19 (5th Cir. 2009)); *Semcrude*, 728 F.3d at 326 ("[w]hen equitable mootness is used as a sword rather than a shield," the presumption that "federal courts should hear and decide on the merits cases properly before them . . . is upended"). Moreover, as discussed further below, an analysis of equitable mootness must proceed under the assumption that an appellant's assertions that plan confirmation violated the law are *true*.

Reflecting that concern, the Third Circuit has held that "reliance on consummation of a plan would not be justified if a third party obtained a benefit that was inconsistent with a contract, statute, or judgment, as any benefit from such an error would result in ill-gotten gains." *Tribune*, 799 F.3d at 278 (internal quotation omitted); *see also id.* at 283 (explaining that "ill-gotten" gains need not be the result of malfeasance, but only that the benefit is "not valid"); *One2One*, 805 F.3d at 453 (Krause, J., concurring) ("[W]e should be even less solicitous of parties who act opportunistically or advocate unlawful plan provisions during confirmation."). This

65

is especially true where the party claiming reliance extensively participated in creating and securing confirmation of the unlawful plan. *See, e.g.*, *Pacific Lumber*, 584 F.3d at 244 ("That there might be adverse consequences to [the plan proponents/funders] is not only a natural result of any ordinary appeal—one side goes away disappointed—but adverse appellate consequences were foreseeable to them as sophisticated investors who opted to press the limits of bankruptcy confirmation and valuation rules."); *see also In re Transwest Resort Props., Inc.*, 801 F.3d 1161, 1170 (9th Cir. 2015) (holding that "when a sophisticated investor . . . helps craft a reorganization plan that 'press[es] the limits' of the bankruptcy laws, appellate consequences are a foreseeable result") (quoting *Pacific Lumber*, 584 F.3d at 244).

As described above, Exide and its Consenting Creditors crafted a Plan that contains several unlawful provisions:  (i) the abandonment of the Vernon Plant in violation of *Midlantic*; (ii) inappropriate non-consensual, third-party releases between non-debtors; (iii) overly broad debtor releases and injunction provisions; and (iv) unequal treatment of Class 8 claims in violation of Bankruptcy Code Section 1123(a)(4). In addition, the Plan's coercive provisions were specifically designed to force DTSC to accept a settlement it had previously rejected through a process that shows Exide's clear lack of good faith in violation of Bankruptcy Code Section 1129(a)(3). Assuming this appeal is meritorious—as the Court must do for purposes

of Exide's anticipated motion to dismiss, *see Tribune*, 799 F.3d at 281 ("we of course must assume [the appellant] will prevail on the merits because the idea of equitable mootness is that *even if* [the appellant] is correct, it would not be fair to award the relief it seeks")—the unlawful Plan provisions identified by DTSC were approved by the Bankruptcy Court in the absence of statutory power to do so and in violation of substantive bankruptcy law principles. That means those provisions are not "valid." They thus constitute ill-gotten benefits on which non-debtor third parties (e.g., the Consenting Creditors, Transferred Entities, Released Parties, and other creditors) cannot justifiably rely for purposes of an equitable mootness analysis. *See Tribune*, 799 F.3d at 283 (holding that where the lower court made an error of law and therefore abused its discretion, the creditors were not entitled to rely on the plan's finality).

In addition, the non-debtor third parties (particularly, the Consenting Creditors, Transferred Entities, and Released Parties) could not justifiably rely on the Plan because they knew that DTSC had both objected to the Bankruptcy Court's authority to approve the Plan's unlawful provisions and promptly appealed its decision, yet they chose to fund and consummate the Plan anyway. *See Pacific Lumber*, 584 F.3d at 244; *Transwest*, 801 F.3d at 1170. Although the non-debtor third parties had the right to delay consummation of the Plan until appellate proceedings had concluded, they consummated the Plan while fully aware of the

risks that it could be modified on appeal. As a result, they had no justifiable reliance interest on the Plan's unlawfully approved provisions.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court improperly approved a Plan that (i) permitted the abandonment of a property that poses an imminent and identifiable harm to public health; (ii) was not proposed in good faith; (iii) included overly broad releases and injunctions; and (iv) permitted disparate treatment of Class 8 claims. In addition, this appeal is not equitably moot because modifying the Confirmation Order would not "fatally scramble" the Plan; it would only eliminate unlawful provisions upon which third parties could not justifiably rely. Therefore, Appellant DTSC respectfully submits that this Court should modify the Confirmation Order to make the Plan compliant with applicable law.

Dated: December 23, 2020

*Of Counsel:*

Nancy A. Mitchell
Matthew L. Hinker (No. 5348)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061
Email:  nmitchell@omm.com
           mhinker@omm.com

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Gregory E. Stuhlman*
Paul D. Brown (No. 3903)
Gregory E. Stuhlman (No. 4765)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:  (302) 295-0191
Email:  brown@chipmanbrown.com
           stuhlman@chipmanbrown.com

*Counsel to Appellant*
*California Department of*
*Toxic Substances Control*

68

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:   (202) 383-5414
Email:  pfriedman@omm.com

-and-

Xavier Becerra
Attorney General Of California
Edward H. Ochoa
Senior Assistant Attorney General
Anthony A. Austin
Heather C. Leslie
Deputy Attorneys General
**CALIFORNIA DEPARTMENT OF
JUSTICE OFFICE OF THE
ATTORNEY GENERAL**
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone:   (916) 210-7245
Email:  anthony.austin@doj.ca.gov
          heather.leslie@doj.ca.gov

69

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 8015(h) of the Federal Rules of Bankruptcy Procedure, the undersigned hereby certifies that:

1.    This document complies with the type-volume limit of Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure—as modified by this Court's order approving Appellant's Unopposed Motion for Leave to File Briefs Containing Words Exceeding the Limits Enumerated in Rule 8015 of the Federal Rules of Bankruptcy Procedure, dated December 16, 2020 [D.I. 43 & 44]—because, excluding the parts of the document exempted by Rule 8015(g) of the Federal Rules of Bankruptcy Procedure, this document contains 15,992 words, as determined by the word-count function of Microsoft Word 2016.

2.    This document complies with the typeface requirements of Rule 8015(a)(5) of the Federal Rules of Bankruptcy Procedure and the type-style requirements of Rule 8015(a)(6) of the Federal Rules of Bankruptcy Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: December 23, 2020

 */s/ Gregory E. Stuhlman*
Gregory E. Stuhlman
Counsel to Appellant