# **<u>TAB 1</u>**

**Declaration of Roy Messing in Support of Debtors' Chapter 11
Petitions and First Day Relief, dated May 19, 2020 [Bankr. D.I. 14]**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x
                                        :
In re                                   :        **Chapter 11**
                                        :
**EXIDE HOLDINGS, INC.,** *et al.*,     :        **Case No. 20– _____ (      )**
                                        :
         Debtors.[1]                    :        **(Joint Administration Requested)**
                                        :
------------------------------------------------------------ x

### DECLARATION OF ROY MESSING IN SUPPORT OF
### DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Roy Messing, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Restructuring Officer of Exide Holdings, Inc. ("**Holdings**") and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with their non-Debtor affiliates, "**Exide**," or the "**Company**").  I am a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**"), a business advisory and expert services firm whose professionals have significant experience providing bankruptcy crisis management, consulting, and financial advisory services.  Prior to my involvement with Exide, I served as a president, chief restructuring officer, liquidating trustee, turnaround advisor, and strategic consultant to numerous companies across various industries, including manufacturing and distribution, chemicals, energy, building materials, commercial real estate, financial services, professional services, medical devices and services, pharmaceuticals, technology, media, telecom, and entertainment.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13800 Deerfield Parkway, Building 200, Milton, Georgia 30004.

2. On April 8, 2020, the Debtors retained Ankura to assist them with their financial and operational restructuring. Since that time, I have been overseeing the Ankura team engaged by the Debtors. Subsequently, on May 18, 2020, I was appointed as the Debtors' Chief Restructuring Officer. In my role as Chief Restructuring Officer, I am responsible for an oversee all matters related to these chapter 11 cases and report directly to the Special Committee (as defined and described more fully below).

3. On the date hereof (the "**Commencement Date**"), each of the Debtors commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable and familiar with Exide's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.

4. I submit this declaration (this "**Declaration**") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of these chapter 11 cases and in support of the motions and applications that the Debtors have filed with the Court, including the first day pleadings filed concurrently herewith (the "**First Day Pleadings**"). I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Exide's employees, advisors, or attorneys, or based upon my experience, knowledge, and information concerning Exide's operations and the battery manufacturing and distribution industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. The Debtors have requested a variety of relief in the First Day Pleadings to minimize the adverse effects of the commencement of these chapter 11 cases. I am familiar

with the contents of each First Day Pleading and I believe the relief sought therein is necessary for the Debtors to transition into chapter 11.  I further believe that the relief requested in the First Day Pleadings will preserve the value of the Debtors' estates.

6.       This Declaration is divided into five (5) sections:

- ▪ <u>Section I</u> provides an overview of the Debtors and these chapter 11 cases;

- ▪ <u>Section II</u> describes the Company's business, its history and its current operations;

- ▪ <u>Section III</u> summarizes the Company's organizational and capital structure;

- ▪ <u>Section IV</u> describes the circumstances that led to the commencement of these chapter 11 cases; and

- ▪ <u>Section V</u> provides a summary of the First Day Pleadings, the factual bases for the relief requested therein, and other information related to these chapter 11 cases.

**I.**
**<u>Overview</u>**

7.       Exide is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid and lithium-ion batteries, with operations in more than twenty (20) countries.  The Company is headquartered in Milton, Georgia and through its four global business groups – Transportation Americas, Transportation Europe and Rest of World ("**ROW**"), Industrial Energy Americas, and Industrial Energy Europe and ROW – the Company provides a comprehensive range of stored electrical energy products and services for industrial and transportation applications.  The Company manufactures and distributes transportation and industrial batteries in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand.

3

8.      This is the Company's second chapter 11 filing in seven (7) years and the third in the Company's history.  In June 2013, Debtor Exide Technologies, LLC (which was a corporation at that time) ("**Exide Technologies**") commenced a chapter 11 case in the Delaware bankruptcy court – *In re Exide Technologies*, Case No. 13-11482 (MWF) (the "**2013 Chapter 11 Case**").  In March 2015, the Delaware bankruptcy court confirmed the Company's plan of reorganization after nearly two (2) years of complex and extensive negotiations.[2]

9.      Notwithstanding the Company's efforts to implement its business plan following its emergence from the 2013 Chapter 11 Case and the support of its new owners and lenders, the Company continued to face liquidity, performance, and operational challenges that were more persistent and widespread than anticipated.  Coupled with adverse industry and market factors as well as substantial environmental costs, these challenges have resulted in reduced liquidity.

10.      Beginning in early 2019, the Company commenced an M&A process to identify buyers or investors for its businesses.  In addition, in an effort to address immediate liquidity constraints, the Company obtained the June 2019 Financing (as defined in <u>Section IV</u> below) to infuse approximately $150 million into its business operations.  In December 2019, the Company completed the Optimization (as defined in <u>Section IV</u> below), under advice of prior counsel, to align the Company's legal structure with its operational structure and to facilitate a potential sale or financing of the Europe/ROW business.  Given their proximity to these chapter 11 cases, the June 2019 Financing and the Optimization are currently under review by the independent Subcommittee, under advisement by Weil (each as defined below).

---

[2]      *See In re Exide Technologies*, Case No. 13-11482 (MWF) [D.I. 3423]

RLF1 23448521v.1

11.     Despite these efforts, the Company continued to face significant liquidity and operational headwinds in 2019 and 2020, which were recently exacerbated and accelerated by the unprecedented health and economic impact of the COVID-19 global pandemic.  As explained in more detail in <u>Section IV</u> of this Declaration, the Company was not able to consummate an out-of-court transaction with a third party purchaser for the sale of its North American and European assets.  Accordingly, facing growing uncertainty with respect to its ability to continue as a going concern, severe liquidity constraints and upcoming interest and maturity payments, the Company began negotiating with an ad hoc group of its noteholders (the "**Ad Hoc Group**") that holds, in the aggregate, approximately (i) 90.11% of the Superpriority Notes, (ii) 87.94% of the Exchange Priority Notes, (iii) 76.40% of the First Lien Notes, and (iv) over 80% of the equity interests in Holdings (each as defined below), and their advisors on the terms and implementation of strategy strategic transaction.  Those discussions culminated in a restructuring support agreement (the "**RSA**") executed on May 18, 2020.  A copy of the RSA is attached hereto as **<u>Exhibit C</u>**.

### A.     Restructuring Support Agreement

12.     As reflected in the RSA, the Debtors have commenced these chapter 11 cases with a clear strategy for the benefit of all stakeholders including their thousands of employees that depend on Exide to earn a living for their families—the sale of all or substantially all of their assets through the continuation of the Debtors' Prepetition Marketing Process (as defined below), at the conclusion of which any and all bids for the Debtors' assets will be evaluated by the Debtors and pursued in accordance with proposed bidding procedures (the "**Marketing Process**").  Importantly, the Debtors intend to pursue this strategy to confirm a chapter 11 plan and pay administrative expenses in these cases.

5

13.     The Marketing Process will provide a transparent and comprehensive avenue through which the Debtors will seek bids or proposals for sale transactions that provide for the following:  (i) a sale of substantially all of the Debtors' assets (the "**Company Sale Transaction**"), (ii) a sale of the Debtors' Exide Americas (as defined below) business segments and/or the assets related thereto, in whole or in parts (the "**Americas Sale Transaction**"), (iii) a sale of the Debtors' Exide Europe/ROW (as defined below) business segments and/or the assets related thereto, in whole or in parts (the "**Europe/ROW Sale Transaction**"), or (iv) the liquidation or winding up of any assets or businesses of the Debtors in a manner other than as described in (i) through (iii) above.

14.     Importantly, pursuant to the RSA, the Ad Hoc Group has submitted a binding credit bid for the Exide Europe/ROW business segment (the "**Europe/ROW Credit Bid**").  The Europe/ROW Credit Bid, which is described further in <u>Section IV</u> below, will serve as the stalking horse for a Europe/ROW Sale Transaction and will be subject to higher or better bids.  In connection with the Credit Bid, the Debtors and the Ad Hoc Group have also negotiated a term sheet contemplating the Interim Financing Facility (as defined below) provided by the Ad Hoc Group to certain of the Debtors' non-Debtor affiliates in Europe to support the Company's Europe/ROW operations during the execution of the Marketing Process.

15.     Accordingly, upon completion of the Marketing Process, the Debtors will have fully market tested the value of their assets and the Debtors will be in the best position to select the transaction or series of transactions to maximize the value of their assets and preserve as many jobs as possible.  In addition, the RSA incorporates a plan term sheet pursuant to which the Ad Hoc Group has agreed to support the pursuit and confirmation of a chapter 11 plan that complies with the absolute priority rule and other requirements of the Bankruptcy Code.

## B.      DIP Financing

16.     As the Debtors continued their review of strategic alternatives, and it became apparent that the commencement of chapter 11 cases would be necessary, the Debtors focused on obtaining debtor in possession financing and the use of Cash Collateral (as defined in the DIP Motion) that would be sufficient to sustain their Exide Americas business during the pendency of a chapter 11 case and would provide sufficient liquidity for completion of the Marketing Process.  In that connection, as described in greater detail in the DIP Declaration,[3] the Debtors, through their investment banker, Houlihan Lokey Capital, Inc. ("**Houlihan**"), solicited offers for debtor-in-possession financing from thirty-eight (38) parties, including the Debtors' existing noteholders and the Prepetition ABL Lenders (as defined below).  Only three (3) offers for financing were received, none of which, standing alone, were adequate to fund the Marketing Process.  Ultimately, the Debtors were able to combine sources and secure postpetition financing (the "**DIP Financing**") in the form of a superiority senior secured debtor-in-possession credit facility in an aggregate principal amount of $40 million (the "**DIP Facility**"), to be provided by BTC Holdings Fund I, LLC and certain of the Debtors' prepetition secured lenders (solely in such capacity, the "**DIP Lenders**") and agented by Blue Torch Finance LLC (together with BTC Holdings Fund I, LLC and its affiliates, "**Blue Torch**"; and solely in such capacity as the agent under the DIP Facility, the "**DIP Agent**"), with a draw of $40 million under the proposed DIP Financing.  A copy of the term sheet (the "**DIP Term Sheet**") containing certain key terms of the DIP Facility is annexed to the RSA.  The Debtors and the DIP Lenders are in the process of

---

[3]     *See Declaration of Jason Feintuch in Support Of Debtors' Motion For (I) Authority To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens And Provide Superpriority Administrative Expense Status, (D) Grant adequate Protection, (E) Modify The Automatic Stay, And (F) Schedule A Final Hearing And (Ii) Related Relief* (the "**DIP Declaration**"), filed contemporaneously herewith.

RLF1 23448521v.1

negotiating a final form credit agreement with respect to the DIP Facility (the "**DIP Credit Agreement**") which will be filed with the Court prior to the hearing on the First Day Pleadings.

17.     In addition to the DIP Financing, the Debtors are in the process of negotiating the terms for the consensual use of the Cash Collateral of the Prepetition ABL Lenders, the Exchange Priority Noteholders, and the First Lien Noteholders for the duration of these chapter 11 cases in exchange for adequate protection.  If the Debtors cannot reach a resolution with the Prepetition ABL Lenders on the consensual use of Cash Collateral, the Debtors will file a motion seeking authority for the use of nonconsensual use of Cash Collateral.

**C.     Case Timeline**

18.     Time is of the essence in these chapter 11 cases.  It cannot be stressed enough that the Debtors must proceed at a targeted and deliberate pace.  As stated, given the challenges in raising financing for these chapter 11 cases, the Debtors options were to (i) accept the proposed amount of financing, which together with the use of Cash Collateral, is projected to allow the Debtors to operate until mid-August and thereafter use sale proceeds resulting from the Marketing Process, or (ii) liquidate all operations immediately at the outset of the cases.  Despite these challenges, the Debtors have designed a case strategy and secured adequate funding that allows operations to continue during the implementation of a well-designed Marketing Process. Thereafter, the Debtors expect to have sufficient sale proceeds to repay the DIP Facility and fund the wind-down and repayment of the Debtors' prepetition debt pursuant to the RSA and related term sheets.

19.     Accordingly, the DIP Term Sheet and the RSA set forth milestones (the "**Milestones**") by which the Debtors must accomplish various objectives.  The Debtors have targeted the following dates to satisfy the Milestones:[4]

| Sale Timeline | | |
|---|---|---|
| Event | Target Date | Milestone Date |
| Entry of order approving the Bidding Procedures Motion | June 8, 2020 | June 18, 2020 |
| Auction to be held if the Debtors receive more than one Qualified Bid | July 7, 2020 | July 18, 2020 |
| Entry of Sale Order | July 20, 2020 | August 2, 2020 |
| Closing of Americas Sale Transaction | August 7, 2020 | August 27, 2020 |
| Closing of Europe/ROW Sale Transaction | To be determined | September 16, 2020 |

| Case Timeline | | |
|---|---|---|
| Event | Target Date | Milestone Date |
| Entry of an order approving DIP Financing on an interim basis | May 20, 2020 | May 22, 2020 |
| File Plan and Disclosure Statement | June 15, 2020 | June 18, 2020 |
| Entry of an order approving DIP Financing on a final basis | June 17, 2020 | June 23, 2020 |
| Confirmation Hearing | August 24, 2020 | September 16, 2020 |
| Plan Effective Date | August 31, 2020 | October 1, 2020 |

20.     The Debtors and the Ad Hoc Group are aligned in their support of an expeditious timeline that minimizes the adverse impact on the Debtors' operations, vendors, and employees, but provides adequate opportunity to secure executable bids for the Debtors' U.S. and European/ROW operations for the highest or best value.  The proposed timeline outlined

---

[4]     The foregoing is only a summary of certain Milestones.  The Milestones described herein are qualified in their entirety by the Milestones described in the DIP Credit Agreement and the milestones described in the RSA.

9

above appropriately balances the Debtors' need to effectuate their sale strategy quickly with their need to adequately market test the value of their businesses.  The amount of work done by the Debtors and their professionals in connection with the Prepetition Marketing Process enhances their ability to complete the Marketing Process on the time frame proposed.  The Debtors believe that proceeding with the Marketing Process is preferable to any of their other alternatives and will inure to the benefit of all constituents, including their employees.  Accordingly, moving forward on the basis of the Milestones is necessary to maximize value for all stakeholders.

<div align="center">

**II.**
**Overview of the Company's Operations**

</div>

    **A.**      **History and Current Business Operations**

        21.     Founded in 1888 and headquartered in Milton, Georgia, Exide has grown to become a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid batteries.  Across the globe, Exide batteries power cars, boats, heavy duty vehicles, golf carts, powersports, and lawn and garden applications.  Its network power solutions deliver energy to vast telecommunication networks in need of uninterrupted power supply.

        22.     More specifically, Exide provides its customers with a comprehensive range of stored electrical energy products and services for industrial and transportation applications in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand.  The Company's operations consist of its (i) North American operations ("**Exide Americas**") and (ii) European and ROW operations ("**Exide Europe/ROW**").

        23.     <u>Transportation</u>.   In its transportation segments, the Company manufactures, distributes, and markets lead-acid and lithium ion batteries for automotive, heavy duty, and recreational applications for a diversified customer base of blue-chip original

<div align="center">10</div>

equipment manufacturers ("**OEM**"), aftermarket retailers, and installers.  Exide's proprietary and private label products include starting, lighting, and ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, motorcycles, recreational vehicles, marine, and other applications.  Exide Americas works with channel partners to deliver its products to customers, while Exide Europe/ROW maintains its own distribution network.

24.    Industrial Energy.  The Company's industrial batteries consist of motive power cells and network power applications.  Motive power cells are used in the material handling industry for equipment such as electric fork-lift trucks as well as in other machinery, including floor cleaning machinery, powered wheelchairs, railroad locomotives, mining equipment, and electric road vehicles.  Network power batteries provide energy storage solutions for critical systems that require uninterrupted power supply and are used to power, among other things, telecommunications systems, computer installations and data centers, hospitals, air traffic control systems, security systems, electric utilities, railways, and various military applications. The Company has a diverse customer base that includes a number of major end-user customers, retailers and OEMs, utilities, and government and military agencies.

### i.  **Exide Americas**

25.    Manufacturing.    Exide Americas produces batteries and battery components out of seven U.S. manufacturing facilities, five of which are dedicated to its transportation business segment (the "**Transportation Americas Facilities**") and two of which are dedicated to its industrial business segment (the "**Industrial Energy Americas Facilities**"). As part of its operational initiatives (described in more detail in Section IV), the Company is focused on transitioning from mixed product plants to plants that produce fewer SKUs and, thus, are able to operate more efficiently.  To that end, the Transportation Americas Facilities are composed of two dedicated battery manufacturing plants and two dedicated battery component

manufacturing plants.[5]  Likewise, both of the Industrial Energy Americas Facilities are dedicated to cell manufacturing.  The Company uses the battery component facilities to strategically supply the battery and cell manufacturing plants, which enables the Company to control the cost, quality and reliability of its products.  In fiscal year 2020, the Company produced approximately 11.7 million batteries in its Transportation Americas Facilities and approximately 714,000 cells in its Industrial Energy Americas Facilities.

26.     As described in detail in the Employee Wages Motion (as defined below), the Debtors are party to certain collective bargaining agreements with local and international unions, which cover approximate 350 employees across its facilities.

27.     <u>Recycling</u>.  The Company has two smelters in the U.S., both of which are currently active battery collection and recycling facilities.  These facilities reclaim lead by recycling spent lead-acid batteries, which are obtained for recycling from Exide's customers (who exchange spent battery cores for credit on purchases) and third party spent-battery collectors.  Recycling keeps batteries from being disposed of improperly or shipped to regions where regulations governing battery disposal are lacking.  In fiscal year 2020, approximately 170,000 tons of batteries, plant scrap, and range lead were recycled at Exide Americas' smelters or by a third party at Exide's request.  Exide's recycling efforts enabled it to better control the cost of lead -- the principal raw material used in making its products.

**ii.     Exide Europe/ROW**

28.     <u>Manufacturing</u>.    Exide Europe/ROW produces batteries and battery components out of nine European manufacturing facilities, four of which are dedicated to its transportation business segment (the "**Transportation Europe/ROW Facilities**") and five of

---

[5]     The fifth Transportation Americas Facility, located in Reading, Pennsylvania, operates as a plastics recycling facility.

which are dedicated to its industrial business segment (the "**Industrial Energy Europe/ROW Facilities**"). Similar to the limited SKU strategy employed at Exide Americas, all of the Exide Europe/ROW facilities are focused on battery production, however, Exide Europe/ROW purchases components from third party suppliers. In fiscal year 2020, the Company produced approximately 12.7 million batteries in its Transportation Exide Europe/ROW Facilities and approximately 5.8 million cells in its Industrial Energy Europe/ROW Facilities.

29.     Recycling. Exide Europe/ROW also has two active smelters located in Europe, which process spent batteries and supply the Exide Europe/ROW facilities with reclaimed lead for use in battery production. In fiscal year 2020, approximately 120,000 tons of batteries, plant scrap, and range lead were recycled at Exide Europe/ROW's smelters or by a third party at Exide's request.

### B.     Events Since the 2013 Chapter 11 Case

30.     Since emerging from the 2013 Chapter 11 Case (as defined below) in 2015, the Company has experienced significant drains on its liquidity and cash flows, including (i) mounting costs for environmental remediation and related litigation with its Vernon Facility (as defined below) and other closed operating sites, (ii) rising production costs, exacerbated by the closure of two (2) of its recycling facilities, which have exposed the Company to price fluctuations in raw material inputs, (iii) operational inefficiencies caused by its legacy mixed-use manufacturing facilities, and (iv) the recent impact of the global COVID-19 pandemic on consumer demand for the Company's products and the functionality of the Company's supply chain, in each case as described in more detail below.

31.     In the past two (2) fiscal years, the Company has taken several measures to attempt to alleviate pressure on its liquidity and ability to operate as a going concern. More

13

specifically, the Company (i) enacted certain operational initiatives, including (a) the divestment of its inefficient branch distribution network, (b) closed multiple mixed-use manufacturing facilities, and (c) unfortunately, had to resort to reducing its headcount in order to manage overhead as a significant input into its cost model, and (ii) delevered its balance sheet and addressed near term debt maturities through the June 2019 Financing (as defined below).  In December 2019, the Company also completed the Optimization (as defined below) to reorganize its corporate structure in order to better facilitate potential sales or financings of its Exide Americas and Exide Europe/ROW business segments as separate entities.  As stated, the June 2019 Financing and the Optimization are under review by the independent Subcommittee.

32.     Notwithstanding its efforts to address liquidity issues, as of the Commencement Date, the Company still faces significant operational and environmental challenges that prompted the Debtors filing of these chapter 11 cases.

### III.
### Corporate and Capital Structure

A.     **Corporate Structure**

33.     As the Debtors are privately-held, none of the Debtors' equity securities have been publicly-traded since the Debtors emerged from the 2013 Chapter 11 Case.  All of the Debtors are direct or indirect subsidiaries of Holdings.  Most of the Debtors' North American operations are owned, directly or indirectly by Debtor Exide Technologies, a Delaware limited liability company that is wholly owned by Holdings.  The Debtors' Europe/ROW operations are primarily held through non-Debtor Exide International Holdings, LP ("**Exide International**"), a limited partnership formed under the laws of the Cayman Islands that is wholly owned by Holdings.  An organizational chart illustrating the corporate and capital structure of the Debtors is annexed hereto as **Exhibit A**.

14

34.     As of the Commencement Date, Holdings' board of directors (the "**Board of Directors**") is comprised of the following six (6) members, including four (4) independent directors:

| Name | Director Since | Position/Affiliation |
|---|---|---|
| Timothy D. Vargo | April 2017 | Chairman of the Board of Directors, President, CEO |
| Andrew Axelrod | August 2019 | Director, Axar Capital |
| Mark G. Barberio | April 2015 | Independent Director |
| Alan Carr | April 2019 | Independent Director |
| William Transier | April 2019 | Independent Director |
| Harvey Tepner | April 2020 | Independent Director |

35.     To the best of my knowledge, none of the independent members of the Board of Directors are affiliated with or employed by any of the Company's shareholders, lenders, or noteholders.

36.     As of the Commencement Date, the Debtors' senior executive team is comprised of the following individuals:

| Name | Position |
|---|---|
| Timothy D. Vargo | CEO and President |
| Mike Judd | Executive Vice President, COO and President, North America |
| Lou Martinez | Executive Vice President and CFO |

37.     To the best of my knowledge, none of the members of the Company's executive management are affiliated with or employed by any of the Company's shareholders, lenders, or noteholders.

38.     Prior to commencing these chapter 11 cases, the Company took measures to ensure a seamless transition into chapter 11 and provide for robust and independent corporate governance procedures.  First, the Company appointed a new independent director to its Board of Directors.  Harvey Tepner, an independent corporate director, was appointed to the Board of Directors in April 2020.  The Company now has four (4) independent directors: Mr. Tepner,

RLF1 23448521v.1

Mark. G. Barberio, Alan Carr, and William Transier.  These individuals bring decades of restructuring and operational turnaround and transformation experience to the Company. Second, the Board of Directors formed a special committee (the "**Special Committee**"), composed solely of its four (4) independent directors to direct and oversee all aspects of the Company's restructuring process and chapter 11 cases.  Third, as described further below, a sub-committee of the Special Committee (the "**Subcommittee**") was established, with Mr. Tepner as the sole member, to investigate, evaluate and control the disposition or resolution of any claims associated with certain prepetition affiliate transactions, including the June 2019 Financing and the Optimization.  Working with the assistance of Weil, Gotshal & Manges LLP ("**Weil**"), the Subcommittee, in its sole discretion, is evaluating the Debtors' prepetition transactions.  Finally, contemporaneously with the filing of these chapter 11 cases, I was appointed as the Chief Restructuring Officer reporting directly to the Special Committee on all aspects of the restructuring and chapter 11 cases.

### B.      Capital Structure

39.      As of the Commencement Date, the Debtors, together with their non-Debtor affiliates, have outstanding funded debt obligations in the amount of approximately $817.4 million in the aggregate, summarized in the following chart:

16

| Instrument / Facility | Principal Outstanding |
|---|---|
| ABL Credit Agreement | $101,200,000 |
| 10.75% Superpriority Lien Senior Secured Notes due 2021 | $152,513,000 |
| 11.0% Exchange Priority Notes due 2024 | $390,000,000 |
| 11.0% First Lien Senior Secured Notes due 2024 | $161,023,000 |
| **Total Secured Debt** | **$804,736,000** |
| 3.79% Deferred Payment Notes due 2022 | $2,700,000 |
| 11.0% Unsecured Notes due 2020 | $9,000,000 |
| 11.0% Unsecured Notes due 2022 | $1,000,000 |
| **Total Unsecured Funded Debt** | **$12,700,000** |
| **Total** | **$817,436,000** |

### i. ABL Facility (Secured)

40.     As of the Commencement Date, there is approximately $101.2 million in aggregate outstanding unpaid principal under that certain ABL Credit Agreement, dated as of April 30, 2015 (as amended, modified, or otherwise supplemented from time to time, the "**ABL Credit Agreement**"), by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, and Exide Holding Netherlands B.V. (each a direct or indirect subsidiary of Holdings and a "**Prepetition ABL Borrower**" and, collectively, the "**Prepetition ABL Borrowers**"), Bank of America, N.A., as administrative agent (the "**Prepetition Admin Agent**"), Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents (collectively, the "**Prepetition Collateral Agents**" and, together with the Prepetition Admin Agent, the "**Prepetition ABL Agents**"), the lenders from time to time party thereto (each a "**Prepetition ABL Lender**" and, collectively, the "**Prepetition ABL Lenders**").  The Debtors' obligations under the ABL Credit Agreement mature on July 31, 2021.

17

41.     The revolving credit commitments under the ABL Credit Agreement are divided into United States, Canadian, United Kingdom, and Dutch revolving credit commitments, in each case, committed to the Prepetition ABL Borrowers organized in that jurisdiction. Pursuant to the ABL Credit Agreement and the Foreign General Continuing Guaranty, dated as of April 30, 2015 (as amended or supplemented from time to time, the "**Foreign ABL Guaranty**"), obligations under the ABL Credit Agreement of the Canadian, United Kingdom, and Dutch Prepetition ABL Borrowers are guaranteed by Holdings, the Prepetition ABL Borrowers and certain subsidiaries of Holdings organized both in and outside of the United States. Pursuant to the ABL Credit Agreement and the U.S. General Continuing Guaranty, dated as of April 30, 2015, obligations under the ABL Credit Agreement of the United States Prepetition ABL Borrowers are guaranteed by Holdings, Exide Technologies, and certain indirect subsidiaries of Holdings organized in the United States and not by any of the European affiliates.

42.     The total amount borrowed on U.S. line under the ABL Credit Agreement is approximately $95 million.  Certain Debtors and certain U.S. non-Debtor affiliates are obligors or guarantors of this obligation.  The Debtors' European affiliates do not guarantee this obligation.  Separately, $6.4 million is drawn and outstanding on the UK line under the ABL Credit Agreement.  The UK obligations are guaranteed by the Debtors and certain non-Debtor affiliates in Europe.

43.     The outstanding obligations under the ABL Credit Agreement are secured in accordance with the terms of the US Security Agreement, dated as of April 30, 2015 (as amended, supplemented, or modified from time to time, the "**ABL Security Agreement**"), and the other United States and foreign security documents specified in the ABL Credit Agreement.

18

Pursuant to the terms of the ABL Security Agreement and the Amended and Restated Intercreditor Agreement, dated as of June 17, 2019 (as amended, supplemented or modified from time to time, the "**Intercreditor Agreement**"), the Prepetition ABL Lenders were granted first-priority liens on certain assets (with certain specified exceptions) including, but not limited to, all accounts, chattel paper, cash and deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights, and commercial tort claims (the "**ABL Priority Collateral**"), and a third-priority lien on the Notes Priority Collateral (as defined below).[6]

### ii.   10.75% Superpriority Lien Senior Secured Notes due 2021 (Secured)

44.     As of the Commencement Date, Debtors Holdings and Exide Technologies are guarantors of secured note obligations consisting of $152.5 million in aggregate outstanding principal of 10.75% Superpriority Lien Senior Secured Notes due 2021 (the "**Superpriority Notes**" and the holders thereof, the "**Superpriority Noteholders**") issued pursuant to that certain Indenture (as amended or otherwise modified from time to time, the "**Superpriority Notes Indenture**") by and between non-Debtor Exide International, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent and Bank of America National Association, as successor trustee and collateral agent, dated as of June 17, 2019.  The Superpriority Notes mature on October 31, 2021 with the ability to extend to October 31, 2022 at the Company's option in exchange for a 1.0% cash fee payable to the Superpriority Noteholders.  The Superpriority Notes were issued in connection with the June 2019 Financing.

---

[6]     An organizational chart illustrating the priority of liens over the assets of the Debtors and their non-Debtor affiliates is attached hereto as **Exhibit B**.

45.     The obligations under the Superpriority Notes Indenture are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of a Superpriority Lien Security Agreement, dated as of June 17, 2019 (as amended or otherwise modified from time to time, the "**Superpriority Security Agreement**").  Pursuant to the terms of the Superpriority Security Agreement and the Intercreditor Agreement, Holdings and certain subsidiaries of Holdings each granted, to the Superpriority Noteholders, first-priority liens on all equipment, inventory, real property, intellectual property, the stock of Exide Technologies and certain subsidiaries of Holdings, and substantially all of the other assets of Exide Technologies, Holdings, and certain subsidiaries of Holdings, other than the ABL Priority Collateral (the "**Notes Priority Collateral**") and a second-priority lien on the ABL Priority Collateral.

### iii.    11% First Lien Secured Notes due 2024 (Secured)

46.     <u>11% Exchange Priority Notes</u>.   As of the Commencement Date, the Debtors have outstanding secured note obligations consisting of $390.0 million in aggregate outstanding principal of 11% Exchange Priority Notes due 2024 (the "**Exchange Priority Notes**" and the holders thereof, the "**Exchange Priority Noteholders**"), issued pursuant to that certain Indenture by and between Exide Technologies, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent, dated as of June 25, 2019 (as amended or otherwise modified from time to time, the "**Exchange Priority and First Lien Notes Indenture**").  The Exchange Priority Notes mature on October 31, 2024.  The Exchange Priority Notes were issued under an exchange offer in connection with the June 2019 Financing, pursuant to which certain 2022 Legacy First Lien Noteholders exchanged their 2022 Legacy First Lien Notes (each as defined below) for Exchange Priority Notes at an agreed-upon exchange rate.

20

47.     <u>First Lien Notes</u>.  As of the Commencement Date, the Debtors have outstanding secured note obligations consisting of $161.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes due 2024 (the "**First Lien Notes**" and the holders thereof, the "**First Lien Noteholders**") issued pursuant to Exchange Priority and First Lien Notes Indenture.  The 2024 First Lien Notes mature on October 31, 2024.

48.     The obligations under the First Lien Notes Indenture are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of an Amended and Restated First Lien Security Agreement, dated as of June 25, 2019 (as amended or otherwise modified from time to time, the "**1L Security Agreement**").  Pursuant to the terms of the 1L Security Agreement and the Intercreditor Agreement, Holdings and certain of its subsidiaries granted to the Exchange Priority Noteholders and the First Lien Noteholders second-priority liens on the Notes Priority Collateral and third-priority liens on the ABL Priority Collateral.  Pursuant to the Exchange Priority and First Lien Notes Indenture, the First Lien Notes are subordinated in contractual right of payment to the Exchange Priority Notes.

### iv.     3.79% Deferred Payment Notes due 2022 (Unsecured)

49.     As of the Commencement Date, Holdings has outstanding unsecured note obligations consisting of $2.7 million in aggregate outstanding principal of 3.79% Second Lien Deferred Payment Notes due 2022 (the "**Legacy Second Lien Notes**") issued pursuant to that certain indenture by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015.  The Legacy Second Lien Notes mature on April 30, 2022.

50.     In connection with the June 2019 Financing, the liens on certain assets of Holdings securing the Legacy Notes were released.

### v.   Legacy First Lien Notes (Unsecured)

51.     <u>11% Legacy First Lien Notes Due 2020</u>.  As of the Commencement Date, the Debtors have outstanding unsecured note obligations consisting of $9.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes Due 2020 (the "**2020 Legacy First Lien Notes**" and the holders thereof, the "**2020 Legacy First Lien Noteholders**"), issued pursuant to that certain indenture by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015 (as amended or otherwise modified from time to time, the "**2020 Legacy First Lien Notes Indenture**").  The 2020 Legacy First Lien Notes matured on April 30, 2020 and the Debtors did not make the maturity payment.

52.     In May 2017, in connection with an exchange offer (the "**2017 Exchange Offer**"), (i) certain 2020 Legacy First Lien Noteholders exchanged their 2020 Legacy First Lien Notes for 2022 Legacy First Lien Notes at an agreed-upon exchange rate, and (ii) the covenants in the 2020 Legacy First Lien Notes Indenture were amended to, among other matters, allow the release of the first priority lien on certain assets of Holdings that previously secured such notes. The current 2020 Legacy First Lien Noteholders are holders of such notes who did not participate in the 2017 Exchange Offer.

53.     <u>11% Legacy First Lien Notes Due 2022</u>.  As of the Commencement Date, the Debtors have outstanding unsecured note obligations consisting of $1.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes Due 2022 (the "**2022 Legacy First Lien Notes**" and the holders thereof, the "**2022 Legacy First Lien Noteholders**") issued pursuant to that certain Indenture by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017  (as amended or otherwise modified from time to time, the "**2022 Legacy First Lien Notes Indenture**").  The

2022 Legacy First Lien Notes were issued in connection with the 2017 Exchange Offer and mature on April 30, 2022.

54.     In connection with the June 2019 Financing, the covenants in the 2022 Legacy First Lien Notes Indenture were amended to, among other matters, allow the release of the first priority lien on certain assets of Holdings that previously secured such notes.  The current 2022 Legacy First Lien Noteholders are holders of such notes who did not participate in the June 2019 Financing.

### vi.    Other Financing Arrangements

55.     As of the Commencement Date, the Debtors have $11.1 million in aggregate outstanding capital lease financing obligations, pursuant to that certain (i) Master Lease Agreement, dated June 29, 2017, by and between Exide Technologies, as lessee, and Stonebriar Commercial Finance LLC, as lessor, for certain battery component manufacturing equipment located at its Kansas City, Missouri facility, and (ii) Master Lease of Personal Property, Finance Lease, dated September 19, 2016, by and between Exide Technologies, as lessee, and BMO Harris Equipment Finance Company, as lessor, for certain battery manufacturing equipment located at its Kansas City, Kansas facility.

### vii.    General Unsecured Claims

56.     In the ordinary course of business, the Debtors incur trade credit on varying terms.   As of the Commencement Date, the Debtors estimate that they have approximately $97.5 million in general unsecured claims, excluding any lease rejection claims.

### viii.    Intercompany Claims

57.     In the ordinary course of business, the Debtors engage in intercompany transactions (collectively, "**Intercompany Transactions**") with each other and with certain of their non-Debtor affiliates (each a "**Non-Debtor Affiliate**", and collectively, the "**Non-Debtor**

**Affiliates**") that give rise to intercompany receivables and payables (collectively, the "**Intercompany Claims**"). The Debtors maintain records of all Intercompany Transactions (including those with Non-Debtor Affiliates) and can ascertain, trace, and account for all Intercompany Claims. The Intercompany Transactions are ordinary course transactions that are integral to the Company's business and the function of the Cash Management System.

58. The primary Intercompany Transactions giving rise to Intercompany Claims are (i) intercompany cash transfers for working capital purposes, which are not entered into in the ordinary course and historically have been documented through intercompany notes, (ii) Management Fee transactions, relating to annual fees charged by Exide Technologies to other Debtors and its Non-Debtor affiliates on account of allocated shared expenses, (iii) centrally-billed Expense allocations, which are recorded on intercompany accounts and are generally not cash settled, and (iv) Intercompany Trade Transactions (each as defined in the Cash Management Motion) pursuant to which the Company engages in the purchase and sale of goods among the Debtors and Non-Debtor Affiliates.

59. Notwithstanding the Company's historical treatment of the settlement of Intercompany Transactions, as described in further detail in the Postpetition Intercompany Protocols in the Cash Management Motion, the Debtors seek to cash settle all Postpetition Intercompany Transactions between Debtors and Non-Debtor Affiliates on a monthly basis. All Postpetition Intercompany Transactions among the Debtors will be recorded as an Intercompany Claim and treated in the same manner as they were prior to the Commencement Date.

### ix.   Equity Ownership

60. As of the Commencement Date, the outstanding shares of common stock, par value $0.01 per share (the "**Holdings Common Stock**") are currently held (either directly and/or through subsidiaries or affiliates) as follows:

| Holder | Percentage of Outstanding Holdings Common Stock |
|---|---|
| MacKay Shields LLC | 39.83% |
| Alliance Bernstein L.P. | 19.12% |
| D.E. Shaw Galvanic Portfolios, L.L.C. | 10.76% |
| Neuberger Berman | 6.38% |
| Axar Capital Management, L.P. | 4.03% |
| Less than 5% holders | 19.88% |
| **Total** | **100%** |

61.     Holdings does not have any other classes of stock outstanding.

**IV.**
**Need for Chapter 11 Relief and the**
**Circumstances Leading to Commencement of These Chapter 11 Cases**

62.     The Debtors are filing these chapter 11 cases to implement and complete the Marketing Process.  The Marketing Process is critical to achieving the Debtors' goals of maximizing creditor recoveries, providing for an equitable distribution to their stakeholders, and, to the greatest extent possible, protecting the interests of their approximately 2,400 employees.[7] Absent the commencement of these cases, and the DIP Financing and Cash Collateral use, the Company would not have the money necessary to sustain its operations during the Marketing Process.

**A.     Prior Chapter 11 Cases**

63.     Under the  plan of reorganization confirmed in the 2013 Chapter 11 Case, Exide deleveraged its balance sheet by approximately $600 million, raised approximately $165 million in new capital, and secured a $200 million exit ABL financing facility.  The Company

---

[7]     The Company employs approximately 7,621 people globally.  Of this number, 5,183 are located throughout Canada, Europe and Asia and are not directly employed by the Debtors.

RLF1 23448521v.1

emerged from the 2013 Chapter 11 Case as a going-concern, continued its operations across virtually all of its existing world-wide business segments, and preserved nearly 10,000 jobs.

64.     The Company emerged from the 2013 Chapter 11 Case in April 2015 and consummated the transactions contemplated in its confirmed plan of reorganization, including the formation of (i) the Exide Creditors' Liquidating Trust (the "**2013 Case GUC Trust**"), for the purpose of liquidating and distributing assets allocated to the general unsecured creditors, and (ii) the Vernon Tort Claims Trust (the "**2013 Case Vernon Trust**") for the purpose of pursuing litigation claims on behalf of tort claimants in connection with environmental obligations of the Company on account of its closed Vernon, California facility (the "**Vernon Facility**"), and distributing any litigation proceeds therefrom.  The 2013 Case GUC Trust is still in existence (and will continue through April 2023) for the purpose of remitting proceeds of preference actions from the Company to the beneficiaries of the 2013 Case GUC Trust.  Under the current applicable timeline, the final distributions under the 2013 Case GUC Trusts will be made during the first calendar quarter of 2022. As of the Commencement Date, the 2013 Case Vernon Trust continues to pursue litigation and mediation claims in connection with the Company's Vernon Facility.

65.     Although the 2013 Chapter 11 Case remains open as of the Commencement Date, administration of the 2013 Case GUC Trust and the 2013 Case Vernon Trust should not interfere with, and will remain separate from, these chapter 11 cases.

**B.     Circumstances Leading to the Chapter 11 Cases**

66.     Even after its emergence from bankruptcy in April 2015, the Company's business continued to face significant operational challenges, substantial environmental costs, and industry trends that severely constrained its liquidity.

26

###### i.   Operational Challenges

67.   <u>Rising Production Costs</u>.   The cost of lead currently represents approximately 37% of the Debtors' cost of goods sold. The Company has generally managed this key cost driver through use of its recycling facilities; however, the closure of the Company's recycling facilities in Frisco, Texas and Vernon, California caused the Company to become more dependent on third party recycled lead tolling.  As a result, the Company has had increase third party tolling contracts to fill shortfalls in its customer battery recycling program, which increased the Company's production costs.  Open market junk battery purchases impact the Company's raw lead cost and expose the Company to fluctuations in the commodity price, which cannot always be passed on to customers.

68.   <u>Operational Inefficiencies</u>. After emerging from the 2013 Chapter 11 Case, the Company continued suffer from operational inefficiencies.  Specifically, the operation of the Company's mixed-use facilities, which produced multiple products at the same time, led to product inefficiencies and reduced margins.  Furthermore, the Company used its own aftermarket store delivery network that proved inefficient, such that the incremental revenue gained from maintain the branch store network was outweighed by the costs of operating the stores.

69.   <u>COVID-19 Impact</u>. Over the past two months, the Company's operations have been significantly impacted by the global COVID-19 pandemic.  Cash receipts have been adversely affected due to lower consumer demand and customers attempting to conserve cash.  Additionally, the Company's supply chains have been impacted by plant shut downs and government enforced lock downs.  In Europe, the Company has been forced to fully suspend operations at a number of its facilities and production has been slowed down in the Americas as well.

RLF1 23448521v.1

### ii.    The Debtors are Highly Levered

70.    Despite a significant increase in capital expenditures and the modernization of its production processes following its emergence from the 2013 Chapter 11 Case, the Company fell short of its operating and margin improvement objectives.  As a result, cash flows are insufficient to service the level of debt with which it emerged from the 2013 Chapter 11 Case and which was incurred during the subsequent five (5) years to fund expenditures on facility remediation costs and capital investments.  As of March 31, 2020, the Company's indebtedness was approximately 9.2x EBITDA; prior to the June 2019 Financing, it was levered to approximately 9.6x EBITDA.[8]  Over the last three years, the Debtors' cash interest expense has averaged approximately $26.8 million per year.  The costs of such debt service has, of course, impacted the Debtors' ability to invest in product and growth initiatives.  Despite the full equitization of the Convertible PIK Notes (as defined below) in connection with the Optimization, the Debtors' current balance sheet is not sustainable over the long term.

### iii.    Environmental Liabilities

71.    As a result of its multinational manufacturing, distribution, and recycling operations, the Company is subject to numerous U.S. federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which it operates (collectively, "**EH&S Laws**").  The Company is exposed to obligations and liabilities under such EH&S laws arising from its current and past manufacturing or recycling/recovery operations and from the handling, release, treatment, storage, and disposal of materials designated as hazardous substances or hazardous wastes (collectively, the "**Environmental Liabilities**").

---

[8]    EBITDA measured as the last-twelve-months EBITDA for each of March, 31, 2020 and June 30, 2019, respectively.

72.     While the Company has spent hundreds of millions of dollars to address Environmental Liabilities attributed to its historic operations, it nonetheless estimates that Environmental Liabilities associated with its closed sites could cost an additional $200 million or more to address over the next five (5) years.

73.     The Company owns or leases twenty-three (23) non-performing properties across the United States and one (1) non-performing property in Canada in which its activities are limited to environmental remediation and/or maintenance efforts (collectively, the "**NPPs**") of which (i) eight (8) NPPs have been remediated and/or are not known to require remediation and (ii) sixteen (16) NPPs are properties that are subject to ongoing environmental remediation efforts.  The remediation efforts undertaken by the Company in connection with the NPPs vary in scope and stage across the various sites.  For example, the Company has completed remediation at its Kankakee, Illinois site pursuant to a voluntary agreement with Illinois state authorities.  With respect to the Vernon Facility, the Company has entered into a series of agreements with federal and state authorities that required the Company to ultimately close the Vernon Facility, conduct significant decommissioning and remediation measures and remit substantial payments in connection with environmental conditions at the site.

74.     Since emerging from the 2013 Chapter 11 Case, the Company has spent approximately $166 million on operating and remediation costs at the Vernon Facility alone and expect to spend approximately $254 million in total.

75.     In 2018 and 2019, the Company spent approximately $35.6 million and $29.5 million, respectively, in environmental remediation costs.  Given the Company's operational headwinds and financial position, as further described herein, payment of remediation costs associated with the Environmental Liabilities continue to cause significant

strains on the Company's liquidity and ability to operate as a going concern and are no longer feasible.

76.     Unlike their predecessors, however, the Debtors do not intend to pursue a recapitalization transaction to emerge from the instant proceedings as a reorganized business. With respect to any assets that the Debtors are unable to sell to third party purchasers through the Marketing Process, the Debtors intend to liquidate or abandon such assets.  At the end of these chapter 11 cases, the Debtors will not be in business, and as such, they will no longer be able to retain and support the ongoing maintenance and remediation of the NPPs.  As such, the Debtors seek to commence good faith negotiations at the outset of these chapter 11 cases with various governmental regulatory agencies concerning the orderly transfer of the NPPs pursuant to the Settlement Procedures (as defined in the Settlement Procedures Motion).[9]

77.     The overarching goal of establishing and implementing the Settlement Procedures is to implement the orderly transfer of the NPPs from the Debtors' liquidating estates in an efficient manner that minimizes the risk of harm to public health and safety but recognizes the Debtors' challenged financial circumstances.  Importantly, the Settlement Procedures do not require agencies to reach a settlement with the Debtors.  Rather, the Settlement Procedures are designed to foster open communications among the parties and facilitate the efficient administration of these chapter 11 cases while significantly reducing the incurrence of unnecessary costs associated with litigating abandonment issues under section 554(a) of the Bankruptcy Code before the Court, which will only be pursued by the Debtors as a last resort.

---

[9] *See the Motion of Debtors for Authorization to (I) Implement Settlement Procedures for Non-Performing Properties and (II) Abandon such Properties, if Necessary* (the "**Settlement Procedures Motion**").

RLF1 23448521v.1

### iv.   Liquidity Constraints

78.     Despite significant investment and operational improvements, Exide Americas continues to experience significant operational strains on its liquidity due to high working capital and capital expenditure requirements, legacy environmental costs, and industry and other pressures, including a mild winter which reduced battery demand and, most recently, COVID-19.  In addition to the foregoing operational challenges, the Company's high leverage, and costs associated with its debt service and maturities, have exacerbated its already-negative free cash flow generation.

### C.   Debtors' Prepetition Restructuring Efforts

### i.   Operational Initiatives

79.     <u>Distribution</u>.  In March 2019, in an effort to address inefficiencies in its distribution model, Exide sold its Transportation Americas branch network business to Battery Systems, Inc. ("**BSI**" and such transaction, the "**Branch Network Sale**").  Prior to the Branch Network Sale, Exide operated approximately 42 branches throughout North America, which sold and distributed batteries and other products to customers, battery specialists, retail stores, and OEM dealers.  Exide now sells its aftermarket Transportation Americas products through the BSI-owned branch network and other aftermarket retailers.  By transitioning to a "truck load" delivery model and relying on channel partners for distribution of its products, Exide is able to focus on large, direct-ship customers for its in-house distribution network, which has significantly improved delivery and cost efficiency.

80.     <u>Facility Closure</u>. In March 2019, as part of its plan to consolidate product lines and move away from mixed product manufacturing plants, Exide announced the closure of its facility located in Columbus, Georgia.  The facility, which closed its primary smelting operations in prior to the Commencement Date and is in the process of closing its remain

<center>31</center>

smelting and manufacturing operations, was one reason for shrinking margins and was a drain on the Company's working capital.

81.     SG&A.  In an effort to reduce its operating expenses, the Company began an extensive review of its overhead expenses, which resulted in the Company undertaking certain cost-cutting measures, including (i) the Branch Network Sale, (ii) the closure of its Columbus, Georgia plant, and (iii) the reduction of its headcount by approximately 800 positions over the past two (2) fiscal years.

### ii.     June 2019 Financing Transactions

82.     In June 2019, as part of its effort to deal with continuing liquidity issues, the Company obtained a new money investment and exchange of existing debt from its lender group (the "**June 2019 Financing**").  The June 2019 Financing consisted of (i) the exchange of 2022 Legacy First Lien Notes (which at the time were secured by a first priority lien on Notes Collateral) for (A) the Exchange Priority Notes and (B) the First Lien Notes, (ii) the amendment of the 2022 Legacy First Lien Notes Indenture to, among other things, eliminate substantially all of the restrictive covenants and certain events of default, and release the collateral thereunder, (iii) the issuance by Exide International of $150.0 million aggregate principal amount of Superpriority Notes, and (iv) the issuance by Exide Technologies of an intercompany note in favor of non-Debtor Exide International, to effect the transfer of approximately $131.1 million of the proceeds of the Superpriority Notes issuance to Exide Technologies for funding short term working capital needs in the Exide Americas business segment.  The June 2019 Financing effectively reduced the Company's indebtedness by approximately $25 million.

### iii.     December 2019 Optimization Transactions

83.     In December 2019, Exide Technologies was a corporation and the ultimate parent of the Company group.  To align the Company's legal structure with its operational

structure and to facilitate a sale or financing of the Europe/ROW business, Exide Technologies completed an internal reorganization (the "**Optimization**"), pursuant to which it converted to a limited liability company.  In connection with the Optimization, the Ad Hoc Group equitized the full amount of approximately $291.0 million of outstanding 7.25% 1.5 Lien Senior Secured Convertible PIK Notes due 2027 (the "**Convertible PIK Notes**") issued pursuant to the Indenture dated as of June 25, 2019.

84.     As a result of the Optimization, the legal entities comprising Exide Americas and the Exide Europe/ROW business segments were shifted to separate sides of the corporate structure and the equitization of the Convertible PIK Notes substantially de-levered the Debtors' capital structure.  More specifically, (i) Holdings was created and became the sole member of Exide Technologies and the new ultimate parent of the business,  (ii) Exide Technologies became the parent of substantially all of the Exide Americas business, and (iii) non-Debtor Exide International, became the parent of substantially all of the Exide Europe/ROW business.

### iv.    Prepetition Marketing Process

85.     In December 2018, the Company initiated a process to evaluate strategic alternatives to enhance value and engaged CMD Global Advisors, LLC (formerly part of XMS Capital Partners) ("**CMD**") as its investment banker.  CMD contacted over 150 potential bidders, sixty (60) of whom signed confidentiality agreements in connection with the process. Ultimately, however, in the Spring of 2020, the Company engaged Weil, Ankura and Houlihan,[10] as legal, financial and investment banking advisors, respectively, to assist and advise in its contingency planning process.

---

[10]    Houlihan was previously engaged by the Company in March 2019 for investment banking services that ultimately culminated in the consummation of the June 2019 Financing.

33

86.     The Board of Directors delegated decision-making authority over the marketing and sale process (the "**Prepetition Marketing Process**") to the Special Committee, which had been formed for the purpose of evaluating potential strategic alternatives.  The Special Committee, with the assistance of Weil, Houlihan, and Ankura, has reviewed a number of potential transactions, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) the continuation of the Company as a standalone entity.

87.     The Company undertook an extensive marketing effort and solicited indications of interest from seventy-five (75) strategic and financial buyers with the financial and operational wherewithal to complete a transaction.  Twenty-nine (29) of the parties contacted executed confidentiality agreements, after which the Company provided them with a Confidential Information Memorandum, financial projections, and access to a data room.

88.     The deadline for interested parties to submit initial bids was May 6, 2020.  The Company received seven (7) indications of interest ("**IOIs**").  Five (5) of the bids were for certain business segments of the Company and two (2) were bids for substantially all of the Company's assets as a going concern, or a combination of assets in the Exide Americas and Exide Europe/ROW business segments (the "**All-Company Bids**").   Following extensive discussions with the Special Committee and its legal and financial advisors, the Company selected twenty-one (21) parties to submit updated IOIs and participate in further negotiations and diligence, including telephonic management presentations that were held during the weeks of May 4 and May 11, 2020.  Following the management presentations, the Company and its advisors continued to provide due diligence to the remaining bidders in advance of the second round of IOIs.  The Company expects to receive second round IOIs on or about May 18, 2020.

34

In the meantime, the Company and its advisors have continued to engage in discussions with the all bidders.

89.     Although the commencement of the chapter 11 cases ensued before the Prepetition Marketing Process was completed, the Prepetition Marketing Process provided both the Debtors and potential bidders with a valuable head start on the sale process.  The prepetition process enabled the Debtors to solicit IOIs and gain more insight into asset values and market conditions.  The Debtors were also able to populate a data room that has virtually all the information that any potential bidder might be interested in.  The Prepetition Marketing Process also provided potential bidders with time to commence their diligence and internal approval processes.  Very shortly after the commencement of these cases, the Debtors intend to file a motion for approval of a sale and bidding procedures related thereto (the "**Bidding Procedures**"), pursuant to which the Debtors will seek authorization to continue the Marketing Process and effectuate a sale of substantially all of their assets.

v.    **Negotiations with Stakeholders**

90.     Given the Company's impending liquidity needs, the Company decided to engage with the Ad Hoc Group to explore the Company's strategic alternatives and solicit input with respect to the Prepetition Marking Process and the availability of short term financing. Beginning during the week of April 13, 2020, the members of the Ad Hoc Group signed confidentiality agreements with the Company.  Since then, the Company continued to have discussions and negotiations with the Ad Hoc Group regarding sale options and financing scenarios.  The Ad Hoc Group retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") to assist with its analysis of the potential strategic alternatives.

91.     The Debtors' engagement with the Ad Hoc Group increased in advance of the April 30, 2020 maturity of the 2020 Legacy First Lien Notes and the Company's impending

liquidity crisis.  Accordingly, the Company's financial and legal advisors engaged with Paul Weiss to develop the RSA and discuss the terms of the DIP Financing.  To that end, during the week of May 4, 2020, the parties began discussing, among other things, (i) ongoing diligence regarding Exide, its operations, and prospects, (ii) the terms of the Ad Hoc Group's Europe/ROW Credit Bid, and (iii) the completion of the Marketing Process in chapter 11.

92.    In connection with the execution of, and pursuant to its obligations under the RSA, the Ad Hoc Group submitted a binding term sheet, a copy of which is annexed to the RSA, containing certain key terms of the Europe/ROW Credit Bid.  The Europe/ROW Credit Bid reflects a purchase price of $430 million, comprised of (i) $70 million, representing a discharge and release of the aggregate principal amount of Exchange Priority Notes and First Lien Notes held by the Ad Hoc Group on account of the Exchange Priority Notes, (ii) $25 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under the Interim Financing Facility, (iii) $161 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under the Superpriority Notes Indenture, and (iv) $174 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under existing Exide Europe/ROW financing arrangements.  In connection with the Europe/ROW Credit Bid, the Ad Hoc Group has also committed to (x) provide an initial $25 million in interim financing to Exide International be used for working capital and general corporate purposes within the Exide Europe/ROW business segment, and up to $50 million of new money exit financing in their discretion (collectively, the "**Interim Financing Facility**") and (y) refinance all amounts owed by non-Debtor Exide Technologies (Transportation) Limited under the ABL Credit Agreement, or otherwise bifurcate the facility provided under the ABL Credit Agreement.

36

93.     Among other customary conditions to closing typical of sale transactoions, as a condition to the closing (the "**Credit Bid Closing**") of any sale transaction pursuant to the Europe/ROW Credit Bid, (i) the sale order shall provide general releases for any claims against the Ad Hoc Group up to the Credit Bid Closing and related to the Europe/ROW Credit Bid, subject to the determination by the Subcommittee that such releases are reasonable and in the best interest of the Debtors and (ii) the Ad Hoc Group and the Debtors must structure the Europe/ROW Credit Bid in a tax efficient manner acceptable to the Ad Hoc Group.

94.     The Debtors, after consultation with their advisors, have determined that selection of the Europe/ROW Credit Bid as the stalking horse for a Europe/ROW Transaction is in the best interests of the Debtors' estates.  Specifically, the Europe/ROW Credit Bid will serve as the stalking horse bid (the "**Europe/ROW Stalking Horse Bid**") for the purchase of the Debtors' equity interests in Exide International and certain other non-Debtor foreign affiliates, all of which equity interests constitute property of Debtor Holdings' estate.[11]  The Europe/ROW Stalking Horse Bid will be subject to better or higher offers, as further described in the Bidding Procedures.  The Marketing Process for the Europe/ROW Sale Transaction will take place on the same Bid Deadline as the Debtors' other sale transactions contemplated by the Bidding Procedures, however, after the Bid Deadline, the timeline of the various sales transactions may diverge.  In the event the Europe/ROW Stalking Horse Bid is not selected as the Successful Bid (as defined in the Bidding Procedures) at the auction, the Europe/ROW Credit Bid shall serve as the Back-up Bid (as defined in the Bidding Procedures) for the relevant assets.

95.     While the Bidding Procedures contemplate that a stalking horse for the Debtors' other assets might be paid a termination fee, the Europe/ROW Credit Bid does not

---

[11]    For the avoidance of doubt, the sale of non-Debtor assets will not be subject to the approval of the Bankruptcy Court or entitled to the protection afforded by section 363 of the Bankruptcy Code.

RLF1 23448521v.1

include a termination fee.  The only protection afforded to the Ad Hoc Group in the event that it

is outbid for the Europe/ROW Assets is the Debtors' agreement to pay the Ad Hoc Group's

reasonable and documented professional fees (and in any event, solely to the extent such fees are

not otherwise paid by the Debtors pursuant to the DIP Financing or the RSA).

### vi.   Key Employee Incentive and Key Employee Retention Programs

96.     The Company has been extremely concerned about possible key employee

attrition and alignment of incentives given the enormous additional burden that has been placed

upon the Company's senior management team and other key employees leading up to the chapter

11 filing, and the likely continued demand on such key employees during these chapter 11 cases.

In response, the Company implemented (i) an employee incentive plan for four key employees,

including certain insiders, and (ii) a retention program for seventeen (17) key employees, in each

case, to ensure that such employees remain with the Company and align their interests with the

Company to execute the Marketing Process in these chapter 11 cases to maximize value.

97.     Specifically, the Special Committee adopted an employee incentive plan

for four key employees (the "**KEIP Participants**") that collectively provides for the payment of

up to approximately $2.0 million in the aggregate, subject to satisfaction of certain criteria.  One-

third of each individual's total eligible amount (aggregating approximately $679,000) was paid

to the KEIP Participants on May 15, 2020.   The remaining two-thirds (aggregating up to

approximately $1.36 million) is payable upon satisfaction of certain incentive-based performance

criteria related to the Marketing Process, subject to Bankruptcy Court approval.  Importantly,

these payments are subject to claw-back, should an employee voluntarily terminate their

employment prior to 45 days after consummation of a sale transaction.

98.     Furthermore, the Company implemented an employee retention program

for seventeen (17) key employees (the "**KERP Participants**") that collectively provides for the

payment of approximately $1.65 million in the aggregate.  For the KERP Participants, fifty percent (50%) of each individual's total eligible amount (aggregating approximately $834,000) was paid to the key employees on May 15, 2020.  The remaining fifty percent (50%) for the KERP Participants is payable, subject to Bankruptcy Court approval.  Importantly, these payments are subject to claw-back, should an employee voluntarily terminate their employment prior to thirty (30) days after consummation of a sale transaction.  The Debtors intend to seek approval of a key employee retention program that is broader than the initial seventeen (17) KERP Participants.

<h2 style="text-align:center">V.<br>First Day Pleadings[12]</h2>

99.     Contemporaneously herewith, the Debtors have filed with the Court certain First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite the Marketing Process.

100.    The First Day Pleadings seek authority to, among other things, obtain postpetition financing, honor wage and benefit obligations to the Company's employees, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with minimal disruption.  I believe that the relief requested in the First Day Pleadings is necessary to give the Debtors an opportunity to work toward a successful restructuring that will inure to the benefit of all of their stakeholders.

---

[12]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Pleadings.

101.    Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 case, except to the extent relief is necessary to avoid immediate and irreparable harm.  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

102.    I am familiar with the content and substance of each of the First Day Pleadings.  I believe approval of the relief sought in each of the First Day Pleadings is critical to the Debtors' ability to implement their chapter 11 strategy successfully, with minimal disruption to their business operations so as to preserve the value of the assets to be sold in connection with the Marketing Process.  Obtaining the relief sought in the First Day Pleadings will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.  The First Day Pleadings include the following:

**A.      Administrative Motions**

**i.    Joint Administration Motion**

103.    Pursuant to the *Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* (the "**Joint Administration Motion**"), the Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Exide Holdings, Inc.

40

104.     Joint administration of the chapter 11 cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the chapter 11 cases will affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### ii.     Prime Clerk Retention Application

105.     Pursuant to the *Application of Debtors Pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 156(c) for Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Commencement Date* (the "**Prime Clerk Retention Application**"), the Debtors request entry of an order appointing Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent  for the Debtors and their chapter 11 cases.  Prime Clerk's responsibilities will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  The terms of Prime Clerk's retention are set forth in that certain engagement agreement by and between Exide Technologies and Prime Clerk (the "**Prime Clerk Engagement Agreement**").

106.     I understand that Prime Clerk is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases.  I have been advised that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  Moreover, I understand that Prime Clerk's role as claims and noticing agent for Exide Technologies in the 2013 Chapter 11 Case makes Prime Clerk uniquely well suited to perform the responsibilities outlined in the

Prime Clerk Engagement Agreement.  I have been further advised that, in light of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.  Based on the foregoing, I believe that the relief requested in the Prime Clerk Retention Application should be approved.

### B.    Operational Motions Requesting Immediate Relief

### i.    DIP Motion

107.    Pursuant to the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Utilize Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing, and (V) Grant Related Relief* (the "**DIP Motion**"), the Debtors request (i) authority to enter into the DIP Credit Agreement consisting of a $25 million first-out loan provided by Blue Torch (the "**First-Out Loan**") and a $15 million last-out loan provided by members of the Ad Hoc Group (the "**Last-Out Loan**", and together with the First-Out Loan, the "**New Money DIP Loans**"), (ii) authority to pay interest and fees pursuant to the Fee Letter, (iii) authority to grant a super-priority administrative claim over the DIP Collateral and superpriority claims over all other administrative expenses, (iv) authority to use Cash Collateral, (v) approval of the form and manner of adequate protection to be provided to the Prepetition Secured Parties, (vi) modification of the automatic stay to the extent necessary to implement the terms of the DIP Documents and the DIP Orders, and (vi) waiver of any applicable stay to provide for immediate effectiveness of the interim DIP Order.

108.    I am familiar with and am involved in the negotiation of the terms of the DIP Credit Agreement and the adequate protection proposed to be provided by the Debtors in exchange for access to Cash Collateral and the DIP Financing. Based on my general experience

RLF1 23448521v.1

in the restructuring industry and my experience with the Debtors' businesses, interim approval of the DIP Facility and access to Cash Collateral is necessary and appropriate to allow the Debtors immediate access to liquidity.  Ankura worked closely with the Debtors' management team to determine the amount of interim funding required to meet the Debtors' short-term liquidity needs pending approval of the Motion on a final basis.  Interim DIP funding in the amount of $40 million and immediate access to Cash Collateral will provide the Debtors with sufficient liquidity to assure their employees, customers, vendors, and suppliers that the Company has the working capital necessary to continue its operations in the ordinary course of business.  It is critical that the Debtors be able to demonstrate adequate liquidity to their vendors at the onset of these chapter 11 cases, as each day of terms lost to vendors reflects approximately $7.0 to $8.0 million in liquidity.

109.    The Debtors anticipate that the commencement of these chapter 11 cases will increase the demands on their free cash due to one-time chapter 11 filing related expenses and possible increases in demands by key constituents. As described below, the Debtors are already experiencing liquidity constraints caused by reduced free cash flow and exacerbated by the costs associated with the NPPs and the economic impact of the COVID-19 global pandemic, among other factors, resulting in a negative impact to revenue of approximately $20 million during April 2020, resulting in a cash position of approximately $7.5 million as of the Commencement Date.  Furthermore, COVID-19 is expected to have an additional $10 million negative impact on revenue through the first half of fiscal year 2020.  Given these challenges, the Debtors' ability to continue to use the Cash Collateral is essential to sustain the Company's operations in bankruptcy and to preserve value for the Debtors' estates.  Access to the Cash Collateral, moreover, is a condition precedent to the DIP Financing.

43

110.    Minimizing disruption to the Debtors' business and operations is especially critical in light of the sale strategy described herein. The Debtors ability to continue the Marketing Process and ultimately effectuate a sale of substantially all of their assets is heavily dependent on their ability to continue to operate the Company as a going concern. If the Debtors are unable to obtain DIP Financing and immediate access to the Cash Collateral, the Debtors likely will be forced into an immediate fire-sale liquidation, which would significantly reduce the expected proceeds from the Marketing Process and reduce recoveries for all stakeholders.

111.    As reflected in the DIP Milestones, the first few weeks of these chapter 11 cases are absolutely critical. As such, it is imperative that the Debtors have immediate access to sufficient liquidity. Based on the foregoing, I submit that the Court should grant the Motion on an interim basis and allow the Debtors to access the Cash Collateral and $40 million under the DIP Facility.

### ii.    Cash Management Motion

112.    Pursuant to the *Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (V) Extend Time to Comply with, or Seek Waiver of, 11 U.S.C. § 345(b)* (the "**Cash Management Motion**"), the Debtors request (i) authority to (a) continue using their existing Cash Management System, Debtor Bank Accounts (as defined below), and Business Forms, (b) implement changes to their Cash Management System in the ordinary course of business, including, without limitation, opening new or closing existing Bank Accounts, and (c) honor certain prepetition obligations related to the Cash Management System;

44

(ii) a waiver of certain U.S. Trustee Guidelines; (iii) authority to continue to perform under and honor intercompany transactions in the ordinary course of business, transfer and utilize funds to collateralize prepetition letters of credit of the Debtors, and make certain payments on behalf of Non-Debtor Affiliates; (iv) administrative expense priority for postpetition Intercompany Claims; and (v) a waiver or an extension of time to comply with certain requirements of section 345(b) of the Bankruptcy Code.

113.    In the ordinary course of business, the Debtors utilize an integrated, centralized Cash Management System to collect, transfer, and disburse funds generated by their operations.  The Cash Management System enables the Debtors to collect and disburse cash generated by their business effectively and efficiently, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate account balances and other financial data.  I thus believe that it is critical for the Cash Management System to remain intact during these chapter 11 cases to ensure seamless continuation of transactions and uninterrupted collection of revenues.

114.    I also understand that, in light of the Debtors' corporate structure, the Cash Management System relies in part on the Debtors' ability to engage in various Intercompany Transactions in the ordinary course of business.  I believe the ability of the Debtors to continue engaging in such Intercompany Transactions is crucial to their continued operations.

115.    If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, I believe their operations would experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate their restructuring strategy and maximize the value of their estates.  Based on the foregoing, I

45

believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### iii.   Employee Wages Motion

116.   Pursuant to the *Motion of Debtors for Authorization to Continue to Honor and Pay Employee Obligations* (the "**Employee Wages Motion**"), the Debtors request authority to pay and honor certain prepetition claims and obligations, continue programs, and maintain funding, in the exercise of their discretion, relating to, among other things: (i) Unpaid Compensation; (ii) Payroll Taxes; (iii) Deductions; (iv) Payroll Processing Fees; (v) the Staffing Providers; (vi) the Supplemental Workforce; (vii) Reimbursable Expenses; (viii) the Employee Benefit Programs; (ix) the Non-Insider Severance Program; (x) Retirement Benefits; (xi) Other Employee Programs; and (xii) the Non-Insider Incentive Programs.

117.   The majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses. These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Similarly, if the Court does not authorize the Debtors to honor their various obligations under the Health Insurance Plans, many Employees will lose access to health coverage.

118.   The Supplemental Workforce is another important component of the Debtors' operations, and ensures that key operational initiatives that are critical to the Debtors' reorganizational prospects continue.  The Supplemental Workforce consists of individuals across a number of the Debtors' departments, including human resources, finance, performance marketing, product, and technology.  Failure to timely pay the obligations related to their

46

Supplemental Workforce would endanger the Debtors' prospects of a successful sale effort and would cause widespread negative effects throughout the Debtors' businesses.

119.    I believe that payment of the amounts requested in the Employee Wages Motion is necessary to effect an orderly transition into chapter 11 and to maximize the value of the Debtors' assets.

### iv.    Critical Vendors Motion

120.    Pursuant to the *Motion of Debtors for Order (I) Authorizing Payment of Certain Prepetition Obligations to Critical Vendors and (II) Granting Related Relief* (the "**Critical Vendors Motion**"), the Debtors request entry of an order authorizing the Debtors to (i) pay non-priority, prepetition claims held by vendors whose goods and services are essential to the Debtors' operations (collectively, the "**Critical Vendors**" and such claims, the "**Critical Vendor Claims**") in an amount not to exceed $10,000,000 on an interim basis (the "**Interim Critical Vendor Cap**") and $15,000,000 on a final basis (inclusive of the interim amount) (the "**Final Critical Vendor Cap**" and, together with the Interim Critical Vendor Cap, the "**Critical Vendor Cap**"), and (ii) related relief.

121.    To keep their business running efficiently and seamlessly, the Debtors rely on a network of Critical Vendors that provide the materials and services necessary to facilitate their operations efficiently and seamlessly.  Due to the interdependent nature of its production and distribution branches, the Debtors' business is highly sensitive and is easily disrupted by any single Critical Vendor refusing to provide the Debtors with essential materials and services for even a short period of time.  Any such disruption could jeopardize the Debtors' ability to continue their manufacturing processes, deliver their products to customers, preserve the value of their business, and ensure stability during these chapter 11 cases.

122.    The Debtors and their advisors have identified those vendors, suppliers and/or service-providers that may be "critical" to the Debtors' businesses (the "**Potential Critical Vendors**") and (ii) developed the Critical Vendor Cap based on an estimate of the aggregate amount of outstanding Critical Vendor Claims as of the Commencement Date.  The Debtors will use commercially reasonable efforts to require all Critical Vendors to continue to provide trade terms in line with historical practice as the *quid pro quo* for payment of Critical Vendor Claims.  Where appropriate, the Debtors will require as a condition to payment of a Critical Vendor Claim that the applicable Critical Vendor enter into a vendor agreement that, among other things, requires the Critical Vendor to provide the Debtors with Customary Trade Terms.  I believe that allowing the Debtors to continue paying certain Critical Vendors, subject to the conditions outlined in the Critical Vendors Motion, is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### v.    Shippers, Warehousemen and Other Lien Claimants Motion

123.    Pursuant to the Motion of Debtors for Order (I) Authorizing Payment of Prepetition Claims Of Shippers, Warehousemen, Import/Export Providers and Other Lien Claimants and (II) Confirming Administrative Expense Priority of Undisputed Commencement Date Orders and Authorizing Payment of Such Obligations in the Ordinary Course of Business ("**Shippers and Lien Claimants Motion**"), the Debtors request entry of an order authorizing, but not directing, the Debtors to pay (i) Shipping and Warehousing Charges, (ii) Import/Export Charges, (iii) Other Lien Claims, and (iv) certain amounts in connection with the Commencement Date Orders to suppliers which will enable the Debtors to (a) secure the delivery, distribution, and sale of the Debtors' goods to customers throughout the United States and abroad, (b) ensure the delivery of goods and raw materials to the Debtors' facilities or (c) satisfy the liens, if any, in respect of amounts owed to such parties.  The Debtors may condition,

48

in their sole discretion, any payments made to the Shippers, Warehousemen, and Customs on the agreement of such parties to continue supplying services to the Debtors on the same trade terms given to them prior to the Commencement Date or upon new trade terms

124.     I understand that approximately $12,000,000 in Liens relating to the prepetition period will become due and payable after the Commencement Date, with approximately $7,350,000 coming due within the thirty (30) days following the Commencement Date. I believe the relief requested in the Shippers and Lien Claimants Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### vi.   Taxes Motion

125.     Pursuant to the *Motion of Debtors for Authority to Pay Certain Prepetition Taxes and Fees* (the "**Taxes Motion**"), the Debtors request authority to satisfy, in the Debtors' sole discretion, all Taxes and Fees due and owing to various local, state, and federal Taxing Authorities that arose prior to the Commencement Date, including all Taxes and Fees subsequently determined by audit or otherwise to be owed for periods prior to the Commencement Date.

126.     In the ordinary course of business, the Debtors are obligated to pay certain taxes and governmental fees, which generally fall into the following categories: (i) Sales and Use Taxes, (ii) Franchise Taxes, (iii) Property Taxes, and (iv) Fees.  I understand that approximately $5,270,000 of the Taxes and Fees relating to the prepetition period will become due and payable after the Commencement Date, with approximately $1,370,000 coming due within the thirty (30) days following the Commencement Date.  Additionally, I understand that the Debtors incurred a real estate transfer tax liability owed to certain German taxing authorities, which the Debtors estimate to be approximately $3,000,000.

127.     I believe that failure to pay the aforementioned Taxes and Fees may cause the Taxing Authorities to take actions that would interfere with the Debtors' continued operations and potentially impose significant costs on the Debtors' estates.  Additionally, I understand that failure to satisfy the prepetition Taxes and Fees may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business. Moreover, to the extent any prepetition Taxes and Fees remain unpaid by the Debtors, I understand that the Debtors' officers and directors may be subject to lawsuits or criminal prosecution.  Based on the foregoing, and as more fully described in the Taxes Motion, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

### vii.     NOL Motion

128.     Pursuant to the *Motion of Debtors for Entry of Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests In and Claims Against the Debtors* (the "**NOL Motion**"), the Debtors seek entry of interim and final orders authorizing the debtors to establish procedures (the "**NOL Procedures**") to protect the potential value of the Debtors' net operating loss carryforwards ("**NOLs**") and other tax benefits (collectively, the "**Tax Attributes**").  The NOL Procedures apply to (i) direct and indirect ownership of Holdings Common Stock and any options or similar rights (within the meaning of applicable treasury regulations) to acquire such stock (the "**Options**") and (ii) the direct and indirect ownership of prepetition claims against one or more of the Debtors (the "**Claims**").  The NOL Procedures relating to Claims will only become effective upon issuance of a final order and are not included in the requested interim order.

129.     The Debtors' Tax Attributes, as of the Commencement Date, include estimated consolidated NOLs of approximately $141.7 million, approximately $148.5 million in

consolidated federal disallowed business interest expense carryforwards under section 163(j) of the Tax Code, and certain other favorable Tax Attributes, including net unrealized built-in losses.

130.    The Tax Attributes are valuable assets.  The Debtors' ability to utilize the Tax Attributes to reduce future tax liability is subject to certain potential statutory limitations arising from an Ownership Change.  The proposed NOL Procedures seek authority to restrict trading of Holdings Common Stock that could result in an Ownership Change occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Likewise, the proposed NOL Procedures would monitor acquisitions, dispositions, and trading of prepetition claims against one or more of the Debtors.  Such restrictions would protect the Debtors' ability to use the Tax Attributes during the pendency of these chapter 11 cases and possibly thereafter.

131.    The NOL Procedures are necessary to preserve the Debtors' ability to use the Tax Attributes, while providing certain latitude for trading.  The Debtors' ability to preserve the Tax Attributes may be seriously jeopardized unless procedures are established immediately. As a result, I believe that the relief requested in the NOL Motion should be granted.

### viii.    Utilities Motion

132.    Pursuant to the *Motion of Debtors for Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Authorizing the Debtors to Honor Obligations to Payment Processors* (the "**Utilities Motion**"), the Debtors request an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the proposed adequate assurance, (iii) prohibiting the Utility

51

Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) authorizing payment of certain Payment Processors.  The Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $978,487.

133.    I believe that preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and restructuring process.  I believe that any interruption in Utility Services – even for a brief period – would seriously disrupt the Debtors' ability to continue manufacturing and selling their products and services.  This interruption would adversely impact customer relationships and would result in a decline in the Debtors' revenues.  Such a result could seriously jeopardize the Debtors' restructuring efforts to the detriment of all parties in interest.  Therefore, I believe it is critical that Utility Services continue uninterrupted during these chapter 11 cases.

134.    I believe the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  Moreover, I believe the proposed Adequate Assurance Procedures are reasonable because they will ensure that the Utility Services continue while providing a streamlined process for Utility Companies to challenge the adequacy of the Proposed Adequate Assurance or seek an alternative form of adequate assurance.  As a result, I believe that the relief requested in the Utilities Motion should be granted.

### ix.    Insurance Motion

135.    Pursuant to the *Motion of Debtors for Order (I) Authorizing Debtors to (A) Continue to Maintain Their Insurance Policies and Programs and Surety Bond Program and (B) Honor All Obligations with Respect Thereto and (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program* (the "**Insurance Motion**"), the Debtors request (i)

52

authority, but not direction, to (a) maintain and renew, in their sole discretion, the Insurance Policies and Programs and the Surety Bond Program, (b) continue honoring their Insurance and Surety Obligations, including posting any collateral in connection therewith, on a postpetition basis in the ordinary course of business, and (c) pay accrued and outstanding prepetition amounts due in connection with the Insurance and Surety Obligations; and (ii) modification of the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

136.     In connection with the operation of the Debtors' business and the management of their properties, the Debtors maintain various insurance policies and programs through several different insurance carriers. The Debtors also maintain workers' compensation insurance as required by law in each of the states in which the Debtors operate and provide coverage to employees for claims arising from or related to their employment by the Debtors. Additionally, in the ordinary course of business, the Debtors are required to provide various types of surety bonds to secure obligations owed to various third parties, including municipalities, state and federal governmental units, and public agencies, relating to their operations. Based on the foregoing, and as more fully described in the Insurance Motion, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved

**x.   Customer Programs Motion**

137.     Pursuant to the *Motion of Debtors for Authority to (i) Honor Certain Prepetition Obligations to Customers, and (ii) Continue and Maintain Related Customer Programs in the Ordinary Course of Business*, the Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) to maintain and administer prepetition customer programs and promotions and (ii) to pay and otherwise honor their obligations to

customers relating thereto, whether arising prior to or after the Commencement Date, as necessary and appropriate in the Debtors' business judgment.

138.    To maximize customer loyalty, the Debtors have maintained and followed, in the ordinary course of business, various practices and programs (collectively, the "**Customer Programs**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' businesses.  To maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of their customers, the Debtors must maintain their Customer Programs and honor their obligations thereunder.  Failure to continue the Customer Programs will place the Debtors at a significant—and potentially insurmountable—comparative disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from these chapter 11 filings, and as such, I believe that the relief requested in the Utilities Motion should be granted.

## Conclusion

139.    This Declaration illustrates the factors that have precipitated the commencement of these chapter 11 cases and the Debtors' critical need for the protections and tools provided to debtors under chapter 11 of the Bankruptcy Code.

140.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 19th day of May, 2020

<div align="right">

/s/ Roy Messing
Roy Messing
Chief Restructuring Officer

Exide Holdings, Inc. and
its Affiliated Debtors

</div>

# **<u>TAB 1(a)</u>**

**Restructuring Support Agreement, dated May 18, 2020
[Bankr. D.I. 14], attached as Exhibit C to the First Day Decl.**

**<u>Exhibit C</u>**

**Restructuring Support Agreement**

**EXECUTION VERSION**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits or schedules hereto, this "***Agreement***"), dated as of May 18, 2020, is entered into by and between:

(i)      Exide Holdings, Inc. ("***Holdings***"); Exide Technologies, LLC; Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation (collectively, with Holdings, the "***Company***" and, each, a "***Company Entity***"); and

(ii)     each undersigned entity, in each such entity's respective capacity as a holder of, or as nominee, investment adviser, sub-adviser, or investment manager, as applicable, to certain funds, accounts, and other entities (including subsidiaries and affiliates of such funds, accounts, and entities) that is a holder of:

    a.   10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to that certain Indenture, dated as of June 17, 2019 (as amended, supplemented or otherwise modified from time to time, the "***Superpriority Senior Secured Notes Indenture***" and the notes issued thereunder, the "***Superpriority Senior Secured Notes***") (in its respective capacity as such, each, a "***Superpriority Senior Secured Noteholder***" and, collectively, the "***Superpriority Senior Secured Noteholders***");

    b.   11% Exchange Priority Notes due 2024 issued pursuant to that certain Indenture, dated as of June 25, 2019 (as amended, supplemented or otherwise modified from time to time, the "***Exchange Priority and First Lien Notes Indenture***" and the notes issued thereunder, the "***Exchange Priority Notes***") (in its respective capacity as such, each, an "***Exchange Priority Noteholder***" and, collectively, the "***Exchange Priority Noteholders***"); and

    c.   11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture (the "***2024 First Lien Notes***" and together with the Superpriority Senior Secured Notes and the Exchange Priority Notes, the "***Notes***") (in its respective capacity as such, each, a "***2024 First Lien Noteholder***" and, collectively, the "***2024 First Lien Noteholders***" and, together with the Superpriority Senior Secured Noteholders and the Exchange Priority Noteholders and their respective successors and permitted assigns and any subsequent Person that becomes party hereto in accordance with the terms hereof, each, a "***Consenting Creditor***" and, collectively, the "***Consenting Creditors***").

The Company, each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."

WHEREAS, the Parties have agreed to enter into certain transactions in furtherance of a financial restructuring of the Company, which is anticipated to be effectuated, in part, by the Company Entities commencing voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to (a) pursue one or more of the following: (i) the Americas Sale Transaction, (ii) the Europe/ROW Sale Transaction, (iii) the Company Sale Transaction (each as defined herein) and (iv) the liquidation or winding up of any assets or businesses of the Company in a manner other than as described in clauses (i) through (iii) above, in each case, consistent with this Agreement, and (b) confirm the Plan (as defined herein) on the terms set forth in this Agreement (any and all such transactions, collectively, the "***Restructuring***");

WHEREAS, the Parties have agreed to the Restructuring consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet, which are the product of arm's-length, good faith discussions between the Parties and their respective professionals;

WHEREAS, as of the date hereof, the Consenting Creditors in the aggregate hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, as of the date hereof, more than two-thirds of the aggregate outstanding principal amount of each series of the Notes;

WHEREAS, Mackay Shields and Axar Capital Management (each a "***Commitment Party***") have hereby committed to (i) provide the DIP Facility and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), in accordance with and subject to the terms and conditions set forth in the DIP Term Sheet, the Financing Orders, and the DIP Credit Agreement, and (ii) implement the Credit Bid in accordance with and subject to the terms and conditions set forth in the Credit Bid Term Sheet; and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      **Certain Definitions.**

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the chapter 11 term sheet attached hereto as **Exhibit B** (together with all schedules,

2

exhibits, and annexes attached thereto, and as may be modified in accordance with Section 11 hereof, the "***Term Sheet***"), or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

(a) "***2024 First Lien Notes***" has the meaning set forth in the Preamble of this Agreement.

(b) "***2024 First Lien Noteholder(s)***" has the meaning set forth in the Preamble of this Agreement.

(c) "***ABL Credit Agreement***" means that certain ABL Credit Agreement, dated as of April 30, 2015, (as amended, supplemented or otherwise modified from time to time), by and among Exide Technologies and the other borrowers from time to time party thereto, each of the guarantors named therein, the lenders party thereto, and Bank of America, N.A., as administrative and collateral agent.

(d) "***Alternative Transaction***" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of any Company Entity or any of their respective subsidiaries or assets, in each case, other than the Restructuring, as set forth herein, including in the Term Sheet;

(e) "***Americas Sale Transaction***" means a sale of any or all of (i) the Industrial Energy Americas business segment of the Company; (ii) the Transportation Americas business segment of the Company; (iii) any operating facilities, assets or equipment located therein of the Company; or (iv) any combination of the items listed in sections (i) through (iii) hereof, in each case, whether by way of sale of assets, merger, consolidation, sale of interests or other transaction structure, as contemplated by one or more Successful Bids.

(f) "***Asset Purchase Agreement(s)***" means any purchase agreement governing any sale of assets to effect the Americas Sale Transaction, the Europe/ROW Sale Transaction, the Company Sale Transaction, or a liquidation, including the Credit Bid APA.

(g) "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

(h) "***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the District of Delaware.

(i) "***Bidding Procedures***" means the bidding procedures approved by the Bidding Procedures Order for the Restructuring, including the Americas Sale Transaction, the Europe/ROW Sale Transaction, the Company Sale Transaction, and any liquidations.

3

(j)      "***Bidding Procedures Motion***" means a motion filed by the Debtors with the Bankruptcy Court for entry of a Bidding Procedures Order.

(k)      "***Bidding Procedures Order***" means any order (i) approving Bidding Procedures for the Restructuring, (ii) setting dates for the submission of bids and the auction or auctions (if any) related thereto, and (iii) granting related relief.

(l)      "***Cash Management Order***" means an order entered by the Bankruptcy Court authorizing the Debtors to implement cash management protocols.

(m)      "***Chapter 11 Cases***" has the meaning in the Preamble of this Agreement. The Chapter 11 Cases shall be filed in the Bankruptcy Court.

(n)      "***CMD***" means CMD Global Advisors, LLC, as investment banking advisor to Paul, Weiss.

(o)      "***Commencement Date***" means the date on which the Debtors commence the Chapter 11 Cases.

(p)      "***Company***" has the meaning set forth in the Preamble of this Agreement.

(q)      "***Company Entity***" has the meaning set forth in the Preamble of this Agreement.

(r)      "***Company Sale Transaction***" means a sale of all or substantially all of the Company's assets or Interests to a Successful Bidder, in each case, whether by way of sale of assets, merger, consolidation, sale of interests or other transaction structure.

(s)      "***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan.

(t)      "***Consenting Creditor Professional Fees and Expenses***" means all reasonable documented fees and expenses of, collectively, Paul, Weiss, Young Conaway, and CMD.

(u)      "***Consenting Creditor(s)***" has the meaning set forth in the Preamble of this Agreement.

(v)      "***Credit Bid***" means the credit bid submitted by the Requisite Exchange Priority Noteholders in accordance with the terms set forth in the Credit Bid Term Sheet for the consummation of the Europe/ROW Sale Transaction.

(w)      "***Credit Bid APA***" means the stock and asset purchase agreement governing the Credit Bid.

(x)      "***Credit Bid Sale Order***" means the Sale Order approving the Debtors' entry into, and consummation of, the Credit Bid APA.

4

(y)     "*Credit Bid Term Sheet*" means the term sheet setting forth the material terms of the Credit Bid attached hereto as **Exhibit C**.

(z)     "*Credit Bid Transaction*" has the meaning set forth in the Credit Bid Term Sheet.

(aa)    "*Debt Documents*" means (i) the Indentures and each of that certain (ii) Superpriority Lien Security Agreement, dated as of June 17, 2019, (iii) Amended and Restated First Lien Security Agreement, dated as of June 25, 2019, (iv) Security Agreement Supplement and Amendment No. 1 to Security Agreements, dated as of December 31, 2019, (v) Amended and Restated Intercreditor Agreement, dated as of June 17, 2019, and (vi) Intercreditor Agreement Joinder No. 1, dated as of June 25, 2019, and all other documents and instruments executed and delivered in connection with each of the foregoing, in each case, as amended, supplemented or otherwise modified from time to time.

(bb)    "*Debtors*" means Holdings, Exide Technologies, LLC, Exide Delaware LLC, Dixie Metals Company, and Refined Metals Corporation, in each case, solely in its capacity as a debtor in possession under the Bankruptcy Code.

(cc)    "*Definitive Documents*" means the documents that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to, the Restructuring, including:  (i) the Plan; (ii) the First Day Pleadings; (iii) the Bidding Procedures; (iv) the Bidding Procedures Motion; (v) the Bidding Procedures Order; (vi) each of the documents comprising the Plan Supplement; (vii) the Disclosure Statement; (viii) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (ix) the Confirmation Order; (x) any Financing Orders; (xi) the DIP Credit Agreement; (xii) the Credit Bid APA; (xiii) the Credit Bid Sale Order; (xiv) the KEIP Motion; (xv) the KEIP Order; (xvi) the KERP Motion; (xvii) the KERP Order; and (xviii) all other material documents necessary or customarily required to consummate the Restructuring.  Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement, including the Term Sheet, and shall otherwise be reasonably acceptable in all material respects to the Required Parties, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Support Period.

(dd)    "*DIP Budget*" means the budget providing for the use of cash collateral and proceeds of the DIP Facility.

(ee)    "*DIP Credit Agreement*" means the credit agreement evidencing the DIP Facility.

(ff)    "*DIP Documents*" means, collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

5

(gg)    "***DIP Facility***" means the debtor-in-possession facility to be provided to the Company Entities consistent with the terms set forth in the DIP Term Sheet and in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Credit Agreement and pursuant to the terms and conditions of the Financing Orders.

(hh)    "***DIP Obligations***" means the obligations of the Debtors to the DIP Credit Agreement.

(ii)    "***DIP Order***" means an order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement.

(jj)    "***DIP Term Sheet***" means the term sheet setting forth the material terms of the DIP Facility attached hereto as **Exhibit D**.

(kk)    "***Disclosure Statement***" means the disclosure statement with respect to the Plan.

(ll)    "***Effective Date***" means the date on which the Plan is consummated.

(mm)    "***Environmental Law***" means any federal, state, local or foreign law, rule, regulation, requirement, decision, order, or other legal requirement relating to the protection of the environment, pollution, natural resources, or human health or safety as it relates to exposure to hazardous substances or materials or hazardous or toxic substances or wastes, pollutants, or contaminants.

(nn)    "***Europe/ROW Assets***" means (i) the Transportation EMEA business segment of the Company; (ii) the Industrial EMEA business segment of the Company; (iii) the Industrial APAC business segment of the Company; (iv) the Recycling EMEA/ROW segment of the Company; (v) any operating facilities, assets, or equipment located therein of the Company; and (vi) any combination of the items listed in sections (i) through (v) hereof, in each case, whether by way of sale of assets, merger, consolidation, sale of interests or other transaction structure, as contemplated by one or more Successful Bids.

(oo)    "***Europe/ROW Sale Transaction***" means a sale of any or all of the Europe/ROW Assets, in each case, whether by way of sale of assets, merger, consolidation, sale of equity interests or other transaction structure, as contemplated by one or more Successful Bids.

(pp)    "***European Bridge Documents***" means the notes purchase agreement and indenture evidencing the European Bridge Notes.

(qq)    "***European Bridge Notes***" means the notes issued by Exide International Holdings LP, consistent with the terms set forth in the European Bridge Term Sheet and in accordance with the terms, and subject in all respects to the conditions, as set forth in the European Bridge Documents.

6

(rr)   "*European Bridge Term Sheet*" means the term sheet setting forth the material terms of the European Bridge Notes attached hereto as **Exhibit E**.

(ss)   "*Exchange Priority and First Lien Notes Indenture*" has the meaning set forth in the Preamble of this Agreement.

(tt)   "*Exchange Priority Noteholder(s)*" has the meaning set forth in the Preamble of this Agreement.

(uu)   "*Exchange Priority Notes*" has the meaning set forth in the Preamble of this Agreement.

(vv)   "*First Day Pleadings*" means the motions, petitions, pleadings, and draft orders that the Company Parties file at the commencement of the Chapter 11 Cases. First Day Pleadings include orders as entered by the Bankruptcy Court.

(ww)   "*Financing Commitment*" means the commitment of a Commitment Party to provide the DIP Facility, in accordance with the terms set forth in this Agreement, including the Term Sheet.

(xx)   "*Financing Orders*" means any interim or final orders authorizing the Debtors to continue to access cash collateral and incur any postpetition financing on an interim basis or final basis consistent with the Term Sheet.

(yy)   "*Financing Motion*" means the motion for use of cash collateral and to incur postpetition financing and enter into any credit agreement with respect thereto.

(zz)   "*Holdings*" has the meaning set forth in the Preamble of this Agreement.

(aaa)   "*Holdings Equity*" means the common stock, par value $0.01 per share, of Holdings or any other equity securities of Holdings into which such stock is reclassified or reconstituted.

(bbb)   "*Indentures*" means collectively, the Superpriority Senior Secured Notes Indenture and the Exchange Priority and First Lien Notes Indenture.

(ccc)   "*Intercompany Note*" means a note executed by the Debtors and a Europe/ROW entity pursuant to which a Debtor can demand payment of intercompany payables that have accrued through the date of the Intercompany Note.

(ddd)   "*Intercompany Transaction*" means an intercompany transaction entered into by the Debtors with one or more of the Debtors' non-debtor affiliates, other than any transaction executed before December 31, 2019.

(eee)   "*KEIP Motion*" means a motion filed by the Debtors with the Bankruptcy Court for entry of a KEIP Order.

7

(fff)    "**KEIP Order**" means an order entered by the Bankruptcy Court authorizing the implementation of a key employee incentive plan.

(ggg)   "**KERP Motion**" means a motion filed by the Debtors with the Bankruptcy Court for entry of a KERP Order.

(hhh)   "**KERP Order**" means an order entered by the Bankruptcy Court authorizing the implementation of a key employee retention plan.

(iii)    "**Netted Intercompany Amount**" means the final netted amount for the relevant period owed to a Debtor or non-Debtor entity, as applicable, on account of, but not limited to, shared service charges (including professional fees of the Company and Consenting Creditors), management fees, and invoices related to products purchased and sold among a Debtor and non-Debtor entity.

(jjj)    "**Non-Performing Properties Motion**" means a motion filed by the Debtors with the Bankruptcy Court for entry of the Non-Performing Properties Order.

(kkk)   "**Non-Performing Properties Order**" means an order entered by the Bankruptcy Court authorizing the Debtors to implement settlement procedures in connection with any of the Debtors' non-performing properties.

(lll)    **Notes**" has the meaning set forth in the Preamble of this Agreement.

(mmm) "**Party**" has the meaning set forth in the Preamble of this Agreement.

(nnn)    "**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Consenting Creditors.

(ooo)   "**Person**" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(ppp)   "**Plan**" means the chapter 11 plan for the Debtors, filed in the Chapter 11 Cases, as it may be amended, restated, or supplemented from time to time, consistent with this Agreement, in form and substance consistent with this Agreement, including the Term Sheet, pursuant to which the Restructuring shall be implemented.

(qqq)   "**Plan Supplement**" means the supplement to the Plan comprised of documents, forms of documents, schedules, and/or exhibits necessary or advisable to effect the Restructuring and otherwise to be filed by the Company with the Bankruptcy Court.

(rrr)    "**Postpetition Intercompany Transaction**" means any transaction with an affiliate entered into by the Debtors after the commencement of the Chapter 11 Cases.

8

(sss)   "***Proceeds Waterfall***" has the meaning set forth in the Term Sheet.

(ttt)   "***Releases***" means the releases set forth in the Credit Bid Term Sheet and the Term Sheet.

(uuu)   "***Restructuring***" has the meaning set forth in the Preamble of this Agreement.

(vvv)   "***Required Parties***" means each of (i) the Company and (ii) the Requisite Noteholders.

(www)   "***Requisite 2024 First Lien Noteholders***" means, as of any date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of the 2024 First Lien Notes held by all Consenting Creditors at such time; provided, that for purposes of this definition, the term "Consenting Creditors" excludes any Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

(xxx)   "***Requisite Exchange Priority Noteholders***" means, as of any date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of the Exchange Priority Notes held by all Consenting Creditors at such time; provided, that for purposes of this definition, the term "Consenting Creditors" excludes any Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

(yyy)   "***Requisite Noteholders***" means, collectively, the Requisite 2024 First Lien Noteholders, the Requisite Exchange Priority Noteholders, and the Requisite Superpriority Senior Secured Noteholders; provided, that for the avoidance of doubt, the term "Requisite Noteholders," or any of the terms of which it is comprised, as used herein shall not hold the same meaning as the same, or similar, terms contained in any of the Indentures.

(zzz)   "***Requisite Superpriority Senior Secured Noteholders***" means, as of any date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of the Superpriority Senior Secured Notes held by all Consenting Creditors at such time; provided, that for purposes of this definition, the term "Consenting Creditors" excludes any Noteholder that, on the relevant date of determination, is in breach of any of its material obligations hereunder.

(aaaa)   "***Sale Order(s)***" means any order entered by the Bankruptcy Court approving the Debtors' entry into, and consummation of, an Asset Purchase Agreement. Sale Order(s) include the Credit Bid Sale Order.

(bbbb)   "***SEC***" means the Securities & Exchange Commission.

(cccc)   "***Securities Act***" means the Securities Act of 1933, as amended.

9

(dddd) "*Specified Defaults*" means collectively, (i) the Default (as defined in the Superpriority Notes Indenture) under the Superpriority Notes Indenture as a result of the Company's failure to pay interest on the Superpriority Notes on April 30, 2020, and the Event of Default (as defined in the Superpriority Notes Indenture) arising from such Default continuing for a period of thirty (30) days; (ii) any defaults under the Indentures as a result of cross-defaults caused by the foregoing; and (iii) any Events of Default or defaults under the Indentures as a result of the solicitation in connection with the Plan, the commencement of the Chapter 11 Cases, the entry into this Agreement or the Definitive Documents, or the implementation of the Restructuring, in each case, including any actions or transactions contemplated or required by the foregoing documents, agreements, or items to the extent in compliance therewith.

(eeee) "*Successful Bid(s)*" has the meaning set forth in the Bidding Procedures.

(ffff) "*Superpriority Senior Secured Notes*" has the meaning set forth in the Preamble of this Agreement.

(gggg) "*Superpriority Senior Secured Noteholder(s)*" has the meaning set forth in the Preamble of this Agreement.

(hhhh) "*Superpriority Senior Secured Notes Indenture*" has the meaning set forth in the Preamble of this Agreement.

(iiii) "*Support Effective Date*" means the date on which the conditions set forth in <u>Section 2</u> of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

(jjjj) "*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (A) date on which this Agreement is terminated in accordance with <u>Section 7</u> hereof and (B) the Effective Date.

(kkkk) "*Term Sheet*" has the meaning set forth in the lead-in to <u>Section 1</u> of this Agreement.

(llll) "*Trustees*" means, collectively, (A) U.S. Bank National Association, solely in its capacity as trustee and collateral agent under the Superpriority Senior Secured Notes Indenture; and (B) U.S. Bank National Association, solely in its capacity as trustee and collateral agent under the Exchange Priority and First Lien Notes Indenture.

(mmmm) "*Weil*" means Weil, Gotshal & Manges LLP, as counsel to the Company.

(nnnn) "*Young Conaway*" means Young Conaway Stargatt & Taylor LLP, as Delaware counsel to the Consenting Creditors.

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this

10

Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## 2.      Support Effective Date.

This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Support Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      the counterpart signature pages to this Agreement shall have been executed and delivered by the (i) Company and (ii) the Consenting Creditors holding at least two-thirds in aggregate principal amount outstanding of each of the (x) Superpriority Senior Secured Notes, (y) Exchange Priority Notes and (z) 2024 First Lien Notes;

(b)      the Company has received a binding Credit Bid Term Sheet from the Buyer (as defined in the Credit Bid Term Sheet) at the direction of the Requisite Exchange Priority Noteholders; and

(c)      the Company shall have paid (or caused to be paid) in cash to the Consenting Creditors all Consenting Creditor Professional Fees and Expenses invoiced as of May 15, 2020.

## 3.      Term Sheet and Plan.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between the terms of this Agreement (excluding the Term Sheet) and the terms of the Term Sheet, the Term Sheet shall control.

## 4.      Definitive Documents.

Each Definitive Document not executed or in a form attached to this Agreement as of the Support Effective Date shall be in form and substance reasonably acceptable to the Required Parties.  The Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date remain subject to negotiation and completion. Upon completion, the Definitive Documents shall contain terms and conditions consistent in all material respects with the terms of this Agreement, unless otherwise consented to by the Required Parties.

11

**5.**    **Agreements of the Consenting Creditors.**

(a)    <u>Agreement to Support</u>.  During the Support Period, subject to the terms and conditions hereof, each of the Consenting Creditors agrees, severally and not jointly, that it shall:

(i)    use its commercially reasonable efforts to support the Restructuring, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring, in a manner consistent with this Agreement (including the Term Sheet), including, without limitation, to effect amendments to and other actions required under the Indentures;

(ii)    refrain from initiating (or directing or encouraging the Trustees or any other party to initiate) any actions, including legal proceedings, that are inconsistent with the Restructuring;

(iii)    if solicited to do so, timely vote (pursuant to the Plan) or cause to be voted all of its Claims and Interests, as applicable, to accept the Plan by delivering its duly executed and completed ballot or ballots accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iv)    negotiate in good faith with the Company the forms of the Definitive Documents (to the extent such Consenting Creditor is a party thereto) and, subject to the consent thresholds specified herein, execute the Definitive Documents to the extent the Consenting Creditors are a party thereto;

(v)    not directly or indirectly, through any Person (including any administrative agent, collateral agent or trustee), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, financing, consummation, or prosecution of any Alternative Transaction;

(vi)    not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); <u>provided</u>, however, that such vote shall, without any further action by the applicable Consenting Creditor, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Creditor at any time following the expiration of the Support Period applicable to such Consenting Creditor;

(vii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment; and

(viii)    support and take all reasonable actions necessary or reasonably requested by the Company to confirm such Consenting Creditor's support for the Restructuring.

12

(b)  Credit Bid.  The Requisite Exchange Priority Noteholders acknowledge and agree that (i) the Credit Bid APA shall constitute a binding and irrevocable offer to consummate the transactions specified therein, which offer shall remain open in accordance with and subject to the Bidding Procedures, and (ii) simultaneously with the consummation of the transactions specified in the Credit Bid APA, the Exchange Priority Notes Claims shall be credit bid for the obligations due and owing to the Company under that *Intercompany Note*, dated as of July 1, 2015.

(c)  Transfers.

(i)  Each Consenting Creditor agrees that, for the duration of the Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or Interests, including any beneficial ownership in any such Claims or Interests,[1] or any option thereon or any right or interest therein (including grant any proxies, deposit any Claims or Interests into a voting trust, or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor  or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or Interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit A** (a "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil and (2) Paul, Weiss, in which event (x) the transferee shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred Claims or Interests, and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims or Interests (such transfer, a "***Permitted Transfer***" and such party to such Permitted Transfer, a "***Permitted Transferee***").  Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(ii)  Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims or Interests subject to this Agreement held by a

---

[1]   As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims or Interests subject to this Agreement and the right to acquire such Claims or Interests.

[2]   As used herein, the term "***Qualified Marketmaker***" means an entity that (a) holds itself out to the public, the syndicated loan market, and/or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, and/or equity interests in, the Company, or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, and/or debt or equity securities).

13

Consenting Creditor with the purpose and intent of acting as a Qualified Marketmaker for such Claims or Interests, shall not be required to become a party to this Agreement as a Consenting Creditor, if (x) such Qualified Marketmaker transfers such Claims or Interests (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the transfer otherwise is a Permitted Transfer and (y) such Consenting Creditor shall be solely responsible for the Qualified Marketmaker's failure to comply with this <u>Section 5(b)</u> and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any Claims or Interests that it acquires from a holder of Claims or Interests that is not a Consenting Creditor to a transferee that is not a Consenting Creditor at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)     This <u>Section 5(b)</u> shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any Claims or Interests.  Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate confidentiality or other agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality or other agreement shall continue to apply and remain in full force and effect according to its terms.

(d)     <u>Additional Claims or Interests</u>.  This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Claims or Interests; <u>provided</u>, that to the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan, or (iii) holds or acquires any interests entitled to vote on the Plan, then, in each case, each such Consenting Creditor shall promptly notify Weil, and each such Consenting Creditor agrees that all such Claims and Interests shall be subject to this Agreement, and agrees that, for the duration of the Support Period and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or Interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with <u>Section 5(a)</u> hereof.  For the avoidance of any doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(e)     <u>Preservation of Rights</u>.  Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Creditor, nor the acceptance of the Plan by any Consenting Creditor, shall: (i) be construed to limit consent and approval rights provided in this Agreement (including the Term Sheet) and the Definitive Documents; (ii) be construed to prohibit any Consenting Creditor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (iii) be construed to prohibit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for

14

the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring; (iv) impair or waive the rights of any Consenting Creditor to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan; or (v) subject to Section 5(f), limit the ability of any Consenting Creditor to assert any rights, claims, and/or defenses under the Indentures and any related documents or agreements.

(f)     Negative Covenants.  The Consenting Creditors agree that, for the duration of the Support Period, each Consenting Creditor shall not take any action inconsistent with, or omit to take any action required by the Indentures, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

(g)     Forbearance.  Each Consenting Creditor agrees that, solely for the duration of the Support Period applicable to such Consenting Creditor, and without prejudice to any right such Consenting Creditor has or may have under the Debt Documents (all of which are expressly reserved subject to the terms of this Agreement and the Definitive Documents), each Consenting Creditor agrees to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Debt Documents and any agreement contemplated thereby, and to defer any claims that have become automatically due and payable thereunder as a result of the commencement of the Chapter 11 Cases, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to the Specified Defaults.  Each Consenting Creditor further agrees that if any applicable trustee or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor shall use commercially reasonable efforts to direct such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action; provided, that in no instance shall any Consenting Creditor be required to provide an indemnity to any administrative agent or collateral agent, as applicable, in connection with such efforts.  Notwithstanding anything to the contrary in this Agreement, the Consenting Creditors are not required to forbear from (x) taking any enforcement action with respect to an Event of Default under the European Bridge Documents (as defined therein) that has not been cured or waived by the applicable percentage of the lenders thereto, in each case, in accordance with the terms of the European Bridge Documents, or (y) the enforcement of any remedies with respect to any European collateral granted by Exide International Holdings LP or any of its European subsidiaries that are permitted to be taken upon a default under any applicable financing arrangement or agreement, including the European Bridge Documents, other than the Specified Defaults or a default or "Event of Default" resulting from the Specified Defaults.  For the avoidance of doubt, the Company's affiliates that serve as borrowers or guarantors pursuant to the Superpriority Senior Secured Notes Indenture serve as express beneficiaries of this Section 5(g).

(h)     Financing Commitments.  Subject to the conditions set forth in the DIP Term Sheet, each Commitment Party, severally and not jointly, agrees to provide (or cause any of its designees to provide) its allocable share of the Financing Commitments as set

15

forth in the DIP Term Sheet on terms and conditions substantially consistent with the DIP Term Sheet.  For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the Commitment Parties made pursuant to this Section 5(h) to enter into the DIP Credit Agreement and provide their allocable share of the Financing Commitment as set forth in the DIP Term Sheet shall terminate; provided, however, that upon the closing of the DIP Credit Agreement, the DIP Credit Agreement shall govern the Financing Commitments and any termination thereof.

6. **Agreements of the Company.**

(a) Covenants.  The Company agrees that, for the duration of the Support Period, the Company shall:

(i) use its commercially reasonable efforts to support the Restructuring, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring, in a manner consistent with this Agreement (including the Term Sheet);

(ii) use its reasonable best efforts to consummate the Americas Sale Transaction, the Europe/ROW Sale Transaction, and/or the Company Sale Transaction, and to apply a portion of the proceeds of any such transaction to repayment of the Notes (net of any repayment of DIP Obligations in accordance with the DIP Order) in an amount to be agreed upon by the Required Parties upon consummation of each such transaction, and to seek entry of Sale Order(s) authorizing such relief upon consummation of any such transaction;

(iii) pursue in good faith, and in consultation with the Consenting Creditors, sales for individual interests and assets, in addition to a sale of the entire business segment, and pursue the transactions that provide the greatest recovery for creditors and are otherwise in the best interests of the Company, on terms and conditions reasonably acceptable to the Consenting Creditors;

(iv) cause its subsidiaries to comply with the terms of this Agreement (to the extent possible without violating any applicable law or regulation, any fiduciary duties of directors and/or officers and/or the terms of any governance documents);

(v) (i) not directly or indirectly access any cash of the Europe/ROW entities (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise) for the use or disposition of, or by, the Company outside of the ordinary course of business; (ii) as soon as reasonably practicable, take all reasonable actions necessary to ensure that no cash or funds are paid, credited or otherwise transferred from any Europe/ROW entity to the Company outside of the ordinary course of business (for the avoidance of doubt, the Company may charge the Europe/ROW entities for all shared services and expenses that are incurred or paid by the Company on behalf of any Europe/ROW entity); and (iii) as soon as reasonably practicable, develop a comprehensive plan (a "Separation Plan") in consultation with the Requisite Noteholders to effectuate an

16

operational and financial separation from its non-debtor EMEA affiliates and to implement such Separation Plan in connection with the Credit Bid Transaction;

(vi)     subject to the conclusion of the investigation conducted by the sub-committee of the special committee of the board of directors of Holdings, not commence an avoidance action or other legal proceeding that challenges (a) the Consenting Creditors' ability to implement the Credit Bid or (b) the validity, enforceability, or priority of the Notes or obligations under each of the Indentures;

(vii)     if the Company receives an unsolicited proposal or expression of interest in undertaking an Alternative Transaction, the Company will within 24 hours of the receipt of such proposal or expression of interest, notify Paul, Weiss of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved;

(viii)     designate the Consenting Creditors as consultation parties in the Bidding Procedures and provide the proposals received by the Company to the Consenting Creditors in accordance with the terms of the Bidding Procedures;

(ix)     provide draft copies of all material motions or applications and other documents (including the First Day Pleadings and all "second day" motions and orders, any Bidding Procedures Motion, any Bidding Procedures Order, any Financing Motion, any Financing Order, the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the Confirmation Order, as applicable) the Debtors intend to file with the Bankruptcy Court to Paul, Weiss, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided, that if delivery of such motions, orders or materials at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(x)     file the First Day Pleadings reasonably determined by the Company, in form and substance acceptable to the Requisite Noteholders, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Requisite Noteholders, from the Bankruptcy Court approving the relief requested in such First Day Pleadings;

(xi)     use its commercially reasonable efforts to obtain any required regulatory and/or third-party approvals to consummate the Restructuring;

(xii)     if the Company receives any notice of violation of or non-compliance with any Environmental Law, provide the Consenting Creditors with notice of such violation or non-compliance as soon as practicably possible, but in no event more than 24 hours after receipt thereof;

17

(xiii)   conduct business during the Chapter 11 Cases to the best of the Company's ability and exercise good faith efforts to not increase the Company's liabilities under applicable Environmental Laws, unless such liabilities are being resolved pursuant to the Non-Performing Properties Order;

(xiv)   provide the Consenting Creditors with copies of all Asset Purchase Agreements, Sale Orders, and other documents effecting any Restructuring, and consult with the Consenting Creditors regarding negotiations related to any such transaction, including the Settlement Procedures as defined in the Non-Performing Properties Motion;

(xv)   promptly pay all Consenting Creditor Professional Fees and Expenses, as required, in each case, in accordance with the terms of their respective engagement letters, and, in each case, without further order of, or application to, the Bankruptcy Court by such professional;

(xvi)   not take, nor encourage any other person or entity to take, any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring;

(xvii)   provide prompt written notice to the Requisite Noteholders between the date hereof and the Effective Date of receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, which seeks to prohibit or enjoin the Restructuring;

(xviii)   (i) retain Roy Messing as chief restructuring officer (ii) provide the Consenting Creditors with any agreements relating to such retention, including the engagement letter detailing the scope of the chief restructuring officer's authority in form and substance acceptable to the Consenting Creditors, (iii) not terminate the chief restructuring officer or modify or reduce the scope of the chief restructuring officer's authority, provided, however, that the chief restructuring officer can be terminated from office for cause and, if so removed, a replacement chief restructuring officer with the same rights and powers that is reasonably acceptable to the Consenting Creditors shall be appointed, and (iv) grant the chief restructuring officer ordinary and customary rights, powers, and authority for chief restructuring officers of companies with over $500 million of funded debt, including the ability to oversee the Restructuring and direct the Company's employees in furtherance of the Restructuring, the obligation to regularly consult with the Consenting Creditors, the ability to attend and observe meetings of the board of directors, and full and unfettered access to the Company's books and records;

(xix)   conduct weekly teleconferences between representatives of the Consenting Creditors, Paul, Weiss, Weil, Ankura, and the EMEA President regarding the Credit Bid Transaction or any other proposed Europe/ROW Sale Transaction;

18

(xx)    provide to the Consenting Creditors (i) access during normal business hours to the Company's books, records, and facilities; (ii) access to the respective management and advisors of the Company during normal business hours for the purposes of evaluating the Company's finances and operations and participating in the Company's planning process with respect to the Restructuring; and (iii) a summary of all Intercompany Transactions eight (8) business days following the end of any given month during the pendency of the Chapter 11 Cases.  The Company shall consult with the Requisite Noteholders regarding any Intercompany Transaction outside the ordinary course of business no less than two (2) days prior to engaging in such transaction;

(xxi)   no later than eight (8) business days following the last day of any given month during the pendency of the Chapter 11 Cases, the Company shall provide the calculations underlying the Netted Intercompany Amount to the EMEA and APAC President prior to the satisfaction of such Netted Intercompany Amount in cash;

(xxii)  not satisfy the Netted Intercompany Amount in cash without the consent of the EMEA and APAC President.  In the event the Netted Intercompany Amount results in any non-Debtor being a payor, such non-Debtor entity shall satisfy the Netted Intercompany Amount in cash no later than five (5) business days following delivery of the calculations underlying the Netted Intercompany Amount in accordance with <u>Section 6(a)(xxi)</u> hereof.  In the event the Netted Intercompany Amount results in any Debtor being a payor, such Debtor shall satisfy the Netted Intercompany Amount in cash no later than thirty (30) calendar days following the end of any given month in accordance with <u>Section 6(a)(xxi)</u> hereof; provided, that to the extent any amounts are owed by a Debtor to a non-Debtor North American affiliate, the Netted Intercompany Amount shall be recorded on the Company's intercompany accounts and shall not be settled in cash;

(xxiii) not engage in a transaction providing for amounts owed by the Debtors to any Europe/ROW entity on account of any Postpetition Intercompany Transaction to be set off against, netted against, or charged against an Intercompany Note or otherwise fail to comply with the Postpetition Intercompany Protocols, as that term is defined in the Cash Management Order.  The Company agrees and shall take such reasonable actions (if any) as are necessary to ensure that no further borrowings, charges, payments or other transactions shall be effected thereunder;

(xxiv)  cooperate with the Requisite Noteholders to develop a DIP Budget that is reasonably acceptable in form and substance to the Requisite Noteholders; and

(xxv)   commence the Chapter 11 Cases in the Bankruptcy Court.

(b)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, (i) the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); <u>provided</u>, that nothing herein shall prejudice any Party's rights to argue that the

19

giving of notice of default or termination was not proper under the terms of this Agreement; and (ii) an enforcement action that is otherwise consistent with the terms of this Agreement and the applicable terms of the applicable Debt Documents with respect to any European collateral owned by Exide International Holdings LP's European subsidiaries shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay in connection therewith).

**7.      Termination of Agreement.**

(a)      This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with <u>Section 21</u> hereof, from (i) the Requisite Noteholders at any time after and during the continuance of any Creditor Termination Event or (ii) the Company at any time after and during the continuance of any Company Termination Event, as applicable.

(b)      A "***Creditor Termination Event***" shall mean any of the following:

(i)      the breach by the Company of (A) any covenant contained in this Agreement or (B) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of four (4) business days following the Company's receipt of written notice pursuant to <u>Sections 7(a)</u> and <u>21</u> hereof (as applicable);

(ii)      any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to <u>Sections 7(a)</u> and <u>21</u> hereof (as applicable);

(iii)      a Definitive Document alters the treatment of the Consenting Creditors specified in the Term Sheet without complying with <u>Section 11</u> hereof and the Requisite Noteholders have not otherwise consented to such Definitive Document;

(iv)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been been stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(v)      the Support Effective Date shall not have occurred on or before the Commencement Date;

(vi)      the Commencement Date shall not have occurred on or before May 19, 2020;

<div align="center">20</div>

(vii)    the Debtors shall not have complied with Milestones set forth in the Term Sheet;

(viii)    the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein (or otherwise as is reasonably acceptable to the Company and the Requisite Noteholders), or (E) granting relief that is inconsistent with this Agreement in any materially adverse respect to the Consenting Creditors, and which order is not reversed, vacated or addressed by a consensual amendment to this Agreement within fifteen (15) business days;

(ix)    if either (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (x) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation, or subordination of, the obligations or Claims under the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Consenting Creditors with respect to any of the foregoing causes of action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid;

(x)    the Company (unless the Company is acting with the consent of the Requisite Noteholders) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction;

(xi)    the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xii)    if the Company (A) withdraws the Plan or (B) publicly announces its intention not to support the Restructuring;

(xiii)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

(xiv)    the occurrence of an Event of Default (other than the Specified Defaults) by a Europe/ROW entity under the Debt Documents that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders thereto in accordance with the terms thereunder;

21

(xv)    the occurrence of any Event of Default under the DIP Facility (as defined therein) that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders thereto in accordance with the terms of the DIP Credit Agreement;

(xvi)   the occurrence of any Event of Default under the European Bridge Documents (as defined therein) that has not been cured (if susceptible to cure) or waived by the applicable percentage of the lenders thereto in accordance with the terms of the European Bridge Documents;

(xvii)  the Company fails to comply with the Postpetition Intercompany Protocols, as that term is defined in the Cash Management Order, or otherwise breaches the provisions of this Agreement with respect to Postpetition Intercompany Transactions, without the reasonable consent of the Requisite Exchange Priority Noteholders;

(xviii)  the Credit Bid Sale Order does not approve the releases provided for in the Credit Bid Term Sheet;

(xix)   the Company files any motion or pleading with the Bankruptcy Court seeking enforcement of the automatic stay arising under section 362 of the Bankruptcy Code that is inconsistent in any material respect with this Agreement;

(xx)    the Consenting Creditors do not receive the Releases or the Bankruptcy Court does not approve the Releases in connection with consideration of approval of the Credit Bid Transaction or the Plan;

(xxi)   the Company receives cash proceeds in connection with any Restructuring, including the Americas Sale Transaction, the Europe/ROW Sale Transaction, and the Company Sale Transaction and (i) fails to use such proceeds to redeem or otherwise satisfy in full all obligations relating to the Notes in accordance with the terms of any of the Indentures, (ii) fails to distribute such proceeds in accordance with the Proceeds Waterfall, or (iii) seeks entry of a Sale Order(s) that does not provide for the repayment or satisfaction of such obligations or that is otherwise not reasonably satisfactory to the Requisite Noteholders, regardless of whether the Plan has been confirmed by the Bankruptcy Court;

(xxii)  the Company obtains entry of a Sale Order(s) (other than the Credit Bid Sale Order) that does not generate cash proceeds sufficient to satisfy the outstanding obligations owed under the ABL Credit Agreement or the Sale Order(s) (other than the Credit Bid Sale Order) does not authorize the repayment of such obligations;

(xxiii)  the Confirmation Order is reversed or vacated;

(xxiv)  any court of competent jurisdiction enters an order declaring this Agreement unenforceable, or null and void;

<div align="center">22</div>

(xxv)   the Company fails to comply with the Plan Milestones (as such term is defined in the Term Sheet);

(xxvi) the Company fails to pay any fees or expenses the Company is required to pay in connection with or under the DIP Credit Agreement, the European Bridge Financing Credit Agreement, or this Agreement;

(xxvii) the Company fails to pay any fees or expenses that it is required to pay to any consultants or local counsel in Canada as may be necessary and appropriate;

(xxviii) the Company fails to engage Roy Messing as provided pursuant to this Agreement on the date hereof;

(xxix)   the Company files any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement (i) in a manner that is adverse to the Consenting Creditors and (ii) remains uncured for five (5) Business Days after the Requisite Noteholders transmit a written notice in accordance with Section 15 of this Agreement describing any such breach;

(xxx) the Company files a Bidding Procedures Motion requesting authorization to enter into a stalking horse purchase agreement with a purchaser for assets of the Debtors (other than the EU/ROW Assets) that is not reasonably acceptable to the Requisite Noteholders, unless such stalking horse bid would satisfy the Notes in full;

(xxxi) the Bankruptcy Court enters a Bidding Procedures Order authorizing the Company to enter into a stalking horse purchase agreement with a purchaser for assets of the Debtors (other than the EU/ROW Assets) that is not reasonably acceptable to the Requisite Noteholders;

(xxxii)  the Bankruptcy Court enters a KEIP Order in form and substance not reasonably acceptable to the Requisite Noteholders;

(xxxiii)the Bankruptcy Court enters a KERP Order in form and substance not reasonably acceptable to the Requisite Noteholders;

(xxxiv) the Debtors or their estates fail to comply with an applicable Environmental Law during the Chapter 11 Cases that poses an immediate and identifiable threat of harm to public health or safety and results in an allowed claim representing a material administrative expense obligation that renders the Restructuring unfeasible, as determined by the Requisite Noteholders in their reasonable discretion; provided, however, that the mere filing of an objection, pleading, or claim by a party in interest in the Chapter 11 Cases on its own shall not give rise to a termination right hereunder;

(xxxv)  any action or inaction by a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) or the Company or a court of competent jurisdiction, under or relating to any Environmental Law, materially and adversely affects the rights of the Consenting Creditors in the Chapter 11 Cases or in connection with the Restructuring,

23

or renders the Restructuring unfeasible, as determined by the Requisite Noteholders in their reasonable discretion; <u>provided</u>, <u>however</u>, that the mere filing of an objection, pleading, or claim by a party in interest in the Chapter 11 Cases, on its own, shall not give rise to a termination right hereunder; or

(xxxvi) the Company commences, consents to, facilitates, allows, or fails to oppose the commencement of any action that challenges (a) the Consenting Creditors' ability to implement the Credit Bid or (b) the validity, enforceability, or priority of the Notes, the liens securing the Notes, or obligations under each of the Indentures.

(c)    A "***Company Termination Event***" shall mean any of the following:

(i)    the breach by one or more of the Consenting Creditors of (A) any covenant contained in this Agreement and (B) any other obligations of the Consenting Creditors set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable), but only if the non-breaching Consenting Creditors own less than two-thirds of the Claims;

(ii)    any representation or warranty in this Agreement made by the Consenting Creditors shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following receipt of notice pursuant to Sections 7(a) and 21 hereof (as applicable), but only if the non-breaching Consenting Creditors own less than two-thirds of the Claims;

(iii)    the board of directors, members, or managers (as applicable) of any Company Entity, including the special committee of the board of directors of Holdings, reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law, including as a result of the investigation being conducted by the sub-committee of the special committee of the board of directors of Holdings; provided, that the Company shall provide notice of such determination to Paul, Weiss via email within one (1) business day after the date thereof;

(iv)    the Company shall not have obtained votes accepting the Plan from holders of the Notes sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(v)    the Support Effective Date shall not have occurred on or before the Commencement Date; or

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such

24

ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance.

(d)     Mutual Termination.   This Agreement may be terminated by mutual agreement of the Company and the Requisite Noteholders upon the receipt of written notice delivered in accordance with Section 21 hereof.

(e)     Automatic Termination.   This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.

(f)     Effect of Termination.   Upon the termination of this Agreement in accordance with this Section 7 (other than pursuant to Section 7(e)) if the Restructuring has not been consummated, and except as provided in Section 15 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Debt Documents, and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each vote or any consents given by any Consenting Creditor prior to such termination shall be deemed, for all purposes, to be null and void ab initio and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Creditor.  If this Agreement has been terminated as to any Consenting Creditor in accordance with this Section 7 (other than pursuant to Section 7(e)) at a time when permission of the Bankruptcy Court shall be required for a Consenting Creditor to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall support and not oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in Section 14 hereof.  The Consenting Creditor shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this Section 7 and Section 21 hereof.

(g)     If the Restructuring has not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

<div align="center">25</div>

**8.     Definitive Documents; Good Faith Cooperation; Further Assurances.**

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.   Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided, that no Consenting Creditor shall be required to incur any material cost, expense, or liability in connection therewith.

**9.     Representations and Warranties.**

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Creditor that becomes a party hereto after the date hereof, as of the date such Consenting Creditor becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(iii)     the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws

26

relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)      Each Consenting Creditor severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor:

(i)      is the beneficial owner of the aggregate principal amount of the Notes, and the aggregate number of shares of Holdings Equity, set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other Notes or Holdings Equity, as applicable, and/or (ii) has, with respect to the beneficial owners of such Notes and Holdings Equity (A) sole investment or voting discretion with respect to such Notes and Holdings Equity, (B) full power and authority to vote on and consent to matters concerning such Notes and Holdings Equity or to exchange, assign and transfer such Notes and Holdings Equity and (C) full power and authority to bind or act on the behalf of, such beneficial owners; and

(ii)      (A) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act; (B) is an institutional accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act); (C) understands that to, the extent any securities are purchased by, or issued to it (if any) pursuant to the Restructuring, such securities have not been and will not be registered under the Securities Act and that such securities will, be offered and sold, as applicable, pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available; (D) is a sophisticated investor with respect to the transactions described herein and has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment; and (E) if such Consenting Creditor is a Requisite Exchange Priority Noteholder (1) the Transferred Equity Interests (as defined in the Credit Bid Term Sheet) are being acquired by such Requisite Exchange Priority Noteholder, through its buyer vehicle, for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Transferred Equity Interests or any interest in them; and (2) such Requisite Exchange Priority Noteholder acknowledges that the Transferred Equity Interests have not been registered under the Securities Act, or any state securities Laws, and understands and agrees that it may not sell or dispose of any of the Transferred Equity Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state, foreign or federal securities Laws.

27

(c)     Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in this <u>Section 9</u>, in each case, to the other Parties.

**10.     Disclosure; Publicity.**

The Company shall submit drafts to Paul, Weiss of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or any other matter relating to the Notes, at least one (1) business day prior to making any such disclosure, and any such press releases and public documents shall be reasonably acceptable in all material respects to the Requisite Noteholders.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company, the principal amount of the Notes or the amount of Holdings Equity, held by the Consenting Creditor, without such Consenting Creditor's prior written consent; <u>provided</u>, <u>however</u>, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Notes or the aggregate amount of Holdings Equity, held by all the Consenting Creditor collectively.

**11.     Amendments and Waivers.**

(a)     This Agreement (including any exhibits or schedules hereto), and the substance and consent rights in the Definitive Documents, may not be waived, modified, amended or supplemented except in accordance with this <u>Section 11</u>.

(b)     This Agreement may be waived, modified, amended or supplemented with the written consent of the Company and the Requisite Noteholders (such consent not to be unreasonably withheld, conditioned, or delayed); <u>provided</u>, <u>however</u>, that:

(i)     any waiver, modification, amendment or supplement to this <u>Section 11</u> shall require the written consent of all of the Parties;

(ii)     any modification, amendment or change to the definition of Requisite Noteholders shall require the written consent of each Consenting Creditor;

(iii)     any change, modification or amendment to this Agreement (including the Term Sheet), any of the Definitive Documents, or the Plan that treats or affects any Consenting Creditor in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors of the same class are treated (after taking into account each of the Consenting Creditor's respective holdings and interests in the Company and the recoveries

28

contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor; and

(iv)     any change, modification or amendment to this Agreement (including the Term Sheet) or the Plan does not materially, adversely affect the rights of a Consenting Creditor, the consent of such Consenting Creditor shall not be required.

(c)     In the event that an adversely affected Consenting Creditor ("Non-Consenting Creditor") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least two-thirds of the aggregate outstanding principal amount of each of the Notes, respectively, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors who have so consented, in a way consistent with (or otherwise reasonably acceptable to the Requisite Noteholders) this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

### 12.     Effectiveness.

This Agreement shall become effective and binding on the Parties on the Support Effective Date, and not before such date; provided, that signature pages executed by Consenting Creditors shall be delivered to (a) the other Consenting Creditors in a redacted form that removes such Consenting Creditor's holdings of the Notes, Holdings Equity or any other Claims against or Interests in the Company and any schedules to such Consenting Creditors' holdings (if applicable) and (b) the Company, Weil and Paul, Weiss in an unredacted form (and to be kept confidential by the Company, Weil and Paul, Weiss).

### 13.     Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in (i) any federal or state court in the Borough of Manhattan in the State of New York, or (ii) the Bankruptcy Court, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is

29

insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the courts as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 13(b)</u> shall be brought in the Bankruptcy Court.

(c)  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 14. **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 15. **Survival.**

Notwithstanding the termination of this Agreement pursuant to <u>Section 7</u> hereof, the agreements and obligations of the Parties in this <u>Section 15</u>, and <u>Sections 6(b)</u>, <u>7(f)</u>, <u>10</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, and <u>22</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

WEIL:\97486621\1\44362.0003

16.     **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of Claims or Interests other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.   The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

19.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

20.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile or by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

31

**21.    Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company or Debtors, to:

Exide Holdings, Inc.
13000 Deerfield Parkway
Building 200
Milton, GA 30004
Attn:  Roy Messing, Chief Restructuring Officer
Email:  Roy.Messing@ankura.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Ray C. Schrock, P.C.
Email:  Ray.Schrock@weil.com
Attn:  Jacqueline Marcus, Esq.
Email:  Jacqueline.Marcus@weil.com
Attn:  Sunny Singh, Esq.
Email:  Sunny.Singh@weil.com

(2)    If to a Consenting Creditor, or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:  Alice Eaton, Esq.
Email:  aeaton@paulweiss.com
Attn:  Robert Britton, Esq.
Email:  rbritton@paulweiss.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

22.     **Reservation of Rights.**

Except as provided in this Agreement, nothing contained herein shall:  (i) limit the rights of any Consenting Creditors under the Debt Documents; or (ii) constitute a waiver or amendment of any provision of the Debt Documents or any agreements executed in connection with the Debt Documents.

23.     **Relationship Among Consenting Creditors.**

It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments among or between them.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Creditor shall in any way affect or negate this understanding and agreement.

24.     **No Solicitation; Representation by Counsel; Adequate Information.**

(a)     This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Consenting Creditors or a solicitation to tender or exchange any of the Notes.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditors has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)     Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

33

## EXHIBIT A

## FORM OF JOINDER AGREEMENT FOR CONSENTING STAKEHOLDERS

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●] (as amended, supplemented or otherwise modified from time to time, the "*Agreement*"), by and among the Company, the holders of Claims and Interests (together with their respective successors and permitted assigns, the "*Consenting Creditors*" and each, a "*Consenting Creditor*") is executed and delivered by _____ (the "*Joining Party*") as of _____ __, 2020.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

2.  Representations and Warranties.  With respect to the aggregate principal amount of the Notes, and with respect to the aggregate number of shares of Holdings Equity, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 9 of the Agreement to each other Party to the Agreement.

3.  Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**

By: _____

Name:

Title:

Principal Amount of Superpriority Senior Secured Notes:     $_____

Principal Amount of Exchange Priority Notes:     $_____

Principal Amount of 2024 First Lien Notes:     $_____

Shares of Holdings Equity:     _____

Notice Address:

Fax: _____

Attention:

Email:

SIGNATURE PAGE TO JOINDER AGREEMENT

Acknowledged:

**EXIDE HOLDINGS, INC.**


By:_____
    Name:
    Title:


**EXIDE TECHNOLOGIES, LLC**


By:_____
    Name:
    Title:


**DIXIE METALS COMPANY**


By:_____
    Name:
    Title:


**REFINED METALS CORPORATION**


By:_____
    Name:
    Title:


SIGNATURE PAGE TO JOINDER AGREEMENT

**EXIDE DELAWARE LLC**


By:_____
    Name:
    Title:

SIGNATURE PAGE TO JOINDER AGREEMENT

**<u>EXHIBIT B</u>**

**CHAPTER 11 TERM SHEET**

## Chapter 11 Term Sheet
## May 18, 2020

This term sheet (including all exhibits and schedules hereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Term Sheet**") sets forth the principal terms of a proposed liquidation of Exide Holdings, Inc. ("**Holdings**") and certain of its direct and indirect subsidiaries (collectively, the "**Company Entities**"); to be effectuated, in part, by certain of the Company Entities commencing voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to pursue the Restructuring (as defined in the RSA) or such other transaction acceptable to the Company Entities and the Requisite Noteholders.

This is the Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of May 18, 2020, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**RSA**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in **Annex 1** attached hereto or, if not defined therein, in the RSA.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO ADDITIONAL TAX STRUCTURING AND DILIGENCE AND THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.  THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY, EXCEPT AS REQUIRED BY LAW, OR AS PERMITTED UNDER AN EXISTING CONFIDENTIALITY AGREEMENT WITH THE COMPANY.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Overview | |
|---|---|
| **Company Entities to Commence Chapter 11 Cases** | Holdings; Exide Technologies, LLC ("**Exide Technologies**"); Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation (collectively, the "**Debtors**"). |
| **Chapter 11 Overview** | |
| **Claims to be Restructured:** | ABL Claims:  Claims in the aggregate principal amount of not less than approximately $101.2 million issued under that certain ABL Credit Agreement, dated as of April 30, 2015, among Holdings, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, and Exide Holding Netherlands B.V., as borrowers, Bank of America, N.A., as administrative agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**ABL Credit Agreement**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the ABL Credit Agreement solely to the extent permitted by the Bankruptcy Code (the "**ABL Claims**").<br><br>Superpriority Notes Guarantee Claims:  Claims in the aggregate principal amount of not less than approximately $152.5 million on account of the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to that certain Indenture, dated as of June 17, 2019, among Exide International Holdings LP, as issuer, the guarantors party thereto, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**Superpriority Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Superpriority Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**Superpriority Notes Guarantee Claims**").<br><br>Exchange Priority Notes Claims: Claims in the aggregate principal amount of not less than approximately $390 million on account of the 11% Exchange Priority Notes due 2024 issued pursuant to that certain Indenture, dated as of June 15, 2019, among Exide Technologies, as issuer, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**Exchange Priority and First Lien Notes Indenture**") plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Exchange Priority and First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**Exchange Priority Notes Claims**").<br><br>First Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $161 million on account of the 11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture, plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Exchange |

2

| Overview |
|---|

Priority and First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**First Lien Notes Claims**", and together with the Superpriority Notes Guarantee Claims and Exchange Priority Notes Claims, the "**Secured Notes Claims**").

2020 Legacy First Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $9 million on account of the 11% First Lien Senior Secured Notes Due 2020 issued pursuant to that certain Indenture, dated as of April 30, 2015, among Exide Technologies, as issuer, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**2020 Legacy First Lien Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the 2020 Legacy First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**2020 Legacy First Lien Notes Claims**").

2022 Legacy First Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $1 million on account of the 11% First Lien Senior Secured Notes Due 2022 issued pursuant to that certain Indenture, dated as of May 24, 2017, among Exide Technologies, as issuer, U.S. Bank N.A., as trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**2022 Legacy First Lien Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the 2022 Legacy First Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**2022 Legacy First Lien Notes Claims**," and with the 2020 Legacy First Lien Notes Claims, the "**Legacy First Lien Notes Claims**").

Legacy Second Lien Notes Claims: Claims in the aggregate principal amount of not less than approximately $2.7 million on account of the 3.79% Second Lien Deferred Payment Notes due 2022 issued pursuant to that certain Indenture, dated as of June 30, 2015, among Exide Technologies, as issuer, Bank of America, N.A., as successor trustee and collateral agent, and the lenders party thereto (as amended, modified, renewed, or supplemented from time to time, the "**Second Lien Notes Indenture**"), plus interest, fees, expenses and other amounts arising and payable under and in accordance with the Second Lien Notes Indenture solely to the extent permitted by the Bankruptcy Code (the "**Legacy Second Lien Notes Claims**" and together with the Legacy First Lien Notes Claims, the "**Legacy Secured Claims**").

General Unsecured Claims: Consisting of any Claim against the Debtors (other than any Intercompany Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any final order of the Bankruptcy Court, including

3

| Overview | |
|---|---|
| | any deficiency claims under section 506(a) of the Bankruptcy Code (the "**General Unsecured Claims**"). |
| **Sale and Marketing Process** | Following the Commencement Date, the Debtors shall continue their prepetition sale and marketing process (the "**Sale Process**") and solicit bids for one or more of the following: (i) the Americas Sale Transaction, (ii) the Europe/ROW Sale Transaction, or (iii) the Company Sale Transaction (each a "**Sale Transaction**").  The Debtors shall solicit bids for any form of sale, investment, acquisition, or similar transaction and shall market and consider bids for each segment of the Company in whole or in part.  The Sale Process shall provide that the Debtors may solicit bids to sell certain assets, including, without limitation, the equity interests in or assets of the Debtors' non-U.S. subsidiaries, independently of other assets pursuant to a separate sales and marketing process.

The Sale Process shall be conducted in accordance with the procedures and timeline set forth in the Bidding Procedures Order (the "**Bidding Procedures**"), subject to approval of the Bankruptcy Court.  The Bidding Procedures shall be in form and substance reasonably acceptable to the Consenting Creditors.  In accordance with the Bidding Procedures, the Debtors shall conduct an auction in which any bid designated as the "stalking horse" under the Bidding Procedures Order (if any) will be subject to an overbid process in accordance with the Bidding Procedures Order (the highest or otherwise best bid pursuant to the Bidding Procedures Order, the "**Successful Bid**" and the purchaser thereunder, the "**Successful Bidder**").

The special committee of Holdings' Board of Directors (the "**Special Committee**") shall have the exclusive right to exercise the Company's authority to oversee and direct the sale process relating to any potential Sale Transaction.   Any references to acts to be performed or determinations to be made by the Company prior to the Effective Date with respect to any Sale Transaction will be deemed to refer to the acts to be performed or determinations to be made by the Special Committee.

The Debtors shall consult with the Consenting Creditors with respect to all material actions taken in connection with any Sale Transaction, including any negotiations, conversations and correspondence related thereto.  All rights of the Consenting Creditors with respect to any Sale Transaction, including to Credit Bid in connection with an Americas Sale Transaction, are reserved. |
| **Milestones** | The Consenting Creditors' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "**Milestones**"), which may be extended with the prior written reasonable consent of the Requisite Noteholders:

1.   File the Bidding Procedures Motion not later than three business days after the Commencement Date [May 22, 2020]; |

4

| Overview | |
|---|---|
| | 2.  Entry of interim order approving the DIP Facility not later than three business days after the Commencement Date [May 22, 2020]; |
| | 3.  File the Plan and Disclosure Statement not later than 30 days after the Commencement Date [June 18, 2020]; |
| | 4.  Entry of Order approving the Bidding Procedures not later than 30 days after the Commencement Date [June 18, 2020]; |
| | 5.  Entry of a final order approving the DIP Facility not later than 35 days after the Commencement Date [June 23, 2020]; |
| | 6.  Deadline to commence the Auction: not later than 60 days after the Commencement Date [July 18, 2020]; |
| | 7.  Entry of Order approving the Disclosure Statement not later than 75 days after the Commencement Date [August 2, 2020]; |
| | 8.  Entry of a sale order approving the Sale Transaction not later than 75 days after the Commencement Date [August 2, 2020]; |
| | 9.  Deadline to consummate Americas Sale Transaction: not later than 100 days after the Commencement Date [August 27, 2020]; |
| | 10. Deadline to consummate Europe/ROW Sale Transaction: not later than 120 days after the Commencement Date [September 16, 2020]; |
| | 11. Deadline to commence the Confirmation Hearing: not later than 120 days after the Commencement Date [September 16, 2020]; and |
| | 12. Deadline for Effective Date under the Plan to Occur: not later than 135 days from the Commencement Date [October 1, 2020]. |
| **Credit Bid** | The Consenting Creditors shall submit an executed purchase agreement to effectuate the Europe/ROW Sale Transaction as set forth in the Credit Bid Term Sheet annexed hereto as **Exhibit 1** in accordance with the terms and deadlines set forth in the Bidding Procedures (the "**Credit Bid Transaction**"). |
| **DIP Facility** | Upon the Commencement Date, the Debtors shall seek authority to obtain debtor-in-possession financing in the aggregate principal amount and on the terms and conditions set forth in the DIP Term Sheet (the "**DIP Facility**" and the Claims arising thereunder, the "**DIP Claims**"). |
| **Sources of Consideration for Distributions** | The Plan shall contemplate Distributions of Cash as assets are monetized, including from: <br><br> (i)     cash on hand; and |

5

| Overview | |
|---|---|
| | (ii)    Sale Transaction Proceeds. |
| **Sale Proceeds Waterfall** | With respect to any Sale Transaction Proceeds from the sale or transfer of Notes Priority Collateral: |
| | a.  On or promptly after the closing date of any Sale Transaction (a "**Closing Date**"), any Initial Notes Priority Collateral Proceeds shall be distributed on a pro rata basis: |
| | i.  *first*, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Initial Notes Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Initial Notes Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed DIP Claims; *provided further* that in the event that the Credit Bid Transaction has been approved by the Bankruptcy Court but has not closed or, alternatively, the approval of the Credit Bid Transaction is pending before the Bankruptcy Court, any Notes Priority Collateral Proceeds shall be (A) segregated and held pending the closing of the Credit Bid Transaction and (B) distributed to each holder of Allowed Secured Notes Claims pursuant to the Proceeds Waterfall (as defined below) one (1) business day following (x) the entry of an order by the Bankruptcy Court denying approval of the Credit Bid Transaction, entry of an order by the Bankruptcy Court approving a "higher or better bid" with respect to a Europe/ROW Sale Transaction, or the signing of an alternative bid in connection with a Europe/ROW Sale Transaction that is not subject to approval by the Bankruptcy Court; *provided* that, if the Credit Bid is selected as the "back-up" bid at the Auction, then such distribution shall be delayed pending the closing of an alternative Europe/ROW Sale Transaction or (y) the closing of the Credit Bid Transaction after applying any applicable reductions to such Allowed Secured Notes Claims on account of any Allowed Secured Claims that are assumed or applied as consideration in connection with the Credit Bid Transaction (this second proviso of clause (a)(i), the "**Notes Proceeds Credit Bid Reserve**" and together with |

6

| Overview |
|---|

| | | the ABL Proceeds Credit Bid Reserve (as defined below), the "**Credit Bid Reserve**"); |
|---|---|---|
| | ii. | *second*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; |
| | iii. | *third*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full; and |
| | iv. | *fourth*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims, Allowed Exchange Priority Notes Claims, Allowed First Lien Notes Claims have been satisfied in full, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full. |
| | b. | On or after the Effective Date, any Excess Notes Priority Collateral proceeds shall be distributed on a pro rata basis: |
| | i. | *first*, subject to the Credit Bid Reserve, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Excess Notes Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Excess Notes Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed DIP Claims; |
| | ii. | *second*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; |
| | iii. | *third*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the |

7

| Overview |
|---|

Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full; and

iv. *fourth*, solely to the extent that the Allowed Superpriority Notes Guarantee Claims, Allowed Exchange Priority Notes Claims, Allowed First Lien Notes Claims have been satisfied in full, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full (clauses (a) and (b) above, the "**Notes Priority Proceeds Waterfall**").

With respect to any sale proceeds from the sale or transfer of ABL Priority Collateral:

a. On or promptly after any Closing Date, any Initial ABL Priority Collateral Proceeds shall be distributed on a pro rata basis:

i. *first*, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full;

ii. *second*, solely to the extent that the Allowed ABL Claims have been paid in full and subject to the Credit Bid Reserve, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Initial ABL Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Initial ABL Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed DIP Claims; *provided further* that in the event that the Credit Bid Transaction has been approved by the Bankruptcy Court but has not closed or, alternatively, the approval of the Credit Bid Transaction is pending before the Bankruptcy Court, any ABL Priority Collateral Proceeds shall be (A) segregated and held pending the closing of the Credit Bid Transaction and (B) distributed to each holder of Allowed Secured Notes Claims pursuant to the Proceeds Waterfall one (1) business day following (x) the entry of an order by the Bankruptcy Court denying approval of the Credit Bid Transaction, entry of an order by the Bankruptcy Court approving a "higher or better bid" with respect to a Europe/ROW Sale Transaction, or the signing of an alternative bid in connection with a

8

| Overview |
|---|

<table>
<tr><td></td><td></td><td>Europe/ROW Sale Transaction that is not subject to approval by the Bankruptcy Court; <em>provided</em> that, if the Credit Bid is selected as the "back-up" bid at the Auction, then such distribution shall be delayed pending the closing of an alternative Europe/ROW Sale Transaction or (y) the closing of the Credit Bid Transaction after applying any applicable reductions to such Allowed Secured Notes Claims on account of any Allowed Secured Claims that are assumed or applied as consideration in connection with the Credit Bid Transaction (this second proviso of clause (a)(ii), the "<strong>ABL Proceeds Credit Bid Reserve</strong>");</td></tr>
</table>

iii.   *third*, solely to the extent that the Allowed ABL Claims and Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; and

iv.   *fourth*, solely to the extent that the Allowed ABL Claims, Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full.

b.   On or after the Effective Date, any Excess ABL Priority Collateral proceeds shall be distributed on a pro rata basis:

i.   *first*, to each holder of an Allowed ABL Claim up to an amount necessary to satisfy the Allowed ABL Claims in full;

ii.   *second*, solely to the extent that the Allowed ABL Claims have been paid in full and subject to the Credit Bid Reserve, to each holder of an Allowed Superpriority Notes Guarantee Claim up to an amount necessary to satisfy the Allowed Superpriority Notes Guarantee Claims in full; *provided* that, solely in the case of any Sale Transaction that results in Excess ABL Priority Collateral Proceeds from the sale or transfer of the Debtors' assets that are subject to liens securing the DIP Facility, any such Excess ABL Priority Collateral Proceeds shall be distributed to each holder of an Allowed DIP Claim prior to any distribution to any holder of an Allowed Superpriority Notes Guarantee Claim up

9

| Overview | |
|---|---|
| | to an amount necessary to satisfy the Allowed DIP Claims; |
| | iii. *third*, solely to the extent that the Allowed ABL Claims and Allowed Superpriority Notes Guarantee Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed Exchange Priority Notes Claims up to an amount necessary to satisfy the Allowed Exchange Priority Notes Claims in full; and |
| | iv. *fourth*, solely to the extent that the Allowed ABL Claims, Allowed Superpriority Notes Guarantee Claims and Allowed Exchange Priority Notes Claims have been satisfied in full and subject to the Credit Bid Reserve, to each holder of an Allowed First Lien Notes Claims up to an amount necessary to satisfy the Allowed First Lien Notes Claims in full (clauses (a) and (b) above, the "**ABL Priority Proceeds Waterfall**" and together with the Notes Priority Proceeds Waterfall, the "**Proceeds Waterfall**"). |
| **Post-Effective Date Corporate Structure** | The Debtor entities shall continue in current corporate form but shall be controlled by the Plan Administrator, reporting to the Post-Confirmation Board as set forth in the Plan Administrator Agreement. |
| **Treatment of Claims and Interests** | |
| **DIP Claims** | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each allowed DIP Claim, each holder thereof shall be paid in full in Cash. |
| **Administrative, Priority Tax, and Priority Non-Tax Claims** | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Administrative Expense Claim, Allowed Priority Tax Claim, and Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Other Secured Claims** Unimpaired, Presumed to Accept | On or as soon as practicable after the Effective Date, to the extent any other secured claims exist (exclusive of the ABL Claims, Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, and First Lien Notes Claims, the "**Other Secured Claims**"), except to the extent that a holder of an Other Secured Claim agrees to less favorable treatment, each holder thereof shall be satisfied by either (a) payment in full in Cash or (b) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. |

10

| Overview |
|---|

| | |
|---|---|
| **ABL Claims**<br><br>Unimpaired, Presumed to Accept | Except to the extent that a holder of an Allowed ABL Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall. |
| **Superpriority Notes Guarantee Claims**<br><br>Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed Superpriority Notes Guarantee Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Superpriority Notes Guarantee Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall.<br><br>For the avoidance of doubt, the Allowed amount of any Superpriority Notes Guarantee Claim shall be reduced for any Superpriority Notes Claims assumed in accordance with the Credit Bid Term Sheet. |
| **Exchange Priority Notes Claims**<br><br>Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Exchange Priority Notes Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall.<br><br>For the avoidance of doubt, the Allowed amount of any Exchange Priority Notes Claim shall be reduced for any Exchange Priority Notes Claims applied as consideration in accordance with the Credit Bid Term Sheet. |
| **First Lien Notes Claims**<br><br>Impaired, Entitled to Vote | Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed First Lien Notes Claim, each holder thereof shall receive its pro rata share of any ABL Priority Collateral Proceeds and Notes Priority Collateral Proceeds pursuant to the Proceeds Waterfall.<br><br>For the avoidance of doubt, the Allowed amount of any First Lien Notes Claim shall be reduced for any First Lien Notes Claims applied as consideration in accordance with the Credit Bid Term Sheet. |
| **General Unsecured Claims**<br><br>Impaired, Deemed to Reject | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each holder thereof shall receive its pro rata share of the Net Cash Proceeds available to the applicable Debtor against which the Allowed General Unsecured |

11

| Overview | |
|---|---|
| | Claim is asserted until all Allowed General Unsecured Claims are satisfied in full after the ABL Claims, Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in Cash or assumed in accordance with the Credit Bid Term Sheet and the Proceeds Waterfall.  For the avoidance of doubt, the Legacy Secured Claims shall constitute General Unsecured Claims against each Debtor, as applicable. |
| **Intercompany Claims**<br><br>Impaired and Deemed to Reject / Unimpaired and Presumed to Accept | All Intercompany Claims shall be adjusted, continued, acquired, settled, reinstated, discharged, eliminated, or treated in accordance with the Credit Bid Term Sheet and otherwise determined by the Debtors in consultation with the Consenting Creditors. |
| **Intercompany Interests**<br><br>Impaired and Deemed to Reject / Unimpaired and Presumed to Accept | All Intercompany Interests shall be adjusted, continued, settled, reinstated, discharged, or eliminated as determined by the Debtors. |
| **Holdings Equity Interests**<br>Impaired, Deemed to Reject | On the Effective Date, all Holdings Equity Interests shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |
| **Subordinated Securities Claims**<br><br>Impaired, Deemed to Reject | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |
| **Plan Administrator Provisions** | |
| **Plan Administrator** | [●] shall serve as plan administrator (the "**Plan Administrator**") for each of the Debtors after the Effective Date in accordance with an agreement setting forth the powers, authority, responsibilities and duties of the Plan Administrator (such agreement, the "**Plan Administrator Agreement**") in form and substance acceptable to the Debtors and Requisite Noteholders.<br><br>The Plan Administrator shall be responsible for all decisions and duties with respect to the wind-down, subject to the authority granted to it under the Plan, the Confirmation Order, the Plan Administrator Agreement.<br><br>After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell, abandon and otherwise liquidate assets of the Debtors in accordance with the Plan. |

12

| Overview | |
|---|---|
| **General Provisions** | |
| **Compromise and Settlement** | The Plan will contain customary provisions for the compromise and settlement of Claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. |
| **Treatment of Executory Contracts and Unexpired Leases** | On the Effective Date, except as otherwise determined by the Debtors, each of the Debtors' executory contracts and unexpired leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected in accordance with the provisions of Bankruptcy Code sections 365 and 1123. |
| **Conditions Precedent to Confirmation** | Confirmation of the Plan will be subject to the satisfaction of customary conditions, including, without limitation, the following: <br><br> a. The Definitive Documents (as defined in the RSA) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 4 of the RSA. <br><br> b. The RSA shall not have been terminated and the RSA shall remain in full force and effect in accordance with its terms. <br><br> c. The Company shall have paid or caused to be paid in cash all Consenting Creditor Professional Fees and Expenses pursuant to the RSA. <br><br> d. The Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance consistent with this Term Sheet and the RSA and reasonably acceptable to the Requisite Noteholders. <br><br> e. The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with this Term Sheet and the RSA and reasonably acceptable to the Requisite Noteholders, which order shall be in full force and effect and no stay thereof shall be in effect. <br><br> f. The Debtors shall not be in default under the DIP Facility or the DIP Order. <br><br> g. The DIP Order shall not have been reversed, stayed, dismissed, or vacated. |

WEIL:\97457690\11\44362.0004

| Overview | |
|---|---|
| | h.   (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (x) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the obligations or Claims under the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered an order providing relief against the interests of the Consenting Creditors with respect to any of the foregoing causes of action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid.  The conditions to confirmation of the Plan may be waived, in whole or in part, by the Debtors and the Requisite Noteholders, as applicable. |
| **Conditions Precedent to Effective Date** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions, including, without limitation, the following (as applicable):  a.   The Definitive Documents (as defined in the RSA) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 4 of the RSA.  b.   The RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms.  c.   The Confirmation Order shall have been entered and shall be in full force and effect and no stay thereof shall be in effect.  d.   The Debtors shall not be in default under the DIP Facility or the DIP Order.  e.   The DIP Order shall not have been reversed, stayed, dismissed, or vacated.  f.   The Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the Superpriority Notes Guarantee Claims or DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors or DIP Lenders; or (ii) supported |

14

| Overview |
|---|

|  | any third party seeking standing to bring such application, adversary proceeding or cause of action. |
|---|---|
|  | g. All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed. |
|  | h. The Company shall have paid or caused to be paid in cash all Consenting Creditor Professional Fees and Expenses invoiced no later than one business day prior to the Effective Date. |
|  | i. All governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained or otherwise waived. |
|  | j. (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (x) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the obligations or Claims under the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid, or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered an order providing relief against the interests of the Consenting Creditors with respect to any of the foregoing causes of action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Debt Documents or (y) limiting the Consenting Creditors' right to implement the Credit Bid. |
|  | The conditions to effectiveness may be waived, in whole or in part, by the Debtors and the Requisite Noteholders, as applicable. |
| **Releases by Debtors:** | Subject to the conclusion of the investigation conducted by the sub-committee of the special committee of the board of directors of Holdings, as of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Liquidating Debtors, and the Estates, in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by or through the |

15

| Overview |
|---|

| | foregoing persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Liquidating Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Liquidating Debtors, or the Estates, or their affiliates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Liquidating Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, and the documents in the Plan Supplement or any related agreements, instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan. |
| **Releases by Third-Parties:** | As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by: <br><br> a.   the Consenting Creditors; |

16

| Overview |
|---|

|  | b. the Trustees;

c. the DIP Agent and the DIP Lenders;

d. the lenders under the European Bridge Financing Facility;

e. all holders of unimpaired Claims who do not file a timely objection to the third party releases provided herein;

f. all holders of Claims who vote to accept the Plan; and

g. with respect to any entity in the foregoing clauses (a) through (f), such entity's (x) predecessors, successors and assigns, (y) subsidiaries, affiliates, managed accounts or funds, managed or controlled by such entity and (z) all persons entitled to assert Claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases.

in each case, from any and all Claims, Interests, or Causes of Action whatsoever (including any derivative Claims, asserted or assertable on behalf of the Debtors, the Liquidating Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Liquidating Debtors, their Estates, the Chapter 11 Cases, the Restructuring, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Liquidating Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Definitive Documents, the Sale Transaction, the Credit Bid, the DIP Facility, the European Bridge Financing Facility, and the documents in the Plan Supplement or any related agreements, instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, that nothing herein shall be construed to release the Released Parties from willful misconduct, or intentional fraud as determined by a Final Order. |
| **Exculpation** | The Plan will contain standard and customary exculpation provisions mutually acceptable to the Debtors and the Requisite Noteholders. |

17

WEIL:\97457690\11\44362.0004

| Overview | |
|---|---|
| **Injunction** | The Plan will contain standard and customary injunction provisions mutually acceptable to the Debtors and the Requisite Noteholders. |
| **Definitive Documentation** | This Term Sheet is indicative, and any final agreement shall be subject to the Definitive Documents.  The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet and the RSA. |
| **Tax Structure** | The terms of the Plan and the transactions contemplated therein shall, to the extent reasonably practicable, be structured in a tax efficient manner as determined by the Company and the Requisite Noteholders; *provided*, that the obligations of the Requisite Noteholders under the Credit Bid Term Sheet shall be subject to the completion of tax diligence and structuring satisfactory to the Requisite Noteholders. |
| **Corporate Actions** | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Liquidating Debtors, as applicable, subject to the reasonable consent of the Requisite Noteholders, may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring under and in connection with the Plan. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to the RSA. |
| **Consent Rights of Consenting Creditors** | Notwithstanding anything to the contrary herein or in the Plan, any and all consent rights of the Consenting Creditors set forth in the RSA with respect to the Sale Transaction or the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, will be incorporated into the Plan by reference and fully enforceable as if stated in full in the Plan. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters in the Chapter 11 Cases, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |

18

**ANNEX 1**

| Defined Terms | |
|---|---|
| **Administrative Expense Claim** | Any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) DIP Claims. |
| **ABL Priority Collateral Proceeds** | Initial ABL Priority Collateral Proceeds and Excess ABL Priority Collateral Proceeds. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075, and the general, local and chambers rules of the Bankruptcy Court. |
| **Cash** | Legal tender of the United States of America. |
| **Cause of Action** | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims. |
| **Claim** | Has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Distribution** | Any initial or subsequent payment or transfer made under the Plan. |
| **Effective Date** | The date that is the first business day on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof. |
| **Estate(s)** | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |

| Defined Terms | |
|---|---|
| **Excess ABL Priority Collateral Proceeds** | Any Net Cash Proceeds arising from the ABL Priority Collateral remaining after the distribution of the Initial ABL Priority Collateral pursuant to the Proceeds Waterfall. |
| **Excess Notes Priority Collateral Proceeds** | Any Net Cash Proceeds arising from the Notes Priority Collateral remaining after the distribution of the Initial Notes Priority Collateral pursuant to the Proceeds Waterfall. |
| **Excluded Party** | Any holder of Interests in or Claims against the Debtors, or any other Person, that (a) seeks any relief materially adverse to the Restructuring, (b) opts out of any third party releases sought in connection with the Plan, (c) is entitled to vote on the Plan and does not vote to accept the Plan, or (d) objects to the Plan or supports an objection to the Plan. |
| **Final Order** | An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| **Holdings Equity Interest** | Any Interest in Holdings. |
| **Initial ABL Priority Collateral Proceeds** | Any Initial Cash Proceeds arising from the ABL Priority Collateral. |
| **Initial Cash Proceeds** | Initial Cash Proceeds means (a) all Cash of the Debtors realized from the Sale Transaction Proceeds less (b) the amount of Cash estimated and reserved, on a pro rata basis with respect to Sale Transaction Proceeds generated by the sale or transfer of Notes Priority Collateral and ABL Priority Collateral, as applicable, in an amount to be agreed by the Debtors and the Requisite Noteholders to adequately fund the wind-down process (including any accrued and unpaid amount of the carve-out). |
| **Initial Notes Priority Collateral Proceeds** | Any Initial Cash Proceeds arising from the Notes Priority Collateral. |
| **Intercompany Claim** | Any pre- or postpetition Claim held against a Debtor held by another Debtor. |
| **Intercompany Interest** | An Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude a Holdings Equity Interest. |

2

| Defined Terms | |
|---|---|
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Liquidating Debtors** | The Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date. |
| **Net Cash Proceeds** | Net Cash Proceeds means (a) any remaining Initial Cash Proceeds and all Cash of the Debtors realized from their business operations less (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) estimated and reserved, on a pro rata basis with respect to Sale Transaction Proceeds generated by the sale or transfer of ABL Priority Collateral or Notes Priority Collateral, as applicable, by the Debtors or the Plan Administrator with the reasonable consent of the Requisite Noteholders to adequately fund the wind-down process and incremental to any amounts reserved to fund the wind-down process from the Initial Cash Proceeds; and (iii) necessary to satisfy any fees required to be paid in accordance with any order of the Bankruptcy Court. |
| **Notes Priority Collateral Proceeds** | Initial Notes Priority Collateral Proceeds and Excess Notes Priority Collateral Proceeds. |
| **Priority Non-Tax Claim** | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| **Priority Tax Claim** | Any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| **Related Parties** | With respect to (i) any Released Party, such Entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, (ii) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement related to the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which releases are provided in the Plan, and (iii) such persons' respective heirs, executors, estates, servants and nominees. |

3

| Defined Terms | |
|---|---|
| **Released Parties** | Collectively, (i) the Debtors, (ii) the Liquidating Debtors, (iii) each of the Consenting Creditors, (iv) the Trustees, (v) the arrangers, agents and lenders under the European Bridge Financing Facility, (vi) the DIP Agents and DIP Lenders, and (vii) the Related Parties for each of the foregoing. |
| **Sale Transaction Proceeds** | The net cash proceeds received by the Debtors (or post-effective Debtors, as applicable) pursuant to one or more of: (i) the Americas Sale Transaction, (ii) the Europe/ROW Sale Transaction, (iii) the Company Sale Transaction, and (iv) the liquidation or winding up of any assets or businesses of the Company Entities in a manner other than as described in clauses (i) through (iii) above. |
| **Secured Claim** | A Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| **Subordinated Securities Claim** | A Claim subject to subordination under section 510(b) of the Bankruptcy Code. |

4

## EXHIBIT C

### CREDIT BID TERM SHEET

### Credit Bid Term Sheet[1]
### May 18, 2020

This term sheet (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Credit Bid Term Sheet**") sets forth the principal terms for a definitive transaction agreement (the "**Purchase Agreement**") for the Credit Bid for the purchase and sale of the Acquired Assets (as defined herein) (the transaction contemplated hereby, the "**Credit Bid Transaction**").

This is the Credit Bid Term Sheet (i) referred to in the Restructuring Support Agreement dated as of May 18, 2020, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**RSA**") and (ii) appended to the Restructuring Term Sheet (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "**Restructuring Term Sheet**") dated as of May 18, 2020.  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the RSA or the Restructuring Term Sheet, as applicable.

| Overview of Credit Bid Terms | |
|---|---|
| **Debtors** | Exide Holdings, Inc. ("**Holdings**"), Exide Technologies, LLC, Dixie Metals Company, Refined Metals Corporation, and Exide Delaware LLC. |
| **Buyer** | A new entity formed by the Requisite Exchange Priority Noteholders for the purpose of effecting the Credit Bid Transaction. |
| **Transferred Equity Interests** | The equity interests of the Debtors in Exide International Holdings LP; Exide International Holdings GP LLC; Exide Holding Europe SAS;[2] and Exide Technologies (Shanghai) Company Limited (collectively, the "**Transferred Equity Interests**"). |
| **Acquired Assets** | a.  Transferred Equity Interests;<br><br>b.  All Claims of the Debtors arising under that certain *Intercompany Note*, dated as of July 1, 2015 issued by Exide Global Holding Netherlands C.V.; and<br><br>c.  such other specified assets of the Debtors (including certain intercompany receivables and Claims), as may be mutually agreed by the Debtors and the Requisite Exchange Priority Noteholders and specified in the Purchase Agreement, if any ((a) through (c), collectively, the "**Acquired Assets**"). |
| **Assumed Liabilities** | Limited to specified liabilities related to the Europe/ROW business being acquired, as may be mutually agreed among the Requisite Exchange Priority Noteholders and the Debtors and specified in the Purchase Agreement. |
| **Stalking Horse** | The Credit Bid Transaction shall serve as the "stalking horse" for the Acquired Assets in accordance with the Bidding Procedures and shall be subject to the consideration of higher or better bids. |
| **Bankruptcy Court Approval** | To the extent the Purchase Agreement includes the sale of any of the Debtors' assets or equity interests, the Credit Bid Transaction shall be subject to approval by the Bankruptcy Court. |

---

[1]   The terms herein are subject to review by tax counsel.

[2]   Works Council information and/or consultation requirements with respect to all or part of the European companies and its possible impact on the Credit Bid Transaction or its timing to be discussed in due course with Buyer based on the Credit Bid Transaction terms and structure (including purchase price) ultimately agreed to.

| Overview of Credit Bid Terms | |
|---|---|
| **Consideration** | The aggregate consideration to be paid by the Buyer for the sale of all of the Acquired Assets and the obligations of the Sellers set forth in the Purchase Agreement shall be comprised of an amount equal to $430 million (the "**Purchase Price**") comprised of the following:<br><br>a.  a discharge and release of Claims under the Exchange Priority and First Lien Notes Indenture (the "**Exchange Priority Notes Claims**") on account of the Exchange Priority Notes in the amount of $70 million;[3]<br><br>b.  the assumption of all Claims outstanding under the Interim Financing Facility (as defined herein) in the amount of $25 million;<br><br>c.  the assumption of all Claims outstanding under the Superpriority Senior Secured Notes Indenture (the "**Superpriority Notes Claims**") in the amount of $161 million;<br><br>d.  the assumption of all Claims outstanding under the Existing EU/ROW Financings in the amount of $174 million; and<br><br>e.  the assumption of certain non-debt liabilities set forth in the Purchase Agreement. |
| **DIP Facility** | The commitments and obligations of the Requisite Exchange Priority Noteholders with respect to the Credit Bid and Interim Financing Facility shall be conditioned on the entry of a final order by the Bankruptcy Court approving the DIP Facility. |
| **Interim Financing Facility** | The Requisite Exchange Priority Noteholders (i) shall commit up to $25 million and (ii) may provide an additional $50 million at the request of Exide International Holdings LP but purchased in the discretion of the Lenders, prior to the closing of the Credit Bid Transaction (the "**Closing Date**"), in each case, in accordance with the term sheet attached as <u>Exhibit E</u> to the RSA, which shall be used for working capital and general corporate purposes (the "**Interim Financing Facility**" and the agreement executed in connection therewith, the "**Interim Financing Agreement**"). The Interim Financing Facility shall rank senior to the Superpriority Notes Claims in terms of liens and payment priority. |
| **Definitive Documents** | The Required Parties shall use commercially reasonable efforts to negotiate in good faith and finalize the Purchase Agreement during the marketing process contemplated by the Bidding Procedures and prior to the bid deadline established by the Bidding Procedures, including, but not limited to, the drafting and negotiation of the Purchase Agreement and the ancillary agreements, schedules, documents, and instruments contemplated thereby, each of which shall be in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders. |
| **ABL Facility** | The Requisite Exchange Priority Noteholders shall commit to (i) refinancing all amounts owed by Exide Technologies (Transportation) Limited under the ABL Credit Agreement or (ii) otherwise bifurcating the facility provided |

---

[3]    Subject to adjustment and purchase price allocation pending the outcome of Works Council with respect to Exide France.

2

| Overview of Credit Bid Terms | |
|---|---|
| | under the ABL Credit Agreement, in each case, not later than the Closing Date. |
| **Existing EU/ROW Financings** | The Requisite Exchange Priority Noteholders agree that all existing European Union financing arrangements, including, but not limited to, local guarantees, performance bonds, lines of credit, overdraft facilities, factoring arrangements (recourse and non-recourse), and capital leases issued by Exide International Holdings LP and its subsidiaries (collectively, the "**Existing EU/ROW Financings**") shall remain in place under the existing terms and conditions or be replaced or refinanced in connection with the consummation of the Credit Bid Transaction. |
| **Go-Shop Provision** | The Credit Bid Transaction shall be subject to higher and better offers, as determined by the Debtors in their reasonable business judgment in accordance with the Bidding Procedures or otherwise.  The Buyer shall not be entitled to a break-up fee in connection with the sale contemplated herein, but shall be entitled to Expense Reimbursement. |
| **Expense Reimbursement** | The Bidding Procedures Order shall provide that in the event that the Debtors consummate a sale or restructuring transaction with respect to substantially all of the assets or equity interests to be acquired pursuant to the Credit Bid Transaction, other than the Credit Bid Transaction (an "**Alternative Europe/ROW Transaction**") or the Debtors terminate the Purchase Agreement pursuant to the Fiduciary Out, the Debtors shall pay in cash all reasonable and documented fees and expenses of the Buyer and the Requisite Exchange Priority Noteholders in connection with the Credit Bid Transaction, including the fees and expenses of Paul, Weiss, as counsel, Young Conaway Stargatt & Taylor, LLP, as Delaware counsel, Walkers, as Cayman counsel, Freshfields Bruckhaus Deringer LLP, as European counsel, De Brauw Blackstone Westbroek N.V., as Dutch counsel, and CMD Global Advisors, LLC, as financial advisor (such payment and reimbursement obligations, the "**Expense Reimbursement**").  The claim of the Buyer in respect of the Expense Reimbursement shall constitute an allowed superpriority administrative expense claim against each of the Debtors under sections 503 and 507(b)(2) of the Bankruptcy Code, senior in respect of lien priority and right to payment of all other administrative expense claims of the Debtors, but subject to a customary carve-out to be provided by an order of the Bankruptcy Court approving the DIP Facility on an interim or final basis (such order, the "**DIP Order**").  For the avoidance of doubt, the Expense Reimbursement shall not be duplicative of any expenses paid to the advisors of the Consenting Creditors in accordance with the DIP Order.<br><br>The Debtors shall pay the Expense Reimbursement by wire transfer of immediately available funds to an account designated by the Buyer within one (1) business day of the consummation of an Alternative Europe/ROW Transaction. |
| **Bidding Procedures** | The Bidding Procedures shall be in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders. |
| **Government Approvals** | The Buyer and the Requisite Exchange Priority Noteholders shall take any and all actions reasonably necessary to obtain all requisite governmental approvals required to effect the Credit Bid Transaction. |

3

| Overview of Credit Bid Terms | |
|---|---|
| **Conditions to Closing** | The closing of the Credit Bid Transaction shall be conditioned upon the satisfaction of customary closing conditions, including (i) the accuracy of representations and warranties made by the parties, (ii) the receipt of requisite approvals, including, but not limited to, approvals required under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, (iii) the absence of any order of a court of competent jurisdiction prohibiting the consummation of the Credit Bid Transaction, (iv) the execution and delivery of the related agreements, (v) the entry by the Bankruptcy Court of an order approving the Credit Bid Transaction (the "**Credit Bid Sale Order**") in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders, and (vi) the payment of the Debtors' professional fees (including any transaction fees) incurred in connection with consummating the Credit Bid Transaction. |
| **Holdings Termination Rights** | Holdings shall have the right to terminate the Purchase Agreement in the event that (i) there are ongoing breaches of representations, warranties or covenants by the Buyer that cause any closing condition to not be satisfied (subject to a ten (10) business day cure period), (ii) the Credit Bid Transaction has not closed by September 16, 2020 (subject to extension for receipt of required approvals), (iii) any government authority has enjoined the consummation of the Credit Bid Transaction, (iv) (A) Holdings enters into a definitive agreement with respect to an Alternative Europe/ROW Transaction or (B) the Bankruptcy Court enters an order approving an Alternative Europe/ROW Transaction, or (v) the special committee of the board of directors (or equivalent organizational body) of any of the Debtors determines in good faith after consultation with outside counsel that the Debtors' continued performance under the Purchase Agreement would be inconsistent with the board's or such governing body's fiduciary duties under applicable law (this clause (v), the "**Fiduciary Out**"). |
| **Buyer Termination Rights** | Buyer shall have the right to terminate the Purchase Agreement in the event that (i) there are ongoing breaches of representations, warranties or covenants by the Debtors that cause any closing condition to not be satisfied (subject to a ten (10) business day cure period), (ii) the Credit Bid Transaction has not closed by September 16, 2020 (subject to extension for receipt of required approvals), (iii) any government authority has enjoined the consummation of the Credit Bid Transaction, (iv) if the bidding procedures order is not entered into by June 18, 2020, (v) if the Credit Bid Sale Order is not entered by August 2, 2020, (vi) if, prior to the Closing Date, the Debtors' bankruptcy cases are converted to cases under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Debtors' bankruptcy cases, (vii) occurrence of a "Creditor Termination Event" (as defined in the RSA) pursuant to the RSA, or (viii) the occurrence of other termination events under the Purchase Agreement to be agreed. |
| **Securities Laws** | To the extent applicable, the Transferred Equity Interests shall be exchanged and sold pursuant to a private placement exception under the Securities Act of 1933, as amended. |
| **Release of Obligations** | Upon the Closing Date:<br><br>a.   each of the Exchange Priority Noteholders shall release each of the borrowers and guarantors under the Exchange Priority and First Lien |

4

| Overview of Credit Bid Terms | |
|---|---|
| | Indenture for any Exchange Priority Notes Claims and related obligations thereunder, including, without limitation, each non-debtor affiliate of the Debtors and up to the amount provided as consideration for the Credit Bid Transaction; and<br><br>b.  each of the Superpriority Senior Secured Noteholders shall release each of the U.S. obligors under the Superpriority Senior Secured Notes Indenture for any obligations and Claims arising thereunder. |
| **Releases** | Subject to the conclusion of the investigation conducted by the sub-committee of the special committee of the board of directors of Holdings, the Purchase Agreement and Credit Bid Sale Order shall contain full mutual general releases (the "**Releases**") effective on the Closing Date between and among the Debtors, the Buyer, the Consenting Creditors, the lenders under the DIP Facility, the agent under the DIP Facility, the DIP Lenders, the trustee under each of the Superpriority Senior Secured Notes Indenture and the Exchange Priority and First Lien Notes Indenture, and such entities' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, for any claims up to the Closing Date except as preserved in the Purchase Agreement and related documentation implementing the Credit Bid Transaction other than claims to the extent conveyed to (and released by) Buyer.  The terms of the Credit Bid Sale Order or other definitive documentation implementing the Releases set forth herein shall be reasonably acceptable to each of the Debtors, the Buyer and the Requisite Exchange Priority Noteholders.<br><br>It shall be a condition precedent to the Closing Date that the Releases are approved in the Credit Bid Sale Order.<br><br>All other debt obligations of the Debtors not assumed, refinanced, or released in connection with the Credit Bid Transaction shall be excluded from the Releases. |
| **Back-Up Bid** | In the event that the Credit Bid is not selected as the successful bid but is otherwise the next highest or best alternative bid, the Purchase Agreement shall serve as the "back-up bid" for the Acquired Assets and shall be binding and irrevocable until an Alternative Europe/ROW Transaction is consummated. |
| **Credit Bid Direction Letter** | The Buyer shall provide to the Debtors a true and correct copy of a direction letter signed by the Requisite Exchange Priority Noteholders and the administrative and collateral agents under the Exchange Priority and First Lien Notes Indenture and the Interim Financing Agreement (collectively, the "**Agents**"), pursuant to which the Requisite Exchange Priority Noteholders have authorized the Agents to, among other things, (i) cause the Credit Bid to be made in the name of the Buyer; and (ii) cause the Buyer to acquire and |

5

| Overview of Credit Bid Terms | |
|---|---|
| | assume from the Debtors all of the acquired assets and equity interests specified in, and in accordance with, the Purchase Agreement. |
| **Transition Services** | The Purchase Agreement shall provide that, upon the Closing Date, the Debtors and the Buyer shall enter into a mutual transition services agreement, in form and substance reasonably acceptable to the Required Parties, which agreement will provide that the Debtors, on one hand, and the Buyer, on the other hand, shall provide such support services to the other party to facilitate the separation of the businesses of the Debtors, in each case, as is mutually agreed upon by the Debtors and the Requisite Exchange Priority Noteholders. Subject to the consent rights of the Requisite Exchange Priority Noteholders in the Bidding Procedures, the Debtors may assign their rights and obligations under any such transition services agreement, in whole or in part, at or following the Closing Date to any third party who acquires the Debtors' applicable assets. |
| **Implementation** | The Consenting Creditors and the Company hereby agree and acknowledge that the transactions contemplated by this Credit Bid Term Sheet, including the conversion or exchange of certain debt instruments for other debt instruments, remains subject in all respects to tax, securities laws, contract, and other due diligence, structuring and definitive documentation. If the parties determine that the proposed transactions cannot be implemented as set forth in this Credit Bid Term Sheet (or it would be unduly burdensome to do so), the parties agree to negotiate in good faith such alternative transaction steps (and to modify this Credit Bid Term Sheet) in such a manner so as to provide the Company and the Requisite Exchange Priority Noteholders with substantially the same economic and legal rights and obligations (including as to consideration) as originally intended to the greatest extent possible; *provided* that any modifications to the terms or structure of the transactions contemplated by this Credit Bid Term Sheet and any definitive documentation relating thereto shall be in form and substance reasonably acceptable to the Requisite Exchange Priority Noteholders and the Company. |

WEIL:\97472979\5\44362.0003

## **EXHIBIT D**

### **DIP TERM SHEET**

**Indicative Term Sheet**
May 18, 2020

| | |
|---|---|
| **Borrower:** | Exide Technologies, LLC (the "Borrower"); provided that, the Borrower shall not be an indirect or direct subsidiary of Exide Holdings, Inc. that is not incorporated or otherwise organized or existing under the laws of the United States. |
| **Guarantors** | Exide Holdings, Inc. ("Holdings"), Dixie Metals Company, Refined Metals Corporation and Exide Delaware LLC (collectively, the "Guarantors" together with the Borrower, the "Debtors"); provided that, that no Guarantor shall be an indirect or direct subsidiary of Exide Holdings, Inc. that is not incorporated or otherwise organized or existing under the laws of the United States. |
| **Credit Facility:** | $40 million Super Priority DIP Term Loans comprised of:<br>▪ A $25 million First-Out Loan (the "First-Out") provided by Blue Torch ("BTC" or "First-Out Lender")<br>▪ A $15 million Last-Out Loan (the "Last-Out") provided by existing noteholders (the "Second-Out Lenders" and together with the First-Out Lender, the "DIP Lenders")<br><br>The DIP Term Loans shall be drawn in a single drawing at closing, and the proceeds shall be deposited into an escrow account from which the Borrower may request disbursements on one or more withdrawal dates upon satisfaction of agreed conditions, including (a) compliance with DIP Budget described below and (b) approval by the DIP Lenders and the bankruptcy court of any key employee retention or incentive plans proposed by the Debtors. The cash held in such escrow account shall not be subject to any liens or claims of the existing secured parties of the ABL Revolver referenced below, including any prepetition or adequate protection liens or claims, but shall subject to the DIP Liens. |
| **Interest Rate:** | L+1,000 comprised of a blended rate of:<br>▪ L+900 for the First-Out<br>▪ L+1,167 for the Last-Out |
| **LIBOR Floor:** | 2.0% |
| **Upfront Fee:** | 3.5% of the Credit Facility initial amount comprised of a blended rate of:<br>▪ 2.5% for the First-Out<br>▪ 5.167% for the Last-Out |
| **Amortization:** | None |
| **Exit Fee:** | 3.5% of the Credit Facility initial amount if, prior to the Maturity, the DIP Term Loans are prepaid, repaid, refinanced or replaced or accelerated (including the acceleration of the DIP Loans after an event of default (an "Event of Default")), comprised of a blended rate of:<br>▪ 1.5% for the First-Out<br>▪ 6.833% for the Last-Out |
| **Agency Fee:** | $100,000 per year |
| **Maturity:** | Upon the earliest of: (a) six months from closing; (b) conversion of any of the Debtor's chapter 11 cases to a case under chapter 7; (c) dismissal of the Debtors' chapter 11 cases; (d) appointment of a chapter 11 trustee, or other fiduciary with decision making authority; (e) the effective date of the Debtor's chapter 11 plan; (f) the closing date of a Section 363 sale of all or substantially all of the Borrower's assets (a "Sale Transaction"); (g) failure to timely satisfy milestones with respect to the Sale Transaction (including, but not limited to, approval of sale procedures, designation of a stalking horse bidder, entry of a sale order and closing); (h) upon the election of the Required Lenders after an Event of Default; (i) any action by the Debtors to challenge, support or encourage a challenge of, or fail to oppose a challenge of (A) any payments made to the DIP Lenders or to the Prepetition Secured Noteholders[1] or (B) the validity or enforceability of any of the DIP Loan Documents, the legality, validity or enforceability of any of the DIP Term Loans or the obligations to the Prepetition Secured Noteholders; and (j) other maturity date triggers as are customary for debtor-in-possession financings and satisfactory to BTC. |

---

[1] "**Prepetition Secured Noteholders**" means holders of the (i) 10.75% Superpriority Lien Senior Secured Notes due 2021,

| | |
|---|---|
| **Use of Proceeds:** | General corporate purposes, and to pay related transaction fees and expenses, including the Carve-Out. |
| **Budget:** | Use of cash collateral and proceeds of the Credit Facility subject to an agreed budget satisfactory to BTC (the "DIP Budget") consisting of forecasted receipts and disbursements of the Debtors (including payment of estate professionals) on a consolidated basis for the rolling 13 weeks commencing on the Credit Facility closing date, and updated every two weeks thereafter, subject to customary permitted variances to be agreed. |
| **Milestones:** | The following milestones, which may be extended or modified with the prior written consent of Required DIP Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed: |

    i.    File the Bidding Procedures Motion not later than three business days after the Commencement Date [May 22, 2020];

    ii.    Entry of interim order approving the DIP Facility not later than three business days after the Commencement Date [May 22, 2020] (the "DIP Order");

    iii.    File the Plan and Disclosure Statement not later than 30 days after the Commencement Date [June 18, 2020];

    iv.    Entry of Order approving the Bidding Procedures not later than 30 days after the Commencement Date [June 18, 2020];

    v.    Entry of a final order approving the DIP Facility not later than 35 days after the Commencement Date [June 23, 2020];

    vi.    Deadline to commence the Auction: not later than 60 days after the Commencement Date [July 18, 2020];

    vii.    Entry of Order approving the Disclosure Statement not later than 75 days after the Commencement Date [August 2, 2020];

    viii.    Entry of a sale order approving the Sale Transaction not later than 75 days after the Commencement Date [August 2, 2020];

    ix.    Deadline to consummate Americas Sale Transaction: not later than 100 days after the Commencement Date [August 27, 2020];

    x.    Deadline to consummate Europe/ROW Sale Transaction: not later than 120 days after the Commencement Date [September 16, 2020];

    xi.    Deadline to commence the Confirmation Hearing: not later than 120 days after the Commencement Date [September 16, 2020]; and

    xii.    Deadline for Effective Date under the Plan to Occur: not later than 135 days from the Commencement Date [October 1, 2020].

---

(ii) 11% Exchange Priority Notes due 2024, and (iii) 11% First Lien Senior Secured Notes due 2024.

| | |
|---|---|
| **Collateral:** | Super-priority administrative claim and first-priority priming security interest (the "DIP Liens") on all property and assets (tangible and intangible, and including all outstanding capital stock of the Borrower and each of its and the Guarantors' material and direct U.S. subsidiaries) that shall be senior to any other liens and security interests, including the adequate protection liens on account of prepetition indebtedness and the liens securing prepetition indebtedness, other than (i) an ABL Revolver of up to $97 million that will be secured by first-priority liens on inventory and accounts receivables assets and subject to a borrowing base customary for facilities of this type, (ii) the Carve-out (as described below) and (iii) other perfected and unavoidable liens on the petition date, including, for the avoidance of doubt, any liens on any property or assets of any indirect or direct subsidiary of Exide Holdings, Inc. that is not incorporated or otherwise organized or existing under the laws of the United States. |
| **Adequate Protection** | In exchange for the Debtors' use of their cash collateral during the chapter 11 cases, among other things, the Prepetition Secured Noteholders shall receive adequate protection, to the extent of any diminution in value of the Prepetition Secured Noteholders' interest in their prepetition collateral (including cash collateral and ABL collateral), in the form of replacement liens (the "AP Liens") and superpriority claims (the "AP Claims"), which shall rank in the same right and priority as their respective liens and claims immediately prior to the commencement of the chapter 11 cases.  Such AP Liens and AP Claims shall be junior to the DIP Liens.  The Debtors shall also pay the fees and expenses of the Second-Out Lenders' attorneys and financial advisors. |
| **Mandatory Prepayments:** | Customary for facilities of this type and satisfactory to the DIP Lenders, including:<br>▪ 100% of proceeds from certain asset sales and sales of subsidiaries<br>▪ 100% of proceeds from incurrence of indebtedness<br>▪ 100% of insurance proceeds, tax refunds, and other extraordinary receipts |
| **Affirmative Covenants:** | Customary for facilities of this type and satisfactory to the DIP Lenders. |
| **Negative Covenants:** | Customary for facilities of this type and satisfactory to the DIP Lenders, including limitations on indebtedness, liens, asset sales, restricted payments and transactions with affiliates |
| **Financial Covenants:** | ▪ Maximum Permitted Variance against DIP Budget<br>▪ Minimum Liquidity |
| **Carve-Out** | An amount equal to the sum of i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any Official Committee (as defined in the DIP Order) (collectively, the "Allowed Professional Fees") incurred by Estate Professionals (as defined in the DIP Order) at any time before or on the date of delivery by the DIP Agent (or the Prepetition Secured Parties (as defined in the DIP Order) after the indefeasible repayment of the DIP Obligations (as defined in the DIP Order) in full ) of a Carve Out Trigger Notice (as defined in the DIP Order) (the "Termination Declaration Date"), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $750,000 incurred following the Termination Declaration Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; provided, that under no circumstances shall any success, completion, or similar fees be paid from the Carve Out following delivery of a Carve Out Trigger Notice (as defined in the DIP Order) unless such fee was earned and payable prior to the Termination Declaration Date; provided, further that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any other grounds. |
| **Events of Default** | Customary for facilities of this type and satisfactory to the DIP Lenders. |
| **Indemnification and Expenses** | Customary indemnity and expense reimbursement provisions satisfactory to the DIP Lenders for the administrative agent, the lenders, their designated advisors and related persons. |

Case 20-11157    Doc 14    Filed 05/19/20    Page 131 of 136

| Additional Diligence: | ▪ Call with management <br> ▪ Review of COVID-19 Impact <br> ▪ Review of Ankura liquidation analysis and smelter valuation <br> ▪ Third party financial diligence <br> ▪ Satisfactory review of bids and sale process <br> ▪ Customary business and industry diligence <br> ▪ Satisfactory legal diligence and documentation |
|---|---|
| Expense Deposit: | Yes |
| Target Close: | May 22, 2020 |
| Term Sheet Expiration Date: | May 20, 2020 |

## EXHIBIT E

### EUROPEAN BRIDGE TERM SHEET

**Exide Technologies – European Bridge Financing**

**Preliminary Summary of Terms and Conditions**

*This Preliminary Summary of Terms and Conditions ("Term Sheet") outlines certain indicative material terms and conditions with respect to the proposed financing described herein for Exide International Holdings LP and its subsidiaries (the "Company").*

<u>Implementation</u>

**The Consenting Creditors and the Company hereby agree and acknowledge that the transactions contemplated by this European Notes Term Sheet, remains subject in all respects to tax, securities laws, contract, and other due diligence and, structuring and definitive documentation. If the parties determine that the proposed transactions cannot be implemented as set forth in this Term Sheet (or it would be unduly burdensome to do so), the parties agree to negotiate in good faith such alternative transaction steps (and to modify this Term Sheet) in such a manner so as to provide the Company and the Lenders with substantially the same economic and legal rights and obligations (including as to consideration) as originally intended to the greatest extent possible; provided that any modifications to the transactions contemplated by this Term Sheet and any definitive documentation relating thereto shall be in form and substance reasonably acceptable to the Lenders.**

| Indicative Term: | Description: |
|---|---|
| **Notes Issuances** | **Initial Notes Issuance**: Up to $25 million (which shall be denominated in US Dollars) (the "**Initial Notes**") to be issued by Exide International Holdings LP (the "**European Issuer**"), all of which shall be issued and purchased on a date to be selected by the European Issuer in consultation with the Lenders on or around prior to [_____], 2020 (the "**Closing Date**"). |
| | **Discretionary Notes Issuance**: Subject to the consent of the Lenders, at any time, up to $50 million (which shall be denominated in US Dollars) (the "**Discretionary Notes**", and together with the Initial Notes, the "**Notes**") may be issued by the European Issuer at the request of the European Issuer, but purchased in the discretion of the Lenders, all of which shall be issued and purchased on a closing date to be determined by the Lenders in consultation with the European Issuer (subject to satisfaction or waiver of the applicable conditions to purchase) (the "**Notes Delayed Draw Date**"). The European Issuer may not issue the Discretionary Notes to any purchaser other than the Lenders without the Lenders' prior consent. |
| | Each holder of the Superpriority Lien Notes (as defined below) may participate in the Initial Notes Issuance and the Discretionary Notes Issuance for at least their pro rata amounts based on their respective holdings of the Superpriority Lien Notes. |
| | The Notes will be purchased pursuant to a notes purchase agreement with terms and conditions customary to notes purchase agreements in connection with a Section 4(a)(2) offering and will be issued pursuant to an indenture subject to guarantees and security as described below. |
| **Guarantors** | Each non-U.S. domiciled subsidiary of the European Issuer that is a guarantor under the existing 10.75% Superpriority Lien Senior Secured Notes due 2021 (the "**Superpriority Lien Notes**") shall guarantee the Notes (collectively, the "**Guarantors**). |
| **Lenders** | [_____] (collectively, the "**Lenders**"). |
| **Fees** | [TBD] |
| **Use of Proceeds** | For working capital and general corporate purposes of the European Issuer and its subsidiaries, in accordance with the Budget (as defined below). |
| **Maturity Date** | The aggregate outstanding principal amount of the Notes will be due and payable on the earlier to occur of (i) June 30, 2024 (the "**Maturity Date**") and (ii) acceleration of the Notes in accordance with the terms thereof (which shall not include an event of default triggered by the acceleration of any notes issued by an Exide U.S. entity as a result of the filing for |

|  | Chapter 11 by the Company (the "**Chapter 11 Filing**"), so long as the European Issuer is not included in the Chapter 11 Filing. |
|---|---|
|  | Immediate automatic acceleration of the Notes if (i) the European Issuer and its subsidiaries are not separated from Exide U.S. entities within 6 months of the Closing Date and (ii) the European Issuer is not majority owned by a permitted holder group comprised of Mackay Shields LLC, D.E. Shaw & Co., L.P., AllianceBernstein Holding L.P., and Axar Capital Management L.P. and their affiliates (the "**Permitted Holders**") within 6 months of the Closing Date. |
|  | There will be no amortization of the Notes prior to the Maturity Date. |
| **Interest Rate** | [TBD] |
| **Security Interest** | The Notes shall be secured exclusively by assets of the European Issuer and the Guarantors that constitute collateral for the existing Superpriority Lien Notes in the following order of payment (i) a first priority perfected lien on the Notes Priority Collateral (as defined in the Intercreditor Agreement), which lien shall rank, subject to the exceptions set forth in the Intercreditor Agreement, senior to each of the liens on the Notes Priority Collateral securing the Superpriority Lien Notes, the ABL Debt, and the First Lien Debt and (ii) a second priority perfected lien on the ABL Priority Collateral (as defined in the Intercreditor Agreement) (but senior to each of the Superpriority Lien Notes and the First Lien Debt), or, subject to the termination of the ABL Facility with respect to the European borrowers thereto, a first priority perfected lien on the ABL Collateral.

The existing intercreditor agreement dated June 17, 2019 (the "**Intercreditor Agreement**") among U.S. Bank National Association in each of its capacities as Superpriority Agent and Notes Control Agent, First Lien Agent, Second Lien Agent and Bank of America, N.A. as ABL Agent and ABL Control Agent, will be amended to include the Notes as having the priority set forth above.

The Company and the Lenders shall discuss alternative options to achieve a "first-out" senior lien with respect to the Notes without executing new security agreements – for example: amendment to the existing Superpriority Lien Notes security documents to include the Notes as "Secured Obligations" (or equivalent term) and subject to a collateral sharing agreement pursuant to which the Notes will be subject to a first-out priority in respect of proceeds of collateral. |
| **Conditions to Purchase** | Conditions to purchase will comprise (i) no Default or Event of Default under the Notes, (ii) each of the representations being true and correct in all material respects, (iii) customary deliverables,  (iv) with respect to the Notes Delayed Draw Date, the European Issuer having not more than $[___] million in available cash.[1] |
| **Mandatory Redemption** | Mandatory redemption of the Notes plus accrued interest and fees will be required (to be applied ratably among the Notes) with:
• 100% of the net cash proceeds from any non-ordinary course sales and casualty events relating to the Notes Priority Collateral (as defined in the Intercreditor Agreement) (subject to thresholds and reinvestment rights to be agreed); and
• 100% of the net cash proceeds from issuances or incurrences of debt by the European Issuer and its subsidiaries (other than permitted indebtedness). |
| **Optional Redemption** | The Notes may be redeemed, in whole or in part, at the option of the Issuer at any time, at a redemption price equal to the greater of 100% of the principal amount to be redeemed and a "make-whole" redemption price, in either case, plus accrued and unpaid interest, if any, to, but excluding, the redemption date. The indenture shall provide that the "make whole" premium applies if the Notes are accelerated (including as a result of automatic acceleration) as a result of bankruptcy or other events of default. |

---

[1] The maximum available cash condition to the delayed draw takes into account the potential for (i) COVID relief financing in certain jurisdictions and (ii) the refinancing of the existing ABL Facility solely with respect to European borrowers, each of which may reduce the requirement for further funding.

| | |
|---|---|
| **Budget** | The Company will deliver a budget for the period through the 6 month anniversary of the Closing Date (a "**Budget**"), which shall be reasonably satisfactory to the Lenders. Thereafter, the Company will deliver a Budget for each year for the life of the Notes, beginning with the Budget for the year ending December 31, 2021. |
| **Milestones** | The Company and the Lenders shall agree to certain milestones with respect to the Company's strategic review (the "**Milestones Covenant**"). |
| **Representations and Affirmative Covenants** | Representations, affirmative and financial reporting covenants and information rights to be substantially identical to those in the indenture governing the Superpriority Lien Notes (the "Existing Superpriority Lien Notes Indenture") and additionally, will include the Milestones Covenant. |
| **Negative Covenants** | Negative covenants to be substantially identical to those in the Existing Superpriority Lien Notes Indenture, subject to modifications to be agreed. The following covenant to be added:

The Debtors shall (i) not directly or indirectly access, or attempt to access, any cash of the Europe/ROW Entities (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise) for the use or disposition of, or by, the Debtors and (ii) take all actions necessary to ensure that no cash or funds are paid, credited or otherwise transferred from any Europe/ROW Entity to the Debtors outside the ordinary course of business.

"**Debtors**" means Exide Technologies, LLC (or any other entity that is the borrower under the DIP Term Loan), Exide Holdings, Inc., Dixie Metals Company, Refined Metals Corporation and Exide Delaware LLC.

"**Europe/ROW Entities**" means non-Debtor entities that operate the Company's (i) the Transportation EMEA/ROW business segment, (ii) the Industrial EMEA/ROW business segment, (iii) Recycling EMEA/ROW segment and (iv) any combination of the items listed in sections (i) through (v) hereof. |
| **Events of Default** | Events of Default to be substantially identical to those in the Superpriority Lien Notes Indenture, subject to (i) modification to include events of default triggered by a failure to comply with the Milestones Covenant (subject to a cure period to be agreed); (ii) the Notes Purchase Agreement for the Notes will not include an event of default caused by the Chapter 11 Filing of the Company and its subsidiaries so long as the European Issuer is not included in such Chapter 11 Filing or for any Specified Default (as defined in the Restructuring Support Agreement) or any Event of Default arising as a result of any Specified Default; and (iii) any action by the Debtors to challenge, support or encourage a challenge of, or fail to oppose a challenge of (A) any payments made to the DIP Lenders (as defined below) or to the Prepetition Secured Noteholders (as defined below) or any liens granted in favor of the DIP Lenders or the Prepetition Secured Noteholders or (B) the validity or enforceability of any of the DIP Loan Documents, the legality, validity or enforceability of any of the DIP Term Loans (as defined below) or the obligations to the Prepetition Secured Noteholders being an event of default, except, in the case of both (A) and (B), any payments made pursuant to the DIP Order and any asset sales contemplated by the DIP Order.

"**DIP Lenders**" means Blue Torch and other lenders under the $15 million last-out loan portion of the DIP Term Loans.

"**DIP Term Loans**" means the $40 million super priority credit facility to the Debtors.

"**Prepetition Secured Noteholders**" means holders of the (i) the Superpriority Lien Notes, (ii) 11% Exchange Priority Notes due 2024, and (iii) 11% First Lien Senior Secured Notes due 2024. |

Case 20-11157   Doc 14   Filed 05/19/20   Page 136 of 136

| | |
|---|---|
| **Form** | The Notes will be issued and purchased pursuant to an indenture and will be issued pursuant to the exemption from the registration requirements of the U.S. Securities Act of 1933, as amended, pursuant to Section 4(a)(2) thereof.<br><br>The Notes will not be registered in any jurisdiction. |
| **Required Consents** | The consent of the requisite holders of the ABL Debt, the Superpriority Lien Notes and the First Lien Debt (in each case as defined in the Intercreditor Agreement) will be required in order to issue the Notes. |
| **Closing Date** | On or prior to [      ], 2020. |
| **Expense Reimbursement** | The Company shall reimburse the Lenders for their reasonable and customary out-of-pocket due diligence and legal expenses in accordance with the terms of that certain [reimbursement] letter agreement dated [_], 2020. |
| **Governing Law** | New York. |

# **<u>TAB 2</u>**

**Motion of Debtors for Authorization to (I) Implement Mandatory
Settlement Procedures for Non-Performing Properties and
(II) Abandon Such Properties, if Necessary, dated May 19, 2020
[Bankr. D.I. 37]**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x
                            :

**In re**                            :        **Chapter 11**
                            :

**EXIDE HOLDINGS, INC.,** *et al.,*     :        **Case No. 20-11157 (CSS)**
                            :

        **Debtors.**[1]         :        **(Joint Administration Requested)**
                            :
------------------------------------------------------------ x

## MOTION OF DEBTORS FOR AUTHORIZATION TO (I) IMPLEMENT MANDATORY SETTLEMENT PROCEDURES FOR NON-PERFORMING PROPERTIES AND (II) ABANDON SUCH PROPERTIES, IF NECESSARY

Exide Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Exide**" or the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement[2]

1.      As one of the world's largest lead-acid battery manufacturers, Exide has always endeavored to comply with federal, state, and local environmental regulations, and to preserve the health and safety of its employees and their surrounding communities. In connection with these efforts, the Company owns[3] and maintains twenty-three (23) non-performing properties across the United States and one (1) non-performing property in Canada (collectively, the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Messing Declaration (as defined herein).

[3]    The Debtors own all of the NPPs other than the NPP located in Commerce, California and portions of the NPPs located in Bristol, Tennessee and Florence, Mississippi (Ellis Street).

"**NPPs**"), of which (i) eight (8) NPPs have been remediated and (ii) sixteen (16) NPPs are properties that are subject to ongoing environmental remediation efforts.[4]  The Company and its predecessor entities have owned a subset of the NPPs since the 1970s and have retained such properties through two previous chapter 11 restructurings that involved the execution of various settlement agreements with regulatory agencies for the remediation of such NPPs.

2.       Unlike their predecessors, however, the Debtors do not intend to pursue a recapitalization transaction to emerge from the instant proceedings as a reorganized business.  As discussed in more detail in the Messing Declaration, the Debtors are conducting a postpetition marketing and sale process for the sale of substantially all of their North American and European assets.  With respect to any assets that the Debtors are unable to sell to third party purchasers, the Debtors intend to liquidate or abandon such assets.  Simply put, at the end of these chapter 11 cases, the Debtors will not be in business, and as such, they will no longer be able to retain and support the ongoing maintenance and remediation of the NPPs.  It is against this backdrop that the Debtors seek to commence good faith negotiations at the outset of these chapter 11 cases with various governmental regulatory agencies (each, an "**Agency**" and collectively, the "**Agencies**")[5] concerning the orderly transfer of the NPPs.

3.       As set forth more fully herein, the Debtors respectfully request that the Court establish settlement procedures (the "**Settlement Procedures**") that enable the Debtors to (i) continue their postpetition marketing efforts to sell as many of the NPPs as possible without the distraction and cost of potentially unnecessary litigation at this critical juncture, (ii) engage in good faith negotiations with the Agencies, including mediation, if necessary, to obtain an agreed upon

---

[4]       A complete list of the NPPs is set forth on **Exhibit B**.

[5]       A complete list of the Agencies is set forth on **Exhibit C**.

solution for the orderly transition of any NPPs that the Debtors are unable to sell and any related issues, and (iii) to the extent settlement negotiations and mediation are not successful, proceed on an expedited timeline for the contested abandonment of the NPP(s) at issue.

4.      More specifically, pursuant to the Settlement Procedures, the Debtors and the Agencies will be required to do the following:

a.  **Initial Settlement Conference**.  The Debtors and relevant Agency will be required to participate in an initial telephonic settlement conference among the Debtors, the Agency, and their respective advisors, on an agreed upon date.  If the settlement discussions continue following the initial settlement conference and the parties reach an agreement, the Debtors shall file a notice of settlement with the Court setting forth the terms of the agreement and providing parties in interest with an opportunity to object to such settlement.

b.  **Mediation Stage**.  If the Debtors and the relevant Agency (i) are unable to agree upon an acceptable date for the initial settlement conference or (ii) do not reach a settlement by June 30, 2020 (as extended upon mutual agreement), the parties shall proceed to the mediation stage.  All mediation proceedings shall be conducted by the Mediator(s) and governed by Rule 9019-5 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("**Local Rule 9019-5**").

c.  **Contested Abandonment Motion**.  If the Debtors and the relevant Agency are unable to reach a settlement by July 14, 2020 through mediation, the parties shall present the Court with a proposed scheduling order setting forth applicable deadlines for the resolution of the Debtors' proposed abandonment of the relevant NPP under section 554(a) of the Bankruptcy Code.

5.      The overarching goal of establishing and implementing the Settlement Procedures is simple—to implement the orderly transfer of the NPPs from the Debtors' liquidating estates in an efficient manner that minimizes the risk of harm to public health and safety as required by the standards set forth in *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986), as further described herein.  ***Importantly, the Settlement Procedures do not require Agencies to reach a settlement with the Debtors***.  Rather, the Settlement Procedures are designed to foster open communications among the parties and facilitate the efficient administration of these chapter

11 cases while significantly reducing the incurrence of unnecessary costs associated with litigating abandonment issues under section 554(a) of the Bankruptcy Code before the Court.

6.     Importantly, the Debtors will continue to take all requisite steps, including the expenditure of costs, necessary to avoid the risk of imminent harm to public health and safety at the NPPs during the implementation of the Settlement Procedures.  The duration contemplated by the Settlement Procedures will not pose a risk of environmental harm.  Rather, the goals of environmental preservation, health, and safety will be advanced to the extent the Settlement Procedures enable the smooth transition of the NPPs to third parties.

7.     For the reasons stated herein, the Debtors respectfully request that the Court enter the proposed order approving the Settlement Procedures, annexed hereto as **Exhibit A**.

## Background

8.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

9.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

10.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Roy Messing in Support of Debtors' Chapter 11 Petitions and First Day Relief*,

sworn to on the date hereof (the "**Messing Declaration**").  An overview of the Mediators (as defined herein) is set forth in the *Declaration of Paul R. Genender In Support of Motion of Debtors For Authorization to (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (the "**Genender Declaration**").  The Messing Declaration and the Genender Declaration have been filed with the Court contemporaneously herewith and are incorporated by reference herein.

### Jurisdiction

11.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### Relief Requested

13.     By this Motion, pursuant to section 105(a) of the Bankruptcy Code and Local Rule 9019-5, the Debtors respectfully request authorization to implement the Settlement Procedures, including, without limitation, the mandatory settlement and mediation process therein, with respect to the orderly transfer or subsequent abandonment of the NPPs set forth on **Exhibit B**.

### General Background

**I.     2002 Bankruptcy and 2013 Bankruptcy**

14.     The Company is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid and lithium-ion batteries, with operations in more than twenty (20) countries.  The Company is headquartered in Milton, Georgia and its North American operations include four (4) battery manufacturing facilities, two (2) battery component manufacturing facilities, and two (2) recycling facilities.  The Company has historically made a priority of safety and compliance with federal, state, and local environmental regulation.  Over time, however, the Company has ceased its business operations at several of the NPPs and limited its activity at each NPP to property maintenance and/or environmental remediation, at all times working to ensure that the NPPs do not pose a risk to public health.

15.     The Company owned the NPPs in April 2002 when its predecessor holding company filed a chapter 11 petition in this District (the "**2002 Bankruptcy**") for the first time and maintained its ownership of the NPPs when it emerged from the 2002 Bankruptcy two (2) years later.  The Company entered into various settlement agreements with environmental regulatory agencies throughout the 2002 Bankruptcy, including settlement agreements with the U.S. Environmental Protection Agency (the "**EPA**") and the National Oceanic and Atmospheric Administration (the "**NOAA**"), whereby the Company agreed to perform necessary environmental work at each of the sites it owned, including the NPPs.

16.     A similar process unfolded when the Company's predecessor holding company filed its second chapter 11 petition in this District in June 2013 (the "**2013 Bankruptcy**").  Shortly before the 2013 Bankruptcy, the California Department of Toxic Substances Control (the "**DTSC**") issued an order in April 2013 suspending the Company's

RLF1 23448333v.1

A-0138

operations at its lead-recycling facility in Vernon, California (the "**Vernon Facility**"), alleging that the facility's underground storm-water system and furnace emissions failed to comply with applicable regulatory standards. The Company also recently had ceased its recycling operations in Frisco, Texas, and Reading, Pennsylvania, prior to filing the 2013 Bankruptcy. The Company emerged from bankruptcy two (2) years later in April 2015 and maintained its ownership of substantially all of the NPPs, which remain the property of the Debtors today.

17.     The remediation efforts undertaken by the Company in connection with the NPPs vary in scope and stage across the various sites. For example, the Company has completed remediation at its Kankakee, Illinois site pursuant to a voluntary agreement with Illinois state authorities. With respect to the Vernon Facility, the Company has entered into a series of agreements with federal and state authorities that required the Company to close the Vernon Facility and remit substantial payments in connection with remediation measures at the site. The Company's compliance efforts have entailed significant expenditures. In 2018 and 2019 alone, the Company spent approximately $35.6 million and $29.5 million, respectively, in environmental remediation costs. The Company also maintains a total of approximately $80 million in financial assurances (including surety bonds and environmental trust funds) in connection with its environmental obligations at the NPPs across the United States.

18.     The Company will continue to take the necessary measures to prevent the risk of imminent and identifiable harm to the public health and safety during the implementation of the Settlement Procedures. Notably, however, the Debtors now stand in a different posture than their predecessors in the 2002 Bankruptcy and 2013 Bankruptcy. Unlike their predecessors, the Debtors will not be emerging from the instant proceedings as a reorganized business entity. The Debtors, with the assistance of their legal and financial advisors, are conducting a postpetition

marketing and sale process of their North American and European assets, including the NPPs, and intend to conduct an orderly wind down of their assets primarily through sales conducted pursuant to section 363 of the Bankruptcy Code. As such, the Debtors will no longer be able to retain and support the ongoing maintenance and remediation of the NPPs following the conclusion of these chapter 11 cases.

## II.      Current Status of the NPPs

19.     As noted above, the Company and its predecessors have successfully completed environmental remediation on a number of the NPPs, eliminating from those sites any associated environmental liability. With respect to eight (8) NPPs for which some environmental liability remains, there are financial assurances in place that the Company estimates will cover, or at least significantly defray, the expected cost of remediation at such sites. For example, the Company estimates that approximately $26 million in financial assurances are available to address onsite contamination at the Vernon Facility and approximately $25 million in financial assurances are available to address contamination at the NPP located in Frisco, Texas. Importantly, as noted above, the Debtors are ensuring that the NPPs are properly supervised and maintained to avoid the risk of imminent harm to public health and safety at the NPPs during these chapter 11 cases. The Debtors are currently incurring approximately $1.6 million on a monthly basis in connection with such efforts.

20.     The Debtors have been engaging and continue to engage in discussions with potential third party purchasers in connection with the NPPs in an effort to sell the NPPs through the postpetition marketing and sale process. For that reason, postpetition marketing efforts continue, however, the Debtors also seek to simultaneously engage in good faith negotiations with the Agencies to develop a consensual transition plan for the orderly transfer of such properties to

the appropriate entity (whether that entity is a third party purchaser or an entity designated by the relevant Agency).  As set forth herein, the main objective of the Settlement Procedures is to facilitate this process while simultaneously reducing the costs associated with potential litigation of abandonment issues arising under section 554(a) of the Bankruptcy Code.

### Overview of Legal Issues Arising in Connection With Abandonment

21.     The Debtors hope to reach a consensual resolution with each Agency in connection with the orderly transfer of every NPP, however, in the event the parties are unable to reach a settlement following the mandatory settlement and mediation stages set forth in the Settlement Procedures, the Debtors will proceed with what is anticipated to be a contested abandonment motion for the specific NPP at issue.  The proposed scheduling order will include deadlines for the submission of relevant briefing from the Debtors and the relevant Agency and an expedited discovery process for the submission of, among other things, evidence and expert reports.

22.     Although this Motion is not meant to set forth the Debtors' affirmative case with respect to abandonment of the NPPs, the Debtors believe that they will be able to satisfy the legal standards governing abandonment to the extent a consensual resolution is not reached with respect to any of the NPPs.  Section 554(a) of the Bankruptcy Code provides:

> After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

11 U.S.C. § 554(a).  The case law makes clear that a debtor has standing to seek abandonment of its property pursuant to section 554(a) of the Bankruptcy Code, as long as a debtor satisfies two basic requirements.  First, the property to be abandoned must be property of the debtor's estate. 11 U.S.C. §§ 541 and 554.  Second, the property to be abandoned must be burdensome or of

inconsequential value or benefit to the debtor's estate.  *N.J. Dep't of Envtl. Prot. v. Atkinson (In re St. Lawrence Corp.),* 248 B.R. 734, 740 (D.N.J. 2000).  If the analysis ended there, there would be no question that the Debtors should be authorized to abandon the NPPs.  Notwithstanding a debtor's broad authority under section 554(a) of the Bankruptcy Code, the U.S. Supreme Court limited such authority, finding that a bankruptcy court "does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety" and that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 506-07 (1986).  The Supreme Court noted that this exception to the abandonment power applied narrowly and qualified its holding with a footnote:

> This exception to the abandonment power vested in the trustee by § 554 *is a narrow one*.  It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment.  The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.* at 507 n.9 (emphasis added).  In the wake of *Midlantic*, courts have adopted the Supreme Court's two-prong test under which abandonment is permitted unless (i) the abandoned property poses an "imminent and identifiable harm" at the time of the abandonment <u>and</u> (ii) the abandonment would violate applicable environmental laws or regulations reasonably calculated to protect the public health or safety.  *See In re St. Lawrence Corp.*, 248 B.R. at 739.[6]

23.     Pursuant to the Settlement Procedures, the Court will only be asked to rule upon a contested abandonment motion if, following the mandatory settlement and mediation stages

---

[6]     The bankruptcy court in *St. Lawrence* held that "the restrictions on abandonment identified in *Midlantic* do not apply unless each of the following conditions have been demonstrated:  (1) an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety; (2) abandonment of the property will

set forth in the Settlement Procedures, the Debtors and an Agency are unable to reach a settlement governing the orderly transfer of the NPP at issue.

### Overview of Settlement Procedures

24.     As previously discussed, approval of the Settlement Procedures will facilitate the efficient administration of these chapter 11 cases and significantly reduce the incurrence of unnecessary costs associated with litigating abandonment issues under section 554(a) of the Bankruptcy Code before the Court.  Many common issues exist with respect to the NPPs and the Agencies, including inquiries from the Agencies regarding (i) the current status of any remediation efforts at the relevant NPP, (ii) an overview of financial assurances available to the relevant Agency (if any), (iii) appraisal values of the relevant NPP, and (iv) the Debtors' transition plan to effectuate the safe and orderly turnover of the NPP to the relevant Agency (or an entity specified by the Agency).  The Settlement Procedures will ultimately enable the Debtors to promote judicial efficiency in these complex chapter 11 cases and administer a streamlined settlement process to focus the efforts of all parties toward a common objective—ensuring the smooth transition of NPPs in a manner that minimizes harm to the public health and safety.

25.     For the avoidance of doubt, the Settlement Procedures do not obligate the parties to settle—the procedures simply provide an orderly and structured framework for parties

---

violate a state statute or regulation; (3) the statute or regulation being violated is reasonably designed to protect the public health and safety from imminent and identifiable harm caused by identified hazards; and (4) compliance with the statute or regulation would not be so onerous as to interfere with the bankruptcy administration itself."  *Id.* at 739.  With respect to the fourth factor, the bankruptcy court explained that "[a]lthough the Supreme Court did not reach this question, it implied that some state laws may impose conditions too onerous on the bankruptcy proceeding to be enforced.  Examples might include the following:  (1) when the estate lacks unencumbered assets with which to comply with state law, (2) when compliance would take too long for the proceeding to be expeditious, or (3) when compliance would allow environmental authorities to completely usurp administration of the case. . . In such cases, the bankruptcy court is free to formulate conditions short of full compliance with state law that will adequately protect the public's health and safety."  *Id.* at 739 n.6 (internal citation omitted).

11

to engage in good faith discussions at the outset of these chapter 11 cases and represent a balanced approach to efficiently resolve disputes without costly litigation and unnecessary expenditure of judicial and estate resources. The goals of this Motion are to obtain the same benefits contemplated by Local Rule 9019-5, which provides for procedures governing mediation of matters in bankruptcy cases and adversary proceedings. Accordingly, the Debtors request that, unless specified otherwise in the Settlement Procedures, Local Rule 9019-5 shall apply to any mediation to be conducted pursuant to an order approving this Motion.

26.     The Settlement Procedures are set forth in the chart below:

| OVERVIEW OF SETTLEMENT PROCEDURES[7] | |
|---|---|
| **Mandatory Participation** | A. Following service of a Settlement Notice (as defined herein) on an Agency (i) compliance with the Settlement Procedures is mandatory and (ii) no party is required to settle or compromise any dispute or enter into a particular settlement or compromise; provided, however, the Debtors and each Agency must serve the required responses, engage in the specified communications to discuss settlement, participate in any mediation in good faith, follow directions of the Mediator (as defined herein), and otherwise comply with the Settlement Procedures in good faith.<br><br>B. All rights, remedies, claims, and defenses of the Debtors and each Agency shall not be impaired, waived, or compromised in any further proceedings in these chapter 11 cases in the event the parties are unable to reach a settlement or compromise following such parties' good faith participation in the Settlement Procedures. |
| **Initial Settlement Conference** | A. With respect to each NPP, the Debtors may initiate settlement discussions with the relevant Agency by serving each Agency with (i) a copy of an order approving this Motion and (ii) a notice setting forth the Debtors' request to engage in settlement discussions regarding the Debtors' proposed abandonment of the relevant NPP (the |

---

[7]     The term "Agency" as used in the Settlement Procedures shall be deemed to refer to more than one Agency to the extent required.

RLF1 23448333v.1

| | "**Settlement Notice**"), the form of which is annexed as <u>Schedule 1</u> to the Proposed Order.<br><br>B. The Debtors propose that the service on or notice to an Agency will be deemed adequate if such service or notice is provided to the Agency's address set forth on <u>Exhibit C</u> annexed hereto by (i) hand delivery, (ii) first class mail, or (iii) overnight mail.<br><br>C. The Settlement Notice will set forth the following:<br><br>    i. A selection of proposed dates and times for an initial telephonic conference among the Debtors, Weil, Gotshal & Manges LLP, Richards, Layton & Finger, P.A., the Agency, and the Agency's counsel (the "**Initial Settlement Conference**").<br><br>    ii. The contact information for the Debtors' legal and financial advisors in the event of any general inquiries ahead of the Initial Settlement Conference.<br><br>    iii. A statement setting forth that the Initial Settlement Conference, together with any continuations or rescheduled settlement calls or meetings arising from the Initial Settlement Conference, shall be subject to Rule 408 of the Federal Rules of Evidence and the confidentiality provisions of Local Rule 9019-5.<br><br>D. Each Agency identified in the Settlement Notice must respond by acceptance of one of the proposed dates and times as promptly as possible.<br><br>E. The Initial Settlement Conference shall be allocated for approximately one (1) hour, which may be extended through mutual agreement of the parties. Subsequent settlement conferences may be scheduled by the parties. |
|---|---|
| **Agreement to Settle** | A. If the Debtors and the Agency reach a settlement, the parties shall execute a settlement agreement and general release (including confidentiality provisions) (the "**Settlement Agreement**") and, if the matter is in litigation or otherwise subject to an adversary proceeding, the Agency shall dismiss any applicable claims in such proceeding with prejudice upon approval of the Settlement Agreement (or as otherwise set forth in such Settlement Agreement). |

B.  Within five (5) calendar days upon executing a Settlement Agreement, the Debtors shall file a notice (the "**Settlement Agreement Notice**") with the Court setting forth the following:

  i.  The execution date of the Settlement Agreement, including the parties thereto.

  ii.  A concise summary of the settlement terms and, if applicable, the transition plan for the relevant NPP.

  iii.  A proposed order approving the Debtors' entry into the Settlement Agreement and approval of the terms thereof (the "**Proposed Settlement Order**").

C.  The Debtors shall (i) serve the Settlement Agreement Notice on the parties listed below and such other parties as the Court may order (collectively, the "**Objection Notice Parties**") and (ii) cause the Settlement Agreement Notice to be published on the website maintained by the Debtors' claims and noticing agent in these chapter 11 cases (https://cases.primeclerk.com/Exide2020), a notice containing information about the applicable Settlement Agreement Notice.  The Objection Notice Parties include:

  i.  Office of the U.S. Trustee:  844 N. King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda J. Casey, Esq.)

  ii.  Counsel to the Ad Hoc Group:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Alice Belisle Eaton, Esq. and Robert Britton, Esq.)

  iii.  Counsel to the DIP Agent: Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071 (Attn: Robert A. Klyman, Esq. and Matthew G. Bouslog, Esq.)

  iv.  Counsel to any statutory committee of unsecured creditors appointed in these chapter 11 cases.

  v.  The non-Debtor parties to the Settlement Agreement.

14

| | |
|---|---|
| | vi. Any party who may be affected if the relief requested in the Settlement Agreement Notice is granted.<br><br>D. Objections to the terms of a Settlement Agreement (a "**Settlement Agreement Objection**") must:<br><br>    i. Be in writing;<br><br>    ii. State the name and address of the objecting party and the amount and nature of the claim or interest of such party (unless such party is the U.S. Trustee);<br><br>    iii. State with particularity the basis and nature of any objection;<br><br>    iv. Conform to the Bankruptcy Rules and Local Rules; and<br><br>    v. Be filed with the Court and served in accordance with the Local Rules by no later than ten (10) calendar days after the filing and service of the relevant Settlement Agreement Notice (the "**Settlement Agreement Objection Deadline**").<br><br>E. If a timely Settlement Agreement Objection is filed and served with respect to an applicable Settlement Agreement and such objection cannot be consensually resolved, the Debtors shall request a hearing before the Court on approval of the applicable Settlement Agreement.<br><br>F. If no timely Settlement Agreement Objection is filed and served with respect to an applicable Settlement Agreement, or if there is such an objection and it is consensually resolved, the Court may enter the Proposed Settlement Order approving the Settlement Agreement upon the expiration of the Settlement Agreement Objection Deadline, or the resolution of such objection upon the submission of the  Proposed Settlement Order under certification of no objection or certification of counsel, as applicable. |
| **Mediation Stage** | A. If the Debtors and the relevant Agency are unable to reach a settlement by June 30, 2020 (as extended upon mutual agreement), the parties shall proceed to mediation (each, a "**Mediation**" and the applicable mediator, the |

RLF1 23448333v.1

"**Mediator**"), where the Mediator shall hear and preside over all mediations hereunder.

B. The Mediator shall have the broadest possible discretion consistent with Local Rule 9019-5 (as modified by any order approving the Motion), including the ability to consolidate mediations involving the same Agency upon application by such Agency and consultation with the Debtors.

C. The Debtors and Agency shall jointly contact the Mediator to schedule the initial mediation date.

D. At the option of the Mediator, all mediation proceedings will take place either (i) telephonically or (ii) by video conference.

E. Unless otherwise instructed by the Mediator, each party shall submit directly to the Mediator and serve on all counsel such materials (the "**Submission**") in form and content as the Mediator directs.  Prior to the Mediation, the Mediator may discuss with the participants to determine what materials would be helpful.   The Submission shall not be filed with the Court and the Court shall not have access to the Submission.

F. Unless otherwise ordered by the Mediator, the following persons must participate in the Mediation (either telephonically or by video conference) (the "**Mediation Parties**"):

   i.   A Debtor representative;

   ii.  If the party is not a natural person, including a governmental entity, a representative who is not the party's attorney of record and who has full authority to negotiate and settle the matter on behalf of the party;

   iii. If the party is a governmental entity that requires settlement approval by an elected official or legislative body, a representative who has authority to recommend a settlement to the elected official or legislative body;

   iv.  The attorney who has primary responsibility for each party's case, including Delaware counsel if engaged at the time of mediation regardless of whether Delaware counsel has primary responsibility for a party, unless Delaware counsel requests to be and is excused from

RLF1 23448333v.1

<table>
<tr><td></td><td>attendance by the Mediator in advance of the Mediation; and<br><br>v. Other interested parties, such as insurers or indemnitors or one or more of their representatives, whose presence is necessary for a full resolution of the matter assigned to mediation.<br><br>G. Willful failure to attend any Mediation and any other material violation of Local Rule 9019-5 shall be reported to the Court by the Mediator any may result in the impositions of sanctions by the Court. Any such report of the Mediator shall comply with the confidentiality requirement of Local Rule 9019-5(d).<br><br>H. The Mediation shall end (i) upon mutual consent of the Debtors and the Agency or (ii) by the Mediator, in the Mediator's sole and reasonable discretion.<br><br>I. No later than July 17, 2020, the Mediator shall file with the Court a certificate (a "**Certificate of Completion**") showing compliance or non-compliance with the mediation requirements of the Settlement Procedures and whether or not a settlement has been reached. Regardless of the outcome of the Mediation, the Mediator shall not provide the Court with any details of the substance of the Mediation.<br><br>J. If the Debtors and Agency reach a settlement as a result of Mediation, the parties shall execute a Settlement Agreement as specified herein and the Debtors shall file a Settlement Agreement Notice in accordance with the terms set forth herein.<br><br>K. If the Debtors and Agency are unable to reach a settlement following Mediation, the Debtors and Agency shall present the Court with a proposed scheduling order ("**Proposed Scheduling Order**") setting forth applicable deadlines for the resolution of the Debtors' proposed abandonment of the relevant NPP under section 554(a) of the Bankruptcy Code.</td></tr>
<tr><td>**Proposed Scheduling Order**</td><td>A. The Proposed Scheduling Order shall be filed no later than July 22, 2020.<br><br>B. The Proposed Scheduling Order shall provide for the following deadlines, unless mutually agreed to otherwise by the parties:</td></tr>
</table>

17

| | |
|---|---|
| |    i.   The parties must conclude all fact discovery, including depositions, no later than August 4, 2020.<br><br>   ii.   The Debtors shall file a motion seeking to abandon the relevant NPP no later than August 11, 2020.<br><br>  iii.  The relevant Agency shall file a response to the Debtors' motion to abandon the relevant NPP no later than August 18, 2020.<br><br>  iv.  A hearing must be held no later than August 25, 2020, subject to the Court's availability. |
| **Deadlines** | Notwithstanding anything contained herein, the deadlines contained herein may be modified solely by (i) the mutual consent of the Debtors and Agency or (ii) by order of the Court. |
| **Good Faith Participation** | A.  The Debtors and each Agency must participate in good faith with the Settlement Procedures. If, after notice and a hearing, the Court determines that a party has not complied with the Settlement Procedures in good faith, the Debtors or Agency, as the case may be, may be subject to such sanctions as the Court deems appropriate in its sole discretion.<br><br>B.  If the Mediator reports to the Court that any party subject to the Settlement Procedures is not cooperating in good faith with the Settlement Procedures, the Court may, without the need for further motion by any party, schedule a hearing and order sanctions. Litigation with respect to the issuance of sanctions shall not delay the commencement of the Mediation Stage of the Settlement Procedures.<br><br>C.  Sanctions may include, but are not limited to:<br><br>   i.   <u>Against Debtors</u>: (a) reasonable attorneys' fees incurred by an Agency with respect to the Settlement Procedures after the receipt of a Settlement Notice and (b) fees and costs related to the Mediation.<br><br>   ii.   <u>Against Agency</u>: (a) reasonable attorneys' fees incurred by the Debtors with respect to the Settlement Procedures after the sending of a |

18

A-0150

| | |
|---|---|
| | Settlement Notice and (b) fees and costs related to the Mediation. |
| **Confidentiality** | A. The confidentiality provisions of Local Rule 9019-5(d) are incorporated into the Settlement Procedures by reference.  No statements or arguments made or positions taken by the Mediator, the Debtors, or the Agency during any part of the process described herein, including the Initial Settlement Conference (together with any continuations or rescheduled settlement calls or meetings arising from the Initial Settlement Conference) and the Mediation Stage may be disclosed by the Mediator or any such parties or their attorneys and advisors to the Court or any third party.<br><br>B. All briefs, records, reports, and other documents received or made by the Mediator while serving in such capacity shall remain confidential and shall not be provided to the Court, unless they would be otherwise admissible.  The Mediator shall not be compelled to disclose such records, reports, and other documents in connection with any hearing held by the Court. |
| **Motions to Compel Payment** | Subject to section 362(b)(4) of the Bankruptcy Code and solely during the period that the Debtors and applicable Agency are actively engaged in settlement discussions and mediation hereunder, the Agencies shall be precluded from filing motions to compel payment from the Debtors in connection with the applicable NPP or otherwise seek judicial relief related thereto. |
| **Existing Jury Trial and Arbitration Rights Unaffected** | Unless an Agency or the Debtors affirmatively waive their right to a jury trial or arbitration that otherwise may exist, participation in the Settlement Procedures shall not waive or otherwise modify such rights.   All parties' rights and defenses to contest the assertion of a jury trial or arbitration are fully preserved. |
| **Fees** | Except as otherwise provided in the Settlement Procedures, each party to the Mediation shall bear its own costs and expenses incurred in connection with the Settlement Procedures, including Mediation, such as attorney's fees, travel, and meals.  For the avoidance of doubt, the Debtors' estates shall bear the expenses of the reasonable fees and costs charged by the Mediator. |
| **Designation of Additional NPPs** | Nothing herein limits the Debtors' rights to designate additional NPP sites to those listed in **Exhibit B** annexed hereto. |

**Settlement Procedures Should Be Approved**

27.     Local Rule 9019-5 states that the Court "may assign to mediation any dispute arising in an adversary proceeding, contested matter *or otherwise in a bankruptcy case*." Local Rule 9019-5 (emphasis added).  Moreover, section 105(a) of the Bankruptcy Code grants bankruptcy courts the equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see also Official Comm. of Unsecured Creditors v. Bechtle (In re Labrum & Doak, LLP)*, 237 B.R. 275, 305 (Bankr. E.D. Pa. 1999) ("Section 105(a) of the Bankruptcy Code grants the Court broad equitable power to issue any order, process or judgment that is necessary or appropriate to advance the bankruptcy proceedings and matters related to the proceeding.") (citations omitted); *In re Patriot Nat'l, Inc.*, Case No. 18-10189 (KG), Feb. 28, 2018 Hr'g Tr. at 145:1-5 (Bankr. D. Del. Feb. 28, 2018) ("And the Court, of course, also has the power under Section 105, I think, to stay the actions and to order mediation.  So I am going to order the parties to the litigation to go to mediation.").

28.     Local Rule 9019-5 clearly contemplates that the Court may order matters to mediation by facilitating the use of mediation in *all matters arising in a bankruptcy case*.  The Debtors are requesting that the Court exercise its authority to implement the Settlement Procedures with respect to any abandonment disputes among the Debtors and the Agencies.  The litigation of such issues without exploring the possibility of whether the parties can reach an early resolution does not serve the interests of the Debtors, their estates, or the public at large.

29.     The Debtors are not pursuing a reorganization of their business in these chapter 11 cases.  And, although the Debtors are continuing their robust prepetition marketing and sale process on a postpetition basis, there is no guarantee that the Debtors will successfully sell all of their assets, including the NPPs, to  a third party purchaser.  In the event the Debtors are unable

20

A-0152

to sell the NPPs, the Debtors will be forced to effectuate the transfer of such properties or abandon them.  As such, the objective of the Settlement Procedures is to ensure the safe and orderly abandonment of the NPPs in a manner that not only transfers the NPPs from a liquidating company that can no longer support the ongoing maintenance of such properties but also ensures that such transfers are conducted in a manner that significantly reduces the threat of harm to public safety.

30.     The Settlement Procedures represent a critical step in the Debtors' chapter 11 cases by expediting in the least expensive manner the resolution of disputes involving the Debtors' abandonment of the NPPs.  Absent the measures proposed herein, the resolution of legal issues arising under section 554(a) of the Bankruptcy Code with respect to every Agency would detrimentally impact and monopolize the Court's resources and the pursuit of endless litigation would serve no useful purpose other than to significantly increase legal costs for all involved.  The Settlement Procedures, on the other hand, impose none of these burdens while also preserving the substantive rights of all parties if a consensual resolution is not reached.

31.     The main objective of the Settlement Procedures is to provide an orderly and structured framework for good faith negotiations and mediation with the Debtors at the outset of these chapter 11 cases.  The process established pursuant to the Settlement Procedures should be approved because it (i) is balanced and fair by placing all Agencies on equal footing to resolve abandonment disputes, (ii) does not modify the substantive rights of any Agency, (iii) allows for a global settlement of disputes related to multiple NPPs and a single Agency, and (iv) preserves confidentiality to foster open communications among the Debtors and the Agencies.

32.     Moreover, section 105(a) of the Bankruptcy Code grants the Court authority to issue sanctions in the event any parties (including the Debtors) fail to participate in good faith with the Settlement Procedures.  *See Caldwell v. Unified Capital Corp. (In re Rainbow Magazine,*

*Inc.)*, 77 F.3d 278, 283-84 (9th Cir. 1996) (holding that bankruptcy courts have the power under section 105(a) to issue sanctions and rejecting the argument that bankruptcy courts lack such authority because they are Article I courts); *Burd v. Walters (In re Walters)*, 868 F.2d 665, 669 (4th Cir. 1989) (same); *In re NNN 400 Capital Ctr. 16, LLC*, No. 16-12728-JTD, 2019 WL 5073844, at *2 (Bankr. D. Del. Oct. 9, 2019) ("Section 105 gives the court broad power to take any action that is necessary or appropriate to enforce rules and prevent an abuse of the process. . . . This power includes the authority to impose sanctions, including an award of attorney's fees, if a party violates a court order or rule."); *In re French Bourekas, Inc.*, 175 B.R. 517, 525 (Bankr. S.D.N.Y. 1994) (holding that bankruptcy court can impose sanctions under section 105(a) of the Bankruptcy Code and its inherent power), *aff'd sub nom. Zwirn v. United Capital Corp. (In re French Bourekas Inc.)*, 195 B.R. 19 (S.D.N.Y. 1996); *Grand St. Realty, LLC v. McCord*, No. 04-CV-4738-CBA, 2005 WL 2436214, at *5-6 (E.D.N.Y. Sept. 30, 2005) (collecting cases and holding that bankruptcy court had authority under section 105(a) to impose sanctions against landlord and its counsel. The Settlement Procedures clearly state that the imposition and level of sanctions will be determined by the Court in its sole discretion—under no circumstances can a technical default result in the imposition of automatic sanctions by the Court. The Debtors set forth potential sanctions in the Settlement Procedures to place the Agencies on notice of the possible repercussions of blatantly ignoring the Settlement Procedures, however, the imposition and scope of sanctions will remain solely within the Court's discretion.

33.     The Debtors propose that Joseph J. Farnan, Jr. and John S. DeGroote serve as mediators for all settlement discussions with the Agencies that proceed to the Mediation Stage and that such appointment serves the interests of all parties, not merely the Debtors. As set forth in the Genender Declaration, both Mr. Farnan and Mr. DeGroote are experienced mediators whose

practices focus on complex business disputes and bankruptcy proceedings. Mr. Farnan served as a United States District Judge for the District of Delaware from 1985 to 2010. During his tenure, Mr. Farnan presided over hundreds of trials, as well as bankruptcy proceedings and matters involving substantial environmental issues. Since retiring from the bench, Mr. Farnan has served as a mediator in complex commercial matters, bankruptcy proceedings, and matters involving environmental issues. Mr. DeGroote has served as a mediator and arbitrator in complex business disputes, including in bankruptcy and business-dissolution matters, since 2013. Mr. DeGroote has also served as a settlement administrator and as a liquidating trustee in connection with corporate chapter 11 bankruptcy proceedings. Before founding his mediation practice, Mr. DeGroote was the president of KPMG Consulting, LLC/BearingPoint, Inc., a $3-billion global consulting firm. In light of the above, the appointment of Joseph J. Farnan, Jr. and John S. DeGroote as mediators will facilitate the efficient administration of the Settlement Procedures in these chapter 11 cases and best position the maximum number of cases for resolution.

34.     The settlement and mediation process set forth in the Settlement Procedures is not the first of its kind. Judge Peck authorized similar settlement procedures in the chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliated debtors (the "**Lehman Debtors**") in 2009. *See In re Lehman Bros. Holdings Inc., et al.*, No. 08-13555-JMP (Bankr. S.D.N.Y), ECF Nos. 4453, 5207. The Lehman Debtors were party to thousands of derivative contracts. In light of the complex nature of such derivative contracts and the common issues existing with respect thereto, the Lehman Debtors requested, and Judge Peck authorized, the implementation of alternative dispute resolution procedures to reduce the cost associated with enforcing the Lehman Debtors' affirmative claims under the derivative contracts, preserving the value available under such contracts, and promoting judicial efficiency in the chapter 11 cases. Many of the features set

forth in the Settlement Procedures were borrowed from the procedures approved by Judge Peck, including mandatory participation in settlement and mediation discussions and the imposition of sanctions in the bankruptcy court's discretion.

35.     As set forth herein, the fundamental purpose of the Settlement Procedures—and mediation in general—is to provide the Debtors and the Agencies an opportunity at the outset of these chapter 11 cases to reach consensual resolutions of any issues arising from the Debtors' abandonment of the NPPs under section 554(a) of the Bankruptcy Code in the face of an impending liquidation of its business.  The implementation of the Settlement Procedures will enable the Debtors to reduce unnecessary administrative expenses, avoid significant legal fees associated with needless litigation, preserve the Court's limited time and resources, and promote judicial efficiency by encouraging consensual resolution among the Debtors and the Agencies.

## Notice

36.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware (Attn: Linda J. Casey, Esq.); (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the District of Delaware; (v) attorneys for the Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Alice Belisle Eaton, Esq. and Robert Britton, Esq.); (vi) attorneys for the Prepetition ABL Agents, Otterbourg P.C., 230 Park Avenue, New York, New York, 10169 (Attn: Daniel F. Fiorillo, Esq., David W. Morse, Esq., and Jonathan N. Helfat, Esq.); (vii) attorneys for the DIP Agents, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071 (Attn: Robert A. Klyman, Esq. and Matthew G. Bouslog, Esq.); (viii) the Banks;  (ix)  the  Environmental  Protection  Agency  and  similar  state  environmental

agencies for states in which the Debtors conduct business; (x) the Agencies; (xi) the offices of the attorneys general for the states in which the Debtors conduct business; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

37. The Debtors respectfully submit that no further notice is required. No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  May 19, 2020
        Wilmington, Delaware

_/s/ Brendan J. Schlauch_
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (_pro hac vice_ pending)
Sunny Singh (_pro hac vice_ pending)
Paul R. Genender (_pro hac vice_ pending)
Jared R. Friedmann (_pro hac vice_ pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007

_Proposed Attorneys for Debtors_
_and Debtors in Possession_

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                                        :
In re                                                   :        Chapter 11
                                                        :
EXIDE HOLDINGS, INC., et al.,                           :        Case No. 20-11157 (CSS)
                                                        :
              Debtors.¹                                 :        (Joint Administration Requested)
                                                        :
------------------------------------------------------- x
```

**ORDER GRANTING AUTHORIZATION TO (I) IMPLEMENT
MANDATORY SETTLEMENT PROCEDURES FOR NON-PERFORMING
PROPERTIES AND (II) ABANDON SUCH PROPERTIES, IF NECESSARY**

Upon the motion, dated May 19, 2020 (the "**Motion**")[2] of Exide Holdings, Inc. and

its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), pursuant to section 105(a) of title 11 of the United States Code

(the "**Bankruptcy Code**") and Rule 9019-5 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"),

for entry of an order granting authorization to implement the Settlement Procedures (as defined

herein), including, without limitation, the mandatory settlement and mediation process therein,

with respect to the orderly transfer or subsequent abandonment of the non-performing properties

listed on **Exhibit B** of the Motion (collectively, the "**NPPs**"), as more fully set forth in the Motion;

and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant

to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
        number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie
        Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000
        Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
        Motion.

States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties; and such notice having been adequate and appropriate, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "**Hearing**"); and upon the Messing Declaration and the Genender Declaration, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

<p align="center">**IT IS HEREBY ORDERED THAT:**</p>

1.       The Motion is granted to the extent set forth herein.

2.       Pursuant to section 105(a) of the Bankruptcy Code and Local Rule 9019-5, the procedures set forth below (the "**Settlement Procedures**"), including, without limitation, the mandatory settlement and mediation process therein, are hereby approved in all respects.

| OVERVIEW OF SETTLEMENT PROCEDURES[3] | |
|---|---|
| **Mandatory Participation** | A. Following service of a Settlement Notice (as defined herein) on an Agency (i) compliance with the Settlement Procedures is mandatory and (ii) no party is required to settle or compromise any dispute or enter into a particular settlement or compromise; provided, however, the Debtors and each Agency must serve the required responses, engage in the specified communications to discuss settlement, participate in any mediation in good |

---

[3]       The term "Agency" as used in the Settlement Procedures shall be deemed to refer to more than one Agency to the extent required.

| | |
|---|---|
| | faith, follow directions of the Mediator (as defined herein), and otherwise comply with the Settlement Procedures in good faith.<br><br>B.  All rights, remedies, claims, and defenses of the Debtors and each Agency shall not be impaired, waived, or compromised in any further proceedings in these chapter 11 cases in the event the parties are unable to reach a settlement or compromise following such parties' good faith participation in the Settlement Procedures. |
| **Initial Settlement Conference** | A.  With respect to each NPP, the Debtors may initiate settlement discussions with the relevant Agency by serving each Agency with (i) a copy of the order approving the Motion and (ii) a notice setting forth the Debtors' request to engage in settlement discussions regarding the Debtors' proposed abandonment of the relevant NPP (the "**Settlement Notice**"), the form of which is annexed as <u>Schedule 1</u> to the order approving the Motion.<br><br>B.  The Debtors propose that the service on or notice to an Agency will be deemed adequate if such service or notice is provided to the Agency's address set forth on <u>Exhibit C</u> annexed to the Motion by (i) hand delivery, (ii) first class mail, or (iii) overnight mail.<br><br>C.  The Settlement Notice will set forth the following:<br><br>    i.  A selection of proposed dates and times for an initial telephonic conference among the Debtors, Weil, Gotshal & Manges LLP, Richards, Layton & Finger, P.A., the Agency, and the Agency's counsel (the "**Initial Settlement Conference**").<br><br>    ii.  The contact information for the Debtors' legal and financial advisors in the event of any general inquiries ahead of the Initial Settlement Conference.<br><br>    iii.  A statement setting forth that the Initial Settlement Conference, together with any continuations or rescheduled settlement calls or meetings arising from the Initial Settlement Conference, shall be subject to Rule 408 of the Federal Rules of Evidence and the confidentiality provisions of Local Rule 9019-5. |

| | |
|---|---|
| | D. Each Agency identified in the Settlement Notice must respond by acceptance of one of the proposed dates and times as promptly as possible. |
| | E. The Initial Settlement Conference shall be allocated for approximately one (1) hour, which may be extended through mutual agreement of the parties. Subsequent settlement conferences may be scheduled by the parties. |
| **Agreement to Settle** | A. If the Debtors and the Agency reach a settlement, the parties shall execute a settlement agreement and general release (including confidentiality provisions) (the "**Settlement Agreement**") and, if the matter is in litigation or otherwise subject to an adversary proceeding, the Agency shall dismiss any applicable claims in such proceeding with prejudice upon approval of the Settlement Agreement (or as otherwise set forth in such Settlement Agreement). |
| | B. Within five (5) calendar days upon executing a Settlement Agreement, the Debtors shall file a notice (the "**Settlement Agreement Notice**") with the Court setting forth the following: |
| |     i. The execution date of the Settlement Agreement, including the parties thereto. |
| |     ii. A concise summary of the settlement terms and, if applicable, the transition plan for the relevant NPP. |
| |     iii. A proposed order approving the Debtors' entry into the Settlement Agreement and approval of the terms thereof (the "**Proposed Settlement Order**"). |
| | C. The Debtors shall (i) serve the Settlement Agreement Notice on the parties listed below and such other parties as the Court may order (collectively, the "**Objection Notice Parties**") and (ii) cause the Settlement Agreement Notice to be published on the website maintained by the Debtors' claims and noticing agent in these chapter 11 cases (https://cases.primeclerk.com/Exide2020), a notice containing information about the applicable Settlement Agreement Notice. The Objection Notice Parties include: |
| |     i. <u>Office of the U.S. Trustee</u>:  844 N. King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda J. Casey, Esq.) |

|  |  |
|---|---|
|  | ii. <u>Counsel to the Ad Hoc Group</u>:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Alice Belisle Eaton, Esq. and Robert Britton, Esq.) |

    iii. <u>Counsel to the DIP Agent</u>: Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071 (Attn: Robert A. Klyman, Esq. and Matthew G. Bouslog, Esq.)

    iv. Counsel to any statutory committee of unsecured creditors appointed in these chapter 11 cases.

    v. The non-Debtor parties to the Settlement Agreement.

    vi. Any party who may be affected if the relief requested in the Settlement Agreement Notice is granted.

D. Objections to the terms of a Settlement Agreement (a "**Settlement Agreement Objection**") must:

    i. Be in writing;

    ii. State the name and address of the objecting party and the amount and nature of the claim or interest of such party (unless such party is the U.S. Trustee);

    iii. State with particularity the basis and nature of any objection;

    iv. Conform to the Bankruptcy Rules and Local Rules; and

    v. Be filed with the Court and served in accordance with the Local Rules by no later than ten (10) calendar days after the filing and service of the relevant Settlement Agreement Notice (the "**Settlement Agreement Objection Deadline**").

E. If a timely Settlement Agreement Objection is filed and served with respect to an applicable Settlement Agreement and such objection cannot be consensually resolved, the Debtors shall request a hearing before the Court on approval of the applicable Settlement Agreement.

<table>
<tr><td></td><td>F.  If no timely Settlement Agreement Objection is filed and served with respect to an applicable Settlement Agreement, or if there is such an objection and it is consensually resolved, the Court may enter the Proposed Settlement Order approving the Settlement Agreement upon the expiration of the Settlement Agreement Objection Deadline, or the resolution of such objection upon the submission of the Proposed Settlement Order under certification of no objection or certification of counsel, as applicable.</td></tr>
<tr><td><strong>Mediation Stage</strong></td><td>A.  If the Debtors and the relevant Agency are unable to reach a settlement by June 30, 2020 (as extended upon mutual agreement), the parties shall proceed to mediation (each, a "<strong>Mediation</strong>" and the applicable mediator, the "<strong>Mediator</strong>"), where the Mediator shall hear and preside over all mediations hereunder.

B.  The Mediator shall have the broadest possible discretion consistent with Local Rule 9019-5 (as modified by any order approving the Motion), including the ability to consolidate mediations involving the same Agency upon application by such Agency and consultation with the Debtors.

C.  The Debtors and Agency shall jointly contact the Mediator to schedule the initial mediation date.

D.  At the option of the Mediator, all mediation proceedings will take place either (i) telephonically or (ii) by video conference.

E.  Unless otherwise instructed by the Mediator, each party shall submit directly to the Mediator and serve on all counsel such materials (the "<strong>Submission</strong>") in form and content as the Mediator directs. Prior to the Mediation, the Mediator may discuss with the participants to determine what materials would be helpful. The Submission shall not be filed with the Court and the Court shall not have access to the Submission.

F.  Unless otherwise ordered by the Mediator, the following persons must participate in the Mediation (either telephonically or by video conference) (the "<strong>Mediation Parties</strong>"):

      i.  A Debtor representative;</td></tr>
</table>

RLF1 23448333v.1

    ii.  If the party is not a natural person, including a governmental entity, a representative who is not the party's attorney of record and who has full authority to negotiate and settle the matter on behalf of the party;

    iii.  If the party is a governmental entity that requires settlement approval by an elected official or legislative body, a representative who has authority to recommend a settlement to the elected official or legislative body;

    iv.  The attorney who has primary responsibility for each party's case, including Delaware counsel if engaged at the time of mediation regardless of whether Delaware counsel has primary responsibility for a party, unless Delaware counsel requests to be and is excused from attendance by the Mediator in advance of the Mediation; and

    v.  Other interested parties, such as insurers or indemnitors or one or more of their representatives, whose presence is necessary for a full resolution of the matter assigned to mediation.

G.  Willful failure to attend any Mediation and any other material violation of Local Rule 9019-5 shall be reported to the Court by the Mediator any may result in the impositions of sanctions by the Court. Any such report of the Mediator shall comply with the confidentiality requirement of Local Rule 9019-5(d).

H.  The Mediation shall end (i) upon mutual consent of the Debtors and the Agency or (ii) by the Mediator, in the Mediator's sole and reasonable discretion.

I.  No later than July 17, 2020, the Mediator shall file with the Court a certificate (a "**Certificate of Completion**") showing compliance or non-compliance with the mediation requirements of the Settlement Procedures and whether or not a settlement has been reached. Regardless of the outcome of the Mediation, the Mediator shall not provide the Court with any details of the substance of the Mediation.

J.  If the Debtors and Agency reach a settlement as a result of Mediation, the parties shall execute a Settlement Agreement as specified herein and the Debtors shall file a

| | |
|---|---|
| | Settlement Agreement Notice in accordance with the terms set forth herein.<br><br>K.  If the Debtors and Agency are unable to reach a settlement following Mediation, the Debtors and Agency shall present the Court with a proposed scheduling order ("**Proposed Scheduling Order**") setting forth applicable deadlines for the resolution of the Debtors' proposed abandonment of the relevant NPP under section 554(a) of the Bankruptcy Code. |
| **Proposed Scheduling Order** | A.  The Proposed Scheduling Order shall be filed no later than July 22, 2020.<br><br>B.  The Proposed Scheduling Order shall provide for the following deadlines, unless mutually agreed to otherwise by the parties:<br><br>    i.   The parties must conclude all fact discovery, including depositions, no later than August 4, 2020.<br><br>    ii.  The Debtors shall file a motion seeking to abandon the relevant NPP no later than August 11, 2020.<br><br>    iii. The relevant Agency shall file a response to the Debtors' motion to abandon the relevant NPP no later than August 18, 2020.<br><br>    iv. A hearing must be held no later than August 25, 2020, subject to the Court's availability. |
| **Deadlines** | Notwithstanding anything contained herein, the deadlines contained herein may be modified solely by (i) the mutual consent of the Debtors and Agency or (ii) by order of the Court. |
| **Good Faith Participation** | A.  The Debtors and each Agency must participate in good faith with the Settlement Procedures. If, after notice and a hearing, the Court determines that a party has not complied with the Settlement Procedures in good faith, the Debtors or Agency, as the case may be, may be subject to such sanctions as the Court deems appropriate in its sole discretion.<br><br>B.  If the Mediator reports to the Court that any party subject to the Settlement Procedures is not cooperating in good faith with the Settlement Procedures, the Court may, |

8

| | |
|---|---|
| | without the need for further motion by any party, schedule a hearing and order sanctions.  Litigation with respect to the issuance of sanctions shall not delay the commencement of the Mediation Stage of the Settlement Procedures.<br><br>C.  Sanctions may include, but are not limited to:<br><br>    i.  <u>Against Debtors</u>:  (a) reasonable attorneys' fees incurred by an Agency with respect to the Settlement Procedures after the receipt of a Settlement Notice and (b) fees and costs related to the Mediation.<br><br>    ii.  <u>Against Agency</u>:  (a)  reasonable attorneys' fees incurred by the Debtors with respect to the Settlement Procedures after the sending of a Settlement Notice and (b) fees and costs  related to the Mediation. |
| **Confidentiality** | A.  The confidentiality provisions of Local Rule 9019-5(d) are incorporated into the Settlement Procedures by reference.  No statements or arguments made or positions taken by the Mediator, the Debtors, or the Agency during any part of the process described herein, including the Initial Settlement Conference (together with any continuations or rescheduled settlement calls or meetings arising from the Initial Settlement Conference) and the Mediation Stage may be disclosed by the Mediator or any such parties or their attorneys and advisors to the Court or any third party.<br><br>B.  All briefs, records, reports, and other documents received or made by the Mediator while serving in such capacity shall remain confidential and shall not be provided to the Court, unless they would be otherwise admissible.  The Mediator shall not be compelled to disclose such records, reports, and other documents in connection with any hearing held by the Court. |
| **Motions to Compel Payment** | Subject to section 362(b)(4) of the Bankruptcy Code and solely during the period that the Debtors and applicable Agency are actively engaged in settlement discussions and mediation hereunder, the Agencies shall be precluded from filing motions to compel payment from the Debtors in connection with the applicable NPP or otherwise seek judicial relief related thereto. |
| **Existing Jury Trial and Arbitration Rights Unaffected** | |

| | |
|---|---|
| | Unless an Agency or the Debtors affirmatively waive their right to a jury trial or arbitration that otherwise may exist, participation in the Settlement Procedures shall not waive or otherwise modify such rights.   All parties' rights and defenses to contest the assertion of a jury trial or arbitration are fully preserved. |
| **Fees** | Except as otherwise provided in the Settlement Procedures, each party to the Mediation shall bear its own costs and expenses incurred in connection with the Settlement Procedures, including Mediation, such as attorney's fees, travel, and meals.   For the avoidance of doubt, the Debtors' estates shall bear the expenses of the reasonable fees and costs charged by the Mediator. |
| **Designation of Additional NPPs** | Nothing herein limits the Debtors' rights to designate additional NPP sites to those listed in **Exhibit B** annexed to the Motion. |

3.      The Court authorizes and appoints Joseph J. Farnan, Jr. and John S. DeGroote (collectively, "**Mediators**" and each, a "**Mediator**") to serve as Mediators and to conduct non-binding mediation in accordance with the Settlement Procedures.

4.      Without limiting the applicability of Local Rule 9019-5, (i) discussions among the Mediation Parties, including discussions with or in the presence of the Mediator, (ii) any mediation statements or any other documents or information provided to the Mediator or the Mediation Parties in the course of the Mediation, and (iii) correspondence, draft resolutions, offers, and counteroffers produced for, or as a result of, the Mediation ((i) through (iii), collectively, the "**Mediation Information**"), shall be strictly confidential, subject to disclosure only to the Mediation Parties, the Mediator, and the lenders under the Debtors' debtor-in-possession financing ("**DIP Financing**" and the lenders thereunder in such capacity, the "**DIP Lenders**") and shall not be admissible or discoverable for any purpose in any judicial or administrative proceeding, and no person or Mediation Party, including counsel for any Mediation Party, or any other party, shall in any way disclose to any non-party or to any court, including, without limitation, in any pleading

or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, offer, or counteroffer that may be made or provided in connection with the Mediation, unless otherwise available and not subject to a confidentiality agreement that would prevent its disclosure or as authorized by the Court.

5.      All Mediation Information shall (i) remain confidential, (ii) be subject to protection under Rule 408 of the Federal Rules of Evidence and any equivalent or comparable state law, and (iii) not constitute a waiver of any existing privileges and immunities.

6.      Notwithstanding anything to the contrary in the Local Rules, the Mediator may conduct the Mediation as he sees fit, establish rules of the Mediation, and consider and take appropriate action with respect to any matters the Mediator deems appropriate to conduct the Mediation, subject to the terms of this Order.

7.      From time to time, but in no event less than every fourteen (14) days, the Debtors shall consult with (i) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases, (ii) counsel to the Ad Hoc Group, and (iii) counsel to the DIP Lenders, regarding the status of the Settlement Procedures.

8.      Notwithstanding anything to the contrary in Local Rule 9019, the DIP Lenders shall be entitled to receive the information exchanged pursuant to the Settlement Procedures.

9.      Nothing contained in this Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, or (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim.

10. Except as otherwise set forth herein, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

11. For the avoidance of doubt, to the extent any provision of this Order conflicts with Local Rule 9019-5, the terms and provisions of this Order shall govern.

12. The Debtors are authorized to take all reasonable actions necessary or appropriate to effectuate the relief granted in this Order.

13. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**<u>Schedule 1</u>**

**Form of Settlement Notice**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x
                                    :
In re                               :        **Chapter 11**
                                    :
**EXIDE HOLDINGS, INC.,** *et al.*, :        **Case No. 20-11157 (CSS)**
                                    :
         Debtors.[1]                :        **(Joint Administration Requested)**
                                    :
------------------------------------------------------------ x

### NOTICE OF INITIAL SETTLEMENT CONFERENCE

On May 19, 2020, Exide Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") filed the *Motion of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. [__]) (the "**Motion**")[2] with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") for entry of an order granting authorization to implement the Settlement Procedures with respect to the orderly transfer or subsequent abandonment of the NPPs, as more fully set forth in the Motion.  On [__], 2020, the Bankruptcy Court entered the *Order Granting Authorization To (I) Implement Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. [__]) (the "**Settlement Procedures Order**"), which, among other things, establishes the key dates related to the Settlement Procedures.  All interested parties should carefully read the Settlement Procedures Order and the Settlement Procedures in their entirety.

**You are receiving this Notice because you have been designated as an Agency in connection with the NPP located at [_].  You are required to comply with the Settlement Procedures Order in all respects, including the deadlines set forth herein.**

### Initial Settlement Conference

The Debtors hereby propose the following dates and times for an initial **telephonic** conference among the (i) Debtors, (ii) Weil, Gotshal & Manges LLP and Richards, Layton & Finger, P.A., as proposed attorneys for the Debtors, (iii) the Agency, and (iv) the Agency's counsel (the "**Initial Settlement Conference**"):

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Procedures Order.

| | |
|---|---|
| ☐ | **June [_], 2020 at [_]:00 a/p.m. (prevailing Eastern Time)** |
| ☐ | **June [_], 2020 at [_]:00 a/p.m. (prevailing Eastern Time)** |
| ☐ | **June [_], 2020 at [_]:00 a/p.m. (prevailing Eastern Time)** |
| ☐ | **June [_], 2020 at [_]:00 a/p.m. (prevailing Eastern Time)** |
| ☐ | **June [_], 2020 at [_]:00 a/p.m. (prevailing Eastern Time)** |

**Each Agency must submit this form to Exide.Environmental@weil.com with an acceptance of <u>one or more</u> proposed dates and times as promptly as possible.** The Initial Settlement Conference shall be allocated for approximately one (1) hour, which may be extended through mutual agreement of the parties.  Subsequent settlement conferences may be scheduled by the parties following the Initial Settlement Conference.

If the Debtors and the relevant Agency are unable to reach a settlement by June 30, 2020 (as extended upon mutual agreement), the parties shall immediately proceed to the Mediation Stage as set forth in the Settlement Procedures Order.

In the event of any general inquiries, please direct any questions to Exide.Environmental@weil.com.

**THE INITIAL SETTLEMENT CONFERENCE, TOGETHER WITH ANY CONTINUATIONS OR RESCHEDULED SETTLEMENT CALLS OR MEETINGS ARISING FROM THE INITIAL SETTLEMENT CONFERENCE SHALL BE SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND THE CONFIDENTIALITY PROVISIONS OF LOCAL RULE 9019-5 (AS MODIFIED BY THE SETTLEMENT PROCEDURES ORDER).**

<u>**Reservation of Rights**</u>

Except as otherwise set forth herein and in the Settlement Procedures Order, all parties reserve their rights to seek Bankruptcy Court relief with respect to any issue arising in connection with the Settlement Procedures (including, if necessary, to seek an extension of the relevant deadlines).

RLF1 23448333v.1

**FAILURE TO ABIDE BY THE SETTLEMENT PROCEDURES ORDER OR ANY OTHER ORDER OF THE BANKRUPTCY COURT IN THESE CHAPTER 11 CASES MAY RESULT IN SANCTIONS IN THE BANKRUPTCY COURT'S SOLE DISCRETION.**

Dated:  [__], 2020
       Wilmington, Delaware

                                   RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Sunny Singh (*pro hac vice* pending)
Paul R. Genender (*pro hac vice* pending)
Jared R. Friedmann (*pro hac vice* pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors
and Debtors in Possession*

3

## Exhibit B

### Schedule of Non-Performing Properties

## List of Non-Performing Properties Subject to Settlement Procedures

1. Baton Rouge Smelter
   2400 Brooklawn Drive
   Baton Rouge, Louisiana 70807

2. Bristol Former Battery Plant
   364 Exide Drive
   Bristol, Tennessee 30094

3. Columbus Battery Plant & Smelter
   3639 Joy Road
   Columbus, Georgia 31906

4. Commerce Smelter
   5831 & 5909 East Randolph Street
   Commerce, California 90040

5. Dallas Smelter (Dixie Metals)
   3030 McGowan Street
   Dallas, Texas 75203

6. Florence Battery
   250 Ellis Street
   Florence, Mississippi 39073

7. Florence Surplus Property
   Olivia Slimon Drive
   Florence, Mississippi 39073

8. Florence (Expander)
   407 Briarhill Road
   Florence, Mississippi 39073

9. Fort Erie Battery Plant
   275 Fort Lewis Street
   Fort Eerie, Ontario L2A 5N6 Canada

10. Frankfort Battery Plant
    555 Hoke Avenue
    Frankfort, Indiana 46041


11. Frisco Smelter
    7471 Old 5th Street
    Frisco, Texas 75034


12. Greer Surplus Lots
    100 Bent Creek Drive
    101 Bent Creek Drive
    103 Bent Creek Drive
    105 Bent Creek Drive
    109 Bent Creek Drive
    203 Bent Creek Drive
    207 Bent Creek Drive
    208 Bent Creek Drive
    209 Bent Creek Drive
    210 Bent Creek Drive
    212 Bent Creek Drive
    106 Sylvan Drive
    108 Sylvan Drive
    110 Sylvan Drive
    107 Bowers Creek Drive
    110 Bowers Creek Drive
    111 Bowers Creek Drive
    112 Bowers Creek Drive
    Greer, South Carolina 29650


13. Greer Battery Plant
    109 Chick Springs Road
    Greer, South Carolina 29650


14. Hamburg Battery Plant
    280 Grand Street
    Hamburg, Pennsylvania 19526

15. Heflin Smelter
    6952 SR-531
    Heflin, Louisiana 71039


16. Kankakee Battery Plant

2475 West Station Street
Kankakee, Illinois 60901

17. Logansport Battery Plant
303 Water Street
Logansport, Indiana 46947

18. Memphis Surplus Lots (17)
Mallory and Castex Avenues
Memphis, Tennessee 38109

19. Memphis Smelter
257 W. Mallory Avenue
Memphis, Tennessee 38109

20. Oley Property
Bull Road
Oley, Pennsylvania 19560

21. Reading Residential/Vacant Property
145-147 Spring Valley Rd
143 Spring Valley Rd
127 Spring Valley Rd
129 Spring Valley Rd
131 Spring Valley Rd
258 Spring Valley Rd
260 Spring Valley Rd
Vacant Land - Isabelle Ct & Josephine Drive
Reading, Pennsylvania 19605

22. Reading Recycling Plant
3000 Montrose Avenue
Reading, Pennsylvania 19605

23. Tampa  Smelter
3507 S. 50th Street
Tampa, Florida 33619

24. Vernon Smelter
2700 S. Indiana Street
Los Angeles, California 90023

3

**<u>Exhibit C</u>**

**Agencies**

**List of Agencies Subject to Settlement Procedures**

1.   Arkansas Department of Environmental Quality
2.   Canada, Ministry Of Environment
3.   Certified Unified Program Agencies
4.   City of Forest City, Missouri
5.   City of Fort Smith, Arkansas
6.   City of Frisco, Texas
7.   City of Kansas City, Missouri
8.   City of Manchester, Iowa
9.   City of Muncie, Indiana
10. City of Muncie Bureau of Water Quality
11. City of Reading, Pennsylvania
12. City of Salina, Kansas
13. City of Vernon, California
14. County Commissioners, Reading, Pennsylvania
15. County Officials, Tampa, Florida
16. Department of Health and Environmental Control
17. Department of Homeland Security
18. Department of Toxic Substances Control
19. Florence, Mississippi, Department of Public Works
20. Florence, Mississippi, Office of the Mayor
21. Florida Department of Environmental Protection
22. Georgia Environmental Protection Division
23. Holt County, Missouri
24. Illinois Department of Natural Resources
25. Indiana Department of Environmental Management
26. Indiana Department of Homeland Security
27. Indiana Occupational Safety and Health Administration
28. Iowa Department of Natural Resources
29. Iowa Occupational Safety and Health Administration
30. Kansas City Fire Department
31. Kansas City Water Services Industrial Waste Division
32. Kansas Department of Health and Environment
33. Louisiana Department of Environmental Quality
34. Michigan Department of Natural Resources
35. Mississippi Department of Environmental Quality
36. Missouri Department of Natural Resources
37. Occupational Safety And Health Administration (Region 3, Philadelphia)
38. Occupational Safety And Health Administration (Region 4, Atlanta)
39. Occupational Safety And Health Administration (Region 6, Dallas)
40. Occupational Safety And Health Administration (Region 7, Kansas City)
41. Pennsylvania Department of Environmental Protection
42. South Coast Air Quality Management District
43. State of Georgia Office of Insurance and Safety Fire
44. State of Kansas Boiler Safety

45. State of Missouri Department of Public Safety Division of Fire Safety
46. Tennessee Council For Environmental Quality
47. Texas Commission of Environmental Quality
48. Unified Government Wyandotte County
49. United States Department Of Labor
50. United States Environmental Protection Agency
51. Wyandotte County Department of Air Quality

RLF1 23448333v.1

# **<u>TAB 3</u>**

**Order Governing Settlement Procedures With Governmental
Agencies Relating to Non-Performing Properties, dated June 9, 2020
[Bankr. D.I. 242]**

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

---------------------------------------------------------- x

                                   :

**In re**                            :       **Chapter 11**

                                   :

**EXIDE HOLDINGS, INC.,** *et al.*,     :       **Case No. 20-11157 (CSS)**

                                   :

        **Debtors.**[1]              :       **(Jointly Administered)**

                                   :

---------------------------------------------------------- x    **Re: Docket No. 37**

## ORDER GOVERNING SETTLEMENT PROCEDURES WITH GOVERNMENTAL AGENCIES RELATING TO NON-PERFORMING PROPERTIES

Upon the motion, dated May 19, 2020 (the "**Motion**")[2] of Exide Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019-5 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an order granting authorization to implement settlement procedures with governmental agencies with respect to the non-performing properties listed on **Exhibit B** of the Motion (collectively, the "**NPPs**"),  and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1409; and due and proper notice of the Motion having been provided to the Notice Parties; and

such notice having been adequate and appropriate, and it appearing that no other or further notice

need be provided; and the Court having reviewed the Motion; and the Court having held a hearing

to consider the relief requested in the Motion and any responses thereto (the "**Hearing**"); and upon

the Messing Declaration and the Genender Declaration, and the record of the Hearing; and the

Court having determined that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein; and it appearing that the relief granted herein is in the best interests

of the Debtors, their estates, their creditors, and all parties in interest; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to section 105(a) of the Bankruptcy Code and Local Rule 9019-5,

the procedures set forth below (the "**Settlement Procedures**"), including, without limitation, the

settlement and mediation process set forth therein, are hereby approved in all respects.

| OVERVIEW OF SETTLEMENT PROCEDURES | |
|---|---|
| **Participants** | A. The following parties have agreed to participate in settlement negotiations, and, if necessary, mediation of all relevant issues in the Bankruptcy Case relating to environmental liabilities for the NPPs (such parties, the "**Participants**"):<br><br>   i.   The Debtors<br><br>   ii.  The United States on behalf of the Environmental Protection Agency<br><br>   iii. California Department of Toxic Substances Control ("**DTSC**");<br><br>   iv.  Florida Department of Environmental Protection; |

| | |
|---|---|
| | v.   Georgia Environmental Protection Division of the Department of Natural Resources;<br><br>vi.  Illinois Environmental Protection Agency;<br><br>vii. Indiana Department of Environmental Management;<br><br>viii. Louisiana Department of Environmental Quality;<br><br>ix. Mississippi Department of Environmental Quality;<br><br>x.   Missouri Department of Natural Resources;<br><br>xi. Commonwealth of Pennsylvania Department of Environmental Protection;<br><br>xii. South Carolina Department of Health and Environmental Control;<br><br>xiii. Tennessee Department of Environment & Conservation;<br><br>xiv. Texas Commission on Environmental Quality; and,<br><br>xv. The Official Committee of Unsecured Creditors (the "**Committee**").<br><br>B.  Nothing herein limits the right of the Debtors and any governmental agency to request that other interested parties – including advisors to the Ad Hoc Group, Westchester Fire Insurance Company ("**Westchester**") or Aspen American Insurance Company and Aspen Specialty Insurance Company (together "**Aspen**" and together with Westchester, the "**Sureties**" or individually, a "**Surety**") – join in the Settlement Procedures, either as full Participants or in a more limited capacity, if the Debtors and the governmental agencies agree that the presence of such parties is necessary or appropriate for a full resolution of the issues relating to environmental liabilities with respect to the NPPs or for a particular NPP; provided, however, that nothing herein shall require any other party to participate in the Settlement Procedures absent its consent or further Court order. |
| **Non-Binding Participation** | C.  No Participant is required to settle or compromise any dispute or enter into a particular settlement or compromise; provided, however, that the Participants |

WEIL:\97511232\2\44362.0005

| | |
|---|---|
| | must engage in the specified communications to discuss settlement and participate in any mediation in good faith.<br><br>D.   The Participants retain all rights, remedies, claims, and defenses and nothing herein, nor participation in the settlement conferences or mediation, shall impair, waive, or compromise any such rights, remedies, claims, and defenses.<br><br>E.   Nothing herein limits the right of the Debtors and any governmental agency to mutually agree upon alternative procedures to resolve issues relating to environmental liabilities for a particular NPP. |
| **Initial Global Settlement Conference** | A.   All Participants will participate in an initial settlement conference (the "**Initial Global Settlement Conference**") on June 15, 2020 in order to discuss the likely issues on which there will be settlement negotiations and that will be mediated, if necessary, relating to the NPPs and a schedule for initial settlement conferences for each NPP (the "**Initial Site-Specific Settlement Conferences**") and the exchange of information that may be necessary to settle.  The Debtors shall consider in good faith any request of any governmental agency for a Surety to participate in the Initial Global Settlement Conference and/or any subsequent settlement conference.  If Debtors deny any such request, the requesting party may seek Court intervention to order inclusion of the Surety.  Any Participant may seek the assistance of the Court if necessary if agreement cannot be reached on the issues and schedule for exchange of information. Participants shall not file a request for administrative expense concerning the issues to be addressed in the Initial Global Settlement Conference, the Initial Site-Specific Settlement Conferences, any subsequent settlement conferences, or any Mediation, until such time that a Certificate of Completion is issued, unless the court establishes a bar date for administrative expense applications prior to that time.<br><br>B.   The Initial Global Settlement Conference, together with any continuations or rescheduled settlement calls or meetings arising from the Initial Settlement Conference, shall be subject to Rule 408 of the Federal Rules of Evidence and the confidentiality provisions of Local Rule 9019-5. |

|  | C. Debtors shall prepare an Initial Global Settlement Conference Notice which will set forth the following: |
|  | i. The agreed upon dates and times for a telephonic conference among the Participants on global settlement issues. |
|  | ii. The contact information for the Debtors' legal and financial advisors in the event of any general inquiries ahead of the Individual Settlement Conference. |
|  | iii. A statement setting forth that the Initial Global Settlement Conference, together with any continuations or rescheduled settlement calls or meetings arising from the Initial Settlement Conference, shall be subject to Rule 408 of the Federal Rules of Evidence and the confidentiality provisions of Local Rule 9019-5. |
|  | D. The Initial Global Settlement Conference shall be allocated for approximately four (4) hours, which may be extended through mutual agreement of the Participants. Subsequent settlement conferences may be scheduled by the Participants. Debtors shall prepare appropriate notices for any follow up settlement conferences. |
| **Site-Specific Settlement Conferences** | A. With respect to each NPP, the Initial Global Settlement Conference shall set a schedule for Initial Site-Specific Settlement Conferences for settlement discussions with the relevant governmental agency, counsel to the Committee and other interested Participants regarding the governmental agencies' proposals for cleanup action with respect to a NPP and funding therefor, Debtors' proposed abandonment of the NPP, and any conditions on abandonment required by *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986) and subsequent case law. The Debtors shall consider in good faith any request of any governmental agency for a Surety to participate in Site-Specific Settlement Conferences. The Debtors consent in advance to Westchester and Aspen participating in the Site-Specific Settlement Conferences related to the NPPs in Texas and Westchester participating in Site-Specific Settlement Conferences related to the NPPs in California and Indiana. Any Participant may seek the assistance of the Court if necessary if agreement cannot be reached on the issues and schedule. Nothing herein shall be |

<table>
<tr><td></td><td>construed as agreement by the governmental agencies that abandonment of any NPP is appropriate under the law.<br><br>B. Unless otherwise agreed to by relevant Participants at the Initial Global Settlement Conference, the Initial Site-Specific Settlement Conference shall be allocated for approximately one (1) hour, which may be extended through mutual agreement of the parties. Subsequent settlement conferences may be scheduled by the parties.</td></tr>
</table>

|  |  |
|---|---|
| **Agreement to Settle** | A. If the Participants reach a settlement, the parties shall execute a proposed settlement agreement which, as appropriate, will be submitted to the Court for approval or incorporated into a proposed Sale Approval Order or Plan of Liquidation and Confirmation Order. If the matter being settled is a pending action in another court approval may also be sought from that court, subject to any applicable governmental public comment process.<br><br>B. Within five (5) calendar days upon executing any Settlement Agreement, the Debtors shall file a notice (the "**Settlement Agreement Notice**") with the Court setting forth the following:<br><br>    i. The execution date of the Settlement Agreement, including the parties thereto.<br><br>    ii. A concise summary of the settlement terms and, if applicable, the transition plan for the relevant NPP.<br><br>    iii. A proposed order approving the Debtors' entry into the Settlement Agreement and approval of the terms thereof (the "**Proposed Settlement Order**") or providing that the terms of the settlement will be subject to approval as part of proceedings on a sale approval order or Plan of Liquidation and Confirmation Order.<br><br>C. The Debtors shall (i) serve any Settlement Agreement Notice on the parties listed below and such other parties as the Court may order (collectively, the "**Objection Notice Parties**") and (ii) cause to be published on the website maintained by the Debtors' claims and noticing agent in these chapter 11 cases (https://cases.primeclerk.com/Exide2020) a notice containing information about the applicable Settlement Agreement Notice. The Objection Notice Parties include: |

|  | i. <u>Office of the U.S. Trustee</u>:  844 N. King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda J. Casey, Esq.) |
|  | ii. <u>Counsel to the Ad Hoc Group</u>:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Alice Belisle Eaton, Esq. and Robert Britton, Esq.) |
|  | iii. <u>Counsel to the DIP Agent</u>: Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071 (Attn: Robert A. Klyman, Esq. and Matthew G. Bouslog, Esq.) |
|  | iv. <u>Counsel to the Committee</u>: Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020 (Attn: Eric Chafetz, Esq. and Robert Hirsh, Esq.). |
|  | v. The non-Debtor parties to the Settlement Agreement. |
|  | vi. Any party who may be affected if the relief requested in the Settlement Agreement Notice is granted, and |
|  | vii. The Environment and Natural Resources Division of the Department of Justice. |
|  | D. Objections to the terms of a Settlement Agreement (a "**Settlement Agreement Objection**") must: |
|  | i. Be in writing; |
|  | ii. State the name and address of the objecting party and the amount and/or nature of the claim or interest of such party (unless such party is the U.S. Trustee or the Committee); |
|  | iii. State with particularity the basis and nature of any objection; |
|  | iv. Conform to the Bankruptcy Rules and Local Rules; and |
|  | v. Be filed with the Court and served in accordance with the Local Rules by no later than ten (10) calendar days after the filing and service of the relevant Settlement Agreement Notice (the "**Settlement Agreement Objection Deadline**") |

|  | unless the Settlement Agreement is being incorporated into a Sale Approval Order, Plan of Liquidation and Confirmation Order in which case it must be filed in accordance with the respective schedule for such objections.<br><br>E.  If a timely Settlement Agreement Objection is filed and served with respect to an applicable Settlement Agreement and such objection cannot be consensually resolved, the Debtors shall request a hearing before the Court on approval of the applicable Settlement Agreement or as part of proceedings on an applicable Sale Approval Order or Plan of Liquidation and Confirmation Order.<br><br>F.  If no timely Settlement Agreement Objection is filed and served with respect to an applicable Settlement Agreement, or if there is such an objection and it is consensually resolved, the Court may enter the Proposed Settlement Order approving the Settlement Agreement upon the expiration of the Settlement Agreement Objection Deadline, or the resolution of such objection upon the submission of the Proposed Settlement Order under certification of no objection or certification of counsel, as applicable, or as part of proceedings on an applicable Sale Approval Order or Plan of Liquidation and Confirmation Order subject to any applicable governmental public comment process. |
| **Mediation Stage** | A.  If the Participants are unable to reach a settlement by June 30, 2020 (as extended upon mutual agreement), the Participants shall participate in one or more mediations that are relevant to the Participants (each, a "**Mediation**" and the applicable mediator, the "**Mediator**"), where the Mediator shall hear and preside over the respective mediation.<br><br>B.  The Participants will mutually agree on which Mediator will preside over the respective mediation, selecting from Judge Joseph J. Farnan, Jr. (retired), Judge Richard Schmidt (retired), or John S. DeGroote; provided, however, that the Mediator presiding over any issues that are specific to the NPPs located in California shall be Judge John Leo Wagner (retired), and the Mediator presiding over any issues that are specific to the NPPs located in Pennsylvania shall be Judge Judith Fitzgerald (retired), although the California and/or Pennsylvania mediators may contact Judge Farnan, Judge Schmidt, or Mr. DeGroote.  The scope of initial mediation matters to be handled by Judge Farnan, Judge Schmidt, or Mr. |

DeGroote, and the scope of NPP-specific mediation matters to be handled by the California and the Pennsylvania Mediator(s), respectively, shall be determined as per Paragraph 3 of this Order below.

C.   The Mediators shall have the broadest possible discretion consistent with this Order and Local Rule 9019-5, including the ability to consolidate mediations involving the same governmental agency upon application by such governmental agency and consultation with the Debtors.

D.   The Participants shall jointly contact the Mediator to schedule the initial mediation date.

E.   At the option of the Mediator, after consultation with the respective Participants, all mediation proceedings will take place either (i) telephonically or (ii) by video conference.

F.   Unless otherwise instructed by the Mediator, each party shall submit directly to the Mediator (the "**Submission**") in form and content as the Mediator directs.  Prior to the Mediation, the Mediator may discuss with the Participants to determine what materials would be helpful and whether any Submissions shall be kept confidential by the Mediator only.  All Submission shall not be filed with the Court and the Court shall not have access to any Submission.

G.   Debtors shall in good faith consider any request from a governmental agency that a Surety participate in the Mediation, and if the Debtors do not agree, the relevant Mediator shall determine in its sole discretion whether a Surety may participate.   The Debtors consent in advance to Westchester and Aspen participating in the Mediation related to the NPPs in Texas and Westchester participating in Mediation related to the NPPs in California and Indiana.

H.   Unless otherwise ordered by the Mediator, all Participants in a Mediation, including any Surety participating in such Mediation, shall have access during the Mediation to a person with full settlement authority for approval of a settlement subject to any applicable public comment process or judicial approval requirements, provided, however, if a governmental entity requires approval of an elected official, an official confirmed by Congress or state legislature (or a person acting in the capacity of such official), or by a legislative body, then the Participant

shall be able to make a recommendation to such official or legislative body at an appropriate time.

I. Willful failure to attend any Mediation and any other material violation of Local Rule 9019-5 as modified herein may be reported to the Court by the Mediator and may result in the imposition of sanctions by the Court. Any such report of the Mediator shall comply with the confidentiality requirement of Local Rule 9019-5(d).

J. The Mediation shall end (i) upon mutual consent of the respective Participants or (ii) by the Mediator, in the Mediator's sole and reasonable discretion.

K. No later than July 17, 2020 (unless extended by agreement of the parties or the Court), the Mediator shall file with the Court a certificate (a "**Certificate of Completion**") stating whether or not a settlement has been reached. Regardless of the outcome of the Mediation, the Mediator shall not provide the Court with any details of the substance of the Mediation.

L. If the Participants reach a settlement as a result of Mediation, the parties shall execute or recommend a proposed Settlement Agreement as specified above and. after any necessary approvals are obtained, the Debtors shall file a Settlement Agreement Notice in accordance with the terms set forth above; provided, however, that before filing any Settlement Agreement Notice with respect to an NPP for which a Surety has issued a bond, the Participants shall have met with such Surety to discuss the terms of the proposed Settlement Agreement and attempt to resolve any objections.

M. If the Participants are unable to reach a settlement following Mediation, the Debtors and governmental agency shall present the Court with a proposed scheduling order ("Proposed Scheduling Order") setting forth applicable deadlines for adjudication of any request by the Debtors to abandon an NPP under section 554(a) of the Bankruptcy Code and any conditions to meet the requirements of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986). The Proposed Scheduling Order may also address any request in bankruptcy court by a government agency for injunctive relief. For the avoidance of doubt, nothing in this Paragraph L, or this Order, requires a Participant to bring any such request for injunctive relief before this Court. Furthermore, nothing herein shall waive or

| | |
|---|---|
| | abrogate any right of a governmental agency under the police or regulatory exception to the automatic stay. |
| **Proposed Scheduling Order** | A. The Proposed Scheduling Order shall be filed no later than July 22, 2020.<br><br>B. The Proposed Scheduling Order shall set forth, at a minimum, the following: a deadline for the parties to conclude all fact discovery, including depositions; a deadline for the Debtors to file a motion seeking to abandon the relevant NPP; and a deadline for the relevant governmental agency to file a response to the Debtors' motion seeking to abandon the relevant NPP.<br><br>C. The Proposed Scheduling Order shall also propose a date for a hearing on the Debtors' motion seeking to abandon the relevant NPP.  The Debtors expect to propose a hearing date no later than August 25, 2020, subject to the Court's availability but the other Participants reserve the right to disagree; provided, however, that the parties may mutually agree to propose a later hearing date, and the Court will decide any dispute as to the hearing date. |
| **Deadlines** | Notwithstanding anything contained herein, the deadlines contained herein may be modified solely by (i) the mutual consent of the Debtors and governmental agency or (ii) by order of the Court. |
| **Good Faith Participation** | The Participants must participate in good faith with the Settlement Procedures in accordance with Local Rule 9019-5 as modified herein. |
| **Confidentiality** | A. The confidentiality provisions of Local Rule 9019-5(d) are incorporated into the Settlement Procedures by reference.  No statements or arguments made or positions taken by the Mediator and the Participants during any part of the process described herein, including the Initial Global Settlement Conference (together with any continuations or rescheduled settlement calls or meetings arising from the Initial Global Settlement Conference) and the Mediation Stage may be disclosed by the Mediator or any such parties or their attorneys and advisors to the Court or any third party. For the avoidance of doubt, nothing in this Order shall waive, abrogate, or impair any privileges, including the common interest or community of interest privilege. |

| | |
|---|---|
| | B. All briefs, records, reports, and other documents received or made by the Mediator while serving in such capacity shall remain confidential and shall not be provided to the Court. The Mediator shall not be compelled to disclose such records, reports, and other documents in connection with any hearing held by the Court. |
| **Automatic Stay and Police or Regulatory Exception and Reservation of Rights** | Nothing herein shall modify or prejudice any Participant's rights under the Automatic Stay at 11 U.S.C. § 362(a), the Police or Regulatory Exception to the Automatic Stay at 11 U.S.C. § 362(b)(4), 28 U.S.C. § 959(b), or 28 U.S.C. § 1452(a), or with respect to any bond, surety instrument, guarantee, or other financial assurance. |
| **Existing Jury Trial and Arbitration Rights Unaffected** | Unless a governmental agency or the Debtors affirmatively waive their right to a jury trial or arbitration that otherwise may exist, participation in the Settlement Procedures shall not waive or otherwise modify such rights. All Participants' rights and defenses to contest the assertion of a jury trial or arbitration are fully preserved. |
| **Fees** | Each party to the Mediation shall bear its own costs and expenses incurred in connection with the Settlement Procedures, including Mediation, such as attorney's fees and other costs. For the avoidance of doubt, the Debtors' estates shall bear the expenses of the reasonable fees and costs charged by the Mediator. |
| **Designation of Additional NPPs** | Nothing herein limits the Debtors' rights to designate additional NPP sites to those listed in **Exhibit B** annexed to the Motion. In the event that a site is added, Debtors shall notify affected agencies who may then decide whether to participate in the procedures set forth in this Order. |

3.  The Court authorizes and appoints Judge Joseph J. Farnan, Jr. (retired), Judge Richard S. Schmidt (retired), and John S. DeGroote as approved Mediators eligible to conduct non-binding mediation, in accordance with the Settlement Procedures, with respect to all issues that are not specific to the NPPs located in California and Pennsylvania. During the Initial Global Settlement Conference, the Participants shall discuss and mutually agree as to which issues

are to be covered in Global mediation and which are to be covered in Site-Specific mediation. The Participants shall agree on which of Judge Farnan, Judge Schmidt, and Mr. DeGroote shall mediate a particular issue that is not specific to the NPPs located in California and Pennsylvania, and if the Participants cannot agree, then the Debtors and the relevant governmental agencies shall each designate one of the mediators and both designated mediators will participate in the mediation of such issue. The Court authorizes and appoints Judge Judith Fitzgerald (retired) to serve as the Mediator and to conduct non-binding mediation, in accordance with the Settlement Procedures, with respect to any issues that are specific to the NPPs located in Pennsylvania. The Court authorizes and appoints Judge John Leo Wagner (retired) to serve as the Mediator and to conduct non-binding mediation, in accordance with the Settlement Procedures, with respect to any issues that are specific to the NPPs located in California. For the avoidance of doubt, the California and/or Pennsylvania mediators may contact and consult with whichever of the above three Mediators gained relevant information or knowledge of the issues through prior stages of mediation(s) conducted pursuant to this Order, and such Mediator(s) may participate in the California or Pennsylvania mediations in a supporting role at the sole discretion of the California and/or Pennsylvania mediators, respectively.

4.    Without limiting the applicability of Local Rule 9019-5, (i) discussions among the Participants, including discussions with or in the presence of the Mediator, (ii) any mediation statements or any other documents or information provided to the Mediator or the Participants in the course of the Mediation, and (iii) correspondence, draft resolutions, offers, and counteroffers produced for, or as a result of, the Mediation ((i) through (iii), collectively, the "**Mediation Information**"), shall be strictly confidential, subject to disclosure only to the Mediator, the Participants, and the lenders under the Debtors' debtor-in-possession financing

("**DIP Financing**" and the lenders thereunder in such capacity, the "**DIP Lenders**") and shall not be admissible or discoverable for any purpose in any judicial or administrative proceeding, and no person or Participant, including counsel for any Participant, or any other party, shall in any way disclose to any non-party or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, offer, or counteroffer that may be made or provided in connection with the Mediation, unless otherwise available and not subject to a confidentiality agreement that would prevent its disclosure or as authorized by the Court. For the avoidance of doubt, Participants shall include the Committee through its counsel and advisors.  To the extent that any mediation statements or any other documents are exchanged between the Participants, such information shall be made available to the Sureties, provided the Sureties agree to be bound by the confidentiality provisions contained herein.

5.      All Mediation Information shall (i) remain confidential, (ii) be subject to protection under Rule 408 of the Federal Rules of Evidence and any equivalent or comparable state law, and (iii) not constitute a waiver of any existing privileges and immunities.

6.      The Mediators may conduct the Mediation as they see fit, establish rules of the Mediation, and consider and take appropriate action with respect to any matters the Mediators deem appropriate to conduct the Mediation, subject to the terms of this Order or further order of the Court.

7.      Subject to the confidentiality provisions of this Order and Local Rule 9019, from time to time, but in no event less than every fourteen (14) days, the Debtors shall consult with (i) counsel to the Committee, (ii) counsel to the Ad Hoc Group, and (iii) counsel to the DIP Lenders, regarding the status of the Settlement Procedures.

8.      Subject to the confidentiality provisions of this Order and Local Rule 9019, the DIP Lenders and the Committee shall be entitled to receive the information exchanged pursuant to the Settlement Procedures.

9.      Nothing contained in this Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action of any Participant; (iv) a waiver of any claims or cause of action  that may exist against any creditor or interest holder, or (v) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim.

10.     Except as otherwise set forth herein, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim, cause of action, or defense held by any party.

11.     For the avoidance of doubt, to the extent any provision of this Order conflicts with Local Rule 9019-5, the terms and provisions of this Order shall govern.

12.     The Debtors and governmental agencies are authorized to take all reasonable actions necessary or appropriate to effectuate this Order.

13.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**Dated: June 9th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

WEIL:\97511232\2\44362.0005

# **<u>TAB 4</u>**

**Notice of Qualified Bids and Designation of Baseline Bid With
Respect to the Americas Assets, dated July 23, 2020
[Bankr. D.I. 589]**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                                             :
In re                                                        :      Chapter 11
                                                             :
EXIDE HOLDINGS, INC., et al.,                                :      Case No. 20–11157 (CSS)
                                                             :
          Debtors.¹                                          :      (Jointly Administered)
                                                             :
                                                             :      Re: Docket Nos. 344, 324 & 548
------------------------------------------------------------ x
```

NOTICE OF QUALIFIED BIDS AND DESIGNATION
OF BASELINE BID WITH RESPECT TO THE AMERICAS ASSETS

PLEASE TAKE NOTICE THAT:

1.      On June 19, 2020, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered an order (Docket No. 344) (the "**Bidding Procedures Order**")² establishing certain procedures (the "**Bidding Procedures**") to govern the sale and auction of substantially all of the assets of Exide Holdings, Inc. and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**"). Pursuant to the Bidding Procedures and the Bidding Procedures Order, the Debtors are seeking to sell substantially all of the Assets (as defined herein), including, (a)(i) the Industrial Energy Americas business segment, (ii) the Transportation Americas business segment, (iii) the Recycling Americas business segment, (iv) any operating facilities located in any of the foregoing business segments, or (v) any combination thereof (collectively, the "**Americas Assets**") and (b)(i) the Transportation EMEA/ROW business segment, (ii) the Industrial EMEA/ROW business segment, (iii) the Recycling EMEA/ROW segment or (iv) any combination thereof (collectively, the "**Europe/ROW Assets**" and, together with the Americas Assets, and any other assets of the Debtors, the "**Assets**").

2.      In accordance with the Bidding Procedures Order, the Debtors accepted a stalking horse bid (the "**Europe/ROW Stalking Horse Credit Bid**") submitted by an entity formed by the Ad Hoc Group (the "**Europe/ROW Stalking Horse Credit Bidder**") for certain of the Europe/ROW Assets pursuant to the Stock and Asset Purchase Agreement appended to the *Notice of Europe/ROW Stalking Horse Agreement* at Exhibit B (Docket No. 324).

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

²       Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order.

3.      On July 8, 2020, pursuant to the Bidding Procedures, the Debtors designated EX Holdings, Inc. ("**EX Holdings**"), a wholly-owned subsidiary of Quexco Incorporated, as Additional Stalking Horse Bidder (the "**Americas Stalking Horse Bidder,**" and such bid, the "**Americas Stalking Horse Bid**") for substantially all of the Americas Assets pursuant to and as set forth in that certain Stock and Asset Purchase Agreement (the "**Americas Stalking Horse Agreement**") by and among Exide Technologies, LLC ("**Seller**"), EX Holdings, and, solely for purposes of Sections 12.17, 12.18 and 12.23, Howard M. Meyers ("**Guarantor**").  Parties in interest were provided the opportunity to object to the designation of the Americas Stalking Horse Bidder (each an "**Americas Stalking Horse Objection**") by no later than July 15, 2020 at 4:00 p.m. (Eastern Time).  No Americas Stalking Horse Objections were received, and on July 16, 2020, the Bankruptcy Court entered the *Order Approving Debtors' Designation of Americas Stalking Horse Bidder and Approving Stalking Horse Bid Protections* (Docket No. 548) (the "**Americas Stalking Horse Order**").

4.      The Europe/ROW Stalking Horse Credit Bid and the Americas Stalking Horse Bid were subject to higher or better offers in accordance with the Bidding Procedures.  The deadline for potential bidders to submit bids for any of the Assets was July 17, 2020 at 4:00 p.m. (Eastern Time) (the "**Bid Deadline**").

5.      The Debtors did not receive any other bids for the Europe/ROW Assets.  As such, the highest and best offer for the Europe/ROW Assets was submitted by the Europe/ROW Stalking Horse Credit Bidder, and the Europe/ROW Stalking Horse Credit Bidder is the Successful Bidder for such Assets.

## Qualified Bids for the Americas Assets

6.      The Debtors received bids for the Americas Assets and have, in the exercise of their reasonable business judgment in consultation with the Consultation Parties, determined that the following bids are "Qualified Bids" under the Bidding Procedures:

    (a) the Americas Stalking Horse Bid; and

    (b) the Bid of Battery BidCo LLC ("**Battery BidCo**") for a base purchase price of $178,600,000, on the terms and conditions set forth in that certain Stock and Asset Purchase Agreement (the "**Battery BidCo Agreement**") by and among Seller, Battery BidCo, and, solely for purposes of Sections 12.17, 12.18 and 12.23, Atlas Capital Resources III LP ("**Guarantor**"), attached hereto as **Exhibit A**.

7.      Pursuant to 18 U.S.C. §§ 156 and 157 and the Bidding Procedures, Qualified Bidders and their representatives may not communicate with one another, collude, or otherwise coordinate for participating in, or otherwise for any purpose regarding, the Auction without the express consent of the Debtors.  Any party found to violate this requirement will be referred to the Office of the United States Trustee of the Department of Justice and the Office of the United States Attorney for the District of Delaware in accordance with applicable law.

### Baseline Bid for the Americas Assets

8.      The Debtors hereby designate the bid of Battery BidCo as the highest or best Qualified Bid for the Americas Assets (the "**Baseline Bid**").

9.      As the Debtors previously announced, the Debtors will hold a virtual Auction on **July 23, 2020 beginning at 10:00 a.m. (Eastern Time)** (the **"Auction"**), and the hearing to consider approval of the sale of the Assets will be held on **August 6, 2020 at 2:00 p.m. (Eastern Time)** before the Bankruptcy Court, 824 N Market St, Wilmington, DE 19801 before the Honorable Christopher S. Sontchi, (the "**Sale Hearing**").

### Minimum Overbid Amount

10.      At the Auction, bidding will start at the purchase price and terms proposed in the Baseline Bid, and Qualified Bidders will be permitted to increase their bids in increments of $1,000,000 (the "**Minimum Overbid Amount**"), which may be modified in accordance with the Bidding Procedures.

### Additional Information

11.      If you have questions concerning the contents of this notice or the sale process, you should contact the representatives of the Debtors with whom you have previously been in contact or the Debtors' advisors, Houlihan Lokey Capital, Inc., at ProjectEdisonMAHL@HL.com, and Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Sunny Singh, Esq. (sunny.singh@weil.com), Gaby Smith, Esq. (gaby.smith@weil.com), and Daphne Papadatos, Esq. (daphne.papadatos@weil.com)).

12.      Copies of the Bidding Procedures Order, the Bidding Procedures, the Europe/ROW Stalking Horse Agreement, the Americas Stalking Horse Agreement, and the Americas Stalking Horse Order may be obtained free of charge at the website dedicated to the Debtors' chapter 11 cases maintained by their claims and noticing agent and administrative advisor, Prime Clerk LLC, located at https://cases.primeclerk.com/Exide2020.

*[Remainder of Page Intentionally Left Blank]*

RLF1 23763657V.1

### Reservation of Rights

13.      In accordance with the Bidding Procedures Order, the Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, adjourn or continue the Auction or the Sale Hearing to a later date, modify the Bidding Procedures, waive terms and conditions set forth therein, or extend the deadlines set forth therein, in each case, to the extent not materially inconsistent with the Bidding Procedures and the Bidding Procedures Order.

Dated: July 23, 2020
     Wilmington, Delaware

<div style="margin-left:35%;">

*/s/ Brendan J. Schlauch*
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

</div>

RLF1 23763657V.1

**<u>Exhibit A</u>**

**Battery BidCo Agreement**

**HIGHLY CONFIDENTIAL**

**STOCK AND ASSET PURCHASE AGREEMENT**

dated as of July __, 2020

by and among

**Exide Technologies, LLC, as Seller**,

**Battery BidCo LLC, as Buyer,**

**and**

**Atlas Capital Resources III LP, as Guarantor**

**HIGHLY CONFIDENTIAL**

## TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS..........................................................................1
Section 1.01    Certain Defined Terms ..............................................................1

ARTICLE II       PURCHASE AND SALE; CLOSING...........................................2
Section 2.01    Purchase and Sale of the Transferred Equity Interests .................2
Section 2.02    Purchase and Sale of Transferred Assets....................................2
Section 2.03    Assignment of Certain Transferred Assets ..................................8
Section 2.04    Closing .................................................................................8
Section 2.05    Cure Costs; Right to Exclude Contracts ......................................9
Section 2.06    Withholding ..........................................................................10

ARTICLE III      PURCHASE PRICE ................................................................11
Section 3.01    Purchase Price .......................................................................11
Section 3.02    Purchase Price Deposit ...........................................................11
Section 3.03    Certain Closing Deliverables ...................................................11
Section 3.04    Estimated Closing Statement; Closing Payment............................14
Section 3.05    Proposed Final Closing Statement and Final Closing Statement..........14
Section 3.06    Post-Closing Adjustment .........................................................16
Section 3.07    Purchase Price Allocation ........................................................16

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLER......................17
Section 4.01    Formation and Qualification of the Transferred Entities..................17
Section 4.02    Capital Structure of the Transferred Entities ...............................17
Section 4.03    Formation and Authority of the Seller Parties; Enforceability .........17
Section 4.04    No Conflict.............................................................................18
Section 4.05    Consents and Approvals ...........................................................18
Section 4.06    Financial Information; Absence of Undisclosed Liabilities ..............19
Section 4.07    Absence of Certain Changes or Events........................................19
Section 4.08    Absence of Litigation...............................................................19
Section 4.09    Compliance with Laws; Permits .................................................20
Section 4.10    Intellectual Property.................................................................20
Section 4.11    Environmental Matters..............................................................21
Section 4.12    Material Contracts....................................................................22
Section 4.13    Employment and Employee Benefits Matters .................................24
Section 4.14    Taxes....................................................................................26
Section 4.15    Real Property ..........................................................................28
Section 4.16    Brokers..................................................................................28
Section 4.17    Title; Sufficiency of Transferred Assets and Assets........................28
Section 4.18    Insurance...............................................................................29
Section 4.19    Affiliate Transactions................................................................29
Section 4.20    Condition of Transferred Assets and Assets..................................29
Section 4.21    Corruption and Trade Regulation ................................................29
Section 4.22    No Other Representations or Warranties .......................................31

HIGHLY CONFIDENTIAL

ARTICLE V          REPRESENTATIONS AND WARRANTIES OF BUYER ......................31
    Section 5.01    Formation and Authority of Buyer; Enforceability ............................31
    Section 5.02    Qualification of the Buyer .................................................................32
    Section 5.03    No Conflict.........................................................................................32
    Section 5.04    Consents and Approvals .....................................................................32
    Section 5.05    Absence of Restraints; Compliance with Laws ..................................33
    Section 5.06    Financial Ability ................................................................................33
    Section 5.07    Brokers ...............................................................................................33
    Section 5.08    Investigation.......................................................................................33
    Section 5.09    Securities Matters ...............................................................................34

ARTICLE VI         ADDITIONAL AGREEMENTS.................................................34
    Section 6.01    Conduct of Business Before the Closing ............................................34
    Section 6.02    Access to Information ........................................................................36
    Section 6.03    Confidentiality ...................................................................................37
    Section 6.04    Regulatory Approvals ........................................................................38
    Section 6.05    Third Party Consents..........................................................................40
    Section 6.06    Exide Canada .....................................................................................40
    Section 6.07    Intercompany Obligations..................................................................40
    Section 6.08    Cooperation ........................................................................................40
    Section 6.09    Bulk Transfer Laws ...........................................................................41
    Section 6.10    Employee Matters ..............................................................................41
    Section 6.11    Collective Bargaining Agreements ....................................................44
    Section 6.12    No Successor Liability .......................................................................45
    Section 6.13    Insurance Matters ..............................................................................45
    Section 6.14    Guarantees; Other Obligations...........................................................47
    Section 6.15    Europe/ROW Buyer ...........................................................................48
    Section 6.16    Financial Reporting............................................................................48
    Section 6.17    Disclosure Schedule Supplement.......................................................49
    Section 6.18    BM Assembly Line .............................................................................49

ARTICLE VII        POST-CLOSING COVENANTS...............................................50
    Section 7.01    Access .................................................................................................50
    Section 7.02    Directors' and Officers' Indemnification and Exculpation .................51
    Section 7.03    Preservation of Books and Records ....................................................51
    Section 7.04    Further Assurances.............................................................................52

ARTICLE VIII       BANKRUPTCY PROVISIONS.................................................52
    Section 8.01    [RESERVED] .....................................................................................52
    Section 8.02    Competing Transaction ......................................................................52
    Section 8.03    Bankruptcy Court Filings...................................................................52
    Section 8.04    Back-Up Bidder .................................................................................53

ARTICLE IX         TAX MATTERS.......................................................................53
    Section 9.01    Transfer Taxes ...................................................................................53
    Section 9.02    Tax Adjustments ................................................................................54
    Section 9.03    Tax Cooperation.................................................................................54

Section 9.04     Post-Closing Filing of Transferred Entity Tax Returns....................54
Section 9.05     Code Section 338 Election..........................................................55
Section 9.06     Canadian Transfer Tax Elections.................................................55
Section 9.07     Survival...................................................................................55

ARTICLE X          CONDITIONS TO CLOSING ....................................................55
Section 10.01    Conditions to Obligations of Seller ...........................................55
Section 10.02    Conditions to Obligations of Buyer ...........................................56
Section 10.03    Frustration of Closing Conditions...............................................57
Section 10.04    Waiver of Closing Conditions ....................................................58

ARTICLE XI         TERMINATION..........................................................................58
Section 11.01    Termination...............................................................................58
Section 11.02    Notice of Termination.................................................................59
Section 11.03    Effect of Termination..................................................................59

ARTICLE XII        MISCELLANEOUS.....................................................................60
Section 12.01    Rules of Construction .................................................................60
Section 12.02    Expenses ...................................................................................61
Section 12.03    Notices .......................................................................................61
Section 12.04    Survival.......................................................................................62
Section 12.05    Limitation on Liability..................................................................63
Section 12.06    Public Announcements................................................................63
Section 12.07    Severability.................................................................................63
Section 12.08    Assignment .................................................................................63
Section 12.09    No Third-Party Beneficiaries .......................................................64
Section 12.10    Entire Agreement ........................................................................64
Section 12.11    Amendments................................................................................64
Section 12.12    Waiver.........................................................................................64
Section 12.13    Governing Law ............................................................................64
Section 12.14    Dispute Resolution; Consent to Jurisdiction.................................65
Section 12.15    Waiver of Jury Trial.....................................................................65
Section 12.16    Admissibility into Evidence..........................................................66
Section 12.17    Remedies; Specific Performance .................................................66
Section 12.18    Non-Recourse .............................................................................66
Section 12.19    Interest........................................................................................67
Section 12.20    Disclosure Schedules and Exhibits..............................................67
Section 12.21    Provision Respecting Legal Representation ..................................67
Section 12.22    Counterparts................................................................................68
Section 12.23    Guaranty......................................................................................68

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Bill of Sale, Assignment and Assumption Agreement |
| Exhibit C | Form of Transferred Leased Property Assignment and Assumption Agreement |
| Exhibit D | Form IP Assignment Agreement |
| Exhibit E | Transaction Accounting Principles and Reference Working Capital Statement |

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule A | Transferred Entities; Transferred Equity Interests |
| Schedule B | Debtors |
| Schedule C | Certain Transaction Agreements Key Terms |

**HIGHLY CONFIDENTIAL**

This STOCK AND ASSET PURCHASE AGREEMENT, dated as of July __, 2020 (the "**Agreement Date**"), is made by and between Exide Technologies, LLC, a Delaware limited liability company ("**Seller**"), and Battery BidCo LLC, a Delaware limited liability company (together with is permitted assigns pursuant to <u>Section 12.08</u>,  "**Buyer**") and, solely for purposes of <u>Section 12.17</u>, <u>12.18</u> and <u>12.23</u>, Atlas Capital Resources III LP, A Delaware limited partnership ("**Guarantor**" and together with Seller and Buyer, the "**Parties**").

PRELIMINARY STATEMENTS

A.      Seller and certain of its Affiliates are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and, on May 19, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), commencing the jointly administered bankruptcy cases pending as *In re Exide Holdings*, Case No. 20-11157 (collectively, the "**Bankruptcy Cases**").

B.      Seller owns or controls, directly or indirectly, the other Seller Parties.

C.      Certain Seller Parties own the equity interests (collectively, the "**Transferred Equity Interests**") of the Persons set forth on <u>Schedule A</u> (each a "**Transferred Entity**" and, together, the "**Transferred Entities**") as and to the extent set forth beside such Transferred Entity's name on <u>Schedule A</u>.

D.      The Seller Parties and the Transferred Entities are engaged in, or hold assets or liabilities relating to, the Business (and/or, in the case of certain of the Seller Parties hold Transferred Equity Interests).

E.      The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties all of the Transferred Equity Interests and the Transferred Assets, and Buyer desires to assume the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.01    <u>Certain Defined Terms</u>.    Capitalized terms used in this Agreement have the meanings specified in <u>Exhibit A</u>.

**HIGHLY CONFIDENTIAL**

## ARTICLE II

## PURCHASE AND SALE; CLOSING

Section 2.01   <u>Purchase and Sale of the Transferred Equity Interests</u>.   On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall and shall cause each other applicable Seller Party to sell, convey, assign, transfer and deliver to Buyer or Buyer's Affiliates, and Buyer shall or shall cause one of its Affiliates to purchase, acquire and accept from each such Seller Party all of such Seller Party's right, title and interest in and to the Transferred Equity Interests.

Section 2.02   <u>Purchase and Sale of Transferred Assets</u>.

(a)   <u>Transferred Assets</u>. On the terms and subject to the conditions set forth in this Agreement and subject to the exclusions set forth in <u>Section 2.02(b)</u> and <u>Section 2.03</u>, at the Closing, Seller shall and shall cause each other Seller Party to sell, convey, assign, transfer and deliver to Buyer, and Buyer shall  purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and  interest in, to and under the following assets, rights and properties,   in each case, other than the Transferred Equity Interests (collectively, the "**Transferred Assets**"):

(i)   all owned real property listed on <u>Schedule 2.02(a)(i)</u> (the "**Transferred Owned Real Property**") held by each Seller Party, together with (to the extent of such Seller Party's interest therein) all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof and all servitudes, easements, privileges, rights-of-way, development rights, air rights, other  surface use agreements and water use and rights agreements related thereto;

(ii)   to the maximum extent permitted by the Bankruptcy Code or applicable Law, the leasehold interests listed on <u>Schedule 2.02(a)(ii)</u> under the real property leases, subleases or licenses (the "**Transferred Leased Real Property**") held by each Seller Party and all rights in respect thereof (including all transferrable options and rights of first offer and/or refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto (the "**Transferred Leases**");

(iii)   to the maximum extent permitted by the Bankruptcy Code, all Assumed Contracts (collectively with the Transferred Leases, the "**Transferred Contracts**");

(iv)   to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Permits, including Environmental Permits (the "**Transferred Permits**");

(v)   all rights of any Seller Party under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current and former employees and agents of any Seller Party or third party to the extent related to the Transferred Assets (or any portion thereof);

(vi)   to the maximum extent permitted by the Bankruptcy Code, all rights of any Seller Party under or pursuant to all warranties, representations and guarantees made by

2

**HIGHLY CONFIDENTIAL**

suppliers, manufacturers and contractors, to any Seller Party to the extent related to the Transferred Assets;

(vii)     to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Business Intellectual Property (and the right to sue, bring claims and other Causes of Action for infringement, misappropriation or violation thereof) and Business Technology,  including the Business Intellectual Property and Business Technology set forth on Schedule 2.02(a)(vii);

(viii)    all assets, rights and properties of or relating to the Assumed Employee Plans;

(ix)      the Transferred Books and Records;

(x)       all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, machinery, tools, tooling, vehicles, and other tangible personal  property to the extent related to the Business, other than those described under Section 2.02(b)(xviii) or Section 2.02(b)(xx);

(xi)      all inventory wherever located, including all semi-finished and finished goods, raw materials, works in progress, packaging, supplies, tooling and parts, whether held at any location or facility of any Seller Party or in transit to any Seller Party, in each case, as of the Effective Time and related to the Business;

(xii)     goodwill of the Business;

(xiii)    all accounts receivable of the Business, which, for the avoidance of doubt, includes all of the accounts receivable in the accounts that comprise "*Accounts receivable, net*" as referenced in Exhibit E;

(xiv)    all customer and supplier lists related to the Business;

(xv)     all rights, demands, claims, causes of action, prepayments, refunds, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation and other claims of any of the Seller Parties against any Person (collectively, "**Causes of Action**") arising from any of the Transferred Assets or related to the Business, including any rights against third parties under Transferred Contracts other than those Causes of Action described in Section 2.02(b)(iv), Section 2.02(b)(v), and Section 2.02(b)(vii);

(xvi)    the assets listed on Schedule 2.02(a)(xvi);

(xvii)   Cash (after taking into account all Cash of the Transferred Entities, but excluding Cash in the bank accounts set forth on Schedule 2.02(b)(xviii)) up to an amount equal to the Target Cash Amount;

(xviii)  to the maximum extent transferrable, all bank accounts related to the Business, other than  those set forth on Schedule 2.02(b)(xviii);

**HIGHLY CONFIDENTIAL**

(xix)   all prepaid expenses and deposits, to the extent related to the Business, other than (A) adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code and (B) those prepaid expenses and deposits set forth Schedule 2.02(b)(xvi);

(xx)   other than any Excluded Assets, all other assets, properties or rights of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, that are owned by a Seller Party and related to the Business; and

(xxi)   to the maximum extent permitted by the Bankruptcy Code or applicable Law and subject to Section 6.13, all occurrence-based Insurance Policies set forth on Schedule 2.02(a)(xxi) (each, a "**Transferred Insurance Policies**") and all rights of any nature with respect to any such Transferred Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries.

(b)   Excluded Assets. Notwithstanding anything to the contrary herein, the following assets, rights or properties of or in the possession of the Seller Parties (the "**Excluded Assets**") shall be retained by the Seller Parties and their Affiliates, other than the Transferred Entities:

(i)   all Available Contracts (other than Transferred Contracts) and all Contracts not related to the Business ("**Excluded Contracts**");

(ii)   Cash in excess of the Target Cash Amount;

(iii)   other than the Transferred Owned Real Property and Transferred Leased Real Property, all right, title and interest in owned and leased real property together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof, and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and, with respect to any such leased real property, all rights in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto (collectively, the "**Excluded Real Property**");

(iv)   all Causes of Action (i) against any Seller Party or any of their respective current or former directors, managers, officers equityholders or Affiliates (as of the date hereof and as of the Closing), including any Cause of Action that is the subject of or may be brought by the Debtors' subcommittee of the special committee of the Board, other than those arising out of or relating to any Transaction Agreement, (ii) arising under Chapter 5 of the Bankruptcy Code, whether pursuant to federal Law or state Law equivalents, or (iii) arising with respect to an Excluded Asset and Excluded Liability (each, an "**Excluded Causes of Action**");

(v)   all claims, rights or interests of the Seller Parties and their Affiliates (other than the Transferred Entities) in or to any refund, rebate, abatement or other recovery for Taxes (other than in respect of (i) any Transfer Taxes borne by Buyer pursuant to Section 9.01 and (ii) any Taxes allocable to Buyer pursuant to Section 9.02), and any other Tax assets (including any Tax attributes), together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof);

**HIGHLY CONFIDENTIAL**

     (vi)  all Tax Returns and all  records (including  all working  papers) related thereto;

     (vii)  other than the Transferred Insurance Policies, all other Insurance Policies and all rights of any nature with respect to any such Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries;

     (viii)  all  nontransferable  Permits,  including  nontransferable Environmental Permits;

     (ix)  all non-transferrable options and rights of first refusal related to the Transferred Leased Real Property;

     (x)  all Intellectual Property that is owned or purported to be owned by any Seller Party, other than the Business Intellectual Property and Business Technology;

     (xi)  all rights and interests of the Seller Parties under the Transaction Agreements;

     (xii)  all assets, rights and properties of or relating to the Employee Plans that are not Assumed Employee Plans or Transferred Entity Employee Plans;

     (xiii)  (A) all minute books (and other similar corporate records) and stock records, (B) any books and records related to the Excluded Assets, (C) any books and records or other data or materials of or in the possession of the Seller Parties that (x) any of the Seller Parties are required by Law or by Final Order of the Bankruptcy Court to retain, (y) any of the Seller Parties reasonably believes are necessary to enable the Seller Parties to prepare and/or file Tax Returns or (z) any of the Seller Parties are prohibited by Law, Contract or Seller Party's or Transferred Entity's public-facing policies, notices or other disclosures concerning the collection, use, or processing of Personal Data ("**Privacy Policies**") from delivering to Buyer (including confidential and personal medical records and Personal Data) or (D) any copies of any books and records that Seller and its Affiliates retain pursuant to Section 7.03; provided, that the Seller Parties shall permit Buyer to make copies of any books and records excluded pursuant to clause (C) to the extent not prohibited by Law, Contract or any Seller Party's or Transferred Entity's Privacy Policies;

     (xiv)  (A) all records and reports prepared or received by any Seller Party or any of its Affiliates in connection with the sale of the Business or the Transactions or any other Transaction Agreement, including all analyses relating to Buyer or any other third-party bidder so prepared or received and (B) all bids and expressions of interest received from third parties with respect to the Business;

     (xv)  any warranties, representations and guarantees pertaining to any Excluded Asset and all rights and defenses pertaining to any Excluded Liability;

     (xvi)  all adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code and the prepaid expenses and deposits set forth on  Schedule 2.02(b)(xvi);

**HIGHLY CONFIDENTIAL**

(xvii)   all right, title and interest in and to all shares, capital stock and other equity interests of any Person owned by any Seller Party, including the Transferred Equity Interests (the transfer of which shall be governed by Section 2.01);

(xviii)  all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, vehicles, and other tangible personal property to the extent exclusively related to the business of the Seller Parties (other than the Business) or located or operated exclusively at the Excluded Real Property (other than the items listed on Schedule 2.02(a)(xvi));

(xix)   the bank accounts set forth on Schedule 2.02(b)(xix) (including any Cash held therein) and all nontransferable bank accounts;

(xx)   any other assets, properties or rights set forth on Schedule 2.02(b)(xx); and

(xxi)   any Transferred Asset that is (A) not located on Transferred Owned Real Property or Transferred Leased Real Property and (B) not removed by Buyer or its Affiliates within sixty (60) days following the Closing from the property where such Transferred Asset is located on the Closing Date, shall be deemed an Excluded Asset and thereafter abandoned property.

(c)   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement and subject to the exclusions set forth in Section 2.02(d),  Buyer shall or shall cause one of its Affiliates to, effective at and as of the Effective Time, assume and thereafter timely pay, discharge and perform in accordance with their terms, only the following Liabilities of the Seller Parties (the "**Assumed Liabilities**"):

(i)   all Liabilities arising under any of the Transferred Contracts, except to the extent that such Liabilities are required to be performed on or prior to the Closing Date;

(ii)   all Liabilities in respect of trade accounts payable of a kind set forth on Schedule 2.02(c)(ii);

(iii)   all Cure Costs payable by Buyer pursuant to Section 2.05;

(iv)   [RESERVED];

(v)   all Liabilities (A) assumed by Buyer pursuant to Section 6.10 and (B) with respect to the Assumed Employee Plans;

(vi)   all Liabilities relating to Buyer's ownership or operation of the Transferred Assets, to the extent arising from events, facts or circumstances that occur from and after the Effective Time; and

(vii)   to the extent that any Affected Union enters into a Modified Labor Agreement with Buyer, all Liabilities arising under such Modified Labor Agreement from and after the Effective Time.

6

**HIGHLY CONFIDENTIAL**

For the avoidance of doubt, any Liability of a Transferred Entity shall continue to be a Liability of such Transferred Entity and will remain with the Transferred Entity that held such Liability as of immediately prior to the Closing.

(d)     Excluded Liabilities.  Notwithstanding any other provision of this Agreement to the contrary, Buyer and Buyer's Affiliates are not assuming or agreeing to pay or discharge, and their Seller Parties and their Affiliates shall be solely and exclusively liable with respect  to, the following Liabilities (the "**Excluded Liabilities**"):

(i)     any Debt or any Seller Guarantee, except to the extent provided in Section 6.14;

(ii)     any Liability to the extent arising out of any Excluded Asset;

(iii)     any Liability of the Seller Parties for Taxes;

(iv)     any Liability expressly retained by the Seller Parties pursuant to Section 6.10, including, but not limited to, any Liability relating to (i) the Employee Plans that are not Assumed Employee Plans and (ii) any Liability relating to an individual who does not accept employment or service with Buyer or an Affiliate of Buyer or who is otherwise terminated by a Seller Party or Transferred Entity prior to or on the Closing Date, irrespective of when such Liabilities arise;

(v)     any Liability relating  to amounts to be  paid by the  Seller  Parties hereunder, including brokers fees;

(vi)     any Environmental Liabilities arising out of, or relating to: (A) Excluded Assets; (B) any properties that are not Transferred Assets; (C) to the maximum extent excludable by the Bankruptcy Code or other applicable Law, any Environmental Liabilities arising out of or relating to any Releases of Hazardous Materials at, on, to, or from the Transferred Assets that occurred prior to the Closing Date; (D) any Environmental Liabilities that the Seller Parties have assumed by Contract from a third party prior to the Closing Date that are not Transferred Contracts; (E) properties that a Seller Party does not own, lease or operate as of the Closing Date; (F) any Environmental Liabilities that arise under a Contract that is not a Transferred Contract; (G) any penalties or fines for violations of Environmental Law that occurred prior to the Closing Date; (H) the Transferred Entities prior to the Closing Date; or (I) Environmental Liabilities that were discharged in any prior bankruptcy proceedings of any Seller Party or Affiliate thereof;

(vii)     to the extent not already excluded under Section 2.02(d)(vi) and to the maximum extent excludable by the Bankruptcy Code or other applicable Law, any Environmental Liabilities arising out of or relating to: (A) any Releases of Hazardous Materials that occurred prior to the Closing Date; (B) any violations of Environmental Law that occurred prior to the Closing Date, regardless of whether those violations continue on or past the Closing Date; and/or (C) any storage, transportation, treatment, disposal, discharge, recycling or Release of Hazardous Materials generated or managed by the Seller Parties, the Transferred Entities or the Business at any location (including, but not limited to, off-site disposal locations) prior to the Closing Date;

**HIGHLY CONFIDENTIAL**

(viii)   any Liability (A) related to any misclassification under the Fair Labor Standards Act or similar state Law or the misclassification of independent contractors prior to the Closing Date, (B) related to workers' compensation claims or coverage related to the period prior to the Closing Date, (C) under any Collective Bargaining Agreement to which any of the Seller Parties or their Affiliates is a party provided the liability arises from the action or inaction of Sellers prior to or on the Closing Date, (D) related to any notice or payment in lieu of notice and any applicable penalties under the WARN Act and similar state or local Law, or any similar provision in a Collective Bargaining Agreement that requires notice on or prior to the Closing Date unless the requirement for notice or payment in lieu of notice and any applicable penalties under the WARN Act and similar state or local Law, or any similar provision in a Collective Bargaining Agreement, arises as a result of Buyer's actions on or after the Closing Date;

(ix)   any Liability relating to wages, bonuses, commissions, independent contractor payments, incentives, payroll, workers' compensation, unemployment benefits, severance or similar payments that arises at or prior to the Closing or that is payable or becomes payable or due in whole or in part to any Person prior to or on the Closing, including all employer Taxes related thereto;

(x)   any Liability in respect of pre-petition trade accounts payable; and

(xi)   any other Liability of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created, other than an Assumed Liability.

Section 2.03   Assignment of Certain Transferred Assets.   Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Government Authority), would constitute a breach or other contravention thereof or a violation of Law or Order, and is not otherwise permitted by the Bankruptcy Code or Order of the Bankruptcy Court (a "**Restricted Transfer**"). If, on the Closing Date, any such attempted transfer or assignment would be a Restricted Transfer or otherwise would be ineffective, the Seller Parties and Buyer will, subject to Section 6.04 and Section 6.05 and except with respect to any Personal Data in possession or control of any Seller Party or any Transferred Entity, cooperate in a mutually agreeable arrangement under which, for up to three (3) months following Closing, (a) Buyer would, in compliance with Law or an Order of the Bankruptcy Court, obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset, claim, right or benefit in accordance with this Agreement, including, for example (and without limitation of other similar arrangements being employed instead and in place thereof), by the applicable Seller Party or Parties subcontracting, sublicensing or subleasing such Transferred Asset to Buyer or (b) the Seller Parties would enforce for the benefit (and at the expense) of Buyer any and all of the Seller Parties' rights, claims or benefits against a third party associated with such Transferred Asset, and the Seller Parties would promptly pay to Buyer when received all monies received by them under any such Transferred Asset, claim, right or benefit (net of the Seller Parties' expenses incurred in connection with any assignment or other performance contemplated by this Section 2.03).

HIGHLY CONFIDENTIAL

Section 2.04   Closing.   The closing of the sale and purchase of the Transferred Equity Interests and the Transferred Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on the second (2nd) Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing. The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**."  For all purposes under this Agreement and each other Transaction Agreement, (a) except as otherwise expressly provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

Section 2.05   Cure Costs; Right to Exclude Contracts.

(a)   Available Contracts.  As soon as reasonably practicable and no later than the date of this Agreement, Seller shall provide Buyer with a list of all executory Contracts Related to the Business, other than Available Software Contracts, to which one or more Seller Parties is a party (such Contracts, the "**Available Contracts**"  and such list, the "**Available Contracts List**"), which list may be updated from time to time prior to Closing by the Seller Parties to add any Available Contracts not previously included thereon. At any time following the Agreement Date until (x) with respect to Available Software Contracts, July 28, 2020 or (y) with respect to all other Available Contracts, the later of (i) the date that is three (3) Business Days prior to date of the hearing at which the Bankruptcy Court considers entry of the Sale Order, and (ii) five (5) Business Days after such Available Contract was added to the Available Contracts List (such date, the "**Determination Date**"), Buyer, in its sole discretion, may deliver one or more written notices to Seller, (each such notice, a  "**Designation Notice**"),  pursuant to which Buyer shall designate in writing which Available Software Contracts or Available Contracts, as applicable, that Buyer wishes to assume at Closing (collectively, the "**Assumed Contracts**") and provided, that, from time to time until the applicable Determination Date, Buyer may, by written notice to Seller, determine not to assume any Available Software Contracts or Available Contracts, as applicable, previously designated as an Assumed Contract (and from and after such date such Contract shall be an Excluded Contract). All Available Software Contracts or Available Contracts, as applicable that Buyer does not timely designate in writing for assumption pursuant to a Designation Notice shall not be considered Assumed Contracts or Transferred Assets, and shall be deemed Excluded Contracts and Excluded Assets for all purposes under this Agreement. Buyer shall not be responsible for any Cure Costs related to any Excluded Contracts. Upon Buyer's reasonable request, subject to the limitations set forth in Section 6.02(b), the Seller Parties shall provide additional detailed information as to the post-Closing Liabilities under the Available Software Contracts or Available Contracts, as applicable sufficient for Buyer to make an informed assessment whether to designate such Contract as an Assumed Contract pursuant to this Section 2.05(a).

(b)   Buyer Commitment to Pay Cure Costs. At or prior to Closing, Buyer shall promptly pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts (as set forth in this Agreement, as agreed to by Debtors and the Contract counterparty

**HIGHLY CONFIDENTIAL**

(subject to **Error! Reference source not found.**) or as determined by the Bankruptcy Court). The Seller Parties shall  cooperate with Buyer to facilitate the payment of the Cure Costs to the Contract counterparties on  or prior to the Closing Date. The Seller Parties shall use commercially reasonable efforts to take  all actions required to assume and assign the Assumed Contracts to Buyer (other than payment of  Cure Costs), including taking all actions required to obtain a Final Order containing a finding that  the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable  requirements of section 365 of the Bankruptcy Code and any other applicable Law.

(c)  Determination of Cure Costs. If any objection i s  f i l e d  by an Available Contract underlined counterparty with respect to any Available Contract, such  Contract shall become a "**Disputed Contract**", and the Seller Parties, in consultation with Buyer,  shall either settle the objection of such counterparty or shall litigate such objection under such  procedures as the Bankruptcy Court shall approve. The Debtors shall not settle a disputed Cure  Cost for an amount in excess of $5,000, individually, and $75,000, in the aggregate, of Seller's  estimated Cure Cost for such Available Contract with regard to any Available Contract that has  been, as of the date of such settlement, designated as an Assumed Contract pursuant to a  Designation Notice, without the express written consent of Buyer (acting reasonably). Upon a  Final Order determining any Cure Costs regarding any Disputed Contract after the Closing (and  prior to the earlier of date that is six (6) months following the Closing Date or confirmation of a  Chapter 11 Plan for the Seller Parties), Buyer shall have the option to (x) pay the Cure Cost with  respect to such Disputed Contract and assume the Disputed Contract as a Transferred Contract or (y) designate the Disputed Contract as an Excluded Contract and shall not be responsible for the  Cure Cost.

(d)  Post-Closing Assumption and Assignment of Contracts. From and after the Closing Date until the earlier of (x) sixty (60) days following Closing or (y) ten (10) days prior to the hearing to confirm or confirmation of, a Chapter 11 Plan for Seller Parties, the Seller Parties and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code to assume and assign a Contract that was not identified as an Assumed Contract as of Closing.

Section 2.06  Withholding.

(a)  All payments under this Agreement are to be made free and clear and without deduction or withholding for any Taxes, except as required by applicable Tax Law.

(b)  If any applicable Tax Law requires the deduction or withholding of any Tax from any such payment, then Buyer shall be entitled to make such deduction or withholding and shall provide notice to the Seller Parties at least ten (10) Business Days prior to the Closing Date, and shall work in good faith with the Seller Parties to minimize any such withheld amounts.

(c)  Subject to Section 2.06(d), any amounts so deducted or withheld by Buyer shall be timely paid to the relevant Taxing Authority in accordance with the applicable Tax Law and Buyer shall use commercially reasonable efforts to provide written receipts evidencing payment in accordance with applicable Tax Law and any other documentation provided by the Taxing Authority in connection with such payment.

**HIGHLY CONFIDENTIAL**

(d)     On Closing, Buyer shall be entitled to withhold such portion of the Purchase Price as is required to be withheld pursuant to section 116 of the Income Tax Act (Canada) and sections 1101 and 1102.2 of the *Quebec Taxation Act* and shall transfer any amounts so withheld to the Canadian Tax Escrow Agent to be held in accordance with the terms of the Canadian Tax Escrow Agreement.

(e)     To the extent that any amounts are deducted or withheld and timely paid pursuant to this  Section 2.06, such amounts will be treated for all purposes of this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. Notwithstanding the foregoing, Taxes for purposes of this Section 2.06 shall not include Transfer Taxes.

## ARTICLE III

## PURCHASE PRICE

Section 3.01    Purchase Price.  The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Equity Interests, the Transferred Assets and the obligations of Seller, the Seller Parties set forth in this Agreement shall be (a) an amount in cash equal to the sum of (i) $178,600,000 (the "**Base Purchase Price**"), plus (ii) the Final Working Capital Increase (if any), minus (iii) the Final Working Capital Decrease (if any), minus (iv) the Final Transferred Entity Debt (if any), plus (v) the Final Cash Amount Increase (if any), minus (vi) the Final Cash Amount Decrease (the resulting number being the "**Purchase Price**"), and (b) the assumption of the Assumed Liabilities.

Section 3.02    Purchase Price Deposit.  Upon the execution of this Agreement, pursuant to the terms of this Agreement and the Escrow Agreement, as applicable, Buyer shall immediately deposit with Citibank N.A., in its capacity as escrow agent (the "**Escrow Agent**"), the sum of $17,860,000 representing ten percent (10%) of the Base Purchase Price, by wire transfer of immediately available funds (the "**Escrowed Funds**"), to be released by the Escrow Agent and delivered to either Buyer or Seller in accordance with this Agreement and the provisions of the Escrow Agreement. The Escrowed Funds (together with any and all accrued investment income thereon) shall be distributed upon the earlier of the Closing or the termination of this Agreement in accordance with Section 3.03(a)(ii) and 3.03(b)(ii) or Section 11.03, as applicable.

Section 3.03    Certain Closing Deliverables.  At the Closing:

(a)     Seller shall deliver or cause to be delivered to Buyer the following:

(i)     to the extent the Transferred Equity Interests are certificated, certificates (or if such certificate cannot be located by the applicable Seller Party, an indemnity in favor of the Transferred Entity in agreed form) evidencing the Transferred Equity Interests, duly endorsed in blank or accompanied by stock powers duly executed in blank;

(ii)     a counterpart of the Joint Written Instructions, duly executed by Seller, directing the Escrow Agent to deliver to Seller the Escrowed Funds;

11

**HIGHLY CONFIDENTIAL**

(iii)     a counterpart of the Bill of Sale, Assignment and Assumption Agreement for Transferred Assets (other than the Transferred Leases), in the form attached hereto as <u>Exhibit B</u> (the "**Bill of Sale, Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties;

(iv)     a counterpart of the Assignment and Assumption Agreement for Transferred Leases, in the form attached hereto as <u>Exhibit C</u> (the "**Transferred Leased Property Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties together with duly executed Transfer Tax or sales disclosure forms, where applicable unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(v)     counterparts of the IP Assignment Agreement, in the form attached hereto as <u>Exhibit D</u> (the "**IP Assignment Agreement**"), duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(vi)     a counterpart of the Debtors TSA, duly executed by the applicable Seller Parties and their Affiliates;

(vii)     counterparts of the Trademark Co-Existence Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(viii)     counterparts of the TSA, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(ix)     counterparts of the IP Cross License Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(x)     counterparts of the Supply Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(xi)     the officer's certificate required to be delivered pursuant to <u>Section 10.02(a)(iv)</u>, a copy of which shall also be delivered to the Title Company;

(xii)     duly executed deeds (the "**Deeds**") or comparable instruments of transfer, in customary form, conveying to Buyer, good and valid fee simple title to the Transferred Owned Real Property free and clear of all Liens, except for Permitted Liens, together with duly executed Transfer Tax or sales disclosure forms, where applicable unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

**HIGHLY CONFIDENTIAL**

(xiii)   a customary owner's title affidavit, in form and substance reasonably acceptable to Seller and the Title Company;

(xiv)   a statement from each Seller Party in accordance with the requirements of Treasury Regulations Section 1.1445-2(b)(2) demonstrating that no withholding is required under Section 1445 of the Code with respect to the Transactions contemplated in this Agreement;

(xv)   a counterpart of each local transfer agreement or other instrument of transfer, in customary form and substance to effect the transfer of the Transferred Equity Interests or Transferred Assets in the jurisdictions set forth on <u>Schedule 3.03(a)(xv)</u> (the "**Local Agreements**"), duly executed by the applicable Seller Parties;

(xvi)   a counterpart of individual employment agreements, in form and substance reasonably acceptable to Buyer, duly executed by each of Mike Judd and Tim Vargo; and

(xvii)   all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Transferred Equity Interests and Transferred Assets to Buyer.

(b)   Buyer shall deliver or cause to be delivered to Seller the following:

(i)   the Closing Payment as specified in the Estimated Closing Statement (less the amount of the Escrowed Funds), by wire transfer of immediately available funds to an account or accounts as directed by Seller (on behalf of itself, the Seller Parties) in the Estimated Closing Statement;

(ii)   a counterpart of the Joint Written Instructions, duly executed by Buyer, directing the Escrow Agent to deliver to Seller the Escrowed Funds;

(iii)   all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(iv)   a receipt for the Transferred Equity Interests, duly executed by Buyer and other instruments of transfer duly executed by Buyer, as required by applicable Law or otherwise required to validly transfer title in and to the Transferred Equity Interests to Buyer;

(v)   a counterpart of the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer;

(vi)   a counterpart of the Transferred Leased Property Assignment and Assumption Agreement, duly executed by Buyer;

(vii)   a counterpart of each Local Agreement, duly executed by Buyer;

13

**HIGHLY CONFIDENTIAL**

(viii)   a counterpart of the Debtors TSA, duly executed by Buyer and its applicable Affiliates;

(ix)   the officer's certificate required to be delivered to Seller pursuant to Section 10.01(a)(iii); and

(x)   such other documents, instruments and certificates as Seller (on behalf of itself and the Seller Parties) may reasonably request.

Section 3.04   Estimated Closing Statement; Closing Payment.  No fewer than two (2) Business Days before the Closing Date, Seller shall prepare and deliver to Buyer a written statement, together with reasonably detailed supporting documentation (the "**Estimated Closing Statement**"), setting forth each of: (i) the amount of Estimated Working Capital; (ii) the amount of any Estimated Working Capital Increase or Estimated Working Capital Decrease; (iii) the amount of the Estimated Transferred Entity Debt; (iv) the Estimated Cash Amount; (v) the amount of the Estimated Cash Amount Increase or Estimated Cash Amount Decrease, as applicable; (vi) the aggregate amount to be paid by Buyer to Seller (for the benefit of itself and the other Seller Parties) at the Closing (the "**Closing Payment**"), which amount shall be equal to the sum of: (A) the Base Purchase Price, plus (B) the Estimated Working Capital Increase, if applicable, minus (C) the Estimated Working Capital Decrease, if applicable, minus (D) the Estimated Transferred Entity Debt, plus (E) the Estimated Cash Amount Increase, if applicable; minus (F) the Estimated Cash Amount Decrease, if applicable; and (vii) the wire transfer information for the account or accounts to which Buyer shall pay the Closing Payment. The Closing Payment and any other payments to be made to Seller under this Agreement shall be paid to Seller for its account and as agent for the account of the other Seller Parties, unless otherwise specified by Seller in the Estimated Closing Statement.

Section 3.05   Proposed Final Closing Statement and Final Closing Statement.

(a)   Within thirty (30) days after the Closing Date, Buyer shall provide to Seller a written statement (the "**Proposed Final Closing Statement**") setting forth (i) the Proposed Final Working Capital, (ii) the Proposed Final Transferred Entity Debt, (iii) the Proposed Final Cash Amount, and (iv) a description in reasonable detail, of any proposed changes to the Estimated Closing Statement, attaching supporting schedules, working papers and all other relevant documents and details to enable a review thereof by Seller.

(b)   Seller shall have sixty (60) days (the "**Review Period**") from the date upon which Buyer delivered its Proposed Final Closing Statement to review the same. During the Review Period, Seller and its Representatives shall be permitted to review Buyer's work papers, all books and records of Buyer and its Affiliates (including, after the Closing, the Transferred Entities) related to the Business  prior to the Closing used or useful in the review of the Proposed Final Closing Statement, and the work papers of Buyer's accountants and Buyer's accountants' review of the Proposed Final Closing Statement, and Buyer shall promptly, and in any event within such time frame as reasonably required by Seller, make available the individuals in Buyer's and its Affiliates' employ as well as Representatives of its independent accountants responsible for and knowledgeable about the information used in, and the preparation of the Proposed Final Closing Statement, to respond to the reasonable inquiries of, or requests for information by, Seller or its

14

**HIGHLY CONFIDENTIAL**

Representatives. Buyer agrees that, following the Closing through the date that the Final Closing Statement becomes conclusive and binding upon the Parties in accordance with this Article III, it will not (and will cause its Affiliates not to) take any actions, except as required by Law, with respect to any books, records, policies or procedures on which the Proposed Final Closing Statement is based or on which the Final Closing Statement is to be based that are inconsistent with or that would impede or delay the determination of the amount of the Final Working Capital, the Final Transferred Entity Debt, the Final Cash Amount, or the preparation of the Dispute Notice (defined below) or the Final Closing Statement, in each case, in the manner and utilizing the methods required by this Agreement.

(c)     If Seller disputes any item set forth in the Proposed Final Closing Statement, Seller shall, during the Review Period, deliver written notice to Buyer of the same, specifying in reasonable detail the basis for such dispute and Seller's proposed modifications to the Proposed Final Closing Statement (such notice, the "**Dispute Notice**"). Upon the expiration of the Review Period, any matters that are not subject to a timely delivered Dispute Notice shall be deemed to have been agreed to and shall be conclusive and binding upon the Parties and shall be reflected in the Final Closing Statement. If Seller does not timely deliver a Dispute Notice, the Proposed Final Closing Statement shall be deemed the Final Closing Statement. During the thirty (30)-day period immediately following the date on which Seller delivers a Dispute Notice (the "**Resolution Period**"), Buyer and Seller shall negotiate in good faith to reach an agreement as to any matters identified in such Dispute Notice as being in dispute, and, to the extent such matters are so resolved within the Resolution Period, then the Proposed Final Closing Statement as revised to incorporate such changes as have been agreed between Buyer and Seller shall be conclusive and binding upon all Parties as the Final Closing Statement.

(d)     If Buyer and Seller fail to resolve any or all such disputed items within the Resolution Period then (subject to the last sentence of Section 3.05(e)), such remaining disputed items shall be finally and conclusively determined by the Bankruptcy Court in accordance with Section 3.05(e).

(e)     The Parties agrees that, to the extent not prohibited by the Bankruptcy Code or other applicable Law, the Bankruptcy Court shall render its determination of the Post-Closing Adjustment (and any component thereof in dispute) based solely on (i) written presentations of Buyer, on the one hand, and Seller, on the other hand, submitted to the Bankruptcy Court and not by independent review, (ii) only those matters in dispute and (iii) the provisions of this Section 3.05(e) and Section 3.05(f) and without assigning a value to any item greater than the greatest value for such item claimed by Buyer or Seller.

(f)     The Closing Payment, the Purchase Price, the Estimated Closing Statement, the Proposed Final Closing Statement and the Final Closing Statement and the determinations and calculations contained therein (including the calculation of Net Working Capital, Transferred Entity Debt, the Cash Amount) shall be prepared in a manner consistent with the Transaction Accounting Principles and Reference Working Capital Statement set forth on Exhibit E.

Section 3.06    Post-Closing Adjustment.

**HIGHLY CONFIDENTIAL**

(a)    If the Post-Closing Adjustment, as finally determined pursuant to <u>Section 3.05</u>, is a positive number, Buyer shall pay an amount equal to the Post-Closing Adjustment to Seller. If the Post-Closing Adjustment, as finally determined pursuant to <u>Section 3.05</u>, is a negative number, Seller shall repay an amount equal   to the absolute value of the Post-Closing Adjustment to Buyer.

(b)    Any payment due under this <u>Section 3.06</u> shall be paid by wire transfer of immediately available funds to an account or accounts, in each case, designated by Seller, on behalf  of itself and the other Seller Parties, or Buyer (as applicable) in the Estimated Closing Statement or the Proposed Final Closing Statement or otherwise in writing, within five (5) Business Days  after the date on which the Final Closing Statement becomes conclusive and binding on the Parties  in accordance with the provisions of <u>Section 3.05</u>, and, if not paid within such period, shall bear  interest at the Interest Rate.  All computations of interest shall be made in accordance with <u>Section 12.19</u>.

(c)    Any amount paid pursuant to this <u>Section 3.06</u> shall be treated as an adjustment to the Purchase Price for income Tax purposes.

Section 3.07    <u>Purchase Price Allocation</u>.  Buyer and Seller agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Transferred Assets and the Transferred Equity Interests in accordance with the allocation under this <u>Section 3.07</u>, except as required by applicable Law.  No later than thirty (30) Business Days after the Final Closing Statement becomes conclusive, Seller shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Transferred Assets and the Transferred Equity Interests prepared in accordance with the methodologies mutually agreeable to the Parties (the   "**Purchase Price Allocation**"). The Purchase Price Allocation shall be conclusive and binding on the Parties, provided, that if Buyer disagrees with Seller's Purchase Price Allocation, Buyer may, within thirty (30) days after delivery of such Purchase Price Allocation, deliver a notice (the   "**Buyer's Allocation Notice**") to Seller to such effect, specifying those items as to which Buyer disagrees and setting forth Buyer's proposed allocation. If the Buyer's Allocation Notice is duly delivered, Buyer and Seller shall, during the thirty (30) days following such delivery, work in good faith to reach agreement on the disputed items or amounts. If Buyer and Seller are unable to reach such agreement, they shall promptly thereafter cause an internationally-recognized independent accounting firm mutually agreeable to Buyer and Seller ("**Independent Accounting Firm**") to resolve any remaining disputes, which decision shall be rendered within forty (40) days after such firm is retained and shall be final and binding on the Parties. One-half of the fees and expenses of the Independent Accounting Firm shall be paid by Buyer, and one-half of such fees and expenses shall be paid by Seller. The Parties shall make appropriate adjustments to the Purchase Price Allocation to reflect changes in the final Purchase Price. The Parties agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation, as adjusted pursuant to the preceding sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Government Authority that is final.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 3.07</u> shall survive the Closing without limitation.

**HIGHLY CONFIDENTIAL**

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer, except as set forth in the Disclosure Schedules:

Section 4.01    Formation and Qualification of the Transferred Entities.  Each Transferred Entity is a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to own and lease its assets, rights and properties to operate its business as now conducted. Each Transferred Entity is duly  qualified as a foreign corporation or other organization to do business, and, to the extent legally  applicable, is in good standing, in each jurisdiction in which the character of its owned, operated  or leased properties or the nature of its activities makes such qualification necessary, except where the  failure to be so qualified or in good standing would not reasonably be expected to have a  Material Adverse Effect.

Section 4.02    Capital Structure of the Transferred Entities.  The authorized capital stock or other equity interests (if applicable) and the number of issued and outstanding shares or other equity interests of each Transferred Entity, and the owner thereof, is set forth on Schedule 4.02. The Seller Parties own  all of the Transferred Equity Interests, free and clear of all Liens, except any Lien arising out of,  under or in connection with the Securities Act or any other applicable securities Laws. All of the  Transferred Equity Interests have been duly authorized and validly issued, are, as applicable, fully    paid and nonassessable and were not issued in violation of any preemptive rights, purchase or call  rights, rights of first refusal, or subscription rights. There are no options, warrants, redemption or  repurchase rights or rights of conversion or other similar rights, agreements, arrangements or   commitments obligating any Transferred Entity to issue or sell any shares of its capital stock or other   equity interests or securities convertible into or exchangeable for its shares or other equity interests,   other than as provided in this Agreement. There are no voting trusts, stockholder or shareholder  agreements, proxies or other agreements in effect with respect to the voting or transfer of the  Transferred Equity Interests of any Transferred Entity.

Section 4.03    Formation and Authority of the Seller Parties; Enforceability.  Each Seller Party is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization. Except for such authorizations required by the Bankruptcy Court, Seller has (and each other Seller Party will have prior to the Closing) the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party. Except for such authorizations required by the Bankruptcy Court, each Seller Party has the requisite corporate or other power to operate its business with respect to the Transferred Assets or the Transferred Equity Interests, as applicable, that it owns as now conducted. Each Seller Party is duly qualified as a foreign corporation or other organization to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such

17

**HIGHLY CONFIDENTIAL**

qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing has not had a Material Adverse Effect. The execution, delivery and performance by each Seller Party of the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party have been (or, in the case of a Seller Party other than Seller, will be prior to the Closing) duly authorized by all requisite corporate action on the part of such Seller Party. This Agreement has been duly executed and delivered by Seller, and upon execution and delivery thereof, the other Seller Transaction Agreements will be duly executed and delivered by the Seller Parties, to the extent party thereto, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Seller Transaction Agreements will constitute, legal, valid and binding obligations of the Seller Parties, to the extent party thereto, enforceable against the Seller Parties, to the extent party thereto, in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 4.04   No Conflict.  Provided that all Consents, waivers or other actions listed on Schedule 4.04 or described in Section 4.05 have been obtained or satisfied, the execution, delivery and performance by the Seller Parties of the Seller Transaction Agreements do not and will not and the consummation of the Seller Transactions will not:

(a)   violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of any of the Seller Parties or the Transferred Entities;

(b)   violate in any material respect any Law or Order, applicable to the Seller Parties, the Transferred Entities or the Business or by which the Transferred Assets or Assumed Liabilities are bound or subject;

(c)   violate, conflict with, result in a breach of or constitute a violation  or default (or any event that, with notice or lapse of time or both would constitute a default) under  or give rise to any right to terminate, cancel or accelerate, or result in a loss of a material benefit under, any Material Contract, other than those violations, conflicts, or breaches that would not reasonably be expected to be material to the Business taken as a whole.

Section 4.05   Consents and Approvals.  The execution, delivery and performance by the Seller Parties of the Seller Transaction Agreements do not and will not require any material Consent, waiver, or other action by, or any material filing with or notification to, any Government Authority by any Seller Party or any Transferred Entity, except (a) in connection with applicable filing, notification, waiting period or approval requirements, to the extent required, under the HSR Act and all applicable Antitrust Laws, (b) entry by the Bankruptcy Court of the Sale Order, (c) where the failure to obtain such Consent or  waiver, or to take such action or make such filing or notification would not reasonably be expected  to be material to the Business taken as a whole.

Section 4.06   Financial Information; Absence of Undisclosed Liabilities.

(a)   Schedule 4.06(a) sets forth (i) the audited consolidated balance sheet (including any notes thereto) and related statements of income and cash flows of Seller and its Affiliates for the fiscal year ended March 31, 2019 (the "**2019 Audited Financial Statements**")

**HIGHLY CONFIDENTIAL**

and (ii) the unaudited consolidated balance sheet and related statements of income and cash flows of Seller and its Affiliates for the nine (9) month period ended December 31, 2019 (the "**2019 Interim Financial Statements**" and, together with the 2019 Audited Financial Statements and any other annual or quarterly financial statements delivered subsequently to Buyer in accordance with Section 6.16 the "**Financial Statements**"). The Financial Statements (A) have been (or will be) prepared based on the books and records of the Seller Parties and the Transferred Entities, (B) have been (or will be) prepared in all material respects in accordance with GAAP, and (C) present fairly (or will present fairly), in all material respects, the financial  condition and results of operation of the Business (on a consolidated basis with the business of its Affiliates) as of the respective dates and for the respective periods presented, subject, in the case  the 2019 Interim Financial Statements and any other annual or quarterly financial statements  delivered under Section 6.16, to normal year-end adjustments and the absence of complete notes  (as applicable) none of which are material in nature.

(b)     Other than (i) Liabilities set forth in the Financial Statements, (ii) Liabilities for Taxes, (iii) Liabilities incurred in the Ordinary Course of Business since December 31, 2019 (none of which related to a violation of Law or any tort or infringement Cause of Action), (iv) Liabilities arising under this Agreement, (v) Excluded Liabilities and (vi) Liabilities that would not reasonably be expected to be material to the Business taken as a whole, there are no Liabilities of the Business or the Transferred Entities that are required to be reflected on, reserved against or otherwise described in a balance sheet prepared in accordance with GAAP.

Section 4.07   Absence of Certain Changes or Events.  Except as contemplated by the Transaction Agreements, or in connection with the negotiation and execution of the Transaction Agreements, the filing of the Bankruptcy Cases or the consummation of the Transactions, since December 31, 2019, (a) through the Agreement Date, the Seller Parties and the Transferred Entities have conducted the Business in all material respects in the Ordinary Course of Business, (b) there has not been a Material Adverse Effect, and ( c ) there has been no change in any method of  accounting or accounting practice of the Seller Parties or Transferred Entities, except as required  by GAAP or applicable Law.

Section 4.08   Absence of Litigation.  No Actions are pending or, to the Knowledge of Seller, threatened in writing against the Seller Parties (with respect to the Business) or the Transferred Entities that would reasonably be expected to be material to the Business taken as a whole or would prevent or materially impair or delay the ability of any Seller Party to consummate the Seller Transactions.

Section 4.09   Compliance with Laws; Permits.

(a)     Each of the Seller Parties and the Transferred Entities are in compliance with all Laws or Orders applicable to the conduct of the Business, except where the failure to be in compliance would not reasonably be expected to be material to the Business taken as a whole. Neither the Seller Parties nor any of the Transferred Entities has received any written notice of or been charged with any violation of any Law applicable to the conduct of the Business, except where such violation would not be reasonably expected to be material to the Business taken as a whole.

**HIGHLY CONFIDENTIAL**

(b)　　Schedule 4.09(b) sets forth each of the material Permits held by any of the Seller Parties and the Transferred Entities. The Permits listed on Schedule 4.09(b) constitute all of the material Permits necessary for the operation of the Business as currently conducted and each such Permit is valid, binding and in full force and effect, in each case, except as would not reasonably be expected to be material to the Business taken as a whole. None of the Seller Parties or Transferred Entities has received written notice from threatening to suspend, revoke, withdraw or modify any Permit listed on Schedule 4.09(b).

Section 4.10　　Intellectual Property.

(a)　　Schedule 4.10(a) sets forth a list of all material Business Registrable IP, other than: (i) any new registrations or applications that would constitute Business Registrable IP after the Agreement Date, or (ii) any registrations or applications that may have expired or been cancelled or abandoned in the Ordinary Course of Business after the Agreement Date. To the Knowledge of the Seller, the Seller Parties or Transferred Entities own all right, title and interest in or have a valid and enforceable written license or right to use, all Business Intellectual Property. To the Knowledge of Seller, the Business Intellectual Property and the Business Technology, as used in the operation of the Business, and the operation of the Business by the Seller Parties and the Transferred Entities does not infringe upon or misappropriate the Intellectual Property of any third party in a manner that would reasonably be expected to be material to the Business  taken as a whole.

(b)　　None of the Seller Parties or the Transferred Entities has received any written claim or notice from any Person during the past three (3) years alleging that the operation of the Business by the Seller Parties or the Transferred Entities infringes upon or misappropriates any Intellectual Property of any third party which, if proven or established, would reasonably be expected to be material to the Business taken as a whole. There are no Actions pending or, to the Knowledge of Seller, threatened in writing against the Seller Parties or the Transferred Entities alleging that the operation of the Business infringes upon or misappropriates any Intellectual Property of any third party which, if proven or established, would reasonably be expected to be material to the Business taken  as a whole.

(c)　　To the Knowledge of Seller, no Person is infringing upon or misappropriating any material Business Intellectual Property, except for any such infringements or misappropriations that would not reasonably be expected to be material to the Business taken as a whole.

(d)　　To the Knowledge of Seller, in the past three (3) years, there have been no security breaches, Data losses or failures of the Systems in each case, except as would not reasonably be expected to be material to the Business taken as a whole.

(e)　　The Seller Parties and the Transferred Entities take commercially reasonable steps to maintain the confidentiality of all Trade Secrets included in the Business Intellectual Property and Business Technology that are material to the Business taken as a whole. To the Knowledge of Seller, during the past three (3) years, there has been no unauthorized use by any Person of any such material Trade Secrets, except as would not reasonably be expected to be material to the Business taken as a whole.

HIGHLY CONFIDENTIAL

(f)     Each of the Seller Parties (with respect to the  Transferred Assets) and the Transferred Entities has, during the past three (3) years, complied in all material respects with (i) all applicable Laws relating to the privacy and security of Personal Data, (ii) their respective Privacy Policies, and (iii) provisions of contracts related to the process of Personal Data. Seller is not aware of any written notices or complaints from any Person regarding a security breach.

(g)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this <u>Section 4.10</u> are the sole and exclusive representations and warranties made pertaining or relating to Intellectual Property, Personal Data and the subject matters set forth in this <u>Section 4.10</u>.

Section 4.11   <u>Environmental Matters</u>.

(a)     Each of the Seller Parties, with respect to the Business, and the Transferred Entities are in compliance with all applicable Environmental Laws, except where the failure to comply would not reasonably be expected to be material to the Business taken as a whole.

(b)     Except as would not reasonably be expected to be material to the Business taken as a whole: (i) each of the Seller Parties, with respect to the Business, and the Transferred Entities are in compliance with all Environmental Permits required to operate the Transferred Assets, the Transferred Entities, and/or the Business, (ii) each such Environmental Permit is valid and in full force and effect, and there are no pending or, to the Knowledge of Seller, threatened proceedings relating to the appeal, revocation, withdrawal, non-renewal, suspension, cancellation or termination of such Environmental Permits, which would reasonably be expected to materially and adversely impact the operations of the Transferred Assets, the Transferred Entities, or the Business, and (iii) any applications for renewal of such Environmental Permits due under Environmental Laws or the terms of such Environmental Permit as of the date of this Agreement have been duly filed with the applicable Government Authority within the time frame required under applicable Environmental Laws.

(c)     There are no Actions pending against any of the Seller Parties, with respect to the Business, or Transferred Entities alleging that any of the Seller Parties or Transferred Entities are violating, or responsible for a Liability under, any Environmental Law, nor have the Seller Parties or Transferred Entities otherwise received any written notice from any Government Authority or other Person alleging any violation of, or Liability under, any Environmental Law, which, in each case, remains pending or unresolved.

(d)     Other than Releases of Hazardous Materials that will need to be addressed under the Resource Conservation and Recovery Act ("**RCRA**") Permits for the Muncie, IN, and Canon Hollow, MO, smelters, there have been no Releases of Hazardous Materials by the Seller Parties, with respect to  the Business, or Transferred Entities at or from the Transferred Owned Real Property or  Transferred Leased Real Property  in concentrations greater than those allowed under  Environmental Laws or Environmental Permits, which would reasonably be expected to require  investigation, remediation or monitoring by the Seller Parties or Transferred Entities that would   reasonably be expected to result in any material Liability.

21

**HIGHLY CONFIDENTIAL**

(e)    No notice to, or approval by, any Government Authority is required under any Environmental Laws in order to lawfully consummate, or otherwise by virtue of, the Transactions, including, but not limited to, any notices or approvals that are required in order to transfer to Buyer any Environmental Permits required to operate the Transferred Assets or the Business, except for such approvals that would not reasonably be expected to be material to the Business taken as a whole.

(f)    To the Knowledge of Seller, the Seller Parties have provided or otherwise made available to Buyer: (i) copies, or a list of, all Environmental Permits currently held by the Seller Parties and the Transferred Entities; (ii) copies of all material, non-privileged documents bearing on the Seller Parties', with respect to the Business, and/or Transferred Entities' unresolved material Environmental Liabilities or violations of Environmental Law, to the extent in their possession or reasonable control.

(g)    Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this <u>Section 4.11</u> are the sole and exclusive representations and warranties pertaining or relating to any environmental matters, including those related to Environmental Laws, Environmental Permits or Hazardous Materials.

Section 4.12    <u>Material Contracts</u>.

(a)    <u>Schedule 4.12(a)</u> lists the following (i) Available Contracts and (ii) Contracts to which any Transferred Entity is a party, in each case that are in effect on the Agreement Date (other than purchase orders) (collectively, the "**Material Contracts**"):

(i)    Contracts, other than Employee Plans, with any current or former officer, employee or director of any Seller Party or Transferred Entity;

(ii)    Collective Bargaining Agreements or other Contracts with Unions currently representing any Transferred Employees;

(iii)    Contracts to sell (including contracts to assign or sublease any material Leased Real Property) or otherwise dispose (other than a non-exclusive license or sublicense) of any material Transferred Asset or Asset, other than in the Ordinary Course of Business, which Contracts have obligations that have not been satisfied or performed;

(iv)    Contracts relating to the acquisition by any Seller Party or Transferred Entity of any operating business or the capital stock of any other Person;

(v)    Contracts relating to the incurrence of Debt or the making of any loans;

(vi)    Contracts (or series of Contracts with the same counterparty), to the extent related to the Business, (A) to purchase goods or products from a supplier that will result in purchases or expenditures by the Seller Parties and the Transferred Entities in an aggregate amount that exceeds $2,500,000 annually or (B) to sell goods or products to a customer that will result in sales by the Seller Parties and the Transferred Entities in an aggregate amount that exceeds $2,500,000 annually, and, in the case of (A) and (B), extends or requires performance by any party

**HIGHLY CONFIDENTIAL**

thereto for more than one (1) year from the Agreement Date and are not terminable by the applicable Seller Parties or any Transferred Entities party thereto without penalty on less than ninety (90) days' notice;

(vii)    Contracts to enter into any commitment for capital expenditures, other than those contemplated by the CapEx Budget, in excess of $500,000 in the aggregate;

(viii)   Contracts with any Government Authority that will result in sales or expenditure by the Seller Parties or Transferred Entities in excess of $2,000,000 annually;

(ix)    Contracts pursuant to which a third party has granted to any Seller Party or Transferred Entity a license under, or a covenant not to sue in respect of, Business Intellectual Property, other than (A) licenses of commercially available off the shelf computer Software pursuant to which the annual license fees are less than $2,000,000 in the aggregate that is not incorporated in, distributed with any product or service of the Business and (B) non-exclusive licenses granted by the Seller Parties or the Transferred Entities to their customers, vendors, suppliers or distributors in the Ordinary Course of Business;

(x)    Contracts containing any non-competition, non-solicitation, most favored nation or similar provision that otherwise prohibits the Seller Parties and the Transferred Entities from freely engaging in any material respect in respect of the Business anywhere in the world;

(xi)    any Contracts disclosed, or required to be disclosed, on Schedule 4.19; or

(xii)   any outstanding material settlement offers or other arrangements with respect to any current Action related to the Transferred Assets or the Business.

(b)    Each Material Contract is a legal, valid and binding obligation of the Seller Party or Transferred Entity party thereto, as the case may be, and, to the Knowledge of Seller, each other party to such Material Contract, and is enforceable against the applicable Seller Party or Transferred Entity, as the case may be, and, to the Knowledge of Seller, each other party to such Material Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.

(c)    To the Knowledge of Seller, none of the Seller Parties or the Transferred Entities has received or delivered any notice of any material default or event that with notice or lapse of time or both would constitute a material default under any Material Contract, except for defaults that would not reasonably be expected to be material to the Business taken as a whole.

Section 4.13    Employment and Employee Benefits Matters.

(a)    Schedule 4.13(a) lists all material Employee Plans, separately identifying which Employee Plans are Transferred Entity Employee Plans. With respect to each material Assumed Employee Plan and Transferred Entity Employee Plan, Seller has previously made available to Buyer a true and complete copy of the following documents, to the extent applicable: (i) any written plan documents and all amendments thereto, (ii) the most recent Forms 5500 and

HIGHLY CONFIDENTIAL

all schedules thereto and the most recent actuarial report, if any, (iii) the most recent IRS determination letter, (iv) insurance Contracts or other funding arrangements, (v) the most recent audited financial statements and actuarial valuation reports, and (vi) any material, non-routine correspondence with any Government Authority received in the past twenty-four (24) months regarding the operation or the administration of such Assumed Employee Plan or Transferred Entity Employee Plan. With respect to each other material Employee Plan, Seller has previously made available to Buyer a true and complete copy of any written plan documents and all amendments thereto or a summary plan description of such plan.

(b)     Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter, or is entitled to rely on an opinion letter, from the IRS.

(c)     Except as set forth on Schedule 4.13(c), no Employee Plan is, and neither Seller nor any of its ERISA Affiliates contribute to any employee benefit plan that is, (i) subject to Title IV of ERISA or Section 412 of the Code, (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) ("**Multiemployer Plan**"), (iii) a "multiple employer plan" as defined in Section 413(e) of the Code, (iv) a "welfare benefit trust" or "voluntary employees beneficiary association" within the meaning of Sections 419, 419A or 501(a)(9) of the Code, (v) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA) or (vi) a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code. Other than as required under Sections 601 to 608 of ERISA or other applicable Law, no Assumed Employee Plan or Transferred Entity Employee Plan provides post-termination or retiree health benefits to any individual for any reason, and, except as required by Law, neither the Seller nor any Transferred Entity has any Liability to provide post-termination or retiree health benefits to any individual or ever represented, promised or contracted to any individual that such individual would be provided with post-termination or retiree health benefits.

(d)     Except where the failure to do so would not reasonably be expected to be material to the Business taken as a whole, (i) each Assumed Employee Plan and Transferred Entity Employee Plan complies in form and has been operated in accordance with its terms and all applicable Laws, (ii) each of the Seller Parties and the Transferred Entities have made all required contributions and paid in full all required insurance premiums and other required payments with regard to each Assumed Employee Plan and Transferred Entity Employee Plan to the extent due or owing on or before the Closing Date, (iii) if intended to qualify for special Tax treatment meets all requirements for such treatment, (iv) if intended to be fully funded and/or book-reserved is fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions and (v) for purposes of each Assumed Employee Plan and Transferred Entity Employee Plan, each Seller Party and Transferred Entity correctly classified those individuals performing services for the Business as common law employees, leased employees, independent contractors or agents.

(e)     No Employee Plan (other than a Multiemployer Plan) that is subject to Title IV of ERISA or Section 412 of the Code (a "**Title IV Plan**") has an "accumulated funding deficiency," whether or not waived, or is subject to a Lien for unpaid contributions under Section 303(k) of ERISA or Section 430(k) of the Code. No Title IV Plan has an "adjusted funding target attainment percentage," as defined in Section 436 of the Code, less than eighty percent (80%).

**HIGHLY CONFIDENTIAL**

With respect to each Title IV Plan, (i) no Action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan, (ii) no "reportable event," as defined in Section 4043 of ERISA, with respect to which the reporting requirement has not been waived has occurred with respect to any such Title IV Plan and (iii) all premiums owed to the Pension Benefit Guaranty Corporation for any period prior to the Closing Date have been timely paid.

(f)      To the Knowledge of Seller, no Actions are pending or threatened in writing from any Government Authority in connection with any Assumed Employee Plan or Transferred Entity Employee Plan (other than routine benefit claims) that would reasonably be expected to be material to the Business taken as a whole.

(g)      Except as set forth on Schedule 4.12(a)(ii), no Seller Party, with respect to the Business, or Transferred Entity is party to or bound by any Collective Bargaining Agreement or other Contract with a Union and no Covered Employee is represented by a Union. To the Knowledge of Seller, there is no effort currently being made or threatened by, or on behalf of, any Union to organize any Covered Employee, and there has been no such effort during the past six (6) months.

(h)      With respect to the Covered Employees, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending, or, to the Knowledge of Seller, threatened against the Seller Parties, the Transferred Entities, or their respective Affiliates, or (ii) any Actions or any other material unfair labor practice charges, grievances, charges or complaints pending, or, to the Knowledge of Seller,  threatened by or on behalf of any employee or group of employees of the Seller Parties, the  Transferred Entities, or their respective Affiliates, except, in each case, as would not reasonably   be expected to result in material Liability to the Business or the Transferred Entities taken as a whole. The Seller Parties and their respective Affiliates are, and have been, in compliance in all material respects with all employment Laws with respect to the Covered Employees.

(i)      With respect to Covered Employees, (i) there has been no plant closing or mass layoff, as those terms (or similar) are commonly used in the federal WARN Act and any parallel state or local legislation or regulations, within the last twelve (12) months; and (ii) there has been no temporary furlough, layoff or plant closing within the last six (6) months which the any Seller Party or the Transferred Entities now reasonably believes will last longer than six (6) months beyond the time period during which the furlough, layoff or plant closing was implemented.

(j)      The Seller Parties and the Transferred Entities, as applicable, have paid in full (i) to all current and former employees primarily dedicated to the Business, any wages, salaries, commissions, bonuses, compensation, overtime, cash out of accrued and unused vacation, paid time off or other leave, severance, and any other amounts that are due and payable prior to the Closing Date; and (ii) to all independent contractors, consultants, and temporary employees performing services for the Business, any fees for services that are due and payable prior to the Closing Date.

**HIGHLY CONFIDENTIAL**

(k)      Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in, accelerate the vesting, funding, or delivery of, or increase the amount or value of, any payment, severance, or benefit to any employee primarily dedicated to the Business, former employee dedicated to the Business, or officer or director, independent contractor, or consultant related to the Business.   No amount paid or payable in connection with the transaction contemplated by this Agreement will, either alone or in combination with another event, be an "excess parachute payment" within the meaning of Section 280G of the Code (determined without regarding the exceptions provided for in Section 280G(b)(5) of the Code).   No Seller Party is a party to any plan, program, agreement, or arrangement that provides for a gross-up or reimbursement of Taxes imposed under Section 4999 or Section 409A of the Code to any employee, director or officer dedicated to the Business, or any other service provider of the Business.

(l)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this <u>Section 4.13</u> are the sole and exclusive representations and warranties made regarding Covered Employees, Employee Plans or other employment or employee benefits matters.

Section 4.14    <u>Taxes</u>.

(a)      Each of (A) the Seller Parties solely with respect to the Transferred Assets and (B) the Transferred Entities have timely filed (or have had filed on their behalf) all material Tax Returns required to be filed, taking into account any extensions of time to file such Tax Returns. All material amounts of Taxes shown due on such Tax Returns owed by (x) the Seller Parties solely with respect to the Transferred Assets and (y) the Transferred Entities, in each case, have been fully paid or properly accrued for on the Financial Statements, other than with respect to any Taxes the payment of which was precluded by reason of the Bankruptcy Cases.

(b)      No material deficiencies for any Taxes that are related to the Business have been proposed, asserted or assessed in writing by a Taxing Authority against any Transferred Entity that are still pending.

(c)      No Transferred Entity has any current material Liability for Taxes of any Person (other than any of the Seller Parties or the Transferred Entities) (i) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) or (ii) as a transferee or successor.

(d)      There are no Liens for Taxes on the Transferred Assets or the Transferred Equity Interests other than Permitted Liens.

(e)      The Transferred Entities have complied in all material respects with all applicable withholding obligations for any material amount of Taxes that are related to the Business required to have been withheld in connection with amounts paid to any Covered Employee of a Transferred Entity or independent contractor.

**HIGHLY CONFIDENTIAL**

(f)     To the Knowledge of Seller, no Seller Party or Transferred Entity has been a party to a "listed transaction" as such term is defined in Treasury Regulations Section 1.6011-4(b)(2).

(g)     No claim has been made by any Taxing Authority in writing in a jurisdiction where any Transferred Entity has not filed a Tax Return that it is or may be subject to Tax by such jurisdiction.

(h)     Within the past two (2) years, no Transferred Entity has distributed shares of another Person, or has had its shares distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(i)     No Transferred Entity is a party to or has any obligation under any Tax sharing, Tax indemnification, or Tax allocation agreement or similar Contract or arrangement (other than any agreement that will be terminated at or before the Closing, is exclusively between the Transferred Entities, or is not primarily related to Taxes).

(j)     Nothing in this <u>Section 4.14</u> or otherwise in this Agreement shall be construed as a representation or warranty with respect to (i) the amount or availability of any net operating loss, capital loss, or Tax credit carryover or other Tax attribute or asset or (ii) any Tax positions that Buyer or any of its respective Representatives or Affiliates (including the Transferred Entities) may take in or in respect of a taxable period (or portion thereof) beginning after the Closing Date.

(k)     None of the Seller Parties or the Transferred Entities has made an election under Section 965(h) of the Code.

(l)     Seller is registered under Part IX of the *Excise Tax Act (Canada)* and Chapter VIII of the *Quebec Sales Tax Act* and its registration numbers are 139813919RT0001 and 1204642121TQ0001, respectively.

(m)     The representations and warranties made by Seller in this <u>Section 4.14</u> constitute the sole and exclusive representations and warranties with respect to Taxes, and no other representation or warranty contained in any other section of this Agreement shall apply to any Tax matters, and no other representation or warranty, express or implied, is being made with respect thereto.

Section 4.15    <u>Real Property.</u>

(a)     <u>Schedule 4.15(a)</u> sets forth a list of all material Owned Real Property and all material Leased Real Property. The Seller Parties and the Transferred Entities have good and valid fee simple title to all such Owned Real Property and valid title to the leasehold estate (as lessee or sublessee) in all such Leased Real Property, in each case, free and clear of all Liens, except for Permitted Liens.

(b)     All material Leases under which the Seller Parties or the Transferred Entities are a lessee or sublessee are in full force and effect and are enforceable as against such

HIGHLY CONFIDENTIAL

Seller Party or Transferred Entity, and to the Knowledge of Seller, as against any other counterparty thereto, in all material respects, in accordance with their respective terms. No written notices of material default under any such Lease or sublease have been sent or received by the Seller Parties or the Transferred Entities within the twelve (12)-month period ending on the Agreement Date and to the Knowledge of Seller no material default by any Seller Party or Transferred Entity exists under any such material Leases. A true and complete, in all material respects, copy of each Transferred Lease has been made available to Buyer.

(c)      None of the Seller Parties or the Transferred Entities has received any written notice from any Government Authority asserting any material violation of applicable Laws (except for Environmental Law, which is subject to Section 4.11 hereof) with respect to the Owned Real Property or Leased Real Property that remains uncured, and to the Knowledge of Seller, no such violations exist.

(d)      To the Knowledge of the Seller, all material buildings, structures and other  improvements on the Owned Real Property are in reasonably good condition and repair, normal wear and tear excepted, for the continued use of the Owned Real Property as it is currently used in all material respects.  The Seller Parties have not leased or otherwise granted to any Person the right to use or occupy any Transferred Owned Real Property and Transferred Leased Real Property or any portion thereof, except as would not reasonably be expected to be material to the Business taken as a whole. There are no outstanding options, rights of first offer or rights of first refusal to purchase any Transferred Owned Real Property or any portion thereof, and none of the Transferred Entities are a party to any agreement or option to purchase any real property or interest therein.  None of the Seller Parties or the Transferred Entities have received a notice of any pending condemnation proceedings or eminent domain proceedings of any kind against the Transferred Owned Real Property and, to the Knowledge of Seller, no such proceedings have been threatened in writing.  None of the Owned Real Property is subject to any right or option of any other Person to purchase or lease an interest in such Owned Real Property.

Section 4.16    Brokers.  Except for fees and expenses of Houlihan Lokey Capital, Inc. (the "**Seller's Banker**"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Seller Parties, the Transferred Entities or any of their respective Affiliates in connection with the Transactions. Buyer shall not be liable for, and shall not assume, any broker, finder, or investment banker fees incurred by Seller or any of its Affiliates.

Section 4.17    Title; Sufficiency of Transferred Assets and Assets.

(a)      Except for Permitted Liens, the Transferred Assets and the Assets (other than, in each case, (x) the Owned Real Property and the leasehold estate (as lessee or sublessee) in any Leased Real Properties, which are the subject of Section 4.15, (y) any personal property leased pursuant to a Transferred Contract and (z) Intellectual Property rights, which are the subject of Section 4.10) are owned by or otherwise made available to the Seller Parties and the Transferred Entities, and, at the Closing, subject to Section 2.03, Buyer or one of its Affiliates will own each of such Transferred Assets and the Transferred Equity Interests or will be vested with good title to such Transferred Assets, as the case may be, free and clear of all Liens, other than Permitted Liens.

**HIGHLY CONFIDENTIAL**

(b)      Assuming receipt of all relevant Consents, and that all Available Contracts are assumed and no Excluded Asset Schedule Supplement is delivered, the Transferred Assets, (together with the Assets, the Intellectual Property rights provided under the IP Cross License Agreement, the Trademark Co-Existence Agreement and the TSA and all rights granted and services to be performed under the Transaction Agreements) constitute all of the properties, rights and assets that are necessary to permit the Buyer to conduct the Business, after the Closing, in all material respects as presently conducted by the Seller Parties.

Section 4.18      Insurance.   Schedule 4.18 provides a summary of all Insurance Policies maintained for, at the expense of, or for the benefit of, the Transferred Entities or the Transferred Assets or the Business.  Each such Insurance Policy is in full force and effect, all premiums due to date thereunder have been paid in full and neither Seller nor any of its Affiliates is in material default with respect to any other obligations thereunder. No written notice of cancellation or nonrenewal, in whole or in part, with respect to any such Insurance Policy currently in force has been received by Seller.

Section 4.19      Affiliate Transactions.   Except: (a) for employment-related arrangements, the payment of compensation and benefits in the Ordinary Course of Business, and travel advances and employees loans, (b) Contracts entered into in the Ordinary Course of Business on an arm's length basis or (c) as set forth on Schedule 4.19, no current officer, manager, director or Affiliate of any Seller Party (other than the Transferred Entities) is a party to any Contract, or business relationship with, or has any material interest in any property used by, any of the Seller Parties or the Transferred Entities.

Section 4.20      Condition of Transferred Assets and Assets.   The items of material, tangible personal property included in the Transferred Assets and Assets are in working condition and are reasonably adequate for the uses to which they are currently being put, the failure of which would not reasonably be expected to be material to the Business taken as a whole.

Section 4.21      Corruption and Trade Regulation.

(a)      Neither the Transferred Entities nor, to the Knowledge of Seller, any Person acting on behalf of the Seller Parties in respect of the Business or Transferred Entities has at any time in the past twelve (12) months:

(i)      violated, or engaged in any activity, practice or conduct which would violate any applicable anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the U.K. Bribery Act  2010 (collectively "**Anti-Corruption Laws**");

(ii)      paid, offered, given, promised to pay, or authorized the unlawful payment of, any money or anything of value to, or for the benefit of, any "foreign public  official" (as such term is defined in Anti-Corruption Laws) or other Person, for the purpose of (A) corruptly obtaining business; or (B) inducing the recipient to use his or her influence or  position to affect any act or decision, in order to obtain or retain business for, direct business to,  or secure an improper advantage for, any Seller Parties, Transferred Entities or the Business; or

29

**HIGHLY CONFIDENTIAL**

(iii)     been or is currently the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement Action related to Anti-Corruption Laws.

(b)     The Seller Parties in respect of the Business and Transferred Entities have implemented policies and procedures intended to promote compliance with International Trade Laws, including, but not limited to, the U.S. and the European Union, and have obtained all material licenses or other authorizations from the relevant Government Authorities in connection with International Trade Laws.

(c)     The Seller Parties in respect of the Business and the Transferred Entities and, to the Knowledge of Seller, any of their respective equityholders, directors, officers, employees, agents, distributors, sales representatives, and consultants, and each other Person acting for, or on behalf of, the Seller Parties in respect of the Business and Transferred Entities, have been for the past three (3) years, and currently are, in material compliance with applicable provisions of, and have not been and are not subject to, and have not engaged and are not engaging in activities that may cause them to be subject to, material penalties, sanctions, or loss of Tax benefits under the International Trade Laws or any applicable Law relating to international trade administered by a Government Authority in any jurisdiction in which the Seller Parties or the Transferred Entities operate for which the applicable statute of limitations is only triggered upon discovery of violative conduct.

(d)     None of the Seller Parties in respect of the Business, the Transferred Entities, or to the Knowledge of Seller, any of their respective members, managers, shareholders, directors, officers, employees, agents, distributors, sales representatives, and consultants, and each other Person acting for, or on behalf of, any of the Seller Parties in respect of the Business or the Transferred Entities has, during the past three (3) years: (i) violated or engaged in any activities that may result in a material violation of, or penalties, sanctions, or loss of Tax benefits under, any International Trade Laws, or (ii) been fifty percent or more owned or controlled by any person that is the target of sanctions under International Trade Laws;

(e)     engaged in any activities with, in or involving (A) Cuba, Iran, North  Korea, Syria, or the Crimea region of Ukraine, (collectively, the "**Embargoed Countries**") and the governments thereof, (B)  any Persons organized, incorporated, established, located, or resident in the Embargoed Countries, (C) any Persons subject to sanctions or other trade restrictions by a  Government Authority in any jurisdiction in which the Seller Parties in respect of the Business or  Transferred Entities operate, or (D) any Persons owned or controlled by, or acting on behalf of,  any Person responsive to clauses (A) through (C), in any manner that would result in a material violation of Law.

(f)     There is no pending or, to the Knowledge of Seller, threatened in writing proceeding against, and no pending or threatened in writing investigation by, a Government Authority of, the Seller Parties in respect of the Business or the Transferred Entities, nor is there any injunction, Order, judgment, ruling, or decree imposed (or threatened in writing to be imposed) upon the Seller Parties in respect of the Business or Transferred Entities by or before any Government Authority, civil or criminal investigation, audit or any other inquiry by a Government

HIGHLY CONFIDENTIAL

Authority, or voluntary disclosure being considered, in each case, in connection with an alleged possible or actual violation of any applicable International Trade Laws.

Section 4.22   No Other Representations or Warranties.   Except for the representations and warranties expressly set forth in this Article IV (as modified by the Disclosure Schedules), none of the Seller Parties or any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, on behalf of the Seller Parties, the Transferred Entities or any of their respective Affiliates, including any representation or warranty regarding any Seller Party, any Transferred Entity or any other Person, the Transferred Equity Interests, any Assets, any Transferred Assets, any Liabilities of any Seller Party or Transferred Entity, including any Assumed Liabilities, the Business, any Transaction, any other rights or obligations to be transferred pursuant to the Transaction Agreements or any other matter, and the Seller Parties hereby disclaim all other representations and warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, whether made by or on behalf of any Seller Party, any Transferred Entity or any other Person, including any of their respective Representatives. Except for the representations and warranties expressly set forth in this Article IV (as modified by the Disclosure Schedules), each Seller Party, as applicable, hereby (a) disclaims and negates any representation or warranty, expressed or implied, at common Law, by statute, or otherwise, relating to the condition of the Transferred Assets, the Assets or the Business, and (b) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, Data or information made, communicated or furnished (orally or in writing, including electronically) to Buyer or any of Buyer's Affiliates or any Representatives of Buyer or any of Buyer's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of the Seller Parties or the Transferred Entities, respectively), including omissions therefrom. Without limiting the foregoing, no Seller Party makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, to Buyer or any  of its Affiliates or any Representatives of Buyer of any of its Affiliates regarding the probable success, profitability or value of the Transferred Entities, the Transferred Assets or the Business.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

Section 5.01   Formation and Authority of Buyer; Enforceability.   Buyer is a limited liability company  duly formed  organized, validly existing and, to the extent legally  applicable, in good standing under the Laws of the State of Delaware and has the requisite limited liability company power and authority to execute,  deliver and perform its obligations under the Buyer Transaction  Agreements  (including the   consummation of the Buyer Transactions). The execution, delivery and performance of this Agreement by Buyer and the consummation of the Buyer Transactions have been duly authorized by all requisite limited liability company action on the part of Buyer, and   no shareholder or other similar approval is required in connection with Buyer's execution, delivery  and performance of this Agreement. The execution, delivery and performance by Buyer and Buyer's Affiliates of each Buyer Transaction Agreement (other than

**HIGHLY CONFIDENTIAL**

this Agreement) to which Buyer or such Affiliates is a party, will be, prior to the Closing, duly authorized by all requisite organizational action on the part of Buyer or such Buyer Affiliate. This Agreement has been (and upon execution and delivery thereof, the other Buyer Transaction Agreements to which Buyer and Buyer's Affiliates are parties) will be, duly executed and delivered by Buyer or Buyer's Affiliates, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes (and upon execution and delivery thereof, the other Buyer Transaction Agreements will constitute, legal, valid and binding obligations of Buyer and Buyer's Affiliate (as applicable) enforceable against them in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 5.02   <u>Qualification of the Buyer</u>.  Buyer has the limited liability company power and authority to operate its businesses as now conducted. Buyer is qualified as a foreign corporation or other organization to do business and, to the extent legally applicable, is in good standing in each jurisdiction where the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing would not materially impair or delay the ability of Buyer to consummate the transactions contemplated by, or perform its obligations under, the Transaction Agreements.

Section 5.03   <u>No Conflict</u>.   Provided that all Consents, waivers and other actions described in <u>Section 5.04</u> have been obtained, the execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not:

(a)     violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Buyer;

(b)     conflict with or violate in any material respect any Law or Order applicable to Buyer; or

(c)     violate or conflict with, result in any breach of, or constitute a violation or default (or, any event that, with notice or lapse of time, or both would constitute a default) under, or give to any Person any right to terminate, accelerate or cancel, or result in the creation of any Lien on any assets or properties of Buyer pursuant to, any Contract to which Buyer or any of its Subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, accelerations or Liens as would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.04   <u>Consents and Approvals</u>.  The execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not require any Consent, waiver or other action by, or any filing with or notification to, any Government Authority, except (a) in connection with applicable filing, notification, waiting period or approval requirements, to the extent required, under the HSR Act and all applicable Antitrust Laws, (b) those required by the Bankruptcy Court in connection with the Bankruptcy Cases, or (c) where the failure to obtain such Consent or waiver, to take such action, or to make such filing or notification, would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

**HIGHLY CONFIDENTIAL**

Section 5.05     Absence of Restraints; Compliance with Laws.

(a)     To the knowledge of Buyer, no facts or circumstances exist that would reasonably be expected to materially impair or delay  the ability  of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(b)     Buyer is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform  its obligations under the Buyer Transaction Agreements.

(c)     There are no Actions pending or, to the knowledge of Buyer, threatened in writing  that would impair or delay in any material respect Buyer's ability to perform its obligations under the Buyer  Transaction Agreements or to consummate the Transactions contemplated by the Buyer  Transaction Agreements.

Section 5.06     Financial Ability.  Buyer has available to it, (a) sufficient immediately available funds and the financial ability to pay the Purchase Price, all Cure Costs and any costs and expenses incurred by Buyer pursuant to, or in connection with the negotiation, execution or performance of the Transaction Agreements and (b) the financial resources and capabilities (financial and  otherwise) to perform its obligations under the Buyer Transaction Agreements. Buyer has not  incurred, and is not contemplating or aware of any obligation, commitment, restriction or other  Liability of any kind, in each case, that would materially impair or adversely affect such resources, funds or  capabilities.

Section 5.07     Brokers.   No   broker, finder or investment banker is entitled to any brokerage, finder's or other fee or  commission from Buyer or any of Buyer's Affiliates in connection with the Transactions.

Section 5.08     Investigation.  Buyer acknowledges and agrees that it (a) has completed such inquiries and investigations as it has deemed appropriate, and, based thereon, has formed an independent judgment concerning, the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Transferred Entities, the Transferred Assets, the Assumed Liabilities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements and (b) has been furnished with, or given access to such information about the Seller Parties, the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Transferred Entities, the Transferred Assets, the Assumed Liabilities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements, in the case of each of (a) and (b), sufficient to execute, deliver and perform its obligations under this Agreement. Buyer further acknowledges and agrees that (x) the only representations and warranties made by Seller are the representations and warranties expressly set forth  in  Article IV (as modified by the Disclosure Schedules) and Buyer has not relied upon any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, Data or information made, communicated or furnished by or on behalf of Seller or any of its Affiliates, any Representatives of Seller or any of its Affiliates or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, Data or information made,

**HIGHLY CONFIDENTIAL**

communicated or furnished by or through the Seller's Banker, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, Data or information and (y) any claims Buyer may have for breach of any representation or warranty shall be based solely on the representations and warranties of Seller expressly set forth in Article IV (as modified by the Disclosure Schedules). Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Transferred Entities, the Assets, the Business, the Transferred Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Article IV (as modified by the Disclosure Schedules) without any other representations or warranties of any nature whatsoever.

Section 5.09    Securities Matters. The Transferred Equity Interests are being acquired by Buyer for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Transferred Equity Interests or any interest in them. Buyer has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Transferred Equity Interests, and Buyer is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Transferred Equity Interests. Buyer acknowledges that the Transferred Equity Interests have not been registered under the Securities Act, or any state securities Laws, and understands and agrees that it may not sell or dispose of any of the Transferred Equity Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state, foreign or federal securities Laws. Buyer understands that the Transferred Equity Interests are being sold to Buyer based in part upon the Buyer's representations contained in this Agreement.

**ARTICLE VI**

**ADDITIONAL AGREEMENTS**

Section 6.01    Conduct of Business Before the Closing. Buyer acknowledges that the Seller Parties are operating the Business in the context of the Bankruptcy Cases. Subject to the foregoing, except (a) as required by applicable Law, by Order of the Bankruptcy Court, (b) as required in connection with any Transaction Agreement or (c) for matters identified on Schedule 6.01, during the Pre-Closing Period:

(i)    Seller shall use, and Seller shall cause the other Seller Parties and Transferred Entities to use, commercially reasonable efforts to, as applicable, operate the Business in the Ordinary Course of Business, maintain the Transferred Assets and the Assets substantially in their current condition (subject to ordinary wear and tear) and, preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with material customers and material suppliers of the Business; and

(ii)    unless Buyer otherwise consents in writing (which consent shall not be unreasonably withheld, conditioned or delayed), Seller will, and will cause the other Seller Parties and the applicable Transferred Entities to, solely with respect to the Business, not do any of the following, in each case, solely to the extent related to the Business:

**HIGHLY CONFIDENTIAL**

(A)      grant any Lien on the Transferred Equity Interests or any Assets or Transferred Assets (in each case, whether tangible or intangible), in each case, other than a Permitted Lien or a Lien that will be discharged at or prior to Closing;

(B)      acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or division;

(C)      except for any such Debt or guaranty that will be discharged at or prior to the Closing or trade accounts payable incurred in the Ordinary Course of Business, incur or issue any Debt, or assume, grant, guarantee or endorse, or otherwise as become responsible for, the obligations of any Person;

(D)      issue or sell any additional shares of, or other equity interests in, the Transferred Entities, or securities convertible into or exchangeable for such shares or equity interests (other than, in each case, the issuance or sale of shares of, or other equity interest in, one Transferred Entity to another Transferred Entity), or issue or grant any options, warrants, calls, subscription rights or other rights of any kind to acquire such shares, other equity interests or securities;

(E)      sell, transfer, lease, sublease or otherwise dispose of any Assets or Transferred Assets (other than transfers between or among the Seller Parties and/or the Transferred Entities), other than in the Ordinary Couse of Business or as required under any applicable Law, any Order entered by the Bankruptcy Court or this Agreement;

(F)      in any material respect, (1) increase the wages, salaries, or bonuses payable to any Covered Employee who is a member of senior management or (2) establish or materially increase any benefits under any Assumed Employee Plan or Transferred Entity Employee Plan, except, in either case, (x) as required by any Assumed Employee Plan or Transferred Entity Employee Plan or any Contract in existence on the Agreement Date, (y) any increase in wages, salaries, bonuses and incentives in the Ordinary Course of Business consistent with past practices with respect to Covered Employees (other than members of senior management), or (z) as required by applicable Law;

(G)      other than in the Ordinary Course of Business (including the settling of product warranty claims in the Ordinary Course of Business) enter into any settlement or release with respect to any material Action related to the Business other than any settlement or release (1) that contemplates only the payment of money without ongoing limits on the conduct or operation of the Business, (2) results in a full release of the applicable Seller Parties or Transferred Entities with respect to the claims giving rise to such Action, and (3) involves the payment of Liabilities reflected or reserved against in full in the Financial Statements;

(H)      materially amend or terminate any Material Contract or enter into any Contract that would have been required to be disclosed as a Material Contract on Schedule 4.12(a), had it been entered into prior to the Agreement Date, in each case, other than in the Ordinary Course of Business;

35

**HIGHLY CONFIDENTIAL**

(I)     declare or set aside any dividends or distributions on any capital stock of any Transferred Entity (in cash or in kind);

(J)     make, change or revoke any material Tax election of any Transferred Entity unless required by GAAP;

(K)     enter into any commitment for capital expenditures that results in the Seller Parties and Transferred Entities exceeding the total capital expenditure amount set forth in the CapEx Budget for the current fiscal year;

(L)     modify or terminate any existing Autozone factoring arrangement; or

(M)     enter into any legally binding commitment with respect to any of the foregoing.

Section 6.02    Access to Information.

(a)     During the Pre-Closing Period, upon reasonable prior written notice, Seller shall, and shall cause each of the other Seller Parties and the applicable Transferred Entities to (solely to the extent possible without incurring third-party costs and expenses unless requested by Buyer as set forth herein) (i) afford the Representatives of Buyer reasonable access, during normal business hours, to their properties, books and records of the Business and the Transferred Entities, (ii) furnish to the Representatives of Buyer such additional financial and operating Data and other information regarding the Business, the Transferred Entities, the Transferred Assets and the Assumed Liabilities as Buyer or its Representatives may from time to time reasonably request for purposes of consummating the Transactions, and (iii) make available to Buyer and its Representatives, during normal business hours, those directors, officers, employees, auditors, accountants and other Representatives of the Seller Parties and the Transferred Entities, except, in the case of (i), (ii) and (iii), as set forth in Section 6.02(b); provided, however, to the extent that Buyer requests, in writing, for Seller to incur any third-party costs and expenses to comply with the obligations set forth in this Section 6.02(a), then Buyer shall promptly reimburse Seller for such costs in accordance with the terms set forth in such written notice to Seller.

(b)     Notwithstanding anything in this Agreement to the contrary,

(i)     (A) in no event shall the Seller Parties, the Transferred Entities or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, or any Order of the Bankruptcy Court, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to any of the Seller Parties, the Transferred Entities or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause any Seller Party, any Transferred Entity or any of their respective Affiliates to breach a confidentiality obligation to which it is bound and (B) any access or investigation contemplated by Section 6.02(a) shall not unreasonably interfere with any of the businesses, personnel or operations of any of the Seller Parties, the Transferred Entities or any of their respective Affiliates or the Business;

**HIGHLY CONFIDENTIAL**

(ii)    the auditors and accountants of any of the Seller Parties, the Transferred Entities or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants; and

(iii)    Buyer and its Representatives shall not conduct any sampling or testing of soil, groundwater, air, or other environmental media of any Seller Party or Transferred Entity.

(c)    If so requested by Seller, Buyer shall enter into a customary joint defense agreement or common interest agreement with one or more of the Seller Parties, the Transferred Entities or any of their respective Affiliates with respect to any information provided to Buyer, or to which Buyer gains access, pursuant to this Section 6.02 or otherwise.

Section 6.03    Confidentiality.    Buyer acknowledges that the Confidential Information and Transaction Information (each as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement, and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Buyer, its Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the obligations under the Confidentiality Agreement shall terminate; provided, however, that Buyer's confidentiality obligations shall terminate only in respect of that portion of the Confidential Information relating to the Business and constituting a Transferred Asset, and for all other Confidential Information, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms. If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms; provided, that the term of the Confidentiality Agreement as set forth therein shall be amended to refer to one (1) year from the date of termination of this Agreement. For the avoidance of doubt, the provisions in the Confidentiality Agreement which by their terms survive the termination of the  Confidentiality  Agreement shall continue  in full force and effect in accordance with their terms (as modified by the previous sentence).

Section 6.04    Regulatory Approvals.

(a)    Subject to Section 6.04(c), the Parties shall, and shall cause their respective Affiliates to, use their reasonable best efforts to take any and all steps to make all required filings and promptly obtain all Consents, Permits, Environmental Permits and Final Orders of all Government Authorities (other than any action of the Bankruptcy Court, which is governed exclusively by Article VIII) that may be, or become, necessary for the execution and delivery of, and performance of their respective obligations pursuant to, the Transaction Agreements (including the  consummation of the Transactions) (collectively, the "**Government Approvals**").

**HIGHLY CONFIDENTIAL**

(b)    On or prior to the Closing, Buyer shall secure financial assurance mechanisms, instruments or arrangements to replace any existing financial assurances currently maintained by the Seller Parties and set forth on Schedule 6.04(b) with respect to the Business under Environmental Permits. Seller agrees to provide reasonable assistance to support Buyer in securing such replacement financial assurances.

(c)    Without limiting the generality of Parties' obligations under Section 6.04(a), to the extent required, each of the Parties shall make its respective filing with respect to the Transactions under the HSR Act, if applicable, within five (5) Business Days from the entry of the Sale Order, unless otherwise extended by mutual agreement between Seller and Buyer, and shall make all other filings required pursuant to the Antitrust Laws of any other jurisdiction as promptly as practicable following the date of this Agreement. Buyer shall, and shall cause its Affiliates to, use reasonable best efforts to resolve as soon as reasonably practicable, but in any event not later than the Outside Date, any inquiry or investigation by any Government Authority relating to the Transactions under any Antitrust Law. In connection with any inquiry or investigation into the Transactions, the Parties further agree to supply as promptly as reasonably practicable any additional information and documentary material that may be requested or required pursuant to applicable Law, including any Antitrust Law. Buyer shall not withdraw its HSR Act filing, or other filing required by Antitrust Law, enter into any agreements to extend any HSR Act waiting period or other waiting period under any Antitrust Law, or enter into any agreements to delay or not to consummate the Transactions without the prior written consent of Seller.  Subject to Article XI, all filings fees related to the HSR  Act or any other filings under any other Antitrust Laws shall be borne by Buyer.

(d)    Notwithstanding any other provision in this Agreement, Buyer shall, and shall cause its Affiliates to promptly take and diligently pursue any or all actions to the extent necessary to eliminate each and every impediment under any Antitrust Law that may be asserted by any Government Authority or any other Person in opposition to the consummation of any of the Transactions, so as to enable the Parties to consummate the Transactions as soon as reasonably practicable, but in any event not later than the Outside Date. In furtherance of this obligation, and without limitation, Buyer shall, and shall cause its Affiliates to: (i) propose, offer, negotiate, commit to, effect, and agree to, by consent decree, hold separate order, or otherwise, any sale, divestiture, license, hold separate, or other disposition of or restriction on, any of the Transferred Assets, Assets, the Transferred Entities or any of Buyer's or Buyer's Affiliates' assets or businesses; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action on the Transferred Assets, the Assets or the Transferred Entities is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date; (ii) create, terminate, amend, or assign existing relationships, ventures, contractual rights, or obligations of the Buyer or Buyer's Affiliate(s), or the Transferred Assets; (iii) amend, assign, or terminate existing licenses or other agreements (and entering into such new licenses or other agreements); (iv) otherwise take or commit to any and all actions that would limit Buyer's freedom of action with respect to, or its ability to retain or hold, directly or indirectly, any businesses, assets, products, or equity interests in the Business of Buyer, Buyer's Affiliate(s), or the Transferred Assets; (v) enter into any Order, consent decree, or other agreement to effectuate any of the foregoing; and (vi) if necessary, defend any threatened or initiated litigation under any Antitrust Law that would prevent or delay consummation of the Transactions.

38

**HIGHLY CONFIDENTIAL**

(e)     Each Party shall promptly notify the other Parties of any oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this <u>Section 6.04</u>, permit the other Parties and their respective Representatives to review in advance any communication relating to the matters that are the subject of this <u>Section 6.04</u> proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this <u>Section 6.04</u>, <u>provided</u>, <u>however</u>, that materials provided to the Party may be reasonably designated as "Outside Counsel Only" and also may be redacted: (i) to remove references concerning the valuation of the Business or competitively sensitive information; (ii) as necessary to comply with contractual arrangements, applicable Law or by Order of the Bankruptcy Court; and (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns.  No Party shall agree to participate in any substantive meeting or discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Government Authority, gives the other Parties the opportunity to attend and participate at such meeting.   Subject to the Confidentiality Agreement, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods.  The Parties shall share the right to control and direct the process by which the Parties hereto seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law, including by directing the strategy and making final determinations related to the review or investigation of the Transactions by any Government Authority and attending all meetings, discussions, and communications with any Government Authority except to the extent that such Government Authority may request to communicate exclusively with one Party.  Nothing in this <u>Section 6.04(d)</u> shall be applicable to Tax matters.

(f)     Buyer shall not, and shall not permit any of its Affiliates to, take any action (including acquiring or agreeing to acquire by merging or consolidating with, or by purchasing the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquiring or agreeing to acquire any assets) that would reasonably be expected to have the effect of (i) materially delaying, impairing or impeding the receipt of, or increasing the risk of not receiving, any  required Government Approval or the issuance or reissuance or transfer of any Permit or  Environmental Permit, (ii) materially delaying, impairing or impeding the expiration or termination of any  applicable waiting period with respect to a Government Approval (and shall not, without the  consent of the Seller Parties, withdraw or refile any filing or restart the waiting period on any  Government Authority's review, or enter into a timing agreement with a Government Authority), (iii) materially increasing the risk of any Government Authority entering an Order prohibiting the consummation of the Transactions or (iv) otherwise materially delaying the consummation of the  Transactions.

(g)     Actions or agreements required of Buyer pursuant to this <u>Section 6.04</u> shall under no circumstances be considered a Material Adverse Effect.

Section 6.05    <u>Third Party Consents</u>. Each Party agrees to cooperate and use commercially reasonable efforts to obtain any other consents and approvals from any third Person other than a

**HIGHLY CONFIDENTIAL**

Governmental Authority that may be required in connection with any Transaction (the "**Third Party Consents**"); provided, that, the foregoing covenant shall not apply to consents of any Government Authority that are addressed elsewhere in this Agreement. Notwithstanding anything in this Agreement to the contrary, no Seller Party or any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any material accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any such Third Party Consent.

Section 6.06   Exide Canada.  Subject to the entry of the Sale Order or any other Order of the Bankruptcy Court approving the Canada Restructuring (defined below), prior to the Closing, Seller or another Seller Party shall acquire 100% of the equity interests of Exide Technologies Canada Corporation ("**Exide Canada**") (the "**Canada Restructuring**"). From and after the consummation of the Canada Restructuring, the equity interests of Exide Canada shall constitute Transferred Equity Interests hereunder and Exide Canada shall constitute a Transferred Entity hereunder.

Section 6.07   Intercompany Obligations.   Seller shall take or cause to be taken such action and make or cause to be made such payments as may be necessary so that, as of the Closing Date, there shall be no intercompany obligations (other than (a) pursuant to the Transaction Agreements, or (b) as set forth on Schedule 6.07) between the Transferred Entities, on the one hand, and Seller and its respective Affiliates (other than the Transferred Entities), on the other hand.  Nothing in this Section 6.07 shall require Seller to terminate or cancel any intercompany obligations exclusively between or among the Transferred Entities.

Section 6.08   Cooperation.  During the Pre-Closing Period, (a) Seller and Buyer shall, and shall cause their respective Affiliates to, (i) other than as permitted by Section 8.02, refrain from taking any actions that would reasonably be expected to materially impair, delay or impede the Closing and (ii) without limiting the foregoing or modifying Buyer's obligations pursuant to Section 6.04, use  commercially reasonable efforts to cause all Closing Conditions of the other Party to be met as  promptly as practicable and in any event on or before the Outside Date; (b) the Seller Parties and  the Transferred Entities shall (at Buyer's sole cost and expense) use their respective commercially  reasonable efforts to cause their Representatives to provide all cooperation reasonably requested  by Buyer in connection with facilitating any debt financing for purposes of Buyer obtaining  financing in connection with the consummation of the Transactions and (c) each Party shall keep  the other Party reasonably apprised of the status of the matters relating to the completion of the  Transactions, including with respect to the negotiations relating to the satisfaction of the Closing  Conditions of the other Party.

Section 6.09   Bulk Transfer Laws.  Buyer acknowledges that the Seller Parties will not comply with the provisions of any bulk transfer Laws or similar Laws (including under any Tax Laws) of any jurisdiction in connection with the Transactions and hereby waives all claims related to the noncompliance therewith.

Section 6.10   Employee Matters.

HIGHLY CONFIDENTIAL

(a)    Offer of Employment. All Covered Employees (including those on leave of absence or disability) employed by a Transferred Entity shall become or continue to be employees of Buyer or an Affiliate of Buyer effective as of the Closing Date. At least twenty (20) days prior to the Closing Date, except as otherwise provided in this paragraph, Buyer or one of its Affiliates shall make a written offer of employment, effective as of the Closing Date and contingent upon the Closing, to each of the Covered Employees not employed by a Transferred Entity. Except for union-represented Covered Employees, such offer of employment shall be (i) at the same location of employment as such Covered Employee's location of employment as of immediately prior to Closing, (ii) on substantially similar terms and conditions of employment as in effect immediately prior to Closing and (iii) with compensation and benefits at a level consistent with Section 6.10(b). Any Covered Employee who becomes employed by Buyer or one of its Affiliates in accordance with this Section 6.10(a) is referred to as a "**Transferred Employee**." With respect to union-represented Covered Employees, such offers shall be consistent with the terms and conditions required by the governing Modified Labor Agreements, if any and to the extent such agreements are applicable. Except as otherwise provided in any Modified Labor Agreement, Buyer may make any offers of employment as offers for employment "at will." With respect to any Covered Employee who is on a long-term disability leave of absence as of the Closing Date, such offer shall be contingent upon such Covered Employee returning to active status within six (6) months of the Closing Date or such longer period as is required by applicable Law. In the event that such inactive Covered Employee does not return to active status, Seller shall be responsible for the costs, expenses and Liabilities associated with such inactive Covered Employee. Seller also shall be responsible for all costs, expenses and Liabilities related to any Covered Employee who rejects an offer of employment from Buyer or an Affiliate of Buyer or otherwise refuses to transfer to Buyer or an Affiliate of Buyer. Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable law and the governing Modified Labor Agreements, if any and as applicable, at any time following the Closing Date.

(b)    Compensation and Benefits.

(i)    Commencing on the Closing Date and continuing for at least twelve (12) months (or such longer period as may be required by applicable Law), except as otherwise may be provided in any Modified Labor Agreement, Buyer or its Affiliates shall provide or cause to be provided to each Transferred Employee, (A) compensation, including base salary or hourly wage rate and cash annual bonus opportunities that is at least the same as that provided to such Transferred Employee immediately prior to the Closing, and (B) employee benefits (excluding equity, phantom equity, defined benefit pension, nonqualified deferred compensation, retiree medical, retiree life, retention bonus and change of control plans, programs, agreements and arrangements) that in the aggregate are substantively comparable to those provided to such Transferred Employee immediately prior to the Closing.

(ii)    Commencing on the Closing Date and continuing for at least twelve (12) months (or such longer period as may be required by applicable Law), except as otherwise may be provided in any Modified Labor Agreement, Buyer or its Affiliates shall provide Transferred Employees with the severance benefits applicable to each such Transferred Employee in accordance with the applicable underlying Employee Plans or agreements as in effect immediately prior to the Closing Date. For the avoidance of doubt, the Seller Parties shall be liable

**HIGHLY CONFIDENTIAL**

for all Liabilities that arise prior to or on the Closing under any Collective Bargaining Agreements, including those covering the Transferred Employees.

(iii)    As of the Closing Date and subject to the <u>Section 6.11</u> herein, Buyer will honor the governing Modified Labor Agreements covering the Transferred Employees, if any and as applicable, and shall indemnify and hold the Seller Parties and their Affiliates harmless with respect to any Liability related to any such agreement to the extent that any Liability arises post-Closing.

(c)    <u>Employees and Employee Plans</u>.

(i)    <u>Liabilities Incurred After Closing</u>. Except as otherwise provided in <u>Section 6.10(c)(ii)</u>, effective as of the Closing, Buyer shall, or shall cause an Affiliate of Buyer to, assume or retain, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Transferred Employee or workers' compensation claims against any Seller Party or Transferred Entity only to the extent such Liabilities were incurred after the Closing. The Seller Parties shall retain all costs, expenses and Liabilities related to the Transferred Employees that are incurred prior to or on the Closing, except as otherwise provided in <u>Section 6.10(c)(ii)</u>.

(ii)    <u>Other Liabilities</u>. Effective as of the Closing and to the extent permissible under applicable Law, Buyer shall, or shall cause an Affiliate of Buyer to, assume or retain, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from any Transferred Employee's accrued and unpaid bonuses, accrued and unused vacation time, accrued and unused sick time, or any other leave time to which a Transferred Employee is or has been entitled, irrespective of when such Liabilities were incurred.

(iii)    <u>Employee Plans</u>.   Effective as of the Closing, Buyer shall, or shall cause an Affiliate of Buyer to, assume each Assumed Employee Plan and continue each Transferred Entity Employee Plan. The Seller Parties shall retain each Employee Plan that is not an Assumed Employee Plan or Transferred Entity Employee Plan, which shall include for the avoidance of doubt, all unfunded benefit liability attributable to such Employee Plan. Except for any net unfunded benefit liability of up to $2,000,000 related to the Transferred Entity Employee Plans in Canada which net amount shall be calculated by offsetting any amount attributable to unfunded benefit liability of any such plan against any amount attributable to overfunding or surplus of any such plan, Seller shall promptly reimburse Buyer or an affiliate of Buyer, as applicable, for any unfunded benefit liability attributable to (A) any Employee Plan that transfers by operation of law to Buyer or an Affiliate of Buyer, (B) any statutory pension termination indemnity, post-employment retirement or similar plan to which any Seller Party contributed to on behalf of the Transferred Employees that relates to the period prior to the Closing or (C) any Covered Employee or any other employee of the Seller and its Affiliates who does not become a Transferred Employee, and shall take all actions necessary to the applicability of any successor liability to Buyer or its Affiliates with respect to such unfunded benefit liabilities, including without limitation, initiating the process of terminating any such underfunded Employee Plans. At the election of Buyer, Seller shall, or shall cause its applicable Affiliate to, assign to Buyer all rights with respect to the Assumed Employee Plans and all rights with respect to the agreements relating to the Assumed Employee Plans set forth on <u>Schedule 6.10(c).</u> As soon as practicable after

42

**HIGHLY CONFIDENTIAL**

the Closing Date, Seller shall deliver to Buyer all material records and documentation relating to the Assumed Employee Plans and shall cooperate with Buyer, Buyer's agents, and the fiduciaries of the Assumed Employee Plans to the extent reasonably necessary for Buyer, Buyer's agents and the fiduciaries of the Assumed Employee Plans to carry out their duties with respect to the Assumed Employee Plans.

(d)    <u>Transferred Employees – Additional Employment Terms.</u>

(i)    <u>Credit for Service</u>.  Except as otherwise may be provided in any Modified Labor Agreement, <u>Buyer shall</u>, and shall cause its Affiliates to, credit Transferred Employees for service earned on and prior to the Closing Date with the Seller Parties and any of their respective Affiliates (including the Transferred Entities) or predecessors, in addition to service earned with Buyer and its Affiliates on or after the Closing Date, (A) to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or, for severance and vacation benefits only, the calculation of benefits under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date and (B) for such additional purposes as may be required by applicable Law; provided, however, that nothing herein shall result in a duplication of benefits with respect to the Transferred Employees. For the avoidance of doubt, there will be no credited service for the purpose of accrual of benefits under any defined benefit pension plan of Buyer or any Affiliate of Buyer.

(ii)    <u>Pre-existing Conditions; Coordination</u>.  Buyer shall, and shall cause its Affiliates to, waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date. Buyer shall, and shall cause its Affiliates to, credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Transferred Employees, deductibles, co-insurance, co-pays and out-of-pocket expenses paid by Transferred Employees and their respective spouses and dependents under the Seller Parties or any of their respective Affiliates' health plans in the calendar year in which the Closing Date occurs.

(iii)    <u>Accrued Vacation and Sick Leave</u>.  Except as otherwise may be provided in any Modified Labor Agreement, Buyer or its Affiliates shall provide each Transferred Employee with credit for the same number of vacation and sick days such Transferred Employee has accrued but not used in the calendar year in which the Closing Date occurs; provided, that to the extent required by applicable Law, such amount shall be paid by Buyer or its Affiliates to the applicable Transferred Employee in cash. In the event that a Transferred Employee is unable to use such carried over vacation and sick days within the calendar year in which the Closing Date occurs, Buyer or its Affiliates shall allow such Transferred Employee to carry over such vacation and sick days to be used in the subsequent calendar year unless such Transferred Employee requests payout at the end of the current calendar year or such payout is required by applicable Law, in either of which events Buyer or its Affiliates will timely make such payments to such Transferred Employee.

HIGHLY CONFIDENTIAL

(iv)    <u>COBRA</u>. On the Closing Date, Seller and its Affiliates shall cease to provide health and welfare coverage to each Transferred Employee and his or her covered dependents and beneficiaries, and Buyer or its Affiliates shall commence providing such coverage to Transferred Employees and his or her covered dependents and beneficiaries. Buyer and its "buying group" (as defined in Treasury Regulation Section 54.4980B-9, Q&A-2(c)) shall be solely responsible for providing continuation coverage under COBRA to those individuals who are or become M&A qualified beneficiaries (as defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) with respect to the Transactions contemplated by this Agreement. Buyer and its Affiliates shall provide coverage required by COBRA to Transferred Employees and their eligible dependents or beneficiaries under group health plans maintained by Buyer or an Affiliate of Buyer with respect to qualifying events occurring after the Closing Date.

(e)    <u>Consultation with Unions</u>. The Parties shall, and shall cause their respective Affiliates to, mutually cooperate in undertaking all reasonably necessary or legally required provision of information to, or consultations, discussions or negotiations with, Unions that represent a Covered Employee.

(f)    Deferred Compensation. The Seller Parties and their Affiliates shall remain responsible for the payment of all nonqualified deferred compensation due to the Transferred Employees under any Employee Plan.

(g)    Restrictive Covenant Assignment. The Seller Parties and their Affiliates shall hereby assign to Buyer all of their rights and interests in any confidentiality, non-solicitation of clients or customers, non-solicitation of employees or consultants, non-interference, non-competition, non-disparagement or similar agreements (existing and in effect as of the date hereof) between the Business and each Transferred Employee, to the extent that such rights and interests protect the interest of the Business and to the extent such assignment is permitted under applicable Law. In the event that such rights and interests are not assignable, Seller shall assist Buyer in the enforcement of such rights and interests.

(h)    <u>No Third Party Beneficiaries</u>. Notwithstanding the provisions of this <u>Section 6.10(h)</u> or any provision of the Agreement, nothing in this <u>Section 6.10(h)</u> or the Agreement is intended to or shall (i) create any third party rights, (ii) amend any employee benefit plan, program, policy or arrangement, (iii) require Buyer or any of its Affiliates or any Seller Party or any of its Affiliates to continue any employee benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified or as otherwise required herein or (iv) provide any Covered Employee or any Transferred Employee with any rights to continued employment.

Section 6.11    <u>Collective Bargaining Agreements</u>.    Prior to the Closing Date, (i) the Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free and clear of the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u>, (ii) the Unions shall have agreed to waive or remove any successor clauses in the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u> and to waive any claim that Buyer has or is required to assume or succeed to those Collective Bargaining Agreements, or (iii) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller Parties pursuant to section

HIGHLY CONFIDENTIAL

1113(c) of the Bankruptcy Code authorizing the applicable Seller Parties to reject the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u>.

Section 6.12   <u>No Successor Liability</u>.   The Parties intend that, to the fullest extent permitted by Law (including under section 363(f) of the Bankruptcy Code), upon the Closing, the Buyer shall not be deemed to: (a) be the successor of any Seller Party, including with respect to any Collective Bargaining Agreement and any Employee Plans (except for any Assumed Benefit Plans), (b) have, de facto or otherwise, merged with or into any Seller Party, (c) be a mere continuation or substantial continuation of any Seller Party, or (d) be liable for any acts or omissions of the Seller Parties in the conduct of the Business or arising under, or related to, the Transferred Assets, other than as expressly set forth in this Agreement. The Parties acknowledge and agree that the Transaction was subject to arm's-length negotiating by Buyer and all Seller Parties. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties acknowledge and agree that the Buyer and Buyer's Affiliates (y) shall not be liable for any Liability or Lien (other than Assumed Liabilities) against the Debtors or any of the Debtors' predecessors or Affiliates (other than those of the Transferred Entities), and (z) shall have no successor or vicarious Liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets, any Excluded Liabilities or any other Liabilities of the Seller Parties arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this <u>Section 6.12</u> shall be reflected in the Sale Order.

Section 6.13   <u>Insurance Matters</u>.

(a)   <u>Buyer Cooperation</u>.   Notwithstanding anything to the contrary in the Agreement, each of Seller and Buyer acknowledge and agree that from and after the Closing, to the extent that Buyer (the "**Transferred Policy Holder**") has the right to pursue a claim under any Transferred Insurance Policy that covers or may reasonably be expected to cover in whole or in part any Excluded Liability retained by the Seller Parties (each, a "**Transferred Policy Beneficiary**" and, collectively, the "**Transferred Policy Beneficiaries**," and each such Excluded Liability, a "**Transferred Covered Loss**"), the Transferred Policy Holder shall (to the extent requested in writing from time to time by any Transferred Policy Beneficiary) use reasonable best efforts to file and pursue on behalf of such Transferred Policy Beneficiary claims under the applicable Transferred Insurance Policy(ies) for such Transferred Covered Loss on behalf of such Transferred Policy Beneficiary. The applicable Transferred Policy Beneficiary shall be responsible for all out-of-pocket expenses reasonably incurred by the Transferred Policy Holder in pursuing claims for Transferred Covered Loss on behalf of such Transferred Policy Beneficiary. To the extent that the Transferred Policy Holder actually collects proceeds under any applicable Transferred Insurance Policy pursuant to this <u>Section 6.13(a)</u>, the Transferred Policy Holder shall promptly remit any such proceeds (net of any then remaining unreimbursed out-of-pocket expenses reasonably incurred by the Transferred Policy Holder or its Affiliates in connection with the pursuit of such proceeds) to the applicable Transferred Policy Beneficiary. The Transferred Policy Holder shall not, without the prior written consent of the applicable Transferred Policy Beneficiary, amend, modify or waive any of its rights under the applicable Transferred Insurance Policies to the extent that doing so could reasonably be expected to adversely affect any coverage thereunder of the Transferred Policy Beneficiaries. Subject to the following sentence, the Transferred Policy Holder shall retain the exclusive right to control claims under such Transferred

**HIGHLY CONFIDENTIAL**

Insurance Policies, provided that the Transferred Policy Beneficiaries shall have the right, but not the duty, to monitor such claims.  Upon the request of any Seller Party, Buyer shall use commercially reasonable efforts to cause such Seller Party to be added as an insured on any applicable Transferred Insurance Policy(ies) covering or potentially covering Transferred Covered Losses with respect to which any Seller Party is or may be a Transferred Policy Beneficiary.  Each Transferred Policy Beneficiary shall exclusively bear and be liable for (and the Transferred Policy Holder shall have no obligation to repay or reimburse any Transferred Policy Beneficiary or its Affiliates) all uninsured, uncovered, unavailable or uncollectible amounts (including deductibles) relating to or associated with all such claims.  In addition, each Transferred Policy Beneficiary shall be responsible for reimbursing the Transferred Policy Holder for any incremental premium increases or fees or other expenses suffered or incurred by the Transferred Policy Holder under any applicable Transferred Insurance Policy covering a Transferred Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase results from the Transferred Policy Holder's collection of proceeds under such policy on behalf of a Transferred Policy Beneficiary in compliance with the foregoing provisions of this Section 6.13(a).  Each Transferred Policy Beneficiary shall also be responsible for any incremental premium increases suffered or incurred by the Transferred Policy Holder under any applicable Transferred Insurance Policy covering a Transferred Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase arises out of or results from the Transferred Policy Holder effecting a reinstatement of a sum insured or policy limit following erosion or exhaustion of such sum insured or policy limit resulting from the Transferred Policy Holder's collection of proceeds under such policy on behalf of a Transferred Policy Beneficiary in compliance with the provisions of this Section 6.13(a). Notwithstanding anything to the contrary in this Section 6.13(a), the Parties' obligations under this Section 6.13(a) shall cease upon the Wind-Up Date.

(b)     Seller Cooperation.   Notwithstanding anything to the contrary in the Agreement, each of Seller and Buyer acknowledge and agree that from and after the Closing, to the extent that any Seller Party (the "**Excluded Policy Holder**") has the right to pursue a claim under any occurrence-based Insurance Policy that covers or may reasonably be expected to cover in whole or in part any Assumed Liability assumed by Buyer (the "**Excluded Policy Beneficiary**," and each such Assumed Liability, an "**Excluded Policy Covered Loss**"), including any such policy that would be a Transferred Insurance Policy pursuant to Section 2.02(a)(xxi), but for the fact that such Insurance Policy is not legally transferable or has not yet been legally transferred pursuant to Section 2.03 (each, an "**Excluded Insurance Policy**"), the Excluded Policy Holder shall (to the extent requested in writing from time to time by the Excluded Policy Beneficiary) use reasonable best efforts to file and pursue on behalf of the Excluded Policy Beneficiary claims under the applicable Excluded Insurance Policy(ies) for such Excluded Policy Covered Loss on behalf of the Excluded Policy Beneficiary. The Excluded Policy Beneficiary shall be responsible for all out-of-pocket expenses reasonably incurred by the Excluded Policy Holder in pursuing claims for Excluded Policy Covered Loss on behalf of the Excluded Policy Beneficiary. To the extent that the Excluded Policy Holder actually collects proceeds under any applicable Excluded Insurance Policy pursuant to this Section 6.13(b), the Excluded Policy Holder shall promptly remit any such proceeds (net of any then remaining unreimbursed out-of-pocket expenses reasonably incurred by the Excluded Policy Holder or its Affiliates in connection with the pursuit of such proceeds) to the Excluded Policy Beneficiary. The Excluded Policy Holder shall not, without the prior written consent of the Excluded Policy Beneficiary, amend, modify or waive any of its rights

**HIGHLY CONFIDENTIAL**

under the applicable Excluded Insurance Policies to the extent that doing so could reasonably be expected to adversely affect any coverage thereunder of the Excluded Policy Beneficiary. Subject to the following sentence, the Excluded Policy Holder shall retain the exclusive right to control claims under such Excluded Insurance Policies, provided that the Excluded Policy Beneficiary shall have the right, but not the duty, to monitor such claims. Upon the request of Buyer, Seller shall use commercially reasonable efforts to cause Buyer to be added as an insured on any applicable Excluded Insurance Policy(ies) covering or potentially covering Excluded Policy Covered Losses with respect to which Buyer is or may be an Excluded Policy Beneficiary. The Excluded Policy Beneficiary shall exclusively bear and be liable for (and the Excluded Policy Holder shall have no obligation to repay or reimburse the Excluded Policy Beneficiary or its Affiliates) all uninsured, uncovered, unavailable or uncollectible amounts (including deductibles) relating to or associated with all such claims.  In addition, the Excluded Policy Beneficiary shall be responsible for reimbursing the Excluded Policy Holder for any incremental premium increases or fees or other expenses suffered or incurred by the Excluded Policy Holder under any applicable Excluded Insurance Policy covering an Excluded Policy Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase results from the Excluded Policy Holder's collection of proceeds under such policy on behalf of the Excluded Policy Beneficiary in compliance with the foregoing provisions of this Section 6.13(b).  The Excluded Policy Beneficiary shall also be responsible for any incremental premium increases suffered or incurred by the Excluded Policy Holder under any applicable Excluded Insurance Policy covering an Excluded Policy Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase arises out of or results from the Excluded Policy Holder effecting a reinstatement of a sum insured or policy limit following erosion or exhaustion of such sum insured or policy limit resulting from the Excluded Policy Holder's collection of proceeds under such policy on behalf of the Excluded Policy Beneficiary in compliance with the provisions of this Section 6.13(b). Notwithstanding anything to the contrary in this Section 6.13(b), the Parties' obligations under this Section 6.13(b) shall cease upon the Wind-Up Date.

Section 6.14   Guarantees; Other Obligations.   At or before the Closing, Buyer shall or shall cause its Affiliates to use commercially reasonable efforts to (i) arrange for substitute letters of credit, guarantees and other obligations to replace (A) any Seller Guarantees listed on Schedule 6.14(A) and outstanding as of the Agreement Date to the extent necessary and required for the operation of the Transferred Assets from and after the Effective Time, and (B) any Seller Guarantees entered into in the Ordinary Course of Business during the Pre-Closing Period, so long as Seller obtained Buyer's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) before the incurrence of the same (the Seller Guarantees described in the foregoing clauses (i)(A) and (i)(B), collectively, the "**Seller Business Guarantees**") or (ii) assume all obligations under each such Seller Business Guarantees, obtaining from the creditor, beneficiary or other counterparty a full release (in a form satisfactory to Seller) of all parties liable, directly or indirectly, for reimbursement to the creditor or fulfillment of other obligations to a beneficiary or counterparty in connection with amounts drawn under the Seller Business Guarantees; provided, however, for the avoidance of doubt, the term Seller Business Guarantees as used in this Section 6.14 shall not include, and Buyer and Buyer's Affiliates shall have no Liability or obligation under this Section 6.14 with respect to, any letters of credit, guarantees or other obligations to the extent such letters of credit, guarantees or other obligations relate to the Excluded Assets or Excluded Liabilities. To the extent the beneficiary or counterparty

47

**HIGHLY CONFIDENTIAL**

under any Seller Business Guarantee does not accept as of the Closing any such substitute letter of credit, Buyer guarantee or other obligation proffered by Buyer, effective from and after the Closing Date until the Wind-up Date, Buyer shall, and shall cause each of its Affiliates to, (x) indemnify, defend and hold harmless Seller and its Affiliates against, and reimburse Seller and its Affiliates for, all amounts paid, including costs or expenses in connection with such Seller Business Guarantees, including Seller's and its Affiliates' expenses in maintaining such Seller Business Guarantees, whether or not any such Seller Business Guarantee is drawn upon or required to be performed, and shall in any event promptly reimburse Seller and its Affiliates to the extent a Seller Business Guarantee is called upon and Seller or its Affiliates make any payment or are obligated to reimburse the party issuing the Seller Business Guarantee and (y) not, without Seller's prior written consent, amend in any manner adverse to Seller or any of its Affiliates, or extend (or permit the extension of), any Seller Business Guarantee or any obligation support by any Seller Business Guarantee. At the request of Seller, and at any time Seller's or its Affiliates' obligations under any Seller Business Guarantee have not been irrevocably released, Buyer shall provide Seller and its Affiliates, with letters of credit, issued by an issuer reasonably acceptable to Seller and in an amount equal to Seller's and its Affiliates' entire potential Liability pursuant to the immediately preceding sentence. Any such letter of credit, guarantee or other financial assurance obligation shall not expire, terminate or be cancelled until the earlier of (i) Seller and its Affiliates are irrevocably and unconditionally fully released from the entire potential Liability with respect to all Seller Guarantees, and (ii) the Wind-up Date with respect to such Seller or Seller Affiliate.

Section 6.15    Europe/ROW Buyer.

(a)    Seller shall use good faith efforts to obligate the Europe/ROW Buyer to agree to the terms and conditions of the IP Cross License Agreement, the Trademark Co-Existence Agreement, the TSA and the Supply Agreement.

(b)    Buyer shall cooperate and negotiate in good faith with the Seller Parties and the Europe/ROW Buyer to agree to the final forms of the Transaction Agreements referred to in Section 6.15(a) no later than the earlier to occur of the Closing hereunder or the Europe/ROW Closing, and if the Europe/ROW Closing is to occur prior to the Closing hereunder and the Transaction Agreements are in a final form, Buyer shall deliver a written acknowledgement that the Transactions Agreements are in final form to be executed and effective at the Closing hereunder; provided, that, Seller shall deliver to Buyer the proposed list of registrations and applications for Exide Licensed IP (as defined in Schedule C) by no later than fourteen (14) days following the Agreement Date.

Section 6.16    Financial Reporting.  After the date hereof and prior to the Closing Date,

(a)    for each full fiscal month beginning July 1, 2020, Seller shall cause to be delivered to Buyer within thirty (30) days after the last day of such month an unaudited consolidated balance sheet of the Americas operations of Exide Holdings, Inc. and its Subsidiaries at the last day of such month and unaudited consolidated statements of income and cash flows of the Americas operations of Exide Holdings, Inc. and its Subsidiaries, for such month and for the period from the beginning of the then current fiscal year to the end of such fiscal month, (b) for each full fiscal quarter beginning with the fiscal quarter ending March 31, 2020, Seller shall cause

HIGHLY CONFIDENTIAL

to be delivered to Buyer within fifty-five (55) days after the last day of such quarter an unaudited consolidated balance sheet of the Americas operations of Exide Holdings, Inc. and its Subsidiaries at the last day of such quarter and unaudited consolidated statements of income and cash flows of the Americas operations of Exide Holdings, Inc. and its Subsidiaries, for such quarter and the for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, and (c) for the fiscal year ended March 31, 2020, Seller shall cause to be delivered to Buyer within ninety (90) days after March 31, 2020, the unaudited consolidated balance sheet of the Americas operations of Exide Holdings, Inc. and its Subsidiaries and consolidated statements of income and cash flows of the Americas operations of Exide Holdings, Inc. and its Subsidiaries for such period then ended; provided, that in each of clauses (a) through (c) hereof, the financial statements delivered pursuant thereto shall be subject to normal year-end audit adjustments and other items, such as footnotes, shall be omitted.

Section 6.17    Disclosure Schedule Supplement.  The Seller may, from time to time prior to the Closing, by notice in accordance with the terms of this Agreement, supplement or amend any Schedule contained in the Disclosure Schedules in order to add information relating to, or resulting from, facts or events occurring subsequent to the execution of this Agreement (each, a "**Disclosure Schedule Supplement**"). In the event that the Seller provides any Disclosure Schedule Supplement, the matters set forth on such Disclosure Schedule Supplement shall not be effective to cure and correct any breach of any representation, warranty or covenant, which would have existed if Seller had not provided such Disclosure Schedule Supplement, including for purposes of termination rights or for determining satisfaction of any condition contained herein. In the event that, prior to the Closing, Seller provides Buyer a Disclosure Schedule Supplement pursuant to the terms of this Section 6.17 due to facts or events occurring subsequent to the execution of this Agreement that, but for this Section 6.17, would entitle Buyer to terminate this Agreement pursuant to Section 11.01(c) (a "**Significant Schedule Supplement**"), Buyer may terminate this Agreement in accordance with Section 11.01(c) within ten (10) Business Days of receipt of such Significant Schedule Supplement. If Buyer does not deliver a termination notice within such ten (10) Business Day period, Buyer shall be deemed to have waived any and all rights, remedies or other recourse to which Buyer might otherwise be entitled in respect of a breach that would be cured by such Significant Schedule Supplement, and such Significant Schedule Supplement shall be effective to cure and correct for all other purposes any breach of any representation, warranty or covenant which would have existed if Seller had not provided such Significant Schedule Supplement, and all references to any Schedule hereto which is supplemented or amended by such Significant Schedule Supplement shall for all purposes after the Closing be deemed to be a reference to such Schedule as so supplemented or amended.

Section 6.18    BM Assembly Line.  Subject the entry of the Sale Order or any other Order of the Bankruptcy Court approving the BMAL Transfer (defined below), prior to the Closing, Seller shall sell and transfer to Europe Exide Corporation Limited or one of its Affiliates (other than a Transferred Entity) all of its right, title and interest in, to and under the assets set forth on Schedule 6.18 (the "**BMAL Transfer**"). From and after the consummation of the BMAL Transfer, such assets set forth on Schedule 6.18 shall constitute Excluded Assets and all Liabilities arising thereunder shall constitute Excluded Liabilities hereunder.

HIGHLY CONFIDENTIAL

## ARTICLE VII

## POST-CLOSING COVENANTS

Section 7.01   Access.

(a)      From and after the Closing Date, in connection with any reasonable business purpose, including the preparation or amendment of Tax Returns, claims or obligations relating to Excluded Liabilities, financial statements, any Action to which Seller or any of its Affiliates is a party, the requirements of any Laws applicable to Seller, or its Affiliates or the determination of any matter relating to the rights or obligations of the Seller Parties or any of their Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases, upon reasonable prior written notice, and except to the extent necessary to (i) ensure compliance with any applicable Law or an Order of the Bankruptcy Court, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any contractual confidentiality obligations, Buyer shall, and shall cause each of the Transferred Entities, their respective Affiliates and their respective Representatives to (as Seller's sole cost and expense), during normal business hours, (A) afford each Seller Party, their respective Representatives and their respective Affiliates reasonable access to the properties, books and records of Buyer and its Affiliates in respect of any of the Transferred Entities, the Business, the Transferred Assets and the Assumed Liabilities, in each case, to the extent relating to any period prior to the Closing Date, (B) furnish to each Seller Party, their respective Representatives and their respective Affiliates such additional financial and other information regarding the Transferred Entities, the Business, the Transferred Assets and the Assumed Liabilities as any Seller Party or their respective Representatives may from time to time reasonably request, in each case, to the extent relating to any period prior to the Closing Date and (C) make available to each Seller Party, their respective Representatives and their respective Affiliates those employees of Buyer or its Affiliates whose assistance, expertise, testimony, notes or recollections or presence may be necessary to assist such Seller Party, their respective Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above, including the presence of such Persons for interviews and depositions and as witnesses in hearings or trials for such purposes; provided, however, that such investigation shall not unreasonably interfere with the business or operations of Buyer or any of its Affiliates; and  provided, further, that the auditors and accountants of Buyer or its Affiliates shall not be obligated  to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants. Notwithstanding anything to the contrary herein, the Seller Parties shall have continued access to all Transferred Books and Records as is necessary to administer the Bankruptcy Cases and the Seller Parties may retain copies of such Transferred Books and Records, as necessary or appropriate in connection with such purpose.

(b)      If so requested by Buyer, on the one hand, or Seller or any of its Affiliates, on the other hand, Seller or one of its Affiliates, or Buyer or one of its Affiliates, as the case may be, shall enter into a customary joint defense agreement or common interest agreement with Buyer and its Affiliates, or Seller and its Affiliates, as applicable, with respect to any information to be provided to Seller or its Affiliates pursuant to Section 7.01(a).

**HIGHLY CONFIDENTIAL**

Section 7.02    Directors' and Officers' Indemnification and Exculpation.

(a)    Buyer agrees that all rights of the individuals who on or prior to the Closing Date were directors, officers, managers or employees (in all of their capacities) of the Transferred Entities (collectively, the "**D&O Indemnified Parties**") shall be entitled to indemnification and exculpation from Liabilities for acts or omissions occurring at or prior to the Closing Date as provided in the organizational documents of the Transferred Entities, as applicable, as in effect on the Agreement Date, which obligation shall survive the Closing Date and shall continue in full force and effect against the applicable Transferred Entity in accordance with the terms of such organizational document. Such rights shall not be amended or otherwise modified in any manner that would adversely affect the rights of the D&O Indemnified Parties, unless such modification is required by Law.

(b)    The provisions of this Section 7.02 are intended to be for the benefit of and shall be enforceable by, each D&O Indemnified Party, his or her successors and heirs and his or her legal Representatives (but no other third parties). The obligations of Buyer under this Section 7.02 shall not be amended, terminated or modified in such a manner as to adversely affect any D&O Indemnified Party (including such Person's successors, heirs and legal Representatives) to whom this Section 7.02 applies without the written consent of the affected D&O Indemnified Party (it being expressly agreed that the D&O Indemnified Parties to whom this Section 7.02 applies shall be third-party beneficiaries of this Section 7.02), and this Section 7.02 shall be enforceable by such D&O Indemnified Parties and their respective successors, heirs and legal Representatives and shall be binding on all successors and assigns of Buyer and each Transferred Entity.

(c)    If Buyer or, following the Closing and prior to the sixth (6th) anniversary of the Closing Date, any Transferred Entity, or any of their respective successors or assigns, (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in such case, Buyer shall use commercially reasonable efforts to cause proper provisions to be made so that the successors and assigns of Buyer or such Transferred Entity or any of their respective successors or assigns, as the case may be, shall assume all of the obligations set forth in this Section 7.02(c).

Section 7.03    Preservation of Books and Records.  Seller and its Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date.  Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the longer of (a) any applicable statute of limitations and (b) a period of the earlier of (x) six (6) years from the Closing Date and (y) the Wind-Up Date.  During such period, (i) Representatives of Seller and its Affiliates shall, upon reasonable notice and for any reasonable business purpose (including the purposes described in Section 7.01), have access during normal business hours to examine, inspect and copy such books and records and (ii) Buyer shall provide to Seller and its Affiliates access to such original books and records of the Transferred Entities or the Business as Seller or its Affiliates shall reasonably request.  Seller or its Affiliates, as applicable, shall return such original books and records to Buyer or such Affiliate as soon as such books and records are no longer needed in connection with the circumstances described in the immediately preceding sentence. After such period, before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall

HIGHLY CONFIDENTIAL

give at least ninety (90) days' prior written notice to Seller of its intention to dispose such books and records, and Seller and/or any of its respective Affiliates shall be given an opportunity,   at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

Section 7.04   Further Assurances.  From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party (including (a) transferring back to Seller or its designees each Excluded Asset and any asset or Liability not contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which asset or Liability was transferred to Buyer at the Closing and (b) transferring to Buyer (and having Buyer assume) any asset or Liability contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which was not transferred to Buyer at the Closing); provided, however, that except for Buyer's obligations to discharge an Assumed Liability and as otherwise provided pursuant to Section 2.03, nothing in this Section 7.04 shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01   [RESERVED].

Section 8.02   Competing Transaction.

(a)   This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties and the Transferred Entities of higher or better competing transactions (including any plan of reorganization, recapitalization or restructuring transaction) in respect of all or any part of the Transferred Assets, the Assets and the Transferred Equity Interests (each a "**Competing Transaction**"), as determined in the Seller Parties' sole and exclusive discretion, and subject to the provisions of the Bidding Procedures Order and Supplemental Bidding Procedures Order.

Section 8.03   Bankruptcy Court Filings.

(a)   Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including  furnishing affidavits or other documents or information for filing with the Bankruptcy Court for  the purposes, among others, of providing necessary assurances of performance by Buyer under  this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of  the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Seller and Buyer shall use their  respective commercially reasonable efforts to defend such appeal.

HIGHLY CONFIDENTIAL

(b)      From and after the date of entry of the Sale Order and until the Closing Date, to the extent reasonably practicable, the Seller Parties shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules,  applications, reports and other papers to be filed or submitted in connection with the Agreement   and the operation of the Business, in each case, for Buyer's prior review and comment at least two (2) Business Days prior to the filing or submission thereof (provided if it is not practicable to  deliver the same within two (2) Business Days of the filings date as soon as practicable thereafter),   and such filings shall be reasonably acceptable to Buyer to the extent related to the Transferred Assets, Transferred Equity Interests, and Assumed Liabilities, or any of Buyer's obligations  hereunder.

Section 8.04   Back-Up Bidder.   Seller and Buyer agree that Buyer will be a "Back-Up Bidder" if and only if Buyer submits the second highest or second best bid at the  Auction (as determined by the Seller Parties) and is named the Back-Up Bidder.  If Buyer becomes the Back-Up Bidder and Seller gives notice (the "**Back-Up Trigger Notice**") to Buyer on or before  the Back-Up Trigger Notice Date that Seller (i) failed to consummate the sale with the winning  bidder, and (ii) has terminated the purchase agreement with the winning bidder, then Buyer shall consummate the transactions in accordance with its rebid.

# ARTICLE IX

# TAX MATTERS

Section 9.01   Transfer Taxes.    Notwithstanding anything to the contrary in this Agreement, to the extent not exempt under the Sale Order or section 1146 of the Bankruptcy Code, (a) where Buyer is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions or any component thereof, Buyer shall promptly pay and discharge such Transfer Tax, and (b) where any of the Seller Parties is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions or any component thereof, Buyer shall pay the amount of such Transfer Tax to the Seller Parties and shall indemnify, defend and hold harmless the Seller Parties and any of their Affiliates and Representatives from and against any such Transfer Taxes (unless such indemnity is prohibited by (or otherwise invalid under) applicable Law in which case Buyer shall indemnify, defend and hold harmless the Seller Parties for an amount equal to any such Transfer Taxes).  The Party required by Law to file a Tax Return with respect to such Transfer Taxes shall, with the cooperation of the other Party, timely prepare and file such Tax Return.  If the Seller Parties or any of their Affiliates (other than a Transferred Entity) is required to pay any Transfer Tax, Buyer shall within five (5) days of receipt of evidence of filing reimburse the Seller Parties for any Transfer Taxes paid by the Seller Parties or such Affiliate in connection with the filing of the applicable Tax Return.  Buyer and Seller each agree to timely sign and deliver (or to cause their respective Affiliates to timely sign and deliver) such certificates or forms as may be necessary or appropriate and to otherwise cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes. No sums payable, or consideration given, by Buyer under this Agreement should be reduced by the amount of any Transfer Tax, and Buyer shall pay any Transfer Tax chargeable on those sums or consideration. All refunds or credits of VAT paid by Buyer under this provision shall belong to Buyer.

**HIGHLY CONFIDENTIAL**

Section 9.02   Tax Adjustments.   Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Transferred Assets or Transferred Equity Interests (including ad valorem taxes, real estate Taxes, personal property Taxes and similar Taxes, and for the avoidance of doubt not to include Taxes of the Transferred Entities) for the Tax period in which the Closing occurs (the "**Straddle Period**") will be apportioned and prorated between Seller Parties and Buyer as of the Closing Date. Buyer shall bear its proportionate share of such Taxes (which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the number of days in the Straddle Period following the Closing Date and the denominator being the total number of days in the Straddle Period, times (ii) the amount of such Taxes), and the Seller Parties shall bear the remaining portion of such Taxes.

Section 9.03   Tax Cooperation.   Without limiting the obligations set forth in Sections 6.02 and 7.01, the Parties shall furnish or cause to be furnished to each other, upon request, and at the sole cost of the requesting Party, as promptly as practicable, such information and assistance relating to the Transferred Entities and the Transferred Assets as is reasonably necessary for the filing of Tax Returns, the making of any election related to Taxes permitted to be made under this Agreement, and the preparation for, or the prosecution or defense of, any audit, claim, demand, proposed adjustment or deficiency relating to Taxes, and any other matter or proceeding relating to Taxes.  Buyer agrees that it shall preserve and keep, or cause to be preserved and kept, all original books and records related to the Business relating to Taxes with respect to any Pre-Closing Tax Period and in the possession of Buyer or its Affiliates in accordance with Section 7.03.  With respect to the taxable period ending March 31, 2021, Buyer shall take all reasonable actions to prevent any Transferred Entity from realizing "subpart F income" (within the meaning of Section 952 of the Code) or "global intangible low-taxed income" (within the meaning of Section 951A(b) of the Code).

Section 9.04   Post-Closing Filing of Transferred Entity Tax Returns.

(a)   The Seller Parties shall prepare and file (or cause to be prepared and filed) any Tax Return of any Transferred Entity (i) due on or before the Closing Date, or (ii) filed on an affiliated, consolidated, combined or unitary basis with any of the Seller Parties or any of their Affiliates (other than a Transferred Entity) for taxable years or periods beginning on or before the Closing Date that is due after the Closing Date. With respect to each such Tax Return prepared and filed by the Seller Parties pursuant to this Section 9.04(a), the Seller Parties shall be responsible for any Taxes of the Seller Parties or any of their Affiliates (other than, as to Tax Returns due after the Closing Date, a Transferred Entity) shown as due on such Tax Returns. Buyer shall be responsible for and pay an amount equal to all other Taxes shown as due on such Tax Returns to the Seller Parties at least ten (10) days prior to the due date for payment of such Taxes.

(b)   To the extent possible under applicable Law, the Parties shall take such actions as shall be necessary or appropriate to cause the taxable year of each Transferred Entity to close for income Tax purposes, as of the close of business on the Closing Date in all applicable Tax jurisdictions.

(c)   Except with the Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed), neither Buyer nor any Affiliate of Buyer shall (or shall cause or permit any Transferred Entity to) (x) settle or compromise any audit, claim, demand, proposed

HIGHLY CONFIDENTIAL

adjustment, deficiency, assessment or administrative or judicial proceeding relating to, or (y) amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return described in <u>Section 9.04(a)</u>.

Section 9.05    <u>Code Section 338 Election</u>.   In the event Buyer provides Seller with written notice of its intent to make an election in accordance with the provisions of Code Section 338(h)(10) Code within sixty (60) days after the Closing Date, Buyer and Seller hereby agree that they shall elect to treat the purchase of the Transferred Equity Interests in accordance with the provisions of Code Section 338(h)(10) and Treasury Regulation Section 1.338(h)(10)-1.   In such a case, Buyer and Seller shall jointly make a timely election pursuant to Code Section 338(h)(10) with respect to the purchase and sale of the Transferred Equity Interests hereunder.

Section 9.06    <u>Canadian Transfer Tax Elections</u>.   In the event that Buyer provides Seller on or before the Closing Date with confirmation that it is registered under Part IX of the *Excise Tax Act (Canada)* and Chapter VIII of the *Quebec Sales Tax Act*, and its registration numbers, then Buyer and Seller shall, if applicable, execute jointly an election under section 167 of the *Excise Tax Act (Canada)* and an election under section 75 of the Act respecting *Québec Sales Tax* to have the sale of the relevant Transferred Assets take place without the imposition of Canadian goods and services or harmonized sales Tax, and without the imposition of Quebec sales Tax, and Buyer shall file such elections within the prescribed time.

Section 9.07    <u>Survival</u>.   The obligations set forth in this <u>Article IX</u> with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.01    <u>Conditions to Obligations of Seller</u>.   The obligation of Seller or any other Seller Party to consummate the Transactions shall be subject to the satisfaction or written waiver by Seller in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)    all representations and warranties of Buyer contained in <u>Article V</u> of this  Agreement shall be true and correct in all material respects as of the Closing as if made on the  Closing Date (other than representations and warranties that are made as of a specific date, which  representations and warranties shall have been true and correct in all material respects as of such specific date); <u>provided</u>, <u>however</u>, that for purposes of determining the satisfaction of the condition in this  clause (i), no effect shall be given to any qualifier of "material" in such representations and  warranties;

(ii)    the covenants contained in this Agreement required to be complied with by Buyer on or before the Closing shall have been complied with in all material respects; and

**HIGHLY CONFIDENTIAL**

(iii)    Seller shall have received a certificate signed by an authorized officer of Buyer, dated as of the Closing Date, certifying as to the satisfaction of the matters set forth in the foregoing clauses (i) and (ii).

(b)    <u>Government Approvals</u>.  Any applicable waiting periods under the HSR Act shall have expired or been terminated and all other Required Approvals shall have been obtained or, if applicable, shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)    <u>No Order</u>.  There shall be no Order in existence that prohibits the sale of the Transferred Equity Interests, the sale of the Transferred Assets or the other Transactions.

(d)    <u>Transaction Agreements</u>.  Buyer shall have executed and delivered to Seller, all Buyer Transaction Agreements.

(e)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be effective and not be subject to any stay.

Section 10.02  <u>Conditions to Obligations of Buyer</u>.   The  obligations  of  Buyer  to consummate the Transactions contemplated by this Agreement shall be subject to the satisfaction or written waiver by Buyer in its sole discretion, at or before the Closing, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)    The representations and warranties of Seller contained in <u>Section 4.01</u> (Formation and Qualification of the Transferred Entities), <u>Section 4.02</u> (Capital Structure of the  Transferred  Entities),  <u>Section 4.03</u>  (Formation  and  Authority  of  the  Seller  Parties; Enforceability), <u>Section 4.04</u> (No Conflict), and <u>Section 4.16</u> (Brokers) shall be true and correct on the Agreement Date and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case it shall be true and correct as of such specified date);

(ii)    all other representations and warranties of Seller contained in this Agreement shall be true and correct on the Agreement Date and on and as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; <u>provided</u>, <u>however</u>, that for purposes of determining the satisfaction of the condition in this clause (ii), no effect shall be given to any qualifier of "material" or "Material Adverse Effect" in such representations and warranties (except in each case for <u>Section 4.07(b)</u>);

(iii)    the covenants contained in this Agreement required to be complied with by the Seller Parties on or before the Closing shall have been complied with in all material respects; and

56

**HIGHLY CONFIDENTIAL**

(iv)     Buyer shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, certifying as to the satisfaction of matters set forth in the foregoing clauses (i), (ii), and (iii).

(b)     <u>Government Approvals</u>.  Any applicable waiting periods under the HSR Act shall have expired or been terminated and all other Required Approvals  shall have been obtained or, if applicable, shall have expired or been waived by the applicable Government Authority, or shall have been terminated.

(c)     <u>Environmental Approvals</u>.  Subject to Buyer's timely satisfaction of its obligations pursuant to <u>Section 6.04(a)</u>, Buyer shall have obtained all approvals (which may be temporary in nature), other than approvals the failure of which to obtain would not materially and adversely affect Buyer's ability to operate any of the facilities as they are presently being operated, required under Environmental Laws and Environmental Permits that must be obtained prior to the Effective Time in order for Buyer to continue lawfully operating any of the facilities as they are presently being operated, in each case without the imposition of additional or modified conditions and requirements that would impose material additional costs.

(d)     <u>No Order</u>.  There shall be no Order in existence that prohibits the sale of the Transferred Equity Interests, the sale of the Transferred Assets or the other Transactions.

(e)     <u>Certain Transaction Agreements</u>.  Each of the TSA, IP Cross License Agreement, the Trademark Co-Existence Agreement, and the Supply Agreement Transaction Agreement shall been fully negotiated and in a final form, which shall include the applicable terms set forth on Schedule C and, subject to <u>Section 6.15</u>, be in a form and substance reasonably acceptable to Seller and Buyer.

(f)     <u>Seller Transaction Agreements</u>.  The Seller Parties shall have executed and delivered, or caused to be executed and delivered, to Buyer all Seller Transaction Agreements.

(g)     <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be effective and not subject to any stay.

(h)     <u>Collective Bargaining Agreements</u>.  (i) The Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free and clear of the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u>, (ii) the Buyer and Seller Parties shall have negotiated and consented to a Modified Labor Agreement with the Unions who are parties to the Modified Labor Agreements that shall not include the requirement that Buyer or its Affiliates sponsor or contribute to a single employer defined benefit pension plan, retiree medical or life insurance plan or multiemployer pension plan, (iii) the Unions shall have agreed to waive or remove any successor  clauses in the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u> and to waive any  claim that Buyer has or is required to assume or succeed to those Collective Bargaining  Agreements, or (ix) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed  by the applicable Seller Parties pursuant to section 1113(c) of the Bankruptcy Code authorizing the applicable Seller Parties to reject the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u>.

**HIGHLY CONFIDENTIAL**

(i)     Pension Liabilities.  The Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free and clear of any and all Liabilities related to any Employer Plan that is subject to Title IV of ERISA.

Section 10.03  Frustration of Closing Conditions.  Neither Seller nor Buyer may rely on the failure of any condition set forth in this Article X to be satisfied if such failure was caused by such Party's failure to act in good faith, to use commercially reasonable efforts to cause the Closing Conditions of each such other Party to be satisfied, or to satisfy its obligations set forth in Section 6.04.

Section 10.04  Waiver of Closing Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article X that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

## ARTICLE XI

## TERMINATION

Section 11.01  Termination.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Seller, if Buyer shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Buyer that would cause any Closing Condition set forth in Section 10.01(a) not to be satisfied, and (i) such breach is not waived by Seller or (ii) if such breach has not been waived by Seller but is curable and is not cured by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt by Buyer of Seller's notice of its intent to terminate and (B) the Outside Date; provided, however, that Seller is not then in material breach of this Agreement, which breach, either individually or in the aggregate with other breaches by the Seller, would result in, if occurring or continuing on the Closing Date, the failure of the Closing Conditions set forth in Section 10.02;

(c)     by Buyer, if Seller shall have breached any representation or warranty or failed to comply with any covenant applicable to Seller that would cause any Closing Condition set forth in Section 10.02(a) not to be satisfied, and (i) such breach is not waived by Buyer or (ii) if such breach has not been waived by Buyer but is curable and is not cured by Seller prior to the earlier to occur of (A) ten (10) Business Days after receipt by Seller of Buyer's notice of its intent to terminate and (B) the Outside Date; provided, however, that Buyer is not then in material breach of this Agreement, which breach, either individually or in the aggregate with other breaches by Buyer, would result in, if occurring or continuing on the Closing Date, the failure of any of the Closing Conditions set forth in Section 10.01;

(d)     by either Seller or Buyer, if the Closing shall not have occurred by (i) August 27, 2020 or (ii) if Buyer is declared the Back-Up Bidder in accordance with Section 8.04, by September 30, 2020 (as either such date may be extended by mutual agreement of the Parties in writing, the "**Outside Date**"); provided, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties or covenants contained

**HIGHLY CONFIDENTIAL**

in this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 11.01(d)</u>;

(e)     by either Seller or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Equity Interests or the Transferred Assets, or the Transaction and such Order shall have become a Final Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 11.01(e)</u> shall not be available to Seller or Buyer whose action or failure to fulfill any obligation under this Agreement has been the cause of, or has resulted in, the issuance of such Order or other action;

(f)     by either Seller or Buyer (unless Buyer is the Back-Up Bidder), if (i) any Seller Party enters into a definitive agreement with respect to a Competing Transaction or (ii) the Bankruptcy Court enters an Order approving a Competing Transaction;

(g)     by Buyer, if any of the Bankruptcy Cases is dismissed, converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Seller Party is appointed in the Bankruptcy Cases;

(h)     [RESERVED];

(i)     [RESERVED]; or

(j)     by Buyer, if Seller has failed to obtain entry of an effective and unstayed Sale Order that is reasonably acceptable to Buyer by no later than August 10, 2020.

Section 11.02   <u>Notice of Termination</u>.  If either Buyer or Seller desires to terminate this Agreement pursuant to <u>Section 11.01</u>, such Party shall give written notice of such termination to the other Party, which notice shall include the specific subsection under which termination is sought.

Section 11.03   <u>Effect of Termination</u>.

(a)     If this Agreement is terminated pursuant to <u>Section 11.01</u>, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) <u>Section 6.03</u>, (ii) this <u>Section 11.03</u>; (iv) <u>Article XII</u> (excluding <u>Section 12.04</u>) and <u>Exhibit A</u>; <u>provided</u>, that, nothing in this <u>Section 11.03</u> shall be deemed to (A) release any Party from any Liability for any breach by such Party of any term of this Agreement prior to the date of termination for any knowing and intentional breach of this Agreement or Fraud committed against the non-breaching Party, as determined by the Bankruptcy Court or (B) impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

(b)     In the event of a valid termination of this Agreement by Seller pursuant to <u>Section 11.01(b)</u>,  then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver  Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver an amount  equal to the Escrowed Funds (together with all accrued investment income

HIGHLY CONFIDENTIAL

thereon (if any)) to  Seller.  Buyer acknowledges that the agreements contained in this <u>Section 11.03(b)</u> are an integral  part of the Transactions, and that without these agreements, Seller would not have entered into this  Agreement; accordingly, if Buyer fails to timely pay any amount due pursuant to this <u>Section 11.03(b)</u> and, in order to obtain such payment, Seller commences an Action which results in a  judgment against Buyer for any such payment set forth in this <u>Section 11.03(b)</u>, Buyer shall pay  Seller its costs and expenses (including reasonable attorney's fees and disbursements) in  connection with such Action, together with interest on such payment at the Interest Rate through   the date such payment was actually received. Seller's receipt of the Escrowed Funds (if any when payable pursuant to the terms of this <u>Section 11.03(b)</u> shall constitute liquidated damages and the sole and exclusive remedy of Seller and its Affiliates against Buyer and any of its Affiliates and each of their respective Representatives for any and all losses and other damages that may be suffered or incurred by Seller, Seller's Affiliates and each of their respective Representatives based upon, relating to, resulting from or arising out of this Agreement or the Transactions, any breach hereof or any failure to perform or comply with any covenant or other obligation hereunder and the circumstances giving rise to such termination.  Further, Buyer agrees that Seller may seek any other remedies at Law or in equity arising from Buyer's breach of this Agreement, pursuant to Section_ 11.03(a) and Section 12.17; provided, however, that in no event shall (i) Seller be entitled to both any such other remedy and also to receive the Escrowed Funds, and (ii) in no event shall the Escrowed Funds (or an amount equal thereto) be paid on more than one occasion.

(c)      In the event of a termination of this Agreement pursuant to <u>Section 11.01</u>, other than a termination pursuant to <u>Section 11.01(b)</u>, then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver an amount equal to the Escrowed Funds (together with all accrued investment income thereon (if any)) to Buyer.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01  <u>Rules of Construction</u>.  The following rules of construction shall govern the interpretation of this Agreement:

(a)      references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of Delaware as required to be applied thereunder by the Bankruptcy Court; references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b)      when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken

**HIGHLY CONFIDENTIAL**

within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c)    whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(d)    (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

(e)    (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) the term "or" shall not be exclusive and shall mean "and/or";

(f)    (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(g)    references to any Person includes such Person's successors and permitted assigns;

(h)    whenever this Agreement requires any Seller Party, to take any action, such requirement shall be deemed to involve an undertaking on the part of the Seller to take such action, or to cause such Seller Party, to take such action;

(i)    unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; and

(j)    each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. Further, prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no

HIGHLY CONFIDENTIAL

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

Section 12.02  <u>Expenses</u>.  Except as otherwise specified in the Transaction Agreements, each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs.

Section 12.03  <u>Notices</u>.  All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this <u>Section 12.03</u>):

| | |
|---|---|
| If to Seller, to: | Exide Technologies, LLC<br>13000 Deerfield Parkway<br>Suite 200<br>Milton, GA 30004<br>Attention:   Legal Department<br>E-mail:   bob.penman@exide.com<br>keith.scott@exide.com |
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:   Ray C. Schrock, P.C.;<br>Sunny Singh, Esq.;<br>Mariel E. Cruz, Esq.<br>E-mail:   ray.schrock@weil.com<br>sunny.singh@weil.com<br>mariel.cruz@weil.com |
| If to Buyer or Guarantor, to: | Battery BidCo, LLC<br>100 Northfield Street<br>Greenwich, CT 06830<br>Attn:   Jacob D. Hudson<br>Email:  jhudson@atlasholdingsllc.com |
| with a copy (which will not constitute notice) to: | Winston & Strawn LLP<br>1901 L Street, N.W.<br>Washington, D.C. 20036<br>Attn:   Christopher M. Zochowski<br>Bradley A. Noojin |

**HIGHLY CONFIDENTIAL**

Email:  czochowski@winston.com
       bnoojin@winston.com

Winston & Strawn LLP

    35 W. Wacker Drive
    Chicago, IL 60601
    Attn:  Dan McGuire

    Email:  DMcguire@winston.com

Section 12.04 <u>Survival</u>. Subject to <u>Section 11.03(a)</u> and   except for any covenant, agreement or obligation that by its terms is to be performed (in whole or in part) by any Party following the Closing including those set forth in Section 3.05 (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 12.05 <u>Limitation on Liability</u>.  Notwithstanding anything in this Agreement or in any other Transaction Agreement to the contrary, (a) except (x) in the event of Fraud, (y) the calculation of, and any adjustments to, the Purchase Price in accordance with <u>Article III</u>, and/or (z) with respect to any Assumed Liabilities, (i) the maximum aggregate Liability of the Seller Parties under, or with respect to, this Agreement  shall not exceed an amount equal to $5,000,000, and (ii) the maximum Liability of Buyer under, or with respect to, this Agreement  shall  not  exceed the Escrowed Funds, and (b) except in the event of Fraud, in no event shall any Party have any Liability under this  Agreement (including under this <u>Article XII</u>) for any consequential, special, incidental, indirect or  punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged  breach of this Agreement). The foregoing limitations in this <u>Section 12.05</u> shall apply to all claims, obligations, Liabilities, Actions or causes of action (whether in Contract or in tort, at Law or in  equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason  of, be connected with, or relate in any manner to, this Agreement, or the negotiation, execution, or   performance of this Agreement or any of the Transactions contemplated by this Agreement and  the relationship between the Parties from inception.

Section 12.06 <u>Public Announcements</u>.   The initial press release with respect to the execution of this Agreement shall be a joint press release to be reasonably agreed upon by the Buyer and Seller.  No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as a Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by Order of the Bankruptcy Court.

Section 12.07 <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of

**HIGHLY CONFIDENTIAL**

this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 12.08  Assignment.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; provided, however, that (a) any Party may assign this Agreement and any or all rights and obligations under this Agreement to any of its controlled Affiliates and (b) Seller may assign any of its rights or obligations under this Agreement to any plan administrator, liquidator, examiner, receiver, liquidation trustee, or similar party appointed for it following the Closing; provided, further, that no such assignment pursuant to the foregoing clause (a) shall release the assigning Party from any Liability under this Agreement.  Any attempted assignment in violation of this Section 12.08 shall be void ab initio.

Section 12.09  No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and, except with respect to the D&O Indemnified Parties pursuant to Section 7.02(a), the Nonparty Affiliates pursuant to Section 12.18, or as otherwise expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.

Section 12.10  Entire Agreement.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 12.11  Amendments.  This Agreement (including all exhibits and schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 12.12  Waiver.  At any time before the Closing, either Seller or Buyer may (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure; provided, that any such waiver shall be in a written instrument duly executed by the waiving Party.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate

64

**HIGHLY CONFIDENTIAL**

as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.13  Governing Law.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "**Transaction Dispute**"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Section 12.14  Dispute Resolution; Consent to Jurisdiction.

(a)  Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.03 (as may be updated from time to time in accordance with Section 12.03); provided, however, upon the closing of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)  submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)  agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)  agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in Section 12.03 (as may be updated from time to time in accordance with Section 12.03) of any process required by any such court, will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)  The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

**HIGHLY CONFIDENTIAL**

Section 12.15  <u>Waiver of Jury Trial</u>.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates or Representatives will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into this Agreement.  Each Party may file an original counterpart or a copy of this <u>Section 12.15</u> with any court as written evidence  of the consent of each Party to the waiver of its right to trial by jury.

Section 12.16  <u>Admissibility into Evidence</u>.  All offers of compromise or settlement among the Parties or their Affiliates or Representatives in connection with the attempted resolution of any Transaction Dispute (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 12.17  <u>Remedies; Specific Performance</u>.

(a)     Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case, (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at Law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and except with respect to Fraud, waives and releases all tort Causes of Action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 12.18  <u>Non-Recourse</u>.  All claims, obligations, Liabilities, Actions or causes of action (whether in Contract or in tort, at Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to, this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the Persons that are expressly identified as Parties in the preamble to this Agreement or, if applicable, their successors and assigns ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present

HIGHLY CONFIDENTIAL

or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants or Representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to, any of the foregoing ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, at law or in equity, or granted by statute) for any claims, causes of action, Actions, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, Actions, and obligations against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this Section 12.18 applies shall be third-party beneficiaries of this Section 12.18.

Section 12.19   Interest.   If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.   All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case, for the actual number of days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 12.20   Disclosure Schedules and Exhibits.   The Disclosure Schedules, Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.   Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.   The representations and warranties of Seller set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules, and neither the Seller, nor any of its Affiliates shall be, or deemed to be, in breach of any such representations and warranties (and no claim shall lie in respect thereof) in respect of any such matter so disclosed in the Disclosure Schedules.   Where only brief particulars of a matter are set out or referred to in the Disclosure Schedules or a reference is made only to a particular part of a disclosed document, full particulars of the matter and the full contents of the document are deemed to be disclosed.   Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or Schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of the Disclosure Schedules if it is reasonably apparent on its face that such disclosure is applicable to such other Schedule(s) or Section(s) as though fully set forth in such other Schedule(s) or section(s).   The inclusion of any matter, information or item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed to constitute (i) an admission of any Liability by Seller to any third party, (ii) an admission that any breach or violation of applicable Laws or any Contract or agreement to which any Seller Party or Transferred Entity is a party exists or has actually occurred, (iii) an admission that such item is outside the Ordinary Course of Business or not consistent with past practice, or (iv) otherwise imply an admission that such item represents a material exception or material fact, event, circumstance or that such item has had, or would reasonably be expected to have a Material Adverse Effect.   The Disclosure Schedules have

HIGHLY CONFIDENTIAL

been arranged for purposes of convenience in separately titled Schedules corresponding to the Sections of this Agreement.

Section 12.21  <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP may serve as counsel to the Seller Parties, on the one hand, and any Transferred Entity, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP may serve as counsel to any Seller Party or any Affiliate or Representative of any Seller Party, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of any Transferred Entity and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates and Representatives to consent to waive any conflict of interest arising from such representation.

Section 12.22  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

Section 12.23  <u>Guaranty</u>.  Subject to the provisions of this <u>Section 12.23</u>, Guarantor does hereby unconditionally and irrevocably guarantee to Seller the full, complete and prompt performance and payment if, as and when due, as the case may be, of the Guaranteed Obligations (as hereafter defined), and if Buyer does not pay or perform any of the Guaranteed Obligations in accordance with their respective terms, Guarantor shall immediately on demand by Seller, pay or perform such Guaranteed Obligations as if Guarantor were the principal obligor primarily liable for the performance thereof and not as a mere surety. Seller may obtain recourse against Guarantor for the payment and performance of the Guaranteed Obligations prior to, concurrently with, or after any other Action to enforce such Guaranteed Obligations. Guarantor shall be entitled to perform or satisfy the Guaranteed Obligations pursuant to the same terms and conditions and subject to the same rights and limitations as are applicable to Buyer under this Agreement. For purposes of this Agreement, "**Guaranteed Obligations**" means each of the obligations of Buyer under this Agreement.  For the avoidance of doubt, Guarantor's obligations under this <u>Section 12.23</u> shall be in exchange for  the conveyance by the Seller Parties of the Transferred Assets and Transferred Equity Interests to  Buyer  or  Guarantor,  as  applicable, subject to, and in accordance with, the other terms and  conditions set forth in this Agreement and provided that the full Purchase Price, Cure Costs and  other monetary obligations to be paid by Buyer at Closing are paid. If the Closing occurs in accordance with <u>Section 2.04</u>, the guaranty set forth in this <u>Section 12.23</u> shall automatically and  simultaneously be extinguished and of no force or effect. There are no third-party beneficiaries of  the guaranty set forth in this <u>Section 12.23</u>.

<div align="center">[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;<br>SIGNATURE PAGE FOLLOWS]</div>

**HIGHLY CONFIDENTIAL**

IN WITNESS WHEREOF, Seller, Buyer and, solely for purposes of Sections 12.17, 12.18 and 12.23, Guarantor, have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

<div align="center">

**SELLER:**

EXIDE TECHNOLOGIES, LLC,
a Delaware limited liability company

</div>

By:  _____
　　　　Name: Timothy D. Vargo
　　　　Title: President & Chief Executive Officer

**HIGHLY CONFIDENTIAL**

**BUYER:**

BATTERY BIDCO LLC,
a Delaware limited liability company

By: _____
    Name:  Jacob D. Hudson
    Title:  Authorized Person

**GUARANTOR:**

ATLAS CAPITAL RESOURCES III LP
a Delaware limited partnership

By:   ATLAS CAPITAL GP III LLP, its general partner

    By:   ATLAS CAPITAL RESOURCES GP III LLC, its
    general partner

    By: _____
        Name:  Jacob D. Hudson
        Title:  Managing Partner

**HIGHLY CONFIDENTIAL**

**EXHIBIT A**

# DEFINITIONS

"**Action**" means any action, suit, arbitration, investigation or proceeding by or before any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) Seller shall not be deemed an Affiliate of Buyer, nor, after the Closing, of any Transferred Entity of which the Transferred Equity Interests are transferred to Buyer pursuant to this Agreement and (b) after the Closing, Buyer shall be deemed an Affiliate of each of the Transferred Entities (and vice versa).

"**Affected Union**" refers to those unions party to Collective Bargaining Agreements set forth in Schedule 4.12(a)(ii).

"**Agreement**" means this Stock and Asset Purchase Agreement, dated as of July __, 2020, by and among Seller, Buyer, and, solely for purposes of Sections 12.17, 12.18 and 12.23, Guarantor, including the Disclosure Schedules and the Exhibits, and all amendments to such agreement made in accordance with Section 12.10.

"**Antitrust Laws**" means the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, and any Laws applicable to Buyer or any Seller Party or any Transferred Entity under any applicable jurisdiction that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assets**" means the assets and properties that are owned, leased or licensed by any Transferred Entity.

"**Assumed Employee Plans**" means any Employee Plan set forth on Schedule 6.10(c), including Exide Technologies 401(k) Savings and Retirement Plan, and the Exide Technologies Hourly 401(k) Plan, but excluding any Title IV Plan, defined benefit pension plan or supplemental or excess benefit retirement plans.

"**Available Software Contract**" means any executory third-party Software Contract that is related to or used in the Business.

"**Auction**" means the auction undertaken pursuant to the Bidding Procedures Order.

"**Back-Up Trigger Notice Date**" means August 31, 2020 at 11:59 p.m. New York City time.

"**Bankruptcy and Equity Exception**" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights

HIGHLY CONFIDENTIAL

generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at Law).

"**Bidding Procedures Order**" means that certain Order of the Bankruptcy Court entered at Docket No. 344 in the Bankruptcy Case.

"**Board**" means the board of directors of Exide Holdings, Inc.

"**Business**" means the operational business of (a) the Seller Parties operated in North America (including, the U.S., Canada and Mexico) and South America and (b) the Transferred Entities, including the business of (i) manufacturing and marketing of certain industrial batteries that are motive power batteries, network power batteries and transportation batteries that are starting, lighting and ignition batteries, in each case, for specified applications, and (ii) the recycling, processing and return of recovered lead, lead alloys and polypropylene chips from certain spent lead acid batteries (and, excluding, for the avoidance of doubt, any operations of the Seller Parties at the Excluded Real Property).

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which commercial banks in New York City, New York are required or authorized by Law to be closed.

"**Business Intellectual Property**" means the Business Registrable IP, Intellectual Property in Software included in Business Technology, and all other Intellectual Property (other than registrations and applications for Intellectual Property or in Software) to the extent owned by any Transferred Entity or owned by any Seller Party and related to the Business.

"**Business Registrable IP**" means patents, patent applications, registered Trademarks, applications for registered Trademarks, copyright registrations and Internet domain names owned by any Transferred Entity or owned any Seller Party and related to the Business and set forth on Schedule 2.02(a)(vii).

"**Business Technology**" means all (a) Software set forth on Schedule 2.02(a)(vii) and (b) Technology (other than Software) to the extent owned by any Transferred Entity or owned by any Seller Party and related to the Business.

"**Buyer Transaction Agreements**" means this Agreement and each other Transaction Agreement to which Buyer or an Affiliate of Buyer is named as a party on the signature pages thereto, and with respect to Transferred Entities named as a party on the signature pages thereto, the TSA, the Supply Agreement, the IP Cross License Agreement, and the Trademark Co-Existence Agreement.

"**Buyer Transactions**" means the transactions contemplated by the Buyer Transaction Agreements.

"**Canadian Tax Escrow Agent**" means Norton Rose Fulbright Canada LLP.

"**Canadian Tax Escrow Agreement**" means the Canadian Tax Escrow Agreement, in form and substance reasonably acceptable to Seller and Buyer.

**HIGHLY CONFIDENTIAL**

"**CapEx Budget**" means the capex budget entitled "**Americas Capex Forecast**" (data room location 6.2.1.3.1) provided by or on behalf of Seller to Buyer on or prior to the Agreement Date.

"**Cash**" means all cash and cash equivalents, including marketable securities and short-term investments, calculated in accordance with GAAP and the Seller Parties' and the Transferred Entities' books and records. For the avoidance of doubt, Cash shall be calculated (i) net of any outstanding checks, outstanding drafts, outstanding wire transfers and outstanding debit transactions written or made from the accounts of the Seller Parties or any of the Transferred Entities, (ii) to exclude cash required to collateralize any letters of credit, performance bonds, surety bonds or other similar instruments or cash subject to legal or other restrictions, including deposits with third parties and other "**restricted**" cash, and (iii) to include checks, other wire transfers and drafts available for deposit for the account of the Seller Parties or any of the Transferred Entities.

"**Cash Amount**" means, at any time, the aggregate amount of Cash of the Seller Parties and the Transferred Entities, calculated in accordance with GAAP, at such time.

"**Change**" has the meaning set forth in the definition of "**Material Adverse Effect**".

"**Closing Conditions**" means the conditions to the respective obligations of the Parties to consummate the Transactions contemplated by this Agreement, in each case, as set forth in Article X.

"**COBRA**" means the continuation of coverage requirements under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any written agreement between Seller or its Affiliates with a Union representing any Covered Employees that governs the terms and conditions of employment whether or not such agreement is expired by its terms.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of March 26, 2020, as amended by that certain Amendment No. 1, dated as of April 30, 2020, by and between Quexco Incorporated and Exide Holdings, Inc., as the same may be amended from time to time in accordance with its terms.

"**Consent**" means any consent, approval or authorization.

"**Contract**" means any written contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"**Control**" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities,

**HIGHLY CONFIDENTIAL**

by Contract or otherwise. The terms "**Controlled by**," "**Controlled**," "**under common Control with**" and "**Controlling**" shall have correlative meanings.

"**Covered Employee**" means any employee of (i) any Transferred Entity or (ii) any Seller Party that is primarily dedicated to the Business, other than those employees listed on Schedule 6.10(a).

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate the assumption by the applicable Seller Party who is a Debtor, and the assignment to Buyer, of the Transferred Contracts to which such Seller Party is party, as determined by the Bankruptcy Court or agreed to by Seller and the non-Seller counterparty to the applicable Transferred Contract.

"**Data**" means databases and compilations, including all data and collections of data, whether machine readable or otherwise.

"**Debt**" means financial indebtedness for borrowed money from third party lending sources (excluding, for the avoidance of doubt, operating leases and capital leases which are Transferred Contracts), calculated in accordance with GAAP and the Seller Parties' and Transferred Entities' books and records.

"**Debtors**" means Seller and each of the Subsidiaries of Seller set forth on Schedule B.

"**Debtors TSA**" means the transition services agreement among the Buyer and its Affiliates, and the applicable Seller Parties and their Affiliates (other than the Transferred Entities) pursuant to which certain transitional estate services will be provided, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**Disclosure Schedules**" means the disclosure schedules, dated as of the Agreement Date (as may be amended, updated, or supplemented pursuant to Section 6.17) delivered by Seller to Buyer, which form a part of this Agreement.

"**Effective Time**" means 12:01 a.m. (local time) on the Closing Date.

"**Employee Plans**" means all employee benefit plans (within the meaning of Section 3(3) of ERISA), and each other material retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, employment, retention, termination, or severance programs or agreements, in each case, pursuant to which any of the Seller Parties or Transferred Entities currently has any obligation with respect to any Covered Employee or former employee of a Transferred Entity , other than statutorily required plans or arrangements (including, for the avoidance of doubt, employment contracts as required by the Laws of any applicable local jurisdiction).

"**Environmental Law**" means any applicable U.S. federal, state, local or non-U.S. statute, Law, ordinance, regulation, rule, code, Order or other legally-binding requirement or rule of Law (including common Law) promulgated by a Government Authority relating to pollution or

HIGHLY CONFIDENTIAL

protection of the environment or worker health and safety as related to exposure to hazardous substances.

"**Environmental Liability**" means any Liability arising under Environmental Law.

"**Environmental Permit**" means any Permit that is required by a Government Authority under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means, with respect to Seller, any other Person that is a member of a controlled group for purposes of Section 4001(a)(14) of ERISA or that is treated as a single employer for purposes of Section 414 of the Code.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of July 10, 2020, by and between Seller and Escrow Agent.

"**Estimated Cash Amount**" means Seller's good faith estimate of the Cash Amount as of the Effective Time.

"**Estimated Cash Amount Decrease**" means the amount (if any) by which the Target Cash Amount exceeds the Estimated Cash Amount set forth on the Estimated Closing Statement.

"**Estimated Cash Amount Increase**" means the amount (if any) by which the Estimated Cash Amount set forth on the Estimated Closing Statement exceeds the Target Cash Amount.

"**Estimated Transferred Entity Debt**" means Seller's good faith estimate of Transferred Entity Debt as of the Effective Time.

"**Estimated Working Capital**" means Seller's good faith estimate of Net Working Capital as of the Effective Time.

"**Estimated Working Capital Decrease**" means the amount, if any, by which the Target Working Capital exceeds the Estimated Working Capital set forth on the Estimated Closing Statement.

"**Estimated Working Capital Increase**" means the amount, if any, by which the Estimated Working Capital set forth on the Estimated Closing Statement exceeds the Target Working Capital.

"**Europe/ROW Buyer**" means the Successful Bidder of the Europe/ROW Assets (each as defined in the Bidding Procedures).

"**Europe/ROW Closing**" means the consummation of the sale of the Europe/ROW Assets (as defined in the Bidding Procedures) to the Europe/ROW Buyer.

"**Exhibits**" means the exhibits attached hereto as of the Agreement Date (and as may be amended from time to time in accordance herewith) which form a part of this Agreement.

Exhibit A-5

HIGHLY CONFIDENTIAL

"**Final Closing Statement**" means a written statement (a) setting forth, (i) the amount of any Final Working Capital Increase or any Final Working Capital Decrease, as applicable, (ii) the Final Working Capital, (iii) the Final Transferred Entity Debt, (iv) the Final Cash Amount, (v) the amount of any Final Cash Amount Increase or Final Cash Amount Decrease, as applicable, and (vi) the Post-Closing Adjustment and (b) indicating any changes to the Estimated Closing Statement as finally determined pursuant to Section 3.05.

"**Final Cash Amount**" means the Cash Amount as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Cash Amount Decrease**" means the amount (if any) by which the Target Cash Amount exceeds the Final Cash Amount.

"**Final Cash Amount Increase**" means the amount (if any) by which the Final Cash Amount exceeds the Target Cash Amount.

"**Final Order**" means an Order that is unstayed and in effect and as to which (i) the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"**Final Transferred Entity Debt**" means the Transferred Entity Debt as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Working Capital**" means the calculation of the Net Working Capital as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Working Capital Decrease**" means the amount (if any) by which the Target Working Capital exceeds the Final Working Capital.

"**Final Working Capital Increase**" means the amount (if any) by which the Final Working Capital exceeds the Target Working Capital.

"**Fraud**" means, with respect to any Party, an actual and intentional misrepresentation of fact with respect to the making of the representations and warranties set forth in this Agreement, provided that such actual and intentional misrepresentation will only be deemed to have occurred if the representations and warranties made by such Party were breached or inaccurate when made with the specific intention that the other Party relies thereon to its detriment.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Government Authority**" means any U.S. federal, state or local or any supra-national, territorial or non-U.S. government, political subdivision, governmental, regulatory or

**HIGHLY CONFIDENTIAL**

administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral (public or private) body.

"**Hazardous Materials**" means any substance, material or waste that is defined or regulated as "**hazardous**," "**toxic**," or as a "**pollutant**," "**contaminant**," "**waste**," or words of similar meaning and regulatory effect under any applicable Environmental Law, including, but not limited to, (a) any petroleum or petroleum product, oil or waste oil; (b) any asbestos or polychlorinated byphenyls; and (c) any other chemical, material or substance (whether solid, liquid or gaseous), the exposure to which or whose discharge, emission, disposal or Release is prohibited, limited or regulated under any applicable Environmental Law.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Insurance Policies**" means, collectively, all policies and programs of or agreements for insurance and interests in insurance pools and programs (in each case, including self-insurance and insurance from Affiliates).

"**Intellectual Property**" means any and all of the following intellectual property rights, title, or interest in or arising under the Laws of the U.S. or any other country: (a) patents, patent applications, and patent rights, including any such rights granted upon any reissue, reexamination, renewal, division, extension, continuation, or continuation-in-part; (b) copyrights, "**moral**" rights, mask work rights, rights in works of authorship, database rights and design rights, whether or not registered or published, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; (c) Trademarks; (d) Trade Secrets; (e) Internet domain names; and (f) all other intellectual property rights relating to Technology.

"**Interest Rate**" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

"**International Trade Laws**" shall mean any applicable Law, regulation, or legal requirement concerning the importation, exportation, re-exportation or deemed exportation of items, technical data, or technology, foreign  including the Tariff Act of 1930 and other Laws relating to the import of items into the U.S. administered by U.S. Customs and Border Protection; the Export Administration Regulations, 15 C.F.R. Part 730 et seq.; the Foreign Trade Regulations, 15 C.F.R. Part 30; the Arms Export Control Act; the International Traffic in Arms Regulations, 22 C.F.R. Part 120-130; executive orders and Laws administered by OFAC; the International Emergency Economic Powers Act; the Trading With the Enemy Act; the anti-boycott Laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury; and export control and trade sanctions Laws administered by the Member States of the European Union.

"**IP Assignment Agreement**" means the IP Assignment Agreement, in the form attached hereto as Exhibit D.

"**IP Cross License Agreement**" means a non-exclusive intellectual property cross license agreement, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

HIGHLY CONFIDENTIAL

"**IRS**" means the U.S. Internal Revenue Service.

"**Joint Written Instructions**" means written instructions from Seller and Buyer, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the Escrowed Funds as provided for under this Agreement.

"**Knowledge of Seller**" means the actual knowledge of the Persons listed on Schedule 1.01.

"**Law**" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"**Leased Real Property**" means the Transferred Leased Real Property and any real property that is leased, subleased or licensed by any Transferred Entity, in each case, granting the Seller Parties and/or the Transferred Entities a right of use or occupancy in such real property.

"**Leases**" means the real property leases and subleases governing the Leased Real Property, including the Transferred Leases.

"**Liabilities**" means any liability, Debt, guarantee, claim, demand, expense, commitment, damages, assurances or obligation (whether direct or indirect, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind.

"**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance or occurrence (each, a "**Change**") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, operations, properties, assets or condition (financial or otherwise) of the Business; provided, that none of the following, either alone or in combination, will constitute a Material Adverse Effect: (i) any Change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (ii) any Change that generally affects any industry in which the Business operates; (iii) general business or economic conditions in any of the geographical areas in which the Transferred Entities or the Business operates; (iv) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, cyber-attack, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, cyber-attack, sabotage or terrorism or military actions, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war; (v) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event, or any global health conditions (including any epidemic, pandemic, or other outbreak of illness, including as a result of the COVID-19 virus or other disease or virus, or any actions by a Government Authority related to the foregoing); (vi) any actions taken by the Buyer or its Affiliates or specifically permitted to be taken or omitted by any Seller Party or Transferred Entity pursuant to this Agreement or any other Transaction Agreement or actions taken or omitted

**HIGHLY CONFIDENTIAL**

to be taken by any Seller Party or Transferred Entity at the request or with the consent of Buyer; (vii) any Changes in applicable Laws or GAAP (or other relevant accounting rules); (viii) any Change resulting from the filing or pendency of the Bankruptcy Cases, actions taken in connection with the Bankruptcy Cases, or any reasonably anticipated effects of such filing, pendency or actions, or from any action approved by the Bankruptcy Court; (ix) any Change resulting from the public announcement of the entry into this Agreement, compliance with terms of this Agreement or the consummation of the Transactions; (x) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; or (xi) any effects or Changes arising from or related to the breach of this Agreement by Buyer; provided, further, that the exceptions set forth in clauses (i) through (v) of this definition shall not be regarded as exceptions solely to the extent that any such described Change has a disproportionately adverse impact on the Business, as compared to other companies similarly situated in the industries in which the Business operates.

"**Modified Labor Agreement**" means a new Collective Bargaining Agreement with an Affected Union that is entered into by Buyer and an Affected Union.

"**Net Working Capital**" has the meaning set forth on Exhibit E.

"**OFAC**" means Office of Foreign Assets Control.

"**Order**" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Government Authority.

"**Ordinary Course of Business**" means the conduct and operation of the Business in the ordinary course taking into account the conduct of the Business since, and effect of, the COVID-19 pandemic.

"**Owned Real Property**" means the Transferred Owned Real Property and all owned and real property owned by any Transferred Entity together with (to the extent of such Seller Party's or Transferred Entity's interest therein) all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof and all servitudes, easements, privileges, rights-of-way, other surface use agreements and water use and rights agreements related thereto.

"**Permits**" means all permits, licenses, authorizations, clearances, registrations, concessions, grants, franchises, certificates, exemptions, variances, waivers and filings issued or required by any Government Authority under applicable Law, in each case, owned by the Seller Parties or the Transferred Entities and necessary for the operation of the Business.

"**Permitted Liens**" means the following Liens: (a) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings during which the Lien cannot be enforced against the applicable property or that may thereafter be paid without penalty, and for which adequate reserves have been established; (b) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, workmen, repairmen and other Liens imposed or permitted by Law in the Ordinary Course of Business with respect to payment of amounts that are not in default or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established; (c) Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance or other types of social security; (d) defects

Exhibit A-9

**HIGHLY CONFIDENTIAL**

or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering, or reasonably expected to materially interfere, with the ordinary course conduct of the Business; (e) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a Government Authority, provided, that the same does not prohibit the use of the Real Property for its current use; (f) Liens not created by the applicable Seller Party or the Transferred Entities that affect the underlying fee, lessor, licensor or sublessor interest of any Leased Real Property or real property over which such Seller Party (with respect to the Business) or the Transferred Entities have easement or other property rights; (g) right, terms or conditions of any leases, subleases, licenses or occupancy agreements for real property made available to Buyer, including title of a lessor under a capital or operating lease; (h) in the case of Intellectual Property, non-exclusive licenses granted in the Ordinary Course of Business and gaps or defects in the chain of title evident from the publicly-available records of the applicable Government Authority maintaining such records; (i) Liens incurred in the Ordinary Course of Business securing Liabilities that do not exceed $1,000,000 in the aggregate; and (k) any other Lien that will be cleared or discharged by the Bankruptcy Court.

"**Person**" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity or Governmental Authority.

"**Personal Data**" means any information in any media that identifies, or would reasonably be used to identify, a particular individual.

"**Post-Closing Adjustment**" means the amount (which may be positive or negative) equal to the sum of: (a) the Final Working Capital minus the Estimated Working Capital, (b) the Final Transferred Entity Debt minus the Estimated Transferred Entity Debt, and (c) the Final Cash Amount minus the Estimated Cash Amount.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is validly terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on and including the Closing Date.

"**Proposed Final Cash Amount**" means Buyer's good faith, proposed final calculation of the Cash Amount as of the Effective Time.

"**Proposed Final Transferred Entity Debt**" means Buyer's good faith, proposed final calculation of the Transferred Entity Debt as of the Effective Time.

"**Proposed Final Working Capital**" means Buyer's good faith, proposed final calculation of the Net Working Capital as of the Effective Time.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, depositing, escaping, leaching, dumping, disposing or migration of any Hazardous

**HIGHLY CONFIDENTIAL**

Materials, including the abandonment or discarding of barrels, containers and other receptacles containing any Hazardous Materials.

"**Related to the Business**" means (i) with respect to any Contract for Software, any such Contract that is (A) related to or used in the Business and (B) legally and operationally transferrable to Buyer as of the Closing Date and (ii) with respect to any other Contract, related to or used in the Business.

"**Reference Working Capital Statement**" has the meaning set forth in Exhibit E.

"**Representative**" of a Person, means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, financial advisors or other representatives of such Person.

"**Required Approvals**" means the approvals of the Government Authorities set forth on Schedule 10.01(b).

"**Restricted Person**" means any of the following: (i) any Person designated on the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, or the Sectoral Sanctions Identifications List, which are enforced by OFAC, or any Person owned 50% or more directly or indirectly by one or more Persons designated on such OFAC-enforced lists; (ii) any Person designated on any of the following lists enforced by BIS: the Denied Persons List, the Entity List, or the Unverified List; (iii) any Person designated on the Debarred Parties List, which is enforced by the U.S. State Department's Directorate of Defense Trade Controls; (iv) the list of Persons subject to nonproliferation sanctions maintained by the State Department; and (v) any Person on any other relevant restricted party list maintained by the European Union and the United Nations enforcement authorities.

"**Sale Order**" shall be an Order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Seller; provided, that it shall not be unreasonable for Buyer to reject any such Order that does not contain (a) provisions approving the Transactions contemplated by this Agreement, and (b) findings of fact, conclusions of Law and ordering provisions that (i) find that Buyer is a purchaser of the Acquired Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the sale is entitled to the protections of Section 363(m) of the Bankruptcy Code, (ii) find that Buyer and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code; and (iii) find that none of Buyer nor any Affiliate of Buyer nor any designee of Buyer is a successor to Sellers or the bankruptcy estate by reason of any theory of Law or equity, and none of the Buyer nor any Affiliate of Buyer nor any designee of Buyer shall assume or in any way be responsible for any liability of Sellers or the bankruptcy estate, except as otherwise expressly provided in this Agreement.

"**Seller Guarantees**" means, collectively, all letters of credit, guarantees, surety bonds, performance bonds and other financial assurance or other performance obligations issued or entered into by or on behalf of (or for the account of) Seller or any of its Affiliates (other than exclusively by the Transferred Entities) in connection with the Transferred Assets.

"**Seller Parties**" means Seller and any Affiliate of Seller designated by Seller as a "Seller Party".

**HIGHLY CONFIDENTIAL**

"**Seller Transaction Agreements**" means this Agreement and each other Transaction Agreement to which any Seller Party or any of its Affiliates (other than a Transferred Entity) is named as a party on the signature pages thereto.

"**Seller Transactions**" means the transactions contemplated by the Seller Transaction Agreements.

"**Software**" means all (a) computer programs, including all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, (c) databases and compilations, including any and all Data and collections of Data, whether machine readable or otherwise, (d) all documentation including user manuals and other training documentation relating to any of the foregoing, in each case, (a)-(d), and (e) Data.

"**Subsidiary**" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising Control.

"**Supply Agreement**" means a supply agreement among the Transferred Entities and the applicable Seller Party or its Affiliate, pursuant to which such Seller Party or its Affiliate shall supply or cause to be supplied Products, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**Systems**" means all the Software, hardware, network and telecommunications equipment and internet-related information Technology that are related to the Business and are material to the operation of the Business as conducted on the Agreement Date.

"**Target Cash Amount**" means $5,000,000.

"**Target Working Capital**" means $210,000,000.

"**Tax**" or "**Taxes**" means any tax, including any and all federal, state, local, foreign and other income, alternative or add-on minimum tax, excise, gross receipts, ad valorem, value-added (including VAT and the Canadian Goods and Services Tax), sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use, environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, real or personal property, escheat, unclaimed property, leasing, transfer, payroll, social security (or similar, including FICA), intangibles or any other tax, custom or duty of any kind whatsoever (whether payable directly or by withholding), or any governmental fee, assessment or charge in the nature of a tax, together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

**HIGHLY CONFIDENTIAL**

"**Tax Returns**" means all returns and reports (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds), real property transfer Tax returns and information returns), including amendments thereof and attachments thereto, required to be supplied to a Taxing Authority relating to Taxes.

"**Taxing Authority**" means any federal, state, local or foreign jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection of such Taxes for such jurisdiction.

"**Technology**" means, collectively, all Software, information, designs, formulae, algorithms, procedures, methods, models, discoveries, processes, techniques, ideas, know-how, technical Data, programs, subroutines, research and development, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice) apparatus, creations, improvements, works of authorship and other similar materials, and confidential, proprietary or non-public information, and all recordings, graphs, drawings, reports, analyses and other writings, and other tangible embodiments of the foregoing in any form whether or not listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"**Trade Secrets**" means confidential and proprietary information and know-how or trade secrets, including ideas, concepts, methods, techniques and inventions (whether patentable or unpatentable), and other works, whether or not developed or reduced to practice, rights in customer, vendor, and prospect lists.

"**Trademark Co-Existence Agreement**" means the trademark agreement, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**Trademarks**" means trademarks, service marks, trade names, service names, trade dress, logos and other identifiers of same, including all goodwill associated therewith, and all common Law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

"**Transaction Accounting Principles**" has the meaning set forth in Exhibit E.

"**Transaction Agreements**" means this Agreement, the TSA, the Debtors TSA, the Bill of Sale, Assignment and Assumption Agreement, the Transferred Leased Property Assignment and Assumption Agreement, the IP Cross License Agreement, the Trademark Co-Existence Agreement, the IP Assignment Agreement, the Supply Agreement, the Escrow Agreement, the Local Agreements, the Deeds and any other agreements, instruments or documents required to be delivered at the Closing, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

**HIGHLY CONFIDENTIAL**

"**Transfer Taxes**" means all sales, use, excise, gross receipts, ad valorem, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added (including VAT and Canadian goods and services Tax, harmonized sales Tax and provincial sales Tax), recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance, franchise, profits, gains, property registration, and similar non-income Taxes, motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings, together with any interest and any penalties, additions to Tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Transferred Books and Records**" means all books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and Data, sales and purchase correspondence, personnel and employment records related to the Business, other than any Tax Returns and any such books and records that constitute Excluded Assets, including those of the type described in Sections 2.02(b)(xiii), and 2.02(b)(xiv).

"**Transferred Entity Debt**" means the aggregate amount of any Debt of the Transferred Entities, calculated in accordance with GAAP, that remains unpaid as of immediately prior to the Closing.

"**Transferred Entity Employee Plans**" means all Employee Plans sponsored by a Transferred Entity.

"**Treasury Regulations**" means the regulations promulgated by the U.S. Department of the Treasury under the Code, as amended from time to time.

"**TSA**" means the transition services agreement among the Transferred Entities and the applicable Seller Party or its Affiliate pursuant to which certain transitional services will be provided, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**U.S.**" means the United States of America.

"**Union**" means any union or other employee representative body.

"**VAT**" means value-added tax.

"**WARN Act**" means Worker Adjustment and Retraining Notification Act of 1988

"**Wind-Up Date**" means the date upon which each Seller Party's corporate existence ceases to exist.

HIGHLY CONFIDENTIAL

2019 Audited Financial Statements ......................................................... Section 4.06(a)
2019 Interim Financial Statements ......................................................... Section 4.06(a)
Action ..................................................................................................... Exhibit A
Affected Union ....................................................................................... Exhibit A
Affiliate .................................................................................................. Exhibit A
Agreement Date ...................................................................................... Preamble
Agreement .............................................................................................. Exhibit A
Anti-Corruption Laws ...................................................... **Error! Reference source not found.**
Antitrust Laws ........................................................................................ Exhibit A
Assets ..................................................................................................... Exhibit A
Assumed Contract ................................................................................. Section 2.05(a)
Assumed Employee Plans ....................................................................... Exhibit A
Assumed Liabilities ............................................................................... Section 2.02(c)
Auction ................................................................................................... Section 8.04
Available Contracts List ........................................................................ Section 2.05(a)
Available Contracts ............................................................................... Section 2.05(a)
Back-Up Trigger Notice ........................................................................ Section 8.04
Back-Up Trigger Notice Date ................................................................ Exhibit A
Bankruptcy and Equity Exception ......................................................... Exhibit A
Bankruptcy Cases ...............................................................Preliminary Statements
Bankruptcy Code ...............................................................Preliminary Statements
Bankruptcy Court ...............................................................Preliminary Statements
Base Purchase Price ............................................................................... Section 3.01
Bidding Procedures Order ...................................................................... Exhibit A
Bill of Sale, Assignment and Assumption Agreement ...................... Section 3.03(a)(iii)
BMAL Transfer ...................................................................................... Section 6.18
Board ...................................................................................................... Exhibit A
Business Day ........................................................................................... Exhibit A
Business Intellectual Property ................................................................ Exhibit A
Business Registrable IP .......................................................................... Exhibit A
Business Technology .............................................................................. Exhibit A
Business .................................................................................................. Exhibit A
Buyer Transaction Agreements .............................................................. Exhibit A
Buyer Transactions ................................................................................ Exhibit A
Buyer ...................................................................................................... Preamble
Buyer's Allocation Notice ..................................................................... Section 3.07
Canada Restructuring ............................................................................ Section 6.06
Canadian Tax Escrow Agent ................................................................. Exhibit A
Canadian Tax Escrow Agreement ......................................................... Exhibit A
CapEx Budget ........................................................................................ Exhibit A
Cash Amount .......................................................................................... Exhibit A
Cash ........................................................................................................ Exhibit A
Causes of Action ................................................................................. Section 2.02(a)(xv)
Change .................................................................................................... Exhibit A
Closing Conditions ................................................................................. Exhibit A
Closing Date ........................................................................................... Section 2.04

**HIGHLY CONFIDENTIAL**

Closing Payment ........................................................................................Section 3.04
Closing Statement ......................................................................................Exhibit A
Closing .......................................................................................................Section 2.04
COBRA .......................................................................................................Exhibit A
Code ...........................................................................................................Exhibit A
Collective Bargaining Agreement .............................................................Exhibit A
Competing Transaction .............................................................................Section 8.02(a)
Confidentiality Agreement ........................................................................Exhibit A
Consent ......................................................................................................Exhibit A
Contract .....................................................................................................Exhibit A
Contracting Parties ....................................................................................Section 12.18
Control .......................................................................................................Exhibit A
Covered Employee .....................................................................................Exhibit A
Cure Costs ..................................................................................................Exhibit A
D&O Indemnified Parties ..........................................................................Section 7.02(a)
Data ............................................................................................................Exhibit A
Debt ...........................................................................................................Exhibit A
Debtors TSA ..............................................................................................Exhibit A
Debtors ......................................................................................................Exhibit A
Deeds .........................................................................................................Section 3.03(a)(xii)
Designation Notice ....................................................................................Section 2.05(a)
Determination Date ...................................................................................Section 2.05(a)
Disclosure Schedules .................................................................................Exhibit A
Dispute Notice ...........................................................................................Section 3.05(c)
Disputed Contract .....................................................................................**Error! Reference source not found.**
Effective Time ...........................................................................................Exhibit A
Embargoed Countries ................................................................................Section 4.21(e)
Employee Plans .........................................................................................Exhibit A
Environmental Law ....................................................................................Exhibit A
Environmental Liability .............................................................................Exhibit A
Environmental Permit ...............................................................................Exhibit A
ERISA .........................................................................................................Exhibit A
ERISA Affiliate .........................................................................................Exhibit A
Escrow Agent .............................................................................................Section 3.02
Escrow Agreement .....................................................................................Exhibit A
Escrowed Funds .........................................................................................Section 3.02
Estimated Cash Amount Decrease .............................................................Exhibit A
Estimated Cash Amount Increase ..............................................................Exhibit A
Estimated Cash Amount ............................................................................Exhibit A
Estimated Closing Statement ....................................................................Section 3.04
Estimated Target Cash Adjustment ...........................................................Exhibit A
Estimated Restricted Payments .................................................................Exhibit A
Estimated Transferred Entity Debt ...........................................................Exhibit A
Estimated Working Capital Decrease ........................................................Exhibit A
Estimated Working Capital Increase .........................................................Exhibit A
Estimated Working Capital ........................................................................Exhibit A

**HIGHLY CONFIDENTIAL**

Europe/ROW Buyer .................................................................................. Exhibit A
Europe/ROW Closing ............................................................................... Exhibit A
Exchange and 1L Notes Indenture .......................................................... Exhibit A
Excluded Assets ................................................................................ Section 2.02(b)
Excluded Causes of Action .......................................................... Section 2.02(b)(iv)
Excluded Contracts ........................................................................ Section 2.02(b)(i)
Excluded Policy Covered Loss ......................................................... Section 6.13(b)
Excluded Insurance Policy ............................................................... Section 6.13(b)
Excluded Liabilities ........................................................................ Section 2.02(d)
Excluded Policy Beneficiary ............................................................. Section 6.13(b)
Excluded Policy Holder ................................................................... Section 6.13(b)
Excluded Real Property .................................................................. Section 2.02(b)(i)
Exhibits .................................................................................................. Exhibit A
Exide Canada .................................................................................... Section 6.06
Final Cash Amount Decrease .................................................................. Exhibit A
Final Cash Amount Increase .................................................................. Exhibit A
Final Cash Amount ................................................................................ Exhibit A
Final Closing Statement ........................................................................ Exhibit A
Final Target Cash Adjustment ............................................................... Exhibit A
Final Restricted Payments .................................................................... Exhibit A
Final Transferred Entity Debt ............................................................... Exhibit A
Final Working Capital Decrease ............................................................ Exhibit A
Final Working Capital Increase ............................................................. Exhibit A
Final Working Capital ........................................................................... Exhibit A
Financial Statements ...................................................................... Section 4.06(a)
GAAP .................................................................................................... Exhibit A
Government Approvals .................................................................... Section 6.04(a)
Government Authority ........................................................................... Exhibit A
Hazardous Materials ............................................................................. Exhibit A
HSR Act ................................................................................................ Exhibit A
Independent Accounting Firm ......................................................... Section 3.05(d)
Insurance Policies ................................................................................. Exhibit A
Intellectual Property ............................................................................. Exhibit A
Interest Rate ......................................................................................... Exhibit A
International Trade Laws ....................................................................... Exhibit A
IP Assignment Agreement .............................................................. Section 3.03(a)(v)
IP Cross License Agreement ................................................................. Exhibit A
IRS ....................................................................................................... Exhibit A
Joint Written Instructions ..................................................................... Exhibit A
Knowledge of Seller .............................................................................. Exhibit A
Law ...................................................................................................... Exhibit A
Leased Real Property ............................................................................. Exhibit A
Leases ................................................................................................... Exhibit A
Liabilities ............................................................................................. Exhibit A
Lien ...................................................................................................... Exhibit A
Local Agreements .................................................... **Error! Reference source not found.**

Exhibit A-17

**HIGHLY CONFIDENTIAL**

Material Adverse Effect .................................................................Exhibit A
Material Contracts .................................................................. Section 4.12(a)
Modified Labor Agreement .....................................................Exhibit A
Multi employer Plan .................................................................. Section 4.13(c)
Net Working Capital .................................................................Exhibit A
Nonparty Affiliates .................................................................Section 12.18
Noteholder .................................................................Exhibit A
OFAC .................................................................Exhibit A
Order .................................................................Exhibit A
Ordinary Course of Business .....................................................Exhibit A
Outside Date .................................................................. Section 11.01(d)
Owned Real Property .................................................................Exhibit A
Parties .................................................................Preamble
Permits .................................................................Exhibit A
Permitted Liens .................................................................Exhibit A
Person .................................................................Exhibit A
Personal Data .................................................................Exhibit A
Post-Closing Adjustment .....................................................Exhibit A
Pre-Closing Period .................................................................Exhibit A
Pre-Closing Tax Period .............................................................Exhibit A
Privacy Policies .................................................................Section 2.02(b)(xiii)
Proposal Final Cash Amount .....................................................Exhibit A
Proposed Final Closing Statement .......................................... Section 3.05(a)
Proposed Final Target Cash Adjustment .................................Exhibit A
Proposed Final Transferred Entity Debt .................................Exhibit A
Proposed Final Working Capital .............................................Exhibit A
Purchase Price Allocation .................................................Section 3.04
Purchase Price .................................................................Section 3.01
RCRA .................................................................Section 4.11(d)
Reference Working Capital Statement.......................................Exhibit A
Related to the Business .................................................................Exhibit A
Release .................................................................Exhibit A
Representative .................................................................Exhibit A
Required Approvals .................................................................Exhibit A
Resolution Period .................................................................Section 3.05(c)
Restricted Person .................................................................Exhibit A
Restricted Transfer .................................................................Section 2.03
Review Period .................................................................Section 3.05(b)
Sale Order .................................................................Exhibit A
Securities Act .................................................................Exhibit A
Seller Guarantees .................................................................Exhibit A
Seller Parties .................................................................Exhibit A
Seller Transaction Agreements .............................................Exhibit A
Seller Transactions .................................................................Exhibit A
Seller .................................................................Preamble
Seller's Banker .................................................................Section 4.16

Exhibit A-18

**HIGHLY CONFIDENTIAL**

Significant Schedule Supplement ...........................................................Section 6.17
Software ..........................................................................................Exhibit A
Straddle Period..................................................................................Section 9.02
Subsidiary ........................................................................................Exhibit A
Supply Agreement ..............................................................................Exhibit A
Systems ...........................................................................................Exhibit A
Target Cash Amount................................................................ Section 2.02(a)(xvii)
Target Working Capital ........................................................................Exhibit A
Tax Returns .......................................................................................Exhibit A
Tax ..................................................................................................Exhibit A
Taxes ...............................................................................................Exhibit A
Taxing Authority ................................................................................Exhibit A
Technology .......................................................................................Exhibit A
Third Party Consents..........................................................................Section 6.05
Ticking Fee .......................................................................................Exhibit A
Title IV Plan ................................................................................ Section 4.13(e)
Trade Secrets.....................................................................................Exhibit A
Trademark Co-Existence Agreement ......................................................Exhibit A
Trademarks .......................................................................................Exhibit A
Transaction Accounting Principles .........................................................Exhibit A
Transaction Agreements ......................................................................Exhibit A
Transaction Dispute ...........................................................................Section 12.13
Transactions .....................................................................................Exhibit A
Transfer Taxes ...................................................................................Exhibit A
Transferred Assets ........................................................................ Section 2.02(a)
Transferred Books and Records .............................................................Exhibit A
Transferred Contracts .................................................................. Section 2.02(a)(iii)
Transferred Covered Loss.............................................................. Section 6.13(a)
Transferred Employee.................................................................. Section 6.10(a)
Transferred Entities ............................................................Preliminary Statements
Transferred Entity Debt .......................................................................Exhibit A
Transferred Entity Employee Plans ........................................................Exhibit A
Transferred Entity .............................................................Preliminary Statements
Transferred Equity Interests.................................................Preliminary Statements
Transferred Insurance Policies........................................................ Section 2.02(a)(xxi)
Transferred Leased Property Assignment and Assumption Agreement............ Section 3.03(a)(iv)
Transferred Leased Real Property ................................................... Section 2.02(a)(ii)
Transferred Leases ...................................................................... Section 2.02(a)(ii)
Transferred Owned Real Property ................................................... Section 2.02(a)(i)
Transferred Permits.................................................................... Section 2.02(a)(iv)
Transferred Policy Beneficiary ....................................................... Section 6.13(a)
Transferred Policy Holder.............................................................. Section 6.13(a)
Treasury Regulations ..........................................................................Exhibit A
TSA .................................................................................................Exhibit A
U.S. .................................................................................................Exhibit A
Union................................................................................................Exhibit A

Exhibit A-19

**HIGHLY CONFIDENTIAL**

VAT ........................................................................................................................Exhibit A
WARN Act...............................................................................................................Exhibit A
Wind-Up Date

Exhibit A-20

**HIGHLY CONFIDENTIAL**

## SCHEDULE A

Transferred Entities; Transferred Equity Interests

| Applicable Seller Party | Transferred Entity | Transferred Equity Interests |
|---|---|---|
| Exide Technologies, LLC | GNB Battery Technologies Japan, Inc. | 1 share of common stock |
| Exide Technologies, LLC | Exide de Mexico S. de R.L. de C.V. | 1participation unit valued at $2,999.00 MxCy |
| Exide Delaware LLC | | 1 participation unit valued at $1.00 MxCy |
| Exide Technologies, LLC | Exide Technologies do Brasil Limitada | 3,925,404 limited company quotas |
| Exide Technologies, LLC | Exide Illinois, Inc. | 100 shares of common stock |
| Exide Technologies, LLC | RBD Liquidation, LLC | 10 units |
| Exide Technologies, LLC or another Seller Party (subject to completion of the restructuring contemplated in Section 6.06). | Exide Technologies Canada Corporation | 3,974,120 shares of common stock |

Schedule A-1

**HIGHLY CONFIDENTIAL**

**SCHEDULE B**

<u>Debtors</u>

1. Exide Holdings, Inc.
2. Exide Technologies, LLC
3. Dixie Metals Company
4. Refined Metals Corporation
5. Exide Delaware, LLC

**HIGHLY CONFIDENTIAL**

## SCHEDULE C

<u>Certain Transaction Agreements Key Terms</u>

**IP Cross License Agreement**

Pursuant to the IP Cross License Agreement, (1) Seller Party and its Affiliates (other than the Transferred Entities) will grant the Transferred Entities a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid-up, non-transferable (except to an Affiliate or acquirer or successor of any or all business lines), non-sublicensable (except to customers, suppliers, distributors and end-users) right, license and covenant not to sue to use, practice and otherwise exploit the Exide Licensed IP and (2) the Transferred Entities and their Affiliates will grant Seller Party and its Affiliates (other than the Transferred Entities) a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid-up, non-transferable (except to an Affiliate or acquirer or successor of any or all business lines), non-sublicensable (except to customers. suppliers, distributors and end-users), right, license and covenant not to sue to use, practice and otherwise exploit the Company Licensed IP.  The IP Cross License Agreement will not contain any obligations regarding technology transfer or require access to any materials or documentation in the possession of a party.  Any developments or improvements with respect to any Intellectual Property licensed under the IP Cross License Agreement shall be owned by the Person that made such development or improvement, as the case may be, and shall not be subject to any cross-license.

- "**Exide Licensed IP**" means the Intellectual Property (other than Trademarks and rights arising from or in respect of domain names) that is owned or controlled by Seller Party and its Affiliates (other than the Transferred Entities) as of Closing.

- "**Company Licensed IP**" means the Intellectual Property (other than Trademarks and rights arising from or in respect of domain names) that is owned or controlled by the Transferred Entities as of Closing.

**Trademark Co-Existence Agreement**

Pursuant to the Trademark Co-Existence Agreement, by and among the Seller Party and/or its Affiliate(s) (other than the Transferred Entities) and the Transferred Entities, (1) Seller Party and its Affiliates (other than the Transferred Entities) will consent to Buyer and the Transferred Entities' exclusive ownership and continued use of the Relevant Co-Existence Marks in the Americas (*i.e.*, all jurisdictions in North America and South America), and (2) the Transferred Entities will consent to Seller Party and its Affiliates' (other than the Transferred Entities') exclusive ownership and continued use of the Relevant Co-Existence Marks in EMEA/APAC (which includes any and all countries that are not in the Americas). The Trademark Co-Existence Agreement shall be freely assignable in whole or in part to any person who acquires any right in any of the Relevant Co-Existence Marks.

Schedule C-1

**HIGHLY CONFIDENTIAL**

- "**Relevant Co-Existence Marks**" means the Trademarks designated as "Y" in the Relevant Co-Existence Marks column of <u>Schedule 4.10(a)</u>, which include, without limitation, "EXIDE", "GNB", "ABSOLYTE", "MARATHON", "SPRINTER", and "TENSOR" in block letters or otherwise, and the Exide, GNB, Absolyte, Marathon, Sprinter, and Tensor logo, either alone or in combination with other words, logos, symbols, or devices and all Trademarks and internet domain names confusingly similar to or embodying any of the foregoing either alone or in combination with other words.

**Supply Agreement**

Pursuant to the Supply Agreement:

(a) the Seller Party and/or its Affiliates' (other than the Transferred Entities) will agree to the long-term supply to the Transferred Entities of:

    (i) products supplied by Seller Party and/or its Affiliates' (other than the Transferred Entities), or by Europe/ROW Buyer this Agreement or at any time in the future during the term of the Supply Agreement, in such reasonable quantities as the Parties shall reasonably agree and set forth in the definitive agreement, under the Sonnenschein and Dryfit brands (provided that the Transferred Entities and their Affiliates shall have the exclusive rights to obtain such supply as well as to market, sell and distribute such products in the Americas and none of Seller Party and/or its Affiliates' (after giving effect to the Closing) shall market, supply, sell or distribute such products under any brand or in white label form in the Americas, other than, in each case, to supply the Transferred Entities); and

    (ii) other products supplied to the Transferred Entities by the Seller Party and its Affiliates' (other than the Transferred Entities) business to be acquired by the Europe/ROW Buyer as of the date of this Agreement that are mutually agreed by the Parties and set forth in the definitive agreement; and

    (iii) The Transferred Entities will be granted an exclusive license under the SONNENSCHEIN and DRYFIT Trademarks (in block letters or otherwise and including the Sonnenschein and Dryfit logos, either alone or in combination with other words, logos, symbols, or devices and all Trademarks confusingly similar to or embodying any of the foregoing either alone or in combination with other words) for the sales and distribution of the products described in subparts (a)(i) and (ii) in the Americas; <u>provided</u>, that the Transferred Entities shall not (i) use such Trademarks in any manner, forms or formats other than those that are in use as of the Closing or otherwise consistent with the manner, forms or formats of such Trademarks in use by Seller Party and/or its Affiliates' (other than the Transferred Entities), or the Europe/ROW Buyer at any time during the future during the term of the Supply Agreement, (ii) use such Trademarks in combination with other words, logos, symbols,

**HIGHLY CONFIDENTIAL**

or devices except as permitted in clause (i) herein, or (iii) use any Trademarks confusingly similar to SONNENSCHEIN or DRY FIT, except as permitted in clause (i) herein.

**TSA**

Pursuant to the TSA, Seller Party and/or its Affiliates (other than the Transferred Entities), on the one hand, and the Transferred Entities, on the other hand, will each provide or cause to be provided certain transitional services to the other. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were provided immediately prior to Closing. Such services will be provided for specified durations up to twelve (12) months and at the service provider's costs plus a pro rata allocation of overhead, an administration fee, and employee time billed at base hourly rates plus a pro rata allocation of payroll expenses.

**Debtors TSA**

Pursuant to the Debtors TSA, Buyer will provide or cause to be provided certain transitional estate services to Seller Party and its Affiliates (other than the Transferred Entities). Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were performed or provided immediately prior to Closing. Such services will be provided for specified durations up to twelve (12) months and at the service provider's costs plus a pro rata allocation of overhead, an administration fee, and employee time billed at base hourly rates plus a pro rata allocation of payroll expenses.

**Assignment:** Each party to the agreements on this Schedule C may assign such agreement (in whole or in part) to its Affiliate or an acquirer of any or all of the business lines of it and its Affiliates.

Schedule C-3

# **<u>TAB 5</u>**

**Notice of Successful Bidders for Americas Assets and
Europe/ROW Assets, dated July 23, 2020 [Bankr. D.I. 591]**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
----------------------------------------------------------- x
                                          :
In re                                     :      Chapter 11
                                          :
EXIDE HOLDINGS, INC., et al.,             :      Case No. 20–11157 (CSS)
                                          :
        Debtors.¹                         :      (Jointly Administered)
                                          :
----------------------------------------------------------- x
```

### NOTICE OF SUCCESSFUL BIDDERS FOR
### AMERICAS ASSETS AND EUROPE/ROW ASSETS

**PLEASE TAKE NOTICE THAT:**

1.      On July 23, 2020, the Debtors filed a *Notice of Qualified Bids and Designation of Baseline Bid with Respect to Americas Assets* (Docket No. 589) (i) qualifying the bid of Battery BidCo LLC for substantially all of the Americas Assets² pursuant to that certain Stock and Asset Purchase Agreement by and among Exide Technologies, LLC, Battery BidCo LLC ("**Battery BidCo**"), and, solely for purposes of Sections 12.17, 12.18 and 12.23, Atlas Capital Resources III LP (the "**Americas Agreement**"),³ (ii) designating the bid of Battery BidCo as the Baseline Bid for the Americas Assets at the Auction, and (iii) announcing that the highest or otherwise best offer for the Europe/ROW Assets was submitted by the Europe/ROW Staking Horse Credit Bidder (the "**Successful Europe/ROW Bidder**," and the Successful Europe/ROW Bidder's winning bid, the "**Successful Europe/ROW Bid**").

2.      On July 23, 2020, the Debtors commenced the Auction and announced that the highest or otherwise best offer for the Americas Assets was submitted by Battery BidCo (the "**Successful Americas Bidder**," and the Successful Americas Bidder's winning bid, the "**Successful Americas Bid**").  Accordingly, the bid submitted by Battery BidCo is the Successful Bid for the Americas Assets.

3.      The Debtors will seek entry of orders (collectively, the "**Sale Orders**") approving the Sale Transactions, free and clear of liens, claims, encumbrances and other interests, to the extent

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

²       Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order (Docket No. 344).

³       A copy of the Americas Agreement is attached to the *Notice Of Qualified Bids And Designation of Baseline Bid With Respect To Americas Assets* as Exhibit A.

permissible by law, at the hearing scheduled for **August 6, 2020 at 2:00 p.m. (Eastern Time)** (the "**Sale Hearing**").  The Sale Hearing may be adjourned to a later date as determined by the Debtors.

4.      The terms of the sales will be governed by the Sale Orders, the Americas Agreement, and the Europe/ROW Agreement[4] (collectively, the "**Agreements**").  The proposed Sale Orders will be filed with the Bankruptcy Court prior to the Sale Hearing.

5.      The deadline to object to the proposed Sale Transactions (each an "**Objection**") is **July 30, 2020 at 12:00 p.m. (Eastern Time)**.  Objections that are timely filed with the Bankruptcy Court in accordance with the Bidding Procedures Order and served on the Objection Notice Parties (as identified and defined in the Bidding Procedures), if any, will be heard at the Sale Hearing.

Dated:  July 23, 2020
      Wilmington, Delaware

/s/ Brendan J. Schlauch
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

---

[4]      "**Europe/ROW Agreement**" means that certain Stock and Asset Purchase Agreement attached to the *Notice of Europe/ROW Stalking Horse Agreement* (Docket No. 324) as <u>Exhibit B</u>.

# **TAB 6**

**Mediators' Final Certificate of Completion File Pursuant to Order Granting Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary, dated July 28, 2020 [Bankr. D.I. 622]**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------ x
                        :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **EXIDE HOLDINGS, INC.,** *et al.*, | : | **Case No. 20-11157 (CSS)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |
| | | Re: Docket Nos. 37, 242, 563 |

------------------------------------------------------------ x

**MEDIATORS' FINAL CERTIFICATE OF COMPLETION FILED PURSUANT TO**
**ORDER GRANTING MOTION OF DEBTORS FOR AUTHORIZATION TO**
**(I) IMPLEMENT MANDATORY SETTLEMENT PROCEDURES FOR**
**NON-PERFORMING PROPERTIES AND**
**(II) ABANDON SUCH PROPERTIES, IF NECESSARY**

COME NOW Hon. Joseph J. Farnan, Jr. (Ret.), Hon. Judith K. Fitzgerald (Ret.), Hon. Richard S. Schmidt (Ret.), Hon. John L. Wagner (Ret.), and John DeGroote, Esq. (the "**Mediators**") and submit this Final Certificate of Completion, stating as follows:

1.         With the agreement of the parties to the Mediation (the "**Participants**"), all five Mediators took part in global mediation sessions.

2.         Pursuant to the Order Governing Settlement Procedures with Governmental Agencies Relating to Non-Performing Properties [Doc. 242] (the "**Order**"), the Mediators presided over multiple global mediation sessions and sessions with individual groups of Participants commencing on July 7, 2020 and continuing through and including July 27, 2020 (the "**Mediation Period**").

3.      In addition, the Mediators met throughout the Mediation Period in private conference.

4.      All sessions and conferences were designed to assist the Participants in reaching a global settlement of their disputes concerning environmental and related issues (the "**Disputes**").

5.      Pursuant to the Order, the Mediators were required to file a Certificate of Completion by July 17, 2020.  *See* Doc. 242 at p. 10 of 15, "MEDIATION STAGE, ¶ K" ("No later than July 17, 2020 (unless extended by agreement of the parties or the Court), the Mediator shall file with the Court a certificate (a "**Certificate of Completion**") stating whether or not a settlement has been reached. Regardless of the outcome of the Mediation, the Mediator shall not provide the Court with any details of the substance of the Mediation.").

6.      By agreement of the Participants, the due date of the Certificate of Completion was extended from July 17, 2020 until July 24, 2020.  *See* Doc. 563.

7.      The Mediators filed a Certificate of Completion on July 24, 2020 [Doc. 595] explaining that a **Mediators' Proposal** had been circulated to the Participants and was under review by the Mediators.  No settlement had been agreed upon as of that date.

8.      Mediators took into account all comments of the Participants and, on July 26, 2020, circulated to the Participants a Memorandum incorporating various suggestions as revisions to the Mediators' Proposal, with acceptances or rejections of the final proposal due by 6:00 P.M. Eastern Prevailing Time on Monday, July 27, 2020.

9.      Throughout the Mediation Period, the Participants worked diligently to address complex, intricate issues in a compressed time and the Mediators wish to advise the Court that

they appreciate the effort and cooperation of each Participant in achieving compromises, without which global resolution could not be achieved.

10.     The Mediators are pleased to report that the Mediators' Proposal, as revised by Memoranda dated July 22, 2020 and July 26, 2020 and e-mails dated July 23, 2020, all as circulated to the Participants, has been accepted by all Participants. This acceptance resulted in a global resolution of the Disputes which, *inter alia*, requires the Debtors to incorporate the settlement into a confirmed plan and becomes effective pursuant to a confirmed plan.

11.     The Mediators also report that the Participants still must implement the global resolution, and the Mediators stand read to assist, if that assistance would be helpful to the process.

WHEREFORE the Mediators submit this Final Certificate of Completion.

Dated:  July 28, 2020                    Respectfully submitted:

                                         /s/ Joseph J. Farnan, Jr.

                                         /s/ Judith K. Fitzgerald

                                         /s/ Richard S. Schmidt

                                         /s/ John L. Wagner

                                         /s/ John DeGroote

**CERTIFICATE OF SERVICE**

I, Judith K. Fitzgerald, Esquire, do hereby certify that on this 28th day of July, 2020, a copy of the foregoing "Mediators' Final Certificate Of Completion Filed Pursuant To Order Granting Motion Of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties And (Ii) Abandon Such Properties, If Necessary" was filed electronically and served by CM/ECF upon all counsel of record.

FOR THE MEDIATORS:

/s/ *Judith K. Fitzgerald*

Judith K. Fitzgerald, Esq.
PA ID 18110
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA  15222
Phone: 412-566-1212
Fax: 412-594-5619
Email: jfitzgerald@tuckerlaw.com

# **TAB 7**

**Clarification to Mediators' Final Certificate of Completion Filed
Pursuant to Order Granting Motion of Debtors For Authorization
To (I) Implement Mandatory Settlement Procedures For
Non-Performing Properties and (II) Abandon Such Properties,
If Necessary, dated July 29, 2020 [Bankr. D.I. 636]**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
----------------------------------------------------------- x
                                          :
In re                                     :        Chapter 11
                                          :
EXIDE HOLDINGS, INC., et al.,             :        Case No. 20-11157 (CSS)
                                          :
        Debtors.¹                         :        (Jointly Administered)
                                          :
                                          :        Re: Docket Nos. 37, 242, 563
----------------------------------------------------------- x
```

**CLARIFICATION TO MEDIATORS' FINAL CERTIFICATE OF COMPLETION**
**FILED PURSUANT TO ORDER GRANTING MOTION OF DEBTORS FOR**
**AUTHORIZATION TO**
**(I) IMPLEMENT MANDATORY SETTLEMENT PROCEDURES FOR**
**NON-PERFORMING PROPERTIES AND**
**(II) ABANDON SUCH PROPERTIES, IF NECESSARY**

COME NOW Hon. Joseph J. Farnan, Jr. (Ret.), Hon. Judith K. Fitzgerald (Ret.), Hon. Richard S. Schmidt (Ret.), Hon. John L. Wagner (Ret.), and John DeGroote, Esq. (the "**Mediators**") and submit this Clarification to the Final Certificate of Completion, stating as follows:

1.       On July 28, 2020, the Mediators filed their Final Certificate of Completion [Doc. 622].

2.       The Mediators reported that the Mediators' Proposal, as revised by Memoranda dated July 22, 2020 and July 26, 2020 and e-mails dated July 23, 2020 (the "**Mediators' Final Proposal")**, all as circulated to the Participants, has been accepted by all Participants.

3.      It has come to the attention of the Mediators that a clarification should be filed and the Mediators therefore file this Clarification to their Final Certificate of Completion.

4.      The Mediators clarify that, as stated in Paragraph 15 of the July 22, 2020 Memorandum, acceptance of the Mediators' Final Proposal is subject to approval of the federal and state agencies involved in the Mediation. That is, as is customary for governmental entities, "acceptance" of the Mediators' Final Proposal by the federal and state agencies involved in the Mediation was their agreement to recommend and commit to pursuing approvals pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable.

WHEREFORE the Mediators submit this Clarification to their Final Certificate of Completion.

Dated:  <u>July 29, 2020</u>                    Respectfully submitted:

<u>/s/ Joseph J. Farnan, Jr.</u>

<u>/s/ Judith K. Fitzgerald</u>

<u>/s/ Richard S. Schmidt</u>

<u>/s/ John L. Wagner</u>

<u>/s/ John DeGroote</u>

Case 20-11157-CSS    Doc 636    Filed 07/29/20    Page 3 of 3

## CERTIFICATE OF SERVICE

I, Judith K. Fitzgerald, Esquire, do hereby certify that on this 29th day of July, 2020, a copy of the foregoing "Clarification to Mediators' Final Certificate Of Completion Filed Pursuant To Order Granting Motion Of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties And (Ii) Abandon Such Properties, If Necessary" was filed electronically and served by CM/ECF upon all counsel of record.

FOR THE MEDIATORS:

/s/ *Judith K. Fitzgerald*

Judith K. Fitzgerald, Esq.
PA ID 18110
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA  15222
Phone: 412-566-1212
Fax: 412-594-5619
Email: jfitzgerald@tuckerlaw.com