# **TAB 8**

**Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief, dated Aug. 6, 2020 [Bankr. D.I. 690]**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------------x
In re                                  :

                                      :       **Chapter 11**

**EXIDE HOLDINGS, INC.** *et al.*,       :       **Case No. 20-11157 (CSS)**

                                      :

            Debtors.[1]           :       **(Jointly Administered)**

                                      :

------------------------------------------------------------------x   **Re: Docket Nos. 63, 344, 591 & 676**

### ORDER (I) APPROVING THE PURCHASE AGREEMENT AMONG DEBTORS AND BUYER, (II) AUTHORIZING SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED <u>LEASES IN CONNECTION THEREWITH, AND (IV) GRANTING RELATED RELIEF</u>

### (Americas Sale Order)

Upon the motion (the "**Sale Motion**"),[2] dated May 19, 2020 [Docket No. 63], of

Exide Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105, 363, 365, 503,

and  507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004,

and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking,

among other things, entry of an order authorizing and approving the sale of substantially all of the

Debtors' assets and the assumption and assignment of certain executory contracts and unexpired

leases of the Debtors in connection therewith; and this Court having held a hearing on June 9, 2020

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined herein) or, if not defined in the Purchase Agreement, the meanings ascribed to such terms in the Sale Motion.

(the "**Bidding Procedures Hearing**") and having taken into consideration this Court's prior order, dated June 19, 2020 [Docket No. 344] (the "**Bidding Procedures Order**"), approving bidding procedures for the sale of substantially all of the Debtors' assets (the "**Bidding Procedures**") and granting certain related relief; and Battery BidCo LLC, a Delaware limited liability company, together with its permitted assigns pursuant to Section 12.08 of the Purchase Agreement (all such entities, collectively "**Buyer**") having submitted the highest and best bid for the Transferred Equity Interests and Transferred Assets (the "**Acquired Assets**"); and this Court having conducted a hearing to consider the Sale Transaction (as defined herein) on August 6, 2020 (the "**Sale Hearing**"), during which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and this Court having reviewed and considered (i) the Sale Motion and the exhibits thereto; (ii) the *Stock and Asset Purchase Agreement*, dated as of July 27, 2020 (as amended, supplemented or otherwise modified, including all exhibits, schedules and other attachments thereto, the "**Purchase Agreement**"), by and among certain of the Debtors, Buyer, and Atlas Capital Resources III LP, as guarantor, a copy of which is attached hereto as **Exhibit A** (along with a change-page only redline against the version annexed to the *Notice of Qualified Bids and Designation of Baseline Bid with respect to the Americas Assets*, filed on July 23, 2020 [Docket No. 589]), and as further amended in **Exhibit B** attached hereto, whereby the applicable Debtors have agreed to, among other things, sell or cause to be sold the Acquired Assets to Buyer, including certain executory contracts and unexpired leases of the Debtors that will be assumed and assigned to Buyer (the "**Assumed Contracts**"), on the terms and conditions set forth in the Purchase Agreement (collectively, the transactions contemplated by the Purchase Agreement, including, for the avoidance of doubt, the Canada Restructuring and the BMAL Transfer (each as defined below), and the other Transaction Documents, the "**Sale Transaction**"); (iii) the Bidding

Procedures Order and the record of the hearing before this Court on June 9, 2020, at which the

Bidding Procedures Order was approved; (iv) the *Declaration of William Peluchiwski in Support*

*of Debtors' (I) Bidding Procedures, Stalking Horse, and Sale Motion and (II) Use of Cash*

*Collateral Motion* [Docket No. 64], the *Declaration of William G. Peluchiwski in Support of*

*Debtors' Omnibus Reply to Debtors' Request for Approval of Bidding Procedures and Related*

*Relief and Debtors' Omnibus Reply to Objections to Debtors' Motion for (I) Authority to (A)*

*Obtain Postpetition Financing and (B) Use of Cash Collateral, and (II) Related Relief* [Docket

No. 299], and the *Declaration of William G. Peluchiwski in Support of Debtors' Omnibus Reply*

*in Support of the Americas Sale Transaction* [Docket No. 677] (collectively, the "**Sale**

**Declarations**"); and (v) the arguments of counsel made, and the evidence proffered or adduced, at

the Sale Hearing; and due notice of the Sale Motion, the Sale Hearing, and the form of this Order

(the "**Proposed Sale Order**") having been provided; and all objections to the Sale Transaction and

the Proposed Sale Order having been withdrawn, resolved, or overruled; and it appearing that the

relief granted herein is in the best interests of the Debtors, their estates, creditors, and all parties in

interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11

cases; and after due deliberation and sufficient cause appearing therefor, it is hereby

### FOUND AND DETERMINED THAT:

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute

this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following

findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such. The Court's

findings shall also include any oral findings of fact and conclusions of law made by this Court

during or at the conclusion of the Sale Hearing.  This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B.  **Jurisdiction and Venue**.  This Court has jurisdiction over the Sale Motion, the Purchase Agreement, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) that this Court can decide by final order under the United States Constitution.  Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.  **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief granted herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014.

D.  **Notice and Opportunity to Object**.  As evidenced by the Affidavits of Service Regarding Sale[3] and the Affidavit of Publication[4] previously filed with the Court, a fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion and the Sale Transaction has been given to all Persons entitled to notice pursuant to the Bidding Procedures Order, including, but not limited to, the following: (i) all counterparties to the Assumed Contracts; (ii) all persons and entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in any Acquired Asset; (iii) all affected federal, state and local regulatory and taxing authorities; (iv) all persons or entities known by the Debtors and their advisors to have recently expressed an interest in a transaction with respect to any of the Acquired Assets; (v) all of

---

3   See *Affidavit of Service* [Docket No. 417]; *Affidavit of Service* [Docket No. 497]; *Affidavit of Service* [Docket No. 527]; *Affidavit of Service* [Docket No. 541]; and [additional affidavits regarding Sale Transaction] (collectively, the "**Affidavits of Service Regarding Sale**").

4   See *Affidavit of Publication* [Docket No. 421] (the "**Affidavit of Publication**").

the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); and (vi) all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

E.     **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement.  In the absence of a stay pending appeal, Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Purchase Agreement at any time after the entry of this Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

F.     **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Purchase Agreement, and the other agreements, documents, and instruments deliverable thereunder or attached thereto or referenced therein (collectively, the "**Transaction Documents**"), and approval of the Sale Transaction.  The Debtors' entry into and performance under the Transaction Documents (i) constitutes a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties, (ii) provides value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their stakeholders, and (iii) is reasonable and appropriate under the circumstances.  Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price and the other terms set forth in the Purchase Agreement constitutes the highest and best offer received for the Acquired Assets; and (ii) the Sale Transaction on the terms set forth in the Transaction Documents presents the best opportunity to maximize the value of the Acquired Assets on a going concern basis and avoids a liquidation

of the Acquired Assets, which would result in significantly less value for all stakeholders of the relevant Debtors.

G. **Compliance with Bidding Procedures Order**.  On June 19, 2020, this Court entered the Bidding Procedures Order approving the Bidding Procedures for, among other things, the Acquired Assets.  The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity or person to make an offer to purchase the Acquired Assets.  The Debtors and Buyer complied with the Bidding Procedures and the Bidding Procedures Order in all respects except as properly waived in the exercise of their fiduciary duties in accordance with the Bidding Procedures.  Buyer subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

H. **Marketing Process**.  As demonstrated by (a) the Motion, (b) the testimony and other evidence proffered or adduced at the Bidding Procedures Hearing and the Sale Hearing, and (c) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, in light of the exigent circumstances presented: (i) the Debtors and their investment banker, Houlihan Lokey Capital, Inc., engaged in a robust and extensive marketing and sale process, both prior to the Petition Date and through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures, (ii) the Debtors and their advisors conducted a fair and open sale process, (iii) the sale process, the Bidding Procedures and the Auction were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets, and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures obtained

the highest and best value for the Acquired Assets for the Debtors and their estates, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Acquired Assets.

I.     **Fair Consideration: Highest or Best Value**.  The consideration to be provided by Buyer under the Purchase Agreement is fair and reasonable consideration for the Acquired Assets and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.  Such consideration constitutes the highest and best bid for the Acquired Assets.  No other person or entity, or group of persons or entities, has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors than Buyer.  Prompt approval of the Sale Transaction is the only means to preserve and maximize the value of the Acquired Assets.

J.     **No Successor or Other Derivative Liability**.  Upon Closing, and to the greatest extent allowed by applicable law, Buyer shall not have any liability (including, but not limited to, any successor liability) or other obligation of any of the Debtors arising under or related to the sale and transfer of the Acquired Assets to Buyer or with respect to the Excluded Liabilities (as defined in the Purchase Agreement), provided that, upon Closing, Buyer shall remain liable for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Purchase Agreement, Buyer shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and Buyer shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, de facto merger, mere

continuation, or substantial continuity, whether known or unknown as of Closing, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing. For the avoidance of doubt, the Debtors are deemed to release and forever discharge Buyer and any of its affiliates, successors, and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the Sale Transaction or operation of the Acquired Assets prior to Closing, except for the Assumed Liabilities.  Buyer is not, and the consummation of the Sale Transaction will not render Buyer, a mere continuation, and Buyer is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between Buyer and the Debtors.  Accordingly, the Sale Transaction does not amount to a consolidation, merger, or de facto merger of Buyer with or into any of the Debtors or their estates and Buyer is not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transaction.

K.  **<u>Good Faith</u>**.  The Transaction Documents and the Sale Transaction were negotiated, proposed, and entered into, and are being undertaken by the Debtors and Buyer in good faith, without collusion, and from arm's-length bargaining positions.  Likewise, the value that the relevant Debtors and their estates will receive on consummation of the Sale Transaction is the product of arm's-length negotiations between the Debtors, Buyer and their respective

representatives and advisors.  Buyer is a "good faith purchaser" within the meaning of section

363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.

Buyer has proceeded in good faith in all respects in that, among other things, (i) Buyer agreed to

subject the Acquired Assets to higher or better offers; (ii) Buyer complied with the provisions of

the Bidding Procedures Order, including compliance with confidentiality obligations and

restrictions under the Bidding Procedures and any applicable non-disclosure or confidentiality

agreement; (iii) Buyer's bid was subjected to competitive Bidding Procedures as set forth in the

Bidding Procedures Order; and (iv) all consideration to be provided by Buyer and all other

material agreements or arrangements entered into by Buyer and the Debtors in connection with

the Sale Transaction have been disclosed and are appropriate.  Other than agreements among the

Debtors and Buyer, as reflected in the Purchase Agreement and herein, the Purchase Price in

respect of the Acquired Assets was not controlled by any agreement among potential bidders.

Neither the Debtors nor Buyer have engaged in any conduct that would cause or permit the

Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of

the Bankruptcy Code.  The Transaction Documents were not entered into and the Sale Transaction

is not being consummated for the purpose of hindering, delaying, or defrauding present or future

creditors of the Debtors.  All consideration to be provided by Buyer in connection with the Sale

Transaction has been disclosed.  Neither the Debtors nor Buyer is entering into the Transaction

Documents, or proposing to consummate the Sale Transaction, fraudulently, for the purpose of

statutory and common law fraudulent conveyance and fraudulent transfer claims whether under

the Bankruptcy Code or under the laws of the United States, any state, territory, possession

thereof, or the District of Colombia.

      L.    **Notice**.  As evidenced by the Affidavits of Service Regarding Sale filed with this

Court: (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids at the Auction), the Sale Hearing, the Sale Transaction, and the Proposed Sale Order was provided by the Debtors; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, or the Proposed Sale Order is required. With respect to Persons whose identities are not reasonably ascertained by the Debtors, publication of the notice in the national editions of The New York Times and USA Today on June 24, 2020, as evidenced by the Affidavit of Publication, was sufficient and reasonably calculated under the circumstances to reach such Persons.

M. **Cure Notice**. As evidenced by the Affidavits of Service Regarding Cure Costs[5] filed with this Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the Cure Notice[6] and the Supplemental Cure Notice[7], which provided notice of the Debtors' executory contracts and unexpired leases available for assumption and assignment to Buyer (the "**Available Contracts**") and of the related proposed Cure Costs upon each non-Debtor counterparty to such contracts. As contemplated by the Purchase Agreement, Buyer may deliver written notices (each, a "**Designation Notice**") to the Debtors designating which Available Contracts it wishes to assume at Closing in connection with the Sale Transaction. Upon receipt of a Designation Notice, the Debtors shall file with this Court

---

[5]   See *Affidavit of Service* [Docket No. 413]; *Affidavit of Service* [Docket No. 555]; and [additional affidavits regarding Cure Costs and Assumed Contracts, if applicable] (collectively, the "**Affidavits of Service Regarding Cure Costs**").

[6]   See *Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No. 353] (the "**Cure Notice**").

[7]   See *Supplemental Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No. 509] (the "**Supplemental Cure Notice**").

a notice of proposed assumption and assignment of the relevant Available Contracts (each, a "**Notice of Assumption and Assignment**"), which assumption and assignment shall be subject to approval by this Court.  The service of the Cure Notice and the Supplemental Cure Notices was timely, good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Available Contracts.  All non-Debtor counterparties to the Available Contracts have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice or Supplemental Cure Notice, as applicable, and to the assumption and assignment of any Available Contract to Buyer.  No defaults exist in the Debtors' performance under the Available Contracts as of the date of this Order other than the failure to pay the Cure Costs, as may be required, or such defaults that are not required to be cured.  In accordance with the terms of the Purchase Agreement, the list of Available Contracts  may be updated by the Debtors from time to time prior to Closing to add additional Contracts or Leases.  Following any such update, the Debtors shall file and serve a supplemental notice in accordance with the terms of the Bidding Procedures Order on any counterparty to a Contract or Lease that was added to the list of Available Contracts.  If the Buyer desires to assume an additional contract from the supplemented list of Available Contracts in accordance with the terms of the Purchase Agreement, the Buyer must provide a supplemental Designation Notice to the Debtors within five (5) Business Day following the receipt of such supplemented list of Available Contracts. Within two (2) business days receipt of such supplemental Designation Notice, the Debtors shall file with the Court a supplemental Notice of Assignment and Assumption with respect to such contracts.  Upon the expiration of the deadline to object to the assumption and assignment of an additional Contract or Lease, no further Court approval shall be required for the transfer of such Contracts or Leases in accordance with the

terms of the Purchase Agreement beyond this Order.  To the extent a counterparty to a Contract or Lease files an objection with respect to the assignment of such Contract or Lease, the Debtors shall be authorized to settle or resolve such objection pursuant to the terms of the Purchase Agreement and this Order without further order from this Court; provided, however, that the Debtors and any counterparty to the applicable Contract or Lease shall have the right to seek a determination from this Court with respect to the assumption and assignment of such Contract or Lease, including with respect to the Cure Amount or consent.

N.    **Satisfaction of Section 363(f) Standards**.  The Debtors are authorized to sell the Acquired Assets owned by the Debtors to Buyer free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), property interests, rights, liabilities, encumbrances, pledges, and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets owned by the Debtors, including, without limitation, any debts, claims, rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee retirement or benefit plan claims, all obligations under the Applicable CBAs[8] workers' compensation claims, severance claims, retiree healthcare or life insurance claims, and/or claims for taxes of or against the Debtors and/or the Acquired Assets owned by the Debtors to the maximum extent available under applicable law, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation

---

[8]    (A) The Agreement between Exide/GNB Industrial Power and The International Brotherhood of Electrical Workers A.F.L-C.I.O. Local 700 Fort Smith, Arkansas; (B) the Agreement between Exide Technologies Canon Hollow Plant and International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers IUE/CWA Local No. 86116 February 20, 2017 – February 20, 2022; and (C) the Agreement between Exide Technologies and International Brotherhood of Electrical Workers Local 1048 at Muncie, Indiana November 9, 2019 to November 8, 2023.

of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior or subsequent to the commencement of these chapter 11 cases, whether known or unknown, whether fixed or contingent, whether anticipated or unanticipated, whether yet accrued or not, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Acquired Assets, the Debtors' operation of the Business before the Closing, or the transfer of the Debtors' interests in the Acquired Assets to Buyer, all Excluded Assets and all Excluded Liabilities (each as defined in the Purchase Agreement) (collectively, all such liens, claims, interests and other matters described above in this paragraph N, but excluding any Assumed Liabilities and any Permitted Liens, the "**Claims**"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion have either consented to or are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.  In addition, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply and, therefore, holders of Claims with an interest in the Acquired Assets owned by the Debtors are adequately protected by having their Claims that constitute interests in such Acquired Assets attach solely to the proceeds of the Sale Transaction in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transaction and by providing for the distributions provided for herein.  All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets owned by the Debtors shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Claims against Buyer or any of its assets, property, Affiliates, successors, assigns, or the Acquired Assets.

O.      Each of (i) the DIP Secured Parties, (ii) Prepetition ABL Secured Parties, and (iii) the Prepetition Notes Secured Parties (each as defined in the Final DIP Order)[9] has consented to the sale of the Acquired Assets to Buyer pursuant to the Purchase Agreement free and clear of any Claims of the DIP Secured Parties, the Prepetition ABL Secured Parties, and Prepetition Notes Secured Parties, as applicable, against the Acquired Assets, subject to the terms and conditions of paragraph 25 of this Order, the DIP Credit Agreement, the Final DIP Order, the ABL Credit Agreement, and the Prepetition Notes Indentures (as defined in the Final DIP Order), as applicable.

P.      Buyer would not have entered into the Transaction Documents and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, (i) if the sale of the Acquired Assets was not free and clear of all Claims and other interests, including, without limitation, any rights or Claims based on any successor or transferee liability (other than, in each case, the Assumed Liabilities), or (ii) if Buyer would, or in the future could, be liable for any such Claims, including, without limitation, any rights or Claims based on any successor or transferee liability (other than, in each case, the Assumed Liabilities). Buyer will not consummate the Sale Transaction unless this Court expressly orders that none of Buyer, its affiliates, their present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims and other interests, including rights or claims based on any successor or transferee liability, other than as expressly provided herein or in the Purchase Agreement.  A sale of the Acquired Assets,

---

[9]      See *Final Order (I) Authorizing The Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 350] (the "**Final DIP Order**").

other than one free and clear of all Claims, would yield substantially less value for the Debtors' estates.

Q.    The total consideration to be provided under the Purchase Agreement reflects Buyer's reliance on this Order to provide it with title to and possession of the Acquired Assets free and clear of all Claims pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.

R.    **Assumption and Assignment of Assumed Contracts**.  The assumption and assignment of the Assumed Contracts are integral to the Sale Transaction, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assumed Contracts (i) is necessary to sell the Acquired Assets to Buyer, (ii) is an integral part of the Acquired Assets being purchased by Buyer, (iii) limit the losses suffered by non-Debtor counterparties to the Assumed Contracts, and (iv) maximize the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Contracts; and, in light of the foregoing, such assumption and assignment of the Assumed Contracts are reasonable, enhance the value of the relevant Debtors' estates.

S.    With respect to each of the Assumed Contracts, the Debtors have met all requirements of section 365(b) of the Bankruptcy Code because Buyer has agreed to cure or will cure on or before the Closing any monetary default required to be cured with respect to the Assumed Contracts under section 365(b)(1) of the Bankruptcy Code and Buyer has provided adequate assurance of future performance under the Assumed Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required. Accordingly, the Assumed Contracts may be assumed by the Debtors and assigned to Buyer as provided for in the Purchase Agreement and herein.  The assumption and assignment of each

Assumed Contract is approved notwithstanding any provision in such Assumed Contract or other restrictions prohibiting its assignment or transfer.  The applicable Cure Notice, Supplemental Cure Notice, or Notice of Assumption and Assignment provided by the Debtors is sufficient to advise the non-Debtor counterparties to the Assumed Contracts that, pursuant to the Purchase Agreement, Buyer's decision on which executory contracts and unexpired leases will be assumed and assigned may not be made until after the entry of this Order.

T.     The authority hereunder for the Debtors to assume and assign any Assumed Contract to Buyer includes the authority to assume and assign an Assumed Contract, as amended.

U.     The assignments by the applicable Debtors of each of the Assumed Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

V.     **Validity of Transfer**.  As of the Closing, the transfer of the Acquired Assets to Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest Buyer with all any legal, equitable and beneficial right, title, and interest of the applicable Debtors in and to the Acquired Assets, free and clear of all Claims (other than Assumed Liabilities and Permitted Liens).  The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

W.     The Transaction Documents are valid and binding contracts between the Debtors and Buyer and shall be enforceable pursuant to their terms.  None of the Transaction Documents were entered into and none of the Debtors or Buyer have entered into the Purchase Agreement or proposed to consummate the Sale Transaction for the purpose of hindering, delaying, or

defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia.  The Transaction Documents, the Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the applicable Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.  None of the Debtors nor Buyer entered into the Purchase Agreement or proposed to consummate the Sale Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to any of the foregoing.

X.    **Exide Canada**.  The Purchase Agreement requires that certain of the Debtors to take certain actions with respect to Exide Technologies Canada Corporation ("**Exide Canada**"). As described further in the Purchase Agreement, the Sale Transaction contemplates that 100% of the equity interests of Exide Canada shall be acquired by Seller or another Seller Party (the "**Canada Restructuring**").  Thereafter, as contemplated by the Purchase Agreement, the equity interests of Exide Canada shall constitute Transferred Equity Interests and, as a result, Acquired Assets.

Y.    As of the date of this Order, Exide Canada is a net payee of intercompany obligations to one or more Debtors in the aggregate amount of $2,916,076.  Pursuant to the terms of the Purchase Agreement, as of the Closing Date, such intercompany obligations shall be terminated and cancelled in full and, in any event, shall not be settled in cash.

Z.    **BMAL Transfer**.  The Purchase Agreement requires that, prior to the Closing, the

Debtors shall sell and transfer to Europe Exide Corporation Limited or one of its Affiliates (other than a Transferred Entity) all of their right, title and interest in, to and under certain assembly line equipment identified in the Purchase Agreement (the "**BMAL Transfer**").  From and after the consummation of the BMAL Transfer, as contemplated by the Purchase Agreement, such equipment shall constitute Excluded Assets and all Liabilities arising thereunder shall constitute Excluded Liabilities.

AA.   **Transfer of Retained Marks**.  Prior to Closing, the Debtors shall cause the transfer, conveyance and assignment of all rights, titles and interest in and to the "Prevailer" trademark held by non-Debtor affiliates to the Debtors. The "Prevailer" trademark shall be transferred to the Buyer upon Closing.

BB.   **Oracle Contracts**. Notwithstanding anything to the contrary in this Order or the Purchase Agreement, no contract between the Debtors and Oracle America, Inc., successor in interest to Hyperion Solutions Corporation, J.D. Edwards and PeopleSoft, Inc., ("**Oracle**") will be assumed and/or assigned without (1) Oracle's prior written consent; and (2) cure of any default under such contract *provided*, *however*, that the Debtors' and Oracles' rights to seek determination by this Court as to whether Oracle's consent is required to assign any such contract is fully preserved.  Oracle's consent to any such assumption and assignment may be conditioned, upon other things, on the execution by the Debtors (or a successor) and the assignee of mutually agreeable assignment documentation. In addition, no provision of this Order or any transition services agreement authorized thereby shall authorize (1) the transfer of any Oracle license agreement to a third party; or (2) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use or license splitting, absent either (i) Oracle's express prior written consent or (ii) a

determination by this Court that Oracle's consent is not required.

CC.   **Infor Agreement**.  Notwithstanding anything to the contrary contained in this Order, this Order does not approve the sale or transfer of the software (the "**Infor Software**") of Infor (US), Inc. ("**Infor**"), or grant any rights to possess or use the Infor Software, to any purchaser of any of the Debtors' assets except to the extent that Infor consents prior to the closing of the subject sale transaction; *provided, however,* that the Debtors' rights to seek determination by this Court as to whether Infor's consent is required to assign any of the Debtors' contracts with Infor is fully preserved.  For the avoidance of doubt, absent Infor's consent, no purchaser of assets shall receive any rights to possess, use, or otherwise benefit from the Infor Software as a result of entry of this Order to the extent such possession, use, or benefit is inconsistent with the express terms of the Infor Software; provided, however, prior to the closing of the subject sale transaction, the purchaser and Infor may agree to enter into an assignment agreement (or assignment agreements) or license (or licenses) for such purchaser's possession and use of the Infor Software.  If Infor and the purchaser do not enter into an assignment agreement or license prior to the sale closing, the Debtors may continue to access and use the Infor Software for the Debtors and their estates sole and exclusive benefit; however, any on-premises Infor Software loaded onto any of the Debtors' asset(s) that is being transferred to the purchaser must be removed and deleted prior to the transfer of the subject asset to the purchaser.  Similarly, any access codes used to access any hosted Infor Software must be deleted from any of the Debtors' assets on which they are contained prior to the transfer of the subject assets to the purchaser.

DD.   **Concur Business Services Agreement**.  Notwithstanding anything in this Order, the Sale Motion, or the Purchase Agreement to the contrary, with respect to the objection of Concur Technologies, Inc. ("**Concur**") [Docket No. 498]: (i) the Business Services Agreement

dated June 29, 2007, including all amendments and sales order forms relating thereto (the "**Business Services Agreement**") shall be assumed and assigned to Buyer and Concur consents to the assumption and assignment of the Business Services Agreement to Buyer, subject to resolution of Concur's Cure Objection; and (ii) Buyer is prohibited from using (including the provision of transition services), or allowing the shared use of, the cloud and other software-related services provided by Concur pursuant to the Business Services Agreement (the "**Cloud Services**") for the benefit of the Debtors or any other third party following the Closing to the extent doing so would be inconsistent with the express terms of the Business Services Agreement unless expressly authorized in writing by Concur.  Concur reserves all rights to object to the Debtors' use, or shared use, of the Cloud Services for the benefit of the Buyer or any third party should the Buyer not receive an assignment of the Business Services Agreement.

EE.    **Westchester Surety Bonds and Indemnity**. The Debtors shall not assume or assign any surety bond or indemnity agreement between the Debtors and Westchester Fire Insurance Company ("**Westchester**") to the Buyer without Westchester's consent; *provided, however*, that the parties' rights to seek determination by this Court as to (i) whether Westchester's consent is required and (ii) whether the applicable surety bond and indemnity agreements are executory contracts or financial accommodations are fully preserved.

FF.    **Ames Lease**.  Notwithstanding anything to the contrary in this Order or the Purchase Agreement, that certain lease between the Debtors and Ames Properties, LLC ("**Ames**") attached as <u>Exhibit A</u> to the objection filed by Ames at Docket No. 670 ("**Ames Lease**") shall not be assumed by the Debtors and assigned to the Buyer unless, as a condition to the assumption and assignment of such lease, Buyer obtains a surety bond to secure the repayment of certain tenant obligations in accordance with the terms of the Ames lease.

GG.   **Aker Wade Agreements**.  At Closing (as defined in the Purchase Agreement) the following agreements between the Debtors and the Aker-Wade Individuals[10] shall be assumed by the Debtors and assigned to the Buyer (the "**Aker Wade Individuals Agreements**"): (i) that certain *Unit Purchase Agreement* dated May 21, 2018; (ii) that certain Promissory Note, dated May 21, 2018; (iii) that certain *License Agreement*, dated May 21, 2018; and (iv) that certain *Purchase Side Letter*, dated May 21, 2018.  In addition, at Closing, Buyer shall enter into new employment agreements (the "**New Employment Agreements**") with the Aker-Wade Individuals that have terms equivalent in all material respects to those set forth in the *Employment Agreement* with Kevin J. Lynch dated May 21, 2018, *Employment Agreement* with Bret E. Aker dated May 21, 2018; *Employment Agreement* with John F. Aker dated May 21, 2018; *Employment Agreement* with James R. Wade dated May 21, 2018, as applicable (collectively, the "**Existing Employment Agreements**").   The New Employment Agreements shall not alter the compensation, place of employment, or post-employment restrictions applicable to the Aker Wade Individuals and the parties reserve all rights related thereto.  Upon execution of the New Employment Agreements, any obligations of the Debtors with respect to the Existing Employment Agreements shall be discharged and the Aker-Wade Individuals shall have no claim against the Debtors on account of such agreements.

HH.   In the event that the Aker Wade Individuals' Agreements are not assumed and assigned at Closing for any reason, the Aker Wade Individuals' rights under 11 U.S.C. § 365(n) or such other rights referenced in the *Aker Wade Individuals' (1) Reservation of Rights Under 11 U.S.C. § 365(N) Regarding Americas Assets and (2) Objection to Motion of Debtors for Entry of*

---

[10]   Kevin J. Lynch, Bret E. Aker, John F. Aker, and James R. Wade are referred to herein as the "Aker Wade Individuals"

*Orders (I)(A) Approving Bidding Procedures for Sales Of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief; and (II)(A) Authorizing Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket. Nos. 557, 558 (redacted)] are hereby reserved.

II. **Settlement with Applicable CBA Unions**.  In connection with the Applicable CBAs, the Debtors and the Buyer have entered negotiations with the unions party to the Applicable CBAs to offer modified collective bargaining agreements.  The Debtors have entered into settlement term sheets with each of the unions party to the Applicable CBAs, which are attached as **Exhibit C** hereto.

JJ. **Cigna ASO Agreement**. Notwithstanding anything to the contrary in this Sale Order, or any Notice related thereto, the *Objection Of Cigna To Notice Of Cure Costs And Proposed Assumption And Assignment Of Executory Contracts And Unexpired Leases In Connection With Sale* [Docket No. 433] (the "Cigna Objection") is adjourned, and the ASO Agreement shall not be assumed and assigned to the Buyer under this Sale Order absent agreement of Cigna, the Debtors, and the Purchaser or, if no agreement can be reached, by further order of the Court; provided, however, that if no such agreement is reached, the Cigna Objection shall be presented to the Court no less than five (5) business days prior to Closing on the Sale.

KK. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired

Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and Buyer intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Order.

LL.   **Legal and Factual Bases**.  The legal and factual bases set forth in the Sale Motion, the Sale Declarations, and at the Sale Hearing establish just cause for the relief granted herein.

MM.  **Necessity of Order**.  Buyer would not consummate the transactions absent the relief provided for in this Order.

**NOW THEREFORE, IT IS ORDERED THAT**:

1.   **Motion is Granted**.  To the extent not already approved pursuant to the Bidding Procedures Order, the Sale Motion and the relief requested therein is granted and approved as set forth herein.

2.   **Objections Overruled**.  Except as provided in paragraph 3 and paragraphs 37 through 41 below, all objections, if any, and any and all joinders thereto, to the Sale Motion or the relief granted herein that have not been previously overruled, withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing, by stipulation filed with this Court, or as provided in this Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.

3.   **Cure Objections**.  If a counterparty to any Available Contract files an objection

to the assumption and assignment of such Available Contract to Buyer, then such contract shall be deemed a "**Disputed Contract**." The Debtors shall be authorized to resolve or settle any objections to the assumption and assignment of Disputed Contracts in accordance with the terms of the Purchase Agreement, including with respect to Cure Costs or necessary consents, without need for any further order or action from this Court. Pursuant to the Purchase Agreement, the Debtors shall not settle a disputed Cure Cost for an amount in excess of $5,000, individually, and $75,000, in the aggregate, of the Debtors' estimated Cure Cost for the relevant Disputed Contract, without the consent of Buyer (acting reasonably).  Upon a Final Order determining any Cure Cost regarding any Disputed Contract after the Closing (and prior to the earlier of the date that is six (6) months following the Closing Date or confirmation of a plan in these chapter 11 cases), Buyer shall have the option to (x) pay the Cure Cost for such Disputed Contract and the Debtors shall be permitted to assume the Disputed Contract and assign such contract to the Buyer as a Transferred Contract or (y) designate the Disputed Contract as an Excluded Contract and shall not be responsible for such Cure Cost.

4.    **Notice**.  Notice of the Sale Motion and Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 and the Bidding Procedures Order.

5.    **Fair Purchase Price**.  The consideration provided by Buyer under the Purchase Agreement is fair and reasonable, is the highest and best offer for the Acquired Assets, and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other

applicable laws of the United States, any state, territory or possession or the District of Columbia.

6.     **Approval of the Purchase Agreement**.   The Transaction Documents, the transactions contemplated thereby, including the Sale Transaction, the Canada Restructuring, the BMAL Transfer, the transfer of the "Prevailer" trademark, and all of the terms and conditions thereof, are hereby authorized and approved in their entirety.  The failure specifically to include any particular provision of the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents, and the relevant Debtors' entry therein, be authorized and approved in their entirety.

7.     **Consummation of Sale Transaction**.     Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized and empowered to transfer the Acquired Assets owned by the Debtors in accordance with the terms of the Purchase Agreement and the terms of this Order.  The relevant Debtors, as well as their directors, officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Transaction Documents and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Transaction Documents and this Order.  For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the Purchase Agreement and this Order.

8.     The relevant Debtors, their affiliates, and their respective directors, officers,

employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments and documents that may be reasonably necessary or desirable to implement the Transaction Documents, including the transfer and, as applicable, the assignment of all the Acquired Assets, the assumption of the Assumed Liabilities, and the assumption and assignment of all the Assumed Contracts, and to take all further actions as may be (i) reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to Buyer, or reducing to Buyer's possession, the Acquired Assets and/or (ii) necessary or appropriate to the performance of the obligations contemplated by the Transaction Documents, pursuant to which Buyer would provide to the Debtors certain ordinary course services and services necessary for the Debtors' ongoing administration of these Chapter 11 Cases, all without further order of this Court.

9.      All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to Buyer upon the Closing Date or at such later time as Buyer reasonably requests.

10.      All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to Buyer in accordance with the Purchase Agreement and this Order, provided that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

11.      Buyer has provided or will provide, as applicable, adequate assurance of future performance of and under the Assumed Contracts, within the meaning of 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  Debtors' creditors and the holders of any Claims are

authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

12.     Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents.

13.     **Transfer of Acquired Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets owned by the Debtors in accordance with the terms of the Purchase Agreement and this Order.  Upon the Closing, the transfer of the Acquired Assets to Buyer shall: (i) be valid, legal, binding, and effective; (ii) vest Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets; and (iii) be free and clear of all Claims against the Debtors and the Acquired Assets owned by the Debtors (including Claims of any Governmental Authority) in accordance with section 363(f) of the Bankruptcy Code and subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing (other than Assumed Liabilities and Permitted Liens).  For the avoidance of doubt, the Acquired Assets shall not include assets for which the Debtors do not have title.  The Doe Run Resources Corporation ("**Doe Run**") disputes the Debtors' title to certain Acquired Assets, and the parties reserve any and all rights to bring such dispute before the Court for final resolution, and neither the Debtors nor the Buyer can compel turnover of the disputed Acquired Assets in Doe Run's possession absent further court order adjudicating

title to the disputed Acquired Assets.

14.     Except as otherwise provided in the Purchase Agreement or herein, all Persons (and their respective successors and assigns) including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Claims (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against the Debtors or the Acquired Assets owned by the Debtors arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets owned by the Debtors, the operation of the Acquired Assets by the Debtors prior to the Closing, or the Sale Transaction, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Buyer, its Affiliates, successors, assigns, its property or the Acquired Assets, including, without limitation, taking any of the following actions with respect to any Claims: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Buyer, its affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, its Affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (iii) creating, perfecting, or enforcing any Claim against Buyer, its affiliates, any of their respective successors, assigns, assets (including the Acquired Assets), and/or properties; (iv) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due against Buyer, its affiliates, any of their respective successors or

assigns; or (v) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof.  No such Person shall assert or pursue against Buyer or its Affiliates, successors or assigns any such Claim.

15.     Notwithstanding the foregoing or any other provision of this Sale Order or the Purchase Agreement to the contrary, the transfer of the Acquired Assets to the Buyer shall not be free and clear of the right to assert setoff or recoupment as a defense by any party that timely filed an objection preserving such right or defense, including, without limitation, Battery Systems, Inc. [Docket Nos. 629 and 630], CNH Industrial America LLC [Docket No. 631], Robert Bosch LLC [Docket No. 632], Hino Motors Manufacturing U.S.A., Inc. and Hino Motors Canada, Ltd., with their applicable affiliates [Docket No. 639], The Doe Run Resources Corporation [Docket No. 640], and MDSA, LLC [Docket No. 641].

16.     This Order (i) shall be effective as a determination that, as of the Closing all Claims have been unconditionally released, discharged and terminated as to Buyer and the Acquired Assets owned by the Debtors and that the conveyances and transfers described herein have been effected, and (ii) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that Buyer is the assignee and owner of the Acquired Assets, and ownership of the Acquired Assets owned by the Debtors is free and clear of all Claims or who may be required to report or insure any title or

state of title in or to any lease (all such entities being referred to as "**Recording Officers**").

All Recording Officers are authorized to strike recorded encumbrances, claims, liens, and

other interests against the Acquired Assets owned by the Debtors recorded prior to the date of

this Order.  A certified copy of this Order may be filed with the appropriate Recording Officers

to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other

interests against the Acquired Assets owned by the Debtors recorded prior to the date of this

Order.  All Recording Officers are hereby authorized to accept for filing any and all of the

documents and instruments necessary, advisable or appropriate, and appropriate to

consummate the transactions contemplated by the Purchase Agreement.

17.     Following the Closing, no holder of any Claim shall interfere with Buyer's title

to or use or enjoyment of the Acquired Assets based on or related to any Claim or based on

any actions or omissions by the Debtors, including any actions or omissions the Debtors may

take in these chapter 11 cases.

18.     Except as expressly set forth in the Purchase Agreement and the Transaction

Documents, and except with respect to the Assumed Contracts, Buyer and each of its affiliates,

successors, assigns, members, partners, officers, directors, principals, and shareholders shall

have no liability whatsoever for any Claims, whether known or unknown as of the Closing,

now existing or hereafter arising, whether fixed or contingent, whether liquidated or

unliquidated, whether asserted derivatively or vicariously, whether asserted based on Buyer's

status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever,

including Claims based on, relating to, and/or arising under, without limitation: (i) any

employment or labor agreement, including Applicable CBAs; (ii) any pension, welfare,

compensation or other Employee Plan, agreements, practices, and programs, including,

without limitation, any pension or Employee Plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, any claims, rights, or causes of action that might arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the Worker Adjustment and Retraining Notification Act of 1988, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state and local discrimination laws, (j) state and local unemployment compensation laws or any other similar state and local laws, (k) state workers' compensation laws, and/or (l) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (vi) any antitrust laws; (vii) any product liability or similar laws, whether state, federal, or otherwise; (viii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes (subject to paragraph 19); (ix) any bulk sales or similar laws; (x) any federal, state, or local tax statutes, rules, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xi) any common law doctrine of *de facto* merger, successor, transferee, or vicarious liability, substantial continuity

liability, successor-in- interest liability theory, and/or any other theory of or related to successor liability.

19.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets owned by the Debtors sold, transferred, or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction contemplated by the Purchase Agreement and the Transaction Documents.

20.     Notwithstanding any provision in this Order or any Transaction Documents, nothing shall: (1) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; (2) authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; (3) authorize the sale, conveyance, assumption, assignment or other transfer to the Buyer of any contracts, leases, purchase orders, agreements, equipment, inventory, property, grants, or other interests of the federal government (collectively, "**Federal Interests**") without compliance by the Debtors and the Buyer with (a) all terms of the Federal Interests, (b) all applicable legal requirements and approvals under non-bankruptcy law; (4) be interpreted to require the government to novate, approve or otherwise consent to the sale, conveyance, assumption, assignment or other transfer of any Federal Interests; (5) affect any government unit's right of setoff or recoupment; or (6) confer exclusive jurisdiction to the Bankruptcy Court with

respect to any governmental interests.

21.     The Continued Use Agreement with regard to equipment purchased or acquired with funds distributed to the Debtors pursuant to the Department of Energy ("**DOE**") Assistance Agreement Award No. DE-EE000026l8 (the "**DOE Assets**"), including those assets described in the attached **Schedule 1**, will not be assumed and assigned under section 365, but may be novated by DOE, subject to DOE consent and in compliance with applicable non-bankruptcy law, with regard to any DOE Assets transferred to the Buyer. If DOE does not consent to the transfer of the DOE Assets to Buyer, (1) Debtors will provide a list of equipment sold that identifies the portion of the actual sale price attributable to, or fair market value of, each transferred DOE Asset (the "**Asset Price**"); and (2) Debtors agree to comply with the terms of the Continued Use Agreement and applicable non-bankruptcy law, including, without limitation, the obligation to pay DOE 49% of the proceeds derived from the sale of any DOE Assets transferred to the Buyer prior to payment from these proceeds to any other creditor, including the DIP Agent and the Prepetition ABL Agent to the extent that the DOE Assets constitute assets described by paragraph 46(d)(a)(ii) of the Final DIP Order. If DOE disputes any such fair market value identified by the Debtors for any DOE Asset included in the Sale, DOE may at its own option, (1) accept payment of 49% of the Asset Price, or (2) direct the purchaser of such equipment to transfer the asset to DOE and compensate the purchaser for 51% of the Asset Price.

22.     Immediately upon the later of (a) the indefeasible receipt by the DIP Agent (as defined in the Final DIP Order) of an amount sufficient to pay the DIP Obligations (as defined in the Final DIP Order) in full in cash, (b) the indefeasible receipt by the Prepetition ABL Agent (as defined in the Final DIP Order) of an amount sufficient to pay the Prepetition ABL

Debt (as defined in the Final DIP Order) in full in cash, and (c) the Closing (the "**Lien Release Date**"), the DIP Secured Parties, the Prepetition ABL Secured Parties, the Prepetition Notes Secured Parties and each of the Debtors' other creditors and any other holder of a lien, claim, encumbrance or other interest shall be deemed to have released any Claims held by such Person on the Acquired Assets (and with respect to the Claims of the DIP Secured Parties and the Prepetition ABL Secured Parties, the DIP Collateral and the Prepetition ABL Collateral, respectively) and are authorized and directed to take any such actions as may be reasonably requested by the Debtors to evidence the release of such Claims, including the execution, delivery and filing or recording of such releases as may be reasonably requested by the Debtors or Buyer or as may be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.  If any DIP Secured Party, ABL Secured Party or Prepetition Notes Secured Party or any other Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims against the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, as applicable, termination statements, instruments of satisfaction, or releases of all interests or Claims which the Person has with respect to the relevant Debtors or the Acquired Assets (and with respect to the Claims of the DIP Secured Parties and the Prepetition ABL Secured Parties, the DIP Collateral and the Prepetition ABL Collateral, respectively), then upon the Lien Release Date (i) the Debtors shall be authorized and directed to execute and file such statements, instruments, or releases on behalf of the Person with respect to the Acquired Assets (and with respect to the Claims of the DIP Secured Parties and the Prepetition ABL Secured Parties, the DIP Collateral and the Prepetition ABL Collateral, respectively) and (ii) Buyer shall be authorized to file,  register, or

otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets (and with respect to the Claims of the DIP Secured Parties and the Prepetition ABL Secured Parties, the DIP Collateral and the Prepetition ABL Collateral, respectively).  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and  every federal, state, or local government agency, department, or office.

23.     On the Closing Date, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets, transferring good and marketable, indefeasible title and interest in all of the Acquired Assets to Buyer with effect at Closing of the Sale Transaction in accordance with the Transaction Documents.

24.     To the maximum extent available under applicable law and to the extent provided for under the Purchase Agreement, Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets and, to the maximum extent available under applicable law and to the extent provided for under the Transaction Documents, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Buyer as of the Closing.  All existing licenses or permits applicable to the business shall remain in place for Buyer's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

25.     **<u>Distribution and Application of Sale Proceeds</u>**.  In accordance with the Purchase Agreement, prior to the Closing, Seller shall provide to Buyer an Estimated Closing

Statement.  The Estimated Closing Statement shall indicate, among other things, that, at the Closing, Buyer shall pay to (i) the DIP Agent, a portion of the Purchase Price in an amount sufficient to pay the DIP Obligations (each as defined in the Final DIP Order) in full in cash (the "**DIP Payoff Amount**"), and (ii) the Seller (in accordance with the terms of the Purchase Agreement), the balance of the Purchase Price remaining due and owing under the Purchase Agreement <u>less</u> the DIP Payoff Amount.  On the Closing Date, (a) the Buyer shall pay the DIP Agent by wire transfer in immediately available funds the DIP Payoff Amount; and (b) the Debtors shall pay, or shall cause to be paid by wire transfer in immediately available funds from the cash proceeds of the Sale Transaction to (x) the Prepetition ABL Agent an amount sufficient to pay the Prepetition ABL Debt (each as defined in the Final DIP Order) in full in cash, and (y) the Americas Stalking Horse Bidder the Termination Payment (each as defined in the Americas Stalking Horse Bid)[11] in an amount not to exceed $7,600,000.00 in connection with the Americas Stalking Horse Bid.  Notwithstanding the foregoing, nothing in this paragraph 25 shall alter the Purchase Price, any conditions to the Closing, or any of the other terms of the Purchase Agreement.

26.     Following the payments provided for in paragraph 25, all Liens, other than those released pursuant paragraph 22, that existed prior to Closing in the Acquired Assets owned by the Debtors shall attach to the remaining proceeds of the Sale Transaction in the same order of priority and with the same extent, validity, force, and effect that such Liens had prior to the Sale Transaction.

27.     <u>**No Successor or Other Derivative Liability**</u>.  By virtue of the Sale Transaction,

---

[11]     See *Notice of Designation of Americas Stalking Horse Bidder* [Docket No. 500] (the "**Americas Stalking Horse Bid**").

neither Buyer nor any of its Affiliates shall be deemed to: (i) be a legal successor, or otherwise

deemed to be a successor, to any of the Debtors under any theory of law or equity; (ii) have,

de facto or otherwise, merged with or into any or all Debtors or their estates; (iii) have a

common identity or a continuity of enterprise with the Debtors; or (iv) be a mere continuation

or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or

any business, enterprise, or operation of the Debtors.  Upon the Closing, to the maximum

extent available under applicable law, Buyer's acquisition of the Acquired Assets owned by

the Debtors shall be free and clear of any "successor liability" claims and other types of

transferee liability of any nature whatsoever, whether known or unknown and whether asserted

or unasserted at the time of the Closing (other than, to the extent applicable, any Assumed

Liabilities), and the Acquired Assets shall not be subject to any Claims arising under or in

connection with any Excluded Asset, including any Excluded Contract or Excluded Liability.

The operations of Buyer and its Affiliates shall not be deemed a continuation of the Debtors'

business as a result of the acquisition of the Acquired Assets.

28.  **Assumption and Assignment of Assumed Contracts**.  The Debtors are hereby

authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and

assign the Assumed Contracts to Buyer free and clear of all Claims, and to execute and deliver

to Buyer such documents or other instruments as may be necessary to assign and transfer the

Assumed Contracts to Buyer as provided in the Purchase Agreement.  Upon the Closing, Buyer

shall be fully and irrevocably vested with all right, title, and interest of the relevant Debtors

in, to, and under the Assumed Contracts and, pursuant to section 365(k) of the Bankruptcy

Code, the Debtors shall be relieved from any further liability with respect to the Assumed

Contracts.  Buyer acknowledges and agrees that, from and after the Closing, it shall comply

with the terms of each Assumed Contract in its entirety, including, without limitation, any indemnification obligations expressly contained in such Assumed Contract that could arise as a result of events or omissions that occur from and after the Closing and any security deposit and/or maintenance reserve obligations pursuant to such Assumed Contracts.

29.     All Cure Costs that have not been waived shall be determined in accordance with the Bidding Procedures Order or this Order and paid by Buyer in accordance with the terms of the Purchase Agreement.  Assumption and payment of the Cure Costs by Buyer shall be in full satisfaction and cure of any and all defaults under the Assumed Contracts and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Upon the assumption by a Debtor and the assignment to Buyer of any Assumed Contract, and the payment of any applicable Cure Costs, each non-Debtor counterparty to the Assumed Contracts is forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Buyer, their Affiliates, successors, or assigns, or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing, and (ii) exercising any rights or remedies against any Debtor or Buyer based on an asserted default that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.  Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to Buyer, of each of the Assumed Contracts.

30.     To the extent a non-Debtor counterparty to the Assumed Contracts fails to

timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.  Consistent with the Bidding Procedures Order, the non-Debtor counterparty to an Assumed Contract is forever bound by the applicable Cure Cost and, upon payment of such Cure Cost as provided herein and in the Purchase Agreement, is hereby enjoined from taking any action against Buyer with respect to any claim for cure under the Assumed Contract.  To the extent no timely Cure Objection or Adequate Assurance Objection has been filed and served with respect to an Assumed Contract, the non-Debtor counterparty to such Assumed Contract is deemed to have consented to the assumption and assignment of the Assumed Contract to Buyer.

31.    The assignments of each of the Assumed Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

32.  **Ipso Facto Clauses**.  Except as otherwise specifically provided for by order of this Court, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Buyer in accordance with their respective terms, including all rights of Buyer as the assignee of the Assumed Contracts, notwithstanding any provision in any Assumed Contract (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, including any provision that prohibits or conditions the assignment or sublease of a Assumed Contract (including without limitation, the granting of a lien therein) or allows the non-Debtor counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, which shall constitute an unenforceable anti-assignment provision that is void and of no force and effect.

There shall be no, and all non-Debtor counterparties to any Assumed Contract are forever barred and permanently enjoined from raising or asserting against the Debtors or Buyer any default, breach, termination, claim, penalty, pecuniary loss, rent or other acceleration of amount due thereunder, escalation, assignment fee, increase, or any other fee charged to Buyer or the Debtors as a result of (i) any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assumed Contracts; or (ii) the assumption or assignment of the Assumed Contracts.

33.     The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any of the Assumed Contracts shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Contracts.

34.   **<u>Statutory Mootness</u>**.  The transactions contemplated by the Purchase Agreement and the other Transaction Documents are undertaken by Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and were negotiated by the parties at arm's-length and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Acquired Assets to Buyer free and clear of Claims, unless such authorization is duly stayed before the Closing Date pending such appeal.  Buyer is a good faith purchaser of the Acquired Assets and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.  The Debtors and Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Order.

35.   **<u>No Avoidance of Purchase Agreement</u>**.  Neither the Debtors nor Buyer has

engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement or the Sale Transaction.

36. **Modification of Purchase Agreement**. Subject to the terms of the Transaction Documents, the Transaction Documents, including the Purchase Agreement, and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court; provided that notwithstanding any such modification, amendment, or supplement, the sale of the Acquired Assets to Buyer will still comply with the requirements of section 363 of the Bankruptcy Code.

37. **Government Agencies' and Prepetition ABL Lenders' Reservation of Rights**. The Debtors and certain other participants in the global settlement mediation either reached agreement on the terms of a proposed global resolution of the matters in mediation or, in the case of governmental entities (the "**Government Agencies**"), agreed to recommend terms of a proposed global resolution of the matters in mediation to those with authority to approve a settlement.[12]

---

[12] For the avoidance of doubt, the Government Agencies shall mean the U.S. Environmental Protection Agency, the State of Florida Department of Environmental Protection, the Georgia Environmental Protection Division of the Department of Natural Resources, the Indiana Department of Environmental Quality, the Commonwealth of Pennsylvania Department of Environmental Protection, the South Carolina Department of Health and Environmental Control, the Tennessee Attorney General & Reporter, the Texas Commission on Environmental Quality, the Illinois Environmental Protection Agency, the Louisiana Department of Environmental Quality, the

38.   Each of the Government Agencies, the Creditors' Committee, and the Ad Hoc Group, subject to the rights set forth below: (i) are not objecting to the repayment in full of the Prepetition ABL Debt from the proceeds of the Sale Transaction (including, without limitation, cash collateralization for contingent obligations owing to the Prepetition ABL Secured Parties as of the Closing Date) pursuant to the terms and conditions of a payoff letter in form and substance satisfactory to the Prepetition ABL Agent (the "**ABL Repayment**"), and (ii) are waiving any remaining right to bring a Challenge (as defined in and contemplated by the Final DIP Order) against the Prepetition ABL Agent and/or any of the other Prepetition ABL Secured Parties.

39.   If the proceeds of the Sale Transaction are applied to the Prepetition ABL Debt in accordance with the aforesaid terms and the Global Settlement (as defined in the Americas Sale Reply[13]) is consummated, and the Prepetition ABL Secured Parties ever assert liens or claims against the equipment, real property, improvements, and fixtures constituting the NPPs (as defined in the Debtors' Americas Sale Reply), then any of the Agencies shall have a right to seek a claw back or other appropriate remedy from the Prepetition ABL Secured Parties of the ABL Repayment solely related to such assertion of liens or claims against the NPPs, and any such claims or causes of action or other remedy of such Government Agency shall not be prejudiced because such Agency did not object to the ABL Repayment or entry of this Order.  Such claw back or other remedy may be sought by appropriately noticed motion in this Court and the Prepetition ABL Secured Parties shall not object to the jurisdiction of this Court

---

Mississippi Department of Environmental Quality, and the California Department of Toxic Substances Control, and each of their respective successors.

[13]   See *Debtors' Omnibus Reply in Support of the Americas Sale Transaction*, filed contemporaneously herewith (the "**Americas Sale Reply**").

to hear such motion or the standing of the Government Agency to bring such motion.  In the event an Agency brings such a motion, all of the Prepetition ABL Secured Parties' rights to defend against any such actions or to bring counterclaims against such Agency in connection with such actions, and such Agency's rights to defend against any such counterclaims, shall be expressly reserved.

40.   If the Global Settlement is not consummated, any of the Government Agencies shall have a right to seek a claw back from the Prepetition ABL Secured Parties of the ABL Repayment or other appropriate remedy against the Prepetition ABL Secured Parties and the claims or causes of action of such Agency shall not be prejudiced because such Agency did not object to the ABL Repayment or entry of this Order.  Such claw back or other remedy may be sought by appropriately noticed motion in this Court and the Prepetition ABL Secured Parties shall not object to the jurisdiction of this Court to hear such motion or the standing of the Government Agency to bring such motion.  In the event a Government Agency brings such a motion, all of the Prepetition ABL Secured Parties' rights to defend against any such actions or to bring counterclaims against such Government Agency in connection with such actions, and such Agency's rights to defend against any such counterclaims, shall be expressly reserved.  In addition, the ABL Adequate Protection Liens (as defined in the Final DIP Order) against the equipment, real property, improvements, and fixtures constituting the NPPs shall be restored to the same extent and in the same order of priority as they existed prior to the repayment of the Prepetition ABL Debt from the Sale Transaction proceeds as set forth in the Final DIP Order, and the Creditors' Committee's and each Agencies' right to bring a Challenge against the Prepetition ABL Agent and/or any of the other Prepetition ABL Secured Parties, shall be restored to the same extent and in the same order of priority as they existed

prior to the Closing.

41.   The provisions of paragraphs 37 through 40 shall survive conversion of the case to chapter 7 or dismissal if a plan is not approved.  If a plan and the Global Settlement are consummated, then all parties' reservation of rights set forth paragraphs 39 and 40 related to the NPPs shall automatically terminate.

42.   **Settlements with Applicable CBA Union**.  The settlement term sheets between the Debtors and the unions party to the Applicable CBAs, as attached on **Exhibit C** hereto, are hereby approved and the parties are authorized to execute and perform any and all actions contained therein.  The Debtors and the Buyer may enter into additional term sheets or settlements with the unions party to the Applicable CBAs on similar terms without any further order from the Court.

43.   **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in closing the Sale Transaction and the Debtors and Buyer intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing, or risk its appeal will be foreclosed as moot.

44.   **Binding Effect of this Order**.  The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors, Buyer and its affiliates, successors, and assigns,

and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, or receiver. Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized to (i) operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of the Transaction Documents and (ii) perform under the Transaction Documents without the need for further order of this Court.

45. **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Order and the terms of the Transaction Documents, the terms of this Order shall control.

46. **Automatic Stay**.  Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Transaction Documents or any other sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

47. **Provisions Non-Severable**.  The provisions of this Order are nonseverable and mutually dependent.

48. **Discharge of Indebtedness**.  Any discharge of indebtedness that might otherwise be recognized for U.S. income tax purposes as income from discharge of indebtedness by the Debtors as a result of the performance of any obligation or taking of any other action

contemplated by the Purchase Agreement, and any discharge or release of indebtedness as result of the Purchase Agreement, is hereby granted by the Court.

49. **<u>Retention of Jurisdiction</u>**.    This Court shall retain jurisdiction to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Order and the Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith) and (ii) adjudicate disputes related to this Order and the Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

Dated: August 6th, 2020
Wilmington, Delaware

CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

Case 20-11157-CSS    Doc 690-1    Filed 08/06/20    Page 1 of 144

## **<u>EXHIBIT A</u>**

(Americas Stock and Asset Purchase Agreement and CPO Redline)

**HIGHLY CONFIDENTIAL**

**STOCK AND ASSET PURCHASE AGREEMENT**

dated as of July 27, 2020

by and among

**Exide Technologies, LLC, as Seller**,

**Battery BidCo LLC, as Buyer,**

**and**

**Atlas Capital Resources III LP, as Guarantor**

**HIGHLY CONFIDENTIAL**

## TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS.............................................................................1
  Section 1.01    Certain Defined Terms...........................................................1

ARTICLE II         PURCHASE AND SALE; CLOSING .........................................2
  Section 2.01    Purchase and Sale of the Transferred Equity Interests .................2
  Section 2.02    Purchase and Sale of Transferred Assets .................................2
  Section 2.03    Assignment of Certain Transferred Assets .................................8
  Section 2.04    Closing ...............................................................................8
  Section 2.05    Cure Costs; Right to Exclude Contracts ....................................9
  Section 2.06    Withholding ........................................................................10

ARTICLE III        PURCHASE PRICE ..................................................................11
  Section 3.01    Purchase Price.....................................................................11
  Section 3.02    Purchase Price Deposit ........................................................11
  Section 3.03    Certain Closing Deliverables .................................................11
  Section 3.04    Estimated Closing Statement; Closing Payment...........................14
  Section 3.05    Proposed Final Closing Statement and Final Closing Statement......14
  Section 3.06    Post-Closing Adjustment ......................................................16
  Section 3.07    Purchase Price Allocation .....................................................16

ARTICLE IV         REPRESENTATIONS AND WARRANTIES OF SELLER.....17
  Section 4.01    Formation and Qualification of the Transferred Entities.................17
  Section 4.02    Capital Structure of the Transferred Entities .............................17
  Section 4.03    Formation and Authority of the Seller Parties; Enforceability .........17
  Section 4.04    No Conflict.........................................................................18
  Section 4.05    Consents and Approvals .......................................................18
  Section 4.06    Financial Information; Absence of Undisclosed Liabilities .............19
  Section 4.07    Absence of Certain Changes or Events.....................................19
  Section 4.08    Absence of Litigation...........................................................19
  Section 4.09    Compliance with Laws; Permits .............................................20
  Section 4.10    Intellectual Property............................................................20
  Section 4.11    Environmental Matters..........................................................21
  Section 4.12    Material Contracts...............................................................22
  Section 4.13    Employment and Employee Benefits Matters .............................24
  Section 4.14    Taxes................................................................................26
  Section 4.15    Real Property .....................................................................28
  Section 4.16    Brokers.............................................................................28
  Section 4.17    Title; Sufficiency of Transferred Assets and Assets.....................28
  Section 4.18    Insurance ..........................................................................29
  Section 4.19    Affiliate Transactions...........................................................29
  Section 4.20    Condition of Transferred Assets and Assets...............................29
  Section 4.21    Corruption and Trade Regulation ...........................................29
  Section 4.22    No Other Representations or Warranties ...................................31

-i-

**HIGHLY CONFIDENTIAL**

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF BUYER ......................31
  Section 5.01   Formation and Authority of Buyer; Enforceability .........................31
  Section 5.02   Qualification of the Buyer .........................................................32
  Section 5.03   No Conflict............................................................................32
  Section 5.04   Consents and Approvals ...........................................................32
  Section 5.05   Absence of Restraints; Compliance with Laws ...............................33
  Section 5.06   Financial Ability ....................................................................33
  Section 5.07   Brokers.................................................................................33
  Section 5.08   Investigation..........................................................................33
  Section 5.09   Securities Matters....................................................................34

ARTICLE VI      ADDITIONAL AGREEMENTS..................................................34
  Section 6.01   Conduct of Business Before the Closing ......................................34
  Section 6.02   Access to Information ..............................................................36
  Section 6.03   Confidentiality .......................................................................37
  Section 6.04   Regulatory Approvals ..............................................................38
  Section 6.05   Third Party Consents................................................................40
  Section 6.06   Exide Canada ........................................................................40
  Section 6.07   Intercompany Obligations..........................................................40
  Section 6.08   Cooperation...........................................................................40
  Section 6.09   Bulk Transfer Laws..................................................................41
  Section 6.10   Employee Matters....................................................................41
  Section 6.11   Collective Bargaining Agreements ..............................................44
  Section 6.12   No Successor Liability .............................................................45
  Section 6.13   Insurance Matters....................................................................45
  Section 6.14   Guarantees; Other Obligations....................................................47
  Section 6.15   Europe/ROW Buyer.................................................................48
  Section 6.16   Financial Reporting..................................................................48
  Section 6.17   Disclosure Schedule Supplement.................................................49
  Section 6.18   BM Assembly Line ..................................................................49

ARTICLE VII      POST-CLOSING COVENANTS..................................................50
  Section 7.01   Access .................................................................................50
  Section 7.02   Directors' and Officers' Indemnification and Exculpation .................51
  Section 7.03   Preservation of Books and Records .............................................51
  Section 7.04   Further Assurances...................................................................52

ARTICLE VIII      BANKRUPTCY PROVISIONS....................................................52
  Section 8.01   [RESERVED] ........................................................................52
  Section 8.02   Competing Transaction .............................................................52
  Section 8.03   Bankruptcy Court Filings...........................................................52
  Section 8.04   Back-Up Bidder .....................................................................53

ARTICLE IX      TAX MATTERS.......................................................................53
  Section 9.01   Transfer Taxes .......................................................................53
  Section 9.02   Tax Adjustments .....................................................................54

**HIGHLY CONFIDENTIAL**

Section 9.03    Tax Cooperation...........................................................................54
Section 9.04    Post-Closing Filing of Transferred Entity Tax Returns....................54
Section 9.05    Code Section 338 Election................................................................55
Section 9.06    Canadian Transfer Tax Elections......................................................55
Section 9.07    Survival.............................................................................................55

ARTICLE X        CONDITIONS TO CLOSING .........................................55
Section 10.01   Conditions to Obligations of Seller..................................................55
Section 10.02   Conditions to Obligations of Buyer..................................................56
Section 10.03   Frustration of Closing Conditions....................................................57
Section 10.04   Waiver of Closing Conditions ..........................................................58

ARTICLE XI       TERMINATION.............................................................58
Section 11.01   Termination.......................................................................................58
Section 11.02   Notice of Termination.......................................................................59
Section 11.03   Effect of Termination........................................................................59

ARTICLE XII      MISCELLANEOUS .......................................................60
Section 12.01   Rules of Construction .......................................................................60
Section 12.02   Expenses............................................................................................61
Section 12.03   Notices...............................................................................................61
Section 12.04   Survival.............................................................................................62
Section 12.05   Limitation on Liability......................................................................63
Section 12.06   Public Announcements......................................................................63
Section 12.07   Severability .......................................................................................63
Section 12.08   Assignment .......................................................................................63
Section 12.09   No Third-Party Beneficiaries............................................................64
Section 12.10   Entire Agreement..............................................................................64
Section 12.11   Amendments......................................................................................64
Section 12.12   Waiver...............................................................................................64
Section 12.13   Governing Law .................................................................................64
Section 12.14   Dispute Resolution; Consent to Jurisdiction....................................65
Section 12.15   Waiver of Jury Trial..........................................................................65
Section 12.16   Admissibility into Evidence..............................................................66
Section 12.17   Remedies; Specific Performance ......................................................66
Section 12.18   Non-Recourse ...................................................................................66
Section 12.19   Interest...............................................................................................67
Section 12.20   Disclosure Schedules and Exhibits...................................................67
Section 12.21   Provision Respecting Legal Representation ......................................67
Section 12.22   Counterparts......................................................................................68
Section 12.23   Guaranty............................................................................................68

-iii-

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Bill of Sale, Assignment and Assumption Agreement |
| Exhibit C | Form of Transferred Leased Property Assignment and Assumption Agreement |
| Exhibit D | Form IP Assignment Agreement |
| Exhibit E | Transaction Accounting Principles and Reference Working Capital Statement |

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule A | Transferred Entities; Transferred Equity Interests |
| Schedule B | Debtors |
| Schedule C | Certain Transaction Agreements Key Terms |

**HIGHLY CONFIDENTIAL**

This STOCK AND ASSET PURCHASE AGREEMENT, dated as of July 27, 2020 (the "**Agreement Date**"), is made by and between Exide Technologies, LLC, a Delaware limited liability company ("**Seller**"), and Battery BidCo LLC, a Delaware limited liability company (together with is permitted assigns pursuant to Section 12.08, "**Buyer**") and, solely for purposes of Section 12.17, 12.18 and 12.23, Atlas Capital Resources III LP, A Delaware limited partnership ("**Guarantor**" and together with Seller and Buyer, the "**Parties**").

PRELIMINARY STATEMENTS

A.      Seller and certain of its Affiliates are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and, on May 19, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), commencing the jointly administered bankruptcy cases pending as *In re Exide Holdings*, Case No. 20-11157 (collectively, the "**Bankruptcy Cases**").

B.      Seller owns or controls, directly or indirectly, the other Seller Parties.

C.      Certain Seller Parties own the equity interests (collectively, the "**Transferred Equity Interests**") of the Persons set forth on Schedule A (each a "**Transferred Entity**" and, together, the "**Transferred Entities**") as and to the extent set forth beside such Transferred Entity's name on Schedule A.

D.      The Seller Parties and the Transferred Entities are engaged in, or hold assets or liabilities relating to, the Business (and/or, in the case of certain of the Seller Parties hold Transferred Equity Interests).

E.      The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties all of the Transferred Equity Interests and the Transferred Assets, and Buyer desires to assume the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.   Capitalized terms used in this Agreement have the meanings specified in Exhibit A.

1

**HIGHLY CONFIDENTIAL**

## ARTICLE II

## PURCHASE AND SALE; CLOSING

Section 2.01   <u>Purchase and Sale of the Transferred Equity Interests</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall and shall cause each other applicable Seller Party to sell, convey, assign, transfer and deliver to Buyer or Buyer's Affiliates, and Buyer shall or shall cause one of its Affiliates to purchase, acquire and accept from each such Seller Party all of such Seller Party's right, title and interest in and to the Transferred Equity Interests.

Section 2.02   <u>Purchase and Sale of Transferred Assets</u>.

(a)   <u>Transferred Assets</u>. On the terms and subject to the conditions set forth in this Agreement and subject to the exclusions set forth in <u>Section 2.02(b)</u> and <u>Section 2.03</u>, at the Closing, Seller shall and shall cause each other Seller Party to sell, convey, assign, transfer and deliver to Buyer, and Buyer shall  purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and  interest in, to and under the following assets, rights and properties,  in each case,  other  than  the  Transferred Equity Interests  (collectively, the "**Transferred Assets**"):

(i)   all owned real property listed on <u>Schedule 2.02(a)(i)</u> (the "**Transferred Owned Real Property**") held by each Seller Party, together with (to the extent of such Seller Party's interest therein) all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof and all servitudes, easements, privileges, rights-of-way, development rights, air rights, other  surface use agreements and water use and rights agreements related thereto;

(ii)   to the maximum extent permitted by the Bankruptcy Code or applicable Law, the leasehold interests listed on <u>Schedule 2.02(a)(ii)</u> under the real property leases, subleases or licenses (the "**Transferred Leased Real Property**") held by each Seller Party and all rights in respect thereof (including all transferrable options and rights of first offer and/or refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto (the "**Transferred Leases**");

(iii)   to the maximum extent permitted by the Bankruptcy Code, all Assumed Contracts (collectively with the Transferred Leases, the "**Transferred Contracts**");

(iv)   to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Permits, including Environmental Permits (the "**Transferred Permits**");

(v)   all rights of any Seller Party under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current and former employees and agents of any Seller Party or third party to the extent related to the Transferred Assets (or any portion thereof);

(vi)   to the maximum extent permitted by the Bankruptcy Code, all rights of any Seller Party under or pursuant to all warranties, representations and guarantees made by

2

**HIGHLY CONFIDENTIAL**

suppliers, manufacturers and contractors, to any Seller Party to the extent related to the Transferred Assets;

       (vii)   to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Business Intellectual Property (and the right to sue, bring claims and other Causes of Action for infringement, misappropriation or violation thereof) and Business Technology,  including the Business Intellectual Property and Business Technology set forth on Schedule 2.02(a)(vii);

       (viii)   all assets, rights and properties of or relating to the Assumed Employee Plans;

       (ix)   the Transferred Books and Records;

       (x)   all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, machinery, tools, tooling, vehicles, and other tangible personal  property to the extent related to the Business, other than those described under Section 2.02(b)(xviii) or Section 2.02(b)(xx);

       (xi)   all inventory wherever located, including all semi-finished and finished goods, raw materials, works in progress, packaging, supplies, tooling and parts, whether held at any location or facility of any Seller Party or in transit to any Seller Party, in each case, as of the Effective Time and related to the Business;

       (xii)   goodwill of the Business;

       (xiii)   all accounts receivable of the Business, which, for the avoidance of doubt, includes all of the accounts receivable in the accounts that comprise "*Accounts receivable, net*" as referenced in Exhibit E;

       (xiv)   all customer and supplier lists related to the Business;

       (xv)   all rights, demands, claims, causes of action, prepayments, refunds, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation and other claims of any of the Seller Parties against any Person (collectively, "**Causes of Action**") arising from any of the Transferred Assets or related to the Business, including any rights against third parties under Transferred Contracts other than those Causes of Action described in Section 2.02(b)(iv), Section 2.02(b)(v), and Section 2.02(b)(vii);

       (xvi)   the assets listed on Schedule 2.02(a)(xvi); provided, however, that notwithstanding anything else to the contrary herein, including this Section 2.02(a), the Seller Party shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and  interest in, to and under the assets, rights and properties identified and set forth in Paragraph 2 of Schedule 2.02(a)(xvi) (the "**Reading Assets**") on the date of the expiration or other earlier termination of the Reading SOW (the "**RSOW Expiration Date**"); provided, further, that, for the avoidance of doubt,

3

**HIGHLY CONFIDENTIAL**

the Reading Assets shall not be transferred to sold, conveyed, assigned, transferred or delivered to Buyer at any time on or prior to the RSOW Expiration Date;

(xvii)   Cash (after taking into account all Cash of the Transferred Entities, but excluding Cash in the bank accounts set forth on Schedule 2.02(b)(xviii)) up to an amount equal to the Target Cash Amount;

(xviii) to the maximum extent transferrable, all bank accounts related to the Business, other than those set forth on Schedule 2.02(b)(xviii);

(xix)   all prepaid expenses and deposits, to the extent related to the Business, other than (A) adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code and (B) those prepaid expenses and deposits set forth Schedule 2.02(b)(xvi);

(xx)   other than any Excluded Assets, all other assets, properties or rights of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, that are owned by a Seller Party and related to the Business; and

(xxi)   to the maximum extent permitted by the Bankruptcy Code or applicable Law and subject to Section 6.13, all occurrence-based Insurance Policies set forth on Schedule 2.02(a)(xxi) (each, a "**Transferred Insurance Policies**") and all rights of any nature with respect to any such Transferred Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries.

(b)   Excluded Assets. Notwithstanding anything to the contrary herein, the following assets, rights or properties of or in the possession of the Seller Parties (the "**Excluded Assets**") shall be retained by the Seller Parties and their Affiliates, other than the Transferred Entities:

(i)   all Available Contracts (other than Transferred Contracts) and all Contracts not related to the Business ("**Excluded Contracts**");

(ii)   Cash in excess of the Target Cash Amount;

(iii)   other than the Transferred Owned Real Property and Transferred Leased Real Property, all right, title and interest in owned and leased real property together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof, and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and, with respect to any such leased real property, all rights in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto (collectively, the "**Excluded Real Property**");

(iv)   all Causes of Action (i) against any Seller Party or any of their respective current or former directors, managers, officers equityholders or Affiliates (as of the date hereof and as of the Closing), including any Cause of Action that is the subject of or may be brought by the Debtors' subcommittee of the special committee of the Board, other than those

4

**HIGHLY CONFIDENTIAL**

arising out of or relating to any Transaction Agreement, (ii) arising under Chapter 5 of the Bankruptcy Code, whether pursuant to federal Law or state Law equivalents, or (iii) arising with respect to an Excluded Asset and Excluded Liability (each, an "**Excluded Causes of Action**");

(v)     all claims, rights or interests of the Seller Parties and their Affiliates (other than the Transferred Entities) in or to any refund, rebate, abatement or other recovery for Taxes (other than in respect of (i) any Transfer Taxes borne by Buyer pursuant to <u>Section 9.01</u> and (ii) any Taxes allocable to Buyer pursuant to <u>Section 9.02</u>), and any other Tax assets (including any Tax attributes), together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof);

(vi)     all Tax Returns and all records (including all working papers) related thereto;

(vii)     other than the Transferred Insurance Policies, all other Insurance Policies and all rights of any nature with respect to any such Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries;

(viii)     all nontransferable Permits, including nontransferable Environmental Permits;

(ix)     all non-transferrable options and rights of first refusal related to the Transferred Leased Real Property;

(x)     all Intellectual Property that is owned or purported to be owned by any Seller Party, other than the Business Intellectual Property and Business Technology;

(xi)     all rights and interests of the Seller Parties under the Transaction Agreements;

(xii)     all assets, rights and properties of or relating to the Employee Plans that are not Assumed Employee Plans or Transferred Entity Employee Plans;

(xiii)     (A) all minute books (and other similar corporate records) and stock records, (B) any books and records related to the Excluded Assets, (C) any books and records or other data or materials of or in the possession of the Seller Parties that (x) any of the Seller Parties are required by Law or by Final Order of the Bankruptcy Court to retain, (y) any of the Seller Parties reasonably believes are necessary to enable the Seller Parties to prepare and/or file Tax Returns or (z) any of the Seller Parties are prohibited by Law, Contract or Seller Party's or Transferred Entity's public-facing policies, notices or other disclosures concerning the collection, use, or processing of Personal Data ("**Privacy Policies**") from delivering to Buyer (including confidential and personal medical records and Personal Data) or (D) any copies of any books and records that Seller and its Affiliates retain pursuant to <u>Section 7.03</u>; <u>provided</u>, that the Seller Parties shall permit Buyer to make copies of any books and records excluded pursuant to clause (C) to the extent not prohibited by Law, Contract or any Seller Party's or Transferred Entity's Privacy Policies;

5

**HIGHLY CONFIDENTIAL**

(xiv)    (A) all records and reports prepared or received by any Seller Party or any of its Affiliates in connection with the sale of the Business or the Transactions or any other Transaction Agreement, including all analyses relating to Buyer or any other third-party bidder so prepared or received and (B) all bids and expressions of interest received from third parties with respect to the Business;

(xv)    any warranties, representations and guarantees pertaining to any Excluded Asset and all rights and defenses pertaining to any Excluded Liability;

(xvi)    all adequate assurance deposits posted in accordance with section 366 of the Bankruptcy Code and the prepaid expenses and deposits set forth on Schedule 2.02(b)(xvi);

(xvii)    all right, title and interest in and to all shares, capital stock and other equity interests of any Person owned by any Seller Party, including the Transferred Equity Interests (the transfer of which shall be governed by Section 2.01);

(xviii)    all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, vehicles, and other tangible personal property to the extent exclusively related to the business of the Seller Parties (other than the Business) or located or operated exclusively at the Excluded Real Property (other than the items listed on Schedule 2.02(a)(xvi));

(xix)    the bank accounts set forth on Schedule 2.02(b)(xix) (including any Cash held therein) and all nontransferable bank accounts;

(xx)    any other assets, properties or rights set forth on Schedule 2.02(b)(xx); and

(xxi)    any Transferred Asset that is (A) not located on Transferred Owned Real Property or Transferred Leased Real Property and (B) not removed by Buyer or its Affiliates within sixty (60) days following the Closing from the property where such Transferred Asset is located on the Closing Date, shall be deemed an Excluded Asset and thereafter abandoned property.

(c)    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement and subject to the exclusions set forth in Section 2.02(d),  Buyer shall or shall cause one of its Affiliates to, effective at and as of the Effective Time, assume and thereafter timely pay, discharge and perform in accordance with their terms, only the following Liabilities of the Seller Parties (the "**Assumed Liabilities**"):

(i)    all Liabilities arising under any of the Transferred Contracts, except to the extent that such Liabilities are required to be performed on or prior to the Closing Date;

(ii)    all Liabilities in respect of trade accounts payable of a kind set forth on Schedule 2.02(c)(ii);

**HIGHLY CONFIDENTIAL**

(iii)     all Cure Costs payable by Buyer pursuant to <u>Section 2.05</u>;

(iv)     [RESERVED];

(v)     all Liabilities (A) assumed by Buyer pursuant to <u>Section 6.10</u> and (B) with respect to the Assumed Employee Plans;

(vi)     all Liabilities relating to Buyer's ownership or operation of the Transferred Assets, to the extent arising from events, facts or circumstances that occur from and after the Effective Time; and

(vii)     to the extent that any Affected Union enters into a Modified Labor Agreement with Buyer, all Liabilities arising under such Modified Labor Agreement from and after the Effective Time.

For the avoidance of doubt, any Liability of a Transferred Entity shall continue to be a Liability of such Transferred Entity and will remain with the Transferred Entity that held such Liability as of immediately prior to the Closing.

(d)     <u>Excluded Liabilities</u>.     Notwithstanding any other provision of this Agreement to the contrary, Buyer and Buyer's Affiliates are not assuming or agreeing to pay or discharge, and their Seller Parties and their Affiliates shall be solely and exclusively liable with respect  to, the following Liabilities (the "**Excluded Liabilities**"):

(i)     any Debt or any Seller Guarantee, except to the extent provided in <u>Section 6.14</u>;

(ii)     any Liability to the extent arising out of any Excluded Asset;

(iii)     any Liability of the Seller Parties for Taxes;

(iv)     any Liability expressly retained by the Seller Parties pursuant to <u>Section 6.10</u>, including, but not limited to, any Liability relating to (i) the Employee Plans that are not Assumed Employee Plans and (ii) any Liability relating to an individual who does not accept employment or service with Buyer or an Affiliate of Buyer or who is otherwise terminated by a Seller Party or Transferred Entity prior to or on the Closing Date, irrespective of when such Liabilities arise;

(v)     any Liability relating  to amounts to be  paid by  the  Seller  Parties hereunder, including brokers fees;

(vi)     any Environmental Liabilities arising out of, or relating to: (A) Excluded Assets; (B) any properties that are not Transferred Assets; (C) to the maximum extent excludable by the Bankruptcy Code or other applicable Law, any Environmental Liabilities arising out of or relating to any Releases of Hazardous Materials at, on, to, or from the Transferred Assets that occurred prior to the Closing Date; (D) any Environmental Liabilities that the Seller Parties have assumed by Contract from a third party prior to the Closing Date that are not Transferred

**HIGHLY CONFIDENTIAL**

Contracts; (E) properties that a Seller Party does not own, lease or operate as of the Closing Date; (F) any Environmental Liabilities that arise under a Contract that is not a Transferred Contract; (G) any penalties or fines for violations of Environmental Law that occurred prior to the Closing Date; (H) the Transferred Entities prior to the Closing Date; or (I) Environmental Liabilities that were discharged in any prior bankruptcy proceedings of any Seller Party or Affiliate thereof;

(vii)    to the extent not already excluded under Section 2.02(d)(vi) and to the maximum extent excludable by the Bankruptcy Code or other applicable Law, any Environmental Liabilities arising out of or relating to: (A) any Releases of Hazardous Materials that occurred prior to the Closing Date; (B) any violations of Environmental Law that occurred prior to the Closing Date, regardless of whether those violations continue on or past the Closing Date; and/or (C) any storage, transportation, treatment, disposal, discharge, recycling or Release of Hazardous Materials generated or managed by the Seller Parties, the Transferred Entities or the Business at any location (including, but not limited to, off-site disposal locations) prior to the Closing Date;

(viii)   any Liability (A) related to any misclassification under the Fair Labor Standards Act or similar state Law or the misclassification of independent contractors prior to the Closing Date, (B) related to workers' compensation claims or coverage related to the period prior to the Closing Date, (C) under any Collective Bargaining Agreement to which any of the Seller Parties or their Affiliates is a party provided the liability arises from the action or inaction of Sellers prior to or on the Closing Date, (D) related to any notice or payment in lieu of notice and any applicable penalties under the WARN Act and similar state or local Law, or any similar provision in a Collective Bargaining Agreement that requires notice on or prior to the Closing Date unless the requirement for notice or payment in lieu of notice and any applicable penalties under the WARN Act and similar state or local Law, or any similar provision in a Collective Bargaining Agreement, arises as a result of Buyer's actions on or after the Closing Date;

(ix)     any Liability relating to wages, bonuses, commissions, independent contractor payments, incentives, payroll, workers' compensation, unemployment benefits, severance or similar payments that arises at or prior to the Closing or that is payable or becomes payable or due in whole or in part to any Person prior to or on the Closing, including all employer Taxes related thereto;

(x)      any Liability in respect of pre-petition trade accounts payable; and

(xi)     any other Liability of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereafter created, other than an Assumed Liability.

Section 2.03   Assignment of Certain Transferred Assets.   Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Government Authority), would constitute a breach or other contravention thereof or a violation of Law or Order, and is not otherwise permitted by the Bankruptcy Code or Order of the Bankruptcy Court (a "**Restricted Transfer**"). If, on the Closing Date, any such

8

**HIGHLY CONFIDENTIAL**

attempted transfer or assignment would be a Restricted Transfer or otherwise would be ineffective, the Seller Parties and Buyer will, subject to Section 6.04 and Section 6.05 and except with respect to any Personal Data in possession or control of any Seller Party or any Transferred Entity, cooperate in a mutually agreeable arrangement under which, for up to three (3) months following Closing, (a) Buyer would, in compliance with Law or an Order of the Bankruptcy Court, obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset, claim, right or benefit in accordance with this Agreement, including, for example (and without limitation of other similar arrangements being employed instead and in place thereof), by the applicable Seller Party or Parties subcontracting, sublicensing or subleasing such Transferred Asset to Buyer or (b) the Seller Parties would enforce for the benefit (and at the expense) of Buyer any and all of the Seller Parties' rights, claims or benefits against a third party associated with such Transferred Asset, and the Seller Parties would promptly pay to Buyer when received all monies received by them under any such Transferred Asset, claim, right or benefit (net of the Seller Parties' expenses incurred in connection with any assignment or other performance contemplated by this Section 2.03).

Section 2.04    Closing.    The closing of the sale and purchase of the Transferred Equity Interests and the Transferred Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 on the second (2nd) Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing. The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**."  For all purposes under this Agreement and each other Transaction Agreement, (a) except as otherwise expressly provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

Section 2.05    Cure Costs; Right to Exclude Contracts.

(a)    Available Contracts.    As soon as reasonably practicable and no later than the date of this Agreement, Seller shall provide Buyer with a list of all executory Contracts Related to the Business, other than Available Software Contracts,  to which one or more Seller Parties is a party (such Contracts, the "**Available Contracts**"  and such list, the "**Available Contracts List**"), which list may be updated from time to time prior to Closing by the Seller Parties to add any Available Contracts not previously included thereon. At any time following the Agreement Date until (x) with respect to Available Software Contracts, July 28, 2020 or (y) with respect to all other Available Contracts, the later of (i) the date that is three (3) Business Days prior to date of the hearing at which the Bankruptcy Court considers entry of the Sale Order, and (ii) five (5) Business Days after such Available Contract was added to the Available Contracts List (such date, the "**Determination Date**"), Buyer, in its sole discretion, may deliver one or more written notices to Seller, (each such notice, a "**Designation Notice**"),  pursuant to which Buyer shall designate in writing which Available Software Contracts or Available Contracts, as applicable, that Buyer wishes to assume at Closing (collectively, the "**Assumed Contracts**") and provided, that, from

**HIGHLY CONFIDENTIAL**

time to time until the applicable Determination Date, Buyer may, by written notice to Seller, determine not to assume any Available Software Contracts or Available Contracts, as applicable, previously designated as an Assumed Contract (and from and after such date such Contract shall be an Excluded Contract). All Available Software Contracts or Available Contracts, as applicable that Buyer does not timely designate in writing for assumption pursuant to a Designation Notice shall not be considered Assumed Contracts or Transferred Assets, and shall be deemed Excluded Contracts and Excluded Assets for all purposes under this Agreement. Buyer shall not be responsible for any Cure Costs related to any Excluded Contracts. Upon Buyer's reasonable request, subject to the limitations set forth in Section 6.02(b), the Seller Parties shall provide additional detailed information as to the post-Closing Liabilities under the Available Software Contracts or Available Contracts, as applicable sufficient for Buyer to make an informed assessment whether to designate such Contract as an Assumed Contract pursuant to this Section 2.05(a).

(b)    Buyer Commitment to Pay Cure Costs. At or prior to Closing, Buyer shall promptly pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts (as set forth in this Agreement, as agreed by Debtors and the Contract counterparty (subject to Section 2.05(c)) or as determined by the Bankruptcy Court). The Seller Parties shall cooperate with Buyer to facilitate the payment of the Cure Costs to the Contract counterparties on or prior to the Closing Date. The Seller Parties shall use commercially reasonable efforts to take all actions required to assume and assign the Assumed Contracts to Buyer (other than payment of Cure Costs), including taking all actions required to obtain a Final Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code and any other applicable Law.

(c)    Determination of Cure Costs. If any objection is filed by an Available Contract counterparty with respect to any Available Contract, such Contract shall become a "**Disputed Contract**", and the Seller Parties, in consultation with Buyer, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Bankruptcy Court shall approve. The Debtors shall not settle a disputed Cure Cost for an amount in excess of $5,000, individually, and $75,000, in the aggregate, of Seller's estimated Cure Cost for such Available Contract with regard to any Available Contract that has been, as of the date of such settlement, designated as an Assumed Contract pursuant to a Designation Notice, without the express written consent of Buyer (acting reasonably). Upon a Final Order determining any Cure Costs regarding any Disputed Contract after the Closing (and prior to the earlier of date that is six (6) months following the Closing Date or confirmation of a Chapter 11 Plan for the Seller Parties), Buyer shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as a Transferred Contract or (y) designate the Disputed Contract as an Excluded Contract and shall not be responsible for the Cure Cost.

(d)    Post-Closing Assumption and Assignment of Contracts. From and after the Closing Date until the earlier of (x) sixty (60) days following Closing or (y) ten (10) days prior to the hearing to confirm or confirmation of, a Chapter 11 Plan for Seller Parties, the Seller Parties and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the

10

**HIGHLY CONFIDENTIAL**

Bankruptcy Court pursuant to section 365 of the Bankruptcy Code to assume and assign a Contract that was not identified as an Assumed Contract as of Closing.

        Section 2.06    Withholding.

        (a)    All payments under this Agreement are to be made free and clear and without deduction or withholding for any Taxes, except as required by applicable Tax Law.

        (b)    If any applicable Tax Law requires the deduction or withholding of any Tax from any such payment, then Buyer shall be entitled to make such deduction or withholding and shall provide notice to the Seller Parties at least ten (10) Business Days prior to the Closing Date, and shall work in good faith with the Seller Parties to minimize any such withheld amounts.

        (c)    Subject to Section 2.06(d), any amounts so deducted or withheld by Buyer shall be timely paid to the relevant Taxing Authority in accordance with the applicable Tax Law and Buyer shall use commercially reasonable efforts to provide written receipts evidencing payment in accordance with applicable Tax Law and any other documentation provided by the Taxing Authority in connection with such payment.

        (d)    On Closing, Buyer shall be entitled to withhold such portion of the Purchase Price as is required to be withheld pursuant to section 116 of the Income Tax Act (Canada) and sections 1101 and 1102.2 of the *Quebec Taxation Act* and shall transfer any amounts so withheld to the Canadian Tax Escrow Agent to be held in accordance with the terms of the Canadian Tax Escrow Agreement.

        (e)    To the extent that any amounts are deducted or withheld and timely paid pursuant to this  Section 2.06, such amounts will be treated for all purposes of this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. Notwithstanding the foregoing, Taxes for purposes of this Section 2.06 shall not include Transfer Taxes.

### ARTICLE III

### PURCHASE PRICE

        Section 3.01   Purchase Price.  The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Equity Interests, the Transferred Assets and the obligations of Seller, the Seller Parties set forth in this Agreement shall be (a) an amount in cash equal to the sum of (i) $178,600,000 (the "**Base Purchase Price**"), plus (ii) the Final Working Capital Increase (if any), minus (iii) the Final Working Capital Decrease (if any), minus (iv) the Final Transferred Entity Debt (if any), plus (v) the Final Cash Amount Increase (if any), minus (vi) the Final Cash Amount Decrease (the resulting number being the "**Purchase Price**"), and (b) the assumption of the Assumed Liabilities.

        Section 3.02   Purchase Price Deposit.  Upon the execution of this Agreement, pursuant to the terms of this Agreement and the Escrow Agreement, as applicable, Buyer shall immediately deposit with Citibank N.A., in its capacity as escrow agent (the "**Escrow Agent**"), the sum of

**HIGHLY CONFIDENTIAL**

$17,860,000 representing ten percent (10%) of the Base Purchase Price, by wire transfer of immediately available funds (the "**Escrowed Funds**"), to be released by the Escrow Agent and delivered to either Buyer or Seller in accordance with this Agreement and the provisions of the Escrow Agreement. The Escrowed Funds (together with any and all accrued investment income thereon) shall be distributed upon the earlier of the Closing or the termination of this Agreement in accordance with Section 3.03(a)(ii) and 3.03(b)(ii) or Section 11.03, as applicable.

Section 3.03    Certain Closing Deliverables.  At the Closing:

(a)    Seller shall deliver or cause to be delivered to Buyer the following:

(i)    to the extent the Transferred Equity Interests are certificated, certificates (or if such certificate cannot be located by the applicable Seller Party, an indemnity in favor of the Transferred Entity in agreed form) evidencing the Transferred Equity Interests, duly endorsed in blank or accompanied by stock powers duly executed in blank;

(ii)    a counterpart of the Joint Written Instructions, duly executed by Seller, directing the Escrow Agent to deliver to Seller the Escrowed Funds;

(iii)    a counterpart of the Bill of Sale, Assignment and Assumption Agreement for Transferred Assets (other than the Transferred Leases and Reading Assets), in the form attached hereto  as Exhibit B (the "**Bill of Sale, Assignment and Assumption Agreement**"), duly executed by the  applicable Seller Parties;

(iv)    a counterpart of the Assignment and Assumption Agreement for Transferred Leases, in the form attached hereto as Exhibit C (the "**Transferred Leased Property Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties together with duly executed Transfer Tax or sales disclosure forms, where applicable unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available   post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(v)    counterparts of the IP Assignment Agreement, in the form attached hereto as Exhibit D (the "**IP Assignment Agreement**"), duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(vi)    a counterpart of each of the Debtors TSA, duly executed by the applicable  Seller Parties and their Affiliates;

(vii)    counterparts of the Trademark Co-Existence Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

12

**HIGHLY CONFIDENTIAL**

        (viii)    counterparts of the TSA, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

        (ix)    counterparts of the IP Cross License Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

        (x)    counterparts of the Supply Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

        (xi)    the officer's certificate required to be delivered pursuant to Section 10.02(a)(iv), a copy of which shall also be delivered to the Title Company;

        (xii)    duly executed deeds (the "**Deeds**") or comparable instruments of transfer, in customary form, conveying to Buyer, good and valid fee simple title to the Transferred Owned Real Property free and clear of all Liens, except for Permitted Liens, together with duly executed Transfer Tax or sales disclosure forms, where applicable unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

        (xiii)    a customary owner's title affidavit, in form and substance reasonably acceptable to Seller and the Title Company;

        (xiv)    a statement from each Seller Party in accordance with the requirements of Treasury Regulations Section 1.1445-2(b)(2) demonstrating that no withholding is required under Section 1445 of the Code with respect to the Transactions contemplated in this Agreement;

        (xv)    a counterpart of each local transfer agreement or other instrument of transfer, in customary form and substance to effect the transfer of the Transferred Equity Interests or Transferred Assets in the jurisdictions set forth on Schedule 3.03(a)(xv) (the "**Local Agreements**"), duly executed by the applicable Seller Parties;

        (xvi)    a counterpart of individual employment agreements, in form and substance reasonably acceptable to Buyer, duly executed by each of Mike Judd and Tim Vargo; and

        (xvii)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Transferred Equity Interests and Transferred Assets to Buyer.

        (b)    Buyer shall deliver or cause to be delivered to Seller the following:

HIGHLY CONFIDENTIAL

(i)      the Closing Payment as specified in the Estimated Closing Statement (less the amount of the Escrowed Funds), by wire transfer of immediately available funds to an account or accounts as directed by Seller (on behalf of itself, the Seller Parties) in the Estimated Closing Statement;

(ii)      a counterpart of the Joint Written Instructions, duly executed by Buyer, directing the Escrow Agent to deliver to Seller the Escrowed Funds;

(iii)      all required Transfer Tax stamps and transfer forms (if any), unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(iv)      a receipt for the Transferred Equity Interests, duly executed by Buyer and other instruments of transfer duly executed by Buyer, as required by applicable Law or otherwise required to validly transfer title in and to the Transferred Equity Interests to Buyer;

(v)      a counterpart of the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer;

(vi)      a counterpart of the Transferred Leased Property Assignment and Assumption Agreement, duly executed by Buyer;

(vii)      a counterpart of each Local Agreement, duly executed by Buyer;

(viii)      a counterpart of each of the Debtors TSA, duly executed by Buyer and its applicable Affiliates;

(ix)      the officer's certificate required to be delivered to Seller pursuant to Section 10.01(a)(iii); and

(x)      such other documents, instruments and certificates as Seller (on behalf of itself and the Seller Parties) may reasonably request.

Section 3.04   Estimated Closing Statement; Closing Payment.  No fewer than two (2) Business Days before the Closing Date, Seller shall prepare and deliver to Buyer a written statement, together with reasonably detailed supporting documentation (the "**Estimated Closing Statement**"), setting forth each of: (i) the amount of Estimated Working Capital; (ii) the amount of any Estimated Working Capital Increase or Estimated Working Capital Decrease; (iii) the amount of the Estimated Transferred Entity Debt; (iv) the Estimated Cash Amount; (v) the amount of the Estimated Cash Amount Increase or Estimated Cash Amount Decrease, as applicable; (vi) the aggregate amount to be paid by Buyer to Seller (for the benefit of itself and the other Seller Parties) at the Closing (the "**Closing Payment**"), which amount shall be equal to the sum of: (A) the Base Purchase Price, plus (B) the Estimated Working Capital Increase, if applicable, minus (C) the Estimated Working Capital Decrease, if applicable, minus (D) the Estimated Transferred Entity Debt, plus (E) the Estimated Cash Amount Increase, if applicable; minus (F) the Estimated

**HIGHLY CONFIDENTIAL**

Cash Amount Decrease, if applicable; and (vii) the wire transfer information for the account or accounts to which Buyer shall pay the Closing Payment. The Closing Payment and any other payments to be made to Seller under this Agreement shall be paid to Seller for its account and as agent for the account of the other Seller Parties, unless otherwise specified by Seller in the Estimated Closing Statement.

Section 3.05    Proposed Final Closing Statement and Final Closing Statement.

(a)      Within thirty (30) days after the Closing Date, Buyer shall provide to Seller a written statement (the "**Proposed Final Closing Statement**") setting forth (i) the Proposed Final Working Capital, (ii) the Proposed Final Transferred Entity Debt, (iii) the Proposed Final Cash Amount, and (iv) a description in reasonable detail, of any proposed changes to the Estimated Closing Statement, attaching supporting schedules, working papers and all other relevant documents and details to enable a review thereof by Seller.

(b)      Seller shall have sixty (60) days (the "**Review Period**") from the date upon which Buyer delivered its Proposed Final Closing Statement to review the same. During the Review Period, Seller and its Representatives shall be permitted to review Buyer's work papers, all books and records of Buyer and its Affiliates (including, after the Closing, the Transferred Entities) related to the Business prior to the Closing used or useful in the review of the Proposed Final Closing Statement, and the work papers of Buyer's accountants and Buyer's accountants' review of the Proposed Final Closing Statement, and Buyer shall promptly, and in any event within such time frame as reasonably required by Seller, make available the individuals in Buyer's and its Affiliates' employ as well as Representatives of its independent accountants responsible for and knowledgeable about the information used in, and the preparation of the Proposed Final Closing Statement, to respond to the reasonable inquiries of, or requests for information by, Seller or its Representatives. Buyer agrees that, following the Closing through the date that the Final Closing Statement becomes conclusive and binding upon the Parties in accordance with this Article III, it will not (and will cause its Affiliates not to) take any actions, except as required by Law, with respect to any books, records, policies or procedures on which the Proposed Final Closing Statement is based or on which the Final Closing Statement is to be based that are inconsistent with or that would impede or delay the determination of the amount of the Final Working Capital, the Final Transferred Entity Debt, the Final Cash Amount, or the preparation of the Dispute Notice (defined below) or the Final Closing Statement, in each case, in the manner and utilizing the methods required by this Agreement.

(c)      If Seller disputes any item set forth in the Proposed Final Closing Statement, Seller shall, during the Review Period, deliver written notice to Buyer of the same, specifying in reasonable detail the basis for such dispute and Seller's proposed modifications to the Proposed Final Closing Statement (such notice, the "**Dispute Notice**"). Upon the expiration of the Review Period, any matters that are not subject to a timely delivered Dispute Notice shall be deemed to have been agreed to and shall be conclusive and binding upon the Parties and shall be reflected in the Final Closing Statement. If Seller does not timely deliver a Dispute Notice, the Proposed Final Closing Statement shall be deemed the Final Closing Statement. During the thirty (30)-day period immediately following the date on which Seller delivers a Dispute Notice (the "**Resolution Period**"), Buyer and Seller shall negotiate in good faith to reach an agreement as to any matters

15

**HIGHLY CONFIDENTIAL**

identified in such Dispute Notice as being in dispute, and, to the extent such matters are so resolved within the Resolution Period, then the Proposed Final Closing Statement as revised to incorporate such changes as have been agreed between Buyer and Seller shall be conclusive and binding upon all Parties as the Final Closing Statement.

(d)    If Buyer and Seller fail to resolve any or all such disputed items within the Resolution Period then (subject to the last sentence of Section 3.05(e)), such remaining disputed items shall be finally and conclusively determined by the Bankruptcy Court in accordance with Section 3.05(e).

(e)    The Parties agrees that, to the extent not prohibited by the Bankruptcy Code or other applicable Law, the Bankruptcy Court shall render its determination of the Post-Closing Adjustment (and any component thereof in dispute) based solely on (i) written presentations of Buyer, on the one hand, and Seller, on the other hand, submitted to the Bankruptcy Court and not by independent review, (ii) only those matters in dispute and (iii) the provisions of this Section 3.05(e) and Section 3.05(f) and without assigning a value to any item greater than the greatest value for such item claimed by Buyer or Seller.

(f)    The Closing Payment, the Purchase Price, the Estimated Closing Statement, the Proposed Final Closing Statement and the Final Closing Statement and the determinations and calculations contained therein (including the calculation of Net Working Capital, Transferred Entity Debt, the Cash Amount) shall be prepared in a manner consistent with the Transaction Accounting Principles and Reference Working Capital Statement set forth on Exhibit E.

Section 3.06    Post-Closing Adjustment.

(a)    If the Post-Closing Adjustment, as finally determined pursuant to Section 3.05, is a positive number, Buyer shall pay an amount equal to the Post-Closing Adjustment to Seller. If the Post-Closing Adjustment, as finally determined pursuant to Section 3.05, is a negative number, Seller shall repay an amount equal   to the absolute value of the Post-Closing Adjustment to Buyer.

(b)    Any payment due under this Section 3.06 shall be paid by wire transfer of immediately available funds to an account or accounts, in each case, designated by Seller, on behalf  of itself and the other Seller Parties, or Buyer (as applicable) in the Estimated Closing Statement or the Proposed Final Closing Statement or otherwise in writing, within five (5) Business Days  after the date on which the Final Closing Statement becomes conclusive and binding on the Parties  in accordance with the provisions of Section 3.05, and, if not paid within such period, shall bear  interest at the Interest Rate.  All computations of interest shall be made in accordance with Section 12.19.

(c)    Any amount paid pursuant to this Section 3.06 shall be treated as an adjustment to the Purchase Price for income Tax purposes.

Section 3.07    Purchase Price Allocation.  Buyer and Seller agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Transferred Assets and the Transferred Equity Interests in accordance with the

**HIGHLY CONFIDENTIAL**

allocation under this <u>Section 3.07</u>, except as required by applicable Law.  No later than thirty (30) Business Days after the Final Closing Statement becomes conclusive, Seller shall deliver to Buyer an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Transferred Assets and the Transferred Equity Interests prepared in accordance with the methodologies mutually agreeable to the Parties (the "**Purchase Price Allocation**"). The Purchase Price Allocation shall be conclusive and binding on the Parties, provided, that if Buyer disagrees with Seller's Purchase Price Allocation, Buyer may, within thirty (30) days after delivery of such Purchase Price Allocation, deliver a notice (the "**Buyer's Allocation Notice**") to Seller to such effect, specifying those items as to which Buyer disagrees and setting forth Buyer's proposed allocation. If the Buyer's Allocation Notice is duly delivered, Buyer and Seller shall, during the thirty (30) days following such delivery, work in good faith to reach agreement on the disputed items or amounts. If Buyer and Seller are unable to reach such agreement, they shall promptly thereafter cause an internationally-recognized independent accounting firm mutually agreeable to Buyer and Seller ("**Independent Accounting Firm**") to resolve any remaining disputes, which decision shall be rendered within forty (40) days after such firm is retained and shall be final and binding on the Parties. One-half of the fees and expenses of the Independent Accounting Firm shall be paid by Buyer, and one-half of such fees and expenses shall be paid by Seller. The Parties shall make appropriate adjustments to the Purchase Price Allocation to reflect changes in the final Purchase Price. The Parties agree for all Tax reporting purposes to report the transactions in accordance with the Purchase Price Allocation, as adjusted pursuant to the preceding sentence, and to not take any position during the course of any audit or other proceeding inconsistent with such schedule unless required by a determination of the applicable Government Authority that is final.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 3.07</u> shall survive the Closing without limitation.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer, except as set forth in the Disclosure Schedules:

Section 4.01   <u>Formation and Qualification of the Transferred Entities</u>. Each Transferred Entity is a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to own and lease its assets, rights and properties to operate its business as now conducted. Each Transferred Entity is duly  qualified as a foreign corporation or other organization to do business, and, to the extent legally  applicable, is in good standing, in each jurisdiction in which the character of its owned, operated  or leased properties or the nature of its activities makes such qualification necessary, except where  the failure to be  so qualified or in good standing would not reasonably be expected to have a  Material Adverse Effect.

Section 4.02   <u>Capital Structure of the Transferred Entities</u>.  The authorized capital stock or other equity interests (if applicable) and the number of issued and outstanding shares or other

17

**HIGHLY CONFIDENTIAL**

equity interests of each Transferred Entity, and the owner thereof, is set forth on Schedule 4.02. The Seller Parties own  all of the Transferred Equity Interests, free and clear of all Liens, except any Lien arising out of,  under or in connection with the Securities Act or any other applicable securities Laws. All of the  Transferred Equity Interests have been duly authorized and validly issued, are, as applicable, fully   paid and nonassessable and were not issued in violation of any preemptive rights, purchase or call   rights, rights of first refusal, or subscription rights. There are no options, warrants, redemption or  repurchase rights or rights of conversion or other similar rights, agreements, arrangements or  commitments obligating any Transferred Entity to issue or sell any shares of its capital stock or other   equity interests or securities convertible into or exchangeable for its shares or other equity interests,   other than as provided in this Agreement. There are no voting trusts, stockholder or shareholder  agreements, proxies or other agreements in effect with respect to the voting or transfer of the  Transferred Equity Interests of any Transferred Entity.

Section 4.03   Formation and Authority of the Seller Parties; Enforceability.  Each Seller Party is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization. Except for such authorizations required by the Bankruptcy Court, Seller has (and each other Seller Party will have prior to the Closing) the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party. Except for such authorizations required by the Bankruptcy Court, each Seller Party has the requisite corporate or other power to operate its business with respect to the Transferred Assets or the Transferred Equity Interests, as applicable, that it owns as now conducted. Each Seller Party is duly qualified as a foreign corporation or other organization to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing has not had a Material Adverse Effect. The execution, delivery and performance by each Seller Party of the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party have been (or, in the case of a Seller Party other than Seller, will be prior to the Closing) duly authorized by all requisite corporate action on the part of such Seller Party. This Agreement has been duly executed and delivered by Seller, and upon execution and delivery thereof, the other Seller Transaction Agreements will be duly executed and delivered by the Seller Parties, to the extent party thereto, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Seller Transaction Agreements will constitute, legal, valid and binding obligations of the Seller Parties, to the extent party thereto, enforceable against the Seller Parties, to the extent party thereto, in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 4.04   No Conflict.  Provided that all Consents, waivers or other actions listed on Schedule 4.04 or described in Section 4.05 have been obtained or satisfied, the execution, delivery and performance by the Seller Parties of the Seller Transaction Agreements do not and will not and the consummation of the Seller Transactions will not:

18

**HIGHLY CONFIDENTIAL**

(a)     violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of any of the Seller Parties or the Transferred Entities;

(b)     violate in any material respect any Law or Order, applicable to the Seller Parties, the Transferred Entities or the Business or by which the Transferred Assets or Assumed Liabilities are bound or subject;

(c)     violate, conflict with, result in a breach of or constitute a violation or default (or any event that, with notice or lapse of time or both would constitute a default) under or give rise to any right to terminate, cancel or accelerate, or result in a loss of a material benefit under, any Material Contract, other than those violations, conflicts, or breaches that would not reasonably be expected to be material to the Business taken as a whole.

Section 4.05   Consents and Approvals.  The execution, delivery and performance by the Seller Parties of the Seller Transaction Agreements do not and will not require any material Consent, waiver, or other action by, or any material filing with or notification to, any Government Authority by any Seller Party or any Transferred Entity, except (a) in connection with applicable filing, notification, waiting period or approval requirements, to the extent required, under the HSR Act and all applicable Antitrust Laws, (b) entry by the Bankruptcy Court of the Sale Order, (c) where the failure to obtain such Consent or waiver, or to take such action or make such filing or notification would not reasonably be expected to be material to the Business taken as a whole.

Section 4.06   Financial Information; Absence of Undisclosed Liabilities.

(a)     Schedule 4.06(a) sets forth (i) the audited consolidated balance sheet (including any notes thereto) and related statements of income and cash flows of Seller and its Affiliates for the fiscal year ended March 31, 2019 (the "**2019 Audited Financial Statements**") and (ii) the unaudited consolidated balance sheet and related statements of income and cash flows of Seller and its Affiliates for the nine (9) month period ended December 31, 2019 (the "**2019 Interim Financial Statements**" and, together with the 2019 Audited Financial Statements and any other annual or quarterly financial statements delivered subsequently to Buyer in accordance with Section 6.16 the "**Financial Statements**"). The Financial Statements (A) have been (or will be) prepared based on the books and records of the Seller Parties and the Transferred Entities, (B) have been (or will be) prepared in all material respects in accordance with GAAP, and (C) present fairly (or will present fairly), in all material respects, the financial condition and results of operation of the Business (on a consolidated basis with the business of its Affiliates) as of the respective dates and for the respective periods presented, subject, in the case the 2019 Interim Financial Statements and any other annual or quarterly financial statements delivered under Section 6.16, to normal year-end adjustments and the absence of complete notes (as applicable) none of which are material in nature.

(b)     Other than (i) Liabilities set forth in the Financial Statements, (ii) Liabilities for Taxes, (iii) Liabilities incurred in the Ordinary Course of Business since December 31, 2019 (none of which related to a violation of Law or any tort or infringement Cause of Action), (iv) Liabilities arising under this Agreement, (v) Excluded Liabilities and (vi) Liabilities that would not reasonably be expected to be material to the Business taken as a whole, there are no Liabilities

19

**HIGHLY CONFIDENTIAL**

of the Business or the Transferred Entities that are required to be reflected on, reserved against or otherwise described in a balance sheet prepared in accordance with GAAP.

Section 4.07    Absence of Certain Changes or Events.  Except as contemplated by the Transaction Agreements, or in connection with the negotiation and execution of the Transaction Agreements, the filing of the Bankruptcy Cases or the consummation of the Transactions, since December 31, 2019, (a) through the Agreement Date, the Seller Parties and the Transferred Entities have conducted the Business in all material respects in the Ordinary Course of Business, (b) there has not been a Material Adverse Effect, and ( c ) there has been no change in any method of  accounting or accounting practice of the Seller Parties or Transferred Entities, except as required  by GAAP or applicable Law.

Section 4.08    Absence of Litigation.  No Actions are pending or, to the Knowledge of Seller, threatened in writing against the Seller Parties (with respect to the Business) or the Transferred Entities that would reasonably be expected to be material to the Business taken as a whole or would prevent or materially impair or delay the ability of any Seller Party to consummate the Seller Transactions.

Section 4.09    Compliance with Laws; Permits.

(a)    Each of the Seller Parties and the Transferred Entities are in compliance with all Laws or Orders applicable to the conduct of the Business, except where the failure to be in compliance would not reasonably be expected to be material to the Business taken as a whole. Neither the Seller Parties nor any of the Transferred Entities has received any written notice of or been charged with any violation of any Law applicable to the conduct of the Business, except where such violation would not be reasonably expected to be material to the Business taken as a whole.

(b)    Schedule 4.09(b) sets forth each of the material Permits held by any of the Seller Parties and the Transferred Entities. The Permits listed on Schedule 4.09(b) constitute all of the material Permits necessary for the operation of the Business as currently conducted and each such Permit is valid, binding and in full force and effect, in each case, except as would not reasonably be expected to be material to the Business taken as a whole. None of the Seller Parties or Transferred Entities has received written notice from threatening to suspend, revoke, withdraw or modify any Permit listed on Schedule 4.09(b).

Section 4.10    Intellectual Property.

(a)    Schedule 4.10(a) sets forth a list of all material Business Registrable IP, other than: (i) any new registrations or applications that would constitute Business Registrable IP after the Agreement Date, or (ii) any registrations or applications that may have expired or been cancelled or abandoned in the Ordinary Course of Business after the Agreement Date. To the Knowledge of the Seller, the Seller Parties or Transferred Entities own all right, title and interest in or have a valid and enforceable written license or right to use, all Business Intellectual Property. To the Knowledge of Seller, the Business Intellectual Property and the Business Technology, as used in the operation of the Business, and the operation of the Business by the Seller Parties and the Transferred Entities does not infringe upon or misappropriate the Intellectual Property of any

20

**HIGHLY CONFIDENTIAL**

third party in a manner that would reasonably be expected to be material to the Business taken as a whole.

(b)     None of the Seller Parties or the Transferred Entities has received any written claim or notice from any Person during the past three (3) years alleging that the operation of the Business by the Seller Parties or the Transferred Entities infringes upon or misappropriates any Intellectual Property of any third party which, if proven or established, would reasonably be expected to be material to the Business taken as a whole. There are no Actions pending or, to the Knowledge of Seller, threatened in writing against the Seller Parties or the Transferred Entities alleging that the operation of the Business infringes upon or misappropriates any Intellectual Property of any third party which, if proven or established, would reasonably be expected to be material to the Business taken as a whole.

(c)     To the Knowledge of Seller, no Person is infringing upon or misappropriating any material Business Intellectual Property, except for any such infringements or misappropriations that would not reasonably be expected to be material to the Business taken as a whole.

(d)     To the Knowledge of Seller, in the past three (3) years, there have been no security breaches, Data losses or failures of the Systems in each case, except as would not reasonably be expected to be material to the Business taken as a whole.

(e)     The Seller Parties and the Transferred Entities take commercially reasonable steps to maintain the confidentiality of all Trade Secrets included in the Business Intellectual Property and Business Technology that are material to the Business taken as a whole. To the Knowledge of Seller, during the past three (3) years, there has been no unauthorized use by any Person of any such material Trade Secrets, except as would not reasonably be expected to be material to the Business taken as a whole.

(f)     Each of the Seller Parties (with respect to the Transferred Assets) and the Transferred Entities has, during the past three (3) years, complied in all material respects with (i) all applicable Laws relating to the privacy and security of Personal Data, (ii) their respective Privacy Policies, and (ii) provisions of contracts related to the process of Personal Data. Seller is not aware of any written notices or complaints from any Person regarding a security breach.

(g)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this <u>Section 4.10</u> are the sole and exclusive representations and warranties made pertaining or relating to Intellectual Property, Personal Data and the subject matters set forth in this <u>Section 4.10</u>.

Section 4.11    <u>Environmental Matters</u>.

(a)     Each of the Seller Parties, with respect to the Business, and the Transferred Entities are in compliance with all applicable Environmental Laws, except where the failure to comply would not reasonably be expected to be material to the Business taken as a whole.

**HIGHLY CONFIDENTIAL**

(b)     Except as would not reasonably be expected to be material to the Business taken as a whole: (i) each of the Seller Parties, with respect to the Business, and the Transferred Entities are in compliance with all Environmental Permits required to operate the Transferred Assets, the Transferred Entities, and/or the Business, (ii) each such Environmental Permit is valid and in full force and effect, and there are no pending or, to the Knowledge of Seller, threatened proceedings relating to the appeal, revocation, withdrawal, non-renewal, suspension, cancellation or termination of such Environmental Permits, which would reasonably be expected to materially and adversely impact the operations of the Transferred Assets, the Transferred Entities, or the Business, and (iii) any applications for renewal of such Environmental Permits due under Environmental Laws or the terms of such Environmental Permit as of the date of this Agreement have been duly filed with the applicable Government Authority within the time frame required under applicable Environmental Laws.

(c)     There are no Actions pending against any of the Seller Parties, with respect to the Business, or Transferred Entities alleging that any of the Seller Parties or Transferred Entities are violating, or responsible for a Liability under, any Environmental Law, nor have the Seller Parties or Transferred Entities otherwise received any written notice from any Government Authority or other Person alleging any violation of, or Liability under, any Environmental Law, which, in each case, remains pending or unresolved.

(d)     Other than Releases of Hazardous Materials that will need to be addressed under the Resource Conservation and Recovery Act ("**RCRA**") Permits for the Muncie, IN, and Canon Hollow, MO, smelters, there have been no Releases of Hazardous Materials by the Seller Parties, with respect to  the Business, or Transferred Entities at or from the Transferred Owned Real Property or  Transferred Leased Real Property  in concentrations greater than those allowed under  Environmental Laws or Environmental Permits, which would reasonably be expected to require  investigation, remediation or monitoring by the Seller Parties or Transferred Entities that would   reasonably be expected to result in any material Liability.

(e)     No notice to, or approval by, any Government Authority is required under any Environmental Laws in order to lawfully consummate, or otherwise by virtue of, the Transactions, including, but not limited to, any notices or approvals that are required in order to transfer to Buyer any Environmental Permits required to operate the Transferred Assets or the Business, except for such approvals that would not reasonably be expected to be material to the Business taken as a whole.

(f)     To the Knowledge of Seller, the Seller Parties have provided or otherwise made available to Buyer: (i) copies, or a list of, all Environmental Permits currently held by the Seller Parties and the Transferred Entities; (ii) copies of all material, non-privileged documents bearing on the Seller Parties', with respect to the Business, and/or Transferred Entities' unresolved material Environmental Liabilities or violations of Environmental Law, to the extent in their possession or reasonable control.

(g)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this Section 4.11 are the sole and exclusive representations and warranties pertaining or relating to any environmental matters, including those related to Environmental Laws, Environmental Permits or Hazardous Materials.

22

**HIGHLY CONFIDENTIAL**

Section 4.12   Material Contracts.

(a)   Schedule 4.12(a) lists the following (i) Available Contracts and (ii) Contracts to which any Transferred Entity is a party, in each case that are in effect on the Agreement Date (other than purchase orders) (collectively, the "**Material Contracts**"):

(i)   Contracts, other than Employee Plans, with any current or former officer, employee or director of any Seller Party or Transferred Entity;

(ii)   Collective Bargaining Agreements or other Contracts with Unions currently representing any Transferred Employees;

(iii)   Contracts to sell (including contracts to assign or sublease any material Leased Real Property) or otherwise dispose (other than a non-exclusive license or sublicense) of any material Transferred Asset or Asset, other than in the Ordinary Course of Business, which Contracts have obligations that have not been satisfied or performed;

(iv)   Contracts relating to the acquisition by any Seller Party or Transferred Entity of any operating business or the capital stock of any other Person;

(v)   Contracts relating to the incurrence of Debt or the making of any loans;

(vi)   Contracts (or series of Contracts with the same counterparty), to the extent related to the Business, (A) to purchase goods or products from a supplier that will result in purchases or expenditures by the Seller Parties and the Transferred Entities in an aggregate amount that exceeds $2,500,000 annually or (B) to sell goods or products to a customer that will result in sales by the Seller Parties and the Transferred Entities in an aggregate amount that exceeds $2,500,000 annually, and, in the case of (A) and (B), extends or requires performance by any party thereto for more than one (1) year from the Agreement Date and are not terminable by the applicable Seller Parties or any Transferred Entities party thereto without penalty on less than ninety (90) days' notice;

(vii)   Contracts to enter into any commitment for capital expenditures, other than those contemplated by the CapEx Budget, in excess of $500,000 in the aggregate;

(viii)   Contracts with any Government Authority that will result in sales or expenditure by the Seller Parties or Transferred Entities in excess of $2,000,000 annually;

(ix)   Contracts pursuant to which a third party has granted to any Seller Party or Transferred Entity a license under, or a covenant not to sue in respect of, Business Intellectual Property, other than (A) licenses of commercially available off the shelf computer Software pursuant to which the annual license fees are less than $2,000,000 in the aggregate that is not incorporated in, distributed with any product or service of the Business and (B) non-exclusive licenses granted by the Seller Parties or the Transferred Entities to their customers, vendors, suppliers or distributors in the Ordinary Course of Business;

HIGHLY CONFIDENTIAL

(x)    Contracts containing any non-competition, non-solicitation, most favored nation or similar provision that otherwise prohibits the Seller Parties and the Transferred Entities from freely engaging in any material respect in respect of the Business anywhere in the world;

(xi)    any Contracts disclosed, or required to be disclosed, on Schedule 4.19; or

(xii)    any outstanding material settlement offers or other arrangements with respect to any current Action related to the Transferred Assets or the Business.

(b)    Each Material Contract is a legal, valid and binding obligation of the Seller Party or Transferred Entity party thereto, as the case may be, and, to the Knowledge of Seller, each other party to such Material Contract, and is enforceable against the applicable Seller Party or Transferred Entity, as the case may be, and, to the Knowledge of Seller, each other party to such Material Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.

(c)    To the Knowledge of Seller, none of the Seller Parties or the Transferred Entities has received or delivered any notice of any material default or event that with notice or lapse of time or both would constitute a material default under any Material Contract, except for defaults that would not reasonably be expected to be material to the Business taken as a whole.

Section 4.13    Employment and Employee Benefits Matters.

(a)    Schedule 4.13(a) lists all material Employee Plans, separately identifying which Employee Plans are Transferred Entity Employee Plans. With respect to each material Assumed Employee Plan and Transferred Entity Employee Plan, Seller has previously made available to Buyer a true and complete copy of the following documents, to the extent applicable: (i) any written plan documents and all amendments thereto, (ii) the most recent Forms 5500 and all schedules thereto and the most recent actuarial report, if any, (iii) the most recent IRS determination letter, (iv) insurance Contracts or other funding arrangements, (v) the most recent audited financial statements and actuarial valuation reports, and (vi) any material, non-routine correspondence with any Government Authority received in the past twenty-four (24) months regarding the operation or the administration of such Assumed Employee Plan or Transferred Entity Employee Plan. With respect to each other material Employee Plan, Seller has previously made available to Buyer a true and complete copy of any written plan documents and all amendments thereto or a summary plan description of such plan.

(b)    Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter, or is entitled to rely on an opinion letter, from the IRS.

(c)    Except as set forth on Schedule 4.13(c), no Employee Plan is, and neither Seller nor any of its ERISA Affiliates contribute to any employee benefit plan that is, (i) subject to Title IV of ERISA or Section 412 of the Code, (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) ("**Multiemployer Plan**"), (iii) a "multiple employer

24

**HIGHLY CONFIDENTIAL**

plan" as defined in Section 413(e) of the  Code, (iv) a "welfare benefit trust" or "voluntary employees beneficiary association" within the  meaning of Sections 419, 419A or 501(a)(9) of the Code, (v) a "multiple employer welfare  arrangement" (as defined in Section 3(40) of ERISA) or (vi) a "nonqualified deferred  compensation plan" within the meaning of Section 409A(d)(1) of the Code.  Other than as required  under Sections 601 to 608 of ERISA or other applicable Law, no Assumed Employee Plan or  Transferred Entity Employee Plan provides post-termination or retiree health benefits to any  individual for any reason, and, except as required by Law, neither the Seller nor any Transferred  Entity has any Liability to  provide post-termination or retiree health benefits to any individual or ever represented, promised  or contracted to any individual that such individual would be provided with post-termination or  retiree health benefits.

(d)       Except where the failure to do so would not reasonably be expected to be material to the Business taken as a whole, (i) each  Assumed Employee Plan and Transferred Entity Employee Plan complies in form and has been operated in accordance with its terms and all applicable Laws, (ii) each of the Seller Parties and the Transferred Entities have made all required contributions and paid in full all required insurance premiums and other required payments with regard to each Assumed Employee Plan and Transferred Entity Employee Plan to the extent due or owing on or before the Closing Date, (iii) if intended to qualify for special Tax treatment meets all requirements for such treatment, (iv) if intended to be fully funded and/or book-reserved is fully funded and/or book reserved, as appropriate, based upon reasonable actuarial assumptions and (v) for purposes of each Assumed Employee Plan and Transferred Entity Employee Plan, each Seller Party and Transferred Entity correctly classified those individuals performing services for the Business as common law employees, leased employees, independent contractors or agents.

(e)       No Employee Plan (other than a Multiemployer Plan) that is subject to Title IV of ERISA or Section 412 of the Code (a "**Title IV Plan**") has an "accumulated funding deficiency," whether or not waived, or is subject to a Lien for unpaid contributions under Section 303(k) of ERISA or Section 430(k) of the Code. No Title IV Plan has an "adjusted funding target attainment percentage," as defined in Section 436 of the Code, less than eighty percent (80%). With respect to each Title IV Plan, (i) no Action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan, (ii) no "reportable event," as defined in Section 4043 of ERISA, with respect to which the reporting requirement has not been waived has occurred with respect to any such Title IV Plan and (iii) all premiums owed to the Pension Benefit Guaranty Corporation for any period prior to the Closing Date have been timely paid.

(f)       To the Knowledge of Seller, no Actions are pending or threatened in writing from any Government Authority in connection with any Assumed Employee Plan or Transferred Entity Employee Plan (other than routine benefit claims) that would reasonably be expected to be material to the Business taken as a whole.

(g)       Except as set forth on Schedule 4.12(a)(ii), no Seller Party, with respect to the Business, or Transferred Entity is party to or bound by any Collective Bargaining Agreement or other Contract with a Union and no Covered Employee is represented by a Union. To the Knowledge of Seller, there is no effort currently being made or threatened by, or on behalf of, any

25

**HIGHLY CONFIDENTIAL**

Union to organize any Covered Employee, and there has been no such effort during the past six (6) months.

(h)     With respect to the Covered Employees, there are no (i) strikes, work stoppages, work slowdowns or lockouts pending, or, to the Knowledge of Seller, threatened against the Seller Parties, the Transferred Entities, or their respective Affiliates, or (ii) any Actions or any other material unfair labor practice charges, grievances, charges or complaints pending, or, to the Knowledge of Seller, threatened by or on behalf of any employee or group of employees of the Seller Parties, the Transferred Entities, or their respective Affiliates, except, in each case, as would not reasonably  be expected to result in material Liability to the Business or the Transferred Entities taken as a whole. The Seller Parties and their respective Affiliates are, and have been, in compliance in all material respects with all employment Laws with respect to the Covered Employees.

(i)     With respect to Covered Employees, (i) there has been no plant closing or mass layoff, as those terms (or similar) are commonly used in the federal WARN Act and any parallel state or local legislation or regulations, within the last twelve (12) months; and (ii) there has been no temporary furlough, layoff or plant closing within the last six (6) months which the any Seller Party or the Transferred Entities now reasonably believes will last longer than six (6) months beyond the time period during which the furlough, layoff or plant closing was implemented.

(j)     The Seller Parties and the Transferred Entities, as applicable, have paid in full (i) to all current and former employees primarily dedicated to the Business, any wages, salaries, commissions, bonuses, compensation, overtime, cash out of accrued and unused vacation, paid time off or other leave, severance, and any other amounts that are due and payable prior to the Closing Date; and (ii) to all independent contractors, consultants, and temporary employees performing services for the Business, any fees for services that are due and payable prior to the Closing Date.

(k)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in, accelerate the vesting, funding, or delivery of, or increase the amount or value of, any payment, severance, or benefit to any employee primarily dedicated to the Business, former employee dedicated to the Business, or officer or director, independent contractor, or consultant related to the Business.  No amount paid or payable in connection with the transaction contemplated by this Agreement will, either alone or in combination with another event, be an "excess parachute payment" within the meaning of Section 280G of the Code (determined without regarding the exceptions provided for in Section 280G(b)(5) of the Code).  No Seller Party is a party to any plan, program, agreement, or arrangement that provides for a gross-up or reimbursement of Taxes imposed under Section 4999 or Section 409A of the Code to any employee, director or officer dedicated to the Business, or any other service provider of the Business.

(l)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by Seller in this Section 4.13 are the sole and exclusive

26

**HIGHLY CONFIDENTIAL**

representations and warranties made regarding Covered Employees, Employee Plans or other employment or employee benefits matters.

Section 4.14    Taxes.

(a)    Each of (A) the Seller Parties solely with respect to the Transferred Assets and (B) the Transferred Entities have timely filed (or have had filed on their behalf) all material Tax Returns required to be filed, taking into account any extensions of time to file such Tax Returns. All material amounts of Taxes shown due on such Tax Returns owed by (x) the Seller Parties solely with respect to the Transferred Assets and (y) the Transferred Entities, in each case, have been fully paid or properly accrued for on the Financial Statements, other than with respect to any Taxes the payment of which was precluded by reason of the Bankruptcy Cases.

(b)    No material deficiencies for any Taxes that are related to the Business have been proposed, asserted or assessed in writing by a Taxing Authority against any Transferred Entity that are still pending.

(c)    No Transferred Entity has any current material Liability for Taxes of any Person (other than any of the Seller Parties or the Transferred Entities) (i) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) or (ii) as a transferee or successor.

(d)    There are no Liens for Taxes on the Transferred Assets or the Transferred Equity Interests other than Permitted Liens.

(e)    The Transferred Entities have complied in all material respects with all applicable withholding obligations for any material amount of Taxes that are related to the Business required to have been withheld in connection with amounts paid to any Covered Employee of a Transferred Entity or independent contractor.

(f)    To the Knowledge of Seller, no Seller Party or Transferred Entity has been a party to a "listed transaction" as such term is defined in Treasury Regulations Section 1.6011-4(b)(2).

(g)    No claim has been made by any Taxing Authority in writing in a jurisdiction where any Transferred Entity has not filed a Tax Return that it is or may be subject to Tax by such jurisdiction.

(h)    Within the past two (2) years, no Transferred Entity has distributed shares of another Person, or has had its shares distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(i)    No Transferred Entity is a party to or has any obligation under any Tax sharing, Tax indemnification, or Tax allocation agreement or similar Contract or arrangement (other than any agreement that will be terminated at or before the Closing, is exclusively between the Transferred Entities, or is not primarily related to Taxes).

27

**HIGHLY CONFIDENTIAL**

(j)     Nothing in this <u>Section 4.14</u> or otherwise in this Agreement shall be construed as a representation or warranty with respect to (i) the amount or availability of any net operating loss, capital loss, or Tax credit carryover or other Tax attribute or asset or (ii) any Tax positions that Buyer or any of its respective Representatives or Affiliates (including the Transferred Entities) may take in or in respect of a taxable period (or portion thereof) beginning after the Closing Date.

(k)     None of the Seller Parties or the Transferred Entities has made an election under Section 965(h) of the Code.

(l)     Seller is registered under Part IX of the *Excise Tax Act (Canada)* and Chapter VIII of the *Quebec Sales Tax Act* and its registration numbers are 139813919RT0001 and 1204642121TQ0001, respectively.

(m)     The representations and warranties made by Seller in this <u>Section 4.14</u> constitute the sole and exclusive representations and warranties with respect to Taxes, and no other representation or warranty contained in any other section of this Agreement shall apply to any Tax matters, and no other representation or warranty, express or implied, is being made with respect thereto.

Section 4.15   <u>Real Property.</u>

(a)     <u>Schedule 4.15(a)</u> sets forth a list of all material Owned Real Property and all material Leased Real Property. The Seller Parties and the Transferred Entities have good and valid fee simple title to all such Owned Real Property and valid title to the leasehold estate (as lessee or sublessee) in all such Leased Real Property, in each case, free and clear of all Liens, except for Permitted Liens.

(b)     All material Leases under which the Seller Parties or the Transferred Entities are a lessee or sublessee are in full force and effect and are enforceable as against such Seller Party or Transferred Entity, and to the Knowledge of Seller, as against any other counterparty thereto, in all material respects, in accordance with their respective terms. No written notices of material default under any such Lease or sublease have been sent or received by the Seller Parties or the Transferred Entities within the twelve (12)-month period ending on the Agreement Date and to the Knowledge of Seller no material default by any Seller Party or Transferred Entity exists under any such material Leases. A true and complete, in all material respects, copy of each Transferred Lease has been made available to Buyer.

(c)     None of the Seller Parties or the Transferred Entities has received any written notice from any Government Authority asserting any material violation of applicable Laws (except for Environmental Law, which is subject to <u>Section 4.11</u> hereof) with respect to the Owned Real Property or Leased Real Property that remains uncured, and to the Knowledge of Seller, no such violations exist.

(d)     To the Knowledge of the Seller, all material buildings, structures and other improvements on the Owned Real Property are in reasonably good condition and repair, normal wear and tear excepted, for the continued use of the Owned Real Property as it is currently

28

**HIGHLY CONFIDENTIAL**

used in all material respects.  The Seller Parties have not leased or otherwise granted to any Person the right to use or occupy any Transferred Owned Real Property and Transferred Leased Real Property or any portion thereof, except as would not reasonably be expected to be material to the Business taken as a whole. There are no outstanding options, rights of first offer or rights of first refusal to purchase any Transferred Owned Real Property or any portion thereof, and none of the Transferred Entities are a party to any agreement or option to purchase any real property or interest therein. None of the Seller Parties or the Transferred Entities have received a notice of any pending condemnation proceedings or eminent domain proceedings of any kind against the Transferred Owned Real Property and, to the Knowledge of Seller, no such proceedings have been threatened in writing. None of the Owned Real Property is subject to any right or option of any other Person to purchase or lease an interest in such Owned Real Property.

Section 4.16   Brokers.  Except for fees and expenses of Houlihan Lokey Capital, Inc. (the "**Seller's Banker**"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Seller Parties, the Transferred Entities or any of their respective Affiliates in connection with the Transactions. Buyer shall not be liable for, and shall not assume, any broker, finder, or investment banker fees incurred by Seller or any of its Affiliates.

Section 4.17   Title; Sufficiency of Transferred Assets and Assets.

(a)   Except for Permitted Liens, the Transferred Assets and the Assets (other than, in each case, (x) the Owned Real Property and the leasehold estate (as lessee or sublessee) in any Leased Real Properties, which are the subject of Section 4.15, (y) any personal property leased pursuant to a Transferred Contract and (z) Intellectual Property rights, which are the subject of Section 4.10) are owned by or otherwise made available to the Seller Parties and the Transferred Entities, and, at the Closing, subject to Section 2.02(a)(xvi) and Section 2.03, Buyer or one of its Affiliates will own each  of such Transferred Assets and the Transferred Equity Interests or will be vested with good title to  such Transferred Assets, as the case may be, free and clear of all Liens, other than Permitted Liens.

(b)   Assuming receipt of all relevant Consents, and that all Available Contracts are assumed, the Transferred Assets, (together with the Assets, the Intellectual Property rights provided under the IP Cross License Agreement, the Trademark Co-Existence Agreement, the TSA and the Debtors TSA (including, for the avoidance of doubt, the Reading SOW ) and all rights granted and services to be performed under the Transaction Agreements) constitute all of the properties, rights and assets that are necessary to permit the Buyer to conduct the Business, after the Closing, in all material respects as presently conducted by the Seller Parties.

Section 4.18   Insurance.  Schedule 4.18 provides a summary of all Insurance Policies maintained for, at the expense of, or for the benefit of, the Transferred Entities or the Transferred Assets or the Business. Each such Insurance Policy is in full force and effect, all premiums due to date thereunder have been paid in full and neither Seller nor any of its Affiliates is in material default with respect to any other obligations thereunder. No written notice of cancellation or nonrenewal, in whole or in part, with respect to any such Insurance Policy currently in force has been received by Seller.

**HIGHLY CONFIDENTIAL**

Section 4.19    <u>Affiliate Transactions</u>.  Except: (a) for employment-related arrangements, the payment of compensation and benefits in the Ordinary Course of Business, and travel advances and employees loans, (b) Contracts entered into in the Ordinary Course of Business on an arm's length basis or (c) as set forth on <u>Schedule 4.19</u>, no current officer, manager, director or Affiliate of any Seller Party (other than the Transferred Entities) is a party to any Contract, or business relationship with, or has any material interest in any property used by, any of the Seller Parties or the Transferred Entities.

Section 4.20    <u>Condition of Transferred Assets and Assets</u>.  The items of material, tangible personal property included in the Transferred Assets and Assets are in working condition and are reasonably adequate for the uses to which they are currently being put, the failure of which would not reasonably be expected to be material to the Business taken as a whole.

Section 4.21    <u>Corruption and Trade Regulation</u>.

(a)    Neither the Transferred Entities nor, to the Knowledge of Seller, any Person acting on behalf of the Seller Parties in respect of the Business or Transferred Entities has at any time in the past twelve (12) months:

(i)    violated, or engaged in any activity, practice or conduct which would violate any applicable anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the U.K. Bribery Act  2010 (collectively "**Anti-Corruption Laws**");

(ii)    paid, offered, given, promised to pay, or authorized the unlawful payment of, any money or anything of value to, or for the benefit of, any "foreign public  official" (as such term is defined in Anti-Corruption Laws) or other Person, for the purpose of (A) corruptly obtaining business; or (B) inducing the recipient to use his or her influence or  position to affect any act or decision, in order to obtain or retain business for, direct business to,  or secure an improper advantage for, any Seller Parties, Transferred Entities or the Business; or

(iii)    been or is currently the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement Action related to Anti-Corruption Laws.

(b)    The Seller Parties in respect of the Business and Transferred Entities have implemented policies and procedures intended to promote compliance with International Trade Laws, including, but not limited to, the U.S. and the European Union, and have obtained all material licenses or other authorizations from the relevant Government Authorities in connection with International Trade Laws.

(c)    The Seller Parties in respect of the Business and the Transferred Entities and, to the Knowledge of Seller, any of their respective equityholders, directors, officers, employees, agents, distributors, sales representatives, and consultants, and each other Person acting for, or on behalf of, the Seller Parties in respect of the Business and Transferred Entities, have been for the past three (3) years, and currently are, in material compliance with applicable provisions of, and have not been and are not subject to, and have not engaged and are not engaging

30

**HIGHLY CONFIDENTIAL**

in activities that may cause them to be subject to, material penalties, sanctions, or loss of Tax benefits under the International Trade Laws or any applicable Law relating to international trade administered by a Government Authority in any jurisdiction in which the Seller Parties or the Transferred Entities operate for which the applicable statute of limitations is only triggered upon discovery of violative conduct.

(d)      None of the Seller Parties in respect of the Business, the Transferred Entities, or to the Knowledge of Seller, any of their respective members, managers, shareholders, directors, officers, employees, agents, distributors, sales representatives, and consultants, and each other Person acting for, or on behalf of, any of the Seller Parties in respect of the Business or the Transferred Entities has, during the past three (3) years: (i) violated or engaged in any activities that may result in a material violation of, or penalties, sanctions, or loss of Tax benefits under, any International Trade Laws, or (ii) been fifty percent or more owned or controlled by any person that is the target of sanctions under International Trade Laws;

(e)      engaged in any activities with, in or involving (A) Cuba, Iran, North  Korea, Syria, or the Crimea region of Ukraine, (collectively, the "**Embargoed Countries**") and the governments thereof, (B)  any Persons organized, incorporated, established, located, or resident in the Embargoed Countries, (C) any Persons subject to sanctions or other trade restrictions by a  Government Authority in any jurisdiction in which the Seller Parties in respect of the Business or  Transferred Entities operate, or (D) any Persons owned or controlled by, or acting on behalf of,  any Person responsive to clauses (A) through (C), in any manner that would result in a material violation of Law.

(f)      There is no pending or, to the Knowledge of Seller, threatened in writing proceeding against, and no pending or threatened in writing investigation by, a Government Authority of, the Seller Parties in respect of the Business or the Transferred Entities, nor is there any injunction, Order, judgment, ruling, or decree imposed (or threatened in writing to be imposed) upon the Seller Parties in respect of the Business or Transferred Entities by or before any Government Authority, civil or criminal investigation, audit or any other inquiry by a Government Authority, or voluntary disclosure being considered, in each case, in connection with an alleged possible or actual violation of any applicable International Trade Laws.

Section 4.22   No Other Representations or Warranties.  Except for the representations and warranties expressly set forth in this Article IV (as modified by the Disclosure Schedules), none of the Seller Parties or any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, on behalf of the Seller Parties, the Transferred Entities or any of their respective Affiliates, including any representation or warranty regarding any Seller Party, any Transferred Entity or any other Person, the Transferred Equity Interests, any Assets, any Transferred Assets, any Liabilities of any Seller Party or Transferred Entity, including any Assumed Liabilities, the Business, any Transaction, any other rights or obligations to be transferred pursuant to the Transaction Agreements or any other matter, and the Seller Parties hereby disclaim all other representations and warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, whether made by or on behalf of any Seller Party, any Transferred Entity or any other Person, including any of their respective Representatives.  Except for the representations and

31

**HIGHLY CONFIDENTIAL**

warranties expressly set forth in this <u>Article IV</u> (as modified by the Disclosure Schedules), each Seller Party, as applicable, hereby (a) disclaims and negates any representation or warranty, expressed or implied, at common Law, by statute, or otherwise, relating to the condition of the Transferred Assets, the Assets or the Business, and (b) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, Data or information made, communicated or furnished (orally or in writing, including electronically) to Buyer or any of Buyer's Affiliates or any Representatives of Buyer or any of Buyer's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of the Seller Parties or the Transferred Entities, respectively), including omissions therefrom. Without limiting the foregoing, no Seller Party makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, to Buyer or any  of its Affiliates or any Representatives of Buyer of any of its Affiliates regarding the probable success, profitability or value of the Transferred Entities, the Transferred Assets or the Business.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

Section 5.01   <u>Formation and Authority of Buyer; Enforceability</u>.  Buyer is a limited liability company  duly formed  organized, validly existing and, to the extent legally  applicable, in good standing under the Laws of the State of Delaware and has the requisite limited liability company power and authority to execute,  deliver and perform its obligations under the Buyer Transaction Agreements  (including the   consummation of the Buyer Transactions). The execution, delivery and performance of this Agreement by Buyer and the consummation of the Buyer Transactions have been duly authorized by all requisite limited liability company action on the part of Buyer, and  no shareholder or other similar approval is required in connection with Buyer's execution, delivery  and  performance  of  this Agreement. The execution, delivery and performance by Buyer and Buyer's Affiliates of each Buyer Transaction Agreement (other than this Agreement) to which Buyer or such Affiliates is a party, will be, prior to the Closing, duly authorized by all requisite organizational action on the part of Buyer or such Buyer Affiliate. This Agreement has been (and upon  execution and delivery thereof, the other Buyer Transaction Agreements to which Buyer and Buyer's Affiliates are parties)  will be, duly executed  and delivered by  Buyer or Buyer's Affiliates, and (assuming due authorization, execution and delivery by the other  parties hereto and thereto) this Agreement constitutes (and upon execution and delivery thereof,  the other Buyer Transaction Agreements will constitute, legal, valid and binding obligations of  Buyer and Buyer's Affiliate (as applicable) enforceable against them in accordance with their respective terms, subject to the  Bankruptcy and Equity Exception.

Section 5.02   <u>Qualification of the Buyer</u>.  Buyer has the limited liability company  power and authority to operate its businesses as now conducted. Buyer is qualified as a foreign corporation or other organization to do business and, to the extent legally applicable, is in good standing in each jurisdiction where the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure

**HIGHLY CONFIDENTIAL**

to be so qualified or in good standing would not materially impair or delay the ability of Buyer to consummate the transactions contemplated by, or perform its obligations under, the Transaction Agreements.

Section 5.03    No Conflict.    Provided that all Consents, waivers and other actions described in Section 5.04 have been obtained, the execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not:

(a)    violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Buyer;

(b)    conflict with or violate in any material respect any Law or Order applicable to Buyer; or

(c)    violate or conflict with, result in any breach of, or constitute a violation or default (or, any event that, with notice or lapse of time, or both would constitute a default) under, or give to any Person any right to terminate, accelerate or cancel, or result in the creation of any Lien on any assets or properties of Buyer pursuant to, any Contract to which Buyer or any of its Subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, accelerations or Liens as would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.04    Consents and Approvals.    The execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not require any Consent, waiver or other action by, or any filing with or notification to, any Government Authority, except (a) in connection with applicable filing, notification, waiting period or approval requirements, to the extent required, under the HSR Act and all applicable Antitrust Laws, (b) those required by the Bankruptcy Court in connection with the Bankruptcy Cases, or (c) where the failure to obtain such Consent or waiver, to take such action, or to make such filing or notification, would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.05    Absence of Restraints; Compliance with Laws.

(a)    To the knowledge of Buyer, no facts or circumstances exist that would reasonably be expected to materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(b)    Buyer is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(c)    There are no Actions pending or, to the knowledge of Buyer, threatened in writing that would impair or delay in any material respect Buyer's ability to perform its

**HIGHLY CONFIDENTIAL**

obligations under the Buyer Transaction Agreements or to consummate the Transactions contemplated by the Buyer Transaction Agreements.

Section 5.06   <u>Financial Ability</u>.   Buyer has available to it, (a) sufficient immediately available funds and the financial ability to pay the Purchase Price, all Cure Costs and any costs and expenses incurred by Buyer pursuant to, or in connection with the negotiation, execution or performance of the Transaction Agreements and (b) the financial resources and capabilities (financial and otherwise) to perform its obligations under the Buyer Transaction Agreements. Buyer has not incurred, and is not contemplating or aware of any obligation, commitment, restriction or other Liability of any kind, in each case, that would materially impair or adversely affect such resources, funds or capabilities.

Section 5.07   <u>Brokers</u>.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer or any of Buyer's Affiliates in connection with the Transactions.

Section 5.08   <u>Investigation</u>.   Buyer acknowledges and agrees that it (a) has completed such inquiries and investigations as it has deemed appropriate, and, based thereon, has formed an independent judgment concerning, the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Transferred Entities, the Transferred Assets, the Assumed Liabilities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements and (b) has been furnished with, or given access to such information about the Seller Parties, the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Transferred Entities, the Transferred Assets, the Assumed Liabilities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements, in the case of each of (a) and (b), sufficient to execute, deliver and perform its obligations under this Agreement. Buyer further acknowledges and agrees that (x) the only representations and warranties made by Seller are the representations and warranties expressly set forth in <u>Article IV</u> (as modified by the Disclosure Schedules) and Buyer has not relied upon any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, Data or information made, communicated or furnished by or on behalf of Seller or any of its Affiliates, any Representatives of Seller or any of its Affiliates or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, Data or information made, communicated or furnished by or through the Seller's Banker, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, Data or information and (y) any claims Buyer may have for breach of any representation or warranty shall be based solely on the representations and warranties of Seller expressly set forth in <u>Article IV</u> (as modified by the Disclosure Schedules). Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Transferred Entities, the Assets, the Business, the Transferred Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in <u>Article IV</u> (as modified by the Disclosure Schedules) without any other representations or warranties of any nature whatsoever.

34

**HIGHLY CONFIDENTIAL**

Section 5.09   <u>Securities Matters</u>. The Transferred Equity Interests are being acquired by Buyer for its own account, and not with a view to, or for the offer or sale in connection with, any public distribution or sale of the Transferred Equity Interests or any interest in them. Buyer has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment in the Transferred Equity Interests, and Buyer is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Transferred Equity Interests. Buyer acknowledges that the Transferred Equity Interests have not been registered under the Securities Act, or any state securities Laws, and understands and agrees that it may not sell or dispose of any of the Transferred Equity Interests except pursuant to a registered offering in compliance with, or in a transaction exempt from, the registration requirements of the Securities Act and any other applicable state, foreign or federal securities Laws. Buyer understands that the Transferred Equity Interests are being sold to Buyer based in part upon the Buyer's representations contained in this Agreement.

**ARTICLE VI**

**ADDITIONAL AGREEMENTS**

Section 6.01   <u>Conduct of Business Before the Closing</u>. Buyer acknowledges that the Seller Parties are operating the Business in the context of the Bankruptcy Cases. Subject to the foregoing, except (a) as required by applicable Law, by Order of the Bankruptcy Court, (b) as required in connection with any Transaction Agreement or (c) for matters identified on <u>Schedule 6.01</u>, during the Pre-Closing Period:

(i)      Seller shall use, and Seller shall cause the other Seller Parties and Transferred Entities to use, commercially reasonable efforts to, as applicable, operate the Business in the Ordinary Course of Business, maintain the Transferred Assets and the Assets substantially in their current condition (subject to ordinary wear and tear) and, preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with material customers and material suppliers of the Business; and

(ii)      unless Buyer otherwise consents in writing (which consent shall not be unreasonably withheld, conditioned or delayed), Seller will, and will cause the other Seller Parties and the applicable Transferred Entities to, solely with respect to the Business, not do any of the following, in each case, solely to the extent related to the Business:

(A)      grant any Lien on the Transferred Equity Interests or any Assets or Transferred Assets (in each case, whether tangible or intangible), in each case, other than a Permitted Lien or a Lien that will be discharged at or prior to Closing;

(B)      acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or division;

(C)      except for any such Debt or guaranty that will be discharged at or prior to the Closing or trade accounts payable incurred in the Ordinary Course of Business, incur or issue any Debt, or assume, grant, guarantee or endorse, or otherwise as become responsible for, the obligations of any Person;

35

**HIGHLY CONFIDENTIAL**

(D)      issue or sell any additional shares of, or other equity interests in, the Transferred Entities, or securities convertible into or exchangeable for such shares or equity interests (other than, in each case, the issuance or sale of shares of, or other equity interest in, one Transferred Entity to another Transferred Entity), or issue or grant any options, warrants, calls, subscription rights or other rights of any kind to acquire such shares, other equity interests or securities;

(E)      sell, transfer, lease, sublease or otherwise dispose of any Assets or Transferred Assets (other than transfers between or among the Seller Parties and/or the Transferred Entities), other than in the Ordinary Couse of Business or as required under any applicable Law, any Order entered by the Bankruptcy Court or this Agreement;

(F)      in any material respect, (1) increase the wages, salaries, or bonuses payable to any Covered Employee who is a member of senior management or (2) establish or materially increase any benefits under any Assumed Employee Plan or Transferred Entity Employee Plan, except, in either case, (x) as required by any Assumed Employee Plan or Transferred Entity Employee Plan or any Contract in existence on the Agreement Date, (y) any increase in wages, salaries, bonuses and incentives in the Ordinary Course of Business consistent with past practices with respect to Covered Employees (other than members of senior management), or (z) as required by applicable Law;

(G)      other than in the Ordinary Course of Business (including the settling of product warranty claims in the Ordinary Course of Business) enter into any settlement or release with respect to any material Action related to the Business other than any settlement or release (1) that contemplates only the payment of money without ongoing limits on the conduct or operation of the Business, (2) results in a full release of the applicable Seller Parties or Transferred Entities with respect to the claims giving rise to such Action, and (3) involves the payment of Liabilities reflected or reserved against in full in the Financial Statements;

(H)      materially amend or terminate any Material Contract or enter into any Contract that would have been required to be disclosed as a Material Contract on Schedule 4.12(a), had it been entered into prior to the Agreement Date, in each case, other than in the Ordinary Course of Business;

(I)      declare or set aside any dividends or distributions on any capital stock of any Transferred Entity (in cash or in kind);

(J)      make, change or revoke any material Tax election of any Transferred Entity unless required by GAAP;

(K)      enter into any commitment for capital expenditures that results in the Seller Parties and Transferred Entities exceeding the total capital expenditure amount set forth in the CapEx Budget for the current fiscal year;

**HIGHLY CONFIDENTIAL**

(L)      modify or terminate any existing Autozone factoring arrangement; or

(M)      enter into any legally binding commitment with respect to any of the foregoing.

Section 6.02    <u>Access to Information</u>.

(a)      During the Pre-Closing Period, upon reasonable prior written notice, Seller shall, and shall cause each of the other Seller Parties and the applicable Transferred Entities to (solely to the extent possible without incurring third-party costs and expenses unless requested by Buyer as set forth herein) (i) afford the Representatives of Buyer reasonable access, during normal business hours, to their properties, books and records of the Business and the Transferred Entities, (ii) furnish to the  Representatives of Buyer such additional financial and operating Data and other information  regarding the Business, the Transferred Entities, the Transferred Assets and the Assumed Liabilities as Buyer or its Representatives may from time to time reasonably request for purposes of consummating the Transactions, and (iii) make available to Buyer and its Representatives, during normal business hours, those directors, officers, employees, auditors, accountants and other Representatives of the Seller Parties and the Transferred Entities, except, in the case of (i), (ii) and (iii), as set forth in <u>Section 6.02(b)</u>; <u>provided</u>, <u>however</u>, to the extent that Buyer requests, in writing, for Seller to incur any third-party costs and expenses to comply with the obligations set forth in this <u>Section 6.02(a)</u>, then Buyer shall promptly reimburse Seller for such costs in accordance with the terms set forth in such written notice to Seller.

(b)      Notwithstanding anything in this Agreement to the contrary,

(i)      (A) in no event shall the Seller Parties, the Transferred Entities or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, or any Order of the Bankruptcy Court, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to any of the Seller Parties, the Transferred Entities or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause any Seller Party, any Transferred Entity or any of their respective Affiliates to breach a confidentiality obligation to which it is bound and (B) any access or investigation contemplated by <u>Section 6.02(a)</u> shall not unreasonably interfere with any of the businesses, personnel or operations of any of the Seller Parties, the Transferred Entities or any of their respective Affiliates or the Business;

(ii)      the auditors and accountants of any of the Seller Parties, the Transferred Entities or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants; and

(iii)      Buyer and its Representatives shall not conduct any sampling or testing of soil, groundwater, air, or other environmental media of any Seller Party or Transferred Entity.

37

**HIGHLY CONFIDENTIAL**

(c)     If so requested by Seller, Buyer shall enter into a customary joint defense agreement or common interest agreement with one or more of the Seller Parties, the Transferred Entities or any of their respective Affiliates with respect to any information provided to Buyer, or to which Buyer gains access, pursuant to this Section 6.02 or otherwise.

Section 6.03    Confidentiality.   Buyer acknowledges that the Confidential Information and Transaction Information (each as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement, and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Buyer, its Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the obligations under the Confidentiality Agreement shall terminate; provided, however, that Buyer's confidentiality obligations shall terminate only in respect of that portion of the Confidential Information relating to the Business and constituting a Transferred Asset, and for all other Confidential Information, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms. If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms; provided, that the term of the Confidentiality Agreement as set forth therein shall be amended to refer to one (1) year from the date of termination of this Agreement. For the avoidance of doubt, the provisions in the Confidentiality Agreement which by their terms survive the termination of the Confidentiality Agreement shall continue in full force and effect in accordance with their terms (as modified by the previous sentence).

Section 6.04    Regulatory Approvals.

(a)     Subject to Section 6.04(c), the Parties shall, and shall cause their respective Affiliates to, use their reasonable best efforts to take any and all steps to make all required filings and promptly obtain all Consents, Permits, Environmental Permits and Final Orders of all Government Authorities (other than any action of the Bankruptcy Court, which is governed exclusively by Article VIII) that may be, or become, necessary for the execution and delivery of, and performance of their respective obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "**Government Approvals**").

(b)     On or prior to the Closing, Buyer shall secure financial assurance mechanisms, instruments or arrangements to replace any existing financial assurances currently maintained by the Seller Parties and set forth on Schedule 6.04(b) with respect to the Business under Environmental Permits. Seller agrees to provide reasonable assistance to support Buyer in securing such replacement financial assurances.

(c)     Without limiting the generality of Parties' obligations under Section 6.04(a), to the extent required, each of the Parties shall make its respective filing with respect to the Transactions under the HSR Act, if applicable, within five (5) Business Days from the entry of the Sale Order, unless otherwise extended by mutual agreement between Seller and Buyer, and shall make all other filings required pursuant to the Antitrust Laws of any other jurisdiction as promptly as practicable following the date of this Agreement. Buyer shall, and shall cause its

38

**HIGHLY CONFIDENTIAL**

Affiliates to, use reasonable best efforts to resolve as soon as reasonably practicable, but in any event not later than the Outside Date, any inquiry or investigation by any Government Authority relating to the Transactions under any Antitrust Law. In connection with any inquiry or investigation into the Transactions, the Parties further agree to supply as promptly as reasonably practicable any additional information and documentary material that may be requested or required pursuant to applicable Law, including any Antitrust Law. Buyer shall not withdraw its HSR Act filing, or other filing required by Antitrust Law, enter into any agreements to extend any HSR Act waiting period or other waiting period under any Antitrust Law, or enter into any agreements to delay or not to consummate the Transactions without the prior written consent of Seller. Subject to Article XI, all filings fees related to the HSR  Act or any other filings under any other Antitrust Laws shall be borne by Buyer.

(d)     Notwithstanding any other provision in this Agreement, Buyer shall, and shall cause its Affiliates to promptly take and diligently pursue any or all actions to the extent necessary to eliminate each and every impediment under any Antitrust Law that may be asserted by any Government Authority or any other Person in opposition to the consummation of any of the Transactions, so as to enable the Parties to consummate the Transactions as soon as reasonably practicable, but in any event not later than the Outside Date. In furtherance of this obligation, and without limitation, Buyer shall, and shall cause its Affiliates to: (i) propose, offer, negotiate, commit to, effect, and agree to, by consent decree, hold separate order, or otherwise, any sale, divestiture, license, hold separate, or other disposition of or restriction on, any of the Transferred Assets, Assets, the Transferred Entities or any of Buyer's or Buyer's Affiliates' assets or businesses; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action on the Transferred Assets, the Assets or the Transferred Entities is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date; (ii) create, terminate, amend, or assign existing relationships, ventures, contractual rights, or obligations of the Buyer or Buyer's Affiliate(s), or the Transferred Assets; (iii) amend, assign, or terminate existing licenses or other agreements (and entering into such new licenses or other agreements); (iv) otherwise take or commit to any and all actions that would limit Buyer's freedom of action with respect to, or its ability to retain or hold, directly or indirectly, any businesses, assets, products, or equity interests in the Business of Buyer, Buyer's Affiliate(s), or the Transferred Assets; (v) enter into any Order, consent decree, or other agreement to effectuate any of the foregoing; and (vi) if necessary, defend any threatened or initiated litigation under any Antitrust Law that would prevent or delay consummation of the Transactions.

(e)     Each Party shall promptly notify the other Parties of any oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this Section 6.04, permit the other Parties and their respective Representatives to review in advance any communication relating to the matters that are the subject of this Section 6.04 proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this Section 6.04, provided, however, that materials provided to the Party may be reasonably designated as "Outside Counsel Only" and also may be redacted: (i) to remove references concerning the valuation of the Business or competitively sensitive information; (ii) as necessary to comply with

39

**HIGHLY CONFIDENTIAL**

contractual arrangements, applicable Law or by Order of the Bankruptcy Court; and (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns. No Party shall agree to participate in any substantive meeting or discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Government Authority, gives the other Parties the opportunity to attend and participate at such meeting. Subject to the Confidentiality Agreement, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods. The Parties shall share the right to control and direct the process by which the Parties hereto seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law, including by directing the strategy and making final determinations related to the review or investigation of the Transactions by any Government Authority and attending all meetings, discussions, and communications with any Government Authority except to the extent that such Government Authority may request to communicate exclusively with one Party. Nothing in this <u>Section 6.04(e)</u> shall be applicable to Tax matters.

(f)     Buyer shall not, and shall not permit any of its Affiliates to, take any action (including acquiring or agreeing to acquire by merging or consolidating with, or by purchasing the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquiring or agreeing to acquire any assets) that would reasonably be expected to have the effect of (i) materially delaying, impairing or impeding the receipt of, or increasing the risk of not receiving, any required Government Approval or the issuance or reissuance or transfer of any Permit or Environmental Permit, (ii) materially delaying, impairing or impeding the expiration or termination of any applicable waiting period with respect to a Government Approval (and shall not, without the consent of the Seller Parties, withdraw or refile any filing or restart the waiting period on any Government Authority's review, or enter into a timing agreement with a Government Authority), (iii) materially increasing the risk of any Government Authority entering an Order prohibiting the consummation of the Transactions or (iv) otherwise materially delaying the consummation of the Transactions.

(g)     Actions or agreements required of Buyer pursuant to this <u>Section 6.04</u> shall under no circumstances be considered a Material Adverse Effect.

Section 6.05   <u>Third Party Consents</u>. Each Party agrees to cooperate and use commercially reasonable efforts to obtain any other consents and approvals from any third Person other than a Governmental Authority that may be required in connection with any Transaction (the "**Third Party Consents**"); <u>provided</u>, that, the foregoing covenant shall not apply to consents of any Government Authority that are addressed elsewhere in this Agreement. Notwithstanding anything in this Agreement to the contrary, no Seller Party or any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any material accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any such Third Party Consent.

**HIGHLY CONFIDENTIAL**

Section 6.06    Exide Canada.  Subject to the entry of the Sale Order or any other Order of the Bankruptcy Court approving the Canada Restructuring (defined below), prior to the Closing, Seller or another Seller Party shall acquire 100% of the equity interests of Exide Technologies Canada Corporation ("**Exide Canada**") (the "**Canada Restructuring**"). From and after the consummation of the Canada Restructuring, the equity interests of Exide Canada shall constitute Transferred Equity Interests hereunder and Exide Canada shall constitute a Transferred Entity hereunder.

Section 6.07    Intercompany Obligations.  Seller shall take or cause to be taken such action and make or cause to be made such payments as may be necessary so that, as of the Closing Date, there shall be no intercompany obligations (other than (a) pursuant to the Transaction Agreements, or (b) as set forth on Schedule 6.07) between the Transferred Entities, on the one hand, and Seller and its respective Affiliates (other than the Transferred Entities), on the other hand.  Nothing in this Section 6.07 shall require Seller to terminate or cancel any intercompany obligations exclusively between or among the Transferred Entities.

Section 6.08    Cooperation.  During the Pre-Closing Period, (a) Seller and Buyer shall, and shall cause their respective Affiliates to, (i) other than as permitted by Section 8.02, refrain from taking any actions that would reasonably be expected to materially impair, delay or impede the Closing and (ii) without limiting the foregoing or modifying Buyer's obligations pursuant to Section 6.04, use  commercially reasonable efforts to cause all Closing Conditions of the other Party to be met as  promptly as practicable and in any event on or before the Outside Date; (b) the Seller Parties and  the Transferred Entities shall (at Buyer's sole cost and expense) use their respective commercially  reasonable efforts to cause their Representatives to provide all cooperation reasonably requested  by Buyer in connection with facilitating any debt financing for purposes of Buyer obtaining  financing in connection with the consummation of the Transactions and (c) each Party shall keep  the other Party reasonably apprised of the status of the matters relating to the completion of the  Transactions, including with respect to the negotiations relating to the satisfaction of the Closing  Conditions of the other Party.

Section 6.09    Bulk Transfer Laws.  Buyer acknowledges that the Seller Parties will not comply with the provisions of any bulk transfer Laws or similar Laws (including under any Tax Laws) of any jurisdiction in connection with the Transactions and hereby waives all claims related to the noncompliance therewith.

Section 6.10    Employee Matters.

(a)    Offer of Employment. All Covered Employees (including those on leave of absence or disability) employed by a Transferred Entity shall become or continue to be employees of Buyer or an Affiliate of Buyer effective as of the Closing Date. At least twenty (20) days prior to the Closing Date, except as otherwise provided in this paragraph, Buyer or one of its Affiliates shall make a written offer of employment, effective as of the Closing Date and contingent upon the Closing, to each of the Covered Employees not employed by a Transferred Entity. Except for union-represented Covered Employees, such offer of employment shall be (i) at the same location of employment as such Covered Employee's location of employment as of immediately prior to Closing, (ii) on substantially similar terms and conditions of employment as in effect immediately prior to Closing and (iii) with compensation and benefits at a level consistent with

41

**HIGHLY CONFIDENTIAL**

Section 6.10(b). Any Covered Employee who becomes employed by Buyer or one of its Affiliates in accordance with this Section 6.10(a) is referred to as a "**Transferred Employee**." With respect to union-represented Covered Employees, such offers shall be consistent with the terms and conditions required by the governing Modified Labor Agreements, if any and to the extent such agreements are applicable. Except as otherwise provided in any Modified Labor Agreement, Buyer may make any offers of employment as offers for employment "at will." With respect to any Covered Employee who is on a long-term disability leave of absence as of the Closing Date, such offer shall be contingent upon such Covered Employee returning to active status within six (6) months of the Closing Date or such longer period as is required by applicable Law. In the event that such inactive Covered Employee does not return to active status, Seller shall be responsible for the costs, expenses and Liabilities associated with such inactive Covered Employee. Seller also shall be responsible for all costs, expenses and Liabilities related to any Covered Employee who rejects an offer of employment from Buyer or an Affiliate of Buyer or otherwise refuses to transfer to Buyer or an Affiliate of Buyer. Notwithstanding the foregoing, nothing herein shall be construed as to prevent Buyer from terminating the employment of any Covered Employee, consistent with applicable law and the governing Modified Labor Agreements, if any and as applicable, at any time following the Closing Date.

   (b)  Compensation and Benefits.

    (i)  Commencing on the Closing Date and continuing for at least twelve (12) months (or such longer period as may be required by applicable Law), except as otherwise may be provided in any Modified Labor Agreement, Buyer or its Affiliates shall provide or cause to be provided to each Transferred Employee, (A) compensation, including base salary or hourly wage rate and cash annual bonus opportunities that is at least the same as that provided to such Transferred Employee immediately prior to the Closing, and (B) employee benefits (excluding equity, phantom equity, defined benefit pension, nonqualified deferred compensation, retiree medical, retiree life, retention bonus and change of control plans, programs, agreements and arrangements) that in the aggregate are substantively comparable to those provided to such Transferred Employee immediately prior to the Closing.

    (ii)  Commencing on the Closing Date and continuing for at least twelve (12) months (or such longer period as may be required by applicable Law), except as otherwise may be provided in any Modified Labor Agreement, Buyer or its Affiliates shall provide Transferred Employees with the severance benefits applicable to each such Transferred Employee in accordance with the applicable underlying Employee Plans or agreements as in effect immediately prior to the Closing Date. For the avoidance of doubt, the Seller Parties shall be liable for all Liabilities that arise prior to or on the Closing under any Collective Bargaining Agreements, including those covering the Transferred Employees.

    (iii)  As of the Closing Date and subject to the Section 6.11 herein, Buyer will honor the governing Modified Labor Agreements covering the Transferred Employees, if any and as applicable, and shall indemnify and hold the Seller Parties and their Affiliates harmless with respect to any Liability related to any such agreement to the extent that any Liability arises post-Closing.

   (c)  Employees and Employee Plans.

**HIGHLY CONFIDENTIAL**

(i)     <u>Liabilities Incurred After Closing</u>. Except as otherwise provided in <u>Section 6.10(c)(ii)</u>, effective as of the Closing, Buyer shall, or shall cause an Affiliate of Buyer to, assume or retain, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Transferred Employee or workers' compensation claims against any Seller Party or Transferred Entity only to the extent such Liabilities were incurred after the Closing. The Seller Parties shall retain all costs, expenses and Liabilities related to the Transferred Employees that are incurred prior to or on the Closing, except as otherwise provided in <u>Section 6.10(c)(ii)</u>.

(ii)     <u>Other Liabilities</u>. Effective as of the Closing and to the extent permissible under applicable Law, Buyer shall, or shall cause an Affiliate of Buyer to, assume or retain, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from any Transferred Employee's accrued and unpaid bonuses, accrued and unused vacation time, accrued and unused sick time, or any other leave time to which a Transferred Employee is or has been entitled, irrespective of when such Liabilities were incurred.

(iii)     <u>Employee Plans</u>.  Effective as of the Closing, Buyer shall, or shall cause an Affiliate of Buyer to, assume each Assumed Employee Plan and continue each Transferred Entity Employee Plan. The Seller Parties shall retain each Employee Plan that is not an Assumed Employee Plan or Transferred Entity Employee Plan, which shall include for the avoidance of doubt, all unfunded benefit liability attributable to such Employee Plan. Except for any net unfunded benefit liability of up to $2,000,000 related to the Transferred Entity Employee Plans in Canada which net amount shall be calculated by offsetting any amount attributable to unfunded benefit liability of any such plan against any amount attributable to overfunding or surplus of any such plan, Seller shall promptly reimburse Buyer or an affiliate of Buyer, as applicable, for any unfunded benefit liability attributable to (A) any Employee Plan that transfers by operation of law to Buyer or an Affiliate of Buyer, (B) any statutory pension termination indemnity, post-employment retirement or similar plan to which any Seller Party contributed to on behalf of the Transferred Employees that relates to the period prior to the Closing or (C) any Covered Employee or any other employee of the Seller and its Affiliates who does not become a Transferred Employee, and shall take all actions necessary to the applicability of any successor liability to Buyer or its Affiliates with respect to such unfunded benefit liabilities, including without limitation, initiating the process of terminating any such underfunded Employee Plans. At the election of Buyer, Seller shall, or shall cause its applicable Affiliate to, assign to Buyer all rights with respect to the Assumed Employee Plans and all rights with respect to the agreements relating to the Assumed Employee Plans set forth on <u>Schedule 6.10(c).</u> As soon as practicable after the Closing Date, Seller shall deliver to Buyer all material records and documentation relating to the Assumed Employee Plans and shall cooperate with Buyer, Buyer's agents, and the fiduciaries of the Assumed Employee Plans to the extent reasonably necessary for Buyer, Buyer's agents and the fiduciaries of the Assumed Employee Plans to carry out their duties with respect to the Assumed Employee Plans.

(d)     <u>Transferred Employees – Additional Employment Terms</u>.

(i)     <u>Credit for Service</u>.  Except as otherwise may be provided in any Modified Labor Agreement, Buyer shall, and shall cause its Affiliates to, credit Transferred

43

**HIGHLY CONFIDENTIAL**

Employees for service earned on and prior to the Closing Date with the Seller Parties and any of their respective Affiliates (including the Transferred Entities) or predecessors, in addition to service earned with Buyer and its Affiliates on or after the Closing Date, (A) to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or, for severance and vacation benefits only, the calculation of benefits under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date and (B) for such additional purposes as may be required by applicable Law; provided, however, that nothing herein shall result in a duplication of benefits with respect to the Transferred Employees. For the avoidance of doubt, there will be no credited service for the purpose of accrual of benefits under any defined benefit pension plan of Buyer or any Affiliate of Buyer.

(ii)    Pre-existing Conditions; Coordination.  Buyer shall, and shall cause its Affiliates to, waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date. Buyer shall, and shall cause its Affiliates to, credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Transferred Employees, deductibles, co-insurance, co-pays and out-of-pocket expenses paid by Transferred Employees and their respective spouses and dependents under the Seller Parties or any of their respective Affiliates' health plans in the calendar year in which the Closing Date occurs.

(iii)    Accrued Vacation and Sick Leave.  Except as otherwise may be provided in any Modified Labor Agreement, Buyer or its Affiliates shall provide each Transferred Employee with credit for the same number of vacation and sick days such Transferred Employee has accrued but not used in the calendar year in which the Closing Date occurs; provided, that to the extent required by applicable Law, such amount shall be paid by Buyer or its Affiliates to the applicable Transferred Employee in cash. In the event that a Transferred Employee is unable to use such carried over vacation and sick days within the calendar year in which the Closing Date occurs, Buyer or its Affiliates shall allow such Transferred Employee to carry over such vacation and sick days to be used in the subsequent calendar year unless such Transferred Employee requests payout at the end of the current calendar year or such payout is required by applicable Law, in either of which events Buyer or its Affiliates will timely make such payments to such Transferred Employee.

(iv)    COBRA.  On the Closing Date, Seller and its Affiliates shall cease to provide health and welfare coverage to each Transferred Employee and his or her covered dependents and beneficiaries, and Buyer or its Affiliates shall commence providing such coverage to Transferred Employees and his or her covered dependents and beneficiaries. Buyer and its "buying group" (as defined in Treasury Regulation Section 54.4980B-9, Q&A-2(c)) shall be solely responsible for providing continuation coverage under COBRA to those individuals who are or become M&A qualified beneficiaries (as defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) with respect to the Transactions contemplated by this Agreement. Buyer and its Affiliates shall provide coverage required by COBRA to Transferred Employees and their eligible

44

**HIGHLY CONFIDENTIAL**

dependents or beneficiaries under group health plans maintained by Buyer or an Affiliate of Buyer with respect to qualifying events occurring after the Closing Date.

(e)     Consultation with Unions.  The Parties shall, and shall cause their respective Affiliates to, mutually cooperate in undertaking all reasonably necessary or legally required provision of information to, or consultations, discussions or negotiations with, Unions that represent a Covered Employee.

(f)     Deferred Compensation. The Seller Parties and their Affiliates shall remain responsible for the payment of all nonqualified deferred compensation due to the Transferred Employees under any Employee Plan.

(g)     Restrictive Covenant Assignment. The Seller Parties and their Affiliates shall hereby assign to Buyer all of their rights and interests in any confidentiality, non-solicitation of clients or customers, non-solicitation of employees or consultants, non-interference, non-competition, non-disparagement or similar agreements (existing and in effect as of the date hereof) between the Business and each Transferred Employee, to the extent that such rights and interests protect the interest of the Business and to the extent such assignment is permitted under applicable Law. In the event that such rights and interests are not assignable, Seller shall assist Buyer in the enforcement of such rights and interests.

(h)     No Third Party Beneficiaries. Notwithstanding the provisions of this Section 6.10(h) or any provision of the Agreement, nothing in this Section 6.10(h) or the Agreement is intended to or shall (i) create any third party rights, (ii) amend any employee benefit plan, program, policy or arrangement, (iii) require Buyer or any of its Affiliates or any Seller Party or any of its Affiliates to continue any employee benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified or as otherwise required herein or (iv) provide any Covered Employee or any Transferred Employee with any rights to continued employment.

(i)     Specified Supervisor.  Notwithstanding anything else to the contrary herein and for the avoidance of doubt, the individual employee listed last on Schedule 6.10(a) (the "**Specified Supervisor**") hereto shall not be deemed a Covered Employee for any purpose hereunder; provided, however, that the Specified Supervisor shall become a Covered Employee hereunder immediately following the later of (x) the effective date of the Debtors' plan of reorganization and (y) the abandonment or other disposition by the Debtors of the last Excluded Real Property (the "**Supervisor Termination Date**") and the terms and conditions set forth in this Agreement with respect to Covered Employee shall be effective and applicable with respect to the Specified Supervisor only from and after such date notwithstanding any specific timing requirements or other terms and conditions that would otherwise be applicable to any other Covered Employees prior to such date.  For the avoidance of doubt, the purpose of this provision is to ensure that the Specified Supervisor does not become, and shall not be construed as, an employee of Buyer or any of Buyer's Affiliates until such time as such Specified Supervisor's duties with respect to the Excluded Real Property shall have been completed or terminated.

Section 6.11   Collective Bargaining Agreements.  Prior to the Closing Date, (i) the Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free

45

**HIGHLY CONFIDENTIAL**

and clear of the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a),</u> (ii) the Unions shall have agreed to waive or remove any successor clauses in the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u> and to waive any claim that Buyer has or is required to assume or succeed to those Collective Bargaining Agreements, or (iii) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller Parties pursuant to section 1113(c) of the Bankruptcy Code authorizing the applicable Seller Parties to reject the Collective Bargaining Agreements set forth on <u>Schedule 4.12(a)</u>.

Section 6.12   <u>No Successor Liability</u>.   The Parties intend that, to the fullest extent permitted by Law (including under section 363(f) of the Bankruptcy Code), upon the Closing, the Buyer shall not be deemed to: (a) be the successor of any Seller Party, including with respect to any Collective Bargaining Agreement and any Employee Plans (except for any Assumed Benefit Plans), (b) have, de facto or otherwise, merged with or into any Seller Party, (c) be a mere continuation or substantial continuation of any Seller Party, or (d) be liable for any acts or omissions of the Seller Parties in the conduct of the Business or arising under, or related to, the Transferred Assets, other than as expressly set forth in this Agreement. The Parties acknowledge and agree that the Transaction was subject to arm's-length negotiating by Buyer and all Seller Parties. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties acknowledge and agree that the Buyer and Buyer's Affiliates (y) shall not be liable for any Liability or Lien (other than Assumed Liabilities) against the Debtors or any of the Debtors' predecessors or Affiliates (other than those of the Transferred Entities), and (z) shall have no successor or vicarious Liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets, any Excluded Liabilities or any other Liabilities of the Seller Parties arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this <u>Section 6.12</u> shall be reflected in the Sale Order.

Section 6.13   <u>Insurance Matters</u>.

(a)   <u>Buyer Cooperation</u>.   Notwithstanding anything to the contrary in the Agreement, each of Seller and Buyer acknowledge and agree that from and after the Closing, to the extent that Buyer (the "**Transferred Policy Holder**") has the right to pursue a claim under any Transferred Insurance Policy that covers or may reasonably be expected to cover in whole or in part any Excluded Liability retained by the Seller Parties (each, a "**Transferred Policy Beneficiary**" and, collectively, the "**Transferred Policy Beneficiaries**," and each such Excluded Liability, a "**Transferred Covered Loss**"), the Transferred Policy Holder shall (to the extent requested in writing from time to time by any Transferred Policy Beneficiary) use reasonable best efforts to file and pursue on behalf of such Transferred Policy Beneficiary claims under the applicable Transferred Insurance Policy(ies) for such Transferred Covered Loss on behalf of such Transferred Policy Beneficiary. The applicable Transferred Policy Beneficiary shall be responsible for all out-of-pocket expenses reasonably incurred by the Transferred Policy Holder in pursuing claims for Transferred Covered Loss on behalf of such Transferred Policy Beneficiary. To the extent that the Transferred Policy Holder actually collects proceeds under any applicable Transferred Insurance Policy pursuant to this  <u>Section 6.13(a)</u>, the Transferred Policy Holder shall promptly remit any such proceeds (net of any then remaining unreimbursed out-of-pocket expenses reasonably incurred by the Transferred Policy Holder or its Affiliates in connection with

**HIGHLY CONFIDENTIAL**

the pursuit of such proceeds) to the applicable Transferred Policy Beneficiary. The Transferred Policy Holder shall not, without the prior written consent of the applicable Transferred Policy Beneficiary, amend, modify or waive any of its rights under the applicable Transferred Insurance Policies to the extent that doing so could reasonably be expected to adversely affect any coverage thereunder of the Transferred Policy Beneficiaries. Subject to the following sentence, the Transferred Policy Holder shall retain the exclusive right to control claims under such Transferred Insurance Policies, provided that the Transferred Policy Beneficiaries shall have the right, but not the duty, to monitor such claims. Upon the request of any Seller Party, Buyer shall use commercially reasonable efforts to cause such Seller Party to be added as an insured on any applicable Transferred Insurance Policy(ies) covering or potentially covering Transferred Covered Losses with respect to which any Seller Party is or may be a Transferred Policy Beneficiary. Each Transferred Policy Beneficiary shall exclusively bear and be liable for (and the Transferred Policy Holder shall have no obligation to repay or reimburse any Transferred Policy Beneficiary or its Affiliates) all uninsured, uncovered, unavailable or uncollectible amounts (including deductibles) relating to or associated with all such claims. In addition, each Transferred Policy Beneficiary shall be responsible for reimbursing the Transferred Policy Holder for any incremental premium increases or fees or other expenses suffered or incurred by the Transferred Policy Holder under any applicable Transferred Insurance Policy covering a Transferred Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase results from the Transferred Policy Holder's collection of proceeds under such policy on behalf of a Transferred Policy Beneficiary in compliance with the foregoing provisions of this Section 6.13(a). Each Transferred Policy Beneficiary shall also be responsible for any incremental premium increases suffered or incurred by the Transferred Policy Holder under any applicable Transferred Insurance Policy covering a Transferred Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase arises out of or results from the Transferred Policy Holder effecting a reinstatement of a sum insured or policy limit following erosion or exhaustion of such sum insured or policy limit resulting from the Transferred Policy Holder's collection of proceeds under such policy on behalf of a Transferred Policy Beneficiary in compliance with the provisions of this Section 6.13(a). Notwithstanding anything to the contrary in this Section 6.13(a), the Parties' obligations under this Section 6.13(a) shall cease upon the Wind-Up Date.

(b)     Seller Cooperation. Notwithstanding anything to the contrary in the Agreement, each of Seller and Buyer acknowledge and agree that from and after the Closing, to the extent that any Seller Party (the "**Excluded Policy Holder**") has the right to pursue a claim under any occurrence-based Insurance Policy that covers or may reasonably be expected to cover in whole or in part any Assumed Liability assumed by Buyer (the "**Excluded Policy Beneficiary**," and each such Assumed Liability, an "**Excluded Policy Covered Loss**"), including any such policy that would be a Transferred Insurance Policy pursuant to Section 2.02(a)(xxi), but for the fact that such Insurance Policy is not legally transferable or has not yet been legally transferred pursuant to Section 2.03 (each, an "**Excluded Insurance Policy**"), the Excluded Policy Holder shall (to the extent requested in writing from time to time by the Excluded Policy Beneficiary) use reasonable best efforts to file and pursue on behalf of the Excluded Policy Beneficiary claims under the applicable Excluded Insurance Policy(ies) for such Excluded Policy Covered Loss on behalf of the Excluded Policy Beneficiary. The Excluded Policy Beneficiary shall be responsible for all out-of-pocket expenses reasonably incurred by the Excluded Policy Holder in pursuing

HIGHLY CONFIDENTIAL

claims for Excluded Policy Covered Loss on behalf of the Excluded Policy Beneficiary. To the extent that the Excluded Policy Holder actually collects proceeds under any applicable Excluded Insurance Policy pursuant to this Section 6.13(b), the Excluded Policy Holder shall promptly remit any such proceeds (net of any then remaining unreimbursed out-of-pocket expenses reasonably incurred by the Excluded Policy Holder or its Affiliates in connection with the pursuit of such proceeds) to the Excluded Policy Beneficiary. The Excluded Policy Holder shall not, without the prior written consent of the Excluded Policy Beneficiary, amend, modify or waive any of its rights under the applicable Excluded Insurance Policies to the extent that doing so could reasonably be expected to adversely affect any coverage thereunder of the Excluded Policy Beneficiary. Subject to the following sentence, the Excluded Policy Holder shall retain the exclusive right to control claims under such Excluded Insurance Policies, provided that the Excluded Policy Beneficiary shall have the right, but not the duty, to monitor such claims. Upon the request of Buyer, Seller shall use commercially reasonable efforts to cause Buyer to be added as an insured on any applicable Excluded Insurance Policy(ies) covering or potentially covering Excluded Policy Covered Losses with respect to which Buyer is or may be an Excluded Policy Beneficiary. The Excluded Policy Beneficiary shall exclusively bear and be liable for (and the Excluded Policy Holder shall have no obligation to repay or reimburse the Excluded Policy Beneficiary or its Affiliates) all uninsured, uncovered, unavailable or uncollectible amounts (including deductibles) relating to or associated with all such claims.  In addition, the Excluded Policy Beneficiary shall be responsible for reimbursing the Excluded Policy Holder for any incremental premium increases or fees or other expenses suffered or incurred by the Excluded Policy Holder under any applicable Excluded Insurance Policy covering an Excluded Policy  Covered Loss (or any  renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase results from the Excluded Policy Holder's collection of proceeds under such policy on behalf of the Excluded Policy Beneficiary in compliance with the foregoing provisions of this Section 6.13(b).  The Excluded Policy Beneficiary shall also be responsible for any incremental premium increases suffered or incurred by the Excluded Policy Holder under any applicable Excluded Insurance Policy covering an Excluded Policy Covered Loss (or any renewal or replacement policy thereto, as applicable) to the extent (and only to such extent) that such increase arises out of or results from the Excluded Policy Holder effecting a reinstatement of a sum insured or policy limit following erosion or exhaustion of such sum insured or policy limit resulting from the Excluded Policy Holder's collection of proceeds under such policy on behalf of the Excluded Policy Beneficiary in compliance with the provisions of this Section 6.13(b). Notwithstanding anything to the contrary in this Section 6.13(b), the Parties' obligations under this Section 6.13(b) shall cease upon the Wind-Up Date.

Section 6.14   Guarantees; Other Obligations.   At or before the Closing, Buyer shall or shall cause its Affiliates to use commercially reasonable efforts to (i) arrange for substitute letters of credit, guarantees and other obligations to replace (A) any Seller Guarantees listed on Schedule 6.14(A) and outstanding as of the Agreement Date to the extent necessary and required for the operation of the Transferred Assets from and after the Effective Time, and (B) any Seller Guarantees entered into in the Ordinary Course of Business during the Pre-Closing Period, so long as Seller obtained Buyer's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) before the incurrence of the same (the Seller Guarantees described in the foregoing clauses (i)(A) and (i)(B), collectively, the "**Seller Business Guarantees**") or (ii) assume all obligations under each such Seller Business Guarantees, obtaining

48

**HIGHLY CONFIDENTIAL**

from the creditor, beneficiary or other counterparty a full release (in a form satisfactory to Seller) of all parties liable, directly or indirectly, for reimbursement to the creditor or fulfillment of other obligations to a beneficiary or counterparty in connection with amounts drawn under the Seller Business Guarantees; provided, however, for the avoidance of doubt, the term Seller Business Guarantees as used in this Section 6.14 shall not include, and Buyer and Buyer's Affiliates shall have no Liability or obligation under this Section 6.14 with respect to, any letters of credit, guarantees or other obligations to the extent such letters of credit, guarantees or other obligations relate to the Excluded Assets or Excluded Liabilities. To the extent the beneficiary or counterparty under any Seller Business Guarantee does not accept as of the Closing any such substitute letter of credit, Buyer guarantee or other obligation proffered by Buyer, effective from and after the Closing  Date until the Wind-up Date, Buyer shall, and shall cause each of its Affiliates to, (x) indemnify, defend and hold harmless Seller and its Affiliates against, and reimburse Seller and its Affiliates for, all amounts paid, including costs or expenses in connection with such Seller Business Guarantees, including Seller's and its Affiliates' expenses in maintaining such Seller Business Guarantees, whether or not any such Seller Business Guarantee is drawn upon or required to be performed, and shall in any event promptly reimburse Seller and its Affiliates to the extent a Seller Business Guarantee is called upon and Seller or its Affiliates make any payment or are obligated to reimburse the party issuing the Seller Business Guarantee and (y) not, without Seller's prior written consent, amend in any manner adverse to Seller or any of its Affiliates, or extend (or permit the extension of), any Seller Business Guarantee or any obligation support by any Seller Business Guarantee. At the request of Seller, and at any  time Seller's or its Affiliates' obligations under any Seller Business Guarantee have not been irrevocably released, Buyer shall provide Seller and its Affiliates, with letters of credit, issued by an issuer reasonably acceptable to Seller and in an amount equal to Seller's and its Affiliates' entire potential Liability pursuant to the immediately preceding sentence. Any such letter of credit, guarantee or other financial assurance obligation shall not expire, terminate or be cancelled until the earlier of (i) Seller and its Affiliates are irrevocably and unconditionally fully released from the entire potential Liability with respect to all Seller Guarantees, and (ii) the Wind-up Date with respect to such Seller or Seller Affiliate.

Section 6.15   Europe/ROW Buyer.

(a)   Seller shall use good faith efforts to obligate the Europe/ROW Buyer to agree to the terms and conditions of the IP Cross License Agreement, the Trademark Co-Existence Agreement, the TSA and the Supply Agreement.

(b)   Buyer shall cooperate and negotiate in good faith with the Seller Parties and the Europe/ROW Buyer to agree to the final forms of the Transaction Agreements referred to in Section 6.15(a) no later than the earlier to occur of the Closing hereunder or the Europe/ROW Closing, and if the Europe/ROW Closing is to occur prior to the Closing hereunder and the Transaction Agreements are in a final form, Buyer shall  deliver a written acknowledgement that the Transactions Agreements are in final form to  be  executed and effective at the Closing hereunder; provided, that, Seller shall deliver to Buyer the  proposed list of registrations and applications for Exide Licensed IP (as defined in Schedule C) by  no later than fourteen (14) days following the Agreement Date.

49

**HIGHLY CONFIDENTIAL**

Section 6.16    <u>Financial Reporting</u>.  After the date hereof and prior to the Closing Date,

(a)    for each full fiscal month beginning July 1, 2020, Seller shall cause to be delivered to Buyer  within thirty (30) days after the last day of such month an unaudited consolidated balance sheet of the Americas operations of Exide Holdings, Inc. and its Subsidiaries at the last day of such month and unaudited consolidated statements of income and cash flows of the Americas operations of Exide Holdings, Inc. and its Subsidiaries, for such month and for the period from the beginning of the then current fiscal year to the end of such fiscal month, (b) for each full fiscal quarter beginning with the fiscal quarter ending March 31, 2020, Seller shall cause to be delivered to Buyer within fifty-five (55) days after the last day of such quarter an unaudited consolidated balance sheet of the Americas operations of Exide Holdings, Inc. and its Subsidiaries at the last day of such quarter and unaudited consolidated statements of income and cash flows of the Americas operations of Exide Holdings, Inc. and its Subsidiaries, for such quarter and the for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, and (c) for the fiscal year ended March 31, 2020, Seller shall cause to be delivered to Buyer within ninety (90) days after March 31, 2020, the unaudited consolidated balance sheet of the Americas operations of Exide Holdings, Inc. and its Subsidiaries and consolidated statements of income and cash flows of the Americas operations of Exide Holdings, Inc. and its Subsidiaries for such period then ended; provided, that in each of clauses (a) through (c) hereof, the financial statements delivered pursuant thereto shall be subject to normal year-end audit adjustments and other items, such as footnotes, shall be omitted.

Section 6.17    <u>Disclosure Schedule Supplement</u>.  The Seller may, from time to time prior to the Closing, by notice in accordance with the terms of this Agreement, supplement or amend any Schedule contained in the Disclosure Schedules in order to add information relating to, or resulting from, facts or events occurring subsequent to the execution of this Agreement (each, a "**Disclosure Schedule Supplement**"). In the event that the Seller provides any Disclosure Schedule Supplement, the matters set forth on such Disclosure Schedule Supplement shall not be effective to cure and correct any breach of any representation, warranty or covenant, which would have existed if Seller had not provided such Disclosure Schedule Supplement, including for purposes of termination rights or for determining satisfaction of any condition contained herein. In the event that, prior to the Closing, Seller provides Buyer a Disclosure Schedule Supplement pursuant to the terms of this <u>Section 6.17</u> due to facts or events occurring subsequent to the execution of this Agreement that, but for this <u>Section 6.17</u>, would entitle Buyer to terminate this Agreement pursuant to <u>Section 11.01(c)</u> (a "**Significant Schedule Supplement**"), Buyer may terminate this Agreement in accordance with <u>Section 11.01(c)</u> within ten (10) Business Days of receipt of such Significant Schedule Supplement. If Buyer does not deliver a termination notice within such ten (10) Business Day period, Buyer shall be deemed to have waived any and all rights, remedies or other recourse to which Buyer might otherwise be entitled in respect of a breach that would be cured by such Significant Schedule Supplement, and such Significant Schedule Supplement shall be effective to cure and correct for all other purposes any breach of any representation, warranty or covenant which would have existed if Seller had not provided such Significant Schedule Supplement, and all references to any Schedule hereto which is supplemented or amended by such Significant Schedule Supplement shall for all purposes after the Closing be deemed to be a reference to such Schedule as so supplemented or amended.

**HIGHLY CONFIDENTIAL**

Section 6.18   <u>BM Assembly Line</u>.  Subject the entry of the Sale Order or any other Order of the Bankruptcy Court approving the BMAL Transfer (defined below), prior to the Closing, Seller shall sell and transfer to Europe Exide Corporation Limited or one of its Affiliates (other than a Transferred Entity) all of its right, title and interest in, to and under the assets set forth on <u>Schedule 6.18</u> (the "**BMAL Transfer**"). From and after the consummation of the BMAL Transfer, such assets set forth on <u>Schedule 6.18</u> shall constitute Excluded Assets and all Liabilities arising thereunder shall constitute Excluded Liabilities hereunder.

**ARTICLE VII**

**POST-CLOSING COVENANTS**

Section 7.01   <u>Access</u>.

(a)    From and after the Closing Date, in connection with any reasonable business purpose, including the preparation or amendment of Tax Returns, claims or obligations relating to Excluded Liabilities, financial statements, any Action to which Seller or any of its Affiliates is a party, the requirements of any Laws applicable to Seller, or its Affiliates or the determination of any matter relating to the rights or obligations of the Seller Parties or any of their Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases, upon reasonable prior written notice, and except to the extent necessary to (i) ensure compliance with any applicable Law or an Order of the Bankruptcy Court, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any contractual confidentiality obligations, Buyer shall, and shall cause each of the Transferred Entities, their respective Affiliates and their respective Representatives to (as Seller's sole cost and expense), during normal business hours, (A) afford each Seller Party, their respective Representatives and their respective Affiliates reasonable access to the properties, books and records of Buyer and its Affiliates in respect of any of the Transferred Entities, the Business, the Transferred Assets and the Assumed Liabilities, in each case, to the extent relating to any period prior to the Closing Date, (B) furnish to each Seller Party, their respective Representatives and their respective Affiliates such additional financial and other information regarding the Transferred Entities, the Business, the Transferred Assets and the Assumed Liabilities as any Seller Party or their respective Representatives may from time to time reasonably request, in each case, to the extent relating to any period prior to the Closing Date and (C) make available to each Seller Party, their respective Representatives and their respective Affiliates those employees of Buyer or its Affiliates whose assistance, expertise, testimony, notes or recollections or presence may be necessary to assist such Seller Party, their respective Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above, including the presence of such Persons for interviews and depositions and as witnesses in hearings or trials for such purposes; <u>provided</u>, <u>however</u>, that such investigation shall not unreasonably interfere with the business or operations of Buyer or any of its Affiliates; and  <u>provided</u>, <u>further</u>, that the auditors and accountants of Buyer or its Affiliates shall not be obligated  to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants. Notwithstanding anything to the contrary herein, the Seller Parties shall have continued access to

51

**HIGHLY CONFIDENTIAL**

all Transferred Books and Records as is necessary to administer the Bankruptcy Cases and the Seller Parties may retain copies of such Transferred Books and Records, as necessary or appropriate in connection with such purpose.

(b)    If so requested by Buyer, on the one hand, or Seller or any of its Affiliates, on the other hand, Seller or one of its Affiliates, or Buyer or one of its Affiliates, as the case may be, shall enter into a customary joint defense agreement or common interest agreement with Buyer and its Affiliates, or Seller and its Affiliates, as applicable, with respect to any information to be provided to Seller or its Affiliates pursuant to Section 7.01(a).

Section 7.02    Directors' and Officers' Indemnification and Exculpation.

(a)    Buyer agrees that all rights of the individuals who on or prior to the Closing Date were directors, officers, managers or employees (in all of their capacities) of the Transferred Entities (collectively, the "**D&O Indemnified Parties**") shall be entitled to indemnification and exculpation from Liabilities for acts or omissions occurring at or prior to the Closing Date as provided in the organizational documents of the Transferred Entities, as applicable, as in effect on the Agreement Date, which obligation shall survive the Closing Date and shall continue in full force and effect against the applicable Transferred Entity in accordance with the terms of such organizational document. Such rights shall not be amended or otherwise modified in any manner that would adversely affect the rights of the D&O Indemnified Parties, unless such modification is required by Law.

(b)    The provisions of this Section 7.02 are intended to be for the benefit of and shall be enforceable by, each D&O Indemnified Party, his or her successors and heirs and his or her legal Representatives (but no other third parties). The obligations of Buyer under this Section 7.02 shall not be amended, terminated or modified in such a manner as to adversely affect any D&O Indemnified Party (including such Person's successors, heirs and legal Representatives) to whom this Section 7.02 applies without the written consent of the affected D&O Indemnified Party (it being expressly agreed that the D&O Indemnified Parties to whom this Section 7.02 applies shall be third-party beneficiaries of this Section 7.02), and this Section 7.02 shall be enforceable by such D&O Indemnified Parties and their respective successors, heirs and legal Representatives and shall be binding on all successors and assigns of Buyer and each Transferred Entity.

(c)    If Buyer or, following the Closing and prior to the sixth (6th) anniversary of the Closing Date, any Transferred Entity, or any of their respective successors or assigns, (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in such case, Buyer shall use commercially reasonable efforts to cause proper provisions to be made so that the successors and assigns of Buyer or such Transferred Entity or any of their respective successors or assigns, as the case may be, shall assume all of the obligations set forth in this Section 7.02(c).

Section 7.03    Preservation of Books and Records.  Seller and its Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date.  Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the longer of

**HIGHLY CONFIDENTIAL**

(a) any applicable statute of limitations and (b) a period of the earlier of (x) six (6) years from the Closing Date and (y) the Wind-Up Date.  During such period, (i) Representatives of Seller and its Affiliates shall, upon reasonable notice and for any reasonable business purpose (including the purposes described in Section 7.01), have access during normal business hours to examine, inspect and copy such books and records and (ii) Buyer shall provide to Seller and its Affiliates access to such original books and records of the Transferred Entities or the Business as Seller or its Affiliates shall reasonably request.  Seller or its Affiliates, as applicable, shall return such original books and records to Buyer or such Affiliate as soon as such books and records are no longer needed in connection with the circumstances described in the immediately preceding sentence. After such period, before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least ninety (90) days' prior written notice to Seller of its intention to dispose such books and records, and Seller and/or any of its respective Affiliates shall be given an opportunity,  at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

Section 7.04   Further Assurances.  From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party (including (a) transferring back to Seller or its designees each Excluded Asset and any asset or Liability not contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which asset or Liability was transferred to Buyer at the Closing and (b) transferring to Buyer (and having Buyer assume) any asset or Liability contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which was not transferred to Buyer at the Closing); provided, however, that except for Buyer's obligations to discharge an Assumed Liability and as otherwise provided pursuant to Section 2.03, nothing in this Section 7.04 shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01   [RESERVED].

Section 8.02   Competing Transaction.

(a)   This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties and the Transferred Entities of higher or better competing transactions (including any plan of reorganization, recapitalization or restructuring transaction) in respect of all or any part of the Transferred Assets, the Assets and the Transferred Equity Interests (each a "**Competing Transaction**"), as determined in the Seller Parties' sole and exclusive discretion, and subject to the provisions of the Bidding Procedures Order and Supplemental Bidding Procedures Order.

Section 8.03   Bankruptcy Court Filings.

53

**HIGHLY CONFIDENTIAL**

(a)     Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Seller and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(b)     From and after the date of entry of the Sale Order and until the Closing Date, to the extent reasonably practicable, the Seller Parties shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with the Agreement and the operation of the Business, in each case, for Buyer's prior review and comment at least two (2) Business Days prior to the filing or submission thereof (provided if it is not practicable to deliver the same within two (2) Business Days of the filings date as soon as practicable thereafter), and such filings shall be reasonably acceptable to Buyer to the extent related to the Transferred Assets, Transferred Equity Interests, and Assumed Liabilities, or any of Buyer's obligations hereunder.

Section 8.04   <u>Back-Up Bidder</u>.   Seller and Buyer agree that Buyer will be a "Back-Up Bidder" if and only if Buyer submits the second highest or second best bid at the Auction (as determined by the Seller Parties) and is named the Back-Up Bidder. If Buyer becomes the Back-Up Bidder and Seller gives notice (the "**Back-Up Trigger Notice**") to Buyer on or before the Back-Up Trigger Notice Date that Seller (i) failed to consummate the sale with the winning bidder, and (ii) has terminated the purchase agreement with the winning bidder, then Buyer shall consummate the transactions in accordance with its rebid.

## ARTICLE IX

## TAX MATTERS

Section 9.01   <u>Transfer Taxes</u>.   Notwithstanding anything to the contrary in this Agreement, to the extent not exempt under the Sale Order or section 1146 of the Bankruptcy Code, (a) where Buyer is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions or any component thereof, Buyer shall promptly pay and discharge such Transfer Tax, and (b) where any of the Seller Parties is liable under applicable Law to pay any Transfer Tax imposed or arising with respect to the Transactions or any component thereof, Buyer shall pay the amount of such Transfer Tax to the Seller Parties and shall indemnify, defend and hold harmless the Seller Parties and any of their Affiliates and Representatives from and against any such Transfer Taxes (unless such indemnity is prohibited by (or otherwise invalid under) applicable Law in which case Buyer shall indemnify, defend and hold harmless the Seller Parties for an amount equal to any such Transfer Taxes). The Party required by Law to file a Tax Return with respect to such Transfer Taxes shall, with the cooperation of the other Party, timely prepare and file such Tax Return. If the Seller Parties or any of their Affiliates (other than a Transferred Entity) is required to pay any Transfer Tax, Buyer shall within five (5) days of receipt of evidence of filing reimburse the Seller Parties for any Transfer Taxes paid by the Seller Parties

54

**HIGHLY CONFIDENTIAL**

or such Affiliate in connection with the filing of the applicable Tax Return. Buyer and Seller each agree to timely sign and deliver (or to cause their respective Affiliates to timely sign and deliver) such certificates or forms as may be necessary or appropriate and to otherwise cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes. No sums payable, or consideration given, by Buyer under this Agreement should be reduced by the amount of any Transfer Tax, and Buyer shall pay any Transfer Tax chargeable on those sums or consideration. All refunds or credits of VAT paid by Buyer under this provision shall belong to Buyer.

Section 9.02   <u>Tax Adjustments</u>.   Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Transferred Assets or Transferred Equity Interests (including ad valorem taxes, real estate Taxes, personal property Taxes and similar Taxes, and for the avoidance of doubt not to include Taxes of the Transferred Entities) for the Tax period in which the Closing occurs (the "**Straddle Period**") will be apportioned and prorated between Seller Parties and Buyer as of the Closing Date. Buyer shall bear its proportionate share of such Taxes (which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the number of days in the Straddle Period following the Closing Date and the denominator being the total number of days in the Straddle Period, times (ii) the amount of such Taxes), and the Seller Parties shall bear the remaining portion of such Taxes.

Section 9.03   <u>Tax Cooperation</u>.   Without limiting the obligations set forth in <u>Sections 6.02</u> and <u>7.01</u>, the Parties shall furnish or cause to be furnished to each other, upon request, and at the sole cost of the requesting Party, as promptly as practicable, such information and assistance relating to the Transferred Entities and the Transferred Assets as is reasonably necessary for the filing of Tax Returns, the making of any election related to Taxes permitted to be made under this Agreement, and the preparation for, or the prosecution or defense of, any audit, claim, demand, proposed adjustment or deficiency relating to Taxes, and any other matter or proceeding relating to Taxes. Buyer agrees that it shall preserve and keep, or cause to be preserved and kept, all original books and records related to the Business relating to Taxes with respect to any Pre-Closing Tax Period and in the possession of Buyer or its Affiliates in accordance with <u>Section 7.03</u>. With respect to the taxable period ending March 31, 2021, Buyer shall take all reasonable actions to prevent any Transferred Entity from realizing "subpart F income" (within the meaning of Section 952 of the Code) or "global intangible low-taxed income" (within the meaning of Section 951A(b) of the Code).

Section 9.04   <u>Post-Closing Filing of Transferred Entity Tax Returns</u>.

(a)   The Seller Parties shall prepare and file (or cause to be prepared and filed) any Tax Return of any Transferred Entity (i) due on or before the Closing Date, or (ii) filed on an affiliated, consolidated, combined or unitary basis with any of the Seller Parties or any of their Affiliates (other than a Transferred Entity) for taxable years or periods beginning on or before the Closing Date that is due after the Closing Date. With respect to each such Tax Return prepared and filed by the Seller Parties pursuant to this <u>Section 9.04(a)</u>, the Seller Parties shall be responsible for any Taxes of the Seller Parties or any of their Affiliates (other than, as to Tax Returns due after the Closing Date, a Transferred Entity) shown as due on such Tax Returns. Buyer shall be

HIGHLY CONFIDENTIAL

responsible for and pay an amount equal to all other Taxes shown as due on such Tax Returns to the Seller Parties at least ten (10) days prior to the due date for payment of such Taxes.

(b)     To the extent possible under applicable Law, the Parties shall take such actions as shall be necessary or appropriate to cause the taxable year of each Transferred Entity to close for income Tax purposes, as of the close of business on the Closing Date in all applicable Tax jurisdictions.

(c)     Except with the Seller's consent (which consent shall not be unreasonably withheld, conditioned or delayed), neither Buyer nor any Affiliate of Buyer shall (or shall cause or permit any Transferred Entity to) (x) settle or compromise any audit, claim, demand, proposed adjustment, deficiency, assessment or administrative or judicial proceeding relating to, or (y) amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return described in <u>Section 9.04(a)</u>.

Section 9.05   <u>Code Section 338 Election</u>.   In the event Buyer provides Seller with written notice of its intent to make an election in accordance with the provisions of Code Section 338(h)(10) Code within sixty (60) days after the Closing Date, Buyer and Seller hereby agree that they shall elect to treat the purchase of the Transferred Equity Interests in accordance with the provisions of Code Section 338(h)(10) and Treasury Regulation Section 1.338(h)(10)-1.   In such a case, Buyer and Seller shall jointly make a timely election pursuant to Code Section 338(h)(10) with respect to the purchase and sale of the Transferred Equity Interests hereunder.

Section 9.06   <u>Canadian Transfer Tax Elections</u>.   In the event that Buyer provides Seller on or before the Closing Date with confirmation that it is registered under Part IX of the *Excise Tax Act (Canada)* and Chapter VIII of the *Quebec Sales Tax Act*, and its registration numbers, then Buyer and Seller shall, if applicable, execute jointly an election under section 167 of the *Excise Tax Act (Canada)* and an election under section 75 of the Act respecting *Québec Sales Tax* to have the sale of the relevant Transferred Assets take place without the imposition of Canadian goods and services or harmonized sales Tax, and without the imposition of Quebec sales Tax, and Buyer shall file such elections within the prescribed time.

Section 9.07   <u>Survival</u>.   The obligations set forth in this <u>Article IX</u> with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

**ARTICLE X**

**CONDITIONS TO CLOSING**

Section 10.01   <u>Conditions to Obligations of Seller</u>.   The obligation of Seller or any other Seller Party to consummate the Transactions shall be subject to the satisfaction or written waiver by Seller in its sole discretion, at or before the Closing, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

56

**HIGHLY CONFIDENTIAL**

(i)      all representations and warranties of Buyer contained in <u>Article V</u> of this Agreement shall be true and correct in all material respects as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct in all material respects as of such specific date); <u>provided</u>, <u>however</u>, that for purposes of determining the satisfaction of the condition in this clause (i), no effect shall be given to any qualifier of "material" in such representations and warranties;

(ii)      the covenants contained in this Agreement required to be complied with by Buyer on or before the Closing shall have been complied with in all material respects; and

(iii)      Seller shall have received a certificate signed by an authorized officer of Buyer, dated as of the Closing Date, certifying as to the satisfaction of the matters set forth in the foregoing clauses (i) and (ii).

(b)      <u>Government Approvals</u>.  Any applicable waiting periods under the HSR Act shall have expired or been terminated and all other Required Approvals shall have been obtained or, if applicable, shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)      <u>No Order</u>.  There shall be no Order in existence that prohibits the sale of the Transferred Equity Interests, the sale of the Transferred Assets or the other Transactions.

(d)      <u>Transaction Agreements</u>.  Buyer shall have executed and delivered to Seller, all Buyer Transaction Agreements.

(e)      <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be effective and not be subject to any stay.

Section 10.02 <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the Transactions contemplated by this Agreement shall be subject to the satisfaction or written waiver by Buyer in its sole discretion, at or before the Closing, of each of the following conditions:

(a)      Representations and Warranties; Covenants.

(i)      The representations and warranties of Seller contained in <u>Section 4.01</u> (Formation and Qualification of the Transferred Entities), <u>Section 4.02</u> (Capital Structure of the Transferred Entities), <u>Section 4.03</u> (Formation and Authority of the Seller Parties; Enforceability), <u>Section 4.04</u> (No Conflict), and <u>Section 4.16</u> (Brokers) shall be true and correct on the Agreement Date and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case it shall be true and correct as of such specified date);

(ii)      all other representations and warranties of Seller contained in this Agreement shall be true and correct on the Agreement Date and on and as of the Closing as if

57

**HIGHLY CONFIDENTIAL**

made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, however, that for purposes of determining the satisfaction of the condition in this clause (ii), no effect shall be given to any qualifier of "material" or "Material Adverse Effect" in such representations and warranties (except in each case for Section 4.07(b));

(iii)    the covenants contained in this Agreement required to be complied with by the Seller Parties on or before the Closing shall have been complied with in all material respects; and

(iv)    Buyer shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, certifying as to the satisfaction of matters set forth in the foregoing clauses (i), (ii), and (iii).

(b)    Government Approvals.  Any applicable waiting periods under the HSR Act shall have expired or been terminated and all other Required Approvals  shall have been obtained or, if applicable, shall have expired or been waived by the applicable Government Authority, or shall have been terminated.

(c)    Environmental Approvals.  Subject to Buyer's timely satisfaction of its obligations pursuant to Section 6.04(a), Buyer shall have obtained all approvals (which may be temporary in nature), other than approvals the failure of which to obtain would not materially and adversely affect Buyer's ability to operate any of the facilities as they are presently being operated, required under Environmental Laws and Environmental Permits that must be obtained prior to the Effective Time in order for Buyer to continue lawfully operating any of the facilities as they are presently being operated, in each case without the imposition of additional or modified conditions and requirements that would impose material additional costs.

(d)    No Order.  There shall be no Order in existence that prohibits the sale of the Transferred Equity Interests, the sale of the Transferred Assets or the other Transactions.

(e)    Certain Transaction Agreements.  Each of the TSA, IP Cross License Agreement, the Trademark Co-Existence Agreement, and the Supply Agreement Transaction Agreement shall been fully negotiated and in a final form, which shall include the applicable terms set forth on Schedule C and, subject to Section 6.15, be in a form and substance reasonably acceptable to Seller and Buyer.

(f)    Seller Transaction Agreements.  The Seller Parties shall have executed and delivered, or caused to be executed and delivered, to Buyer all Seller Transaction Agreements.

(g)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be effective and not subject to any stay.

(h)    Collective Bargaining Agreements.  (i) The Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free and clear of the Collective

58

**HIGHLY CONFIDENTIAL**

Bargaining Agreements set forth on Schedule 4.12(a), (ii) the Buyer and Seller Parties shall have negotiated and consented to a Modified Labor Agreement with the Unions who are parties to the Modified Labor Agreements that shall not include the requirement that Buyer or its Affiliates sponsor or contribute to a single employer defined benefit pension plan, retiree medical or life insurance plan or multiemployer pension plan, (iii) the Unions shall have agreed to waive or remove any successor  clauses in the Collective Bargaining Agreements set forth on Schedule 4.12(a) and to waive any  claim that Buyer has or is required to assume or succeed to those Collective Bargaining  Agreements, or (ix) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed  by the applicable Seller Parties pursuant to section 1113(c) of the Bankruptcy Code authorizing the applicable Seller Parties to reject the Collective Bargaining Agreements set forth on Schedule 4.12(a).

(i)      Pension Liabilities.  The Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free and clear of any and all Liabilities related to any Employer Plan that is subject to Title IV of ERISA.

Section 10.03  Frustration of Closing Conditions.  Neither Seller nor Buyer may rely on the failure of any condition set forth in this Article X to be satisfied if such failure was caused by such Party's failure to act in good faith, to use commercially reasonable efforts to cause the Closing Conditions of each such other Party to be satisfied, or to satisfy its obligations set forth in Section 6.04.

Section 10.04  Waiver of Closing Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article X that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

# ARTICLE XI

# TERMINATION

Section 11.01  Termination.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Seller, if Buyer shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Buyer that would cause any Closing Condition set forth in Section 10.01(a) not to be satisfied, and (i) such breach is not waived by Seller or (ii) if such breach has not been waived by Seller but is curable and is not cured by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt by Buyer of Seller's notice of its intent to terminate and (B) the Outside Date; provided, however, that Seller is not then in material breach of this Agreement, which breach, either individually or in the aggregate with other breaches by the Seller, would result in, if occurring or continuing on the Closing Date, the failure of the Closing Conditions set forth in Section 10.02;

(c)      by Buyer, if Seller shall have breached any representation or warranty or failed to comply with any covenant applicable to Seller that would cause any Closing Condition

59

**HIGHLY CONFIDENTIAL**

set forth in <u>Section 10.02(a)</u> not to be satisfied, and (i) such breach is not waived by Buyer or (ii) if such breach has not been waived by Buyer but is curable and is not cured by Seller prior to the earlier to occur of (A) ten (10) Business Days after receipt by Seller of Buyer's notice of its intent to terminate and (B) the Outside Date; <u>provided</u>, <u>however</u>, that Buyer is not then in material breach of this Agreement, which breach, either individually or in the aggregate with other breaches by Buyer, would result in, if occurring or continuing on the Closing Date, the failure of any of the Closing Conditions set forth in <u>Section 10.01</u>;

(d)    by either Seller or Buyer, if the Closing shall not have occurred by (i) August 27, 2020 or (ii) if Buyer is declared the Back-Up Bidder in accordance with <u>Section 8.04</u>, by September 30, 2020 (as either such date may be extended by mutual agreement of the Parties in writing, the "**Outside Date**"); <u>provided</u>, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties or covenants contained in this Agreement by Buyer or Seller, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 11.01(d)</u>;

(e)    by either Seller or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Equity Interests or the Transferred Assets, or the Transaction and such Order shall have become a Final Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 11.01(e)</u> shall not be available to Seller or Buyer whose action or failure to fulfill any obligation under this Agreement has been the cause of, or has resulted in, the issuance of such Order or other action;

(f)    by either Seller or Buyer (unless Buyer is the Back-Up Bidder), if (i) any Seller Party enters into a definitive agreement with respect to a Competing Transaction or (ii) the Bankruptcy Court enters an Order approving a Competing Transaction;

(g)    by Buyer, if any of the Bankruptcy Cases is dismissed, converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Seller Party is appointed in the Bankruptcy Cases;

(h)    [RESERVED];

(i)    [RESERVED]; or

(j)    by Buyer, if Seller has failed to obtain entry of an effective and unstayed Sale Order that is reasonably acceptable to Buyer by no later than August 10, 2020.

Section 11.02  <u>Notice of Termination</u>.  If either Buyer or Seller desires to terminate this Agreement pursuant to <u>Section 11.01</u>, such Party shall give written notice of such termination to the other Party, which notice shall include the specific subsection under which termination is sought.

Section 11.03  <u>Effect of Termination</u>.

**HIGHLY CONFIDENTIAL**

(a)     If this Agreement is terminated pursuant to Section 11.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) Section 6.03, (ii) this Section 11.03; (iv) Article XII (excluding Section 12.04) and Exhibit A; provided, that, nothing in this Section 11.03 shall be deemed to (A) release any Party from any   Liability for any breach by such Party of any term of this Agreement prior to the date of termination  for any knowing and intentional breach of this Agreement or Fraud committed against the non-breaching Party, as determined by the Bankruptcy Court or (B) impair the right of any Party to  compel specific performance by any other Party of its obligations under this Agreement.

(b)     In the event of a valid termination of this Agreement by Seller pursuant to Section 11.01(b),  then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver  Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver an amount  equal to the Escrowed Funds (together with all accrued investment income thereon (if any)) to  Seller.  Buyer acknowledges that the agreements contained in this Section 11.03(b) are an integral  part of the Transactions, and that without these agreements, Seller would not have entered into this  Agreement; accordingly, if Buyer fails to timely pay any amount due pursuant to this Section 11.03(b) and, in order to obtain such payment, Seller commences an Action which results in a  judgment against Buyer for any such payment set forth in this Section 11.03(b), Buyer shall pay  Seller its costs and expenses (including reasonable attorney's fees and disbursements) in  connection with such Action, together with interest on such payment at the Interest Rate through   the date such payment was actually received. Seller's receipt of the Escrowed Funds (if any when payable pursuant to the terms of this Section 11.03(b) shall constitute liquidated damages and the sole and exclusive remedy of Seller and its Affiliates against Buyer and any of its Affiliates and each of their respective Representatives for any and all losses and other damages that may be suffered or incurred by Seller, Seller's Affiliates and each of their respective Representatives based upon, relating to, resulting from or arising out of this Agreement or the Transactions, any breach hereof or any failure to perform or comply with any covenant or other obligation hereunder and the circumstances giving rise to such termination.  Further, Buyer agrees that Seller may seek any other remedies at Law or in equity arising from Buyer's breach of this Agreement, pursuant to Section  11.03(a) and Section 12.17; provided, however, that in no event shall (i) Seller be entitled to both any such other remedy and also to receive the Escrowed Funds, and (ii) in no event shall the Escrowed Funds (or an amount equal thereto) be paid on more than one occasion.

(c)     In the event of a termination of this Agreement pursuant to Section 11.01, other than a termination pursuant to Section 11.01(b), then Buyer and Seller shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver an amount equal to the Escrowed Funds (together with all accrued investment income thereon (if any)) to Buyer.

HIGHLY CONFIDENTIAL

# ARTICLE XII

# MISCELLANEOUS

Section 12.01  <u>Rules of Construction</u>.  The following rules of construction shall govern the interpretation of this Agreement:

(a)  references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of Delaware as required to be applied thereunder by the Bankruptcy Court; references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b)  when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c)  whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(d)  (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

(e)  (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) the term "or" shall not be exclusive and shall mean "and/or";

(f)  (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

**HIGHLY CONFIDENTIAL**

(g)     references to any Person includes such Person's successors and permitted assigns;

(h)     whenever this Agreement requires any Seller Party, to take any action, such requirement shall be deemed to involve an undertaking on the part of the Seller to take such action, or to cause such Seller Party, to take such action;

(i)     unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; and

(j)     each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. Further, prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

Section 12.02 <u>Expenses</u>.  Except as otherwise specified in the Transaction Agreements, each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs.

Section 12.03 <u>Notices</u>.  All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this <u>Section 12.03</u>):

| | |
|---|---|
| If to Seller, to: | Exide Technologies, LLC<br>13000 Deerfield Parkway<br>Suite 200<br>Milton, GA 30004<br>Attention:   Legal Department<br>E-mail:       bob.penman@exide.com<br>              keith.scott@exide.com |
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153 |

63

**HIGHLY CONFIDENTIAL**

|                  |        |                            |
|------------------|--------|----------------------------|
|                  | Attention: | Ray C. Schrock, P.C.; |
|                  |        | Sunny Singh, Esq.;         |
|                  |        | Mariel E. Cruz, Esq.       |
|                  | E-mail: | ray.schrock@weil.com      |
|                  |        | sunny.singh@weil.com       |
|                  |        | mariel.cruz@weil.com       |

If to Buyer or Guarantor, to:

Battery BidCo, LLC
100 Northfield Street
Greenwich, CT 06830
Attn:    Jacob D. Hudson
Email:  jhudson@atlasholdingsllc.com

with a copy (which will not constitute notice) to:

Winston & Strawn LLP
1901 L Street, N.W.
Washington, D.C. 20036
Attn:    Christopher M. Zochowski
         Bradley A. Noojin
Email:  czochowski@winston.com
         bnoojin@winston.com

Winston & Strawn LLP

35 W. Wacker Drive
Chicago, IL 60601
Attn:    Dan McGuire

Email:   DMcguire@winston.com

Section 12.04 <u>Survival</u>. Subject to <u>Section 11.03(a)</u> and   except for any covenant, agreement or obligation that by its terms is to be performed (in whole or in part) by any Party following the Closing including those set forth in Section 3.05 (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 12.05 <u>Limitation on Liability</u>.  Notwithstanding anything in this Agreement or in any other Transaction Agreement to the contrary, (a) except (x) in the event of Fraud, (y) the calculation of, and any adjustments to, the Purchase Price in accordance with <u>Article III</u>, and/or (z) with respect to any Assumed Liabilities, (i) the maximum aggregate Liability of the Seller Parties under, or with respect to, this Agreement  shall not exceed an amount equal to $5,000,000, and (ii) the maximum Liability of Buyer under, or with respect to, this Agreement  shall  not exceed the Escrowed Funds, and (b) except in the event of Fraud, in no event shall any Party have any Liability under this  Agreement (including under this <u>Article XII</u>) for any consequential, special, incidental, indirect or  punitive damages, lost profits or similar items (including loss of revenue, income or profits,  diminution of value or loss of business reputation or opportunity

64

**HIGHLY CONFIDENTIAL**

relating to a breach or alleged breach of this Agreement). The foregoing limitations in this <u>Section 12.05</u> shall apply to all claims, obligations, Liabilities, Actions or causes of action (whether in Contract or in tort, at Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to, this Agreement, or the negotiation, execution, or performance of this Agreement or any of the Transactions contemplated by this Agreement and the relationship between the Parties from inception.

Section 12.06 <u>Public Announcements</u>. The initial press release with respect to the execution of this Agreement shall be a joint press release to be reasonably agreed upon by the Buyer and Seller. No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as a Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by Order of the Bankruptcy Court.

Section 12.07 <u>Severability</u>. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 12.08 <u>Assignment</u>. This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties. No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that (a) any Party may assign this Agreement and any or all rights and obligations under this Agreement to any of its controlled Affiliates and (b) Seller may assign any of its rights or obligations under this Agreement to any plan administrator, liquidator, examiner, receiver, liquidation trustee, or similar party appointed for it following the Closing; <u>provided</u>, <u>further</u>, that no such assignment pursuant to the foregoing clause (a) shall release the assigning Party from any Liability under this Agreement. Any attempted assignment in violation of this <u>Section 12.08</u> shall be void *ab initio*.

Section 12.09 <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to the D&O Indemnified Parties pursuant to <u>Section 7.02(a)</u>, the Nonparty Affiliates pursuant to <u>Section 12.18</u>, or as otherwise expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.

**HIGHLY CONFIDENTIAL**

Section 12.10  Entire Agreement.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 12.11  Amendments.  This Agreement (including all exhibits and schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 12.12  Waiver.  At any time before the Closing, either Seller or Buyer may (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure; provided, that any such waiver shall be in a written instrument duly executed by the waiving Party.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.13  Governing Law.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "**Transaction Dispute**"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Section 12.14  Dispute Resolution; Consent to Jurisdiction.

(a)     Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.03 (as may be updated from time to time in accordance with Section 12.03); provided, however, upon the closing of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

66

**HIGHLY CONFIDENTIAL**

(i)      submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)      agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)      agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in Section 12.03 (as may be updated from time to time in accordance with Section 12.03) of any process required by any such court, will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)      The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

Section 12.15   Waiver of Jury Trial.   To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates or Representatives will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.   Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into this Agreement.   Each Party may file an original counterpart or a copy of this Section 12.15 with any court as written evidence  of the consent of each Party to the waiver of its right to trial by jury.

Section 12.16   Admissibility into Evidence.   All offers of compromise or settlement among the Parties or their Affiliates or Representatives in connection with the attempted resolution of any Transaction Dispute (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 12.17   Remedies; Specific Performance.

(a)      Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)      Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.   Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the

HIGHLY CONFIDENTIAL

provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case, (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at Law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and except with respect to Fraud, waives and releases all tort Causes of Action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 12.18  <u>Non-Recourse</u>.  All claims, obligations, Liabilities, Actions or causes of action (whether in Contract or in tort, at Law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to, this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the Persons that are expressly identified as Parties in the preamble to this Agreement or, if applicable, their successors and assigns ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants or Representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or Representative of, and any financial advisor or lender to, any of the foregoing ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, at law or in equity, or granted by statute) for any claims, causes of action, Actions, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, Actions, and obligations against any such Nonparty Affiliates.  It is expressly agreed that the Nonparty Affiliates to whom this <u>Section 12.18</u> applies shall be third-party beneficiaries of this <u>Section 12.18</u>.

Section 12.19  <u>Interest</u>.  If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.  All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case, for the actual number of days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 12.20  <u>Disclosure Schedules and Exhibits</u>.  The Disclosure Schedules, Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.  The representations and warranties of Seller

**HIGHLY CONFIDENTIAL**

set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules, and neither the Seller, nor any of its Affiliates shall be, or deemed to be, in breach of any such representations and warranties (and no claim shall lie in respect thereof) in respect of any such matter so disclosed in the Disclosure Schedules.  Where only brief particulars of a matter are set out or referred to in the Disclosure Schedules or a reference is made only to a particular part of a disclosed document, full particulars of the matter and the full contents of the document are deemed to be disclosed.  Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or Schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of the Disclosure Schedules if it is reasonably apparent on its face that such disclosure is applicable to such other Schedule(s) or Section(s) as though fully set forth in such other Schedule(s) or section(s).  The inclusion of any matter, information or item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed to constitute (i) an admission of any Liability by Seller to any third party, (ii) an admission that any breach or violation of applicable Laws or any Contract or agreement to which any Seller Party or Transferred Entity is a party exists or has actually occurred, (iii) an admission that such item is outside the Ordinary Course of Business or not consistent with past practice, or (iv) otherwise imply an admission that such item represents a material exception or material fact, event, circumstance or that such item has had, or would reasonably be expected to have a Material Adverse Effect.  The Disclosure Schedules have been arranged for purposes of convenience in separately titled Schedules corresponding to the Sections of this Agreement.

Section 12.21  <u>Provision Respecting Legal Representation</u>.  Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP may serve as counsel to the Seller Parties, on the one hand, and any Transferred Entity, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP may serve as counsel to any Seller Party or any Affiliate or Representative of any Seller Party, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of any Transferred Entity and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates and Representatives to consent to waive any conflict of interest arising from such representation.

Section 12.22  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

Section 12.23  <u>Guaranty</u>.  Subject to the provisions of this <u>Section 12.23</u>, Guarantor does hereby unconditionally and irrevocably guarantee to Seller the full, complete and prompt performance and payment if, as and when due, as the case may be, of the Guaranteed Obligations (as hereafter defined), and if Buyer does not pay or perform any of the Guaranteed Obligations in accordance with their respective terms, Guarantor shall immediately on demand by Seller, pay or perform such Guaranteed Obligations as if Guarantor were the principal obligor

69

**HIGHLY CONFIDENTIAL**

primarily liable for the performance thereof and not as a mere surety. Seller may obtain recourse against Guarantor for the payment and performance of the Guaranteed Obligations prior to, concurrently with, or after any other Action to enforce such Guaranteed Obligations. Guarantor shall be entitled to perform or satisfy the Guaranteed Obligations pursuant to the same terms and conditions and subject to the same rights and limitations as are applicable to Buyer under this Agreement. For purposes of this Agreement, "**Guaranteed Obligations**" means each of the obligations of Buyer under this Agreement. For the avoidance of doubt, Guarantor's obligations under this Section 12.23 shall be in exchange for the conveyance by the Seller Parties of the Transferred Assets and Transferred Equity Interests to Buyer or Guarantor, as applicable, subject to, and in accordance with, the other terms and conditions set forth in this Agreement and provided that the full Purchase Price, Cure Costs and other monetary obligations to be paid by Buyer at Closing are paid. If the Closing occurs in accordance with Section 2.04, the guaranty set forth in this Section 12.23 shall automatically and simultaneously be extinguished and of no force or effect. There are no third-party beneficiaries of the guaranty set forth in this Section 12.23.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]

**HIGHLY CONFIDENTIAL**

IN WITNESS WHEREOF, Seller, Buyer and, solely for purposes of <u>Sections 12.17</u>, <u>12.18</u> and <u>12.23</u>, Guarantor, have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**SELLER:**

EXIDE TECHNOLOGIES, LLC,
a Delaware limited liability company

By: _____
     Name: Timothy D. Vargo
     Title:   President & Chief Executive Officer

**HIGHLY CONFIDENTIAL**

**BUYER:**

BATTERY BIDCO LLC,
a Delaware limited liability company

By: _____
    Name:  Jacob D. Hudson
    Title:  Authorized Person

**GUARANTOR:**

ATLAS CAPITAL RESOURCES III LP
a Delaware limited partnership

By:  ATLAS CAPITAL GP III LLP, its general partner

    By:  ATLAS CAPITAL RESOURCES GP III LLC, its
    general partner

    By: _____
        Name:  Jacob D. Hudson
        Title:  Managing Partner

**HIGHLY CONFIDENTIAL**

**EXHIBIT A**

# DEFINITIONS

"**Action**" means any action, suit, arbitration, investigation or proceeding by or before any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) Seller shall not be deemed an Affiliate of Buyer, nor, after the Closing, of any Transferred Entity of which the Transferred Equity Interests are transferred to Buyer pursuant to this Agreement and (b) after the Closing, Buyer shall be deemed an Affiliate of each of the Transferred Entities (and vice versa).

"**Affected Union**" refers to those unions party to Collective Bargaining Agreements set forth in Schedule 4.12(a)(ii).

"**Agreement**" means this Stock and Asset Purchase Agreement, dated as of July 27, 2020, by and among Seller, Buyer, and, solely for purposes of Sections 12.17, 12.18 and 12.23, Guarantor, including the Disclosure Schedules and the Exhibits, and all amendments to such agreement made in accordance with Section 12.10.

"**Antitrust Laws**" means the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, and any Laws applicable to Buyer or any Seller Party or any Transferred Entity under any applicable jurisdiction that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assets**" means the assets and properties that are owned, leased or licensed by any Transferred Entity.

"**Assumed Employee Plans**" means any Employee Plan set forth on Schedule 6.10(c), including Exide Technologies 401(k) Savings and Retirement Plan, and the Exide Technologies Hourly 401(k) Plan, but excluding any Title IV Plan, defined benefit pension plan or supplemental or excess benefit retirement plans.

"**Available Software Contract**" means any executory third-party Software Contract that is related to or used in the Business.

"**Auction**" means the auction undertaken pursuant to the Bidding Procedures Order.

"**Back-Up Trigger Notice Date**" means August 31, 2020 at 11:59 p.m. New York City time.

"**Bankruptcy and Equity Exception**" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent

**HIGHLY CONFIDENTIAL**

conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at Law).

"**Bidding Procedures Order**" means that certain Order of the Bankruptcy Court entered at Docket No. 344 in the Bankruptcy Case.

"**Board**" means the board of directors of Exide Holdings, Inc.

"**Business**" means the operational business of (a) the Seller Parties operated in North America (including, the U.S., Canada and Mexico) and South America and (b) the Transferred Entities, including the business of (i) manufacturing and marketing of certain industrial batteries that are motive power batteries, network power batteries and transportation batteries that are starting, lighting and ignition batteries, in each case, for specified applications, and (ii) the recycling, processing and return of recovered lead, lead alloys and polypropylene chips from certain spent lead acid batteries (and, excluding, for the avoidance of doubt, any operations of the Seller Parties at the Excluded Real Property).

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which commercial banks in New York City, New York are required or authorized by Law to be closed.

"**Business Intellectual Property**" means the Business Registrable IP, Intellectual Property in Software included in Business Technology, and all other Intellectual Property (other than registrations and applications for Intellectual Property or in Software) to the extent owned by any Transferred Entity or owned by any Seller Party and related to the Business.

"**Business Registrable IP**" means patents, patent applications, registered Trademarks, applications for registered Trademarks, copyright registrations and Internet domain names owned by any Transferred Entity or owned any Seller Party and related to the Business and set forth on Schedule 2.02(a)(vii).

"**Business Technology**" means all (a) Software set forth on Schedule 2.02(a)(vii) and (b) Technology (other than Software) to the extent owned by any Transferred Entity or owned by any Seller Party and related to the Business.

"**Buyer Transaction Agreements**" means this Agreement and each other Transaction Agreement to which Buyer or an Affiliate of Buyer is named as a party on the signature pages thereto, and with respect to Transferred Entities named as a party on the signature pages thereto, the TSA, the Supply Agreement, the IP Cross License Agreement, and the Trademark Co-Existence Agreement.

"**Buyer Transactions**" means the transactions contemplated by the Buyer Transaction Agreements.

"**Canadian Tax Escrow Agent**" means Norton Rose Fulbright Canada LLP.

**HIGHLY CONFIDENTIAL**

"**Canadian Tax Escrow Agreement**" means the Canadian Tax Escrow Agreement, in form and substance reasonably acceptable to Seller and Buyer.

"**CapEx Budget**" means the capex budget entitled "**Americas Capex Forecast**" (data room location 6.2.1.3.1) provided by or on behalf of Seller to Buyer on or prior to the Agreement Date.

"**Cash**" means all cash and cash equivalents, including marketable securities and short-term investments, calculated in accordance with GAAP and the Seller Parties' and the Transferred Entities' books and records. For the avoidance of doubt, Cash shall be calculated (i) net of any outstanding checks, outstanding drafts, outstanding wire transfers and outstanding debit transactions written or made from the accounts of the Seller Parties or any of the Transferred Entities, (ii) to exclude cash required to collateralize any letters of credit, performance bonds, surety bonds or other similar instruments or cash subject to legal or other restrictions, including deposits with third parties and other "**restricted**" cash, and (iii) to include checks, other wire transfers and drafts available for deposit for the account of the Seller Parties or any of the Transferred Entities.

"**Cash Amount**" means, at any time, the aggregate amount of Cash of the Seller Parties and the Transferred Entities, calculated in accordance with GAAP, at such time.

"**Change**" has the meaning set forth in the definition of "**Material Adverse Effect**".

"**Closing Conditions**" means the conditions to the respective obligations of the Parties to consummate the Transactions contemplated by this Agreement, in each case, as set forth in Article X.

"**COBRA**" means the continuation of coverage requirements under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any written agreement between Seller or its Affiliates with a Union representing any Covered Employees that governs the terms and conditions of employment whether or not such agreement is expired by its terms.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of March 26, 2020, as amended by that certain Amendment No. 1, dated as of April 30, 2020, by and between Quexco Incorporated and Exide Holdings, Inc., as the same may be amended from time to time in accordance with its terms.

"**Consent**" means any consent, approval or authorization.

"**Contract**" means any written contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

Exhibit A-3

**HIGHLY CONFIDENTIAL**

"**Control**" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The terms "**Controlled by**," "**Controlled**," "**under common Control with**" and "**Controlling**" shall have correlative meanings.

"**Covered Employee**" means any employee of (i) any Transferred Entity or (ii) any Seller Party that is primarily dedicated to the Business, excluding, for the avoidance of doubt, those employees listed on Schedule 6.10(a).

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate the assumption by the applicable Seller Party who is a Debtor, and the assignment to Buyer, of the Transferred Contracts to which such Seller Party is party, as determined by the Bankruptcy Court or agreed to by Seller and the non-Seller counterparty to the applicable Transferred Contract.

"**Data**" means databases and compilations, including all data and collections of data, whether machine readable or otherwise.

"**Debt**" means financial indebtedness for borrowed money from third party lending sources (excluding, for the avoidance of doubt, operating leases and capital leases which are Transferred Contracts), calculated in accordance with GAAP and the Seller Parties' and Transferred Entities' books and records.

"**Debtors**" means Seller and each of the Subsidiaries of Seller set forth on Schedule B.

"**Debtors TSA**" means the transition services agreement among the Buyer and its Affiliates, and the applicable Seller Parties and their Affiliates (other than the Transferred Entities) pursuant to which certain transitional estate services will be provided, which shall include the applicable terms set forth in Schedule C and be in the form and substance reasonably acceptable to Seller and Buyer.

"**Disclosure Schedules**" means the disclosure schedules, dated as of the Agreement Date (as may be amended, updated, or supplemented pursuant to Section 6.17) delivered by Seller to Buyer, which form a part of this Agreement.

"**Effective Time**" means 12:01 a.m. (local time) on the Closing Date.

"**Employee Plans**" means all employee benefit plans (within the meaning of Section 3(3) of ERISA), and each other material retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, employment, retention, termination, or severance programs or agreements, in each case, pursuant to which any of the Seller Parties or Transferred Entities currently has any obligation with respect to any Covered Employee or former employee of a Transferred Entity , other than statutorily required plans or arrangements (including, for the avoidance of doubt, employment contracts as required by the Laws of any applicable local jurisdiction).

Exhibit A-4

HIGHLY CONFIDENTIAL

"**Environmental Law**" means any applicable U.S. federal, state, local or non-U.S. statute, Law, ordinance, regulation, rule, code, Order or other legally-binding requirement or rule of Law (including common Law) promulgated by a Government Authority relating to pollution or protection of the environment or worker health and safety as related to exposure to hazardous substances.

"**Environmental Liability**" means any Liability arising under Environmental Law.

"**Environmental Permit**" means any Permit that is required by a Government Authority under any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means, with respect to Seller, any other Person that is a member of a controlled group for purposes of Section 4001(a)(14) of ERISA or that is treated as a single employer for purposes of Section 414 of the Code.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of July 10, 2020, by and between Seller and Escrow Agent.

"**Estimated Cash Amount**" means Seller's good faith estimate of the Cash Amount as of the Effective Time.

"**Estimated Cash Amount Decrease**" means the amount (if any) by which the Target Cash Amount exceeds the Estimated Cash Amount set forth on the Estimated Closing Statement.

"**Estimated Cash Amount Increase**" means the amount (if any) by which the Estimated Cash Amount set forth on the Estimated Closing Statement exceeds the Target Cash Amount.

"**Estimated Transferred Entity Debt**" means Seller's good faith estimate of Transferred Entity Debt as of the Effective Time.

"**Estimated Working Capital**" means Seller's good faith estimate of Net Working Capital as of the Effective Time.

"**Estimated Working Capital Decrease**" means the amount, if any, by which the Target Working Capital exceeds the Estimated Working Capital set forth on the Estimated Closing Statement.

"**Estimated Working Capital Increase**" means the amount, if any, by which the Estimated Working Capital set forth on the Estimated Closing Statement exceeds the Target Working Capital.

"**Europe/ROW Buyer**" means the Successful Bidder of the Europe/ROW Assets (each as defined in the Bidding Procedures).

"**Europe/ROW Closing**" means the consummation of the sale of the Europe/ROW Assets (as defined in the Bidding Procedures) to the Europe/ROW Buyer.

Exhibit A-5

HIGHLY CONFIDENTIAL

"**Exhibits**" means the exhibits attached hereto as of the Agreement Date (and as may be amended from time to time in accordance herewith) which form a part of this Agreement.

"**Final Closing Statement**" means a written statement (a) setting forth, (i) the amount of any Final Working Capital Increase or any Final Working Capital Decrease, as applicable, (ii) the Final Working Capital, (iii) the Final Transferred Entity Debt, (iv) the Final Cash Amount, (v) the amount of any Final Cash Amount Increase or Final Cash Amount Decrease, as applicable, and (vi) the Post-Closing Adjustment and (b) indicating any changes to the Estimated Closing Statement as finally determined pursuant to Section 3.05.

"**Final Cash Amount**" means the Cash Amount as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Cash Amount Decrease**" means the amount (if any) by which the Target Cash Amount exceeds the Final Cash Amount.

"**Final Cash Amount Increase**" means the amount (if any) by which the Final Cash Amount exceeds the Target Cash Amount.

"**Final Order**" means an Order that is unstayed and in effect and as to which (i) the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"**Final Transferred Entity Debt**" means the Transferred Entity Debt as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Working Capital**" means the calculation of the Net Working Capital as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Working Capital Decrease**" means the amount (if any) by which the Target Working Capital exceeds the Final Working Capital.

"**Final Working Capital Increase**" means the amount (if any) by which the Final Working Capital exceeds the Target Working Capital.

"**Fraud**" means, with respect to any Party, an actual and intentional misrepresentation of fact with respect to the making of the representations and warranties set forth in this Agreement, provided that such actual and intentional misrepresentation will only be deemed to have occurred if the representations and warranties made by such Party were breached or inaccurate when made with the specific intention that the other Party relies thereon to its detriment.

"**GAAP**" means U.S. generally accepted accounting principles.

Exhibit A-6

**HIGHLY CONFIDENTIAL**

"**Government Authority**" means any U.S. federal, state or local or any supra-national, territorial or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral (public or private) body.

"**Hazardous Materials**" means any substance, material or waste that is defined or regulated as "**hazardous**," "**toxic**," or as a "**pollutant**," "**contaminant**," "**waste**," or words of similar meaning and regulatory effect under any applicable Environmental Law, including, but not limited to, (a) any petroleum or petroleum product, oil or waste oil; (b) any asbestos or polychlorinated byphenyls; and (c) any other chemical, material or substance (whether solid, liquid or gaseous), the exposure to which or whose discharge, emission, disposal or Release is prohibited, limited or regulated under any applicable Environmental Law.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Insurance Policies**" means, collectively, all policies and programs of or agreements for insurance and interests in insurance pools and programs (in each case, including self-insurance and insurance from Affiliates).

"**Intellectual Property**" means any and all of the following intellectual property rights, title, or interest in or arising under the Laws of the U.S. or any other country: (a) patents, patent applications, and patent rights, including any such rights granted upon any reissue, reexamination, renewal, division, extension, continuation, or continuation-in-part; (b) copyrights, "**moral**" rights, mask work rights, rights in works of authorship, database rights and design rights, whether or not registered or published, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; (c) Trademarks; (d) Trade Secrets; (e) Internet domain names; and (f) all other intellectual property rights relating to Technology.

"**Interest Rate**" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

"**International Trade Laws**" shall mean any applicable Law, regulation, or legal requirement concerning the importation, exportation, re-exportation or deemed exportation of items, technical data, or technology, foreign  including the Tariff Act of 1930 and other Laws relating to the import of items into the U.S. administered by U.S. Customs and Border Protection; the Export Administration Regulations, 15 C.F.R. Part 730 et seq.; the Foreign Trade Regulations, 15 C.F.R. Part 30; the Arms Export Control Act; the International Traffic in Arms Regulations, 22 C.F.R. Part 120-130; executive orders and Laws administered by OFAC; the International Emergency Economic Powers Act; the Trading With the Enemy Act; the anti-boycott Laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury; and export control and trade sanctions Laws administered by the Member States of the European Union.

"**IP Assignment Agreement**" means the IP Assignment Agreement, in the form attached hereto as <u>Exhibit D</u>.

Exhibit A-7

HIGHLY CONFIDENTIAL

"**IP Cross License Agreement**" means a non-exclusive intellectual property cross license agreement, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**IRS**" means the U.S. Internal Revenue Service.

"**Joint Written Instructions**" means written instructions from Seller and Buyer, a form of which is attached to the Escrow Agreement as an exhibit thereto, directing the Escrow Agent to deliver the Escrowed Funds as provided for under this Agreement.

"**Knowledge of Seller**" means the actual knowledge of the Persons listed on Schedule 1.01.

"**Law**" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"**Leased Real Property**" means the Transferred Leased Real Property and any real property that is leased, subleased or licensed by any Transferred Entity, in each case, granting the Seller Parties and/or the Transferred Entities a right of use or occupancy in such real property.

"**Leases**" means the real property leases and subleases governing the Leased Real Property, including the Transferred Leases.

"**Liabilities**" means any liability, Debt, guarantee, claim, demand, expense, commitment, damages, assurances or obligation (whether direct or indirect, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien or charge of any kind.

"**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance or occurrence (each, a "**Change**") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, operations, properties, assets or condition (financial or otherwise) of the Business; provided, that none of the following, either alone or in combination, will constitute a Material Adverse Effect: (i) any Change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (ii) any Change that generally affects any industry in which the Business operates; (iii) general business or economic conditions in any of the geographical areas in which the Transferred Entities or the Business operates; (iv) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, cyber-attack, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, cyber-attack, sabotage or terrorism or military actions, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war; (v) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or

**HIGHLY CONFIDENTIAL**

other weather event, or any global health conditions (including any epidemic, pandemic, or other outbreak of illness, including as a result of the COVID-19 virus or other disease or virus, or any actions by a Government Authority related to the foregoing); (vi) any actions taken by the Buyer or its Affiliates or specifically permitted to be taken or omitted by any Seller Party or Transferred Entity pursuant to this Agreement or any other Transaction Agreement or actions taken or omitted to be taken by any Seller Party or Transferred Entity at the request or with the consent of Buyer; (vii) any Changes in applicable Laws or GAAP (or other relevant accounting rules); (viii) any Change resulting from the filing or pendency of the Bankruptcy Cases, actions taken in connection with the Bankruptcy Cases, or any reasonably anticipated effects of such filing, pendency or actions, or from any action approved by the Bankruptcy Court; (ix) any Change resulting from the public announcement of the entry into this Agreement, compliance with terms of this Agreement or the consummation of the Transactions; (x) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; or (xi) any effects or Changes arising from or related to the breach of this Agreement by Buyer; provided, further, that the exceptions set forth in clauses (i) through (v) of this definition shall not be regarded as exceptions solely to the extent that any such described Change has a disproportionately adverse impact on the Business, as compared to other companies similarly situated in the industries in which the Business operates.

"**Modified Labor Agreement**" means a new Collective Bargaining Agreement with an Affected Union that is entered into by Buyer and an Affected Union.

"**Net Working Capital**" has the meaning set forth on Exhibit E.

"**OFAC**" means Office of Foreign Assets Control.

"**Order**" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Government Authority.

"**Ordinary Course of Business**" means the conduct and operation of the Business in the ordinary course taking into account the conduct of the Business since, and effect of, the COVID-19 pandemic.

"**Owned Real Property**" means the Transferred Owned Real Property and all owned and real property owned by any Transferred Entity together with (to the extent of such Seller Party's or Transferred Entity's interest therein) all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof and all servitudes, easements, privileges, rights-of-way, other surface use agreements and water use and rights agreements related thereto.

"**Permits**" means all permits, licenses, authorizations, clearances, registrations, concessions, grants, franchises, certificates, exemptions, variances, waivers and filings issued or required by any Government Authority under applicable Law, in each case, owned by the Seller Parties or the Transferred Entities and necessary for the operation of the Business.

"**Permitted Liens**" means the following Liens: (a) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate proceedings during which the Lien cannot be enforced against the applicable property or that may thereafter be paid without penalty, and for which adequate reserves have been

**HIGHLY CONFIDENTIAL**

established; (b) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, workmen, repairmen and other Liens imposed or permitted by Law in the Ordinary Course of Business with respect to payment of amounts that are not in default or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established; (c) Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance or other types of social security; (d) defects or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering, or reasonably expected to materially interfere, with the ordinary course conduct of the Business; (e) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a Government Authority, provided, that the same does not prohibit the use of the Real Property for its current use; (f) Liens not created by the applicable Seller Party or the Transferred Entities that affect the underlying fee, lessor, licensor or sublessor interest of any Leased Real Property or real property over which such Seller Party (with respect to the Business) or the Transferred Entities have easement or other property rights; (g) right, terms or conditions of any leases, subleases, licenses or occupancy agreements for real property made available to Buyer, including title of a lessor under a capital or operating lease; (h) in the case of Intellectual Property, non-exclusive licenses granted in the Ordinary Course of Business and gaps or defects in the chain of title evident from the publicly-available records of the applicable Government Authority maintaining such records; (i) Liens incurred in the Ordinary Course of Business securing Liabilities that do not exceed $1,000,000 in the aggregate; and (k) any other Lien that will be cleared or discharged by the Bankruptcy Court.

"**Person**" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity or Governmental Authority.

"**Personal Data**" means any information in any media that identifies, or would reasonably be used to identify, a particular individual.

"**Post-Closing Adjustment**" means the amount (which may be positive or negative) equal to the sum of: (a) the Final Working Capital <u>minus</u> the Estimated Working Capital, (b) the Final Transferred Entity Debt <u>minus</u> the Estimated Transferred Entity Debt, and (c) the Final Cash Amount <u>minus</u> the Estimated Cash Amount.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is validly terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on and including the Closing Date.

"**Proposed Final Cash Amount**" means Buyer's good faith, proposed final calculation of the Cash Amount as of the Effective Time.

"**Proposed Final Transferred Entity Debt**" means Buyer's good faith, proposed final calculation of the Transferred Entity Debt as of the Effective Time.

Exhibit A-10

**HIGHLY CONFIDENTIAL**

"**Proposed Final Working Capital**" means Buyer's good faith, proposed final calculation of the Net Working Capital as of the Effective Time.

"**Reading SOW**" means the mutually reasonably agreed-upon statement of work under the Debtors TSA pursuant to which certain transitional services will be provided solely with respect to Reading Assets, which shall include the applicable terms set forth in Schedule C.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, depositing, escaping, leaching, dumping, disposing or migration of any Hazardous Materials, including the abandonment or discarding of barrels, containers and other receptacles containing any Hazardous Materials.

"**Related to the Business**" means (i) with respect to any Contract for Software, any such Contract that is (A) related to or used in the Business and (B) legally and operationally transferrable to Buyer as of the Closing Date and (ii) with respect to any other Contract, related to or used in the Business.

"**Reference Working Capital Statement**" has the meaning set forth in Exhibit E.

"**Representative**" of a Person, means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, financial advisors or other representatives of such Person.

"**Required Approvals**" means the approvals of the Government Authorities set forth on Schedule 10.01(b).

"**Restricted Person**" means any of the following: (i) any Person designated on the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, or the Sectoral Sanctions Identifications List, which are enforced by OFAC, or any Person owned 50% or more directly or indirectly by one or more Persons designated on such OFAC-enforced lists; (ii) any Person designated on any of the following lists enforced by BIS: the Denied Persons List, the Entity List, or the Unverified List; (iii) any Person designated on the Debarred Parties List, which is enforced by the U.S. State Department's Directorate of Defense Trade Controls; (iv) the list of Persons subject to nonproliferation sanctions maintained by the State Department; and (v) any Person on any other relevant restricted party list maintained by the European Union and the United Nations enforcement authorities.

"**Sale Order**" shall be an Order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Seller; provided, that it shall not be unreasonable for Buyer to reject any such Order that does not contain (a) provisions approving the Transactions contemplated by this Agreement, and (b) findings of fact, conclusions of Law and ordering provisions that (i) find that Buyer is a purchaser of the Acquired Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the sale is entitled to the protections of Section 363(m) of the Bankruptcy Code, (ii) find that Buyer and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code; and (iii) find that none of Buyer nor any Affiliate of Buyer nor any designee of Buyer is a successor to Sellers or the bankruptcy estate by reason of any theory of Law or equity, and none of the Buyer nor any Affiliate

Exhibit A-11

**HIGHLY CONFIDENTIAL**

of Buyer nor any designee of Buyer shall assume or in any way be responsible for any liability of Sellers or the bankruptcy estate, except as otherwise expressly provided in this Agreement.

"**Seller Guarantees**" means, collectively, all letters of credit, guarantees, surety bonds, performance bonds and other financial assurance or other performance obligations issued or entered into by or on behalf of (or for the account of) Seller or any of its Affiliates (other than exclusively by the Transferred Entities) in connection with the Transferred Assets.

"**Seller Parties**" means Seller and any Affiliate of Seller designated by Seller as a "Seller Party".

"**Seller Transaction Agreements**" means this Agreement and each other Transaction Agreement to which any Seller Party or any of its Affiliates (other than a Transferred Entity) is named as a party on the signature pages thereto.

"**Seller Transactions**" means the transactions contemplated by the Seller Transaction Agreements.

"**Software**" means all (a) computer programs, including all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, (c) databases and compilations, including any and all Data and collections of Data, whether machine readable or otherwise, (d) all documentation including user manuals and other training documentation relating to any of the foregoing, in each case, (a)-(d), and (e) Data.

"**Subsidiary**" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person, and with respect to which entity such first Person is not otherwise prohibited contractually or by other legally binding authority from exercising Control.

"**Supply Agreement**" means a supply agreement among the Transferred Entities and the applicable Seller Party or its Affiliate, pursuant to which such Seller Party or its Affiliate shall supply or cause to be supplied Products, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**Systems**" means all the Software, hardware, network and telecommunications equipment and internet-related information Technology that are related to the Business and are material to the operation of the Business as conducted on the Agreement Date.

"**Target Cash Amount**" means $5,000,000.

"**Target Working Capital**" means $210,000,000.

Exhibit A-12

**HIGHLY CONFIDENTIAL**

"**Tax**" or "**Taxes**" means any tax, including any and all federal, state, local, foreign and other income, alternative or add-on minimum tax, excise, gross receipts, ad valorem, value-added (including VAT and the Canadian Goods and Services Tax), sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use, environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, real or personal property, escheat, unclaimed property, leasing, transfer, payroll, social security (or similar, including FICA), intangibles or any other tax, custom or duty of any kind whatsoever (whether payable directly or by withholding), or any governmental fee, assessment or charge in the nature of a tax, together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Tax Returns**" means all returns and reports (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds), real property transfer Tax returns and information returns), including amendments thereof and attachments thereto, required to be supplied to a Taxing Authority relating to Taxes.

"**Taxing Authority**" means any federal, state, local or foreign jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection of such Taxes for such jurisdiction.

"**Technology**" means, collectively, all Software, information, designs, formulae, algorithms, procedures, methods, models, discoveries, processes, techniques, ideas, know-how, technical Data, programs, subroutines, research and development, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice) apparatus, creations, improvements, works of authorship and other similar materials, and confidential, proprietary or non-public information, and all recordings, graphs, drawings, reports, analyses and other writings, and other tangible embodiments of the foregoing in any form whether or not listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"**Trade Secrets**" means confidential and proprietary information and know-how or trade secrets, including ideas, concepts, methods, techniques and inventions (whether patentable or unpatentable), and other works, whether or not developed or reduced to practice, rights in customer, vendor, and prospect lists.

"**Trademark Co-Existence Agreement**" means the trademark agreement, which shall include the applicable terms set forth in <u>Schedule C</u> and, subject to <u>Section 6.15</u>, be in the form and substance reasonably acceptable to Seller and Buyer.

"**Trademarks**" means trademarks, service marks, trade names, service names, trade dress, logos and other identifiers of same, including all goodwill associated therewith, and all common Law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

"**Transaction Accounting Principles**" has the meaning set forth in <u>Exhibit E</u>.

Exhibit A-13

HIGHLY CONFIDENTIAL

"**Transaction Agreements**" means this Agreement, the TSA, the Debtors TSA (including, for the avoidance of doubt, the Reading SOW), the Bill of Sale, Assignment and Assumption Agreement, the Transferred Leased Property Assignment and Assumption Agreement, the IP Cross License Agreement, the Trademark Co-Existence Agreement, the IP Assignment Agreement, the Supply Agreement, the Escrow Agreement, the Local Agreements, the Deeds and any other agreements, instruments or documents required to be delivered at the Closing, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"**Transfer Taxes**" means all sales, use, excise, gross receipts, ad valorem, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added (including VAT and Canadian goods and services Tax, harmonized sales Tax and provincial sales Tax), recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance, franchise, profits, gains, property registration, and similar non-income Taxes, motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings, together with any interest and any penalties, additions to Tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Transferred Books and Records**" means all books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and Data, sales and purchase correspondence, personnel and employment records related to the Business, other than any Tax Returns and any such books and records that constitute Excluded Assets, including those of the type described in Sections 2.02(b)(xiii), and 2.02(b)(xiv).

"**Transferred Entity Debt**" means the aggregate amount of any Debt of the Transferred Entities, calculated in accordance with GAAP, that remains unpaid as of immediately prior to the Closing.

"**Transferred Entity Employee Plans**" means all Employee Plans sponsored by a Transferred Entity.

"**Treasury Regulations**" means the regulations promulgated by the U.S. Department of the Treasury under the Code, as amended from time to time.

"**TSA**" means the transition services agreement among the Transferred Entities and the applicable Seller Party or its Affiliate pursuant to which certain transitional services will be provided, which shall include the applicable terms set forth in Schedule C and, subject to Section 6.15, be in the form and substance reasonably acceptable to Seller and Buyer.

"**U.S.**" means the United States of America.

"**Union**" means any union or other employee representative body.

"**VAT**" means value-added tax.

Exhibit A-14

**HIGHLY CONFIDENTIAL**

"**WARN Act**" means Worker Adjustment and Retraining Notification Act of 1988

"**Wind-Up Date**" means the date upon which each Seller Party's corporate existence ceases to exist.

**HIGHLY CONFIDENTIAL**

2019 Audited Financial Statements ........................................................ Section 4.06(a)
2019 Interim Financial Statements ......................................................... Section 4.06(a)
Action ................................................................................................. Exhibit A
Affected Union ................................................................................... Exhibit A
Affiliate .............................................................................................. Exhibit A
Agreement Date ................................................................................. Preamble
Agreement .......................................................................................... Exhibit A
Anti-Corruption Laws ....................................................................... Section 4.21(a)(i)
Antitrust Laws ................................................................................... Exhibit A
Assets ................................................................................................. Exhibit A
Assumed Contract .............................................................................. Section 2.05(a)
Assumed Employee Plans .................................................................. Exhibit A
Assumed Liabilities ........................................................................... Section 2.02(c)
Auction ............................................................................................... Section 8.04
Available Contracts List .................................................................... Section 2.05(a)
Available Contracts ........................................................................... Section 2.05(a)
Back-Up Trigger Notice ................................................................... Section 8.04
Back-Up Trigger Notice Date ........................................................... Exhibit A
Bankruptcy and Equity Exception ..................................................... Exhibit A
Bankruptcy Cases .............................................................................. Preliminary Statements
Bankruptcy Code ............................................................................... Preliminary Statements
Bankruptcy Court ............................................................................... Preliminary Statements
Base Purchase Price ........................................................................... Section 3.01
Bidding Procedures Order .................................................................. Exhibit A
Bill of Sale, Assignment and Assumption Agreement ...................... Section 3.03(a)(iii)
BMAL Transfer .................................................................................. Section 6.18
Board .................................................................................................. Exhibit A
Business Day ...................................................................................... Exhibit A
Business Intellectual Property ........................................................... Exhibit A
Business Registrable IP ..................................................................... Exhibit A
Business Technology .......................................................................... Exhibit A
Business .............................................................................................. Exhibit A
Buyer Transaction Agreements .......................................................... Exhibit A
Buyer Transactions ............................................................................ Exhibit A
Buyer .................................................................................................. Preamble
Buyer's Allocation Notice ................................................................. Section 3.07
Canada Restructuring ......................................................................... Section 6.06
Canadian Tax Escrow Agent .............................................................. Exhibit A
Canadian Tax Escrow Agreement ...................................................... Exhibit A
CapEx Budget .................................................................................... Exhibit A
Cash Amount ..................................................................................... Exhibit A
Cash .................................................................................................... Exhibit A
Causes of Action ................................................................................ Section 2.02(a)(xv)
Change ................................................................................................ Exhibit A
Closing Conditions ............................................................................ Exhibit A
Closing Date ....................................................................................... Section 2.04

Exhibit A-16

Closing Payment .......................................................................................................Section 3.04
Closing Statement .............................................................................................................Exhibit A
Closing ....................................................................................................................Section 2.04
COBRA ..............................................................................................................................Exhibit A
Code ...................................................................................................................................Exhibit A
Collective Bargaining Agreement.....................................................................................Exhibit A
Competing Transaction ..........................................................................................Section 8.02(a)
Confidentiality Agreement................................................................................................Exhibit A
Consent ..............................................................................................................................Exhibit A
Contract..............................................................................................................................Exhibit A
Contracting Parties ................................................................................................Section 12.18
Control ...............................................................................................................................Exhibit A
Covered Employee.............................................................................................................Exhibit A
Cure Costs .........................................................................................................................Exhibit A
D&O Indemnified Parties .......................................................................................Section 7.02(a)
Data ...................................................................................................................................Exhibit A
Debt....................................................................................................................................Exhibit A
Debtors TSA ......................................................................................................................Exhibit A
Debtors...............................................................................................................................Exhibit A
Deeds.........................................................................................................Section 3.03(a)(xii)
Designation Notice.................................................................................................Section 2.05(a)
Determination Date ................................................................................................Section 2.05(a)
Disclosure Schedules ........................................................................................................Exhibit A
Dispute Notice .......................................................................................................Section 3.05(c)
Disputed Contract ..................................................................................................Section 2.05(c)
Effective Time ...................................................................................................................Exhibit A
Embargoed Countries.............................................................................................Section 4.21(e)
Employee Plans .................................................................................................................Exhibit A
Environmental Law............................................................................................................Exhibit A
Environmental Liability.....................................................................................................Exhibit A
Environmental Permit ........................................................................................................Exhibit A
ERISA ................................................................................................................................Exhibit A
ERISA Affiliate .................................................................................................................Exhibit A
Escrow Agent.........................................................................................................Section 3.02
Escrow Agreement.............................................................................................................Exhibit A
Escrowed Funds .....................................................................................................Section 3.02
Estimated Cash Amount Decrease .....................................................................................Exhibit A
Estimated Cash Amount Increase .....................................................................................Exhibit A
Estimated Cash Amount ....................................................................................................Exhibit A
Estimated Closing Statement .................................................................................Section 3.04
Estimated Target Cash Adjustment ...................................................................................Exhibit A
Estimated Restricted Payments .........................................................................................Exhibit A
Estimated Transferred Entity Debt ...................................................................................Exhibit A
Estimated Working Capital Decrease ................................................................................Exhibit A
Estimated Working Capital Increase .................................................................................Exhibit A

Exhibit A-17

HIGHLY CONFIDENTIAL

Estimated Working Capital ............................................................................... Exhibit A
Europe/ROW Buyer ........................................................................................... Exhibit A
Europe/ROW Closing ........................................................................................ Exhibit A
Exchange and 1L Notes Indenture .................................................................... Exhibit A
Excluded Assets ................................................................................... Section 2.02(b)
Excluded Causes of Action .......................................................... Section 2.02(b)(iv)
Excluded Contracts ............................................................................. Section 2.02(b)(i)
Excluded Policy Covered Loss ............................................................. Section 6.13(b)
Excluded Insurance Policy .................................................................... Section 6.13(b)
Excluded Liabilities ............................................................................... Section 2.02(d)
Excluded Policy Beneficiary ................................................................. Section 6.13(b)
Excluded Policy Holder ........................................................................ Section 6.13(b)
Excluded Real Property ...................................................................... Section 2.02(b)(i)
Exhibits ............................................................................................................ Exhibit A
Exide Canada .................................................................................... Section 6.06
Final Cash Amount Decrease ............................................................................ Exhibit A
Final Cash Amount Increase .............................................................................. Exhibit A
Final Cash Amount ............................................................................................ Exhibit A
Final Closing Statement .................................................................................... Exhibit A
Final Target Cash Adjustment ........................................................................... Exhibit A
Final Restricted Payments ................................................................................. Exhibit A
Final Transferred Entity Debt ............................................................................ Exhibit A
Final Working Capital Decrease ........................................................................ Exhibit A
Final Working Capital Increase ......................................................................... Exhibit A
Final Working Capital ........................................................................................ Exhibit A
Financial Statements .............................................................................. Section 4.06(a)
GAAP ................................................................................................................ Exhibit A
Government Approvals ............................................................................ Section 6.04(a)
Government Authority ........................................................................................ Exhibit A
Hazardous Materials .......................................................................................... Exhibit A
HSR Act ............................................................................................................. Exhibit A
Independent Accounting Firm ................................................................ Section 3.05(d)
Insurance Policies .............................................................................................. Exhibit A
Intellectual Property ........................................................................................... Exhibit A
Interest Rate ....................................................................................................... Exhibit A
International Trade Laws .................................................................................... Exhibit A
IP Assignment Agreement ..................................................................... Section 3.03(a)(v)
IP Cross License Agreement .............................................................................. Exhibit A
IRS .................................................................................................................... Exhibit A
Joint Written Instructions .................................................................................. Exhibit A
Knowledge of Seller .......................................................................................... Exhibit A
Law .................................................................................................................... Exhibit A
Leased Real Property .......................................................................................... Exhibit A
Leases ................................................................................................................ Exhibit A
Liabilities ........................................................................................................... Exhibit A

Exhibit A-18

**HIGHLY CONFIDENTIAL**

Lien ....................................................................................................Exhibit A
Local Agreements .............................................................Section 3.03(a)(xiii)
Material Adverse Effect ......................................................................Exhibit A
Material Contracts.........................................................................Section 4.12(a)
Modified Labor Agreement ................................................................Exhibit A
Multi employer Plan ......................................................................Section 4.13(c)
Net Working Capital ..........................................................................Exhibit A
Nonparty Affiliates ........................................................................Section 12.18
Noteholder.........................................................................................Exhibit A
OFAC..................................................................................................Exhibit A
Order ..................................................................................................Exhibit A
Ordinary Course of Business .............................................................Exhibit A
Outside Date...................................................................................Section 11.01(d)
Owned Real Property .........................................................................Exhibit A
Parties ................................................................................................ Preamble
Permits ...............................................................................................Exhibit A
Permitted Liens ..................................................................................Exhibit A
Person.................................................................................................Exhibit A
Personal Data .....................................................................................Exhibit A
Post-Closing Adjustment ...................................................................Exhibit A
Pre-Closing Period .............................................................................Exhibit A
Pre-Closing Tax Period ......................................................................Exhibit A
Privacy Policies..............................................................................Section 2.02(b)(xiii)
Proposal Final Cash Amount .............................................................Exhibit A
Proposed Final Closing Statement .................................................Section 3.05(a)
Proposed Final Target Cash Adjustment ...........................................Exhibit A
Proposed Final Transferred Entity Debt ............................................Exhibit A
Proposed Final Working Capital ........................................................Exhibit A
Purchase Price Allocation ...............................................................Section 3.04
Purchase Price ................................................................................Section 3.01
Reading Assets ..............................................................Section 2.02(a)(xvi)
Reading SOW .....................................................................................Exhibit A
RCRA...............................................................................................Section 4.11(d)
Reference Working Capital Statement................................................Exhibit A
Related to the Business ......................................................................Exhibit A
Release ...............................................................................................Exhibit A
Representative .....................................................................................Exhibit A
Required Approvals ............................................................................Exhibit A
Resolution Period..............................................................................Section 3.05(c)
Restricted Person ...............................................................................Exhibit A
Restricted Transfer ...........................................................................Section 2.03
Review Period ..................................................................................Section 3.05(b)
RSOW Expiration Date..................................................Section 2.02(a)(xvi)
Sale Order ..........................................................................................Exhibit A
Securities Act.....................................................................................Exhibit A

Exhibit A-19

**HIGHLY CONFIDENTIAL**

Seller Guarantees ............................................................................ Exhibit A
Seller Parties ................................................................................... Exhibit A
Seller Transaction Agreements ......................................................... Exhibit A
Seller Transactions .......................................................................... Exhibit A
Seller .............................................................................................. Preamble
Seller's Banker ............................................................................. Section 4.16
Significant Schedule Supplement .................................................. Section 6.17
Software .......................................................................................... Exhibit A
Specified Supervisor .................................................................. Section 6.10(i)
Straddle Period ............................................................................ Section 9.02
Subsidiary ....................................................................................... Exhibit A
Supervisor Termination Date ...................................................... Section 6.10(i)
Supply Agreement ........................................................................... Exhibit A
Systems ........................................................................................... Exhibit A
Target Cash Amount ............................................................ Section 2.02(a)(xvii)
Target Working Capital .................................................................... Exhibit A
Tax Returns ..................................................................................... Exhibit A
Tax .................................................................................................. Exhibit A
Taxes ............................................................................................... Exhibit A
Taxing Authority .............................................................................. Exhibit A
Technology ...................................................................................... Exhibit A
Third Party Consents .................................................................... Section 6.05
Ticking Fee ...................................................................................... Exhibit A
Title IV Plan ............................................................................... Section 4.13(e)
Trade Secrets ................................................................................... Exhibit A
Trademark Co-Existence Agreement ................................................. Exhibit A
Trademarks ...................................................................................... Exhibit A
Transaction Accounting Principles .................................................... Exhibit A
Transaction Agreements ................................................................... Exhibit A
Transaction Dispute ..................................................................... Section 12.13
Transactions .................................................................................... Exhibit A
Transfer Taxes ................................................................................. Exhibit A
Transferred Assets ....................................................................... Section 2.02(a)
Transferred Books and Records ........................................................ Exhibit A
Transferred Contracts ........................................................... Section 2.02(a)(iii)
Transferred Covered Loss ........................................................... Section 6.13(a)
Transferred Employee ................................................................. Section 6.10(a)
Transferred Entities ....................................................... Preliminary Statements
Transferred Entity Debt ................................................................... Exhibit A
Transferred Entity Employee Plans .................................................... Exhibit A
Transferred Entity ......................................................... Preliminary Statements
Transferred Equity Interests ........................................... Preliminary Statements
Transferred Insurance Policies ............................................ Section 2.02(a)(xxi)
Transferred Leased Property Assignment and Assumption Agreement ............ Section 3.03(a)(iv)
Transferred Leased Real Property ........................................ Section 2.02(a)(ii)

Exhibit A-20

**HIGHLY CONFIDENTIAL**

Transferred Leases ................................................................................. Section 2.02(a)(ii)
Transferred Owned Real Property ...................................................................... Section 2.02(a)(i)
Transferred Permits................................................................................. Section 2.02(a)(iv)
Transferred Policy Beneficiary ................................................................................ Section 6.13(a)
Transferred Policy Holder....................................................................................... Section 6.13(a)
Treasury Regulations ................................................................................ Exhibit A
TSA ............................................................................................................. Exhibit A
U.S. ............................................................................................................ Exhibit A
Union........................................................................................................... Exhibit A
VAT ............................................................................................................ Exhibit A
WARN Act.................................................................................................. Exhibit A
Wind-Up Date

Exhibit A-21

EXHIBIT B

# FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [•], 2020 by and among the Sellers Parties (collectively, "Assignors") and [BUYER AFFILIATE], a [Delaware limited liability company] ("Assignee") (each of the Assignors and Assignee, a "Party" and, together, the "Parties").

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in that certain Stock and Asset Purchase Agreement (as amended, supplemented or otherwise modified, the "Purchase Agreement"), dated as of [•], 2020, by and among Exide Technologies, LLC, a Delaware limited liability company ("Seller"), Battery Bidco LLC and Atlas Capital Resources III LP ("Guarantor").

WHEREAS, Seller, Assignee and Guarantor have entered into the Purchase Agreement pursuant to which Assignee has agreed to purchase the Transferred Assets and the Transferred Equity Interests and to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement;

WHEREAS, pursuant to this Agreement, each of the Assignors shall sell, convey, assign, transfer, and deliver to Assignee, and Assignee shall purchase, acquire, and accept delivery from each such Assignor, all of such Assignor's right, title and interest in, to, and under the Transferred Assets, in each case on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, pursuant to this Agreement, the Assignee shall assume and thereafter timely pay, discharge and perform in accordance with their terms the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.02 thereof).

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     Assignment of Purchased Assets. Effective as of the Effective Time, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.02 thereof), each Assignor hereby sells, conveys, assigns, transfers, and delivers to Assignee, and Assignee hereby purchases, acquires, and accepts delivery from each such Assignor, all of such Assignor's right, title and interest in, to and under the Transferred Assets.

2.     Assumption of Assumed Liabilities. Effective as of the Effective Time, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.02 thereof), Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of the Assumed Liabilities.

    3.    <u>Binding Agreement</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

    4.    <u>Conflict</u>. The respective rights of Assignors and Assignee with respect to the Transferred Assets sold, conveyed, assigned, transferred and delivered hereby and the Assumed Liabilities assumed hereby shall be governed exclusively by the Purchase Agreement and nothing in this Agreement shall alter any liability or obligation arising under the Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the Parties with respect to such Transferred Assets and such Assumed Liabilities. If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern.

    5.    <u>Sole Remedy</u>. The sole and exclusive remedy of the Assignee and Assignors with respect to any breach of this Agreement shall be as set forth in the Purchase Agreement.

    6.    <u>Notices</u>. All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section):

If to Assignors, to:

> Exide Technologies, LLC
> 13000 Deerfield Parkway
> Suite 200
> Milton, GA 30004
> Attention: Legal Department
>     E-mail:bob.penman@exide.com
>     keith.scott@exide.com

With a copy (which will not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention:    Ray C. Schrock, P.C.;
>     Sunny Singh, Esq.;
>     Mariel E. Cruz, Esq.
> E-mail:    ray.schrock@weil.com
>     sunny. singh@weil. com
>     mariel. cruz@weil. Com

If to Assignee, to:

> Battery BidCo, LLC
> 100 Northfield Street
> Greenwich, CT 06830
> Attn:   Jacob D. Hudson

Tel:    (203) 622-9138
Fax:   (203) 622-0151
Email: jhudson@atlasholdingsllc.com

with a copy (which will not constitute
notice) to:

Winston & Strawn LLP
1901 L Street, N.W.
Washington, D.C. 20036
Attn:   Christopher M. Zochowski
           Bradley A. Noojin
Tel:   (202) 282-5780
Fax:   (202) 282-5100
Email: czochowski@winston.com
            bnoojin@winston.com

Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
Attn:  Dan McGuire
Tel:   (312) 558-5600
Fax:   (312) 558-5700
Email:  DMcguire@winston.com

7.       Severability. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

8.       Amendments. This Agreement may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

9.       Further Assurances. Each of the Parties shall execute and deliver such documents, and take such other action, as shall be reasonably requested by any other Party to carry out the transactions contemplated by this Agreement.

10.       Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

Exhibit B-3

A-0459

11.     <u>Governing Law</u>. This Agreement will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

12.     <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a Party hereto, including any Affiliates of any Party.

13.     <u>Entire Agreement</u>. This Agreement, the Purchase Agreement and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, Assignee and Assignors have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

ASSIGNORS

By: _____
Name:
Title:

By: _____
Name:
Title:

By: _____
Name:
Title:

ASSIGNEE

[BUYER AFFILIATE],
a [Delaware limited liability company]

By: _____
Name:
Title:

EXHIBIT C

# FORM OF TRANSFERRED LEASED PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Assignment") is made as of the [•] day of [•], by and between [Seller Party][1] a [•] ("Assignor"), and [•], a [•] ("Assignee") (each of Assignor and Assignee, a "Party" and, together, the "Parties").

**WHEREAS**, [the Parties are parties] [[•] and Assignee are parties] to that certain Stock and Asset Purchase Agreement, dated [•], 2020, by and among Exide Technologies, LLC, [Assignee] [Battery BidCo LLC] and [Atlas Capital Resources III LP] (as amended, supplemented or otherwise modified, the "Purchase Agreement"). Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement;

**WHEREAS**, the execution and delivery of this Assignment is contemplated by Sections 3.03(a)(iv) and 3.03(b)(vi) of the Purchase Agreement; and

**WHEREAS**, Assignor desires to assign, transfer, convey and deliver to Assignee the leases described on Schedule I attached hereto, including all amendments, modifications, and supplements thereto (the "Leases", and each a "Lease"), and Assignee desires to accept such assignment of the Leases, together with all right, title, and interest of Assignor thereunder. The properties encumbered by the Leases (the "Leased Premises") are described on Schedule II attached hereto.

**NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Assignment and Assumption of Lease. For and in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, effective as of the Effective Time, Assignor hereby assigns, transfers, conveys, and delivers to Assignee all of Assignor's estate, right, title and interest as tenant of the leasehold estate described under the Leases, and Assignee hereby accepts the assignment, transfer, conveyance and delivery of Assignor's estate, right, title and interest in, to and under such leasehold estates.

2. Assumption of Assumed Liabilities. Effective as of the Effective Time, Assignor hereby assigns, and Assignee hereby assumes and agrees to pay, discharge, or perform when due all Assumed Liabilities related to the Leases and agrees to be bound by all duties and obligations, on or after the Closing Date, of the "Tenant" or "Lessee", as applicable, under each Lease.

---

[1] **Note to Draft:** Each Seller Party that is party to a Lease will be party to this Assignment.

Exhibit C-1
A-0462

3.    <u>Conflict</u>. The assignment and assumption of the Leases (and the Assumed Liabilities related thereto) made hereunder are made in accordance with, and subject to, the Purchase Agreement (including, without limitation, any surviving representations, warranties, covenants, and agreements contained therein), which are incorporated herein by reference. If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Assignment, the provisions of the Purchase Agreement shall govern.

4.    <u>Binding Agreement</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns

5.    <u>Sole Remedy</u>. The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

6.    <u>Notices</u>. All notices and other communications under or by reason of this Assignment shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section):

If to Assignors, to:

Exide Technologies, LLC
13000 Deerfield Parkway
Suite 200
Milton, GA 30004
Attention:    Legal Department
E-mail:    bob.penman@exide.com
    keith.scott@exide.com

With a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:    Ray C. Schrock, P.C.;
    Sunny Singh, Esq.;
    Mariel E. Cruz, Esq.
E-mail:    ray.schrock@weil.com
    sunny. singh@weil. com
    mariel. cruz@weil. Com

If to Assignee, to:

Battery BidCo, LLC
100 Northfield Street
Greenwich, CT 06830
Attn:   Jacob D. Hudson
Tel:    (203) 622-9138
Fax:    (203) 622-0151
Email: jhudson@atlasholdingsllc.com

Exhibit C-2
A-0463

with a copy (which will not constitute
notice) to:

                    Winston & Strawn LLP
                    1901 L Street, N.W.
                    Washington, D.C. 20036
                    Attn:   Christopher M. Zochowski
                              Bradley A. Noojin
                    Tel:    (202) 282-5780
                    Fax:    (202) 282-5100
                    Email: czochowski@winston.com
                            bnoojin@winston.com

                    Winston & Strawn LLP
                    35 W. Wacker Drive
                    Chicago, IL 60601
                    Attn:   Dan McGuire
                    Tel:    (312) 558-5600
                    Fax:    (312) 558-5700
                    Email:  DMcguire@winston.com

7.     <u>Severability</u>. If any term or provision of this Assignment is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Assignment will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

8.     <u>Amendments</u>. This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

9.     <u>Further Assurances</u>. Each of the Parties shall execute and deliver such documents, and take such other action, as shall be reasonably requested by any other party to carry out the transactions contemplated by this Assignment.

10.     <u>Counterparts</u>. This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

11.     <u>Governing Law</u>. This Assignment will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Exhibit C-3
A-0464

12. <u>No Third-Party Beneficiaries</u>. Nothing in this Assignment shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.

13. <u>Recordation</u>. This Assignment (or any memorandum thereof) shall not be recorded in any public records.

14. <u>Entire Agreement</u>. This Assignment, the Purchase Agreement and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

* * * * *

Exhibit C-4
A-0465

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

**Assignor:**

**[_____] a [_____]**

By:_____
Name: _____
Title: _____

**Assignee:**

**[_____], a [_____]**

By:_____
Name: _____
Title: _____

Case 20-11157-CSS    Doc 690-1    Filed 08/06/20    Page 110 of 144

## SCHEDULE I

### LEASES

# SCHEDULE II

## LEASED PREMISES

**EXHIBIT D**

# FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT** ("Assignment"), effective as of [•] ("Effective Date"), is by and between [Seller Party][1], a [•] organized and existing under the laws of [•] ("Assignor"), and [Transferred Entity], a [•] organized and existing under the laws of [•] ("Assignee") (each of Assignor and Assignee, a "Party" and, together, the "Parties").

**WHEREAS**, pursuant to that certain Stock and Asset Purchase Agreement, dated as of July [•], 2020, by and between [Assignor] [Exide Technologies, LLC ("Seller")], [Battery BidCo LLC] ("Buyer") and [Atlas Capital Resources III LP] (as amended, supplemented or otherwise modified, the "Purchase Agreement"). [Seller] [Assignor] has agreed to sell[, or cause Assignor to sell,] and Buyer has agreed to purchase from Assignor, all of Assignor's right, title and interest in, to, and under the Transferred Assets, in each case, on the terms and subject to the conditions set forth in the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement;

**WHEREAS**, as required in the Purchase Agreement, Assignor hereby desires to sell, convey, assign, transfer, and deliver to Assignee all Business Intellectual Property and Business Technology, including the Intellectual Property and Business Technology set forth on Exhibit A hereto (the "Assigned IP"); and

**WHEREAS**, Assignee desires to purchase, acquire and accept delivery of the Assigned IP from Assignor, which Assigned IP shall be acquired by Buyer in connection with Buyer's acquisition of the Transferred Equity Interests (including, for the avoidance of doubt, the equity interests of Assignee) pursuant to the terms of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

1.    Assignment of Intellectual Property. Assignor hereby conveys, sells, assigns and transfers to Assignee its entire worldwide right, title and interest in and to the Assigned IP, together with any and all goodwill connected with and symbolized by the Assigned IP, the same to be held and enjoyed by Assignee for its own use and enjoyment and the use and enjoyment of its successors, assigns and other legal representatives as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, as assignee of its respective entire right, title and interest therein, including, without limitation, all rights in and to all fees, income, royalties, damages and payments now or hereafter due or payable with respect thereto, all causes of action (whether in law or in equity) with respect thereto, and the right to sue,

_____

[1] **Note to Draft:** Each Seller Party that is the owner of Assigned IP will be party to this Assignment.

counterclaim, and recover for past, present and future infringement, misappropriation, dilution or other violation of the rights assigned or to be assigned under this Assignment.

2.   <u>Binding Agreement</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns. It is understood that any finding of invalidity of one assignment as effected hereby shall not affect the assignment of other Assigned IP.

3.   <u>Severability</u>. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

4.   <u>Amendments</u>. This Agreement may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

5.   <u>Further Assurances</u>. Each of the Parties shall execute and deliver such documents, and take such other action, as shall be reasonably requested by the other Party to carry out the transactions contemplated by this Assignment, and shall take such reasonable actions as may be necessary or appropriate to record, memorialize or make effective the assignments of the Assigned IP contemplated hereby as may be reasonably requested by the other Party, and to vest and perfect in Assignee such right, title, and interest in and to the Assigned IP as sold, assigned and transferred to Assignee hereunder.

6.   <u>Recordations</u>. Assignor hereby authorizes and requests the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record Assignee as assignee and owner of the entire right, title and interest in, to and under the Assigned IP.

7.   <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

8.   <u>Governing Law</u>. This Agreement will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

9.   <u>No Third-Party Beneficiaries</u>. Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.

10.    <u>Entire Agreement</u>. This Agreement, the Purchase Agreement and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**Assignor:**

[•]

By:_____

Name:
Title:

**Assignee:**

[•]

By:_____

Name:
Title:

## EXHIBIT A

## ASSIGNED IP

[Relevant portions of Schedule 2.02(a)(Vii) and Schedule 4.10(a) of the Purchase Agreement to be included here.]

**HIGHLY CONFIDENTIAL**

**SCHEDULE A**

Transferred Entities; Transferred Equity Interests

| Applicable Seller Party | Transferred Entity | Transferred Equity Interests |
|---|---|---|
| Exide Technologies, LLC | GNB Battery Technologies Japan, Inc. | 1 share of common stock |
| Exide Technologies, LLC | Exide de Mexico S. de R.L. de C.V. | 1participation unit valued at $2,999.00 MxCy |
| Exide Delaware LLC | | 1 participation unit valued at $1.00 MxCy |
| Exide Technologies, LLC | Exide Technologies do Brasil Limitada | 3,925,404 limited company quotas |
| Exide Technologies, LLC | Exide Illinois, Inc. | 100 shares of common stock |
| Exide Technologies, LLC | RBD Liquidation, LLC | 10 units |
| Exide Technologies, LLC or another Seller Party (subject to completion of the restructuring contemplated in Section 6.06). | Exide Technologies Canada Corporation | 3,974,120 shares of common stock |

Schedule A-1

**HIGHLY CONFIDENTIAL**

**SCHEDULE B**

<u>Debtors</u>

1. Exide Holdings, Inc.
2. Exide Technologies, LLC
3. Dixie Metals Company
4. Refined Metals Corporation
5. Exide Delaware, LLC

Schedule B-1

**HIGHLY CONFIDENTIAL**

# SCHEDULE C

Certain Transaction Agreements Key Terms

**IP Cross License Agreement**

Pursuant to the IP Cross License Agreement, (1) Seller Party and its Affiliates (other than the Transferred Entities) will grant the Transferred Entities a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid-up, non-transferable (except to an Affiliate or acquirer or successor of any or all business lines), non-sublicensable (except to customers, suppliers, distributors and end-users) right, license and covenant not to sue to use, practice and otherwise exploit the Exide Licensed IP and (2) the Transferred Entities and their Affiliates will grant Seller Party and its Affiliates (other than the Transferred Entities) a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid-up, non-transferable (except to an Affiliate or acquirer or successor of any or all business lines), non-sublicensable (except to customers. suppliers, distributors and end-users), right, license and covenant not to sue to use, practice and otherwise exploit the Company Licensed IP.  The IP Cross License Agreement will not contain any obligations regarding technology transfer or require access to any materials or documentation in the possession of a party.  Any developments or improvements with respect to any Intellectual Property licensed under the IP Cross License Agreement shall be owned by the Person that made such development or improvement, as the case may be, and shall not be subject to any cross-license.

- "**Exide Licensed IP**" means the Intellectual Property (other than Trademarks and rights arising from or in respect of domain names) that is owned or controlled by Seller Party and its Affiliates (other than the Transferred Entities) as of Closing.

- "**Company Licensed IP**" means the Intellectual Property (other than Trademarks and rights arising from or in respect of domain names) that is owned or controlled by the Transferred Entities as of Closing.

**Trademark Co-Existence Agreement**

Pursuant to the Trademark Co-Existence Agreement, by and among the Seller Party and/or its Affiliate(s) (other than the Transferred Entities) and the Transferred Entities, (1) Seller Party and its Affiliates (other than the Transferred Entities) will consent to Buyer and the Transferred Entities' exclusive ownership and continued use of the Relevant Co-Existence Marks in the Americas (*i.e.*, all jurisdictions in North America and South America), and (2) the Transferred Entities will consent to Seller Party and its Affiliates' (other than the Transferred Entities') exclusive ownership and continued use of the Relevant Co-Existence Marks in EMEA/APAC (which includes any and all countries that are not in the Americas). The Trademark Co-Existence Agreement shall be freely assignable in whole or in part to any person who acquires any right in any of the Relevant Co-Existence Marks.

Schedule C-1

**HIGHLY CONFIDENTIAL**

- • "**Relevant Co-Existence Marks**" means the Trademarks designated as "Y" in the Relevant Co-Existence Marks column of <u>Schedule 4.10(a)</u>, which include, without limitation, "EXIDE", "GNB", "ABSOLYTE", "MARATHON", "SPRINTER", and "TENSOR" in block letters or otherwise, and the Exide, GNB, Absolyte, Marathon, Sprinter, and Tensor logo, either alone or in combination with other words, logos, symbols, or devices and all Trademarks and internet domain names confusingly similar to or embodying any of the foregoing either alone or in combination with other words.

**Supply Agreement**

Pursuant to the Supply Agreement:

(a) the Seller Party and/or its Affiliates' (other than the Transferred Entities) will agree to the long-term supply to the Transferred Entities of:

   (i) products supplied by Seller Party and/or its Affiliates' (other than the Transferred Entities), or by Europe/ROW Buyer this Agreement or at any time in the future during the term of the Supply Agreement, in such reasonable quantities as the Parties shall reasonably agree and set forth in the definitive agreement, under the Sonnenschein and Dryfit brands (provided that the Transferred Entities and their Affiliates shall have the exclusive rights to obtain such supply as well as to market, sell and distribute such products in the Americas and none of Seller Party and/or its Affiliates' (after giving effect to the Closing) shall market, supply, sell or distribute such products under any brand or in white label form in the Americas, other than, in each case, to supply the Transferred Entities); and

   (ii) other products supplied to the Transferred Entities by the Seller Party and its Affiliates' (other than the Transferred Entities) business to be acquired by the Europe/ROW Buyer as of the date of this Agreement that are mutually agreed by the Parties and set forth in the definitive agreement; and

   (iii) The Transferred Entities will be granted an exclusive license under the SONNENSCHEIN and DRYFIT Trademarks (in block letters or otherwise and including the Sonnenschein and Dryfit logos, either alone or in combination with other words, logos, symbols, or devices and all Trademarks confusingly similar to or embodying any of the foregoing either alone or in combination with other words) for the sales and distribution of the products described in subparts (a)(i) and (ii) in the Americas; <u>provided</u>, that the Transferred Entities shall not (i) use such Trademarks in any manner, forms or formats other than those that are in use as of the Closing or otherwise consistent with the manner, forms or formats of such Trademarks in use by Seller Party and/or its Affiliates' (other than the Transferred Entities), or the Europe/ROW Buyer at any time during the future during the term of the Supply

Schedule C-2

**HIGHLY CONFIDENTIAL**

Agreement, (ii) use such Trademarks in combination with other words, logos, symbols, or devices except as permitted in clause (i) herein, or (iii) use any Trademarks confusingly similar to SONNENSCHEIN or DRY FIT, except as permitted in clause (i) herein.

**TSA**

Pursuant to the TSA, Seller Party and/or its Affiliates (other than the Transferred Entities), on the one hand, and the Transferred Entities, on the other hand, will each provide or cause to be provided certain transitional services to the other. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were provided immediately prior to Closing. Such services will be provided for specified durations up to twelve (12) months and at the service provider's costs plus a pro rata allocation of overhead, an administration fee, and employee time billed at base hourly rates plus a pro rata allocation of payroll expenses.

**Debtors TSA**

Pursuant to the Debtors TSA, Seller Party and its Affiliates (other than the Transferred Entities), on the one hand, and Buyer or one of its Affiliates, on the other hand, will provide or cause to be provided certain transitional estate or other services to the other, including the services set forth in the Reading SOW. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were performed or provided immediately prior to Closing. Such services will be provided for specified durations up to twelve (12) months. Services will be provided for a service fee equal to the *sum* of (a) the service provider's costs (without duplication of the following), *plus* (b) a pro rata allocation of overhead, *plus* (c) a reasonable administration fee, *plus* (d) employee time billed at base hourly rates, *plus* (e) a pro rata allocation of payroll-related expenses, *plus* (f) $15,000 per month (or a pro rata portion thereof in respect of any partial month) in respect of services provided by and costs related to the Specified Supervisor.

**Reading SOW**

Pursuant to the Reading SOW, notwithstanding anything to the contrary in the Debtors TSA:

a. Seller Party and its Affiliates (other than the Transferred Entities) will provide or cause to be provided certain transitional estate or other services to Buyer and its Affiliates solely with respect to the Reading Assets, including, pursuant to Buyer's supply of plastic for conversion into usable plastic chips, Seller Party's and/or its Affiliate's provision of certain plastic tolling services to convert such plastic into usable plastic chips;

b. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were performed or provided immediately prior to Closing. Such services will be provided for a term ending on the earlier of (i) the sixtieth (60th) day after the Closing, and (ii) the thirtieth (30th) day after notice of termination shall have been delivered by one party to the other;

Schedule C-3

**HIGHLY CONFIDENTIAL**

   c.  Such services will be provided for a service fee equal to the *sum* of (a) the service provider's costs (without duplication of the following), *plus* (b) a pro rata allocation of overhead, *plus* (c) a reasonable administration fee, *plus* (d) employee time billed at base hourly rates, *plus* (e) a pro rata allocation of payroll-related expenses, *plus* (f) $80,000.

On the RSOW Expiration Date, Buyer and Seller shall, or shall cause their applicable Affiliate, to deliver a signature page counterpart to the other party of a bill of sale and assignment and assumption agreement in substantially the form of <u>Exhibit B</u> or otherwise in the form and substance reasonably acceptable to Buyer and Seller, pursuant to which Seller shall convey the Reading Assets to Buyer effective on the RSOW Expiration Date.


**Assignment:** Each party to the agreements on this <u>Schedule C</u> may assign such agreement (in whole or in part) to its Affiliate or an acquirer of any or all of the business lines of it and its Affiliates.

Case 20-11157-CSS    Doc 690-1    Filed 08/06/20    Page 123 of 144

**HIGHLY CONFIDENTIAL**

**STOCK AND ASSET PURCHASE AGREEMENT**

dated as of July ——27, 2020

by and among

**Exide Technologies, LLC, as Seller**,

**Battery BidCo LLC, as Buyer,**

**and**

**Atlas Capital Resources III LP, as Guarantor**

AmericasActive:14915406.2AmericasActive:14923736.1

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Bill of Sale, Assignment and Assumption Agreement |
| Exhibit C | Form of Transferred Leased Property Assignment and Assumption Agreement |
| Exhibit D | Form IP Assignment Agreement |
| Exhibit E | Transaction Accounting Principles and Reference Working Capital Statement |

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule A | Transferred Entities; Transferred Equity Interests |
| Schedule B | Debtors |
| Schedule C | Certain Transaction Agreements Key Terms |

**HIGHLY CONFIDENTIAL**

This STOCK AND ASSET PURCHASE AGREEMENT, dated as of July —27, 2020 (the "**Agreement Date**"), is made by and between Exide Technologies, LLC, a Delaware limited liability company ("**Seller**"), and Battery BidCo LLC, a Delaware limited liability company (together with is permitted assigns pursuant to Section 12.08, "**Buyer**") and, solely for purposes of Section 12.17, 12.18 and 12.23, Atlas Capital Resources III LP, A Delaware limited partnership ("**Guarantor**" and together with Seller and Buyer, the "**Parties**").

PRELIMINARY STATEMENTS

A.     Seller and certain of its Affiliates are debtors-in-possession under title 11 of the  United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and, on May 19, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States  Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), commencing the jointly  administered bankruptcy cases pending as *In re Exide Holdings*, Case No. 20-11157 (collectively,  the "**Bankruptcy Cases**").

B.     Seller owns or controls, directly or indirectly, the other Seller Parties.

C.     Certain Seller Parties own the equity interests (collectively, the "**Transferred Equity Interests**") of the Persons set forth on Schedule A (each a "**Transferred Entity**" and, together, the "**Transferred Entities**") as and to the extent set forth beside such Transferred  Entity's name on Schedule A.

D.     The Seller Parties and the Transferred Entities are engaged in, or hold assets or  liabilities relating to, the Business (and/or, in the case of certain of the Seller Parties hold  Transferred Equity Interests).

E.     The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the  Seller Parties all of the Transferred Equity Interests and the Transferred Assets, and Buyer desires  to assume the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth  in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable  consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending  to be legally bound, agree as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.01   Certain Defined Terms.   Capitalized terms used in this Agreement have the meanings specified in Exhibit A.

1

**HIGHLY CONFIDENTIAL**

(vi)    to the maximum extent permitted by the Bankruptcy Code, all rights of any Seller Party under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors, to any Seller Party to the extent related to the Transferred Assets;

(vii)    to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Business Intellectual Property (and the right to sue, bring claims and other Causes of Action for infringement, misappropriation or violation thereof) and Business Technology, including the Business Intellectual Property and Business Technology set forth on Schedule 2.02(a)(vii);

(viii)    all assets, rights and properties of or relating to the Assumed Employee Plans;

(ix)    the Transferred Books and Records;

(x)    all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, machinery, tools, tooling, vehicles, and other tangible personal property to the extent related to the Business, other than those described under Section 2.02(b)(xviii) or Section 2.02(b)(xx);

(xi)    all inventory wherever located, including all semi-finished and finished goods, raw materials, works in progress, packaging, supplies, tooling and parts, whether held at any location or facility of any Seller Party or in transit to any Seller Party, in each case, as of the Effective Time and related to the Business;

(xii)    goodwill of the Business;

(xiii)    all accounts receivable of the Business, which, for the avoidance of doubt, includes all of the accounts receivable in the accounts that comprise "*Accounts receivable, net*" as referenced in Exhibit E;

(xiv)    all customer and supplier lists related to the Business;

(xv)    all rights, demands, claims, causes of action, prepayments, refunds, rights of recovery, credits, allowances, rebates, or rights of setoff or subrogation and other claims of any of the Seller Parties against any Person (collectively, "**Causes of Action**") arising from any of the Transferred Assets or related to the Business, including any rights against third parties under Transferred Contracts other than those Causes of Action described in Section 2.02(b)(iv), Section 2.02(b)(v), and Section 2.02(b)(vii);

(xvi)    the assets listed on Schedule 2.02(a)(xvi); provided, however, that notwithstanding anything else to the contrary herein, including this Section 2.02(a), the Seller Party shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and interest in, to and under the assets, rights and properties identified and set forth in Paragraph 2 of Schedule

3

**HIGHLY CONFIDENTIAL**

2.02(a)(xvi) (the "**Reading Assets**") on the date of the expiration or other earlier termination of the Reading SOW (the "**RSOW Expiration Date**"); provided, further, that, for the avoidance of doubt, the Reading Assets shall not be transferred to sold, conveyed, assigned, transferred or delivered to Buyer at any time on or prior to the RSOW Expiration Date;

(xvii)  Cash (after taking into account all Cash of the Transferred Entities, but excluding Cash in the bank accounts set forth on Schedule 2.02(b)(xviii)) up to an amount  equal to the Target Cash Amount;

(xviii)  to the maximum extent transferrable, all bank accounts related to the Business, other than those set forth on Schedule 2.02(b)(xviii);

(xix)   all prepaid expenses and deposits, to the extent related to the Business, other than (A) adequate assurance deposits posted in accordance with section 366 of the  Bankruptcy Code and (B) those prepaid expenses and deposits set forth Schedule 2.02(b)(xvi);

(xx)   other than any Excluded Assets, all other assets, properties or rights of every kind and description, wherever located, whether real, personal or mixed, tangible or  intangible, that are owned by a Seller Party and related to the Business; and

(xxi)   to the maximum extent permitted by the Bankruptcy Code or applicable Law and subject to Section 6.13, all occurrence-based Insurance Policies set forth on Schedule 2.02(a)(xxi) (each, a "**Transferred Insurance Policies**") and all rights of any nature with respect to any such Transferred Insurance Policy, including any recoveries thereunder and any rights to assert claims seeking any such recoveries.

(b)   Excluded Assets. Notwithstanding anything to the contrary herein, the following assets, rights or properties of or in the possession of the Seller Parties (the "**Excluded  Assets**") shall be retained by the Seller Parties and their Affiliates, other than the Transferred  Entities:

(i)   all Available Contracts (other than Transferred Contracts) and all  Contracts not related to the Business ("**Excluded Contracts**");

(ii)   Cash in excess of the Target Cash Amount;

(iii)   other than the Transferred Owned Real Property and Transferred Leased Real Property, all right, title and interest in owned and leased real property together with  all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof,  and all servitudes, easements, rights-of-way, other surface use agreements and water use  agreements related thereto and, with respect to any such leased real property, all rights in respect  thereof (including all options and rights of first refusal) and all tenements, hereditaments,  appurtenances and other property rights appertaining thereto (collectively, the "**Excluded Real  Property**");

4

**HIGHLY CONFIDENTIAL**

(e)      To the extent that any amounts are deducted or withheld and timely paid pursuant to this  Section 2.06, such amounts will be treated for all purposes of this Agreement as  having been paid to the Person to whom such amounts would otherwise have been paid. Notwithstanding the foregoing, Taxes for purposes of this Section 2.06 shall not include Transfer Taxes.

## ARTICLE III

## PURCHASE PRICE

Section 3.01   Purchase Price.  The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Equity Interests, the Transferred Assets and the obligations of Seller,  the Seller Parties set forth in this Agreement shall be (a) an amount in cash equal to the sum of (i) $178,600,000 (the "**Base Purchase Price**"), plus (ii) the Final Working Capital Increase (if any), minus (iii) the Final Working Capital Decrease (if any), minus (iv) the Final Transferred Entity  Debt (if any), plus (v) the Final Cash Amount Increase (if any), minus (vi) the Final Cash Amount  Decrease (the resulting number being the "**Purchase Price**"), and (b) the assumption of the  Assumed Liabilities.

Section 3.02   Purchase Price Deposit.   Upon the execution of this Agreement, pursuant to  the  terms  of  this  Agreement  and  the  Escrow  Agreement,  as  applicable,  Buyer  shall immediately  deposit  with  Citibank  N.A.,  in  its  capacity  as  escrow  agent  (the  "**Escrow Agent**"),  the  sum  of  $17,860,000 representing ten percent (10%) of the Base Purchase Price, by wire transfer of immediately available funds (the "**Escrowed Funds**"), to be released by the Escrow Agent and  delivered to either Buyer or Seller in accordance with this Agreement and the  provisions  of  the  Escrow  Agreement.  The  Escrowed  Funds  (together  with  any  and  all accrued investment income  thereon) shall be distributed upon the earlier of the Closing or the termination of this Agreement  in accordance with Section 3.03(a)(ii) and 3.03(b)(ii) or Section 11.03, as applicable.

Section 3.03   Certain Closing Deliverables.  At the Closing:

(a)      Seller shall deliver or cause to be delivered to Buyer the following:

(i)      to the extent the Transferred Equity Interests are certificated, certificates (or if such certificate cannot be located by the applicable Seller Party, an indemnity in  favor of the Transferred Entity in agreed form) evidencing the Transferred Equity Interests, duly  endorsed in blank or accompanied by stock powers duly executed in blank;

(ii)      a counterpart of the Joint Written Instructions, duly executed by  Seller, directing the Escrow Agent to deliver to Seller the Escrowed Funds;

(iii)      a counterpart of the Bill of Sale, Assignment and Assumption Agreement for Transferred Assets (other than the Transferred Leases and Reading Assets), in the

12

**HIGHLY CONFIDENTIAL**

form attached hereto as <u>Exhibit B</u> (the "**Bill of Sale, Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties;

(iv)    a counterpart of the Assignment and Assumption Agreement for Transferred Leases, in the form attached hereto as <u>Exhibit C</u> (the "**Transferred Leased Property Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties together with duly executed Transfer Tax or sales disclosure forms, where applicable unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms shall be delivered to Seller promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(v)    counterparts of the IP Assignment Agreement, in the form attached hereto as <u>Exhibit D</u> (the "**IP Assignment Agreement**"), duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(vi)    a counterpart of <u>each of</u> the Debtors TSA, duly executed by the applicable Seller Parties and their Affiliates;

(vii)    counterparts of the Trademark Co-Existence Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(viii)    counterparts of the TSA, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(ix)    counterparts of the IP Cross License Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(x)    counterparts of the Supply Agreement, duly executed by the applicable Seller Parties or their Affiliates (other than the Transferred Entities), on the one hand, and the applicable Transferred Entities, on the other hand;

(xi)    the officer's certificate required to be delivered pursuant to <u>Section 10.02(a)(iv)</u>, a copy of which shall also be delivered to the Title Company;

(xii)    duly executed deeds (the "**Deeds**") or comparable instruments of transfer, in customary form, conveying to Buyer, good and valid fee simple title to the Transferred Owned Real Property free and clear of all Liens, except for Permitted Liens, together with duly executed Transfer Tax or sales disclosure forms, where applicable unless under applicable Law such Transfer Tax stamps or duly stamped transfer forms are only available post-Closing (in which case such Transfer Tax stamps or duly stamped transfer forms

13

**HIGHLY CONFIDENTIAL**

(v)     a counterpart of the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer;

(vi)     a counterpart of the Transferred Leased Property Assignment and  Assumption Agreement, duly executed by Buyer;

(vii)     a counterpart of each Local Agreement, duly executed by Buyer;

(viii)     a counterpart of each of the Debtors TSA, duly executed  by Buyer and its applicable Affiliates;

(ix)     the officer's certificate required to be delivered to Seller pursuant to Section 10.01(a)(iii); and

(x)     such other documents, instruments and certificates as Seller (on  behalf of itself and the Seller Parties) may reasonably request.

Section 3.04   Estimated Closing Statement; Closing Payment.  No fewer than two (2) Business Days before the Closing Date, Seller shall prepare and deliver to Buyer a written  statement, together with reasonably detailed supporting documentation (the "**Estimated Closing  Statement**"), setting forth each of: (i) the amount of Estimated Working Capital; (ii) the amount  of any Estimated Working Capital Increase or Estimated Working Capital Decrease;  (iii) the  amount of the Estimated Transferred Entity Debt; (iv) the Estimated Cash Amount; (v) the amount  of the Estimated Cash Amount Increase or Estimated Cash Amount Decrease, as applicable; (vi)  the aggregate amount to be paid by Buyer to Seller (for the benefit of itself and the other Seller  Parties) at the Closing (the "**Closing Payment**"), which amount shall be equal to the sum of: (A)  the Base Purchase Price, plus (B) the Estimated Working Capital Increase, if applicable, minus (C) the Estimated Working Capital Decrease, if applicable, minus (D) the Estimated Transferred  Entity Debt, plus (E) the Estimated Cash Amount Increase, if applicable; minus (F) the Estimated  Cash Amount Decrease, if applicable; and (vii) the wire transfer information for the account or  accounts to which Buyer shall pay the Closing Payment. The Closing Payment and any other  payments to be made to Seller under this Agreement shall be paid to Seller for its account and as  agent for the  account of the  other  Seller  Parties, unless  otherwise  specified  by Seller in  the  Estimated Closing Statement.

Section 3.05   Proposed Final Closing Statement and Final Closing Statement.

(a)     Within thirty (30) days after the Closing Date, Buyer shall provide to Seller  a written statement (the "**Proposed Final Closing Statement**") setting forth (i) the Proposed Final Working Capital, (ii) the Proposed Final Transferred Entity Debt, (iii) the Proposed Final Cash Amount, and (iv) a description in reasonable detail, of any proposed changes to the Estimated Closing Statement, attaching supporting schedules, working papers and all other relevant documents and details to enable a review thereof by Seller.

15

**HIGHLY CONFIDENTIAL**

sublessee) in  any Leased Real Properties, which are the subject of <u>Section 4.15</u>, (y) any personal property leased  pursuant to a Transferred Contract and (z) Intellectual Property rights, which are the subject of <u>Section 4.10</u>) are owned by or otherwise made available to the Seller Parties and the Transferred  Entities, and, at the Closing, subject to <u>Section 2.02(a)(xvi) and</u> <u>Section 2.03</u>, Buyer or one of  its Affiliates will own each  of such Transferred Assets and the Transferred Equity Interests or will be vested with good title to  such Transferred Assets, as the case may be, free and clear of all Liens, other than Permitted Liens.

(b)    Assuming receipt of all relevant Consents, and that all Available Contracts are assumed ~~and no Excluded Asset Schedule Supplement is delivered~~, the Transferred Assets, (together with the Assets, the Intellectual Property rights provided under the IP Cross License Agreement, the Trademark Co-Existence Agreement ~~and~~, the TSA <u>and the Debtors TSA (including, for the avoidance of doubt, the Reading SOW )</u> and all rights granted and services to be performed under the Transaction Agreements) constitute all of the properties, rights and assets that are necessary to permit the Buyer to conduct the Business, after the Closing, in all material respects as presently conducted by the Seller Parties.

Section 4.18   <u>Insurance</u>.  <u>Schedule 4.18</u> provides a summary of all Insurance Policies maintained for, at the expense of, or for the benefit of, the Transferred Entities or the Transferred  Assets or the Business.  Each such Insurance Policy is in full force and effect, all premiums due to  date thereunder have been paid in full and neither Seller nor any of its Affiliates is in material  default with respect to any other obligations thereunder. No written notice of cancellation or  nonrenewal, in whole or in part, with respect to any such Insurance Policy currently in force has  been received by Seller.

Section 4.19   <u>Affiliate Transactions</u>.  Except: (a) for employment-related arrangements, the payment of compensation and benefits in the Ordinary Course of Business, and travel advances and employees loans, (b) Contracts entered into in the Ordinary Course of Business on an arm's  length basis or (c) as set forth on <u>Schedule 4.19</u>, no current officer, manager, director or Affiliate  of any Seller Party (other than the Transferred Entities) is a party to any Contract, or business  relationship with, or has any material interest in any property used by, any of the Seller Parties or  the Transferred Entities.

Section 4.20   <u>Condition of Transferred Assets and Assets</u>.   The items of material, tangible  personal property included in the Transferred Assets and Assets are in working condition and are  reasonably adequate for the uses to which they are currently being put, the failure of which would  not reasonably be expected to be material to the Business taken as a whole.

Section 4.21   <u>Corruption and Trade Regulation</u>.

(a)    Neither the Transferred Entities nor, to the Knowledge of Seller, any Person  acting on behalf of the Seller Parties in respect of the Business or Transferred Entities has at any  time in the past twelve (12) months:

31

**HIGHLY CONFIDENTIAL**

permitted under applicable Law. In the event that such rights and interests are not assignable, Seller shall assist Buyer in the enforcement of such rights and interests.

(h)     No Third Party Beneficiaries. Notwithstanding the provisions of this Section 6.10(h) or any provision of the Agreement, nothing in this Section 6.10(h) or the Agreement is intended to or shall (i) create any third party rights, (ii) amend any employee benefit plan, program, policy or arrangement, (iii) require Buyer or any of its Affiliates or any Seller Party or  any of its Affiliates to continue any employee benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified or as otherwise required herein or (iv) provide any Covered Employee or any Transferred Employee with any rights to  continued employment.

(i)     Specified Supervisor. Notwithstanding anything else to the contrary herein and for the avoidance of doubt, the individual employee listed last on Schedule 6.10(a) (the "**Specified Supervisor**") hereto shall not be deemed a Covered Employee for any purpose hereunder; provided, however, that the Specified Supervisor shall become a Covered Employee hereunder immediately following the later of (x) the effective date of the Debtors' plan of reorganization and (y) the abandonment or other disposition by the Debtors of the last Excluded Real Property (the "**Supervisor Termination Date**") and the terms and conditions set forth in this Agreement with respect to Covered Employee shall be effective and applicable with respect to the Specified Supervisor only from and after such date notwithstanding any specific timing requirements or other terms and conditions that would otherwise be applicable to any other Covered Employees prior to such date.  For the avoidance of doubt, the purpose of this provision is to ensure that the Specified Supervisor does not become, and shall not be construed as, an employee of Buyer or any of Buyer's Affiliates until such time as such Specified Supervisor's duties with respect to the Excluded Real Property shall have been completed or terminated.

Section 6.11   Collective Bargaining Agreements.   Prior to the Closing Date, (i) the Bankruptcy Court shall have determined that the Seller Parties can sell the Transferred Assets free and clear of the Collective Bargaining Agreements set forth on Schedule 4.12(a), (ii) the Unions shall have agreed to waive or remove any successor clauses in the Collective Bargaining Agreements set forth on Schedule 4.12(a) and to waive any claim that Buyer has or is required to assume or succeed to those Collective Bargaining Agreements, or (iii) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller Parties pursuant to section 1113(c) of the Bankruptcy Code authorizing the applicable Seller Parties to reject the Collective Bargaining Agreements set forth on Schedule 4.12(a).

Section 6.12   No Successor Liability.   The Parties intend that, to the fullest extent permitted by Law (including under section 363(f) of the Bankruptcy Code), upon the Closing, the Buyer shall not be deemed to: (a) be the successor of any Seller Party, including with respect to any Collective Bargaining Agreement and any Employee Plans (except for any Assumed Benefit Plans), (b) have, de facto or otherwise, merged with or into any Seller Party, (c) be a mere continuation or substantial continuation of any Seller Party, or (d) be liable for any acts or omissions of the Seller Parties in the conduct of the Business or arising under, or related to, the Transferred Assets, other than as expressly set forth in this Agreement. The Parties acknowledge and agree that the Transaction was subject to arm's-length negotiating by Buyer and all Seller

48

**HIGHLY CONFIDENTIAL**

**EXHIBIT A**

# DEFINITIONS

"**Action**" means any action, suit, arbitration, investigation or proceeding by or before any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) Seller shall not be deemed an Affiliate of Buyer, nor, after the Closing, of any Transferred Entity of which the Transferred Equity Interests are transferred to Buyer pursuant to this Agreement and (b) after the Closing, Buyer shall be deemed an Affiliate of each of the Transferred Entities (and vice versa).

"**Affected Union**" refers to those unions party to Collective Bargaining Agreements set forth in Schedule 4.12(a)(ii).

"**Agreement**" means this Stock and Asset Purchase Agreement, dated as of July —27, 2020, by and among Seller, Buyer, and, solely for purposes of Sections 12.17, 12.18 and 12.23, Guarantor, including the Disclosure Schedules and the Exhibits, and all amendments to such agreement made in accordance with Section 12.10.

"**Antitrust Laws**" means the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, and any Laws applicable to Buyer or any Seller Party or any Transferred Entity under any applicable jurisdiction that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"**Assets**" means the assets and properties that are owned, leased or licensed by any Transferred Entity.

"**Assumed Employee Plans**" means any Employee Plan set forth on Schedule 6.10(c), including Exide Technologies 401(k) Savings and Retirement Plan, and the Exide Technologies Hourly 401(k) Plan, but excluding any Title IV Plan, defined benefit pension plan or supplemental or excess benefit retirement plans.

"**Available Software Contract**" means any executory third-party Software Contract that is related to or used in the Business.

"**Auction**" means the auction undertaken pursuant to the Bidding Procedures Order.

"**Back-Up Trigger Notice Date**" means August 31, 2020 at 11:59 p.m. New York City time.

Exhibit A-1

**HIGHLY CONFIDENTIAL**

commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"**Control**" means, with respect to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The terms "**Controlled by**," "**Controlled**," "**under common Control with**" and "**Controlling**" shall have correlative meanings.

"**Covered Employee**" means any employee of (i) any Transferred Entity or (ii) any Seller Party that is primarily dedicated to the Business, excluding, for ~~other than~~avoidance of doubt, those employees listed on Schedule 6.10(a).

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to section 365(b)(1) of the Bankruptcy Code to effectuate the assumption by the applicable Seller Party who is a Debtor, and the assignment to Buyer, of the Transferred Contracts to which such Seller Party is party, as determined by the Bankruptcy Court or agreed to by Seller and the non-Seller counterpart to the applicable Transferred Contract.

"**Data**" means databases and compilations, including all data and collections of data, whether machine readable or otherwise.

"**Debt**" means financial indebtedness for borrowed money from third party lending sources (excluding, for the avoidance of doubt, operating leases and capital leases which are Transferred Contracts), calculated in accordance with GAAP and the Seller Parties' and Transferred Entities' books and records.

"**Debtors**" means Seller and each of the Subsidiaries of Seller set forth on Schedule B.

"**Debtors TSA**" means the transition services agreement among the Buyer and its Affiliates, and the applicable Seller Parties and their Affiliates (other than the Transferred Entities) pursuant to which certain transitional estate services will be provided, which shall include the applicable terms set forth in Schedule C and~~, subject to Section 6.15,~~ be in the form and substance reasonably acceptable to Seller and Buyer.

"**Disclosure Schedules**" means the disclosure schedules, dated as of the Agreement Date (as may be amended, updated, or supplemented pursuant to Section 6.17) delivered by Seller to Buyer, which form a part of this Agreement.

"**Effective Time**" means 12:01 a.m. (local time) on the Closing Date.

"**Employee Plans**" means all employee benefit plans (within the meaning of Section 3(3) of ERISA), and each other material retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, employment, retention, termination, or severance programs or agreements, in each case, pursuant to which any of the Seller Parties or Transferred Entities currently has any obligation with respect to any Covered Employee or

Exhibit A-4

**HIGHLY CONFIDENTIAL**

"**Post-Closing Adjustment**" means the amount (which may be positive or negative) equal to the sum of: (a) the Final Working Capital <u>minus</u> the Estimated Working Capital, (b) the Final Transferred Entity Debt <u>minus</u> the Estimated Transferred Entity Debt, and (c) the Final Cash Amount <u>minus</u> the Estimated Cash Amount.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is validly terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on and including the Closing Date.

"**Proposed Final Cash Amount**" means Buyer's good faith, proposed final calculation of the Cash Amount as of the Effective Time.

"**Proposed Final Transferred Entity Debt**" means Buyer's good faith, proposed final calculation of the Transferred Entity Debt as of the Effective Time.

"**Proposed Final Working Capital**" means Buyer's good faith, proposed final calculation of the Net Working Capital as of the Effective Time.

"<u>**Reading SOW**</u>" <u>means the mutually reasonably agreed-upon statement of work under the Debtors TSA pursuant to which certain transitional services will be provided solely with respect to Reading Assets, which shall include the applicable terms set forth in Schedule C.</u>

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, depositing, escaping, leaching, dumping, disposing or migration of any Hazardous Materials, including the abandonment or discarding of barrels, containers and other receptacles containing any Hazardous Materials.

"**Related to the Business**" means (i) with respect to any Contract for Software, any such Contract that is (A) related to or used in the Business and (B) legally and operationally transferrable to Buyer as of the Closing Date and (ii) with respect to any other Contract, related to or used in the Business.

"**Reference Working Capital Statement**" has the meaning set forth in Exhibit E.

"**Representative**" of a Person, means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, financial advisors or other representatives of such Person.

"**Required Approvals**" means the approvals of the Government Authorities set forth on <u>Schedule 10.01(b)</u>.

"**Restricted Person**" means any of the following: (i) any Person designated on the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List, or the Sectoral Sanctions Identifications List, which are enforced by OFAC, or any Person owned 50% or more directly or indirectly by one or more Persons designated on such OFAC-enforced

Exhibit A-11

**HIGHLY CONFIDENTIAL**

reduced to practice) apparatus, creations, improvements, works of authorship and other similar materials, and confidential, proprietary or non-public information, and all recordings, graphs, drawings, reports, analyses and other writings, and other tangible embodiments of the foregoing in any form whether or not listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"**Trade Secrets**" means confidential and proprietary information and know-how or trade secrets, including ideas, concepts, methods, techniques and inventions (whether patentable or unpatentable), and other works, whether or not developed or reduced to practice, rights in customer, vendor, and prospect lists.

"**Trademark Co-Existence Agreement**" means the trademark agreement, which shall include the applicable terms set forth in <u>Schedule C</u> and, subject to <u>Section 6.15</u>, be in the form and substance reasonably acceptable to Seller and Buyer.

"**Trademarks**" means trademarks, service marks, trade names, service names, trade dress, logos and other identifiers of same, including all goodwill associated therewith, and all common Law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

"**Transaction Accounting Principles**" has the meaning set forth in <u>Exhibit E</u>.

"**Transaction Agreements**" means this Agreement, the TSA, the Debtors TSA, (including, for the avoidance of doubt, the Reading SOW), the Bill of Sale, Assignment and Assumption Agreement, the Transferred Leased Property Assignment and Assumption Agreement, the IP Cross License Agreement, the Trademark Co-Existence Agreement, the IP Assignment Agreement, the Supply Agreement, the Escrow Agreement, the Local Agreements, the Deeds and any other agreements, instruments or documents required to be delivered at the Closing, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"**Transfer Taxes**" means all sales, use, excise, gross receipts, ad valorem, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added (including VAT and Canadian goods and services Tax, harmonized sales Tax and provincial sales Tax), recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance, franchise, profits, gains, property registration, and similar non-income Taxes, motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings, together with any interest and any penalties, additions to Tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Transferred Books and Records**" means all books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and Data,

Exhibit A-14

**HIGHLY CONFIDENTIAL**

2019 Audited Financial Statements ............................................................ Section 4.06(a)
2019 Interim Financial Statements ............................................................. Section 4.06(a)
Action ....................................................................................................................... Exhibit A
Affected Union ....................................................................................................... Exhibit A
Affiliate .................................................................................................................... Exhibit A
Agreement Date .................................................................................................... Preamble
Agreement .............................................................................................................. Exhibit A
Anti-Corruption Laws .................................................................................. Section 4.21(a)(i)
Antitrust Laws ....................................................................................................... Exhibit A
Assets ....................................................................................................................... Exhibit A
Assumed Contract .......................................................................................... Section 2.05(a)
Assumed Employee Plans .................................................................................. Exhibit A
Assumed Liabilities ....................................................................................... Section 2.02(c)
Auction ............................................................................................................. Section 8.04
Available Contracts List ............................................................................... Section 2.05(a)
Available Contracts ....................................................................................... Section 2.05(a)
Back-Up Trigger Notice ................................................................................ Section 8.04
Back-Up Trigger Notice Date ............................................................................ Exhibit A
Bankruptcy and Equity Exception ................................................................... Exhibit A
Bankruptcy Cases ...................................................................... Preliminary Statements
Bankruptcy Code ...................................................................... Preliminary Statements
Bankruptcy Court ...................................................................... Preliminary Statements
Base Purchase Price ...................................................................................... Section 3.01
Bidding Procedures Order ................................................................................. Exhibit A
Bill of Sale, Assignment and Assumption Agreement ................... Section 3.03(a)(iii)
BMAL Transfer .............................................................................................. Section 6.18
Board ....................................................................................................................... Exhibit A
Business Day .......................................................................................................... Exhibit A
Business Intellectual Property ......................................................................... Exhibit A
Business Registrable IP ..................................................................................... Exhibit A
Business Technology ........................................................................................... Exhibit A
Business ................................................................................................................... Exhibit A
Buyer Transaction Agreements ....................................................................... Exhibit A
Buyer Transactions ............................................................................................. Exhibit A
Buyer ....................................................................................................................... Preamble
Buyer's Allocation Notice ........................................................................... Section 3.07
Canada Restructuring .................................................................................... Section 6.06
Canadian Tax Escrow Agent ............................................................................ Exhibit A
Canadian Tax Escrow Agreement ................................................................... Exhibit A
CapEx Budget ....................................................................................................... Exhibit A
Cash Amount ......................................................................................................... Exhibit A
Cash ......................................................................................................................... Exhibit A
Causes of Action .......................................................................................... Section 2.02(a)(xv)
Change ..................................................................................................................... Exhibit A
Closing Conditions .............................................................................................. Exhibit A

Exhibit A-16

**HIGHLY CONFIDENTIAL**

Leased Real Property .................................................... Exhibit A
Leases ....................................................................... Exhibit A
Liabilities ................................................................. Exhibit A
Lien .......................................................................... Exhibit A
Local Agreements ................................................. Section 3.03(a)(xiii)
Material Adverse Effect ................................................ Exhibit A
Material Contracts ................................................... Section 4.12(a)
Modified Labor Agreement ............................................. Exhibit A
Multi employer Plan ................................................. Section 4.13(c)
Net Working Capital ..................................................... Exhibit A
Nonparty Affiliates ................................................... Section 12.18
Noteholder ................................................................. Exhibit A
OFAC ....................................................................... Exhibit A
Order ........................................................................ Exhibit A
Ordinary Course of Business ........................................... Exhibit A
Outside Date ........................................................ Section 11.01(d)
Owned Real Property ..................................................... Exhibit A
Parties ...................................................................... Preamble
Permits ..................................................................... Exhibit A
Permitted Liens .......................................................... Exhibit A
Person ...................................................................... Exhibit A
Personal Data ............................................................. Exhibit A
Post-Closing Adjustment ................................................ Exhibit A
Pre-Closing Period ....................................................... Exhibit A
Pre-Closing Tax Period .................................................. Exhibit A
Privacy Policies ................................................... Section 2.02(b)(xiii)
Proposal Final Cash Amount ............................................. Exhibit A
Proposed Final Closing Statement ................................. Section 3.05(a)
Proposed Final Target Cash Adjustment ................................ Exhibit A
Proposed Final Transferred Entity Debt ................................ Exhibit A
Proposed Final Working Capital ......................................... Exhibit A
Purchase Price Allocation ......................................... Section 3.04
Purchase Price ..................................................... Section 3.01
Reading Assets .................................................. Section 2.02(a)(xvi)
Reading SOW ............................................................. Exhibit A
RCRA ................................................................ Section 4.11(d)
Reference Working Capital Statement ................................... Exhibit A
Related to the Business .................................................. Exhibit A
Release ..................................................................... Exhibit A
Representative ............................................................ Exhibit A
Required Approvals ....................................................... Exhibit A
Resolution Period ................................................... Section 3.05(c)
Restricted Person ........................................................ Exhibit A
Restricted Transfer ................................................. Section 2.03

Exhibit A-19

**HIGHLY CONFIDENTIAL**

| | |
|---|---|
| Review Period | Section 3.05(b) |
| RSOW Expiration Date | Section 2.02(a)(xvi) |
| Sale Order | Exhibit A |
| Securities Act | Exhibit A |
| Seller Guarantees | Exhibit A |
| Seller Parties | Exhibit A |
| Seller Transaction Agreements | Exhibit A |
| Seller Transactions | Exhibit A |
| Seller | Preamble |
| Seller's Banker | Section 4.16 |
| Significant Schedule Supplement | Section 6.17 |
| Software | Exhibit A |
| Specified Supervisor | Section 6.10(i) |
| Straddle Period | Section 9.02 |
| Subsidiary | Exhibit A |
| Supervisor Termination Date | Section 6.10(i) |
| Supply Agreement | Exhibit A |
| Systems | Exhibit A |
| Target Cash Amount | Section 2.02(a)(xvii) |
| Target Working Capital | Exhibit A |
| Tax Returns | Exhibit A |
| Tax | Exhibit A |
| Taxes | Exhibit A |
| Taxing Authority | Exhibit A |
| Technology | Exhibit A |
| Third Party Consents | Section 6.05 |
| Ticking Fee | Exhibit A |
| Title IV Plan | Section 4.13(e) |
| Trade Secrets | Exhibit A |
| Trademark Co-Existence Agreement | Exhibit A |
| Trademarks | Exhibit A |
| Transaction Accounting Principles | Exhibit A |
| Transaction Agreements | Exhibit A |
| Transaction Dispute | Section 12.13 |
| Transactions | Exhibit A |
| Transfer Taxes | Exhibit A |
| Transferred Assets | Section 2.02(a) |
| Transferred Books and Records | Exhibit A |
| Transferred Contracts | Section 2.02(a)(iii) |
| Transferred Covered Loss | Section 6.13(a) |
| Transferred Employee | Section 6.10(a) |
| Transferred Entities | Preliminary Statements |
| Transferred Entity Debt | Exhibit A |
| Transferred Entity Employee Plans | Exhibit A |

Exhibit A-20

**HIGHLY CONFIDENTIAL**

### SCHEDULE A

Transferred Entities; Transferred Equity Interests

| Applicable Seller Party | Transferred Entity | Transferred Equity Interests |
|---|---|---|
| Exide Technologies, LLC | GNB Battery Technologies Japan, Inc. | 1 share of common stock |
| Exide Technologies, LLC | Exide de Mexico S. de R.L. de C.V. | 1participation unit valued at $2,999.00 MxCy |
| Exide Delaware LLC | | 1 participation unit valued at $1.00 MxCy |
| Exide Technologies, LLC | Exide Technologies do Brasil Limitada | 3,925,404 limited company quotas |
| Exide Technologies, LLC | Exide Illinois, Inc. | 100 shares of common stock |
| Exide Technologies, LLC | RBD Liquidation, LLC | 10 units |
| Exide Technologies, LLC or another Seller Party (subject to completion of the restructuring contemplated in Section 6.06). | Exide Technologies Canada Corporation | 3,974,120 shares of common stock |

Schedule A-1

**HIGHLY CONFIDENTIAL**

**SCHEDULE B**

<u>Debtors</u>

1. Exide Holdings, Inc.
2. Exide Technologies, LLC
3. Dixie Metals Company
4. Refined Metals Corporation
5. Exide Delaware, LLC

Schedule B-1

**HIGHLY CONFIDENTIAL**

otherwise consistent with the manner, forms or formats of such Trademarks in use by Seller Party and/or its Affiliates' (other than the Transferred Entities), or the Europe/ROW Buyer at any time during the future during the term of the Supply Agreement, (ii) use such Trademarks in combination with other words, logos, symbols, or devices except as permitted in clause (i) herein, or (iii) use any Trademarks confusingly similar to SONNENSCHEIN or DRY FIT, except as permitted in clause (i) herein.

**TSA**

Pursuant to the TSA, Seller Party and/or its Affiliates (other than the Transferred Entities), on the one hand, and the Transferred Entities, on the other hand, will each provide or cause to be provided certain transitional services to the other. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were provided immediately prior to Closing. Such services will be provided for specified durations up to twelve (12) months and at the service provider's costs plus a pro rata allocation of overhead, an administration fee, and employee time billed at base hourly rates plus a pro rata allocation of payroll expenses.

**Debtors TSA**

Pursuant to the Debtors TSA, ~~Buyer will provide or cause to be provided certain transitional estate services to~~ Seller Party and its Affiliates (other than the Transferred Entities), on the one hand, and Buyer or one of its Affiliates, on the other hand, will provide or cause to be provided certain transitional estate or other services to the other, including the services set forth in the Reading SOW. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were performed or provided immediately prior to Closing. Such services will be provided for specified durations up to twelve (12) months ~~and at~~. Services will be provided for a service fee equal to the *sum* of (a) the service provider's costs (without duplication of the following), *plus* (b) a pro rata allocation of overhead, ~~an~~*plus* (c) a reasonable administration fee, ~~and~~*plus* (d) employee time billed at base hourly rates, *plus* (e) a pro rata allocation of payroll-related expenses, *plus* (f) $15,000 per month (or a pro rata portion thereof in respect of any partial month) in respect of services provided by and costs related to the Specified Supervisor.

**Reading SOW**

Pursuant to the Reading SOW, notwithstanding anything to the contrary in the Debtors TSA:

    a. Seller Party and its Affiliates (other than the Transferred Entities) will provide or cause to be provided certain transitional estate or other services to Buyer and its Affiliates solely with respect to the Reading Assets, including, pursuant to Buyer's supply of plastic for conversion into usable plastic chips, Seller Party's and/or its Affiliate's

Schedule C-3

**HIGHLY CONFIDENTIAL**

provision of certain plastic tolling services to convert such plastic into usable plastic chips;

b. Such services will be provided in a manner substantially equivalent and with standards of quality and availability consistent with how such services were performed or provided immediately prior to Closing. Such services will be provided for a term ending on the earlier of (i) the sixtieth (60th) day after the Closing, and (ii) the thirtieth (30th) day after notice of termination shall have been delivered by one party to the other;

c. Such services will be provided for a service fee equal to the *sum* of (a) the service provider's costs (without duplication of the following), *plus* (b) a pro rata allocation of overhead, *plus* (c) a reasonable administration fee, *plus* (d) employee time billed at base hourly rates, *plus* (e) a pro rata allocation of payroll-related expenses, *plus* (f) $80,000.

On the RSOW Expiration Date, Buyer and Seller shall, or shall cause their applicable Affiliate, to deliver a signature page counterpart to the other party of a bill of sale and assignment and assumption agreement in substantially the form of Exhibit B or otherwise in the form and substance reasonably acceptable to Buyer and Seller, pursuant to which Seller shall convey the Reading Assets to Buyer effective on the RSOW Expiration Date.

**Assignment:** Each party to the agreements on this Schedule C may assign such agreement (in whole or in part) to its Affiliate or an acquirer of any or all of the business lines of it and its Affiliates.

Schedule C-4

## EXHIBIT B

(Amendment to the Americas Stock and Asset Purchase Agreement)

1.      Section 2.02(a)(xvi) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

> "(xvi)  the assets listed on Schedule 2.02(a)(xvi); provided, however, that notwithstanding anything else to the contrary herein, including this Section 2.02(a), the Seller Party shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and  interest  in,  to and under (A) the assets, rights and properties identified and set forth in Paragraph 1 of Schedule 2.02(a)(xvi) (the "**Columbus Assets**") on the earlier of (y) the effective date of the Europe/ROW Closing and (z) the date of the first Business Day after the fiftieth (50th) day following the Closing (the "**Columbus Transfer Date**"), provided that Seller shall provide Buyer with two (2) days' prior written notice of the Columbus Transfer Date, and (B) the assets, rights and properties identified and set forth in Paragraph 2 of Schedule 2.02(a)(xvi) (the "**Reading Assets**") on the date of the expiration or other earlier termination of the Reading SOW (the "**RSOW Expiration Date**"); provided, further, that, for the avoidance of doubt, the Columbus Assets and the Reading Assets shall not be transferred to sold, conveyed, assigned, transferred or delivered to Buyer at any time on or prior to the Columbus Transfer Date or the RSOW Expiration Date, respectively;"

2.      Section 3.03(a)(iii) of the Purchase Agreement is hereby amended by inserting the phrase ", Columbus Assets" immediately following the term "Transferred Leases."

3.      Paragraph 1 of Schedule 2.02(a)(xvi) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

> "1.      All (a) equipment (including, without limitation, rotary furnace, RLS equipment, and  charging equipment), and (b) lead and inventory, in each case, located at the Columbus, GA facility; provided, that title to the equipment described in clause (a) shall not pass to Buyer or Buyer's Affiliate until the Columbus Transfer Date.  Physical transfer to be  facilitated by Seller; provided, that all costs and expenses related to such transfer shall be  borne by Buyer. Buyer shall cooperate with Seller with respect to such transfer and be  ready to accept and accept delivery of such equipment and inventory by the Columbus Transfer Date."

4.      Except to the extent that the Purchase Agreement and the Disclosure Schedules thereto are modified by this Order, the remaining provisions, terms and conditions of the Purchase Agreement and the Disclosure Schedules thereto shall remain unmodified and in full force and effect.  All references to the Purchase Agreement in the Purchase Agreement (including the defined term "*Agreement*" and the terms "*hereunder*," "*hereof*," "*herein*," or words of like import) or in any Transaction Agreement shall mean the Purchase Agreement or Disclosure Schedules (as applicable) as amended by this Order.

## **EXHIBIT C**

**EXIDE TECHNOLOGIES AND THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS AFL-CIO LOCAL 700
SETTLEMENT TERM SHEET**

This term sheet (the "**Term Sheet**"), dated August 5 , 2020, sets forth the terms of a settlement (the "**Settlement**") between Exide Technologies (the "**Company**") and the International Brotherhood of Electrical Workers AFL-CIO Local 700 (the "**IBEW Local 700**" or "the **Union**") with respect to the collective bargaining agreement between the Company and the Union (the "**CBA**") governing the Company's facility located at 4115 S. Zero St., Fort Smith, Arkansas 72908 (the "**Facility**") and potential objections that could be raised by the Union to a sale of the Facility, among other assets, to Battery BidCo LLC(the"Buyer") pursuant to the Stock and Asset Purchase Agreement dated as of July 27, 2020 by and between Exide Technologies, LLC, as Seller, Battery BidCo LLC as Buyer, and Atlas Capital  Resources III LP, as Guarantor (the "**Sale**").  The Company and the Union may be referred to each as a "**Party**" and collectively as the "**Parties.**"

The Company has cases pending (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

| Settlement Terms | |
|---|---|
| **Termination of CBA; Conditions Precedent** | The CBA will be deemed terminated effective immediately as to the Facility upon the closing of the Sale (such date, the "**CBA Termination Date**"). |
| **Facility Sale during the Company's Chapter 11 Cases** | The Parties acknowledge that this Settlement was reached in the context of the Company's sale of the Facility to the Buyer.  The Union shall not oppose the Sale or entry of the proposed order filed by the Company with the Bankruptcy Court (Notice of Filing of Proposed Sale Order Regarding Sale of Americas Assets (Docket No. 616 of the Chapter 11 Cases)). |
| **Buyer's Negotiation of Modified CBA** | The Buyer has agreed to enter into a modified collective bargaining agreement (the "**Modified CBA**") with the Union to become effective upon the closing of the Sale as confirmed in a separate email from Buyer counsel. The Modified CBA shall include the same terms and conditions as the CBA, including recognition of seniority with the Company, *except* that under the Modified CBA the Buyer and its affiliates shall have no obligation or liability, irrespective of when it arises, with respect to contributions to or benefits under any defined benefit pension ("DB Pension Provisions"), retiree medical and/or retiree life insurance plans ("Retiree Medical/Insurance Provisions") or policies or arrangements related to any current employees, former employees, new hires and/or their respective dependents and beneficiaries related to DB Pension Provisions or Retiree Medical/Insurance Provisions.  For avoidance of any doubt, the Buyer will not assume any obligations under defined benefit pension, retiree medical and/or retiree life insurance plans, or policies or arrangements referenced in the CBA or any previous or expired CBAs covering bargaining unit |

| | workers related to DB Pension Provisions or Retiree Medical/Insurance Provisions . |
|---|---|
| **Buyer Agreement to provide Credit for Earned But Unused Vacation and Service** | The Buyer has agreed that it or its affiliate, as applicable, will provide each Facility employee with credit for the same number of vacation and sick days that each Facility employee, as applicable, has accrued but not used in the calendar year in which the closing date of the sale of the Facility to the Buyer occurs. |
| **Resolution of Grievances** | The Parties have satisfied all of their legal obligations to each other to bargain over the terms of conditions of employment at the Facility including, but not limited to, the effects of the sale of the Facility.<br><br>Except for the Identified Claims, the Parties have resolved all claims and causes of action, known or unknown, which each Party has asserted or could have asserted as of the CBA Termination Date against the other Party with respect to the Facility employees, including, but not limited to, all grievances, unfair labor practice charges, and all disputes under the CBA and any predecessor collective bargaining agreements. The Company agrees that it will continue to comply with the CBA as consistent with this Agreement (the "CBA Ordinary Course Compliance Obligation") from the date of this Agreement until the CBA Termination Date (the "Interim Period"), and that the Union may utilize the dispute resolution provisions of the CBA if the Company violates the CBA Ordinary Course Compliance Obligation during the Interim Period. |
| **Union Reservation of Rights Regarding Identified Claims** | The Union shall be permitted to assert a general unsecured claim in the Company's Chapter 11 Cases arising out of the termination of the CBA, including any termination of the Exide Pension Plan, and in addition there shall be an undisputed, allowed priority unsecured claim of $7,012.26, and a general unsecured claim of $17,266.25 in resolution of financial claims related to litigation concerning the March 31, 2018 Arbitration decision by arbitrator Patrick Halte regarding the transfer of FLMA administration to UNUM. All such claims shall be referred to as the "**Identified Claims**." |
| **Mutual Release** | Upon the CBA Termination Date, in consideration of the actions of the Company, and for other good and valuable consideration, and except as provided in the Resolution of Grievances and Union Reservation of Rights Regarding Identified Claims" provisions *supra* ,the receipt and sufficiency of which are hereby acknowledged, the Union and the Company hereby irrevocably release and discharge each other from any and all claims, liabilities, damages, losses, and causes of action of any kind or nature whatsoever arising or based on events or omissions occurring prior to the CBA Termination Date, whether known or unknown, contingent or liquidated, including contract claims, claims under the WARN Act and ERISA and all other statutory claims, claims for paid time off, claims for pension or other contributions, withdrawal liability, reallocation liability, redetermination liability, interest on any amounts, liquidated damages, claims for attorneys' fees or any costs or expenses whatsoever, including any and all claims arising under or related to the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, |

2

| | administration, confirmation or consummation of this Settlement, the CBA, or any agreement or document created, modified, amended, terminated or entered into in connection with this Settlement, provided, however, that this release of claims does not include the Identified Claims or any objections of the Company thereto. |
|---|---|
| | **General Provisions** |
| **Amendment** | This Term Sheet may not be modified or amended except by written agreement of the Parties. |
| **Governing Law** | This Term Sheet shall be governed by and construed in accordance with the laws of the state of Delaware, without regard to any conflicts of law provision that would permit or require the application of the law of any other jurisdiction.  In the event of any dispute, the parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, in any federal district court located in the state, county and city of Wilmington, Delaware. |
| **No Third Party Beneficiaries** | This Term Sheet and the Settlement shall be solely for the benefit of the Parties.  Except for any beneficiary of a release (solely as it relates such release), no other person or entity shall be a third-party beneficiary of this Term Sheet or any agreements contemplated herein. |

*[Signatures follow on next page.]*

| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS AFL-CIO LOCAL 700 | EXIDE TECHNOLOGIES LLC |
|---|---|
| *Eugene Wilson* | *[signature]* |
| Name | Name |
| *Business Manager* | President-Americas & COO |
| Title | Title |
| Date 8/5/2020 | Date 08/06/2020 |

3

**EXIDE TECHNOLOGIES AND THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1048
SETTLEMENT TERM SHEET**

This term sheet (the "**Term Sheet**"), dated August ___, 2020, sets forth the terms of a settlement (the "**Settlement**") between Exide Technologies (the "**Company**") and the International Brotherhood of Electrical Workers, Local 1048 (the "**IBEW Local 1048**" or "the **Union**") with respect to the collective bargaining agreement between the Company and the Union (the "CBA") governing the Company's facility located at 2601 W. Mt. Pleasant Blvd., Muncie, Indiana 47302 (the "**Facility**") and potential objections that could be raised by the Union to a sale of the Facility, among other assets, to Battery BidCo LLC (the "**Buyer**") pursuant to the Stock and Asset Purchase Agreement, dated as of July 27, 2020, by and among Exide Technologies, LLC, as Seller, Battery BidCo LLC, as Buyer, and Atlas Capital Resources III LP, as Guarantor (the "**Sale**"). The Company and the Union may be referred to each as a "**Party**" and collectively as the "**Parties**."

The Company has cases pending (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

| Settlement Terms | |
|---|---|
| **Termination of CBA; Conditions Precedent** | The CBA will be deemed terminated effective immediately as to the Facility upon the closing of the Sale (such date, the "**CBA Termination Date**"). |
| **Facility Sale during the Company's Chapter 11 Cases** | The Parties acknowledge that this Settlement was reached in the context of the Company's sale of the Facility to the Buyer. The Union shall not oppose the Sale or entry of the proposed order filed by the Company with the Bankruptcy Court (Notice of Filing of Proposed Sale Order Regarding Sale of Americas Assets (Docket No. 616 of the Chapter 11 Cases)). |
| **Buyer's Negotiation of Modified CBA** | The Buyer has agreed to enter into a modified collective bargaining agreement (the "**Modified CBA**") with the Union to become effective upon the closing of the Sale. The Modified CBA shall include the same terms and conditions as the CBA, _except_ that under the Modified CBA the Buyer and its affiliates shall have no obligation or liability, irrespective of when it arises, with respect to contributions to or benefits under any defined benefit pension, retiree medical and/or retiree life insurance plans, policies or arrangements related to any current employees, former employees, new hires and/or their respective dependents and beneficiaries. For avoidance of any doubt, the Buyer will not assume any obligations under defined benefit pension, retiree medical and/or retiree life insurance plans, policies or arrangements referenced in the CBA or any previous or expired CBAs covering bargaining unit workers. |
| **Buyer Agreement to provide Credit for Earned But Unused Vacation and Service** | The Buyer has agreed that it or its affiliate, as applicable, will provide each Facility employee with credit for the same number of vacation and sick days that each Facility employee, as applicable, has accrued but not used in the calendar year in which the closing date of the sale of the Facility to the |

| | Buyer occurs. |
|---|---|
| **Resolution of Grievances** | The Parties have satisfied all of their legal obligations to each other to bargain over the terms of conditions of employment at the Facility including, but not limited to, the effects of the sale of the Facility.<br><br>Except for the Identified Claims, the Parties have resolved all claims and causes of action, known or unknown, which each Party has asserted or could have asserted as of the CBA Termination Date against the other Party with respect to the Facility employees, including, but not limited to, all grievances, unfair labor practice charges, and all disputes under the CBA and any predecessor collective bargaining agreements. |
| **Union Reservation of Rights Regarding Identified Claims** | The Union shall be permitted to assert a general unsecured claim in the Company's Chapter 11 Cases arising out of the termination of the CBA. Such claims shall be referred to as the "Identified Claims." |
| **Mutual Release** | Upon the CBA Termination Date, in consideration of the actions of the Company, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Union and the Company hereby irrevocably release and discharge each other from any and all claims, liabilities, damages, losses, and causes of action of any kind or nature whatsoever arising or based on events or omissions occurring prior to the CBA Termination Date, whether known or unknown, contingent or liquidated, including contract claims, claims under the WARN Act and ERISA and all other statutory claims, claims for paid time off, claims for pension or other contributions, withdrawal liability, reallocation liability, redetermination liability, interest on any amounts, liquidated damages, claims for attorneys' fees or any costs or expenses whatsoever, including any and all claims arising under or related to the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of this Settlement, the CBA, or any agreement or document created, modified, amended, terminated or entered into in connection with this Settlement, provided, however, that this release of claims does not include the Identified Claims or any objections of the Company thereto. |
| | **General Provisions** |
| **Amendment** | This Term Sheet may not be modified or amended except by written agreement of the Parties. |
| **Governing Law** | This Term Sheet shall be governed by and construed in accordance with the laws of the state of Delaware, without regard to any conflicts of law provision that would permit or require the application of the law of any other jurisdiction. In the event of any dispute, the parties will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, in any federal district court located in the state, county and city of Wilmington, Delaware. |
| **No Third Party Beneficiaries** | This Term Sheet and the Settlement shall be solely for the benefit of the Parties. Except for any beneficiary of a release (solely as it relates such |

2

release), no other person or entity shall be a third-party beneficiary of this Term Sheet or any agreements contemplated herein.

*[Signatures follow on next page.]*

| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1048 | EXIDE TECHNOLOGIES LLC |
|---|---|
| Name | Name |
| Title BUSINESS MANAGER | Title President-Americas + COO |
| Date 8/5/2020 | Date 08\06\2020 |

3

**EXIDE TECHNOLOGIES AND THE INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE, AND FURNITURE WORKERS IUE/CWA LOCAL NO. 86116**
**SETTLEMENT TERM SHEET**

This term sheet (the "**Term Sheet**"), dated August __, 2020, sets forth the terms of a settlement (the "**Settlement**") between Exide Technologies (the "**Company**") and the International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers IUE/CWA Local No. 86116 ("**Local No. 86116**" or "the **Union**") with respect to the collective bargaining agreement between the Company and the Union (the "**CBA**") governing the Company's facility located at 25102 Exide Drive, Forest City, Missouri 64451 (the "**Facility**") and potential objections that could be raised by the Union to a sale of the Facility, among other assets, to Battery BidCo LLC (the "**Buyer**") pursuant to the Stock and Purchase Asset Agreement, dated as of July 27, 2020, by and among Exide Technologies, LLC, as Seller, Battery BidCo LLC, as Buyer, and Atlas Capital Resources III LP, as Guarantor (the "**Sale**"). The Company and the Union may be referred to each as a "**Party**" and collectively as the "**Parties**."

The Company has cases pending (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

| Settlement Terms | |
|---|---|
| **Termination of CBA; Conditions Precedent** | The CBA will be deemed terminated effective immediately as to the Facility upon the closing of the Sale (such date, the "**CBA Termination Date**"). |
| **Facility Sale during the Company's Chapter 11 Cases** | The Parties acknowledge that this Settlement was reached in the context of the Company's sale of the Facility to the Buyer. The Union shall not oppose the Sale or entry of the proposed order filed by the Company with the Bankruptcy Court (Notice of Filing of Proposed Sale Order Regarding Sale of Americas Assets (Docket No. 616 of the Chapter 11 Cases)). |
| **Buyer's Negotiation of Modified CBA** | The Buyer has agreed to enter into a modified collective bargaining agreement (the "**Modified CBA**") with the Union to become effective upon the closing of the Sale. The Modified CBA shall include the same terms and conditions as the CBA, _except_ that under the Modified CBA the Buyer and its affiliates shall have no obligation or liability, irrespective of when it arises, with respect to contributions to or benefits under any defined benefit pension, retiree medical and/or retiree life insurance plans, policies or arrangements related to any current employees, former employees, new hires and/or their respective dependents and beneficiaries. For avoidance of any doubt, the Buyer will not assume any obligations under defined benefit pension, retiree medical and/or retiree life insurance plans, policies or arrangements referenced in the CBA or any previous or expired CBAs covering bargaining unit workers. |
| **Buyer Agreement to provide Credit for Earned But Unused** | The Buyer has agreed that it or its affiliate, as applicable, will provide each Facility employee with credit for the same number of vacation and sick days that each Facility employee, as applicable, has accrued but not used in |

| Beneficiaries | Parties.  Except for any beneficiary of a release (solely as it relates such release), no other person or entity shall be a third-party beneficiary of this Term Sheet or any agreements contemplated herein. |

*[Signatures follow on next page.]*

| LOCAL NO. 86116 | EXIDE TECHNOLOGIES LLC |
|---|---|
| *signature* | *signature* |
| Name | Name |
| PResident | President-Americas ? COO |
| Title | Title |
| Date  8-6-2020 | Date  08/06/2020 |

3

A-0511

### Schedule 1

| Identification # | Asset Description |
|---|---|
| 3771915.16191.161 | ITG Assembly Line 4 |
| 3771915.16191.161 | BM Envelopers 4A and 4B (BMV15) |
| 3771915.16191.161 | TBS COS10 |
| 1223101.16191.102 | COS10 Tooling |
| X00000011201 | Bitrode Rectifier |
| X00000011202 | Bitrode Rectifier |
| X00000011203 | Bitrode Rectifier |
| X00000011204 | Bitrode Rectifier |
| X00000011205 | Bitrode Rectifier |
| X00000011206 | Bitrode Rectifier |
| X00000007498 | Rotary Pump Type RP3 |
| X00000011223 | Rotary Pump Type RP4 |
| X00000007567 | Silo Screw Conveyor |
| X00000007518 | Absolutaire Heating Unit 1of4 |
| X00000007519 | Absolutaire Heating Unit 2of4 |
| X00000007520 | Absolutaire Heating Unit 3of4 |
| X00000007521 | Absolutaire Heating Unit 4of4 |
| X00000011211 | Jib Crane |
| X00000007452 | Dell PowerEdge R620 |
| X00000007449 | Dell PowerEdge R620 |
| X00000011217 | Dell PowerConnect 8024F |
| X00000007576 | Infinity |
| X00000011277 | Riverbed steelhead |
| X00000011278 | Cylinder Transfer Reversing |
| X00000011214 | CPM Pos Remote setpoint |
| X00000007501 | CPM Neg Remote setpoint |
| X00000007524 | Lead Pumping System |
| X00000007525 | Tenant Floor Scrubber |
| X00000007526 | Shelving - Crib, Prod |
| X00000007527 | Heat seal tooling grp. 86 |
| X00000007534 | Concast drum POSa |
| X00000007535 | Concast drum POSb |
| X00000007536 | Concast drum NEGa |
| X00000011295 | Concast drum NEGb |
| X00000007441 | Pin-Printer on Hi Rater#1 |
| X00000007474 | 3500 3-WHEEL FORK TRUCK |
| X00000007445 | 3500 3-WHEEL FORK TRUCK |
| X00000007447 | 3500 3-WHEEL FORK TRUCK |
| X00000007448 | 3500 3-WHEEL FORK TRUCK |
| X00000007450 | 3500 3-WHEEL FORK TRUCK |
| X00000007451 | 4 Reel Holder/ 14 Safety Cages |
| X00000011216 | Cylinder conveyor to silo |
| X00000007429 | Hipot test |

| X00000007446 | 5000 LB LIFT TRUCK |
|---|---|
| X00000007472 | Sure Torque WeldTester ST-120S |
| X00000011224 | Pneu. Oxide Transfer System |
| X00000007569 | Carrier 30 ton AC - Form Roof |
| X00000007465 | Oxide Sifter |
| X00000011220 | Lead Pot Insulation |
| X00000011212 | Lead Ingot Conveyor |
| X00000011241 | Insight-blue,green,purp cards |
| X00000007529 | WasteWater PVC (900ft) |
| X00000007460 | Baghouse 7 Fan/Motor |
| X00000007462 | Baghouse 6 Fan/Motor |
| X00000011276 | Panel for material handling |
| X00000007493 | hoist system - pasting |
| X00000007444 | Jig Mold |
| X00000011235 | Storage Silo 3 |
| X00000011236 | Storage Silo 2 |
| X00000011237 | Storage Silo 1 |
| X00000007463 | Carrier 50 ton AC - Form Roof |
| X00000007464 | Carrier 50 ton AC - Form Roof |
| X00000011290 | Weigh Scale |
| X00000011297 | Tinning Station |
| X00000011213 | Melt Pot Assembly |
| X00000007494 | General COS Spare Parts |
| X00000011287 | Dell EqualLogic PS4110x |
| X00000011256 | filter press for pasting |
| X00000011257 | Pasting Receiver Hopper Pos |
| X00000011267 | Pasting Receiver Hopper Neg |
| X00000011268 | pos line calendar rolls |
| X00000007533 | neg line calendar rolls |
| X00000011215 | Cylinder Caster CC5-0 |
| X00000007489 | GROUP 75/75U/85/86 NEG Die |
| X00000007490 | GROUP 75/75U/85/86 POS Die |
| X00000007433 | Post (lug) aligner |
| X00000011225 | Hi-Dense Conveyor#1 |
| X00000011226 | Hi-Dense Conveyor#2 |
| X00000007487 | GROUP 34/78/78U NEG Die |
| X00000007488 | GROUP 34/78/78U POS Die |
| X00000007528 | 2 Sets Concast Spare Parts |
| X00000007458 | Oxide Bag-House#1 |
| X00000011227 | Oxide Bag-House#2 |
| X00000011228 | Ing Rand Air Compressor/Filter |
| X00000007469 | Chiller System 30ton front |
| X00000011200 | RO Water System |
| X00000007492 | COS Mold 75/86 |
| X00000011279 | neg line full line control sys |
| X00000011280 | pos line full line control sys |
| X00000007491 | COS Mold 24/34/78 |
| X00000007468 | Absolutaire Make-Up Air Unit |

| X00000011251 | CPM Neg Expander Feeder |
|---|---|
| X00000011252 | CPM Neg Fibre Feeder |
| X00000011253 | CPM Neg Carbon Feeder#1 |
| X00000011254 | CPM Neg Carbon Feeder#2 |
| X00000011246 | CPM Pos TiO2 Feeder |
| X00000011248 | CPM Pos Sure Cure Feeder |
| X00000011249 | CPM Pos Glass Beads Feeder |
| X00000011250 | CPM Pos Fibre Feeder |
| X00000007470 | Ing Rand Air Control / Piping |
| X00000011262 | Pasting Mezzanine |
| X00000011243 | Concast Steam Cleaning NEG |
| X00000011244 | Concast Steam Cleaning POS |
| X00000011271 | pos line cutter/tab blankers |
| X00000011272 | neg line cutter/tab blankers |
| X00000011209 | chill room |
| X00000007467 | Reymsa Cooling Tower |
| X00000007466 | process data loging - Polytron |
| X00000011265 | Duall Scrubber - Formation |
| X00000011266 | CPM Pos HMI Control System |
| X00000007517 | CPM Neg HMI Control System |
| X00000011269 | Wonderware |
| X00000011270 | neg line drum paster |
| X00000007455 | pos line drum paster |
| X00000007471 | Sodium Sulfate Addition System |
| X00000007475 | Spencer Vac System |
| X00000011207 | Rectifier Switch Board |
| X00000007577 | Chilled Water System 30ton AC |
| X00000011296 | Switchgear D1 Rect/Assy |
| X00000011255 | CPM Neg Oxide Feeder |
| X00000011247 | CPM Pos Oxide Feeder |
| X00000011263 | CPM Neg Readcon CPM |
| X00000011264 | CPM Pos Readcon CPM |
| X00000007457 | Grecon Spark Detect System |
| X00000007459 | Baghouse 7 |
| X00000007461 | Baghouse 6 |
| X00000011273 | neg line plate stackers |
| X00000011274 | pos line plate stackers |
| X00000007456 | Concentrated Acid Facility |
| X00000007568 | Post builder |
| X00000011238 | 5 Transformers/Pole Move |
| X00000011239 | Lead Pot Electrical |
| X00000011240 | Ball Mill 1 Electrical |
| X00000007435 | Ball Mill 2 Electrical |
| X00000007436 | Leak test |
| X00000011292 | Ultra Sonic Cover Sealer |
| X00000007434 | Heat sealer |
| X00000011299 | Case Punch |
| X00000007502 | Cure Room Racking |

| X00000011208 | Acid Mixing System |
|---|---|
| X00000011218 | Ball Mill M15#1 |
| X00000011219 | Ball Mill M15#2 |
| X00000011293 | Hi-Rate Test Machine |
| X00000011294 | Finish Hi-Rater/Hi-Pot Tester |
| X00000007432 | Intercell weld |
| X00000011291 | Battery Washer |
| X00000011284 | winder#2 |
| X00000011285 | winder#1 |
| X00000011286 | winder#3 |
| X00000011288 | COS Machine |
| X00000011242 | Concast Line Neg |
| X00000011245 | Concast Line POS |
| X00000011210 | Curing Chambers |
| X00000011289 | Formation Auto Vac Filling |
| X00000007522 | Ductwork, Stacks, Louvers, etc |
| X00000007523 | Formation Tables (40) / Weirs |
| 3771915.16191.061 | Acid Scrubbers |
| 3771915.16191.061 | Cooling Towers |
| 3771915.16191.061 | Källström 1 |
| 3771915.16191.061 | Laptop/Laser Bar Code |
| 3771915.16191.168 | Mac Stackers |
| 3771915.16191.061 | Ro Water System |
| 3771915.16191.115 | Vent Hoods |
| 3771915.16191.159 | Paste Return System (Paste Miser) |
| 3771915.16191.159 | ITG Flash Dry Oven line 1 |
| 3771915.16191.168 | Pasting Line 1 Improvements |
| 3771915.16191.061 | Källström Acid Filler 4A and 4B |
| 3771915.16191.061 | ITG Formation Tables (qty 62) |
| 3771915.16191.061 | Formation Conveyors |
| 3771915.16191.030 | Ventilation System |
| 3771915.16191.030 | Firing Circuits Rectifiers |
| 3771915.16191.030 | Oxmaster Mixer |
| 3771915.16191.030 | MAC Continuous Pasting Line 3 |
| 3771915.16191.030 | TCM Lifts Model # FCB25-7 |
| 3771915.16191.030 | Relocate Air Compressor to over Mach Shop |
| 3771915.16191.030 | Waterbath System |
| 3771915.16191.030 | Acid Farm Improvements |
| 3771915.16191.030 | Acid Resistant Flooring |
| 3771915.16191.030 | Site Prep Work |
| 3771915.16191.168 | Bag house and Stack Extensions |
| 3771915.16191.168 | Vision System (Plate Sentinel) |
| 3771915.16191.168 | Cure Ovens (qty 36) |
| 3771915.16191.168 | Heat Seal machine line 1 finishing. |
| 3771915.16191.168 | Wirtz Concast Machine |
| 3771915.16191.168 | Line 3 Improvements |
| 3771915.16191.168 | Assy Line 4 Case Punch Robot and various mods |
| 3771915.16191.168 | Finishing Line 4 |

| 3771915.16191.168 | Oxide |
|---|---|
| 1223101.16191.102 | Plastic Mold Tooling |
| 1223101.16191.102 | ConCast Tooling |
| 1223101.16191.102 | Casting Bookmold Tooling |
| 1223101.16191.102 | Finishing Line Tooling |
| 1223101.16191.102 | Pasting Filter Press Replacement |
| 1223101.16191.102 | Process Vents |
| 1223101.16191.102 | ConCast Tooling |
|  | Finishing Upgrade |
|  | Formation Tooling |
|  | Grid Mods |
|  | Refurbish Scissor Lift |

# **<u>TAB 9</u>**

**Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and
Its Affiliated Debtors, dated Aug. 14, 2020 [Bankr. D.I. 742]**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                            :

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **EXIDE HOLDINGS, INC.,** *et al.,* | : | **Case No. 20–11157 (CSS)** |
|  | : |  |
| **Debtors.**[1] | : | **(Jointly Administered)** |
|  | : |  |

---------------------------------------------------------- x

## AMENDED JOINT CHAPTER 11 PLAN OF
## EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Zachary I. Shapiro
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: August 14, 2020
       Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

# TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION. ..............................................................1

SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS..........................18

    2.1.    Administrative Expense Claims.............................................................................18
    2.2.    Fee Claims. .............................................................................................................18
    2.3.    Priority Tax Claims.................................................................................................19
    2.4.    DIP Claims..............................................................................................................19
    2.5.    Restructuring Expenses...........................................................................................19
    2.6.    Trustees Fees...........................................................................................................19

SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS. ....................................20

    3.1.    Classification in General.........................................................................................20
    3.2.    Grouping of Debtors for Convenience Only............................................................20
    3.3.    Summary of Classification......................................................................................20
    3.4.    Special Provision Governing Unimpaired Claims. .................................................21
    3.5.    Elimination of Vacant Classes................................................................................21
    3.6.    Voting Classes; Presumed Acceptance by Non-Voting Classes..............................21
    3.7.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code........................................................................................................................21

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS. ............................................22

    4.1.    Priority Non-Tax Claims (Class 1). ........................................................................22
    4.2.    Other Secured Claims (Class 2). .............................................................................22
    4.3.    ABL Claims (Class 3).............................................................................................22
    4.4.    Superpriority Notes Guarantee Claims (Class 4).....................................................23
    4.5.    Exchange Priority Notes Claims (Class 5)...............................................................24
    4.6.    First Lien Notes Claims (Class 6)............................................................................24
    4.7.    General Unsecured Claims (Class 7). ......................................................................25
    4.8.    Intercompany Claims (Class 8)...............................................................................25
    4.9.    Intercompany Interests (Class 9).............................................................................25
    4.10.   Holdings Equity Interests (Class 10). .....................................................................26
    4.11.   Subordinated Securities Claims (Class 11)..............................................................26

SECTION 5.    MEANS FOR IMPLEMENTATION. .............................................................27

    5.1.    Europe/ROW Sale Transaction...............................................................................27
    5.2.    Compromise and Settlement of Claims, Interests, and Controversies.....................27
    5.3.    The GUC Trust. ......................................................................................................31
    5.4.    The Environmental Trust. .......................................................................................33
    5.5.    Canada Non-Performing Property. ..........................................................................33
    5.6.    Plan Administrator..................................................................................................34
    5.7.    Corporate Action.....................................................................................................36
    5.8.    Withholding and Reporting Requirements. .............................................................36
    5.9.    Exemption From Certain Transfer Taxes.................................................................37
    5.10.   Effectuating Documents; Further Transactions........................................................37
    5.11.   Preservation of Rights of Action.............................................................................38
    5.12.   Certificate of Incorporation and By-Laws. ..............................................................38
    5.13.   Stock Trading Restrictions......................................................................................38
    5.14.   Assignment and Assumption of Superpriority Notes. ..............................................39

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 5.15. | Cancellation of Existing Securities and Agreements | 39 |
| 5.16. | Subordinated Claims. | 40 |
| 5.17. | Nonconsensual Confirmation. | 40 |
| 5.18. | Closing of Chapter 11 Cases. | 40 |
| 5.19. | Notice of Effective Date. | 40 |
| 5.20. | Corporate Form. | 40 |
| 5.21. | Separability. | 40 |
| SECTION 6. | DISTRIBUTIONS. | 41 |
| 6.1. | Distributions Generally. | 41 |
| 6.2. | Distribution Record Date. | 41 |
| 6.3. | Date of Distributions. | 41 |
| 6.4. | Disbursing Agent. | 41 |
| 6.5. | Rights and Powers of Disbursing Agent. | 42 |
| 6.6. | Expenses of Disbursing Agent. | 42 |
| 6.7. | No Postpetition Interest on Claims. | 42 |
| 6.8. | Delivery of Distributions. | 42 |
| 6.9. | Distributions after Effective Date. | 43 |
| 6.10. | Unclaimed Property. | 43 |
| 6.11. | Time Bar to Cash Payments. | 44 |
| 6.12. | Manner of Payment under Plan. | 44 |
| 6.13. | Satisfaction of Claims. | 44 |
| 6.14. | Minimum Cash Distributions. | 44 |
| 6.15. | Setoffs and Recoupments. | 44 |
| 6.16. | Allocation of Distributions between Principal and Interest. | 44 |
| 6.17. | No Distribution in Excess of Amount of Allowed Claim. | 45 |
| SECTION 7. | PROCEDURES FOR DISPUTED CLAIMS. | 45 |
| 7.1. | Objections to Claims. | 45 |
| 7.2. | Resolution of Disputed Claims. | 45 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 45 |
| 7.4. | Distributions after Allowance. | 45 |
| 7.5. | Estimation of Claims. | 45 |
| 7.6. | No Distributions Pending Allowance. | 46 |
| 7.7. | Claim Resolution Procedures Cumulative. | 46 |
| 7.8. | Interest. | 46 |
| 7.9. | Insured Claims. | 46 |
| SECTION 8. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 47 |
| 8.1. | Rejection of Executory Contracts and Unexpired Leases. | 47 |
| 8.2. | Determination of Assumption Disputes and Deemed Consent. | 47 |
| 8.3. | Rejection Damages Claims. | 48 |
| 8.4. | Insurance Policies. | 48 |
| 8.5. | Intellectual Property Licenses and Agreements. | 49 |
| 8.6. | Tax Agreements. | 49 |
| 8.7. | Assignment. | 50 |
| 8.8. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 50 |
| 8.9. | Reservation of Rights. | 50 |
| SECTION 9. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. | 51 |
| 9.1. | Conditions Precedent to the Effective Date. | 51 |

ii

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 9.2. | Waiver of Conditions Precedent. | 52 |
| 9.3. | Effect of Failure of Conditions to Effective Date. | 52 |
| SECTION 10. | EFFECT OF CONFIRMATION. | 53 |
| 10.1. | Vesting of Assets. | 53 |
| 10.2. | Term of Injunctions or Stays. | 53 |
| 10.3. | Injunction. | 54 |
| 10.4. | Binding Effect. | 55 |
| 10.5. | Releases by the Debtors. | 55 |
| 10.6. | Releases By Holders of Claims and Interests. | 55 |
| 10.7. | Exculpation. | 57 |
| 10.8. | Waiver of Statutory Limitation on Releases. | 57 |
| 10.9. | Solicitation of the Plan. | 57 |
| 10.10. | Corporate Action. | 58 |
| SECTION 11. | RETENTION OF JURISDICTION. | 58 |
| 11.1. | Retention of Jurisdiction. | 58 |
| 11.2. | Courts of Competent Jurisdiction. | 60 |
| SECTION 12. | MISCELLANEOUS PROVISIONS. | 60 |
| 12.1. | Payment of Statutory Fees. | 60 |
| 12.2. | Substantial Consummation. | 60 |
| 12.3. | Dissolution of Creditors' Committee. | 60 |
| 12.4. | Amendments. | 60 |
| 12.5. | Revocation or Withdrawal of the Plan. | 61 |
| 12.6. | Severability of Plan Provisions upon Confirmation. | 61 |
| 12.7. | Governing Law. | 61 |
| 12.8. | Time. | 62 |
| 12.9. | Additional Documents | 62 |
| 12.10. | Immediate Binding Effect. | 62 |
| 12.11. | Successors and Assigns. | 62 |
| 12.12. | Entire Agreement. | 62 |
| 12.13. | Notices. | 62 |

**Schedule 1**:   Settling Governmental Authorities
**Schedule 2**:   Non-Performing Properties
**Schedule 3**:   Transferred Entities

iii

Each of the Debtors proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A. **Definitions.**

1.1    ***2020 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.2    ***2022 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017, as amended, supplemented or otherwise modified from time to time.

1.3    ***ABL Agents*** means Bank of America, N.A., as administrative agent, and Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents, under the ABL Credit Agreement, and their permitted successors and assigns.

1.4    ***ABL Credit Agreement*** means that certain ABL Credit Agreement by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, Exide Holding Netherlands B.V., the ABL Agents, and the ABL Lenders, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.5    ***ABL Lenders*** means "Lenders" as defined in the ABL Credit Agreement.

1.6    ***Acquired Assets*** means, collectively, the Transferred Equity Interests and the Transferred Assets.

1.7    ***Administrative Expense Claim*** means any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors;  (b) Restructuring Expenses; (c) Trustees Fees; and (d) any Claim Allowed under section 503(b)(9) of the Bankruptcy Code.

1.8    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.9    ***Allowed*** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, GUC Trustee or Plan Administrator, as applicable; (c) as to which the liability of the Debtors or GUC Trust, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (d) expressly allowed hereunder; *provided, however,* that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and

1

shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Plan Administrator and the GUC Trustee shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

1.10 ***Alternative Transaction Structure*** means the implementation steps necessary to consummate the Europe/ROW Sale Transaction pursuant to the Europe/ROW Purchaser's election under Section 2.08 of the Europe/ROW Purchase Agreement. The Alternative Transaction Structure shall be filed with the Plan Supplement if such election is made by the Europe/ROW Purchaser in accordance with the Europe/ROW Purchase Agreement.

1.11 ***Americas Closing*** means "Closing" as defined in the Americas Purchase Agreement.

1.12 ***Americas Purchase Agreement*** means that certain Stock and Asset Purchase Agreement by and among Exide Technologies, Battery BidCo LLC, and Atlas Capital Resources III LP, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.13 ***Americas Sale Order*** means the *Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on August 6, 2020 (Docket No. 690).

1.14 ***Americas Sale Transaction*** means the transaction to be effectuated pursuant to the Americas Purchase Agreement.

1.15 ***Aspen*** means, collectively, Aspen American Insurance Company, and Aspen Specialty Insurance Company, solely in their capacity as providers of surety insurance to the Debtors pursuant the Aspen Surety Bond Agreements.

1.16 ***Aspen Surety Bond Agreements*** means the applicable agreements governing the surety bond obligations of Aspen to the Debtors with respect to the Frisco Non-Performing Property.

1.17 ***Asset*** means all of the rights, title, and interests of a Debtor in, and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property.

1.18 ***Assumed Liabilities*** means "Assumed Liabilities" as defined in the Europe/ROW Purchase Agreement.

1.19 ***Assumption Dispute*** means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.20 ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Europe/ROW Purchaser pursuant to the Plan that will be included in the Plan Supplement, as may be amended, modified, or supplemented from time to time in accordance with the Europe/ROW Purchase Agreement and the Confirmation Order.

1.21     ***Avoidance Actions*** means any action commenced or that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

1.22     ***Ballot*** means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

1.23     ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.24     ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.25     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.26     ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

1.27     ***Bidding Procedures Order*** means that certain *Order (I) Approving (A) Bidding Procedures for Sales of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 19, 2020 (Docket No. 344).

1.28     ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.29     ***Canada MOE*** means the Ontario Ministry of the Environment, Conservation and Parks.

1.30     ***Canada Non-Performing Property*** means the Debtors' non-performing property located in Fort Erie, Ontario, Canada.  For the purposes of the Plan, such property shall not be deemed to be a "Non-Performing Property" as such term is used herein.

1.31     ***Canada NPP Claim*** means any civil Claim or Cause of Action by the Canada MOE against the Debtors under Environmental Laws (including Environmental Laws of Canada) with respect to the Canada Non-Performing Property.

1.32     ***Canada NPP Remediation Funds*** means the Cash deposit, in an amount to be determined by the Debtors in consultation with the Requisite Noteholders, to be made by the Debtors for the environmental remediation of the Canada Non-Performing Property.

3

1.33    ***Cash*** means legal tender of the United States of America.

1.34    ***Cause of Action*** means any action, Claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).   Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or any other Avoidance Actions, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.35    ***Challenge Deadline*** means "Challenge Deadline" as defined in the DIP Order.

1.36    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on May 19, 2020, and styled *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS).

1.37    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.38    ***Class*** means any group of Claims or Interests classified as set forth in <u>Section 3</u> of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.39    ***Commencement Date*** means the date on which the Debtors commenced the Chapter 11 Cases.

1.40    ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.41    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.42    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.43    ***Confirmation Order*** means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.44    ***Consenting Creditors*** means each of the holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that are party to the RSA together with their respective successors and permitted assigns and any subsequent holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that become party to the RSA in accordance with the terms of the RSA.

1.45    ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

4

1.46     **Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.47     **D&O Policy** means any insurance policy that covers, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

1.48     **Debtors** means Exide Holdings, Inc.; Exide Technologies, LLC; Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation.

1.49     **Debtors in Possession** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.50     **Definitive Documents** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Europe/ROW Sale Transaction and the Global Settlement, including, but not limited to: (a) the Plan; (b) the Disclosure Statement; (c) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; (f) the GUC Trust Agreement; and (g) the Environmental Settlement Documents.

1.51     **DIP Agent** means "DIP Agent" as defined in the DIP Order.

1.52     **DIP Claim** means any Claim of the DIP Lenders or DIP Agent arising under the DIP Loan Documents or the DIP Order.  For the avoidance of doubt, DIP Claims includes all DIP Obligations.

1.53     **DIP Facility** means "DIP Facility" as defined in the DIP Order.

1.54     **DIP Lenders** means "DIP Lenders" as defined in the DIP Order.

1.55     **DIP Loan Documents** means "DIP Loan Documents" as defined in the DIP Order.

1.56     **DIP Motion** means the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (Docket No.26).

1.57     **DIP Obligations** means "DIP Obligations" as defined in the DIP Order.

1.58     **DIP Order** means the final order approving the DIP Motion (Docket No. 350).

1.59     **Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.60     **Disbursing Agent** means the Plan Administrator; *provided*, that with respect to distributions to holders of Allowed General Unsecured Claims, the GUC Trustee shall be the "Disbursing Agent" and distribute the GUC Trust Assets as and when provided for in the GUC Trust Agreement.

1.61 ***Disclosure Statement*** means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.62 ***Disputed*** means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order. If the Debtors, or any parties in interest, dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors, or any parties in interest, do not dispute, and Disputed as to the balance of such Claim.

1.63 ***Distribution*** means payment or distribution of consideration to holders of Allowed Claims pursuant to this Plan.

1.64 ***Distribution Date*** means a date or dates as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.65 ***Distribution Record Date*** means the Effective Date of the Plan or such other date as determined by (a) the GUC Trustee with respect to General Unsecured Claims, (b) the Plan Administrator with the consent of the Requisite Noteholders and applicable Trustee with respect to the Superpriority Notes, Exchange Priority Notes, and First Lien Notes, or (c) the Plan Administrator with respect to all other Allowed Claims. For the avoidance of doubt, the Distribution Record Date shall not apply to holders of public securities.

1.66 ***DTC*** means the Depositary Trust Company or any successor securities clearing agency.

1.67 ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in <u>Section 9</u> hereof have been satisfied or waived in accordance with the terms of the Plan.

1.68 ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.69 ***Environmental Global Settlement Payment*** means the $10,000,000 Cash payment to be made to the Environmental Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.70 ***Environmental Laws*** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (a) pollution, (b) the protection or regulation of human health, natural resources, or the environment, (c) the management of hazardous materials, or (d) the release of hazardous materials into the environment.

1.71 ***Environmental NPP Claim*** means any civil Claim or Cause of Action by the Settling Governmental Authorities against the Debtors under Environmental Laws with respect to or arising out of the Non-Performing Properties, including the Frisco Non-Performing Property.

1.72 ***Environmental Settlement Agreement*** means that certain Settlement Agreement among the Debtors, the Consenting Creditors, the Transferred Entities, each of the Settling Governmental Authorities, and Westchester relating to the Non-Performing Properties, in form and substance as agreed to by such parties and to be filed with the Plan Supplement.

6

1.73 ***Environmental Settlement Documents*** means the Environmental Settlement Agreement, the Environmental Trust Agreements, and any other documents or instruments required by such documents.

1.74 ***Environmental Sureties*** means, collectively, Westchester and Aspen.

1.75 ***Environmental Trust*** means the trust established pursuant to the Environmental Trust Agreements and the Environmental Settlement Agreement.

1.76 ***Environmental Trust Agreements*** means one or more trust agreements by and among the Debtors, the Settling Governmental Authorities, and the Environmental Trustee, in form and substance as agreed to by such parties and filed with the Plan Supplement and consistent with <u>Section 5</u> of the Plan.

1.77 ***Environmental Trust Assets*** shall, pursuant to the Global Settlement, consist of (a) the Environmental Global Settlement Payment, (b) the contributions by Westchester in accordance with the terms of the Environmental Trust Agreements, (c) the Transferred Non-Performing Properties or any proceeds thereof to the extent a Transferred Non-Performing Property is sold prior to the Effective Date, and (d) the Environmental Trust Causes of Action.

1.78 ***Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to any Transferred Non-Performing Property.

1.79 ***Environmental Trustee*** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Environmental Trust, and any successor thereto in accordance with the Environmental Trust Agreements.

1.80 ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.81 ***Europe/ROW Closing*** means "Closing" as defined in the Europe/ROW Purchase Agreement.

1.82 ***Europe/ROW Purchase Agreement*** means that certain Stock and Asset Purchase Agreement, by and between Exide Holdings, Inc., the other seller parties, and the Europe/ROW Purchaser, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.83 ***Europe/ROW Purchaser*** means EIH Europe Acquisition LLC.

1.84 ***Europe/ROW Sale Transaction*** means the sale of the Acquired Assets to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement.

1.85 ***European Bridge Notes*** means the notes issued pursuant to the European Bridge Notes Indenture.

7

1.86    ***European Bridge Notes Indenture*** means that certain indenture, to be entered into by and between non-Debtor Exide International Holdings LP, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, documenting the terms of an interim financing facility in accordance with the Europe/ROW Purchase Agreement, the proceeds of which may be used to fund, among other things, the Global Settlement Payments by the Transferred Entities.

1.87    ***Exchange Priority and First Lien Notes Indenture*** means that certain indenture, by and among Exide Technologies, as issuer, the guarantor parties thereto, and the Exchange Priority and First Lien Notes Trustee, dated as of June 25, 2019, as amended, supplemented or otherwise modified from time to time.

1.88    ***Exchange Priority and First Lien Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Exchange Priority and First Lien Notes Indenture.

1.89    ***Exchange Priority Notes*** means the 11% Exchange Priority Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.90    ***Exchange Priority Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and First Lien Notes Indenture, against distributions to be made to the holders of the Exchange Priority Notes under this Plan or otherwise, for payment of any Exchange Priority Notes Indenture Trustee Fees.

1.91    ***Exchange Priority Notes Claim*** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder.

1.92    ***Exchange Priority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the Exchange Priority Notes.

1.93    ***Exculpated Parties*** means collectively: (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) each of the DIP Lenders and the DIP Agent, (e) the Creditors' Committee and each of its members in their capacity as such, (f) the GUC Trust, (g) the GUC Trustee, (h) the Trustees, (i) the Consenting Creditors, and (j) with respect to each of the foregoing Persons or Entities in clauses (a) through (i), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.94    ***Exide International*** means non-Debtor Exide International Holdings, LP.

1.95    ***Exide Technologies*** means Exide Technologies, LLC.

1.96    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

8

1.97    **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.98    **First Lien Notes** means the 11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.99    **First Lien Notes Charging Lien** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and First Lien Notes Indenture, against distributions to be made to the holders of the First Lien Notes under this Plan or otherwise, for payment of any First Lien Notes Indenture Trustee Fees.

1.100    **First Lien Notes Claim** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder.

1.101    **First Lien Notes Indenture Trustee Fees** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the First Lien Notes.

1.102    **Former Officers and Directors** means any Person that served in a capacity as an officer or director of any of the Debtors, other than those (a) Persons that were officers or directors of the Debtors immediately prior to the Americas Closing or (b) Persons that are officers or directors of the Debtors immediately prior to the Effective Date.

1.103    **Frisco Cause of Action** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to the Frisco Non-Performing Property.

1.104    **Frisco NPP Claim** means any civil Claim or Cause of Action by the Frisco Governmental Authorities against the Debtors under Environmental Laws with respect to or arising out of the Frisco Non-Performing Property.

9

1.105     **_Frisco Global Settlement Payment_** means the $100,000 Cash payment to be made to the Frisco Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.106     **_Frisco Governmental Authority_** means each of (a) the Texas Commission on Environmental Quality, and (b) the City of Frisco, Texas.

1.107     **_Frisco Non-Performing Property_** means the Non-Performing Property located at 7471 South Fifth Street, Frisco, Texas.

1.108     **_Frisco Settlement Agreement_** means that certain Settlement Agreement among the Debtors, the Transferred Entities, the Frisco Governmental Authorities, and Aspen relating to the Frisco Non-Performing Property, to be filed with the Plan Supplement.

1.109     **_Frisco Trust_** means the trust established pursuant to the Frisco Trust Agreement and the Frisco Settlement Agreement.

1.110     **_Frisco Trust Agreement_** means the trust agreement by and among the Debtors, the Frisco Governmental Authorities, and the Frisco Trustee, substantially in the form included in the Plan Supplement and consistent with Section 5 of the Plan.

1.111     **_Frisco Trust Assets_** shall, pursuant to the Global Settlement, consist of:  (a) the Frisco Global Settlement Payment, (b) the contributions by Aspen in accordance with the Frisco Trust Agreement, (c) the Frisco Non-Performing Property, and (d) the Frisco Causes of Action.

1.112     **_Frisco Trustee_** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Frisco Trust, and any successor thereto in accordance with the Frisco Trust Agreement.

1.113     **_General Unsecured Claim_** means any unsecured Claim against any Debtor, other than an Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.  The Legacy Notes Claims shall constitute General Unsecured Claims against Holdings. For the avoidance of doubt, Environmental NPP Claims and Frisco NPP Claims shall also constitute General Unsecured Claims provided that participation by the Settling Governmental Authorities in recoveries provided to General Unsecured Creditors under the Plan on account of Environmental NPP Claims, or the Frisco Governmental Authorities on account of Frisco NPP Claims, shall be subject to Section 4.7(b)(ii) of the Plan.

1.114     **_Global Settlement_** shall have the meaning ascribed to such term in Section 5.2(a) of the Plan.

1.115     **_Global Settlement Documents_** means the Plan, the Definitive Documents contained in the Plan Supplement comprising the Global Settlement, and the Environmental Settlement Documents, each of which shall be acceptable in form and substance to each of the Global Settlement Parties.  For the avoidance of doubt, the Global Settlement Parties acknowledge and agree that the Plan is acceptable, subject to any consent rights contained in Section 12.4 hereof.

1.116     **_Global Settlement Party_** means each of the Debtors, the Consenting Creditors, the Creditors' Committee, the Settling Governmental Authorities, and the Environmental Sureties.

1.117     **_Global Settlement Payments_** means, collectively, the Environmental Global Settlement Payment, the Frisco Global Settlement Payment, and the GUC Global Settlement Payment.

1.118   **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code; *provided*, that for the avoidance of doubt, the term "Governmental Unit" shall not include the PBGC.

1.119   **GUC Global Settlement Payment** means the $2,400,000 Cash payment to be made to the GUC Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.120   **GUC Trust** means the trust established under the Plan in accordance with the GUC Trust Agreement.

1.121   **GUC Trust Agreement** means that certain GUC Trust Agreement to be entered into by the Debtors, the GUC Trustee, the Transferred Entities, and the Creditors' Committee, to be filed with the Plan Supplement.

1.122   **GUC Trust Assets** shall, pursuant to the Global Settlement, consist of: (a) the GUC Global Settlement Payment, and (b) the GUC Trust Causes of Action.

1.123   **GUC Trust Causes of Action** means (a) all Avoidance Actions, (b) Causes of Action of the Debtors against Former Officers and Directors, and (c) Causes of Action of the Debtors arising under commercial tort law; *provided*, that GUC Trust Causes of Action shall exclude (a) all Avoidance Actions or Causes of Action against any Released Party, Exculpated Party, ABL Lender, or ABL Agent, (b) the Environmental Trust Causes of Action, (c) the Frisco Environmental Causes of Action, (d) any Causes of Action settled pursuant to the Global Settlement, and (e) any other Causes of Actions of the Debtors, including those arising under sections 542 or 549 of the Bankruptcy Code.

1.124   **GUC Trust Beneficial Interests** means the beneficial interests in the GUC Trust.

1.125   **GUC Trustee** means the Person or Entity selected by the Creditors' Committee to serve as the trustee of the GUC Trust, and any successor thereto in accordance with the GUC Trust Agreement.

1.126   **Holdings** means Exide Holdings, Inc.

1.127   **Holdings Equity Interests** means all Interests in Holdings, including Holdings Stock and any options, warrants or rights to acquire any such Interests.

1.128   **Holdings Stock** means all common stock and preferred stock in Holdings.

1.129   **Impaired** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.130   **Insured Claim** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.131   **Intercompany Claim** means a Claim against any Debtor by another Debtor or non-Debtor Affiliate of such other Debtor.

1.132   **Intercompany Interest** means an Interest in a Debtor held by another Debtor.  For the avoidance of doubt, Intercompany Interest shall exclude any Holdings Equity Interest.

1.133   **Intercreditor Agreement** means that certain Amended and Restated Intercreditor Agreement, by and between the ABL Agents and U.S. Bank, in its separate capacities as trustee and

11

collateral agent under each of the Superpriority Notes Indenture, the Exchange Priority and First Lien Notes Indenture, and the 2020 Legacy First Lien Notes Indenture, dated June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.134   ***Interest*** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.135   ***June 2019 Financing*** means the new money investment and debt exchange of existing debt by the Debtors' lender group completed in June 2019, as described in Article III of the Disclosure Statement

1.136   ***Legacy Notes Indentures*** means, collectively, the (a) Legacy Second Lien Notes Indenture, (b) the 2020 Legacy First Lien Notes Indenture, and (c) the 2022 Legacy First Lien Notes Indenture.

1.137   ***Legacy Second Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.138   ***Legacy Notes Claims*** means Claims arising under any of the Legacy Notes Indentures.

1.139   ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.140   ***Net Cash Proceeds*** means (a) all Cash of the Debtors realized from their business or Wind-Down operations or the Sale Transaction Proceeds *less* (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Restructuring Expenses, Trustees Fees, Priority Tax Claims, DIP Claims, ABL Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) estimated and reserved by the Debtors or the Plan Administrator with the reasonable consent of the Requisite Noteholders to adequately fund the Wind-Down; (iii) necessary to satisfy any Statutory Fees required to be paid in accordance with the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court; and (iv) necessary to satisfy the Debtors' obligations under the Europe/ROW Purchase Agreement and the Global Settlement (including the turnover to the Environmental Trust of any sale proceeds of the Non-Performing Properties received prior to the Effective Date or the Global Settlement Payments, to the extent received by the Debtors from the Transferred Entities pursuant to Section 5.2(g) hereof).

1.141   ***Non-Performing Properties*** means the properties set forth on Schedule 2 attached hereto.

1.142   ***Notes Deficiency Claims*** means the deficiency Claims on account of indebtedness under the Superpriority Notes Indenture or the Exchange Priority and First Lien Notes Indenture under section 506(a) of the Bankruptcy Code.

12

1.143 ***Optimization*** means the internal reorganization of the Debtors completed in December 2019, as described in Article III of the Disclosure Statement, that was the subject of the investigation by the sub-committee of the special committee of the Debtors' board of directors.

1.144 ***Other Secured Claim*** means a Secured Claim, other than (a) the ABL Claims, (b) the Superpriority Notes Guarantee Claims, (c) the Exchange Priority Notes Claims, (d) the First Lien Notes Claims, and (e) the DIP Claims.

1.145 ***PBGC*** means the Pension Benefit Guaranty Corporation.

1.146 ***PBGC Claims*** means all Claims of the PBGC, including any UBL Claim or any Claim for plan termination premiums under section 4006 of ERISA, against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14) based upon or relating to the Pension Plan or any agreements relating thereto.

1.147 ***Pension Plan*** means the following Pension Plan as to which Holdings was the plan sponsor, as such term is defined in ERISA Section 3(16)(B):  Exide Technologies Retirement Plan.

1.148 ***Permitted Liens*** means "Permitted Liens" as defined in the Europe/ROW Purchase Agreement.

1.149 ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other Entity.

1.150 ***Plan*** means this joint chapter 11 plan, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with <u>Section 12.4</u> herein.

1.151 ***Plan Administrator*** means the person or entity selected by the Debtors charged with overseeing the tasks outlined in <u>Section 5.5</u> of this Plan.  The identity of the Plan Administrator shall be filed with the Bankruptcy Court prior to the Confirmation Hearing.

1.152 ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Assumption Schedule, (b) GUC Trust Agreement, (c) Environmental Settlement Agreement, (d) Environmental Trust Agreements, (e) Frisco Settlement Agreement, and (f) Frisco Trust Agreement.  The Plan Supplement shall be filed at least seven (7) days prior to the deadline to objection to confirmation of the Plan; *provided*, that through the Effective Date, the Debtors shall have the right to amend any documents contained in, and exhibits to, any Plan Supplement subject to the requirements of <u>Section 12.4</u> of the Plan and except that the Debtors shall not have the right to amend any Environmental Settlement Document without the consent of the Settling Governmental Authorities.

1.153 ***Prerequisite Condition*** has the meaning set forth in <u>Section 9.1(k)</u> hereof.

1.154 ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

13

1.155   **Priority Tax Claim** means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.156   **Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.157   **Professional Fee Escrow Account** means "Professional Fee Escrow Account" as defined in the DIP Order.

1.158   **Proof of Claim** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.159   **Related Parties** means with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; *provided*, that the Former Officers and Directors of the Debtors shall not be "Related Parties."

1.160   **Released Parties** means collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties.

1.161   **Releasing Parties** has the meaning set forth in Section 10.6 hereof.

1.162   **Requisite Noteholders** means, collectively, as of date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of each of (a) the Exchange Priority Notes held by all Consenting Creditors at such time, (b) the First Lien Notes held by all Consenting Creditors at such time, and (c) the Superpriority Notes held by all Consenting Creditors at such time.  For the avoidance of doubt, the term "Requisite Noteholders" as used herein shall not hold the same meaning as the same or similar terms contained in the Exchange Priority and First Lien Notes Indenture or the Superpriority Notes Indenture.

1.163   **Restructuring Expenses** means the reasonable and documented fees, costs, and expenses of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) Young Conaway Stargatt & Taylor LLP, and (c) CMD Global Advisors, LLC.

1.164   **RSA** means that certain Restructuring Support Agreement, dated as of May 18, 2020, by and among the Debtors and the Consenting Creditors, as the same may be amended, supplemented, or modified from time to time in accordance with its terms.

14

1.165   ***Sale Transaction*** means any transaction or series of transactions pursuant to one or more of (a) the Americas Sale Transaction, (b) the Europe/ROW Sale Transaction, (c) the Wind-Down, or (d) any other sale of Assets (other than the sale of any Non-Performing Property) of any of the Debtors prior to the Effective Date.

1.166   ***Sale Transaction Proceeds*** means the net cash proceeds received by the Debtors, the Plan Administrator, or the Wind-Down Estates, as applicable, pursuant one or more of the Sale Transactions.

1.167   ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.168   ***Secured Claim*** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in this Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.169   ***Settling Governmental Authorities*** means the Persons and Entities listed on Schedule 1 attached hereto, and each of their respective successors.

1.170   ***Single Share*** has the meaning set forth in Section 4.10(b) hereof.

1.171   ***Statutory Fees*** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

1.172   ***Subordinated Securities Claim*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.173   ***Subsequent Condition*** has the meaning set forth in Section 9.1(k) hereof.

1.174   ***Successful Bid*** has the meaning set forth in the Bidding Procedures Order.

1.175   ***Superpriority Note Documents*** means "Note Documents" as defined in the Superpriority Notes Indenture.

1.176   ***Superpriority Notes*** means the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to the Superpriority Notes Indenture.

1.177   ***Superpriority Notes Charging Lien*** means any Lien or other priority in payment to which the Superpriority Notes Trustee is entitled, pursuant to the Superpriority Notes Indenture, against distributions to be made to the holders of the Superpriority Notes under this Plan or otherwise, for payment of any Superpriority Notes Indenture Trustee Fees.

1.178   ***Superpriority Notes Guarantee Claim*** means a Secured Claim arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors.

15

1.179    ***Superpriority Notes Indenture*** means that certain indenture, by and among Exide International, as issuer, the guarantor parties thereto, and the Superpriority Notes Trustee, dated as of June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.180    ***Superpriority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Superpriority Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Superpriority Notes Indenture with respect to the Superpriority Notes.

1.181    ***Superpriority Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Superpriority Notes Indenture.

1.182    ***Superpriority Security Documents*** means "Security Documents" as defined in the Superpriority Notes Indenture.

1.183    ***Tax Code*** means the Internal Revenue Code of 1986, as amended,

1.184    ***Transferred Assets*** has the meaning set forth in the Europe/ROW Purchase Agreement.

1.185    ***Transferred Entities*** means "Transferred Entities" as defined in the Europe/ROW Purchase Agreement and listed on Schedule 3 hereto, including their respective successors and assigns.

1.186    ***Transferred Equity Interests*** means "Transferred Equity Interests" as defined in the Europe/ROW Purchase Agreement.

1.187    ***Transferred Non-Performing Properties*** means the Non-Performing Properties, other than the Frisco Non-Performing Property, transferred to the Environmental Trust on the Effective Date.

1.188    ***Treasury Regulation*** means the final, temporary and proposed regulations promulgated under the Tax Code.

1.189    ***Trustees*** means, collectively, (a) the Superpriority Notes Trustee, and (b) the Exchange Priority and First Lien Notes Trustee.

1.190    ***Trustees Charging Liens*** means, collectively, (a) the Superpriority Notes Charging Lien (b) the Exchange Priority Notes Charging Lien, and (c) the First Lien Notes Charging Lien.

1.191    ***Trustees Fees*** means, collectively, (a) the Superpriority Notes Indenture Trustee Fees, (b) the Exchange Priority Notes Indenture Trustee Fees, and (c) the First Lien Notes Indenture Trustee Fees.

1.192    ***UBL Claim*** means any and all Claims of the PBGC for the "unfunded benefit liabilities" together with interest of the Pension Plan under ERISA Section 4062(b)(1)(A) against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14).

16

1.193   *Unexpired Lease* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.194   *Unimpaired* means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.195   *Voting Deadline* means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

1.196   *Westchester* means Westchester Fire Insurance Company, in its capacity as provider of surety insurance pursuant the Westchester Surety Bond Agreements.

1.197   *Westchester Surety Bond Agreements* means the applicable agreements governing the surety bond obligations of Westchester to the Debtors with respect to the Debtors' Non-Performing Properties.

1.198   *Wind-Down* means, following the Effective Date, the process to sell, abandon, wind down, dissolve, liquidate or distribute any remaining assets of the Debtors' Estates in accordance with the Plan.

1.199   *Wind-Down Budget* means an amount to be agreed between the Debtors and the Requisite Noteholders for the purpose of effectuating the Wind-Down.

1.200   *Wind-Down Estates* means the Debtors, or any successor thereto, by merger, consolidation or otherwise, pursuant to and under the Plan on or after the Effective Date; *provided*, that Wind-Down Estates shall not include the Environmental Trust, the Frisco Trust or the GUC Trust.

B.   **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.   **Controlling Document.**

In the event of an inconsistency between the Plan and any other document, the terms of the Plan shall control (unless stated otherwise in such other document.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that, if there is determined to be any inconsistency between any Plan provision and any

17

provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

D. **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Requisite Noteholders as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1 hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

SECTION 2. **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1. *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such other date or terms as may be mutually agreed upon between the holder of such an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator, as applicable.

2.2. *Fee Claims.*

**(a)** All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Plan Administrator, as applicable. The Plan Administrator and the GUC Trustee are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

**(b)** On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or the Plan Administrator, as applicable, shall separately escrow such estimated amounts in the Professional Fee Escrow Account (less any amounts already reserved for such professional in the Professional Fee Escrow Account) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim. When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and

18

ownership thereof shall vest in, the Wind-Down Estates and the Plan Administrator without any further action or order of the Bankruptcy Court.

(c)     For the avoidance of doubt, paragraph 23 of the DIP Order shall continue to apply to the Professional Fee Escrow Account and Fee Claims.

2.3.     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

2.4.     *DIP Claims*

Unless indefeasibly paid in full in Cash prior to the Effective Date, the DIP Claims shall be deemed Allowed in the full amount of the DIP Obligations, and each holder of a DIP Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such DIP Claim, Cash in an amount equal to such Claim on the Effective Date.  Upon the indefeasible payment in full in Cash of all DIP Claims, all Liens and security interests granted pursuant to the DIP Loan Documents shall be deemed cancelled and shall be of no further force and effect, and each DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

2.5.     *Restructuring Expenses*

During the period commencing on the Commencement Date through the Effective Date, the Debtors have, and will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA.  Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Plan Administrator shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

2.6.     *Trustees Fees*

On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan, including the closing of the Europe/ROW Sale Transaction), the Debtors or Plan Administrator shall pay in Cash all reasonable unpaid documented Trustees Fees without application or approval of the Bankruptcy Court and without a reduction to recoveries of the holders of the

19

Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable.  For the avoidance of doubt, nothing herein affects each Trustees' right to exercise its Trustees Charging Lien against distributions to the holders of the Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable.  Any Trustees Fees invoiced after the Effective Date shall be paid promptly by the Plan Administrator, but no later than ten (10) business days after receiving an invoice.

The Trustees shall provide the Debtors, the Consenting Creditors, and the Creditors' Committee with an estimate of the Trustees Fees no later than five (5) business days prior to the Effective Date.  If the Debtors dispute any requested Trustee Fees, the Debtors or Plan Administer shall (i) pay the undisputed portion of Trustees Fees, and (ii) notify the applicable Trustee of such dispute within two (2) days after presentment of the invoices by the Trustees.  Upon such notification, the applicable Trustee may assert its Trustees Charging Lien to pay the disputed portion of its Trustees Fees or submit such dispute for resolution by the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable indenture. Nothing herein shall be deemed to impair, waive, discharge or negatively impact any Trustees Charging Lien.

SECTION 3.   **CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.   ***Classification in General.***

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.   ***Grouping of Debtors for Convenience Only.***

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan.  Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  Except as provided in Section 5 of this Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

3.3.   ***Summary of Classification.***

The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are

20

set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in <u>Section 3.5</u>.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Superpriority Notes Guarantee Claims | Impaired | Yes |
| 5 | Exchange Priority Notes Claims | Impaired | Yes |
| 6 | First Lien Notes Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 8 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 9 | Intercompany Interests | Impaired | No (Deemed to reject) |
| 10 | Holdings Equity Interests | Impaired | No (Deemed to reject) |
| 11 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

### 3.4.  *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5.  *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 3.6.  *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

### 3.7.  *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with <u>Section 12</u> hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

21

SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS.**

4.1.    ***Priority Non-Tax Claims (Class 1).***

(a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

(b)    *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*:

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

(c)    *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.    ***ABL Claims (Class 3)***

(a)    *Classification*:  Class 3 consists of the ABL Claims.

(b)     *Allowance*:  The ABL Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $101,939,274.01 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the ABL Credit Agreement.

(c)     *Treatment*:

(i)     In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive Cash until all holders of Allowed ABL Claims are satisfied in full, taking into account any amounts paid to the holders of Allowed ABL Claims pursuant to the Americas Sale Order.

(ii)     The Challenge Deadline relating to the ABL Credit Agreement and ABL Agent shall be deemed irrevocably expired (A) with respect to the Creditors' Committee as of the date of the entry of the Americas Sale Order, (B) with respect to the Settling Governmental Authorities, on the Effective Date, and (C) with respect to all other Persons and Entities, on August 27, 2020.  For the avoidance of doubt, any reservation of rights relating to the ABL Credit Agreement and the ABL Agent, including paragraphs 37 to 41 of the Americas Sale Order, shall be deemed expired on the foregoing dates with respect to the foregoing parties, as applicable.

(d)     *Voting*:  Class 3 is Unimpaired, and the holders of ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of ABL Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such ABL Claims.

4.4.     ***Superpriority Notes Guarantee Claims (Class 4).***

(a)     *Classification*: Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors.

(b)     *Allowance*:  The Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture) and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)     *Treatment*:  The obligations under the Superpriority Notes Indenture shall be assumed by and assigned to the Europe/ROW Purchaser at the Europe/ROW Closing in accordance with the Europe/ROW Purchase Agreement and the Superpriority Notes Guarantee Claims and all Liens securing such Claims shall remain against and be ratified by the Europe/ROW Purchaser.  Immediately upon such assumption and transfer of the Acquired Assets under the Europe/ROW Purchase Agreement, and without any further action, the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released and discharged.

(d)     *Voting*:  Class 4 is Impaired, and the holders of the Superpriority Notes Guarantee Claims are entitled to vote to accept or reject the Plan.

23

4.5.    ***Exchange Priority Notes Claims (Class 5).***

(a)    *Classification*: Class 5 consists of Exchange Priority Notes Claims against the Debtors.

(b)    *Allowance*:  The Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $390,000,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for Allowed Exchange Priority Notes Claims, each holder thereof shall receive (i) at the Europe/ROW Closing, its Pro Rata share of the consideration contemplated by <u>Section 5.1(a)</u> of the Plan in exchange for an aggregate amount of $70,000,000 of Exchange Priority Notes Claims, and (ii) for all remaining Allowed Exchange Priority Notes Claims, Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)    *Voting*:  Class 5 is Impaired, and the holders of the Exchange Priority Notes Claims are entitled to vote to accept or reject the Plan.

4.6.    ***First Lien Notes Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of First Lien Notes Claims against the Debtors.

(b)    *Allowance*:  The First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $161,023,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)    *Treatment*:  Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed First Lien Notes Claim, each holder thereof shall receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)    *Voting*:  Class 6 is Impaired, and the holders of the First Lien Notes Claims are entitled to vote to accept or reject the Plan.

24

4.7.     *General Unsecured Claims (Class 7).*

(a)     *Classification*:  Class 7 consists of General Unsecured Claims against the Debtors.

(b)     *Treatment*:

(i)     Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each holder thereof shall receive its Pro Rata share of (A) the GUC Trust Beneficial Interests (entitling such holder to a Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement), and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, until all Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(ii)     The Settling Governmental Authorities, Environmental Trust, Frisco Governmental Authorities, and Frisco Trust shall not participate in distributions on account of their Environmental NPP Claims and Frisco NPP Claims, as applicable, from the GUC Trust up to the amount of the GUC Global Settlement Payment.  After the GUC Trust has distributed Cash in an aggregate amount equal to the GUC Global Settlement Payment, each Settling Governmental Authority and Frisco Governmental Authority shall be entitled to its Pro Rata share of Distributions in accordance with Section 4.7(b)(i) on account of any Allowed Environmental NPP Claims and Allowed Frisco NPP Claims, as applicable.

(iii)     All Notes Deficiency Claims shall not receive distributions in accordance with Section 4.7(b) and such Claims are waived for all purposes, including for voting and for distributions pursuant to and in accordance with this Section 4.7(b).

(c)     *Voting*:  Class 7 is Impaired, and the holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.8.     *Intercompany Claims (Class 8).*

(a)     *Classification*:  Class 8 consists of Intercompany Claims against the Debtors.

(b)     *Treatment*:  On or after the Effective Date, all Intercompany Claims will be cancelled and not entitled to distribution or any recovery under the Plan.

(c)     *Voting*:  Class 8 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

4.9.     *Intercompany Interests (Class 9).*

(a)     *Classification*:  Class 9 consists of Intercompany Interests in the Debtors.

25

(b)    *Treatment*:  All Intercompany Interests in a subsidiary Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 5.6(f) of the Plan.  Each holder of an Intercompany Interest in a subsidiary Debtor shall neither receive nor retain any property of the estate or direct interest in property of the estate of such Debtor on account of such Intercompany Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in such Debtor may receive its Pro Rata Share of any remaining assets in the Debtor.

(c)    *Voting*:  Class 9 is Impaired, and the holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.10.    ***Holdings Equity Interests (Class 10).***

(a)    *Classification*: Class 10 consists of Holdings Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of Holdings Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Holdings Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all Holdings Equity Interests shall be cancelled and one share of Holdings common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Holdings Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of a Holdings Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Holdings Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Holdings Stock may receive its share of any remaining assets of Holdings consistent with such holder's rights of payment existing immediately prior to the Commencement Date unless otherwise determined by the Plan Administrator, on the date that Holdings' Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and (iii) the continuing rights of former holders of Holdings Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)    *Voting*:  Class 10 is Impaired, and the holders of Holdings Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Holdings Equity Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Holdings Equity Interests.

4.11.    ***Subordinated Securities Claims (Class 11).***

(a)    *Classification*:  Class 11 consists of Subordinated Securities Claims against the Debtors.

(b)    *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of

26

the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

      (c)    *Voting*:  Class 11 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Subordinated Securities Claims.

## SECTION 5.    **MEANS FOR IMPLEMENTATION.**

    5.1.    ***Europe/ROW Sale Transaction.***

      (a)    *Europe/ROW Sale Transaction*.  On the Effective Date, in accordance with the Europe/ROW Purchase Agreement, the following will occur, subject to the satisfaction or waiver of all applicable closing conditions under the Europe/ROW Purchase Agreement:

      (i)    pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, all Acquired Assets shall be transferred to, and the Acquired Assets owned by the Debtors shall vest free and clear of all Liens (other than Permitted Liens), Claims, charges, interests, or other encumbrances, in the Europe/ROW Purchaser or such other entity as set forth in the Europe/ROW Purchase Agreement, and all Assumed Liabilities shall be assumed by the Europe/ROW Purchaser or such other entity designated by the Europe/ROW Purchaser in accordance with the terms of the Europe/ROW Purchase Agreement.  In the event that the Europe/ROW Purchaser determines to pursue the Alternative Transaction Structure pursuant to its rights under Section 2.08 of the Europe/ROW Purchase Agreement, all other transactions as are necessary to consummate the Europe/ROW Sale Transaction in accordance with the Alternative Transaction Structure; and

      (ii)    the releases provided for in Section 12.22 of the Europe/ROW Purchase Agreement shall become effective and binding on the parties thereto.

      (b)    *Sources of Consideration for Plan Distribution.*

    The Debtors and the Plan Administrator, as applicable, shall fund Distributions under this Plan with the aggregate consideration comprised of (i) the Sale Transaction Proceeds, (ii) Cash on hand, and (iii) the Global Settlement Payments.

    5.2.    ***Compromise and Settlement of Claims, Interests, and Controversies***

      (a)    The provisions of the Plan, including treatment provided for hereunder for General Unsecured Claims, including Environmental NPP Claims and Frisco NPP Claims, and the Claims of the Environmental Sureties, and the Global Settlement Documents incorporate and reflect a proposed compromise and settlement by and among the Global Settlement Parties (the "**Global Settlement**"). Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, the Global Settlement, and any documents related to the Europe/ROW Sale Transaction, shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a General Unsecured Claim, an Environmental NPP Claim, a Frisco NPP Claim, or a Claim that the Environmental Sureties may have with respect to any such Claim or any Distribution to be made on account of any such Claim and are also in consideration of the significant value provided to the Estates by the Consenting Creditors, the Europe/ROW Purchaser and the Transferred Entities.  The entry

27

of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)　　The terms of the Global Settlement shall become effective and binding upon all parties, including the Global Settlement Parties and the Transferred Entities, automatically upon the Effective Date without the need for any further action or Bankruptcy Court approval.

(c)　　*GUC Trust.*  The GUC Trust shall be established in accordance with the GUC Trust Agreement and the GUC Trust Assets shall be deemed to have been contributed to the GUC Trust free and clear of all Liens, charges, encumbrances, and Interests for the benefit of the holders of Allowed General Unsecured Claims.  Solely for purposes of distributions from the GUC Trust: (i) all GUC Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all unsecured guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors and the GUC Trust; and (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors and the GUC Trust.  Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Wind-Down Estates or modify or affect the requirements of section 553 of the Bankruptcy Code for purposes of effectuating a setoff against the Debtors, the Wind-Down Estates or the GUC Trust.  Moreover, such substantive consolidation shall  not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(d)　　*Environmental Trust.*

(i)　　The Environmental Trust shall be established in accordance with the Environmental Settlement Documents and the Environmental Trust Assets shall be transferred to the Environmental Trust free and clear of all Liens, charges, encumbrances, and Interests.  The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein.  For the avoidance of doubt, the Settling Governmental Authorities shall not assert any Environmental NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, and any Environmental NPP Claim asserted as a General Unsecured Claim shall be treated in accordance with Section 4.7(b)(ii) of the Plan; *provided*, that the foregoing shall not affect any defensive rights of set-off or recoupment of any of the Settling Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.

(ii)　　Prior to the Effective Date, the Debtors shall not sell or transfer any of the Non-Performing Properties without the prior written consent of the relevant Settling Governmental Authorities; *provided*, that in the event the Debtors sell or otherwise transfer a Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of such Non-Performing Property, all proceeds of such sale shall be contributed to the Environmental Trust  on the Effective Date in lieu of such Non-Performing Property.  For the avoidance of doubt, the sale of a Non-Performing Property pursuant to this Section 5.2(d)(ii) shall not affect the

28

respective rights of the Settling Governmental Authorities or the Environmental Sureties relating to such Non-Performing Property.

(iii) Westchester shall make all required contributions to the Environmental Trust in accordance with the Environmental Settlement Documents.

(e) *Frisco Trust*.

(i) The Frisco Trust shall be established in accordance with the Frisco Trust Agreement and the Frisco Settlement Agreement, and the Frisco Trust Assets shall be transferred to the Frisco Trust free and clear of all Liens. The Frisco Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, the Frisco Governmental Authorities shall not assert any Frisco NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, and any Frisco NPP Claim asserted as a General Unsecured Claim shall be treated in accordance with Section 4.7(b)(ii) of the Plan; *provided*, that the foregoing shall not affect any defensive rights set-off or recoupment of any of the Frisco Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.

(ii) Prior to the Effective Date, the Debtors shall not sell or transfer the Frisco Non-Performing Property without the prior written consent of the relevant Frisco Governmental Authorities; *provided*, that in the event the Debtors sell or otherwise transfer the Frisco Non-Performing Property with the consent of the Frisco Governmental Authorities, all proceeds of such sale shall be contributed to the Frisco Trust on the Effective Date in lieu of the Frisco Non-Performing Property. For the avoidance of doubt, the sale of the Frisco Non-Performing Property pursuant to this Section 5.2(e)(ii) shall not affect the respective rights of the Frisco Governmental Authorities or the Environmental Sureties relating to the Frisco Non-Performing Property.

(iii) Aspen shall make all required contributions to the Frisco Trust in accordance with the Frisco Settlement Agreement and the Frisco Trust Agreement.

(f) *Consenting Creditors*.

(i) Certain Consenting Creditors shall purchase the European Bridge Notes issued pursuant to the terms of the European Bridge Notes Indenture in an aggregate amount equal to at least $12,500,000.

(ii) On the Effective Date, the Exchange Priority and First Lien Notes Trustee, at the direction of the Requisite Noteholders, shall be deemed to have waived (A) all Liens on or against the Non-Performing Properties, including with respect to any proceeds of the sale of any Non-Performing Properties and (B) any Claims, Interests or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims.

(iii) The Trustees and Consenting Creditors shall take all actions required or necessary under the Superpriority Notes Indentures and the Exchange Priority and First Lien Notes Indenture to effectuate the Europe/ROW Sale Transaction in accordance with the terms of the Plan and the Europe/ROW Purchase Agreement.

(g) *Transferred Entities*. On the Effective Date, the Transferred Entities shall pay (i) the GUC Global Settlement Payment to the GUC Trust, (ii) the Environmental Global Settlement

29

Payment to the Environmental Trust, and (iii) the Frisco Global Settlement Payment to the Frisco Trust; *provided*, that for each of the contributions contemplated in the foregoing clauses (i) through (iii), the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors in partial satisfaction of outstanding intercompany payables owed by the Transferred Entities to the Debtors and, following such Cash payment, on the Effective Date, the Debtors shall make the contributions to the GUC Trust, the Environmental Trust, or the Frisco Trust, as applicable.

(h)     *Environmental Sureties.*

(i)     On the Effective Date, the Environmental Sureties shall be deemed to waive all Claims (including Administrative Expense Claims, Priority Non-Tax Claims, or General Unsecured Claims) Interests or Causes of Action against the Debtors, the Wind-Down Estates, the Plan Administrator, the GUC Trust or the GUC Trust Assets other than any Other Secured Claims that Westchester may hold on account of cash collateral in the amount of $5,000,000 posted by the Debtors with respect to the Westchester Surety Bond Agreements.

(ii)     Upon the sale of any Non-Performing Property that is covered by the Westchester Surety Bond Agreement, Westchester's rights under the Westchester Surety Bond Agreements shall be governed by the Environmental Settlement Documents.

(iii)     Upon the sale of the Frisco Non-Performing Property, Aspen's rights under the Aspen Surety Bond Agreements against the Settling Governmental Authority, including any state's right to recoupment, shall remain unaffected.

(i)     *Other Provisions.*

(i)     As a condition precedent to consummation of the Global Settlement, (A) the Global Settlement Parties (other than the Settling Governmental Authorities) shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, the confirmation or consummation of the Plan or approval of the Global Settlement, and (B) the Settling Governmental Authorities shall not oppose any term or provision of the Plan, Disclosure Statement, or Global Settlement, in each case, subject to the rights of the Global Settlement Parties, including the Settling Governmental Authorities, with respect to amendments to the Plan as set forth in Section 12.4 of the Plan.

(ii)     The Settling Governmental Authorities, the Environmental Trust, the Frisco Governmental Authorities, and the Frisco Trust waive all Environmental NPP Claims and Frisco NPP Claims, as applicable, against the GUC Trust up to the amount of the GUC Global Settlement Payment, in the aggregate, in accordance with Section 4.7(b)(ii) of the Plan.

(iii)     The Global Settlement Parties agree to exchange releases or covenants not to sue as set forth in Section 10 of the Plan or as provided in the Environmental Settlement Agreement.

(iv)     The Debtors shall not designate any additional properties as Non-Performing Properties, without the prior written consent of the Settling Governmental Authorities.

(v)     The terms of the Global Settlement (A) shall not affect any rights the Settling Governmental Authorities or the Frisco Governmental Authorities may have against any purchaser of any of the Debtors' Assets that is not a Global Settlement Party, and (B) are without prejudice

30

to any (x) Claims other than Environmental NPP Claims held by the Settling Governmental Authorities or Frisco NPP Claims held by the Frisco Governmental Authorities, as applicable, and (y) any Claim, Interest, or Cause of Action of any Governmental Unit that is not a Settling Governmental Authority or Frisco Governmental Authority.

(vi)     All pending or potential discovery and litigation by any Global Settlement Party against any other Global Settlement Party related to the Chapter 11 Cases or any of the transactions related thereto shall be subject to a standstill and shall be deemed withdrawn upon the Effective Date.

(vii)    The GUC Trust Agreement, the Environmental Trust Agreements, the Frisco Trust Agreement, and any other documentation required to effectuate the Global Settlement shall be solely for the benefit of the Global Settlement Parties and, for the avoidance of doubt, no third-parties shall be beneficiaries of the Global Settlement or any such documents.

(viii)   The Superpriority Notes Indenture and the Exchange Priority and First Lien Notes Indenture shall be deemed amended and modified to the extent necessary to allow, permit and effectuate the transactions contemplated by the Plan and the Europe/ROW Sale Transaction.

5.3.     *The GUC Trust.*

(a)     *Execution of GUC Trust Agreement.* On the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the Requisite Noteholders, and the GUC Trustee, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims.  This Section 5.3 sets forth certain of the rights, duties, and obligations of the GUC Trustee.  In the event of any conflict between the terms of this Section 5.3 and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.

(b)     *Purpose of GUC Trust*.  The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan with respect to the GUC Trust Assets and General Unsecured Claims, including, but not limited to, resolving outstanding Disputed General Unsecured Claims and making distributions to holders of Allowed General Unsecured Claims in accordance with the Plan.

(c)     *GUC Trust Assets*.  The GUC Trust shall consist of the GUC Trust Assets.

(d)     *GUC Trustee*.  The GUC Trustee shall be responsible to manage the day-to-day operations of the GUC Trust.

(e)     *Role of GUC Trustee*.  In furtherance of, and consistent with, the purposes of the GUC Trust and the Plan, the GUC Trustee shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims, and (v) have the power and authority to perform such other functions as are provided for in the Plan and the GUC Trust Agreement.  In all circumstances, the GUC Trustee shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor.  The investment powers of the GUC Trustee are limited to powers to invest in demand and time

31

deposits in banks or savings institutions, or temporary investment such as short-term certificates of deposit or U.S. Treasury bills.

> (f) *Preservation of Privilege*. The Debtors and the GUC Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Trust Assets. The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, retain the right to waive their own privileges.

> (g) *Transferability of GUC Trust Beneficial Interests*. GUC Trust Beneficial Interests shall not be certificated and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law, or as and to the extent determined by the GUC Trustee.

> (h) *Costs and Expenses of GUC Trustee*. The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trustee and its retained professionals, shall be paid exclusively from the GUC Trust Assets.

> (i) *Retention of Professionals by GUC Trustee*. The GUC Trustee may retain and reasonably compensate counsel and other professionals, which may include, but is not limited to, Creditors' Committee professionals, to assist in their duties as GUC Trustee on such terms as the GUC Trustee deems appropriate without Bankruptcy Court approval.

> (j) *U.S. Federal Income Tax Treatment of GUC Trust*. In furtherance of this Section 5.3 of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the holders of General Unsecured Claims shall be treated as the beneficiaries and grantors of the GUC Trust; (iii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the GUC Trust Assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims, followed by the deemed transfer of such GUC Trust Assets to the GUC Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (vi) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the GUC Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims based on their respective interests in the GUC Trust, including the holders of General Unsecured Claims holding Disputed Claims, in such manner as the GUC Trustee deems reasonable and appropriate; and (viii) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC

Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made for all or any portion of the GUC Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders of General Unsecured Claims, and the GUC Trustee), and solely with respect to the impacts assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

**(k)**      *Expedited Determination*.  The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

**(l)**      *Dissolution*.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, and (iii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims.

### 5.4.      *The Environmental Trust.*

**(a)**      *Execution of Environmental Trust Agreements*.  On or before the Effective Date, the Environmental Trust Agreements, substantially in the form attached to the Environmental Settlement Documents, shall be executed, and all other necessary steps shall be taken to establish the Environmental Trust and the beneficial interests therein, which shall be for the benefit of the Settling Governmental Authorities and Westchester, as provided in the Environmental Settlement Documents.

**(b)**      *Environmental Trust Assets*.  The Environmental Trust shall consist of the Environmental Trust Assets.  On or before the Effective Date, the Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Environmental Trust as specified and in the amounts provided in the Environmental Settlement Documents.

**(c)**      *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against a Non-Performing Property shall be irrevocably cancelled on the Effective Date.  Any person holding a Lien against a Non-Performing Property shall take any action reasonably requested by the Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Environmental Trustee.

### 5.5.      *Canada Non-Performing Property.*

**(a)**      On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Remediation Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; *provided*, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount of remediation costs and/or abandonment of the Canada Non-Performing Property.  The Debtors are authorized to transfer title to or proceeds from the Canada Non-Performing Property to the Canada MOE or its designee.  For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Remediation Funds deposited for use by the Canada MOE.

33

**(b)**      Upon completion of the environmental remediation, any excess Canada NPP Remediation Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

**(c)**      In the event the Canada NPP Remediation Funds are not sufficient to cover the cost of the environmental remediation of the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

5.6.      ***Plan Administrator.***

**(a)**      *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan.

**(b)**      *Authority*.  Subject to Section 6.2 of this Plan, and the Plan Administrator Agreement, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)      subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims (for the avoidance of doubt, the GUC Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims, including Environmental NPP Claims and Frisco NPP Claims asserted against the GUC Trust);

(ii)      make Distributions to holders of Allowed Claims in accordance with this Plan, other than with respect to Allowed General Unsecured Claims;

(iii)      exercise its reasonable business judgment to direct and control the Wind-Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)      prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)      other than GUC Trust Causes of Action, the Environmental Trust Causes of Action, or Frisco Causes of Action, or any Causes of Action released by the Debtors pursuant to the Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates, other than with respect to the GUC Trust Assets;

(vi)      retain professionals to assist in performing its duties under the Plan;

(vii)      maintain the books and records and accounts of the Debtors;

34

(viii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(ix)    following the Effective Date, pay all Restructuring Expenses in Cash in accordance with Section 2.5 of this Plan;

(x)    following the Effective Date, pay all Trustees Fees in Cash in accordance with Section 2.6 of the Plan.

(xi)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiii)    pay statutory fees in accordance with Section 12.1 of the Plan;

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan; and

(xv)    close the Chapter 11 Cases, subject to the reasonable consent of the GUC Trustee.

(c)    *Boards of Directors and Officers*.  The officers and directors of the Debtors existing prior to the Effective Date shall be relieved of any all duties with the respect to the Debtors as of the Effective Date.  The Plan Administrator shall serve as the initial director or manager, as applicable, and sole officer of each Wind-Down Estate after the Effective Date.  The Plan Administrator shall elect such additional directors, managers and officers as the Plan Administrator deems necessary to implement this Plan and the actions contemplated herein.  The Plan Administrator shall also have the power to act by written consent to remove any director, manager or officer of any Wind-Down Estate.

(d)    *Wind-Down*.  After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind-Down according to the Wind-Down Budget without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Wind-Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(e)    *Indemnification*.  Each of the Wind-Down Estates shall indemnify and hold harmless the Plan Administrator solely in its capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's bad faith, gross negligence, willful misconduct or criminal conduct.

(f)    *Dissolution*.  After the Effective Date, the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of this Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all

35

Interests in a Wind-Down Estate) and complete the winding up of such Wind-Down Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Wind-Down Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Wind-Down Estate.  The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Wind-Down Estate as a corporate entity in good standing until such time as such Wind-Down Estate is dissolved or merged out of existence in accordance with the Plan.

### 5.7. *Corporate Action.*

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

### 5.8. *Withholding and Reporting Requirements.*

(a) *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b) *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, Wind-Down Estates, GUC Trustee or such other Person designated by the Plan Administrator, Wind-Down Estates or GUC Trustee (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Plan Administrator.  If such request is made by the Plan Administrator, Wind-Down Estates, or such other Person designated by the Plan Administrator or Wind-Down Estates and the holder fails to comply within 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Wind-Down Estate and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the applicable Wind-Down Estate and their respective property.  If such request is made by the GUC Trustee or such other Entity designated by the GUC Trustee and the holder fails to comply within 180 days after the request is made, the amount

of such distribution shall irrevocably revert to the GUC Trust and any Claim in respect of such distribution shall be forever barred from assertion against the GUC Trustee or the GUC Trust, or the property of each of them.

### 5.9. *Exemption From Certain Transfer Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Trust, or the Frisco Trust), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.10. *Effectuating Documents; Further Transactions.*

**(a)** On or as soon as practicable after the Effective Date, the Plan Administrator shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate.

**(b)** Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of, the Wind-Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)     The Debtors shall be authorized to implement the Sale Transactions and the Global Settlement (including the creation of the GUC Trust, the Environmental Trust and the Frisco Trust) in the manner most tax efficient to the Wind-Down Estates and the Environmental Trust, and consistent with the Environmental Settlement Documents.

(d)     All matters provided for herein involving the corporate structure of the Debtors or the Wind-Down Estates, to the extent applicable, or any corporate or related action required by the Debtors or the Wind-Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind-Down Estates.

5.11.     *Preservation of Rights of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred or settled pursuant to this Plan (including pursuant to the Global Settlement, Environmental Settlement Documents, and the Frisco Settlement Agreement), the Confirmation Order, or by another Bankruptcy Court order (including the Americas Sale Order) or transferred to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement or the Americas Sale Transaction, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Plan Administrator, or the GUC Trustee, will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to this Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator or the GUC Trustee, as applicable, may determine is in the best interest of the Debtors and their Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself.

5.12.     *Certificate of Incorporation and By-Laws.*

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of this Plan.  Such amended organizational documents (if any) shall be filed with the Bankruptcy Court in advance of the Effective Date.

5.13.     *Stock Trading Restrictions*

The restrictions imposed by the *Interim Order Establishing Notification Procedures And Approving Restrictions On Certain Transfers Of Interests In The Debtors* (Docket No. 113), as the same

38

may be amended from time to time, shall remain effective and binding through the closing of the Chapter 11 Cases.

### 5.14.   *Assignment and Assumption of Superpriority Notes.*

On the Europe/ROW Closing Date, Exide International's outstanding obligations on account of the Claims arising under the Superpriority Notes Indenture shall be assigned to and assumed by the Europe/ROW Purchaser. To consummate the Europe/ROW Purchaser's assumption of Exide International's obligations thereunder, the Superpriority Notes Indenture shall be assigned, assumed and ratified (and modified to the extent necessary) in accordance with a supplemental indenture executed by the Europe/ROW Purchaser, as provided in the Superpriority Notes Indenture. Pursuant to the supplemental indenture and other amendments and supplements to the Superpriority Notes Documents, the Europe/ROW Purchaser shall assume all obligations of Exide International for (i) the due and punctual payment of the principal, premium (if any) and interest on account of the Superpriority Notes and (ii) the performance of each covenant arising under the Superpriority Notes, the Superpriority Notes Indenture and the Security Documents (as defined in the Superpriority Notes Indenture). The outstanding Claims under the Superpriority Notes Indenture will continue to be secured by the liens and security interests against the Europe/ROW Assets created and granted under the Superpriority Notes Indenture. Immediately upon such assumption, and without any further action, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released and discharged, (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Security Documents shall be deemed fully satisfied, released and discharged, (iii) the holders of Superpriority Notes shall waive any existing defaults under the Superpriority Notes Indenture, and (iv) the liens, security interests and claims against the non-debtor entities shall remain in existence and be valid, enforceable and remain in full force and effect after such assumption; *provided*, *however*, that Exide International shall be released from any continuing obligations arising under the Superpriority Notes Indenture and the Superpriority Security Documents.

### 5.15.   *Cancellation of Existing Securities and Agreements*

**(a)**      Except for the purpose of evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, including but not limited to the Exchange Priority and First Lien Notes Indenture and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged. For the avoidance of doubt, but subject to Section 5.15(b) below, on the Effective Date, the Exchange Priority and First Lien Notes Indenture shall be deemed terminated and cancelled and the Exchange Priority and First Lien Notes Trustee shall be discharged and released without any further action.

**(b)**      The Exchange Priority and First Lien Notes Indenture shall continue in effect to the extent necessary to (i) allow the Plan Administrator or Exchange Priority and First Lien Notes Trustee, as applicable, to make distributions under the Plan, (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction (iii) permit the Exchange Priority and First Lien Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien; (iv) allow the Exchange Priority and First Lien Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture; (v) to exercise its rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture; (vi) permit the Exchange Priority and First Lien Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in this Section 5.15. For the avoidance of

39

doubt, all indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.

### 5.16.   *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator or the GUC Trustee, as applicable, to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 5.17.   *Nonconsensual Confirmation.*

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject, or are deemed to reject, the Plan.

### 5.18.   *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the applicable Wind-Down Estate or Plan Administrator shall, subject to the reasonable consent of the GUC Trustee, seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 5.19.   *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 5.20.   *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of this Plan and applicable law.

### 5.21.   *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

40

SECTION 6.    **DISTRIBUTIONS**.

>    6.1.    *Distributions Generally.*

Except as otherwise provided in the Plan and the GUC Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

>    6.2.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests. The Debtors, the Plan Administrator or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. The Distribution Record Date shall not apply to the DIP Claims and the ABL Claims, the holders of which shall receive a distribution in accordance with Section 2 or Section 4 of the Plan, respectively, to the extent not previously satisfied.

>    6.3.    *Date of Distributions.*

>    **(a)**    Except as otherwise provided in the Plan and in the GUC Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on or about the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Section 4 of the Plan; *provided*, that the Plan Administrator or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

>    **(b)**    (i) The Plan Administrator, shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Priority Non-Tax Claims, and Disputed Priority Tax Claims, and (ii) the GUC Trustee shall reserve an amount sufficient to pay holders of Disputed General Unsecured Claims, in each case, the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of a Disputed Administrative Expense Claim, Disputed Secured Claim, Disputed Priority Non-Tax Claim, and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved on account of such Disputed Claim that is Disallowed or does not become an Allowed Claim as Net Cash Proceeds.

>    6.4.    *Disbursing Agent.*

Other than as contemplated in Section 6.2 of the Plan, all distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', or Wind Down Estates', as applicable, books and records. The Plan Administrator shall cooperate

in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 5.7 of the Plan.

     6.5.    ***Rights and Powers of Disbursing Agent.***

       **(a)**    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.  No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

       **(b)**    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

     6.6.    ***Expenses of Disbursing Agent.***

       Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; *provided*, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Trust Assets in accordance with the GUC Trust Agreement.

     6.7.    ***No Postpetition Interest on Claims.***

       Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

     6.8.    ***Delivery of Distributions.***

       **(a)**    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as

applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with <u>Section 5.7</u> of the Plan.

(b)      Notwithstanding the foregoing, the following shall apply to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and DIP Claims, respectively:

(i)      all distributions of Cash on account of Exchange Priority Notes Claims and First Lien Notes Claims, if any, shall be deposited with the Exchange Priority and First Lien Notes Trustee for distribution to holders of Exchange Priority Notes Claims and First Lien Notes Claims in accordance with the terms of the Exchange Priority and First Lien Notes Indenture.  All distributions other than of Cash on account of Exchange Priority Notes Claims or First Lien Notes Claims, if any, may, with the consent of the Exchange Priority and First Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Exchange Priority Notes Claims and First Lien Notes Claims in accordance with the terms of the Plan and the Exchange Priority and First Lien Notes Indenture; *provided*, that until such distributions are made, the Trustees Charging Lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Exchange Priority and First Lien Notes Trustee.  To the extent the Exchange Priority and First Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Exchange Priority and First Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.  As to any holder of an Exchange Priority Notes Claim or First Lien Notes Claim that is held in the name of or by a nominee of DTC, the Disbursing Agent shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable after the Effective Date.

(ii)      All distributions on account of DIP Claims, if any, shall be deposited with the DIP Agent for distribution to holders of DIP Claims in accordance with terms of the DIP Loan Documents.  To the extent the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the DIP Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

6.9.    ***Distributions after Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

6.10.    ***Unclaimed Property.***

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors, Wind-Down Estates or the GUC Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors, Wind-Down Estates or GUC Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Wind-Down Estates or GUC Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

43

6.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Estates (or GUC Trust in the case of checks issued by the GUC Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Plan Administrator or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of, and exchange for, such Allowed Claims.

6.14.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.15.    *Setoffs and Recoupments.*

The Debtors, Wind-Down Estates, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Wind-Down Estates, or GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

6.16.    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Wind-Down Estates or the GUC Trust, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

RLF1 23874638V.1

6.17.    *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

SECTION 7.    **PROCEDURES FOR DISPUTED CLAIMS.**

7.1.    *Objections to Claims.*

The Plan Administrator, on behalf of each of the Wind-Down Estates, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive authority to object to all General Unsecured Claims.  After the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.

7.2.    *Resolution of Disputed Claims.*

On and after the Effective Date, (a) the Plan Administrator, on behalf of each of the Wind-Down Estates, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court.  The Debtors, Wind-Down Estates, Plan Administrator and GUC Trustee, as applicable, shall cooperate with respect to any objections to Claims that seek to convert a type of Claim to another type of Claim as to which a different party or parties may compromise, settle, otherwise resolve, or withdraw objections, and, in each case, the rights and defenses of the Debtors, Wind-Down Estates, Plan Administrator or the GUC Trustee, as applicable, to any such objections are fully preserved.

7.3.    *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.    *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan or the GUC Trust Agreement, as applicable, without interest, as provided in Section 7.8 of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.5.    *Estimation of Claims.*

The (a) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), as applicable, may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims;

45

and (b) GUC Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed General Unsecured Claims. The (I) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), with respect to the Claims set forth in clause (a) of this Section 7.5; and (II) GUC Trustee, with respect to General Unsecured Claims, in each case, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Plan Administrator or GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### 7.6.    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.7.    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 7.8.    *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 7.9.    *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies; *provided*, that this requirement shall not apply to Settling Governmental Authorities. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

46

SECTION 8.     **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

      8.1.     ***Rejection of Executory Contracts and Unexpired Leases.***

        **(a)**     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Section 8.4 of the Plan; or (v) is identified for assumption on the Assumption Schedule included in the Plan Supplement. The Debtors shall confer with the Settling Governmental Authorities, the Environmental Trustee or the Frisco Trustee, as applicable, and exchange information and reasonably cooperate to determine the appropriate disposition of any contracts or unexpired leases that relate to the Non-Performing Properties and take appropriate action relating thereto.

        **(b)**     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Europe/ROW Purchaser or Wind-Down Estates, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Europe/ROW Purchaser or Wind-Down Estates, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

      8.2.     ***Determination of Assumption Disputes and Deemed Consent.***

        **(a)**     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Europe/ROW Purchase Agreement, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

        **(b)**     The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Wind-Down Estate, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon

47

any property or Asset of any Debtor, or Wind-Down Estates, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)      If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided*, that the Debtors or Wind-Down Estates, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)      To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Transferred Entities or the Europe/ROW Purchaser shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)      Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

8.3.     *Rejection Damages Claims.*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 7 (General Unsecured Claims).  Such Claim shall be forever barred and shall not be enforceable against the Debtors, Europe/ROW Purchaser, Wind-Down Estates, the GUC Trust, the Environmental Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors, Wind-Down Estates, or the GUC Trust, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

8.4.     *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing,

48

and any other order of the Bankruptcy Court, on the Effective Date: (i) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and Wind-Down Estates, or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (d) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by Section 7.9 of this Plan.

8.5.    *Intellectual Property Licenses and Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and the Wind-Down Estates and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind-Down Estates and the Europe/ROW Purchaser, as applicable, and the Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.6.    *Tax Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors, Wind-Down Estates, and Europe/ROW Purchaser, as applicable and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the

49

Plan.  Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Wind-Down Estates or Europe/ROW Purchaser, as applicable, and Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

     8.7.    ***Assignment.***

     To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

     8.8.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

     Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

     8.9.    ***Reservation of Rights.***

     **(a)**    The Debtors may amend the Assumption Schedule and any cure notice until five (5) Business Days immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

     **(b)**    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or Wind-Down Estates, or their respective affiliates have any liability thereunder.

     **(c)**    Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of

RLF1 23874638V.1

the Debtors and Wind Down Estates, under any executory or non-executory contract or any unexpired or expired lease.

        **(d)**      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Wind-Down Estates, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

**SECTION 9.**     **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

     9.1.     ***Conditions Precedent to the Effective Date.***

        The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

        **(a)**      the Definitive Documents shall be consistent with the RSA and otherwise approved by the Requisite Noteholders consistent with their respective consent and approval rights as set forth in Section 4 of the RSA;

        **(b)**      the RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms;

        **(c)**      the Definitive Documents shall be consistent with the Global Settlement and, to the extent the terms of a Definitive Document adversely affect the Global Settlement or treatment of the Settling Governmental Authorities thereunder, are otherwise approved by the Settling Governmental Authorities;

        **(d)**      the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

        **(e)**      the Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the First Lien Notes Claims, the Superpriority Notes Guarantee Claims, or the DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors, the Transferred Entities or the DIP Lenders; or (ii) supported any third party seeking standing to bring such application, adversary proceeding or cause of action;

        **(f)**      the Debtors shall have paid or caused to be paid in Cash all Restructuring Expenses and Trustees Fees invoiced no later than one Business Day prior to the Effective Date;

        **(g)**      all governmental approvals, including Bankruptcy Court approval, necessary to consummate the Plan and the transactions contemplated hereby shall have been obtained or otherwise waived;

        **(h)**      (i) the Debtors (or any Person or Entity on behalf of the Debtors or their Estates with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims, or (B) limiting the Europe/ROW Purchaser's or the Trustees' right to implement the Europe/ROW Sale Transaction, or (ii) the Bankruptcy Court (or any court with jurisdiction

51

over the Chapter 11 Cases) shall not have entered a Final Order providing relief against the interests of the Consenting Creditors or the Trustees with respect to any of the foregoing Causes of Action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims or (y) limiting the Consenting Creditors' or the Trustees' right to implement the Europe/ROW Sale Transaction;

        **(i)**      all agreements necessary to implement the Plan, including the Europe/ROW Sale Transaction, the Global Settlement, and the Environmental Settlement Documents, shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; *provided*, that approval of the Environmental Settlement Documents may not be waived without the consent of each of the Settling Governmental Authorities party thereto;

        **(j)**      all releases or covenants not to sue contained in the Environmental Settlement Agreement and the Frisco Settlement Agreement shall be in form and substance acceptable to the Requisite Noteholders;

        **(k)**      notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided*, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

      9.2.    ***Waiver of Conditions Precedent.***

        **(a)**      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent in Section 9.1 of the Plan other than the conditions set forth in Sections 9.1(c) and (i) may be waived in writing by the Debtors with the prior written consent of the Requisite Noteholders (and the Creditors' Committee with respect to the terms of the Global Settlement) without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld. If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.19 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors. Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement (including those set forth in Sections 9.1(c) and (j)) shall not be waived without the prior written consent of each of the Global Settlement Parties.

        **(b)**      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

      9.3.    ***Effect of Failure of Conditions to Effective Date.***

        Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered

or if the Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

SECTION 10.   **EFFECT OF CONFIRMATION.**

10.1.   ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates acquired by the Europe/ROW Purchaser under the Europe/ROW Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Europe/ROW Purchaser; (ii) all property of the Debtors' Estates constituting GUC Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Environmental Trust; (iv) all property of the Debtors' Estates constituting Frisco Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Frisco Trust; and (v) all remaining property of the Debtors' Estates shall vest in the Wind-Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other Interests.  Notwithstanding any provisions in the Plan, the Environmental Trust and the Frisco Trust shall take the Transferred Non-Performing Properties and the Frisco Non-Performing Property, as applicable, subject to the obligations set forth in the Environmental Settlement Documents and the Frisco Settlement Agreement, as applicable.  On and after the Effective Date, the Wind-Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Wind-Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind-Down Estates may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

10.2.   ***Term of Injunctions or Stays.***

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.3.    *Injunction.*

(a)    Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.

(b)    Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Environmental Trust, the Frisco Trust, or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Environmental Trust, and the Frisco Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities; or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Trust, and the Frisco Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Trust, and the Frisco Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Trust, and the Frisco Trust, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this **Section 10.3**.

(d)    The injunctions in this **Section 10.3** shall extend to any successors of the Debtors (including the Wind Down Estates), the GUC Trust, the Environmental Trust, and the Frisco Trust and their respective property and interests in property.

54

10.4.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

10.5.    *Releases by the Debtors.*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the Wind-Down Estates, in each case, on behalf of themselves and their respective successors (including the Frisco Trust, the Environmental Trust, and the GUC Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plan, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Definitive Documents, the Europe/ROW Sale Transaction or the Global Settlement.**

10.6.    *Releases By Holders of Claims and Interests.*

**As of the Effective Date, except (A) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date and (B) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following (each such Person or Entity, a "*Releasing Party*" and, collectively, the "*Releasing Parties*"):**

55

(a)       the Consenting Creditors;

(b)       the Creditors' Committee and each of its members in their capacity as such,

(c)       all holders of Claims who vote to accept the Plan;

(d)       all holders of Claims who are deemed to accept the Plan;

(e)       all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in this <u>Section 10.6</u>;

(f)       solely with respect to the Europe ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims; and

(g)       with respect to any Person or Entity in the foregoing clauses (a) through (f), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (f);

in each case, from any and all Claims and Causes of Action (including, without limitation, any PBGC Claims and Canada NPP Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the European Bridge Notes, the Pension Plan, the Optimization, the June 2019 Financing, any Environmental Law, the Global Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including any Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Europe/ROW Sale Transaction, or the Global Settlement.  Except as otherwise set forth in subsection (g) of this <u>Section 10.6</u>, the Persons and Entities in (a) through (h) of this <u>Section 10.6</u> shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this <u>Section 10.6</u> against each of the Released Parties.

56

**Notwithstanding anything to the contrary in this <u>Section 10.6</u>,  Governmental Units are not Releasing Parties under the Plan and are not providing a release or covenant not to sue except as provided in the Environmental Settlement Documents or other separate settlement document with a Governmental Unit.**

10.7.    *Exculpation.*

**To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Loan Documents; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence, or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan**.

10.8.    *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER <u>SECTION 10</u> OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 10</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

10.9.    *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have previously solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of

57

disclosure in connection with such solicitation, and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under this Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

> **10.10.    *Corporate Action.***

> Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

## SECTION 11.    **RETENTION OF JURISDICTION.**

> **11.1.    *Retention of Jurisdiction.***

> On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

> (a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

> (b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

> (c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

> (d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

> (e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

> (f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      to hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees;

(i)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, Europe/ROW Sale Transaction, any other Sale Transactions, the Global Settlement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)      to hear, adjudicate, decide, or resolve any and all matters related to Section 10 of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to resolve disputes concerning Disputed Claims or the administration thereof;

(o)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors, the GUC Trust, the Environmental Trust, or the Frisco Trust pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

11.2.    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

SECTION 12.    **MISCELLANEOUS PROVISIONS.**

12.1.    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

12.2.    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.3.    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

12.4.    *Amendments.*

**(a)**    *Plan Modifications*.  Subject to (i) the terms of the RSA and all consent rights contained therein, and (ii) the consent of the Global Settlement Parties with respect to any amendment to the Global Settlement, including the Environmental Settlement Documents, or other provisions of the Plan or Definitive Documents that impact the Global Settlement (including any amendment to the definition of Settling Governmental Authorities or Schedule 1 to this Plan), (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Noteholders (and the Global Settlement Parties, solely as it pertains to the Global Settlement), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to

60

carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

**(b)**     *Other Amendments*.   Subject to the terms of the RSA and, solely with respect to the terms of the Global Settlement, subject to the consent of the Global Settlement Parties, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that any change to the Environmental Settlement Documents may not be made without the written consent of the parties thereto.

### 12.5.     *Revocation or Withdrawal of the Plan.*

Subject to the terms of the RSA, the Global Settlement, the Environmental Settlement Documents and the Europe/ROW Purchase Agreement, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

### 12.6.     *Severability of Plan Provisions upon Confirmation.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Requisite Noteholders (and the Global Settlement Parties with respect to the Global Settlement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Wind-Down Estate (as the case may be); and (3) nonseverable and mutually dependent.

### 12.7.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

12.8.   *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.9.   *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

12.10.   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind-Down Estates, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

12.11.   *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12.   *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.   *Notices.*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Debtors or the Plan Administrator:

Exide Holdings, Inc.
13000 Deerfield Parkway
Building 200
Milton, GA 30004
Attention: Roy Messing, Chief Restructuring Officer
Telephone: (678) 566-9000

62

- and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Ray C. Schrock, P.C.
            Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(ii) if to the Requisite Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Alice Belisle Eaton, Esq.
            Robert Britton, Esq.
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

(iii) if to the Creditors' Committee:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attn:   Robert Hirsh, Esq.
            Eric Chafetz, Esq.
            Michael Kaplan, Esq.
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  August 14, 2020

By:     _/s/ Roy Messing_____
            Name: Roy Messing
            Title: Chief Restructuring Officer

**EXIDE HOLDINGS, INC.**
**EXIDE TECHNOLOGIES, LLC**
**EXIDE DELAWARE LLC**
**DIXIE METALS COMPANY**
**REFINED METALS COMPANY**

63

## Schedule 1

**Settling Governmental Authorities**

1. U.S. Environmental Protection Agency
2. State of Florida Department of Environmental Protection
3. Georgia Environmental Protection Division of the Department of Natural Resources
4. Indiana Department of Environmental Quality
5. Commonwealth of Pennsylvania Department of Environmental Protection
6. South Carolina Department of Health and Environmental Control
7. Tennessee Attorney General & Reporter
8. Texas Commission on Environmental Quality
9. Illinois Environmental Protection Agency
10. Louisiana Department of Environmental Quality
11. Mississippi Department of Environmental Quality
12. California Department of Toxic Substances Control

## Schedule 2

**Non-Performing Properties**

1. Baton Rouge Smelter
   2400 Brooklawn Drive
   Baton Rouge, Louisiana 70807

2. Bristol Former Battery Plant
   364 Exide Drive
   Bristol, Tennessee 30094

3. Columbus Battery Plant & Smelter
   3639 Joy Road
   Columbus, Georgia 31906

4. Dallas Smelter (Dixie Metals)
   3030 McGowan Street
   Dallas, Texas 75203

5. Florence Battery
   250 Ellis Street
   Florence, Mississippi 39073

6. Florence Surplus Property
   Olivia Slimon Drive
   Florence, Mississippi 39073

7. Florence (Expander)
   407 Briarhill Road
   Florence, Mississippi 39073

8. Frankfort Battery Plant
   555 Hoke Avenue
   Frankfort, Indiana 46041

9. Greer Surplus Lots
   100 Bent Creek Drive
   101 Bent Creek Drive
   103 Bent Creek Drive
   105 Bent Creek Drive
   109 Bent Creek Drive
   203 Bent Creek Drive
   207 Bent Creek Drive
   208 Bent Creek Drive
   209 Bent Creek Drive
   210 Bent Creek Drive

RLF1 23874638V.1

A-0585

212 Bent Creek Drive
106 Sylvan Drive
108 Sylvan Drive
110 Sylvan Drive
107 Bowers Creek Drive
110 Bowers Creek Drive
111 Bowers Creek Drive
112 Bowers Creek Drive
Greer, South Carolina 29650

10. Greer Battery Plant
109 Chick Springs Road
Greer, South Carolina 29650

11. Hamburg Battery Plant
280 Grand Street
Hamburg, Pennsylvania 19526

12. Heflin Smelter
6952 SR-531
Heflin, Louisiana 71039

13. Kankakee Battery Plant
2475 West Station Street
Kankakee, Illinois 60901

14. Logansport Battery Plant
303 Water Street
Logansport, Indiana 46947

15. Memphis Surplus Lots (17)
Mallory and Castex Avenues
Memphis, Tennessee 38109

16. Memphis Smelter
257 W. Mallory Avenue
Memphis, Tennessee 38109

17. Oley Property
Bull Road
Oley, Pennsylvania 19560

18. Reading Residential/Vacant Property
145-147 Spring Valley Rd
143 Spring Valley Rd
127 Spring Valley Rd

129 Spring Valley Rd
131 Spring Valley Rd
258 Spring Valley Rd
260 Spring Valley Rd
Vacant Land - Isabelle Ct & Josephine Drive
Reading, Pennsylvania 19605

19. Reading Recycling Plant
3000 Montrose Avenue
Reading, Pennsylvania 19605

20. Tampa  Smelter
3507 S. 50th Street
Tampa, Florida 33619

21. Vernon Smelter
2700 S. Indiana Street
Los Angeles, California 90023

**Schedule 3**

**Transferred Entities**

1.   Exide International Holdings LP
2.   Exide International Holdings GP LLC
3.   Exide Holding Europe S.A.S.
4.   Exide Technologies (Shanghai) Company Limited
5.   Exide Australia Pty Limited Australia
6.   Exide Technologies GmbH
7.   Exide Technologies BV Belium
8.   Exide Technologies A/S
9.   Exide Technologies Oy
10.  Exide Technologies S.A.S.
11.  Exide Technologies GmbH (includes a Switzerland branch)
12.  Exide Technologies Operations GmbH & Co. KG
13.  HAGEN Batterie AG
14.  GNB Technologies (China) Limited
15.  GNB Technologies (India) Private Limited
16.  Tudor India Private Limited
17.  Exide Technologies S.r.l.
18.  Coöperatie Exide Europe U.A.
19.  Exide Global Holding Netherlands C.V.
20.  Exide Holding Netherlands B.V.
21.  Exide Technologies B.V.
22.  Exide Technologies Limited
23.  Exide Technologies AS
24.  Exide Technologies S.A.
25.  Exide Technologies SSC sp. z o.o.
26.  Exide Technologies, Lda.
27.  Exide Technologies Recycling II, Lda.
28.  G.V.B. – Gestão e Valorização de Baterias, Lda.
29.  Exide Technologies LLC
30.  Exide Singapore Pte Limited
31.  Exide Holding Asia Pte Limited
32.  Exide Technologies Recycling S.L.U.
33.  Exide Technologies S.L.U.
34.  Exide Transportation Holding Europe S.L.U.
35.  Exide Technologies AB
36.  GNB Batteries Trading MEA LLC
37.  CMP Batteries Pension Limited
38.  Euro Exide Corporation Limited
39.  Exide Technologies (Transportation) Limited
40.  GNB Industrial Power (UK) Limited
41.  EH International, LLC

# **<u>TAB 10</u>**

**Amended Disclosure Statement for Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors, dated Aug. 14, 2020 [Bankr. D.I. 733] \*excluding exhibits**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                    :
In re                               :        Chapter 11
                                    :
EXIDE HOLDINGS, INC., et al.,       :        Case No. 20–11157 (CSS)
                                    :
        Debtors.[1]                 :        (Jointly Administered)
                                    :
-------------------------------------------------------- x
```

## AMENDED DISCLOSURE STATEMENT
## FOR JOINT CHAPTER 11 PLAN OF
## EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
| Ray C. Schrock, P.C. | Daniel J. DeFranceschi |
| Sunny Singh | Zachary I. Shapiro |
| 767 Fifth Avenue | One Rodney Square 920 N. King Street |
| New York, New York 10153 | Wilmington, Delaware 19801 |
| Telephone:  (212) 310-8000 | Telephone: (302) 651-7700 |
| Facsimile:  (212) 310-8007 | Facsimile:  (302) 651-7701 |

*Attorneys for Debtors*
*and Debtors in Possession*

Dated:   August 14, 2020
         Wilmington, Delaware

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

Docket No. 743
Filed: 8/14/20

**A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "<u>PLAN</u>"). A COPY OF THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u>.**

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN, INCLUDING THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

**THE PLAN SEEKS A RELEASE OF CLAIMS THAT YOU MAY HAVE AGAINST THIRD PARTIES, INCLUDING CERTAIN FOREIGN AFFILIATES OF THE DEBTORS, SUCH AS ANY GUARANTEE CLAIMS YOU MAY HAVE AGAINST SUCH PARTIES.  IF YOU ARE A HOLDER OF A CLAIM IN CLASS 1 (PRIORITY NON-TAX CLAIMS), CLASS 2 (OTHER SECURED CLAIMS), CLASS 3 (ABL CLAIMS), CLASS 4 (SUPERPRIORITY NOTES GUARANTEE CLAIMS), CLASS 5 (EXCHANGE PRIORITY NOTES CLAIMS), CLASS 6 (FIRST LIEN NOTES CLAIMS), AND CLASS 7 (GENERAL UNSECURED CLAIMS), YOU MAY BE AFFECTED BY SUCH RELEASES AND INJUNCTIONS IN THE PLAN. YOU SHOULD CAREFULLY REVIEW SECTION 10.6 OF THE PLAN AND SECTIONS I.F. AND V.I. OF THE DISCLOSURE STATEMENT TO SEE IF AND HOW YOUR RIGHTS MAY BE AFFECTED.  IF YOU OBJECT TO SUCH RELEASES OR INJUNCTIONS, YOU MUST FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN. FAILURE TO OBJECT TO THE PLAN MAY RESULT IN SUCH RELEASES BEING APPROVED BY THE BANKRUPTCY COURT.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS AUGUST 14, 2020 (THE "<u>VOTING RECORD DATE</u>").**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 17, 2020 (THE "<u>VOTING DEADLINE</u>"), UNLESS EXTENDED BY THE DEBTORS.**

**IF YOU FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN, A HEARING WILL BE HELD VIRTUALLY, TELEPHONICALLY AND VIA ZOOM, ON SEPTEMBER 25, 2020 AT 2:00 P.M AT WHICH YOU WILL BE RQUIRED TO APPEAR.**

## RECOMMENDATION BY THE DEBTORS
## AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**The Special Committee of the Board of Directors of Exide Holdings Inc. and the board of directors, managers or members, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan (as defined herein) and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.**

**The Official Committee of Unsecured Creditors also recommends that all creditors whose votes are being solicited submit ballots to accept the Plan.**

**Holders of approximately (a) 100% of the Superpriority Notes Guarantee Claims (as defined herein), (b) 100% of the Exchange Priority Notes Claims (as defined herein), and (c) 85.35% of the First Lien Notes Claims (as defined herein) have already agreed to vote in favor of the Plan under the RSA.[2]**

---

[2] All of the holders of First Lien Notes Claims in the Ad Hoc Group (as defined in this Disclosure Statement) hold either Superpriority Notes Guarantee Claims or Exchange Priority Notes Claims.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN. HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ BOTH THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  IN PARTICULAR, ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION IX OF THIS DISCLOSURE STATEMENT.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED CREDITOR RECOVERIES, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION IX OF THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT (AS DEFINED BELOW).

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS ANNEXED HERETO AS EXHIBIT D.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

A HEARING TO CONSIDER CONFIRMATION OF THE PLAN WILL BE HELD BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, CHIEF UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801, ON SEPTEMBER 25, 2020 AT 2: 00 P.M. (EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.

THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE SEPTEMBER 17, 2020 AT 4:00 P.M. (EASTERN TIME).

PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

RLF1 23874670V.1

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

II. OVERVIEW OF THE COMPANY'S OPERATIONS ................................................... 14
    A.    The Debtors' Business ............................................................................ 14
    B.    Debtors' Organizational Structure. ...................................................... 16
    C.    Directors and Officers. ........................................................................... 16
    D.    Debtors' Existing Capital Structure ..................................................... 17
    E.    DOE Grant Funded Assets ..................................................................... 22

III. KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES ............. 22
    A.    Background and Prior Restructuring ..................................................... 22
    B.    Circumstances Leading to Commencement of the Chapter 11 Cases ..................... 22
    C.    Debtors' Prepetition Restructuring Efforts .......................................... 24
    D.    Prepetition Marketing Process ............................................................... 26
    E.    Negotiations with Ad Hoc Group and Restructuring Support Agreement ............. 27

IV. OVERVIEW OF THE CHAPTER 11 CASES ............................................................... 29
    A.    Commencement of The Chapter 11 Cases and First-Day Motions ...................... 29
    B.    DIP Financing and Cash Collateral ....................................................... 30
    C.    Settlement Procedures Relating to Non-Performing Properties ............... 31
    D.    The Canadian Non-Performing Property ............................................... 32
    E.    Procedural Motions and Retention of Professionals ............................. 32
    F.    Appointment of the Creditors' Committee ............................................. 32
    G.    KEIP/KERP Motion ............................................................................... 33
    H.    Bar Date ................................................................................................... 33
    I.    Statements and Schedules, and Rule 2015.3 Financial Reports ........... 34
    J.    PBGC Claims .......................................................................................... 34
    K.    Subcommittee Investigation of Certain Prepetition Affiliate Transactions ............. 35
    L.    Bidding Procedures and Postpetition Marketing Process ..................... 36
    M.    Mediation and Global Settlement ........................................................... 38
    N.    Retiree Benefits ...................................................................................... 38

V. SUMMARY OF PLAN ..................................................................................................... 40
    A.    Administrative Expenses and Priority Claims ...................................... 40
    B.    Classification of Claims and Interests ................................................... 42
    C.    Treatment of Claims and Interests ........................................................ 43
    D.    Means for Implementation ...................................................................... 49

iii

E.     **Distributions** ................................................................................ 62

F.     **Procedures for Disputed Claims** .................................................... 66

G.     **Executory Contracts and Unexpired Leases** ................................. 68

H.     **Conditions Precedent to Confirmation of Plan and Effective Date** ............ 72

I.     **Effect of Confirmation of Plan** ...................................................... 74

J.     **Retention of Jurisdiction** ............................................................... 79

K.     **Miscellaneous Provisions** .............................................................. 80

**VI. VALUE** ...................................................................................................... **84**

**VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN** ............... **84**

**VIII. CERTAIN RISK FACTORS TO BE CONSIDERED** ...................................... **92**

A.     **Certain Bankruptcy Law Considerations** ...................................... 92

B.     **Additional Factors** ......................................................................... 94

**IX. VOTING PROCEDURES AND REQUIREMENTS** ......................................... **95**

A.     **Voting Deadline** .............................................................................. 95

B.     **Voting Procedures** .......................................................................... 96

C.     **Parties Entitled to Vote** .................................................................. 96

**X. CONFIRMATION OF PLAN** ........................................................................ **98**

A.     **Combined Hearing** ......................................................................... 98

B.     **Objections to Confirmation and Final Approval of Disclosure Statement** ............... 99

C.     **Requirements for Confirmation of Plan** ...................................... 100

(i)     **Requirements of Section 1129(a) of Bankruptcy Code** ............... 100

(ii)     **Additional Requirements for Non-Consensual Confirmation Under Section 1129(b) of the Bankruptcy Code** ................................ 102

**XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** .................... **103**

A.     **Alternative Plan** ........................................................................... 104

B.     **Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law** ........... 104

**XII. CONCLUSION AND RECOMMENDATION** ............................................... **105**

EXHIBIT A:      Plan

EXHIBIT B:      Restructuring Support Agreement

EXHIBIT C-1:  Organizational Structure Chart

EXHIBIT C-2:  Lien Priority Chart

EXHIBIT D:      Liquidation Analysis

EXHIBIT E:      *Pension Benefit Guaranty Corporation's Objection to Debtors' Proposed Disclosure Statement* (Docket No. 735)

# I.
# INTRODUCTION

Exide Holdings, Inc. ("**Holdings**") and its affiliated debtors (collectively, the "**Debtors**" and together with their non-Debtor affiliates, "**Exide**" or the "**Company**") commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on May 19, 2020 (the "**Commencement Date**").

The Debtors submit this disclosure statement (as amended, modified, or supplemented from time to time, the "**Disclosure Statement**") pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the *Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, dated August 11, 2020 (as amended, modified, or supplemented, the "**Plan**").[1]  The Plan is annexed hereto as <u>Exhibit A</u> and is incorporated herein by reference.

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events that have occurred or will occur in the Chapter 11 Cases, and certain documents related to the Plan.

As described more fully below, the Plan incorporates a proposed Global Settlement among the Debtors, the Creditors' Committee, the Ad Hoc Group, the Settling Governmental Authorities and the Environmental Sureties.[2]  In light of the overwhelming support from the Debtors' key stakeholders and to maximize recoveries to creditors, the Debtors seek to move forward expeditiously with the solicitation of votes and a hearing on confirmation of the Plan.  Accordingly, the Debtors are seeking conditional approval of this Disclosure Statement from the Bankruptcy Court at a hearing to be held on August 14, 2020.  Final approval of the Disclosure Statement will be considered at the Combined Hearing (defined herein), together with the Europe/ROW Sale Transaction (defined herein), and the Debtors' request to confirm the Plan.

## A.  Restructuring Support Agreement, Bidding Procedures and Sale of Assets

In the months leading up to the commencement of these Chapter 11 Cases, facing growing uncertainty with respect to their ability to continue as a going concern, severe liquidity constraints and upcoming interest and maturity payments, the Debtors began negotiating with an ad hoc group of noteholders (the "**Ad Hoc Group**") and its advisors to explore strategic alternatives for the Company.  As of the Commencement Date, the Ad Hoc Group held, in the aggregate, approximately (i) 99.78% of the Superpriority Notes, (ii) 99.78% of the Exchange Priority Notes, (iii) 80.69% of the First Lien Notes, and (iv) over 80% of the equity interests in Holdings.[3]  The Debtors' negotiations with the Ad Hoc Group culminated in that certain restructuring support agreement executed on May 18, 2020 (the "**RSA**").[4]  In connection with the execution

---

[1]   Capitalized terms used in this Disclosure Statement, but not defined herein, shall have the meanings ascribed to such terms in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

[2]   The Settling Governmental Authorities' agreement is subject to obtaining approval from those with authority and public comment on the Environmental Settlement Agreement.

[3]   As a result of postpetition joinders to the RSA, the Ad Hoc Group currently holds, in the aggregate, approximately (i) 100% of the Superpriority Notes Guarantee Claims, (ii) 100% of the Exchange Priority Notes Claims, and (iii) 85.35% of the First Lien Notes Claims.  All of the holders of the First Lien Notes Claims in the Ad Hoc Group hold either Superpriority Notes Guarantee Claims or Exchange Priority Notes Claims.

[4]   A copy of the RSA is annexed hereto as <u>Exhibit B</u>.

of, and pursuant to its obligations under the RSA, the Ad Hoc Group submitted a binding credit bid (the "**Europe/ROW Credit Bid**") for the Europe/ROW Assets (as defined below), which reflected a credit bid purchase price of $430 million (subject to certain terms and conditions, as discussed more fully below).[5] The Debtors, after consultation with their advisors, designated the Europe/ROW Credit Bid as the stalking horse bid (the "**Europe/ROW Stalking Horse Credit Bid**") for the Europe/ROW Assets.  Importantly, the RSA provided that the Europe/ROW Stalking Horse Credit Bid was subject to better or higher offers, as further described in the Bidding Procedures (as defined below).  Finally, pursuant to the RSA, the Ad Hoc Group agreed to support the pursuit and confirmation of a chapter 11 plan that complies with the absolute priority rule and other requirements of the Bankruptcy Code.  In furtherance thereof, on June 17, 2020, Holdings, Exide Technologies, LLC ("**Exide Technologies**"), and EIH Europe Acquisition LLC entered into a *Stock and Asset Purchase Agreement* setting forth the terms and conditions of the Europe/ROW Credit Bid (the "**Europe/ROW Purchase Agreement**").

The Debtors commenced these Chapter 11 Cases to implement a sale of substantially all of their assets in an effort to maximize recoveries for all creditors and preserve as many jobs as possible.  To that end, on the Commencement Date, the Debtors filed the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sales of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief; and (II)(A) Authorizing Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Docket No. 63) (the "**Bidding Procedures Motion**") and commenced a postpetition sale and marketing process for substantially all of the Debtors' assets.  On June 19, 2020, the Bankruptcy Court entered an order approving the relief requested in the Bidding Procedures Motion (Docket No. 344) (the "**Bidding Procedures Order**"), including auction and sale procedures for the sale of the Debtors' assets (the "**Bidding Procedures**").

Pursuant to the Bidding Procedures, parties could submit bids for the purchase of any and all of the Debtors' assets in accordance with the terms of the Bidding Procedures.  The Bidding Procedures were designed to promote a competitive and expedient bidding and sale process, and were intended to generate the greatest level of interest in and the best value for the Debtors' assets while affording the Debtors maximum flexibility to execute asset sales as quickly and efficiently as possible.  Specifically, pursuant to the Bidding Procedures, the Debtors sought to sell substantially all of their assets, including (a)(i) the Exide Americas industrial energy business segment, (ii) the Exide Americas transportation business segment, (iii) the Exide Americas recycling business segment, (iv) any operating facilities located in any of the foregoing business segments, or (v) any combination thereof (collectively, the "**Americas Assets**") and (b)(i) the Exide Europe/ROW transportation business segment, (ii) the Exide Europe/ROW industrial business segment, (iii) the Exide Europe/ROW recycling business segment or (iv) any combination thereof (collectively, the "**Europe/ROW Assets**" and, together with the Americas Assets, and any other assets of the Debtors, the "**Assets**").

In accordance with the Bidding Procedures, the Debtors designated the Europe/ROW Credit Bid as the stalking horse bid with respect to the Europe/ROW Assets and were also authorized to designate stalking horse bidders for the Americas Assets in accordance with the Bidding Procedures Order.  On July 8, 2020, the Debtors designated EX Holdings, Inc. as the stalking horse bidders for the Americas Assets and sought

---

[5]   As described more fully below, in connection with the Europe/ROW Credit Bid, the Ad Hoc Group also committed to provide Interim Financing Facility (as defined below) to Exide International to be used for working capital and general corporate purposes within the Exide Europe/ROW business segment.

approval of (a) a break-up fee in an amount equal to $5,100,000 (3% of the cash component of the purchase price), and (b) the amount of the reasonable, out-of-pocket and documented expenses of the Stalking Horse Bidder up to an aggregate amount of $2,500,000 (collectively, the "**Americas Stalking Horse Bid Protections**") (Docket No. 500). On July 16, 2020, the Bankruptcy Court entered an order approving the Debtors' designation of EX Holdings, Inc. as the stalking horse bidder for the Americas Assets and the Americas Stalking Horse Bid Protections (Docket No. 548).

On July 23, 2020, the Debtors filed the *Notice of Qualified Bids and Designation of Baseline Bid With Respect to the Americas Assets* (Docket No. 589), in which the Debtors announced, among other things, that no other bids were submitted for the Europe/ROW Assets, and therefore the Europe/ROW Credit Bid submitted by the Europe/ROW Stalking Horse Credit Bidder is the Successful Bid (as defined in the Bidding Procedures) for the Europe/ROW Assets.  The purchase price under the Successful Bid for the Europe/ROW Assets is approximately $430 million (subject to certain terms and conditions as described more fully herein).

Subsequently, following a virtual auction, the Debtors filed the *Notice of Successful Bidders for Americas Assets and Europe/ROW Assets* (Docket No. 591), in which the Debtors announced, among other things, that the highest or otherwise best bid for the Americas Assets was submitted by Battery BidCo LLC (the "**U.S. Buyer**"), and therefore the bid submitted by the U.S. Buyer was the Successful Bid (as defined in the Bidding Procedures) for the Americas Assets.  The purchase price under the Successful Bid for the Americas Assets was $178.6 million (subject to adjustments provided therein) plus other valuable consideration, including the assumption of certain operating liabilities, commitments to employ over 2,000 of the Debtors' employees and the payment of cure obligations in accordance with the terms and conditions of the *Stock and Asset Purchase Agreement* by and among the U.S. Buyer, Exide Technologies, and, solely for purposes of Sections 12.17, 12.18 and 12.23, Atlas Capital Resources III LP (the "**Americas Purchase Agreement**").

On August 6, 2020, the Bankruptcy Court approved the Americas Purchase Agreement and authorized the Debtors to consummate the sale transaction for the Americas Assets (the "**Americas Sale Transactions**"). The Debtors anticipate that the closing of the Americas Sale Transaction will occur in August 2020.

Consistent with the proposed Global Settlement, the Europe/ROW Credit Bid has been incorporated into the Plan and the Debtors will seek approval of such transaction at the Combined Hearing.

## B. Subcommittee Investigation of Certain Prepetition Affiliate Transactions

Prior to the Commencement Date, the Board of Directors (as defined below) formed a special committee (the "**Special Committee**"), composed solely of its four (4) independent directors, to direct and oversee all aspects of the Company's restructuring process and the Chapter 11 Cases.  A sub-committee of the Special Committee (the "**Subcommittee**"), with independent director Harvey Tepner as the sole member, was established to investigate, evaluate and control the disposition or resolution of any claims associated with certain prepetition affiliate transactions, including the June 2019 Financing (as defined below) and the Optimization (as defined below) (collectively, the "**Transactions**").  Working with the assistance of the Debtors' legal advisor, Weil, Gotshal & Manges LLP ("**Weil**"), the Subcommittee, independently and in its sole discretion, evaluated certain prepetition transactions of the Debtors.

The Subcommittee's investigation included extensive factual and legal analysis. The Subcommittee conducted its investigation in close coordination with the official committee of unsecured creditors (the "**Creditors' Committee**"), which conducted its own contemporaneous investigation of the Transactions and other prepetition transactions occurring after the Debtors exited from their last bankruptcy in 2015. Counsel for the Creditors' Committee, Lowenstein Sandler LLP, actively participated in most of the

interviews conducted by the Subcommittee and was provided with detailed summaries of interviews that preceded their involvement or were with the Company's legal advisors at the time of the Transactions. On July 21, 2020, Weil and counsel for the Creditors' Committee exchanged their preliminary conclusions, which were consistent in all material respects.

The Subcommittee did not identify any valuable, colorable claims or causes of action belonging to the Debtors related to the Transactions or to the conduct of the Company's directors and officers in connection with the Transactions. Moreover, as to any potential claims for breach of fiduciary duty with respect to the Transactions, the Subcommittee determined that the business judgment standard would apply and was easily satisfied. Additionally, the Subcommittee concluded that the time and expense associated with pursuing any such claims or causes of action likely would exceed any potential value that could be recovered from such claims or causes of action. The Subcommittee also determined that the Debtors' unsecured creditors, including environmental creditors, suffered no damages as a result of the Transactions.

The proposed Global Settlement incorporates a settlement of all causes of action that could be brought with respect to any prepetition affiliate transactions, including the June 2019 Financing and the Optimization (each as defined herein). The Subcommittee believes that the proposed Global Settlement is fair and reasonable and that the benefits of the proposed Global Settlement, including the recoveries to environmental creditors and General Unsecured Creditors, which the Subcommittee believes would not be available in the absence of the proposed Global Settlement, far outweigh any potential claims that are settled.

### C. Settlement Procedures Relating to Non-Performing Properties, Mediation, and Global Settlement

It was clear from the outset of these Chapter 11 Cases that the Debtors would not emerge from these Chapter 11 Cases as a reorganized business, and therefore would have to proceed to liquidate or abandon any assets that they are unable to sell to third party purchasers through the marketing process. Specifically, the Debtors will no longer be able to retain and support the ongoing maintenance and remediation of their non-performing properties ("**NPPs**").[6] To that end, on the Commencement Date, the Debtors filed the *Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, if Necessary* (Docket No. 37) (the "**NPP Settlement Procedures Motion**"). By the NPP Settlement Procedures Motion, the Debtors sought to establish certain settlement procedures, which enabled the Debtors to (i) continue their postpetition marketing efforts to sell as many of the NPPs as possible without the distraction and cost of potentially unnecessary litigation during the Chapter 11 Cases, (ii) engage in good faith negotiations with the various governmental regulatory agencies and sureties—including mediation, if necessary—to obtain an agreed upon solution for the orderly transition of any NPPs that the Debtors were unable to sell and any related issues, and (iii) to the extent settlement negotiations and mediation are not successful, proceed on an expedited timeline for the contested abandonment of the remaining NPPs, while minimizing the risk of harm to public health and safety. On June 9, 2020, the Bankruptcy Court entered an order (the "**NPP Settlement Procedures Order**") granting the NPP Settlement Procedures Motion and establishing the Settlement Procedures (as defined therein) (Docket No. 242).

Following the appointment of the Creditors' Committee and the entry of the NPP Settlement Procedures Order, and concurrently with the Debtors' postpetition marketing process, the Debtors engaged in good-faith and arm's-length negotiations with the Department of Justice ("**DOJ**"), certain federal and state environmental agencies identified on Schedule 1 of the Plan (the "**Settling Governmental Authorities**"), the City of Frisco, Texas (together with the U.S. Environmental Protection Agency and the Texas

---

[6]    The NPPs are identified on Schedule 2 to the Plan.

Commission on Environmental Quality, both of which are also Settling Governmental Authorities, the "**Frisco Governmental Authorities**"), Westchester Fire Insurance Company ("**Westchester**"), Aspen American Insurance Company and Aspen Special Insurance Company (together, "**Aspen**" and collectively with Westchester, the "**Environmental Sureties**"), the Creditors' Committee, and the Ad Hoc Group (collectively, the "**Global Settlement Parties**") to try to resolve all the issues in connection with the Chapter 11 Cases without litigation.

By early July 2020, pursuant to the NPP Settlement Procedures Order, the Debtors and the Settling Governmental Authorities agreed to engage in a global mediation process that involved the participation of the all Global Settlement Parties. Commencing on July 7, 2020 and continuing through July 27, 2020, Hon. Joseph J. Farnan, Jr. (Ret.), Hon. Judith K. Fitzgerald (Ret.), Hon. Richard S. Schmidt (Ret.), Hon. John L. Wagner (Ret.), and John DeGroote, Esq. (the "**Mediators**") presided over multiple global mediation sessions and sessions with individual groups of participants. On July 28, 2020, the Mediators filed the *Mediators' Final Certificate of Completion File Pursuant to Order Granting Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. 622) (the "**Mediators' Initial Certificate of Completion**"), and on July 29, 2020, the Mediators filed the *Clarification to Mediators' Final Certificate of Completion Filed Pursuant to Order Granting Motion of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. 636) (the "**Mediators' Revised Certificate of Completion**"), in which the Mediators announced that the Global Settlement Parties have accepted the Mediators' Proposal (as defined therein), and that representatives for the Settling Governmental Authorities have agreed "to recommend [the Mediators' Proposal] and commit to pursuing approvals [from those with authority] pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable." *See* Mediators' Revised Certificate of Completion at ¶4. Importantly, the Global Settlement Parties' acceptance or recommendation of the Mediators' Proposal resulted in a global resolution of all issues and disputes (the "**Global Settlement**") relating to (i) the abandonment of the Debtors' non-performing properties; (ii) the Europe/ROW Sale Transaction including the releases contained therein and the investigation of various prepetition transactions; and (iii) the Americas Sale Transaction and use of proceeds realized therefrom and certain other issues and disputes. The proposed Global Settlement requires the Debtors to incorporate such Global Settlement into the Plan and seek approval of the Global Settlement in connection with the confirmation of the Plan. The Global Settlement remains subject to the negotiation of final settlement documentation and the approval of the necessary authorities acting for the Settling Governmental Authorities.

The proposed Global Settlement includes the following:

I.    **Environmental Trust**. An environmental trust (the "**Environmental Trust**") will be established pursuant to the Plan. The Environmental Trust will receive (i) a substantial cash contribution to be paid by the Debtors' non-Debtor European and Rest of World Affiliates that will be transferred in accordance with the Europe/ROW Credit Bid;[7](ii) payment of the full amount of any surety bonds in accordance with the terms of the surety bond agreements (or as otherwise provided by applicable state law); (iii) title to the Debtors' owned NPPs (other than the NPP located in Frisco, Texas) free and clear of all claims, liens, and interests; and (iv) environmental causes of action assigned by the Debtors, including any insurance coverage for environmental liabilities relating to the NPPs. Moreover, the Debtors, Creditors' Committee, and the Ad Hoc Group have agreed to waive all rights relating to sale proceeds from the potential future sale of any NPPs.

---

[7]    These entities are referred to in the Plan as the "**Transferred Entities**."

**II.**   **General Unsecured Creditors' Trust**.  A general unsecured creditors' trust (the "**GUC Trust**") will be established pursuant to the Plan.  The GUC Trust will receive (i) a substantial cash contribution in the amount of $2.4 million from the Transferred Entities (the "**GUC Global Settlement Payment**"); and (ii) certain non-environmental causes of action.  Moreover, the Environmental Sureties and the Ad Hoc Group have agreed to waive distributions on account of any general unsecured claims (including deficiency claims) against the GUC Trust.  The Settling Governmental Authorities are entitled to receive distributions from the GUC Trust in accordance with the following:

   a.   The Settling Governmental Authorities, whose representatives have recommended the proposed Global Settlement, may receive distributions from the GUC Settlement Payment solely on account of non-environmental claims;

   b.   The Settling Governmental Authorities, whose representatives have recommended the proposed Global Settlement, will waive distributions from the GUC Settlement Payment solely on account of environmental claims; and

   c.   To the extent the GUC Trust receives proceeds in excess of the GUC Settlement Payment, the Settling Governmental Authorities, whose representatives have recommended the proposed Global Settlement, may receive distributions from such excess proceeds on account of both environmental and non-environmental claims.

**III.**   **Frisco Trust**. An environmental trust (the "**Frisco Trust**") will be established pursuant to the Plan. The Frisco Trust will receive (i) a cash contribution to be paid by the Debtors' non-Debtor European and Rest of World Affiliates that will be transferred in accordance with the Europe/ROW Credit Bid; (ii) payment of the full amount of any surety bonds, up to the full cost of remediation, in accordance with the terms of the surety bond agreements (or as otherwise provided by applicable state law); (iii) title to the Frisco NPP free and clear of all claims, liens, and interests; and (iv) environmental causes of action related to the Frisco NPP assigned by the Debtors.  Moreover, the Debtors, Creditors' Committee, and the Ad Hoc Group have agreed to waive all rights relating to sale proceeds from the potential future sale of the Frisco NPP.

**IV.**   **Mutual Releases**.  The proposed Global Settlement includes mutual releases among the parties and covenants not to sue by the Settling Governmental Authorities consistent with the Global Settlement, which will be included in the Environmental Settlement Agreement and incorporated into the Plan by reference.

**V.**   **Commitments to Support the Plan**.

   a.   The Creditors' Committee has agreed to support and the Settling Governmental Authorities and the Environmental Sureties have agreed not to oppose the direct or indirect sale of the Americas Assets (subject to certain rights to seek clawback in the event that the Global Settlement fails) and the sale of the Europe/ROW business.

   b.   The Global Settlement Parties (other than the Settling Governmental Authorities) have agreed not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, the confirmation or consummation of the Plan or approval of the Global Settlement.  The Settling Governmental Authorities  have agreed not to oppose any term or provision of the Plan, Disclosure Statement, or Global Settlement.  The Global Settlement Parties, however, retain certain rights to amendments to the Plan as set forth in the Plan.

RLF1 23874670V.1

Accordingly, the final phase in these Chapter 11 Cases is the confirmation and consummation of the Plan, pursuant to which the Debtors will seek approval of the (i) Europe/ROW Credit Bid, (ii) Global Settlement, the (iii) various releases or covenants not to sue among the parties to the Global Settlement as well as certain consensual and non-consensual third party releases with respect to the Consenting Creditors and Transferred Entities in exchange for their substantial contributions to the Chapter 11 Cases.  Under the Plan, the Debtors will distribute the excess cash proceeds from the sale of Americas Assets and other assets to their creditors in accordance with the absolute priority rule and section 1129 of the Bankruptcy Code and the Global Settlement.

### D.  Confirmation Timeline

The Debtors seek to move forward expeditiously with the solicitation of votes and a hearing on confirmation of the Plan in an effort to minimize the continuing accrual of administrative expenses.  Accordingly, subject to the Bankruptcy Court's approval, the Debtors are proceeding on the following timeline with respect to the Disclosure Statement and the Plan:

| | |
|---|---|
| Hearing on Conditional Approval of Disclosure Statement | August 14, 2020 at 3:00 p.m. (ET) |
| Plan Supplement Filing | Seven (7) calendar days prior to the Voting Deadline (anticipated to be September 10, 2020) |
| Voting Deadline | September 17, 2020 at 5:00 p.m. (ET) |
| Deadline to Object to Final Approval of Disclosure Statement, the Europe/ROW Sale Transaction, and/or Confirmation of Plan | September 17, 2020 at 4:00 p.m. (ET) |
| Deadline to File (i) Reply to Plan Objection(s), (ii) Brief in Support of Plan Confirmation, (iii) Declarations in Support of Confirmation, and (iv) Voting Certification | September 23, 2020 at 4:00 p.m. (ET) |
| Combined Hearing | September 25, 2020 at 2:00 p.m. (ET) |

### E.  Summary of Plan Classification and Treatment of Claims

**THE DEBTORS AND CREDITORS' COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST POSSIBLE RECOVERY FOR ALL STAKEHOLDERS.**

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder

thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

**HOLDERS OF CLAIMS IN CLASS 4 (SUPERPRIORITY NOTES GUARANTEE CLAIMS), CLASS 5 (EXCHANGE PRIORITY NOTES CLAIMS), AND CLASS 6 (FIRST LIEN NOTES CLAIMS) ARE THE ONLY CLASSES BEING SOLICITED UNDER, AND THE ONLY CLASSES ENTITLED TO VOTE ON, THE PLAN.**

**THE PLAN PROVIDES THAT HOLDERS OF CLAIMS IN CLASS 4 (SUPERPRIORITY NOTES GUARANTEE CLAIMS), CLASS 5 (EXCHANGE PRIORITY NOTES CLAIMS), AND CLASS 6 (FIRST LIEN NOTES CLAIMS) WHO (I) WHO VOTE TO ACCEPT THE PLAN OR ABSTAIN FROM VOTING ON THE PLAN, OR (II) WHO VOTE TO REJECT THE PLAN BUT, IN EITHER CASE, DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN SECTION 10.6 OF THE PLAN, SHALL BE DEEMED TO GRANT SUCH RELEASES.**

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests under the Plan.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, see Article V—Summary of Plan below.  The Plan constitutes a separate plan for each Debtor.  Each class of Claims and Interests only addresses claims against, or interest in ,a particular Debtor.  A discussion of the amount of Claims in each Class is set forth in Article V.B hereof.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan |
|-------|--------------------------|-----------|------------------------|------------------------------|--------------------------------|
| 1 | Priority Non-Tax Claims | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Other Secured Claims | (i) Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.<br><br>(ii) Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash | Unimpaired | No (Presumed to accept) | 100% |

8

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan |
|---|---|---|---|---|---|
| | | collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator. | | | |
| 3 | ABL Claims | (i) In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive Cash until all holders of Allowed ABL Claims are satisfied in full, taking into account any amounts paid to the holders of Allowed ABL Claims pursuant to the Americas Sale Order. <br><br> (ii) The Challenge Deadline relating to the ABL Credit Agreement and ABL Agent shall be deemed irrevocably expired (A) with respect to the Creditors' Committee as of the date of the entry of the Americas Sale Order, (B) with respect to the Settling Governmental Authorities, on the Effective Date, and (C) with respect to all other Persons and Entities, on August 27, 2020. For the avoidance of doubt, any reservation of rights relating to the ABL Credit Agreement and the ABL Agent, including paragraphs 37 to 41 of the Americas Sale Order, shall be deemed expired on the foregoing dates with respect to the foregoing parties, as applicable. | Unimpaired | No (Presumed to accept) | 100% |
| 4 | Superpriority Notes Guarantee Claims | The obligations under the Superpriority Notes Indenture shall be assumed by and assigned to the Europe/ROW Purchaser at the Europe/ROW Closing in accordance with the Europe/ROW Purchase Agreement and the Superpriority Notes Guarantee Claims and all Liens securing such Claims shall remain against and be ratified by the Europe/ROW Purchaser. Immediately upon such assumption and transfer of the Acquired Assets under the Europe/ROW Purchase Agreement, and without any further action, the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released and discharged. | Impaired | Yes | 100% |
| 5 | Exchange Priority Notes Claims | Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for Allowed Exchange Priority Notes Claims, each holder thereof shall receive (i) at the Europe/ROW Closing, its Pro Rata share of the consideration contemplated by Section 5.1(a) of the Plan in exchange for an aggregate amount of $70,000,000 of Exchange Priority Notes Claims, and (ii) for all remaining Allowed Exchange Priority Notes Claims, Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted. | Impaired | Yes | 17% |

RLF1 23874670V.1

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan |
|---|---|---|---|---|---|
| 6 | First Lien Notes Claims | Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed First Lien Notes Claim, each holder thereof shall receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted. | Impaired | Yes | 0% |
| 7 | General Unsecured Claims | (i) Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each holder thereof shall receive its Pro Rata share of (A) the GUC Trust Beneficial Interests (entitling such holder to a Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement), and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, until all Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.<br><br>(ii) The Settling Governmental Authorities, Environmental Trust, Frisco Governmental Authorities, and Frisco Trust shall not participate in distributions on account of their Environmental NPP Claims and Frisco NPP Claims, as applicable, from the GUC Trust up to the amount of the GUC Global Settlement Payment.  After the GUC Trust has distributed Cash in an aggregate amount equal to the GUC Global Settlement Payment, each Settling Governmental Authority and Frisco Governmental Authority shall be entitled to its Pro Rata share of Distributions in accordance with Section 4.7(b)(i) of the Plan on account of any Allowed Environmental NPP Claims and Allowed Frisco NPP Claims, as applicable.<br><br>(iii) All Notes Deficiency Claims shall not receive distributions in accordance with Section 4.7(b) and such Claims are waived for all purposes, including for voting and for distributions pursuant to and in accordance with Section 4.7(b) of the Plan. | Impaired | No (Deemed to Reject) | 1% [8] |

---

[8]   Pursuant to the Plan and the Global Settlement, the GUC Trust will receive (i) the GUC Global Settlement Payment; and (ii) the GUC Trust Causes of Action.  The value of the GUC Trust Causes of Action is currently undetermined.  The GUC Trustee will evaluate such causes of action and will determine whether to pursue or abandon them.  The estimated 1% recovery assumes that the GUC trustee abandons the GUC Trust Causes of Action and distributes the GUC Global Settlement Payment.  If that does not happen, the approximate recovery for General Unsecured Claims under the Plan may be less than 1%.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan |
|---|---|---|---|---|---|
| 8 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will be cancelled and not entitled to distribution or any recovery under the Plan. | Impaired | No (Deemed to Reject) | 0% |
| 9 | Intercompany Interests | All Intercompany Interests in a subsidiary Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 5.6(f) of the Plan. Each holder of an Intercompany Interest in a subsidiary Debtor shall neither receive nor retain any property of the estate or direct interest in property of the estate of such Debtor on account of such Intercompany Interests thereafter; provided, however, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in such Debtor may receive its Pro Rata Share of any remaining assets in the Debtor. | Impaired | No (Deemed to Reject) | 0% |
| 10 | Holdings Equity Interests | Except to the extent that a holder of Holdings Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Holdings Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all Holdings Equity Interests shall be cancelled and one share of Holdings common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Holdings Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of a Holdings Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Holdings Stock; provided, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Holdings Stock may receive its share of any remaining assets of Holdings consistent with such holder's rights of payment existing immediately prior to the Commencement Date unless otherwise determined by the Plan Administrator, on the date that Holdings' Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and (iii) the continuing rights of former holders of Holdings Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent. | Impaired | No (Deemed to reject) | 0% |
| 11 | Subordinated Securities Claims | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on | Impaired | No (Deemed to reject) | 0% |

11

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approximate Recovery Under Plan |
|---|---|---|---|---|---|
| | | account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | | | |

### F.   Summary of Plan Releases and Exculpation Provisions

> **THE PLAN SEEKS A RELEASE OF CLAIMS THAT YOU MAY HAVE AGAINST THIRD PARTIES, INCLUDING CERTAIN FOREIGN AFFILIATES OF THE DEBTORS, SUCH AS ANY GUARANTEE CLAIMS YOU MAY HAVE AGAINST SUCH PARTIES.  IF YOU ARE A HOLDER OF A CLAIM IN CLASS 1 (PRIORITY NON-TAX CLAIMS), CLASS 2 (OTHER SECURED CLAIMS), CLASS 3 (ABL CLAIMS), CLASS 4 (SUPERPRIORITY NOTES GUARANTEE CLAIMS), CLASS 5 (EXCHANGE PRIORITY NOTES CLAIMS), CLASS 6 (FIRST LIEN NOTES CLAIMS), AND CLASS 7 (GENERAL UNSECURED CLAIMS), YOU MAY BE AFFECTED BY SUCH RELEASES AND INJUNCTIONS IN THE PLAN. YOU SHOULD CAREFULLY REVIEW SECTION 10.6 OF THE PLAN AND SECTIONS I.F. AND V.I. OF THE DISCLOSURE STATEMENT TO SEE IF AND HOW YOUR RIGHTS MAY BE AFFECTED.  IF YOU OBJECT TO SUCH RELEASES OR INJUNCTIONS, YOU MUST FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN.   FAILURE TO OBJECT TO THE PLAN MAY RESULT IN SUCH RELEASES BEING APPROVED BY THE BANKRUPTCY COURT.**
>
> **IF YOU FILE AN OBJECTION TO THE PLAN RELEASES IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN, A HEARING WILL BE HELD VIRTUALLY, TELEPHONICALLY AND VIA ZOOM, ON SEPTEMBER 25, 2020 AT 2:00 P.M AT WHICH YOU WILL BE RQUIRED TO APPEAR.**

The Plan provides for the release of the Released Parties (as defined below) by (a) the Debtors pursuant to Section 10.5 of the Plan (the "**Estate Releases**") and (b) the Releasing Parties (as defined below) pursuant to Section 10.6 of the Plan (the "**Third-Party Releases**").   The Plan also provides for the exculpation of the Exculpated Parties (as defined below) pursuant to Section 10.7 of the Plan.

**The releases of the Released Parties and the exculpation of the Exculpated Parties are an integral part of the Plan and the proposed Global Settlement.**

**The Pension Benefit Guaranty Corporation ("PBGC") disputes the proposed releases and exculpation provided for in the Plan.  Please see the PBGC Objection (defined herein) annexed hereto as <u>Exhibit E</u>.**

With respect to Third-Party Releases, the "**Releasing Parties,**" as defined in the Plan, are collectively:

a)   the Consenting Creditors;

b)   the Creditors' Committee and each of its members in their capacity as such;

c)   all holders of Claims who vote to accept the Plan;

d)   all holders of Claims who are deemed to accept the Plan;

e)   all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in Section 10.6 of the Plan;

f)   ***solely with respect to the Europe ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims***; and

g)   with respect to any Person or Entity in the foregoing clauses (a) through (g), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (g).

The "**Released Parties**" are, as defined in the Plan: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties.  .[9]

The "**Exculpated Parties**" are, as defined in the Plan: (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) each of the DIP Lenders and the DIP Agent, (e) the Creditors' Committee and each of its members in their capacity as such, (f) the GUC Trust, (g) the GUC Trustee, (h) the Trustees, (i) the Consenting Creditors, and (j) with respect to each of the foregoing Persons or Entities in clauses (a) through (i), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein.

The Debtors believe that the Estate Releases satisfy the business judgment standard.  In exchange for the material benefits they will receive through the Plan, including the Global Settlement and Europe/ROW Credit Bid, and based upon the investigation conducted by the Subcommittee, the Debtors and the

---

[9]   "***Related Parties***" means with respect to any Exculpated Party or Released Party, as defined in the Plan: (a) such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; *provided*, that the Former Officers and Directors of the Debtors shall not be "Related Parties."

Creditors' Committee, have determined that the Estate Releases of the Released Parties are reasonable, appropriate and are being provided in exchange for fair consideration.

With respect to the Third-Party Releases, the Debtors believe that such releases are appropriate and may become binding in accordance with section 1141(a) of the Bankruptcy Code and applicable law. The Debtors believe that parties who abstain from voting and are given an opportunity to opt out of the Third-Party Releases but do not opt out may be deemed to consent to such releases under section 1141(a) of the Bankruptcy Code and applicable law. In addition, with respect to the non-consensual releases by all General Unsecured Creditors of the Europe/ROW Purchaser, the Transferred Entities and Consenting Creditors, the released parties have provided substantial and valuable consideration to the Chapter 11 Cases in exchange for such releases.

The Debtors will demonstrate at the Combined Hearing that the Released Parties are entitled to such releases because the Released Parties have made substantial and valuable contributions to the Debtors' restructuring through, among other things, efforts to negotiate and implement the Plan and the Global Settlement, including the $12.5 million cash contributions to be made by the Transferred Entities that will allow recoveries on account of Environmental NPP Claims and General Unsecured Claims that otherwise would not have been available at all. The contributions of such parties will maximize the value of the Debtors' estates for the benefit of all economic parties in interest.

In addition, each of the Exculpated Parties has made a substantial contribution to the Debtors' reorganization efforts and played an integral role in working towards an expeditious resolution of these Chapter 11 Cases. The Debtors and the Creditors' Committee believe that the exculpation provisions are appropriately limited to the Exculpated Parties' participation in these Chapter 11 Cases and have appropriate carve outs for liability resulting from gross negligence, willful misconduct, or fraud. Accordingly, each of the Released Parties and the Exculpated Parties warrant the benefit of the release and exculpation provisions.

Governmental Units (as defined in the Plan) are not Releasing Parties under the Plan and are not providing a release or covenant not to sue except as provided in the Environmental Settlement Agreement. The Governmental Units anticipate that the Environmental Settlement Agreement will include mutual releases among the parties or covenants not to sue by Settling Governmental Authorities consistent with the Global Settlement, which will be incorporated into the Debtors' proposed chapter 11 plan.

The Debtors and the Creditors' Committee believe that the Estate Releases and exculpation provisions in the Plan are necessary and appropriate and meet the requisite legal standards promulgated by the Bankruptcy Courts in this jurisdiction. Moreover, the Debtors will be prepared to present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions in the Plan.

## II.
## OVERVIEW OF THE COMPANY'S OPERATIONS

### A.     The Debtors' Business

Exide is a global leader in stored electrical energy solutions and one of the world's largest producers and recyclers of lead-acid and lithium-ion batteries, with operations in more than twenty (20) countries. The Company was founded in 1888 and is headquartered in Milton, Georgia. Through its four global business groups – Transportation Americas, Transportation Europe and Rest of World ("**ROW**"), Industrial Energy Americas, and Industrial Energy Europe and ROW – the Company provides a comprehensive range of stored electrical energy products and services for industrial and transportation applications. The Company

manufactures and distributes transportation and industrial batteries in North America, Europe, Asia, the Middle East, India, Australia, and New Zealand. Across the globe, Exide batteries power cars, boats, heavy duty vehicles, golf carts, powersports, and lawn and garden applications. Its network power solutions deliver energy to vast telecommunication networks in need of uninterrupted power supply.

The Company's operations consist of its (i) North American operations ("**Exide Americas**") and (ii) European and ROW operations ("**Exide Europe/ROW**").

*Transportation.* In its transportation segments, the Company manufactures, distributes, and markets lead-acid and lithium ion batteries for automotive, heavy duty, and recreational applications for a diversified customer base of blue-chip original equipment manufacturers ("**OEM**"), aftermarket retailers, and installers. Exide's proprietary and private label products include starting, lighting, and ignition batteries for cars, trucks, off-road vehicles, agricultural and construction vehicles, motorcycles, recreational vehicles, marine, and other applications. Exide Americas works with channel partners to deliver its products to customers, while Exide Europe/ROW maintains its own distribution network.

*Industrial Energy.* The Company's industrial batteries consist of motive power cells and network power applications. Motive power cells are used in the material handling industry for equipment such as electric fork-lift trucks as well as in other machinery, including floor cleaning machinery, powered wheelchairs, railroad locomotives, mining equipment, and electric road vehicles. Network power batteries provide energy storage solutions for critical systems that require uninterrupted power supply and are used to power, among other things, telecommunications systems, computer installations and data centers, hospitals, air traffic control systems, security systems, electric utilities, railways, and various military applications. The Company has a diverse customer base that includes a number of major end-user customers, retailers and OEMs, utilities, and government and military agencies.

### 1)   Exide Americas

*(a) Manufacturing.* Exide Americas produces batteries and battery components out of seven U.S. manufacturing facilities—five of which are dedicated to its transportation business segment (the "**Transportation Americas Facilities**") and two of which are dedicated to its industrial business segment (the "**Industrial Energy Americas Facilities**"). As part of its operational initiatives (described in further detail in Article III hereof), the Company is focused on transitioning from mixed product plants to plants that produce fewer SKUs and, thus, are able to operate more efficiently. To that end, the Transportation Americas Facilities are composed of two dedicated battery manufacturing plants and two dedicated battery component manufacturing plants.[10] Likewise, both of the Industrial Energy Americas Facilities are dedicated to cell manufacturing. The Company uses the battery component facilities to strategically supply the battery and cell manufacturing plants, which enables the Company to control the cost, quality and reliability of its products. In fiscal year 2020, the Company produced approximately 11.7 million batteries in its Transportation Americas Facilities and approximately 714,000 cells in its Industrial Energy Americas Facilities.

*(b) Recycling.* The Company has two smelters in the U.S., both of which are currently active battery collection and recycling facilities. These facilities reclaim lead by recycling spent lead-acid batteries, which are obtained for recycling from Exide's customers (who exchange spent battery cores for credit on purchases) and third party spent-battery collectors. Recycling keeps batteries from being disposed of improperly or shipped to regions where regulations governing battery disposal are lacking. In fiscal year 2020, approximately 170,000 tons of batteries, plant scrap, and range lead were recycled at Exide Americas'

---

[10] The fifth Transportation Americas Facility, located in Reading, Pennsylvania, operates as a plastics recycling facility.

smelters or by a third party at Exide's request.  Exide's recycling efforts enabled it to better control the cost of lead—the principal raw material used in making its products.

2)    *Exide Europe/ROW*

*(a) Manufacturing*.  Exide Europe/ROW produces batteries and battery components out of nine European manufacturing facilities, four of which are dedicated to its transportation business segment (the "**Transportation Europe/ROW Facilities**") and five of which are dedicated to its industrial business segment (the "**Industrial Energy Europe/ROW Facilities**").  Similar to the limited SKU strategy employed at Exide Americas, all of the Exide Europe/ROW facilities are focused on battery production, however, Exide Europe/ROW purchases components from third party suppliers.  In fiscal year 2020, the Company produced approximately 12.7 million batteries in its Transportation Exide Europe/ROW Facilities and approximately 5.8 million cells in its Industrial Energy Europe/ROW Facilities.

*(b) Recycling*.  Exide Europe/ROW also has two active smelters located in Europe, which process spent batteries and supply the Exide Europe/ROW facilities with reclaimed lead for use in battery production.  In fiscal year 2020, approximately 120,000 tons of batteries, plant scrap, and range lead were recycled at Exide Europe/ROW's smelters or by a third party at Exide's request.

### B.    Debtors' Organizational Structure.

All of the Debtors are direct or indirect subsidiaries of Holdings.  Most of the Debtors' North American operations are owned, directly or indirectly by Debtor Exide Technologies LLC, a Delaware limited liability company that is wholly owned by Holdings.  The Debtors' Europe/ROW operations are primarily held through non-Debtor Exide International Holdings, LP ("**Exide International**"), a limited partnership formed under the laws of the Cayman Islands that is wholly owned by Holdings.  An organizational chart illustrating the corporate and capital structure of the Debtors is annexed hereto as Exhibit C-1.

### C.    Directors and Officers.

As of the Commencement Date, Holdings' board of directors (the "**Board of Directors**") is comprised of the following six (6) members, including four (4) independent directors:

| Name | Director Since | Position/Affiliation |
|---|---|---|
| Timothy D. Vargo | April 2017 | Chairman of the Board of Directors, President, CEO |
| Andrew Axelrod | August 2019 | Director, Axar Capital |
| Mark G. Barberio | April 2015 | Independent Director |
| Alan Carr | April 2019 | Independent Director |
| William Transier | April 2019 | Independent Director |
| Harvey Tepner | April 2020 | Independent Director |

As noted above, prior to the Commencement Date, the Board of Directors formed (i) the Special Committee composed of Messrs. Barberio, Carr, Transier and Tepner to direct and oversee all aspects of the Company's

16

restructuring process and Chapter 11 Cases, and (ii) the Subcommittee composed of Mr. Tepner to investigate prepetition affiliate transactions of the Company.

As of the date of this Disclosure Statement, the Debtors' senior executive team is comprised of the following individuals:

| Name | Position |
|---|---|
| Timothy D. Vargo | CEO and President |
| Mike Judd | Executive Vice President, COO and President, North America |
| Lou Martinez | Executive Vice President and CFO |

### D.   Debtors' Existing Capital Structure

#### a)   Prepetition Indebtedness

As of the Commencement Date, the Debtors, together with their non-Debtor affiliates, had outstanding funded debt obligations in the amount of approximately $817.4 million in the aggregate, summarized in the following chart:

| Instrument / Facility | Principal Outstanding |
|---|---|
| ABL Credit Agreement | $101,200,000 |
| 10.75% Superpriority Lien Senior Secured Notes due 2021 | $152,513,000 |
| 11.0% Exchange Priority Notes due 2024 | $390,000,000 |
| 11.0% First Lien Senior Secured Notes due 2024 | $161,023,000 |
| **Total Secured Debt** | **$804,736,000** |
| 3.79% Deferred Payment Notes due 2022 | $2,700,000 |
| 11.0% Unsecured Notes due 2020 | $9,000,000 |
| 11.0% Unsecured Notes due 2022 | $1,000,000 |
| **Total Unsecured Funded Debt** | **$12,700,000** |
| **Total** | **$817,436,000** |

#### (a)   *ABL Facility (Secured)*

As of the Commencement Date, there was approximately $101.2 million in aggregate outstanding unpaid principal under that certain ABL Credit Agreement, dated as of April 30, 2015 (as amended, modified, or otherwise supplemented from time to time, the "**ABL Credit Agreement**"), by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, and Exide Holding Netherlands B.V. (each a direct or indirect subsidiary of Holdings and a "**Prepetition ABL Borrower**" and, collectively, the "**Prepetition ABL Borrowers**"), Bank of America, N.A., as administrative agent (the "**Prepetition Admin Agent**"), Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents (collectively, the "**Prepetition Collateral Agents**" and, together with the Prepetition Admin Agent, the "**Prepetition ABL Agents**"), the lenders from time to time party thereto (each a "**Prepetition ABL**

Lender" and, collectively, the "**Prepetition ABL Lenders**").  The Debtors' obligations under the ABL Credit Agreement mature on July 31, 2021.

The revolving credit commitments under the ABL Credit Agreement are divided into United States, Canadian, United Kingdom, and Dutch revolving credit commitments, in each case, committed to the Prepetition ABL Borrowers organized in that jurisdiction. Pursuant to the ABL Credit Agreement and the Foreign General Continuing Guaranty, dated as of April 30, 2015 (as amended or supplemented from time to time, the "**Foreign ABL Guaranty**"), obligations under the ABL Credit Agreement of the Canadian, United Kingdom, and Dutch Prepetition ABL Borrowers are guaranteed by Holdings, the Prepetition ABL Borrowers and certain subsidiaries of Holdings organized both in and outside of the United States.  Pursuant to the ABL Credit Agreement and the U.S. General Continuing Guaranty, dated as of April 30, 2015, obligations under the ABL Credit Agreement of the United States Prepetition ABL Borrowers are guaranteed by Holdings, Exide Technologies, and certain indirect subsidiaries of Holdings organized in the United States and not by any of the European affiliates.

As of the Commencement Date, the total amount borrowed on the U.S. line under the ABL Credit Agreement was approximately $95 million (the "**ABL Obligations**").  The Debtors' European affiliates do not guarantee this obligation.  Separately, as of the Commencement Date, $6.4 million was drawn and outstanding on the UK line under the ABL Credit Agreement.  The UK obligations are guaranteed by the Debtors and certain non-Debtor affiliates in Europe.

The outstanding obligations under the ABL Credit Agreement are secured in accordance with the terms of the US Security Agreement, dated as of April 30, 2015 (as amended, supplemented, or modified from time to time, the "**ABL Security Agreement**"), and the other United States and foreign security documents specified in the ABL Credit Agreement.  Pursuant to the terms of the ABL Security Agreement and the Amended and Restated Intercreditor Agreement, dated as of June 17, 2019 (as amended, supplemented or modified from time to time, the "**Intercreditor Agreement**"), the Prepetition ABL Lenders were granted first-priority liens on certain assets (with certain specified exceptions) including, but not limited to, all accounts, chattel paper, cash and deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights, and commercial tort claims (the "**ABL Priority Collateral**"), and a third-priority lien on the Notes Priority Collateral (as defined below).[11]

Following the Commencement Date, the U.S. Line increased by approximately $6 million for amounts owed related to hedging, purchasing card exposure and prepetition professional fees, and the UK line was paid down to $0 by certain non-Debtor affiliates of the Debtors.  The ABL Obligations are expected to be repaid in full in cash upon the closing of the Americas Sale Transaction.

(b)  *10.75% Superpriority Lien Senior Secured Notes due 2021 (Secured)*

As of the Commencement Date, Debtors Holdings and Exide Technologies were guarantors of secured note obligations consisting of $152.5 million in aggregate outstanding principal of 10.75% Superpriority Lien Senior Secured Notes due 2021 (the "**Superpriority Notes**" and the holders thereof, the "**Superpriority Noteholders**") issued pursuant to that certain Indenture (as amended or otherwise modified from time to time, the "**Superpriority Notes Indenture**") by and between non-Debtor Exide International, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent and Bank of America National Association, as successor trustee and collateral agent, dated as of June 17, 2019.  The Superpriority Notes mature on October 31, 2021 with the ability to extend to October 31, 2022 at the

---

[11] An organizational chart illustrating the priority of liens over the assets of the Debtors and their non-Debtor affiliates is annexed hereto as <u>Exhibit C-2</u>.

Company's option in exchange for a 1.0% cash fee payable to the Superpriority Noteholders. The Superpriority Notes were issued in connection with the June 2019 Financing (as defined below).

The obligations under the Superpriority Notes Indenture are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of a Superpriority Lien Security Agreement, dated as of June 17, 2019 (as amended or otherwise modified from time to time, the "**Superpriority Security Agreement**"). Pursuant to the terms of the Superpriority Security Agreement and the Intercreditor Agreement, Holdings and certain subsidiaries of Holdings each granted, to the Superpriority Noteholders, first-priority liens on all equipment, inventory, real property, intellectual property, the stock of Exide Technologies and certain subsidiaries of Holdings, and substantially all of the other assets of Exide Technologies, Holdings, and certain subsidiaries of Holdings, other than the ABL Priority Collateral (the "**Notes Priority Collateral**") and a second-priority lien on the ABL Priority Collateral.

> (c)   *11% First Lien Secured Notes due 2024 (Secured)*

11% Exchange Priority Notes. As of the Commencement Date, the Debtors had outstanding secured note obligations consisting of $390.0 million in aggregate outstanding principal of 11% Exchange Priority Notes due 2024 (the "**Exchange Priority Notes**" and the holders thereof, the "**Exchange Priority Noteholders**"), issued pursuant to that certain Indenture by and between Exide Technologies, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee and collateral agent, dated as of June 25, 2019 (as amended or otherwise modified from time to time, the "**Exchange Priority and First Lien Notes Indenture**"). The Exchange Priority Notes mature on October 31, 2024. The Exchange Priority Notes were issued under an exchange offer in connection with the June 2019 Financing, pursuant to which certain 2022 Legacy First Lien Noteholders exchanged their 2022 Legacy First Lien Notes (each as defined below) for Exchange Priority Notes at an agreed-upon exchange rate.

First Lien Notes. As of the Commencement Date, the Debtors had outstanding secured note obligations consisting of $161.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes due 2024 (the "**First Lien Notes**" and the holders thereof, the "**First Lien Noteholders**") issued pursuant to Exchange Priority and First Lien Notes Indenture. The 2024 First Lien Notes mature on October 31, 2024.

The obligations under the First Lien Notes Indenture are guaranteed by Holdings and certain subsidiaries of Holdings and are secured, in each case, in accordance with the terms of an Amended and Restated First Lien Security Agreement, dated as of June 25, 2019 (as amended or otherwise modified from time to time, the "**1L Security Agreement**"). Pursuant to the terms of the 1L Security Agreement and the Intercreditor Agreement, Holdings and certain of its subsidiaries granted to the Exchange Priority Noteholders and the First Lien Noteholders second-priority liens on the Notes Priority Collateral and third-priority liens on the ABL Priority Collateral. Pursuant to the Exchange Priority and First Lien Notes Indenture, the First Lien Notes are subordinated in contractual right of payment to the Exchange Priority Notes.

> (d)   *3.79% Deferred Payment Notes due 2022 (Unsecured)*

As of the Commencement Date, Holdings had outstanding unsecured note obligations consisting of $2.7 million in aggregate outstanding principal of 3.79% Second Lien Deferred Payment Notes due 2022 (the "**Legacy Second Lien Notes**") issued pursuant to that certain indenture by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015. The Legacy Second Lien Notes mature on April 30, 2022.

In connection with the June 2019 Financing, the liens on certain assets of Holdings securing the Legacy Notes were released.

RLF1 23874670V.1

*(e)*     *Legacy First Lien Notes (Unsecured)*

<u>11% Legacy First Lien Notes Due 2020</u>.  As of the Commencement Date, the Debtors had outstanding unsecured note obligations consisting of $9.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes Due 2020 (the "**2020 Legacy First Lien Notes**" and the holders thereof, the "**2020 Legacy First Lien Noteholders**"), issued pursuant to that certain indenture by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015 (as amended or otherwise modified from time to time, the "**2020 Legacy First Lien Notes Indenture**").  The 2020 Legacy First Lien Notes matured on April 30, 2020 and the Debtors did not make the maturity payment.

In May 2017, in connection with an exchange offer (the "**2017 Exchange Offer**"), (i) certain 2020 Legacy First Lien Noteholders exchanged their 2020 Legacy First Lien Notes for 2022 Legacy First Lien Notes at an agreed-upon exchange rate, and (ii) the covenants in the 2020 Legacy First Lien Notes Indenture were amended to, among other things, allow the release of the first priority lien on certain assets of Holdings that previously secured such notes.  The current 2020 Legacy First Lien Noteholders are holders of such notes who did not participate in the 2017 Exchange Offer.

<u>11% Legacy First Lien Notes Due 2022</u>.  As of the Commencement Date, the Debtors had outstanding unsecured note obligations consisting of $1.0 million in aggregate outstanding principal of 11% First Lien Senior Secured Notes Due 2022 (the "**2022 Legacy First Lien Notes**" and the holders thereof, the "**2022 Legacy First Lien Noteholders**") issued pursuant to that certain Indenture by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017 (as amended or otherwise modified from time to time, the "**2022 Legacy First Lien Notes Indenture**").  The 2022 Legacy First Lien Notes were issued in connection with the 2017 Exchange Offer and mature on April 30, 2022.

In connection with the June 2019 Financing, the covenants in the 2022 Legacy First Lien Notes Indenture were amended to, among other things, allow the release of the first priority lien on certain assets of Holdings that previously secured such notes.  The current 2022 Legacy First Lien Noteholders are holders of such notes who did not participate in the June 2019 Financing.

*(f)*     <u>Other Financing Arrangements</u>

As of the Commencement Date, the Debtors had $11.1 million in aggregate outstanding capital lease financing obligations, pursuant to that certain (i) Master Lease Agreement, dated June 29, 2017, by and between Exide Technologies, as lessee, and Stonebriar Commercial Finance LLC, as lessor, for certain battery component manufacturing equipment located at its Kansas City, Missouri facility, and (ii) Master Lease of Personal Property, Finance Lease, dated September 19, 2016, by and between Exide Technologies, as lessee, and BMO Harris Equipment Finance Company, as lessor, for certain battery manufacturing equipment located at its Kansas City, Kansas facility.

*(g)*     <u>General Unsecured Claims</u>

In the ordinary course of business, the Debtors incur trade credit on varying terms.  As of the Commencement Date, the Debtors estimated that they had approximately $97.5 million in general unsecured claims, excluding any lease rejection claims.

### b) Intercompany Claims

In the ordinary course of business, the Debtors engage in intercompany transactions (collectively, "**Intercompany Transactions**") with each other and with certain of their non-Debtor affiliates (each a "**Non-Debtor Affiliate**", and collectively, the "**Non-Debtor Affiliates**") that give rise to intercompany receivables and payables (collectively, the "**Intercompany Claims**"). The Debtors maintain records of all Intercompany Transactions (including those with Non-Debtor Affiliates) and can ascertain, trace, and account for all Intercompany Claims. The Intercompany Transactions are ordinary course transactions that are integral to the Company's business and the function of their cash management system.

The primary Intercompany Transactions giving rise to Intercompany Claims are (i) intercompany cash transfers for working capital purposes, which are not entered into in the ordinary course and historically have been documented through intercompany notes, (ii) management fee transactions, relating to annual fees charged by Exide Technologies to other Debtors and its Non-Debtor affiliates on account of allocated shared expenses, (iii) centrally-billed expense allocations, which are recorded on intercompany accounts and are generally not cash settled, and (iv) intercompany trade transactions pursuant to which the Company engages in the purchase and sale of goods among the Debtors and Non-Debtor Affiliates.[12]

Notwithstanding the Company's historical treatment of the settlement of Intercompany Transactions, as described in further detail in the Postpetition Intercompany Protocols in the Cash Management Motion, the Debtors settle all Postpetition Intercompany Transactions between Debtors and Non-Debtor Affiliates on a monthly basis. All Postpetition Intercompany Transactions among the Debtors will be recorded as an Intercompany Claim and treated in the same manner as they were prior to the Commencement Date.

### c) Equity Ownership

As of the Commencement Date, the outstanding shares of common stock, par value $0.01 per share, were held (either directly and/or through subsidiaries or affiliates) as follows:

| Holder | Percentage of Outstanding Holdings Common Stock[13] |
|---|---|
| MacKay Shields LLC | 39.83% |
| Alliance Bernstein L.P. | 19.12% |
| D.E. Shaw Galvanic Portfolios, L.L.C. | 10.76% |
| Neuberger Berman | 6.38% |
| Axar Capital Management, L.P. | 4.03% |
| Less than 5% holders | 19.88% |
| **Total** | **100%** |

---

[12] Additional information regarding the Intercompany Transactions can be found in the Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (V) Extend Time to Comply with, or Seek Waiver of, 11 U.S.C. § 345(b) (Docket No. 3) (the "**Cash Management Motion**").

[13] As of the Commencement Date, Holdings did not have any other classes of stock outstanding.

### E.        DOE Grant Funded Assets

Prior to the Petition Date, the Debtors received funding pursuant to a Department of Energy ("**DOE**") financial assistance funding opportunity, Assistance Agreement Award No. DE-EE0002618 (the "**Grant**"), with which the Debtors purchased certain equipment generally used in the manufacturing of advanced lead acid battery technologies (the "**Grant Funded Assets**"). Pursuant to the terms of the Grant, the Debtors received grant funds in the amount of approximately $34.3 million and the Debtors contributed approximately $35.7 million to acquire more than $58 million in Grant Funded Assets. The Debtors' property interest in the Grant Funded Assets are limited and conditional, subject to compliance with all applicable DOE regulations, including but not limited to 10 C.F.R. § 600.321. Pursuant to these regulations, DOE retains conditional title to the Grant Funded Assets, and the Debtors are required to use the Grant Funded Assets in furtherance of the program purpose. The Debtors may not dispose of the Grant Funded Assets without complying with the requirements of 10 C.F.R. 600.321. the Grant agreements, 11 U.S.C. § 363(h) & (j) and other applicable non-bankruptcy law.

### III.
### KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

### A.        Background and Prior Restructuring

This is the Company's second chapter 11 filing in seven (7) years and the third in the Company's history. In June 2013, Debtor Exide Technologies, LLC (which was a corporation at that time) commenced a chapter 11 case in the Delaware bankruptcy court—*In re Exide Technologies*, Case No. 13-11482 (MWF) (the "**2013 Chapter 11 Case**"). In March 2015, the Delaware bankruptcy court confirmed the Company's plan of reorganization after nearly two (2) years of complex and extensive negotiations.[14]

Under the plan of reorganization confirmed in the 2013 Chapter 11 Case, Exide deleveraged its balance sheet by approximately $600 million, raised approximately $165 million in new capital, and secured a $200 million exit ABL financing facility. The Company emerged from the 2013 Chapter 11 Case as a going-concern, continued its operations across virtually all of its existing world-wide business segments, and preserved nearly 10,000 jobs.

The Company emerged from the 2013 Chapter 11 Case in April 2015 and consummated the transactions contemplated in its confirmed plan of reorganization, including the formation of (i) the Exide Creditors' Liquidating Trust (the "**2013 Case GUC Trust**"), for the purpose of liquidating and distributing assets allocated to general unsecured creditors, and (ii) the Vernon Tort Claims Trust (the "**2013 Case Vernon Trust**") for the purpose of pursuing litigation claims on behalf of tort claimants in connection with environmental obligations of the Company on account of its closed Vernon, California facility (the "**Vernon Facility**"), and distributing any litigation proceeds therefrom. The 2013 Case GUC Trust is still in existence (and will continue through April 2023) for the purpose of remitting proceeds of preference actions and other assets from the Company to the beneficiaries of the 2013 Case GUC Trust. Under the current applicable timeline, the final distributions under the 2013 Case GUC Trusts will be made during the first calendar quarter of 2022. As of the Commencement Date, the 2013 Case Vernon Trust continues to pursue litigation and mediation claims in connection with the Company's Vernon Facility.

### B.        Circumstances Leading to Commencement of the Chapter 11 Cases

Notwithstanding the Company's efforts to implement its business plan following its emergence from the 2013 Chapter 11 Case and the support of its new owners and lenders, the Company continued to face

---

[14]     *See In re Exide Technologies*, Case No. 13-11482 (MWF) (Docket No. 3423).

liquidity, performance, and operational challenges that were more persistent and widespread than anticipated. Despite significant investment and operational improvements, the Company continues to experience significant operational strains on its liquidity due to high working capital and capital expenditure requirements, legacy environmental costs, and industry and other pressures, including a mild winter which reduced battery demand and, most recently, the COVID-19 pandemic. In addition to the foregoing operational challenges, the Company's high leverage, and costs associated with its debt service and maturities, have exacerbated its already-negative free cash flow generation.

### a) Operational Challenges

#### (i) Rising Production Costs

The cost of lead currently represents approximately 37% of the Debtors' cost of goods sold. The Company has generally managed this key cost driver through use of its recycling facilities. However, the closure of the Company's recycling facilities in Frisco, Texas and Vernon, California caused the Company to become more dependent on third party recycled lead tolling. As a result, the Company had to increase third party tolling contracts to fill shortfalls in its customer battery recycling program, which increased the Company's production costs. Open market junk battery purchases impact the Company's raw lead cost and expose the Company to fluctuations in the commodity price, which cannot always be passed on to customers.

#### (ii) Operational Inefficiencies

After emerging from the 2013 Chapter 11 Case, the Company continued to suffer from operational inefficiencies. Specifically, the operation of the Company's mixed-use facilities, which produced multiple products at the same time, led to product inefficiencies and reduced margins. Furthermore, the Company used its own aftermarket store delivery network that proved inefficient, such that the incremental revenue gained from maintaining the branch store network was outweighed by the costs of operating the stores.

#### (iii) COVID-19 Impact

Over the past two months, the Company's operations have been significantly impacted by the global COVID-19 pandemic. Cash receipts have been adversely affected due to lower consumer demand and customers attempting to conserve cash. Additionally, the Company's supply chains have been impacted by plant shut downs and government enforced lock downs. In Europe, the Company has been forced to fully suspend operations at a number of its facilities and production has been slowed down in the North American operations as well.

### b) The Debtors are Highly Levered

Despite a significant increase in capital expenditures and the modernization of its production processes following its emergence from the 2013 Chapter 11 Case, the Company fell short of its operating and margin improvement objectives. As a result, cash flows are insufficient to service the level of debt with which it emerged from the 2013 Chapter 11 Case and which was incurred during the subsequent five (5) years to fund expenditures on facility remediation costs and capital investments. As of March 31, 2020, the Company's indebtedness was approximately 9.2x EBITDA; prior to the June 2019 Financing (as defined below), it was levered to approximately 9.6x EBITDA.[15] Over the last three years, the Debtors' cash interest expense has averaged approximately $26.8 million per year. The costs of such debt service has, of course, impacted the Debtors' ability to invest in product and growth initiatives. Despite the full equitization of

---

[15] EBITDA measured as the last-twelve-months EBITDA for each of March, 31, 2020 and June 30, 2019, respectively.

the Convertible PIK Notes (as defined below) in connection with the Optimization (as defined below), the Debtors' current balance sheet is not sustainable over the long term.

*c)* **Environmental Liabilities**

As a result of its multinational manufacturing, distribution, and recycling operations, the Company is subject to numerous U.S. federal, state, and local environmental, occupational health, and safety laws and regulations, as well as similar laws and regulations in other countries in which it operates (collectively, "**EH&S Laws**"). The Company is exposed to obligations and liabilities under such EH&S laws arising from its current and past manufacturing or recycling/recovery operations and from the handling, release, treatment, storage, and disposal of materials designated as hazardous substances or hazardous wastes (collectively, the "**Environmental Liabilities**").

The Company owns or leases twenty-three (23) non-performing properties across the United States and one (1) non-performing property in Canada in which its activities are limited to environmental remediation and/or maintenance efforts (collectively, the "**NPPs**") of which (i) eight (8) NPPs have been remediated and/or are not known to require significant remediation other than operation and maintenance, and (ii) sixteen (16) NPPs are properties that are subject to ongoing environmental remediation efforts. The remediation efforts undertaken by the Company in connection with the NPPs vary in scope and stage across the various sites. For example, the Company has completed remediation at its Kankakee, Illinois site pursuant to a voluntary agreement with Illinois state authorities. With respect to the Vernon Facility, the Company is subject to a Non-Prosecution Agreement with the U.S. Attorney's Office for the Central District of California and a series of orders from the California Department of Toxic Substances Control that required the Company to ultimately close the Vernon Facility, conduct significant decommissioning and remediation measures and remit substantial payments in connection with environmental conditions at the site.

The Company has spent hundreds of millions of dollars to address Environmental Liabilities attributed to its historic operations. Since emerging from the 2013 Chapter 11 Case, the Company has spent approximately $166 million on operating and remediation costs at the Vernon Facility alone. In 2018 and 2019, the Company spent approximately $35.6 million and $29.5 million, respectively, in environmental remediation costs.

Given the Company's operational headwinds and financial position, as further described herein, payment of remediation costs associated with the Environmental Liabilities continued to cause significant strains on the Company's liquidity and ability to operate as a going concern and are no longer feasible. Unlike their predecessors, however, the Debtors did not commence these Chapter 11 Cases with the intent to pursue a recapitalization transaction and emerge from the Chapter 11 Cases as a reorganized business. On the contrary, with respect to any assets that the Debtors would be unable to sell to third party purchasers through the pre and postpetition marketing process, the Debtors' intent was to liquidate or abandon such assets. At the end of these Chapter 11 Cases, the Debtors will not emerge as a reorganized business, and as such, they will no longer be able to retain and support the ongoing maintenance and remediation of the NPPs. As such, the Debtors sought to commence good faith negotiations at the outset of these Chapter 11 Cases with various governmental regulatory agencies concerning the NPPs pursuant to certain settlement procedures established by the Bankruptcy Court in these Chapter 11 Cases. The Debtors' overarching goal of establishing and implementing these settlement procedures in the Chapter 11 Cases with respect to the NPPs was to deal with the NPPs in an efficient and orderly manner that minimizes the risk of harm to public health and safety but also recognizes the Debtors' challenged financial circumstances.

**C.** **Debtors' Prepetition Restructuring Efforts**

24

<blockquote><i>a)</i>    <b>Operational Initiatives</b></blockquote>

In an effort to reduce its operating expenses, the Company began an extensive review of its overhead expenses, which resulted in the Company undertaking certain cost-cutting measures.

<blockquote>(i)      Distribution</blockquote>

In March 2019, in an effort to address inefficiencies in its distribution model, Exide sold its Transportation Americas branch network business to Battery Systems, Inc. ("**BSI**" and such transaction, the "**Branch Network Sale**"). Prior to the Branch Network Sale, Exide operated approximately 42 branches throughout North America, which sold and distributed batteries and other products to customers, battery specialists, retail stores, and OEM dealers. Exide now sells its aftermarket Transportation Americas products through the BSI-owned branch network and other aftermarket industry. By transitioning to a "truck load" delivery model and relying on channel partners for distribution of its products, Exide is able to focus on large, direct-ship customers for its in-house distribution network, which has significantly improved delivery and cost efficiency.

<blockquote>(ii)     Facility Closure</blockquote>

In March 2019, as part of its plan to consolidate product lines and move away from mixed product manufacturing plants, Exide announced the closure of its facility located in Columbus, Georgia. The facility, which closed its primary smelting operations prior to the Commencement Date and is in the process of closing its remaining smelting and manufacturing operations, was one reason for shrinking margins and was a drain on the Company's working capital.

<blockquote>(iii)    Headcount Reduction</blockquote>

Following an extensive review of it overhead expenses, the Company reduced its headcount by approximately 800 positions over the past two (2) fiscal years.

<blockquote><i>b)</i>    <b>June 2019 Financing Transaction</b></blockquote>

In June 2019, as part of its effort to deal with continuing liquidity issues, the Company obtained a new money investment and exchange of existing debt from its lender group (the "**June 2019 Financing**"). The June 2019 Financing consisted of (i) the exchange of 2022 Legacy First Lien Notes (which at the time were secured by a first priority lien on Notes Collateral) for (a) the Exchange Priority Notes and (b) the First Lien Notes, (ii) the amendment of the 2022 Legacy First Lien Notes Indenture to, among other things, eliminate substantially all of the restrictive covenants and certain events of default, and release the collateral thereunder, (iii) the issuance by Exide International of $150.0 million aggregate principal amount of Superpriority Notes, (iv) the exchange and conversion of 7.00% Second Lien Senior Secured Convertible PIK Notes due 2025 and 7.25% Second Lien Senior Secured Convertible PIK Notes due 2025 for (a) 7.25% 1.5 Lien Senior Secured Convertible PIK Notes due 2027 (the "**Convertible PIK Notes**"), and (b) common equity of Exide Technologies, and (v) the issuance by Exide Technologies of an intercompany note in favor of non-Debtor Exide International, to effect the transfer of approximately $131.1 million of the proceeds of the Superpriority Notes issuance to Exide Technologies for funding short term working capital needs in the Exide Americas business segment. The June 2019 Financing effectively reduced the Company's indebtedness by approximately $25 million, and provided approximately $118 million of new money on the Company's balance sheet, net of transaction fees and costs.

*c)*     **December 2019 Optimization Transactions**

In December 2019, Exide Technologies was a corporation and the ultimate parent of the Company group. To align the Company's legal structure with its operational structure and to facilitate a sale or financing of the Europe/ROW business, Exide Technologies completed an internal reorganization (the "**Optimization**"), pursuant to which it converted to a limited liability company.  In connection with the Optimization, the Ad Hoc Group equitized the full amount of approximately $291.0 million of outstanding Convertible PIK Notes issued pursuant to the Indenture dated as of June 25, 2019.

As a result of the Optimization, with limited exceptions, the legal entities comprising Exide Americas and the Exide Europe/ROW business segments were shifted to separate sides of the corporate structure and the equitization of the Convertible PIK Notes substantially de-levered the Debtors' capital structure.  More specifically, (i) Holdings was created and became the sole member of Exide Technologies and the new ultimate parent of the business, (ii) Exide Technologies became the parent of substantially all of the Exide Americas business, and (iii) non-Debtor Exide International, became the parent of substantially all of the Exide Europe/ROW business (other than Exide Technologies (Shanghai) Co., Ltd, which will remain a subsidiary of Exide Technologies).[16]

**D.**     **Prepetition Marketing Process**

In December 2018, the Company initiated a process to evaluate strategic alternatives to enhance value and engaged XMS Capital Partners, LLC ("**XMS**") as its investment banker. XMS contacted over 150 potential bidders, sixty (60) of whom signed confidentiality agreements in connection with the process.  Ultimately, however, in the spring of 2020, the Company engaged Weil, Gotshal & Manges LLP ("**Weil**"), Ankura Consulting Group, LLC ("**Ankura**"), and Houlihan Lokey Capital, Inc. ("**Houlihan**"),[17] as its legal, financial and investment banking advisors, respectively, to assist and advise in its contingency planning process.

The Board of Directors delegated decision-making authority over the marketing and sale process (the "**Prepetition Marketing Process**") to the Special Committee.

The Company undertook an extensive marketing effort and solicited indications of interest from seventy-eight (78) strategic and financial buyers with the financial and operational wherewithal to complete a transaction. Thirty-two (32) of the parties contacted executed confidentiality agreements, after which the Company provided them with a Confidential Information Memorandum, financial projections, and access to a data room.

The deadline for interested parties to submit initial bids was May 6, 2020.  The Company received seven (7) indications of interest ("**IOIs**").  Five (5) of the bids were for certain business segments of the Company and two (2) were bids for substantially all of the Company's assets as a going concern, or a combination of assets in the Exide Americas and Exide Europe/ROW business segments (the "**All-Company Bids**"). Following extensive discussions with the Special Committee and its legal and financial advisors, the Company selected twenty-one (21) parties to submit updated IOIs and participate in further negotiations and diligence, including telephonic management presentations that were held during the weeks of May 4 and May 11, 2020.  Following the management presentations, the Company and its advisors continued to

---

[16]   Given their proximity to these Chapter 11 Cases, the June 2019 Financing and the Optimization were reviewed by the independent Subcommittee, under advisement by Weil, as well as the Creditors' Committee and its advisors.

[17]   Houlihan was previously engaged by the Company in March 2019 for investment banking services that ultimately culminated in the consummation of the June 2019 Financing.

provide due diligence to the remaining bidders in advance of the second round of IOIs. The Company expected to receive the second round IOIs on or about May 18, 2020, and in the meantime, the Company and its advisors continued to engage in discussions with all bidders.

Although the commencement of these Chapter 11 Cases ensued before the Prepetition Marketing Process was completed, the Prepetition Marketing Process provided both the Debtors and potential bidders with a valuable head start on the sale process. The Prepetition Marketing Process enabled the Debtors to solicit IOIs and gain more insight into asset values and market conditions. The Debtors were also able to populate a data room that has virtually all the information that any potential bidder might be interested in. The Prepetition Marketing Process also provided potential bidders with time to commence their diligence and internal approval processes. As discussed in further detail below, shortly after the commencement of these Chapter 11 Cases, the Debtors filed a motion for approval of a sale and bidding procedures related thereto, pursuant to which the Debtors sought authorization to continue the Prepetition Marketing Process and effectuate a sale of substantially all of their assets.

### E.    Negotiations with Ad Hoc Group and Restructuring Support Agreement

Despite the Company's aforementioned prepetition restructuring efforts, the Company continued to face significant liquidity and operational headwinds in 2019 and 2020, which were exacerbated and accelerated by the unprecedented health and economic impact of the COVID-19 global pandemic. Facing growing uncertainty with respect to its ability to continue as a going concern, severe liquidity constraints and upcoming interest and maturity payments, the Company began negotiating with the Ad Hoc Group that held, as of the Commencement Date, in the aggregate, approximately (i) 99.78% of the Superpriority Notes, (ii) 99.78% of the Exchange Priority Notes, (iii) 80.69% of the First Lien Notes, and (iv) over 80% of the equity interests in Holdings, and their advisors to explore the Company's strategic alternatives and solicit input with respect to the Prepetition Marketing Process and the availability of short term financing. During the week of April 13, 2020, certain members of the Ad Hoc Group signed confidentiality agreements with the Company. Since then, the Company continued to have discussions and negotiations with the Ad Hoc Group regarding sale options and financing scenarios. The Ad Hoc Group retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") to assist with its analysis of the potential strategic alternatives.

The Debtors' engagement with the Ad Hoc Group increased in late April 2020, in advance of the April 30, 2020 maturity of the 2020 Legacy First Lien Notes and the Company's impending liquidity crisis. In early May 2020, the parties began discussing, among other things, (i) ongoing diligence regarding Exide, its operations, and prospects, (ii) the terms of the Ad Hoc Group's Europe/ROW Credit Bid (as defined below), and (iii) the completion of the Prepetition Marketing Process in chapter 11.

The Debtors' discussions with the Ad Hoc Group culminated in the RSA executed on May 18, 2020. In connection with the execution of, and pursuant to its obligations under the RSA, the Ad Hoc Group submitted a binding credit bid for the Exide Europe/ROW business segment (the "**Europe/ROW Credit Bid**"). A term sheet containing certain key terms of the Europe/ROW Credit Bid was annexed to the RSA. The Europe/ROW Credit Bid reflected a purchase price of $430 million, comprised of (i) $70 million, representing a discharge and release of the aggregate principal amount of Exchange Priority Notes and First Lien Notes held by the Ad Hoc Group on account of the Exchange Priority Notes, (ii) $30 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under the European Bridge Notes Indenture, (iii) $161 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under the Superpriority Notes Indenture, and (iv) $174 million, in the form of an assumption by the Ad Hoc Group of 100% of the aggregate amount of Claims outstanding under existing Exide Europe/ROW financing arrangements.

The Europe/ROW Purchaser – a Delaware limited liability company formed by the members of the Ad Hoc Group for the benefit of all holders of the Exchange Priority Notes – will serve as the buyer for the Europe/ROW Assets under the Europe/ROW Purchase Agreement.  In accordance with the Europe/ROW Purchase Agreement, Exide International's outstanding obligations on account of the Claims arising under the Superpriority Notes Indenture (approximately $161 million) will be assigned to and assumed by the Europe/ROW Purchaser on the Europe/ROW Closing Date.  To consummate the Europe/ROW Purchaser's assumption of Exide International's obligations thereunder, the Superpriority Notes Indenture will be assigned, assumed and ratified (and modified to the extent necessary) in accordance with a supplemental indenture executed by the Europe/ROW Purchaser, as provided in the Superpriority Notes Indenture. Pursuant to the supplemental indenture and other amendments and supplements to the Superpriority Notes Documents, the Europe/ROW Purchaser will assume all obligations of Exide International for (i) the due and punctual payment of the principal, premium (if any) and interest on account of the Superpriority Notes and (ii) the performance of each covenant arising under the Superpriority Notes, the Superpriority Notes Indenture and the Security Documents (as defined in the Superpriority Notes Indenture).  The outstanding Claims under the Superpriority Notes Indenture will continue to be secured by the liens and security interests against the Europe/ROW Assets created and granted under the Superpriority Notes Indenture. Immediately upon such assumption, and without any further action, (i) the Superpriority Notes Guarantee Claims against the Debtors will be deemed fully satisfied, released and discharged, (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Security Documents will be deemed fully satisfied, released and discharged, (iii) the holders of Superpriority Notes will waive any existing defaults under the Superpriority Notes Indenture, and (iv) the liens, security interests and claims against the non-debtor entities will remain in existence and be valid, enforceable and remain in full force and effect after such assumption, *provided*, *however*, that Exide International will be released from any continuing obligations arising under the Superpriority Notes Indenture and Superpriority Security Documents.

Additionally, pursuant to the Plan and the Europe/ROW Purchase Agreement, in exchange for the Europe/ROW Credit Bid under the Europe/ROW Purchase Agreement (which secured claim will be assigned from the Exchange Priority and First Lien Notes Trustee to the Europe/ROW Purchaser) and the discharge and release of $70 million of outstanding Claims on account of the Exchange Priority Notes, each consenting holder of an Allowed Exchange Priority Notes Claim will receive its Pro Rata share of the LLC interests of the Europe/ROW Purchaser. If less than 100% of the holders of Allowed Exchange Priority Notes Claims have been identified as of the Europe/ROW Closing Date, the board of managers of the Europe/ROW Purchaser may (i) at any time following the Europe/ROW Closing Date, distribute such unidentified holders' allocation of LLC interests to known holders of Allowed Exchange Priority Notes Claims on a Pro Rata basis, (ii) hold such unidentified holders' allocation of LLC interests in escrow and distribute such interests to the remaining holders of Allowed Exchange Priority Notes Claims once such holders have been identified, or (iii) cancel such interests.

Following the discharge and release of the $70 million in outstanding Claims on account of the Exchange Priority Notes in connection with the Europe/ROW Purchase Agreement, all holders of remaining Allowed Exchange Priority Notes Claims will receive Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash. Finally, each holder of an Allowed First Lien Notes Claim will receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash.  The Trustees have been directed by the majority of holders as provided under the Superpriority Notes Indenture and Exchange Priority and First Lien Notes Indenture to support and to take all necessary steps and actions to implement and consummate the transactions contemplated under the Plan and Europe/ROW Purchase Agreement.

In connection with the Europe/ROW Credit Bid, the Ad Hoc Group also committed to (x) provide $30 million in interim financing to Exide International to be used for working capital and general corporate purposes within the Exide Europe/ROW business segment, and up to $50 million of new money exit financing in their discretion pursuant to the European Bridge Notes Indenture and (y) refinance all amounts owed by non-Debtor Exide Technologies (Transportation) Limited under the ABL Credit Agreement, or otherwise bifurcate the facility provided under the ABL Credit Agreement. Pursuant to the RSA, the Europe/ROW Credit Bid served as the stalking horse for a Europe/ROW sale transaction and was subject to higher or better bids. In connection with the Europe/ROW Credit Bid, the Debtors and the Ad Hoc Group also negotiated a term sheet contemplating the Interim Financing Facility provided by the Ad Hoc Group to certain of the Debtors' non-Debtor affiliates in Europe to support the Company's Europe/ROW operations during the execution of the postpetition marketing process.

The Debtors, after consultation with their advisors, determined that selection of the Europe/ROW Credit Bid as the stalking horse for a Europe/ROW sale transaction was in the best interests of the Debtors' estates. Specifically, the Debtors determined that the Europe/ROW Credit Bid will serve as the stalking horse bid (the "**Europe/ROW Stalking Horse Credit Bid**") for the purchase of the Debtors' equity interests in Exide International and certain other non-Debtor foreign affiliates, all of which equity interests constitute property of Holdings' estate.[18]

Importantly, the RSA provided that the Europe/ROW Stalking Horse Credit Bid was subject to better or higher offers, as further described in the Bidding Procedures, and that in the event the Europe/ROW Stalking Horse Credit Bid was not selected as the Successful Bid (as defined in the Bidding Procedures) at the auction, the Europe/ROW Credit Bid shall serve as the Back-up Bid (as defined in the Bidding Procedures) for the relevant assets.

Finally, the RSA incorporated a plan term sheet pursuant to which the Ad Hoc Group agreed to support the pursuit and confirmation of a chapter 11 plan that complies with the terms and conditions of the RSA, the absolute priority rule and other requirements of the Bankruptcy Code.

## IV.
## OVERVIEW OF THE CHAPTER 11 CASES

### A.  Commencement of The Chapter 11 Cases and First-Day Motions

On May 19, 2020, the Debtors commenced the Chapter 11 Cases. The Debtors continue to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To that end, the Debtors filed various motions seeking relief from the Bankruptcy Court to promote a seamless transition between the Debtors' prepetition and postpetition business operations and minimize any disruptions to the Debtors' operations (the "**First Day Motions**"). At the second day hearing held on June 18, 2019, the Bankruptcy Court granted substantially all of the relief requested in the First Day Motions on a final basis and entered various final orders authorizing the Debtors to, among other things:

- Continue to use their cash management system, bank accounts, and business forms (Docket No. 330);

- Continue paying employee wages and benefits (Docket No. 327);

---

[18]   For the avoidance of doubt, the sale of non-Debtor assets will not be subject to the approval of the Bankruptcy Court or entitled to the protections afforded by the Bankruptcy Code.

- Pay certain critical vendors and obligations with respect to prepetition orders of goods and services to be delivered postpetition (Docket No. 326);

- Pay certain prepetition claims of shippers, warehousemen, and other lien claimants (Docket No. 329);

- Continue to honor certain prepetition obligations to customers and to maintain customer programs (Docket No. 333);

- Continue insurance programs and the workers' compensation program, the processing of workers' compensation claims, and continue the Debtors' surety bond program (Docket No. 328);

- Continue to pay all taxes, fees, and similar charges and assessments, whether arising prepetition or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course (Docket No. 332); and

- Approve Debtors' form of adequate assurance of payment to utility companies, establish procedures for utility companies to request adequate assurance of payment, and prohibit utility companies from altering or discontinuing services (Docket No. 334).

    **B.**    **DIP Financing and Cash Collateral**

    *(a)*    DIP Financing

To address the working capital needs of the Debtors and provide sufficient liquidity for the duration of the Chapter 11 Cases and the completion of the postpetition marketing process as contemplated by the RSA, the Debtors solicited offers for debtor-in-possession financing from thirty-eight (38) parties, including the Debtors' existing noteholders and the Prepetition ABL Lenders. Only three (3) offers for financing were received, none of which, standing alone, were adequate to fund the postpetition marketing process. Ultimately, the Debtors were able to combine sources and secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $40 million (the "**DIP Facility**"), to be provided by BTC Holdings Fund I, LLC and certain members of the Ad Hoc Group (solely in such capacity, the "**DIP Lenders**") and agented by Blue Torch Finance LLC (together with BTC Holdings Fund I, LLC and its affiliates, "**Blue Torch**"; and solely in such capacity as the agent under the DIP Facility, the "**DIP Agent**"), with a draw of $40 million under the proposed DIP Financing.

On the Commencement Date, the Debtors filed a motion seeking authority to enter into the DIP Facility (Docket No. 26).[19]  On May 21, 2020, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on an interim basis (Docket No. 123) (the "**Interim DIP Order**").  On June 19, 2020, the Bankruptcy Court entered an order granting the relief requested in the DIP Motion on a final basis (Docket No. 350) (the "**DIP Order**").

The DIP Financing is required to be repaid in full in cash at the closing of the Americas Sale Transaction.

    *(b)*    Cash Collateral

---

[19]   Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify Automatic Stay, and (F) Schedule Final Hearing and (II) Related Relief (Docket No. 26) (the "**DIP Motion**").

The DIP Financing was conditioned on the Debtors' having access to cash collateral, which was necessary under the DIP budget to fund the Chapter 11 Cases and continue the Debtors' business operations. Without immediate access to cash collateral, the Debtors would have been unable to make payments to employees, vendors, and suppliers, satisfy operating costs, fund the Chapter 11 Cases, and access the DIP Financing, which would have forced the Debtors into an emergency fire sale and an immediate liquidation of their businesses. Unfortunately, the Debtors' attempts to reach an agreement with the Prepetition ABL Lenders regarding consensual use of cash collateral were unsuccessful—the Prepetition ABL Lenders refused to agree to the consensual use of cash collateral. Accordingly, on the Commencement Date, the Debtors filed a motion for the nonconsensual use of cash collateral (Docket No.80).[20]

On May 21, 2020, after holding an evidentiary hearing, the Bankruptcy Court entered an order granting the Cash Collateral Motion on an interim basis (Docket No. 124) (the "**Interim Cash Collateral Order**"). Pursuant to the Interim Cash Collateral Order, the Debtors were authorized, on an interim basis, to use the cash collateral of the Prepetition ABL Lenders on a nonconsensual basis, provided that the Debtors provide the Prepetition ABL Lenders with the same adequate protection that they are providing to the Prepetition Secured Parties under the Interim DIP Order, as well as the following additional adequate protection:

- <u>Financial Reporting</u>.  The Debtors were required to continue the same reporting as was required under the Prepetition ABL Credit Agreement by the deadlines set forth therein, including the monthly Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement).

- <u>Adjusted Borrowing Base</u>.  The Debtors would be required to cease using cash collateral without further Court approval if the Debtors' outstanding balance under the Prepetition ABL Credit Agreement exceeds the most recent borrowing base calculation in accordance with the Prepetition ABL Credit Agreement plus $30 million.  The borrowing base formula, including any discretionary reserves, would not be modified from the formula applicable under the Prepetition ABL Credit Agreement nor would any additional discretionary reserves be added after the Commencement Date.

On June 19, 2020, the Bankruptcy Court entered an order granting the Cash Collateral Motion on a final basis (Docket No. 349).

### C.   Settlement Procedures Relating to Non-Performing Properties

As previously discussed, it was clear from the outset of these Chapter 11 Cases that at the end of these Chapter 11 Cases, following the sale of substantially all of their assets, the Debtors would not be in business, and therefore would be required to liquidate, abandon, or otherwise address any assets that they were unable to sell to third party purchasers through the postpetition marketing process. Specifically, at the end of these Chapter 11 Cases, the Debtors will no longer be able to retain and support the ongoing maintenance and remediation of the NPPs.

To that end, on the Commencement Date, the Debtors filed the NPP Settlement Procedures Motion (Docket No. 37). By the NPP Settlement Procedures Motion, the Debtors sought to establish certain settlement procedures, which would enable the Debtors to: (i) continue their postpetition marketing efforts to sell as many of the NPPs as possible without the distraction and cost of potentially unnecessary litigation during the Chapter 11 Cases, (ii) engage in good faith negotiations with the various governmental regulatory

---

[20]   Motion of Debtors for Interim and Final Orders (I) Authorizing Use of Cash Collateral; (II) Granting Adequate Protection to the Prepetition ABL Lenders; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); (IV) Authorizing the Debtors to Continue Performing Under Factoring Agreements; and (V) Granting Related Relief (Docket No. 80) (the "**Cash Collateral Motion**").

agencies and the sureties—including mediation, if necessary—to obtain an agreed upon orderly solution for the NPPs that the Debtors are unable to sell and any related issues, and (iii) to the extent settlement negotiations and mediation were not successful, proceed on an expedited timeline for the contested abandonment of the NPP(s) at issue. The overarching goal of establishing and implementing the Settlement Procedures (as defined in the NPP Settlement Procedures Motion) was to deal with the NPPs in an orderly and efficient manner that would minimize the risk of harm to public health and safety but recognizes the Debtors' challenged financial circumstances. Importantly, the Settlement Procedures did not require regulatory agencies to reach a settlement with the Debtors—rather, the Settlement Procedures were designed to foster open communications and good faith negotiations among the parties and facilitate the efficient administration of these Chapter 11 Cases while significantly reducing the incurrence of unnecessary costs associated with litigating abandonment issues under section 554(a) of the Bankruptcy Code before the Bankruptcy Court, which would only be pursued by the Debtors as a last resort.

On June 9, 2020, the Bankruptcy Court granted the NPP Settlement Procedures Motion and entered the NPP Settlement Procedures Order (Docket No. 242).

### D.  The Canadian Non-Performing Property

The Debtors own one non-performing property located in Fort Erie, Ontario, Canada. The applicable Canadian environmental authority, the Ontario Ministry of the Environment, Conservation and Parks (the "**Canada MOE**") did not participate in the mediation that culminated in the Global Settlement, and generally has not appeared in these Chapter 11 Cases, but received notice of all proceedings. The Debtors intend to negotiate the Environmental Liabilities associated with the Canada Non-Performing Property with the Canada MOE. On or before the Effective Date, the Debtors will escrow funds in an amount to be determined by the Debtors in consultation with the Requisite Noteholders for such purposes. No surety bonds have been issued or will be issued in connection with the Canadian non-performing facility. If any amount remains in the Canada NPP Remediation Funds escrow account (as defined in the Plan) following the applicable remediation, such amount will revert to the Wind Down Estates. Remaining Claims, if any, held by the Canada MOE associated with the Canada Non-Performing Property will constitute General Unsecured Claims. The release and exculpation provisions set forth in Section 10 of the Plan shall apply to the Canadian MOE with respect to the Canada Non-Performing Property.

### E.  Procedural Motions and Retention of Professionals

The Debtors have also filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders with respect to such relief.

### F.  Appointment of the Creditors' Committee

On May 28, 2020, the Creditors' Committee was appointed by the United States Trustee for the District of Delaware pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases (Docket No. 156).

The members of the Creditors' Committee include the Pension Benefit Guaranty Corp., SMC LLC, Onix Networking Corp., Exide Creditors' Liquidating Trust, and Ronald Sanders.

The Creditors' Committee retained Lowenstein Sandler LLP and Potter Anderson & Corroon LLP as its attorneys, AlixPartners LLP as its financial advisor, B. Riley FBR, Inc. as its investment banker, and WSP USA, Inc. as its environmental consultant.

### G.    KEIP/KERP Motion

On June 8, 2020, the Debtors filed a motion (the "**KEIP/KERP Motion**") seeking authority to implement a key employee incentive program (the "**KEIP**") and a key employee retention program (the "**KERP,**" and together with the KEIP, the "**Employee Programs**") (Docket No. 237).  Under the KEIP, three (3) of the Debtors' key employees (collectively, the "**KEIP Participants**"), are eligible to collectively receive $956,250 (plus 1.55% of any value of the U.S. sale process in excess of certain threshold amounts, as further explained in the KEIP/KERP Motion).  Under the KERP, one hundred and fifteen (115) of the Debtors' non-insider key employees (collectively, the "**KERP Participants**"), are eligible to collectively receive approximately $4.5 million.

The KERP divides participants into two groups, and provides for payment to each group in two installments. The first group of the KERP Participants consists of sixteen (16) key employees (the "**Group 1 KERP Participants**") who received one half (1/2) of their total KERP payment on May 15, 2020, in the aggregate amount of approximately $834,000. The second group of KERP Participants consists of ninety-nine (99) key employees (the "**Group 2 KERP Participants**") who received the first of the two payments, equaling one half (1/2) of the total KERP payment, upon the Court's approval of the KERP.  The second installment of the KERP payment totaling $2.2. million will be paid upon consummation of the Americas Sale Transaction.

The KEIP contemplates three payments to the KEIP Participants, one prepetition and two postpetition. The prepetition payment was made to KEIP Participants on May 15, 2020, in the aggregate amount of the approximately $679,000.  The postpetition KEIP award is split into two independent, variable amounts, meaning that depending on the results achieved, the KEIP Participants can earn one, both, or neither of the two amounts.  The postpetition KEIP award is tied to (i) the KEIP Transaction (defined below), and (ii) outperformance of the adjusted operating cash flow set forth in the DIP Budget.

On June 30, 2020, the Bankruptcy Court entered an order (Docket No. 419) approving the Debtors' KEIP/KERP Motion, with certain modifications.  The Debtors expect that KEIP payments totaling between $1 to 1.4 million will be made at closing to the KEIP Participants, with the range of total remaining KEIP/KERP payments calculated as follows:

|  | Low ($mm) | High ($mm) |
|---|---|---|
| KEIP |  |  |
| Operating Cash Flow | 0.3 | 0.7 |
| KEIP Transaction | 0.7 | 0.7 |
| KEIP Total | 1.0 | 1.4 |
| **KERP Total** | 2.2 | 2.2 |
| **KEIP/KERP** | **3.2** | **3.6** |

### H.    Bar Date

On June 15, 2020, the Debtors filed with the Bankruptcy Court a motion (Docket No. 279) (the "**Bar Date Motion**") seeking authority to establish the following deadlines for filing proofs of claims in the Chapter 11 Cases: (i) establishing 5:00 p.m., prevailing Eastern Time, on the  date that is thirty (30) days after service of the Bar Date Notice (as defined in the Bar Date Motion), as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) establishing November 16, 2020, at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of

claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) establishing the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedule, as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) establish the later of (y) the General Bar Date or the Governmental Bar Date, as applicable, and (z) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases.

On June 25, 2020, the Bankruptcy Court entered an order (Docket No. 373) (the "**Bar Date Order**") approving the Debtors' Bar Date Motion and establishing the aforementioned deadlines to file proofs of claim in the Chapter 11 Cases.  Pursuant to the Bar Date Order, the General Bar Date in these Chapter 11 Cases was July 31, 2020 and the Governmental Bar Date is November 16, 2020.

### I.       Statements and Schedules, and Rule 2015.3 Financial Reports

The Debtors filed their (i) schedules of assets and liabilities and (ii) statements of financial affairs on June 26, 2020 (Docket Nos. 392-405, 409).  The Debtors also filed their Rule 2015.3 financial report on June 26, 2020 (Docket No. 407).

### J.       PBGC Claims

On July 31, 2020, the PBGC filed a contingent claim in the amount of $110.1 million against each of the Debtors (the "**Unfunded Benefit Liability Claims**") on account of statutory liability under 29 U.S.C. § 1362 and 1368 for the unfunded benefit liabilities of the Exide Technologies Retirement Plan (the "**Pension Plan**").  Contemporaneously, on July 31, 2020, the PBGC also filed a contingent claim in the amount of $32,928,750 against each of the Debtors (the "**Termination Premiums Claims**") on account of certain termination premiums, insurance premiums, interest and penalties (collectively, the "**Termination Premiums**") that may become due and owed to the PBGC under certain circumstances upon termination of the Pension Plan.  The Unfunded Benefit Liability Claims and the Termination Premiums Claims are contingent on the termination of the Pension Plan, and for purposes of such claims, it is assumed that the Pension Plan terminated on May 31, 2020.[21]  On July 31, 2020, the PBGC (i) issued a notice of determination indicating its intent to proceed to have the Pension Plan terminated under ERISA § 4042, 29 U.S.C. § 1342, and the PBGC appointed as statutory trustee and under ERISA § 4048, 29 U.S.C. § 1348, to have July 31, 2020 established as the Pension Plan's termination date, and (ii) published a notice to participants in the *New York Times* regarding PBGC's initiation of termination proceedings.

The Debtors are evaluating the PBGC Claims (as defined in the Plan), including the Unfunded Liability Claims and the Termination Premiums Claims.  Pursuant to the Plan, if the releases are approved by the Bankruptcy Court, the PBGC will be deemed to have released the PBGC Claims and permanently enjoined from pursuing such claims against the Europe/ROW Purchaser, the Transferred Entities and the Consenting Creditors.  On August 14, 2020, the PBGC filed the *Pension Benefit Guaranty Corporation's Objection to Debtors' Proposed Disclosure Statement* (Docket No. 735) (the "**PBGC Objection**"), a copy of which is annexed hereto as Exhibit E.  For the reasons set forth therein, the PBGC disputes the Plan and the proposed

---

[21]    In the event the Pension Plan terminates, the assets of the Pension Plan may be insufficient to cover the benefit liabilities of the Pension Plan. This insufficiency is the amount of the Pension Plan's unfunded benefit liabilities under 29 U.S.C. § 1362(b).  Upon termination of the Pension Plan, the contributing sponsor of the Pension Plan and each member of the contributing sponsor's controlled group become jointly and severally liable to PBGC for the total amount of the Pension Plan's unfunded benefit liabilities and the Termination Premiums.

releases under the Plan.  The Debtors intend to engage in discussions with the PBGC regarding the PBGC Claims.

### K.     Subcommittee Investigation of Certain Prepetition Affiliate Transactions

On April 3, 2020, the Subcommittee of the Special Committee was created, with independent director Harvey Tepner as the sole member, to investigate, evaluate, and control the disposition or resolution of any claims associated with certain prepetition affiliate transactions, including the June 2019 Financing and the Optimization.  The Subcommittee oversaw the investigation and engaged and directed Weil to lead the investigation in evaluating the viability of any potential claims and causes of action related to the Transactions.  The Subcommittee's investigation took place over approximately four months (from April through July 2020) and included extensive factual and legal analysis.  On behalf of the Subcommittee, Weil first requested and received pertinent information and documents from the Company and its legal and financial advisors, and subsequently reviewed thousands of documents.  Weil next conducted interviews reasonably necessary to understand the Transactions and to evaluate any potential claims in connection with the Transactions.  Weil conducted 24 interviews in total.  Interviewees included all Board members at the time the Transactions were approved, relevant current and former management of the Company, the Company's legal and financial advisors in connection with the Transactions, and the Company's third party auditor.

The Subcommittee also engaged independent financial advisors Ankura and Houlihan Lokey to assist with the investigation of the June 2019 Financing and Optimization, respectively.  The investigation analyzed the viability of potential claims including for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and equitable subordination with respect to the June 2019 Financing as well as for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and unlawful distribution with respect to the Optimization.

The Subcommittee remained actively engaged throughout the investigation. Mr. Tepner, as the sole member of the Subcommittee, directly participated in certain interviews and received summaries of all of the other interviews conducted.  He also reviewed key documents, including the materials presented to the Board when approving the Transactions respectively.  Further, during the course of the investigation, Mr. Tepner communicated with Weil on at least a weekly basis regarding the status of the investigation to oversee the process and to offer guidance, and on several occasions communicated with Weil and independent financial advisors Houlihan Lokey and Ankura regarding their respective analyses of the Transactions.

The Subcommittee also conducted its investigation in close coordination with the Creditors' Committee, which conducted its own contemporaneous investigation of the Transactions.  As a result, the Subcommittee's investigation was fully transparent to counsel for the Creditors' Committee Lowenstein Sandler LLP ("**Lowenstein**").  Lowenstein and its financial advisor, AlixPartners LLP, actively participated in most of the interviews and were provided with detailed verbal summaries and updates of interviews that preceded their involvement or were with the Company's legal advisors at the time of the Transactions. Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, also engaged in periodic and open discussions in connection with the investigation of the Transactions.  On July 21, 2020 towards the end of their respective investigations, Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, exchanged their preliminary conclusions, which were consistent in all material respects.

After its nearly four month thorough investigation, the Subcommittee did not identify any valuable, colorable claims or causes of action belonging to the Debtors related to the Transactions or to the conduct of the Company's directors and officers in connection with the Transactions.  Moreover, as to any potential claims for breach of fiduciary duty with respect to the Transactions, the Subcommittee determined that the

business judgment standard would apply and was satisfied. Additionally, the Subcommittee concluded that the time and expense associated with pursuing any such claims or causes of action likely would exceed any potential value that could be recovered from such claims or causes of action and that the value of any potential recovery did not exceed the benefits of the sale of the Europe/ROW Assets for the Debtors. The Subcommittee also determined that Exide Technologies LLC's unsecured creditors, including environmental creditors, suffered no damages as a result of the Transactions.

## L.  Bidding Procedures and Postpetition Marketing Process

In support of the postpetition marketing and sale process, the Debtors and their advisors developed the Bidding Procedures to facilitate the marketing and sale of substantially all of their assets in these Chapter 11 Cases in an orderly and value-maximizing manner. On the Commencement Date, the Debtors filed the Bidding Procedures Motion (Docket No. 63), and on June 19, 2020, the Bankruptcy Court entered the Bidding Procedures Order (Docket No. 344).

Generally, pursuant to the Bidding Procedures, parties could submit bids for the purchase of any and all of the Debtors' assets in accordance with the terms of the Bidding Procedures. The Bidding Procedures were designed to promote a competitive and expedient bidding and sale process, and were intended to generate the greatest level of interest in, and the best value for, the Debtors' assets, while affording the Debtors maximum flexibility to execute asset sales as quickly and efficiently as possible. The Bidding Procedures were intended to provide the Debtors with flexibility to solicit proposals, negotiate transactions, provide stalking horse protections (if necessary and appropriate), hold an auction (if necessary and appropriate) and consummate one or more sale transactions for the highest or best value, all while protecting the due process rights of all interested parties and ensuring that there was a full and fair opportunity to review and consider proposed transactions.

Specifically, pursuant to the Bidding Procedures, the Debtors sought to sell substantially all of their assets, including, (a) the Americas Assets, which included (i) the Exide Americas industrial energy business segment, (ii) the Exide Americas transportation business segment, (iii) the Exide Americas recycling business segment, (iv) any operating facilities located in any of the foregoing business segments, or (v) any combination thereof and (b) the Europe/ROW Assets, which included (i) the Exide Europe/ROW transportation business segment, (ii) the Exide Europe/ROW industrial business segment, (iii) the Exide Europe/ROW recycling segment, or (iv) any combination thereof.

The Debtors' postpetition marketing process, which was led by Houlihan Lokey, was extensive and involved solicitations of interest from a diverse set of potential strategic and financial parties. Prior to and following the Commencement Date, Houlihan Lokey contacted over seventy-eight (78) potential third party bidders, approximately thirty-two (32) of which executed non-disclosure agreements allowing them to receive confidential information with respect to the Debtors' assets. The diligence conducted in connection with the Debtors' assets was extensive and included, among other things, (i) compiling over 6,500 documents in an electronic data room; (ii) facilitating discussions between potential bidders and the Debtors' management team; and (iii) hosting numerous on-site visits.

According to the original timeline approved by the Bankruptcy Court, the Debtors' deadline to designate a stalking horse for the Debtors' assets was June 22, 2020 and the deadline to submit bids for the Debtors' assets was July 10, 2020. These deadlines were subsequently extended to provide the Debtors with additional time to negotiate purchase agreements with potential bidders for the Debtors' Americas Assets.

As previously discussed in greater detail, in accordance with the Bidding Procedures, the Debtors accepted the Europe/ROW Stalking Horse Credit Bid submitted by an entity formed by the Ad Hoc Group (the "**Europe/ROW Stalking Horse Credit Bidder**") for certain of the Europe/ROW Assets pursuant to the

Stock and Asset Purchase Agreement appended as Exhibit B to the *Notice of Europe/ROW Stalking Horse Agreement* (Docket No. 324) (the "**Europe/ROW Sale Transaction**").

On July 8, 2020, the Debtors filed the *Notice of Designation of Americas Stalking Horse Bidder* (Docket No. 500) (the "**Americas Stalking Horse Bidder Designation Notice**") designating EX Holdings, Inc. as an Additional Stalking Horse Bidder (the "**Americas Stalking Horse Bidder**" and such Additional Stalking Horse Bid, the "**Americas Stalking Horse Bid**") for certain of the Debtors' assets pursuant to and as set forth in the Stock and Asset Purchase Agreement appended as Exhibit C to the Americas Stalking Horse Bidder Designation Notice). The Americas Stalking Horse Bid provided for cash consideration in the amount of $170,000,000, plus additional consideration described in further detail in the Americas Stalking Horse Bidder Designation Notice. In accordance with the Bidding Procedures, the Americas Stalking Horse Bid was subject to higher or better offers. [22] Parties in interest were provided the opportunity to object to the designation of the Americas Stalking Horse Bidder by no later than July 15, 2020 at 4:00 p.m. (Eastern Time). No Objections to the designation of the Americas Stalking Horse Bidder were received, and on July 16, 2020, the Bankruptcy Court entered the *Order Approving Debtors' Designation of Americas Stalking Horse Bidder and Approving Stalking Horse Bid Protections* (Docket No. 548).

The Europe/ROW Stalking Horse Credit Bid and the Americas Stalking Horse Bid were both subject to higher or better offers in accordance with the Bidding Procedures. The deadline for potential bidders to submit bids for any of the Assets was July 17, 2020 at 4:00 p.m. (Eastern Time) (the "**Bid Deadline**").

Following the Americas Stalking Horse Bidder Designation Notice, the Debtors continued to negotiate with potential bidders and ultimately received three (3) bids by the designated bid deadline. The three bids consisted of (i) the bid submitted by the U.S. Buyer for substantially all of the Debtors' Americas Assets; (ii) a bid submitted by a third party for the Debtors' property and assets located in Canon Hollow, Missouri; and (iii) a bid submitted by a third party for the Debtors' interests in a non-Debtor Canadian subsidiary. The Debtors did not receive any additional bids for the Europe/ROW Assets. The Debtors and their legal and financial advisors reviewed and analyzed all three (3) bids with the Special Committee, which was empowered to approve or reject any bid or proposal received.

Following extensive discussions and analysis with the Special Committee, the Debtors ultimately determined that the bid submitted by the U.S. Buyer was a Qualified Bid pursuant to the Bidding Procedures and that such bid would serve as a baseline bid at the auction. On July 23, 2020, the Debtors filed the *Notice of Qualified Bids and Designation of Baseline Bid With Respect to the Americas Assets* (Docket No. 589) (the "**Notice of Successful Europe/ROW Bid and Qualified Americas Bids**"), in which the Debtors announced that:

(a) the Debtors did not receive any other bids for the Europe/ROW Assets, and, as such, the highest and best offer for the Europe/ROW Assets was submitted by the Europe/ROW Stalking Horse Credit Bidder, and the Europe/ROW Stalking Horse Credit Bidder is the Successful Bidder for such Europe/ROW Assets (the "**Successful Europe/ROW Bidder**" and the Successful Europe/ROW Bidder's winning bid, the "**Successful Europe/ROW Bid**");

(b) the Debtors received bids for the Americas Assets and have, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, determined that the following bids are "Qualified Bids" under the Bidding Procedures:

---

[22]   On July 8, 2020, the Debtors also filed the *Notice of Extension of Certain Deadlines and Rescheduled Auction Under the Bidding Procedures Order* (Docket No. 501), which modified and extended certain key dates in the Debtors' postpetition marketing process.

(i) the Americas Stalking Horse Bid; and

(ii) the Bid of the U.S. Buyer for a base purchase price of $178,600,000, on the terms and conditions set forth in that certain Stock and Asset Purchase Agreement attached as Exhibit A to the Notice of Successful Europe/ROW Bid and Qualified Americas Bids;

(c) the Debtors designated the bid of the U.S. Buyer as the highest or best Qualified Bid for the Americas Assets (the "**Baseline Bid**"); and

(d) The Debtors will hold an auction on July 23, 2020 beginning at 10:00 a.m. (Eastern Time) (the "**Auction**") and the hearing to consider approval of the sale of the Assets will be held on August 6, 2020 at 2:00 p.m. (Eastern Time) before the Bankruptcy Court.

Subsequently, on July 23, 2020, the Debtors filed the *Notice of Successful Bidders for Americas Assets and Europe/ROW Assets* (Docket No. 591) (the "**Notice of Successful Bids for Americas Assets and Europe/ROW Assets**"), in which the Debtors announced that:

(a) the highest or otherwise best offer for the Americas Assets was the bid submitted by Battery BidCo (the "**Successful Americas Bidder**," and the Successful Americas Bidder's winning bid, the "**Successful Americas Bid**") and accordingly, the bid submitted by Battery BidCo is the Successful Bid for the Americas Assets; and

(b) the Debtors would seek entry of orders approving the sale transaction with each of the Successful Europe/ROW Bidder and the Successful Americas Bidder, free and clear of liens, claims, encumbrances and other interests, to the extent permissible by law, at the hearing scheduled for August 6, 2020 at 2:00 p.m. (Eastern Time) (the "**Sale Hearing**").

## M.   Mediation and Global Settlement

As described in more detail at Article I, above, following the appointment of the Creditors' Committee and the entry of the NPP Settlement Procedures Order, and concurrently with the Debtors' postpetition marketing process, the Debtors engaged in good-faith and arm's-length negotiations with the Global Settlement Parties that culminated in the acceptance of the Mediators' Proposal by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the Environmental Sureties and which the Settling Governmental Authorities have agreed to recommend to those with authority to approve the Global Settlement. The proposed Global Settlement is incorporated into the Plan and provides for a potential global resolution of issues relating to (i) the abandonment of the Debtors' non-performing properties; (ii) the Europe/ROW Sale Transaction including the releases contained therein and the investigation of various prepetition transactions; and (iii) the Americas Sale Transaction and use of proceeds realized therefrom, and certain other issues and disputes among the Debtors and the Global Settlement Parties, pursuant to the Mediators' Proposal, and is described more fully herein at Article I.

## N.   Retiree Benefits

As part of their restructuring and eventual Wind-Down, the Debtors are seeking to reduce or eliminate their obligations with respect to Retiree Benefits. Section 1114 of the Bankruptcy Code requires that the Debtors negotiate with an authorized representative for the Retirees prior to any modification of Retiree Benefits. To that end, the Debtors have filed the Debtors' *Motion for an Order Authorizing the United States Trustee to Appoint an Official Committee of Retired Employees* (Docket No. 726), which seeks the appointment of a committee of Non-Unionized Retirees (the "**Retiree Committee**") to serve as the authorized

representative of the Non-Union Retirees.  The United Auto Workers and the International Brotherhood of Teamsters (together, the "**Union Retiree Representatives**") have agreed to represent their respective Union Retirees during these negotiations.

While informal negotiations regarding the modification of Retiree Benefits have begun, the Debtors will engage in formal negotiations once the Retiree Committee is appointed.  The Debtors anticipate that, at the conclusion of formal negotiations with the Retiree Committee and the Union Retiree Representatives, the Debtors may agree to pay some amount in cash in connection with a negotiated settlement.

RLF1 23874670V.1

**V.**
**SUMMARY OF PLAN**

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as Exhibit A.

      **A.**      **Administrative Expenses and Priority Claims**

            *i.*      *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such other date or terms as may be mutually agreed upon between the holder of such an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator, as applicable.

            *ii.*      *Fee Claims.*

      (a)      All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Plan Administrator, as applicable. The Plan Administrator and the GUC Trustee are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

      (b)      On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or the Plan Administrator, as applicable, shall separately escrow such estimated amounts in the Professional Fee Escrow Account (less any amounts already reserved for such professional in the Professional Fee Escrow Account) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim. When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in the Wind-Down Estates and the Plan Administrator without any further action or order of the Bankruptcy Court.

      (c)      For the avoidance of doubt, paragraph 23 of the DIP Order shall continue to apply to the Professional Fee Escrow Account and Fee Claims.

40

### iii.     Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### iv.     DIP Claims.

Unless indefeasibly paid in full in Cash prior to the Effective Date, the DIP Claims shall be deemed Allowed in the full amount of the DIP Obligations, and each holder of a DIP Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such DIP Claim, Cash in an amount equal to such Claim on the Effective Date.  Upon the indefeasible payment in full in Cash of all DIP Claims, all Liens and security interests granted pursuant to the DIP Loan Documents shall be deemed cancelled and shall be of no further force and effect, and each DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

### v.     Restructuring Expenses.

During the period commencing on the Commencement Date through the Effective Date, the Debtors have, and will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Plan Administrator shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### vi.     Trustees Fees

On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan, including the closing of the Europe/ROW Sale Transaction), the Debtors or Plan Administrator shall pay in Cash all reasonable unpaid documented Trustees Fees without application or approval of the Bankruptcy Court and without a reduction to recoveries of the holders of the Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable. For the avoidance of doubt, nothing herein affects each Trustees' right to exercise its Trustees Charging Lien against distributions to the holders of the Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable.  Any Trustees Fees invoiced after the Effective Date shall be paid promptly by the Plan Administrator, but no later than ten (10) business days after receiving an invoice.

The Trustees shall provide the Debtors, the Consenting Creditors, and the Creditors' Committee with an estimate of the Trustees Fees no later than five (5) business days prior to the Effective Date.  If the Debtors

41

dispute any requested Trustee Fees, the Debtors or Plan Administer shall (i) pay the undisputed portion of Trustees Fees, and (ii) notify the applicable Trustee of such dispute within two (2) days after presentment of the invoices by the Trustees. Upon such notification, the applicable Trustee may assert its Trustees Charging Lien to pay the disputed portion of its Trustees Fees or submit such dispute for resolution by the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable indenture. Nothing herein shall be deemed to impair, waive, discharge or negatively impact any Trustees Charging Lien.

**B.**     **Classification of Claims and Interests**

*i.*     ***Classification in General.***

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

*ii.*     ***Grouping of Debtors for Convenience Only.***

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. Except as provided in **Error! Reference source not found.** of the Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

*iii.*     ***Summary of Classification.***

The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Section 3 of the Plan. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.5 of the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Superpriority Notes Guarantee Claims | Impaired | Yes |
| 5 | Exchange Priority Notes Claims | Impaired | Yes |
| 6 | First Lien Notes Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 8 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 9 | Intercompany Interests | Impaired | No (Deemed to reject) |
| 10 | Holdings Equity Interests | Impaired | No (Deemed to reject) |
| 11 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

> ### iv.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

> ### v.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Combined Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

> ### vi.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Combined Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

> ### vii.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Section 12 of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

> ## C.    <u>Treatment of Claims and Interests</u>

> ### i.    *Priority Non-Tax Claims (Class 1).*

> (a)    *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

(b)     *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

ii.     ***Other Secured Claims (Class 2).***

(a)     *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)     *Treatment*:

(i)     Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)     Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

(c)     *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

iii.     ***ABL Claims (Class 3)***

(a)     *Classification*:  Class 3 consists of the ABL Claims.

(b)     *Allowance*:  The ABL Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 101,939,274.01 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the ABL Credit Agreement.

(c)     *Treatment*:

(i)      In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive Cash until all holders of Allowed ABL Claims are satisfied in full, taking into account any amounts paid to the holders of Allowed ABL Claims pursuant to the Americas Sale Order.

(ii)      The Challenge Deadline relating to the ABL Credit Agreement and ABL Agent shall be deemed irrevocably expired (A) with respect to the Creditors' Committee as of the date of the entry of the Americas Sale Order, (B) with respect to the Settling Governmental Authorities, on the Effective Date, and (C) with respect to all other Persons and Entities, on August 27, 2020.  For the avoidance of doubt, any reservation of rights relating to the ABL Credit Agreement and the ABL Agent, including paragraphs 37 to 41 of the Americas Sale Order, shall be deemed expired on the foregoing dates with respect to the foregoing parties, as applicable.

(d)      *Voting*:  Class 3 is Unimpaired, and the holders of ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of ABL Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such ABL Claims.

iv.      ***Superpriority Notes Guarantee Claims (Class 4).***

(a)      *Classification*:  Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors.

(b)      *Allowance*:  The Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture) and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)      *Treatment*:  The obligations under the Superpriority Notes Indenture shall be assumed by and assigned to the Europe/ROW Purchaser at the Europe/ROW Closing in accordance with the Europe/ROW Purchase Agreement and the Superpriority Notes Guarantee Claims and all Liens securing such Claims shall remain against and be ratified by the Europe/ROW Purchaser.  Immediately upon such assumption and transfer of the Acquired Assets under the Europe/ROW Purchase Agreement, and without any further action, the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released and discharged.

(d)      *Voting*:  Class 4 is Impaired, and the holders of the Superpriority Notes Guarantee Claims are entitled to vote to accept or reject the Plan.

v.      ***Exchange Priority Notes Claims (Class 5).***

(a)      *Classification*:  Class 5 consists of Exchange Priority Notes Claims against the Debtors.

(b)      *Allowance*:  The Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 390,000,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not

45

be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for Allowed Exchange Priority Notes Claims, each holder thereof shall receive (i) at the Europe/ROW Closing, its Pro Rata share of the consideration contemplated by Section 5.1(a) of the Plan in exchange for an aggregate amount of $70,000,000 of Exchange Priority Notes Claims, and (ii) for all remaining Allowed Exchange Priority Notes Claims, Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)     *Voting*:  Class 5 is Impaired, and the holders of the Exchange Priority Notes Claims are entitled to vote to accept or reject the Plan.

### vi.     *First Lien Notes Claims (Class 6).*

(a)     *Classification*:  Class 6 consists of First Lien Notes Claims against the Debtors.

(b)     *Allowance*:  The First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $ 161,023,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed First Lien Notes Claim, each holder thereof shall receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)     *Voting*:  Class 6 is Impaired, and the holders of the First Lien Notes Claims are entitled to vote to accept or reject the Plan.

### vii.     *General Unsecured Claims (Class 7).*

(a)     *Classification*:  Class 7 consists of General Unsecured Claims against the Debtors.

(b)     *Treatment*:

(i)     Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each holder thereof shall receive its Pro Rata share of (A) the GUC Trust Beneficial Interests (entitling such holder to a Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust

46

Agreement), and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, until all Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(ii)     The Settling Governmental Authorities, Environmental Trust, Frisco Governmental Authorities, and Frisco Trust shall not participate in distributions on account of their Environmental NPP Claims and Frisco NPP Claims, as applicable, from the GUC Trust up to the amount of the GUC Global Settlement Payment.  After the GUC Trust has distributed Cash in an aggregate amount equal to the GUC Global Settlement Payment, each Settling Governmental Authority and Frisco Governmental Authority shall be entitled to its Pro Rata share of Distributions in accordance with Section 4.7(b)(i) of the Plan on account of any Allowed Environmental NPP Claims and Allowed Frisco NPP Claims, as applicable.

(iii)     All Notes Deficiency Claims shall not receive distributions in accordance with Section 4.7(b) of the Plan and such Claims are waived for all purposes, including for voting and for distributions pursuant to and in accordance with Section 4.7(b) of the Plan.

(c)     *Voting*:  Class 7 is Impaired, and the holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claim.

> viii.     **Intercompany Claims (Class 8).**

(a)     *Classification*:  Class 8 consists of Intercompany Claims against the Debtors.

(b)     *Treatment*:  On or after the Effective Date, all Intercompany Claims will be cancelled and not entitled to distribution or any recovery under the Plan.

(c)     *Voting*:  Class 8 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

> ix.     **Intercompany Interests (Class 9).**

(a)     *Classification*:  Class 9 consists of Intercompany Interests in the Debtors.

(b)     *Treatment*:  All Intercompany Interests in a subsidiary Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 5.6(f) of the Plan.  Each holder of an Intercompany Interest in a subsidiary Debtor shall neither receive nor retain any property of the estate or direct interest in property of the estate of such Debtor on account of such Intercompany Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in such Debtor may receive its Pro Rata Share of any remaining assets in the Debtor.

(c)     *Voting*:  Class 9 is Impaired, and the holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

x.      **Holdings Equity Interests (Class 10).**

(a)      *Classification*: Class 10 consists of Holdings Equity Interests.

(b)      *Treatment*:  Except to the extent that a holder of Holdings Equity Interests agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for Holdings Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all Holdings Equity Interests shall be cancelled and one share of Holdings common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Holdings Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of a Holdings Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Holdings Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Holdings Stock may receive its share of any remaining assets of Holdings consistent with such holder's rights of payment existing immediately prior to the Commencement Date unless otherwise determined by the Plan Administrator, on the date that Holdings' Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and (iii) the continuing rights of former holders of Holdings Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)      *Voting*:  Class 10 is Impaired, and the holders of Holdings Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Holdings Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Holdings Equity Interests.

xi.      **Subordinated Securities Claims (Class 11).**

(a)      *Classification*:  Class 11 consists of Subordinated Securities Claims against the Debtors.

(b)      *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)      *Voting*:  Class 11 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Subordinated Securities Claims.

D.       **Means for Implementation**

i.       *Europe/ROW Sale Transaction.*

(a)       *Europe/ROW Sale Transaction.*  On the Effective Date, in accordance with the Europe/ROW Purchase Agreement, the following will occur, subject to the satisfaction or waiver of all applicable closing conditions under the Europe/ROW Purchase Agreement:

(i)       pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, all Acquired Assets (as defined in the Plan) shall be transferred to, and the Acquired Assets owned by the Debtors shall vest free and clear of all Liens (other than Permitted Liens), Claims, charges, interests, or other encumbrances, in the Europe/ROW Purchaser or such other entity as set forth in the Europe/ROW Purchase Agreement, and all Assumed Liabilities shall be assumed by the Europe/ROW Purchaser or such other entity designated by the Europe/ROW Purchaser in accordance with the terms of the Europe/ROW Purchase Agreement.  In the event that the Europe/ROW Purchaser determines to pursue the Alternative Transaction Structure pursuant to its rights under Section 2.08 of the Europe/ROW Purchase Agreement, all other transactions as are necessary to consummate the Europe/ROW Sale Transaction in accordance with the Alternative Transaction Structure; and

(ii)       the releases provided for in Section 12.22 of the Europe/ROW Purchase Agreement shall become effective and binding on the parties thereto.

(b)       *Sources of Consideration for Plan Distribution.*

The Debtors and the Plan Administrator, as applicable, shall fund Distributions under the Plan with the aggregate consideration comprised of (i) the Sale Transaction Proceeds, (ii) Cash on hand, and (iii) the Global Settlement Payments.

ii.       *Compromise and Settlement of Claims, Interests, and Controversies*

(a)       The provisions of the Plan, including treatment provided for hereunder for General Unsecured Claims, including Environmental NPP Claims and Frisco NPP Claims, and the Claims of the Environmental Sureties and the Global Settlement Documents incorporate and reflect a proposed compromise and settlement by and among the Global Settlement Parties (the "***Global Settlement***"). Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, the Global Settlement, and any documents related to the Europe/ROW Sale Transaction, shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a General Unsecured Claim, an Environmental NPP Claim, a Frisco NPP Claim, or a Claim that the Environmental Sureties may have with respect to any such Claim or any Distribution to be made on account of any such Claim and are also in consideration of the significant value provided to the Estates by the Consenting Creditors, the Europe/ROW Purchaser and the Transferred Entities.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)       The terms of the Global Settlement shall become effective and binding upon all parties, including the Global Settlement Parties and the Transferred Entities, automatically upon the Effective Date without the need for any further action or Bankruptcy Court approval.

(c) *GUC Trust.* The GUC Trust shall be established in accordance with the GUC Trust Agreement and the GUC Trust Assets shall be deemed to have been contributed to the GUC Trust free and clear of all Liens, charges, encumbrances, and Interests for the benefit of the holders of Allowed General Unsecured Claims. Solely for purposes of distributions from the GUC Trust: (i) all GUC Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all unsecured guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors and the GUC Trust; and (iii) each and every General Unsecured Claim filed or to be filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the consolidated Debtors and the GUC Trust. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Wind-Down Estates or modify or affect the requirements of section 553 of the Bankruptcy Code for purposes of effectuating a setoff against the Debtors, the Wind-Down Estates or the GUC Trust. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

(d) *Environmental Trust.*

(i) The Environmental Trust shall be established in accordance with the Environmental Settlement Documents and the Environmental Trust Assets shall be transferred to the Environmental Trust free and clear of all Liens, charges, encumbrances, and Interests. The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, the Settling Governmental Authorities shall not assert any Environmental NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, and any Environmental NPP Claim asserted as a General Unsecured Claim shall be treated in accordance with Section 4.7(b)(ii) of the Plan; *provided*, that the foregoing shall not affect any defensive rights of set-off or recoupment of any of the Settling Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.

(ii) Prior to the Effective Date, the Debtors shall not sell or transfer any of the Non-Performing Properties without the prior written consent of the relevant Settling Governmental Authorities; *provided*, that in the event the Debtors sell or otherwise transfer a Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of such Non-Performing Property, all proceeds of such sale shall be contributed to the Environmental Trust on the Effective Date in lieu of such Non-Performing Property. For the avoidance of doubt, the sale of a Non-Performing Property pursuant to Section 5.2(d)(ii) of the Plan shall not affect the respective rights of the Settling Governmental Authorities or the Environmental Sureties relating to such Non-Performing Property.

(iii) Westchester shall make all required contributions to the Environmental Trust in accordance with the Environmental Documents.

(e) *Frisco Trust.*

(i) The Frisco Trust shall be established in accordance with the Frisco Trust Agreement and the Frisco Settlement Agreement, and the Frisco Trust Assets shall be transferred to the Frisco Trust free and clear of all Liens. The Frisco Settlement Agreement contains covenants not to sue

and releases which are incorporated herein.  For the avoidance of doubt, the Frisco Governmental Authorities shall not assert any Frisco NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, and any Frisco NPP Claim asserted as a General Unsecured Claim shall be treated in accordance with Section 4.7(b)(ii) of the Plan; *provided*, that the foregoing shall not affect any defensive rights set-off or recoupment of any of the Frisco Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.

(ii)       Prior to the Effective Date, the Debtors shall not sell or transfer the Frisco Non-Performing Property without the prior written consent of the relevant Frisco Governmental Authorities; *provided*, that in the event the Debtors sell or otherwise transfer the Frisco Non-Performing Property with the consent of the Frisco Governmental Authorities, all proceeds of such sale shall be contributed to the Frisco Trust  on the Effective Date in lieu of the Frisco Non-Performing Property.  For the avoidance of doubt, the sale of the Frisco Non-Performing Property pursuant to Section 5.2(e)(ii) of the Plan shall not affect the respective rights of the Frisco Governmental Authorities or the Environmental Sureties relating to the Frisco Non-Performing Property.

(iii)       Aspen shall make all required contributions to the Frisco Trust in accordance with the Frisco Settlement Agreement and the Frisco Trust Agreement.

(f)       *Consenting Creditors*.

(i)       Certain Consenting Creditors shall purchase the European Bridge Notes issued pursuant to the terms of the European Bridge Notes Indenture in an aggregate amount equal to at least $12,500,000.

(ii)       On the Effective Date, the Exchange Priority and First Lien Notes Trustee, at the direction of the Requisite Noteholders, shall be deemed to have waived (A) all Liens on or against the Non-Performing Properties, including with respect to any proceeds of the sale of any Non-Performing Properties and (B) any Claims, Interests or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims.

(iii)       The Trustees and Consenting Creditors shall take all actions required or necessary under the Superpriority Notes Indentures and the Exchange Priority and First Lien Notes Indenture to effectuate the Europe/ROW Sale Transaction in accordance with the terms of the Plan and the Europe/ROW Purchase Agreement.

(g)       *Transferred Entities*.  On the Effective Date, the Transferred Entities shall pay (i) the GUC Global Settlement Payment to the GUC Trust, (ii) the Settlement Payment to the Environmental Trust, and (iii) the Frisco Global Settlement Payment to the Frisco Trust; *provided*, that for each of the contributions contemplated in the foregoing clauses (i) through (iii), the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors in partial satisfaction of outstanding intercompany payables owed by the Transferred Entities to the Debtors and, following such Cash payment, on the Effective Date, the Debtors shall make the contributions to the GUC Trust, the Environmental Trust, or the Frisco Trust, as applicable.

(h)       *Environmental Sureties*.

(i)       On the Effective Date, the Environmental Sureties shall be deemed to waive all Claims (including Administrative Expense Claims, Priority Non-Tax Claims, or General Unsecured Claims) Interests or Causes of Action against the Debtors, the Wind-Down Estates, the

Plan Administrator, the GUC Trust or the GUC Trust Assets other than any Other Secured Claims that Westchester may hold on account of cash collateral in the amount of $ 5,000,000 posted by the Debtors with respect to the Westchester Surety Bond Agreements.

(ii)     Upon the sale of any Non-Performing Property that is covered by the Westchester Surety Bond Agreement, Westchester's rights under the Westchester Surety Bond Agreements shall be governed by the Environmental Settlement Documents.

(iii)     Upon the sale of the Frisco Non-Performing Property, Aspen's rights under the Aspen Surety Bond Agreements against the Settling Governmental Authority, including any state's right to recoupment, shall remain unaffected.

(i)     *Other Provisions*.

(i)     As a condition precedent to consummation of the Global Settlement, (A) the Global Settlement Parties other than the Settling Governmental Authorities shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, the confirmation or consummation of the Plan or approval of the Global Settlement, and (B) the Settling Governmental Authorities shall not oppose any term or provision of the Plan, Disclosure Statement, or Global Settlement, in each case subject to the rights of the Global Settlement Parties, including the Settling Governmental Authorities, with respect to amendments to the Plan as set forth in Section 12.4 of the Plan.

(ii)     The Settling Governmental Authorities, the Environmental Trust, the Frisco Governmental Authorities, and the Frisco Trust waive all Environmental NPP Claims and Frisco NPP Claims, as applicable, against the GUC Trust up to the amount of the GUC Global Settlement Payment, in the aggregate, in accordance with Section 4.7(b)(ii) of the Plan.

(iii)     The Global Settlement Parties agree to exchange releases or covenants not to sue as set forth in Section 10 of the Plan or as provided in the Environmental Settlement Agreement.

(iv)     The Debtors shall not designate any additional properties as Non-Performing Properties, without the prior written consent of the Settling Governmental Authorities.

(v)     The terms of the Global Settlement (A) shall not affect any rights the Settling Governmental Authorities or the Frisco Governmental Authorities may have against any purchaser of any of the Debtors' Assets that is not a Global Settlement Party, and (B) are without prejudice to any (x) Claims other than Environmental NPP Claims held by the Settling Governmental Authorities or Frisco NPP Claims held by the Frisco Governmental Authorities, as applicable, and (y) any Claim, Interest, or Cause of Action of any Governmental Unit that is not a Settling Governmental Authority or Frisco Governmental Authority.

(vi)     All pending or potential discovery and litigation by any Global Settlement Party against any other Global Settlement Party related to the Chapter 11 Cases or any of the transactions related thereto shall be subject to a standstill and shall be deemed withdrawn upon the Effective Date.

(vii)     The GUC Trust Agreement, the Environmental Trust Agreements, the Frisco Trust Agreement, and any other documentation required to effectuate the Global Settlement shall

be solely for the benefit of the Global Settlement Parties and, for the avoidance of doubt, no third-parties shall be beneficiaries of the Global Settlement or any such documents.

(viii)    The Superpriority Notes Indenture and the Exchange Priority and First Lien Notes Indenture shall be deemed amended and modified to the extent necessary to allow, permit and effectuate the transactions contemplated by the Plan and the Europe/ROW Sale Transaction.

iii.    **The GUC Trust.**

(a)    *Execution of GUC Trust Agreement.* On the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the Requisite Noteholders, and the GUC Trustee, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims. Section 5.3 of the Plan sets forth certain of the rights, duties, and obligations of the GUC Trustee. In the event of any conflict between the terms of Section 5.3 of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.

(b)    *Purpose of GUC Trust.* The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan with respect to the GUC Trust Assets and General Unsecured Claims, including, but not limited to, resolving outstanding Disputed General Unsecured Claims and making distributions to holders of Allowed General Unsecured Claims in accordance with the Plan.

(c)    *GUC Trust Assets.* The GUC Trust shall consist of the GUC Trust Assets.

(d)    *GUC Trustee.* The GUC Trustee shall be responsible to manage the day-to-day operations of the GUC Trust.

(e)    *Role of GUC Trustee.* In furtherance of and consistent with the purposes of the GUC Trust and the Plan, the GUC Trustee shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims, and (v) have the power and authority to perform such other functions as are provided for in the Plan and the GUC Trust Agreement. In all circumstances, the GUC Trustee shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor. The investment powers of the GUC Trustee are limited to powers to invest in demand and time deposits in banks or savings institutions, or temporary investment such as short-term certificates of deposit or U.S. Treasury bills.

(f)    *Preservation of Privilege.* The Debtors and the GUC Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Trust Assets. The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, retain the right to waive their own privileges.

(g)     *Transferability of GUC Trust Beneficial Interests*.  GUC Trust Beneficial Interests shall not be certificated and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law, or as and to the extent determined by the GUC Trustee.

(h)     *Costs and Expenses of GUC Trustee*.  The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trustee and its retained professionals, shall be paid exclusively from the GUC Trust Assets.

(i)     *Retention of Professionals by GUC Trustee*.  The GUC Trustee may retain and reasonably compensate counsel and other professionals, which may include, but is not limited to, Creditors' Committee professionals, to assist in their duties as GUC Trustee on such terms as the GUC Trustee deems appropriate without Bankruptcy Court approval.

(j)     *U.S. Federal Income Tax Treatment of GUC Trust*.  In furtherance of Section 5.3 of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the holders of General Unsecured Claims shall be treated as the beneficiaries and grantors of the GUC Trust; (iii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the GUC Trust Assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims, followed by the deemed transfer of such GUC Trust Assets to the GUC Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (vi) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the GUC Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims based on their respective interests in the GUC Trust, including the holders of General Unsecured Claims holding Disputed Claims, in such manner as the GUC Trustee deems reasonable and appropriate; and (viii) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made for all or any portion of the GUC Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders of General Unsecured Claims, and the GUC Trustee), and solely with respect to the impacts assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

(k)     *Expedited Determination*.  The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(l)     *Dissolution*.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, and (iii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims.

iv.     ***The Environmental Trust.***

(a)     *Execution of Environmental Trust Agreement*.  On or before the Effective Date, the Environmental Trust Documents, substantially in the form attached to the Environmental Settlement Agreement, shall be executed, and all other necessary steps shall be taken to establish the Environmental Trust and the beneficial interests therein, which shall be for the benefit of the Settling Governmental Authorities and Westchester, as provided in the Environmental Settlement Documents.

(b)     *Environmental Trust Assets*.  The Environmental Trust shall consist of the Environmental Trust Assets.  On or before the Effective Date, the Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Environmental Trust as specified and in the amounts provided in the Environmental Settlement Documents.

(c)     *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against a Non-Performing Property shall be irrevocably cancelled on the Effective Date.  Any person holding a Lien against a Non-Performing Property shall take any action reasonably requested by the Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Environmental Trustee.

v.     ***Canada Non-Performing Property.***

(a)     On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Remediation Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; *provided*, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount of remediation costs and/or abandonment of the Canada Non-Performing Property.  The Debtors are authorized to transfer title to or proceeds from the Canada Non-Performing Property to the Canada MOE or its designee.  For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Remediation Funds deposited for use by the Canada MOE.

(b)     Upon completion of the environmental remediation, any excess Canada NPP Remediation Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

(c)     In the event the Canada NPP Remediation Funds are not sufficient to cover the cost of the environmental remediation of the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

vi.     ***Plan Administrator.***

(a)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11

Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan.

(b)     *Authority*.  Subject to Section 6.2 of the Plan, and the Plan Administrator Agreement, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of the Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims (for the avoidance of doubt, the GUC Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims, including Environmental NPP Claims and Frisco NPP Claims asserted against the GUC Trust);

(ii)     make Distributions to holders of Allowed Claims in accordance with the Plan, other than with respect to Allowed General Unsecured Claims;

(iii)     exercise its reasonable business judgment to direct and control the Wind-Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)     other than GUC Trust Causes of Actions, the Environmental Trust Causes of Action, or Frisco Causes of Action, or any Causes of Action released by the Debtors pursuant to the Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates, other than with respect to the GUC Trust Assets;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     maintain the books and records and accounts of the Debtors;

(viii)     incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(ix)     following the Effective Date, pay all Restructuring Expenses in Cash in accordance with Section 2.5 of the Plan;

(x)     following the Effective Date, pay all Trustees Fees in Cash in accordance with Section 2.6 of the Plan.

(xi)     administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of

such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiii)    pay statutory fees in accordance with Section 12.1 of the Plan;

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan; and

(xv)    close the Chapter 11 Cases, subject to the reasonable consent of the GUC Trustee.

(c)    *Boards of Directors and Officers*.   The officers and directors of the Debtors existing prior to the Effective Date, shall be relieved of any all duties with the respect to the Debtors as of the Effective Date.  The Plan Administrator shall serve as the initial director or manager, as applicable, and sole officer of each Wind-Down Estate after the Effective Date.  The Plan Administrator shall elect such additional directors, managers and officers as the Plan Administrator deems necessary to implement the Plan and the actions contemplated herein.  The Plan Administrator shall also have the power to act by written consent to remove any director, manager or officer of any Wind-Down Estate.

(d)    *Wind-Down*.   After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind-Down according to the Wind-Down Budget without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Wind-Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(e)    *Indemnification*.   Each of the Wind-Down Estates shall indemnify and hold harmless the Plan Administrator solely in its capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's bad faith, gross negligence, willful misconduct or criminal conduct.

(f)    *Dissolution*.   After the Effective Date, the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of the Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Wind-Down Estate) and complete the winding up of such Wind-Down Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Wind-Down Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Wind-Down Estate.  The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Wind-Down Estate as a corporate entity in good standing until such time as such Wind-Down Estate is dissolved or merged out of existence in accordance with the Plan.

   vii.    **Corporate Action.**

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved,

and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

viii.        **Withholding and Reporting Requirements.**

(a)        *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)        *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, Wind-Down Estates, GUC Trustee or such other Person designated by the Plan Administrator, Wind-Down Estates or GUC Trustee (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Plan Administrator.  If such request is made by the Plan Administrator, Wind-Down Estates, or such other Person designated by the Plan Administrator or Wind-Down Estates and the holder fails to comply within 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Wind-Down Estate and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the applicable Wind-Down Estate and their  respective property.  If such request is made by the GUC Trustee or such other Entity designated by the GUC Trustee and the holder fails to comply within 180 days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Trust and any Claim in respect of such distribution shall be forever barred from assertion against the GUC Trustee or the GUC Trust, or the property of each of them.

ix.        **Exemption From Certain Transfer Taxes.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Trust, or the Frisco Trust), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax

RLF1 23874670V.1

or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

> *x.*        ***Effectuating Documents; Further Transactions.***

(a)        On or as soon as practicable after the Effective Date, the Plan Administrator shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate.

(b)        Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Wind-Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)        The Debtors shall be authorized to implement the Sale Transactions and the Global Settlement (including the creation of the GUC Trust, the Environmental Trust and the Frisco Trust) in the manner most tax efficient to the Wind-Down Estates and the Environmental Trust, and consistent with the Environmental Settlement Documents.

(d)        All matters provided for herein involving the corporate structure of the Debtors or the Wind-Down Estates, to the extent applicable, or any corporate or related action required by the Debtors or the Wind-Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind-Down Estates.

xi.     *Preservation of Rights of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred or settled pursuant to the Plan (including pursuant to the Global Settlement, Environmental Settlement Documents, and the Frisco Settlement Agreement), the Confirmation Order, or by another Bankruptcy Court order (including the Americas Sale Order) or transferred to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement or the Americas Sale Transaction, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Plan Administrator, or the GUC Trustee, will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to the Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator or the GUC Trustee, as applicable, may determine is in the best interest of the Debtors and their Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

xii.    **Certificate of Incorporation and By-Laws.**

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of the Plan.  Such amended organizational documents (if any) shall be filed with the Bankruptcy Court in advance of the Effective Date.

xiii.   **Stock Trading Restrictions**

The restrictions imposed by the Interim Order Establishing Notification Procedures And Approving Restrictions On Certain Transfers Of Interests In The Debtors (Docket No. 113), as the same may be amended from time to time, shall remain effective and binding through the closing of the Chapter 11 Cases.

xiv.    **Cancellation of Existing Securities and Agreements**

(a)     Except for the purpose of evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, including but not limited to the Exchange Priority and First Lien Notes Indenture and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.  For the avoidance of doubt, but subject to Section 5.14(b) of the Plan, on the Effective Date, the Exchange Priority and First Lien Notes Indenture shall be deemed terminated and cancelled and the Exchange Priority and First Lien Notes Trustee shall be discharged and released without any further action.

(b)  The Exchange Priority and First Lien Notes Indenture shall continue in effect to the extent necessary to (i) allow the Plan Administrator or Exchange Priority and First Lien Notes Trustee, as applicable, to make distributions under the Plan, (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction (iii) permit the Exchange Priority and First Lien Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien; (iv) allow the Exchange Priority and First Lien Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture; (v) to exercise its rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture; (vi) permit the Exchange Priority and First Lien Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in Section 5.14 of the Plan  For the avoidance of doubt, all indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.

> xv.  **Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator or the GUC Trustee, as applicable, to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

> xvi.  **Nonconsensual Confirmation.**

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

> xvii.  **Closing of Chapter 11 Cases.**

After an Estate has been fully administered, the applicable Wind-Down Estate or Plan Administrator shall, subject to the reasonable consent of the GUC Trustee, seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

> xviii.  **Notice of Effective Date.**

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

> xix.  **Corporate Form**

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of the Plan and applicable law.

*xx.*      **Separability.**

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

     **E.**      **Distributions**

*i.*      **Distributions Generally.**

Except as otherwise provided in the Plan and the GUC Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

*ii.*      **Distribution Record Date.**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests. The Debtors, the Plan Administrator or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount. The Distribution Record Date shall not apply to the DIP Claims and the ABL Claims, the holders of which shall receive a distribution in accordance with <u>Section 2</u> or **Error! Reference source not found.** 4 of the Plan, respectively, to the extent not previously satisfied.

*iii.*      **Date of Distributions.**

     *(a)*      Except as otherwise provided in the Plan and in the GUC Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on or about the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of **Error! Reference source not found.** of the Plan; *provided*, that the Plan Administrator or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

     *(b)*      (i) The Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Priority Non-Tax Claims and Disputed Priority Tax Claims, and (ii) the GUC Trustee shall reserve an amount sufficient to pay holders of Disputed General Unsecured Claims, in each case, the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of a Disputed Administrative Expense Claims, Disputed Secured Claim, Disputed Priority Non-Tax Claim and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved on account of such Disputed Claim that is Disallowed or does not become an Allowed Claim as Net Cash Proceeds.

62

### iv.     *Disbursing Agent.*

Other than as contemplated in Section 6.2 of the Plan, all distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors', or Wind Down Estates', as applicable, books and records.  The Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 5.7 of the Plan.

### v.     *Rights and Powers of Disbursing Agent.*

*(a)*     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.  No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

*(b)*     A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### vi.     *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; *provided*, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Trust Assets in accordance with the GUC Trust Agreement.

### vii.     *No Postpetition Interest on Claims.*

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

viii.     ***Delivery of Distributions.***

(a)     Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 5.7 of the Plan.

(b)     Notwithstanding the foregoing, the following shall apply to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and DIP Claims, respectively:

(i)     all distributions of Cash on account of Exchange Priority Notes Claims and First Lien Notes Claims, if any, shall be deposited with the Exchange Priority and First Lien Notes Trustee for distribution to holders of Exchange Priority Notes Claims and First Lien Notes Claims in accordance with the terms of the Exchange Priority and First Lien Notes Indenture.  All distributions other than of Cash on account of Exchange Priority Notes Claims or First Lien Notes Claims, if any, may, with the consent of the Exchange Priority and First Lien Notes Trustee, be made by the Disbursing Agent directly to holders of Exchange Priority Notes Claims and First Lien Notes Claims in accordance with the terms of the Plan and the Exchange Priority and First Lien Notes Indenture; *provided*, that until such distributions are made, the Trustees Charging Lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Exchange Priority and First Lien Notes Trustee.  To the extent the Exchange Priority and First Lien Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Exchange Priority and First Lien Notes Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.  As to any holder of an Exchange Priority Notes Claim or First Lien Notes Claim that is held in the name of or by a nominee of DTC, the Disbursing Agent shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable after the Effective Date.

(ii)     all distributions on account of DIP Claims, if any, shall be deposited with the DIP Agent for distribution to holders of DIP Claims in accordance with the terms of the DIP Loan Documents.  To the extent the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the DIP Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

ix.     ***Distributions after Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

x.      **Unclaimed Property.**

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors, Wind-Down Estates or the GUC Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors, Wind-Down Estates or GUC Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of three hundred and sixty-five (365) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Wind-Down Estates or GUC Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

xi.      **Time Bar to Cash Payments.**

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Estates (or GUC Trust in the case of checks issued by the GUC Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

xii.      **Manner of Payment under Plan.**

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Plan Administrator or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

xiii.      **Satisfaction of Claims.**

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of, and exchange for, such Allowed Claims.

xiv.      **Minimum Cash Distributions.**

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to Section 6.15 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

xv.      **Setoffs and Recoupments.**

The Debtors, Wind-Down Estates, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Wind-Down Estates, or GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a

65

waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

> ### xvi.     *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Wind-Down Estates, or the GUC Trust, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

> ### xvii.     *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

> ### F.     **Procedures for Disputed Claims**

> ### i.     *Objections to Claims.*

The Plan Administrator, on behalf of each of the Wind-Down Estates, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive authority to object to all General Unsecured Claims.  After the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one-hundred and eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.

> ### ii.     *Resolution of Disputed Claims.*

On and after the Effective Date, (a) the Plan Administrator, on behalf of each of the Wind-Down Estates, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims without approval of the Bankruptcy Court.  The Debtors, Wind-Down Estates, Plan Administrator and GUC Trustee, as applicable, shall cooperate with respect to any objections to Claims that seek to convert a type of Claim to another type of Claim as to which a different party or parties may compromise, settle, otherwise resolve, or withdraw objections, and, in each case, the rights and defenses of the Debtors, Wind-Down Estates, Plan Administrator or the GUC Trustee, as applicable, to any such objections are fully preserved.

> ### iii.     *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### iv. *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan or the GUC Trust Agreement, as applicable, without interest, as provided in Section 7.8 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### v. *Estimation of Claims.*

The (a) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), as applicable, may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims; and (b) GUC Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed General Unsecured Claims. The (I) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), with respect to the Claims set forth in clause (a) of Section 7.5 of the Plan; and (II) GUC Trustee, with respect to General Unsecured Claims, in each case, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Plan Administrator or GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### vi. *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### vii. *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### viii. *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### ix.     *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies, *provided*, that this requirement shall not apply to Settling Governmental Authorities.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### G.     **Executory Contracts and Unexpired Leases**

### i.     *Rejection of Executory Contracts and Unexpired Leases.*

(a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Section Section 1.iv.4 of the Plan; or (v) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  The Debtors shall confer with the Settling Governmental Authorities, the Environmental Trustee or the Frisco Trustee, as applicable, and exchange information and reasonably cooperate to determine the appropriate disposition of any contracts or unexpired leases that relate to the Non-Performing Properties and take appropriate action relating thereto.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Europe/ROW Purchaser or Wind-Down Estates, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Europe/ROW Purchaser or Wind-Down Estates, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### ii.     *Determination of Assumption Disputes and Deemed Consent.*

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Europe/ROW Purchase Agreement, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule.  At least ten (10) days before the Combined Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or**

**authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Wind-Down Estate, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Wind-Down Estates, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plans shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided*, that the Debtors or Wind-Down Estates, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Transferred Entities or the Europe/ROW Purchaser shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party. The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

     *iii.*     **Rejection Damages Claims.**

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 7 (General Unsecured Claims). Such Claim shall be forever barred and shall not be enforceable against the Debtors, Europe/ROW Purchaser, Wind-Down Estates, the GUC Trust, the Environmental Trust, or their respective Estates, properties or interests in property as agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors,

Wind-Down Estates, or the GUC Trust, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### iv. *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (i) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and Wind-Down Estates, or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (d) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by Section 7.9 of the Plan.

### v. *Intellectual Property Licenses and Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtors and the Wind-Down Estates and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with <u>Section Section 1.i</u> of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind-Down Estates and the Europe/ROW Purchaser, as applicable, and the Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### vi. *Tax Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in

effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, shall be assumed by the Debtors, Wind-Down Estates, and Europe/ROW Purchaser, as applicable and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with <u>Section Section 1.i</u> of the Plan.  Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Wind-Down Estates or Europe/ROW Purchaser, as applicable, and Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

> vii.  *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

> viii.  *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

> ix.  *Reservation of Rights.*

(a)  The Debtors may amend the Assumption Schedule and any cure notice until five (5) Business Days immediately prior to the commencement of the Combined Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Combined Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Combined Hearing, with such extension applying in the case of any and all subsequent adjournments of the Combined Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)  Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or Wind-Down Estates, or their respective affiliates have any liability thereunder.

71

(c)     Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and Wind Down Estates, under any executory or non-executory contract or any unexpired or expired lease.

(d)     Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Wind-Down Estates, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

**H.     Conditions Precedent to Confirmation of Plan and Effective Date**

*i.     Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)     the Definitive Documents shall be consistent with the RSA and otherwise approved by the Requisite Noteholders consistent with their respective consent and approval rights as set forth in Section 4 of the RSA;

(b)     the RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms;

(c)     the Definitive Documents shall be consistent with the Global Settlement and, to the extent the terms of a Definitive Document adversely affect the Global Settlement or treatment of the Settling Governmental Authorities thereunder, are otherwise approved by the Settling Governmental Authorities;

(d)     the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

(e)     the Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the First Lien Notes Claims, the Superpriority Notes Guarantee Claims, or the DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors, the Transferred Entities, or the DIP Lenders; or (ii) supported any third party seeking standing to bring such application, adversary proceeding or cause of action;

(f)     the Debtors shall have paid or caused to be paid in Cash all Restructuring Expenses and Trustee Fees invoiced no later than one Business Day prior to the Effective Date;

(g)     all governmental approvals, including Bankruptcy Court approval, necessary to consummate the Plan and the transactions contemplated hereby shall have been obtained or otherwise waived;

(h)     (i) the Debtors (or any Person or Entity on behalf of the Debtors or their Estates with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims, or (B) limiting the Europe/ROW Purchaser's or the Trustees' right

72

to implement the Europe/ROW Sale Transaction, or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered a Final Order providing relief against the interests of the Consenting Creditors or the Trustees with respect to any of the foregoing Causes of Action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims or (y) limiting the Consenting Creditors' or the Trustees' right to implement the Europe/ROW Sale Transaction;

(i)     all agreements necessary to implement the Plan, including the Europe/ROW Sale Transaction, the Global Settlement, and the Environmental Settlement Documents, shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; *provided*, that approval of the Environmental Settlement Documents may not be waived without the consent of each of the Settling Governmental Authorities party thereto;

(j)     all releases or covenants not to sue contained in the Environmental Settlement Agreement and the Frisco Settlement Agreement shall be in form and substance acceptable to the Requisite Noteholders;

(k)     notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

### ii.     *Waiver of Conditions Precedent.*

(a)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section Section 1.i of the Plan other than the conditions set forth in <u>Sections Section 1.i(c)</u> and <u>(i)</u> may be waived in writing by the Debtors with the prior written consent of the Requisite Noteholders (and the Creditors' Committee with respect to the terms of the Global Settlement) without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.19 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement (including those set forth in Sections Section 1.i(c) and (i)) shall not be waived without the prior written consent of each of the Global Settlement Parties.

(b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### iii.     *Effect of Failure of Conditions to Effective Date.*

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered or if the

Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## I.   **Effect of Confirmation of Plan**

### i.   *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates acquired by the Europe/ROW Purchaser under the Europe/ROW Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Europe/ROW Purchaser; (ii) all property of the Debtors' Estates constituting GUC Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Environmental Trust; (iv) all property of the Debtors' Estates constituting Frisco Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Frisco Trust; and (v) all remaining property of the Debtors' Estates shall vest in the Wind-Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other Interests. Notwithstanding any provisions in the Plan, the Environmental Trust and the Frisco Trust shall take the Transferred Non-Performing Properties and the Frisco Non-Performing Property, as applicable, subject to the obligations set forth in the Environmental Settlement Documents and the Frisco Settlement Agreement, as applicable.  On and after the Effective Date, the Wind-Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein. Without limiting the foregoing, the Wind-Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind-Down Estates may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

### ii.   *Term of Injunctions or Stays*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

iii. *Injunction.*

(a)      Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.

(b)      Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Environmental Trust, the Frisco Trust, or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Environmental Trust, and the Frisco Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities; or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Trust, and the Frisco Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Trust, and the Frisco Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Trust, and the Frisco Trust, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)      By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section iii of the Plan.

(d)      The injunctions in Section iii of the Plan shall extend to any successors of the Debtors (including the Wind Down Estates), the GUC Trust, the Environmental Trust, and the Frisco Trust and their respective property and interests in property.

iv. *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

75

>          *v.        Releases by the Debtors.*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the Wind-Down Estates, in each case, on behalf of themselves and their respective successors (including the Frisco Trust, the Environmental Trust, and the GUC Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plans, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Definitive Documents, the Europe/ROW Sale Transaction or the Global Settlement.

>          *vi.       Releases By Holders of Claims and Interests.*

As of the Effective Date, except (A) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date and (B) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following (each such Person or Entity, a "*Releasing Party*" and, collectively, the "*Releasing Parties*"):

>          (a)       the Consenting Creditors;

>          (b)       the Creditors' Committee and each of its members in their capacity as such,

>          (c)       all holders of Claims who vote to accept the Plan;

>          (d)       all holders of Claims who are deemed to accept the Plan;

(e)      all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in Section 10.6 of the Plan;

(f)      solely with respect to the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims; and

(g)      with respect to any Person or Entity in the foregoing clauses (a) through (f), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (f);

in each case, from any and all Claims and Causes of Action (including, without limitation, any PBGC Claims and Canada NPP Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the European Bridge Notes, the Pension Plans, the Optimization, the June 2019 Financing, any Environmental Law, the Global Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including any Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Europe/ROW Sale Transaction, or the Global Settlement.  Except as otherwise set forth in subsection (g) of Section 10.6, the Persons and Entities in (a) through (h) of Section Section 1.vi shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under Section Section 1.vi against each of the Released Parties.

Notwithstanding anything to the contrary in Section 10.6 of the Plan,  Governmental Units are not Releasing Parties under the Plan and are not providing a release or covenant not to sue except as provided in the Environmental Settlement Documents or other separate settlement document with a Governmental Unit.

vii.      ***Exculpation.***

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit

of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Loan Documents; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence, or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### viii. *Waiver of Statutory Limitation on Releases*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER SECTION 10 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 10 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### ix. *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have previously solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### x. *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or

any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

**J.**       **Retention of Jurisdiction**

*i.*       ***Retention of Jurisdiction.***

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)       to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)       to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)       to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)       to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

(e)       to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)       to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)       to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)       to hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees;

(i)       to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, Europe/ROW Sale Transaction, any other Sale Transactions, the Global Settlement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)      to hear, adjudicate, decide, or resolve any and all matters related to **Error! Reference source not found.** of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to resolve disputes concerning Disputed Claims or the administration thereof;

(o)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors, the GUC Trust, the Environmental Trust, or the Frisco Trust pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

   *ii.*      ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

   **K.**      **Miscellaneous Provisions**

   *i.*      ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to

§ 3717 of title 31 of the United States Code for each Debtor's case. The obligations under Section 12.1 of the Plan shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### ii.    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### iii.    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

### iv.    *Amendments.*

(a)    *Plan Modifications.*  Subject to (i) the terms of the RSA and all consent rights contained therein, and (ii) the consent of the Global Settlement Parties with respect to any amendment to the Global Settlement, including the Environmental Settlement Documents, or other provisions of the Plan or Definitive Documents that impact the Global Settlement (including any amendment to the definition of Settling Governmental Authorities or Schedule 1 to the Plan), (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Noteholders (and the Global Settlement Parties, solely as it pertains to the Global Settlement), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments.*  Subject to the terms of the RSA and, solely with respect to the terms of the Global Settlement, subject to the consent of the Global Settlement Parties, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided,* that any change to the Environmental Settlement Documents may not be made without the written consent of the parties thereto.

### v.    *Revocation or Withdrawal of the Plan.*

Subject to the terms of the RSA, the Global Settlement, the Environmental Settlement Documents and the Europe/ROW Purchase Agreement, the Debtors reserve the right to revoke or withdraw the Plan, including

81

the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

### vi.        Severability of Plan Provisions upon Confirmation.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Requisite Noteholders (and the Global Settlement Parties with respect to the Global Settlement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Wind-Down Estate (as the case may be); and (3) nonseverable and mutually dependent.

### vii.        Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

### viii.        Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### ix.        Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

   *x.*   ***Immediate Binding Effect.***

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind-Down Estates, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

   *xi.*   ***Successors and Assigns.***

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

   *xii.*   ***Entire Agreement.***

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

   *xiii.*   ***Notices.***

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Debtors or the Plan Administrator:

    Exide Holdings, Inc.
    13000 Deerfield Parkway
    Building 200
    Milton, GA 30004
    Attention: Roy Messing, Chief Restructuring Officer
    Telephone: (678) 566-9000

     - and –

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, NY 10153
    Attn: Ray C. Schrock, P.C.
      Sunny Singh
    Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007

(ii) if to the Requisite Noteholders:

    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    1285 Avenue of the Americas
    New York, New York 10019
    Attn:    Alice Belisle Eaton, Esq.

Robert Britton, Esq.
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

(iii) if to the Creditors' Committee:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attn:    Robert Hirsh, Esq.
         Eric Chafetz, Esq.
         Michael Kaplan, Esq.
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

# VI.
# VALUE

As described above, the Debtors conducted the postpetition marketing process in accordance with the Bidding Procedures Order.  The Debtors believe that the postpetition marketing process is the best method of valuing their businesses as it allows the market to speak as to that value.  The purchase prices for the Debtors' Assets, which were obtained through a robust postpetition marketing process and are the product of negotiations that were conducted in good faith and at arms' length, are the best indicators of value.

Pursuant to the Notice of Successful Europe/ROW Bid and Qualified Americas Bids, and the Notice of Successful Americas Bid, the Debtors designated as the highest or best bids: (i) the Successful Europe/ROW Bid, and (ii) the Successful Americas Bid.  The purchase price under the Successful Europe/ROW Bid in consideration for the Europe/ROW Assets is $430 million on the terms and conditions set forth in that certain Stock and Asset Purchase Agreement attached as Exhibit B to the Notice of Europe/ROW Stalking Horse Agreement.  The purchase price under the Successful Americas Bid in consideration for the Americas Assets is $178.6 million on the terms and conditions set forth in that certain Stock and Asset Purchase Agreement attached as Exhibit A to the Notice of Successful Europe/ROW Bid and Qualified Americas Bids.

# VII.
# CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims.  The following summary does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired, deemed to reject the Plan or otherwise entitled to payment in full in cash under the Plan.  This summary also does not address the U.S. federal income tax consequences to holders of Superpriority Notes Guarantee Claims, which, pursuant to the Plan, will be assumed by the Transferred Entities on the Europe/ROW Closing Date.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury Regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts.  Accordingly, there can be no assurance that the IRS would not take a contrary position as to the U.S. federal income tax consequences described herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances, or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated investment companies, tax-exempt organizations, trusts, governmental authorities or agencies, dealers and traders in securities, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in foreign currency, persons who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income and accrual method taxpayers that report income on an "applicable financial statement").  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes (including by way of distributions to the GUC Trust and the Environmental Trust) that the Debtors themselves will be the Wind-Down Estates (and not any successor, by merger, consolidation or otherwise, to the Debtors), and that all distributions to holders of Claims will be taxed accordingly.  Thus, all references in this summary to the Debtors as relates to periods after the Effective Date should be considered references to the Wind-Down Estates as a continuation of the Debtors.

Additionally, this discussion assumes that: (i) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

     A.    **Certain U.S. Federal Income Tax Consequences to the Debtors**

For U.S. federal income tax purposes, each of the Debtors is a member of an affiliated group of corporations of which Holdings is the common parent and which files a single consolidated U.S. federal income tax return (the "**Tax Group**"), or disregarded as separate from its owner for U.S. federal income tax purposes

whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group. The Debtors estimate that, as of the Commencement Date, the Tax Group had approximately $141.7 million in consolidated net operating loss ("**NOL**") carryforwards, approximately $148.5 million in consolidated federal disallowed business interest expense carryforwards under Section 163(j) of the Tax Code, and certain other favorable tax benefits (collectively, the "**Tax Attributes**"). A portion of the Debtors' Tax Attributes are subject to limitation under section 382 of the Tax Code by reason of an ownership change of the Debtors in connection with their prior 2015 bankruptcy restructuring. The amount of any such Tax Attributes and limitations remain subject to audit and potential adjustment by the IRS.

The tax impact of the Plan on the Tax Attributes of the Tax Group is discussed in Section VII.A.3 below.

       *1.*     *Sale Transactions, Transfer of Assets to the Trusts, and Wind-Down*

The Plan authorizes the Debtors to implement one or more Sale Transactions, including the Americas Sale Transaction and the Europe/ROW Sale Transaction, to sell all, or substantially all, of the Debtors' assets. Moreover, the Plan provides for the transfer, on the Effective Date, of the GUC Trust Assets to the GUC Trust on behalf of holders of General Unsecured Claims, the transfer of the Environmental Trust Assets to the Environmental Trust on behalf of holders of Environmental NPP Claims, and the transfer of the Frisco Trust Assets to the Frisco Trust on behalf of holders of Frisco NPP Claims. For U.S. federal income tax purposes, the transfer of assets to each of the trusts generally is treated equivalent to a sale of the assets at the fair market value. See Section VII.C, infra. Accordingly, all of these transactions will result in the recognition of income, gains, losses, or deductions. The Debtors' current year deductions, NOL carryforwards, and other Tax Attributes generally should be available to offset some or all of the tax gains or income that might be recognized, subject to the potential application of section 382 of the Tax Code, as discussed below. See Section VII.A.3 — "Limitation of NOL Carryforwards and Other Tax Attributes," below. Depending on the value of the transferred assets, the timing of when such sales or transfers occur, and the availability of and any limitations on the Debtors' Tax Attributes for applicable federal (as well as state and local) income tax purposes, the Debtors may incur certain income tax liabilities relating to such transfers.

       *2.*     *Cancellation of Debt and Reduction of Tax Attributes*

In general, the Tax Code provides that a debtor must recognize cancellation of debt ("**COD**") income upon the elimination or reduction of debt for insufficient consideration. The amount of COD income generally is equal to the amount by which the adjusted issue price of cancelled debt exceeds the sum of the amount of cash and the fair market value of any other property given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. One such exception to such income recognition is provided for any COD arising by reason of the discharge of the debtor's indebtedness in a bankruptcy case or to the extent of the debtor's insolvency immediately before the cancellation of the debt. In such case, the Tax Code generally requires the debtor to reduce certain of its tax attributes—such as current year NOLs and NOL carryforwards, tax credits, capital loss carryforwards, and tax basis in assets—by the amount of any such excluded COD income. Although not free from doubt, it is expected that carryover of disallowed interest expense would not be a tax attribute subject to such reduction. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

In general, any reduction in tax attributes under the COD rules does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs. Also, where the Debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury

RLF1 23874670V.1

Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

Consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, the Debtors believe that no COD should be incurred by any Debtor as a result of the implementation of the Plan prior to the disposition by such Debtor of all or substantially all of its assets and the distribution of all of its assets (other than to the extent any Allowed Claim's distribution is subject to a maximum amount, or has been, or is separately settled, for less than its carrying value).  In such case, the reduction of tax attributes resulting from such COD (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs) generally is not expected to have a material impact on the Debtors.  There can be no assurance that the IRS will agree to such characterization, due to, among other things, the lack of direct authoritative guidance as to when COD occurs in the context of a liquidating Chapter 11 plan, and thus there can be no assurance that all or a substantial amount of the COD will not be incurred earlier.

### 3.    Limitation of NOL Carryforwards and Other Tax Attributes

The Tax Group's ability to utilize its Tax Attributes could be subject to limitation (including an additional limitation to the extent such Tax Attributes are subject to an existing limitation) if the Tax Group underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code after the Commencement Date.  Accordingly, the Debtors obtained the Stock Restrictions Order from the Bankruptcy Court, effective as of the Commencement Date, imposing certain restrictions with respect to trading in Holdings stock so as to avoid such an ownership change.

Pursuant to the Plan, a single share of Holdings common stock will be issued for the benefit of former holders of Holdings Equity Interests, pursuant to which the former holders of Holdings Equity Interests will maintain their economic interests in any residual assets of the Debtors after the satisfaction of all Allowed Claims, which economic interests will be nontransferable except by operation of law.  Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not believe that the Plan should result in an ownership change of the Tax Group.  There is no assurance that the IRS will not challenge this position and, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, there is no assurance that the IRS would not successfully assert a contrary position (including with respect to the treatment for federal income tax purposes of the holders of Claims as continuing creditors and not as effective equity holders of Exide throughout the liquidation process).

If, notwithstanding the Debtors' position, an ownership change were considered to occur (by reason of the creditors' contingent interest under the Plan in any sale proceeds being recharacterized as a stock interest), the availability of the Debtors' Tax Attributes thereafter would be severely limited and may be rendered effectively unavailable, unless the special bankruptcy exception in section 382(l)(5) of the Tax Code were to apply.  Such exception would apply if existing shareholders and qualifying creditors are treated as retaining or receiving, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of Holdings pursuant to the Plan.  If the ownership change were to qualify for this exception, certain of the Debtors' Tax Attributes may nevertheless remain available.

### B.    Consequences for Holders of Certain Claims

For purposes of this discussion, a "U.S. Holder" is a holder of an Allowed Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within

the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust, or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

### 1. Holders of Exchange Priority Notes Claims or First Lien Notes Claims

Pursuant to the Plan, holders of Allowed Exchange Priority Notes Claims will receive their Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in cash, and holders of Allowed First Lien Notes Claims will receive their Pro Rata share of Net Cash Proceeds thereafter, until all Allowed First Lien Notes Claims are satisfied in full in cash.

In general, a U.S. Holder of an Allowed Exchange Priority Notes Claim or an Allowed First Lien Notes Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of any cash received with respect to its Allowed Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in the Allowed Claims exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* Section VII.B.3, "Character of Gain or Loss," below.  In addition, a U.S. Holder of a Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  *See* Section VII.B.2, "Distributions in Respect of Accrued But Unpaid Interest or OID," below.

Because holders of Allowed Exchange Priority Notes Claims or Allowed First Lien Notes Claims may receive multiple distributions, a U.S. Holder may have additional gain and/or imputed interest income in respect of any additional distributions received.  In addition, it is possible that the recognition of any loss realized by a U.S. Holder with respect to its Allowed Claim as to which additional distributions could be received may be deferred until all distributions have been made.

### 2. Distributions with Respect to Accrued But Unpaid Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of an Allowed Claim is received in satisfaction of interest accrued or OID accrued, in each case during its holding period, such amount will be taxable to the U.S. Holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the holder's normal method of accounting).  Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  It is unclear whether a U.S. Holder would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.  Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

Section 6.16 of the Plan provides that, except as otherwise required by law, distributions to U.S. Holders with respect to any Allowed Claim will be allocated first to the principal amount of such Allowed Claims,

with any excess allocated to unpaid interest that accrued on these Claims, if any. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 3. Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the holder reports income using the accrual or cash method of tax accounting, whether the Claim was acquired at a market discount, whether, and to what extent, the holder previously claimed a bad debt deduction, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument is less than: (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a statutorily defined *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than with respect to a Claim for accrued, but unpaid, interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the receipt of cash and other consideration in satisfaction of such Claims.

## C. Tax Treatment of the GUC Trust and Holders of Beneficial Interests Therein

### 1. Classification of the GUC Trust as a Liquidating Trust

**II.**The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than with respect to any portion of the assets transferred to the GUC Trust and allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) will be required to treat the transfer of the GUC Trust Assets to the GUC Trust as (1) a transfer of the GUC Trust Assets (subject to any obligations relating to those assets) directly to the holders of Allowed General Unsecured Claims receiving interests in the GUC Trust (other than to the extent any of the GUC Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such holders to the GUC Trust of the GUC Trust Assets in exchange for interests in the GUC Trust. Accordingly, except in the event of contrary definitive guidance, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust (i.e., the beneficiaries of the GUC Trust) would be treated for U.S. federal income tax purposes

as the grantors and owners of their respective share of the GUC Trust Assets transferred to the GUC Trust (other than such GUC Trust Assets as are allocable to Disputed Claims).

Although the following discussion assumes that the GUC Trust will be treated as a liquidating trust for U.S. federal income tax purposes, no ruling will necessarily be requested from the IRS concerning the tax status of the GUC Trust as a grantor trust. Accordingly, there can be no assurance that the IRS will not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the GUC Trust and the U.S. Holders of Allowed General Unsecured Claims receiving interests in the GUC Trust could vary from those discussed herein. Certain U.S. federal income tax consequences of the GUC Trust or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 are also discussed below.

1.   General "Liquidating Trust" Tax Reporting by the GUC Trust and GUC Trust Beneficiaries

For all U.S. federal income tax purposes, all parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) must treat the GUC Trust as a grantor trust of which holders of beneficial interests in the GUC Trust (as determined for U.S. federal income tax purposes) are the owners and grantors. Accordingly, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the GUC Trust (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The GUC Trustee will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The GUC Trustee also will annually send to each holder of a beneficial interest in the GUC Trust a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

All taxable income and loss of the GUC Trust will be allocated among, and treated as directly earned and incurred by, holders of beneficial interests in the GUC Trust with respect to such holder's undivided interest in the GUC Trust Assets (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of Claims receiving interests in the GUC Trust.

As soon as reasonably practicable after the transfer of the GUC Trust Assets to the GUC Trust, the GUC Trustee will make a good faith valuation of the GUC Trust Assets. All parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) must report consistently with such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a U.S. Holder with respect to its beneficial interests in the GUC Trust are not dependent on the GUC Trust distributing any cash or other proceeds, subject to any portion(s) of the GUC Trust allocable to Disputed Claims. Thus, a U.S. Holder of Allowed General Unsecured Claims receiving interests in the GUC Trust may incur a U.S. federal income tax liability with respect to its allocable share of GUC Trust's income even if the GUC Trust does not make a concurrent distribution to the U.S. Holder. In general, other than in respect of cash retained on account of Disputed Claims, a

90

distribution of cash by the GUC Trust will not be separately taxable to a beneficial owner of the GUC Trust since the beneficial owner is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by GUC Trust).  U.S. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the GUC Trust on account of Disputed Claims.

The GUC Trust will comply with all applicable governmental withholding requirements.  If any beneficiaries of the GUC Trust are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).  As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to holders of General Unsecured Claims or non-U.S. Holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the GUC Trust.

2. *Tax Reporting for the GUC Trust Assets Allocable to Disputed Claims*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of an IRS private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee (A) may elect to treat any of the GUC Trust Assets allocable to, or retained on account of, Disputed Claims (a "**Disputed Claims Reserve**") as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claims Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to such assets (including any gain recognized upon the disposition of such assets).  All distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.  All parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) will be required to report for tax purposes consistently with the foregoing.

B.   **Information Reporting and Back-Up Withholding**

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder: (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.   THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME

TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

### A.        Certain Bankruptcy Law Considerations

#### a)        Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if the Voting Classes (as defined herein) voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan under chapter 11 of the Bankruptcy Code, or a subsequent liquidation under chapter 7 of the Bankruptcy Code.

#### b)        Risk of Failing to Satisfy Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Classes, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Claims and Interests as those proposed in the Plan.

#### c)        Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

### d)       Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Sections 9.1 and 9.2 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### e)       Risk of Termination of RSA

The RSA contains certain provisions that give the parties the ability to terminate the RSA if various conditions are satisfied.  As noted above, termination of the RSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with regulators, Settling Governmental Authorities, vendors, suppliers, employees, and customers.  If the RSA is terminated, each vote or any consent given by any Consenting Creditor prior to such termination will be deemed null and void *ab initio*.  If the termination of the RSA takes place when Bankruptcy Court approval is required for a Consenting Creditor to change or withdraw its vote to accept the Plan, the Company has agreed to support and not oppose any such attempt to change or withdraw a vote.

### f)       Risk Related to Possible Objections to Plan

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan.  While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### g)       Conversion to Chapter 7

If a chapter 11 plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Article 0 hereof, as well as the liquidation analysis, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests (the "**Liquidation Analysis**").

### h)       Global Settlement May Not Be Approved by the Settling Governmental Authorities or the Bankruptcy Court

As described more fully above, the Plan incorporates a proposed Global Settlement among the Debtors, the Creditors' Committee, the Ad Hoc Group, the Settling Governmental Authorities and the Environmental Sureties.  However, Global Settlement remains subject to: (i) the Settling Governmental Authorities obtaining approval from those with authority and public comment on the Environmental Settlement Agreement, and (ii) approval of the Bankruptcy Court.  Such approvals may not be obtained.

### i)       Conditions to Europe/ROW Sale May Not Be Satisfied

The Europe/ROW Sale Transaction is subject to certain closing conditions set out at Article X of the Europe/ROW Purchase Agreement (the "**Closing Conditions**").  There is no assurance that the Closing Conditions will be satisfied. The failure to satisfy all Closing Conditions, unless waived, could result in the inability to close the Europe/ROW Sale Transaction and could jeopardize consummation of the Plan.

93

*j)*      **Settlement of Retiree Benefits May Impact Ability to Confirm a Plan**

The Debtors will engage in negotiations with the Retiree Committee and the Union Representatives to modify the Retiree Benefits pursuant to Section 1114 of the Bankruptcy Code.  The outcome of such negotiations is uncertain and any negotiated settlement (including a cash settlement, if any) or Court determination may impact the ability of the Debtors to effect and confirm the Plan.

**B.**      **Additional Factors**

*a)*      **Claims Could be More than Projected**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.   Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and that variation may be material.

*b)*      **Projections and Other Forward-Looking Statements are not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect, and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

*c)*      **Debtors Could Withdraw Plan**

Subject to the terms of, and without prejudice to, the rights of any party to the RSA, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

*d)*      **Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

*e)*      **No Representations Outside Disclosure Statement are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

*f)*      **No Reliance on Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Combined Hearing

94

or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

*g)*   **No Legal or Tax Advice is Provided by Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

*h)*   **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

*i)*   **Certain Tax Consequences**

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Article VII hereof.

## IX.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) (each, an "**Eligible Holder**" and, collectively, the "**Eligible Holders**") as of August 14, 2020 (the "**Voting Record Date**") should carefully review the Plan annexed hereto as Exhibit A.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

**A.**   **Voting Deadline**

All Eligible Holders as of the Voting Record Date will be provided with a Ballot together with this Disclosure Statement to vote to accept or reject the Plan (a "**Ballot**").  Only Eligible Holders are entitled to vote to accept or reject the Plan.  Because Classes 1, 2, and 3 are unimpaired and deemed to accept, and Classes 7, 8, 9, 10, and 11 are conclusively deemed to reject, only Class 4, 5, and 6 are entitled to vote.

The Debtors have engaged Prime Clerk LLC as its voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

EACH BALLOT CONTAINS DETAILED VOTING INSTRUCTIONS AND SETS FORTH IN DETAIL, AMONG OTHER THINGS, THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, THE VOTING RECORD DATE FOR VOTING PURPOSES, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS.  ELIGIBLE HOLDERS SHOULD READ THE BALLOT CAREFULLY AND FOLLOW THE INSTRUCTIONS THEREIN.

THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 17, 2020, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").  FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE

VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.  IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED*, *HOWEVER*, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO ALLOW SUCH BALLOT TO BE COUNTED.

If you have any questions concerning voting procedures, you may contact the voting agent at:

**Prime Clerk LLC**
**Telephone: (844) 230-7218 (toll free) or +1 (347) 859-8784 (international)**
**E-mail: Exide2020@Primeclerk.com with "Exide Holdings, Inc." in the subject line**

Additional copies of this Disclosure Statement are available upon a request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B. Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to Eligible Holders.  In order to vote, Eligible Holders should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

### C. Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof, or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of:  (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the

claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) are impaired under the Plan and the only Classes of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Class**" or the "**Voting Claims**").

Claims and Interests in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article I of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article X of this Disclosure Statement.

> a) **Miscellaneous**

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  Any Ballot marked to both accept and reject the Plan will not be counted.  If an Eligible Holder casts more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect such Eligible Holder's intent, and thus, will supersede any prior Ballot.  If an Eligible Holder casts Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

<i>b)</i>    **Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

<i>c)</i>    **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, and 10.7 of the Plan. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the RSA.

<i>d)</i>    **Change of Vote**

Subject to the terms of the RSA, any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

<i>e)</i>    **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**X.**<br>**CONFIRMATION OF PLAN**

**A.**    **Combined Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Debtors will request that the Bankruptcy Court schedule a hearing to consider: (i) final approval of the Disclosure Statement, (ii) confirmation of the Plan, (iii) approval of the Europe/ROW Sale Transaction, and (iv) the Global Settlement, and any objections thereto (the "**Combined Hearing**"). Subject to the Bankruptcy Court's availability, the Combined Hearing will be

98

held on **September 25, 2020 at 2:00 p.m. (Eastern Time)**.  Notice of the Combined Hearing will be provided to all known creditors and equity holders or their representatives.  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Combined Hearing, at any subsequent adjourned Combined Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

### B.    <u>Objections to Confirmation and Final Approval of Disclosure Statement</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to final approval of the Disclosure Statement and confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline on **September 17, 2020 at 4:00 p.m. (Eastern Time)** (the **"Objection Deadline"**).  Objections, if any, to final approval of the Disclosure Statement, the Europe/ROW Sale Transaction and/or confirmation of the Plan (including objections to the releases and exculpation provisions provided therein) must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; (iv) set forth the basis for the objection and the specific grounds therefor, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; and (v) be filed, together with proof of service. Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. All other parties in interest must file their objections and responses in writing with the United States Bankruptcy Court Clerk's Office, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.  Pursuant to Bankruptcy Rule 3017, any objection or response must also be served upon and received by the following parties no later than the Objection Deadline:

| | |
|---|---|
| ***Debtors*** | ***Office of the U.S. Trustee*** |
| Exide Holdings, Inc., *et al.* | Office of the U.S. Trustee for |
| c/o Prime Clerk LLC, | the District of Delaware |
| One Grand Central Place, | 844 N. King Street |
| 60 East 42nd Street, Suite 1440, | Wilmington, Delaware 19801 |
| New York, New York 10165 | Attn: Linda J. Casey, Esq. |
| | Email: linda.casey@usdoj.gov |
| | |
| ***Attorneys to the Debtors*** | ***Attorneys to the Debtors*** |
| Weil, Gotshal & Manges LLP | Richards, Layton, & Finger, P.A. |
| 767 Fifth Avenue | One Rodney Square |
| New York, New York 10153 | 920 North King Street |
| Attn:  Ray C. Schrock, P.C. | Wilmington, Delaware 19801 |
|  Sunny Singh, Esq. | Attn: Daniel J. DeFranceschi, Esq. |
| Email:  ray.schrock@weil.com |  Zachary I. Shapiro, Esq. |
|  sunny.singh@weil.com | Email: defranceschi@rlf.com |
| |  shapiro@rlf.com |
| | |
| ***Attorneys to the Creditors' Committee*** | ***Attorneys to the Ad Hoc Group*** |
| Lowenstein Sandler LLP | Paul, Weiss, Rifkind, Wharton & |
| 1251 Avenue of the Americas | Garrison LLP |
| New York, New York 10020 | 1285 Avenue of the Americas |
| Attn.: Robert M. Hirsh, Esq. | New York, NY 10019 |
|  Eric Chafetz, Esq. | Attn:  Alice Belisle Eaton, Esq. |
| Email: rhirsh@lowenstein.com |  Robert Britton, Esq. |
|  echafetz@lowenstein.com | Email:  aeaton@paulweiss.com |

rbritton@paulweiss.com

***Attorneys to the DIP Agents***
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
Attn: Robert A. Klyman, Esq.
    Matthew G. Bouslog, Esq.
Email: rklyman@gibsondunn.com
    mbouslog@gibsondunn.com

***Attorneys to the Trustee under the Indentures***
Arent Fox LLP
1301 Avenue of the Americas
New York, New York 10019
Attn.: Andrew Silfen, Esq.
Email: andrew.silfen@arentfox.com

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**     **Requirements for Confirmation of Plan**

**(i)**     **Requirements of Section 1129(a) of Bankruptcy Code**

*(a)*     General Requirements

At the Combined Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)     the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)     any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the

RLF1 23874670V.1

Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

(xi)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

*(b)*     Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests, and (ii) the Liquidation Analysis annexed hereto as <u>Exhibit D</u>.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis annexed hereto as <u>Exhibit D</u> is

provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and will be prepared on a Debtor-by-Debtor basis with a summary on a consolidated basis. There can be neither any assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

        *(c)*      <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan. As noted above, the Plan provides for the sale of substantially all of the Debtors' assets and the distribution of the proceeds of such sale, to be followed by the liquidation of the Debtors. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Plan Administrator to liquidate the Debtors' remaining assets. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code. Moreover, Article VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

        **(ii)**    <u>**Additional Requirements for Non-Consensual Confirmation Under Section 1129(b) of the Bankruptcy Code**</u>

In the event that any impaired Class of Claims or Interests does not accept, or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Claims in Class 7 (General Unsecured Claims), Class 8 (Intercompany Claims) and Class 11 (Subordinated Securities Claims), holders of Interests in Class 9 (Intercompany Interests), Class 10 (Holdings Equity Interests), and holders of Claims in Class 11 (Subordinated Securities Claims) will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

        *(d)*      <u>Unfair Discrimination Test</u>

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority. The Plan provides that Claims and Interests of equal priority will receive comparable treatment

102

and the Debtors believe such treatment is fair under the circumstances.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

*(e)*     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured), and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to any rejecting class, as further explained below.

(i)     *Other Secured Creditors*

The Bankruptcy Code provides that each holder of an impaired secured claim either: (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the Effective Date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.  The Debtors submit that the Plan satisfies the "fair and equitable" test with respect to holders of secured claims.

(ii)     *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.  The Plan provides that holders of Claims in Class 7 (General Unsecured Claims) shall receive their Pro Rata share of (A) the GUC Trust Beneficial Interests (as defined in the Plan), and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims (each as defined in Plan) are satisfied in full in accordance with the Plan, until all Allowed General Unsecured Claims are satisfied in full in Cash.  Further, the Plan also provides that holders of Claims or Interests in any Class junior to the holders of Claims in Class 7 (General Unsecured Claims) will not receive or retain any property under the Plan unless and until all Allowed General Unsecured Claims have been satisfied in full.  Therefore, the Debtors submit that the Plan satisfies the "fair and equitable" test with respect to holders of unsecured claims.

(iii)     *Equity Interests*

The Bankruptcy Code requires that either: (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock, and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, all Interests in Class 9 (Intercompany Equity Interests) will be cancelled, reinstated, or receive such other treatment as is determined by the Debtors and all Interests in Class 10 (Holdings Equity Interests) shall be deemed cancelled and holders of such Interests will neither receive nor retain any property on account of such interests.  Therefore, the Debtors submit that the Plan satisfies the "fair and equitable" test with respect to holders of equity interests.

# XI.
# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) preparation and presentation of an alternative plan of reorganization, or (ii) liquidation under chapter 7 of the Bankruptcy Code.

### A.  Alternative Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan of reorganization. The Debtors, however, do not believe that there are any practical alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### B.  Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining proceeds, according to their respective priorities. Unsecured creditors with the same priority share in Pro Rata to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

The Debtors submit that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the Chapter 11 Cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases. The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, the additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets. The assets available for distribution to creditors would be reduced by such additional expenses and by the claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations.

The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis that the Debtors will file no later than the date that the Plan Supplement is filed.

## XII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in the voting classes to vote in favor thereof.

Dated:  August 14, 2020

By:      /s/ *Roy Messing*
         Name: Roy Messing
         Title: Chief Restructuring Officer

**EXIDE HOLDINGS, INC.**
**EXIDE TECHNOLOGIES, LLC**
**EXIDE DELAWARE LLC**
**DIXIE METALS COMPANY**
**REFINED METALS COMPANY**

RLF1 23874670V.1

A-0701

# **TAB 11**

**Order Approving Stipulation and Agreement to Extend Challenge
Deadline for the Creditors Committee' and Governmental Authorities
[Bankr. D.I. 789]**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re:                                      :      **Chapter 11**
                                            :
**EXIDE HOLDINGS, INC.,** *et al.,*          :      **Case No. 20-11157 (CSS)**
                                            :
                            **Debtors.**[1]  :      **(Jointly Administered)**
                                            :
                                            :      Re: Docket No. 350 & 788

---------------------------------------------------------- x

### ORDER APPROVING STIPULATION AND AGREEMENT TO
### EXTEND CHALLENGE DEADLINE FOR THE CREDITORS' COMMITTEE AND
### <u>GOVERNMENTAL AUTHORITIES</u>

The Court having considered the *Stipulation and Agreement to Extend Challenge Deadline*

*for the Creditors' Committee and Governmental Authorities*, a copy of which is attached hereto as

<u>**Exhibit 1**</u> (the "**Stipulation**"),[2] between the Parties; the Court having determined that good and

adequate cause exists for approval of the Stipulation; and the Court having determined that no

further notice of the Stipulation must be given; and after due deliberation and sufficient cause

appearing therefor, it is **ORDERED THAT**:

1.      The Stipulation is APPROVED.

2.      The Challenge Deadline is hereby extended to September 3, 2020 solely for the

Governmental Authorities and the Creditors' Committee.

3.      Nothing herein shall preclude any of the Governmental Authorities from seeking

further extensions of the Challenge Deadline for cause as provided in the Final DIP Order nor shall

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]     Capitalized terms that are used herein and not otherwise defined shall have the meanings given to them in the Stipulation.

any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and

Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the

Challenge Deadline.   To the extent any of the Governmental Authorities seek such further

extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from

opposing such request.

4.      This Court shall retain jurisdiction with respect to all matters arising under or

related to this Order and to interpret, implement, and enforce the provisions of this Order.

**Dated: August 27th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**Stipulation**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------ x

In re:                                              : **Chapter 11**
                                                    :
**EXIDE HOLDINGS, INC.,** *et al.*,                 : **Case No. 20-11157 (CSS)**
                                                    :
                                        **Debtors.¹** : **(Jointly Administered)**
                                                    :
                                                    : Re: Docket No. 350
------------------------------------------------------------ x

**STIPULATION AND AGREEMENT TO EXTEND CHALLENGE
DEADLINE FOR THE CREDITORS' COMMITTEE AND
GOVERNMENTAL AUTHORITIES²**

The Debtors, the Consenting Creditors, the Creditors' Committee, and the United States

on behalf of the Environmental Protection Agency and the California Department of Toxic

Substances Control, Georgia Environmental Protection Division of the Department of Natural

Resources, Indiana Attorney General, Louisiana Department Of Environmental Quality,

Mississippi Department of Environmental Quality, Commonwealth of Pennsylvania Department

of Environmental Protection, South Carolina Department of Health and Environmental Control,

Tennessee Attorney General & Reporter, and Texas Commission on Environmental Quality

(collectively, the "**Governmental Authorities**" and, together with the Debtors, the Creditors'

Committee and the Consenting Creditors, the "**Parties**"), through their respective counsel enter

into this *Stipulation and Agreement to Extend Challenge Deadline for the Creditors' Committee*

---

¹   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
    number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie
    Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000
    Deerfield Parkway, Building 200, Milton, Georgia 30004.

²   Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the *Final
    Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II)
    Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV)
    Granting Related Relief* [Docket No. 350] (the "**Final DIP Order**").

*and Governmental Authorities* (the "**Stipulation**") and hereby stipulate and agree as follows:

1.      The Parties agree and stipulate, in accordance with paragraph 25(e) of the Final DIP Order, that the Challenge Deadline is hereby extended from August 27, 2020 to September 3, 2020 solely for the Governmental Authorities and the Creditors' Committee.

2.      On August 19, 2020, the Governmental Authorities provided the Debtors and the Consenting Creditors a  draft *Consent Decree and Settlement Agreement among Debtors, United States on Behalf of the Environmental Protection Agency, California Department of Toxic Substances and Control, Florida Department of Environmental Protection, Georgia Environmental Protection Division of the Department of Natural Resources, Illinois Environmental Protection Agency, State of Indiana on Behalf of Indiana Department of Environmental Management, Louisiana Department of Environmental Quality, Mississippi Department of Environmental Quality, the Commonwealth of Pennsylvania Department of Environmental Protection, South Carolina Department of Health & Environmental Control, Tennessee Department of Environment and Conservation, and Texas Commission on Environmental Quality, Westchester Fire Insurance Company, the Environmental Response Trust Trustee, Transferred Entities and Consenting Creditors Regarding the Non-Performing Properties* (the "**Consent Decree and Settlement Agreement**").  The Debtors and Consenting Creditors provided comments on that draft on August 21, 2020.

3.      The Governmental Authorities agreed to provide their response (the "**Initial Comments**") to the Debtors' and Consenting Creditors' comments on the draft Consent Decree and Settlement Agreement on or prior to August 26, 2020.  The Governmental Authorities provided such comments in writing by email from the United States Department of Justice to Weil, Gotshal & Manges, as counsel to the Debtors, and Paul, Weiss, Rifkind, Wharton & Garrison LLP,

2

as counsel for the Consenting Creditors, at 10:01 a.m. Eastern time on August 26, 2020 (the "**Initial Comment Deadline**").

4.      By providing the Initial Comments by the Initial Comment Deadline, none of the Governmental Parties or other Parties shall be precluded from providing additional comments on the Consent Decree and Settlement Agreement after such Deadline.

5.      Nothing herein shall preclude any of the Governmental Authorities from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order, nor shall any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline.  To the extent any of the Governmental Authorities seek such further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

6.      The Parties have agreed that pursuant to the DIP Order the extension of the Challenge Deadline is effective between the Parties on the terms set forth herein without entry of the Order.

Dated:  August 26, 2020
         Wilmington, Delaware

Respectfully submitted,

/s/ Robert A. Britton
_____
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
Ian J. Bambrick (No. 5455)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (302) 571-1253
Email: pmorgan@ycst.com
sgreecher@ycst.com
amagaziner@ycst.com
ibambrick@ycst.com

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alice Belisle Eaton (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
William A. Clareman (admitted *pro hac vice*)
David Giller (admitted *pro hac vice*)
Eugene Y. Park (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: aeaton@paulweiss.com
rbritton@paulweiss.com
wclareman@paulweiss.com
dgiller@paulweiss.com
epark@paulweiss.com

*Counsel for the Ad Hoc Committee*

/s/ Brendan J. Schlauch
_____
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Jacqueline Marcus (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

*/s/ Eric S. Chafetz*

POTTER ANDERSON & CORROON LLP
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail: csamis@potteranderson.com
kgood@potteranderson.com
astulman@potteranderson.com

– and –

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Robert M. Hirsh, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, New York, 10020
Telephone: (212) 262-6700
E-mail: krosen@lowenstein.com
rhirsh@lowenstein.com
echafetz@lowenstein.com

*Counsel to the Official Committee
of Unsecured Creditors*

UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

By: */s/ Matthew C. Indrisano*
MATTHEW C. INDRISANO
Trial Attorney
Email: matthew.indrisano@usdoj.gov
Telephone: (202) 514-1398
United States Department of Justice
Environment and Natural Resources
Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Email: alan.tenenbaum@usdoj.gov
Telephone: (202) 514-5409

ERIC D. ALBERT
Senior Attorney
Email: eric.albert@usdoj.gov
Telephone: (202) 514-2800

JAMES D. FREEMAN
Senior Attorney
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Email: James.Freeman2@usdoj.gov

THE CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL


By: */s/ James R. Potter*
JAMES R. POTTER
California State Bar No. 166992
ANTHONY A. AUSTIN
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Tel.: 213-369-6326
Email: James.Potter@doj.ca.gov


XAVIER BECERRA
Attorney General of California


EDWARD A. OCHOA
Senior Assistant Attorney General


JAMES R. POTTER
Deputy Attorney General


GEORGIA ENVIRONMENTAL
PROTECTION DIVISION OF THE
DEPARTMENT OF NATURAL
RESOURCES


By: */s/ Whitney Groff*
Whitney Groff (Ga. Bar No. 738079)
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-3338
Fax: (404) 657-3239
Email: wgroff@law.ga.gov

ATTORNEY GENERAL OF INDIANA


By: */s/ Heather M. Crockett*
HEATHER M. CROCKETT
Deputy Attorney General
Office of Indiana Attorney General
Indiana Government Center South, Fifth
Floor
302 W. Washington Street
Indianapolis, Indiana  46204-2794
Telephone:    (317) 233-6254
Fax:          (317) 232-7979
hcrockett@atg.in.gov


OFFICE OF THE SECRETARY, LEGAL
AFFAIRS DIVISION LOUISIANA
DEPARTMENT OF ENVIRONMENTAL
QUALITY


By: */s/ Dwayne M. Murray*
Dwayne M. Murray, LA Bar #18658
*Bankruptcy Counsel to LDEQ*
Murray & Murray, LLC
4970 Bluebonnet Blvd, Suite B
Baton Rouge, LA 70809
225-925-1110
225-925-1116
dmm@murraylaw.net


-and-


Oscar Magee, Attorney
(La. Bar # 32302)
Dwana C. King, Deputy General Counsel
(La. Bar #20590)
P.O. Box 4302
Baton Rouge, Louisiana  70821-4302
Phone: 225.219.3985
Fax: 225.219.4068
oscar.magee@la.gov
dwana.king@la.gov

6

MISSISSIPPI DEPT. OF
ENVIRONMENTAL QUALITY

By: */s/ Theodore Lampton*
THEODORE LAMPTON
MS Bar No. 101199
Senior Attorney
Mississippi Department of
Environmental Quality
P.O. Box 2261
Jackson, MS 39225-2261
Phone: (601) 961-5573
tlampton@mdeq.ms.gov

THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:

By: */s/ Vera N. Kanova*
VERA N. KANOVA, Assistant Counsel
PA ID No. 316676
Office of Chief Counsel
400 Market Street
Harrisburg, PA 17101-2063
Telephone: 717-787-9370
Email: verkanova@pa.gov

SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL:

By: */s/ Sara V. Martinez*
SARA V. MARTINEZ
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.0288
Email: martinsv@dhec.sc.gov

JACQUELYN S. DICKMAN
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.03350
Email: dickmajs@dhec.sc.gov

D. CLAY ROBINSON
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.3369
Email: robinsdc@dhec.sc.gov

TENNESSEE ATTORNEY GENERAL &
REPORTER HERBERT H. SLATERY III

By: */s/ Laura L. McCloud*
LAURA L. MCCLOUD (#16206)
Senior Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-8933
Attorneys for TDEC

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY

By: */s/ Abigail R. Ryan*
ABIGAIL R. RYAN
Texas State Bar No. 240359569
JASON B. BINFORD
Texas State Bar No. 24045499
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
jason.binford@oag.texas.gov

KEN PAXTON
Attorney General of Texas
JEFFREY C. MATEER
First Assistant Attorney General
RYAN L. BANGERT
Deputy First Assistant Attorney General
DARREN L. MCCARTY
Deputy Attorney General for Civil
Litigation
RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division