# **<u>TAB 12</u>**

**Order Approving Stipulation and Agreement to Extend Challenge Deadline for Governmental Authorities and Creditors' Committee [Bankr. D.I. 808]**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:

EXIDE HOLDINGS, INC., *et al.*,

Debtors.[1]

------------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 20-11157 (CSS)

(Jointly Administered)

**Re: Docket Nos. 350 & 789**

## ORDER APPROVING STIPULATION AND
## AGREEMENT TO FURTHER EXTEND CHALLENGE DEADLINE FOR
## GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE

The Court having considered the *Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee*, a copy of which is attached hereto as **Exhibit 1** (the "Stipulation"),[2] between the Parties; the Court having determined that no further notice of the Stipulation must be given; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED THAT**:

1.      The Stipulation is APPROVED.

2.      The Challenge Deadline is hereby extended to September 17, 2020 solely for the Governmental Authorities and the Creditors' Committee.

3.      Nothing herein shall preclude any of the Governmental Authorities from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order nor shall any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms that are used herein and not otherwise defined shall have the meanings given to the them in the Stipulation

Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities seek further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

4.     This Court shall retain jurisdiction with respect to all matters arising under or related to this Order and to interpret, implement, and enforce the provisions of this Order.

**Dated: September 3rd, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

2

RLF1 23954459v.2

# **Exhibit 1**

**Stipulation**

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| EXIDE HOLDINGS, INC., *et al.*, | Case No. 20-11157 (CSS) |
| | |
| Debtors.[1] | (Jointly Administered) |
| | |
| | **Re: Docket Nos. 350 & 789** |

------------------------------------------------------- x

## STIPULATION AND AGREEMENT TO FURTHER
## EXTEND CHALLENGE DEADLINE FOR
## <u>GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE</u>[2]

The Debtors, the Consenting Creditors, the Creditors' Committee, and the United States on behalf of the Environmental Protection Agency and the California Department of Toxic Substances Control, Georgia Environmental Protection Division of the Department of Natural Resources, Indiana Attorney General, Louisiana Department Of Environmental Quality, Mississippi Department of Environmental Quality, Commonwealth of Pennsylvania Department of Environmental Protection, South Carolina Department of Health and Environmental Control, Tennessee Attorney General & Reporter, and Texas Commission on Environmental Quality (collectively, the "<u>Governmental Authorities</u>" and, together with the Debtors, the Creditors' Committee and the Consenting Creditors, the "<u>Parties</u>"), through their respective counsel enter into this *Stipulation and Agreement to Further Extend Challenge Deadline for the Governmental*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 350] (the "<u>Final DIP Order</u>")

*Authorities and Creditors' Committee* (the "Stipulation") and hereby stipulate and agree as follows:

1.      The Parties agree and stipulate, in accordance with paragraph 25(e) of the Final DIP Order, that the Challenge Deadline is hereby further extended from September 3, 2020 to September 17, 2020 solely for the Governmental Authorities and the Creditors' Committee.

2.      Nothing herein shall preclude any of the Governmental Authorities from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order, nor shall any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities seek such further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

3.      The Parties have agreed that pursuant to the DIP Order the extension of the Challenge Deadline is effective between the Parties on the terms set forth herein without entry of the Order.

2

Dated: September 2, 2020                    Respectfully submitted,
      Wilmington, Delaware

*/s/ Robert A. Britton*                     */s/ Brendan J. Schlauch*

YOUNG CONAWAY STARGATT &                    RICHARDS, LAYTON & FINGER, P.A.
TAYLOR, LLP                                 Daniel J. DeFranceschi (No. 2732)
Pauline K. Morgan (No. 3650)                Zachary I. Shapiro (No. 5103)
Sean T. Greecher (No. 4484)                 Brendan J. Schlauch (No. 6115)
Andrew L. Magaziner (No. 5426)              One Rodney Square
Ian J. Bambrick (No. 5455)                  920 N. King Street
Rodney Square                               Wilmington, Delaware 19801
1000 North King Street                      Telephone: (302) 651-7700
Wilmington, Delaware 19801                  Facsimile:  (302) 651-7701
Tel: (302) 571-6600
Fax: (302) 571-1253                         -and-
Email: pmorgan@ycst.com
sgreecher@ycst.com                          WEIL, GOTSHAL & MANGES LLP
amagaziner@ycst.com                         Ray C. Schrock, P.C. (admitted *pro hac vice*)
ibambrick@ycst.com                          Jacqueline Marcus (admitted *pro hac vice*)
                                            Sunny Singh (admitted *pro hac vice*)
                                            767 Fifth Avenue
-and-                                       New York, New York  10153
                                            Telephone:  (212) 310-8000
PAUL, WEISS, RIFKIND, WHARTON &             Facsimile:  (212) 310-8007
GARRISON LLP
Alice Belisle Eaton (admitted *pro hac vice*)   *Attorneys for Debtors*
Robert A. Britton (admitted *pro hac vice*)     *and Debtors in Possession*
William A. Clareman (admitted *pro hac vice*)
David Giller (admitted *pro hac vice*)
Eugene Y. Park (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: aeaton@paulweiss.com
rbritton@paulweiss.com
wclareman@paulweiss.com
dgiller@paulweiss.com
epark@paulweiss.com

*Counsel for the Ad Hoc Committee*

3

*/s/ Eric Chafetz*
POTTER ANDERSON & CORROON LLP
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail: csamis@potteranderson.com
kgood@potteranderson.com
astulman@potteranderson.com

– and –

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Robert M. Hirsh, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, New York, 10020
Telephone: (212) 262-6700
E-mail: krosen@lowenstein.com
rhirsh@lowenstein.com
echafetz@lowenstein.com

*Counsel to the Official Committee
of Unsecured Creditors*

UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

By: */s/Matthew C. Indrisano*
MATTHEW C. INDRISANO
Trial Attorney
Email: matthew.indrisano@usdoj.gov
Telephone: (202) 514-1398
United States Department of Justice
Environment and Natural Resources
Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Email: alan.tenenbaum@usdoj.gov
Telephone: (202) 514-5409

ERIC D. ALBERT
Senior Attorney
Email: eric.albert@usdoj.gov
Telephone: (202) 514-2800

JAMES D. FREEMAN
Senior Attorney
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Email: James.Freeman2@usdoj.gov

1

THE CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL

By: */s/ James R. Potter*
JAMES R. POTTER
California State Bar No. 166992
ANTHONY A. AUSTIN
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Tel.: 213-369-6326
Email: James.Potter@doj.ca.gov

XAVIER BECERRA
Attorney General of California

EDWARD A. OCHOA
Senior Assistant Attorney General

JAMES R. POTTER
Deputy Attorney General

GEORGIA ENVIRONMENTAL
PROTECTION DIVISION OF THE
DEPARTMENT OF NATURAL
RESOURCES

By: */s/Whitney Groff*
Whitney Groff (Ga. Bar No. 738079)
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-3338
Fax: (404) 657-3239
Email: wgroff@law.ga.gov

ATTORNEY GENERAL OF INDIANA

By: */s/Heather M. Crockett*
HEATHER M. CROCKETT
Deputy Attorney General
Office of Indiana Attorney General
Indiana Government Center South, Fifth
Floor
302 W. Washington Street
Indianapolis, Indiana  46204-2794
Telephone: (317) 233-6254
Fax: (317) 232-7979
hcrockett@atg.in.gov

OFFICE OF THE SECRETARY, LEGAL
AFFAIRS DIVISION LOUISIANA
DEPARTMENT OF ENVIRONMENTAL
QUALITY

By: */s/Dwayne M. Murray*
Dwayne M. Murray, LA Bar #18658
*Bankruptcy Counsel to LDEQ*
Murray & Murray, LLC
4970 Bluebonnet Blvd, Suite B
Baton Rouge, LA 70809
225-925-1110
225-925-1116
dmm@murraylaw.net

-and-

Oscar Magee, Attorney
(La. Bar # 32302)
Dwana C. King, Deputy General Counsel
(La. Bar #20590)
P.O. Box 4302
Baton Rouge, Louisiana  70821-4302
Phone: 225.219.3985
Fax: 225.219.4068
oscar.magee@la.gov
dwana.king@la.gov

2

MISSISSIPPI DEPT. OF
ENVIRONMENTAL QUALITY

By: _/s/Theodore Lampton_
THEODORE LAMPTON
MS Bar No. 101199
Senior Attorney
Mississippi Department of
Environmental Quality
P.O. Box 2261
Jackson, MS 39225-2261
Phone: (601) 961-5573
tlampton@mdeq.ms.gov

THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:

By: _/s/Vera N. Kanova_
VERA N. KANOVA, Assistant Counsel
PA ID No. 316676
Office of Chief Counsel
400 Market Street
Harrisburg, PA 17101-2063
Telephone: 717-787-9370
Email: verkanova@pa.gov

SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL:

By: _/s/Sara V. Martinez_
SARA V. MARTINEZ
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.0288
Email: martinsv@dhec.sc.gov

JACQUELYN S. DICKMAN
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.03350
Email: dickmajs@dhec.sc.gov

D. CLAY ROBINSON
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.3369
Email: robinsdc@dhec.sc.gov

TENNESSEE ATTORNEY GENERAL &
REPORTER HERBERT H. SLATERY III

By: _/s/Laura L. McCloud_
LAURA L. MCCLOUD (#16206)
Senior Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-8933
Attorneys for TDEC

3

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY

By: /s/Abigail R. Ryan
ABIGAIL R. RYAN
Texas State Bar No. 240359569
JASON B. BINFORD
Texas State Bar No. 24045499
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
jason.binford@oag.texas.gov

KEN PAXTON
Attorney General of Texas
JEFFREY C. MATEER
First Assistant Attorney General
RYAN L. BANGERT
Deputy First Assistant Attorney General
DARREN L. MCCARTY
Deputy Attorney General for Civil
Litigation
RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

4

# __TAB 13__

**Order Approving Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee [Bankr. D.I. 840]**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| EXIDE HOLDINGS, INC., *et al.*, | : Case No. 20-11157 (CSS) |
|  | : |
| Debtors.[1] | : (Jointly Administered) |
|  | : |
|  | : **Re: Docket Nos. 350, 789 & 808** |
|  | : |

-------------------------------------------------------- x

**ORDER APPROVING STIPULATION AND
AGREEMENT TO FURTHER EXTEND CHALLENGE DEADLINE FOR
GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE**

The Court having considered the *Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee*, a copy of which is attached hereto as **Exhibit 1** (the "Stipulation"),[2] between the Parties; the Court having determined that no further notice of the Stipulation must be given; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED THAT**:

1.      The Stipulation is APPROVED.

2.      The Challenge Deadline is hereby extended to September 24, 2020 solely for the Governmental Authorities who are signatories to the Stipulation and the Creditors' Committee.

3.      Nothing herein shall preclude any of the Governmental Authorities who are signatories to the Stipulation or the Creditors' Committee from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order nor shall any provision of this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms that are used herein and not otherwise defined shall have the meanings given to the them in the Stipulation

Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities who are signatories to the Stipulation seek further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

4.      This Court shall retain jurisdiction with respect to all matters arising under or related to this Order and to interpret, implement, and enforce the provisions of this Order.

**Dated: September 17th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**Stipulation**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------- x

In re:

EXIDE HOLDINGS, INC., *et al.*,

                        Debtors.[1]

----------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 20-11157 (CSS)

(Jointly Administered)

**Re: Docket Nos. 350, 789 & 808**

## STIPULATION AND AGREEMENT TO FURTHER
## EXTEND CHALLENGE DEADLINE FOR
## GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE[2]

The Debtors, the Consenting Creditors, the Creditors' Committee, and the United States on behalf of the Environmental Protection Agency and the California Department of Toxic Substances Control, the Georgia Environmental Protection Division of the Department of Natural Resources, Indiana Attorney General, Louisiana Department of Environmental Quality, Mississippi Department of Environmental Quality, Commonwealth of Pennsylvania Department of Environmental Protection, South Carolina Department of Health and Environmental Control, Tennessee Attorney General & Reporter, and Texas Commission on Environmental Quality (collectively, the "Governmental Authorities" and, together with the Debtors, the Creditors' Committee and the Consenting Creditors, the "Parties"), through their respective counsel enter into this *Stipulation and Agreement to Further Extend Challenge Deadline for the Governmental*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 350] (the "Final DIP Order")

*Authorities and Creditors' Committee* (the "Stipulation") and hereby stipulate and agree as follows:

1.      The Parties agree and stipulate, in accordance with paragraph 25(e) of the Final DIP Order, that the Challenge Deadline is hereby further extended from September 17, 2020 to September 24, 2020 solely for the Governmental Authorities and the Creditors' Committee.

2.      Nothing herein shall preclude any of the Governmental Authorities or the Creditors' Committee from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order, nor shall any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities seek such further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

3.      The Parties have agreed that pursuant to the DIP Order the extension of the Challenge Deadline is effective between the Parties on the terms set forth herein without entry of the Order.


[SIGNATURE PAGES FOLLOW]

Dated: September 16, 2020                         Respectfully submitted,
      Wilmington, Delaware

| | |
|---|---|
| */s/ Robert A. Britton* | */s/ Megan E. Kenney* |

YOUNG CONAWAY STARGATT &                   RICHARDS, LAYTON & FINGER, P.A.
TAYLOR, LLP                                Daniel J. DeFranceschi (No. 2732)
Pauline K. Morgan (No. 3650)               Zachary I. Shapiro (No. 5103)
Sean T. Greecher (No. 4484)                Brendan J. Schlauch (No. 6115)
Andrew L. Magaziner (No. 5426)             Megan E. Kenney (No. 6426)
Ian J. Bambrick (No. 5455)                 One Rodney Square
Rodney Square                              920 N. King Street
1000 North King Street                     Wilmington, Delaware 19801
Wilmington, Delaware 19801                 Telephone: (302) 651-7700
Tel: (302) 571-6600                        Facsimile:  (302) 651-7701
Fax: (302) 571-1253
Email: pmorgan@ycst.com                    -and-
sgreecher@ycst.com
amagaziner@ycst.com                        WEIL, GOTSHAL & MANGES LLP
ibambrick@ycst.com                         Ray C. Schrock, P.C. (admitted *pro hac vice*)
                                           Jacqueline Marcus (admitted *pro hac vice*)
-and-                                      Sunny Singh (admitted *pro hac vice*)
                                           767 Fifth Avenue
PAUL, WEISS, RIFKIND, WHARTON &            New York, New York  10153
GARRISON LLP                               Telephone:  (212) 310-8000
Alice Belisle Eaton (admitted *pro hac vice*)   Facsimile:  (212) 310-8007
Robert A. Britton (admitted *pro hac vice*)
William A. Clareman (admitted *pro hac vice*)
David Giller (admitted *pro hac vice*)     *Attorneys for Debtors*
Eugene Y. Park (admitted *pro hac vice*)   *and Debtors in Possession*
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: aeaton@paulweiss.com
rbritton@paulweiss.com
wclareman@paulweiss.com
dgiller@paulweiss.com
epark@paulweiss.com

*Counsel for the Ad Hoc Committee*

*/s/ Eric Chafetz*
POTTER ANDERSON & CORROON LLP
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail: csamis@potteranderson.com
kgood@potteranderson.com
astulman@potteranderson.com

– and –

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Robert M. Hirsh, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, New York, 10020
Telephone: (212) 262-6700
E-mail: krosen@lowenstein.com
rhirsh@lowenstein.com
echafetz@lowenstein.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

By: */s/Matthew C. Indrisano*
MATTHEW C. INDRISANO
Trial Attorney
Email: matthew.indrisano@usdoj.gov
Telephone: (202) 514-1398
United States Department of Justice
Environment and Natural Resources
Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station

4

Washington, D.C. 20044

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Email: alan.tenenbaum@usdoj.gov
Telephone: (202) 514-5409

ERIC D. ALBERT
Senior Attorney
Email: eric.albert@usdoj.gov
Telephone: (202) 514-2800

JAMES D. FREEMAN
Senior Attorney
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Email: James.Freeman2@usdoj.gov

THE CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL
By: */s/ James R. Potter*
JAMES R. POTTER
California State Bar No. 166992
ANTHONY A. AUSTIN
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Tel.: 213-369-6326
Email: James.Potter@doj.ca.gov
XAVIER BECERRA
Attorney General of California
EDWARD A. OCHOA
Senior Assistant Attorney General
JAMES R. POTTER
Deputy Attorney General

GEORGIA ENVIRONMENTAL
PROTECTION DIVISION OF THE
DEPARTMENT OF NATURAL
RESOURCES
By: */s/Whitney Groff*
Whitney Groff (Ga. Bar No. 738079)
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-3338
Fax: (404) 657-3239
Email: wgroff@law.ga.gov

ATTORNEY GENERAL OF INDIANA
By: */s/Heather M. Crockett*
HEATHER M. CROCKETT
Deputy Attorney General
Office of Indiana Attorney General
Indiana Government Center South,
Fifth Floor
302 W. Washington Street
Indianapolis, Indiana 46204-2794
Telephone: (317) 233-6254
Fax: (317) 232-7979
hcrockett@atg.in.gov

OFFICE OF THE SECRETARY, LEGAL
AFFAIRS DIVISION LOUISIANA
DEPARTMENT OF ENVIRONMENTAL
QUALITY
By: */s/Dwayne M. Murray*
Dwayne M. Murray, LA Bar #18658
*Bankruptcy Counsel to LDEQ*
Murray & Murray, LLC
4970 Bluebonnet Blvd, Suite B
Baton Rouge, LA 70809
225-925-1110
225-925-1116
dmm@murraylaw.net

-and-

Oscar Magee, Attorney
(La. Bar # 32302)
Dwana C. King, Deputy General Counsel
(La. Bar #20590)
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: 225.219.3985
Fax: 225.219.4068
oscar.magee@la.gov
dwana.king@la.gov

MISSISSIPPI DEPT. OF
ENVIRONMENTAL QUALITY
By: */s/Theodore Lampton*
THEODORE LAMPTON
MS Bar No. 101199
Senior Attorney
Mississippi Department of
Environmental Quality
P.O. Box 2261
Jackson, MS 39225-2261
Phone: (601) 961-5573
tlampton@mdeq.ms.gov

THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:
By: */s/Vera N. Kanova*
VERA N. KANOVA, Assistant Counsel
PA ID No. 316676
Office of Chief Counsel
400 Market Street
Harrisburg, PA 17101-2063
Telephone: 717-787-9370
Email: verkanova@pa.gov

SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL:
By: */s/Sara V. Martinez*
SARA V. MARTINEZ
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.0288
Email: martinsv@dhec.sc.gov
JACQUELYN S. DICKMAN
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.03350
Email: dickmajs@dhec.sc.gov
D. CLAY ROBINSON
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.3369
Email: robinsdc@dhec.sc.gov

TENNESSEE ATTORNEY GENERAL &
REPORTER HERBERT H. SLATERY III
By: */s/Laura L. McCloud*
LAURA L. MCCLOUD (#16206)
Senior Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-8933
Attorneys for TDEC

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY
By: */s/Abigail R. Ryan*
ABIGAIL R. RYAN
Texas State Bar No. 240359569
JASON B. BINFORD
Texas State Bar No. 24045499
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
jason.binford@oag.texas.gov
KEN PAXTON
Attorney General of Texas
JEFFREY C. MATEER
First Assistant Attorney General
RYAN L. BANGERT
Deputy First Assistant Attorney General
DARREN L. MCCARTY
Deputy Attorney General for Civil
Litigation
RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

# **TAB 14**

**Second Amended Joint Chapter 11 Plan of Exide Holdings, Inc.
and its Affiliated Debtors [Bankr. D.I. 871]**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                          :
In re                                     :        Chapter 11
                                          :
EXIDE HOLDINGS, INC., et al.,             :        Case No. 20–11157 (CSS)
                                          :
              Debtors.[1]                 :        (Jointly Administered)
                                          :
------------------------------------------------------------ x
```

### SECOND AMENDED JOINT CHAPTER 11 PLAN OF
### EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Zachary I. Shapiro
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: September 23, 2020
        Wilmington, Delaware

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

# TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION. ...................................................1

SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS....................................20

    2.1.    Administrative Expense Claims.................................................20
    2.2.    Fee Claims. ...................................................................20
    2.3.    Priority Tax Claims.............................................................21
    2.4.    DIP Claims ....................................................................21
    2.5.    Restructuring Expenses.........................................................22
    2.6.    Trustees Fees .................................................................22

SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS. ................................22

    3.1.    Classification in General.......................................................22
    3.2.    Grouping of Debtors for Convenience Only....................................22
    3.3.    Summary of Classification.....................................................23
    3.4.    Special Provision Governing Unimpaired Claims. ............................23
    3.5.    Elimination of Vacant Classes.................................................23
    3.6.    Voting Classes; Presumed Acceptance by Non-Voting Classes.................24
    3.7.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code .........................................................................24

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS. ...............................24

    4.1.    Priority Non-Tax Claims (Class 1). ...........................................24
    4.2.    Other Secured Claims (Class 2). ..............................................24
    4.3.    ABL Claims (Class 3) ........................................................25
    4.4.    Superpriority Notes Guarantee Claims (Class 4).............................25
    4.5.    Exchange Priority Notes Claims (Class 5)....................................26
    4.6.    First Lien Notes Claims (Class 6). ...........................................26
    4.7.    General Unsecured Claims (Class 7). .........................................27
    4.8.    Environmental NPP Claims (Class 8). ........................................27
    4.9.    Intercompany Claims (Class 9)................................................28
    4.10.   Intercompany Interests (Class 10). ..........................................29
    4.11.   Holdings Equity Interests (Class 11). ........................................29
    4.12.   Subordinated Securities Claims (Class 12). ..................................29

SECTION 5.    MEANS FOR IMPLEMENTATION. ...........................................30

    5.1.    Europe/ROW Sale Transaction................................................30
    5.2.    Compromise and Settlement of Claims, Interests, and Controversies ........30
    5.3.    The GUC Trust. ..............................................................36
    5.4.    The Environmental Response Trust. ..........................................38
    5.5.    The Vernon Environmental Response Trust....................................39
    5.6.    Canada Non-Performing Property. ............................................39
    5.7.    Plan Administrator............................................................39
    5.8.    Corporate Action.............................................................42
    5.9.    Withholding and Reporting Requirements.....................................42
    5.10.   Exemption From Certain Transfer Taxes. .....................................43
    5.11.   Effectuating Documents; Further Transactions. ...............................43
    5.12.   Preservation of Rights of Action. .............................................44
    5.13.   Certificate of Incorporation and By-Laws. ...................................44

## TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| 5.14. | Stock Trading Restrictions | 44 |
| 5.15. | Assignment and Assumption of Superpriority Notes. | 45 |
| 5.16. | Cancellation of Existing Securities and Agreements | 45 |
| 5.17. | Subordinated Claims. | 46 |
| 5.18. | Nonconsensual Confirmation. | 46 |
| 5.19. | Closing of Chapter 11 Cases. | 46 |
| 5.20. | Notice of Effective Date. | 46 |
| 5.21. | Corporate Form. | 46 |
| 5.22. | Separability. | 46 |
| SECTION 6. | DISTRIBUTIONS. | 47 |
| 6.1. | Distributions Generally. | 47 |
| 6.2. | Distribution Record Date. | 47 |
| 6.3. | Date of Distributions. | 47 |
| 6.4. | Disbursing Agent. | 47 |
| 6.5. | Rights and Powers of Disbursing Agent. | 48 |
| 6.6. | Expenses of Disbursing Agent. | 48 |
| 6.7. | No Postpetition Interest on Claims. | 48 |
| 6.8. | Delivery of Distributions. | 48 |
| 6.9. | Distributions after Effective Date. | 49 |
| 6.10. | Unclaimed Property. | 49 |
| 6.11. | Time Bar to Cash Payments. | 50 |
| 6.12. | Manner of Payment under Plan. | 50 |
| 6.13. | Satisfaction of Claims. | 50 |
| 6.14. | Minimum Cash Distributions. | 50 |
| 6.15. | Setoffs and Recoupments. | 50 |
| 6.16. | Allocation of Distributions between Principal and Interest. | 50 |
| 6.17. | No Distribution in Excess of Amount of Allowed Claim. | 51 |
| SECTION 7. | PROCEDURES FOR DISPUTED CLAIMS. | 51 |
| 7.1. | Objections to Claims. | 51 |
| 7.2. | Resolution of Disputed Claims. | 51 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 51 |
| 7.4. | Distributions after Allowance. | 51 |
| 7.5. | Estimation of Claims. | 52 |
| 7.6. | No Distributions Pending Allowance. | 52 |
| 7.7. | Claim Resolution Procedures Cumulative. | 52 |
| 7.8. | Interest. | 52 |
| 7.9. | Insured Claims. | 52 |
| SECTION 8. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 53 |
| 8.1. | Rejection of Executory Contracts and Unexpired Leases. | 53 |
| 8.2. | Determination of Assumption Disputes and Deemed Consent. | 53 |
| 8.3. | Rejection Damages Claims. | 55 |
| 8.4. | Insurance Policies. | 55 |
| 8.5. | Intellectual Property Licenses and Agreements. | 55 |
| 8.6. | Tax Agreements. | 56 |
| 8.7. | Assignment. | 56 |
| 8.8. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 56 |
| 8.9. | Reservation of Rights. | 57 |

ii

**TABLE OF CONTENTS**
(continued)

SECTION 9.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. .....................................57

   9.1.   Conditions Precedent to the Effective Date. ...................................................................57
   9.2.   Waiver of Conditions Precedent. ...................................................................................59
   9.3.   Effect of Failure of Conditions to Effective Date. ........................................................59

SECTION 10.   EFFECT OF CONFIRMATION. ...................................................................................59

   10.1.   Vesting of Assets. ..........................................................................................................59
   10.2.   Term of Injunctions or Stays..........................................................................................60
   10.3.   Injunction. ......................................................................................................................60
   10.4.   Binding Effect.................................................................................................................61
   10.5.   Releases by the Debtors. ................................................................................................61
   10.6.   Releases By Holders of Claims and Interests. ...............................................................62
   10.7.   Exculpation. ...................................................................................................................63
   10.8.   Waiver of Statutory Limitation on Releases. ................................................................64
   10.9.   Solicitation of the Plan...................................................................................................64
   10.10.   Corporate Action.............................................................................................................65

SECTION 11.   RETENTION OF JURISDICTION. ..............................................................................65

   11.1.   Retention of Jurisdiction. ...............................................................................................65
   11.2.   Courts of Competent Jurisdiction. .................................................................................66

SECTION 12.   MISCELLANEOUS PROVISIONS...............................................................................67

   12.1.   Payment of Statutory Fees. ............................................................................................67
   12.2.   Substantial Consummation. ...........................................................................................67
   12.3.   Dissolution of Creditors' Committee..............................................................................67
   12.4.   Amendments. ..................................................................................................................67
   12.5.   Revocation or Withdrawal of the Plan............................................................................68
   12.6.   Severability of Plan Provisions upon Confirmation. .....................................................68
   12.7.   Governing Law. ..............................................................................................................68
   12.8.   Time.................................................................................................................................69
   12.9.   Additional Documents ....................................................................................................69
   12.10.   Immediate Binding Effect...............................................................................................69
   12.11.   Successors and Assigns. .................................................................................................69
   12.12.   Entire Agreement............................................................................................................69
   12.13.   Notices. ...........................................................................................................................69

**Schedule 1**:   Settling Governmental Authorities
**Schedule 2**:   Non-Performing Properties
**Schedule 3**:   Transferred Entities

iii

Each of the Debtors proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A. **Definitions.**

1.1    ***2020 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.2    ***2022 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017, as amended, supplemented or otherwise modified from time to time.

1.3    ***ABL Agents*** means Bank of America, N.A., as administrative agent, and Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents, under the ABL Credit Agreement, and their permitted successors and assigns.

1.4    ***ABL Claim*** means a Claim arising under the ABL Credit Agreement.

1.5    ***ABL Credit Agreement*** means that certain ABL Credit Agreement by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, Exide Holding Netherlands B.V., the ABL Agents, and the ABL Lenders, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.6    ***ABL Lenders*** means "Lenders" as defined in the ABL Credit Agreement.

1.7    ***Acquired Assets*** means, collectively, the Transferred Equity Interests and the Transferred Assets.

1.8    ***Administrative Expense Claim*** means any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors;  (b) Restructuring Expenses; (c) Trustees Fees; and (d) any Claim Allowed under section 503(b)(9) of the Bankruptcy Code.

1.9    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.10    ***Allowed*** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is not identified in the Schedules as contingent, unliquidated, or disputed; (c) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, GUC Trustee or Plan Administrator, as applicable; (d) as to which the liability of the Debtors or GUC Trust, as applicable, and

1

the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (e) expressly allowed hereunder; *provided, however*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Plan Administrator and the GUC Trustee shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

1.11    ***Alternative Transaction Structure*** means the implementation steps necessary to consummate the Europe/ROW Sale Transaction pursuant to the Europe/ROW Purchaser's election under Section 2.08 of the Europe/ROW Purchase Agreement.  The Europe/ROW Purchaser made such election in accordance with the Europe/ROW Purchase Agreement and the Debtors filed the Alternative Transaction Structure with the Plan Supplement at Docket No. 821.

1.12    ***Americas Closing*** means "Closing" as defined in the Americas Purchase Agreement.

1.13    ***Americas Purchase Agreement*** means that certain Stock and Asset Purchase Agreement by and among Exide Technologies, Battery BidCo LLC, and Atlas Capital Resources III LP, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.14    ***Americas Sale Order*** means the *Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on August 6, 2020 (Docket No. 690).

1.15    ***Americas Sale Transaction*** means the transaction to be effectuated pursuant to the Americas Purchase Agreement.

1.16    ***Aspen*** means, collectively, Aspen American Insurance Company, and Aspen Specialty Insurance Company, solely in their capacity as providers of surety insurance to the Debtors pursuant the Aspen Surety Bond Agreements.

1.17    ***Aspen Surety Bond Agreements*** means the applicable agreements governing the surety bond obligations of Aspen to the Debtors with respect to the Frisco Non-Performing Property.

1.18    ***Asset*** means all of the rights, title, and interests of a Debtor in, and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property.

1.19    ***Assumed Liabilities*** means "Assumed Liabilities" as defined in the Europe/ROW Purchase Agreement.

1.20    ***Assumption Dispute*** means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.21    ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Europe/ROW Purchaser, the Environmental

2

Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities, as applicable, pursuant to the Plan and included in the Plan Supplement at Docket No. 821, as may be amended, modified, or supplemented from time to time.

1.22   ***Avoidance Actions*** means any action commenced or that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

1.23   ***Ballot*** means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

1.24   ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.25   ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.26   ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.27   ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

1.28   ***Bidding Procedures Order*** means that certain *Order (I) Approving (A) Bidding Procedures for Sales of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 19, 2020 (Docket No. 344).

1.29   ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.30   ***California DTSC*** means the California Department of Toxic Substances Control.

1.31   ***Canada MOE*** means the Ontario Ministry of the Environment, Conservation and Parks.

1.32   ***Canada Non-Performing Property*** means the Debtors' non-performing property located in Fort Erie, Ontario, Canada.  For the purposes of the Plan, such property shall not be deemed to be a "Non-Performing Property" as such term is used herein.

3

1.33     ***Canada NPP Claim*** means any civil Claim or Cause of Action by the Canada MOE against the Debtors under Environmental Laws (including Environmental Laws of Canada) with respect to the Canada Non-Performing Property.

1.34     ***Canada NPP Risk Management Measures Funds*** means the Cash deposit, in an amount to be determined by the Debtors in consultation with the Requisite Noteholders, to be made by the Debtors for the environmental risk management of the Canada Non-Performing Property.

1.35     ***Cash*** means legal tender of the United States of America.

1.36     ***Cause of Action*** means any action, Claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or any other Avoidance Actions, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.37     ***Challenge Deadline*** means "Challenge Deadline" as defined in the DIP Order.

1.38     ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on May 19, 2020, and styled *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS).

1.39     ***City of Frisco*** means the City of Frisco, Texas.

1.40     ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.41     ***Class*** means any group of Claims or Interests classified as set forth in <u>Section 3</u> of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.42     ***Columbus Development Authority*** means the Development Authority of Columbus, Georgia.

1.43     ***Columbus Non-Performing Property*** means the Non-Performing Property located at 3639 Joy Road, Columbus, Georgia.

1.44     ***Columbus NPP Termination Documents*** means that certain Agreement Regarding Termination Documents, by and between Exide Technologies and the Columbus Development Authority, dated as of September 9, 2020, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.  The Columbus NPP Termination Documents were filed with the Plan Supplement at Docket No. 821.

4

1.45    ***Commencement Date*** means the date on which the Debtors commenced the Chapter 11 Cases.

1.46    ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.47    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.48    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.49    ***Confirmation Order*** means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.50    ***Consenting Creditors*** means each of the holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that are party to the RSA together with their respective successors and permitted assigns and any subsequent holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that become party to the RSA in accordance with the terms of the RSA.

1.51    ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.52    ***Cure Amount*** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.53    ***D&O Policy*** means any insurance policy that covers, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

1.54    ***Debtors*** means Exide Holdings, Inc.; Exide Technologies, LLC; Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation.

1.55    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.56    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Europe/ROW Sale Transaction and the Global Settlement, including, but not limited to: (a) the Plan; (b) the Disclosure Statement; (c) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; (f) the GUC Trust Agreement; and (g) the Environmental Settlement Documents.

1.57    ***DIP Agent*** means "DIP Agent" as defined in the DIP Order.

1.58    ***DIP Claim*** means any Claim of the DIP Lenders or DIP Agent arising under the DIP Loan Documents or the DIP Order.  For the avoidance of doubt, DIP Claims includes all DIP Obligations.

5

1.59    ***DIP Facility*** means "DIP Facility" as defined in the DIP Order.

1.60    ***DIP Lenders*** means "DIP Lenders" as defined in the DIP Order.

1.61    ***DIP Loan Documents*** means "DIP Loan Documents" as defined in the DIP Order.

1.62    ***DIP Motion*** means the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (Docket No.26).

1.63    ***DIP Obligations*** means "DIP Obligations" as defined in the DIP Order.

1.64    ***DIP Order*** means the final order approving the DIP Motion (Docket No. 350).

1.65    ***Disallowed*** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.66    ***Disbursing Agent*** means the Plan Administrator; *provided*, that with respect to distributions to holders of Allowed General Unsecured Claims, the GUC Trustee shall be the "Disbursing Agent" and distribute the GUC Trust Assets as and when provided for in the GUC Trust Agreement.

1.67    ***Disclosure Statement*** means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.68    ***Disputed*** means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors, or any parties in interest, dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors, or any parties in interest, do not dispute, and Disputed as to the balance of such Claim.

1.69    ***Distribution*** means payment or distribution of consideration to holders of Allowed Claims pursuant to this Plan.

1.70    ***Distribution Date*** means a date or dates as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.71    ***Distribution Record Date*** means the Effective Date of the Plan or such other date as determined by (a) the GUC Trustee with respect to General Unsecured Claims, (b) the Plan Administrator with the consent of the Requisite Noteholders and applicable Trustee with respect to the Superpriority Notes, Exchange Priority Notes, and First Lien Notes, or (c) the Plan Administrator with respect to all other Allowed Claims.  For the avoidance of doubt, the Distribution Record Date shall not apply to holders of public securities.

1.72    ***DTC*** means the Depositary Trust Company or any successor securities clearing agency.

6

1.73    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in <u>Section 9</u> hereof have been satisfied or waived in accordance with the terms of the Plan.

1.74    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.75    ***Environmental Global Settlement Payment*** means the $7,412,477 Cash payment to be made to the Environmental Response Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement with respect to the Transferred Non-Performing Properties.

1.76    ***Environmental Laws*** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (a) pollution, (b) the protection or regulation of human health, natural resources, or the environment, (c) the management of hazardous materials, or (d) the release of hazardous materials into the environment.

1.77    ***Environmental NPP Claim*** means any Transferred NPP Claim, Vernon NPP Claim, or Frisco NPP Claim.  For the avoidance of doubt, all Environmental NPP Claims are unsecured Claims against a Debtor and are not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.78    ***Environmental Response Trust*** means the trust established pursuant to the Environmental Trust Agreements and the Environmental Settlement Agreement with respect to the Transferred Non-Performing Properties.

1.79    ***Environmental Settlement Agreement*** means that certain Consent Decree and Settlement Agreement Regarding the Non-Performing Properties, among the Debtors, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, each of the Settling Governmental Authorities, and Westchester relating to the Non-Performing Properties, substantially in the form of the version dated September 22, 2020 and filed at Docket No. 869, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.80    ***Environmental Settlement Documents*** means the Environmental Settlement Agreement, the Environmental Trust Agreements, the Vernon Environmental Trust Agreement, and any other documents or instruments required by such documents.

1.81    ***Environmental Sureties*** means, collectively, Westchester and Aspen.

1.82    ***Environmental Trust Agreements*** means one or more trust agreements by and among the Debtors, the Settling Governmental Authorities, the Transferred Entities, and the Environmental Trustee, in form and substance as agreed to by such parties and filed with the Court and consistent with the Environmental Settlement Agreement and <u>Section 5</u> of the Plan.

1.83    ***Environmental Trust Assets*** shall, pursuant to the Global Settlement, consist of (a) the Environmental Global Settlement Payment, (b) the contributions by Westchester in accordance with the terms of the Environmental Trust Agreements with respect to the Transferred Non-Performing Properties, (c) the Transferred Non-Performing Properties or any proceeds thereof to the extent a Transferred Non-Performing Property is sold prior to the Effective Date, and (d) the Environmental Trust Causes of Action.

1.84    ***Environmental Trust Beneficial Interests*** means the beneficial interests in the Environmental Response Trust.

7

1.85     ***Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to any Transferred Non-Performing Property.

1.86     ***Environmental Trustee*** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Environmental Response Trust, and any successor thereto in accordance with the Environmental Trust Agreements.

1.87     ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.88     ***Europe/ROW Closing*** means "Closing" as defined in the Europe/ROW Purchase Agreement.

1.89     ***Europe/ROW Purchase Agreement*** means that certain Stock and Asset Purchase Agreement, by and between Exide Holdings, Inc., the other seller parties, and the Europe/ROW Purchaser, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.90     ***Europe/ROW Purchaser*** means EIH Europe Acquisition LLC.

1.91     ***Europe/ROW Sale Transaction*** means the sale of the Acquired Assets to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement.

1.92     ***European Bridge Notes*** means the notes issued pursuant to the European Bridge Notes Indenture.

1.93     ***European Bridge Notes Indenture*** means that certain indenture, to be entered into by and between non-Debtor Exide International Holdings LP, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, documenting the terms of an interim financing facility in accordance with the Europe/ROW Purchase Agreement, the proceeds of which may be used to fund, among other things, the Global Settlement Payments by the Transferred Entities.

1.94     ***Exchange Priority and First Lien Notes Indenture*** means that certain indenture, by and among Exide Technologies, as issuer, the guarantor parties thereto, and the Exchange Priority and First Lien Notes Trustee, dated as of June 25, 2019, as amended, supplemented or otherwise modified from time to time.

1.95     ***Exchange Priority and First Lien Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Exchange Priority and First Lien Notes Indenture.

1.96     ***Exchange Priority Notes*** means the 11% Exchange Priority Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.97     ***Exchange Priority Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange

Priority and First Lien Notes Indenture, against distributions to be made to the holders of the Exchange Priority Notes under this Plan or otherwise, for payment of any Exchange Priority Notes Indenture Trustee Fees.

1.98    ***Exchange Priority Notes Claim*** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder.

1.99    ***Exchange Priority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the Exchange Priority Notes.

1.100    ***Exculpated Parties*** means collectively: (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) each of the DIP Lenders and the DIP Agent, (e) the Creditors' Committee and each of its members in their capacity as such, (f) the GUC Trust, (g) the GUC Trustee, (h) the Trustees, (i) the Consenting Creditors, and (j) with respect to each of the foregoing Persons or Entities in clauses (a) through (i), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.101    ***Exide International*** means non-Debtor Exide International Holdings, LP.

1.102    ***Exide Technologies*** means Exide Technologies, LLC.

1.103    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.104    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.105    ***First Lien Notes*** means the 11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.106    ***First Lien Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and

9

First Lien Notes Indenture, against distributions to be made to the holders of the First Lien Notes under this Plan or otherwise, for payment of any First Lien Notes Indenture Trustee Fees.

1.107    ***First Lien Notes Claim*** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder.

1.108    ***First Lien Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the First Lien Notes.

1.109    ***Former Officers and Directors*** means any Person that served in a capacity as an officer or director of any of the Debtors, other than those (a) Persons that were officers or directors of the Debtors immediately prior to the Americas Closing or (b) Persons that are officers or directors of the Debtors immediately prior to the Effective Date.

1.110    ***Frisco Assets*** shall, pursuant to the Global Settlement, consist of:  (a) the Frisco Global Settlement Payment, (b) the contributions by Aspen in accordance with the Frisco Settlement Agreement, and (c) the Frisco Non-Performing Property.

1.111    ***Frisco CDC*** means the Frisco Community Development Corporation.

1.112    ***Frisco Global Settlement Payment*** means the $100,000 Cash payment to be made to TCEQ by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.113    ***Frisco Governmental Authority*** means each of (a) TCEQ, (b) the City of Frisco, and (c) the Frisco CDC.

1.114    ***Frisco Non-Performing Property*** means the Non-Performing Property located at 7471 South Fifth Street, Frisco, Texas.

1.115    ***Frisco NPP Claim*** means any civil Claim or Cause of Action by the Frisco Governmental Authorities against the Debtors under Environmental Laws with respect to or arising out of the Frisco Non-Performing Property.

1.116    ***Frisco Settlement Agreement*** means that certain Consent Decree and Settlement Agreement Regarding the Non-Performing Exide Frisco Site, by and among the Debtors, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Frisco Governmental Authorities, and Aspen relating to the Frisco Non-Performing Property, substantially in the form of the version dated September 10, 2020 and filed with the Plan Supplement at Docket No. 821, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.117    ***General Unsecured Claim*** means any unsecured Claim against any Debtor, other than an Intercompany Claim or an Environmental NPP Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.  The Legacy Notes Claims shall constitute General Unsecured Claims against Holdings.  For the avoidance of doubt, Environmental NPP Claims shall not constitute General Unsecured Claims.

10

1.118   ***Global Settlement*** shall have the meaning ascribed to such term in Section 5.2(a) of the Plan.

1.119   ***Global Settlement Documents*** means the Plan, the Definitive Documents contained in the Plan Supplement comprising the Global Settlement, and the Environmental Settlement Documents, each of which shall be acceptable in form and substance to each of the Global Settlement Parties.  For the avoidance of doubt, the Global Settlement Parties acknowledge and agree that the Plan is acceptable, subject to any consent rights contained in Section 12.4 hereof.

1.120   ***Global Settlement Party*** means each of the Debtors, the Consenting Creditors, the Creditors' Committee, the Settling Governmental Authorities, and the Environmental Sureties.

1.121   ***Global Settlement Payments*** means, collectively, the Environmental Global Settlement Payment, the Vernon Global Settlement Payment (subject to the satisfaction of the Payment Condition), the Frisco Global Settlement Payment, and the GUC Global Settlement Payment.

1.122   ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code; *provided*, that for the avoidance of doubt, the term "Governmental Unit" shall not include the PBGC.

1.123   ***GUC Global Settlement Payment*** means the $2,400,000 Cash payment to be made to the GUC Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.124   ***GUC Trust*** means the trust established under the Plan in accordance with the GUC Trust Agreement.

1.125   ***GUC Trust Agreement*** means that certain General Unsecured Creditors' Trust Agreement to be entered into by the Debtors, the GUC Trustee, the Requisite Noteholders, and the Creditors' Committee, substantially in the form of the version dated September 10, 2020 and filed with the Plan Supplement at Docket No. 821, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.126   ***GUC Trust Assets*** shall, pursuant to the Global Settlement, consist of: (a) the GUC Global Settlement Payment, and (b) the GUC Trust Causes of Action.

1.127   ***GUC Trust Beneficial A Interests*** means beneficial interests in the GUC Trust entitling the respective holder to its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement.

1.128   ***GUC Trust Beneficial B Interests*** means beneficial interests in the GUC Trust entitling the respective holder to its Pro Rata share of the GUC Trust Assets after the GUC Trust has distributed Cash to holders of Allowed General Unsecured Claims in an aggregate amount equal to the GUC Global Settlement Payment.

1.129   ***GUC Trust Causes of Action*** means (a) all Avoidance Actions, (b) Causes of Action of the Debtors against Former Officers and Directors, and (c) Causes of Action of the Debtors arising under commercial tort law; *provided*, that GUC Trust Causes of Action shall exclude (a) all Avoidance Actions or Causes of Action against any Released Party, Exculpated Party, ABL Lender, or ABL Agent, (b) the Environmental Trust Causes of Action, (c) the Vernon Environmental Trust Causes of Action, (d) any Causes of Action settled pursuant to the Global Settlement, and (e) any other Causes of Actions of the Debtors, including those arising under sections 542 or 549 of the Bankruptcy Code.

11

1.130   **GUC Trustee** means the Person or Entity selected by the Creditors' Committee to serve as the trustee of the GUC Trust, and any successor thereto in accordance with the GUC Trust Agreement.

1.131   **Holdings** means Exide Holdings, Inc.

1.132   **Holdings Equity Interests** means all Interests in Holdings, including Holdings Stock and any options, warrants or rights to acquire any such Interests.

1.133   **Holdings Stock** means all common stock and preferred stock in Holdings.

1.134   **Impaired** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.135   **Insured Claim** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.136   **Intercompany Claim** means a Claim against any Debtor by another Debtor or non-Debtor Affiliate of such other Debtor.

1.137   **Intercompany Interest** means an Interest in a Debtor other than a Holdings Equity Interest.

1.138   **Intercreditor Agreement** means that certain Amended and Restated Intercreditor Agreement, by and between the ABL Agents and U.S. Bank, in its separate capacities as trustee and collateral agent under each of the Superpriority Notes Indenture, the Exchange Priority and First Lien Notes Indenture, and the 2020 Legacy First Lien Notes Indenture, dated June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.139   **Interest** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.140   **June 2019 Financing** means the new money investment and debt exchange of existing debt by the Debtors' lender group completed in June 2019, as described in Article III of the Disclosure Statement.

1.141   **Legacy Notes** means the 3.79% Second Lien Deferred Payment Notes due 2022, the 11% First Lien Senior Secured Notes due 2020, and the 11% First Lien Senior Secured Notes due 2022 issued pursuant to the Legacy Notes Indentures.

1.142   **Legacy Notes Charging Lien** means any Lien or other priority in payment to which the Legacy Notes Trustee is entitled, pursuant to the Legacy Notes Indentures, against distributions to be made to the holders of the Legacy Notes Claims under this Plan or otherwise, for payment of any Legacy Notes Indenture Trustee Fees.

12

1.143    ***Legacy Notes Indentures*** means, collectively, the (a) Legacy Second Lien Notes Indenture, (b) the 2020 Legacy First Lien Notes Indenture, and (c) the 2022 Legacy First Lien Notes Indenture.

1.144    ***Legacy Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Legacy Notes Trustee, whether prior to or after the Commencement Date, and whether prior to or after the consummation of the Plan, under the Legacy Notes Indentures.

1.145    ***Legacy Notes Trustee*** means Delaware Trust Company, in its capacity as successor trustee and collateral agent under the Legacy Notes Indentures.

1.146    ***Legacy Second Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.147    ***Legacy Notes Claims*** means Claims arising under any of the Legacy Notes Indentures.

1.148    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.149    ***Net Cash Proceeds*** means (a) all Cash of the Debtors realized from their business or Wind-Down operations or the Sale Transaction Proceeds *less* (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Restructuring Expenses, Trustees Fees, Priority Tax Claims, DIP Claims, ABL Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) estimated and reserved by the Debtors or the Plan Administrator with the reasonable consent of the Requisite Noteholders to adequately fund the Wind-Down; (iii) necessary to satisfy any Statutory Fees required to be paid in accordance with the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court; and (iv) necessary to satisfy the Debtors' obligations under the Europe/ROW Purchase Agreement and the Global Settlement (including the turnover to the Environmental Response Trust or the Vernon Environmental Response Trust of any sale proceeds of the Transferred Non-Performing Properties or the Vernon Non-Performing Property, as applicable, received prior to the Effective Date or the Global Settlement Payments, to the extent received by the Debtors from the Transferred Entities pursuant to <u>Section 5.2(h)</u> hereof).

1.150    ***New Board*** means the new board of directors of Holdings on and after the Effective Date.

1.151    ***Non-Performing Properties*** means the properties set forth on <u>Schedule 2</u> attached hereto.

1.152    ***Notes Deficiency Claims*** means the deficiency Claims on account of indebtedness under the Superpriority Notes Indenture or the Exchange Priority and First Lien Notes Indenture under section 506(a) of the Bankruptcy Code.

1.153    ***Optimization*** means the internal reorganization of the Debtors completed in December 2019, as described in Article III of the Disclosure Statement, that was the subject of the investigation by the sub-committee of the special committee of the Debtors' board of directors.

13

1.154    ***Other Secured Claim*** means a Secured Claim, other than (a) the ABL Claims, (b) the Superpriority Notes Guarantee Claims, (c) the Exchange Priority Notes Claims, (d) the First Lien Notes Claims, and (e) the DIP Claims.

1.155    ***Payment Condition*** means the approval by the Bankruptcy Court of the release by the California state governmental agencies, including the California DTSC, set forth in Section 10.6 in favor of the Europe ROW Purchaser, the Transferred Entities, and the Consenting Creditors.

1.156    ***PBGC*** means the Pension Benefit Guaranty Corporation.

1.157    ***PBGC Claims*** means all Claims of the PBGC, including any UBL Claim or any Claim for plan termination premiums under section 4006 of ERISA, against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14) based upon or relating to the Pension Plan or any agreements relating thereto.

1.158    ***Pension Plan*** means the following Pension Plan as to which Holdings was the plan sponsor, as such term is defined in ERISA Section 3(16)(B):  Exide Technologies Retirement Plan.

1.159    ***Permitted Liens*** means "Permitted Liens" as defined in the Europe/ROW Purchase Agreement.

1.160    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other Entity.

1.161    ***Plan*** means this joint chapter 11 plan, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 12.4 herein.

1.162    ***Plan Administrator*** means the person or entity selected by the Debtors charged with overseeing the tasks outlined in Section 5.5 of this Plan, or any successor appointed by the New Board. The identity of the Plan Administrator shall be filed with the Bankruptcy Court prior to the Confirmation Hearing.

1.163    ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Assumption Schedule, (b) GUC Trust Agreement, (c) Environmental Settlement Agreement, (d) Environmental Trust Agreements, (e) Frisco Settlement Agreement, (f) Vernon Environmental Trust Agreement, and (g) Columbus NPP Termination Documents.  The first Plan Supplement was filed at least seven (7) days prior to the deadline to object to confirmation of the Plan; *provided*, that through the Effective Date, the Debtors shall have the right to amend any documents contained in, and exhibits to, any Plan Supplement subject to the requirements of Section 12.4 of the Plan and except that the Debtors shall not have the right to amend any Environmental Settlement Document without the consent of the Settling Governmental Authorities.

1.164    ***Postpetition Accounts Payable*** means any postpetition Cure Amount due or accrued on account of any executory contract or unexpired lease designated for assignment and assumption to the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ) pursuant to the Environmental Settlement Documents or the Frisco Settlement Agreement, as applicable.

14

1.165    *Prerequisite Condition* has the meaning set forth in Section 9.1(k) hereof.

1.166    *Priority Non-Tax Claim* means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.167    *Priority Tax Claim* means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.168    *Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.169    *Professional Fee Escrow Account* means "Professional Fee Escrow Account" as defined in the DIP Order.

1.170    *Proof of Claim* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.171    *Related Parties* means with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; *provided*, that the Former Officers and Directors of the Debtors shall not be "Related Parties."

1.172    *Released Parties* means collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties.

1.173    *Releasing Parties* has the meaning set forth in Section 10.6 hereof.

1.174    *Requisite Noteholders* means, collectively, as of date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of each of (a) the Exchange Priority Notes held by all Consenting Creditors at such time, (b) the First Lien Notes held by all Consenting Creditors at such time, and (c) the Superpriority Notes held by all Consenting Creditors at such time.  For the avoidance of doubt, the term "Requisite Noteholders" as used herein shall not hold the same meaning as the same or similar terms contained in the Exchange Priority and First Lien Notes Indenture or the Superpriority Notes Indenture.

15

1.175    ***Restructuring Expenses*** means the reasonable and documented fees, costs, and expenses of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) Young Conaway Stargatt & Taylor LLP, and (c) CMD Global Advisors, LLC.

1.176    ***RSA*** means that certain Restructuring Support Agreement, dated as of May 18, 2020, by and among the Debtors and the Consenting Creditors, as the same may be amended, supplemented, or modified from time to time in accordance with its terms.

1.177    ***Sale Transaction*** means any transaction or series of transactions pursuant to one or more of (a) the Americas Sale Transaction, (b) the Europe/ROW Sale Transaction, (c) the Wind-Down, or (d) any other sale of Assets (other than the sale of any Non-Performing Property) of any of the Debtors prior to the Effective Date.

1.178    ***Sale Transaction Proceeds*** means the net cash proceeds received by the Debtors, the Plan Administrator, or the Wind-Down Estates, as applicable, pursuant one or more of the Sale Transactions.

1.179    ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.180    ***Secured Claim*** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in this Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.181    ***Settling Governmental Authorities*** means the Persons and Entities listed on Schedule 1 attached hereto, and each of their respective successors.

1.182    ***Single Share*** has the meaning set forth in Section 4.11(b) hereof.

1.183    ***Statutory Fees*** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

1.184    ***Subordinated Securities Claim*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.185    ***Subsequent Condition*** has the meaning set forth in Section 9.1(k) hereof.

1.186    ***Successful Bid*** has the meaning set forth in the Bidding Procedures Order.

1.187    ***Superpriority Note Documents*** means "Note Documents" as defined in the Superpriority Notes Indenture.

1.188    ***Superpriority Notes*** means the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to the Superpriority Notes Indenture.

1.189    ***Superpriority Notes Charging Lien*** means any Lien or other priority in payment to which the Superpriority Notes Trustee is entitled, pursuant to the Superpriority Notes Indenture, against

16

distributions to be made to the holders of the Superpriority Notes under this Plan or otherwise, for payment of any Superpriority Notes Indenture Trustee Fees.

1.190   ***Superpriority Notes Guarantee Claim*** means a Secured Claim arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors.

1.191   ***Superpriority Notes Indenture*** means that certain indenture, by and among Exide International, as issuer, the guarantor parties thereto, and the Superpriority Notes Trustee, dated as of June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.192   ***Superpriority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Superpriority Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Superpriority Notes Indenture with respect to the Superpriority Notes.

1.193   ***Superpriority Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Superpriority Notes Indenture.

1.194   ***Superpriority Security Documents*** means "Security Documents" as defined in the Superpriority Notes Indenture.

1.195   ***Tax Code*** means the Internal Revenue Code of 1986, as amended,

1.196   ***TCEQ means*** the Texas Commission on Environmental Quality.

1.197   ***Transferred Assets*** has the meaning set forth in the Europe/ROW Purchase Agreement.

1.198   ***Transferred Entities*** means "Transferred Entities" as defined in the Europe/ROW Purchase Agreement and listed on <u>Schedule 3</u> hereto, including their respective successors and assigns.

1.199   ***Transferred Equity Interests*** means "Transferred Equity Interests" as defined in the Europe/ROW Purchase Agreement.

1.200   ***Transferred Non-Performing Properties*** means (a) the Non-Performing Properties (other than the Vernon Non-Performing Property and the Frisco Non-Performing Property) and (b) the related personal property and equipment transferred to the Environmental Response Trust on the Effective Date pursuant to the Environmental Settlement Agreement.

1.201   ***Transferred NPP Claim*** means any civil Claim or Cause of Action by the Settling Governmental Authorities against the Debtors under Environmental Laws with respect to, or arising out of, the Transferred Non-Performing Properties.

1.202   ***Treasury Regulation*** means the final, temporary and proposed regulations promulgated under the Tax Code.

1.203   ***Trustees*** means, collectively, (a) the Superpriority Notes Trustee, and (b) the Exchange Priority and First Lien Notes Trustee.

17

1.204   ***Trustees Charging Liens*** means, collectively, (a) the Superpriority Notes Charging Lien (b) the Exchange Priority Notes Charging Lien, (c) the First Lien Notes Charging Lien, and (d) the Legacy Notes Charging Lien.

1.205   ***Trustees Fees*** means, collectively, (a) the Superpriority Notes Indenture Trustee Fees, (b) the Exchange Priority Notes Indenture Trustee Fees, and (c) the First Lien Notes Indenture Trustee Fees.

1.206   ***UBL Claim*** means any and all Claims of the PBGC for the "unfunded benefit liabilities" together with interest of the Pension Plan under ERISA Section 4062(b)(1)(A) against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14).

1.207   ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.208   ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.209   ***Vernon Environmental Response Trust*** means the trust established pursuant to the Vernon Environmental Trust Agreement and the Environmental Settlement Agreement with respect to the Vernon Non-Performing Property, in accordance with the Environmental Settlement Agreement.

1.210   ***Vernon Environmental Trust Agreement*** means the trust agreement by and among the Debtors, the United States on behalf of the U.S. Environmental Protection Agency, the Transferred Entities, and the Vernon Environmental Trustee, in form and substance as agreed to by such parties and filed with the Court and consistent with the Environmental Settlement Agreement and Section 5 of the Plan.

1.211   ***Vernon Environmental Trust Assets*** shall, pursuant to the Global Settlement and Section 5.2(e) hereof, consist of (a) the Vernon Global Settlement Payment, (b) the Vernon Non-Performing Property or any proceeds thereof to the extent the Vernon Non-Performing Property is sold prior to the Effective Date, and (c) the Vernon Environmental Trust Causes of Action.

1.212   ***Vernon Environmental Trust Beneficial Interests*** means the beneficial interests in the Vernon Environmental Response Trust.

1.213   ***Vernon Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to the Vernon Non-Performing Property.

1.214   ***Vernon Environmental Trustee*** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Vernon Environmental Response Trust, and any successor thereto in accordance with the Vernon Environmental Trust Agreement.

1.215   ***Vernon Global Settlement Payment*** means the $2,587,523 Cash payment to be made to the Vernon Environmental Response Trust or the Vernon Standby Trust in accordance with the

18

Environmental Settlement Agreement, by the Transferred Entities on the Effective Date pursuant to the Global Settlement if the Payment Condition is satisfied.

1.216   ***Vernon Non-Performing Property*** means the Debtors' non-performing property located at 2700 S. Indian Street, Los Angeles, California and the related personal property and equipment transferred to the Vernon Environmental Response Trust on the Effective Date pursuant to the Environmental Settlement Agreement.

1.217   ***Vernon NPP Claim*** means any civil Claim or Cause of Action against the Debtors under Environmental Laws with respect to or arising out of the Vernon Non-Performing Property.

1.218   ***Vernon Standby Trust*** means the Closure/Postclosure Trust established by the Debtors in 2013 for the benefit of the California DTSC relating to remediation of the Vernon Non-Performing Property.

1.219   ***Vernon Trust Condition*** means that the Vernon Environmental Trustee and the California DTSC reach a mutual, written agreement on or before the Effective Date that provides covenants not to sue or equivalent protections for the parties to the Vernon Environmental Trust Agreement from the California DTSC that are substantively identical to the covenants not to sue set forth in Paragraph 45.c.i of the Environmental Settlement Agreement being granted by the Settling Governmental Authorities (other than the Frisco Governmental Authorities) to the parties to the Environmental Trust Agreements.

1.220   ***Voting Deadline*** means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

1.221   ***Westchester*** means Westchester Fire Insurance Company, in its capacity as provider of surety insurance pursuant the Westchester Surety Bond Agreements.

1.222   ***Westchester Surety Bond Agreements*** means the applicable agreements governing the surety bond obligations of Westchester to the Debtors with respect to the Non-Performing Properties.

1.223   ***Wind-Down*** means, following the Effective Date, the process to sell, abandon, wind down, dissolve, liquidate or distribute any remaining assets of the Debtors' Estates in accordance with the Plan.

1.224   ***Wind-Down Budget*** means an amount to be agreed between the Debtors and the Requisite Noteholders for the purpose of effectuating the Wind-Down.

1.225   ***Wind-Down Estates*** means the Debtors, or any successor thereto, by merger, consolidation or otherwise, pursuant to and under the Plan on or after the Effective Date; *provided*, that Wind-Down Estates shall not include the Environmental Response Trust, the Vernon Environmental Response Trust, or the GUC Trust.

B.   **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For

19

purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C. **Controlling Document.**

In the event of an inconsistency between the Plan and any other document, the terms of the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

D. **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Requisite Noteholders as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1 hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

SECTION 2.    **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such other date or terms as may be mutually agreed upon between the holder of such an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator, as applicable.

2.2.    *Fee Claims.*

(a)      All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the

Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Plan Administrator, as applicable.  The Plan Administrator and the GUC Trustee are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or the Plan Administrator, as applicable, shall separately escrow such estimated amounts in the Professional Fee Escrow Account (less any amounts already reserved for such professional in the Professional Fee Escrow Account) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Wind-Down Estates and the Plan Administrator without any further action or order of the Bankruptcy Court.

(c)     For the avoidance of doubt, paragraph 23 of the DIP Order shall continue to apply to the Professional Fee Escrow Account and Fee Claims.

2.3.     ***Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

2.4.     ***DIP Claims***

Unless indefeasibly paid in full in Cash prior to the Effective Date, the DIP Claims shall be deemed Allowed in the full amount of the DIP Obligations, and each holder of a DIP Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such DIP Claim, Cash in an amount equal to such Claim on the Effective Date.  Upon the indefeasible payment in full in Cash of all DIP Claims, all Liens and security interests granted pursuant to the DIP Loan Documents shall be deemed cancelled and shall be of no further force and effect, and each DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

2.5.    *Restructuring Expenses*

During the period commencing on the Commencement Date through the Effective Date, the Debtors have, and will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA.  Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Plan Administrator shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

2.6.    *Trustees Fees*

On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan, including the closing of the Europe/ROW Sale Transaction), the Debtors or Plan Administrator shall pay in Cash all reasonable unpaid documented Trustees Fees without application or approval of the Bankruptcy Court and without a reduction to recoveries of the holders of the Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable.  For the avoidance of doubt, nothing herein affects each Trustees' right to exercise its Trustees Charging Lien against distributions to the holders of the Superpriority Notes, Exchange Priority Notes, or First Lien Notes, as applicable.  Any Trustees Fees invoiced after the Effective Date shall be paid promptly by the Plan Administrator, but no later than ten (10) business days after receiving an invoice.

The Trustees shall provide the Debtors, the Consenting Creditors, and the Creditors' Committee with an estimate of the Trustees Fees no later than five (5) business days prior to the Effective Date.  If the Debtors dispute any requested Trustee Fees, the Debtors or Plan Administer shall (i) pay the undisputed portion of Trustees Fees, and (ii) notify the applicable Trustee of such dispute within two (2) days after presentment of the invoices by the Trustees. Upon such notification, the applicable Trustee may assert its Trustees Charging Lien to pay the disputed portion of its Trustees Fees or submit such dispute for resolution by the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable indenture. Nothing herein shall be deemed to impair, waive, discharge or negatively impact any Trustees Charging Lien.

SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    *Grouping of Debtors for Convenience Only.*

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan.  Each Class of Claims will be deemed to contain sub-classes for

22

each of the Debtors, to the extent applicable for voting and distribution purposes.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  Except as provided in <u>Section 5</u> of this Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

3.3.     ***Summary of Classification.***

The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in <u>Section 3.5</u>.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Superpriority Notes Guarantee Claims | Impaired | Yes |
| 5 | Exchange Priority Notes Claims | Impaired | Yes |
| 6 | First Lien Notes Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 8 | Environmental NPP Claims | Impaired | No (Deemed to reject) |
| 9 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to reject) |
| 11 | Holdings Equity Interests | Impaired | No (Deemed to reject) |
| 12 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

3.4.     ***Special Provision Governing Unimpaired Claims.***

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.     ***Elimination of Vacant Classes.***

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

23

3.6.     ***Voting Classes; Presumed Acceptance by Non-Voting Classes***

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.7.     ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with Section 12 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

SECTION 4.     **TREATMENT OF CLAIMS AND INTERESTS.**

4.1.     ***Priority Non-Tax Claims (Class 1).***

(a)     *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

(b)     *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.2.     ***Other Secured Claims (Class 2).***

(a)     *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)     *Treatment*:

(i)     Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)     Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

(c)     *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.     ***ABL Claims (Class 3)***

(a)     *Classification*:  Class 3 consists of the ABL Claims.

(b)     *Allowance*:  The ABL Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $101,939,274.01 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the ABL Credit Agreement.

(c)     *Treatment*:

(i)     In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive Cash until all holders of Allowed ABL Claims are satisfied in full, taking into account any amounts paid to the holders of Allowed ABL Claims pursuant to the Americas Sale Order.

(ii)     The Challenge Deadline relating to the ABL Credit Agreement and ABL Agent shall be deemed irrevocably expired (A) with respect to the Creditors' Committee as of the date of the entry of the Americas Sale Order, (B) with respect to the Settling Governmental Authorities, on the Effective Date, and (C) with respect to all other Persons and Entities, on August 27, 2020.  For the avoidance of doubt, any reservation of rights relating to the ABL Credit Agreement and the ABL Agent, including paragraphs 37 to 41 of the Americas Sale Order, shall be deemed expired on the foregoing dates with respect to the foregoing parties, as applicable.

(d)     *Voting*:  Class 3 is Unimpaired, and the holders of ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of ABL Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such ABL Claims.

4.4.     ***Superpriority Notes Guarantee Claims (Class 4).***

(a)     *Classification*: Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors.

(b)     *Allowance*:  The Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture) and such Claims against the Debtors shall not be subject to any

25

avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)      *Treatment*:  Following the Europe/ROW Closing, the Superpriority Notes and all of the outstanding Claims arising thereunder (including, for the avoidance of doubt, the Superpriority Notes Guarantee Claims) shall be contributed by the Consenting Creditors to the Europe/ROW Purchaser in accordance with the Europe/ROW Purchase Agreement.  At the Europe/ROW Closing, the Europe/ROW Purchaser shall contribute the Superpriority Notes to Exide International and the Superpriority Notes shall be cancelled.  At the Europe/ROW Closing and without limiting the above, and without any further action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or further order of the Bankruptcy Court, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released, and discharged, and (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed terminated, released, discharged and without further effect.

(d)      *Voting*:  Class 4 is Impaired, and the holders of the Superpriority Notes Guarantee Claims are entitled to vote to accept or reject the Plan.

4.5.      ***Exchange Priority Notes Claims (Class 5).***

(a)      *Classification*: Class 5 consists of Exchange Priority Notes Claims against the Debtors.

(b)      *Allowance*:  The Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $390,000,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise) counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)      *Treatment*:  Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for Allowed Exchange Priority Notes Claims, each holder thereof shall receive (i) at the Europe/ROW Closing, its Pro Rata share of the consideration contemplated by Section 5.1(a) of the Plan in exchange for an aggregate amount of $70,000,000 of Exchange Priority Notes Claims, and (ii) for all remaining Allowed Exchange Priority Notes Claims, Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)      *Voting*:  Class 5 is Impaired, and the holders of the Exchange Priority Notes Claims are entitled to vote to accept or reject the Plan.

4.6.      ***First Lien Notes Claims (Class 6).***

(a)      *Classification*:  Class 6 consists of First Lien Notes Claims against the Debtors.

26

(b)       *Allowance*:   The First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $161,023,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)       *Treatment*:   Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed First Lien Notes Claim, each holder thereof shall receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)       *Voting*:   Class 6 is Impaired, and the holders of the First Lien Notes Claims are entitled to vote to accept or reject the Plan.

4.7.   ***General Unsecured Claims (Class 7).***

(a)       *Classification*:   Class 7 consists of General Unsecured Claims against the Debtors.

(b)       *Treatment*:

(i)       Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction and release of, and in exchange for, such Allowed General Unsecured Claim, each holder thereof shall receive its Pro Rata share of (A) the GUC Trust Beneficial A Interests, and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which shall be shared on a Pro Rata basis with the holders of Allowed Environmental NPP Claims, until all Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(ii)       All Notes Deficiency Claims shall not receive distributions in accordance with this <u>Section 4.7(b)</u> and such Claims are waived for all purposes, including for voting and for distributions pursuant to and in accordance with this <u>Section 4.7(b)</u>.

(c)       *Voting*:   Class 7 is Impaired, and the holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.8.   ***Environmental NPP Claims (Class 8).***

(a)       *Classification*:   Class 8 consists of Environmental NPP Claims against the Debtors.

(b)       *Treatment*:   Except to the extent that a holder of an Allowed Environmental NPP Claim agrees to less favorable treatment of such Claim or otherwise, in full and final

27

satisfaction and release of, and in exchange for, such Allowed Environmental NPP Claim, each holder of an Allowed Environmental NPP Claim shall receive:

(i)      (A) if such holder is a Global Settlement Party, then such holder shall be a beneficiary of the Environmental Trust Beneficial Interests and/or the Vernon Environmental Trust Beneficial Interests, as applicable under the Environmental Settlement Documents; (B) if such holder is not a Global Settlement Party and the Payment Condition is satisfied as to such holder but the Vernon Trust Condition is not satisfied, then the Non-Performing Property relating to such holder's Environmental NPP Claim shall be abandoned, and the relevant Global Settlement Payment shall be made, in each case in accordance with Section 5.2(e)(ii) of the Plan; (C) if such holder is not a Global Settlement Party and the Payment Condition is not satisfied as to such holder, the Non-Performing Property relating to such holder's Environmental NPP Claim shall be abandoned in accordance with Section 5.2(e)(iii) of the Plan, and such holder shall receive a first priority Lien against such Non-Performing Property to secure its Environmental NPP Claim; or (D) if such holder is not a Global Settlement Party and the Payment Condition is satisfied as to such holder and the Vernon Trust Condition is satisfied, then such holder shall be a beneficiary of the Vernon Environmental Trust Beneficial Interests in accordance with the Environmental Settlement Documents;

(ii)      its Pro Rata share of GUC Trust Beneficial B Interests;

(iii)     Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which shall be shared on a Pro Rata basis with holders of Allowed General Unsecured Claims, until all Allowed Environmental NPP Claim are satisfied in full in Cash or such Net Cash Proceeds are exhausted; and

(iv)      Notwithstanding anything to the contrary, the foregoing shall not affect any defensive rights of set-off or recoupment of any holder of an Environmental NPP Claim against any Claims asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee, as applicable.

(c)      *Voting*: Class 8 is Impaired, and the holders of Environmental NPP Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Environmental NPP Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Environmental NPP Claims.

### 4.9.   *Intercompany Claims (Class 9).*

(a)      *Classification*:   Class 9 consists of Intercompany Claims against the Debtors.

(b)      *Treatment*:   On or after the Effective Date, all Intercompany Claims will be cancelled and not entitled to distribution or any recovery under the Plan.

(c)      *Voting*: Class 9 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

28

4.10.     *Intercompany Interests (Class 10).*

(a)     *Classification*:  Class 10 consists of Intercompany Interests in the Debtors.

(b)     *Treatment*:  All Intercompany Interests in a subsidiary Debtor shall be cancelled if and when such Debtor is dissolved in accordance with Section 5.7(f) of the Plan.  Each holder of an Intercompany Interest in a subsidiary Debtor shall neither receive nor retain any property of the estate or direct interest in property of the estate of such Debtor on account of such Intercompany Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in such Debtor may receive its Pro Rata Share of any remaining assets in the Debtor.

(c)     *Voting*:  Class 10 is Impaired, and the holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.11.     *Holdings Equity Interests (Class 11).*

(a)     *Classification*: Class 11 consists of Holdings Equity Interests.

(b)     *Treatment*:  Except to the extent that a holder of Holdings Equity Interests agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for Holdings Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all Holdings Equity Interests shall be cancelled and one share of Holdings common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Holdings Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of a Holdings Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Holdings Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Holdings Stock may receive its share of any remaining assets of Holdings consistent with such holder's rights of payment existing immediately prior to the Commencement Date unless otherwise determined by the Plan Administrator, on the date that Holdings' Chapter 11 Case is closed in accordance with Section 5.16 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and (iii) the continuing rights of former holders of Holdings Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)     *Voting*:  Class 11 is Impaired, and the holders of Holdings Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Holdings Equity Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Holdings Equity Interests.

4.12.     *Subordinated Securities Claims (Class 12).*

(a)     *Classification*:  Class 12 consists of Subordinated Securities Claims against the Debtors.

29

(b)    *Treatment*: Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims. On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*: Class 12 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Subordinated Securities Claims.

SECTION 5.    **MEANS FOR IMPLEMENTATION.**

5.1.    ***Europe/ROW Sale Transaction.***

(a)    *Europe/ROW Sale Transaction*. On the Effective Date, in accordance with the Europe/ROW Purchase Agreement, the following will occur, subject to the satisfaction or waiver of all applicable closing conditions under the Europe/ROW Purchase Agreement:

(i)    pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, all Acquired Assets shall be transferred to, and the Acquired Assets owned by the Debtors shall vest free and clear of all Liens (other than Permitted Liens), Claims, charges, interests, or other encumbrances, in the Europe/ROW Purchaser or such other entity as set forth in the Europe/ROW Purchase Agreement, and all Assumed Liabilities shall be assumed by the Europe/ROW Purchaser or such other entity designated by the Europe/ROW Purchaser in accordance with the terms of the Europe/ROW Purchase Agreement;

(ii)    all other transactions as are necessary to consummate the Europe/ROW Sale Transaction in accordance with the Alternative Transaction Structure; and

(iii)    the releases provided for in Section 12.22 of the Europe/ROW Purchase Agreement shall become effective and binding on the parties thereto.

(b)    *Sources of Consideration for Plan Distribution.*

The Debtors and the Plan Administrator, as applicable, shall fund Distributions under this Plan with the aggregate consideration comprised of (i) the Sale Transaction Proceeds, (ii) Cash on hand, and (iii) the Global Settlement Payments.

5.2.    ***Compromise and Settlement of Claims, Interests, and Controversies***

(a)    The provisions of the Plan, including treatment provided for hereunder for General Unsecured Claims and Environmental NPP Claims, and the Global Settlement Documents incorporate and reflect a proposed compromise and settlement of various issues and disputes related to the Debtors (the "***Global Settlement***"). Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, the Global Settlement, and any documents related to the Europe/ROW Sale Transaction, shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of an Environmental NPP Claim may have with respect to any such Claim or any Distribution to be made on account of any such Claim and are also in consideration of the significant value provided to the Estates by the Consenting Creditors, the Europe/ROW

30

Purchaser and the Transferred Entities. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

(b)      The terms of the Global Settlement shall become effective and binding upon all parties, including the Global Settlement Parties and the Transferred Entities, automatically upon the Effective Date without the need for any further action or Bankruptcy Court approval.

(c)      *GUC Trust.* The GUC Trust shall be established in accordance with the GUC Trust Agreement and the GUC Trust Assets shall be deemed to have been contributed to the GUC Trust free and clear of all Liens, charges, encumbrances, and Interests for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims. Solely for purposes of distributions from the GUC Trust: (i) all GUC Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all unsecured guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim or Environmental NPP Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors and the GUC Trust; and (iii) each and every General Unsecured Claim and Environmental NPP Claim filed or to be filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim or Environmental NPP Claims, as applicable, against and obligation of the consolidated Debtors and the GUC Trust. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Wind-Down Estates or modify or affect the requirements of section 553 of the Bankruptcy Code for purposes of effectuating a setoff against the Debtors, the Wind-Down Estates or the GUC Trust, as applicable. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or Environmental NPP Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim or Environmental NPP Claim subordinated in accordance with any contractual rights or equitable principles.

(d)      *Environmental Response Trust.*

(i)      The Environmental Response Trust shall be established in accordance with the Environmental Settlement Documents and the Environmental Trust Assets shall be transferred to the Environmental Response Trust free and clear of all Liens, charges, encumbrances, and Interests. The Environmental Global Settlement Payment shall be paid by the Transferred Entities to the Environmental Response Trust in accordance with the terms of the Environmental Settlement Agreement and shall not be subject to satisfaction of the Payment Condition. The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, the Settling Governmental Authorities shall not assert any Transferred NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. All Transferred NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan.

(ii)      Prior to the Effective Date, the Debtors shall not sell or transfer any of the Transferred Non-Performing Properties without the prior written consent of the Settling Governmental Authorities with jurisdiction over such Transferred Non-Performing Property; *provided*, that in the event the Debtors sell or otherwise transfer a Transferred Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of such Transferred Non-Performing

31

Property, all proceeds of such sale shall be contributed to the Environmental Response Trust on the Effective Date in lieu of such Transferred Non-Performing Property.  For the avoidance of doubt, the sale of a Transferred Non-Performing Property pursuant to this Section 5.2(d)(ii) shall not affect the respective rights of the Settling Governmental Authorities or the Environmental Sureties relating to such Transferred Non-Performing Property.

(iii)    Westchester shall make all required contributions to the Environmental Response Trust in accordance with the Environmental Settlement Documents.

(e)    *Vernon Environmental Response Trust*.

(i)    If the Payment Condition and the Vernon Trust Condition are satisfied:

(A)    the Vernon Environmental Response Trust shall be established in accordance with the Environmental Settlement Documents and the Vernon Environmental Trust Assets shall be transferred to the Vernon Environmental Response Trust free and clear of all Liens, charges, encumbrances, and Interests.  The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein.  For the avoidance of doubt, any Vernon NPP Claims against the Debtors shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim.  All Vernon NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan;

(B)    the Vernon Global Settlement Payment shall be paid by the Transferred Entities to the Vernon Environmental Response Trust in accordance with the terms of the Environmental Settlement Agreement;

(C)    prior to the Effective Date, the Debtors shall not sell or transfer the Vernon Non-Performing Property without the prior written consent of the Settling Governmental Authorities with jurisdiction over the Vernon Non-Performing Property; *provided*, that in the event the Debtors sell or otherwise transfer the Vernon Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of the Vernon Non-Performing Property, all proceeds of such sale shall be contributed to the Vernon Environmental Response Trust on the Effective Date in lieu of the Vernon Non-Performing Property.  For the avoidance of doubt, the sale of the Vernon Non-Performing Property pursuant to this Section 5.2(e)(i)(C) shall not affect the respective rights of the Settling Governmental Authorities with jurisdiction over the Vernon Non-Performing Property or the Environmental Sureties relating to the Vernon Non-Performing Property; and

(D)    Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents.

(ii)    If the Payment Condition is satisfied, but the Vernon Trust Condition is *not* satisfied:

32

(A)     pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens;

(B)     the Vernon Environmental Trust Assets shall not be transferred to the Vernon Environmental Response Trust;

(C)     the Vernon Global Settlement Payment shall be paid by the Transferred Entities to the Vernon Standby Trust in accordance with the terms of the Environmental Settlement Agreement;

(D)     the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property, except to the extent that a Vernon NPP Claim is Allowed as an Environmental NPP Claim.  For the avoidance of doubt, any Vernon NPP Claim shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, following the abandonment of the Vernon Non-Performing Property; and

(E)     Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents.

(iii)     If the Payment Condition is *not* satisfied:

(A)     pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens, other than any Liens granted pursuant to Section 4.8(b) of the Plan;

(B)     the Vernon Environmental Trust Assets shall not be transferred to the Vernon Environmental Response Trust;

(C)     the Vernon Global Settlement Payment shall not be payable by the Transferred Entities;

(D)     Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents; and

(E)     the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property except to the extent a Vernon NPP Claim is Allowed as an Environmental NPP Claim.  For the avoidance of doubt, any Vernon NPP Claim shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, following the abandonment of the Vernon Non-Performing Property.

(f)     *Frisco Settlement Agreement*.

33

(i)      The Frisco Assets shall be transferred to the Frisco Governmental Authorities pursuant to the terms of the Frisco Settlement Agreement and free and clear of all Liens.  The Frisco Settlement Agreement contains covenants not to sue and releases which are incorporated herein.  For the avoidance of doubt, the Frisco Governmental Authorities shall not assert any Frisco NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, an Other Secured Claim, or a General Unsecured Claim; *provided*, that the foregoing shall not affect any defensive rights set-off or recoupment of any of the Frisco Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.  All Frisco NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan.

(ii)      The Frisco Governmental Authorities (other than TCEQ) shall make all required payments to Aspen in accordance with the Frisco Settlement Agreement.

(iii)      Aspen shall make all required payments to TCEQ in accordance with the Frisco Settlement Agreement.

(g)      *Consenting Creditors*.

(i)      Certain Consenting Creditors shall purchase the European Bridge Notes issued pursuant to the terms of the European Bridge Notes Indenture in an aggregate amount equal to at least $12,500,000.

(ii)      On the Effective Date, the Exchange Priority and First Lien Notes Trustee, at the direction of the Requisite Noteholders, shall be deemed to have waived (A) all Liens on or against the Non-Performing Properties, including with respect to any proceeds of the sale of any Non-Performing Properties and (B) any Claims, Interests or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims.

(iii)      The Trustees and Consenting Creditors shall take all actions required or necessary under the Superpriority Notes Indentures and the Exchange Priority and First Lien Notes Indenture to effectuate the Europe/ROW Sale Transaction in accordance with the terms of the Plan and the Europe/ROW Purchase Agreement.

(h)      *Transferred Entities*.  On the Effective Date, the Transferred Entities shall pay (i) the GUC Global Settlement Payment to the GUC Trust, (ii) the Environmental Global Settlement Payment to the Environmental Response Trust (which, for the avoidance of doubt, shall not be subject to satisfaction of the Payment Condition), (iii) the Frisco Global Settlement Payment to TCEQ, and (iv) subject to the satisfaction of the Payment Condition, the Vernon Global Settlement Payment to the Vernon Environmental Response Trust in accordance with the Environmental Settlement Agreement; *provided*, that for each of the contributions contemplated in the foregoing clauses (i) through (iv), the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors in partial satisfaction of outstanding intercompany payables owed by the Transferred Entities to the Debtors and, following such Cash payment, on the Effective Date, the Debtors shall make the contributions to the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust (only if the Payment Condition is satisfied), or TCEQ, as applicable.

(i)      *Environmental Sureties*.

(i)      On the Effective Date, the Environmental Sureties shall be deemed to waive all Claims (including Administrative Expense Claims, Priority Non-Tax Claims, or

34

General Unsecured Claims) Interests or Causes of Action against the Debtors, the Wind-Down Estates, the Plan Administrator, the GUC Trust or the GUC Trust Assets other than any Other Secured Claims that Westchester may hold on account of cash collateral in the amount of $5,000,000 posted by the Debtors with respect to the Westchester Surety Bond Agreements.

(ii)     Upon the sale of any Non-Performing Property that is covered by the Westchester Surety Bond Agreement, Westchester's rights under the Westchester Surety Bond Agreements shall be governed by the Environmental Settlement Documents.

(j)     *Other Provisions.*

(i)     As a condition precedent to consummation of the Global Settlement, (A) the Global Settlement Parties (other than the Settling Governmental Authorities) shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, the confirmation or consummation of the Plan or approval of the Global Settlement, and (B) the Settling Governmental Authorities shall not oppose any term or provision of the Plan, Disclosure Statement, or Global Settlement, in each case, subject to the rights of the Global Settlement Parties, including the Settling Governmental Authorities, with respect to amendments to the Plan as set forth in <u>Section 12.4</u> of the Plan.

(ii)     The Global Settlement Parties agree to exchange releases or covenants not to sue as set forth in <u>Section 10</u> of the Plan or as provided in the Environmental Settlement Agreement or the Frisco Settlement Agreement.

(iii)     The Debtors shall not designate any additional properties as Non-Performing Properties, without the prior written consent of the Settling Governmental Authorities.

(iv)     The terms of the Global Settlement (A) shall not affect any rights the Settling Governmental Authorities or the Frisco Governmental Authorities may have against any purchaser of any of the Debtors' Assets that is not a Global Settlement Party, and (B) are without prejudice to any (x) Claims other than Transferred NPP Claims held by the Settling Governmental Authorities or Frisco NPP Claims held by the Frisco Governmental Authorities, as applicable, and (y) any Claim, Interest, or Cause of Action of any Governmental Unit that is not a Settling Governmental Authority or Frisco Governmental Authority.

(v)     All pending or potential discovery and litigation by any Global Settlement Party against any other Global Settlement Party related to the Chapter 11 Cases or any of the transactions related thereto shall be subject to a standstill and shall be deemed withdrawn upon the Effective Date.

(vi)     The GUC Trust Agreement, the Environmental Settlement Documents, the Frisco Settlement Agreement, and any other documentation required to effectuate the Global Settlement shall be solely for the benefit of the Global Settlement Parties and, for the avoidance of doubt, no third-parties shall be beneficiaries of the Global Settlement or any such documents.

(vii)     The Superpriority Notes Indenture and the Exchange Priority and First Lien Notes Indenture shall be deemed amended and modified to the extent necessary to allow, permit and effectuate the transactions contemplated by the Plan and the Europe/ROW Sale Transaction.

(k)     *Columbus Non-Performing Property Transaction.*

35

(i)      To facilitate the transfer of the Columbus Non-Performing Property to the Environmental Response Trust, as required by the Environmental Settlement Agreement, and pursuant to sections 105(a), 365 and 554(a) of the Bankruptcy Code, on the Effective Date, in accordance with the Columbus NPP Termination Documents and subject to the satisfaction or waiver of all applicable closing conditions under the Columbus NPP Termination Documents:

> (A)      Exide Technologies' lease and the bond purchase agreement related to the Columbus Non-Performing Property, including any security documentation related thereto, shall terminate;

> (B)      Exide Technologies shall be deemed to have abandoned the revenue bonds issued in connection with the development of the Columbus Non-Performing Property and no further payments shall be due thereunder;

> (C)      the Columbus Development Authority shall quitclaim its interest in the parcel located at the Columbus Non-Performing Property to Exide Technologies; and

> (D)      the Debtors and the Columbus Development Authority shall take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

### 5.3.   *The GUC Trust.*

(a)      *Execution of GUC Trust Agreement.* On the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the Requisite Noteholders, and the GUC Trustee, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims.  This <u>Section 5.3</u> sets forth certain of the rights, duties, and obligations of the GUC Trustee.  In the event of any conflict between the terms of this <u>Section 5.3</u> and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.

(b)      *Purpose of GUC Trust*.  The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan with respect to the GUC Trust Assets, General Unsecured Claims, and Environmental NPP Claims, including, but not limited to, resolving outstanding Disputed General Unsecured Claims and Disputed Environmental NPP Claims and making distributions to holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims in accordance with the Plan.

(c)      *GUC Trust Assets*.  The GUC Trust shall consist of the GUC Trust Assets.

(d)      *GUC Trustee*.  The GUC Trustee shall be responsible to manage the day-to-day operations of the GUC Trust.

(e)      *Role of GUC Trustee*.  In furtherance of, and consistent with, the purposes of the GUC Trust and the Plan, the GUC Trustee shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power

and authority, (iv) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims and Disputed Environmental NPP Claims, and (v) have the power and authority to perform such other functions as are provided for in the Plan and the GUC Trust Agreement.  In all circumstances, the GUC Trustee shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor.  The investment powers of the GUC Trustee are limited to powers to invest in demand and time deposits in banks or savings institutions, or temporary investment such as short-term certificates of deposit or U.S. Treasury bills.

(f)    *Preservation of Privilege*.  The Debtors and the GUC Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Trust Assets.  The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, retain the right to waive their own privileges.

(g)    *Transferability of GUC Trust Beneficial Interests*.  GUC Trust Beneficial Interests shall not be certificated and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law, or as and to the extent determined by the GUC Trustee.

(h)    *Costs and Expenses of GUC Trustee*.  The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trustee and its retained professionals, shall be paid exclusively from the GUC Trust Assets.

(i)    *Retention of Professionals by GUC Trustee*.  The GUC Trustee may retain and reasonably compensate counsel and other professionals, which may include, but is not limited to, Creditors' Committee professionals, to assist in their duties as GUC Trustee on such terms as the GUC Trustee deems appropriate without Bankruptcy Court approval.

(j)    *U.S. Federal Income Tax Treatment of GUC Trust*.  In furtherance of this Section 5.3 of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims and Environmental NPP Claims, consistent with the terms of the Plan; (ii) the holders of General Unsecured Claims and Environmental NPP Claims shall be treated as the beneficiaries and grantors of the GUC Trust; (iii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims and Environmental NPP Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, holders of and Environmental NPP Claims, and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the GUC Trust Assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims and Environmental NPP Claims, followed by the deemed transfer of such GUC Trust Assets to the GUC Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (vi) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding

37

the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the GUC Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims and Environmental NPP Claims based on their respective interests in the GUC Trust, including the holders of General Unsecured Claims and Environmental NPP Claims holding Disputed Claims, in such manner as the GUC Trustee deems reasonable and appropriate; and (viii) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made for all or any portion of the GUC Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders of General Unsecured Claims and Environmental NPP Claims, and the GUC Trustee), and solely with respect to the impacts assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

(k)     *Expedited Determination*.  The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(l)     *Dissolution*.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims and Disputed Environmental NPP Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, and (iii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims and Disputed Environmental NPP Claims.

5.4.     ***The Environmental Response Trust.***

(a)     *Execution of Environmental Trust Agreements*.  On or before the Effective Date, the Environmental Trust Agreements, substantially in the form attached to the Environmental Settlement Agreement, shall be executed, and all other necessary steps to be taken to establish the Environmental Response Trust and the Environmental Trust Beneficial Interests shall be authorized.

(b)     *Environmental Trust Assets*.  The Environmental Response Trust shall consist of the Environmental Trust Assets.  On or before the Effective Date, the Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Environmental Response Trust as specified and in the amounts provided in the Environmental Settlement Documents.

(c)     *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against a Non-Performing Property shall be irrevocably cancelled on the Effective Date. Any person holding a Lien against a Non-Performing Property shall take any action reasonably requested by the Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Environmental Trustee.

RLF1 24035068v.1

5.5.     *The Vernon Environmental Response Trust.*

Subject to the satisfaction of the Payment Condition and the Vernon Trust Condition:

(a)     *Execution of Vernon Environmental Trust Agreement*.  On or before the Effective Date, the Vernon Environmental Trust Agreement, substantially in the form attached to the Environmental Settlement Agreement, shall be executed, and all other necessary steps to be taken to establish the Vernon Environmental Response Trust and the Vernon Environmental Trust Beneficial Interests shall be authorized.

(b)     *Vernon Environmental Trust Assets*.  The Vernon Environmental Response Trust shall consist of the Vernon Environmental Trust Assets.  On or before the Effective Date, the Vernon Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Vernon Environmental Response Trust as specified and in the amounts provided in the Plan and the Environmental Settlement Documents.

(c)     *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against the Vernon Non-Performing Property shall be irrevocably cancelled on the Effective Date.  Any person holding a Lien against the Vernon Non-Performing Property shall take any action reasonably requested by the Vernon Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Vernon Environmental Trustee.

5.6.     *Canada Non-Performing Property.*

(a)     On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Risk Management Measures Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; *provided*, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount necessary to implement environmental risk management measures and/or abandonment of the Canada Non-Performing Property.  The Debtors are authorized to transfer title to or proceeds from the Canada Non-Performing Property to the Canada MOE or its designee. For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Risk Management Measures Funds deposited for use by the Canada MOE.

(b)     Upon the implementation of environmental risk management measures, any excess Canada NPP Risk Management Measures Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

(c)     In the event the Canada NPP Risk Management Measures Funds are not sufficient to cover the cost of implementing the environmental risk management measures at the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

5.7.     *Plan Administrator.*

(a)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined

39

below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan.

(b)     *Authority*.  Subject to Section 5.7(c) of this Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims and Environmental NPP Claims (for the avoidance of doubt, the GUC Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims and Environmental NPP Claims asserted against the GUC Trust);

(ii)     make Distributions to holders of Allowed Claims in accordance with this Plan, other than with respect to Allowed General Unsecured Claims;

(iii)     exercise its reasonable business judgment to direct and control the Wind-Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)     other than GUC Trust Causes of Action, the Environmental Trust Causes of Action, the Vernon Environmental Trust Causes of Action, or any Causes of Action released by the Debtors pursuant to the Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates, other than with respect to the GUC Trust Assets;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     maintain the books and records and accounts of the Debtors;

(viii)     incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(ix)     following the Effective Date, pay all Restructuring Expenses in Cash in accordance with Section 2.5 of this Plan;

(x)     following the Effective Date, pay all Trustees Fees in Cash in accordance with Section 2.6 of the Plan.

(xi)     administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of

40

such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiii)    pay statutory fees in accordance with <u>Section 12.1</u> of the Plan;

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan; and

(xv)    close the Chapter 11 Cases, subject to the reasonable consent of the GUC Trustee.

(c)    *Boards of Directors and Officers*.

(i)    The officers and directors of the Debtors existing prior to the Effective Date shall be relieved of any and all duties with the respect to the Debtors as of the Effective Date.

(ii)    Upon the Effective Date, the New Board shall consist of one or more directors selected by the Debtors and the Requisite Noteholders, which shall be announced by notice filed with the Bankruptcy Court prior to the Confirmation Hearing.

(iii)    Upon the Effective Date, the new governance structure of Holdings will be set forth in the Amended Organizational Documents.

(iv)    The New Board shall, among other things, oversee and direct the Plan Administrator (solely in its capacity as the Plan Administrator and not in his capacity as the custodian of the Single Share) and the administration of the Wind-Down Estates in accordance with the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish, in consultation with the Requisite Noteholders and the Plan Administrator, such procedures and protocols as it deems necessary to carry out its duties and as are otherwise acceptable to the Requisite Noteholders.

(d)    *Wind-Down*.   After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind-Down according to the Wind-Down Budget without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Wind-Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(e)    *Indemnification*.   Each of the Wind-Down Estates shall indemnify and hold harmless the New Board and the Plan Administrator solely in their capacities as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or the New Board's bad faith, gross negligence, willful misconduct or criminal conduct.

(f)    *Dissolution*.   After the Effective Date, the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of this Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all

41

Interests in a Wind-Down Estate) and complete the winding up of such Wind-Down Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Wind-Down Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Wind-Down Estate.  The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Wind-Down Estate as a corporate entity in good standing until such time as such Wind-Down Estate is dissolved or merged out of existence in accordance with the Plan.

5.8. ***Corporate Action.***

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

5.9. ***Withholding and Reporting Requirements.***

(a) *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b) *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, Wind-Down Estates, GUC Trustee or such other Person designated by the Plan Administrator, Wind-Down Estates or GUC Trustee (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Plan Administrator.  If such request is made by the Plan Administrator, Wind-Down Estates, or such other Person designated by the Plan Administrator or Wind-Down Estates and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Wind-Down Estate and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the applicable Wind-Down Estate and their  respective property.  If such request is made by the GUC Trustee or such other Entity designated by the GUC Trustee and the holder fails to comply within ninety (90) days after the request is

42

made, the amount of such distribution shall irrevocably revert to the GUC Trust and any Claim in respect of such distribution shall be forever barred from assertion against the GUC Trustee or the GUC Trust, or the property of each of them.

5.10. **Exemption From Certain Transfer Taxes.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.11. **Effectuating Documents; Further Transactions.**

(a)     On or as soon as practicable after the Effective Date, the Plan Administrator shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate.

(b)     Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of, the Wind-Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Estates) except for those expressly required pursuant to the Plan.

43

(c)     The Debtors shall be authorized to implement the Sale Transactions and the Global Settlement (including the creation of the GUC Trust, the Environmental Response Trust, and, if necessary, the Vernon Environmental Response Trust) in the manner most tax efficient to the Wind-Down Estates, the Environmental Response Trust, and the Vernon Environmental Response Trust, and consistent with the Environmental Settlement Documents.

(d)     All matters provided for herein involving the corporate structure of the Debtors or the Wind-Down Estates, to the extent applicable, or any corporate or related action required by the Debtors or the Wind-Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind-Down Estates.

### 5.12.   *Preservation of Rights of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred or settled pursuant to this Plan (including pursuant to the Global Settlement, Environmental Settlement Documents, and the Frisco Settlement Agreement), the Confirmation Order, or by another Bankruptcy Court order (including the Americas Sale Order) or transferred to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement or the Americas Sale Transaction, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Plan Administrator, or the GUC Trustee, will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to this Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator or the GUC Trustee, as applicable, may determine is in the best interest of the Debtors and their Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself.

### 5.13.   *Certificate of Incorporation and By-Laws.*

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of this Plan.  Such amended organizational documents (if any) shall be filed with the Bankruptcy Court in advance of the Effective Date.

### 5.14.   *Stock Trading Restrictions*

The restrictions imposed by the *Interim Order Establishing Notification Procedures And Approving Restrictions On Certain Transfers Of Interests In The Debtors* (Docket No. 113), as the same

may be amended from time to time, shall remain effective and binding through the closing of the Chapter 11 Cases.

5.15.   *Assignment and Assumption of Superpriority Notes.*

Following the Europe/ROW Closing, the Consenting Creditors shall contribute the Superpriority Notes, together with all of the outstanding Claims arising thereunder and under the Superpriority Notes Indenture to the Europe/ROW Purchaser in exchange for preferred equity interests of the Europe/ROW Purchaser.  After the Europe/ROW Closing, the Europe/ROW Purchaser shall contribute the Superpriority Notes to Exide International and the Superpriority Notes shall be cancelled. At the Europe/ROW Closing and without limiting the above, and without any further action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or further order of the Bankruptcy Court, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released, and discharged, and (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed terminated, released, discharged and without further effect.

The Superpriority Notes Indenture and Superpriority Security Documents and all outstanding Claims arising under the Superpriority Notes Indenture shall be cancelled and terminated.  For the avoidance of doubt, and in furtherance of the Superpriority Notes Indenture, Exide International shall immediately deliver or be deemed to deliver and surrender the Superpriority Notes to the Superpriority Notes Trustee for cancellation.

5.16.   *Cancellation of Existing Securities and Agreements*

(a)   Except for the purpose of evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, including, but not limited to, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.  For the avoidance of doubt, but subject to Section 5.16(b) below, on the Effective Date, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall be deemed terminated and cancelled and the Exchange Priority and First Lien Notes Trustee and Legacy Notes Trustee shall be discharged and released without any further action.

(b)   The Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall continue in effect to the extent necessary to (i) allow the Plan Administrator, Exchange Priority and First Lien Notes Trustee, or Legacy Notes Trustee, as applicable, to make distributions under the Plan, (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction (iii) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien, First Lien Trustee Charging Lien, and Legacy Notes Charging Lien, as applicable; (iv) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture or the Legacy Notes Indentures, as applicable; (v) to exercise its rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable; (vi) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in this Section 5.16.  For the avoidance of doubt, all

45

indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.

### 5.17.   *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator or the GUC Trustee, as applicable, to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 5.18.   *Nonconsensual Confirmation.*

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject, or are deemed to reject, the Plan.

### 5.19.   *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the applicable Wind-Down Estate or Plan Administrator shall, subject to the reasonable consent of the GUC Trustee, seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 5.20.   *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 5.21.   *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of this Plan and applicable law.

### 5.22.   *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

46

SECTION 6.     **DISTRIBUTIONS**.

     6.1.     ***Distributions Generally.***

     Except as otherwise provided in the Plan and the GUC Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

     6.2.     ***Distribution Record Date.***

     As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtors, the Plan Administrator or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.  The Distribution Record Date shall not apply to the DIP Claims and the ABL Claims, the holders of which shall receive a distribution in accordance with <u>Section 2</u> or <u>Section 4</u> of the Plan, respectively, to the extent not previously satisfied.

     6.3.     ***Date of Distributions.***

     (a)     Except as otherwise provided in the Plan and in the GUC Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on or about the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of <u>Section 4</u> of the Plan; *provided*, that the Plan Administrator or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

     (b)     (i) The Plan Administrator, shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Priority Non-Tax Claims, and Disputed Priority Tax Claims, and (ii) the GUC Trustee shall reserve an amount sufficient to pay holders of Disputed General Unsecured Claims and Disputed Environmental NPP Claims, in each case, the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  After the resolution of a Disputed Administrative Expense Claim, Disputed Secured Claim, Disputed Priority Non-Tax Claim, and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved on account of such Disputed Claim that is Disallowed or does not become an Allowed Claim as Net Cash Proceeds.

     6.4.     ***Disbursing Agent.***

     Other than as contemplated in <u>Section 6.2</u> of the Plan, all distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the

books and records of the Debtors or the Wind Down Estates, as applicable,. The Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in <u>Section 5.7</u> of the Plan.

6.5.    ***Rights and Powers of Disbursing Agent.***

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)    A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Expenses of Disbursing Agent.***

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; *provided*, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Trust Assets in accordance with the GUC Trust Agreement.

6.7.    ***No Postpetition Interest on Claims.***

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.    ***Delivery of Distributions.***

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee

unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 5.7 of the Plan.

(b)     Notwithstanding the foregoing, the following shall apply to holders of Exchange Priority Notes Claims, First Lien Notes Claims,  Legacy Notes Claims, and DIP Claims, respectively:

(i)     all distributions of Cash on account of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims, if any, shall be deposited with the Exchange Priority and First Lien Notes Trustee and Legacy Notes Trustee, as applicable, for distribution to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims in accordance with the terms of the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable. All distributions other than of Cash on account of Exchange Priority Notes Claims, First Lien Notes Claims, or Legacy Notes Claims, if any, may, with the consent of the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee, as applicable, be made by the Disbursing Agent directly to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims in accordance with the terms of the Plan, the Exchange Priority and First Lien Notes Indenture, and the Legacy Notes Indentures; *provided*, that until such distributions are made, the Trustees Charging Liens shall attach to the property to be distributed in the same manner as if such distributions were made through the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee, as applicable. To the extent the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee, as applicable, shall be deemed a "Disbursing Agent" for purposes of the Plan. As to any holder of an Exchange Priority Notes Claim, First Lien Notes Claim, or Legacy Notes Claim that is held in the name of or by a nominee of DTC, the Disbursing Agent shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable after the Effective Date.

(ii)     All distributions on account of DIP Claims, if any, shall be deposited with the DIP Agent for distribution to holders of DIP Claims in accordance with the terms of the DIP Loan Documents. To the extent the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the DIP Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

6.9.     ***Distributions after Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

6.10.     ***Unclaimed Property.***

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors, Wind-Down Estates or the GUC Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors, Wind-Down Estates or GUC Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of distribution. After such date all

49

unclaimed property or interest in property shall revert to the Wind-Down Estates or GUC Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

6.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Estates (or GUC Trust in the case of checks issued by the GUC Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Plan Administrator or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction of, and exchange for, such Allowed Claims.

6.14.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.15.    *Setoffs and Recoupments.*

The Debtors, Wind-Down Estates, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Wind-Down Estates, or GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

6.16.    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Wind-Down Estates or the GUC Trust, as applicable), distributions with respect to an Allowed Claim shall be allocated first to

50

the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 6.17. *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

## SECTION 7.   PROCEDURES FOR DISPUTED CLAIMS.

### 7.1. *Objections to Claims.*

The Plan Administrator, on behalf of each of the Wind-Down Estates, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims. The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive authority to object to all General Unsecured Claims. After the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim shall be served and filed on or before the later of (a) one hundred eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.

### 7.2. *Resolution of Disputed Claims.*

On and after the Effective Date, (a) the Plan Administrator, on behalf of each of the Wind-Down Estates, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims and Environmental NPP Claims without approval of the Bankruptcy Court. The Debtors, Wind-Down Estates, Plan Administrator and GUC Trustee, as applicable, shall cooperate with respect to any objections to Claims that seek to convert a type of Claim to another type of Claim as to which a different party or parties may compromise, settle, otherwise resolve, or withdraw objections, and, in each case, the rights and defenses of the Debtors, Wind-Down Estates, Plan Administrator or the GUC Trustee, as applicable, to any such objections are fully preserved.

### 7.3. *Payments and Distributions with Respect to Disputed Claims.*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.4. *Distributions after Allowance.*

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan or the GUC Trust Agreement, as applicable, without interest, as provided in Section 7.8 of the Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

51

7.5.    *Estimation of Claims.*

The (a) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), as applicable, may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims; and (b) GUC Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed General Unsecured Claims or Disputed Environmental NPP Claims.  The (I) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), with respect to the Claims set forth in clause (a) of this Section 7.5; and (II) GUC Trustee, with respect to General Unsecured Claims or Environmental NPP Claims, in each case, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Plan Administrator or GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

7.6.    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.7.    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.8.    *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

7.9.    *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies; *provided*, that this requirement shall not apply to Settling Governmental Authorities.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such satisfaction, the portion of such Claim so satisfied may be

52

expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

SECTION 8.     **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

      8.1.     *Rejection of Executory Contracts and Unexpired Leases.*

      (a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Section 8.4 of the Plan; or (v) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  The Debtors shall confer with the Settling Governmental Authorities, the Environmental Trustee, or the Frisco Governmental Authorities, as applicable, and exchange information and reasonably cooperate to determine the appropriate disposition of any contracts or unexpired leases that relate to the Non-Performing Properties and take appropriate action relating thereto.

      (b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Europe/ROW Purchaser or Wind-Down Estates, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Europe/ROW Purchaser or Wind-Down Estates, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

      8.2.     *Determination of Assumption Disputes and Deemed Consent.*

      (a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement, or the Frisco Settlement Agreement, as applicable, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

      (b)     The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification

53

A-0789

of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Wind-Down Estate, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Wind-Down Estates, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided*, that the Debtors or Wind-Down Estates, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Transferred Entities shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party; *provided*, *further*, that solely with respect to executory contracts and unexpired leases designated to be assumed and assigned to the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), the Debtors shall be responsible to pay the Postpetition Accounts Payable.  The Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), as applicable, may agree to be responsible for all other Cure Amounts, in each case in an amount as is determined to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party; *provided*, that in the absence of such agreement, the executory contract or unexpired lease relating to such Cure Amounts shall be deemed rejected under the Plan.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     To the extent an Assumption Dispute relates solely to the Postpetition Accounts Payable, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that pursuant to the Environmental Settlement Agreement or the Frisco Settlement Agreement, as applicable, the Debtors shall be responsible to pay the determined amount of such Postpetition Accounts Payable to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Postpetition Accounts Payable or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court

(f)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and

54

assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### 8.3.   *Rejection Damages Claims.*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 7 (General Unsecured Claims).  A proof of such Claim must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Wind-Down Estates, or the GUC Trust, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

### 8.4.   *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (i) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and Wind-Down Estates, or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (d) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by Section 7.9 of this Plan.

### 8.5.   *Intellectual Property Licenses and Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed assumed by the Debtors and the Wind-Down Estates and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to

55

a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind-Down Estates and the Europe/ROW Purchaser, as applicable, and the Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 8.6.    *Tax Agreements.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, be assumed by the Debtors, Wind-Down Estates, and Europe/ROW Purchaser, as applicable and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Wind-Down Estates or Europe/ROW Purchaser, as applicable, and Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 8.7.    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 8.8.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.9.     *Reservation of Rights.*

(a)      The Debtors may amend the Assumption Schedule and any cure notice until five (5) Business Days immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)      Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or Wind-Down Estates, or their respective affiliates have any liability thereunder.

(c)      Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and Wind Down Estates, under any executory or non-executory contract or any unexpired or expired lease.

(d)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Wind-Down Estates, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

SECTION 9.     **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

9.1.     *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)      the Definitive Documents shall be consistent with the RSA and otherwise approved by the Requisite Noteholders consistent with their respective consent and approval rights as set forth in Section 4 of the RSA;

(b)      the RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms;

(c)      the Definitive Documents shall be consistent with the Global Settlement and, to the extent the terms of a Definitive Document adversely affect the Global Settlement or treatment of the Settling Governmental Authorities thereunder, are otherwise approved by the Settling Governmental Authorities;

(d)      the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

(e)     the Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the First Lien Notes Claims, the Superpriority Notes Guarantee Claims, or the DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors, the Transferred Entities or the DIP Lenders; or (ii) supported any third party seeking standing to bring such application, adversary proceeding or cause of action;

(f)     the Debtors shall have paid or caused to be paid in Cash all Restructuring Expenses and Trustees Fees invoiced no later than one Business Day prior to the Effective Date;

(g)     all governmental approvals, including Bankruptcy Court approval, necessary to consummate the Plan and the transactions contemplated hereby shall have been obtained or otherwise waived;

(h)     (i) the Debtors (or any Person or Entity on behalf of the Debtors or their Estates with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims, or (B) limiting the Europe/ROW Purchaser's or the Trustees' right to implement the Europe/ROW Sale Transaction, or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered a Final Order providing relief against the interests of the Consenting Creditors or the Trustees with respect to any of the foregoing Causes of Action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims or (y) limiting the Consenting Creditors' or the Trustees' right to implement the Europe/ROW Sale Transaction;

(i)     (A) all agreements necessary to implement the Plan, including the Europe/ROW Sale Transaction, the Global Settlement, the Environmental Settlement Documents, the Frisco Settlement Agreement, and the Columbus NPP Termination Documents shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; *provided*, that approval of the Environmental Settlement Documents may not be waived without the consent of each of the Settling Governmental Authorities party thereto, and (B) the Debtors, the Consenting Creditors, and the Transferred Entities shall have complied with all of their respective obligations under the Environmental Settlement Documents except to the extent such obligations are expressly provided in the Environmental Settlement Documents to occur after the Effective Date;

(j)     all releases or covenants not to sue contained in the Environmental Settlement Agreement and the Frisco Settlement Agreement shall be in form and substance acceptable to the Requisite Noteholders;

(k)     notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided*, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be

deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.2.   ***Waiver of Conditions Precedent.***

(a)   Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 of the Plan other than the conditions set forth in Sections 9.1(c) and (i) may be waived in writing by the Debtors with the prior written consent of the Requisite Noteholders (and the Creditors' Committee with respect to the terms of the Global Settlement) without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.19 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors.  Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement (including those set forth in Sections 9.1(c) and (j)) shall not be waived without the prior written consent of each of the Global Settlement Parties.

(b)   The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.3.   ***Effect of Failure of Conditions to Effective Date.***

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered or if the Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

SECTION 10.   **EFFECT OF CONFIRMATION.**

10.1.   ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates acquired by the Europe/ROW Purchaser under the Europe/ROW Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Europe/ROW Purchaser; (ii) all property of the Debtors' Estates constituting GUC Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Environmental Response Trust; (iv) subject to Section 5.2(e), all property of the Debtors' Estates constituting Vernon Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Vernon Environmental Response Trust; (v) all property of the Debtors' Estates constituting Frisco Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Frisco CDC pursuant to the Frisco Settlement Agreement; and (vi) all remaining property of the Debtors' Estates shall vest in the

59

Wind-Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other Interests, subject to treatment of Other Secured Claims under the Plan.  Notwithstanding any provisions in the Plan, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC shall take the Transferred Non-Performing Properties, the Vernon Non-Performing Property (unless abandoned pursuant to Section 5.2(e)), and the Frisco Non-Performing Property, as applicable, subject to the obligations set forth in the Environmental Settlement Documents and the Frisco Settlement Agreement, as applicable.  On and after the Effective Date, the Wind-Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Wind-Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind-Down Estates may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

10.2.   ***Term of Injunctions or Stays.***

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.3.   ***Injunction.***

(a)   **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)   **Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind-Down Estates, the GUC**

60

Trust, the Consenting Creditors, the Transferred Entities, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the Frisco CDC, as applicable, or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities; or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this <u>Section 10.3</u>.

(d)     The injunctions in this <u>Section 10.3</u> shall extend to any successors of the Debtors, including the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, and their respective property and interests in property.

(e)     Notwithstanding the foregoing, nothing in this <u>Section 10.3</u> shall enjoin the assertion of a defensive right of recoupment.

10.4.   *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

10.5.   *Releases by the Debtors.*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the Wind-Down Estates, in each case, on

61

behalf of themselves and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust, and the GUC Trust, as applicable), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plan, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Definitive Documents, the Europe/ROW Sale Transaction or the Global Settlement.

10.6.   *Releases By Holders of Claims and Interests.*

As of the Effective Date, except (A) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date and (B) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following (each such Person or Entity, a "*Releasing Party*" and, collectively, the "*Releasing Parties*"):

(a)      the Consenting Creditors;

(b)      the Creditors' Committee and each of its members in their capacity as such,

(c)      all holders of Claims who vote to accept the Plan;

(d)      all holders of Claims who are deemed to accept the Plan;

(e)      all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in this **Section 10.6**;

(f)        solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims and Environmental NPP Claims, and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws; and

(g)        with respect to any Person or Entity in the foregoing clauses (a) through (f), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (f);

in each case, from any and all Claims and Causes of Action (including, without limitation, any PBGC Claims and Canada NPP Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the European Bridge Notes, the Pension Plan, the Optimization, the June 2019 Financing, any Environmental Law, the Global Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including any Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Europe/ROW Sale Transaction, or the Global Settlement.  Except as otherwise set forth in subsection (g) of this Section 10.6, the Persons and Entities in (a) through (h) of this Section 10.6 shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.6 against each of the Released Parties.

Notwithstanding anything to the contrary in this Section 10.6, Governmental Units (other than any California state governmental agency, including the California DTSC, that has jurisdiction regarding the enforcement of Environmental Laws) are not Releasing Parties under the Plan and are not providing a release or covenant not to sue except as provided in the Environmental Settlement Documents or other separate settlement document with a Governmental Unit.

10.7.    *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim

63

**arising between the Commencement Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Loan Documents; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence, or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not bar the obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan**.

        10.8.    ***Waiver of Statutory Limitation on Releases.***

        EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER <u>SECTION 10</u> OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 10</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

        10.9.    ***Solicitation of the Plan.***

        As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have previously solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under this Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

64

10.10.   *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

SECTION 11.   **RETENTION OF JURISDICTION.**

11.1.   *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)   to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)   to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)   to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)   to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

(e)   to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)   to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)   to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

65

(h)      to hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees;

(i)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, Europe/ROW Sale Transaction, any other Sale Transactions, the Global Settlement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)      to hear, adjudicate, decide, or resolve any and all matters related to <u>Section 10</u> of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to resolve disputes concerning Disputed Claims or the administration thereof;

(o)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities relating to the Frisco Non-Performing Property, pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

11.2.      ***Courts of Competent Jurisdiction.***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of

66

jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

SECTION 12.   **MISCELLANEOUS PROVISIONS.**

### 12.1. *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### 12.2. *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3. *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

### 12.4. *Amendments.*

(a)    *Plan Modifications.*  Subject to (i) the terms of the RSA and all consent rights contained therein, and (ii) the consent of the Global Settlement Parties with respect to any amendment to the Global Settlement, including the Environmental Settlement Documents, or other provisions of the Plan or Definitive Documents that impact the Global Settlement (including any amendment to the definition of Settling Governmental Authorities or Schedule 1 to this Plan), (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Noteholders (and the Global Settlement Parties, solely as it pertains to the Global Settlement), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

67

(b)      *Other Amendments*.  Subject to the terms of the RSA and, solely with respect to the terms of the Global Settlement, subject to the consent of the Global Settlement Parties, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that any change to the Environmental Settlement Documents may not be made without the written consent of the parties thereto.

### 12.5.      *Revocation or Withdrawal of the Plan.*

Subject to the terms of the RSA, the Global Settlement, the Environmental Settlement Documents and the Europe/ROW Purchase Agreement, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

### 12.6.      *Severability of Plan Provisions upon Confirmation.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Requisite Noteholders (and the Global Settlement Parties with respect to the Global Settlement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Wind-Down Estate (as the case may be); and (3) nonseverable and mutually dependent.

### 12.7.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

68

12.8. *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.9. *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtors and all holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest are authorized to prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

12.10. *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind-Down Estates, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

12.11. *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12. *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13. *Notices.*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Debtors or the Plan Administrator:

        Exide Holdings, Inc.
        13000 Deerfield Parkway
        Building 200
        Milton, GA 30004
        Attention: Roy Messing, Chief Restructuring Officer
        Telephone: (678) 566-9000

69

- and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Ray C. Schrock, P.C.
            Sunny Singh
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(ii) if to the Requisite Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Alice Belisle Eaton, Esq.
            Robert Britton, Esq.
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

(iii) if to the Creditors' Committee:

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attn:   Robert Hirsh, Esq.
            Eric Chafetz, Esq.
            Michael Kaplan, Esq.
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  September 23, 2020

By:     */s/ Roy Messing*
          Name: Roy Messing
          Title: Chief Restructuring Officer

**EXIDE HOLDINGS, INC.**
**EXIDE TECHNOLOGIES, LLC**
**EXIDE DELAWARE LLC**
**DIXIE METALS COMPANY**
**REFINED METALS COMPANY**

70

## Schedule 1

**Settling Governmental Authorities**

1.  U.S. Environmental Protection Agency
2.  State of Florida Department of Environmental Protection
3.  Georgia Environmental Protection Division of the Department of Natural Resources
4.  Indiana Department of Environmental Quality
5.  Commonwealth of Pennsylvania Department of Environmental Protection
6.  South Carolina Department of Health and Environmental Control
7.  Tennessee Attorney General & Reporter
8.  Texas Commission on Environmental Quality
9.  City of Frisco, Texas
10. Frisco Community Development Corporation
11. Illinois Environmental Protection Agency
12. Louisiana Department of Environmental Quality
13. Mississippi Department of Environmental Quality

**Schedule 2**

**Non-Performing Properties**

1. Baton Rouge Smelter
   2400 Brooklawn Drive
   Baton Rouge, Louisiana 70807

2. Bristol Former Battery Plant
   364 Exide Drive
   Bristol, Tennessee 30094

3. Columbus Battery Plant & Smelter
   3639 Joy Road
   Columbus, Georgia 31906

4. Dallas Smelter (Dixie Metals)
   3030 McGowan Street
   Dallas, Texas 75203

5. Florence Battery
   250 Ellis Street
   Florence, Mississippi 39073

6. Florence Surplus Property
   Olivia Slimon Drive
   Florence, Mississippi 39073

7. Florence (Expander)
   407 Briarhill Road
   Florence, Mississippi 39073

8. Frankfort Battery Plant
   555 Hoke Avenue
   Frankfort, Indiana 46041

9. Frisco Smelter
   7471 Old 5th Street
   Frisco, Texas 75034

10. Greer Surplus Lots
    100 Bent Creek Drive
    101 Bent Creek Drive
    103 Bent Creek Drive
    105 Bent Creek Drive
    109 Bent Creek Drive

203 Bent Creek Drive
207 Bent Creek Drive
208 Bent Creek Drive
209 Bent Creek Drive
210 Bent Creek Drive
212 Bent Creek Drive
106 Sylvan Drive
108 Sylvan Drive
110 Sylvan Drive
107 Bowers Creek Drive
110 Bowers Creek Drive
111 Bowers Creek Drive
112 Bowers Creek Drive
Greer, South Carolina 29650

11. Greer Battery Plant
    109 Chick Springs Road
    Greer, South Carolina 29650

12. Hamburg Battery Plant
    280 Grand Street
    Hamburg, Pennsylvania 19526

13. Heflin Smelter
    6952 SR-531
    Heflin, Louisiana 71039

14. Kankakee Battery Plant
    2475 West Station Street
    Kankakee, Illinois 60901

15. Logansport Battery Plant
    303 Water Street
    Logansport, Indiana 46947

16. Memphis Surplus Lots (17)
    Mallory and Castex Avenues
    Memphis, Tennessee 38109

17. Memphis Smelter
    257 W. Mallory Avenue
    Memphis, Tennessee 38109

18. Oley Property
    Bull Road
    Oley, Pennsylvania 19560

19. Reading Residential/Vacant Property
    145-147 Spring Valley Rd
    143 Spring Valley Rd
    127 Spring Valley Rd
    129 Spring Valley Rd
    131 Spring Valley Rd
    258 Spring Valley Rd
    260 Spring Valley Rd
    Vacant Land - Isabelle Ct & Josephine Drive
    Reading, Pennsylvania 19605

20. Reading Recycling Plant
    3000 Montrose Avenue
    Reading, Pennsylvania 19605

21. Tampa  Smelter
    3507 S. 50th Street
    Tampa, Florida 33619

22. Vernon Smelter
    2700 S. Indiana Street
    Los Angeles, California 90023

**Schedule 3**

**Transferred Entities**

1.  Exide International Holdings LP
2.  Exide International Holdings GP LLC
3.  Exide Holding Europe S.A.S.
4.  Exide Technologies (Shanghai) Company Limited
5.  Exide Australia Pty Limited Australia
6.  Exide Technologies GmbH
7.  Exide Technologies BVBA
8.  Exide Technologies A/S
9.  Exide Technologies Oy
10. Exide Technologies S.A.S.
11. Exide Technologies GmbH (includes a Switzerland branch)
12. Exide Technologies Operations GmbH & Co. KG
13. HAGEN Batterie AG
14. GNB Technologies (China) Limited
15. GNB Technologies (India) Private Limited
16. Tudor India Private Limited
17. Exide Technologies S.r.l.
18. Coöperatie Exide Europe U.A.
19. Exide Global Holding Netherlands C.V.
20. Exide Holding Netherlands B.V.
21. Exide Technologies B.V.
22. Exide Technologies Limited
23. Exide Technologies AS
24. Exide Technologies S.A.
25. Exide Technologies SSC sp. z o.o.
26. Exide Technologies, Lda.
27. Exide Technologies Recycling II, Lda.
28. G.V.B. – Gestão e Valorização de Baterias, Lda.
29. Exide Technologies LLC
30. Exide Singapore Pte Limited
31. Exide Holding Asia Pte Limited
32. Exide Technologies Recycling S.L.U.
33. Exide Technologies S.L.U.
34. Exide Transportation Holding Europe S.L.U.
35. Exide Technologies AB
36. GNB Batteries Trading MEA LLC
37. CMP Batteries Pension Limited
38. Euro Exide Corporation Limited
39. Exide Technologies (Transportation) Limited
40. GNB Industrial Power (UK) Limited
41. EH International, LLC

# **TAB 15**

**Order Approving Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee [Bankr. D.I. 878]**

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:

EXIDE HOLDINGS, INC., *et al*.,

                              Debtors.[1]

-------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 20-11157 (CSS)

(Jointly Administered)

Re: Docket Nos. 350, 789, 808 & 840

## ORDER APPROVING STIPULATION AND AGREEMENT TO FURTHER EXTEND CHALLENGE DEADLINE FOR GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE

The Court having considered the *Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee*, a copy of which is attached hereto as **Exhibit 1** (the "Stipulation"),[2] between the Parties; the Court having determined that no further notice of the Stipulation must be given; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED THAT**:

1.      The Stipulation is APPROVED.

2.      The Challenge Deadline is hereby extended to October 1, 2020 solely for the Governmental Authorities who are signatories to the Stipulation and the Creditors' Committee.

3.      Nothing herein shall preclude any of the Governmental Authorities who are signatories to the Stipulation or the Creditors' Committee from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order nor shall any provision of this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms that are used herein and not otherwise defined shall have the meanings given to the them in the Stipulation

Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities who are signatories to the Stipulation seek further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

4.      This Court shall retain jurisdiction with respect to all matters arising under or related to this Order and to interpret, implement, and enforce the provisions of this Order.

**Dated: September 24th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**Stipulation**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re:                                              :   Chapter 11
                                                    :
                                                    :   Case No. 20-11157 (CSS)
EXIDE HOLDINGS, INC., *et al.*,                     :
                                                    :   (Jointly Administered)
                                Debtors.[1]          :
                                                    :   Re: Docket Nos. 350, 789 & 808
                                                    :

---------------------------------------------------------- x

**STIPULATION AND AGREEMENT TO FURTHER**
**EXTEND CHALLENGE DEADLINE FOR**
**GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE[2]**

The Debtors, the Consenting Creditors, the Creditors' Committee, and the United States

on behalf of the Environmental Protection Agency and the California Department of Toxic

Substances Control, the Georgia Environmental Protection Division of the Department of Natural

Resources, Indiana Attorney General, Louisiana Department of Environmental Quality,

Mississippi Department of Environmental Quality, Commonwealth of Pennsylvania Department

of Environmental Protection, South Carolina Department of Health and Environmental Control,

Tennessee Attorney General & Reporter, and Texas Commission on Environmental Quality

(collectively, the "Governmental Authorities" and, together with the Debtors, the Creditors'

Committee and the Consenting Creditors, the "Parties"), through their respective counsel enter

into this *Stipulation and Agreement to Further Extend Challenge Deadline for the Governmental*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, Inc. (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 350] (the "Final DIP Order").

*Authorities and Creditors' Committee* (the "Stipulation") and hereby stipulate and agree as follows:

1.      The Parties agree and stipulate, in accordance with paragraph 25(e) of the Final DIP Order, that the Challenge Deadline is hereby further extended from September 24, 2020 to October 1, 2020 solely for the Governmental Authorities and the Creditors' Committee.

2.      Nothing herein shall preclude any of the Governmental Authorities or the Creditors' Committee from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order, nor shall any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities seek such further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

3.      The Parties have agreed that pursuant to the DIP Order the extension of the Challenge Deadline is effective between the Parties on the terms set forth herein without entry of the Order.

[SIGNATURE PAGES FOLLOW]

2

Dated: September 23, 2020
     Wilmington, Delaware

Respectfully submitted,

/s/ Eugene Y. Park

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
Ian J. Bambrick (No. 5455)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (302) 571-1253
Email: pmorgan@ycst.com
sgreecher@ycst.com
amagaziner@ycst.com
ibambrick@ycst.com

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alice Belisle Eaton (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
William A. Clareman (admitted *pro hac vice*)
David Giller (admitted *pro hac vice*)
Eugene Y. Park (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: aeaton@paulweiss.com
rbritton@paulweiss.com
wclareman@paulweiss.com
dgiller@paulweiss.com
epark@paulweiss.com

*Counsel for the Ad Hoc Committee*

/s/ Megan E. Kenney

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
Megan E. Kenney (No. 6426)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Jacqueline Marcus (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

3

*/s/ Eric S. Chafetz*
POTTER ANDERSON & CORROON LLP
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail: csamis@potteranderson.com
kgood@potteranderson.com
astulman@potteranderson.com

– and –

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Robert M. Hirsh, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, New York, 10020
Telephone: (212) 262-6700
E-mail: krosen@lowenstein.com
rhirsh@lowenstein.com
echafetz@lowenstein.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

By: */s/Matthew C. Indrisano*
MATTHEW C. INDRISANO
Trial Attorney
Email: matthew.indrisano@usdoj.gov
Telephone: (202) 514-1398
United States Department of Justice
Environment and Natural Resources
Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station

4

Washington, D.C. 20044

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Email: alan.tenenbaum@usdoj.gov
Telephone: (202) 514-5409

ERIC D. ALBERT
Senior Attorney
Email: eric.albert@usdoj.gov
Telephone: (202) 514-2800

JAMES D. FREEMAN
Senior Attorney
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Email: James.Freeman2@usdoj.gov

5

THE CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL
By: */s/ James R. Potter*
JAMES R. POTTER
California State Bar No. 166992
ANTHONY A. AUSTIN
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Tel.: 213-369-6326
Email: James.Potter@doj.ca.gov
XAVIER BECERRA
Attorney General of California
EDWARD A. OCHOA
Senior Assistant Attorney General
JAMES R. POTTER
Deputy Attorney General

GEORGIA ENVIRONMENTAL
PROTECTION DIVISION OF THE
DEPARTMENT OF NATURAL
RESOURCES
By: */s/Whitney Groff*
Whitney Groff (Ga. Bar No. 738079)
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-3338
Fax: (404) 657-3239
Email: wgroff@law.ga.gov

ATTORNEY GENERAL OF INDIANA
By: */s/Heather M. Crockett*
HEATHER M. CROCKETT
Deputy Attorney General
Office of Indiana Attorney General
Indiana Government Center South,
Fifth Floor
302 W. Washington Street
Indianapolis, Indiana 46204-2794
Telephone: (317) 233-6254
Fax: (317) 232-7979
hcrockett@atg.in.gov

OFFICE OF THE SECRETARY, LEGAL
AFFAIRS DIVISION LOUISIANA
DEPARTMENT OF ENVIRONMENTAL
QUALITY
By: */s/Dwayne M. Murray*
Dwayne M. Murray, LA Bar #18658
*Bankruptcy Counsel to LDEQ*
Murray & Murray, LLC
4970 Bluebonnet Blvd, Suite B
Baton Rouge, LA 70809
225-925-1110
225-925-1116
dmm@murraylaw.net

-and-

Oscar Magee, Attorney
(La. Bar # 32302)
Dwana C. King, Deputy General Counsel
(La. Bar #20590)
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: 225.219.3985
Fax: 225.219.4068
oscar.magee@la.gov
dwana.king@la.gov

MISSISSIPPI DEPT. OF
ENVIRONMENTAL QUALITY
By: */s/Theodore Lampton*
THEODORE LAMPTON
MS Bar No. 101199
Senior Attorney
Mississippi Department of
Environmental Quality
P.O. Box 2261
Jackson, MS 39225-2261
Phone: (601) 961-5573
tlampton@mdeq.ms.gov

6

THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:
By: */s/Vera N. Kanova*
VERA N. KANOVA, Assistant Counsel
PA ID No. 316676
Office of Chief Counsel
400 Market Street
Harrisburg, PA 17101-2063
Telephone: 717-787-9370
Email: verkanova@pa.gov

SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL:
By: */s/Sara V. Martinez*
SARA V. MARTINEZ
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.0288
Email: martinsv@dhec.sc.gov
JACQUELYN S. DICKMAN
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.03350
Email: dickmajs@dhec.sc.gov
D. CLAY ROBINSON
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.3369
Email: robinsdc@dhec.sc.gov

TENNESSEE ATTORNEY GENERAL &
REPORTER HERBERT H. SLATERY III
By: */s/Laura L. McCloud*
LAURA L. MCCLOUD (#16206)
Senior Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-8933
Attorneys for TDEC

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY
By: */s/Abigail R. Ryan*
ABIGAIL R. RYAN
Texas State Bar No. 240359569
JASON B. BINFORD
Texas State Bar No. 24045499
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
jason.binford@oag.texas.gov
KEN PAXTON
Attorney General of Texas
JEFFREY C. MATEER
First Assistant Attorney General
RYAN L. BANGERT
Deputy First Assistant Attorney General
DARREN L. MCCARTY
Deputy Attorney General for Civil
Litigation
RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

7

# __TAB 16__

**Order Approving Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee, dated Oct. 1, 2020 [Bankr. D.I. 900] (together with Bankr. D.I. 789, 808, 840, and 878)**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------- x

In re:                                                  :    Chapter 11
                                                        :
EXIDE HOLDINGS, INC., *et al.*,                         :    Case No. 20-11157 (CSS)
                                                        :
                                    Debtors.[1]         :    (Jointly Administered)
                                                        :
                                                        :    Re: Docket Nos. 350, 789, 808, 840 & 878

---------------------------------------------------------- x

**ORDER APPROVING STIPULATION AND**
**AGREEMENT TO FURTHER EXTEND CHALLENGE DEADLINE FOR**
**GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE**

The Court having considered the *Stipulation and Agreement to Further Extend Challenge Deadline for Governmental Authorities and Creditors' Committee*, a copy of which is attached hereto as **Exhibit 1** (the "Stipulation"),[2] between the Parties; the Court having determined that no further notice of the Stipulation must be given; and after due deliberation and sufficient cause appearing therefor, it is **ORDERED THAT**:

1. The Stipulation is APPROVED.

2. The Challenge Deadline is hereby extended to October 8, 2020 solely for the Governmental Authorities who are signatories to the Stipulation and the Creditors' Committee.

3. Nothing herein shall preclude any of the Governmental Authorities who are signatories to the Stipulation or the Creditors' Committee from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order nor shall any provision of this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms that are used herein and not otherwise defined shall have the meanings given to the them in the Stipulation.

Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities who are signatories to the Stipulation seek further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

4.      This Court shall retain jurisdiction with respect to all matters arising under or related to this Order and to interpret, implement, and enforce the provisions of this Order.

**Dated: October 1st, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**Stipulation**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------ x

In re:                                                 : Chapter 11
                                                       :
                                                       :
EXIDE HOLDINGS, INC., *et al.*,                        : Case No. 20-11157 (CSS)
                                                       :
                                                       : (Jointly Administered)
                                Debtors.[1]            :
                                                       : Re: Docket Nos. 350, 789, 808, 840 & 878
                                                       :
------------------------------------------------------------ x

**STIPULATION AND AGREEMENT TO FURTHER**
**EXTEND CHALLENGE DEADLINE FOR**
**GOVERNMENTAL AUTHORITIES AND CREDITORS' COMMITTEE[2]**

The Debtors, the Consenting Creditors, the Creditors' Committee, and the United States

on behalf of the Environmental Protection Agency and the California Department of Toxic

Substances Control, the Georgia Environmental Protection Division of the Department of Natural

Resources, Indiana Attorney General, Louisiana Department of Environmental Quality,

Mississippi Department of Environmental Quality, Commonwealth of Pennsylvania Department

of Environmental Protection, South Carolina Department of Health and Environmental Control,

Tennessee Attorney General & Reporter, and Texas Commission on Environmental Quality

(collectively, the "Governmental Authorities" and, together with the Debtors, the Creditors'

Committee and the Consenting Creditors, the "Parties"), through their respective counsel enter

into this *Stipulation and Agreement to Further Extend Challenge Deadline for the Governmental*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 350] (the "Final DIP Order").

*Authorities and Creditors' Committee* (the "Stipulation") and hereby stipulate and agree as follows:

1.    The Parties agree and stipulate, in accordance with paragraph 25(e) of the Final DIP Order, that the Challenge Deadline is hereby further extended from October 1, 2020 to October 8, 2020 solely for the Governmental Authorities and the Creditors' Committee.

2.    Nothing herein shall preclude any of the Governmental Authorities or the Creditors' Committee from seeking further extensions of the Challenge Deadline for cause as provided in the Final DIP Order, nor shall any provision of this Stipulation modify or abridge any application of the Bankruptcy Code and Bankruptcy Rules (including Local Rule 9006-2) to any such request for further extensions of the Challenge Deadline. To the extent any of the Governmental Authorities seek such further extensions of the Challenge Deadline, nothing herein shall prevent or preclude any Party from opposing such request.

3.    The Parties have agreed that pursuant to the DIP Order the extension of the Challenge Deadline is effective between the Parties on the terms set forth herein without entry of the Order.

[SIGNATURE PAGES FOLLOW]

Dated: September 30, 2020    Respectfully submitted,
   Wilmington, Delaware

| | |
|---|---|
| */s/ Eugene Y. Park* | */s/ Megan E. Kenney* |

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
Ian J. Bambrick (No. 5455)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel: (302) 571-6600
Fax: (302) 571-1253
Email: pmorgan@ycst.com
sgreecher@ycst.com
amagaziner@ycst.com
ibambrick@ycst.com

-and-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alice Belisle Eaton (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
William A. Clareman (admitted *pro hac vice*)
David Giller (admitted *pro hac vice*)
Eugene Y. Park (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: aeaton@paulweiss.com
rbritton@paulweiss.com
wclareman@paulweiss.com
dgiller@paulweiss.com
epark@paulweiss.com

*Counsel for the Ad Hoc Committee*

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Brendan J. Schlauch (No. 6115)
Megan E. Kenney (No. 6426)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Jacqueline Marcus (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors
and Debtors in Possession*

*/s/ Eric S. Chafetz*
POTTER ANDERSON & CORROON LLP
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail: csamis@potteranderson.com
kgood@potteranderson.com
astulman@potteranderson.com

– and –

LOWENSTEIN SANDLER LLP
Kenneth A. Rosen, Esq.
Robert M. Hirsh, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, New York, 10020
Telephone: (212) 262-6700
E-mail: krosen@lowenstein.com
rhirsh@lowenstein.com
echafetz@lowenstein.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

UNITED STATES ON BEHALF OF
U.S. ENVIRONMENTAL PROTECTION
AGENCY:

By: */s/Matthew C. Indrisano*
MATTHEW C. INDRISANO
Trial Attorney
Email: matthew.indrisano@usdoj.gov
Telephone: (202) 514-1398
United States Department of Justice
Environment and Natural Resources
Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division
United States Department of Justice

ALAN S. TENENBAUM
National Bankruptcy Coordinator
Email: alan.tenenbaum@usdoj.gov
Telephone: (202) 514-5409

ERIC D. ALBERT
Senior Attorney
Email: eric.albert@usdoj.gov
Telephone: (202) 514-2800

JAMES D. FREEMAN
Senior Attorney
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Email: James.Freeman2@usdoj.gov

THE CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL
By: */s/ James R. Potter*
JAMES R. POTTER
California State Bar No. 166992
ANTHONY A. AUSTIN
Deputy Attorneys General
1300 I Street, Suite 125
Sacramento, CA 95814
Tel.: 213-369-6326
Email: James.Potter@doj.ca.gov
XAVIER BECERRA
Attorney General of California
EDWARD A. OCHOA
Senior Assistant Attorney General
JAMES R. POTTER
Deputy Attorney General


GEORGIA ENVIRONMENTAL
PROTECTION DIVISION OF THE
DEPARTMENT OF NATURAL
RESOURCES
By: */s/Whitney Groff*
Whitney Groff (Ga. Bar No. 738079)
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-3338
Fax: (404) 657-3239
Email: wgroff@law.ga.gov


ATTORNEY GENERAL OF INDIANA
By: */s/Heather M. Crockett*
HEATHER M. CROCKETT
Deputy Attorney General
Office of Indiana Attorney General
Indiana Government Center South,
Fifth Floor
302 W. Washington Street
Indianapolis, Indiana 46204-2794
Telephone: (317) 233-6254
Fax: (317) 232-7979
hcrockett@atg.in.gov

OFFICE OF THE SECRETARY, LEGAL
AFFAIRS DIVISION LOUISIANA
DEPARTMENT OF ENVIRONMENTAL
QUALITY
By: */s/Dwayne M. Murray*
Dwayne M. Murray, LA Bar #18658
*Bankruptcy Counsel to LDEQ*
Murray & Murray, LLC
4970 Bluebonnet Blvd, Suite B
Baton Rouge, LA 70809
225-925-1110
225-925-1116
dmm@murraylaw.net


-and-


Oscar Magee, Attorney
(La. Bar # 32302)
Dwana C. King, Deputy General Counsel
(La. Bar #20590)
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: 225.219.3985
Fax: 225.219.4068
oscar.magee@la.gov
dwana.king@la.gov


MISSISSIPPI DEPT. OF
ENVIRONMENTAL QUALITY
By: */s/Theodore Lampton*
THEODORE LAMPTON
MS Bar No. 101199
Senior Attorney
Mississippi Department of
Environmental Quality
P.O. Box 2261
Jackson, MS 39225-2261
Phone: (601) 961-5573
tlampton@mdeq.ms.gov

5

THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:
By: */s/Vera N. Kanova*
VERA N. KANOVA, Assistant Counsel
PA ID No. 316676
Office of Chief Counsel
400 Market Street
Harrisburg, PA 17101-2063
Telephone: 717-787-9370
Email: verkanova@pa.gov

SOUTH CAROLINA DEPARTMENT OF
HEALTH AND ENVIRONMENTAL
CONTROL:
By: */s/Sara V. Martinez*
SARA V. MARTINEZ
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.0288
Email: martinsv@dhec.sc.gov
JACQUELYN S. DICKMAN
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.03350
Email: dickmajs@dhec.sc.gov
D. CLAY ROBINSON
South Carolina Department of Health
and Environmental Control
2600 Bull Street
Columbia, South Carolina 29201
Phone: 803.898.3369
Email: robinsdc@dhec.sc.gov

TENNESSEE ATTORNEY GENERAL &
REPORTER HERBERT H. SLATERY III
By: */s/Laura L. McCloud*
LAURA L. MCCLOUD (#16206)
Senior Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-8933
Attorneys for TDEC

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY
By: */s/Abigail R. Ryan*
ABIGAIL R. RYAN
Texas State Bar No. 240359569
JASON B. BINFORD
Texas State Bar No. 24045499
Assistant Attorneys General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
abigail.ryan@oag.texas.gov
jason.binford@oag.texas.gov
KEN PAXTON
Attorney General of Texas
JEFFREY C. MATEER
First Assistant Attorney General
RYAN L. BANGERT
Deputy First Assistant Attorney General
DARREN L. MCCARTY
Deputy Attorney General for Civil
Litigation
RACHEL R. OBALDO
Assistant Attorney General
Chief, Bankruptcy & Collections Division

# **<u>TAB 17</u>**

**California Department of Toxic Substances Control's
Preliminary Objection to Confirmation of Second Amended
Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated
Debtors, dated Oct. 7, 2020 [Bankr. D.I. 917] *excluding exhibits**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x

In re:

EXIDE HOLDINGS, INC., *et al.*,

                Debtors.[1]

Chapter 11

Case No. 20-11157 (CSS)

(Jointly Administered)

**Re: Docket Nos. 871**

**Objection Deadline: October 7, 2020 at 4:00 p.m.**

**Hearing Date: October 15, 2020 at 11:00 a.m.**

-------------------------------------------------------- x

**CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S**
**PRELIMINARY OBJECTION TO CONFIRMATION OF**
**SECOND AMENDED JOINT CHAPTER 11 PLAN OF EXIDE**
**HOLDINGS, INC. AND ITS AFFILIATED DEBTORS [DOCKET NO. 871][2]**

The California Department of Toxic Substances Control ("DTSC") hereby files this preliminary objection (the "Objection") to confirmation of the *Second Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 871] or any subsequently amended version thereof (the "Plan")[3] as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] DTSC is required by the schedule to file this Objection before the Debtors have filed any evidence in support of confirmation of the Plan or any motion or other pleading setting forth their case for abandoning the Vernon Plant. In addition, discovery is ongoing and DTSC has had no opportunity to take any depositions. As a result, DTSC is filing this as a preliminary objection and reserves all of its rights to supplement this Objection.

[3] Capitalized terms used but not otherwise herein shall have the meanings ascribed to such terms in the respective First Day Pleadings.

### SUMMARY OF OBJECTIONS

1.     The Debtors' long-standing indifference to the environmental impact of their operations in California—and the catastrophic effect of that disregard on the surrounding communities—is a matter of public record. Exide's facility in Vernon, CA (the "Vernon Plant") spewed lead and other powerful neurotoxins throughout six southeast Los Angeles communities for years, including onto schools, parks and thousands of homes in working-class, primarily Latino neighborhoods. Although the Vernon Plant is closed, it remains highly contaminated and an ongoing daily risk to those same neighborhoods. *See Declaration of Grant Cope in Support of the California Department of Toxic Substances Control's Objections to Debtors' Second Amended Joint Chapter 11 Plan*, filed contemporaneously herewith ("Cope Decl.") ¶¶ 5–6. DTSC believes the remaining contamination at the Vernon Plant—in particular loose lead dust—poses an imminent and substantial danger to public health and the environment because the site requires daily lead-containment maintenance to protect surrounding communities, and will require such daily maintenance indefinitely unless and until the contamination is removed. *Id.* at ¶¶ 19, 29-39.

2.     Despite extensive negotiations, aided by skillful mediators, the Debtors (and the well-heeled entities controlling the Debtors' capital structure and acquiring the Debtors' most profitable assets) refused to address or provide any meaningful reconciliation for the Debtors' decades of wanton environmental damage. Worse, they now propose a potential outcome wherein the Vernon Plant could be abandoned—effectively orphaned onto the backs of the very same surrounding residents that have already suffered from the Plant—with insufficient funding to even make the site safe, while the Consenting Creditors hive off the Debtors' valuable assets and reap the benefit of non-consensual releases that believe make them untouchable for the damage.

3.      The Debtors' responsibility for the damage to California is inarguable. On March 11, 2015, the United States Attorney's Office for the Central District of California ("USAO") and Exide Technologies entered into a Non-Prosecution Agreement (the "Non-Prosecution Agreement") that required the Exide Technologies to immediately and forever close the Vernon Plant and to pay $50 million to clean up the site and surrounding neighborhoods.[4] Exide admitted committing felony violations of the hazardous waste laws and acknowledged responsibility for its criminal conduct. Exide also admitted that the Vernon Plant produced a host of hazardous wastes, including lead, cadmium, arsenic and volatile organic compounds. The Non-Prosecution Agreement required Exide to immediately stop operations and begin the closure process for the Vernon Plant, including demolition and cleanup of the site. The Debtors failed to meet their obligations under the Non-Prosecution Agreement.

4.      In late 2017, the Debtors began a Phase 1 Closure of the Vernon Plant. To facilitate the Phase 1 Closure, a temporary structure called the Full Enclosure Unit (the "FEU"), consisting of scaffolding, trusses, and a polyethylene barrier, was erected around the Debtors' main operation building to allow the safe decontamination and deconstruction of that building. The FEU is a structure built specifically to be deconstructed and reconstructed so systematic demolition can occur for different portions of that building. *See* Cope Decl. ¶ 30. Without the FEU and its associated air pollution control devices and monitoring equipment, there would be releases and migration of dust containing extremely high levels of lead and other metals. *Id.* The FEU system is not a permanent solution to the danger posed by the Vernon Plant. It reportedly costs hundreds of thousands of dollars per month to rent and requires daily operation, maintenance, inspections,

---

[4] A copy of the Non-Prosecution Agreement is available at https://documents.latimes.com/exide-non-prosecution-agreement/ *See also* https://www.justice.gov/usao-cdca/pr/exide-technologies-admits-role-major-hazardous-waste-case-and-agrees-permanently-close.

and monitoring to ensure hazardous materials do not escape the Vernon Plant and further contaminate the surrounding communities.

5.      The Debtors have not advanced this Phase 1 Closure plan sufficiently to avoid the ongoing need for the transitional solution of installing the FEU, therefore, the ongoing daily risk of release or discharge of lead remains. *Id.* at ¶29. Instead, on March 21, 2020, the Debtors cited the COVID-19 pandemic as a reason to discontinue all active closure work, claiming a *force majeure. Id.* at ¶24. Thereafter, Exide continued only the minimum tasks required to prevent additional releases at the Vernon Plant. *Id.* Meanwhile, the FEU and other equipment at the Vernon Plant continue to degrade. On April 20, 2020, DTSC directed the Debtors to resume their closure activities but on April 22, 2020, the Debtors reasserted their position that COVID-19 constituted a *force majeure*. On July 3, 2020, DTSC again directed the Debtors to restart their closure work, refuted the *force majeure* claim, and described in detail why neither the COVID-19 pandemic nor these Chapter 11 Cases constituted sufficient cause to halt the closure and corrective action at the Vernon Plant. The Debtors again ignored DTSC's direction, choosing instead to allow the imminent and identifiable harm to the citizens that live and work in the surrounding areas to continue. *Id.*

6.      The Debtors' position is particularly egregious because they know that the FEU is a temporary structure not designed to be the sole barrier between the highly contaminated areas inside the FEU and the local communities. Large amounts of highly noxious dirt and debris remain precariously protected by the FEU. *See* Cope Decl. at ¶¶ 17, 19, 21-23, 29-39.  As each day passes, the likelihood that the FEU fails increases—with the risk of failure exacerbated by both high summer temperatures and the extreme Santa Ana winds that typically occur in the fall. *Id.* at ¶30. The FEU has already torn and ripped on a number of occasions, resulting in violations cited by

DTSC and other regulatory authorities. *Id.* at ¶¶ 21-22. A catastrophic failure of the FEU would cause high levels of contaminated dust to escape, further harming the communities near the Vernon Plant. *Id.* at ¶ 31.

7.      Against that backdrop, the Debtors have proposed a patently unconfirmable plan that (i) does not address or relieve the imminent and identifiable harm to the communities surrounding the Vernon Plant; (ii) includes provisions that, if not satisfied, improperly and impermissibly cause the Vernon property to be deemed abandoned to Exide Technologies, LLC; (iii) inappropriately conditions the Plan's woefully insufficient distribution to California on the Bankruptcy Court's approval of impermissible non-consensual third-party releases; (iv) transfers the Debtors' profitable operations to their secured creditors (and major equity holders) in what amounts to a foreclosure sale; (v) provides for extensive unwarranted releases, injunctions, and exculpations; and (vi) fails to satisfy numerous provisions of section 1129 of the Bankruptcy Code.

8.      The Plan effectively foists all of the risk and costs of the Vernon Plant onto the shoulders of Californians and would allow the parties most responsible to walk away from an imminent and substantial public health risk with broad and full releases. Incredibly, the Plan seeks to "death trap" the Bankruptcy Court by conditioning DTSC's releases on whether the Debtors can meet their legal burden for the granting of non-consensual third party releases. The Plan is not confirmable by this Bankruptcy Court.

## **BACKGROUND**

A.      **Overview of Plan Process.**

9.      It was clear from the outset of these Chapter 11 Cases that the Debtors would not emerge as a reorganized business and would instead liquidate their estates. Disclosure Statement at 4. The Debtors' estates include a number of highly contaminated properties and, on the

Commencement Date, the Debtors filed the *Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, if Necessary* [Docket No. 37] (the "Settlement Procedures Motion"). On June 9, 2020, the Bankruptcy Court entered an order (the "Settlement Procedures Order") granting the Settlement Procedures Motion. *Id.*

10.    Pursuant to the Settlement Procedures Order, the Debtors, the Settling Governmental Authorities, DTSC, the Frisco Governmental Authorities, the Environmental Sureties, the Creditors Committee, and the Consenting Creditors engaged in good-faith and arm's-length negotiations to resolve the issues related to the Chapter 11 Cases. In early July 2020, the Debtors, the Settling Governmental Authorities, and DTSC engaged in a global mediation process that involved the participation of the Global Settlement Parties. *Id.* at 4-5.

11.    On July 28, 2020, the mediators filed the *Mediators' Final Certificate of Completion File Pursuant to Order Granting Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary* [Docket No. 622], and on July 29, 2020, the Mediators filed the *Clarification to Mediators' Final Certificate of Completion Filed Pursuant to Order Granting Motion of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* [Docket No. 636] (the "Mediators' Revised Certificate of Completion"). *Id.* at 5. In the Mediators' Revised Certificate of Completion, the mediators announced the Global Settlement Parties and DTSC had accepted the Mediators' Proposal (as defined therein) and agreed to "recommend [the Mediators' Proposal] and commit to pursuing approvals [from those with authority] pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable." Mediators' Revised

Certificate of Completion at ¶4.

12.     All of the parties involved in the mediation understood that the Mediators' Proposal was subject to agreement on definitive documentation and approval of the parties with authority for certain of the Settling Governmental Authorities. The Debtors understood that, in the case of DTSC, the proposed settlement required the approval the Secretary of the California Environmental Protection Agency among others. Rather than wait for the approvals from those with authority, the Debtors instead filed the *Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* [Docket No. 742] (the "Initial Plan") and the Disclosure Statement on August 14, 2020. Absent the Global Settlement, the Initial Plan was not confirmable.

13.     DTSC understood that that Debtors would only proceed with the Initial Plan if all of the Settling Governmental Authorities (including DTSC) obtained approval of the proposed settled and negotiated specific provisions of the Initial Plan evidencing that understanding. DTSC and the other Settling Governmental Authorities also took steps to assure that their rights were preserved in the event the settlement was not completed as evidenced by the negotiation of a clawback in the Americas Sale Order and the multiple extensions of the Challenge Period. See Docket Nos. 789, 808, 840, 878, and 900.

14.     DTSC, the Debtors, and other Global Settlement Parties engaged in significant negotiation and discussion of the settlement documents. Those negotiations, and the subsequent approval process, lasted for approximately a month and a half. Ultimately, DTSC rejected the settlement on September 18, 2020.

15.     The Debtors, hastily converted the Initial Plan into the Plan, and requested the Bankruptcy Court expeditiously confirm the Plan. The Debtors did not (i) file a motion seeking abandonment or present their case in support of abandonment, (ii) provide any evidence in support

of confirmation of the Plan, (iii) provide DTSC with a meaningful opportunity to challenge the Plan, (iv) modify their Disclosure Statement to reflect the terms the Plan or (v) otherwise follow even basic procedure. Instead, the Debtors—and their controlling Consenting Creditors—clearly intend to try to use the confirmation process to deprive DTSC of basic procedural fairness and force through an unconfirmable Plan.  And, they are asking the Court to be complicit in that plan.

**B.**     **Summary of Provisions of Plan Applicable to DTSC.**

16.     The Plan classifies Environmental NPP Claims in Class 8. Environmental NPP Claims include both DTSC's claims (referred to as Vernon NPP Claims) and all other Environmental NPP Claims (those of the Settling Governmental Agencies). Section 4.8(b)(i)(A) of the Plan provides that a holder of Environmental NPP Claim (other than DTSC) receives beneficial interests in the Environmental Response Trust. The Environmental Response Trust is established in accordance with the Environmental Settlement Documents and vested with: (a) $7,412,477 in Cash, (b) the contributions by Westchester in accordance with the terms of the Environmental Trust Agreements, with respect to the Transferred Non-Performing Properties, (c) the Transferred Non-Performing Properties or any proceeds thereof to the extent a Transferred Non-Performing Property is sold prior to the Effective Date, and (d) the Environmental Trust Causes of Action related to the Transferred Non-Performing Properties. The Environmental Settlement Documents provide that, in certain circumstances, holders of Environmental NPP Claims (other than DTSC) can share in the residual value of any of the Transferred Non-Performing Properties after cleanup obligations are satisfied.

17.     By contrast, Section 4.8(b)(i) of the Plan enumerates three alternative treatments of Environmental NPP Claims held by parties that are not Global Settlement Parties, which is only DTSC. The treatment of DTSC's claims is dependent upon the satisfaction of two conditions: (i)

the Payment Condition (which requires the Bankruptcy Court to impose a non-consensual discharge and release of the Debtors and numerous third parties, as set forth in Section 10.6 of the Plan, on all California state agencies, including DTSC, that have jurisdiction regarding the enforcement of Environmental Laws) and (ii) the Vernon Trust Condition (which requires DTSC to reach an agreement with the Vernon Environmental Trustee that contains, among other things covenants not to sue in favor of the Transferred Entities). The satisfaction (or not) of these two conditions dictates the treatment provided on account of Environmental NPP Claims held by DTSC.

18.  Specifically, the Plan provides for three alternate scenarios:

i.  <u>Scenario 1</u>: If the Payment Condition and the Vernon Trust Condition are both satisfied, DTSC will receive beneficial interests in the Vernon Environmental Trust. The Vernon Environmental Trust is established in accordance with the Environmental Settlement Documents and vested with (a) $2,587,523 in Cash, (b) the Vernon Non-Performing Property or any proceeds thereof to the extent the Vernon Non-Performing Property is sold prior to the Effective Date, and (c) the Vernon Environmental Trust Causes of Action;

ii.  <u>Scenario 2</u>: If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, then the Vernon Plant is abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens and the Vernon Global Settlement Payment is paid to the Vernon Standby Trust; or

iii.  <u>Scenario 3</u>: If the Payment Condition is not satisfied, then the Vernon Global Settlement Payment is not paid and the Vernon Plant is abandoned to Exide Technologies, LLC on the Effective Date subject to a first priority lien in favor of DTSC.

19.  The Plan also provides that any Vernon NPP Claims against the Debtors shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. Plan at §5.2(e).

20.  Finally, the Plan includes releases applicable to DTSC in Sections 10.5 and 10.6 that are far broader and more burdensome than those agreed to by the Settling Governmental Authorities in the Environmental Settlement Agreement. The chart below (the "<u>Release Chart</u>")

summarizes the disparity in the various release sections:

| **Issue** | **Plan (DTSC only)** | **Environmental Settlement Agreement (Environmental Agencies Outside California)** |
|---|---|---|
| Identity of Releasing Parties | Releasing Parties under the Plan are broad and include:<br><br>■ "all California state governmental agencies, including [DTSC], that have jurisdiction regarding the enforcement of Environmental Laws" Plan §10.6(f).<br><br>■ "such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Person or Entity solely with respect to the matters for which the Releasing Parties are providing releases . . ." Plan §10.6(g). | Releasing Parties under Environmental Settlement Agreement are limited to:<br><br>■ the Department of Justice on behalf of the U.S. Environmental Protection Agency (and any successor department or agencies of the United States).<br><br>■ only the specified Settling Governmental Authorities. |
| Identity of Released Parties | The scope of the parties being released pursuant to the Plan is broad and includes parties not listed in the Environmental Settlement Agreement, including:<br><br>■ DIP Lenders<br>■ DIP Agent<br>■ Creditors' Committee and its members<br>■ A broader definition of "Related Parties" (discussed below) Plan §§1.172, 10.5, 10.6 | The scope of the Governmental Releases and Covenants Not to Sue is narrower, and the Environmental Settlement Agreement excludes a number of parties included as Released Parties in the Plan. |
| Debtors' Related Parties | The Plan includes a number of Debtor "Related Parties" that benefit from the releases in the Plan but do not benefit from the releases and covenants not to sue in the Environmental Settlement Agreement. Those parties included in the Plan (but not in the Environmental Settlement Agreement) include:<br><br>■ subsidiaries<br>■ Affiliates<br>■ managed accounts or funds<br>■ fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors<br>■ agents<br>■ advisory board members<br>■ financial advisors, attorneys, accountants, investment bankers, consultants, and representatives<br>■ management companies<br>■ fund advisors and other professionals, solely to the | The scope of the "Related Parties" is far narrower in the Environmental Settlement Agreement. The Environmental Settlement Agreement excludes a number of parties included in the Plan as Debtors' "Related Parties" and includes only one party not listed in the Plan:<br><br>■ trustees |

| **Issue** | **Plan (DTSC only)** | **Environmental Settlement Agreement (Environmental Agencies Outside California)** |
|---|---|---|
| | extent such person and entities acted on behalf of the Released Parties<br>▪ Persons' respective heirs, executors, estates, servants and nominees. Plan §1.171 | |
| Related Parties for Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities | The Plan includes a number of parties related to the Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities which benefit from the releases in the Plan, but do not benefit from the releases and covenants not to sue in the Environmental Settlement Agreement. Those parties included in the Plan (but not in the Environmental Settlement Agreement) include:<br><br>▪ subsidiaries<br>▪ Affiliates<br>▪ managed accounts or funds<br>▪ agents<br>▪ advisory board members<br>▪ financial advisors, attorneys, accountants, investment bankers, consultants, and representatives<br>▪ management companies<br>▪ fund advisors and other professionals, solely to the extent such person and entities acted on behalf of the Released Parties<br>▪ Persons' respective heirs, executors, estates, servants and nominees Plan §1.171 | The scope of the parties related to the Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities that benefit from the Governmental Releases and Covenants Not to Sue is far narrower. The Environmental Settlement Agreement excludes a number of parties included in the Plan as "Related Parties" and includes only one party not listed in the Plan:<br><br>▪ trustees |
| Scope of Debtor Releases | The scope of the releases of the Debtors and Related Parties is broader in the Plan than in the Environmental Settlement Agreement. The releases in the Plan include:<br><br>▪ All Claims and Causes of Action (including injunctive relief)<br>▪ Claims and Causes of Action under the broadly defined term Environmental Law<br>▪ Releases are not limited to the Vernon Plant<br><br>In addition, the Debtors' releases under the Plan include Claims or Causes of Action relating to:<br><br>▪ Chapter 11 Cases<br>▪ pre-and post-petition marketing process<br>▪ Europe/ROW Sale Transaction<br>▪ DIP Facility<br>▪ European Bridge Notes<br>▪ Pension Plan | The DOJ and Global Settlement Parties are only providing covenants not to file a civil action or take any administrative or other civil action against the Debtors pursuant to CERCLA and RCRA, or any similar state laws with respect to each of the Included NPPs. |

| Issue | Plan (DTSC only) | Environmental Settlement Agreement (Environmental Agencies Outside California) |
|---|---|---|
| | <ul><li>Optimization</li><li>June 2019 Financing</li><li>Global Settlement</li><li>Purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estate</li><li>Subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan</li><li>Business or contractual arrangements between any Debtor and any Released Party</li><li>Restructuring of Claims and Interests before or during the Chapter 11 Cases</li><li>Disclosure Statement</li><li>RSA</li><li>Plan (including nay Plan Supplement)</li><li>DIP Loan Documents or any related agreements (including the Definitive Documents)</li><li>instruments, and other documents relating thereto</li><li>solicitation of votes with respect to the Plan</li><li>any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Plan §10.6</li></ul> | |
| Scope of Releases for Consenting Creditors, Trustees, Europe/ROW Purchaser and Transferred Entities | The scope of the releases for the Consenting Creditors, Trustees, Europe/ROW Purchaser, and Transferred Entities under the Plan is substantially similar to the Scope of Debtor Releases described above, including releasing all Claims and Causes of Action under Environmental Law. Plan §10.6 | The scope of the Governmental Releases and Covenants Not to Sue as to the Consenting Creditors, Trustees, Europe/ROW Purchaser, and Transferred Entities is similar to the releases provided in the Plan but are more narrowly tailored and do not apply to as many parties and are limited to civil action or administrative or other civil action pursuant to CERCLA and RCRA or any similar state laws with respect to each of the Included NPPs. |

## ARGUMENT

**A.      The Plan Impermissibly Deems the Vernon Plant Abandoned.**

21.      The Plan seeks to strong arm both DTSC and the Court by proposing that if either the Payment Condition or the Vernon Trust Condition fails, the Vernon Plant shall be "deemed" abandoned to Exide Technologies, LLC.  The Debtors have not provided any evidence that such abandonment is permitted by law and have not provided a process for the required full and fair hearing of those issues. Nor does DTSC believe that abandonment is appropriate where, as here, the contaminated property requires active monitoring to avoid actual danger to the surrounding area.

22.      Section 554(a) of the Bankruptcy Code provides, after *notice and a hearing*, the trustee *may* abandon any property of the estate that is *burdensome* to the estate or that is of *inconsequential value and benefit* to the estate. 11 U.S.C. § 554(a) (emphasis added). The Bankruptcy Code is clear, "after notice and a hearing [] means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). Further, Local Rule 9006-1 provides that "[n]o motion will be scheduled on less notice than [fourteen (14) days prior to the hearing date] except by order of the Court on written notice specifying the exigencies justifying shortened notice.

23.      The Debtors have never filed a motion seeking to abandon the Vernon Plant. The only "notice" the Debtors provided that the Vernon Plant might be abandoned was in their modified Plan, which provides that, upon the non-occurrence of certain conditions and "pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the [Vernon Plant] shall be deemed abandoned." The Debtors have not presented a *prima facie* case (or any case) that the Vernon Plant may be abandoned and instead seem to assume that this Court will simply ignore the necessary

procedural safeguards to achieve confirmation.

24.     But this Bankruptcy Court already recognized the need to carefully evaluate any request by the Debtors to abandon a Non-Performing Property in the *Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties* [Docket No. 242] (the "Settlement Procedures Order"). The Settlement Procedures Order provides that if the participants to the mediation are unable to reach an agreement, the Debtors and the governmental agency must present the Bankruptcy Court with a scheduling order setting forth applicable deadlines for adjudicating any request by the Debtors to abandon a Non-Performing Property under section 554(a) of the Bankruptcy Code and any conditions to meet the requirements of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986). Settlement Procedures Order at 10-11. The Settlement Procedures Order further provided that any such proposed scheduling order must include deadlines related to fact discovery, including depositions, a deadline for the Debtors to file a motion seeking to abandon the relevant Non-Performing Property, and a deadline for the governmental agency to file a response to the Debtors' motion seeking to abandon the Non-Performing Property. *Id.* at 11.

25.     The failure to follow the appropriate procedures for abandoning the Vernon Plant is particularly egregious because the burden of proof is initially on the party seeking to abandon, in this instance, the Debtor, to establish that the property is burdensome or of inconsequential value or benefit to the estate. *In re Dewsnup*, 908 F.2d 588, 590 (10th Cir. 1990), *aff'd sub. Nom. Dewsnup v. Timm*, 502 U.S. 410 (1992). If that party meets their burden, the burden then shifts to the party opposing abandonment to apply an exception to the trustee's abandonment power. *Id.*

26.     In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986), the Supreme Court ruled that when Congress enacted section 544

of the Bankruptcy Code, there were "well-recognized restrictions on a trustee's abandonment power." *Id*. at 501. The Court further found, "One cannot assume that [in enacting section 554(a)] Congress . . . intended to discard a well-established judicial restriction on the abandonment power" and "also presumably included the established corollary that a trustee could not exercise [its] abandonment power in violation of certain state and federal laws." *Id*. at 501-502.

27.     In short, the Debtors may not simply "deem" the Vernon Plant abandoned because the following four considerations render abandonment impermissible (i) an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety, (ii) abandonment of the property violates California law and regulations, (iii) the statutes and regulations being violated are reasonably designed to protect the public health and safety from the imminent and identifiable harm caused by the hazards identified at the Vernon Plant, and (iv) compliance with the statute or regulation would not be so onerous as to interfere with the bankruptcy administration itself.

*i.*     ***An identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety.***

28.     *Midlantic* bars a specific abandonment of property if an identified hazard exists that poses a risk of imminent and identifiable harm to the public health and safety. In *Midlantic*, the existence of an identified hazard was not in dispute as the debtors' property contained 470,000 gallons of highly toxic and carcinogenic waste oil in unguarded, deteriorating containers "present[ing] risks of explosion, fire, contamination of water supplies, destruction of natural resources, and injury, genetic damage, or death through personal contact." *Midlantic*, 474 U.S. at 499 n. 3. Similar to *Midlantic*, the existence of an identified hazard at the Vernon Plant is not in dispute. *See* Messing Decl. ¶ 71-73; *see also* Non-Prosecution Agreement, Appendix 1 at 1-2 ("[The Vernon Plant] generates hazardous wastes, including corrosive fluids and waste containing

metals such as lead, cadmium, arsenic, antimony, zinc and chromium.").

29.     The Non-Prosecution Agreement required the Debtors to immediately and permanently cease recycling operations at the Vernon Plant, close the facilities at the Vernon Plant, demolish, deconstruct, and remove all facility structures, equipment, and appurtenances, and correct and remediate any surface, subsurface, and groundwater contamination, in accordance with the terms of the Closure and Clean-Up Agreements and Closure/Post-Closure Plan (each as defined in the Non-Prosecution Agreement). In late 2017, the Debtors commenced the first phase of the closure, which included the decontamination, deconstruction, and disposal of nearly all of the equipment and buildings that were previously used to handle hazardous waste, primarily spent lead acid batteries, at the Vernon Plant. *See* Cope Decl. ¶¶ 12, 17.

30.     To undertake that closure, the FEU was erected to temporarily allow the safe decontamination and deconstruction of the building previously used for production work (the "Containment Building"). The FEU incorporates numerous air pollution control devices, including air scrubbers and baghouses, as well as monitoring equipment, which are critical components to prevent off-site migration of dust. As the FEU is a temporary structure, it requires daily operations, maintenance, inspections, and monitoring and active operation and maintenance is necessary to maintain a negative pressure environment to prevent the release of lead dust into the surrounding community. *Id.* at ¶¶ 17, 19-20.

31.     Large amounts of dust remains inside the Containment Building, and that dust is extremely high in contents of lead and other metals—orders of magnitude greater than dust located outside the FEU. *Id.* at ¶ 31. The levels of concentration of lead in the dust at the site (10,500 mg/kg to 58,000 mg/kg) are at least 100 to 1,000 times higher than the CalEPA/DTSC commercial/industrial and residential soil/dust screening level (320 mg/kg and 80/kg) for lead. *Id.*

at ¶35. DTSC testing at the Vernon Plant also indicates that significant levels of arsenic, and other dangerous materials, are present in the dust and soil at the Vernon Plant. *Id*. at ¶ 5. In addition, the wastewater treatment plant, surface impoundment, and storm water conveyance system are critical infrastructure to prevent the release of lead contaminated water to local surface water bodies. *Id*. at ¶¶ 38-39. These systems are critical, and require ongoing operations and maintenance to prevent and mitigate the risk of noxious material from reaching groundwater and surface waters. *Id*. Failure to monitor and repair liners and other leak prevention systems are paramount to preventing lead and other carcinogens from reaching important aquifers and other water sources. *Id*. Yet following the commencement of these Chapter 11 Cases, the Debtors ceased the required maintenance and repair of these systems.

32.     To date, only one of the three distinct segments of the Containment Building has been demolished. The FEU is currently located over the portion of the Containment Building that previously operated as the Smelter Building, with only the FEU preventing further dispersion of lead. Inside of the FEU is essentially an active demolition project, but one that was abruptly halted without appropriate or safe mothballing, only the FEU.

33.     The FEU is a temporary structure, it was not designed to remain in place for an indefinite amount of time, rather it was designed to act only as a short-term safeguard between the highly contaminated environment inside the FEU and the surrounding community. *Id*. at ¶ 30. Simply stated, the likelihood of failure of the FEU increases as time passes and that risk is further exacerbated by the high summer temperatures and the Santa Ana winds (most common in the fall and spring). *Id*. Despite regular ongoing inspections and maintenance, there have been several large tears in the approximate two years of the FEU's operation. *Id*. at ¶¶ 21-23, 30.

34.     There remains a significant potential for near future harms associated with the

abandonment of the Vernon Plant. Those harms include: (i) on-site exposure to surface dust with high lead concentrations; (ii) off-site dust and dirt exposure (i.e., lead-dust on neighboring properties); and (iii) exposure to contaminated surface water (e.g., related to failure of the water treatment plant, overflow of the storm water conveyance system, and the surface impoundment, etc.). *Id.* at ¶¶ 29-39.

35.     Therefore, an identified hazard exists at the Vernon Plant and that hazard—the massive amounts of dust and material laden with lead and other hazardous materials that require constant monitoring to assure they are even temporarily contained—poses a risk of imminent and identifiable harm to the public health and safety.

### ii.     *The abandonment of the property will violate a state statute or regulation.*

36.     As the owner and operator of the Vernon Plant, Debtor Exide Technology is required by California's Hazardous Waste Control Law ("HWCL") and its implementing regulations to maintain the safety of the Plant and to conduct specific cleanup activities. Cal. Health and Safety Code §§ 25100-25259; Cal Code Regs, Title 22, Div. 4.5, 66360.1 *et seq.* ("Title 22"). As the owner and operator of the property, the Debtors are required to "manage and operate [the Vernon Plant] according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). If Debtors are allowed to abandon the Vernon Plant, the Vernon Plant will be left in a condition that does and will violate numerous provisions of the HWCL.

37.     Three sets of requirements will be violated by abandonment of the Vernon Plant. First, the Vernon Plant will be out of compliance with its fundamental obligation to prevent releases, its obligations to conduct closure, and its obligation to conduct corrective action. The latter two are required not only by the statutes and regulations, but also by enforceable orders that

DTSC issued at various times throughout the Debtors' ownership of the Vernon Plant. These orders are aimed at remediating the Plant and surrounding contaminated areas and protecting the health and safety of nearby residents. *See* Cope Decl. ¶¶ 7-16; *see also Jalbert v. XL Insurance America, Inc.*, No. CV 17-7167-GW, 2018 WL 4850403, at *3 (C.D. Cal., June 7, 2018) (discussing undisputed facts regarding Exide's operation and DTSC's regulation of the Vernon Plant).

38.     The HWCL's overarching safety requirement is specified at Title 22, section 66265.31. The Vernon Plant must be "operated to minimize the possibility of . . . any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment."  *See* Cope Decl. ¶¶ 7-16. There are also specific requirements applicable to the Containment Building. For example, the owner and operator must "use controls and practices to ensure containment of the hazardous waste within the unit." *Id.* § 66265.1101(c).

39.     As discussed above, diligent maintenance of the FEU is required to prevent releases of highly toxic lead dust into the air and the surrounding community. If the Vernon Plant is abandoned, Debtors' funding for, and therefore maintenance of the FEU will stop and the plant will immediately be in violation of Title 22, sections 66265.31 & 66265.1101(c) and numerous other HWCL requirements.

40.     As noted above, Debtors have ongoing obligations under two separate HWCL protocols for investigating or removing contamination: "closure" and "corrective action."

41.     The *closure* process applies to any hazardous waste management unit, for example a surface impoundment or containment building that the facility used to treat, store, or dispose of hazardous waste. In accordance with a DTSC-approved closure plan, the owner or operator of the

facility must close each hazardous waste management unit in a manner that "[m]inimizes the need for further maintenance" and that "minimizes or eliminates . . . post-closure escape of hazardous wastes [or] hazardous constituents." Cal. Code of Regulations, Title 22, § 66265.111. The owner and operator of a facility "for which closure and postclosure plans have been approved *shall carry out the plans during the closure and postclosure period required by law*." Cal. Health & Safety Code § 25248 (emphasis added).

42.     Abandonment will prevent Debtors from completing closure work at the Vernon Plant in violation of the HWCL requirements and DTSC's Orders. Pursuant to Section 25248 of the HWCL, on November 20, 2014, during Exide's prior bankruptcy proceedings, this Court authorized Exide to enter into the 2014 Stipulation and Order, docket HWCA No. 2014-6489. The 2014 Stipulation and Order was intended, among other things, to resolve disputes regarding the Closure/Post Closure Plan and the cost of implementing it. Exide has completed some of the steps required in Phase 1 of the final Closure Plan, but numerous steps remain.  Indeed, even before Exide claimed a *force majeure* as an excuse to halt the closure work in early 2020, Exide was not scheduled to finish the Phase 1 work until December 2021.  DTSC estimates that completing that work, as is required to stabilize the property and mitigate the risk of imminent harm, will cost approximately $72 million, which far exceeds the financial assurance provided by Exide under the 2014 Stipulation and Order, as amended. *See Declaration of Perry Myers in Support of the California Department of Toxic Substances Control's Objections to Debtors' Second Amended Joint Chapter 11 Plan*, filed contemporaneously herewith, ¶ 2; Cope Decl. ¶ 41. Further, two additional closure/post-closure phases need to be completed. By abandoning the property, Exide will leave the property with entire phases of closure unfinished; Cope Decl. ¶ 12.

43.     The *corrective action* process applies to releases of hazardous waste or constituents

that occurred outside the hazardous waste management units. Whenever DTSC "determines that there is or has been a release . . . of hazardous waste or constituents into the environment from a hazardous waste facility," Health and Safety Code section 25187(b) authorizes DTSC to issue an "order for corrective action." DTSC has issued such orders to Exide.

44.     Abandonment would violate Exide's corrective action obligations. Pursuant to Section 25187 of the HWCL, in February 2002, DTSC issued a Corrective Action Consent Order (the "<u>CACO</u>") to Exide. Under the CACO, Exide is required to, *inter alia*, undertake corrective action of and investigate releases at and from the Vernon Plant. For example, in July 2020 DTSC ordered Exide to undertake corrective action work after further investigation of the Vernon Plant found high levels of metals in dust and dirt onsite. Cope Decl. ¶ 16. If Exide is allowed to abandon the Vernon Plant without undertaking such corrective action work, there is risk of imminent harm posed by such high metal concentrations will be great. *Id.* at ¶¶ 35-37.

### iii.    *The statutes and regulations being violated are reasonably designed to protect the public health and safety from imminent and identifiable harm caused by identified hazards.*

45.     The HWCL, and the numerous provisions that abandonment would violate, are specifically designed to protect the public health and safety from imminent and identifiable harms caused by the release and disposal of hazardous waste. *See* Cal. Health and Safety Code §§ 25100, 25101; *Dep't of Toxic Substances Control v. Superior Court*, 44 Cal. App. 4th 1418, 1424 (Cal. Ct. App. 1996) ("Our Legislature enacted the HWCL to protect California's citizens and its environment from the unreasonable threat posed by the improper treatment, storage and disposal of hazardous waste."); *see also People v. Taylor*, 7 Cal. App. 4th 677, 688 (Cal. Ct. App. 1992). The HWCL establishes comprehensive "cradle to grave" standards for the generation, storage, transportation, treatment, and disposal of hazardous waste in California. Cal. Health and Safety Code §§ 25189.1, 25352.

46.     In enacting the HWCL, the California Legislature found that there were long-term threats to public health, air, and water quality posed "by the inappropriate handling, storage, use, and disposal of hazardous wastes" and declared that "[i]n order to protect the public health and the environment . . . , it is in the public interest to establish regulations and incentives which ensure that the generators of hazardous waste employ technology and management practices for the safe handling, treatment, recycling, and destruction of their hazardous wastes prior to disposal." Cal. Health and Safety Code §§ 25100(b), 25101(a).

47.     The HWCL includes numerous provisions specifically targeted to prevent, address, and ameliorate imminent harms to public health and the environment. *See, e.g.*, Cal. Health and Safety Code §§ 25186.2 ("The department may temporarily suspend any permit, registration, or certificate issued pursuant to this chapter prior to any hearing if the department determines that conditions may present an imminent and substantial endangerment to the public health or safety or the environment."); 25187(h) ("Any provision of an order issued under this section . . . effect upon issuance by the department . . . if the department . . . finds that the violation or violations of law associated with that provision may pose an imminent and substantial endangerment to the public health or safety or the environment . . . ."); 25187.5 ("If corrective action is not taken on or before the date specified in an order issued pursuant to Section 25187, or if in the judgment of the department immediate corrective action is necessary to remedy or prevent an imminent substantial danger to the public health, domestic livestock, wildlife, or the environment, the department may take, or contract for the taking of, that corrective action and recover the cost thereof as provided in subdivision (c).").

48.     Further, California administers the HWCL in lieu of federal administration of the federal Resource Conservation and Recovery Act ("RCRA"), which was likewise enacted to

protect public and safety from environmental harm. 42 U.S.C. § 6926; Cal. Health & Safety Code

§§ 25101(d); 25159; *California ex rel. Ingenito v. U.S. Army*, 91 F. Supp. 3d 1185, 1186 (E.D.

Cal. 2015) ("California enacted the HWCL as the analogue to RCRA, finding it was in the best

interest of Californians for the state to administer its own program."); *see also United States v.*

*Humphries*, 728 F.3d 1028, 1032 (9th Cir. 2013) (describing the purpose of RCRA which is "to

subject hazardous waste to 'cradle-to-grave' regulation in order to protect public health and the

environment.") (quoting *Am. Chemistry Council v. EPA*, 337 F.3d 1060, 1065 (D.C. Cir. 2003);

*West Virginia State Univ. Bd. of Governors for and on behalf of West Virginia State Univ. v. The*

*Dow Chemical Co.*, No. 2:17-cv-3558, 2020 WL 2842057, at *14 (S.D. W.Va., June 1, 2020)

("RCRA seeks to achieve its goals by assuring that hazardous waste management practices are

conducted in a manner which protects human health and the environment, and requiring that

hazardous waste be properly managed in the first instance thereby reducing the need

for corrective action at a future date.") (citing and quoting 42 U.S.C. 6902(a)(4)–(5)) (internal

quotations omitted).

49.     Accordingly, it is beyond argument that the HWCL and its implementing

regulations were specifically designed and intended to protect the public health and safety from

imminent and identifiable harms caused by the release and disposal of hazardous waste. *Dep't of*

*Toxic Substances Control*, 44 Cal. App. 4th at 1424.

**iv.     Compliance with the statutes and regulations would not be so onerous as to interfere**
**with the bankruptcy administration itself.**

50.     Compliance with the applicable California laws and regulations is not so onerous

as to interfere with the bankruptcy process itself. *Midlantic*, 474 U.S. at 507. Nor would

compliance with the applicable state laws—designed to protect the public health and safety—

obstruct or prevent distribution of estate assets. *See, e.g. In re Guterl Special Steel Corp.*, 316 B.R.

843, 860 (Bankr. W.D. Pa. 2004) ("Supreme Court appeared to leave open the possibility that abandonment is permissible where rigid adherence to a state law or regulation designed to protect public health and safety was so 'onerous' as to interfere with the bankruptcy process itself...[one] which, if enforced, would obstruct or prevent expeditious distribution of estate assets.").

51.    Compliance with the HWCL and DTSC's Orders will not interfere with the bankruptcy process nor obstruct or prevent the expeditious distribution of estate assets. Of course, compliance with the HWCL and DTSC's Orders requires funding and the Debtors have valuable assets, which could be tapped for such funding. Instead, the Debtors (and their controlling Consenting Creditors) seek to run what amounts to a foreclosure sale through a Chapter 11 plan rendering those assets unavailable to fund environmental cleanup. Worse still, those same parties seek extremely broad releases that if imposed would prevent DTSC from seeking funding from or asserting claims against those parties.  It is important to note that the test is not whether compliance with environmental protection laws and orders will interfere with a debtor's *particular scheme* of bankruptcy. The test is whether there is *any* bankruptcy process and expeditious distribution available that still allows compliance with environmental protection laws and orders.  Here there is: a Chapter 11 plan that (i) actually funds the work necessary (even if done by others) to remediate the imminent and identifiable harm and leave the property in a safe state and (ii) does not release parties so that DTSC retains claims. The Debtors and the Consenting Creditors simply have failed to propose such a plan. If the Debtor are unwilling to propose a Chapter 11 plan that allows compliance with their obligations under applicable state law, they should not be permitted to continue the Chapter 11 Cases or receive the benefits afforded by the confirmation of a Chapter 11 plan that amounts to a foreclosure sale with releases.

**B.      The Plan Does Not Meet the Requirements of Section 1129.**

52.      The Debtors bear the burden of proving, by a preponderance of the evidence, that each of the requirements of section 1129(a) of the Bankruptcy Code is satisfied with respect to the Plan. *See In re Paragon Offshore PLC*, No. 16-10386 (CSS), 2016 WL 6699318, at *1 (Bankr. D. Del. Nov. 15, 2016); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("For the court to confirm a plan, the plan proponents must establish by a preponderance of the evidence that the plan satisfies each of the requirements of 11 U.S.C. § 1129"). The Plan fails a number of the requirements of section 1129(a) of the Bankruptcy Code, including sections 1129(a)(1), (3), (5), (7), (8), (9), (10), and (11); therefore, the Plan cannot be confirmed.

*i.      The Plan does not comply with Section 1129(a)(1) of the Bankruptcy Code as the Plan fails to provide the same treatment for each Claim or Interest within a particular Class.*

53.      Section 1129(a)(1) of the Bankruptcy Code provides that a court may confirm a plan of reorganization only if "[t]he plan complies with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(1). The phrase "applicable provisions" includes sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and interests and the contents of a plan of reorganization. *See, e.g., Kane v. Johns-Mansville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988); *In re S&W Enterprise*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [Section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.") (internal citations omitted).

54.      The Plan fails to satisfy the requirements of Section 1123(a)(4), which mandates that a chapter 11 plan:

> provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. §1124(a)(4). The tenet of equality of treatment codified in Section 1124(a)(4) is a critical component of the Bankruptcy Code. *See In re Combustion Eng'g, Inc.* 391 F.3d 190, 239 (3d Cir. 2004) ("Equality of distribution among distribution among creditors is a central policy of the Bankruptcy Code.") (citations omitted). While section 1123(a)(4) does not require precise equality—only approximate equality—differences in the distributions and other procedural variations that produce a substantive difference in the opportunity to recover violate section 1123(a)(4). *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013); *In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002) (holding that a difference in the procedural protections offered to certain claimants violated section 1123(a)(4) because some claimants were "accorded far more effective recovery rights" than others).

55.     The Plan clearly—and purposefully—fails to satisfy section 1123(a)(4). The Plan provides different and less favorable treatment to members of Class 8 based on whether such claim holder is a Global Settlement Party. The Plan appears designed to impose that disparate treatment to punish DTSC for not agreeing to the terms of the Environmental Settlement Documents. DTSC has not consented to such less favorable treatment and the Debtors cannot force DTSC to accept such treatment without DTSC's consent.

56.     As discussed above, the Plan provides three different treatment options depending on whether or not two different conditions are satisfied. Subsections (a), (b), and (c) below explain why, regardless of which treatment option applies, the Plan fails to satisfy section 1123(a)(4).

**a.  If the Payment Condition and the Vernon Trust Condition are both satisfied, the Treatment Provided to DTSC under the Plan does not, and cannot, comply with Bankruptcy Code Section 1123(a)(4).**

57.     In the circumstances where both the Payment Condition and the Vernon Trust Condition are met, the Plan treatment for DTSC still differs materially from other holders of Environmental NPP Claims in the following respects:  (i) DTSC receives its treatment only if

certain conditions outside its control are met, (ii) DTSC receives less than its pro rata share of the economic consideration being provided to Class 8 holders, and (iii) as set forth in the Release Chart above, DTSC is forced to provide releases that are broader than those voluntarily granted by other holders of Environmental NPP Claims.

58.     DTSC receives its most favorable treatment only if both the (i) Payment Condition and (ii) the Vernon Trust Condition are met. Those two conditions are not imposed on other holders of Environmental NPP Claims presumably because those holders voluntarily agreed to provide less expansive releases. The difference between the voluntary agreement to certain conditions and the imposition of facially similar, but materially different, conditions is a substantive, not a procedural, difference in these Chapter 11 Cases. Significantly, at least one of the conditions is not within DTSC's control. Specifically, the Payment Condition conditions DTSC's treatment on whether or not the Bankruptcy Court imposes broad non-consensual third-party releases on DTSC and other California agencies. As discussed below and in the Release Chart, those releases are broader than those required from holders of other Environmental NPP Claims. Even if the releases were the same, however, the Bankruptcy Court's ability to impose nonconsensual, third-party releases is limited by applicable law and requires the Debtors to make a factual showing supporting such releases. *See supra Objection C(ii); see also*, *In re Continental Airlines, Inc*. 203 F.3d 203, 214 (3d Cir. 2000) ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and *specific factual findings to support these conclusions*[.]") (emphasis added). DTSC does not have any control over whether the Debtors are successful in carrying their burden on releases and thus DTSC's recovery may not be the same as other holders based on factors outside of DTSC's control.

59.     The Plan also fails to provide the same economic treatment to each of the

Environmental NPP Claims in Class 8 even if both the Payment Condition and Vernon Trust Condition are met.[5]

60.     The Plan proposes to allocate $10,000,000 in Cash to the various Non-Performing Properties overseen by the agencies in Class 8. The Vernon Plant, the only Non-Performing Property regulated by a non-Global Settlement Party, would receive and allocation of $2,587,523. Other holders of Environmental NPP Claims that are Global Settlement Parties receive an aggregate allocation of $7,412,477 in Cash through their collective beneficial interests in the Environmental Response Trust. Such holders also have the opportunity, in certain circumstances, to receive residual value from other properties within the Environmental Response Trust—a benefit not available for the Vernon Plant.

61.     The Plan, therefore, allocates approximately 25.8 percent of the total consideration provided to the benefit of holders of Environmental NPP Claims to the Vernon Plant and 74.2 percent to the other Non-Performing Properties. This allocation provides DTSC with significantly less than its proportionate share of the consideration allocated to Class 8. By the Debtors' own calculation—which DTSC believes vastly underestimates the costs of remediation required at the Vernon Plant—the cost to remediate the Vernon Plant amounts to approximately 44 percent of the total liabilities associated with all Non-Performing Properties.[6] DTSC expects the actual percentage of Cash distributions to which the Vernon Plant would be entitled in Class 8 is substantially higher but, even on the basis of the Debtors' numbers, the Plan diverts 18.2 percent of the total consideration to Environmental NPP Claims from DTSC to other members of Class 8,

---

[5] As discussed, linking DTSC's treatment of its Environmental NPP Claim to the approval of third-party releases is inappropriate.
[6] At filing, the Debtors estimated they would spend a total of $200 million on remediation at the Non-Performing Properties over the next five (5) years, including $88 million (or 44 percent) at the Vernon Facility. *See* Messing Decl. at ¶¶ 72, 74.

without DTSC's consent. And that is before allocation of any residual value is distributed. This inequality in treatment of Environmental NPP Claims is inappropriate and in direct contravention of section 1123(a)(4).

62.     The Plan's failure to provide the same treatment to each Environmental NPP Claim is also apparent when comparing the non-economic terms of the proposed treatments provided to DTSC and the Global Settlement Parties. As set forth in the Environmental Settlement Agreement, the Global Settlement Parties agree to consensually provide certain Governmental Releases and Covenants Not to Sue. However, in the Plan, releases, injunctions and exculpations are imposed on California state agencies, including DTSC, without their consent.

63.     As summarized in the Release Chart, the releases set forth in Section 10.6 of the Plan are broader, and more burdensome, than those agreed to by the Settling Governmental Authorities. The Plan seeks to impose releases on all California state governmental agencies that have jurisdiction regarding the enforcement of Environmental Laws, including but not limited to DTSC. However, the Plan expressly provides that other Governmental Units, including the Global Settlement Parties, are not Releasing Parties. *See* Plan 10.6 (Notwithstanding anything to the contrary in this Section 10.6, *Governmental Units (other than any California state governmental agency, including the [DTSC], that has jurisdiction regarding the enforcement of Environmental Laws) are not Releasing Parties under the Plan*) (emphasis added).

64.     Instead, the Settling Governmental Authorities agreed to provide the Governmental Releases and Covenants Not to Sue, which are far narrower than the non-consensual releases the Debtors seek to impose on California agencies through the Plan. The Governmental Releases and Covenants Not to Sue in favor of the Debtors are limited to covenants "not to file a civil action or take administrative or other civil action against the Debtors pursuant to CERCLA and RCRA, or

any similar state laws with respect to each of the Included NPPS." Environmental Settlement Agreement at 45(a). However, with respect to the Debtors, the releases set forth in Section 10.6 of the Plan are far more extensive, as they purport to release all Claims and Causes of Action related to Environmental Law, a broadly-defined term. Additionally, as set forth in more detail in the Release Chart, not only are the releases in the Plan broader in scope, but they also purport to release additional "Related Parties."

65.     Similarly, and as summarized in the Release Chart, the Governmental Releases and Covenants Not to Sue in favor of the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser and the Trustees are narrower than the scope of the release contained in Section 10.6 of the Plan. *See* Release Chart; *cf.* Environmental Settlement Agreement at 45(b) and Plan at §10.6. As an example, the Settling Governmental Authorities reserve certain rights, including *claims for any location other than the Non-Performing Property*. Environmental Settlement Agreement at 48(a). However, the releases in Section 10.6 force DTSC (and other California agencies) to release Claims and Causes under Environmental Law against the Released Parties for locations other than the Vernon Plant, including off-site liability arising from the Debtors' operation of the Vernon Plant. *See, e.g.*, Non-Prosecution Agreement, Appendix 1, at 2 ("Exide admits it knowingly caused the transportation of hazardous waste contaminated with corrosive acid to Bakersfield, California" and caused that location to "receive corrosive hazardous wastes . . . a significant number of times over the past two decades, in violation of federal law."). Additionally, the Claims and Causes of Action released pursuant to the Plan relate to Environmental Law, a much broader release than provided by the Environmental Settlement Agreement, which is limited to covenants not to file civil action or take administrative action civil causes of action pursuant to CERCLA and RCRA, or similar state laws.

66.     These are not mere procedural differences but rather substantive and material differences in the treatment of Environmental NPP Claims and as such violates Section 1123(a)(4).

67.     Therefore, even if the Payment Condition and the Vernon Condition are satisfied, the Plan does not comply with Section 1123(a)(4) and cannot be confirmed.

**b.  If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, then the treatment provided to DTSC does not, and cannot, comply with Bankruptcy Code Section 1123(a)(4).**

68.     In the event the Vernon Trust Condition is not satisfied but the Payment Condition is satisfied, the treatment provided to DTSC similarly fails to satisfy Section 1123(a)(4) of the Bankruptcy Code. For the reasons set forth in Section B(i)(a) of this Objection, treatment pursuant to Plan Section 4.8(b)(i)(B) discriminates against California, as it imposes overly broad and burdensome third-party releases that exceed the scope of the Governmental Releases and Covenants Not to Sue. Further, for the reasons set forth in the prior section of this Objection, treatment pursuant to Plan Section 4.8(b)(i)(B) fails to provide the same economic treatment to each of the Environmental NPP Claims in Class 8. Finally, treatment pursuant to Plan Section 4.8(b)(i)(B) of the Plan purports to abandon the Vernon Plant to Exide Technologies, LLC. The Plan does not purport to deem any other Non-Performing Property abandoned. For the reasons set forth in Section A of this Objection, the Plan cannot deem the Vernon Plant abandoned. For the foregoing reasons, treatment of DTSC's Environmental NPP Claims pursuant to Plan Section 4.8(b)(i)(B) violates Section 1123(a)(4) of the Bankruptcy Code.

**c.  If the Payment Condition is not satisfied the treatment provided to DTSC does not, and cannot, comply with Bankruptcy Code Section 1123(a)(4).**

69.     In the event the Payment Condition is not satisfied, the treatment provided to DTSC likewise fails to satisfy Section 1123(a)(4) of the Bankruptcy Code. If the Payment Condition is not satisfied, the Plan deprives DTSC of any cash consideration. Such treatment fails to provide

the same economic treatment to each holder of Environmental NPP Claims and, for the reasons set forth in Section (B)(i)(a) of this Objection, violates Section 1123(a)(4) of the Bankruptcy Code. Further, upon the failure of the Payment Condition, the Plan deems the Vernon Plant abandoned to Exide Technologies, LLC. The Plan does not purport to deem any other Non-Performing Property abandoned. For the reasons set forth in Section A of this Objection, the Plan cannot deem the Vernon Plant abandoned, and the purported abandonment of the Vernon Plant violates Section 1123(a)(4) of the Bankruptcy Code.

ii.     ***The Plan does not comply with Section 1129(a)(1) of the Bankruptcy Code because the Plan fails to provide adequate means for the plan's implementation.***

70.     Section 1129(a)(1) of the Bankruptcy Code further requires a plan to comply with section 1123(a)(5), which mandates that a plan "provide adequate means for the plan's implementation" and then provides an illustrative list of appropriate means of implementation, such as transferring property, merging with other businesses, or curing a prior default. 11 U.S.C. § 1123(a)(5). The Plan fails to provide or articulate adequate means for its implementation, and therefore cannot be confirmed.

a.  **The Plan fails to provide adequate means for its implementation, as the Debtors cannot abandon the Vernon Plant.**

71.     In the event either the Payment Condition or the Vernon Trust Condition is not satisfied, the Plan provides "pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date." Plan at §5.2(e)(ii)(A), (iii)(A). Therefore, the Plan can only be confirmed if the Bankruptcy Court determines that the Vernon Plant can be abandoned. Notably, the satisfaction of the Payment Condition is beyond DTSC's control, and the Vernon Trust Condition cannot be imposed on DTSC.

72.     Section 1123(a)(5) is an empowering section meant to enhance the ability of the

trustee or debtor in possession to deal with property of the estate. Nonetheless, under well-established principles its scope is not unbounded. *See In re Fed-Mogul Glob. Inc.*, 684 F.3d 355, 381 (3d Cir. 2012). One important restriction is the long-standing presumption against preemption of state police power laws and regulations, a presumption that is rooted in federalism concerns and the historic primacy of state regulation of matters of health and safety. *Id.* (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

73.     For the reasons set forth in Section A of this Objection, the Debtors cannot abandon the Vernon Plant.

### b.  Even if the Debtors are permitted to abandon the Vernon Plant, the Plan fails to provide adequate means for its implementation.

74.     Even if the Debtors were able to deem the Vernon Plant abandoned to Exide Technologies, LLC, the Plan fails to provide adequate means for its implementation because the Debtors have not identified a Plan Administrator or New Board. While identification of such parties is often administrative, it is unclear that the Debtors will be able to find a Plan Administrator or members of a New Board that will serve given the potential liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. § 9601.

75.     Absent agreements with (i) a Plan Administrator, and (ii) individuals to serve on the New Board, the Plan fails to provide adequate means for its implementation, does not comply with Section 1123(a)(5) of the Bankruptcy Code, and cannot be confirmed.

### iii.   *The Plan was not proposed in good faith and therefore does not comply with section 1129(a)(3) of the Bankruptcy Code.*

76.     Section 1129(a)(3) of the Bankruptcy Code requires the Debtors must show that the plan has been proposed in good faith and not by any means forbidden by law. As discussed below, the Debtors cannot meet that burden. First, the Plan discriminates against, and is intentionally punitive to, DTSC solely due to the fact that California rejected a Global Settlement. Second, the

Debtors' lack of good faith in proposing the Plan is further evidenced by their efforts to deem the Vernon Plant abandoned in contravention of binding Supreme Court precedent. Third, the Debtors cannot demonstrate the Plan was proposed in good faith as the Plan's primary purpose is to distribute the estates' remaining valuable assets to insiders while also securing valuable releases for those same insiders. Lastly, the Plan fails to satisfy 1129(a)(3) as the Plan impermissibly seeks to cramdown the Plan on dissenting impaired creditors.

77.      Although the term "good faith" as used in section 1129(a)(3) is not defined, in considering this factor, courts have considered whether a plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984). It must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan and "[a]mong other things, good faith provides a check on the debtor's intentional impairment of claims." *In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (internal citations omitted)*; In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D. N.J. 2000) ("The classification and treatment of classes of claims is always subject to the good faith requirements under section 1129(a)(3)").

78.      After extensive mediation, the Settling Governmental Authorities and DTSC agreed to recommend—subject to ongoing negotiation, documentation, and final approval—the terms of a settlement. Fully aware the proposed settlement remained subject to negotiation and approval by the necessary authorities, the Debtors nevertheless filed the Initial Plan and proceeded towards confirmation along an expedited timeframe. The Initial Plan presumed the settlement would be approved by each of the Settling Governmental Authorities, including DTSC. Despite extensive negotiations, however, DTSC did not approve the terms of the proposed settlement nor

the terms of the Initial Plan.

79.     Following DTSC's determination not to settle, the Debtors filed the Plan. As discussed in more detail in Section B(i) of this Objection, the Plan (i) openly discriminates against California in terms of the treatment of Environmental NPP Claims, and (ii) conditions the treatment of Environmental NPP Claims on the approval of third-party releases that, if approved, are more extensive than those imposed on other parties. The Plan also improperly seeks to Disallow Administrative Expense Claims asserted by DTSC. These provisions exist solely to punish California and are not the product of good faith.

80.     Second, even if the Debtors followed the proper procedural requirements, the Debtors, as set forth in additional detail in Section A of this Objection, cannot abandon (or deem abandoned) the Vernon Plant.

81.     Third, the Plan seeks to strip the remaining value from the Debtors' estates and divert those assets to the Consenting Creditors yet provides little—or no—consideration to address or remediate identified hazards that pose imminent and identifiable harm to the public health and safety. This construct is in direct contravention of Supreme Court precedent. The fact that the Consenting Creditors control the Debtors' capital structure—and are the only impaired class that accepted the Plan—further evidences the Debtors' lack of good faith in pursuing confirmation of the Plan.

82.     In addition, the Plan fails to satisfy the good faith requirement of section 1129(a)(3) because the Plan is in direct contravention of the Settlement Procedures Order. The Debtors, in a transparent effort to secure releases for their insider-creditors, disregarded the requirements of the Settlement Procedures Order or general procedural safeguards—which places affirmative requirements on the Debtor with respect to the abandonment of a Non-Performing Property—and

instead seek to deem the Vernon Plant abandoned on the Effective Date. Because the Debtors know they are not following those procedures, they are not proceeding in good faith.

83.      In addition, a plan proponent's motives and methods for achieving compliance with the voting requirement of section 1129(a)(10) must be scrutinized under the rubric of section 1129(a)(3). *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). As set forth in more detail in Section B(viii) of this Objection, the only classes of claims that voted to accept the Plan are controlled by insiders. In fact, the Debtors did not even solicit votes to accept or reject the Plan from holders of Environmental NPP Claims or General Unsecured Claims, instead the Debtors deemed those Classes to reject the Plan. The Debtors' willful solicitation of votes from only those classes of Claims controlled by insiders constitutes bad faith and does not comply with the requirements of section 1129(a)(10).

84.      Finally, for the reasons discussed in Section C of this Objection the Plan violates section 1129(a)(3) of the Bankruptcy Code because it impermissibly seeks to secure extensive—and impermissible—releases for third-parties.

### iv.      *The Plan does not disclose the identities of the Plan Administrator or the New Board and therefore fails to comply with Section 1129(a)(5)(A)(i) of the Bankruptcy Code.*

85.      Section 1129(a)(5)(A)(i) requires the proponent of the plan to disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or  successor to the debtor under the plan. The Plan fails to identify the Plan Administrator or the members of the New Board.

86.      DTSC believes that the members of the New Board and/or the Plan Administrator may be subject to liability under CERCLA and related California state law. Therefore, the Debtors must identify the Plan Administrator and members of the New Board as expeditiously as possible and demonstrate by a preponderance of the evidence that such individuals intend to serve in such

capacity following the Effective Date.

*v.* ***The Plan fails to satisfy the best interests test and as a result does not comply with Section 1129(a)(7).***

87. Section 1129(a)(7) of the Bankruptcy Code—the "best interests test"—requires that, with respect to each class, each holder of a claim or an equity interest in such class either (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code on such date. 11 U.S.C. § 1129(a)(7).

88. Section 1129(a)(7) is clear, the liquidation analysis applies to *individual* holders of impaired claims or interest that do not accept the plan. *See Bank of Am. Nat'l Trust,* 526 U.S. 434, 441 n. 13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."). Section 1129(a)(7)(A) requires a determination whether a "prompt chapter 7 liquidation would provide a better return to *particular creditors* or interest holders than a chapter 11 reorganization." *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) (internal quotation marks and citation omitted) (emphasis added). The measuring date for such a comparative recovery is the effective date of the proposed bankruptcy plan. Thus, a bankruptcy court must contrive a hypothetical Chapter 7 liquidation on the effective date of the plan to determine each creditor's treatment. *See Lason*, 200 B.R. at 232 (citing *In re Sierra-Cal*, 210 B.R. 168, 171-72 (Bankr. E.D. Cal. 1997)).

89. The liquidation analysis attached to the Disclosure Statement as Exhibit D (the "Liquidation Analysis") is of no assistance to the Court and is therefore improper, even recognizing that all liquidation analyses are inherently speculative. The Liquidation Analysis relates to the Initial Plan and does not accurately reflect the terms of the Plan. The classification

of Claims and Interests analyzed in the Liquidation Analysis is inconsistent with the Classification of Claims and Interests in the Plan. The Liquidation Analysis does not provide any analysis of Environmental NPP Claims, instead it "[e]xcludes consideration provided on account of Environmental NPP Claims pursuant to the Global Settlement." By failing to provide the Bankruptcy Court with any evidence that the treatment of impaired creditors (and specifically DTSC) is at least as favorable as under a prompt chapter 7 liquidation, the Debtors have failed to even attempt to meet their burden of proving that the Plan is in the best interests of creditors in satisfaction of section 1129(a)(7) of the Bankruptcy Code.

90.     Further, DTSC believes that a prompt liquidation would provide at least as favorable a return to DTSC than under the current Plan. Under the current Plan, the Vernon Plant could receive a minimum of nothing and a maximum of $2.5 million and would lose any right to pursue those parties responsible for the Debtors' past acts. In a prompt liquidation, the Vernon Plant might not receive an allocation of $2.5 million, but DTSC would retain claims against all parties and the Vernon Plant would not be immediately abandoned. In that scenario, DTSC could work with the Chapter 7 trustee to pursue litigation against those parties responsible for the Debtors' past actions. DTSC believes, and the Debtors have not demonstrated to the contrary, that a Chapter 7 liquidation would result in a better recovery for California than the treatment provided by the Plan.

***vi.     By its terms the Plan fails to satisfy Section 1129(a)(8) of the Bankruptcy Code. As the Plan unfairly discriminates against certain Environmental NPP Claims and is not fair and equitable with respect to Class 8 Claims, the Plan does not satisfy Section 1129(b) of the Bankruptcy Code.***

91.     Section 1129(a)(8) of the Bankruptcy Code requires that, with respect to each class of claims or interests, such class has accepted the plan or is not impaired by the plan. 11 U.S.C. § 1129(a)(8). The plan fails to satisfy this section because Classes 7, 8, 9, 10, 11, and 12 are impaired

and are deemed to reject. Instead, the Debtors seek confirmation of the Plan pursuant to 1129(b) with respect to the rejecting Class of Claims or Interests.

92.     Section 1129(b) of the Bankruptcy Code provides that if a plan otherwise meets all of the other applicable requirements of section 1129(a) (except those in subsection (a)(8)), then a court may confirm a plan over the dissenting vote of an impaired class of claims so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. 11. U.S.C. § 1129(b)(1). As the Plan fails to satisfy a number of other requirements of 1129(a), an analysis of whether the Plan satisfies 1129(b) is unwarranted; nevertheless, the Plan is not fair and equitable with respect to Environmental NPP Claims and discriminates unfairly against certain Environmental NPP Claims.

93.     The weight of judicial authority holds that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code if similar claims are treated differently without a reasonable basis for the disparate treatment. *See Exide* 303 B.R. 48,78 (Bankr. D. Del. 2003); *In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993); *In re Buttonwood Partners, Ltd*., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990). The unfair discrimination standard of section 1129(b) "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (citing *In re Johns-Manville Corp*., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)). Delaware courts have held that "[t]he hallmarks of the various tests [of unfair discrimination under section 1129(b)(1)] have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In re Lernout & Hauspie Speech Products, N.V*., 301 B.R. 651, 660 (Bankr. D. Del. 2003) (citations omitted); *In re Tribune Media Company*, 587 B.R. 606 (D. Del. 2018); *aff'd In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020)

(analyzing principles framing the "unfair-discrimination" standard).

94.      "In considering whether a plan unfairly discriminates, courts apply a rebuttable presumption that unfair discrimination exists if there [is]: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of net present value of all payments) or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *Armstrong,* 348 B.R. 111 at 121 and *In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999); *see also In re Lernout & Hauspie Speech Prods, N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (explaining rebuttable presumption); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (adopting rebuttable presumption test). When assessing unfair discrimination, "the analysis for determining whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting class." *In re Nuverra Envtl. Solutions, Inc.*, 590 B.R. 75, 89 (D. Del. 2018) (citing *In re Tribune Co.*, 472 B.R. 223, 244 (Bankr. D. Del. 2012)).

### a. The Plan may unfairly discriminate between General Unsecured Claims and Environmental NPP Claims.

95.      The Plan treats holders of Allowed General Claims differently than Environmental NPP Claims.

96.      The Plan provides that a holder of an Allowed General Unsecured Claim receives (a) the GUC Trust Beneficial A Interests and (b) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan. The GUC Trust Beneficial A Interests are allocated their Pro Rata share of $2,400,000 that is funded to the GUC Trust. The treatment of Allowed General Unsecured Claims

is not subject to any conditions.

97.     The Plan provides that a holder of an Allowed Environmental NPP Claim receives either (i) beneficial interests in the Environmental Response Trust if the holder is a Global Settlement Party, or (ii) if the holder is not a Global Settlement Party: (a) beneficial interest in the Vernon Environmental Trust, (b) the abandonment of the Non-Performing Property and $2,587,523, or (c) the abandonment of the Non-Performing Property and a Lien against such Non-Performing Property. All holders of Allowed NPP Claims also receive their Pro Rata share of GUC Trust Beneficial B Interests; and Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan. The GUC Beneficial B Interests effectively provide holder the right to receive their Pro Rata share of the GUC Trust Assets after the GUC Trust has distributed $2,400,000 to holders of GUC Trust Beneficial A Interests.

98.     Because the Plan provides different recoveries for similarly situated classes, a rebuttable presumption exists as to unfair discrimination. At this point, DTSC does not have sufficient information to determine whether such different treatment results in unfair discrimination. The Debtors have also failed to demonstrate that the Plan does not unfairly discriminate between General Unsecured Claims and Environmental NPP Claims.  In order to confirm the Plan, the Debtors must make that showing.

   **b.   The Plan also unfairly discriminates among Environmental NPP Claims.**

99.     While the Plan *may* unfairly discriminate between General Unsecured Claims and Environmental NPP Claims, the plan unambiguously and unfairly discriminates among holders of Environmental NPP Claims. Such discrimination is in direct contravention of Section 1129(a) and Section 1129(b) of the Bankruptcy Code.

100.    The Plan effectively attempts to create two subclasses within Class 8: (i)

Environmental NPP Claims held by Global Settlement Parties and (ii) Environmental NPP Claims held by non-Global Settlement Parties (i.e. DTSC). An application of the rebuttable presumption test evidences the Plan's unfair treatment and discrimination against Environmental NPP Claims held by DTSC. First, the Environmental NPP Claims are a dissenting class under the Plan. Second, the claims held by holders of General Unsecured Claims, Environmental NPP Claims held by Global Settlement Parties, and Environmental NPP Claims held by DTSC are all entitled to the same priority. Finally, the Plan provides for different treatment to holders of Environmental NPP Claims on the basis of whether such holder is a Global Settlement Party; treatment that results in both (a) a materially lower percentage recovery for DTSC, and (b) an allocation of materially greater risk to DTSC. There is no reasonable basis for this discrimination; in fact, the disparate treatment is specifically designed to punish DTSC in a misguided effort to compel DTSC to accept the subpar settlement reflected in the Global Settlement.

101.    Therefore, the Plan unfairly, without any rational basis, discriminates between two classes of the same priority, and the Plan cannot be confirmed as it fails to satisfy section 1129(b)(1) of the Bankruptcy Code.

c.    **The Plan is not fair and equitable.**

102.    Section 1129(b)(2) sets forth the standards for determining whether a plan is fair and equitable with respect to impaired dissenting claims or interest. A plan is "fair and equitable" within the meaning of section 1129(b)(2) if it provides that the holder of any claim or interest in a class junior to the claims or interests of such class will not receive or retain under the plan on account of such junior claim or interest any property. 11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (stating that absolute priority rule "provides that dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property.") (citation omitted).

103.     The Plan is not fair and equitable because it improperly Disallows any Vernon NPP Claims against the Debtors to the extent that such Vernon NPP Claims are asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. Other holders of Claims are free to compromise Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, or Other Secured Claims; however, the Plan may not simply Disallow DTSC's claims.

104.     Therefore the Plan fails to satisfy section 1129(b)(2) of the Bankruptcy Code and cannot be confirmed.

### vii.     The Plan fails to provide for the payment of Allowed Priority Claims and therefore does not satisfy Section 1129(a)(9) of the Bankruptcy Code.

105.     Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive full compensation absent agreement to differing treatment. 11 U.S.C. § 1129(a)(9). Despite the fact that the Governmental Bar Date is November 16, 2020, the Plan purports to Disallow Vernon NPP Claims against the Debtors to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. Plan at §§ 5.2(e)(i)(A), 5.2(e)(ii)(D), 5.2(e)(iii)(E). Those provisions of the Plan only apply to DTSC. To the extent DTSC has any Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims or Other Secured Claims, such Claims must be satisfied in full, in Cash under the Plan.

### viii.     Excluding the votes of insiders, no class of impaired claims voted to accept the Plan and therefore, the Plan does not satisfy Section 1129(a)(10) of the Bankruptcy Code.

106.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of at least one impaired class of claims, excluding the votes of any insider. 11 U.S.C. § 1129(a)(10). The prohibition against insider voting protects creditors from having to fight a cramdown plan premised on the acceptance by a class of creditors holding insider claims. *In re 266 Washington*

*Assocs.,* 141 B.R. 275, 287 (Bankr. E.D.N.Y. 1992); *see also, In re Anderson Oaks (Phase 1) Ltd. P'ship*, 77 B.R. 108, 112-13 (Bankr. W.D. Tex. 1987) ("In short, [] there must be some one other than the debtor, other than the insiders, and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable grounds that justify resort to cram down.").

107.    Pursuant to section 3.3 of the Plan, the only Classes of Claims Impaired by the Plan that are entitled to vote to accept or reject the Plan are (i) Class 4 Superpriority Notes Guarantee Claims, (ii) Class 5 Exchange Priority Notes, and (iii) Class 6 First Lien Notes Claims. Each of these Classes of Claims is controlled by insiders, and therefore, absent the affirmative vote of another class, the Debtors cannot satisfy Section 1129(a)(10) of the Bankruptcy Code.

108.    Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors. Superpriority Notes Guarantee Claims are Secured Claims arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors. The Superpriority Notes are the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to the Superpriority Notes Indenture. The Plan provides that the Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture. The Superpriority Noteholders hold first-priority liens on all equipment, inventory, real property, intellectual property, the stock of Exide Technologies and certain subsidiaries of Holdings, and substantially all of the other assets of Exide Technologies, Holdings and certain subsidiaries of Holdings, other than certain collateral pledged to secure ABL Claims, and a hold second-priority lien on the collateral pledged to secure ABL Claims. Messing Decl. ¶ 45.

109.     The Consenting Creditors hold at least 90 percent (and may hold 100 percent) of the Superpriority Notes. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately (i) 90.11% of the Superpriority Notes); *see also Verified Statement of the Ad Hoc Group Pursuant to Bankruptcy Rule 2019* [Docket No. 140] (the "2019 Statement") (stating that the Consenting Creditors hold in excess of $154 million in outstanding principal of Superpriority Notes).

110.     Class 5 consists of Exchange Priority Notes Claims against the Debtors. Exchange Priority Notes Claims are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder. The Exchange Priority Notes are the 11% Exchange Priority Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture. The Plan provides the Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $390 million (plus all accrued but unpaid interest, costs, fees and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture).

111.     The Consenting Creditors hold at least 87.9 percent (and may hold 98 percent) of the Exchange Priority Notes. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately [] (ii) 87.94% of the Exchange Priority Notes); *see also* 2019 Statement (providing that the Consenting Creditors hold in excess of $381.7 million in outstanding principal of Exchange Priority Notes).

112.     Class 6 consists of First Lien Notes Claims against the Debtors. First Lien Notes Claims are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder. The First Lien Notes are the 11% First Lien Senior Secured Notes due in 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture. The

Plan provides that First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $161,023,000 (plus all accrued but unpaid interest, costs, fees and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture).

113.    The Consenting Creditors hold at least 76.4 percent (and may hold 85 percent) of the First Lien Notes. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately [] (iii) 76.4% of the First Lien Notes); see also the 2019 Statement which provides the Consenting Creditors hold in excess of $137.05 million in outstanding principal of Exchange Priority Notes.

114.    The Consenting Creditors also hold in excess of 80 percent of the equity interests in Holdings. Messing Decl. ¶ 11 ("[The Ad Hoc Group] holds, in the aggregate, approximately [] (iv) 80% of the equity interests in Holdings); *see also* 2019 Statement.

115.    Section 101(31)(B) defines "insider" to include persons in control of the debtor. The Consenting Creditors control Class 4, Class 5 and Class 6 and control a super-majority of Interests in the Debtors. The Consenting Creditors are "insiders" as contemplated by the Bankruptcy Code. Further, even if the Consenting Creditors did not exercise actual day-to-day control of the Debtors, the Consenting Creditors are, nevertheless, insiders. *See, In re S. Beach Sec., Inc.* 376 B.R. 881, 889 (Bankr. N.D. Ill. 2007) ("To be an insider of the debtor [as a person in control], a person need not have legal or absolute control of the debtor.") (quotation omitted). Congress' use of the word "includes" in section 101(31) evinces its "expansive view of the insider class, suggesting that the statutory definition is not limiting and must be applied on a case by case basis." *In re Holly Knoll P'ship*, 167 B.R. 381 (Bankr. E.D. Pa. 1994) (citations omitted); see also *In re Oakwood Homes Corp.* 340 B.R. 510, 523 (Bankr. D. Del. 2006) ("[From the legislative

history] courts have applied insider status flexibility to include a broad range of parties who have a close relationship with the debtor.") (citations omitted).

116.     The Plan seeks to accomplish what Section 1129(a)(10) forbids: cramdown of a plan using an insider-dominated class without any indicia of support for the plan by non-insider affected parties. The Debtors have not—and cannot—satisfy their burden under Section 1129(a)(10), and the Bankruptcy Court should not allow the Debtors to utilize the votes of classes of Claims controlled by insiders to confirm a Plan that strips any remaining value from the Debtors' estates, compels the imposition of burdensome, onerous overbroad releases on non-consenting creditors, and threatens to improperly abandon contaminated property.

## C.     The Injunctions, Releases, and Exculpation Provisions in the Plan are Impermissible.

117.     The Plan contains overbroad injunctions, releases, exculpation, and discharge provisions that should not be approved by the Bankruptcy Court. The Plan purports to provide various third parties with releases from (i) claims held by other third parties, and (ii) claims held by the Debtors. Both are impermissible and warrant denial of confirmation of the Plan. Further, the injunctions and exculpations are overly broad and act as a *de facto* discharge of liability, in direct contravention of section 1141 of the Bankruptcy Code.

### i.     *The Release of Third-Party Claims are inappropriate.*

118.     Section 524(e) of the Bankruptcy Code provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Accordingly, the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities. *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000).

119.     Although the Third Circuit has not established a blanket rule permitting or proscribing non-debtor releases, it has stated that "our precedents regarding nonconsensual third-

party releases and injunctions in the bankruptcy plan context set forth *exacting standards that must be satisfied* if such releases and injunctions are to be permitted, and *suggest that courts considering such releases do so with caution*." *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (emphasis added); *see also In re Cont'l Airlines*, 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases [are] *fairness, necessity to the reorganization, and specific factual findings to support these conclusions*[.]") (emphasis added).

120.    Further, "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied…the broader context of the *Continental* discussion" provides that such releases should only be approved in the "context of extraordinary cases." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001), *appeal dismissed by*, 280 B.R. 339 (D. Del. 2002); *see also, Was. Mut.*, 442 B.R. at 351 ("While the Third Circuit has not barred third party releases, it has recognized that they are the exception, not the rule.") (citing *In re Cont'l Airlines*, 203 F.3d 203). These Chapter 11 Cases are not an extraordinary case.

121.    In the Debtors' previous Chapter 11 proceedings, the Court ruled that "non-consensual releases may be approved only in an 'extraordinary' case if *all* of the following four factors are present: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution the Debtor's plan, (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release." *In re Exide Techs.*, 303 B.R. 48 at 75 (emphasis added). This Court has also noted a permanent injunction limiting the liability of nondebtor parties is a rare thing and warned against the exercise of "unfettered discretion to discharge nondebtors from

liability." *See In re Genesis Health*, 266 B.R. at 608 (discussing *In re Cont'l Airlines*, 203 F.3d at 212, 213, n.9) (quotations omitted).

### a. The non-consensual release is not necessary to the success of the Debtors' reorganization.

122.    To determine whether non-debtor releases are necessary to the reorganization, the plan proponent must demonstrate that there is a relationship between the debtor's successful reorganization and the non-consensual parties' release, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability. *In re Genesis Health*, 266 B.R. at 607. Where the debtors are liquidating, as here, the non-consensual, third-party releases can never be necessary to the reorganization because the liquidation can be successfully accomplished with or without the releases. *See In re In re Wash. Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) citing *In re Nickels Midway Pier, LLC*, WL 20345442, at *13 (Bankr. D.N.J. May 21, 2010); *see also* Disclosure Statement at 24 ("the Debtors did not commence these Chapter 11 Cases with the intent to pursue a recapitalization transaction and emerge from the Chapter 11 Cases as a reorganized business. On the contrary . . . the Debtors' intent was to liquidate")

### b. The Released Parties—the releases—have not provided a sufficient financial contribution to the Debtors' plan.

123.    The Plan provides the Transferred Entities provide certain *de minimis* consideration to holders of General Unsecured Creditors and Global Settlement Parties that hold Environmental NPP Claims and, if this Court imposes the third-party releases set forth in Section 10.6 on DTSC (and purportedly on other California state governmental agencies), the Transferred Entities contribute a token amount for the benefit of DTSC. The financial contribution provided by the Transferred Entities is insufficient to allow this Bankruptcy Court to sanction the permissibility of the extensive, burdensome, and onerous releases in favor of the Transferred Entities.

124.    The exacting standards that must be satisfied if such releases are to be permitted require specific factual findings to support the non-consensual releases. Absent the *de minimis* consideration provided by the Transferred Entities, the Plan is otherwise devoid of financial contributions from the other Released Parties. Therefore, as to all of the other Released Parties, the releases proposed in section 10.6 of the Plan are inappropriate and cannot be approved.

125.    Further, even though the Plan provides that the Transferred Entities provide small financial considerations for the benefit of holders of General Unsecured Claims and Environmental NPP Claims, the Transferred Entities are affiliates of the Debtors. The Plan provides that all Intercompany Claims, which include Claims between the Debtors and non-Debtor Affiliates, will be cancelled and not entitled to a distribution or recovery under the Plan. Plan at §4.9. The Disclosure Statement and Plan are devoid of any information related to the outstanding balances of Intercompany Claims between the Debtors and the Transferred Entities. Therefore, the contribution provided by the Transferred Entities may be illusory. Regardless, the contribution provided by the Transferred Entities is far from critical to the Plan, as the token contribution inures to the benefit of classes of Claims that are deemed to reject the Plan.

c.  **The Plan is not feasible, and therefore the releases set forth in Section 10.6 cannot be approved.**

126.    Given the Debtors may not be able to implement the Plan and that the abandonment of the Vernon Plant may require a subsequent liquidation of Exide Technologies, the Plan is not feasible. Further, the only financial consideration provided by a Released Party is the consideration provided by the Transferred Entities. That financial consideration does not make the Plan feasible. Instead, it provides miniscule distributions to holders of General Unsecured Claims and certain Environmental NPP Claims. That consideration is insufficient to warrant the proposed releases. Finally, as the other Released Parties are not providing financial contributions, the Debtors are

therefore unable to demonstrate their contributions are necessary to make the plan feasible.

**d.  The releases proposed in Section 10.6 are not fair to the non-consenting creditors and therefore cannot be approved.**

127.    DTSC is a non-consenting creditor; DTSC is also a party to and has participated in the administration of the Chapter 11 Cases. Other state governmental agencies have not similarly participated in the Chapter 11 Cases. Nevertheless, the Plan however seeks to impose a release upon "all California state governmental agencies, including the [DTSC], that have jurisdiction regarding the enforcement of Environmental Laws." Plan at §10.6. This release is unfair and unnecessarily broad; it is also contrary to California law because it improperly presumes that all California state agencies may be bound by these Chapter 11 Cases. Finally, the Bankruptcy Court does not have jurisdiction over the other agencies, who have not appeared in the Chapter 11 Cases.

128.    The State of California does not have a unitary system of government, but instead a system of divided executive power. *Marine Forests Soc. v. California Coastal Comm'n*, 36 Cal.4th 1, 31 (Cal. 2005). Accordingly, each individual state agency is considered a separate legal entity. *People ex re. Lockyer v. Superior Court (Cole National Corp.)*, 122 Cal. App. 4th 1060, 1078 (Ct. App. 2004). For purposes of exercising their statutory functions, agencies of the State of California are generally held to be separate legal entities that do not represent each other and cannot bind each other in litigation. *See, e.g.*, *Redevelopment Agency of the City of San Marcos* v. *Com. on State Mandates*, 43 Cal. App. 4th 1188, 1194-1195 (1996) (Department of Finance permitted to intervene in action against the Commission on the ground that the Department and the Commission serve distinct statutory purposes and the Department "is more like an adversary party . . . than it is an equivalent to the Commission itself."); *Riddell v. State of Cal.*, 50 Cal. App. 4th 1607, 1611-1612 (1996) (The fact that two state agencies are both part of the same executive state government does not deprive them of lien rights against each other); *State Water Resources*

*Control Bd.* v. *Office of Admin. Law*, 12 Cal. App. 4th 697, 699-700 (1993) (Water Resources Control Board sought writ of mandate to vacate Office of Administrative Law's ruling that the Board's amendment to water quality control plan violated state Administrative Procedure Act).

129.    Furthermore, all of the other individual federal and state environmental regulatory agencies involved in these Chapter 11 Cases agreed to the Governmental Releases and Covenants Not to Sue, which are limited to only their respective agencies. The Debtors and Settling Governmental Agencies did not seek to impose the Governmental Releases and Covenants Not to Sue on all other federal or state agencies with jurisdiction regarding the enforcement of Environmental Laws. Similarly, there is no need to impose the releases in the Plan upon all California state agencies and doing so discriminates against the State of California. The Debtors cannot demonstrate sufficient support to warrant the unfair releases proposed in Section 10.6 of the Plan

130.    The releases set forth in Section 10.6 of the Plan must be proscribed or the Bankruptcy Court must deny confirmation of the Plan.

ii.    ***The Releases by the Debtors are inappropriate.***

131.    Under Section 10.5 of the Plan entitled "Releases by the Debtors," the Debtors on behalf of the Debtors, the Estates, and the Wind-Down Estates and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust and the GUC Trust) purport to grant extremely broad releases to, among other entities, (i) the Debtors, (ii) each of the Consenting Creditors, (iii) the Europe/ROW Purchaser, (vi) the Transferred Entities, each of the DIP Lenders and the DIP Agent and (v) the Creditors' Committee. Specifically, Section 10.5 of the Plan provides:

> the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the

Wind-Down Estates, in each case, on behalf of themselves and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust and the GUC Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plan, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date…"

Plan at §10.5. Section 10.5 of the Plan further purports to extend these releases to the Related Parties, which include each of the Released Parties Affiliates, current and former officers, directors, principals, stockholders, members, partners, employees, agents, advisory board members, professionals and other representatives. Plan at §§ 1.159 and 10.5.

132.   "Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *In re Wash. Mut., Inc.*, 442 B.R. 314, 345 (Bankr. D. Del. 2011) (citation omitted). In considering the specific facts in these Chapter 11 Cases, the Releases by the Debtors provided in Section 10.5 are unfair and unwarranted. Courts in the Third Circuit consider five

factors in determining whether a debtor's release of a non-debtor is appropriate under a plan:

    i.    an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

    ii.    a substantial contribution to the plan by the non-debtor;

    iii.    the necessity of the release to the reorganization;

    iv.    the overwhelming acceptance of the plan and release by creditors and interest holders;

    v.    the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Was. Mut.*, 442 BR. at 346; *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Exide Techs.*, 303 B.R. 48, 71-72 (Bankr. D. Del. 2003).

133.    The foregoing factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Wash. Mut., Inc.* 442 B.R. at 346. However, these factors "form the foundation for such an analysis, with due consideration of other factors that may be relevant to [the] case." *Id.* at 347. Furthermore, the proponents of a plan bear the burden of proving that the plan complies with all the requirements of the Bankruptcy Code for confirmation.

134.    In considering the facts and circumstances of these Chapter 11 Cases and the breadth of the proposed releases, the release of the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, and their Related Parties are impermissible and unfair; the Debtors cannot demonstrate that the releases satisfy even one of the factors utilized to evaluate the appropriateness of a release, nor can the Debtors offer any credible evidence in support of the factors. Actions pursuing the Released Parties for many of the claims the Debtors seek to release would not deplete the estate's resources. Further, none of the parties proposed to be released by the Debtors provided a "substantial contribution" to the Plan.  Instead, certain of the Released

Parties provided *de minimis* consideration in a transparent attempt to purchase releases—releases that serve to shield such parties from liability well in excess of their contributions. And many of the other Released Parties provided no consideration or contribution at all. The releases by the Debtors are not necessary for the reorganization because the Debtors are not reorganizing. Further, the only classes that voted to accept the Plan are controlled by the Consenting Creditors. All other classes, including the Environmental NPP Claims and the General Unsecured Claims, were deemed to reject the Plan. Finally, the Plan's meager distribution to General Unsecured Claims and Environmental NPP Claims is well shy of payment of all or substantially all of the claims of the creditors and interest holders.

135.    In light of the foregoing, the Bankruptcy Court should proscribe the Releases by the Debtors included in Section 10.5 or deny confirmation of the Plan.

### iii.      *The Plan's injunction is overly broad and impermissibly operates as a discharge of the Debtors and third-parties.*

136.    Section 1141(d)(3) of the Bankruptcy Code bars the Chapter 11 discharge of a debtor that liquidates substantially all property of its estate, that does not engage in business after consummation of a Chapter 11 plan, and that would be denied a discharge under section 727(a) of the Bankruptcy Code. Here, the Debtors are corporate entities that sold (or seek to sell through the Plan) substantially all of their assets, proposed a liquidating Chapter 11 plan, and will not continue in business post-Effective Date. The Debtors are not allowed a discharge.

137.    The Debtors improperly attempt to effect a discharge through the Plan's overly broad injunction provisions in sections 10.3(b)-(d). An injunction such as the one set forth in sections 10.3 of the Plan is "inappropriate as applied to the Debtors because a liquidating Chapter 11 plan may not provide for a discharge of the debtor." *In re Bigler LP*, 442 B.R. 537, 545-46 (Bankr. S.D. Tex. 2010); *see also In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir.

2011) (*en banc*) (explaining that suit injunctions must be "both necessary to the reorganization and

fair").

138.    If approved, the injunction in Section 10.6 provides:

> *all Entities who have held, hold or may hold Claims against or Interests in the Debtors [] and other parties in interest*, along with their respective present or former employees, agents, officers, directors, principals, and affiliates *are permanently enjoined*, on and after the Effective Date, solely *with respect to any Claims, Interests and Causes of Action that will be or are treated by the Plan* from (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind … against or affecting the *Debtors, the Wind-Down Estates*, the GUC Trust, the *Consenting Creditors*, the *Transferred Entities*, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the Frisco CDC, as applicable, [or the property of any such entity]; (ii) enforcing, levying, attaching…collecting, or otherwise recovering by any means, whether directly or indirectly, any judgment, award, decree, or order against the *Debtors, the Wind-Down Estates*, the Trustees, the *Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities*, [or the property of such entity]; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the *Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities*, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at §10.3 (emphasis added).

139.    The provisions of this injunction would result in the discharge of the Debtors, the

Wind-Down Estates, the Trustees, Consenting Creditors, the Europe/ROW Purchaser, the

Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response

Trust, and the Frisco CDC from any Claim, Interest, or Cause of Action that will be or are treated

by the Plan. The scope of the injunction is far too broad and not only impermissibly operates as a discharge of the Debtors, but also impermissibly seeks to insulate third-parties that are not entitled to such protection. The proposed injunctions are neither necessary to the reorganization of the Debtor nor fair and therefore, must be denied.

140.    Further, the releases set forth in Section 10.5 and 10.6 and the injunctions set forth in Section 10.3 impermissibly act as a discharge of any and all Claims and Causes of Action based on or relating to, or in any manner *arising prior to the Effective Date* in contravention of the Bankruptcy Code. *See* Plan 10.5 and 10.6 (emphasis added). Bankruptcy Code section 1141(d)(1) provides that a discharge extends only to debts that arose *before the date of confirmation* of a Chapter 11 plan; therefore, even if the proposed releases were warranted—and they are not—the Plan must use the Confirmation Date, not the Effective Date. 11 U.S.C. § 1141(d)(1)(A).

141.    The injunctions set forth in Section 10.3 must be appropriately revised or the Bankruptcy Court should deny confirmation of the Plan.

iv.    ***The exculpation provision of the Plan is impermissible and must be denied.***

142.    The exculpation provision is overly broad as it essentially absolves the Exculpated Parties from any Claim or Cause of Action, arising on or after the Commencement Date through the Effective Date. The Plan defines Exculpated Parties as:

> (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) each of the DIP Lenders and the DIP Agent, (e) the Creditors' Committee and each of its members in their capacity as such, (f) the GUC Trust, (g) the GUC Trustee, (h) the Trustees, (i) the Consenting Creditors, and (j) with respect to each of the foregoing Persons or Entities in clauses (a) through (i), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided [therein].

143.    Simply stated, the universe of potential claims being released is too broad to be permissible. The exculpation clause must be limited to the fiduciaries who have served during the Chapter 11 Cases: estate professionals, the Creditors' Committee and its members, and the

Debtors' directors and officers. *See In re Wash. Mut., Inc.*, 442 B.R. at 350-351. The exculpation provision of the Plan must be revised or confirmation of the Plan must be denied.

**C.      Other Objections to Confirmation of the Plan.**

*i.      The Plan cannot be confirmed at it is an improper amendment of the Initial Plan.*

144.      In Section 12.4 of both the Initial Plan and the Plan the Debtors reserved the right to amend or modify the Plan prior to entry of the Confirmation Order; however, the right to amend certain provisions of the Initial Plan required the consent of certain parties, including DTSC. Absent DTSC's consent, the Debtors were not permitted to amend or modify the "definition of Settling Governmental Authorities or Schedule 1 to the [Initial Plan]." Initial Plan at §12.4(a). Despite this clear and unambiguous provision, the Debtors amended the Plan, including modifying the definition of Settling Governmental Authorities, without the consent of DTSC. Therefore, the Plan is invalid and cannot be confirmed.

*ii.      The Releases by Holders of Claims and Interests in Section 10.6 are incomprehensible.*

145.      The Releases by Holders of Claims and Interests in Section 10.6 are impermissible and should not be approved. However, even if the Bankruptcy Court finds the Releases by Holders of Claims and Interests meet the requirements under Third Circuit precedent—and they do not— the Plan cannot be confirmed as the releases are unclear and incomprehensible.

146.      Section 10.6 provides:

"As of the Effective Date…the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following…(f) solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims and Environmental NPP Claims and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws…in each case, from any and all Claims and Causes of Action . . . ."

147.      A plain reading of the release provision is difficult, if not impossible. Although the

language is unclear, seemingly (A) the release being imposed on DTSC pursuant to 10.6(f)(i) is a release of only the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors (and no other party, including any Related Party), and (B) the release being imposed on California state governmental agencies, including DTSC, pursuant to 10.6(f)(ii) is limited to the Trustees. The expansive language in subsection (g) further complicates Section 10.6 as it applies to "any Person or Entity in the foregoing clauses." The provisions of the Releases by Holders of Claims and Interests is further confused by the final provision of Section 10.6. As the language is ambiguous at best, the Plan may not be confirmed.

### iii.   *The Disclosure Statement should not be approved.*

148.    The Debtors elected to pursue a combined hearing on approval of the Disclosure Statement and confirmation of the Initial Plan. However, the Global Settlement which served as the basis for the Initial Plan was not approved; instead, the Debtors filed the Plan, which differs dramatically in key provisions from the Initial Plan. The Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code as it does not contain adequate information related to the abandonment of Non-Performing Properties, the treatment of Environmental NPP Claims, or the means for the implementation of the Plan, including the identification of the Plan Administrator and the New Board. Therefore, the Disclosure Statement should not be approved by the Court at the Combined Hearing.

## <u>CONCLUSION</u>

WHEREFORE, DTSC respectfully request that this Court sustain the Objection and require the Debtors to modify the Plan accordingly or deny confirmation of the Plan.

Dated: October 7, 2020                    Respectfully Submitted,


                                          /s/ Matthew L. Hinker
                                          NANCY A. MITCHELL
                                          nmitchell@omm.com
                                          MATTHEW L. HINKER
                                          mhinker@omm.com
                                          O'MELVENY & MYERS LLP
                                          7 Times Square
                                          New York, New York  10036
                                          Telephone:    (212) 326-2000
                                          Facsimile:    (213) 326-2061

                                          PETER FRIEDMAN
                                          pfriedman@omm.com
                                          O'MELVENY & MYERS LLP
                                          1625 Eye Street, NW
                                          Washington, DC  20006
                                          Telephone:    (202) 383-5300
                                          Facsimile:    (202) 383-5414

                                                   -and-

                                          JAMES R. POTTER
                                          james.potter@doj.ca.gov
                                          California Department of Justice
                                          Office of the Attorney General
                                          Public Rights Division
                                          Environment Section
                                          300 S. Spring Street
                                          Los Angeles, CA 90013

                                          ANTHONY A. AUSTIN
                                          anthony.austin@doj.ca.gov
                                          HEATHER C. LESLIE
                                          heather.leslie@doj.ca.gov
                                          California Department of Justice
                                          Office of the Attorney General
                                          Public Rights Division
                                          Environment Section
                                          1300 I Street, Suite 125
                                          Sacramento, CA 95814
                                          Tel.: 213-369-6326

                                          XAVIER BECERRA
                                          Attorney General of California
                                          EDWARD H. OCHOA
                                          Senior Assistant Attorney General

*Counsel to the California Department of*
*Toxic Substances Control*

# <u>TAB 17(a)</u>

**Declaration of Grant Cope in Support of the California Department of Toxic Substance Control's Objections to Debtors' Second Amended Joint Chapter 11 Plan, dated Oct. 7, 2020 [Bankr. D.I. 917-1], as attached to Confirmation Objection *excluding exhibits**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| EXIDE HOLDINGS, INC., *et al.*,[1] | Case No. 20-11157 (CSS) |
| Debtors. | Jointly Administered |

**DECLARATION OF GRANT COPE IN SUPPORT OF THE
CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S
OBJECTIONS TO DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**

I, GRANT COPE, hereby declare as follows:

1.      I am currently the Deputy Director of the Site Mitigation & Restoration Program at the California Department of Toxic Substances Control ("DTSC").  I offer this declaration in support of DTSC's Objections to Exide Holdings, Inc. and its affiliated debtors' (collectively, "Exide") Second Amended Joint Chapter 11 Plan (the "Plan").  The facts stated herein are true to the best of my knowledge, information, and belief based on DTSC's investigation and study of the Vernon Plant (as defined below) and surrounding area.[2]

2.      DTSC is a California government agency with authority to regulate all aspects of hazardous waste management in California.  *See* Cal. Health & Safety Code § 58000 *et seq.* DTSC implements and enforces California's Hazardous Waste Control Law ("HWCL"), Health & Safety Code § 25100 *et seq.*, as well as laws concerning the cleanup of releases or threatened releases of hazardous substances.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms not otherwise defined herein have the meaning set forth in DTSC's Objections to the Plan.

## I.    The Vernon Plant

3.      Exide is the owner of a property located at 2700 South Indiana Street, Vernon, California that formerly operated as a lead-acid battery recycling facility (the "Vernon Plant"). Exide acquired the Vernon Plant in September 2000 and conducted operations there until approximately March 2015.  The Vernon Plant's average production was 100,000 to 120,000 tons of lead per year, which is equivalent to approximately 11 million automotive batteries, or approximately the number of spent batteries generated in California annually.  Approximately 85% of the lead was derived from used automobile batteries, whereas the remaining 15% came from other batteries and scrap lead.

4.      From 2000 to 2015, Exide operated the Vernon Plant under hazardous waste facility "interim status" authorization, which allows a facility to continue operations pending a decision on its permit application.  In 2015, DTSC informed Exide that the company would not receive a permit to continue operation and Exide agreed to comply with state and federal cleanup requirements described in orders that DTSC issued to Exide.  Concurrently, the United States Attorney's Office for the Central District of California ("USAO") agreed not to criminally prosecute Exide for violations of hazardous waste laws in exchange for ceasing operations at the Vernon facility and agreeing to abide by DTSC's cleanup requirements.  A true and correct copy of the Non-Prosecution Agreement is attached as Exhibit 1.

5.      As a result of Exide's operations, the Vernon Plant is heavily contaminated with lead, arsenic, mercury, and other Constituents of Concern ("COCs") known to have negative health effects, as described further below.  For example, the detected concentrations of lead in soil and dust at the Vernon Plant measure as high as 106,000 mg/kg, far exceeding DTSC's modified Screening Level for lead in industrial soils of 320 mg/kg and the U.S. Environmental Protection Agency's Regional Screening Level of 800 mg/kg.

6.      Contamination from the Vernon Plant also extended far offsite.  In this declaration, the term "Vernon Site" refers to the Vernon Plant and the surrounding areas that have been contaminated with hazardous substances from the Vernon Plant.

**II.      DTSC's Enforcement Actions Against Exide**

7.      Under the HWCL, DTSC is authorized to initiate enforcement actions against regulated entities, including issuing corrective action orders and imposing penalties for noncompliance with such orders.  *See* Cal. Health & Safety Code §§ 25187, 25187.1, 25188, 25189, 25189.2.  Pursuant to this authority, DTSC has executed a series of enforcement actions against Exide aimed at remediating the Vernon Site and protecting the health and safety of California residents.

A.      The 2002 Corrective Action Consent Order

8.      In February 2002, DTSC issued a Corrective Action Consent Order (the "CACO") to Exide.  Under the CACO, Exide is required to, *inter alia*, undertake corrective action of and investigate releases at and from the Vernon Plant.  A true and correct copy of the CACO is attached as Appendix 2 to the Non-Prosecution Agreement.  See Exhibit 1.

B.      The 2014 Stipulation and Order

9.      On November 20, 2014, during Exide's prior bankruptcy proceedings, this Court authorized Exide to enter into the 2014 Stipulation and Order, docket HWCA No. 2014-6489.[3] The purpose of the 2014 Stipulation and Order was to resolve disputes regarding Exide's (i) obligations under the CACO and the 2013 stipulation and order requiring Exide to take certain actions to address the Vernon Plant's air emissions and storm water conveyance system,

---

[3] The 2014 Stipulation and Order was stipulated and ordered by DTSC on November 21, 2014, and amended in 2015 and 2016.  It was referred to in various documents in the bankruptcy proceeding as the "2014 Stipulation and Order," "2014 Vernon Stipulation," "2014 Vernon Stipulation and Order," and the "2014 Order."

(ii) Hazardous Waste Permit Application, (iii) Closure/Post Closure Plan and Cost Estimate (as required by the Permit Application), and (iv) funding of financial assurance obligations for the Closure/Post Closure Plan and Cost Estimate.

10.     Under the 2014 Stipulation and Order, Exide agreed, *inter alia*, to (i) provide financial assurance for closure and corrective action activities, and (ii) to organize corrective action activities into off-site activities in residential areas and industrial areas and on-site activities at the Vernon Plant, including action to address groundwater contamination.  A true and correct copy of the 2014 Stipulation and Order is attached as Exhibit 2.

### C.     The 2015 Amendment and Closure Plan

11.     In March 2015, concurrent with Exide's motions for authority to enter into a Non-Prosecution Agreement with the USAO and to close the Vernon Plant, Exide sought and obtained the Bankruptcy Court's permission to enter into a Stipulation and Order Amending the 2014 Stipulation and Order, docket number HWCA No. 2014-6489 (the "2015 Amendment"). A true and correct copy of the 2015 Amendment is attached as Exhibit 3.

12.     In December 2016, DTSC approved Exide's Closure Plan for the Vernon Plant (the "Closure Plan").  The Closure Plan has three phases: (1) "Phase One" closure work to remove all hazardous wastes from all regulated hazardous waste units, to remove all such units and to demolish to grade all buildings related to such hazardous waste units; (2) "Phase Two" contingent closure work to address unforeseen circumstances that arise during closure or additional activities that are required to complete or certify final facility closure, including removal of contaminated soil beneath the equipment, buildings, structures and pavement; and (3) "Phase Three" post-closure and contingent post-closure work to implement long-term inspections, monitoring and maintenance.  A true and correct copy of the Closure Plan is attached as Exhibit 4.

### D.     DTSC's July 19, 2019 Letter

13.     Under the CACO and 2014 Stipulation and Order, as amended, Exide is required to determine the nature and extent of the contamination at and from its Vernon Plant, including any impact in the surrounding residential areas.  In October 2018, Exide submitted a Draft Residential RCRA Facility Investigation ("RFI") Report, but the report did not comply with requirements of the CACO or the 2014 Stipulation and Order.  In the report, Exide claimed, without support, that it is not responsible for contamination in the surrounding residential areas and that further off-site corrective action was not warranted.

14.     In a July 19, 2019 letter, DTSC found that Exide failed to determine the nature and extent of the contamination from its Vernon Plant, in violation of the CACO and 2014 Stipulation and Order (as amended).  Among other things, DTSC found that:

a.     Under the CACO, Exide was required to determine the nature and extent of the release of hazardous waste or constituents from the Vernon Plant without qualification. Instead, Exide improperly calculated an "Urban Background" level for lead, antimony, and cadmium and could not accurately evaluate the extent of its releases based on this "Urban Background" level.  Exide used this improper level and, thus, could not and failed to conduct the required determination of the extent of its releases into the residential areas surrounding the Vernon Plant.

b.     Exide willfully disregarded DTSC and U.S. Environmental Protection Agency ("EPA") guidance documents in calculating its lead, antimony, and cadmium background levels.  Exide also failed to follow DTSC direction on how to complete the Residential RFI in accordance with the applicable guidance documents.

c.      Exide failed to follow the conditionally-approved Residential RFI Work
        Plan, including DTSC's comments on the Work Plan, when conducting
        the Residential RFI and preparing the RFI Report.

d.      Exide failed to identify and fill data gaps in its investigation and used the
        data gaps to limit its analysis of contamination in the residential areas.

15.      The July 19 Letter informed Exide that: (i) Exide's refusal to determine the nature
and extent of the contamination from the Vernon Plant, as detailed in that letter and its
attachments, violated the CACO and 2014 Stipulation and Order; and (ii) this refusal amounted
to 24 separate violations of the CACO and 2014 Stipulation and Order, resulting in stipulated
penalties of $240,000.  Given Exide's refusal to conduct a proper investigation to determine the
nature and extent of its contamination from the Vernon Plant, the DTSC informed Exide that
DTSC would exercise its authority to modify the Residential RFI Work Plan and Draft
Residential RFI Report, and would complete any necessary Residential RFI work.  The DTSC
also informed Exide that it would be responsible for all costs incurred by DTSC.  A true and
correct copy of the July 19 Letter is attached as Exhibit 5.

**E.      The July 2020 IM Letter**

16.      On July 3, 2020, DTSC issued to Exide a Notification of Requirement to Perform
Interim Measures Letter ("IM Letter"), which ordered Exide to undertake additional corrective
action work associated with high levels metals concentrations from dust and dirt samples
collected during DTSC's November 2019 sampling.  The samples were collected from seven
structures located outside the main containment building (described further below), but within
the Vernon Plant property, and the highest concentration of lead in dust was 48,000 mg/kg,
collected in the Engineering Building's basement.  A true and correct copy of the July 2020 IM
Letter is attached as Exhibit 6.

### III.    Current Conditions at the Vernon Plant

17.    Exide began on-site closure activities, as described in the December 2016 Closure Plan, in late 2017.  The containment building where the main lead processing was conducted in recent years is currently maintained under negative pressure in a temporary full enclosure unit ("FEU"), which is intended to prevent the release of lead and other COCs into the environment. Because air will naturally flow from higher-pressure areas to lower-pressure areas, the negative pressure allows air to flow into the building but not escape from it.

18.    The following photograph depicts the Vernon Plant, with the white FEU encapsulating the large building on the right:



19.    The FEU, along with its associated air pollution control devices (air scrubbers and baghouses) and associated monitoring equipment, are critical infrastructure to prevent off-site migration of dust containing very high levels of lead and other metals present in this building. The FEU requires daily operations, maintenance, inspections, and monitoring.  Active operation and maintenance of the baghouses is also necessary to maintain a negative pressure environment

and to prevent the release of lead dust into the surrounding communities.  Inspections of the entire FEUs outer layer and regular maintenance is necessary to prevent even the smallest of tears from growing.

20.     Monitoring is necessary to ensure that negative pressure performance requirements are met in the FEU, that baghouses are operating properly, and to verify that airborne lead dust is not migrating from the Containment Building.  This monitoring is accomplished through observing a network of manometers to ensure adequate negative pressure in maintained, and by reviewing data from air samples collected at high-volume lead- and arsenic-in-air sample collection stations at the facility's perimeter.

21.     Notably, the FEU has experienced multiple tears since the Phase 1 closure began in late 2017, including a large tear identified the morning of June 10, 2020, which is depicted in the following photograph:



22.     Previous tears have led to violation notices issued by the South Coast Air Quality Management District ("SCAQMD") and DTSC due to the loss of adequate negative pressure. SCAQMD has issued three prior notices of violation and DTSC issued one since closure began.

23.     Previous tears to the FEU include one on December 26, 2019, where heavy plastic sheeting covering the FEU ripped during a seasonal wind event.  DTSC and SCAQMD issued separate Notices of Violation to Exide following this incident for not maintaining the required negative pressure.  Exide responded to the incident and completed repairs and added upgraded protections within approximately one week.  A similar incident also occurred on February 17, 2019.  In response to the February 17, 2019, incident SCAQMD issued a notice of violation to Exide on March 15, 2019.

24.     The Phase 1 closure was scheduled to be completed by December 2021 (based on the most recently amended schedule proposal submitted by Exide on November 6, 2019), but on March 21, 2020, Exide suspended active closure work at the facility.  Exide claims the COVID-19 pandemic has created a *force majeure* situation, preventing active closure work from continuing.  DTSC strongly disagrees with Exide's *force majeure* assertion and has directed Exide to resume work.  Exide has refused, but has continued basic maintenance and security measures to prevent a release from the Vernon Plant.  Exide's suspension of closure work violates the California Health & Safety Code and the 2014 Stipulation and Order.

**IV.     Health Effects of COCs Present at the Vernon Plant**

25.     Many of the COCs found at the Vernon Plant are known to have severe negative health effects when inhaled or ingested.

26.     Lead is a neurotoxin that accumulates both in soft tissues, bones, and teeth.  Lead is a highly poisonous metal (through ingestion and inhalation pathways), affecting almost every organ and system in the body.  It has adverse effects on learning and memory and causes other

neurological effects (such as peripheral neuropathy and psychiatric problems), anemia, damage

to the kidneys, high blood pressure in middle-aged and older people and brain damage,

cardiovascular effects, immunological, reproductive and developmental effects.  It may cause

miscarriage in pregnant women exposed to high levels of lead.  Children are particularly

vulnerable to the negative health impacts of lead exposure and are more likely to ingest and

inhale lead in contaminated dusts and soils.

27.    Arsenic is a known human carcinogen.  Chronic, long term exposures to arsenic

causes cancer of the liver, bladder, and lungs in people exposed to it.  Inhaling high levels of

arsenic even for brief periods of time or lower levels can irritate the throat and lungs.  It can

damage blood vessels, have adverse effects on the heart (abnormal heart rhythm), cause

peripheral neuropathy characterized by numbness of hands and feet 'pins and needles' sensation

and cause kidney damage, anemia (decreased production of red and white blood cells.  Acute

high dose exposures or chronic lower dose exposures can lead to nausea, vomiting and diarrhea

and irritation of the gastrointestinal tract.

28.    Beryllium, cadmium, mercury, selenium, trichloroethylene, vanadium, and zinc

are also known to lead to a variety of adverse health effects, including cancer.

**V.     The Imminent and Identifiable Risk of Harm at the Vernon Site**

29.    DTSC has determined that the Vernon Plant poses an imminent and identifiable

risk of harm and that Exide's proposed abandonment of the property would substantially increase

that risk.  Specifically, Exide's failure to implement the Closure Plan and instead rely solely on

the FEU has created a significant and imminent risk that residents and on-site and off-site

workers, including construction workers, will ingest, inhale, or have dermal contact with dust

and soils containing elevated concentrations of COCs, particularly lead.

30.     As noted above, the FEU is designed as a temporary structure and should not remain in place indefinitely as the primary barrier between the highly contaminated environment inside the FEU and the community at large.  The likelihood of a catastrophic failure increases with time and is exacerbated by high summer temperatures and high Santa Ana winds (most common in the fall and spring).  Despite regular inspections and maintenance, there have already been several large tears, which, as described above, resulted in regulatory violations.

31.     Should a catastrophic failure of the FEU occur, large amounts of contaminated dust would be released into other areas of the site and the surrounding community.  The dust currently inside the Containment Building is extremely high in lead content—orders of magnitude higher than dust located outside the FEU.  And it will continue to reside there until the Phase 1 Closure is completed.  While Exide claims that previous tears to the FEU were immediately abated and that no off-site spread of lead occurred, Exide will not be in a position to abate future tears if it is permitted to abandon the property.  In addition, Exide was fortunate to avoid a catastrophic failure in those prior instances, and if Exide abandons the property, it will not be in a position to perform the maintenance necessary to avoid a catastrophic failure in the future or address the resulting damage when such a failure occurs.

32.     A catastrophic failure of the temporary FEU would endanger current on-site and off-site workers, nearby residents, future residents, and residential construction workers. Occupants of the Vernon Plant, industrial/commercial properties, residential properties, and children at schools and in parks may be exposed to the COCs by way of the exposure routes described above. A particular area of interest is comprised of residential, school, and park properties where vulnerable populations, including children and pregnant women, would face exposure to dust containing extremely high levels of lead if the FEU were to fail.

33.     DTSC has concluded that excessive amounts of lead and other heavy metals (on the order of thousands of tons) have been emitted into the atmosphere and deposited to the ground and other surfaces around the Vernon Plant.  Much of this deposited contamination is then re-suspended by wind events or passing trucks and vehicles resulting in secondary fugitive emissions that transport heavier particulates even farther from the facility into surrounding areas. Over the years Exide has been required to perform interim measures and emergency response actions to clean-up and mitigate high levels of lead on-site and in the surrounding off-site industrial and residential areas.  Still, lead and other hazardous metals are persistently detected, as noted in results from samples collected by DTSC onsite in November 2019.  There is thus an imminent risk of harm associated with Exide abandoning the Vernon Plant and permanently halting closure and corrective action.

34.     The harm related to Exide halting its closure activities and corrective action can be summarized by the following prioritized issues:

- On-site exposure to surface dust containing high COC concentrations;

- Off-site dust and dirt exposures (*e.g.*, lead-dust on neighboring properties and in drainage from roof tops); and

- Exposure to contaminated surface water.

35.     **On-site surface dust**.  Earlier interim measures data collected at, or immediately near, the Vernon Plant, on paved surfaces, such as sidewalks or roadways, shows that concentrations of metals including lead, arsenic, and antimony are present at levels that pose an unacceptable cumulative cancer risk and non-cancer hazard to the general public that would be exacerbated if the site were abandoned by Exide.  For example, very high concentrations of lead was detected in dust on paved surfaces (10,500 mg/kg to 58,000 mg/kg).  These levels are at

least a hundred to thousand times higher than the CalEPA/DTSC commercial/industrial and residential soil/dust screening level for lead of 320 mg/kg and 80 mg/kg, respectively.

36.    **Off-site soil and dust.**  Surface dust (from paved surfaces) and soil samples were collected from locations stepping out from the boundary of the facility to the residential neighborhood located 4,500 feet away as part of the investigation to determine the nature and extent of contamination originating from the Vernon Plant.  These samples show that concentrations of lead are highest closest to the facility and gradually drops off as the distance from the facility increases. For instance, lead concentrations in all soil and surface dust samples collected from the first 500 foot radius around the outside of the facility exceeded the commercial/industrial screening level of 320 mg/kg, with maximum concentrations in soils and dust reaching 6,700 mg/kg and 4,800 mg/kg, respectively. Arsenic concentrations also exceeded the upper bound Southern California ambient level of 12 mg/kg in six out of ten dust samples and six out of nine soil samples collected from the first 500 ft radius stepping out from the facility.

37.    Prior to its bankruptcy filing, Exide was supposed to coordinate with the neighboring Baker Commodities, Inc. site, which is under a DTSC Voluntary Cleanup Agreement, to clean up lead and other metals contamination in Baker's parking lot and building rooftops.  Exide published a work plan in July 14, 2015, indicating that a soil sample collected by Exide from the Baker parking lot contained a lead concentration of 42,000 mg/kg and that this sample location is approximately 700 feet southeast of Exide's emissions stack area.  Further sampling at the Baker site in 2018, performed by a SCAQMD inspector, confirmed that even higher levels of lead were present throughout the area.

38.     **Contaminated Surface Water.**  The Vernon Plant's wastewater treatment plant, surface impoundment, and stormwater conveyance system were scheduled to remain in place through the end of the Phase 2 Closure.  These systems work together to ensure that lead-contaminated wastewater and stormwater does not flow from the facility into the surrounding area and into municipal stormwater systems during rain events and is instead treated and released to the municipal sanitary sewer system under a Los Angeles County Sanitation District Waste Discharge Permit.  Exide's failure to operate and maintain these critical systems upon abandoning the property could result in the release of lead-contaminated stormwater onto the sidewalks and streets surrounding the facility, as well as to local surface water bodies via the municipal stormwater system.

39.     The surface impoundment is an open, in-ground, L-shaped, lined collecting pool with a capacity of 2,350,000 gallons.  It is in the South Yard of the Vernon Plant.  Exide is required to remove any accumulated stormwater/rainwater and sediment within 24 hours and conduct frequent inspections and any necessary maintenance and repairs to "maintain the integrity" of the liner system.  If Exide abandons the property and such tasks are not conducted in a timely manner, particularly during a heavy storm event, water contaminated with COCs could overflow and enter the Los Angeles River, a water body listed under Section 303(d) of the Clean Water Act as an "impaired water."

**VI.     Anticipated Maintenance and Remediation Costs at the Vernon Plant.**

40.     DTSC understands that Exide is currently spending around $800,000 per month to maintain and monitor the Vernon Plant, even while the Phase 1 Closure work has been halted.

41.     Completing the Phase 1 closure work and certain corrective action tasks is an essential part of mitigating the imminent risk of harm at and from the Vernon Plant.  Based on DTSC's analysis of these tasks and their expected costs, an analysis that has been performed by

staff working under my direction, DTSC estimates that it will cost approximately $72 million to complete these tasks and mitigate the imminent risk of harm at and from the Vernon Plant.

42.     DTSC estimates that future closure and on-site corrective action costs at the Vernon Plant to complete all phases of the Closure Plan will total approximately $145 million, which is substantially more than the $88 million estimated by Exide in its First Day Declaration in the bankruptcy case. It is also substantially more than the approximately $26 million of financial assurances available to DTSC under the 2014 Stipulation and Order for this work.

43.     DTSC also estimates that future off-site industrial and residential clean-up costs related to the Vernon Plant will be substantial and far exceed the approximately $3 million of financial assurance that is available to DTSC under the 2014 Stipulation and Order for this work.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2020.

_____

Grant Cope

# __TAB 17(b)__

**Declaration of Perry Myers in Support of the California Department of Toxic Substances Control's Objections to Debtors' Second Amended Joint Chapter 11 Plan, dated October 7, 2020 [Bankr. D. I. 917-8], as attached to Confirmation Objection**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| EXIDE HOLDINGS, INC., *et al.*,[1] | Case No. 20-11157 (CSS) |
| Debtors. | Jointly Administered |

### DECLARATION OF PERRY MYERS IN SUPPORT OF THE CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S OBJECTIONS TO DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN

I, Perry Myers, hereby declare as follows:

1.      I am currently a Supervising Hazardous Substances Engineer I for the Northern California Engineering Services Unit in the California Department of Toxic Substances Control's ("DTSC") Engineering and Special Projects Office ("ESPO").  ESPO serves as DTSC's in-house engineering consultant and performs specialized engineering work for DTSC, including the preparation and review of cost estimates and the review of work plans submitted to DTSC by regulated parties.  I offer this declaration in support of DTSC's Objections to Exide Holdings, Inc. and its affiliated debtors' (collectively, "Exide") Second Amended Joint Chapter 11 Plan (the "Plan").  The facts stated herein are true to the best of my knowledge, information, and belief based on my investigation and study of Exide's Vernon, California property (the "Vernon Plant").

2.      Completing Phase 1 closure and certain corrective action tasks are an essential part of mitigating the imminent risk of harm at and from the Plant.  Based on my analysis of these tasks and their expected costs, I have estimated with a reasonable degree of professional

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

certainty that it will cost approximately $72 million to mitigate the imminent risk of harm at and from the Vernon Plant.   A true and correct copy of the list of necessary tasks and estimated costs is attached as <u>Exhibit 1</u>.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2020.

Perry Myers

2

# __TAB 18__

**Debtors' (I) Memorandum of Law in Support of Confirmation
of Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc.
and its Affiliated Debtors and (II) Omnibus Reply to Objections
Thereto, dated October 12, 2020 [Bankr. D.I. 942]**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x
                         :

**In re**                         :       **Chapter 11**
                         :

**EXIDE HOLDINGS, INC.,** *et al.,*        :       **Case No. 20–11157 (CSS)**
                         :

       **Debtors.**[1]               :       **(Jointly Administered)**
                         :

---------------------------------------------------------- x

## DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Zachary I. Shapiro
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: October 12, 2020
        Wilmington, Delaware

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................1

PLEADINGS AND EVIDENCE IN SUPPORT OF CONFIRMATION .......................................6

FACTS ........................................................................................................7

    **A.**   General Background ..............................................................7

    **B.**   The Global Settlement. .........................................................8

    **C.**   Marketing Process for Europe/ROW Business. ...................................14

    **D.**   Plan Solicitation ................................................................16

ARGUMENT .................................................................................................18

I.    THE AMENDED PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED ................................................................18

    **A.**   Amended Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code. ................19

    **B.**   Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code. ...............................................................20

    **C.**   Amended Plan Complies with Section 1123(a) of the Bankruptcy Code. ..............23

    **D.**   Amended Plan Complies with Section 1123(b) of the Bankruptcy Code. ............24

        **1.**   Plan Permissive Provisions. ........................................... 24

        **2.**   The Global Settlement Is An Integral Component of the Amended Plan and Should Be Approved Pursuant to Bankruptcy Rule 9019 .......... 25

        **3.**   Columbus NPP Termination Documents Should Be Approved. .............. 36

        **4.**   Plan Releases Should Be Approved. ......................................... 38

        **5.**   Europe/ROW Sale Transaction Maximizes Stakeholder Recoveries and is a Sound Exercise of the Debtors' Business Judgment. .................. 65

    **E.**   Amended Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code. .................67

    **F.**   Amended Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code. ........................................70

    **G.**   Amended Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. ........71

    **H.**   Debtors Have Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code ...............................................................72

    **I.**   Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor ...........................................................74

    **J.**   Amended Plan Has Been Accepted by or Is Presumed to Have Been Accepted by All Impaired Classes Entitled to Vote on Amended Plan .................77

    **K.**   Amended Plan Provides for Payment in Full of All Allowed Priority Claims. .........................................................................78

**L.**      Amended Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code. ...............79

**M.**     Amended Plan Is Feasible. ......................................................................................80

**N.**      Amended Plan Complies with Section 1129(a)(12) of the Bankruptcy Code. ..........................................................................................................84

**O.**      Amended Plan Satisfies Section 1129(a)(13) of the Bankruptcy Code. ...............85

**P.**      Amended Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes. ...........................87

       **1.**      Amended Plan Does Not Discriminate Unfairly. .................................... 87

       **2.**      Amended Plan Is Fair and Equitable. ..................................................... 89

**II.**    THE OBJECTIONS TO THE AMENDED PLAN SHOULD BE OVERRULED AND AMENDED PLAN CONFIRMED. ......................................................................90

   **A.**      Objection by California DTSC Should be Overruled. ............................................90

       **1.**      Abandonment of the Vernon Non-Performing Property, if Required Pursuant to the Amended Plan, Should Be Approved. ............. 90

       **2.**      Amended Plan Satisfies Section 1129 of the Bankruptcy Code. .............. 91

       **3.**      The Injunction, Releases, and Exculpation Provided for in the Amended Plan are Appropriate and Should be Approved. ..................... 119

       **4.**      All Other Objections by California DTSC Should be Overruled. .......... 119

   **B.**      The Americas Buyer's Objection Should Be Overruled. .....................................121

       **1.**      The Americas Purchase Agreement Sets Forth Clear Transaction Accounting Principles for the Working Capital Adjustment. ................. 122

       **2.**      The Debtors Will Be Able to Pay Any Amounts Owed in Connection with the Post-Closing Adjustment. ...................................... 123

**III.**    DISCLOSURE STATEMENT, SOLICITATION PROCEDURES, AND VOTING PROCEDURES SHOULD BE APPROVED On a Final Basis. .....................128

   **A.**      The Disclosure Statement Contains Adequate Information. .................................128

**IV.**    CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER. ..................................................................................................................131

CONCLUSION ...............................................................................................................133

## **Exhibits**

**Exhibit A**: Objections Chart
**Exhibit B**: California DTSC Plan Releases
**Exhibit C**: *JRV Group* Confirmation Hearing Transcript

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 710 Long Ridge Rd. Operating Co.*,
   Case No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ..................46, 51

*In re Abbotts Dairies of Pa., Inc.*,
   788 F.2d 143 (3d Cir. 1986)....................................................................................67

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) .....................27, 71

*In re Affiliated Foods, Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000)....................................................................71

*In re Aleris Int'l, Inc.*,
   Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)....................40

*In re Am. Capital Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012).....................................................................................76

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986) ..............................................................................19

*In re Armstrong World Indus., Inc.*,
   *348 B.R. 111 (D. Del. 2006)* ..............................................................................18, 83

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)................................................................................................70

*In re Bildisco*,
   682 F.2d 72 (3d Cir. 1982), *aff'd* 465 U.S. 513 (1984) .........................................37

*In re Bush Indus., Inc.*,
   315 B.R. 292 (Bankr. W.D.N.Y. 2004) .................................................................67

*In re Capmark Fin. Grp. Inc.*,
   438 B.R. 471 (Bankr. D. Del. 2010) .......................................................27, 28, 29

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
   860 F.2d 94 (3d Cir. 1988)....................................................................................121

*In re Charter Commc'ns*,
   419 B.R. .....................................................................................................28, 73, 103

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010) ......................................................67

*In re Coastal Broad. Sys., Inc.*,
   570 F. App'x 188 (3d Cir. 2014) .......................................................19, 98

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000) ...........................................50, 54, 56, 57

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ..............................27, 28, 58, 67

*In re Dana Corp.*,
   412 B.R. 53 (S.D.N.Y. 2008) ...........................................................91

*Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*,
   527 B.R. 157 (D. Del. 2015) .........................................23, 91, 98

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. ............................................................................64, 71, 84

*In re Emerge Energy Services LP*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ................50, 77, 118

*In re Energy Future Holdings Corp.*,
   Case No. 14-10979 (CSS) .................................................................51

*In re Enron Corp.*,
   No. 01 B 16034 .............................................................................105

*Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.)*,
   925 F.2d 320 (9th Cir.1991) ..........................................................106

*In re EV Energy Partners, L.P.*,
   Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) ................60, 66

*In re Evergreen Energy, Inc.*,
   546 B.R. 549 (Bkrtcy. D. Del. 2016) .............................................109

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ..............................................42, 58

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) ...............................................122

*In re Fidelis, Inc.*
   481 B.R. 503 (Bankr. E.D. Mo. 2012) ..........................................51

*In re Filene's Basement, LLC,*
   Case No. 11-13511 (KJC), 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014) ....................32

*In re Finlay Enterprises, Inc.,*
   No. 09-14873 JMP, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .....................77, 86

*Fletcher v. Atex, Inc,*
   68 F.3d 1451 (2d Cir. 1995) .................................................................................................105

*In re Freedom Rings, LLC,*
   Case No. 05-14268 (CSS) (Bankr. D. Del. Apr. 20, 2006) ....................................................51

*In re Gen. Wireless Operations, Inc.,*
   Case No. 17-10506 (BLS) (Bankr. D. Del. Oct. 26, 2017)....................................................58

*Geyer v. Ingersoll Publ'ns Co.,*
   621 A.2d 784 (Del. Ch. 1992)............................................................................................105

*In re Glob. Indus. Techs., Inc.,*
   No. 02-21626-JKF, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) ...............................28

*In re Greate Bay Hotel & Casino, Inc.,*
   251 B.R. ..............................................................................................................................18

*In re Greate Bay Hotel & Casino, Inc.,*
   251 B.R. 213 (Bankr. D.N.J. 2000) .....................................................................................94

*Grp. of Inst. Inv'rs, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,*
   318 U.S. 523 (1943)............................................................................................................37

*Harco Nat'l Ins. Co. v. Green Farms, Inc.,*
   No. CIV.A. 1331, 1989 WL 110537 (Del. Ch. Sept. 19, 1989) ..........................................105

*In re Hercules Offshore, Inc.,*
   565 B.R. 732 (Bankr. D. Del. 2016) .....................................................................................56

*In re Heritage Highgate, Inc.,*
   679 F.3d 132 (3d Cir. 2012)........................................................................................76, 118

*In re Hibbard Brown & Co.,*
   217 B.R. 41 (Bankr. S.D.N.Y. 1998)....................................................................................29

*In re HQ Global Holdings, Inc.,*
   290 B.R. 507 (Bankr. D. Del. 2003) .....................................................................................37

*In re Idearc Inc.,*
   423 B.R. 138 (Bankr. N.D. Tex. 2009)...........................................................................19, 98

*In re Indianapolis Downs, LLC,*
　486 B.R. 286 (Bankr. D. Del. 2013) ............................................................41, 42, 58

*In re Indu Craft Inc.,*
　2012 WL 3070387 (S.D.N.Y., July 27, 2012) ....................................................112

*In re Insys Therapeutics, Inc.,*
　Case No.19-11292 (JTD) (Bankr. D. Del. Jan. 16, 2020)......................................58

*In the Matter of Jersey City Med. Ctr.,*
　817 F.2d 1055(3d Cir. 1987)..................................................................................20

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,*
　987 F.2d 154 (3d Cir. 1993).....................................................................................20

*In re Johns-Manville Corp.,*
　68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y.
　1987), *aff'd*, 843 F.2d 636 (2d Cir. 1998)..............................................................84

*In re Key3Media Grp.,*
　336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2,
　2006) ........................................................................................................................48

*In re KiOR, Inc.,*
　Case No. 14-12514 (CSS) (Bankr. D. Del. June 8, 2015) ......................................22

*L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.),*
　209 F.3d. 291 (3d Cir. 2000)...................................................................................37

*In re LBI Media, Inc.,*
　Case No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) ....................................60

*In re Lernout & Hauspie Speech Prods., N.V.,*
　301 B.R. 651 (Bankr. D. Del. 2003) .......................................................................84

*Lisanti v. Lubektin (In re Lisanti Foods, Inc.),*
　329 B.R. 491 (D.N.J. 2005) ....................................................................................69

*In re Louise's, Inc.,*
　211 B.R. 798 (D. Del. 1997) ...................................................................................27

*In re Marvel Ent. Grp., Inc.,*
　222 B.R. 243 (D. Del. 1998) ...................................................................................27

*In re Marvel Entm't Grp.,*
　273 B.R. 58 (D. Del. 2002)......................................................................................41

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ..............................................................40, 48

*In re Maxus Energy Corp.*,
    Case No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) ....................................60

*In re Medford Crossings North, LLC*,
    No. 07-25115, 2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011) ...........................50

*In re Microfab, Inc.*,
    105 B.R. 161 (Bankr. D. Mass. 1989) .................................................................108

*Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*,
    474 U.S. 494 .........................................................................................................21

*In re Model Reorg Acquisition, LLC*,
    Case No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) .....................................60

*Myers v. Martin* (*In re Martin*),
    91 F.3d 389 (3d Cir. 1996) ........................................................................28, 32, 35

*N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp.*,
    515 F. App'x 176 (3d Cir. 2013) ........................................................................104

*In re Nailite Int'l*,
    No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878 (Bankr. D. Del. Dec. 8,
    2009) ......................................................................................................................77

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994) ..............................................................................32

*In re New Gulf Res., LLC*,
    Case No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) ...................................58

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) .....................................................................29

*In re Nutritional Sourcing Corp.*,
    *398 B.R. 816 (Bankr. D. Del. 2008)* .....................................................................18

*In re Nuverra Envtl. Sols., Inc.*,
    Case No. 17-10949 (KJC) (Bankr. D. Del. July 25, 2017) ..............................66, 95

*In re Oldco M Corp.*,
    438 B.R. 775 (Bankr. S.D.N.Y. 2010) ...........................................................107, 108

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) .....................................................................60

*In re PPI Enters. (U.S.), Inc.*,
  228 B.R. 339 (Bankr. D. Del. 1998) ........................................................................67

*In re Penn Cent. Transp. Co.*,
  596 F.2d 1127 (3d Cir. 1979)................................................................................27

*In re Phoenix Petroleum, Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................121

*Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*),
  761 F.2d 1374 (9th Cir. 1985) ...............................................................................76

*In re PNG Ventures, Inc.*,
  Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010)...........................................53, 56

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968)................................................................................................27

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000).............................................................41, 60, 64, 67

*In re Pyxus Int'l, Inc.*,
  Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) ....................................66

*In re Rock & Republic Enterprises*,
  2011 WL 4756571 (Bankr. S.D.N.Y. 2011) .........................................................107

*RRX Indus., Inc., v. Lab-Con, Inc.*,
  772 F.2d 543 (9th Cir. 1985) ...............................................................................105

*In re Superior Air Charter, LLC*,
  Case No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020).....................................60

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ........................................................................69

*In re Tidewater Inc.*,
  Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017)....................................66

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984) ....................................................................67

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011), *aff'd*, 587 B.R. 606 (D. Del. 2018), *aff'd*,
  972 F.3d 228 (3d Cir. 2020) .........................................................................77, 118

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) *aff'd as modified*, Case No. 12-CV-1072
GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*,
799 F.3d 272 (3d Cir. 2015) ............................................................................. *passim*

*In re Tribune Company*,
Case No. 18-2909, 2020 WL 5035797 (3d Cir. Aug. 26, 2020) ..................................94, 95, 97

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*,
426 B.R. 114 (Bankr. D. Del. 2010) ................................................................. *passim*

*In re U.S. Truck Co.*,
47 B.R. 932 (E.D. Mich. 1985), *aff'd sub nom. Teamsters Nat'l Freight Indus.
Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581
(6th Cir. 1986) ...........................................................................................................77

*In re United Artists Theatre Co. v. Walton*,
315 F.3d 217 (3d Cir. 2003) ....................................................................................56

*United States v. Bestfoods*,
524 U.S. 51 (1998) ................................................................................................105

*United States v. Energy Res. Co.*,
495 U.S. 545 (1990) ...........................................................................................49, 76

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ....................................................................... *passim*

*In re W.R. Grace & Co.*,
729 F.3d 311 (3d Cir. 2013) ..........................................................23, 76, 91, 98

*In re W.R. Grace*,
446 B.R. ..................................................................................................................56

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ............................................29, 42, 60, 90

*In re Western Management, Inc.*,
6 B.R. 438 (W.D. Kentucky, August 1, 1980) ..................................................113

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
434 F.3d 639 (3d Cir. 2006) .....................................................................................29

*In re Winstar Communications, Inc.*,
554 F.3d 382 (3d Cir. 2009) ...................................................................................109

*In re Woodbridge Grp. of Cos., LLC*,
592 B.R. 761 (Bankr. D. Del. 2018) .............................................................31, 33

*In re WorldCom Inc.*,
    Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
    2003) ..........................................................................................................................84

*In re WR Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013)...................................................................76, 89, 90

*Yadkin Valley Bank & Trust v. Linda McGee, Trustee (n re Hutchinson)*,
    5 F.3d 750 (4th Cir.1993) ....................................................................................106

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bank D. Del. 1999) ............................................................ *passim*

**Statutes**

11 U.S.C. 1129(a)(7)(A)(ii) ...................................................................................101

11 U.S.C. § 507(a)(2)...............................................................................................81

11 U.S.C. § 1125(a)(1).............................................................................................121

11 U.S.C. § 1126(g) ...................................................................................65, 66, 74

11 U.S.C. § 1129(a)(9)(A) ...........................................................................119, 120

11 U.S.C. § 1129(a)(14)............................................................................................17

42 U.S.C. § .................................................................................................................70

42 U.S.C. § 9601......................................................................................................104

42 U.S.C. § 9601(20)(F) .........................................................................................104

42 U.S.C. § 9601(20)(G)(ii).....................................................................................104

42 U.S.C. § 9601(20)(G)(iv)....................................................................................104

United States Code title 31 section 3717 ...............................................................81

Bankruptcy Code .......................................................................................... *passim*

Cal. Health & Safety Code § 25323.5.....................................................................104

CERCLA..........................................................................................................100, 104

COBRA........................................................................................................................82

Environmental Laws ......................................................................21, 22, 39, 93

Comprehensive Environmental Response, Compensation, and Liability Act ..............................70

**Other Authorities**

72 Am. Bankr. L.J. 227, 228, 249 (1998) ....................................................................95

Bankruptcy Rules.................................................................................... *passim*

H.R. Rep. 95-595 .....................................................................................18

H.R. Rep. No. 95-595 (1977)................................................................18, 63

reprinted in 1978 U.S.C.C.A.N. 5787 ...................................................109

S.Rep. No. 95–989 (1978) ....................................................................109

S. Rep. No. 95-989 (1978) ......................................................................18

Exide Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),[2] submit this Memorandum of Law and omnibus reply to the Confirmation Objections[3] (the "**Memorandum**") in support of the Debtors' request for confirmation of the *Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, filed contemporaneously herewith (as the same has been or may be amended, modified, supplemented, or restated, the "**Amended Plan**").

<u>**PRELIMINARY STATEMENT**</u>

1.     The Amended Plan is a remarkable achievement to attain a consensual resolution of these chapter 11 cases that will preserve over 5,000 jobs, maximize recoveries to creditors and effectuate the safe and orderly transition of the Debtors' Non-Performing Properties.  A consensual chapter 11 plan supported by almost 100% of the Debtors' secured noteholders, the Creditors' Committee, the PBGC, and all but one of the Debtors' fourteen (14) environmental regulators (all such thirteen (14) regulators, including California Department of Toxic Substances Control ("**California DTSC**"), collectively, the "**Participating Governmental Authorities**") seemed unimaginable at the commencement of these chapter 11 cases just five (5) months ago.  The limited liquidity available to the Debtors, the uncertainties and challenges caused by the global pandemic outbreak, and the number of highly complex and difficult issues that had to be addressed presented the potential for years of extended, complex and expensive litigation among competing parties and interests.  But, with the assistance of five (5) Court-approved mediators (collectively, the "**Mediators**"), including four (4) retired bankruptcy or district court judges, and the good faith efforts of the Debtors, the Creditors'

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan or the Disclosure Statement (each as defined herein).

[3]     Objections to confirmation of the Amended Plan (collectively, the "**Confirmation Objections**") are listed on the Objections Chart attached hereto as <u>**Exhibit A**</u> or addressed herein.

Committee, the Consenting Creditors, and the Settling Governmental Authorities—who banded together to address the issues in recognition of the economic and practical realities—the Debtors and their stakeholders have achieved the impossible.  The confirmation of the Amended Plan represents the final step in the administration of these highly successful chapter 11 cases.  For the reasons set forth herein and in the supporting evidence and pleadings submitted in support of confirmation, the Amended Plan satisfies the requirements of section 1129 of the Bankruptcy Code, is in the best interests of creditors and should be confirmed.

2.      The Amended Plan is premised upon a hard-fought Global Settlement that entails a fully integrated compromise and settlement of potential claims that could be brought by the Debtors, the Participating Governmental Authorities, Creditors' Committee, and Environmental Sureties.   Importantly, the Global Settlement provides full payment of administrative and priority claims, a guaranteed recovery for general unsecured creditors that otherwise was highly uncertain, and resolves significant and contentious issues regarding the Non-Performing Properties and the Debtors' prepetition attempts to recapitalize and reorganize their businesses through the June 2019 Financing and the Optimization.  The Amended Plan also incorporates the Europe/ROW Sale Transaction pursuant to which the Debtors' secured noteholders will consummate their market-tested credit bid to purchase the equity interests of the Debtors' European and Rest-of-World businesses which, together with the financing to those businesses being provided by the Ad Hoc Group, will enable such businesses to continue as a going concern.   In addition, following extensive negotiations, the Amended Plan now also includes a settlement with the PBGC pursuant to which the Transferred Entities will make a settlement payment of $6.0 million to the PBGC in exchange for the PBGC's release of the PBGC Claims against the Transferred Entities, Consenting Creditors and certain of their Related

Parties.  The Debtors have also resolved the objection to the Amended Plan filed by Westchester Fire Insurance Company ("**Westchester**").

3.     The benefits of the Amended Plan are obvious and cannot be overstated. The alternative is also clear:  endless and costly litigation that will harm all parties in interest and benefit no one.  The reality that all parties in interest have accepted (except the state of California) is that the Debtors have limited funds and no means to orderly transition the Non-Performing Properties absent the Global Settlement and the financial support offered by the Consenting Creditors and Transferred Entities.  There is no escaping the reality that the Non-Performing Properties must be immediately transitioned or abandoned.  The Debtors are simply unable to maintain them.  In addition, if the Plan is not confirmed, administrative and priority claims will not be satisfied and general unsecured creditors will likely recover nothing.  The ongoing operations of the Debtors' European and Rest-of-World businesses will also be put in jeopardy and thousands of jobs unnecessarily put at risk.

4.     In light of the above, California DTSC's opposition to the Amended Plan is inexplicable and puzzling.  The Debtors have been completely transparent with California DTSC (as they have been with all parties in these cases) and provided voluminous information and access to records so that California DTSC can confirm for itself the fundamental fairness of the Global Settlement and the stark realities of the alternative.  To that end, California DTSC participated in the global case mediation that lasted approximately two (2) months and involved extensive and open exchange of information.  Indeed, California DTSC participated in the negotiation of the mediation procedures and even selected one (1) of the Mediators.  After the Mediators' proposal was accepted by all parties and agreed to be recommended by the Participating Governmental Authorities, including California DTSC, despite a consensual freeze

on discovery and litigation that was agreed by all parties, in response to informal discovery requests from California DTSC, the Debtors provided California DTSC with nearly 20,000 documents and access to the Debtors' professionals and the Creditors' Committee's professionals to address California DTSC's discovery requests regarding the independent investigations conducted by the Subcommittee (as defined below) and the Creditors' Committee. California DTSC, along with the United States Department of Justice on behalf of the Environmental Protection Agency (the "**DOJ**" or the "**EPA**", as applicable), also led the negotiations of the Amended Plan and the Environmental Settlement Agreement on behalf of the Participating Governmental Authorities, including provisions that California DTSC insisted on or accepted but now complains are unfair.

5.      Unfortunately, after investing months of time and resources, the Debtors and other Global Settlement Parties learned at the last minute that California DTSC would not proceed with the settlement recommended by the Mediators and accepted by all other parties. No good reason has been offered for California DTSC's abrupt about-face.  Instead, California DTSC appears to have decided that it must try to blow up the Amended Plan and Global Settlement so that it can claim a hollow victory with its citizens.[4]  There is no alternative to the Global Settlement and the Amended Plan.  As stated above, no matter what, the Non-Performing Properties must be abandoned or transitioned.  The Debtors are not continuing their operations and have no ability to maintain any Non-Performing Properties.  It is quite telling that the other Participating Governmental Authorities, including the EPA who has concurrent jurisdiction over the Vernon Non-Performing Property, reacted to California DTSC's withdrawal by working collaboratively with the other Global Settlement Parties on a short timeline to save the Global

---

[4]     *See* Jared Blumenfeld & Meredith Williams, Op-Ed: Exide's latest bid to avoid additional liability for poisoning L.A. County communities, LA. Times (Oct. 4, 2020), https://www.latimes.com/opinion/story/2020-10-04/op-ed-exides-latest-bid-to-avoid-additional-liability-for-poisoning-l-a-county-communities.

Settlement and mitigate the unnecessary disruption caused by California DTSC's last minute reversal.  The continued support of the Settling Governmental Authorities speaks volumes as to the fairness of the Global Settlement and demonstrates that it is the best (and only) option for the safe and orderly transition of the Non-Performing Properties.

6.      Notwithstanding California DTSC's actions, the Debtors and the other Global Settlement Parties have continued to offer California DTSC the opportunity to still participate in the Global Settlement.  California DTSC can either consent and participate willingly in the Global Settlement that California DTSC agreed to recommend less than four (4) weeks ago or, if the Third Party Releases contained in Section 10.6 of the Amended Plan are approved as to California DTSC so that the Consenting Creditors receive the benefit of their bargain in exchange for making the approximately $2.6 million settlement payment allocable to the Vernon Non-Performing Property, California DTSC will receive the key benefits of the Global Settlement.  Absent California DTSC's consent or approval by the Court of the Third Party Releases as to California DTSC, the Debtors have no choice but to abandon the Vernon Non-Performing Property.

7.      The Amended Plan is supported by all of the Debtors' key stakeholders: the Consenting Creditors; the Settling Governmental Authorities; the Creditors' Committee; the Environmental Sureties; the PBGC; and various other significant secured and unsecured creditors.  In addition, of the more than 25,000 parties in interest who were served with notice of the Confirmation Hearing, only eight (8) objections to the Amended Plan were filed—of which six (6) relate to the Amended Plan itself and two (2) relate to cure and adequate assurance issues that are now moot.  The Debtors have also been advised by Prime Clerk LLC ("**Prime Clerk**"), the Debtors' claims and balloting agent, that the Plan has been accepted by 100% of the

members of every class of impaired creditors that voted on the Amended Plan.  *See* the Voting
Certification.

8.      It bears emphasis that, in less than five (5) months, the Debtors have
accomplished all of their objectives in these chapter 11 cases against all odds.  The Amended
Plan ensures the ongoing long-term viability of the Debtors' Europe/ROW business operations
and the related preservation of thousands of jobs.  The Global Settlement ensures that the
Debtors will transition their Non-Performing Properties in an orderly manner, allows the Debtors
to satisfy their administrative and priority creditors in full, and guarantees a distribution to
general unsecured creditors that would not have been available without litigation and with no
guarantee of any recovery.

9.      For these reasons, as stated more fully below, and those set forth in the
supporting pleadings, the Debtors respectfully request that the Court approve the Amended Plan,
including the Global Settlement and the Europe/ROW Sale Transaction.

## PLEADINGS AND EVIDENCE IN SUPPORT OF CONFIRMATION

10.      In further support of the Amended Plan, the Debtors submit the following
declarations:

  i.    Declaration of Roy Messing, the Debtors' Chief Restructuring
        Officer, in Support of Confirmation of the Amended Plan (the
        "**Messing Confirmation Declaration**");

  ii.   Declaration of Christopher Robinson, a Managing Director of
        Ankura Consulting Group, LLC ("**Ankura**"), the Debtors'
        financial advisor, in Support of Confirmation of the Amended
        Plan (the **"Robinson Declaration"**);

  iii.  Declaration of Harvey Tepner, member of the Debtors'
        Subcommittee, in Support of the Debtor Releases and
        Confirmation of the Amended Plan (the "**Tepner Declaration**");

iv.   Declaration of William G. Peluchiwski, a Managing Director of Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**"), the Debtors' investment banker, in Support of the Europe/ROW Sale Transaction and Confirmation of the Amended Plan (the "**Peluchiwski Declaration**"); and

v.   Declaration of Craig E. Johnson of Prime Clerk LLC With Respect to the Tabulation of Votes on the Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors (the "**Voting Certification**").

11.   In addition, the Debtors have filed contemporaneously herewith *Debtors' Memorandum of Law in Support of Abandonment of the Vernon Non-Performing Property Pursuant to the Amended Plan* (the "**Abandonment Memorandum**") and the following declarations in support thereof:

i.   Declaration of Roy Messing, the Debtors' Chief Restructuring Officer, in Support of Abandonment of the Vernon Non-Performing Property (the "**Messing Abandonment Declaration**"); and

ii.   Declaration of Eric Fraske, a Senior Consultant and Engineer of Alta Environmental, Inc. and Resident Engineer on site at the Vernon Non-Performing Property, the Debtors' environmental consultant, in Support of Abandonment of the Vernon Non-Performing Property (the "**Fraske Abandonment Declaration**");

12.   The Debtors will file a proposed order confirming the Amended Plan (the "**Proposed Confirmation Order**") as soon as practicable after the filing of this Memorandum and, in any event, prior to the Confirmation Hearing.

## **FACTS**

### A.   **General Background**

13.   Set forth below is a general summary of the pertinent facts and circumstances of these chapter 11 cases.  The Debtors also respectfully refer the Court to the

First Day Declaration;[5] the Disclosure Statement;[6] the Messing Confirmation Declaration; the Robinson Declaration; the Tepner Declaration; the Peluchiwski Declaration; the Messing Abandonment Declaration; the Fraske Abandonment Declaration; the Affidavit of Service of Solicitation Materials [Docket No. 793] (the "**Solicitation Affidavit**"); the *Affidavit of Publication* [Docket No. 798] (the "**Publication Affidavit**"); the Voting Certification; the *Affidavit of Service* [Docket No. 847] (the "**Plan Supplement Affidavit**" and collectively with the items listed in this paragraph, the "**Supporting Declarations**"), and the record of these chapter 11 cases for facts that bear on confirmation of the Amended Plan. The Supporting Declarations and any testimony and other declarations that may be adduced or submitted at or in connection with the Confirmation Hearing (as defined herein) are incorporated herein.

> **B.**      **The Global Settlement.**

14.      At the outset of these chapter 11 cases, the Debtors requested approval of global settlement procedures (the "**Settlement Procedures**") in connection with their twenty-two (22) non-performing properties subject to the Global Settlement (collectively, the "**Non-Performing Properties**"), to attempt to reach a consensual agreement for the orderly transfer of the Non-Performing Properties from the Debtors' liquidating estates. A critical objective of the Settlement Procedures was to preserve the Debtors' limited resources and reduce the incurrence of unnecessary costs associated with litigating abandonment issues. If settlements could not be reached, the Debtors advised parties and the Court that they would have no choice but to seek to abandon the Non-Performing Properties. Following negotiations with the Participating Governmental Agencies, including California DTSC, on June 9, 2020, the Court entered an order

---

[5]      The "**First Day Declaration**" means the *Declaration of Roy Messing in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 14], filed on the Commencement Date.

[6]      The "**Disclosure Statement**" means the *Amended Disclosure Statement for Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 743].

A-0928

approving the Settlement Procedures on a fully consensual basis.[7]  Following the initial global settlement conference with the Participating Governmental Agencies, the Debtors and the Participating Governmental Agencies engaged in site-specific settlement conferences throughout the month of June.

15.     By early July, the Debtors and the Participating Governmental Agencies had not made meaningful progress in negotiation.  As such, the Debtors and the Participating Governmental Agencies consensually agreed to proceed to the second stage of the Settlement Procedures with the participation of the Consenting Creditors and the Creditors' Committee, and thereafter engaged in a global mediation process.  The Mediators presided over multiple global mediation sessions and sessions with individual groups of participants commencing on July 7, 2020 and continuing through July 27, 2020.

16.     Discussions expanded to larger case issues as it became clear to all parties and the Mediators that a comprehensive resolution was needed.  The Creditors' Committee got more involved as they were conducting a parallel investigation of claims related to prepetition transactions that would need to be addressed for complete resolution.  Because estate releases and validity of noteholder liens, among other things, were conditions to the Europe/ROW Stalking Horse Credit Bid, the potential objections to that transaction were also brought into the mediation.

17.     On July 20, 2020, the Mediators made a "mediators' proposal" to all parties in the mediation that proposed to comprehensively resolve all case issues among the parties.  The Mediators set a deadline by which all parties would have to advise the Mediators if they accepted or rejected (or, in the case of the Participating Governmental Authorities, agreed to

---

[7]     *See Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties* [Docket No. 242] (the "**Settlement Procedures Order**")

recommend) the Mediators' proposal.  If all parties accepted (or agreed to recommend) the Mediators' proposal, the Mediators would advise the parties that the proposal was accepted or recommended, as applicable.  If the proposal was rejected by any party, the Mediators would advise the parties that the settlement was rejected without disclosing the rejecting party or parties.  Follow certain clarifications, the Mediators circulated a final mediators' proposal to the parties.

18.     On July 28, 2020, the Mediators filed the *Mediators' Final Certificate of Completion File Pursuant to Order Granting Motion of Debtors for Authorization to (I) Implement Mandatory Settlement Procedures for Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. 622), and on July 29, 2020, the Mediators filed the *Clarification to Mediators' Final Certificate of Completion Filed Pursuant to Order Granting Motion of Debtors For Authorization To (I) Implement Mandatory Settlement Procedures For Non-Performing Properties and (II) Abandon Such Properties, If Necessary* (Docket No. 636) (the "**Mediators' Revised Certificate of Completion**"), in which the Mediators announced that the Global Settlement Parties had accepted the Mediators' Proposal (as defined therein), and that representatives for the Participating Governmental Authorities had agreed "to recommend [the Mediators' Proposal] and commit to pursuing approvals [from those with authority] pursuant to applicable law expeditiously and in good faith, and subject to public comment where applicable." *See* Mediators' Revised Certificate of Completion at ¶4.

19.     The initial draft of the Environmental Settlement Documents, which were intended to implement the Mediators' Proposal, included the following terms:

       i.    **<u>Environmental Response Trust</u>**.  An environmental response trust (the "**Environmental Response Trust**") would be established.  The Environmental Response Trust will receive (i) a $10 million cash contribution to be paid by the Consenting Creditors or Transferred

Entities; (ii) payment of the full amount of any surety bonds in accordance with the terms of the surety bond agreements (or as otherwise provided by applicable state law); (iii) title to the Debtors' owned Non-Performing Properties (other than the Frisco Non-Performing Property) free and clear of all claims, liens, and interests; and (iv) environmental causes of action assigned by the Debtors, including any insurance coverage for environmental liabilities relating to the Non-Performing Properties. Moreover, the Debtors, Creditors' Committee, and the Consenting Creditors agreed to waive all rights relating to sale proceeds from the future sale of any Non-Performing Properties.

ii.     **General Unsecured Creditors' Trust**. A general unsecured creditors' trust (the "**GUC Trust**") would also be established. The GUC Trust will receive a cash contribution in the amount of $2.4 million from the Consenting Creditors or Transferred Entities (the "**GUC Global Settlement Payment**"). The Settling Governmental Authorities would be entitled to receive distributions from the GUC Trust in accordance with the following:

   a.     The Participating Governmental Authorities may receive distributions from the GUC Global Settlement Payment solely on account of non-environmental claims;

   b.     The Participating Governmental Authorities will waive distributions from the GUC Global Settlement Payment solely on account of environmental claims; and

   c.     To the extent the GUC Trust receives proceeds in excess of the GUC Global Settlement Payment, the Participating Governmental Authorities may receive distributions from such excess proceeds on account of both environmental and non-environmental claims.

iii.    **Frisco Trust**. An environmental trust (the "**Frisco Trust**") will be established for the Frisco Non-Performing Property. The Frisco Trust will receive (i) a $100,000 to be paid by the Transferred Entities; (ii) payment of the full amount of any surety bonds, up to the full cost of remediation, in accordance with the terms of the surety bond agreements (or as otherwise provided by applicable state law); (iii) title to the Frisco Non-Performing Property free and clear of all claims, liens, and interests; and (iv) environmental causes of action related to the Frisco Non-Performing Property assigned by the Debtors. Moreover, the Debtors, Creditors' Committee, and the Consenting Creditors agreed to waive all rights relating to sale proceeds from the future sale of the Frisco Non-Performing Property.

iv.   **Mutual Releases**.   The proposed Global Settlement includes mutual releases among the parties and covenants not to sue by the Participating Governmental Authorities consistent with the Global Settlement, which would be included in the Environmental Settlement Agreement and incorporated into the Amended Plan.

v.   **Commitments to Support the Plan**.   The Global Settlement Parties agreed to support or not oppose a plan consistent with the foregoing terms and to work together to document the agreement.

20.      Following acceptance (or recommendation) of the Mediators' Proposal by each of the Global Settlement Parties, as outlined in the Mediators' Revised Certificate of Completion, the parties proceeded to document the settlement.   Accordingly, the Debtors drafted a chapter 11 plan in consultation with the other Global Settlement Parties.   The Participating Governmental Agencies, including California DTSC, provided substantial input on the plan, in particular the sections related to implementation of the Global Settlement and treatment of their claims.   Ultimately, the Debtors filed the *Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 706] (the "**Initial Plan**"), on August 11, 2020 after receiving explicit sign-off from each of the other Global Settlement Parties.   Three days later, on August 14, 2020, the Debtors filed the *Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* [Docket No. 742] (the "**First Amended Plan**") to make certain clarifications to the Initial Plan.   Again, the First Amended Plan was filed with approval of each of the Global Settlement Parties, including California DTSC.

21.      Likewise, the DOJ, in conjunction with the other Participating Governmental Authorities (including California DTSC), formulated drafts of the Environmental Settlement Documents, including the Environmental Settlement Agreement.   Included in the Environmental Settlement Documents were releases, covenants not to sue, and allocations of the Global Settlement Payments among the Participating Governmental Authorities—each of which were in accordance with the Mediators' Proposal and were drafted with the participation of

California DTSC.  As the Participating Governmental Authorities were putting the final touches on the version of the Environmental Settlement Agreement to be filed with the Court during the week of September 7, 2020, California DTSC notified the Debtors and the other Participating Governmental Authorities that it would be seeking (for the first time) the input of the Governor of California in his capacity as the individual with authority to approve California DTSC's participation in the Global Settlement.  Notwithstanding the fact that the Debtors and the Participating Governmental Authorities had openly discussed the intention to file a draft of the Environmental Settlement Agreement by September 9, 2020, California DTSC informed others that they would be meeting with the Governor on September 14, 2020.  Given the approaching deadline (contained in the First Amended Plan) to file a draft of the Environmental Settlement Agreement with the Plan Supplement, the Debtors and the Settling Governmental Authorities prepared the draft in accordance with the terms already discussed with California DTSC and filed a draft of the Environmental Settlement Agreement with the Plan Supplement [Docket No. 821] on September 12, 2020.

22.     On September 15, 2020, California DTSC notified the Debtors and the other Participating Governmental Authorities that, notwithstanding their participation in the Global Settlement negotiations, they would be withdrawing from the Global Settlement.  In the days and weeks that followed California DTSC's puzzling withdrawal, the Debtors and the Settling Governmental Authorities banded together to salvage the deal.

23.     To the credit of the Debtors, the Settling Governmental Authorities, the Consenting Creditors, and the Environmental Sureties, the Amended Plan currently in front of the Court represents the parties' successful effort at "putting the pieces back together" despite California DTSC's withdrawal.  In order to avoid rendering all of the parties' respective efforts

wasted, and to avoid widespread abandonment of the Non-Performing Properties, the Global Settlement Parties re-constructed the Environmental Settlement Documents and the Amended Plan in such a way that would achieve the same results, just without requiring the participation of California DTSC.

**C.     Marketing Process for Europe/ROW Business.**

24.     The Debtors' postpetition marketing process conducted pursuant to the Court-approved bidding procedures (the "**Postpetition Marketing Process**"), which was led by Houlihan Lokey, was extensive and involved solicitations of interest from a diverse set of potential strategic and financial parties. Peluchiwski Decl. ¶ 9.   In accordance with the Bidding Procedures approved by the Court on June 19, 2020,[8] the Debtors solicited bids for the Company's Europe/ROW business in addition to the Europe/ROW Stalking Horse Credit Bid. Peluchiwski Decl. ¶ 9. The Bidding Procedures provided maximum flexibility and incentives for bidders to participate. *Id.* ¶ 13. Among other things, bidders could submit bids for some or all of the Debtors' assets and there was no break-up fee payable to the Europe/ROW Stalking Horse. *Id.*   All parties in interest, including potential bidders, were provided notice of the Bidding Procedures, which notice was also published in the national editions of The New York Times and USA Today. *See Affidavit of Service* [Docket No. 361] and *Affidavit of Publication* [Docket No. 421].

25.     Prior to and following the Commencement Date, Houlihan Lokey contacted over seventy-eight (78) potential third party bidders, approximately thirty-two (32) of which executed nondisclosure agreements allowing them to receive confidential information

---

[8]     *See Order (I) Approving (A) Bidding Procedures for Sales of Debtors' Assets, (B) Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief* [Docket No. 344].

with respect to the Debtors' assets. Peluchiwski Decl. ¶ 9. The diligence conducted in connection with the Debtors' assets was extensive and included, among other things, (i) access to over 6,500 documents in an electronic data room; (ii) discussions between potential bidders and the Debtors' management team; and (iii) numerous on-site visits hosted by the Debtors. *Id.* ¶ 10.

26.     On June 18, 2020, the Debtors filed the *Notice of Europe/ROW Stalking Horse Agreement* [Docket No. 324], which included the material terms of the Europe/ROW Stalking Horse Credit Bid and a copy of the Stock and Asset Purchase Agreement dated as of June 17, 2020 (the "**Europe/ROW Stalking Horse Agreement**") by and among Exide Holdings, Inc., EIH Europe Acquisition LLC, and the other parties thereto.

27.     Despite the extensive efforts of the Debtors and their advisors, the Debtors did not receive any Qualified Bids by the bid deadline set forth in the Bidding Procedures (other than the Europe/ROW Stalking Horse Credit Bid). Peluchiwski Decl. ¶ 17. Accordingly, on July 23, 2020, the Debtors filed the *Notice of Successful Bidders for Americas Assets and Europe/ROW Assets* [Docket No. 591], pursuant to which the Debtors designated the Europe/ROW Stalking Horse Credit Bid as the Successful Bid and the Europe/ROW Purchaser as the Successful Bidder. As stated in the Notice of Successful Bid, the Debtors now seek to consummate the Europe/ROW Sale Transaction with the Europe/ROW Purchaser pursuant to the Amended Plan.

28.     As set forth in the Peluchiwski Sale Declaration, Houlihan Lokey and the Debtors apprised the Special Committee throughout the entire Postpetition Marketing Process, in addition to consistently updating and coordinating with other key stakeholders, such as the DIP Lenders, the Ad Hoc Group and Indenture Trustee (on an arms-length basis), the ABL Agent, and the Creditors' Committee. Peluchiwski Decl. ¶ 20. Furthermore, the Postpetition Marketing

Process was supervised by the Court and all parties in interest have been on notice of the Debtors' sale efforts since the Commencement Date.

29.     At bottom, there are no alternative Qualified Bids for a going concern sale of the Debtors' Europe/ROW business.  Peluchiwski Decl. ¶ 17.

**D.     Plan Solicitation**

30.     In light of their limited liquidity position following the closing of the Americas Sale Transaction, the Debtors sought an expedited process to obtain conditional approval of the Disclosure Statement.  At the hearing held on August 14, 2020 (the "**Conditional Disclosure Statement Hearing**"), the Court conditionally approved the Disclosure Statement,[9] subject to final notice and a hearing, in accordance with section 1125 of the Bankruptcy Code. Further, the Court scheduled the Combined Hearing, and approved certain solicitation and confirmation materials and procedures, including the Solicitation Packages, the Solicitation and Tabulation Procedures, the forms of Ballots, the Publication Notice, and the Combined Hearing Notice (each as defined herein), among other related relief.

31.     As set forth in the Voting Certification and as further described below, the Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and plan solicitation, as well as the Disclosure Statement Order.

32.     On August 14, 2020, the Court entered the *Order (I) Conditionally Approving the Disclosure Statement, (II) Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling a Combined Hearing, (IV) Establishing Notice and Objection*

---

[9]     The "**Conditional Disclosure Statement Order**" means the *Order (I) Conditionally Approving the Disclosure Statement, (II) Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling a Combined Hearing, (IV) Establishing Notice and Objection Procedures For Final Approval of Disclosure Statement and Confirmation of Plan, and (V) Granting Related Relief* (Docket No. 745).

*Procedures for Final Approval of Disclosure Statement and Confirmation of Plan, and (V) Granting Related Relief* [Docket No. 745] (together with any schedules and exhibits thereto, the "**Disclosure Statement Order**").  Following the Court's entry of the Disclosure Statement Order, the Debtors caused Prime Clerk to distribute copies of the Disclosure Statement Order, the Combined Hearing Notice,[10] and a form of ballot with voting instructions (the "**Ballot**" and, collectively, the "**Solicitation Package**") to each holder of a claim in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims).  *See* Solicitation Affidavit.  Furthermore, the Debtors caused Prime Clerk to publish a summary version of the Combined Hearing Notice (the "**Publication Notice**") substantially in the form attached to the Disclosure Statement Order at Exhibit 2 in the national editions of *The New York Times* and *USA Today* on August 20, 2020.  *See* Publication Affidavit.

33.     On September 12, 2020, the Debtors filed the Plan Supplement, consisting of the Assumption Schedule for the Europe/ROW Sale Transaction, a substantially final form of the GUC Trust Agreement, the proposed Environmental Settlement Agreement, the proposed Frisco Settlement Agreement, the Alternative Transaction Structure Summary, and the Columbus NPP Termination Documents.  The Debtors caused the Plan Supplement to be served on the Master Service List and holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims).  *See* Plan Supplement Affidavit.[11]

---

[10]   The "**Combined Hearing Notice**" means the *Notice of (I) Hearing to Approve (A) Disclosure Statement on a Final Basis, (B) Plan, and (C) Europe/Row Sale Transaction; (II) Confirmation Objection Procedures; (III) Establishment of Voting Record Date, and (IV) Procedures and Deadline for Voting on the Plan* [Docket No. 747].

[11]   In an effort to limit substantial service costs, the Debtors caused Prime Clerk to mail or e-mail the notice of the Plan Supplement on (i) parties who filed proofs of claim in these chapter 11 cases, and (ii) parties listed on the Debtors' schedules of assets and liabilities.

34.     The deadline to vote on the Plan was September 17, 2020 at 5:00 p.m. (prevailing Eastern Time).   Prime Clerk's analysis of the ballots indicates that Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims)—the only classes of Claims entitled to vote on the Plan—voted to accept the Plan in accordance with the requirements of section 1126 of the Bankruptcy Code (as set forth below). *See* Voting Certification.

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected |
|---|---|---|---|---|
| Class 4 (Superpriority Notes Guarantee Claims) | 100% | 100% | 0% | 0% |
| Class 5 (Exchange Priority Notes Claims) | 100% | 100% | 0% | 0% |
| Class 6 (First Lien Notes Claims) | 100% | 100% | 0% | 0% |

## ARGUMENT

35.     This Memorandum is divided into four (4) parts.  Part I addresses the applicable requirements for confirmation of the Amended Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each such requirement and achievement of the objectives of chapter 11.  Part II responds to certain objections to confirmation of the Amended Plan. Part III addresses the Disclosure Statement and Solicitation Procedures and their satisfaction of the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules. Part IV requests a waiver of any stay of the Proposed Confirmation Order.

## I.     THE AMENDED PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED.

36.     To achieve confirmation of the Amended Plan, the Debtors must demonstrate that the Amended Plan satisfies section 1129(a) of the Bankruptcy Code by a

preponderance of the evidence.[12]   As the United States Court of Appeals for the Fifth Circuit

stated in *Heartland Federal Savings & Loan Ass'n. v. Briscoe Enterprises, Ltd. II* (*In re Briscoe*

*Enterprises, Ltd. II*):   "The combination of legislative silence, Supreme Court holdings, and the

structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the

evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."

994 F.2d 1160, 1165 (5th Cir. 1993); *see also See In re W.R. Grace & Co.,* 475 B.R. 34, 114 (D.

Del. 2012), *aff'd,* 729 F.3d 311, 729 F.3d 332, 532 F. App'x 264 (3d Cir. 2013); *In re Nutritional*

*Sourcing Corp.,* 398 B.R. 816, 824 (Bankr. D. Del. 2008) (*citing In re Armstrong World Indus.,*

*Inc.*, 348 B.R. 111, 120 (D. Del. 2006).   The Debtors will demonstrate, by a preponderance of the

evidence, that all of the subsections of section 1129 of the Bankruptcy Code have been satisfied

with respect to the Amended Plan.

      A.     **Amended Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.**

      37.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply

with the applicable provisions of the Bankruptcy Code.   The legislative history of section

1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123

of the Bankruptcy Code governing classification of claims and contents of the plan, respectively.

*See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re*

*Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative

history reflects that 'the applicable provisions of chapter 11 [includes sections] such as section

---

[12]    Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code are inapplicable to the Debtors.  Section 1129(a)(14) relates to the payment of domestic support obligations.  *See* 11 U.S.C. § 1129(a)(14).  The Debtors are not subject to any domestic support obligations and, as such, this section of the Bankruptcy Code is inapplicable.  Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  *See* 11 U.S.C. § 1129(a)(15).  None of the Debtors is an "individual," and, accordingly, section 1129(a)(15) is inapplicable.  Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law.  *See* 11 U.S.C. § 1129(a)(16).  Each Debtor is a moneyed, business, or commercial corporation; accordingly, section 1129(a)(16) is inapplicable.

1122 and 1123, governing classification and contents of plan." (alteration in original) (quoting H.R. Rep. 95-595, at 412)).   The Amended Plan fully complies with the requirements of the Bankruptcy Code.

## B.   Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code.

38.   Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."   11 U.S.C. § 1122(a).   Under this section, a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to the other claims or interests in that class.   A plan proponent has significant flexibility in classifying claims and interests into multiple classes, provided that there is a reasonable basis to do so and that all claims or interests within a given class are "substantially similar." *See Coastal Broad. Sys.*, 570 F. App'x at 193; *see also Idearc*, 423 B.R. at 160 ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class."), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011). To determine whether claims are "substantially similar," courts have held that the proper focus is on "the legal character of the claim as it relates to the *assets of the debtor*."   *AOV Indus.*, 792 F.2d at 1150-51 (emphasis in original); *see also Tribune Co.*, 476 B.R. at 855 (concluding that phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them" (internal quotation marks omitted)), *aff'd as modified*, Case No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015).

39.   Though claims classified together must be sufficiently similar, the Bankruptcy Code does not forbid "the presence of similar claims in different classes. Although

the legislative history behind section 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).   The Third Circuit has held that separate classification of similar claims is impermissible where the sole purpose of the classification scheme is to gerrymander votes and create an artificial impaired consenting class. S*ee John Hancock Mut. Life Ins. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993).

        40.     In total, there are eleven (11) Classes of Claims against and Interests in the Debtors as follows:

    i.    <u>Class 1</u> includes Priority Non-Tax Claims, which are Claims entitled to priority in payment under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

    ii.    <u>Class 2</u> includes Other Secured Claims, which are Secured Claims, other than ABL Claims, Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, or First Lien Notes Claims.

    iii.    <u>Class 3</u> includes ABL Claims, which are Claims arising under the ABL Credit Agreement.

    iv.    <u>Class 4</u> includes Superpriority Notes Guarantee Claims, which are Claims arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors.

    v.    <u>Class 5</u> includes Exchange Priority Notes Claims, which are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder.

    vi.    <u>Class 6</u> includes First Lien Notes Claims, which are Claims arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder.

    vii.    <u>Class 7</u> includes General Unsecured Claims, which are Claims against the Debtors (other than Intercompany Claims and Environmental NPP Claims) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Court.

    viii.   <u>Class 8</u> includes Environmental NPP Claims, which includes unsecured claims of the Participating Governmental Agencies against the Debtors under Environmental Laws with respect to the Non-Performing Properties.

    ix.   <u>Class 9</u> includes Intercompany Claims, which are prepetition Claims against a Debtor held by another Debtor or non-Debtor Affiliate.

    x.   <u>Class 10</u> includes Intercompany Interests, which are Interests in a Debtor other than Holdings Equity Interests.

    xi.   <u>Class 11</u> includes Holdings Equity Interests, which are Interests in Exide Holdings, Inc.

    xii.   <u>Class 12</u> includes Subordinated Securities Claims, which are Claims subject to subordination under section 510(b) of the Bankruptcy Code.

41.    The classification scheme of the Amended Plan is rational and complies with the Bankruptcy Code.   Generally, the Amended Plan incorporates a "waterfall" classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code except as provided by the Global Settlement.   All Claims and Interests within a Class have the same or similar rights against the Debtors.   The Amended Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.

42.    In particular, the separate classification of General Unsecured Claims in Class 7 and Environmental NPP Claims in Class 8 manifestly complies with the requirements of section 1122.   Environmental NPP Claims have different legal rights against the Debtors than General Unsecured Claims because of the overlay of Environmental Laws.   For example, in connection with abandonment of the Non-Performing Properties, the Debtors may be required to expend additional funds to satisfy *Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l Prot.*, 474 U.S. 494 (1986).   For this and other reasons, Environmental NPP Claims were always considered separately during these chapter 11 cases from the outset, including in the Mediators' Proposal

that was accepted by all parties and forms the foundation of the classification scheme in the Amended Plan.

43.    Further, the classification of claims in the Amended Plan poses no risk whatsoever of gerrymandering votes and manufacturing artificial support for the plan, the primary concern of courts that have heard challenges to classification schemes in chapter 11 plans. *See*, *e.g.* June 8, 2015 Hr'g Tr. at 182:1-18, *In re KiOR, Inc.*, Case No. 14-12514 (CSS) (Bankr. D. Del. June 8, 2015) [Docket No. 644] ("you can't [classify similar claims in different classes] for some sort of illegitimate purpose, and of course, that's gerrymandering."). Class 7 and Class 8 are each deemed conclusively to reject the plan, so neither the bifurcation into two classes nor the classification of California DTSC within Class 8 could possibly manipulate even a single vote with respect to the Amended Plan

44.    Accordingly, the classification scheme of the Amended Plan complies with section 1122 of the Bankruptcy Code and should be approved.

**C.    Amended Plan Complies with Section 1123(a) of the Bankruptcy Code.**

45.    Section 1123(a) of the Bankruptcy Code sets forth five applicable requirements that the proponent of a chapter 11 plan must satisfy.[13]   *See* 11 U.S.C. § 1123(a). The Amended Plan fully complies with each such requirement:

> i.    The Amended Plan designates Classes of Claims and Classes of Interests as required by section 1123(a)(1). *See* Amended Plan, § 3.
>
> ii.    The Amended Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Amended Plan and the treatment of each such Impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively. *See* Amended Plan, §§ 3 and 4.

---

[13]    The requirements set forth in sections 1123(a)(6), 1123(a)(7), and 1123(a)(8) of the Bankruptcy Code do not apply.  Sections 1123(a)(6) and 1123(a)(7) do not apply because the Plan provides for the wind down of the Debtors.  Section 1123(a)(8) only applies in a case in which the debtor is an individual and thus, is inapplicable to these chapter 11 cases.

iii.   Except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4). *See* Amended Plan, § 4. As explained below, California DTSC's objection on the basis of section 1123(a)(4) should be overruled. Fundamentally, California DTSC fails to recognize that the Amended Plan offers the same opportunity to all holders of Environmental NPP Claims—settlement or abandonment. That is all that is required to comply with section 1123(a)(4) of the Bankruptcy Code. *See Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (quoting *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)), aff'd, 648 F. App'x 277 (3d Cir. 2016).

iv.   The Amended Plan provides adequate means for its implementation as required by section 1123(a)(5) through, among other things: (a) the Global Settlement, *see* Plan § 5.2; (b) the Europe/ROW Sale Transaction, *see* Amended Plan, § 5.1; (c) the provisions governing distributions under the Amended Plan, *see* Amended Plan, § 6; (d) the creation and governance of the GUC Trust, *see* Amended Plan, § 5.3; (e) the creation and governance of the Environmental Response Trust, *see* Amended Plan, § 5.4; (f) subject to satisfaction of certain conditions, the creation and governance of the Vernon Response Trust, or the abandonment of the Vernon Non-Performing Property, *see* Amended Plan, §§ 5.5, 5.2; and (g) the wind down of the Debtors with respect to assets that are not sold in the Americas Sale Transaction, the Europe/ROW Sale Transaction, or contributed to the GUC Trust, the Environmental Response Trust, the Vernon Response Trust (or abandoned, if applicable), or the Frisco CDC, *see* Amended Plan, § 5.7.

**D.     Amended Plan Complies with Section 1123(b) of the Bankruptcy Code.**

**1.     Plan Permissive Provisions.**

46.     Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Amended Plan is consistent with section 1123(b):

i.   As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, Section IV of the

Amended Plan describes the treatment for Unimpaired Classes and Impaired Classes.

ii. With respect to the Debtors' executory contracts or unexpired leases, the Amended Plan provides for the assumption or rejection by the Debtors or the Wind Down Estates or the assumption and assignment thereof to the Transferred Entities in accordance with the Europe/ROW Purchase Agreement, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), in accordance with the Environmental Settlement Agreement or the Frisco Settlement Agreement, as applicable, and all as contemplated by section 1123(b)(2) of the Bankruptcy Code. *See* Amended Plan, § 8.

iii. As permitted by section 1123(b)(3)(A) of the Bankruptcy Code and explained in greater detail below, (a) the Global Settlement embodied in Section 5.2 of the Amended Plan represents a fair compromise and settlement of claims among the Global Settlement Parties; and (b) Section 10.5 of the Amended Plan provides for a release of Claims and Causes of Action owned by the Debtors' estates.

iv. As permitted by section 1123(b)(4) of the Bankruptcy Code, the Amended Plan provides for (A) the sale of the Debtors' Europe/ROW business to the Europe/ROW Purchaser, and (B) the transfer of the Non-Performing Properties to the Environmental Response Trust, the Frisco CDC, and, if applicable, the Vernon Response Trust. This provision is addressed in further detail below.

v. As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan "may include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). In accordance with section 1123(b)(6) of the Bankruptcy Code, the Amended Plan (a) contains certain release and exculpation provisions consistent with the applicable provisions of the Bankruptcy Code and Third Circuit law, as described in greater detail herein and (b) provides that the Court will retain jurisdiction over all matters arising in and related to these chapter 11 cases.

**2.      The Global Settlement Is An Integral Component of the Amended Plan and Should Be Approved Pursuant to Bankruptcy Rule 9019.**

47.    The Amended Plan incorporates the Global Settlement among the Debtors,

the Settling Governmental Authorities, the Environmental Sureties, the Creditors' Committee,

and the Consenting Creditors, which collectively hold more than ninety-five percent (95%) of

Claims entitled to vote.  Approval of the Global Settlement is a condition precedent to the confirmation of the Amended Plan.  The approval of the Global Settlement and confirmation of the Amended Plan will maximize and expedite recoveries to creditors and provide certainty and finality to the Debtors and all parties in interest.  The Amended Plan and the Global Settlement are the result of intense, good-faith, arm's-length negotiations with parties in interest and economic stakeholders, all of which was conducted pursuant to Court-approved Settlement Procedures and guided by the Mediators. The Global Settlement is the foundation of the Amended Plan.  It is overwhelmingly supported by the Debtors' economic stakeholders and should be approved.

48.    The Global Settlement is in the best interests of the Debtors and their Estates because without it, the Debtors would incur significant delay and expense engaging in what would certainly be lengthy and protracted litigation with the Participating Governmental Agencies and the Creditors' Committee.  The Global Settlement entails a fully integrated compromise and settlement of potential claims related to (i) environmental remediation or abandonment of the Debtors' Non-Performing Properties, and (ii) prepetition transactions, including the June 2019 Financing and the Optimization.  *See* Disclosure Statement, p. 4-7.

49.    The Global Settlement, as amended following California DTSC's withdrawal, includes the following key terms:[14]

i.    the establishment of a trust for the benefit of holders of Transferred NPP Claims and the appointment of a trustee recommended by the Settling Governmental Authorities.  The Environmental Response Trust shall receive (A) title to the Transferred Non-Performing Properties from the Debtors free and clear of all liens, (B) certain causes of action of the Debtors related to the Transferred Non-Performing Properties, and (C) a

---

[14]    The overview of the Global Settlement provided herein is qualified in its entirety by reference to the Amended Plan.

$7,412,477 settlement payment from the Transferred Entities (to be funded by a loan from the Consenting Creditors to such entities);

ii. the Frisco Governmental Authorities shall receive (A) title to the Frisco Non-Performing Property from the Debtors free and clear of all liens, (B) certain causes of action of the Debtors related to the Frisco Non-Performing Property, and (C) a $100,000 settlement payment from the Transferred Entities (to be funded by a loan from the Consenting Creditors to such entities);

iii. the establishment of a trust for the benefit of holders of Allowed General Unsecured Claims and the appointment of a trustee chosen by the Creditors' Committee. The GUC Trust shall receive (A) certain causes of action of the Debtors, and (B) a $2,400,000 settlement payment from the Transferred Entities (to be funded by a loan from the Consenting Creditors to such entities);

iv. the release or covenant not to sue, as applicable, of each of the Global Settlement Parties pursuant to the terms of the Environmental Settlement Agreement and the Frisco Settlement Agreement, as applicable; and

v. the support of the Settling Governmental Authorities, the Environmental Sureties, and the Creditors' Committee for the Disclosure Statement, the Amended Plan, and the Europe/ROW Sale Transaction.

50. Moreover, the Global Settlement, as implemented through the Amended Plan, provides for the transition or abandonment, as applicable, of the Vernon Non-Performing Property based upon whether California DTSC becomes a Global Settlement Party or, in the absence of such an election, the occurrence of the Payment Condition and the Vernon Trust Condition, meaning (1) the Bankruptcy Court approves the release by the California state governmental agencies, including California DTSC, in favor of the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors and the Vernon Environmental Trustee and (2) California DTSC reach an agreement providing covenants substantively identical to those being granted by the Settling Governmental Authorities. The treatment based upon these conditions is as follows:

i. If California DTSC becomes a Global Settlement Party, a beneficial interest in the Vernon Non-Performing Property will be transferred to California DTSC by way of the Vernon Environmental Trust Beneficial

Interests and a settlement payment of approximately $2.6 million will be made by the Transferred Entities (*See* Amended Plan, § 4.8(b).);

ii. If California DTSC does not become a Global Settlement Party but the Payment Condition and the Vernon Trust Condition are satisfied, then the Vernon Non-Performing Property and approximately $2.6 million settlement payment will be transferred to the newly created Vernon Environmental Response Trust, in which California DTSC will receive a beneficial interest (*See* Amended Plan, §§ 4.8(b), 5.2(e)(i).);

iii. If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, the Vernon Non-Performing Property will be abandoned and a settlement payment of approximately $2.6 million will be made by the Transferred Entities (*See* Amended Plan, §§ 4.8(b), 5.2(e)(ii).); and

iv. If the Payment Condition is not satisfied, the Vernon Non-Performing Property will be abandoned and California DTSC will receive a first priority lien against such property.  *See* Amended Plan, §§ 4.8(b), 5.2(e)(iii).

51.    Each aspect of the Global Settlement is interdependent and relied upon by creditors who made material concessions as to their respective positions to enable the expeditious confirmation of the Amended Plan.  A modification to any aspect of the Global Settlement or the failure to approve the Global Settlement *in toto* almost certainly will result in unravelling of the Global Settlement, the Amended Plan and the Europe/ROW Transaction. Such an occurrence would set back the administration of the chapter 11 cases for an extended period as the Debtors and their stakeholders get bogged down in the maze of frenzied litigation.

52.    For the reasons set forth below, the Debtors respectfully submit that the Court should approve the Global Settlement.

### a.  Applicable Legal Standard

53.    Section 1123(b)(3) of the Bankruptcy Code provides that a "plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).    As part of the restructuring process, the Court "may

28

approve a compromise or settlement" under Bankruptcy Rule 9019(a), and "[t]he standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019[.]" *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004). To be approved, a settlement need only be "fair and equitable." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Marvel Ent. Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). Namely, a settlement must be "fair and equitable." *TMT Trailer Ferry,* 390 U.S. at 424.

54.     In making this determination, it is not necessary for a court to conduct a "mini-trial" of the facts or the merits of the underlying disputes to be settled or "decide the numerous questions of law or fact raised by litigation." *Capmark*, 438 B.R. at 515 ("[T]he Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise."); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979) (explaining that a court need only consider those facts that are necessary to enable it to evaluate the settlement and to make an informed and independent judgment about the settlement). Instead, the court "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness." *Capmark*, 438 B.R. at 515; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242 (Bankr. S.D.N.Y. 2007) ("[A] bankruptcy court need not be aware of or decide the particulars of each individual claim resolved by the settlement agreement, or assess the minutia of each and every claim; rather, the court need only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.") (internal

quotation marks omitted), *appeal dismissed*, 371 B.R. 660  (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420

(2d Cir. 2008).

        55.     In the Third Circuit, when evaluating whether the settlement is fair and

equitable and above the lowest point in the range of reasonableness, courts consider the

following four factors:

        i.    the probability of success in litigation;

        ii.    the likely difficulties in collection;

        iii.    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

        iv.    the paramount interest of the creditors.

*See Capmark*, 438 B.R. at 515 (quoting *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d

Cir. 1996)).

        56.     In addition to the *Martin* factors, a court should defer to the debtor's

business judgment "so long as there is a legitimate business justification for [its] action." *Coram*

*Healthcare*, 315 B.R. at 330 (citing *Martin*, 91 F.3d at 395); *see also JPMorgan Chase Bank,*

*N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns),* 419 B.R. 221, 252

(Bankr. S.D.N.Y. 2009) (explaining that while the "approval of a settlement rests in the Court's

sound discretion, the debtor's business judgment should not be ignored"), *appeal dismissed sub*

*nom. R2 Invs. LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 449 B.R. 14

(S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012); *see e.g., In re Glob. Indus. Techs., Inc.*, No.

02-21626-JKF, 2013 WL 587366, at *11 (Bankr. W.D. Pa. Feb. 13, 2013) ("The Settlements are

fair and equitable and a proper exercise of the Debtors' business judgment because they enable

the Debtors to consummate the [plan] and to reorganize their business operations, while at the

same time avoiding complex, expensive and protracted litigation with uncertain outcomes that

could cripple the Debtors' ability to reorganize."). In considering whether to approve a settlement, courts should exercise their discretion "in light of the general public policy favoring settlements." *Capmark*, 438 B.R. at 515 (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Finally, when evaluating the settlement, courts look to "whether the settlement as a whole is reasonable." *In re Wash. Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable. This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole. Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately."); *see also In re NII Holdings, Inc.*, 536 B.R. 61, 105 (Bankr. S.D.N.Y. 2015) ("[A]s mandated by precedent, the Court will undertake its own analysis of each component of the Settlement . . . and of the Settlement as a whole . . . .").

57.     For the reasons stated below, the Global Settlement is fair and equitable and falls above the lowest point in the range of reasonableness.

### b.  Balance Between Possibility of Success in Litigation and Future Benefits of Global Settlement Weighs in Favor of Global Settlement.

58.     It is indisputable that if the Global Settlement is not implemented under the Amended Plan, the Debtors would incur significant delay and expense engaging in lengthy and protracted litigation.  Litigating the claims resolved by the Global Settlement would unnecessarily prolong these chapter 11 cases and substantially delay or preclude the Debtors' ability to successfully consummate Amended Plan and the Europe/ROW Sale Transaction. Given

the Debtors' limited resources, extensive litigation over all of the issues resolved by the Global Settlement could result in the Debtors' inability to satisfy administrative and priority claims, the possibility that all or some of the twenty-two (22) Non-Performing Properties subject to the Global Settlement are unable to be orderly transitioned and unnecessary risk to the Debtors' European/ROW operations to continue as a going concern.  Indeed, the Debtors and their estates have already avoided significant costs by virtue of securing the recommendation of the Global Settlement by the Global Settlement Parties nearly two (2) months ago.

59.     The Global Settlement is the result of extensive analysis by the Debtors and their advisors and is entered into on a fully informed basis by the Global Settlement Parties, including the Debtors, the Creditors' Committee, and the Settling Governmental Authorities, with respect to potential claims against the Consenting Creditors, Transferred Entities and their related parties.  As explained below, the Debtors and Creditors' Committee each undertook an extensive and independent evaluation of potential estate causes of action arising from various prepetition transactions involving the Consenting Creditors.  The Debtors and the Creditors' Committee each independently came to the same conclusion that such claims would be difficult to succeed on and would require extensive litigation.  Accordingly, the Debtors concluded that the value and benefits offered by the Global Settlement—*e.g.*, full payment of administrative and priority claims, $2.4 million for General Unsecured Claims, resolution of environmental disputes, and preservation of the Debtors' foreign businesses on a going concern basis—far outweighed the alternative of extended and expensive litigation with no certainty of recovery, let alone the recovery and benefits offered by the Global Settlement. *See, e.g., In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 774 (Bankr. D. Del. 2018) (finding factor favored approval of

settlement because "lengthy and expensive litigation on a variety of fronts . . . would eat up the successful litigants' ability to recover on their claims").

### c. Difficulties in Collection.

60.     As explained above, the claims resolved by the Global Settlement have been fully investigated by the Subcommittee and the Creditors' Committee, with both estate fiduciaries concluding that successfully litigating the claims on the merits would be very challenging and is outweighed by the certainty and value offered to Debtors and their estates by the Global Settlement.  Moreover, as a practical matter, any recovery to creditors, which is highly uncertain, would take years to achieve.  The potential claims have not yet been litigated; while they have been analyzed, no complaint has been filed, let alone has litigation progressed. As a result, the potential claims are nowhere close to the collection stage. Moreover, even assuming eventual success in litigation, a judgment by any court likely would be subject to multiple layers of appellate review.  Such review could, of course, delay not only the Debtors' ability to collect on a judgment, but also the Debtors' more basic need to resolve these cases and require expenditure of valuable (and finite) estate assets.

61.     Were the Debtors to litigate any of the claims or causes of action subject to the Global Settlement, they would face difficulty in collecting and distributing the proceeds of such claims or causes of action to creditors.  As set forth herein, the claims and causes of action are complex and would likely take substantial time to resolve. Litigating these claims would certainly involve lengthy discovery, trials, and appeals, all at the expense and delay of creditor recoveries. The Global Settlement represents a source of funds, available on the Effective Date.

### d. Complexity of Litigation.

62.     In general, settlements are favored in bankruptcy. *In re Filene's Basement, LLC*, Case No. 11-13511 (KJC), 2014 WL 1713416, at *5 (Bankr. D. Del. Apr. 29, 2014).  This

33

policy preference reflects the reality that the delays, complexity, and cost associated with litigation can erode and potentially eliminate stakeholder recoveries—separate and apart from the risk generally inherent in litigation. *See Nellis v. Shugrue*, 165 B.R. 115, 124 (S.D.N.Y. 1994). In this regard, the Third Circuit has recognized that compromises are favored precisely to "minimize litigation and expedite the administration of a bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

63.     This convention is particularly relevant in these chapter 11 cases, not only because of the limited resources available to the Debtors' Estates, but also in large part due to the expansive set of disputes that are resolved by the Global Settlement and the complexity of the issues at play. Each of the Participating Governmental Authorities (including California DTSC) and the Creditors' Committee could seek to assert Claims that, absent the comprehensive and efficient resolution achieved by the Global Settlement, would require extensive, costly, and complicated litigation that would inevitably bleed the Estates' dry of the little remaining liquidity they currently have.

64.     The environmental legal issues related to remediation and transitioning of the Non-Performing Property are vast. In a preview of what litigation related to even a single Non-Performing Property might look like, California DTSC served the Debtors with discovery requests related to the Vernon Non-Performing Property dating back to 1922. In response, the Debtors produced nearly 20,000 documents and records. Extrapolated over an additional twenty-one (21) Non-Performing Properties—each of which is subject to jurisdictional enforcement of environmental laws by separate state agencies—the complexity and breadth of this potential litigation is difficult to fathom for any company, let alone a bankrupt debtor with extremely

limited capital resources and a long line of creditors awaiting distribution of their share of those resources.

65.     If the weight of environmental litigation were not enough, absent the Global Settlement the Debtors would also be faced with litigation of estate claims that could be brought.  The June 2019 Financing and the Optimization involve numerous issues of detailed fact and law, some of which would present litigation challenges for the Debtors. The complexity of these facts is evidenced by the substantial volume of documents and information that the Subcommittee and the Creditors' Committee each collected and reviewed in connection with their respective investigations. Notwithstanding the investigations, litigation on these issues would require extensive discovery and pretrial proceedings, and a lengthy trial.  This necessarily would require significant expense to prosecute.

66.     As noted above, the Debtors do not have the resources to pay these litigation expenses.  Moreover, lengthy litigation would delay any recoveries to the Debtors' creditors, without any assurance of eventual collection on the potential claims. *See Woodbridge*, 592 B.R. at 774 (benefits of plan settlement "heavily outweighs the lengthy and costly litigation that lies in wait if the settlements are not approved").

### e.  The Global Settlement Is In the Paramount Interests of Creditors.

67.     The Global Settlement is in the best interests of the Debtors' creditors because it maximizes creditors' recoveries under the Amended Plan and resolves significant issues without litigation that would otherwise significantly prolong these chapter 11 cases.  Two of the Debtors' primary stakeholders—the Settling Governmental Authorities and the Creditors' Committee—both participated in the Global Settlement negotiations and ultimately decided that the method in which the Mediator's Proposal, as implemented by Global Settlement contained in the Amended Plan, fairly addressed their respective claims and was in their best interests.

68.     In addition, the Creditors' Committee undertook an independent analysis with respect to the potential value of claims and causes of action by the Debtors on account of the June 2019 Financing and the Optimization and based on such diligence, ultimately determined that the value derived from entering into the Global Settlement—namely, the establishment of the GUC Trust and the value of the GUC Trust Assets—outweighed the risk associated with litigating any potential claims.   Notably, the PBGC—the largest non-environmental unsecured creditor of the Debtors—now also supports the Global Settlement and the Amended Plan.

69.     For the reasons stated herein, the Debtors submit that the Global Settlement was the result of arm's length and good faith negotiations and represents the best path forward to avoid protracted and costly litigation to the detriment of all creditors and parties in interest.  Accordingly, the Global Settlement falls well within the range of reasonableness,  is fair and equitable under the *Martin* factors, and should be approved.

### 3.      Columbus NPP Termination Documents Should Be Approved.

70.     As of the Commencement Date, the Debtors were party to a partnership with a public body, the Development Authority of Columbus, Georgia (the "**Columbus Development Authority**"), pursuant to which the Columbus Development Authority issued to Exide Technologies LLC ("**Exide Technologies**") taxable revenue bonds (the "**Bonds**"), which the Debtors used to finance the development of the Debtors' property located in Columbus, Muscogee County, Georgia (the "**Columbus Non-Performing Property**").  In accordance with the issuance of the Bonds, the Debtors conveyed title to a portion of the Columbus Non-Performing Property site to the Columbus Development Authority.  In turn, Exide Technologies and the Columbus Development Authority entered into a lease-back agreement pursuant to which the Columbus Development Authority became the lessor and the Debtors became the

lessee of the Columbus Non-Performing Property. Lease payments made by Exide Technologies, as the lessee, were made directly to Exide Technologies, as holder of the Bonds, through accounting book entries, rather than to the Columbus Development Authority, as lessor, since Exide Technologies was the ultimate economic beneficiary of the lease payments. This series of transactions was captured in a lease financing agreement and a bond purchase agreement, each dated as of July 1, 2011 (the "**Lease and Bond Purchase Agreements**").

71.    Pursuant to the Amended Plan, the Debtors have agreed to transfer the Columbus Non-Performing Property to the Environmental Response Trust as part of the Environmental Settlement Agreement. To facilitate this transfer, the Debtors seek authority pursuant to the Amended Plan to take the following actions in accordance with the Columbus NPP Termination Documents:

> i.    enter into the Columbus Non-Performing Property Termination Documents appended as Exhibit 6 to the Plan Supplement, including the Agreement Regarding Termination Documents, dated September 9, 2020 (the "Bond Termination Agreement");
>
> ii.    terminate the Lease and Bond Purchase Agreements, including any security documentation related thereto;
>
> iii.    abandon the Bonds issued in connection with the development of the Columbus Non-Performing Property; and
>
> iv.    take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

72.    To facilitate the transfer of the Columbus Non-Performing Property to the Environmental Response Trust "free of all liens, charges, encumbrances, and Interests," the Debtors request that the Court approve the rejection of the Lease as a sound exercise of the Debtors' business judgment in accordance with section 365(a) the Bankruptcy Code,[15] and

---

[15]    *See, e.g., Grp. of Inst. Inv'rs, Inc. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) (noting "the question whether a lease should be rejected . . . is one of business

further request authority to abandon the Bonds in accordance with sections 105(a) and 554(a) of the Bankruptcy Code.  The Debtors, in their discretion, have determined that the Lease is no longer necessary for, or beneficial to, the Estates and imposes unnecessary expenses on the Estates.  Further, the value of the Bonds was solely derived from the series of transactions contained in the Lease and Bond Purchase Agreements, which enabled the Debtors to generate funds to finance the development of the Columbus Non-Performing Property.  The Bonds do not represent any inherent value to any third party purchaser, since no such purchaser could become a lessee on the Columbus Non-Performing Property.  As such, the Bonds do not hold any market value, cannot realistically be sold, and are of inconsequential value to the Estates, and as such their abandonment should be approved.

### 4.   Plan Releases Should Be Approved.

73.   The Amended Plan, Europe/ROW Purchase Agreement, Environmental Settlement Agreement, and Frisco Settlement Agreement provide for four (4) categories of releases:

   i.   The Amended Plan provides for releases of claims held by: (a) the Debtors and their Estates, including those that the Creditors' Committee could seek to assert, against the Released Parties and their Related Parties,[16] (the

---

judgment."); *Nat'l Lab. Rels. Bd. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *see also L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d. 291, 298 (3d Cir. 2000); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003). In applying the business judgment standard, bankruptcy courts give deference to a debtor's decision to assume or reject leases.

[16]   As defined in Section 1.137 of the Amended Plan, "**Released Parties**" means "collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties."

As defined in Section 1.167 of the Amended Plan, "**Related Parties**" means "with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members,

38

"**Estate Releases**"), *see* Amended Plan, § 10.5, (b) the Seller Parties, as such term is defined in, and pursuant to, the Europe/ROW Purchase Agreement (the "**Debtor Seller Parties Releases**"), (c) the Debtors and their Estates pursuant to the Environmental Settlement Agreement and the Frisco Settlement Agreement (the "**Global Settlement Releases**" and, together with the Estate Release and the Debtor Seller Parties Releases, the "**Debtor Releases**");

ii. consensual releases of the Released Parties by the holders of Claims who (a) are deemed to have accepted the Amended Plan, (b) are entitled to vote and either (1) accepted the Amended Plan or (2) rejected the Amended Plan or abstained from voting but did not opt out of the release (the "**Consensual Third Party Releases**").  Notably, no parties entitled to vote rejected the Amended Plan.  Creditors holding 20.72% of the debt in the Voting Classes abstained from voting on the Amended Plan and opted out of the Third Party Releases and therefore are not subject thereto.[17]

iii. non-consensual releases by holders of General Unsecured Claims and California state environmental agencies, including California DTSC (as the only government agency that has not executed the Environmental Settlement Agreement) (collectively, the "**California Environmental Agencies**") *solely in favor* of the Europe/ROW Purchaser, the Transferred Entities, the Consenting Creditors and the Trustees (the "**Non-Consensual Third Party Releases**", together with the Consensual Third Party Releases, the "**Third Party Releases**", and both together with the Debtor Releases, the "**Plan Releases**"), *see* Amended Plan, § 10.6; and

iv. consensual releases and covenants not to sue among the parties to the Environmental Settlement Documents.  *See* Environmental Settlement Agreement, Art. IX; Frisco Settlement Agreement, Art. VIII.

     **a.**     **California's Misunderstanding of the Plan Releases.**

    74.    As an initial matter, the Debtors must correct California DTSC's complete misunderstanding of the releases provided for by the Amended Plan and the Environmental Settlement Agreement.  For the convenience of the Court, attached hereto as Exhibit B is a

---

partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; provided, that the Former Officers and Directors of the Debtors shall not be "Related Parties.'."

17    *See* Voting Certification at ¶ [11].

correct summary of the releases actually applicable to the California Environmental Agencies pursuant to the Amended Plan and a comparison to the Environmental Settlement Agreement. First and foremost, the Nonconsensual Third Party Release applicable to the California Environmental Agencies (and General Unsecured Creditors) *only* apply to claims against the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser, and the Trustees. Period. Full stop. *See* Amended Plan § 10.6(f):

> As of the Effective Date…the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following:… ***solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors***, all holders of General Unsecured Claims and Environmental NPP Claims, and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws).

(emphasis added).

75.     In fact, unlike the Settling Governmental Authorities—who are providing covenants not to sue not only to the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, but also to the Debtors, their related parties and the related parties of the Consenting Creditors—the release applicable to the California Enforcement Agencies in Section 10.6(f) of the Amended Plan does *not* extend to such parties. California DTSC also argues that, in light of various carve-outs, the Settling Governmental Authorities' covenants not to sue the Debtors in the Environmental Settlement Agreement are narrower than the Plan Releases applicable to the California Environmental Agencies. *See* California DTSC Objection ¶ 64. But exactly the opposite is true: the Amended Plan does not even provide for releases of the Debtors or their Related Parties (or the Related Parties of the Consenting Creditors) by the California Environmental Agencies.

76.     Moreover, the scope of the releases that the Settling Governmental Authorities are providing to the Consenting Creditors, Transferred Entities, Europe/ROW Purchaser, and Trustees are substantively the same as the scope of the nonconsensual releases applicable to the California Environmental Agencies.  For the avoidance of any doubt, the Debtors have included the following language in the Amended Plan:

> For the avoidance of doubt, the scope of any releases provided by any California Environmental Agency that has jurisdiction regarding the enforcement of Environmental Laws, including the California DTSC, pursuant to this Section 10.6 of the Plan shall not be construed or deemed to be any broader than the scope of the covenants not to sue set forth in paragraph 45(b) of the Environmental Settlement Agreement provided by the Settling Governmental Authorities.

77.     California DTSC also takes issue with the Debtor releases provided in Section 10.5 of the Amended Plan, alleging specifically that "the Plan includes releases applicable to DTSC in Sections 10.5 and 10.6 that are far broader and more burdensome than those agreed to by the Settling Governmental Authorities in the Environmental Settlement Agreement."  *See* California DTSC Objection ¶ 20.  This evinces a complete misunderstanding of the difference between debtor releases and third-party releases.  The releases contained in Section 10.5 of the Amended Plan pertain only to claims held *by* the Debtors, not *against* the Debtors.  The California Enforcement Agencies are not releasing the Debtors pursuant to Section 10.5 of the Amended Plan.

78.     Needless to say, despite California DTSC's blatantly incorrect complaints to the contrary, the releases applicable to the California Enforcement Agencies are substantively the same in scope and cover only a subset of the parties benefitting from covenants not to sue by the Settling Governmental Authorities.  Accordingly, the California Enforcement Agencies are actually treated better—not worse—under the Amended Plan.

**b.      Debtor Releases Are Appropriate and Should Be Approved.**

79.      The Debtor Releases are an integral component of the Amended Plan and comply with the Bankruptcy Code and applicable law.   The overwhelming support for the Amended Plan, including the Debtor Releases, by the Creditors' Committee and the Settling Governmental Authorities—following their own due diligence and independent analysis—are compelling evidence that the Debtor Releases should be approved.   All creditors received notice of the Plan Releases and their right to object to such releases.   Only California DTSC has raised a concern with respect to the Debtor Releases.   This is a significant endorsement of the Debtor Releases that the Court should not overlook.   In particular, it reinforces and affirms the Debtors' determination—led by their independent subcommittee—that the Debtor Releases are in the best interests of the Debtors' estates.   *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994) (stating that creditor approval of a release is "the single most important factor" to determine whether a release is appropriate).   Accordingly, for these reasons and for the reasons set forth below, the Debtor Releases should be approved.

*i.      Applicable Legal Standard.*

80.      Pursuant to section 1123(b)(3)(A), a debtor may release claims under a Chapter 11 plan "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."   *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010), *appeal dismissed,* 2011 WL 3420441 (D. Del. Aug. 4, 2011); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (finding that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's

business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan").

81.    As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference. *See, e.g., Spansion,* 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors . . . ."); *In re Marvel Ent. Grp., Inc.,* 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted).  Additionally, under Third Circuit precedent, a release by a debtor is appropriate if, in the debtor's judgment, any claims of the estate being released are of only marginal viability.  *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (approving release by debtor of potential avoidance claims in connection with a prepetition leveraged recapitalization because the claims were "of only marginal viability" and not worth pursuing).

82.    When evaluating a debtor's release of claims, some courts in this district also have considered the following non-exclusive and disjunctive list of factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bank D. Del. 1999) (the "***Zenith* Factors**"), which were first articulated as the standard for a third party release: (i) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that,

without the injunction, there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (v) [a] provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *Id.* at 110; *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 303–04 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements."); *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (stating that the *Zenith* Factors "simply provide guidance in the [c]ourt's determination of fairness"); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* Factors are not exclusive or conjunctive requirements).  As a list of non-conjunctive factors, these factors provide a way of "weighing the equities of the particular case after a fact-specific review." *Indianapolis Downs*, 486 B.R. at 303.

83.    Here, because approval of the Debtor Releases was both a valid exercise of the Debtors' business judgment and appropriate under the *Zenith* Factors, the Debtor Releases should be approved.

ii.    *Approval of the Debtor Releases Is a Valid Exercise of the Debtors' Business Judgment.*

84.    The Special Committee approved the Debtor Releases in conjunction with the Global Settlement after an extensive and thorough investigation conducted by an independent subcommittee of the Special Committee (the "**Subcommittee**") in close coordination with the Creditors' Committee.

85.    The Subcommittee Investigation and its Coordination with the Creditors' Committee.  The Subcommittee was created to investigate, evaluate, and control the disposition or resolution of any claims associated with prepetition affiliate transactions including the June 2019 Financing and the Optimization (the "**Prepetition Transactions**").  Tepner Decl.  ¶ 8.

44

Harvey Tepner, the sole member of the Subcommittee since its formation on April 3, 2020, is a highly qualified and experienced independent director. *Id.* ¶¶ 3, 4, 5, 8. He has served as an independent director, restructuring expert, strategic advisor, and private investor in a variety of situations. *Id.* ¶ 3. In addition to sitting on the Board of Exide Holdings, Inc., he has served as an independent director on numerous other boards, including the board of Core-Mark Holding Company (NASDAQ: CORE), one of the largest consumer merchandise distributors in North America, and Village Roadshow Entertainment Group (BVI) Limited, a producer and co-financier of film and TV entertainment. *Id.* ¶ 4. His experience also includes working as a senior executive of WL Ross & Co. LLC, an alternative asset manager and private equity firm. *Id.* ¶ 5. Prior to joining the board of Holdings (the "**Board**"), Mr. Tepner had no business or personal relationship with Exide or its management. *Id.* ¶ 6. Mr. Tepner had met some of the Consenting Creditors through the years on other occasions in meetings with large groups of creditors for companies in which he was involved or at conferences or social events. *Id*.

86. The Subcommittee oversaw the investigation and engaged and directed Weil to lead the investigation in evaluating the viability of any potential claims and causes of action related to the Prepetition Transactions. Tepner Decl. ¶ 10. The Subcommittee's investigation took place over approximately four months (from April through July 2020) and included extensive factual and legal analysis. *Id.* On behalf of the Subcommittee, Weil first requested and received pertinent information and documents from the Company and its legal and financial advisors, and subsequently reviewed thousands of documents. *Id.* Weil next conducted interviews necessary to understand the Prepetition Transactions and to evaluate potential claims in connection with them. *Id.* Weil conducted twenty-four (24) interviews in total. *Id.* Interviewees included all board members at the time the Prepetition Transactions were approved,

relevant current and former management of the Company, the Company's legal and financial advisors in connection with the Prepetition Transactions, and the Company's third party auditor. *Id.* The Subcommittee also engaged independent financial advisors Ankura and Houlihan Lokey to assist with the investigation of the June 2019 Financing and Optimization, respectively. *Id.*[18]

87.     Significantly, the Subcommittee conducted its investigation in close coordination with the Creditors' Committee, which conducted its own contemporaneous investigation of the Prepetition Transactions.     Tepner Decl. ¶ 12.     As a result, the Subcommittee's investigation was fully transparent to counsel for the Creditors' Committee, Lowenstein Sandler LLP ("**Lowenstein**").     *Id.*     Thousands of documents were shared with the Creditors' Committee's advisors pursuant to a Confidentiality Agreement as well as a Common Interest Agreement.     *Id.*     Lowenstein and its financial advisor, AlixPartners LLP, actively participated in most of the interviews and were provided with detailed verbal summaries and updates of interviews that preceded their involvement or were with the Company's legal advisors at the time of the Prepetition Transactions.  *Id.* ¶ 13.  Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, also engaged in periodic and open discussions in connection with the investigation of the Prepetition Transactions.  *Id.* ¶ 14. Towards the end of their respective investigations, Weil, on behalf of the Subcommittee, and Lowenstein, on behalf of the Creditors' Committee, exchanged their preliminary conclusions, which were consistent in all material respects. *Id.* ¶ 15.

---

[18]     Before the investigation began, the Subcommittee analyzed whether there were any conflicts of interest with respect to the engagements of Weil, Houlihan Lokey, and Ankura and determined there were none.  *Id.* ¶ 9. Weil did not represent the Company in connection with any of the Prepetition Transactions.  *Id.*  Houlihan Lokey was able to assist with the evaluation of the Optimization since it did not serve as the financial advisor on that transaction.  *Id.*  For purposes of evaluating the June 2019 Financing (which Houlihan Lokey had worked on), Ankura was used to analyze that transaction utilizing a team that was separate from Chief Restructuring Officer Roy Messing and his team.  *Id.*  Ankura did not serve as the financial advisor on either the June 2019 Financing or the Optimization.  *Id.*

88.     After its nearly four month investigation, the Subcommittee did not identify any valuable, colorable claims or causes of action belonging to the Debtors related to the Prepetition Transactions or to the conduct of the Company's directors and officers in connection with the Prepetition Transactions.  *Id.* ¶ 16.  The Subcommittee's investigation analyzed the viability of potential claims including for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and equitable subordination with respect to the June 2019 Financing, as well as for actual fraudulent conveyance, constructive fraudulent conveyance, breach of fiduciary duty, and unlawful distribution with respect to the Optimization.  *Id.*  The Subcommittee determined that the Debtors' unsecured creditors, including environmental creditors, suffered no damages as a result of the Prepetition Transactions.  *Id.*  Moreover, as to any potential claims for breach of fiduciary duty with respect to the Prepetition Transactions, the Subcommittee determined that the business judgment standard would apply and was satisfied. *Id.*   Additionally, the Subcommittee concluded that the time and expense associated with pursuing any claims or causes of action likely would exceed any potential value that could be recovered from such claims or causes of action and that the value of any potential recovery also did not exceed the benefits of the Global Settlement and the sale of the Europe/ROW Assets.  *Id.* ¶ 17.

89.     <u>Subcommittee's Consideration of the Global Settlement</u>.     In recommending that the Special Committee approve the Global Settlement, including the Debtor Releases, the Subcommittee considered the value of the potential claims and causes of action being released, which the Subcommittee determined to have little likelihood of success, in relation to the value provided to the Debtors pursuant to the Global Settlement, including: (i) settlement of claims by the Settling Governmental Authorities, Creditors' Committee, and

Environmental Sureties, (ii) the number of employee jobs that would be preserved as a result of the Europe/ROW Sale, and (iii) avoiding a free fall insolvency in Europe, which could have involved the Debtors in protracted litigation. Tepner Decl. ¶ 18. The Subcommittee also considered the fact that its conclusions regarding the strength and value of the potential claims being released (or the lack thereof) were consistent with the conclusions of the Creditors' Committee and that the Creditors' Committee was supportive of the Global Settlement. *Id.* ¶ 19.

90.     Considered against this backdrop, it was certainly within the business judgment of the Subcommittee to determine that the Debtor Releases are appropriate and to recommend that the Special Committee approve the Global Settlement, which provided significant value to all stakeholders.

     iii.  *The Debtor Releases are Appropriate under the Zenith Factors*.

91.     Application of the *Zenith* factors here also demonstrates that the balance of equities weighs in favor of approving the Debtor Releases. First, an identity of interests is shared between the Debtors and the Released Parties because each shares a common goal of having the Plan confirmed and consummating the transactions thereunder. *See, e.g.*, *Zenith*, 241 B.R. at 110 (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared an identity of interest with debtor "in seeing that the Plan succeed and the company reorganize"); *In re 710 Long Ridge Rd. Operating Co.*, Case No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder").

92.     Second, the Released Parties have provided significant value to the Debtors' Estates throughout these Chapter 11 Cases. The Debtors, Consenting Creditors, and

48

Creditors' Committee are all parties to the Global Settlement embodied in the Amended Plan, which resulted in a consensual outcome to these chapter 11 cases that avoids potentially costly and protracted litigation and provides for the establishment of the Environmental Response Trust and General GUC Trust for the benefit of multiple constituencies.  Messing Confirmation Decl. ¶ 30.  The Debtors' advisors and directors guided the Debtors through these challenging times and were crucial in negotiating the terms of the Global Settlement.  Messing Confirmation Decl. ¶ 30.  The Consenting Creditors also submitted a binding credit bid for the Exide Europe/ROW business segment, which further supported the Debtors by agreeing that there would be no break-up fee in connection with the credit bid and provided for the assumption of obligations under the Superpriority Notes Indenture by the Transferred Entities.  Peluchiwski Decl. ¶ 14.  After an extensive marketing process, the Debtors did not receive any other Qualified Bids for the Europe/ROW Assets, and the Europe/ROW Purchaser will serve as the buyer for the Europe/ROW Assets under the Europe/ROW Purchase Agreement.  *Id.* ¶ 17, 19.  Additionally, the consent of the Consenting Creditors to the use of cash collateral and the support of the DIP Lenders, which includes certain Consenting Creditors, crucially provided the Debtors a means by which to pay their ordinary-course operating expenses, finance these Chapter 11 cases, and pursue a going concern sale process for their assets to maximize recoveries for all stakeholders. *See* First Day Declaration ¶¶ 16-17, 109-11.

93.     Finally, certain Released Parties will provide value to the Debtors through the Amended Plan itself.  The Amended Plan contemplates that the Transferred Entities will pay the Global Settlement Payments in cash through loan proceeds that will be provided by the Consenting Creditors for these purposes.  The Consenting Creditors are also parties to a settlement with the PBGC, pursuant to which the Transferred Entities (through a loan from the

Consenting Creditors) will fund a $6.0 million settlement payment to the PBGC.  In total, the Consenting Creditors and Transferred Entities will provide $18.5 million in settlement payments under the Plan to the Debtors' creditors and will forgo their deficiency and prepetition intercompany claims to enhance unsecured creditor recoveries.

94.     Third, the Debtor Releases are essential to the success of the Amended Plan.  Messing Confirmation Decl. ¶ 29; Tepner Decl. ¶ 21.  The Debtor Releases contained in the Europe/ROW Purchase Agreement served as a crucial inducement for the Europe/ROW Purchaser to participate in the Europe/ROW Sale.  Peluchiwski Decl. ¶ 14; Tepner Decl. ¶ 21. Moreover, the Global Settlement Release encompasses the releases that were exchanged among the Global Settlement Parties as part of the Global Settlement.  Tepner Decl. ¶ 21.  Acceptance of the Global Settlement, including the releases therein, allowed the Debtors to move forward with the consensual Amended Plan and avoid lengthy, complex, and value-destructive litigation with creditors.  Messing Confirmation Decl. ¶ 25; Tepner Decl. ¶ 21.  Had the Debtor Releases not been provided, that would have destroyed the Debtors' ability to secure the valuable consideration provided under the Global Settlement and Amended Plan.  Messing Confirmation Decl. ¶ 30; Tepner Decl. ¶ 21.

95.     Finally, an overwhelming majority of the Debtors' creditors are supportive of the Amended Plan.  Indeed, other than California DTSC, not a single party has questioned the Debtor Releases.  The Debtor Releases are also supported by the Creditors' Committee, the Settling Governmental Authorities, and the PBGC following their own independent analysis. When a debtor's creditors (who are most affected by a debtor's release of claims or causes of action) are supportive of a chapter 11 plan, that provides strong evidence that supports finding the release to be appropriate.  *See Master Mortg.*, 168 B.R. at 938 (stating that creditor approval

of a release is "the single most important factor" to determine whether a release is appropriate); *see also In re Key3Media Grp.*, 336 B.R. 87, 97-98 (Bankr. D. Del. 2005) (granting a settlement of estate causes of action over a creditor's objection because, among other things, a majority of creditors approved of the settlement), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006).[19]

**c.     Third Party Releases Are Appropriate and Should Be Approved.**

96.     The Third Party Releases are essential components of the Amended Plan and Global Settlement and should be approved.

*i.     The Court Should Approve the Non-consensual Third Party Releases.*

97.     As explained above, the Non-consensual Releases by holders of General Unsecured Claims and the California Environmental Agencies (as the only parties in Class 8 who have not voluntarily accepted the Global Settlement) ***only extend to the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser and the Trustees*** (for purposes of the Non-consensual Third Party Releases, the "**Non-consensual Released Parties**")*.   See* Plan § 10.6(f).

98.     The Non-consensual Third Party Releases satisfy the standard for permissible non-consensual releases and should be approved.  Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The authority granted under section 105(a) is "consistent with the traditional understanding that bankruptcy courts, as

---

[19]   The only *Zenith* Factor not present here is that there is no provision in the Amended Plan that provides for payment of all or substantially all of the claims of affected classes.  Given the Debtors' financial condition, it would not be realistic to expect the impaired classes to receive full recoveries.  Additionally, case law is clear that not each factor is relevant in every case, and releases may be approved where only one or two factors are present.  *See, e.g., Spansion*, 426 B.R. at 143 (approving release where the released parties were actively involved in negotiating the plan and four of five creditor classes voted overwhelmingly in favor).

courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).   This Circuit has utilized section 105(a) to extend the protections of the Bankruptcy Code to non-debtors in the third party release context.  *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ("In order for a reorganization plan that includes an injunction barring third-party claims against non-debtors to be approved, the injunction must be 'both necessary to the reorganization and fair' under 11 U.S.C. § 105(a).") (citing *In re Global Indus. Techs., Inc.,* 645 F.3d 201, 206 (3d Cir. 2011).

99.     The Third Circuit recognizes that non-consensual releases of third-party claims against non-debtors are permissible where such releases meet "[t]he hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions. . . ." *Skirnick Harwood Halebian & Feffer v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000).   "[I]f there is an appropriate bankruptcy justification for the releases in the absence of affirmative consent, a debtor may proceed under *Continental*."  *In re Emerge Energy Servs. LP*, Case No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019).

100.     In applying *Continental*'s hallmarks and determining whether the circumstances of a case justify the approval of third-party releases, this Court considers four factors: "whether: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors received reasonable compensation in exchange for the release." *In re Spansion,* 426 B.R. at 144 (citing *In*

*re Genesis Health Ventures, Inc.* 266 B.R. 591, 607-08 (Bankr. D. Del. 2001), *appeal dismissed*, 280 B.R. 339 (D. Del. 2002)).

101. Although courts often examine releases in the context of reorganization cases, reorganization of a going concern business is not a mandatory precondition and liquidation plans also qualify for such relief. *See e.g., In re Medford Crossings North, LLC*, No. 07-25115, 2011 WL 182815, at *18 (Bankr. D.N.J. Jan. 20, 2011) (denying third party release and injunction on other grounds, but rejecting argument that a liquidating plan is *per se* ineligible for such relief); *In re Fidelis, Inc*. 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) ("[E]ven though this Case is a liquidation, the same principal applies as in a reorganization. A release of a non-debtor is appropriate only if, without it, there would be little likelihood of accomplishing of the goal of a chapter 11: the confirmation of a successful plan of liquidation that benefits the creditors, including the unsecured creditors."); *see also Hr'g Tr.* 115-17, *In re Freedom Rings, LLC*, Case No. 05-14268 (CSS) (Bankr. D. Del. Apr. 20, 2006) [Docket No. 385] (approving non-consensual third party releases in favor of a prepetition creditor that had made a critical cash contribution where the creditor would not have done so but-for the release and the only alternative would have been to convert the cases to a chapter 7 liquidation).

102. The *Spansion* factors are meant to serve as guidance and are not an exhaustive or conjunctive list of requirements that must be met before a court may authorize a non-consensual third party release. *See*, *e.g.*, *Hr'g Tr. 67:8-13*, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) Bankr. D. Del. Dec. 3, 2015) [Docket No. 7255] ("The Delaware courts that have ruled on [non-consensual third party releases] have looked at, among other things, whether (a) the release[e] has provided a critical contribution to the Debtors' plan; and (b) . . . whether the non-consenting creditors were compensated for their contributions."); *In*

*re 710 Long Ridge Rd. Operating Co., II*, No. 13-13653 (DGHS), 2014 WL 886433, *1, *14-15 (Bankr. D.N.J. Mar. 5, 2014).  For the reasons set forth below, the Non-consensual Third Party Releases are fair, necessary to the Debtors' reorganization, and supported by ample evidence demonstrating the same.

103.    First, the Nonconsensual Released Parties have made substantial contributions to the chapter 11 cases and Amended Plan.  Vital to the successful outcome of the Global Settlement was the participation by the Consenting Creditors, which they did on a purely voluntary basis—the Court-approved mediation procedures did not require participation by the Consenting Creditors.[20]   In fact, prior to the Consenting Creditors joining the mediation, the other Global Settlement Parties were at an impasse, largely due to the lack of cash resources available to the Debtors.

104.    The substantial contributions by the Non-consensual Released Parties to the Global Settlement and the Amended Plan include:

i.      funding of the $12.5 million in aggregate Global Settlement Payments by the Transferred Entities and Consenting Creditors, which has since increased to $18.5 million following the settlement with the PBGC;

ii.     consent by the Consenting Creditors to the use of cash collateral and a significant portion of the debtor-in-possession financing capital from certain of the Consenting Creditors, millions of dollars of which were used to fund, among other things, the Subcommittee investigation and the Creditors' Committee investigation, each of which scrutinized prepetition transactions involving the Consenting Creditors—said differently, the Consenting Creditors funded millions of dollars for investigations *into potential actions against themselves*;

iii.    the agreement of the Consenting Creditors to purchase the Debtors' Europe/ROW business that had no other qualified bidders, in exchange for forgiveness of a significant amount of secured debt, which would otherwise come before any unsecured claims in priority of distribution;

---

[20]     *See Order Governing Settlement Procedures With Governmental Agencies Relating to Non-Performing Properties* [Docket No. 242] (the "**Settlement Procedures Order**").

    iv.    waivers by the Consenting Creditors of any deficiency claims and the Transferred Entities of any prepetition Intercompany Claims which will increase distributions to general unsecured creditors;

    v.    voluntary agreement by the Consenting Creditors to release their liens on the Non-Performing Properties and the proceeds thereof, including adequate protection liens, to facilitate the Global Settlement and provide incremental value to the Settling Governmental Authorities; and

    vi.    cancellation of the Debtors' guarantee of $155.9 million of principal obligations under the Superpriority Notes Indenture, plus all accrued and unpaid interest.

105.    Without these significant contributions by the Non-consensual Released Parties, the Debtors would not be before the Court with an Amended Plan that has the support of virtually every single creditor and fiduciary of the Debtors. *See In re W.R. Grace & Co.*, 446 B.R. 96, 138 (Bankr. D. Del. 2011) (finding that parties involved in settlement with debtor made substantial contribution where, absent the release, settling parties would not have contributed a significant sum which was necessary for the reorganization), *aff'd,* 475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 311, 729 F.3d 332, 532 F. App'x 264 (3d Cir. 2013); Hr'g Tr. 74:14–75:5, *In re PNG Ventures, Inc.*, Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Docket No. 368] (explaining that a contribution is substantial when there is a fair exchange for the release of the creditors' claims and finding that lenders, by compromising their claims and providing financing so that unsecured creditors received distributions they would not otherwise have received, made such a contribution).

106.    In addition, the Debtors' use of cash collateral of the Consenting Creditors and their support of the Debtors during these chapter 11 cases has enabled the Debtors and their estates to realize multiple other benefits that could not have been achieved in a chapter 7 or foreclosure proceeding without the support of the Consenting Creditors, including:

    i.    a going concern sale of the Americas Assets, which preserved over 2,000 jobs for the Debtors, as well as valuable customers, and

allowed the Debtors to satisfy their ABL Loan Obligations and DIP Loan in full;

ii.     funding of retiree health benefits during the chapter 11 cases and through December 31, 2020 pursuant to the recent settlement achieved with various represents of the Debtors' retirees;

iii.    funding of severance and other payments to the Debtors' employees who must be terminated as a result of the Debtors' liquidation;

iv.     adequate funding of administrative expense obligations throughout the pendency of these chapter 11 cases and avoiding an abrupt and irrevocable interruption of the Debtors' business operations during the sale process; and

v.      preventing immediate liquidation at fire sale prices and termination of thousands of employees during the global COVID-19 pandemic.

107.    Second, in exchange for their many critical contributions described above, the Non-consensual Released Parties have required, and are entitled to, certainty of no further litigation with the Debtors or their estates and creditors.  No reasonable actor would proceed otherwise. If the Non-consensual Third Party Releases are not approved as to the California Enforcement Agencies, approximately $2.6 million of the Global Settlement Payments will not be provided for the benefit of the Vernon Non-Performing Property.  Accordingly, this *Spansion* factor weighs in favor of approval of the Non-consensual Third Party Releases.

108.    In its objection, California DTSC refers to the Transferred Entities' contributions as "*de minimis*."  Docket No. 917, ¶ 123.  While California DTSC—unlike every other Settling Governmental Authority that accepted the Global Settlement and recognizes the extraordinary undertaking by the Transferred Entities that, as described above, is vital to the Amended Plan's success—is apparently disenchanted by these contributions, the adequacy of these contributions is not a question of quantum but rather one of necessity.  *See Spansion*, 426 B.R. at 145 (analyzing whether released parties' "contributions rise to the level of the *critical*

financial contribution contemplated in *Continental* and *Genesis* that is needed to obtain approval of non-consensual releases.") (emphasis added) (internal citations omitted).  Because each of the Non-consensual Released Parties has provided a critical and substantial contribution, this factor weighs in favor of approval of the Non-consensual Third Party Releases.

109.    Third, the Released Parties' contributions are necessary to make the Debtors' Plan feasible.  Without the Consenting Creditors' funding of these chapter 11 cases and the Global Settlement Payments through their loan to the Transferred Entities, the Debtors would not be in a position to propose the Amended Plan.  Absent the Global Settlement, the Debtors would be forced to abandon all of the now-settled Non-Performing Properties, which would have resulted in costly and time-consuming litigation with numerous environmental regulators and likely rendered confirmation of a plan—including paying all administrative and priority claims in full—impossible.    Thus, the Consenting Creditors' contributions are critical to the Amended Plan's feasibility.  Therefore, this factor also weighs in favor of approval of the Non-consensual Third Party Releases.

110.    Finally, other creditors, including California DTSC, will receive reasonable compensation in exchange for the Nonconsensual Third Party Releases.  As noted above, absent the Non-consensual Released Parties' contributions to the chapter 11 cases, the Amended Plan would not have come to fruition and Debtors would be forced to liquidate their remaining assets and abandon the Non-Performing Properties.  Messing Confirmation Decl. at ¶ 33.  Through the Non-consensual Released Parties' efforts, the holders of General Unsecured Claims and the California Environmental Agencies that are subject to the Non-consensual Third Party Releases are receiving adequate consideration on account of such claims, especially given that litigation against the Consenting Creditors on any claims would be very difficult to succeed

on.  *See In re Hercules Offshore, Inc.*, 565 B.R. 732, 760 (Bankr. D. Del. 2016) (approving third party lender releases and considering the "viability of such claims" against the lenders as a relevant factor).

111.    The Global Settlement Payments will provide funding to promote the safe and orderly transition of the Non-Performing Properties and also provide the only realistic and guaranteed option for any recovery to general unsecured creditors.  *See*, *e.g.*, *In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (indicating releases should be "given in exchange for fair consideration") (citing *Continental*, 203 F.3d at 214–15); S*ee also Opt-Out Lenders v. Millennium Lab Holdings II, LLC (Millennium Lab Holdings II, LLC),* 591 B.R. at 586 (affirming bankruptcy court's finding that that non-consensual releases were appropriate where payments and distributions made under the plan "dwarfed any recoveries . . . in a wipeout liquidation"); *In re W.R. Grace*, 446 B.R. at 138–39 (approving non-consensual third-party release provision in plan of reorganization where, absent the release and settlement, substantial expenses would be incurred by the estate and where creditors' recovery after litigation was uncertain but recovery under the plan would be certain and significant); Hr'g Tr. 74:8–75:17, *In re PNG Ventures, Inc.*, Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Docket No. 368] (approving non-consensual third-party release where, absent such release and settlement, unsecured creditors—who otherwise would be "out of the money"—would receive a distribution under the plan).

112.    Accordingly, the Non-consensual Third Party Releases are appropriate and permissible pursuant to *Continental*.

ii.        *The Court Should Also Approve the Consensual Third Party Releases.*

113.    Section 10.6 of the Amended Plan also contains consensual releases by the following parties (collectively, the "**Releasing Parties**") against the Released Parties for liability relating to the Debtors and these chapter 11 cases (the "**Consensual Third Party Releases**"):

  i.    the Consenting Creditors;

  ii.   the Creditors' Committee and each of its members in their capacity as such;

  iii.  all holders of Claims who vote to accept the Plan;

  iv.   all holders who are deemed to accept the Plan;

  v.    all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in Section 10.6 of the Plan; and

  vi.   with respect to any Person or Entity in the foregoing clauses (i) through (vi), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (i) through (vi).

114.    The Consensual Third Party Releases do ***not*** apply to rejecting or abstaining creditors that have opted out of the Consensual Third Party Releases on the Ballot. As such, the Consensual Third Party Releases are limited in scope and only affect the stakeholders that have consented to such treatment by voting in favor of the Amended Plan or failed to opt out or object to such release.

115.    In this district, a release is consensual where, as here, the parties have consented to the release because they either voted to accept the plan (or were deemed to accept the Amended Plan as a result of their Unimpaired treatment) or were given notice of the opportunity to opt out of or object to the releases but did not do so. *See In re Indianapolis*

*Downs*, 486 B.R. 286, 286 (Bankr. D. Del. 2013) (collecting cases); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (finding that voting in favor of a plan with third-party releases binds the voting party thereto); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (same); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (finding that unimpaired creditors deemed to accept the plan could be bound to third-party release therein because such creditors had not objected to the release, were being paid in full, and had received adequate consideration for the release); *In re New Gulf Res., LLC*, Case No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) [Docket No. 514] (confirming plan and binding creditors who abstained or rejected the plan and did not opt out of third-party releases); *In re Insys Therapeutics, Inc.*, Case No.19-11292 (JTD) (Bankr. D. Del. Jan. 16, 2020) [Docket No. 1115] (confirming plan and binding creditors who were deemed to reject and did not opt out of third-party releases); *In re Gen. Wireless Operations, Inc.*, Case No. 17-10506 (BLS) (Bankr. D. Del. Oct. 26, 2017) [Docket No. 1117] (same).  Here, the Solicitation Package provided clear notice of, among other things, the Consensual Third Party Releases and provided release opt-out instructions for those holders of Claims that were entitled to vote on the Amended Plan. Accordingly, the Debtors submit that the Consensual Third Party Releases discussed above should be approved.

116.    In addition, as described above, the Released Parties have provided important and substantial contributions to the chapter 11 cases and confirmation of the Amended Plan.

d.      **The Exculpation Provision is Appropriate and Should be Approved.**

117.    Section 10.7 of the Amended Plan also contains a customary exculpation for certain Exculpated Parties for claims arising out of or related to, among other things, the

administration of these chapter 11 cases, the negotiation, formulation, preparation, and pursuit of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan (the "**Exculpation Provision**"). Importantly, following receipt of informal comments from the U.S. Trustee, the Amended Plan has been modified to limit the Exculpated Parties to estate fiduciaries.[21]   In addition, the Exculpation Provision carves out acts or omissions that are determined by a Final Order to have constituted fraud or willful misconduct and applies only to fiduciaries of the Debtors' Estates.

118.    Each of the Exculpated Parties has participated in the Debtors' chapter 11 cases in good faith.  Without the support of the Exculpated Parties, the Debtors would not have been able to execute their chapter 11 strategy, commence these chapter 11 cases, and propose a plan supported by virtually all creditors.  The Exculpation Provision is necessary to protect fiduciaries of the Debtors' Estates that have made substantial contributions to the chapter 11 cases from collateral attacks related to good faith acts or omissions related to the Debtors' chapter 11 cases.

119.    Further, the scope of the Exculpation Provision is appropriately tailored to cover only actions taken in connection with the negotiation of the Amended Plan and Definitive Documents and will not affect any liability that arises from fraud, gross negligence, or willful misconduct, as determined by final order.  Courts in this and other districts have approved similar exculpation provisions in chapter 11 plans of similarly-situated debtors. *In re Superior Air Charter, LLC*, Case No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) [Docket No. 212]; *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) [Docket No. 839];

---

[21]    As defined in Section 1.100 of the Amended Plan, "**Exculpated Parties**" now means "collectively the: (a) Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) Creditors' Committee and each of its members in their capacity as such, (e) the GUC Trust, (f) the GUC Trustee, and (g) with respect to each of the foregoing Persons or Entities in clauses (a) through (f), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein."

A-0981

*In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [Docket No. 238]; *In re Model Reorg Acquisition, LLC*, Case No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) [Docket No. 222]; *In re Maxus Energy Corp.*, Case No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) [Docket No. 1460].

120.    Based upon the foregoing, the Amended Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Amended Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### e.    The Injunction Provision is Appropriate and Should be Approved.

121.    California DTSC argues that the Injunction Provision (i) operates as an impermissible *de facto* discharge of the liquidating Debtors, in contravention of section 1141(d)(3) of the Bankruptcy Code, (ii) impermissibly extends the proposed injunction to certain third-parties including the Wind-Down Estates, the Trustees, Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, and (iii) assuming the Injunction Provision is a *de facto* discharge, such discharge would be improper under section 1141(d)(1) of the Bankruptcy Code as a discharge may only extend to debts arising before the date of confirmation of the Plan, and the Injunction Provision extends to Claims and Causes of Action arising prior to the Effective Date.  *See* California DTSC Objection ¶¶ 135-40.  These arguments fail as the Injunction Provision is an appropriate and necessary component of the Plan and is not a discharge under section 1141 of the Bankruptcy Code.

122.    As an initial matter, this Court recently overruled an objection asserting that certain third-party releases and an injunction provision set forth in a chapter 11 plan of liquidation worked in concert to provide a *de facto* discharge for the debtors, such that no entity

could continue to enforce a claim against the debtors. *See In re JRV Group USA L.P.,* 19-11095

(CSS) (Bankr. D. Del. 2019) ("**JRV Group**"). Specifically, this Court held:

> [although there] is no discharge under [1141]…there are independent provisions that, when taken in concert, arguably provided for a *de facto* discharge…but the important point is that [the express releases, third-party releases, and injunctions] stand…on their own as appropriate and authorized by the Code. So if you have three independent factors, all of which are appropriate, all of which are supported by the evidence, and all of which are authorized by the Code, and the *de facto* effect is that they give a de facto discharge, I really don't think that undoes what you were otherwise allowed to do…my belief in ruling is that the fact that the elements that result in the *de facto* discharge are all appropriate, supported by the evidence, supported by the law, supported by the Code, and the fact that, when you combine and you end up with a *de facto* discharge -- which you obviously can't have a *per se* discharge in the plan -- I think is of no moment.

*See* June 19, 2020, Hr'g Tr. 23:10–24:14, *In re JRV Group USA L.P.,* 19-11095 (CSS) (Bankr.

D. Del. 2019).[22]

123.    Accordingly, even if the Injunction Provision did operate as a *de facto*

discharge, it would be of no consequence as to whether or not the Injunction Provision should be

approved. Indeed, Courts have routinely approved injunctions in chapter 11 liquidating plans.

*See In re Optim Energy, LLC, et al.*, Case No. 14-10262 (BLS) [Docket No. 1159] (Bankr. D.

Del. July 30, 2015); *In re Refco Public Commodity Pool, L.P. f/k/a S&P Managed Futures Index

Fund, LP*, Case No. 14-11216 (BLS) [Docket No. 217] (Bankr. D. Del. Sept. 9, 2014); *In re

Coldwater Creek Inc. et al.*, Case No. 14-10867 (BLS) [Docket No. 981] (Bankr. D. Del. Sept.

17, 2014); *In re GSE Envtl., Inc., et al.*, Case No. 14-11126 (MFW) [Docket No. 340] (Bankr. D.

Del. July 24, 2014); *In re THQ Inc., et al.*, Case No. 12-13398 (MFW) [Docket No. 929] (Bankr.

D. Del. July 17, 2013); *In re B456 Systems, Inc., et al.*, Case No. 12-12859 (KJC) [Docket No.

1675] (Bankr. D. Del. May 20, 2013); *In re Food Processing Liquidation Holdings, LLC, et al.*,

Case No. 11-13139 (KG) [Docket No. 698] (Bankr. D. Del. April 26, 2012); *In re UBI*

---

[22] The transcript of the hearing on confirmation of the debtors' chapter 11 plan in *JRV Group* is annexed hereto as **Exhibit C**.

*Liquidating Corp., et al*., Case No. 10-13005 (KJC) [Docket No. 1447] (Bankr. D. Del. Oct. 19, 2011).

124.    Consistent with the weight of authority on this issue, the Injunction Provision contained in Section 10.3 of the Plan is customary and merely seeks to assure that parties do not interfere with the consummation and implementation of the Plan and all the transactions contemplated thereby.  The Injunction Provision implements the Debtor Releases, Third Party Release, and the Exculpation Provision embodied in the Plan, in part, by permanently enjoining all persons and entities from, among other things, commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions. There is nothing unusual or inappropriate about the Injunction Provision.  Without the Injunction Provision, the carefully crafted and intensely negotiated structure and purpose of the Plan and Global Settlement could be contravened.

125.    The Injunction Provision is also necessary to the distribution scheme in the Amended Plan. This is a liquidating plan.  In order for assets to de distributed pursuant to the Plan, the assets of the Debtors' estates must be protected against an attempt by a creditor to obtain more than its entitlement under the Plan. Such prohibited actions would, obviously, disrupt the Global Settlement and proposed distribution structure incorporated in the Amended Plan.

126.    Accordingly, the proposed Injunction Provision should be approved as it is critical to accomplishing the Plan's overall objectives and is consistent with section 1123(b)(6) of the Bankruptcy Code.

**5.      Europe/ROW Sale Transaction Maximizes Stakeholder Recoveries and is a Sound Exercise of the Debtors' Business Judgment.**

127.    In addition to the Global Settlement, the Amended Plan seeks approval for a going concern and value-maximizing sale of the Debtors' Europe/ROW operations to the Europe/ROW Purchaser in exchange for a credit bid by the Consenting Creditors.  As the Court record shows, and as is set forth more fully herein, the Debtors attempted to address their liquidity challenges and balance sheet maturities through prior chapter 11 cases, an out-of-court recapitalization transaction, and a prepetition marketing and sale process—in each instance, the Debtors' efforts ultimately proved unsuccessful.  With the assistance of their advisors, the Debtors subsequently pursued a Court-approved, public and transparent postpetition sale process, pursuant to which the Debtors cast a wide net, marketed their assets, and sought a value-maximizing sale transaction.  The Europe/ROW Sale Transaction effectuated through the Amended Plan is the outcome of those immense efforts.  As the record clearly demonstrates, there were no other qualified purchasers of the Debtors' Europe/ROW business.

128.    The Europe/ROW Sale Transaction permits the Debtors to, among other things, achieve the following benefits for all of their constituents:

    i.    transition the Debtors' Europe/ROW business as a going concern;

    ii.    minimize disruption to the Debtors' creditors through an orderly transition plan that involves a post-Effective Date shared services relationship with the Debtors' Americas business;

    iii.    ensure the possibility of a successful Global Settlement by securing the support of the Consenting Creditors and by providing new financing to the Europe/ROW business in the amount of at least $36 million through the issuance bridge financing notes, a portion of the proceeds of which will be used by the Transferred Entities to fund the approximately $12.5 million Global Settlement Payments and the $6.0 settlement payment to the PBGC; and

    iv.    preserve jobs for over 5,000 employees of the Debtors' Europe/ROW business.

129.    Pursuant to section 1123(b)(4) of the Bankruptcy Code, a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4).  As permitted by section 1123(b)(4) of the Bankruptcy Code, the Amended Plan provides for the consummation of the Europe/ROW Sale Transaction pursuant to the Europe/ROW Purchase Agreement, which will effect a going-concern sale of substantially all of the Debtors' Europe/ROW businesses.

130.    As described more fully in the Peluchiwski Declaration, following an approximately four-month, extensive prepetition and postpetition marketing process for the sale of the Debtors' assets or equity interests, the Debtors, with the approval of the Special Committee, determined that the bid submitted by the Europe/ROW Purchaser was the highest or otherwise best offer available in the market and would generate the most value for the Debtors' stakeholders.   Peluchiwski Decl. ¶¶ 18, 20.   Accordingly, the Debtors entered into the Europe/ROW Purchase Agreement.  *Id.* ¶ 19.  The Europe/ROW Sale Transaction provides for the going-concern sale of the Debtors' Europe/ROW businesses and was the product of extensive, arms'-length, good-faith negotiations between the parties.  *Id.* ¶ 21.

131.    By market testing the Europe/ROW Purchase Agreement through a Court-approved sale process, the Debtors used their best efforts to obtain the highest or otherwise best bid for the Debtors' assets or equity interests.  Accordingly, the Europe/ROW Sale Transaction constitutes a sound and reasonable exercise of the Debtors' business judgment, is reasonable and appropriate under the circumstances, and is in the best interests of the Debtors and their Estates, creditors, and other parties in interest.

132.    Based upon the foregoing, the Amended Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Amended Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**E.      Amended Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.**

133.    Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in*  1978 U.S.C.C.A.N. 5963 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re PWS Holding Corp.*, 228 F.3d at 248;  *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).  As demonstrated below, the Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation, as well as the Disclosure Statement Order regarding disclosure and solicitation of the Amended Plan.

**1.  Postpetition Disclosure and Solicitation.**

134.    Under section 1125 of the Bankruptcy Code, prior to the solicitation of votes on a plan of reorganization, a debtor must disclose information that is adequate to permit an informed judgment by creditors and shareholders entitled to vote on the plan.  Pursuant to the Disclosure Statement Order, the Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment regarding whether to accept or reject the Amended Plan.  As set forth in the

Voting Certification, each holder of a Claim in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) was sent the Solicitation Package required by the Disclosure Statement Order.  The Solicitation Package was transmitted in connection with the solicitation of votes to accept the Amended Plan in compliance with section 1125 of the Bankruptcy Code and the Disclosure Statement Order.  The Debtors did not solicit acceptances of the Amended Plan from any creditor prior to the transmission of the Disclosure Statement.

### 2.   Acceptance or Rejection of the Amended Plan.

135.   Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Amended Plan.  Under section 1126, only holders of Allowed Claims in Impaired Classes of Claims and Interests that will receive or retain property under the Amended Plan on account of such Claims or Interests may vote to accept or reject the Amended Plan.  In accordance with Sections 3 and 4 of the Amended Plan and section 1126 of the Bankruptcy Code, with respect to each Debtor, the Debtors solicited acceptances of the Amended Plan from the holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) that are entitled to vote to accept or reject the Amended Plan.  In accordance with Sections 3 and 4 of the Amended Plan, the Disclosure Statement Order, and sections 1126(f) and (g) of the Bankruptcy Code, the Debtors did not solicit acceptances from the holders of Claims or Interests in (i) Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (ABL Claims), as the holders of such Claims and Interests are not impaired under the Amended Plan and thus are presumed to accept the Amended Plan, or (ii)  Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims), as the holders of such Claims and Interests will not receive any distribution or property, other than as

68

provided pursuant to the Global Settlement, on account of their Claims and Interests and thus are deemed to reject the Amended Plan.

136.   In addition, the Debtors did not solicit votes from holders of Claims in Class 7 (General Unsecured Claims) and Class 8 (Environmental NPP Claims).   Bankruptcy courts in this and other jurisdictions have approved chapter 11 plans where the debtors did not solicit holders of general unsecured claims or equity interests that were deemed to reject the chapter 11 plan but were receiving some consideration.  *See, e.g.*, *In re Pyxus Int'l, Inc*., Case No. 20-11570 (LSS) (Bankr. D. Del. Aug. 21, 2020) (Docket No. 355) (confirming plan where existing equity class that was deemed to reject the plan received distributions in the form of *pro rata* share of a cash distribution); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [Docket No. 238] (same); *In re Nuverra Envtl. Sols., Inc.*, Case No. 17-10949 (KJC) (Bankr. D. Del. July 25, 2017) [Docket No. 366] (confirming plan where impaired general unsecured class that was deemed to reject the plan received distribution in the form of equity and/or warrants); *In re Tidewater Inc.*, Case No. 17-11132 (BLS) (Bankr. D. Del. July 17, 2017) [Docket No. 378] (confirming plan where impaired equity class that was deemed to reject the plan received distribution in the form of equity and/or warrants).

137.   As the Amended Plan provides that holders of General Unsecured Claims and Environmental NPP Claims are entitled to receive a recovery in the form of the Global Settlement Payments, as a gift from the Consenting Creditors through the Transferred Entities in connection with the Global Settlement (rather than receiving a distribution on account of their prepetition Claims), holders of such Claims are properly deemed to have rejected the Amended Plan pursuant to section 1126(g) of the Bankruptcy Code and did not need to be solicited.  *See* Disclosure Statement Order, ¶ D.

138.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject a plan of reorganization.  As evidenced by the Voting Certification, as to each Debtor, as applicable, the Amended Plan has been accepted by creditors holding Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims).

### F.    Amended Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code.

139.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Third Circuit has defined the good faith standard as requiring a showing that "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  *PPI Enters.*, 228 B.R. at 347 (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)), *aff'd*, 324 F.3d 197 (3d Cir. 2003); *see also PWS Holding Corp.*, 228 F.3d at 242 ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (alteration in original) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)). "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). The court is given "considerable discretion in finding good faith." *W.R. Grace*, 475 B.R. at 87 (quoting *Coram Healthcare*, 271 B.R. at 234).

140.     As discussed above, from the outset of these chapter 11 cases, the Debtors have proceeded in a constructive and cooperative manner to achieve consensus whenever possible and avoid expending scarce resources on disputes and litigation in order to maximize recoveries to creditors.  No one—not even California DTSC—can seriously question the open and collaborative process undertaken by the Debtors to garner support for a consensual resolution of these chapter 11 cases—precisely in the manner prescribed by the Bankruptcy Code.  Indeed, California DTSC has participated in every single step of the process to advance these chapter 11 cases until it abruptly pulled out of the Global Settlement ten (10) days before the Confirmation Hearing was originally scheduled to occur.

141.     Moreover, the framework of the Amended Plan (including all documents necessary to effectuate the Global Settlement and the Europe/ROW Sale Transaction embodied therein) is premised on the Mediators' Proposal and is the result of months of negotiations, including mediation, among the Debtors, the Consenting Creditors, the Creditors' Committee, PBGC, and the Settling Governmental Authorities (and even California DTSC).  Not a single party, other than California DTSC through its self-serving objection, has questioned the Debtors' good faith in pursuing the Amended Plan.

142.     For the reasons stated herein, the Debtors submit that the Amended Plan unequivocally furthers the objectives and purposes of the Bankruptcy Code.

### G.     Amended Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.

143.     Section 1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees which are

made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *accord Lisanti v. Lubektin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007).

144.     All payments for services provided to the Debtors during these chapter 11 cases must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.2 of the Amended Plan provides that all Fee Claims must be approved by the Court pursuant to final fee applications as reasonable.  Finally, the Amended Plan provides that the Court shall retain jurisdiction to "hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees."  *See* Amended Plan, § 11.1(h).  Therefore, the Amended Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code with respect to the Debtors' professionals.

### H.     Debtors Have Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code.

145.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a successor to a debtor under the plan and that such appointment be consistent with the interests of creditors and equity security holders and with public policy.  In addition, to the extent there are any insiders that will be retained or employed by the reorganized

debtors, section 1129(a)(5)(B) requires that the plan proponent disclose the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5).

146.    Contemporaneously herewith, the Debtors have filed a notice announcing the Plan Administrator and the New Board in compliance with section 1129(a)(5).  As set forth in the notice, the Plan Administrator shall be Scott Rinaldi of Ankura and the sole member of the New Board shall be William Transier, who is currently a member of the Special Committee.  Mr. Rinaldi will be compensated at $30,000 per month for its role as Plan Administrator.  In addition, Mr. Rinadli will have access to a small team of Ankura professionals to assist with the wind down, for which Ankura will charge the wind down estates an hourly fee.  Mr. Transier will be compensated $25,000 per month for his services, which is the same as he is compensated for his current role as a member of the Special Committee.

147.    In their respective capacities as fiduciaries of the Debtors' Estates, the Plan Administrator and members of the New Board are immune from liability under federal and state environmental laws, including the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), with respect to any contamination of real property previously owned, leased or operated by the Debtors prior to the Effective Date, including the Non-Performing Properties and the Canada Non-Performing Property.  This is because, generally speaking, most Environmental Laws, including CERCLA, impose liability for remediating environmental contamination on (1) the party that caused the contamination, (2) the current owner or operator of the contaminated real property, or (3) the owner or operator of the contaminated property at the time the contamination occurred.  See, e.g., 42 U.S.C. § 9607(a) and Cal. Health & Safety Code § 25323.5.  Neither the Plan Administrator nor the New Board falls into any of these categories:  (1) they did not, and could not, have caused contamination at

Debtor sites that were sold, abandoned or otherwise transferred before their involvement with the Debtors' Estates, which shall begin with their appointment on the Effective Date, and (2) they have never owned or operated, in any capacity, any of the Debtors current or former sites. Furthermore, with respect to any CERCLA liability on or after the Effective Date, the Plan Administrator and the New Board are being appointed to oversee the Wind-Down Estates and Holdings, respectively. The Non-Performing Properties, on the other hand, will not be an asset or a liability of either of those entities on and after the Effective Date—they will either be transferred to a trust pursuant to the Environmental Settlement Documents or otherwise abandoned. As such, the Plan Administrator and the New Board will not have any oversight over, or any authority to operate or control any of the Non-Performing Properties and thus should not be subject to CERCLA liability with respect to the same.

148.    Simply put, neither the Plan Administrator nor the New Board had any connection whatsoever to properties that were sold, abandoned or otherwise transferred before or during their involvement with the Debtors' Estates and therefore cannot be held liable under Environmental Laws for any contamination that may exist on such sites.

## I.    Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor.

149.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity interest holders in the Debtors—commonly referred to as the "best interests" test. The best interests test focuses on potential individual dissenting creditors rather than classes of claims. *See 203 N. LaSalle St.,* 526 U.S. at 441 n.13. It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount

such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

150.     Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."  *Adelphia Commc'ns*, 368 B.R. at 252.  The Court must evaluate the liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."  *Affiliated Foods*, 249 B.R. at 788; *W.R. Grace*, 475 B.R. at 142 ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation").  As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.  *See Drexel Burnham Lambert Grp.*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

151.     The best interests test does not apply to the holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (ABL Claims), because each holder in such Classes is Unimpaired under the Amended Plan, presumed to accept the Amended Plan, and will either receive payment in full, in Cash, be reinstated and paid in the ordinary course, or otherwise its legal, equitable, or contractual rights will not be altered.  Accordingly, the holders of such Claims or Interests are receiving or retaining under the

Amended Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery under chapter 7.

152.    As set forth in the Liquidation Analysis and the Messing Declaration, the best interests test is satisfied as to <u>every single holder</u> of a Claim in Classes 4, 5, 6, 7, 8, 9, and 12 and Interests in Classes 10 and 11.   Messing Confirmation Decl. ¶ 35. Specifically, the Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.   *See* Disclosure Statement, Ex. D (Liquidation Analysis).

153.    The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals, (ii) the delay and erosion of value that would be caused to the Debtors' assets due to the need of the newly appointed chapter 7 trustee and its professionals to familiarize themselves with the assets and liabilities of the Debtors, (iii) the reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the chapter 7 trustee, and (iv) the additional General Unsecured Claims that would likely arise as a result of the rejection of certain executory contracts and unexpired leases, and other potential claims that may arise in a chapter 7 liquidation.

154.    The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings.   As such, the Debtors' Liquidation Analysis should be afforded deference.   *See Charter Commc'ns*, 419 B.R. at 261-62 (discrediting creditors' objection to liquidation analysis

because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize"). Accordingly, the Amended Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

155. California DTSC's objections that the Amended Plan does not satisfy section 1129(a)(7) of the Bankruptcy Code are addressed below.

**J.      Amended Plan Has Been Accepted by or Is Presumed to Have Been Accepted by All Impaired Classes Entitled to Vote on Amended Plan.**

156. Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accepts the plan, as follows: "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). As set forth above, holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 3 (ABL Claims) are not impaired under the Amended Plan and are, therefore, conclusively presumed to have accepted the Amended Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, as evidenced by the Voting Certification, the Amended Plan has been accepted by 100% of voting creditors in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) entitled to vote and who voted on the Amended Plan. Thus, as to such Classes, the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied.

157. Holders of Claims or Interests in Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims) are deemed to have rejected the Amended Plan pursuant to section 1126(g) of the Bankruptcy

Code.  As to these Classes, the Amended Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

### K.     Amended Plan Provides for Payment in Full of All Allowed Priority Claims.

158.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide. 11 U.S.C. § 1129(a)(9).

159.    The Amended Plan complies with section 1129(a)(9) of the Bankruptcy Code.  The Amended Plan provides that, unless a holder agrees to less favorable treatment, holders of allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will be paid in full, in Cash, on the later of the Effective Date and the first business day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes Allowed.  *See* Amended Plan, § 2.1.

160.    Moreover, the Amended Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8), as described herein) will (i) be paid in full, in Cash on or as soon as practicable after the Effective Date, or (ii) receive such other treatment so as to render such holder's Claim Unimpaired.  *See* Amended Plan, § 4.1. The Amended Plan, therefore, satisfies the requirements of section 1129(a)(9)(A) and (B).

161.    The Amended Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of Priority Tax Claims under section 507(a)(8).  Pursuant to Section 2.3 of the Amended Plan, unless holders agree to less favorable treatment, holders of Allowed Priority Tax Claims (i) will be paid Cash in an amount

equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is Allowed on the Effective Date, (b) the first business day after the date that is forty-five (45) calendar days after the date such Claim becomes Allowed, and (c) the date such Claim is due and payable in the ordinary course as such obligation becomes due; or (ii) will receive equal annual Cash payments in an aggregate amount equal to the amount of such Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date. *See* Amended Plan, § 2.3. Accordingly, the Amended Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**L.     Amended Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.**

162.     Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Amended Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). Here, all Classes entitled to vote on the Amended Plan—Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims)—are impaired and have voted to accept the Amended Plan, without including the acceptance of the Amended Plan by any insiders in such Class.

163.     California DTSC objects to the Amended Plan on the basis of their misstatement of the Bankruptcy Code and their incorrect assertion that the votes of the Consenting Creditors cannot be relied upon to confirm the Amended Plan. The Debtors address this objection below in Part II of this Memorandum.

164.     Accordingly, the Amended Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

M.     **Amended Plan Is Feasible.**

165.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find

that the Amended Plan is feasible as a condition precedent to confirmation.  Specifically, it

requires that confirmation is not likely to be followed by liquidation of the debtor, unless such

liquidation is proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility test set forth in

section 1129(a)(11) requires the Court to determine whether the Amended Plan may be

implemented and has a reasonable likelihood of success.  *See Energy Res.*, 495 U.S. at 549; *Kane*

*v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

166.    Section 1129(a)(11) "does not require a plan's success to be guaranteed."

*In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012).  Rather, "[t]he key element of

feasibility is whether there is a ***reasonable probability*** the provisions of the plan can be

performed."  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 142 (3d Cir. 2012) (emphasis added)

(quoting *In re TCI 2 Holdings, LLC,* 428 B.R. 117, 148 (Bankr. D.N.J. 2010)); *In re W.R. Grace*

*& Co.*, 475 B.R. 34, 115 (D. Del. 2012) ("[T]he bankruptcy court need not require a guarantee of

success, but rather only must find that the plan present[s] a workable scheme of organization and

operation from which there may be reasonable expectation of success." (internal quotations

omitted)), *aff'd,* 729 F.3d 332 (3d Cir. 2013), and *aff'd,* 532 F. App'x 264 (3d Cir. 2013),

and *aff'd,* 729 F.3d 311 (3d Cir. 2013), and *aff'd*, 729 F.3d 332 (3d Cir. 2013).  "The purpose of

section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and

equity security holders more under a proposed plan than the debtor can possibly attain after

confirmation."  *Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374,

1382 (9th Cir. 1985).  The mere prospect of financial uncertainty cannot defeat confirmation on

feasibility grounds.  *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd sub*

*nom. Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581 (6th Cir. 1986).

167.    Feasibility is a "low threshold." *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *15 (Bankr. D. Del. Dec. 5, 2019); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement." (quoting *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir.1993))), *aff'd*, 587 B.R. 606 (D. Del. 2018), *aff'd*, 972 F.3d 228 (3d Cir. 2020), and *aff'd in part*, 587 B.R. 606 (D. Del. 2018), and *aff'd*, 972 F.3d 228 (3d Cir. 2020). Bankruptcy courts have found that feasibility is established where a debtor has "sufficient resources" to meet its obligations under the plan, including its "obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases." *In re Finlay Enterprises, Inc.*, No. 09-14873 JMP, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010); *accord In re Nailite Int'l*, No. 09-10526 (MFW), 2009 Bankr. LEXIS 4878, at *12-13 (Bankr. D. Del. Dec. 8, 2009) (finding that plan was "feasible" and "satisfie[d] the requirements of section 1129(a)(11)" because it was "a plan of liquidation" that provided for "the means for implementing the [plan] and demonstrate[d] the Debtor's ability to make the payments anticipated" under the plan).   For the reasons set forth below, the Amended Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

168.    The Debtors have demonstrated that there is a reasonable probability that they will have sufficient funds to meet their post-Confirmation Date obligations to pay for the ongoing costs of administering and consummating the Amended Plan and ultimately closing these chapter 11 cases.  As established in the Messing Declaration, the Amended Plan embodies a rational plan for the orderly wind down of the Debtors' estates and the delivery of distributions

to holders of Allowed Claims following the consummation of the Global Settlement and the value-maximizing Europe/ROW Sale Transaction. Messing Confirmation Decl. ¶ 40. Specifically, the Amended Plan sets forth certain Cash payments that the Debtors and/or the Plan Administrator will make on or after the Effective Date. *Id.* Such payments include, among others, payments to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. *Id.* In accordance with the Global Settlement and the GUC Trust Agreement, the Amended Plan also provides for the establishment of the GUC Trust for the benefit of holders of Allowed General Unsecured Claims, to which the Debtors will transfer the GUC Trust Assets. *Id.*

169.   Further, the Debtors will be able to meet their obligations under the Amended Plan. Roy Messing and his team at Ankura have estimated the Debtors' anticipated sources and uses of funds following confirmation. The Debtors retained Ankura to assist with their financial and operational restructuring on April 8, 2020, and Mr. Messing was appointed as the Debtors' Chief Restructuring Officer on May 18, 2020. *Id.* ¶ 7 n.3. Since then, Mr. Messing and the Ankura team have been responsible for the Debtors' books and records. *Id.* ¶ 40. They have carefully reviewed filed Claims and assets, consulted with the Debtors' counsel and other advisors, and received input from the Debtors' management and employees who have extensive knowledge of the Debtors' assets and liabilities. *Id.* Based on this experience and their deep understanding of the business, the Ankura team was able to prepare estimates of the Debtors' anticipated sources and uses of funds that are reasonable and well-founded.

170.   As detailed in the Messing Declaration, the value of the Debtors' remaining assets is approximately $36.6 million as of October 9, 2020. *Id.* ¶ 42. These assets include:

| Estimated Sources | Amount |
|---|---|
| Cash Balance as of October 9, 2020 | $23.5 million |
| Insurance Cash Collateral | $10.5 million |
| Utility Adequate Assurance | $1.5 million |
| Other Receipts | $1.1 million |
| TOTAL SOURCES: | $36.6 million |

171.    The Debtors project that they will have wind-down expenses of approximately $6.9 million, *id.* ¶ 43, including:

| Estimated Uses of Funds | Amount |
|---|---|
| Operating Expenses | $1.1 million |
| Restructuring Professionals | $2.3 million |
| Post-Effective Wind-Down Expenses | $3.5 million |
| TOTAL USES: | $6.9 million |

172.    The Debtors estimate that the total amount of outstanding claims that must be paid prior to any distributions to the Exchange Priority Notes Claims will be approximately $15 million, *id.* ¶ 45, consisting of the following:

| Estimated Outstanding Claims | Amount |
|---|---|
| Administrative Expense Claims[23] | $8.7 million (of which approximately $4.0 million are |

---

[23]    As reflected in the amendment to the Europe/ROW Purchase Agreement, filed contemporaneously herewith (the "**Amended Europe/ROW Purchase Agreement**"), the Debtors will pay certain investment banking fees in connection with the Europe/ROW Sale Transaction, provided that, to the extent the payment of such investment banking fees result in a shortfall in the Debtors ability to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, the Transferred Entities (or their designee) will reimburse the Debtors the portion of any paid investment banking fees to the extent required to make up for such shortfall.  Accordingly, such fees have not been included in the estate of claims required to be satisfied by the Debtors.  *See* Amended Europe/ROW Purchase Agreement § 4.16.

|  | 503(b)(9) Claims) |
|---|---|
| **Priority Tax Claims** | $4.3 million |
| **Other Secured Claims** | $2.0 million |
| **TOTAL CLAIMS:** | **$15 million** |

173.    After these disbursements, the Debtors expect to have a surplus of approximately $14.8 million, which will be more than sufficient to satisfy any contingencies that may arise, including any potential working capital claim asserted by the Americas Buyer (as defined below), which is addressed further below in Part III of this Memorandum.  *Id.* ¶ 46.  As with any projections, there is a possibility that there may be some variance in the wind-down budget and expenses.  The Debtors believe that the surplus could range from $11.3 million to $20.3 million, but they expect that the surplus will still be sufficient to cover any contingencies in either of those scenarios.  *Id.*  Accordingly, the Debtors satisfy the standard for feasibility under section 1129(a)(11) of the Bankruptcy Code.

174.    The Americas Buyer (as defined below) objects to the Amended Plan on the basis that the Debtors must reserve a sufficient amount of cash to pay the Post-Closing Adjustment (as defined below).  The Debtors address this objection below in Part II of this Memorandum.

175.    Accordingly, the Amended Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**N.    Amended Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.**

176.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"   11 U.S.C. § 1129(a)(12).   Section 507 of the Bankruptcy Code

84

provides that "any fees and charges assessed against the estate under [section 1930] of title 28"

are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with

sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Amended Plan

provides for the payment of such fees, together with interest (if any) pursuant to section 3717 of

title 31 of the United States Code on the Effective Date and thereafter as may be required.

### O.  Amended Plan Satisfies Section 1129(a)(13) of the Bankruptcy Code.

177.  Section 1129(a)(13) requires that:

> The plan provides for the continuation after its effective date of
> payment of all retiree benefits . . . at the level established pursuant
> to subsection (e)(1)(B) or (g) of section 1114 of this title, at any
> time prior to confirmation of the plan, for the duration of the
> period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).

178.  On August 13, 2020, the Debtors filed the *Debtors' Motion for an Order*

*Authorizing the United States Trustee to Appoint an Official Committee of Retired Employees*

(Docket No. 726) (the "**Retiree Motion**"), which requested that the Court authorize and direct

the U.S. Trustee to appoint an official committee to represent the Non-Union Retirees (a

"**Retiree Committee**") to engage in negotiations with the Debtors to modify retiree benefits.

The United Auto Workers Union and the Allentown Teamsters Union (together, the "**Union**

**Representatives**") had already agreed to represent the Debtors' unionized employees, the UAW

Retirees and the Allentown Retirees, respectively, pursuant to Section 1114(b) and 1114(c).  On

August 14, 2020, the Court entered the *Order Appointing an Official Committee of Retired*

*Employees* (Docket No. 740) (the "**Retiree Order**").

179.  Immediately upon the appointment of the Non-Union Representatives, the

Debtors made a proposal to the Union Representatives and the Non-Union Representatives

regarding the terms for modification of the health, dental and life insurance benefits provided by

the Debtors to approximately 220 Retirees.  After considerable deliberation and negotiation, and in view of the Debtors' financial condition, the Debtors, the Union Representatives and the Non-Union Representatives agreed to the terms pursuant to which benefits under the Retiree Plan will be terminated pursuant to section 1114 of the Bankruptcy Code.

180.    The Debtors, the Union Representatives and the Non-Union Representatives have agreed on the following settlement ("**Retiree Settlement**"): (i) all healthcare benefits to the retirees shall be terminated as of the Effective Date; (ii) notwithstanding this termination, the Debtors shall directly pay or otherwise reimburse all retirees who opt in to COBRA healthcare coverage for the costs of such coverage for the period through December 31, 2020; (iii) in order to be eligible for such reimbursement, the Retiree must opt in to COBRA coverage on or before December 1, 2020; (iv) the Debtors will not subsidize or provide reimbursement for any COBRA healthcare expenses after December 31, 2020; (v) the Debtors shall continue to pay all life insurance premiums due on behalf of retirees entitled to life insurance benefits through December 31, 2020; (vi) the Debtors will not pay premiums for life insurance benefits after December 31, 2020 and such life insurance benefits will be terminated; and (vii) the Debtors will send a notice to retirees summarizing the settlement described above.

181.    The Debtors intend to file a stipulation and agreement seeking an order authorizing the Debtors to terminate the retiree benefits under the terms of the Retiree Settlement pursuant to section 1114 of the Bankruptcy Code and anticipate that the Creditors' Committee, the Ad Hoc Group and the United States Trustee will not object to such stipulation and agreement.

182.     As provided by section 1129(a)(13), the Amended Plan provides for the continuation of all existing retiree benefits after the Effective Date at the level established under the terms of the Retiree Settlement pursuant section 1114(e)(1)(B) of the Bankruptcy Code.

**P.      Amended Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes.**

183.     Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

184.     The only classes entitled to vote on the Amended Plan—Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims)—voted to accept the Amended Plan, therefore, "cram down" is only relevant to those Classes of Claims and Interests that are deemed to have rejected the Amended Plan (*i.e.*, Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims)).  The Amended Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

**1.      Amended Plan Does Not Discriminate Unfairly.**

185.     Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a

reasonable basis for the disparate treatment.  *See Armstrong World Indus.*, 348 B.R. at 121 (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination" (quoting *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003)); *accord In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003); *Johns-Manville,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1998). As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., Drexel Burnham Lambert Grp.*, 138 B.R. at 715 (separate classification and treatment was rational where members of each class "possess[ed] different legal rights"), *aff'd sub nom. Lambert Brussels Assocs., L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).

186.    The Amended Plan does not discriminate unfairly with respect to Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims).  California DTSC objects to the Amended Plan on the basis that Class 8 (Environmental NPP Claims) is unfairly discriminated against in comparison to Class 7 (General Unsecured Claims).  The Debtors address this objection below in Part II of this Memorandum.  Holders of Claims and Interests in each of the remaining Classes are properly

classified in separate classes because they hold different legal rights as set forth in the following table:

| Class | Rationale For Separate Classification |
|---|---|
| Class 9 (Intercompany Claims) | ▪ Composed of claims by Debtors or non-Debtor affiliates against the Debtors |
| Class 10 (Intercompany Interests) | ▪ Composed of holders of Interests in the Debtors, other than Holdings Equity Interests |
| Class 11 (Holdings Equity Interests) | ▪ Composed of holders of Interests in Exide Holdings, Inc. |
| Class 12 (Subordinated Securities Claims) | ▪ Composed of holders of Claims subject to subordination under Section 510(b) of the Bankruptcy Code |

187.    As demonstrated herein, the Debtors have sound bases for classifying Claims or Interests in Classes 9, 10, 11, and 12 differently.  Accordingly, the Amended Plan does not "discriminate unfairly" with respect to such impaired Classes of Claims or Interests.

**2.      Amended Plan Is Fair and Equitable.**

188.    To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) that each holder of the nonaccepting class will receive or retain on account of such claim property of a value equal to the allowed amount of such claim, or (ii) that a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan.  *See* 11 U.S.C. § 1129(b)(2)(B).

189.    To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) that a holder of an interest that is junior to the

nonaccepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(C).

190.    The "fair and equitable" rule is satisfied as to the holders of Claims in Classes 7, 8, 9, and 12, and Interests in Classes 10 and 11, as no Claims or Interests junior to each such class, as applicable, will receive or retain any property under the Amended Plan on account of such junior Claims or Interests. *See In re Finlay Enters. Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan). Moreover, no senior creditor will receive in excess of the full value of its Claim under the Amended Plan. As such, the Amended Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to Class 7 (General Unsecured Claims), Class 8 (Environmental NPP Claims), Class 9 (Intercompany Claims), Class 10 (Intercompany Interests), Class 11 (Holdings Equity Interests), and Class 12 (Subordinated Securities Claims) and may be confirmed despite the rejection by such Classes.

## II.    THE OBJECTIONS TO THE AMENDED PLAN SHOULD BE OVERRULED AND AMENDED PLAN CONFIRMED.

### A.    Objection by California DTSC Should be Overruled.

#### 1.    Abandonment of the Vernon Non-Performing Property, if Required Pursuant to the Amended Plan, Should Be Approved.

191.    California DTSC objects to the alternative of abandonment of the Vernon Non-Performing Property provided in the Amended Plan. The Debtors address this objection in the Abandonment Memorandum, filed contemporaneously herewith.

## 2. Amended Plan Satisfies Section 1129 of the Bankruptcy Code.

### a. California DTSC's Treatment Under the Amended Plan.

192.    Under the Amended Plan, California DTSC is classified in Class 8 along with each other holder of Environmental NPP Claims against the Debtors. The treatment that creditors in Class 8 will receive pursuant the Amended Plan is determined by whether such holder voluntary accepts the Global Settlement or rejects it, which only California DTSC has done.

i.      If California DTSC becomes a Global Settlement Party, as it had intended prior to its abrupt election not to participate in the Global Settlement, it would receive (i) Vernon Environmental Trust Beneficial Interests in the Vernon Environmental Response Trust that will receive $2,587,523 and title to the Vernon Non-Performing Property free and clear of all claims and encumbrances, (ii) its Pro Rata share of the GUC Trust Beneficial B Interests (the "**Class 8 GUC Interests**"), and (iii) its Pro Rata share of Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied, as described in further detail in the Amended Plan (the "**Class 8 Net Cash Proceeds**" and, together with the Class 8 GUC Interests, the "**Universal Class 8 Recovery**"). *See* Amended Plan, § 4.8(b).

ii.     If California DTSC does not become a Global Settlement Party but the Payment Condition and the Vernon Trust Condition are satisfied—meaning the Bankruptcy Court approves the release by the California state governmental agencies, including California DTSC, in favor of the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors and the Vernon Environmental Trustee and California DTSC reach an agreement providing covenants substantively identical to those being granted by the Settling Governmental Authorities—then California DTSC will receive, through the newly created Vernon Environmental Response Trust, the same distribution that it would if it were a Global Settlement Party, outlined above. *See* Amended Plan, §§ 4.8(b), 5.2(e)(i).

iii.    If the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied, California DTSC will receive, in addition to the Universal Class 8 Recovery, the benefit of a $2,587,523 cash distribution from the Transferred Entities to the Vernon Standby Trust—a trust in which it already holds a

> beneficial interest pursuant to transactions entered into prior the Commencement Date—though it will receive no beneficial interest in the Vernon NPP, which will be abandoned by the Debtors pursuant to the Amended Plan.  *See* Amended Plan, §§ 4.8(b), 5.2(e)(ii).
>
> iv.   Finally, if the Payment Condition is not satisfied, the Vernon Non-Performing Property will be abandoned and California DTSC will receive, in lieu of the cash payment discussed in the foregoing, a first priority Lien against the Vernon Non-Performing Property to secure its Environmental NPP Claim in addition to receiving the Universal Class 8 Recovery.  *See* Amended Plan §§ 4.8(b), 5.2(e)(iii).  The value of this lien is estimated at $29.6 million, if remediated, based on third-party bids.

193.   For the avoidance of doubt, these potential recoveries are similarly available to all members of Class 8 and, to the extent actual recoveries differ among holders of Environmental NPP Claims, such disparate recovery is due solely to each creditor's decision to participate in or abstain from the Global Settlement.

> **b.   The Treatment of California DTSC Under the Amended Plan is Not Less Favorable Than That of the Other Members of Class 8 and Complies with Section 1123(a)(4) of the Bankruptcy Code.**

194.   California DTSC argues that the Amended Plan provides disparate treatment to different Environmental NPP Claims classified in Class 8 because: (i) treatment depends on whether a claimholder is a Global Settlement Party; (ii) the economic treatment of California DTSC's claims is different from that of the other claims in Class 8; and (iii) California DTSC is subject to more onerous releases than are the Global Settlement Parties.  These objections are all without merit and should be overruled.

195.   First and foremost, under the applicable legal test, it is the opportunity for recovery, not the distribution ultimately received, that must be equal among members of the same class.  This is entirely consistent with Third Circuit law.  This court has held that "[p]roviding different treatment to a creditor who agrees to settle instead of litigating is permitted

by section 1123(a)(4) . . . What is important is that each claimant within a class have the same opportunity to receive equal treatment." *In re Washington Mutual, Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) (*citing to In re Dana Corp.,* 412 B.R. 53, 62 (S.D.N.Y. 2008)); *Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (*quoting In re W.R. Grace & Co*., 729 F.3d 311, 327 (3d Cir. 2013)), *aff'd*, 648 F. App'x 277 (3d Cir. 2016). Under the Amended Plan, California DTSC is afforded the same opportunity for recovery as every other holder of Environmental NPP Claims, but has chosen on its own volition to pursue different treatment.

196.     Additionally, as explained above, California DTSC has misunderstood and misstated the non-consensual release it will be subject to under the Amended Plan, if approved. As explained in greater detail in paragraph 76 herein, the Settling Governmental Authorities are providing covenants not to sue to the Debtors, officers and directors and other related parties of the Debtors and Consenting Creditors that the California Environmental Agencies are not being required to release in order to realize the benefits of the Global Settlement. *See* Exhibit B (California DTSC Plan Releases).

> i.      *California has been Offered the Same Opportunity as all Other Class 8 Creditors.*

197.     In its objection, California DTSC ignores completely the opportunity it has been afforded to enter into the Global Settlement.  California DTSC asserts, "DTSC receives its most favorable treatment only if both the (i) Payment Condition and (ii) the Vernon Trust Condition [sic] are met."  *See* California DTSC Objection ¶ 58.  Not so.  In reality, California

DTSC receives its most favorable recovery by opting, as each other holder of Environmental NPP Claims has, into the Global Settlement.  Under the Amended Plan, each member of Class 8 is entitled to identical treatment; to the extent California DTSC ultimately receives different recovery than any other member of Class 8, that results entirely from its decision to opt out of the Global Settlement, an opportunity that California DTSC has been equally afforded and had accepted prior to a recent reversal in its decision.

198.    Even if the recovery California DTSC ultimately receives pursuant to the Amended Plan were found to be materially less favorable than that of the other members of Class 8, which the Debtors assert cannot be the case under any of the options available to it as explained below, California DTSC agreed to such treatment by opting for it in lieu of participating in the Global Settlement.  *In re WR Grace & Co.*, 729 F.3d at 346 (holding that by filing a proof of claim a creditor had agreed to the less favorable treatment of binding itself to litigating its claim in the Bankruptcy Court.).  Otherwise stated, every holder of an Environmental NPP Claim is offered the same opportunity: accept the Global Settlement and its benefits or reject it and the Debtors will seek to abandon the applicable NPP location.  Only California has chosen not to settle and reject.  California has the right to reject the Global Settlement treatment that is being offered equally to all holders of Environmental NPP Claims, but it must live with the consequences.  California's rejection and resulting recovery does not, however, violate section 1123(a)(4) of the Bankruptcy Code or render the Amended Plan unconfirmable.

ii.      *California is Receiving Equal Treatment if Both Conditions are Satisfied.*

94

199.    California DTSC further argues that even if both Payment Conditions are satisfied, the economic treatment it would receive (i.e., an allocation of approximately $2.6 million in the form of the Vernon Global Settlement Payment) differs among claims in Class 8 because that amount is less than California's pro rata share of the entire $10 million settlement payment based upon California's estimated damages.  *See* California DTSC Objection ¶ 60.  In addition, California argues that other states have access to residual value from other Non-Performing Properties, which is not offered to California.  *See id.*

200.    Such objection is without merit and should be overruled.  First, California ignores that if both Payment Conditions are satisfied, the Vernon Non-Performing Property will be transferred to the Vernon Trust in which California DTSC will receive a beneficial interest. So California DTSC is not just receiving a beneficial interest in approximately $2.6 million. Moreover, the Amended Plan's allocation of $10 million settlement being provided by the Consenting Creditors and Transferred Entities among the Non-Performing Properties overseen by the agencies holding Environmental NPP Claims is not intended to (nor is it legally required to) reflect a pro rata recovery based on the size of each Environmental NPP Claim against the Debtors.  Such payment is not coming from the Debtors at all, but instead is being made as a settlement payment (or in this scenario, a substantial contribution) by the Consenting Creditors and Transferred Entities.  There is no requirement under the Bankruptcy Code that a settlement payment or substantial contribution made by a third party to resolve a unique dispute be offered in equal or pro-rated amounts for similarly situated creditors.

201.    Moreover, the allocation of the $10 million settlement payment was negotiated among the Participating Governmental Agencies, including California DTSC.   The Debtors understand that the determination of these allocations began with the estimated costs of

future cleanup and then took into account for each of the Non-Performing Properties, including the Vernon Non-Performing Property:  (1) the availability of financial assurance, (2) the value of the property that may be used to support cleanup, and (3) the degree of litigation risk for the NPP as to whether various tasks underlying the estimated cleanup would meet the test under *Midlantic*.

202.    Similarly, California DTSC's objection that it cannot share in the residual value of the other Non-Performing Properties is of no merit.  Residual value from other properties will not be allocated or required to be shared pursuant to the Amended Plan; rather, if it is to be distributed and shared, such sharing is only occurring pursuant to an agreement among the holders of Environmental NPP Claims who are voluntarily entering into the Global Settlement—something California declined to do.  It is not surprising that the Settling Governmental Authorities are not willing to share any excess residual proceeds of their NPP with California given its actions.  As any course that the members of Class 8 choose to take with respect to their property is entirely independent of the operation of the Amended Plan, such voluntary creditor agreements cannot serve as the basis of a charge of disparate treatment within Class 8.

*iii.*       *Releases are Not Broader.*

203.    California DTSC argues that the releases imposed on it by the Amended Plan are broader than those granted by the Global Settlement Parties.  *See* Objection ¶ 63. Again, California fails to recognize that it is only entitled to the same opportunity as other creditors in Class 8.  The ultimate treatment of California, including the releases it is required to provide, is of its own making.

96

204.    Moreover, contrary to California DTSC's assertions, under any of the potential scenarios under the Amended Plan, California DTSC would only grant the releases contained in section 10.6(f) of the Amended Plan, which describes releases substantively identical to those granted by the Settling Government Agencies, as confirmed by the new language added to the Amended Plan and to a narrower set of parties. *See supra* ¶ 76; Exhibit B.

205.    Moreover, the fact that the releases are to be granted by all California regulatory agencies with authority to enforce Environmental Laws, as opposed to just California DTSC, is essential to the efficacy of the releases and the operation of the Amended Plan.  The State of California, unlike the other states involved in the Global Settlement, is unique in that environmental authority is more widely dispersed across multiple state agencies.  If California DTSC were the only agency in the state of California to grant the releases, then another agency with similar or overlapping jurisdiction could bring the very actions that the releases aimed to prohibit.  The Nonconsensual Released Parties have no comfort that California will not seek to pursue them or find a loophole in contravention of the intent of the release, especially given California's abrupt withdrawal from the Global Settlement and fierce opposition to the Amended Plan.  On the contrary, the Nonconsensual Released Parties do have that comfort from the Settling Government Agencies.  Specifically, the Amended Plan now includes acknowledgments from each state Settling Governmental Authority that such authority is the primary state governmental agency in its State with responsibility for enforcing Environmental Laws applicable to Non-Performing Properties located within its jurisdiction, specifically to address this very risk.  See Amended Plan § 5.2(j)(v).

> **c.      The Amended Plan Does Not Unfairly Discriminate Against Class 8.**

206.     California DTSC further objects to its treatment under the Amended Plan on the basis that it may unfairly discriminate between General Unsecured Claims and Environmental NPP Claims, though the Objection notably falls short of alleging that such discrimination *does* exist.   In support of this objection, California DTSC offers only that the General Unsecured Claims in Class 7 receive different treatment than the Environmental NPP Claims in Class 8.  This objection fails because it both misinterprets the recovery available to these respective creditors and misapplies the law with respect to unfair discrimination under section 1129(b)(1) of the Bankruptcy Code.

207.     Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair.  When courts assess unfair discrimination under section 1129(b) of the Bankruptcy Code, "[t]he hallmarks of the various tests have been whether there is a reasonable basis for the discrimination and whether the debtor can confirm and consummate a plan without the proposed discrimination."  *Greate Bay Hotel & Casino*, 251 B.R. at 228.  There are several tests courts have employed to determine whether a proposed plan discriminates unfairly, though the Third Circuit recently affirmed this court's application of the rebuttable presumption test in *In re Tribune Company*, Case No. 18-2909, 2020 WL 5035797, at *9-11 (3d Cir. Aug. 26, 2020) (summarizing the various standards applied to unfair discrimination and affirming under de novo review the Delaware Bankruptcy Court's application of the rebuttable presumption test); *Hargreaves v. Nuverra Env'tl Sols, Inc. (In re Nuverra Env'tl Sols, Inc.)*, 590 B.R. 75, 90 (D. Del. 2018) (adopting and applying the rebuttable presumption test).  Under this test, "a rebuttable presumption of unfair discrimination arises when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's

98

treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *Tribune Co.*, 972 F.3d at 241 (citing to Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 228, 249 (1998).).  This rebuttable presumption may be overcome "if the court finds that a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization." *Id.*  However, the District Court for the District of Delaware has noted that the above is not an exhaustive list of circumstances that may rebut the presumption. *Nuverra Env'tl. Sols.*, 590 B.R. at 93.

208.    California DTSC asserts, incorrectly, that "[b]ecause the Plan provides different recoveries for similarly situated classes, a rebuttable presumption exists as to unfair discrimination." *See* California DTSC Objection ¶ 98.  As discussed above, under the rebuttable presumption test, different treatment only yields a presumption of discrimination if it results in a materially lower percentage recovery for the dissenting class or a materially greater allocation of risk. *Tribune Co.*, 2020 WL 5035797. at *9.  In this case, there is no need to rebut a presumption of discrimination because, applying the foregoing test to the Amended Plan, no such presumption can be applied in the first place.  California DTSC, as a member of Class 8, is neither receiving a lower percentage recovery nor accepting a greater allocation of risk in connection with the proposed distribution than are holders of General Unsecured Claims classified in Class 7.

209.   Of the myriad options available to California DTSC under the Amended Plan, none involves it receiving less than it would if classified with General Unsecured Claims. If it were a member of Class 7, California DTSC would receive its Pro Rata share of the $2,400,000 GUC Global Settlement Payment, among the other GUC Trust Assets, to be distributed by the GUC Trust.  Under the treatment provided to Class 8, however, it is <u>only not</u> receiving a Pro Rata share of the $2,400,000 GUC Global Settlement Payment.  If there is any excess amounts distributed by the GUC Trust, holders of Class 7 Claims and Class 8 Claims, including California, share in such excess distributions ratably.  *See* Amended Plan § 4.8(b)(1).

210.   In all scenarios, California DTSC will receive in excess of a Pro Rata share of $2,400,000.  California DTSC will receive one of the following:

    i.    a beneficial interest in the Vernon Response Trust, which would be the recipient of the $2,587,523 cash distribution and title to the Vernon Non-Performing Property, if California DTSC consents to participation as a Global Settlement Party or if the Payment Conditions are both satisfied;

    ii.    a beneficial interest in the cash distribution of $2,587,523 if the Payment Condition is satisfied but the Vernon Trust Condition is not satisfied; or

    iii.    if neither of the Payment Conditions are satisfied and the Debtors are permitted to abandon the Vernon property as proposed, California will still receive a first prior lien against the Vernon Non-Performing Property worth substantially in excess of $2,400,000.  Messing Confirmation Decl. ¶ 49.

211.   Under arguably its least beneficial recovery—*i.e.*, abandonment of the Vernon property—California DTSC ignores that it would still receive a first priority lien against the Vernon Non-Performing Property.  This lien has significant value (and certainly more than a Pro Rata share of $2,400,000), as evidenced by a robust marketing and sale process in which the Debtors received six bids for the Vernon Non-Performing Property, ranging up to $29,600,000. *See* Messing Confirmation Decl. ¶ 50

212.    Even if the treatment ultimately received by California DTSC were less favorable than that of General Unsecured Claims in Class 7, that would not be the proper metric by which to assess unfair discrimination, which is instead concerned with the treatment offered to a class as a whole.  The Third Circuit made clear in *Tribune* that "the cramdown provision's text also makes plain that unfair discrimination applies only to classes of creditors (not the individual creditors that comprise them), and then only to classes that dissent."  *Tribune Co.*, 2020 WL 5035797, at *10.  That is to say, the treatment of the class as a whole must be unfairly unfavorable in comparison to the treatment of the allegedly preferred class as a whole.  In other words, not only must the treatment chosen and received by California DTSC be unfavorable to that received by General Unsecured Creditors for its objection to have any merit, but so must be the entire scheme arranged for the benefit of holders of Environmental NPP Claims under the Amended Plan.  This recovery scheme, which addresses the unique rights and privileges of holders of Environmental NPP Claims by providing them with the option to receive recovery significantly in excess of $2,400,000 provided exclusively to General Unsecured Claims in Class 7, and a beneficial interest in the property underlying their Environmental NPP Claim or otherwise receive a first priority lien against such property, in no way discriminates against Class 8.

213.    California DTSC also objects, improperly, that the Amended Plan discriminates among Environmental NPP Claims in Class 8 arguing that the alternative treatment provided to holders of claims in Class 8 *de facto* creates two sub-classes.  California cites no case to support its argument, which is unsurprising.  The Amended Plan does not create two subclasses within Class 8.  As stated above, all creditors in Class 8 are offered the same opportunity—participate in the Global Settlement or receive an alternative treatment.  The choice

is California's.  If California's theory of subclasses were correct, no plan could ever offer an opportunity to a class of creditors, which is not the case.  *See Del. Tr. Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery." (*quoting In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)), *aff'd*, 648 F. App'x 277 (3d Cir. 2016).

214.   Moreover, California's theory, if accepted, would be contrary to the long standing case law and deference given to debtor to establish classes of claims under its Plan.  *See In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("the grouping of similar claims in different classes is permitted so long as the classification is reasonable") (internal citations omitted); *see also In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

215.   Accordingly, the treatment of California DTSC under the Amended Plan satisfies the requirements of the Bankruptcy Code and the Amended Plan may be confirmed.

      **d.**     **The Amended Plan Contains Adequate Means for Implementation Pursuant to Section 1129(a)(1) of the Bankruptcy Code.**

216.   In its objection, California DTSC incorrectly argues that the Debtors cannot abandon the Vernon Non-Performing Property and thus, the Amended Plan lacks adequate means for implementation.  The Debtors address their ability to abandon the Vernon Non-Performing Property in the Abandonment Memorandum, filed contemporaneously herewith.

e.      The Debtors Have Proposed the Amended Plan in Good Faith, as Required by Section 1129(a)(3) of the Bankruptcy Code.

217.    California DTSC argues that the Amended Plan was not proposed in good faith and therefore does not comply with section 1129(a)(3) of the Bankruptcy Code. *See* California DTSC Objection ¶¶ 76-84.  California DTSC, however, offers no independent reason to attack the good faith nature of the Amended Plan.  Rather, California DTSC alleges that the Amended Plan lacks good faith because it unfairly discriminates against California DTSC and seeks to abandon the Vernon Non-Performing Property, a fact that this Court acknowledges was a possibility early in these Chapter 11 Cases.  As explained above and in the accompany Abandonment Memorandum, the Amended Plan does not discriminate unfairly or violate applicable law in connection with abandonment.  Accordingly, California DTSC's "boot-strap" objection to good faith must be dismissed.

218.    California DTSC's principal arguments against the Amended Plan stem from their decision to withdraw from the Global Settlement.  However, even California DTSC acknowledges in their objection that the Settling Governmental Authorities and California DTSC itself agreed to recommend the terms of a settlement.  *See* California DTSC Objection ¶ 78. Therefore, the Debtors stood on a firm belief that the Amended Plan would, in reasonable likelihood, not only achieve results consistent with the Bankruptcy Code, but also fulfill the needs of key stakeholders, including California DTSC.  Thus, the fact that the Debtors proposed a plan which trusted in California DTSC's and other parties' representations and confidence in a unified resolution does not constitute evidence of bad faith.

219.    Moreover, out of all interested stakeholders and key constituencies, California DTSC is the *only* party alleging bad faith by the Debtors in proposal of the Amended Plan.  The Debtors, the other Global Settlement Parties, and each of the their respective members

and advisors, and all other parties in interest have worked diligently and with the honest purpose to maximize the value of the Debtors' Estates for the benefit of all creditors and to achieve the Debtors' goals entering these chapter 11 cases, including the orderly transition of the Debtors' Non-Performing Properties.  As discussed further herein, the Amended Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith  and at arms' length, are consistent with the Bankruptcy Code, and each are integral to the Amended Plan and supported by valuable consideration.

220.    In addition, California DTSC's passing allegation that the Amended Plan seeks to strip value from the Debtors' Estates and divert them to the Consenting Creditors can be easily dismissed.  As explained, at all relevant times, the Debtors have operated under the guidance and direction of the independent Special Committee.  In addition, the Debtors marketed the Europe/ROW Assets in accordance with the Court-approved Bidding Procedures.  No party placed a qualified bid on such assets other than the Consenting Creditors' credit bid.  The terms of the credit bid and related agreements have been on file for months and fully evaluated by the Debtors, the Creditors' Committee, and other parties in interest.  The Europe/ROW Sale Transaction is not, by any stretch, an improper diversion of value.

221.    Accordingly, California DTSC's claim that the Amended Plan was not proposed in good faith is unfounded and must be dismissed.

### f.    Debtors Have Identified the Plan Administrator and the New Board in Compliance with Section 1129(a)(5) of the Bankruptcy Code.

222.    As discussed above, the Debtors have filed a notice announcing the identities of the Plan Administrator and the sole member of the New Board.  Furthermore, Part I of this Memorandum addresses the inaccurate suggestion by California DTSC that the Plan Administrator and the New Board may be subject to CERCLA liability.

g.      **Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor.**

223.    In its objection, California DTSC argues that that Amended Plan fails to satisfy Section 1129(a)(7) of the Bankruptcy Code.  California DTSC contends that a chapter 7 liquidation would provide "at least as favorable a return to the DTSC"[24] as under the Amended Plan, since under the Amended Plan the Vernon Non-Performing Property "could receive a minimum of nothing and a maximum of $2.6 million and would lose any right to pursue those parties responsible for the Debtors' past acts," whereas in a chapter 7 liquidation "the [Vernon Non-Performing Property] might not receive an allocation of $2.6 million, but DTSC would retain claims against all parties and the [Vernon Non-Performing Property] would not be immediately abandoned."  California DTSC further contends that in evaluating whether the Amended Plan meets the "best interests" test, the Liquidation Analysis is not useful, since it was filed in connection with the *Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, dated August 11, 2020 (Docket No. 706) (the "**Initial Plan**").

i.      *California DSTC Fares No Better in a Hypothetical Liquidation of the Amended Plan Than It Did Under the Initial Plan.*

224.    First, although the filing of the Liquidation Analysis predated the filing of the Amended Plan, California DTSC is projected to receive the same $0 recovery in a hypothetical liquidation under *both* the Initial Plan and the Amended Plan.  Per the Liquidation Analysis, in a hypothetical liquidation under the Initial Plan, holders of Claims in Class 7

---

[24]    California appears to misunderstand the "best interests" test.  If California receives "at least as favorable a result" under the Amended Plan as it does under a hypothetical liquidation, the best interests test will be satisfied as to California.  The Amended Plan fails the best interests test only if California would recover more in a hypothetical chapter 7 liquidation than under the Amended Plan.  *See* 11 U.S.C. 1129(a)(7)(A)(ii) ("each holder of a claim or interest of such class…(ii) will receive or retain under the plan on account of such claim or interest property of a value…that is ***not less than the amount such holder would so receive or retain*** [in a hypothetical chapter 7 liquidation]." (emphasis added).

(general unsecured claims) (including California DTSC), were not projected to receive *any* recovery on account of their Claims. Under the Amended Plan, California DTSC's Claims fall into Class 8 (Environmental NPP Claims), which is another class of unsecured claims that are subordinate to senior secured claims, which will not be satisfied in full in a hypothetical chapter 7 liquidation.

225.    As stated in the Messing Declaration at ¶ 37, California DSTC fares no better in a hypothetical liquidation of the Amended Plan than it did under the Initial Plan, and confirmation of the Amended Plan will provide non-accepting holders of impaired claims or equity interests with a recovery that is not less than what they would otherwise receive (if any) in connection with a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code. As previously stated herein, the estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis were based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings. As such, the Debtors' Liquidation Analysis should be afforded deference. *See In re Charter Commc'ns*, 419 B.R. 221, 261-62 (Bankr. S.D.N.Y. 2009) (finding that Debtors' liquidation analysis "appear[ed] to have relied on reasonable assumptions.").

ii.    *Potential Recovery on Claims Against Third Parties Does Not Constitute Property Received or Retained From a Chapter 7 Trustee, and Therefore Are Irrelevant to a Liquidation Analysis.*

226.    The recovery California DTSC alleges pursuant to the Non-consensual Third Party Releases is irrelevant to the analysis under a hypothetical chapter 7 liquidation and must be disregarded in any liquidation analysis. Section 1129(a)(7)(A)(ii) only considers recoveries ***from the debtor***, and does not take into account any recovery from third parties. This is clear from the language of the statute, which considers only recoveries received or retained "if

106

the debtor were liquidated." *Id.*  Section 1129(a)(7)(A)(ii) also only refers to "*claims.*"  *See id.*

("(7) With respect to each impaired class of *claims or interests*"; "(A) each holder of a *claim or interests* of such class. . . (2) will receive or retain under the plan *on account of such claim or interest…*") (emphasis added).  Bankruptcy claims are classified against debtors only, not against third parties.  *See In re Chateaugay Corp.*, 53 F.3d 478, 496 (2d Cir. 1995) ("Claim" as defined in Bankruptcy Code Section 101(5), was intended by Congress to be broadly interpreted so that "all legal obligations of the debtor. . . will be able to be dealt with in a bankruptcy case.").  Therefore, the plain language of Section 1129(a)(7)(A)(ii) only requires courts to weigh claims classified against debtors when considering the best interests of creditors.

227.    In accordance with the statute's plain terms, courts look at the dividend the creditor would receive from the chapter 7 trustee, and only that amount, for comparison with the dividend available under a debtor's chapter 11 plan.  *In re Dow Corning Corp.*, 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) (holding that the best interest of creditors test does not require payment of post-petition interest at the same rate in a hypothetical chapter 7 as would apply outside of bankruptcy because courts look only at the dividend the creditor would receive from the chapter 7 trustee); *see also* 7 *Collier on Bankruptcy* ¶ 1129.03[7][b].  Essentially, courts consider only liquidation of property of the estate.  *In re Gen. Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 734 (Bankr. N.D. Cal. 1998) (holding that only assets should be included in the debtor's liquidation analysis "because they are property of Debtor's estate").  Based on the foregoing, claims against non-debtor third parties should be excluded from the "best interests" analysis.  *See In re Plant Insulation Co.*, 469 B.R. 843, 886 (Bankr. N.D. Cal.), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), and *aff'd*, 544 F. App'x 669 (9th Cir. 2013) (holding that the claims of creditors against

non-debtor third parties could not be considered in a liquidation analysis even when those claims would otherwise remain in a chapter 7 case and be discharged pursuant to Section 524(g) in a chapter 11 case).  The outcome of such claims will <u>not</u> directly affect the bankruptcy res, because the debtor is not a party to those claims. See *Worldview Entm't Holdings Inc. v. Woodrow*, 611 B.R. 10, 15-16 (S.D.N.Y. 2019) quoting *In re Falchi*, No. 97 B 43080, 1998 WL 274679, at *7 (Bankr. S.D.N.Y. May 27, 1998)  ("Likewise, if Yashiro succeeds against the Non-Debtor defendants on its breach of contract and fraud claims, its recovery will not affect debtor's estate because it will be payable to Yashiro, and Yashiro does not allege or demonstrate otherwise. Non-Debtor Defendants are correct that because Yashiro's claims against them will not impact Falchi's estate, they are not "related to" his chapter 11 case and must be dismissed[.]").

228.    Although some courts have come to different conclusions, they are distinguishable. *See In re Quigley Co., Inc.*, 437 B.R. 102 (S.D.N.Y. 2010) or *In re Ditech Holding Corporation*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019).  *In Quigley*, the court permitted claims against the parent entity of the debtor to be factored into the liquidation analysis. However, as further explained in *Plant Insulation Co.*, the *Quigley* decision did not actually weigh claims against "third parties," as are in dispute in the present case; rather, *Quigley* concerned derivative claims against a co-obligor of the Debtor.  *In re Plant Insulation Co.*, 469 B.R. at 888, *citing to In re Quigley*, 437 B.R. at 145-46.  Derivative claims are property of the estate, and, therefore, any recoveries by creditors on such claims would flow directly from the debtor.[25]  Accordingly, *Quigley* is consistent with the authority cited above because such claims were property of the estate.

---

[25]    It is well settled that a bankrupt entity becomes the owner of any derivative claims which may be asserted by stockholders on its behalf.  It is equally well established that "[i]f the cause of action belongs to the estate, the trustee has exclusive standing to assert it . . . and consequently the automatic stay prevents creditors or shareholders from asserting the claim . . . ."  *In re Granite Partners, L.P.*, 194 B.R. 318, 324–25 (Bankr.

25

229.    In *Ditech*, the objecting parties argued that the Plan failed to meet the "best interests" test under Section 1129(a)(7) on account of the Debtors' intention to transfer assets pursuant to a plan free and clear of applicable consumer claims and defenses. Among their arguments, objectors contended that in a hypothetical chapter 7 liquidation, any asset sales would be subject to Section 363(o) such that consumer creditors would retain successor liability claims against the purchasers of the assets.   The decision in *Ditech* was rooted in an analysis of the interplay between Sections 363 and 1123, and in direct reference to Section 363(o), which expressly prohibited the sales free and clear of consumer borrower claims in Section 363 sales. In that context and that context alone, the Court found that the debtors' chapter 11 plan did not meet the "best interest" test.   The Court's finding in *Ditech* is confined to Section 363(o) and the protections afforded thereunder, and cannot supplant the principle that a creditor's recovery against a third party on a direct claim that is not property of the estate and should be excluded from the "best interests" analysis.

            iii.    *The Best Interests Test Cannot Consider Recoveries on the Claims against the Nonconsensual Releases Parties Because They Are At Best Speculative and Hypothetical.*

230.    Next, California DTSC's statement that under the Amended Plan the Vernon Non-Performing Property "would lose any right to pursue those parties responsible for the Debtors' past acts," is a blatant mischaracterization of the Non-Consensual Releases. Again, such releases <u>only</u> release the Europe/ROW Purchaser, the Transferred Entities, the Consenting Creditors, and the Trustees, and do not purport to release any other party.  Second, as explained

---

S.D.N.Y. 1996) (emphasis added);  *see also In re Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (holding that both plaintiff's and tort victims' rights were "derivative" of those of debtor; thus, claims were the exclusive property of the estate); *see also Seward v. Devine*, 888 F.2d 957, 963 (2d Cir. 1989) (holding that "[t]he bankruptcy estate encompasses 'all legal or equitable interests of the debtor in property as of the commencement of the case,' including any causes of action possessed by the debtor") (citations omitted); *see also In re WorldCom, Inc.*, 323 B.R. 844, 849 (Bankr. S.D.N.Y. 2005) ("[Plaintiff] does not dispute that derivative claims are property of the estate").

below, the best interest test only evaluates recovery from the Debtors in a hypothetical chapter 7 liquidation – not claims against, or potential recoveries from, third parties.  Third, as the record demonstrates, any recovery on the basis of claims against such Nonconsensual Released Parties is speculative at best. *See In re Charter Commc'ns*, 419 B.R. at 261-62 (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize").  As described in more detail at ¶ 86 herein, the Subcommittee investigated the viability of potential claims that could be subject to the Debtor Releases, and approved the Debtor Releases in conjunction with the Global Settlement upon concluding that the Debtor Releases would not extinguish any claims with sufficient likelihood of success and prospect of recovery that would warrant the costs, expenses, and litigation risks of pursuing those claims.

231.    As for any direct Claims of the California Environmental Agencies against the Nonconsensual Released Parties, such claims are also highly speculative.  First, the Consenting Creditors are not liable for the Debtors' obligations to remediate environmental contamination at the Non-Performing Properties and there are no viable legal theories that could be asserted to compel the Consenting Creditors to fund such obligations.

232.    The Consenting Creditors are both lenders to, and (as a result of June 2019 Financing and the Optimization) certain Consenting Creditors are owners of equity in, the Debtors.  In neither capacity do the Consenting Creditors have liability for contamination at Debtor-owned property.   This is because, generally speaking, most state and federal environmental laws impose liability for remediating environmental contamination on (1) the party that caused the contamination, (2) the current owner or operator of the contaminated real

110

property, or (3) the owner or operator of the contaminated property at the time the contamination occurred. *See*, e.g., 42 U.S.C. § 9601)(a) and Cal. Health & Safety Code § 25323.5. The Consenting Creditors do not fall into any of these categories.

233.   Moreover, CERCLA includes a specific exemption that shields lenders from liability with respect to contamination on real property collateral, provided that the lender does not "participate in the management" of the facility in question.  42 U.S.C. § 9601(20)(F). CERCLA provides that a lender "participates in management" only if it (A) undertakes decision-making control or responsibility for the facility's hazardous substances handling or disposal practices, or (B) exercises managerial control over day-to-day decision making with respect to environmental matters or over substantially all of the "operational functions" of the facility.  42 U.S.C. § 9601(20)(G)(ii).  There simply is no evidence that any of the Consenting Creditors undertook decision-making control over any of the Debtors' operations.  In addition, CERCLA makes it clear that typical lender behavior, such as "providing financial or other advice or counseling in an effort to mitigate, prevent, or cure default or diminution in the value" of a facility, does not constitute "participation in management."  42 U.S.C. § 9601(20)(G)(iv).

234.   The Consenting Creditors similarly have no liability in their capacity as holders of equity in the Debtors.  Under traditional corporate law principles, a corporation is recognized as a legal entity distinct from its owners. *See, e.g., N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp.*, 515 F. App'x 176, 179 (3d Cir. 2013) (finding that it is a fundamental proposition that a corporation is a separate entity from its shareholders). Consequently, shareholders are ordinarily insulated from liability for the corporation's action, beyond the amount of their equity investment.  The United States Supreme Court has made it clear that a shareholder will only be held derivatively liable for the environmental obligations of

a corporate entity in which the shareholder holds a security interest if that shareholder has disregarded or violated traditional corporate principles in relation to that corporate entity, as to permit a court to pierce the corporate veil. *United States v. Bestfoods*, 524 U.S. 51 (1998).

235.   While piercing the corporate veil involves a fact-specific analysis, the general rule may be stated as follows: Where the parent or shareholder exercises such a high degree of control over the corporation that the latter can be viewed as a "mere instrumentality" or "alter ego" of the parent, courts will pierce the corporate veil to prevent fraud, injustice, or circumvention of a statute or public policy. *See, e.g.*, *RRX Indus., Inc., v. Lab-Con, Inc*., 772 F.2d 543, 545 (9th Cir. 1985). *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)). Indeed, "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a 'difficult task.'" *Fletcher v. Atex, Inc*, 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV.A. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). There is <u>no</u> evidence that the Consenting Creditors, in their capacity as equityholders or otherwise, exercised such a high degree of control over the Debtors that would permit piercing the corporate veil.

236.   Even if such evidence existed, which is denied, California DTSC would lack standing to pursue such these claims since under applicable law, the right to bring an action to pierce the corporate veil is the exclusive property of the estate in bankruptcy. *See In re Enron Corp.*, No. 01 B 16034( ), 2003 WL 1889040, at *3 (Bank. S.D.N.Y. Apr. 17, 2003) (noting that, "Delaware law allows a subsidiary to maintain an action against a corporate parent, courts have found that a Delaware court would permit a debtor corporation to assert a claim to pierce its own corporate veil […] Thus, the trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature.")

237.    In stark contrast to the speculative claims purported to be released pursuant to the Nonconsensual Releases, the Amended Plan provides California DTSC with the opportunity to share in a fixed and tangible recovery.  And contrary to California DTSC's assertion, the Plan does not only offer $2.6 million to California DTSC.  California DTSC will also receive a beneficial interest free and clear of all liens or a first priority lien on the Vernon Non-Performing Property.  This recovery is much greater than the speculative claims California DTSC would retain in a hypothetical chapter 7 liquidation.

> iv.    *Vernon Non-Performing Property Would Be Promptly Abandoned in a Hypothetical Liquidation*

238.    Finally, there is absolutely no basis for California DTSC's contention that the Vernon Non-Performing Property "would not be immediately abandoned" in a hypothetical liquidation.  California DTSC does not even attempt to provide any factual or legal basis as to why a chapter 7 trustee would not promptly abandon the Vernon Non-Performing Property— because there is no basis for such a conclusion.  Upon conversion to a chapter 7 liquidation, California DTSC should expect the accelerated disposition of the Vernon Non-Performing Property due to pressure on the chapter 7 trustee(s) to expedite creditor recoveries and avoid ongoing administration costs. See *Yadkin Valley Bank & Trust v. Linda McGee, Trustee (n re Hutchinson),* 5 F.3d 750, 753 (4th Cir.1993) ("the duty to close the estate expeditiously is the trustee's "main duty," 4 *Collier on Bankruptcy, supra,* ¶ 704.01(3), at 704–5, and "overriding responsibility," *Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.),* 925 F.2d 320, 324 (9th Cir.1991).) By contrast, the Debtors' liquidation analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, and should be accorded deference.

239.     In light of the foregoing, the Plan complies with section 1129(a)(7) of the Bankruptcy Code and should be approved over the objection of California DTSC.

> **h.     California DTSC Does Not, and Will Not, Hold any Priority Claims Against the Debtors.**

240.     California DTSC argues that the Amended Plan fails for specifically targeting California DTSC's ability to assert Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, or an Other Secured Claims (for purposes of the California DTSC Objection only, collectively "**Priority Claims**").  *See* California DTSC Objection ¶¶ 103-05.  However, this argument fails to recognize that (i) all other holders of Class 8 (Environmental NPP Claims) are identically treated, including with respect to bar of Priority Claims, (ii) California DTSC does not actually hold Priority Claims because the Debtors are fulfilling their obligations as they come due during the pendency of these chapter 11 cases, and (iii) any post-Effective Date claims accruing against the Wind-Down Estates to the benefit of California DTSC are not permitted to be Priority Claims according to law.

241.     First, California DTSC incorrectly claims, "[o]ther holders of Claims are free to compromise Administrative Expense Claims, Priority Tax-Claims, Priority Non-Tax Claims, or an Other Secured Claims" while the Amended Plan seeks to disallow only those Priority Claims held by California DTSC.  *See* California DTSC Objection ¶¶ 103-05.  However, Section 5 of the Amended Plan clearly applies the same treatment to *all* holders of Environmental NPP Claims in Class 8, not just the Vernon NPP Claims or California DTSC.  *See* Amended Plan, §§ 5.2(e)(i), 5.2(g)(i).

242.     Additionally, California DTSC does not assert, nor hold, any Priority Claims.  In order to maintain a working, negotiating relationship with the parties, Debtors have maintained good standing, complied with, and remedied all environmental obligations in the

ordinary course as such obligation have come due and payable during the course of these chapter 11 cases. Moreover, courts have regularly held that environmental agencies will not be able to obtain administrative expense priority for future contingent remediation costs. *See In re Rock & Republic Enters.*, No. 10-11728 (AJG), 2011 WL 4756571 at *5 (Bankr. S.D.N.Y. Oct. 7, 2011) ("Although a claim may be contingent, only 'actual' administrative expenses, not contingent expenses, are entitled to priority under § 503."); *see also In re Oldco M Corp.*, 438 B.R. 775 (Bankr. S.D.N.Y. 2010) (denying future remediation costs at the debtor's former facility). California DTSC has not demonstrated it has expended any money on remediation of the Vernon Non-Performing Property since the Commencement Date that would entitle it to asset Priority Claims, nor has it proven that it will be required to do so in the future. Thus, California DTSC cannot argue particular Priority Claims hold priority based upon a particularized determination. *Id.* at 786; *see also In re Microfab, Inc.*, 105 B.R. 161, 166 (Bankr. D. Mass. 1989) (denying the state's request for administrative expense priority as premature where the state had not yet expended any funds to clean up the site and the court "cannot speculate as to what amounts might eventually be allowable as actual and necessary expenses of the estate") (internal citations omitted); *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1010 (2d Cir. 1991) ("The District Court has ruled that response costs for post-petition remedial action qualify as administrative expenses; whether any particular item of cost is entitled to priority requires a *particularized* determination.").

243.     Ultimately, California DTSC fails to see their situation is not unique, the Debtors have maintained compliance with their environmental obligations at the Vernon Non-Performing Property through the pendency of the chapter 11 cases, and, like all other holders of Environmental NPP Claims, California DTSC does not have and, in the interest of avoiding

costly litigation that would waste the assets of the Estates to the detriment of all of the Debtors'

stakeholders, should not be permitted to assert a Priority Claim.

> **i.** **Each Class of Impaired Claims Has Voted to Accept the Amended Plan in Satisfaction of Section 1129(a)(10) of the Bankruptcy Code.**

244.    California DTSC argues that because the Consenting Creditors hold, in the

aggregate, a supermajority of the equity interest of Exide Holdings, regardless of their individual

holdings, all of the Consenting Creditors are thus "insiders" and their votes to accept the

Amended Plan should not be counted for purposes of satisfying section 1129(a)(10).   *See*

California DTSC Objection ¶¶ 106-116.  This is a gross misreading of the Bankruptcy Code as

the Consenting Creditors cannot be considered insiders as a group and even if certain individual

Consenting Creditors are deemed statutory insiders, the approval of the Amended Plan by all

remaining claimholders in Class 4, Class 5 and Class 6 is sufficient to satisfy section 1129(a)(10)

of the Bankruptcy Code.

245.    Courts have recognized that there are two types of "insiders" under the

Code: statutory insiders set forth in section 101(31) of the Bankruptcy Code and non-statutory

insiders as defined in *In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009).   The

distinction between these two types of "insiders" turns on whether the creditor's close

relationship to the debtor suggests that any transactions were not conducted at arm's length.

*Winstar*, 554 F.3d at 397 (quoting S.Rep. No. 95–989, at 24 (1978), as reprinted in 1978

U.S.C.C.A.N. 5787, 5810).

246.    Section 101(31) of the Bankruptcy Code provides the statutory definition

of the term "insider".  In the case of a debtor that is a corporation, section 101(B)(iv) states that a

"person in control of the debtor" is an insider, and "actual control (or its close equivalent) is

necessary for a person or entity to constitute an insider of section 101(31)'s 'person in control'

language." *Winstar*, 554 F.3d at 396.   Non-statutory insiders, however, "need not have control over a debtor; rather, courts will analyze (i) whether there is a close relationship between the debtor and creditor, and (ii) whether there is some evidence, other than the relationship, suggesting that any transactions were not conducted at arm's length." *Stanziale v. Khan (In re Evergreen Energy, Inc.)*, 546 B.R. 549, 563-66 (Bankr. D. Del. 2016).

247.   California DTSC attempts to make a claim that the Consenting Creditors are insiders.  *See* California DTSC Objection ¶ 115.  DTSC incorrectly claims the Consenting Creditors, together, are a "person in control of the debtor".   Section 101(41) of the Bankruptcy Code defines the term "person" to include an "individual, partnership, and corporation" and not a group of individuals, partnerships or corporations.  If any holder of claims in a class is an insider, their claims would rightfully be excluded from a class for the purposes of voting for the Amended Plan, but a group of holders cannot be deemed as insiders collectively simply due their collaboration as an ad hoc group of stakeholders.  The Consenting Creditors are an ad hoc group of noteholders that have voluntarily and unofficially organized on an at-will basis in order to protect each of their individual interests and are not bound to each other in any legally enforceable manner.  *See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 351-52 (S.D.N.Y. 2013) (rejecting argument that defendant lenders were non-statutory insiders based, *inter alia*, on lack of sufficient allegations to support veil-piercing necessary to link defendant lenders to sister corporate subsidiaries alleged to have close relationship with debtors); *but see Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, Adv. No. 10–50514 (KG), 2010 WL 3522132, at *6-8 (Banker. D. Del. Sept. 1, 2010) (considering whether group of prepetition lenders and Credit Suisse could qualify as insiders, where prepetition lenders and Credit Suisse were linked by

prepetition credit agreement); *Exide Techs.*, 299 B.R. at 742-43 (finding that plaintiffs had sufficiently alleged facts to survive motion to dismiss claim that prepetition lender group, who had allegedly exercised control over the debtors via a common prepetition credit facility, were insiders).

248.    Additionally, California DTSC fails to provide any evidentiary support that the negotiations and agreements between the Debtors and the Consenting Creditors that led to the Amended Plan (with many of such negotiations including other parties in interest) were conducted other than in an arm's-length manner.  Indeed, prior to the Commencement Date, the Board of Directors of Exide Holdings formed the Special Committee comprised solely of its four (4) independent directors to direct and oversee all aspects of the Debtors' restructuring process, in part to maintain arm's-length negotiations with the Consenting Creditors.  The Special Committee has had full control of the Debtors and these chapter 11 cases since their commencement.  None of the Consenting Creditors are members of the Special Committee, has attended Special Committee meetings, or had any involvement in the authorization of the Amended Plan or its related filings from the perspective of the Debtors.

249.    Furthermore, all members of Class 4, Class 5, and Class 6 that submitted ballots voted to approve the Plan.  While it is true that one (1) member of the Consenting Creditors may be considered a statutory insider due to owning more than 20% of the voting securities of Exide Holdings, and another member of the Consenting Creditors may be considered a statutory insider due to the fact that its managing partner serves on the board of directors of Exide Holdings, Inc., even if the claims of these two Consenting Creditors were disregarded for the purposes of voting for the Amended Plan, the fact that all of the remaining holders of claims in Class 4, Class 5 and Class 6 (approximately 20% of which are not

Consenting Creditors) voted to accept the Amended Plan means that the Amended Plan has satisfied the criteria under section 1129(a)(10).   Accordingly, the Court should overrule the California DTSC objection that the Debtors have not satisfied their burden under Section 1129(a)(10).

> 3.   **The Injunction, Releases, and Exculpation Provided for in the Amended Plan are Appropriate and Should be Approved.**

> > a.   **Plan Releases and Injunction.**

250.   The Debtors make their affirmative case for the Plan Releases and Injunction in <u>Part I</u> of this Memorandum and appropriately dispel the objections of California DTSC.

> > b.   **Exculpation.**

251.   California DTSC objects to the Amended Plan on the basis that the exculpation provision contained in section 10.7 of the Amended Plan is impermissibly broad because of the inclusion of non-fiduciaries as Exculpated Parties.   This objection is without merit, as the Third Amended Plan has addressed this issue by removing from the definition of Exculpated Parties: (i) the DIP Lenders and DIP Agents and (ii) the Consenting Creditors. Accordingly, the Amended Plan does not provide for exculpation of any non-fiduciaries and California DTSC's objection must be overruled.

> 4.   **All Other Objections by California DTSC Should be Overruled.**

> > a.   **Amended Plan is a Proper Amendment of the Initial Plan.**

252.   California DTSC argues that the Amended Plan cannot be confirmed because it is an improper amendment of the Initial Plan (as defined in the California DTSC Objection).   California DTSC recognizes that Section 12.4 of the Initial Plan expressly reserved the Debtors' right to amend or modify the Initial Plan prior to the entry of the Confirmation

Order.   Notwithstanding this, California DTSC suggests that some amendments are only permissible with the consent of certain parties.   California DTSC contends that the Amended Plan is invalid because, contrary to Section 12.4(a) of the Initial Plan, the definition of Settling Governmental Authorities was modified without the consent of California DTCS.

253.   This argument is outrageous.   California DTSC cannot seriously contend that certain rights it was given to consent to amendments to the Initial Plan when it was a party to the Global Settlement should continue to apply after it withdrew from the Global Settlement and bar the Debtors from modifying the Initial Plan to address California DTSC's withdrawal.

254.   This argument also lacks foundation as a matter of law, which is clear that the chapter 11 plan belongs to the debtor. This is reflected in Section 12.4 of the Initial Plan (and the Amended Plan), which expressly reserves the right of the Debtors to amend or modify the Amended Plan prior to the entry of the Confirmation Order.   The Bankruptcy Code supports this more generally. Section 1121(b) of the Bankruptcy Code provides that the debtor has the exclusive right to file a plan until 120 days after the date of order for relief. Section 1127(a) of the Bankruptcy Code provides that the proponent of the plan or the reorganized debtor may modify the plan at any time before confirmation of the plan. *See Indu Craft, Inc. v. Bank of Baroda (In re Indu Craft Inc.)*, No. 11 Civ. 5996 (JMF), 2012 WL 3070387 (S.D.N.Y. July 27, 2012); *In re W. Mgmt., Inc.*, 6 B.R. 438 (Bankr. W.D. Ky. Aug. 1, 1980).   Section 1127(a) of the Bankruptcy provides that, so long as the amended plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, "[a]fter the proponent of the plan files a modification of such plan with the court, the plan as modified becomes the plan."   Taken together, these provisions demonstrate that California DTSC's position that modifications to the plan were impermissible without California DTSC's consent is incorrect—and for good reason.

Rather, the terms of the Initial Plan and any subsequent modifications or amendments are the purview of the Debtors. Per Section 1126(a) of the Bankruptcy Code, California DTSC is entitled to accept or reject the Amended Plan, as amended or modified, as it sees fit. However, California DTSC is not entitled to invalidate or prevent prosecution of the Amended Plan because of amendments or modifications made without its consent.

        **b.**        **Disclosure Statement Satisfies the Requirements of Section 1125 of the Bankruptcy Code.**

255.    In its objection, California DTSC demonstrates its lack of understanding of the purpose of the Disclosure Statement according to the Bankruptcy Code. The Debtors address their affirmative case for approval of the Disclosure Statement in <u>Part III</u> of this Memorandum.

        **B.**        **The Americas Buyer's Objection Should Be Overruled.**

256.    The buyer in the Americas Sale Transaction, ACR III Edison Holdings LLC (f/k/a Battery BidCo LLC) (the "**Americas Buyer**"), asserts that that the Amended Plan should not be confirmed unless the Debtors establish a cash reserve sufficient to pay the Post-Closing Adjustment under the *Stock and Asset Purchase Agreement* by and among Debtor Exide Technologies, LLC, as seller, the Americas Buyer, as buyer, and Atlas Capital Resources III LP, as guarantor (the "**Americas Purchase Agreement**"). Americas Buyer Obj. ¶ 17 [Docket No. 924]. According to the Americas Buyer, the Debtors have not demonstrated that they can pay the Post-Closing Adjustment in full and thus will not be able to satisfy the requirements of sections 1129(a)(1), 1129(a)(9), and 1129(a)(11) of the Bankruptcy Code. *Id.* As detailed below, however, the Debtors already have determined that many of the amounts the Americas Buyer alleges the Debtors owe are either unsubstantiated or wrong, and the Debtors expect to

have more than enough cash to satisfy any amount that ultimately will be owed to the Americas Buyer (if anything) in connection with the Post-Closing Adjustment.

> **1.      The Americas Purchase Agreement Sets Forth Clear Transaction Accounting Principles for the Working Capital Adjustment.**

257.    Under the Americas Purchase Agreement, the aggregate consideration paid for the Americas Assets must be adjusted to account for the difference between $210 million (the "**Target Working Capital**") and the Net Working Capital (as defined in the Americas Purchase Agreement) of the Americas business as of the Effective Time of the transaction (the "**Final Working Capital**"). *See* Americas Purchase Agreement § 3.01, Ex. A, Ex. E.   If the Target Working Capital exceeds the Final Working Capital, the Base Purchase Price of $178.6 million must be adjusted downward to account for that decrease in working capital, and to the extent the decrease is not offset by an increase in cash, the Debtors must make an additional payment to the Americas Buyer (the "**Post-Closing Adjustment**"). *See* Americas Purchase Agreement §§ 3.01, 3.06.

258.    To effectuate this Post-Closing Adjustment, the Debtors were required to prepare a written statement at least two business days before the Closing setting forth their good faith estimate of the Americas business's Net Working Capital as of the Effective Time (the "**Estimated Working Capital**") and the amount of any working capital adjustment that would need to be made in connection with the Closing.  *See* Americas Purchase Agreement § 3.04, Ex. A.   Within 30 days of the Closing, the Americas Buyer was required to provide a written statement setting forth the Americas Buyer's own good faith, proposed final calculation of the Net Working Capital as of the Effective Time (the "**Proposed Final Working Capital**") and a description of any proposed changes to the Estimated Working Capital, "attaching supporting schedules, working papers and all other relevant documents and details to enable a review

thereof by [the Debtors]." *See* Americas Purchase Agreement § 3.05(a).  In other words, the clear terms of the Americas Purchase Agreement place the burden of proving any proposed changes to the Estimated Working Capital on the Americas Buyer.

259.    The Debtors then have 60 days to review the Proposed Final Working Capital and underlying documentation, make inquiries of relevant employees or representatives of the Americas Buyer, its affiliates, and its accountants, and assess whether to dispute any items in the Proposed Final Working Capital.  *See* Americas Purchase Agreement § 3.05(b)-(c).  If the Debtors dispute any items in the Proposed Final Working Capital, the Debtors and the Americas Buyer must negotiate in good faith and either revise the Net Working Capital calculations to reflect their agreement or bring unresolved issues to this Court for resolution.  *See* Americas Purchase Agreement § 3.05(c)-(d).

260.    The Americas Purchase Agreement clearly dictates that all calculations of Net Working Capital must be done in accordance with "the accounting principles, practices, methodologies and policies, regardless of materiality, that were employed by [Exide Technologies, LLC], on and for the year ended March 31, 2020, to prepare its consolidated financial statements" (the "**Transaction Accounting Principles**").  *See* Americas Purchase Agreement § 3.05(f), Ex. E.  Furthermore, current assets and current liabilities must be "calculated only using the applicable general ledger accounts specified" in the Americas Purchase Agreement.  *See* Americas Purchase Agreement Ex. E.

**2.      The Debtors Will Be Able to Pay Any Amounts Owed in Connection with the Post-Closing Adjustment.**

261.    In accordance with the procedures established in the Americas Purchase Agreement, at Closing, the Debtors credited the Americas Buyer approximately $10 million to address the difference between the Target Working Capital and the Estimated Working Capital

delivered at the Closing.   Robinson Decl. ¶ 8.   In its Proposed Final Working Capital calculations, the Americas Buyer claims that the Final Working Capital is lower than what the Debtors calculated, and that it therefore is entitled to an additional Post-Closing Adjustment of approximately $19.7 million to account for that alleged shortfall.   Americas Buyer Obj. ¶ 12. According to the Americas Buyer, "[t]he inability of [the Debtors] to pay the Post-Closing Adjustment . . . means that the [Amended] Plan is not feasible under section 1129(a)(11)."   *Id.* ¶ 25.  But the Americas Buyer's objection is without merit.

262.   When calculating the Target Working Capital and the Estimated Working Capital, the Debtors complied with the Transaction Accounting Principles—*i.e.*, the accounting principles, practices, methodologies, and policies that were used historically in preparing Exide Technologies, LLC's consolidated financial statements.   Robinson Decl. ¶ 8.   Under the Americas Purchase Agreement, the Americas Buyer was required to use those same Transaction Accounting Principles to determine the Proposed Final Working Capital so that all of the Net Working Capital calculations would be determined from the same baseline.   *See* Americas Purchase Agreement § 3.05(f), Ex. E.   The Americas Buyer was also required to provide the Debtors with supporting schedules, working papers, and all other relevant documents and details to enable the Debtors to review the Proposed Final Working Capital.   *See* Americas Purchase Agreement § 3.05(a).

263.   But the Americas Buyer appears to have repeatedly departed from the Transaction Accounting Principles in its calculations of the Proposed Final Working Capital and failed to provide required documentation in support of many of its calculations.   *See* Robinson Decl. ¶ 9.  As further detailed in the Robinson Declaration, the Debtors already have determined that approximately $14.6 million of the alleged shortfall in Net Working Capital either appears

inconsistent with the Transaction Accounting Principles or is not currently substantiated by the facts and information provided.  Robinson Decl. ¶ 9.  For example:

i.   The Americas Buyer's calculation does not appropriately reflect the reserves already taken in the business's books and records that are specifically related to accounts receivable that are more than 60 days past due ("**Non-Performing Accounts Receivable**"), Robinson Decl. ¶ 12;

ii.  The Americas Buyer improperly included invoices that have been delayed due to a governmental administrative process in the calculation of Non-Performing Accounts Receivable, *id.*  ¶ 14;

iii. The balance for in-transit inventory appears inconsistent with prior periods, and the Americas Buyer has not shown that its accounting for those in-transit inventory balances was consistent with historical practices, *id.* ¶ 18;

iv.  The Americas Buyer has failed to substantiate its calculation of an accounting adjustment used to account for the difference between actual production cost incurred and the standard cost assumption, *id.*  ¶ 21;

v.   The Americas Buyer appears to have overstated freight and logistics accruals, benefits accruals, deferred rent liabilities, and employee liabilities, *id.* ¶¶ 23-26; and

vi.  The Americas Buyer improperly recognized a rebate accrual in the current period for a marketing event that is not scheduled to occur until 2021, *id.* ¶ 27.

264.    The Debtors and their advisors' review of the Proposed Final Working Capital is ongoing and may well uncover additional discrepancies between the Americas Buyer's calculations and the Transaction Accounting Principles or other calculations that are not adequately supported by the information provided.  Robinson Decl. ¶ 28.

265.    At this stage, however, the Court does not need to determine the full extent to which the Americas Buyer has overstated the Proposed Final Working Capital.  As discussed above, the feasibility determination is a low threshold that only requires the Court to determine that there is a reasonable probability that the provisions of the plan can be performed.

125

*In re Heritage Highgate, Inc.*, 679 F.3d at 142; *In re Emerge Energy Servs. LP*, 2019 WL

7634308, at *15; *In re W.R. Grace & Co.*, 475 B.R. at 115; *In re Tribune Co.*, 464 B.R. at 185.

266.    After correcting the errors in the Americas Buyer's calculations, the

remaining asserted claim by the Americas Buyer is $5.1 million, which the Debtors are

continuing to review and which will be more than covered by the $15.8 million surplus that the

Debtors expect to have even if all of the $5.1 million (or more) is valid.  Moreover, even if the

Americas Buyer is able to provide additional information that justifies some of the calculations

that appear to diverge from the Transaction Accounting Principles and calculations that are

currently unsubstantiated, the Debtors and their advisors anticipate that the final amount of the

Post-Closing Adjustment will still be below the projected surplus.  *See* Robinson Decl. ¶ 10.   In

all events, the Debtors should reasonably be able to satisfy any further Post-Closing Adjustment

that is necessary when Final Working Capital is ultimately determined.  Accordingly, there is a

reasonable probability that the Amended Plan can be performed and that the Debtors will have

sufficient resources to pay the costs of administering and fully consummating the Amended Plan

and closing these chapter 11 cases.

267.    The Americas Buyer also contends that confirmation of the Amended Plan

would violate sections 1129(a)(1) and (a)(9) because the Debtors "cannot pay the Post-Closing

Adjustment on the Effective Date."  Americas Obj. ¶¶ 21, 24.  But the Bankruptcy Code does not

require the Debtors to pay the Post-Closing Adjustment on the Effective Date.   Section

1129(a)(9) provides that, as of the effective date, a holder of an administrative claim is only

entitled to a payment "equal to the ***allowed amount*** of such claim."  11 U.S.C. § 1129(a)(9)(A)

(emphasis added).  Because the Americas Buyer's claim has not yet been determined to be an

"allowed amount" under the Bankruptcy Code, the Debtors have no obligation to pay the full

amount of that claim on the Effective Date.  Indeed, the Americas Purchase Agreement gives the Debtors 60 days to review the Americas Buyer's claim and file a Dispute Notice, which does not even expire until November 23, 2020.  *See* Americas Purchase Agreement § 3.05(b).

268.    Finally, the Americas Buyer argues that the Amended Plan should not be confirmed because the Debtors are "required to reserve the entire amount of Buyer's Administrative Expense Claim under the terms of the [Amended] Plan."  Americas Buyer Obj. ¶ 24.  The Americas Buyer misunderstands the Amended Plan.  The Amended Plan and the Proposed Confirmation Order establish an adequate and customary process for resolving Disputed Administrative Expense Claims—a process that does not require the Debtors to reserve the full amount of the Americas Buyer's claim at this time.

269.    The Amended Plan states that "[t]he Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Administrative Claims."   Amended Plan, § 6.3(b)(i).  In the latest version of the Amended Plan, the Debtors clarified that this amount will be reserved "[p]rior to any distributions of Net Cash Proceeds" as intended.  *Id.*  There is nothing in the Amended Plan stating that all Cash must be distributed or reserved on the Effective Date.  To the contrary, the express terms of the Amended Plan clearly contemplate a customary claims reconciliation process pursuant to which the Plan Administrator will evaluate Administrative Expense Claims prior to making distributions, and will only make distributions once such claims have been appropriately allowed or reserved for.  Further, the Administrative Claims Bar Date set forth in the Proposed Confirmation Order is 35 days *after* entry of the Proposed Confirmation Order.  No distribution will be made before that date.  *See* Proposed Confirmation Order ¶ 49.

270.    In short, nothing in the Bankruptcy Code or the Amended Plan allows a buyer in a liquidation to inflate a working capital adjustment by ignoring contractually agreed-

upon accounting methods and failing to provide contractually required documentation and then hold up the entire bankruptcy by asserting that its erroneous and unsupported calculations are administrative claims against the estate that must be reserved for in cash before any distributions are even made.  For these reasons, the Americas Buyer's objection should be overruled.

## III.   DISCLOSURE STATEMENT, SOLICITATION PROCEDURES, AND VOTING PROCEDURES SHOULD BE APPROVED ON A FINAL BASIS.

### A.   The Disclosure Statement Contains Adequate Information.

271.   On August 14, 2020, the Court entered the Conditional Disclosure Statement Order approving the Disclosure Statement as conditionally containing adequate information and authorizing the Debtors to solicit votes on the Plan based upon the adequacy of the information contained in the Disclosure Statement.  The Debtors submit that the Disclosure Statement contains adequate information necessary to enable all parties in interest entitled to vote on the Amended Plan to make an informed judgment with respect to the Amended Plan, as required by the Bankruptcy Code and the Bankruptcy Rules.

272.   The Debtors received only one objection to the approval of the Disclosure Statement on a final basis, from California DTSC.  In its objection, California DTSC contends that the Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code because it does not contain adequate information related to the abandonment of Non-Performing Properties, the treatment of Environmental NPP Claims, or the means for the implementation of the Plan, and should not be approved.

273.   Under section 1125 of the Bankruptcy Code, a plan proponent must provide holders of impaired claims and interests with "adequate information" regarding a debtor's proposed plan, which is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's

books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

274.    As an initial matter, California DTSC lacks standing to object to the adequacy of the Disclosure Statement.  The primary purpose of a disclosure statement is to provide sufficient information to allow parties <u>entitled to vote on a proposed plan</u> to make an informed decision about whether to vote to accept or reject the plan.  *See, e.g.*, *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Phx. Petroleum, Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan.").

275.    Consistent with the solicitation procedures set forth in the Conditional Disclosure Statement Order, the only parties entitled to vote to accept or reject the Plan are holders of Claims in Class 4 (Superpriority Notes Guarantee Claims), Class 5 (Exchange Priority Notes Claims), and Class 6 (First Lien Notes Claims) (collectively, the "**Notes Claims**" or the "**Voting Classes**").  As such, the Court must only determine whether the holders of the Claims in the Voting Classes have received adequate information.  *See, e.g., In re Ferretti*, 128 B.R. 16, 18–20 (Bankr. D.N.H. 1991) (holding that the purpose of a disclosure statement is to give parties in interest, whose votes are being solicited, adequate information about the plan *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99–100 (Bankr. D. Del. 1999)) ("In considering the adequacy of a

disclosure statement, it is important to keep in mind the audience.  Here, those entitled to vote on the Plan are sophisticated, institutional investors. Given the sophistication of the parties, the wealth of information contained in the Disclosure Statement and publicly available elsewhere, the approval by the SEC and the lack of objection by any party entitled to vote on the Plan, we readily conclude that the Disclosure Statement contains adequate information and the votes solicited by it are valid.")

276.    The Disclosure Statement is extensive and contains adequate information to enable holders of Claims in the Voting Classes to make an informed judgment about the Plan. Holders of the Notes Claims are sophisticated, institutional investors.  Approximately 95% of the Notes Claims holders are signatories to the RSA, and have been actively represented by competent counsel and continually updated and informed throughout these chapter 11 cases.  The Debtors received no other objections regarding the Disclosure Statement, the Solicitation Procedures, and/or the Voting Procedures, either during the solicitation period or in conjunction with confirmation of the Amended Plan, and an overwhelming majority of the holders of Claims in the Voting Classes have voted to accept the Plan.[26]

277.    Further, any objection as to the sufficiency of information received by California DTSC is unfounded.  California DTSC has been party to ample information in these chapter 11 cases, both through its participation in the mediation that culminated in the Global Settlement, and in response to its various discovery requests in connection with its objections to the Amended Plan, pursuant to which the Debtors produced approximately 20,000 responsive documents. Indeed, California DTSC possessed sufficient information to produce a 60-page objection to the Amended Plan.

---

[26]    *See* Voting Certification at ¶ 9.

278.        In light of the foregoing and the reasons articulated in the Disclosure Statement Motion,[27] the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Motion, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

## IV.    CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER.

279.    The Debtors respectfully request that the Court direct that the Proposed Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).   Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."   Fed. R. Bankr. P. 3020(e).   As such, and as the Advisory Committee Notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately."   Fed. R. Bankr. P. 3020(e) advisory committee's note to 1999 amendment.

280.    Under the circumstances, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Amended Plan and commence its implementation as soon as possible following entry of the Proposed Confirmation Order.   The Debtors' prompt emergence from chapter 11 will enable the orderly wind down of the Debtors' estates following consummation of the Sale Transactions.   Furthermore, each day that the Debtors remain in chapter 11 they incur additional administrative and professional costs.   For these reasons, the Debtors, their advisors, and other

---

[27]    "**Disclosure Statement Motion**" means *Debtors' Motion for an Order (I) Approving Disclosure Statement; (II) Establishing Notice and Objection Procedures for Confirmation of the Plan; (III) Approving Solicitation Packages and Procedures for Distribution Thereof; (IV) Approving the Forms of Ballots and Establishing Procedures for Voting on the Plan; and (V) Granting Related Relief* (Docket No. 539).

key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions necessary to effectuate the Amended Plan so that the Effective Date may occur as soon as possible after the entry of the Proposed Confirmation Order.  Based on the foregoing, the requested waiver of the 14-day stay is in the best interests of the Debtors' estates and creditors and will not prejudice any parties in interest.

## **CONCLUSION**

281.    The Amended Plan complies with all of the requirements of section 1129

of the Bankruptcy Code and should be confirmed.

Dated: October 12, 2020
         Wilmington, Delaware

                              */s/ Zachary I. Shapiro*
                              RICHARDS, LAYTON & FINGER, P.A.
                              Daniel J. DeFranceschi (No. 2732)
                              Zachary I. Shapiro (No. 5103)
                              One Rodney Square
                              920 N. King Street
                              Wilmington, Delaware 19801
                              Telephone: (302) 651-7700
                              Facsimile:  (302) 651-7701

                              -and-

                              WEIL, GOTSHAL & MANGES LLP
                              Ray C. Schrock, P.C. (admitted *pro hac vice*)
                              Sunny Singh (admitted *pro hac vice*)
                              767 Fifth Avenue
                              New York, New York  10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007

                              *Attorneys for Debtors*
                              *and Debtors in Possession*

**<u>Exhibit A</u>**

**Objections Chart**

**In re Exide Holdings, Inc., et al.,**
**Summary Chart of Objections to Confirmation of Amended Plan**

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| 1 | 850 | Victor M. Koelsch | 1.  **Releases**: Mr. Koelsch seeks to preserve direct claims against the current directors and/or officers to the extent that any of those directors or officers were on the Board at the time of Koelsch's termination or at the time of the recharacterization of the termination. Such claims arise from pre-petition actions of the board of directors and/or officers. | 1.  Section 10.6 of the Plan does not release direct claims of holders of General Unsecured Claims against the Debtors' officers and directors. The Debtors have included language in the Confirmation Order addressing Mr. Koelsch's objection and believe this objection has been resolved.  See Proposed Confirmation Order ¶ 57:<br><br>57.  Notwithstanding anything contained in the Plan or this Order to the contrary, neither the Plan nor this Order releases any of the Debtors' current or former directors and officers from direct claims brought by Victor Koelsch or bars such claims in any way, subject to all defenses or counterclaims that the Debtor's officers and directors may have.  Any claims brought by Victor Koelsch against the Debtors' current or former directors and officers are independent from, and not included in, the general unsecured claims. |
| 2 | 855 | Golder Associates, Inc.<br><br>("**Golder**") | 1.  Golder objects to the Debtors proposed cure amount ($0) as listed on the Assumption Schedule for the Environmental Trust. | 1.  This objection is moot.  The Debtors' agreement with this counterparty is no longer an agreement designated to be assumed by the Debtors and assigned to the Environmental Trust. |
| 3 | 883 | Adamo Auctions Inc. | 1.  Adamo objects to the sale of Exide Holdings, Inc. real estate that was transferred to the Americas Buyer. | 1.  This objection should be overruled. The Americas Sale Transaction was approved on August 6, 2020, pursuant to the Americas Sale Order[1], which has become a final order. The |

---

[1] "**Americas Sale Order**" means the *Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing Sale of Certain Of Debtors Assets Free and Clear Of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment Of Certain Executory Contracts And Unexpired Leases In Connection Therewith, and (IV) Granting Related Relief* (Docket No. 690).

WEIL:\97631777\5\44362.0005

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|-----|-----------|-----------------|----------------------|-------------------|
| | | ("**Adamo**") | | transaction has since closed.  All parties were given the opportunity to submit bids on a timely basis. Adamo did not submit a timely bid for the Americas Assets and lacks standing to object now. *See In re Colony Hill Associates*, 111 F.3d 269, 274 (2d Cir. 1997) (a disgruntled bidder that fails to submit a timely bid has no standing to challenge an approved sale). |
| 4 | 854; 916 | American Integrated Services, Inc.  ("**AIS**") | 1.  AIS objects to the Debtors' proposed amended pre-petition cure amount ($0) (as amended on the Assumption Schedule for the Environmental Trust).  2.  The Plan impermissibly extends the time for Debtors to assume or reject executory contracts that may be assigned to Vernon Environmental Response Trust.  3.  The Plan purports to transfer certain equipment owned by AIS to the Vernon Non-Performing Property.  4.  The Plan provides for impermissible non-consensual third party releases by general unsecured creditors. | 1.  This objection is moot.   The Debtors' agreement with this counterparty is no longer an agreement designated to be assumed by the Debtors and assigned to the Environmental Trust.  2.  This objection is moot for the reason set forth in the preceding paragraph.  3.  The Debtors are not and legally could not transfer any AIS owned equipment pursuant to the Amended Plan. The Debtors will work with AIS to identify the equipment and arrange for its return.  4.  The Debtors have included language in the Confirmation Order confirming that such releases will not apply to AIS and believe this objection has been resolved.   *See* Proposed Confirmation Order ¶ 59:  59. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, AIS shall not be bound by the releases set forth in Section 10.6 of the Plan, nor shall AIS be bound by any similar or equivalent third party release set forth in this Confirmation Order. In |

WEIL:\97631777\5\44362.0005

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| | | | | addition, nothing in Section 10.7 of the Plan or any similar or equivalent provision of this Confirmation Order shall diminish, limit, impair or affect any AIS Administrative Expense Claim under Section 2.1 of the Plan. |
| | | | 5.  The Exculpation Provisions appears to eliminate the Debtors' liability for administrative claims by including the Debtors as an Exculpated Party. | 5.  The Debtors acknowledge and agree that nothing in the plan constitutes a waiver of any Administrative Expense Claims of AIS, *provided that*, the Debtors reserve all rights to assert any and all defenses or objections in connection with any such alleged Claims. |
| | | | 6.  AIS objects that it is an administrative creditor and requests that the Debtors demonstrate that they have the funds to fulfill their administrative expense obligations. | 6.  The Debtors respond to this objection in Section I(M) (paras 167-177) and Section II(B) (paras 260-274) of the Confirmation Brief. |
| 5 | 923 | Infor (US), Inc. ("**Infor**") | 1.  Infor objects to the third party release, exculpation, and injunction provisions to the extent that they purport to limit Infor's rights against non-Debtors. | 1.  The Debtors have included language in the Confirmation Order addressing Infor's objection and Debtors believe this objection has been resolved. *See* Proposed Confirmation Order ¶ 60:

60. The *License Agreement* dated as of October 20, 2000, between Exide Technologies, LLC, and Infor (US), Inc. ("Infor"), as successor to Future Three, Inc., as amended from time to time, for the AutoRelease AutoScan software (the "Infor Software") shall be deemed rejected as of the date of entry of this Order. Within five (5) days of the date of entry of this Order, the Debtors shall (i) remove all copies of the Infor Software and any portions thereof from assets of the Debtors and cease accessing and using any |

WEIL:\97631777\5\44362.0005

| No. | Docket No. | Objecting Party | Summary of Objection | Debtors' Response |
|---|---|---|---|---|
| | | | | hosted Infor Software; (ii) destroy all copies of the Infor Software contained in the Debtors' assets and related documentation and delete all access codes; and (iii) certify to Infor in writing that the Debtors have complied with the foregoing subparagraphs (i) and (ii).   Any claim or motion of Infor seeking payment with respect to the License Agreement or the Infor Software shall be filed within thirty (30) days of the date of entry of this Order. Infor shall be deemed to have opted out of the granting of any releases under section 10.6 of the Plan. Notwithstanding anything to the contrary contained in this Order, in the Plan or in any document filed or prepared in connection therewith, Infor shall retain all rights against all non-Debtors and third parties. |
| | | | 2.   Infor requests that the Court order the On-Premise Software Agreement be deemed rejected upon confirmation. | 2.   See above |
| | | | 3.   Infor objects to any use of or access to the Infor Software by or for the benefit of any third party, including without limitation any purchaser of the Debtors' assets, any liquidating trustee or liquidating trust, or any other successor to the Debtors. | 3.   See above |
| | | | 4.   Infor objects to any purported transfer or vesting under the Plan of any rights with respect to Infor's copyrighted Software as a violation of Bankruptcy Code section 365 and federal copyright law. | 4.   See above. |

WEIL:\97631777\5\44362.0005

**<u>Exhibit B</u>**

**California DTSC Plan Releases**

| Issue | California DTSC | Environmental Agencies Outside of California |
|---|---|---|
| Identity of Releasing Parties | All California state governmental agencies, including California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws.<br><br>*See* Amended Plan, § 10.6(f). | The Settling Government Agencies.<br><br>*See* ESA ¶ 45.<br><br>The Amended Plan is being amended to include the following representation for the Settling Government Agencies: |
| Identity of Released Parties | • The Europe/ROW Purchaser<br>• The Transferred Entities<br>• The Consenting Creditors<br>• Trustees<br><br>*See* Amended Plan, § 10.6(f). | • The Debtors<br>• The Europe/ROW Purchaser<br>• The Transferred Entities<br>• The Consenting Creditors<br>• the Trustees<br>• Related Parties<br><br>*See* ESA ¶ 45(a) and (b). |
| Release of Debtors or Debtors' Related Parties | Such releases do not include or extend to the Debtors or their Related Parties.<br><br>*See* Amended Plan, § 10.6. | Covenants not to sue include claims against Debtors' successors, assigns, officers and directors, employees, and trustees, but only to the extent that the alleged liability of such Debtors' Related Party is based solely on its status as and in its capacity as a Debtors' Related Party.<br><br>*See* ESA ¶ 46(a). |

| Related Parties for Consenting Creditors, Trustees, Europe/ROW Purchaser, Transferred Entities, and Trustees | Releases do not extend to Related Parties of the Consenting Creditors, Trustees, Europe/ROW Purchaser, Transferred Entities, and Trustees<br><br>*See* Amended Plan § 10.6(f). | The covenants not to sue the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser, and the Trustees also applies to:<br>a.  their respective successors, assigns, managed accounts or funds, current and former officers and directors, principals, stockholders, members, partners, employees, Specified Affiliates, trustees; and<br>b. Restructuring Professionals, defined as:<br>• Paul, Weiss, Rifkind, Wharton & Garrison, LLP, as counsel to the Consenting Creditors;<br>• Young Conway Stargatt & Taylor, LLP, as Delaware counsel to the Consenting Creditors;<br>• CMD Global Partners, LLC, as financial advisor to the Consenting Creditors;<br>• Arent Fox LLP, as counsel to the Trustees; and<br>• Morris James LLP, as Delaware counsel to the Trustees.<br><br>*See* ESA ¶ 46. |
| Scope of Debtor Releases | None.<br><br>*See* Amended Plan, § 10.6. | Covenant not to file a civil action or take any administrative or other civil action against the Debtors with respect to each of the Included NPPs and certain other Non-Performing Properties.<br><br>Covenant not to file any Environmental NPP Claim against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim.<br><br>*See* ESA ¶ 45. |

2

| Scope of Releases for Consenting Creditors, Trustees, Europe/ROW Purchaser, and Transferred Entities | The Plan provides releases for all Claims and Causes of Action relating to or arising prior to the Effective Date from: <ul><li>The Debtors;</li><li>The Chapter 11 Cases;</li><li>The Europe/ROW Sale Transaction;</li><li>The DIP Facility;</li><li>The European Bridge Notes;</li><li>The Optimization;</li><li>The June 2019 Financing;</li><li>The RSA;</li><li>The Disclosure Statement;</li><li>The Plan (including any Plan Supplement); or</li><li>The business or contractual arrangements between any Debtor and any Released Party;</li></ul> *See* Amended Plan, § 10.6.<br><br>The Amended Plan is being amended to include the following language: "For the avoidance of doubt, the scope of any release by CA in section 10.6(f) of the Amended Plan shall not be construed or deemed to be any broader than the scope of the covenants not to sue set forth in paragraph 45 of the ESA provided by the Settling Government Agencies." | Covenant not to sue or file, pursue, commence, or initiate any civil Claim or civil Cause of Action against the Consenting Creditors, the Transferred Entities, the Europe/ROW Purchaser, or the Trustees, based on or relating to or arising from: <ul><li>The Debtors;</li><li>The Bankruptcy Cases;</li><li>The Europe/ROW Sale Transaction;</li><li>The DIP Facility</li><li>The European Bridge Notes;</li><li>The Optimization;</li><li>The June 2019 Financing;</li><li>The RSA</li><li>The Disclosure Statement;</li><li>The Plan; or</li><li>The Debtors' business;</li></ul> Includes any civil Claim or civil Cause of Action arising under Chapter 5 of the Bankruptcy Code or similar state law under any theory of recharacterization, preference, fraudulent transfer, fraudulent conveyance, equitable subordination or equitable disallowance.<br><br>*See* ESA ¶ 45(b)(i). |
| --- | --- | --- |

3

| Carve Outs Against Consenting Creditors, Transferred Entities, Europe/ROW Purchaser, and Trustees | The Released Parties are not released from any willful misconduct or intentional fraud as determined by a Final Order or any obligation of any party under the Plan or any agreement executed to implement the Plan, the Europe/ROW Sale Transaction, or the Global Settlement.<br><br>*See* Amended Plan, § 10.6. | The ESA is without prejudice to:<br>• Any action based on a failure to meet a requirement of the ESA or the Amended Plan;<br>• Criminal liability;<br><br>*See* ESA ¶ 48(a). |

4

**<u>Exhibit C</u>**

*JRV Group* **Confirmation Hearing Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                  .  Chapter 11
                                  .
IN RE:                            .
                                  .  Case No. 19-11095(CSS)
JRV GROUP USA L.P.,               .
                                  .
                                  .  824 Market Street
                                  .  Wilmington, Delaware 19801
                Debtor.           .
. . . . . . . . . . . . . . . .   .  Friday, June 19, 2020
```

TRANSCRIPT OF TELEPHONIC HEARING RE:   CONFIRMATION
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

```
For the Debtor:              Jeffrey W. Dulberg, Esq.
                             Robert M. Saunders, Esq.
                             Colin R. Robinson, Esq.
                             PACHULSKI, STANG, ZIEHL
                              & JONES, LLP


For the U.S. Trustee:        Linda J. Casey, Esq.
                             OFFICE OF THE U.S. TRUSTEE


For the Official Committee
of Unsecured Creditors:      Ericka Johnson, Esq.
                             Matthew P. Ward, Esq.
                             WOMBLE BOND DICKINSON US, LLP




(Appearances Continued)




Audio Operator:              Electronically Recorded
                             by CourtSmart
                             and Leslie Murin, ECRO


Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA TELEPHONE:   (Continued)

For Corner Flag, LLC:        Paul Heath, Esq.
                             Zachary Shapiro, Esq.
                             RICHARDS, LAYTON & FINGER, PA

                             Alexander Gerten, Esq.
                             CRAVATH, SWAINE & MOORE, LLP

                             Annerose Tashiro, Esq.
                             SCHULTZE & BRAUN

For RV World, Inc.:          Matthew B. Harvey, Esq.
                             MORRIS, NICHOLS, ARSHT
                              & TUNNELL, LLP

For the U.S.A.               Ellen W. Slights, Esq.
                             U.S. DEPARTMENT OF JUSTICE

Also Appearing:              Andrew De Camara
                             SHERWOOD PARTNERS, INC.

                             Henry Cruz
                             AMERICAN FASTBACKS

                             James Gansman
                             Michael Hayes
                             ROCK CREEK PARTNERS, LLC

                             Mark Gottlieb
                             BXV PARTNERS
```

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 364 of 401 PageID #: 8597
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 4 of 33

3

<u>INDEX</u>

| | Page |
|---|---|
| PRESENTMENT/ARGUMENT BY MR. ROBINSON | 5 |
| Gerzeny Settlement | 6 |
| Objection of the United States | 15 |
| Objections of the United States Trustee | 16 |
| COMMENTS BY MR. WARD | 25 |
| COMMENTS BY MR. HARVEY | 28 |
| COURT DECISION | 28 |

| EXHIBIT | IDENT. | EVID. |
|---|---|---|
| Kahn Declaration | | 15 |
| Cruz Declaration | | 15 |
| Kaltenmark Declaration | | 15 |
| Gansman Declaration | | 15 |
| De Camara Declaration | | 15 |
| Daniels Declaration | | 15 |

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 365 of 401 PageID #: 8598
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 5 of 33

4

1          (Proceedings commence at 10:05 a.m.)

2               THE COURT:  Good morning, everybody.  This is Judge

3     Sontchi.  We are here in the JRV Group case, 19-11095.

4               We are obviously proceeding remotely, which means

5     that all audio is through CourtCall.  There is no audio

6     through Zoom.  If you want to be heard or hear what's going

7     on, you need to be on CourtCall.

8               Also, with CourtCall, it's always very important to

9     please mute your phones, unless you are speaking.  That's

10    particularly true if you're on a cell phone, a speaker phone,

11    or even ear buds.  We get a lot of background noise.  And

12    identify yourself as often as possible.  And I am actually

13    getting some background noise right now, so there may be

14    someone who has not muted his or her phone.

15              Thank you for appearing by Zoom.  That's very

16    helpful for the Court, especially if we have any dialogue as

17    to substance.  But again, no video -- or excuse me-- no audio

18    on Zoom; it's only video.

19              I don't anticipate any problems, but if there are

20    any disruptions with Zoom bombers, et cetera, we have some

21    strategies in place to deal with that.  That's, for example,

22    why you were in the -- excuse me.  That, for example, is why

23    you were in the waiting room to utilize that to take care of

24    people who are disrupting the matter.  If worse comes to

25    worst, and I can't get it under control, we will simply

1    terminate the Zoom portion of the call and continue on

2    CourtCall.

3         Just so everyone knows, also, because of security,

4    I will not be admitting anyone to Zoom after the first ten

5    minutes of the hearing.  If you fall off for any reason and I

6    recognize your name -- which I probably will, since there's a

7    few -- not that many of you on the phone today or on Zoom

8    today -- I will let you back in.  But if any new people show

9    up or anybody with a strange ID, they will not be admitted

10   after the first ten minutes of the call.

11        So those are the dos and don'ts.  I'll turn it over

12   to the debtor.

13        MR. ROBINSON:  Good morning, Your Honor.  Colin

14   Robinson, Pachulski, Stang, Ziehl & Jones, on behalf of JRV

15   Group, the debtor.

16        Your Honor, I'm joined today by my colleagues Jeff

17   Dulberg, Rob Saunders, and Steve Kahn.  Also with us is

18   Andrew De Camara, the CRO of the debtor.  And Your Honor, we

19   have co-counsel from Barnes & Thornburg, Mr. Kaltenmark, and

20   Mr. Cruz, also with the debtor.

21        Your Honor, we really just have one item on the

22   agenda today, that's confirmation of the joint plan of

23   liquidation filed by the debtor and the committee.  Just from

24   the standpoint of the agenda, Your Honor, we resolved all

25   objections, minus a couple open issues with Ms. Casey's

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 367 of 401 PageID #: 8600
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 7 of 33

6

1    office.  We resolved the objections with language in the

2    order with the United States with Ms. Slights.  And what I'll

3    call the "Gerzeny objection" has also been resolved.  I'm

4    going to have some bullet points to read into the record in a

5    little bit.

6              So, unless Your Honor has any questions --

7              THE COURT:  I don't know what -- the what

8    objection?

9              MR. ROBINSON:  I'm sorry, Your Honor.

10             THE COURT:  What are you calling it?

11             MR. ROBINSON:  Gerzeny --

12             THE COURT:  I don't see that on the agenda.  Are

13   you talking about RV World?

14             MR. ROBINSON:  Yeah, sorry.  RV World, yes, RV

15   World.

16             THE COURT:  Okay.

17             MR. ROBINSON:  We've resolved the RV World

18   objection and we'll have some -- a settlement to provide on

19   the record to Your Honor that will then be documented down

20   the road.

21             THE COURT:  So I assume that also -- I assume that

22   also resolves their motion?

23             MR. ROBINSON:  Yes, their motion and the objection

24   --

25             THE COURT:  For their claims.

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 368 of 401 PageID #: 8601
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 8 of 33

7

1          MR. ROBINSON:  -- the objection -- correct, Your

2     Honor, yes.  Yes.

3          THE COURT:  Okay.

4          MR. ROBINSON:  It resolves -- and frankly, a

5     pending adversary proceeding, as well.

6          THE COURT:  Okay.

7          MR. ROBINSON:  Okay.  So, Your Honor, for good

8     reason, we haven't been before Your Honor on this case for a

9     long time.  I think I looked back and we -- it may have been

10    September of last year for the sale hearing.  And we're

11    before you today for good reason, and we've been working hard

12    behind the scenes to get to a consensual confirmed joint plan

13    of liquidation between the committee and the debtor's secured

14    lender.

15         The plan was the result of a global settlement that

16    we brought before Your Honor back in November of last year

17    and which was approved.  And following that, all the parties

18    worked hard to come up with a joint plan of liquidation.

19         And as Your Honor may recall how this case started

20    out, the number one reason for this -- filing this case was

21    safety.  The asset at issue was -- is the debtor's outfitted

22    Jeeps, which ran into some NHTSA issues, in terms of the

23    weight.  And the owners of the company wanted to address

24    those safety issues through the Chapter 11 process.  And when

25    the case initially started, the idea was Chapter 11 was going

1    to be used to dismantle these Jeeps, get them off the road,

2    sell the parts.

3         And then we had a fortuitous turn of events, we had

4    a committee appointed.  And we were able to move and pivot to

5    a sale process, a very successful sale process that brought

6    in a significant amount of proceeds into the estate that

7    initially hadn't been thought that we would be able to get.

8    And those proceeds, thanks to the cooperation and consents --

9    consensus with the committee and the DIP lender, led to the

10   global settlement, so that we were able to provide for a

11   return to general unsecured creditors, and at the same time

12   able to accomplish the ultimate goal, which was to remove the

13   Jeeps off the road and get them to a purchaser that was able

14   to kind refit them, so they're safe.  And we've accomplished

15   that, and that's why we're before Your Honor today.  And it

16   really -- I can't stress enough, it really was a cooperative

17   effort between the committee, the debtor, and the debtors'

18   lenders.

19        So, Your Honor, with that, the first thing I wanted

20   to do was actually read into the record the proposed

21   settlement with Gerzeny -- if you don't mind, we can just

22   call them "Gerzeny" -- to start that off, Your Honor.

23        THE COURT:  Okay.  And for the record, Gerzeny is

24   G-e-r-z-e-n-y, for the transcript.

25        You may.

1          MR. ROBINSON:   Thank you, Your Honor.

2          And I believe, Your Honor, Mr. Harvey, their

3     counsel, is on the phone, so ...

4          Your Honor, the debtors and the creditors'

5     committee have agreed to a settlement with RV World of

6     Nokomis, a/k/a Gerzeny, under which Gerzeny has agreed to

7     drop its objection for the combined plan and disclosure

8     statement, and the releases it contains and under which the

9     debtor will propose -- drop its opposition to the allowance

10    of Gerzeny's claim for voting purposes.

11         To reach this settlement, the debtors agree to make

12    a cash payment of $32,500 to Gerzeny on the effective date of

13    the plan, to dismiss with prejudice the adversary proceeding

14    that it's brought against Gerzeny, and provide Gerzeny the

15    release of certain claims related to modified Jeeps that have

16    been sold, consigned, or delivered to Gerzeny, including any

17    claims for turnover.

18         Under the settlement, Gerzeny shall be permitted to

19    sell the three modified Jeeps that are still in its

20    possession, subject to the obligation to remediate those

21    vehicles to comply with NHTSA -- N-H-T-S-A -- regulations and

22    to indemnify the secured lenders and their owners,

23    affiliates, and certain of their personnel in connection with

24    any damages such parties suffer in connection with Gerzeny

25    sales of these vehicles, including reasonable legal fees up

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 371 of 401 PageID #: 8604
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 11 of 33

10

1    to a cap of $150,000.

2           Additionally Gerzeny shall retain its unsecured

3    claim as reduced by the thirty-two-thousand-five-hundred-

4    dollar cash payment it shall receive and any further

5    mitigation of its claim it undertakes.  However, it shall

6    waive the first $8,125 of recovery it would otherwise be

7    entitled to receive in respect of its unsecured claim.

8           Memorialization of this settlement shall be

9    submitted to the Court, and the parties thereto shall submit

10   an order to the Court under certification of counsel

11   approving the settlement.  And that concludes the recitation

12   of the proposed -- of the settlement, Your Honor.

13          THE COURT:  Mr. Harvey, any comment?

14          MR. HARVEY:  Your Honor, just I wanted to echo

15   that, you know, that generally that was a correct recitation.

16   It remains subject to documentation, particularly where we're

17   going to engage in good faith negotiations here over the

18   scope of the releases being provided under the settlement

19   agreement.

20          THE COURT:  Thank you.

21          Mr. Ward, any comment?

22          MR. WARD:  Thanks, Your Honor.  We do want to speak

23   generally in favor of the plan, but no comments with respect

24   to the Gerzeny settlement.

25          THE COURT:  Okay.  Very good.  Thank you.

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 372 of 401 PageID #: 8605
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 12 of 33

11

 1              Anyone else on the Gerzeny issues?

 2          (No verbal response)

 3              THE COURT:  All right.  Thank you, Mr. Robinson.

 4      You may continue.

 5              MR. ROBINSON:  Thank you, Your Honor.  Your Honor,

 6      if you may recall, Ms. Slights' office filed an objection on

 7      behalf of the U.S. Government.  We have resolved that

 8      objection.  We worked out agreed language with Ms. Slights

 9      that is part of the revised confirmation order; I believe

10      it's Paragraph 39.  And I don't see Ms. Slights on the Zoom,

11      I don't know if she's on the phone.  But I can report we are

12      resolved with Ms. Slights.

13              MS. SLIGHTS:  Yes, Your Honor.  This is Ellen

14      Slights representing the IRS.  And Mr. Robinson is correct,

15      the language that we've negotiated does resolve the

16      objection.

17              THE COURT:  All right.  Very good.  It's nice to

18      hear your voice.

19              MS. SLIGHTS:  Thank you.

20              THE COURT:  That's good to hear, that you were able

21      to resolve.

22              MS. SLIGHTS:  Thanks.

23              MR. ROBINSON:  And Your Honor, I'd be remiss if we

24      -- Ms. Johnson and I worked with Ms. Slights to get there,

25      and we do appreciate her cooperation and she was quite

12

1     responsive, so we're grateful for that, as always.

2              Your Honor, that just leaves the United States

3     Trustee's objections, which we've resolved the vast majority

4     of, and there's just a couple of issues.  Before I got there,

5     I just wanted to take care of the housekeeping in terms of

6     the declarations for admission.

7              THE COURT:  Okay.

8              MR. ROBINSON:  Okay.  Your Honor, initially, in

9     response to the United States' objection, we filed three

10    declarations that they're now moot, but I'd still like to

11    move them in evidence.  The first is the declaration of

12    Steven Kahn, that's at Docket Number 432.

13             THE COURT:  Uh-huh.

14             MR. ROBINSON:  Do you want to do them all together,

15    Your Honor, or one at a time?

16             THE COURT:  Yeah, let's do them all together.

17             MR. ROBINSON:  Okay.  Thank you, Your Honor.

18             The second is the declaration of Mr. Henry Cruz,

19    that is at Docket Number 433.  The third is the declaration

20    of Randy J. Kaltenmark at Docket 434.  In support of -- those

21    were addressing the I-R -- or the U.S. objection, Your Honor.

22             Your Honor, in terms of confirmation, we have the

23    declaration from James Gansman of Rock Creek Advisors, the

24    committee's financial advisor; that's at Docket 435.

25             THE COURT:  Okay.

1          MR. ROBINSON:  Your Honor, there's also the

2     declaration of the debtors' CRO, Andrew De Camara, at Docket

3     436.

4          THE COURT:  Okay.

5          MR. ROBINSON:  And Your Honor, I want to --

6     numerically, out of order, but last, but not least, is the

7     declaration of our -- Mr. Brad Daniels, our balloting agent,

8     with BMC, and that's at Docket Number 430.

9          THE COURT:  Okay.  I think I see Mr. Kahn and Mr.

10    Cruz.  I'm not sure if I see Mr. Kaltenmark.  There he is, I

11    see Mr. Kaltenmark.  And Mr. Gansman, I think I saw you, as

12    well.  Is Mr. Gansman on the video?

13         MR. GANSMAN:  Your Honor, I am -- I'm on CourtCall;

14    I could not get in through Zoom.

15         THE COURT:  Okay.  I'm sorry to hear that, I

16    apologize.  That may have been on our side.

17         And do we have the balloting agent on the phone?

18       (No verbal response)

19         THE COURT:  Mr. Robinson?

20         MR. ROBINSON:  I understood he was, Your Honor.  I

21    don't hear him.

22         THE COURT:  You might be on mute, sir, if you're --

23    if I'm not hearing you.

24         THE OPERATOR:  And Your Honor, this is CourtCall.

25    I do show Mr. Robinson connected with a live line.

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 375 of 401 PageID #: 8608
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 15 of 33

14

1          (Pause in proceedings)

2                  THE OPERATOR:  Would you like me to check his line,

3     Your Honor?

4                  THE COURT:  Well, I have Colin Robinson on my list.

5     Is the -- what's the name of the balloting agent, Mr.

6     Robinson?

7                  MR. ROBINSON:  Brad Daniel with BMC, Your Honor.

8                  THE COURT:  Do you have a Brad Daniel, Cynthia?

9                  THE OPERATOR:  I do not, Your Honor.

10                  THE COURT:  Okay.

11                  MR. ROBINSON:  Your Honor, we'll --

12                  THE COURT:  All right.

13                  MR. ROBINSON:  Sorry, Your Honor.

14                  THE COURT:  Well, that's okay.  It's just the

15    balloting agent.  So, Ms. Casey, do you have any -- since you

16    have the only pending objection, do you have any objection to

17    the Court allowing the balloting agent's declaration, even

18    though he is not present for cross-examination?

19                  MS. CASEY:  No objection, Your Honor.

20                  THE COURT:  Okay.  All right.  Well, we'll allow

21    that.

22          Any objection to the admission of any of the

23    declarations that were just identified on the record?

24          (No verbal response)

25                  THE COURT:  Okay.  I hear none.  They're admitted

1    without objection.

2          (Kahn Declaration received in evidence)

3          (Cruz Declaration received in evidence)

4          (Kaltenmark Declaration received in evidence)

5          (Gansman Declaration received in evidence)

6          (De Camara Declaration received in evidence)

7          (Daniels Declaration received in evidence)

8          THE COURT:  Does anyone wish to cross-examine any

9    of the witnesses, other than the balloting agent, who's not

10   here?

11         (No verbal response)

12         THE COURT:  Okay.  I don't hear any; I have no

13   questions, so that takes care of that.

14         Should we turn to Ms. Casey's objection?

15         MR. ROBINSON:  Yes, Your Honor.  I'll let -- I'll

16   turn it over to Ms. Casey.  I -- and she'll correct me if I'm

17   wrong.  I believe the remaining issues as to Ms. Casey's

18   objection have to do with the proposed third-party release in

19   the plan and the objection as to that there's a de facto

20   discharge being provided under the plan.  And I'll let Ms.

21   Casey set out her position, and if -- and I'll just respond,

22   Your Honor.

23         THE COURT:  That's fine.

24         Ms. Casey, you may proceed.

25         MS. CASEY:  Good morning, Your Honor.  Linda Casey

16

1    on behalf of the United States Trustee.

2          Your Honor, we -- that is the two remaining issues.

3    The first issue is that the debtor here is a liquidating

4    corporate entity as an LLC and is not entitled to a discharge

5    under the Bankruptcy Code.  While the plan itself doesn't

6    provide the express word "discharge," it does include

7    provisions that would result in the equivalent of a

8    discharge.

9          First and primarily would be Section 17.3, which

10   provides that the payments under the plan are in full

11   satisfaction of all of the claims and interests of the

12   debtors.  And then you also add the releases, both the

13   express releases and the third-party releases that release

14   all claims against the debtors, and the injunction that

15   enjoins those released claims and the claims that are

16   satisfied.  And what you end up with a debtor who is not

17   entitled to a discharge, having no claims that are not being

18   paid through the plan enforceable against the debtor, which

19   is the functional equivalent of a discharge.

20         The plan payments are not, in fact, in settlement

21   of the claims.  They may be in settlement of the obligations

22   under the plan to make disbursements, but they are not in

23   settlement of the underlying claims.  Creditors here are not

24   receiving full payment, creditors here are not consenting to

25   a reduction of their claims.  They are consulting solely to -

1       - or those who have voted for it have voted to accept a plan

2       that is providing treatment that is less than full payment.

3       But they are not, in fact -- there is no accord in

4       satisfaction or agreement that the plan distribution somehow

5       reduces their claim and discharges the remaining portion of

6       it.

7               So, individually and combined, these provisions,

8       the releases, the injunctions, and 17.3 that says that the

9       plan payments are in satisfaction of the claim all work to

10      provide that no entity can continue to enforce a claim

11      against the debtors.  And in fact, that would be the

12      functional equivalent of a discharge, which is not

13      permissible.

14              Certainly, there's nothing in the plan -- our

15      objection is not to say that the injunction cannot protect

16      the estate or the liquidating trust from claims, but the --

17      their corporate entity is not entitled to a discharge.  And

18      therefore, as to the debtor, these provisions are

19      inappropriate.

20              We also object to the third-party releases.  Your

21      Honor is very familiar with our arguments, we have made them

22      before, so I'll be very brief.  But in this plan, you have

23      unimpaired creditors and fully impaired creditors have to

24      file an objection to opt out of the releases.  And creditors

25      in voting classes have to either reject the plan and mark off

1    that they are opting out; or, if they do not wish to vote, so

2    they're abstaining creditors, opt out.  And it is the U.S.

3    Trustee's position and has been in these cases that the

4    consent cannot be deemed from non-action.  You actually have

5    to take an affirmative action to indicate that you are

6    consenting to a claim.  And we object to deeming consent

7    where we don't have an affirmative action.

8              Again, we've made this argument before, so I'm

9    willing to truncate my oral argument on that point.  If Your

10   Honor doesn't have any questions, that's our objection.

11             THE COURT:  Thank you very much.  I appreciate it.

12   No, no questions.

13             Mr. Robinson --

14             MS. CASEY:  Thank you.

15             THE COURT:  -- do you wish to be heard?

16             MR. ROBINSON:  Yes, Your Honor, just briefly.  I

17   will note -- and I should have said this at the beginning,

18   Your Honor -- we did appreciate -- Ms. Casey did give us

19   several comments in the run-up to here that we were able to

20   work through, so we're just happy to have these two remaining

21   issues today.  We appreciated her efforts on that.

22             Your Honor, I'll take the second one -- I'll take

23   the second one, first, in terms of the release.  Your Honor,

24   we think this Court is (indiscernible) the type of third-

25   party releases that are being sought here today are

1    appropriate.  We provided the appropriate notice, in terms of

2    the balance and the opt-in/opt-out and the notice to the

3    parties.

4               Your Honor, as set forth in the declaration, both

5    from Mr. De Camara and Mr. Gansman, these releases are an

6    integral part of the plan.  They're something that were

7    bargained for in good faith amongst all the parties and the

8    debtor is seeking the releases.  And the released parties

9    made significant -- or they're the crux of the case,

10   contributions to get here to, not only the global settlement,

11   the committee settlement that we got approved in November,

12   but also the combined plan and disclosure statement.  The

13   debtor doesn't believe there's any material claims that were

14   worth pursuing or retaining, and that's why the debtor

15   supports the release.

16              And then all of the parties-in-interest are going

17   to benefit from these transactions.  Again, without the

18   cooperation of all the parties seeking the third-party

19   release, we wouldn't be here today with a plan that provides

20   a distribution to general unsecured creditors.  And we think

21   it's fair and reasonable.  And Your Honor, I'll just -- from

22   a voting perspective, all three voting classes approved the

23   plan.

24              On the discharge part of it, Your Honor, I think

25   that -- I understand Ms. Casey's point.  But I think, when

20

1    you -- we're not asking for a discharge, there's no specific

2    language.  And what's being asked for, in terms of the

3    releases for the debtor, the third-party releases, is

4    reasonable.  And the claims are being released, but that's

5    part of the negotiation and agreement of a plan.  And I'm a

6    little -- it's -- that's really all I have to say about that,

7    just --

8              THE COURT:  Okay.  Sorry, I forgot to un-mute my

9    phone.

10             Anyone else wish to heard?

11             MR. WARD:  Your Honor, at some point, the committee

12   would like to speak in favor of the plan, at the appropriate

13   time.

14             THE COURT:  No comment on the specific objection of

15   Ms. Casey, though?

16             MR. WARD:  And with respect to Ms. Casey's

17   objections, yes, we also have a couple of observations, Your

18   Honor.

19             THE COURT:  All right.  Well, let's hear them.

20             MR. WARD:  First, Your Honor, it's -- we think that

21   the releases were consensual.  As Your Honor knows, the

22   determination of whether a third-party release is consensual

23   is (indiscernible) circumstances of each case.  And we cited

24   a number of cases in our brief that talk about affirmative

25   consent; in other words, opting into a third-party release is

1    not required in order for it to be consensual.  Here, all of

2    the creditors had the opportunity to opt out of the release,

3    either through checking the box or objecting to the plan.

4    There as no death trap in the plan, you know, for failure to

5    agree to the release.  It didn't impact their recoveries.

6              And I would just point Your Honor to the

7    Indianapolis Downs cases, as well as Your Honor's Molycorp

8    case, which we cited in our brief, for the proposition that a

9    third-party release is consensual against even abstaining

10   parties, so long as they have the opportunity to opt out and

11   fail to do so.

12             And that's what we had here, Your Honor.  We had

13   two classes, Classes 7 and 8, which were deemed to reject the

14   plan, but they were given the option to opt out, Your Honor.

15   And just with respect to the circumstances of this particular

16   case, as you drill down on those classes, those fully

17   impaired creditors are all affiliates or controlled by Corner

18   Flag, the DIP lender.  So there's really no prejudice to

19   those two classes.

20             Corner Flag -- and I'll talk about this in closing,

21   as we talk about the plan as a whole -- was instrumental in

22   getting us to this deal.  And it's also a beneficiary of the

23   third-party releases.  But you know, as I'll explain, it is

24   deferring payment even on its DIP, in order to get us to this

25   plan.

1            So, if you look at Class 7, Class 7 was

2    intercompany claims.  That consists of the claims held by

3    EHG&A, that's the Canada affiliate, which, as we noted in our

4    brief, that's owned by Corner Flag.  And Class 8 is -- that

5    consists of the equity interests, the ownership of the

6    debtor.  That was 1 percent ownership held by JRV Group USA

7    Management Corp., and 99 percent held by JRV Group Holding

8    USA, LP.  Both of those entities are also directly or

9    indirectly owned by Corner Flag.

10           So deeming to reject didn't cause anybody any

11   prejudice with respect to Classes 7 and 8.  And again, all of

12   the creditors were given the option to opt out under the

13   plan.  And under those circumstances, coupled with Corner

14   Flag's support of the plan, we think that the releases are

15   consensual and the plan should be approved.

16           THE COURT:  All right.  Thank you.

17           Anyone else before I rule?

18       (No verbal response)

19           THE COURT:  Okay.  Well, we'll take the second

20   point first.  And as Ms. Casey acknowledges, I've ruled on

21   this on numerous occasions, and they continue to raise it,

22   which is fine.  I understand their position, and certainly

23   reasonable minds can disagree, and you never know when I'm

24   going to change my mind.  So keep plugging away.

25           But I noticed some inconsistency on the Court with

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 384 of 401 PageID #: 8617
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 24 of 33

23

1   regard to this, but I do view a -- I do view giving people a

2   release that then goes out on reasonable notice that says, if

3   you don't want to give it, you have to either opt out, vote

4   no, et cetera, is constructive consent.  And I think these

5   releases are consensual.  People have been given reasonable

6   notice, consistent with due process; an opportunity to object

7   or opt out, they've chosen not to do so.  I believe that's

8   constructive consent.  So I'll overrule that objection.

9          With regard to the de facto discharge point, that's

10  an interesting point and very creative.  Clearly, they're not

11  entitled to a discharge under 1141 -- I believe is the magic

12  number, but I may be wrong -- and there is no discharge here

13  under that provision.  However, there are independent

14  provisions that, when taken in concert, arguably provide for

15  a de facto discharge.  And now Ms. Casey went through that

16  very well and clearly, and I think it's a fair point.  I

17  think it's a fair point to say that there is a de facto

18  discharge here.

19         But the important point is that all three

20  provisions that she discussed stand, I believe, on their own

21  as appropriate and authorized by the Code.  So, if you have

22  three independent factors, all of which are appropriate, all

23  of which are supported by the evidence, and all of which are

24  authorized under the Code, and the de facto effect is that

25  they give a de facto discharge, I really don't think that

1    undoes what you were otherwise allowed to do.  That may be

2    the de facto effect.

3           But we often, in the law, have sort of knock-on

4    effects like this, where we have authorized activities that

5    might have a knock-on effect of providing some de facto

6    relief, especially when done in combination with other

7    factors, other elements, that you wouldn't otherwise be

8    authorized to get.  So I'm not saying it's not a good point,

9    but my belief in ruling is that the fact that the elements

10   that result in the de factor discharge are all appropriate,

11   supported by the evidence, supported by the law, supported by

12   the Code, and the fact that, when you combine and you end up

13   with a de facto discharge -- which you obviously can't have a

14   per se discharge in the plan -- I think is of no moment.  So

15   I am going to overrule that objection, as well.

16           Now no more objections, Mr. Robinson?

17           MR. ROBINSON:  No, Your Honor, no -- there are no -

18   -

19           THE COURT:  Okay.

20           MR. ROBINSON:  -- remaining objections.

21           THE COURT:  I got the revised order right before

22   the hearing.

23           MR. ROBINSON:  I apologize, Your Honor.

24           THE COURT:  That's okay, that happens.

25           And it looks like what was printed out,

1    unfortunately for me, was the clean and not the blackline.

2    So, before we turn to the order, is there anything anyone

3    would like to say in connection with confirmation?  I guess

4    this is your chance, Mr. Ward --

5                MR. WARD:  Your Honor --

6                THE COURT:  -- to make the speak you want to make.

7                MR. WARD:  Well, Your Honor, I do want to echo Mr.

8    Robinson's comments at the beginning of the case, that -- and

9    just reiterate how collaboratively the parties worked

10   together here.  Your Honor may recall, on day one of the

11   case, the debtors told the Court that this case was doomed

12   for conversion to Chapter 7.  And really, Your Honor, at the

13   time, the future of this case did look pretty bleak because

14   the biggest asset, really the only asset of the debtors, were

15   these vehicles that were overweight and they were unable to

16   be sold.

17               So, recognizing that safety was the main concern of

18   all the parties, at that point, what the debtor proposed to

19   do was simply disassemble the Jeeps and sell off the parts

20   and convert the case to Chapter 7.  And in one of our

21   preliminary meetings with the debtor's professionals, the

22   committee suggested -- really, it was the committee's

23   financial advisor, Jim Gansman at Rock Creek Advisors, who

24   suggested that we disassemble a limited number of the Jeeps

25   and compare the price that we would get through that

1    disassembly with the price that we could get through

2    modifying the Jeeps, in order to make them compliant with

3    NHTSA, so that they could be sold.  So the debtors agreed

4    with that approach, that was a big concession on the debtor's

5    part, and that was documented in the Court's first sale

6    order.

7              So the parties ultimately determined that that was,

8    in fact, the better approach to maximize value, while also

9    maintaining safety.  So we, as the creditors' committee, we

10   worked with the debtors to consummate a sale for all of the

11   Jeeps in a way that complied with NHTSA and continued to

12   ensure safety.  And in that respect, it was extremely

13   helpful, Your Honor, to have one of our committee members,

14   Deaver Motors, which is a car dealer and was intimately

15   familiar with selling vehicles, and especially with the NHTSA

16   regulations.

17             Concurrent with the sales, Your Honor, the

18   committee also worked with the debtors to negotiate with

19   Corner Flag to allocate sufficient funds to allow us -- to

20   allow the debtor to operate during the sale process, and then

21   eventually to cover administrative and priority claims

22   necessary to allow a plan to be confirmed, as well as

23   additional professional fees that would arise because this

24   case was going to be prolonged, in order to get to

25   confirmation.  And I'll just say, Your Honor, after intense

1    negotiations by all the parties -- and that included in-

2    person meetings, both in Delaware, as well as in New York --

3    we were able to get to that resolution.  And after that

4    settlement, the committee's professionals, especially my

5    partner Ericka Johnson -- who is on the video call -- took

6    the laboring oar on preparing a joint plan and a disclosure

7    statement that's before Your Honor.

8          I want to emphasize, Your Honor, that the plan

9    calls for significant concessions by Corner Flag, including

10   deferring even amounts that are payable to Corner Flag under

11   the DIP.  And that would be to cover operating costs to get

12   us to where we are today, as well as administrative costs,

13   administrative expenses, priority claims, professional fees,

14   and even a carveout for general unsecured creditors.  It also

15   allows for the establishment of a litigation trust to pursue

16   what we believe to be valuable causes of action.

17         Your Honor, none of this would have been possible

18   without Corner Flag's support and the collaborative effort of

19   all of the professionals.  So this really is, truly, a good

20   result for everybody.  Value was maximized, safety was

21   ensured, and all constituents get a recovery.  And that just

22   simply wouldn't have been possible without everybody working

23   together.

24         THE COURT:  Thank you very much.

25         Anyone else?

1          MR. HARVEY:  Your Honor, this is Matthew Harvey

2     from Morris, Nichols, Arsht & Tunnell, on behalf of Gerzeny's

3     RV World.

4          I neglected to say earlier my comments that, you

5     know, obviously, this is a confirmation hearing, and we had

6     an objection to confirmation; we had a voting objection.  Our

7     settlement is not yet fully documented.  I think the terms

8     read in were consistent with it.  The issue we're dealing

9     with is the scope and extent of the release and I think we'll

10    get there.  I just wanted to note that, to the extent we

11    don't get there, I'm -- my client's rights regarding its

12    claim and the priority of its claim that we asserted in our

13    papers are reserved.  That's all I have, Your Honor.  Thank

14    you.

15          THE COURT:  Do you need to make any changes to the

16    confirmation order, Mr. Harvey?

17          MR. HARVEY:  I have not reviewed the latest

18    confirmation order that came through this morning, Your

19    Honor.

20          THE COURT:  Okay.  Anyone else?

21      (No verbal response)

22          THE COURT:  All right.  So let's do this.  I'm

23    going to confirm the plan.  I'm going to approve the

24    disclosure statement.  Obviously, all the 1129 factors have

25    been met.  There was adequate information under 1125.  All

1    objections are either resolved or overruled.

2            What I would propose, Mr. Robinson, is that you

3    touch base with Mr. Harvey and anyone else on the latest form

4    of order that you submitted this morning and I have not read

5    because we literally got it minutes before the hearing.   I

6    will read that, as well.   But after you have had a discussion

7    with everybody, if you could submit the proposed order under

8    certification of counsel with a blackline and upload the

9    clean.   And assuming everybody is on board with the order and

10   I have -- don't have any problems with it, I'll get it signed

11   as soon as possible.   If there are any issues, I'll let you

12   know.   And if anybody has any issues, I'll either deal with

13   it or we might have to have a call, but I doubt that will be

14   the case.   Is that acceptable?

15           MR. ROBINSON:   Yes, that is, Your Honor.   Yes, Your

16   Honor, that is, and we'll follow that instruction.

17           THE COURT:   Okay.

18           MR. ROBINSON:   And Your Honor, just for the record,

19   Mr. Daniel did join.   I apologize.   I think I might have

20   crossed him up on the new start time of the hearing, so he

21   did join the hearing and --

22           THE COURT:   Okay.

23           MR. ROBINSON:   So just to let you know that.

24           THE COURT:   So -- well, we won't cross-examine him

25   now and publish him for being late.

1        (Laughter)

2                THE COURT:  All right.  And thank you -- well, that

3    was my request --

4                MR. ROBINSON:  No problem.

5                THE COURT:  -- to move the hearing, so I appreciate

6    everyone's flexibility.  There's a -- as you can tell,

7    probably, I'm -- this is not what my house looks like, I'm in

8    court.  I find it much more useful to be in chambers.  So

9    there are some protests planned outside the courthouse this

10   afternoon, so I wanted to get everything done, if at all

11   possible, and allow everyone to get home prior to that, just

12   as -- not that I expect anything to happen, but you know, you

13   need to be cautious.  So I appreciate you agreeing to the

14   continuance -- or excuse me -- to the earlier time frame.

15               So I'll just await the order.  It probably won't

16   get done this afternoon.  Like I said, we're going to be out

17   of chambers, but we'll certainly get it done either over the

18   weekend or first thing Monday, depending on when you submit

19   it.  Okay?

20               MR. ROBINSON:  Thank you, Your Honor.

21               THE COURT:  All right.  Well, I'm glad --

22               MR. ROBINSON:  We appreciate you taking the time

23   today.

24               THE COURT:  I'm certainly glad this case worked out

25   so well, to say the least.  It did not look so good when it

Case 1:20-cv-01402-RGA   Document 48-1   Filed 12/23/20   Page 392 of 401 PageID #: 8625
Case 20-11157-CSS   Doc 942-3   Filed 10/12/20   Page 32 of 33

31

1    came in.  As a former Jeep owner and somewhat of a Jeep

2    enthusiast, I'm glad these cars are -- these SUV/cars are

3    still on the road.  I'm tempted to buy one, but I think that

4    would be inappropriate.  And I would certainly have trouble

5    with the Missus if I came home with yet another --

6          (Recorded proceedings concluded at 10:41 a.m.)

7                            *****

32

1                              <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct

3       transcript from the electronic sound recording of the

4       proceedings in the above-entitled matter to the best of my

5       knowledge and ability.

6

7

8

9

10

11       _____        June 23, 2020

12       Coleen Rand, AAERT Cert. No. 341

13       Certified Court Transcriptionist

14       For Reliable

# **<u>TAB 19</u>**

**Declaration of Roy Messing in Support of Abandonment of the
Vernon Non-Performing Property Pursuant to the Amended Plan,
dated October 13, 2020 [Bankr. D.I. 950] \*excluding exhibits**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------- x
                        :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **EXIDE HOLDINGS, INC.,** *et al.*, | : | **Case No. 20–11157 (CSS)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------- x

### DECLARATION OF ROY MESSING IN SUPPORT OF ABANDONMENT OF THE VERNON NON-PERFORMING PROPERTY PURSUANT TO THE AMENDED PLAN

I, Roy Messing, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.    I am the Chief Restructuring Officer of Exide Holdings, Inc. ("**Holdings**") and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with their non-Debtor affiliates, "**Exide**," or the "**Company**"). I am also a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**"), the Debtors' financial advisors.

2.    I submit this declaration (the "**Declaration**") in support of abandonment of the Vernon Non-Performing Property (the "**Vernon NPP**") pursuant to the *Third Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* (as may be amended, modified, supplemented, or restated, the "**Amended Plan**").[2] I have separately submitted a declaration, filed

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Disclosure Statement, the Confirmation Brief, or the Abandonment Brief, filed contemporaneously herewith, as applicable.

contemporaneously herewith, in support of confirmation of the Amended Plan including the Amended Plan Supplement, dated September 12, 2020 (ECF No. 821) and the Second Plan Supplement filed September 12, 2020 (Docket No. 825) (as may be further amended, modified, restated, or supplemented, the "**Plan Supplements**").

3.       In my capacity as CRO, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.  For a further discussion of my credentials, see the *Declaration of Roy Messing Pursuant In Support of Debtors' Chapter 11 Petitions and First Day Relief* dated May 19, 2020 (ECF No. 14) (the "**First Day Declaration**").

4.       Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and other information, including relevant historical records, as part of my duties and responsibilities as CRO for the Debtors, or my opinion based upon my familiarity with the Debtors' business, operations, and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## <u>HISTORY OF THE VERNON NPP</u>

9.       The Vernon NPP is a former lead-acid battery recycling facility located at 2700 South Indiana Street, Vernon, California, which I understand originally commenced operations in 1922, and was modernized and expanded in 1982.

10.      In 1981, pursuant to the Resource Conservation and Recovery Act ("**RCRA**"), the facility was granted "interim status," allowing for continued operations pending the DTSC's review and final determination on RCRA permitting.

11.      In September 2000, Exide acquired the Vernon NPP and conducted recycling operations on site.

12.     In 2002, Exide was simultaneously operating under "interim status" and implementing corrective action activities for lead and arsenic contamination pursuant to a 2002 Corrective Action Consent Order with the DTSC (the "**CACO**"), which, *inter alia,* grants the DTSC the right to access the property and conduct any work "it deems necessary to protect human health or the environment." A true and correct copy of the CACO is attached hereto as **Exhibit 1**.

13.     In early 2014, Exide submitted a revised RCRA Hazardous Waste Facility Permit application to the DTSC.

14.     In March 2014, Exide ceased operations at the Vernon NPP.

15.     In November 2014, during Exide's 2013 Chapter 11 Case, Exide and the DTSC entered into the 2014 Stipulation and Order (the "**2014 Order**"), which resolved disputes concerning Exide's on- and off-site corrective action obligations under the CACO, its permit application and corresponding closure and post closure plan requirements, and funding of financial assurances for the closure and post closure plan. A true and correct copy of the 2014 Order is attached hereto as **Exhibit 2**.

16.     In February 2015, the DTSC informed Exide of its intent to deny the Company's RCRA Hazardous Waste Facility Permit application.

17.     In March 2015, Exide entered into a non-prosecution agreement with the U.S. Department of Justice and the DTSC (the "**NPA**"), in which Exide agreed to withdraw its RCRA permit application and permanently close the Vernon NPP facility through implementation of a DTSC-approved closure plan.  A true and correct copy of the NPA is attached hereto as **Exhibit 3**.

18.     In March 2015, concurrent with the NPA, Exide and the DTSC entered into the 2015 Amended Stipulation and Order (the "**2015 Amended Order**"), which required Exide to submit a closure plan to describe procedures for remediation, deconstruction, and closure of the

Vernon NPP.  A true and correct copy of the 2015 Amended Order is attached hereto as **Exhibit 4**.

19.     In April 2016, Exide and the DTSC entered into the 2016 Second Amended Stipulation and Order (the "**2016 Amended Order**"), which resolved a dispute over off-site corrective action expenditures.  A true and correct copy of the 2016 Amended Order is attached hereto as **Exhibit 5**.

20.     On December 8, 2016, the DTSC approved Exide's final closure plan for the Vernon NPP (the "**Closure Plan**" and in combination with the CACO, 2014 Order, NPA, 2015 Amended Order, and 2016 Amended Order, the "**DTSC Requirements**"), which proposed a phased approach for decontamination, deconstruction, and disposal of hazardous waste management equipment and structures at the Vernon NPP.  A true and correct copy of the Closure Plan is attached hereto as **Exhibit 6**.

### <u>EXIDE'S COMMUNICATIONS WITH THE DTSC<br>DURING THE COVID-19 PANDEMIC</u>

21.     Exide's closure efforts continued until March 21, 2020 when, due to the COVID-19 pandemic and stay-at-home orders issued by the State of California, Los Angeles County, and the City of Vernon, Exide informed the DTSC by letter of its declaration of a *force majeure* with respect to closure activities at the Vernon NPP.  A true and correct copy of Exide's March 21 letter is attached hereto as **Exhibit 7**.

22.     On April 20 2020, the DTSC responded to Exide's letter and disputed Exide's declaration of a *force majeure* and interpretation of the stay-at-home orders.  A true and correct copy of the DTSC's April 20 letter is attached hereto as **Exhibit 8**.

RLF1 24139327v.1

23.    On April 22, 2020, Exide replied by letter on April 22, 2020, in which it further explained the basis of its position on the *force majeure* and stay-at-home orders.  A true and correct copy of Exide's April 22 letter is attached hereto as **Exhibit 9**.

24.    On July 3, 2020, the DTSC replied to Exide's April 22 correspondence, reiterating its position on the *force majeure* declaration and the stay-at-home orders, and referencing a corresponding order issued by DSTC proposing work measures at the Vernon NPP to abate what the DTSC described as "a substantial amount of unsecured lead-contaminated dust outside of the FEU" (the "**Interim Measures Order**").  In its July 3 letter, the DTSC asserted that abatement of this dust, as well as addressing the FEU tent's service life, was "time-critical work" that should be completed immediately.  The DTSC further asserted in its letter that the FEU's "multiple tears since closure began" and its "finite service period" required immediate attention.  A true and correct copy of the DTSC's July 3 letter is attached hereto as **Exhibit 10**.  A true and correct copy of Interim Measures Order is attached hereto as **Exhibit 11**.

25.    On July 8, 2020, through its counsel, Exide replied to the DTSC's July 3 letter and Interim Measures Order, further disputing the DTSC's interpretation of the stay-at-home orders and Exide's *force majeure* declaration.  Exide also noted its disagreement with the DTSC's claim that this was "time critical" work because (i) the FEU tent recently had been repaired and solidified and no ambient air samples revealed any elevated, non-permissible levels of lead or arsenic even when there were tears in the FEU; and (ii) the purportedly contaminated dust samples were collected by the DTSC in November 2019 but were not identified by the DTSC as an alleged hazard requiring Exide's immediate attention until some eight months later.  A true and correct copy of Exide's July 8 letter is attached hereto as **Exhibit 12**.

26.     The DTSC has not responded to Exide's July 8 letter, nor has the DTSC taken any additional enforcement action to require any immediate action at the site.  Accordingly, activity at the Vernon NPP remains focused on preventing lead or other contaminants from escaping the property, rather than abatement – are ongoing.

## EXPENDITURES AT THE VERNON NPP

27.     Since the implementation of the Closure Plan in 2017, Exide spent more than $75 million implementing the plan and complying with the DTSC Requirements.

28.     Debtors currently spend approximately $750,000 per month to maintain and secure the Vernon NPP.  This includes payroll and benefits, utilities, and third-party vendors.

29.     The Debtors do not have the unencumbered assets or authority to use cash collateral necessary to continue maintaining and securing the Vernon NPP site in perpetuity and have no other funds to resume and complete the remediation pursuant to the DTSC Requirements.

30.     In the event that the Vernon NPP is abandoned, however, over $26 million would be made available to DTSC to continue maintenance efforts and restart the remediation efforts at the site.  Specifically, DTSC would have access to $11,158,854 through a surety bond with Westchester Fire Insurance Company, $3,000,000 through the Residential Off-Site Corrective Action Trust Fund, and $15,325,140.39 through the Closure Financial Assurance Trust Fund, all of which may be used by DTSC to finance onsite or offsite remediation efforts.  A true and correct copy of the most recent trust fund account statement is attached hereto as **Exhibit 13**.  A true and correct copy of the Westchester Fire Insurance Company surety bond is attached hereto as **Exhibit 14**.

31.     In their sound business judgment, the Debtors have determined that the Vernon NPP is of inconsequential value and burdensome to the Debtors' estate because in the absence of

6

a sale or abandonment of the Vernon NPP, the Debtors' estate would be required to make significant expenditures in connection with ongoing decommissioning and remediation obligations, including those imposed upon the Debtors pursuant to the DTSC Requirements, which would deplete the estate's limited resources while providing no benefit to the estate or its constituents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 12, 2020

/s/ *Roy Messing*
Name: Roy Messing
Title: Chief Restructuring Officer

7