# **TAB 19(a)**

**Non-Prosecution Agreement, dated March 11, 2015
[Bankr. D.I. 950-3], attached as Exhibit 3 to the
Messing Decl. *excluding Appendix and attachments**

## NON-PROSECUTION AGREEMENT

### INTRODUCTION

1.      Exide Technologies, 13000 Deerfield Parkway, Suite 200, Milton, Georgia
("Exide"), by its undersigned officer and through its attorneys, Sheppard Mullin Richter and
Hamilton LLP, and the United States Attorney's Office for the Central District of California
("the USAO") hereby enter into this Non-Prosecution Agreement ("the Agreement").  The
Agreement shall be in effect for ten years from the date it is fully executed, provided, however,
that the effectiveness of the Agreement is contingent in all respects—including without
limitation the admissions set forth herein—on (i) bankruptcy court approval of Exide's entry into
the Agreement; (ii) confirmation of Exide's plan of reorganization in *In re Exide Technologies*,
U.S. Bankruptcy Court for the District of Delaware Case No. 13-11482; and (iii) the occurrence
of the effective date of Exide's plan of reorganization in *In re Exide Technologies*, U.S.
Bankruptcy Court for the District of Delaware Case No. 13-11482.  If (i)-(iii) above do not
occur, the Agreement is null and void.

2.      This Agreement is limited to the USAO and cannot bind any other federal, state,
or local prosecuting, administrative or regulatory authorities.

### NON-PROSECUTION

3.      The USAO agrees that if Exide is in full compliance with the material obligations
under this Agreement, then the USAO will not prosecute Exide or any of Exide's officers,
directors, or employees during the ten year term of the Agreement or thereafter for any alleged
violations of federal criminal laws related to the conduct described in the Statement of
Admissions and Facts attached hereto as Appendix 1, the Statute of Limitations Tolling
Agreement attached hereto as Appendix 5, or any other conduct for which Exide was or had been
under investigation by the USAO as of the effective date of the Agreement.  This Agreement is
intended to resolve the USAO's grand jury investigation of Exide.

### ADMISSIONS AND ACCEPTANCE OF RESPONSIBILITY FOR VIOLATIONS

4.      Upon satisfaction of the contingencies in paragraph 1, above, Exide admits that it
committed the felony violations set forth in the Statement of Admissions and Facts attached
hereto, and incorporated herein, as Appendix 1.  Exide accepts and acknowledges responsibility
for such criminal conduct.  In the event that the USAO determines that Exide has breached this
Agreement, and a decision is made by the USAO to proceed with a criminal prosecution of
Exide, Exide agrees that the Statement of Admissions and Facts are admissible against it at any
subsequent trial or district court proceeding.  In the event that the USAO determines that there
has been a breach of this Agreement, the USAO will give Exide notice and 30 days to cure.

5.     Exide agrees that it shall not publicly deny any admission or statement of fact contained in the Statement of Admissions and Facts.  The decision of whether any statement by any agent or employee of Exide contradicting a fact contained in the Statement of Admissions and Facts will be imputed to Exide for the purpose of determining whether Exide has breached this Agreement shall be in the sole and reasonable discretion of the USAO.  Upon the USAO's notification to Exide's counsel, Sheppard Mullin Richter and Hamilton LLP, of a public statement by any agent or employee of Exide, that in whole or in part publicly denies a statement of fact contained in the Statement of Admissions and Facts, Exide may avoid breach of this Agreement by publicly repudiating such statement within 48 hours after notification by the USAO.  Nothing herein is intended to or shall prevent Exide from defending itself in legal proceedings and/or administrative actions involving any third party or prevent any Exide employee or agent from making any statements in any third party legal proceedings and/or administrative actions.

## CLOSURE OF THE RECYCLING FACILITY IN THE CITY OF VERNON

6.     Exide is the owner and operator of a lead-acid battery recycling facility located at 2700 South Indiana Street, Vernon, California ("the Facility").

7.     The Facility has been operated by Exide since it purchased its predecessor, GNB Technologies Inc., in 2000.  The property on which the Facility is located has been operated as a secondary lead and/or metal recycling operation on a nearly-continual basis since 1922.

8.     This Agreement requires Exide to immediately and permanently cease recycling operations at the Facility.  Exide agrees to close the Facility and to demolish, deconstruct, and remove all Facility structures, equipment, and appurtenances, and to correct and remediate any surface, subsurface, and groundwater contamination, in accordance with the terms of the "Closure and Clean-up Agreements" and "Closure/Post-Closure Plan" (as defined below).

## CORRECTIVE AND REMEDIAL ACTION

9.     Exide has entered into several agreements with the State of California, Department of Toxic Substances Control ("DTSC") regarding Facility closure and post-closure requirements, and requirements for the assessment, correction, and remediation of both on-site and off-site environmental contamination.  These agreements are hereinafter referred to as the "Closure and Clean-up Agreements," and include the following documents, along with their appendices, exhibits, and necessarily incorporated reference documents:

      a.  The 2002 Corrective Action Consent Order, Docket No. P3-01/02-010, attached hereto, and incorporated herein, as Appendix 2;

      b.  The 2013 Stipulation and Order, Docket HWCA P3-12/13-010 OAH No. 2013050540, attached hereto, and incorporated herein, as Appendix 3; and

      c.  The 2014 Stipulation and Order, Docket HWCA No. 2014-6489, attached hereto, and incorporated herein, as Appendix 4.

      10.    Exide shall cease operations at the Facility and shall close the Facility in accordance with the requirements of the Closure and Clean-up Agreements and the "Closure/Post-Closure Plan" submitted to DTSC on October 1, 2014 as part of its Hazardous Waste Permit Application or amendments thereof.

      11.    Exide shall comply with the terms of the Closure and Clean-up Agreements. In addition, in lieu of making the 2015 and 2016 anniversary payments to the Residential Off-Site Corrective Action Trust Fund on the schedule set forth in paragraph 10 of the 2014 Stipulation and Order, Exide shall make a single payment of $3,000,000 to the Residential Off-Site Corrective Action Trust Fund within 30 days after the effective date of Exide's plan of reorganization in *In re Exide Technologies*, U.S. Bankruptcy Court for the District of Delaware Case No. 13-11482. Such payment shall satisfy Exide's obligation to make the 2015 and 2016 payments.

      12.    During the effective period of this Agreement, Exide shall prepare and submit to the USAO, on or before January 15th and July 15th of each year, a biannual report that summarizes the closure and clean-up findings, activities, and progress, as required by Paragraphs 9, 10, and 11, that were conducted and obtained during the preceding six month period, including, among other things, (1) the addresses, locations, and results of any sampling and laboratory analyses relating to the affected properties, (2) the completion of any remediation on those properties, (3) the disposition of any wastes and materials removed from those properties, and (4) any related activities planned for the next six month reporting period. The USAO reserves the right to release and disseminate the annual report to affected population groups, regulatory agencies, and political subdivisions.

BLOOD TESTING FOR LOCAL POPULATION

      13.    Exide agrees to pay for periodic blood lead and arsenic level monitoring, as defined and directed by the Los Angeles County Department of Public Health, for the local population surrounding the Facility. The term "local population" is defined as those individuals residing within the Northern and Southern Residential Assessment Areas and the Expanded Northern and Southern Residential Assessment Areas, as those areas are defined in the written

description set forth below, and as further described and defined in the maps attached hereto, and incorporated herein, as Appendix 6: Expanded Northern Residential Assessment Area – north of Noakes, west of Marianna St. to E. 5th St/LanFranco west to Pomona Freeway southwest to Euclid south to 8th St. east to Grande Vista south to Olympic east to Los Palos south to Union Pacific east to Herbert south to Noakes east to Marianna. Expanded Southern Residential Assessment Area – south of Fruitland east of Downey to the LA River to Heliotrope Ave south to 61st west to Riverside south to Gage Ave west to Cedar north to Randolph east to Downey north to Fruitland. This obligation shall continue for a period of five years from the date this Agreement is executed.

14.     Exide agrees to pay for and cause the dissemination of public notifications once per annum, on or about January 15th of each year during the five year effective period of this requirement, advising and notifying the local population that such blood tests are available free-of-charge.

## TOLLING OF STATUTE OF LIMITATIONS

15.     Exide agrees to toll all applicable statutes of limitations for alleged criminal violations occurring within the Central District of California arising under various federal environmental crimes statutes and the attendant regulations, including the federal Resource Conservation and Recovery Act, Title 42, United States Code, Sections 6901 et seq., the federal Hazardous Materials Transportation Act, Title 49, United States Code, Sections 5101 et seq., the federal Clean Air Act, Title 42, United States Code, Sections 7401, et seq., the federal Clean Water Act, Title 33, United States Code, Sections 1251, et seq., and Title 18, United States Code, Sections 2, 371, and 1001, during the time period that this Agreement is in effect. The tolling agreement is attached hereto and incorporated by reference herein as Appendix 5.

## SUCCESSOR LIABILITY

16.     The Agreement shall apply to and be binding upon Exide and its successors and assigns. Exide shall disclose the terms and conditions of the Agreement to all employees, consultants or independent contractors who are assigned or engaged to assist Exide in complying with its obligations and duties hereunder.

## PUBLIC DISSEMINATION OF AGREEMENT

17.     This Agreement is a public document. The parties agree that it may be disclosed by the USAO to the media or public at the sole discretion of the USAO. Exide agrees that it shall not disclose the Agreement to any party, except as follows:

a.     Exide is required to disclose the Agreement to any party by the Bankruptcy Court, the terms and obligations of its Chapter 11 reorganization, or any term of obligation of any agreement entered into pursuant to the reorganization, or to effectuate the reorganization; or

b.     The USAO has previously disclosed the Agreement to the media or public.

## NO ADDITIONAL AGREEMENTS

18.     Except as expressly set forth herein, there are no additional promises, understandings or agreements between the USAO on the one hand, and Exide on the other, concerning any other criminal prosecution, civil litigation or administrative proceeding relating to any other federal, state or local charges that may now be pending or hereafter be brought against Exide.  Nor may any additional agreement, understanding or condition relating to the conduct described in the Statement of Admissions and Facts, attached hereto as Appendix 1, be entered into unless in writing and signed by all parties.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

STEPHANIE YONEKURA
Acting United States Attorney


_____                        3/11/15
JOSEPH O. JOHNS                                          Date
Assistant United States Attorney
Chief, Environmental Crimes Section

Case 20-11157-CSS   Doc 850-3   Filed 10/13/20   Page 6 of 271

I have read this Agreement, and carefully reviewed every part of it with the attorneys for Exide Technologies. I understand it, and I voluntarily agree to it on behalf of Exide Technologies. As the representative of Exide Technologies, I represent that I have authority to act for and on behalf of the corporation. Further, I have consulted with the corporation's attorneys and fully understand the corporation's rights that may apply to this matter. No other promises or inducements have been made to the corporation, other than those set forth in this Agreement. In addition, no one has threatened or forced me or any member of the corporation in any way to enter into this Agreement. Finally, I am satisfied with the representation of the corporation's attorneys in this matter.


_____                                    _____3/11/15_____
ROBERT M. CARUSO, solely in his capacity as                  Date
President and Chief Executive Officer
EXIDE TECHNOLOGIES


We are the attorneys for Exide Technologies. We have carefully reviewed every part of this Agreement with Robert M. Caruso, President and Chief Executive Officer of Exide Technologies, who to my knowledge has authority to act for and on behalf of the corporation. To my knowledge, the corporation's decision to enter into this Agreement is an informed and voluntary one.


_____                                    _____3/11/15_____
CHARLES L. KREINDLER                                         Date
Sheppard Mullin Richter and Hampton LLP
Attorneys for Exide Technologies

# APPENDIX 1

Non-Prosecution Agreement for Exide Technologies, Inc.

APPENDIX 1

STATEMENT OF ADMISSIONS AND FACT

A.    Factual Background and History of Exide and the Facility

The Exide Facility is located at 2700 South Indiana Street in the City of Vernon, California.  The property occupies a total area of approximately 15 acres, which is bounded by East 26th Street towards the north and Bandini Boulevard towards the south.  The Facility is an operating battery recycling facility and is characteristic of the heavy industrial nature of the immediate, surrounding land uses.  The outskirts of the industrial area surrounding the Facility are bounded by the Boyle Heights residential area to the north and the Maywood residential area to the south.  The site has been operated as a secondary lead and/or metal recycling operation on a nearly-continual basis since 1922.  The Facility generates hazardous wastes, including corrosive fluids and waste containing metals such as lead, cadmium, arsenic, antimony, zinc, and chromium.  Other compounds emitted pursuant to permits at the site include semi-volatile organic compounds, and aromatic and halogenated volatile organic compounds such as benzene, ethyl benzene, and trichloroethylene.  The generation, management, storage, treatment, and release of hazardous wastes and pollutants are regulated and permitted by several agencies, including the California Department of Toxic Substances Control and the South Coast Air Quality Management District.

B.    Allegations Regarding Lead in Blood Impacts

Lead is a soft, heavy metal.  Lead enters the body by two paths, inhalation or ingestion. With respect to lead in blood, the USAO alleges that: (1) children under the age of six are known to ingest more lead than adults because of the normal hand-to-mouth behavior of young children; (2) the most common manner by which children ingest lead is by placing objects that have lead-contaminated soil or dust on them in their mouths; and (3) there is no known safe level of lead in human blood.  During the early 1990s, the United States Centers for Disease Control and Prevention determined that nearly 1,000,000 children within the United States had levels of lead in their blood stream high enough to cause irreversible damage to their health.

C.    Admissions Regarding Felony Violations

The Facility is designed to receive and recycle lead-acid batteries into their basic, constituent parts – lead and plastic.  At peak operation, the Facility receives approximately 40,000 batteries per day, which are initially crushed and broken apart in a hammer mill.  During this process, the batteries are separated into three primary components streams: acid, lead, and plastic.  The lead is reprocessed and smelted to produce a lead product that can be reused to

Non-Prosecution Agreement for Exide Technologies, Inc.

manufacture new lead-acid batteries.  The plastic is rinsed, loaded into van trailers, and transported to an off-site facility for reprocessing into new, resin-coated plastic pellets which can be used to manufacture new lead-acid batteries and other consumer products.  The acid is neutralized and treated on-site.

Illegal Storage of Hazardous Waste

Exide admits that it knowingly stored corrosive and lead-contaminated hazardous waste inside leaking van trailers, owned by Wiley Sanders Truck Line, Inc., parked at the Facility.  Exide admits that it illegally stored such hazardous waste a significant number of times over the past two decades, in violation of federal law.  Each incident could be charged as a felony violation of the federal Resource Conservation and Recovery Act, Title 42, United States Code, Section 6928(d)(2), with a maximum corporate fine of up to $500,000 per incident.

Illegal Disposal of Hazardous Waste

Exide admits that it knowingly caused the disposal of corrosive and lead-contaminated hazardous waste by allowing it to leak from van trailers owned by Wiley Sanders Truck Line, Inc., which were parked at the Facility.  Exide admits that it allowed such disposal to occur a significant number of times over the past two decades, in violation of federal law.  Each incident could be charged as a felony violation of the federal Resource Conservation and Recovery Act, Title 42, United States Code, Section 6928(d)(2), with a maximum corporate fine of up to $500,000 per incident.

Illegal Shipment of Hazardous Waste in Leaking Trailers

Exide admits that it knowingly and willfully caused the shipment of hazardous waste contaminated with lead and corrosive acid in leaking van trailers owned by Wiley Sanders Truck Line, Inc. and operated by Lutrel Trucking, Inc. and KW Plastics of California, Inc., from the Facility to Bakersfield, California, a significant number of times over the past two decades, in violation of federal law.  Each incident could be charged as a felony violation of the federal Hazardous Materials Transportation Act, Title 49, United States Code, Section 5124, with a maximum corporate fine of up to $500,000 per incident.

Illegal Transportation of Hazardous Waste to an Unpermitted Facility

Exide admits that it knowingly caused the transportation of hazardous waste contaminated with corrosive acid to a facility in Bakersfield, California, namely, KW Plastics of California, Inc., that was not permitted by the State of California, Department of Toxic

Non-Prosecution Agreement for Exide Technologies, Inc.

Substances Control to receive corrosive hazardous wastes.  Exide admits that it caused these illegal transportations of hazardous waste a significant number of times over the past two decades, in violation of federal law.  Each incident could be charged as a felony violation of the federal Resource Conservation and Recovery Act, Title 42, United States Code, Section 6928(d)(1), with a maximum corporate fine of up to $500,000 per incident.

D.     Exide Costs Associated with the Non-Prosecution Agreement

        The direct costs of Exide's compliance with the terms and conditions of this Agreement are estimated by the parties to be between approximately $108,000,000 and approximately $133,000,000 .  Facility closure and clean-up costs, including contamination in the Northern and Southern Residential Assessment Areas, is presently estimated to be approximately $50,000,000. Recycling of lead-acid batteries at the Facility generates cost savings for Exide for the raw goods that it uses to manufacture lead-acid batteries (for sale to retail consumers), including metallic lead and plastic needed to mold battery cases.  The parties estimate that  closure of the Facility will cost Exide between $15,000,000 and $38,000,000 on an annualized basis for the cost of metallic lead and  case plastic that must otherwise be purchased from other market sources. Exide also acknowledges that it has invested approximately $35,000,000 since 2010, to upgrade and improve pollution control technology at the Facility.  As a result of this Agreement, Exide must demolish and deconstruct such upgrades as part of its permanent closure of the Facility.  In addition, Exide acknowledges that compliance with this Agreement will cost an additional $8,000,000 to $10,000,000 for other Facility closure related costs.

# APPENDIX 2



*Project File : C 1ST QRTR 2002*

## Department of Toxic Substances Control

Edwin F. Lowry, Director
1011 N. Grandview Avenue
Glendale, California 91201

*2002-967*



FILE COPY



MAR 04 2002

*M-4*

Gray Davis
Governor

Winston H. Hickox
Agency Secretary
California Environmental
Protection Agency

February 25, 2002

Certified Mail

Mr. Neal S. Lebo
Executive Director
Global Environmental, Health & Safety
Exide Technologies
3000 Montrose Avenue
Reading, Pennsylvania 19605

CORRECTIVE ACTION CONSENT ORDER FOR EXIDE CORPORATION, 2700 SOUTH INDIANA AVENUE, CITY OF VERNON, ( EPA ID NUMBER: CAD 097 854 541)

Dear Mr. Lebo:

Enclosed is a signed and executed Corrective Action Consent Order Docket No. P3-01/02-010. The effective date of the Consent Order is February 25, 2002. As set forth in section 3.1 of the Consent Order, the Department of Toxic Substances Control (DTSC) has designated Mr. Liang Chiang as the DTSC Project Coordinator for this project. All inquiries and future correspondence related to this project may be directed to Mr. Chiang at the following address:

Mr. Liang Chiang, P.E.
Hazardous Substances Engineer
Southern California Permitting Branch
Department of Toxic Substances Control
1011 N. Grandview Avenue
Glendale, California 91201

Case 20-11157-CSS  Doc 950-3  Filed 10/13/20  Page 13 of 271

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption. For a list of simple ways you can reduce demand and cut your energy costs, see our Web-site at www.dtsc.ca.gov.*

⊛ Printed on Recycled Paper

Mr. Neal S. Lebo
February 25, 2002
Page 2

If you have any questions, please contact me at (818) 551-2920 or Mr. Liang Chiang,
P.E., at (818) 551-2964.

Sincerely,

Jose Kou, P.E., Chief
Southern California Permitting Branch
Hazardous Waste Management Program

Enclosure

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7099 3220 0008 0830 9103**

cc:    Mr. Ari Levine
       Deputy General Counsel &
       Assistant Secretary
       Exide Corporation
       645 Penn Street
       Reading, PA 19612-4205

       Mr. Thomas Wideman
       Exide Technologies
       2700 S. Indiana Street
       Vernon, California  90023-0957

       Mr. William L. Taylor
       GNB Technologies, Inc.
       375 Northridge Road
       Atlanta, Georgia 30350

       Mr. Thomas J.P. McHenry
       Gibson, Dunn & Crutcher, LLP
       333 South Grand Avenue
       Los Angeles, California 90071

Mr. Neal S. Lebo
February 25, 2002
Page 3

cc:    Mr. Jeffrey Pierce
RMT, Inc.
35 Glenlake Parkway, Suite 500
Atlanta, Georgia 30328-3496

Ms. Carmen Santos-Prior
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California 94105

Mr. Kevin Wong
U.S. EPA, Region IX
75 Hawthorne Street
San Francisco, California 94105

Mr. Rick Moss, Chief
Permitting Division
Hazardous Waste Management Program
Department of Toxic Substances Control
1001 I Street, 11th Floor/ P.O. Box 0806,
Sacramento, California 95812-0806

Ms. Orchid Kwei
Office of Legal Counsel
Department of Toxic Substances Control
1001 I Street, 23th Floor/ P.O. Box 0806,
Sacramento, California 95812-0806

Ms. Florence Gharibian, Chief
Statewide Compliance Division, Southern California Branch
Department of Toxic Substances Control
1011 North Grandview Avenue
Glendale, California 91201

Mr. Phil B. Chandler, Unit Chief
Southern California Permitting Branch
Department of Toxic Substances Control
1011 North Grandview Avenue
Glendale, California 91201

Mr. Neal S. Lebo
February 25, 2002
Page 4

cc:   Mr. Mukul Agarwal, Unit Chief
      Statewide Compliance Division, Southern California Branch
      Department of Toxic Substances Control
      1011 North Grandview Avenue
      Glendale, California 91201

      Mr. Hossein Nassiri
      Permitting Division
      Hazardous Waste Management Program
      Department of Toxic Substances Control
      1001 I Street, 11th Floor/ P.O. Box 0806,
      Sacramento, California 95812-0806

      Ms. Bridget Fitzsenry
      Permitting Division
      Hazardous Waste Management Program
      Department of Toxic Substances Control
      1001 I Street, 11th Floor/ P.O. Box 0806,
      Sacramento, California 95812-0806

      Ms. Ruth Williams-Morehead
      Statewide Compliance Division, Southern California Branch
      Department of Toxic Substances Control
      1011 North Grandview Avenue
      Glendale, California 91201

STATE OF CALIFORNIA
ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of: | Docket No.: P3-01/02-010 |
| Exide Corporation<br>2700 Indiana Avenue<br>Vernon, CA 90058<br>US EPA ID No.: CAD 097 854 541 | CORRECTIVE ACTION<br>CONSENT ORDER |
| Exide Corporation<br>2700 Indiana Avenue<br>Vernon, CA 90058<br>Respondent. | Health and Safety Code<br>Section 25187 |

## 1.0 INTRODUCTION

1.1. _Parties_. The Department of Toxic Substances Control
(DTSC or Department) and Exide Corporation (formerly GNB Battery
Technologies, Inc., hereinafter referred to as "Respondent"), the
owner and operator of a hazardous waste treatment and storage
facility, enter into this Corrective Action Consent Order (Consent
Order) and agree as follows:

1.2. _Permitting Status_. Respondent is the owner and
operator of a hazardous waste treatment and storage facility located
at 2700 Indiana Avenue, Vernon, CA 90058 (Facility). The Facility
engages in the management of hazardous waste pursuant to an interim
status document (ISD) issued by the Department of Health Services
(DHS), which was DTSC's predecessor agency, on August 19, 1983.

1.3. _Jurisdiction_. Jurisdiction exists pursuant to
Health and Safety Code (HSC) sections 25187, 25187.1, and 25200.10.
HSC 25187 authorizes DTSC to issue an order to require corrective
action when DTSC determines that there is or has been a release of
hazardous waste or hazardous waste constituents into the environment
from a hazardous waste facility.

-1-

If DTSC determines that the presence of any hazardous waste at a facility or site at which hazardous waste is, or has been, stored, treated, or disposed of, or the release of any hazardous waste from the facility or site may present a substantial hazard to human health or the environment, HSC section 25187.1 authorizes DTSC to issue an order requiring the owner or operator of a facility or site to conduct monitoring, testing, analysis, and reporting with respect to the facility or site which DTSC deems reasonable to ascertain the nature and extent of the hazard.

HSC section 25200.10(a) mandates that DTSC require corrective action for all releases of hazardous waste or constituents from a solid waste management unit or a hazardous waste management unit at a facility engaged in hazardous waste management.

1.4.  Definition of Terms  The terms used in this Consent Order are as defined in section 25100 et seq. of the HSC and section 66260.10 of Title 22 of the California Code of Regulations (CCR), except as otherwise provided.

1.5.  Attachments  All attachments to this Consent Order are incorporated herein by this reference.

1.6  Purpose  The parties enter into this Consent Order to avoid the expense of litigation and to carry out promptly the corrective action described below. The Respondent agrees to implement all approved work plans and to undertake all actions required by the terms and conditions of this Consent Order, including any portions of this Consent Order incorporated by reference.  Respondent waives any right to request a hearing on this Consent Order pursuant to H&SC section 25187.

Case 20-1157-CSS  Doc 956-3  Filed 10/13/20  Page 18 of 271

1.7.  Non-Admission of Liability.  By entering into this Consent Order, Respondent does not admit to any findings of fact or

-2-

A-1120

conclusions of law as may be set forth herein.

## 2.0 FINDINGS OF FACT

2.1. In October 1990, DTSC completed a RCRA Facility Assessment (RFA) which identified solid waste management units (SWMUs) and areas of concern (AOCs). Additional SWMUs and AOCs were revealed in DTSC's review of the May 1997 Part B application. Tables 1 and 2 identify SWMUs and AOCs, where DTSC has determined that there has or may have been a release of a hazardous waste or constituent based upon the 1990 RFA, the list in the May 1997 Part B application, and its review of the May 1997 Part B application. Figures 1 through 5 illustrate the locations of the SWMUs and AOCs. DTSC has determined that further investigation is needed to ascertain the nature and extent of contamination in the SWMUs and AOCs listed in Section 2.1, from which there has or may have been a release or threatened release of hazardous waste or constituents into the environment. The presence of hazardous waste at the Facility and the release of hazardous waste from the Facility may present a substantial hazard to human health and the environment.

TABLE 1

SOLID WASTE MANAGEMENT UNITS

EXIDE CORPORATION

VERNON, CALIFORNIA

| Unit | Unit Name | Map Designation |
|------|-----------|-----------------|
| 1 | Earthen Disposal Pit | A-1 |
| 2 | Acid Collection and Neutralization Tank | A-2 |
| 3 | Battery Storage Area | A-3 |
| 4 | Effluent Treatment Area | A-4 |

Case 1:11-57-CSS   Doc 850-3   Filed 10/13/20   Page 19 of 271

-3-

| | | |
|---|---|---|
| 5 | Wastewater Treatment/Sludge Collection System | A-5 |
| 6 | Earthen Acid Dump Pit | A-6 |
| 7 | Slag Storage Pile | A-7 |
| 8 | Crushed Battery Storage Area | A-8 |
| 9 | Rubber Chip Storage Area | A-9 |
| 10 | Old Battery Separation Building | A-10 |
| 11 | Old Mixed Metals Extrusion Building | A-11 |
| 12 | Zinc Alloy Operations Area | A-12 |
| 13 | Metals Warehouse | A-13 |
| 14 | Smelting Pots | A-14 |
| 15 | Lead Oxide Building and Warehouse | A-15 |
| 16 | Main Smelting Building | A-16 |
| 17 | Blast Furnace Flue Bins | A-17 |
| 18 | Main Smelting Building Baghouses | A-18 |
| 19 | Crushed Battery Storage and Crushed Case Elevator | A-19 |
| 20 | Radiation Lab and North Radiation Yard | A-20 |
| 21 | Acid Tanks | A-21 |
| 22 | Sumps | A-22 |
| 23 | Mud and Dross Bins | A-23 |
| 24 | Rainwater Retention Pond | A-24 |
| 25 | Truck Wash Pit | A-25 |
| 26 | Truck Dumper | A-26 |
| 27 | Battery Hopper and Oscillating Conveyor | A-27 |
| 28 | Polypropylene Loading Dock | A-28 |
| 29 | Crushed Drum Storage Piles | A-29 |
| 30 | Battery Storage Areas | A-30 |
| 31 | Reverberatory Furnace Feedstock Room | A-31 |
| 32 | Acid Tank and Battery Dump Bin Sump | A-32 |
| 33 | Hammer Mill Conical Collector | A-33 |

-4-

A-1122

| 34 | Muds Holding Tanks | A-34 |
| 35 | Baghouse Dust Slurry Sumps | A-35 |
| 36 | Reverberatory and Soft Lead Baghouses | A-36 |
| 37 | Blast Furnace Feedstock Room | A-37 |
| 38 | Special Alloy Kettles and Lead Casting Machinery | A-38 |

TABLE 2

AREAS OF CONCERN

EXIDE CORPORATION

VERNON, CALIFORNIA

| Unit | Unit Name | Map Designation |
|------|-----------|-----------------|
| 39 | Underground Fuel Tanks | A-39 |
| 40 | Solid Soda Ash Product Storage | A-40 |
| 41 | Aluminum Smelting Building/Sweat Building/Lead Shot | M-1 |
| 42 | Northwest Storage Piles | M-2 |
| 43 | Battery Breaking | M-3 |
| 44 | Tin Dross Smelting Building | M-4 |
| 45 | Copper Sulfate Building | M-5 |
| 46 | Diesel Underground Fuel Tanks/Oil Pump House | M-6,7 |
| 47 | Covered Bin Storage next to Copper Sulfate Building | M-8 |
| 48 | Old Fill Area | M-9 |
| 49 | Blue Lead Warehouse | M-10 |
| 50 | Machine Shop and Maintenance Storage | M-11 |
| 51 | Gasoline Underground Fuel Tanks | M-12 |
| 52 | Storage Shed | M-13 |
| 53 | Battery Loading Dock | M-14 |

-5-

A-1123

| 54 | Acid Pit | M-15 |
| 57 | Garage | M-16 |
| 58 | New Acid Neutralization System | M-17 |
| 59 | Rubber Chip Storage | M-18 |
| 60 | Battery Breaking | M-19 |
| 61 | Rail Spur (between SE and NE yards) | M-20 |
| 62 | Battery Breaking | M-21 |
| 63 | Battery Storage | M-22 |
| 64 | Rail-spur Off-loading | M-23 |
| 65 | Classifier | M-24 |
| 66 | Drainage System | M-25 |
| 67 | Classifier | M-26 |
| 68 | Storage Piles | M-27 |
| 69 | Bins Along Drainage Channel | M-28 |
| 70 | Pond in Center of SE Yard | M-29 |
| 71 | Baghouse slurry sumps (2) | N/A |
| 72 | Mud holding tank piping system where below grade | N/A |
| 73 | Acid sump and piping beneath initial battery feed hopper | N/A |
| 74 | Acid collection system at hammer mill crusher/pan feeder and piping | N/A |
| 75 | Industrial Waste Clarifier within waste water treatment system | N/A |
| 76 | Waste Water Treatment System | N/A |

2.2. Based on information available to DTSC, DTSC has determined that a release of hazardous waste has occurred at or from the following SWMUs. Respondent agrees to the characterization of these SWMUs and statement of facts contained in Section 2.2 of this Consent

-6-

A-1124

Order solely for the purposes of the issuance of this Consent Order.

    a.  Unit 3:  Battery Storage Area

Spills from spent and leaking lead-acid storage batteries occurred during the operation of this unit.

    b.  Unit 6:  Earthen Acid Dump Pit

Releases of hazardous waste took place during the operation of the unit.  Sampling of the ground water in 1987 showed that this pit was one of the prime contributors to acid, lead, and other metal contamination of the ground water.

    c.  Unit 9:  Hard Rubber Chip Wastepile

The Department of Health Services (DHS) sampled leachate from the hard rubber chip waste pile in 1987 and 1989 and on both sample dates reported hazardous levels of lead leaching onto the asphalt.

    d.  Unit 10:  Old Battery Separation Building

The groundwater samples taken in 1987 showed that this unit has contributed to acid and lead contamination of the ground water.

    e.  Unit 11:  Old Mixed Metals Extrusion Building

Trichloroethene (TCE) was used as a cooling medium during the operation of this unit and sample results taken from groundwater monitoring well MW-11 indicate the release of TCE.

    f.  Unit 12:  Zinc Alloy Operations Area

Groundwater monitoring results from monitoring well MW-5 indicate the release of zinc.

    g.  Unit 14:  Smelting Pots

Spills occurred during the operation of this unit.  In the 1950's. a spill of molten lead occurred which required cleanup of contaminated soil to a depth of 35 feet below ground surface (bgs).

    h.  Unit 15:  Lead Oxide Building Warehouse

Powdered lead was used in the production of lead oxide. At least one release of lead oxide onto the streets adjoining the Facility was documented during the operation of this unit.

i. Unit 24:  Rainwater Retention Pond

The Los Angeles Regional Water Quality Control Board (LARWQCB) documented a potential release in August 1985. In August 1985 the Respondent drained water from the pond into the flood control channel and as a result water seeped under the pond's liner and damaged the liner. Samples taken by DHS on September 1, 1989, showed the pond water to have hazardous levels of soluble lead.

j. Unit 28:  Polypropylene Loading Dock

DHS analyzed samples of polypropylene and leachate from the polypropylene and found hazardous levels of lead in both.

k. Unit 29: Crushed Drum Storage Piles

Samples taken by DHS in 1989 showed hazardous levels of lead and antimony to exist in the crushed drum storage piles then located in the West Yard.

2.3. Hazardous wastes or constituents have migrated or may migrate from the Facility into the environment through soil, surface water, ground water, and air pathways.

a. **Soil Matrix, Pore-gas, and Pore-liquid:**

(1) <u>Off-site Soil Matrix Sampling</u> - DTSC conducted soil sampling in 1994 which confirmed the off-site presence of lead contamination in surface soils.

(2) <u>On-site Soil Matrix Sampling</u> - A number of on-site soil sampling efforts have been conducted. For example, on September 21, 1989, and on March 5, 1997, samples were obtained by DTSC from sediment accumulated in the bottom of an impoundment used for secondary containment (SWMU 24),

-8-

A-1126

referred to by Respondent as the storm water retention pond, which revealed lead contamination. Due to the discovery of cracks in the liner system for the stormwater retention pond noted by DTSC in its inspections of April 30 and June 24, 1997, the pond liners were replaced in August 1997. Sampling confirmed the presence of lead contamination in the soils underlying the pond.

(3)  Pore-Gas - Lateral and vertical migration of gas phase contamination may have occurred from the Earthen Disposal Pit (SWMU 1) Earthen Acid Dump Pit (SWMU 6), Slag Storage Pile (SWMU 7), and Old Mixed Metals Extrusion Building (SWMU 11).  The underground tank AOCs may also be sources of pore-gas migration.  Elevated levels of methane, hydrogen sulfide or other gases may exist.

(4)  Pore-Liquid - Lateral and vertical subsurface migration of pore-liquid may have occurred from  the Earthen Disposal Pit (SWMU 1), Earthen Acid Dump Pit (SWMU 6), Slag Storage Pile (SWMU 7), Old Mixed Metals Extrusion Building (SWMU 11), and Stormwater Retention Pond (SWMU 24).

b.    Air:

(1)  On-site Air Contamination  - Hazardous waste or constituents may be released from activities such as soil excavation for repairs or maintenance purposes undertaken at or near any of the SWMUs or AOCs.  On-site effects of such releases must be evaluated.

(2)  Off-site Ambient Air Contamination  - Respondent has emitted lead during the operation of the Facility.  Although the South Coast Air Quality Monitoring District (SCAQMD) has established emission limitations, Respondent may still emit

A-1127

up to those numerical limits. Off-site effects of past
releases of airborne lead must be evaluated together with
current permitted emissions.

c.   Surface Water:

(1)   On-site Surface Water Contamination - The potential
for past and present release(s) to on-site surface water
exists because a flood control channel bifurcates the
Facility. Samples obtained by DTSC from the channel and in
nearby storm drains revealed concentrations of lead that
exceeded hazardous waste level.

(2)   Off-site Surface Water Contamination - The potential
for past and present release(s) to off-site surface water
exists because (a) water from the surface impoundment has
historically been discharged pursuant to a discharge permit
to the industrial sewer which ultimately discharges to the
ocean after treatment; and (b) before the Facility was
bermed, storm water, which may have contained lead
particulates, was discharged to the adjoining streets and
through run-off grates to storm drains and surface water
channels.

d.   Ground Water:

At present, a total of seventeen groundwater monitoring
wells have been installed on- and off-site at the Facility.
Analyses of groundwater samples from these wells indicate
that hazardous constituents have migrated from areas of the
Facility and have contaminated ground water underlying the
Facility.   The 1994 RFI work plan stated that six (6) of
the SWMUs [Earthen Disposal Pit (SWMU 1), Old Mixed Metals
Extrusion Building (SWMU 11), Old Battery Storage Area (SWMU

-10-

30), Earthen Acid Disposal Pit (SWMU 6), Crushed Battery
Case Storage Area (SWMU 19), and Old Battery Separation
Building (SWMU 19)] may be subject to Article 6, Chapter 14,
Division 4.5 of 22CCR. Samples taken from on-site wells
exceeded Federal Maximum Contaminant Levels (MCLs) for up to
six (6) organic hazardous constituents, and exceed
California Action Levels for up to eight (8) organic
hazardous constituents. Data from earlier groundwater
monitoring indicates that levels of inorganic chemicals in
groundwater samples may also exceed Federal MCLs.

2.4. The hazardous waste and constituents of concern at the
Facility are metals such as lead, cadmium, aluminum, arsenic, sodium,
antimony, iron, manganese, zinc; acids [pH], such as sulfuric acid;
semi-volatile organic compounds; and, aromatic and halogenated volatile
organic compounds such as benzene, ethyl benzene, and trichloroethylene
(TCE).

2.5. The Facility is bounded on the south by Bandini Blvd,
on the north by 26th street, on the east by Indiana Street (the main
office/administration building is east of Indiana Street), and on the
west by additional industrial sites. The Facility is bifurcated east to
west by the Union Pacific and Santa Fe Railroad and north to south by an
open Flood Control channel and a buried storm box culvert. The Facility
is located in the southern portion of the Los Angeles Forebay Area of
the central Groundwater Basin of the Los Angeles Coastal Plain,
approximately .1 mile north of the Los Angeles River. Based on
measurements taken on-site, the first ground water encountered beneath
the facility is at depths of 85 to 90 feet bgs. In 1991, the local
groundwater flow pattern had 180° radius along a southeast-directed axis.
However, there are no monitoring wells to the northwest, and

-11-

consequently information on flow direction is incomplete.  The seventeen (17) groundwater monitoring wells at the Facility are shallow and interconnection with deeper underlying aquifer units, such as the Exposition and Gage, is unknown.  The June 13, 1994, Basin Plan of the Los Angeles Regional Water Quality Control Board (LARWQCB) indicates that the ground water beneath the Facility is beneficial for municipal uses.

2.6.  Releases from the Facility may migrate through the vadose zone either toward air and/or surface and ground water since some of the contaminants identified in the sampling are mobile in gas-phase.

### 3.0 PROJECT COORDINATOR

3.1.  Within fourteen (14) days of the effective date of this Consent Order, DTSC and Respondent shall each designate a Project Coordinator and shall notify each other in writing of the Project Coordinator selected.  Each Project coordinator shall be responsible for overseeing the implementation of this Consent Order and for designating a person to act in his/her absence.  All communications between Respondent and DTSC, and all documents, report approvals, and other correspondence concerning activities performed pursuant to this Consent Order shall be directed through the Project Coordinators.  Each party may change its Project Coordinator with at least seven (7) days prior written notice.

### 4.0 WORK TO BE PERFORMED

4.1.  Respondent agrees to perform any and all work undertaken pursuant to this Consent Order to the extent applicable and in a manner consistent with:  the attached Scopes of Work; DTSC-approved RCRA Facility Investigation Work Plan, Corrective Measures Study Work Plan, and Corrective Measures Implementation Work Plan; and any other work plans submitted by Respondent and approved by  DTSC; Public

-12-

Participation Policy and Procedures Manual, published by DTSC, as previously amended; H&SC and other applicable state and federal laws and their implementing regulations; and applicable DTSC or U.S. EPA guidance documents. Applicable guidance documents include, but are not limited to, the "RCRA Facility Investigation (RFI) Guidance" (Interim Final, May 1989, EPA 530/SW-89-031), "RCRA Groundwater Monitoring Technical Enforcement Guidance Document" (OSWER Directive 9950.1, September 1986), "Test Methods For Evaluating Solid Waste" (SW-846), "Construction Quality Assurance for Hazardous Waste Land Disposal Facilities" (EPA 530/SW-85-031, July 1986), "Corrective Action Orientation Manual" (Draft Working copy, June 1994, DTSC), and the Guidance Manual for Groundwater Investigations (California Environmental protection Agency, July 1995).

## 5.0  INTERIM MEASURES (IM)

5.1  Respondent shall evaluate available data and assess the need for interim measures in addition to those specifically required by this Consent Order. Interim measures shall be used whenever possible to control or abate immediate threats to human health and/or the environment, and to prevent and/or minimize the spread of contaminants while long-term corrective action alternatives are being evaluated.

5.2  Within ninety (90) days of the effective date of this Consent Order, Respondent shall submit a Current Conditions Report in accordance with the scope of work outlined in the letters from Mr. Jeffery Pierce of Integrated Environmental Solutions to Mr. Liang Chiang of DTSC, dated September 6, 2001 and October 2, 2001, respectively, and appended hereto as Attachment 1 and Attachment 2.

5.3  In the event Respondent identifies an immediate or potential threat to human health and/or the environment, discovers new releases of hazardous waste and/or hazardous waste constituents, or discovers new solid waste management units not previously identified,

-13-

Respondent shall notify the DTSC Project Coordinator orally within 24 hours of discovery and notify DTSC in writing within fifteen (15) calendar days of discovery summarizing the findings, including the immediacy and magnitude of the potential threat to human health and/or the environment.  Within thirty (30) calendar days of receiving DTSC's written request, Respondent shall submit to DTSC an IM Work Plan for approval.  In some instances, where interim measures must be implemented quickly to prevent harm to human health and the environment, DTSC may reduce or limit the elements of, or requirement for, the submittal of work plans and specifications.  The IM Work Plan shall include a schedule for submitting to DTSC an IM Operation and Maintenance (O&M) Plan and IM Plans and Specifications.  The IM Work Plan, IM O&M Plan, and IM P&S shall be developed in a manner consistent with the Scope of Work for Interim Measures Implementation appended as Attachment 3.  If DTSC determines that immediate action is required, the DTSC Project Coordinator may orally authorize the Respondent to act prior to DTSC's receipt of the IM Work Plan.

5.4  If DTSC identifies an immediate or potential threat to human health and/or the environment, discovers new releases of hazardous waste and/or hazardous waste constituents, or discovers new solid waste management units not previously identified, DTSC will notify Respondent in writing.  Within thirty (30) calendar days of receiving DTSC's written notification, Respondent shall submit to DTSC for approval an IM Work Plan that identifies Interim Measures that will mitigate the threat.  In some instances, where interim measures must be implemented quickly to prevent harm to human health and the environment, DTSC may reduce or limit the elements of, or requirement for, the submittal of work plans and specifications.  The IM Work Plan shall include a schedule for submitting to DTSC an IM Operation and Maintenance (O&M)

-14-

Plan and IM Plans and Specifications.  The IM Work Plan, IM O&M Plan, and IM P&S shall be developed in a manner consistent with the Scope of Work for Interim Measures Implementation appended as Attachment 3.  If DTSC determines that immediate action is required, the DTSC Project Coordinator may orally authorize the Respondent to act prior to DTSC's receipt of the IM Work Plan.

5.5  All IM Work Plans shall ensure that the Interim Measures are designed to mitigate current or potential threats to human health and/or the environment, and should, to the extent practicable, be consistent with the objectives of, and contribute to the performance of, any remedy which may be required at the Facility.

5.6  Concurrent with the submission of an IM Work Plan, Respondent shall submit to DTSC a Health and Safety Plan in accordance with the Scope of Work for a Health and Safety Plan, Attachment 4.

5.7  Concurrent with the submission of an IM Work Plan, Respondent shall submit for DTSC's approval a Community Profile in accordance with Attachment 5.  Based on the information provided in the Community Profile, if DTSC determines that there is a high level of community concern about the Facility, DTSC may require Respondent to prepare a Public Participation Plan or to prepare a supplement to any existing Public Participation Plan.

## 6.0  RCRA FACILITY INVESTIGATION (RFI)

6.1 The Respondent submitted an RFI Work Plan, dated April 1995, to DTSC for review and approval.  The work plan was deemed technically insufficient and has not been approved.  Within ninety (90) calendar days of receipt of DTSC's comments on the 1995 RFI Work Plan, Respondent shall submit to DTSC a revised Work Plan for a RCRA Facility Investigation ("RFI Work Plan") of the entire Facility, including the SWMUs and AOCs identified in Tables 1 and 2 of section 2.1.  The RFI

-15-

Work Plan is subject to approval by DTSC and shall be developed in a manner consistent with the Scope of Work for a RCRA Facility Investigation contained in Attachment 6. DTSC will review the Current Conditions Report and RFI Work Plan and notify Respondent in writing of DTSC's approval or disapproval.

6.2 The RFI Work Plan shall detail the methodology to: (1) gather data needed to make decisions on interim measures/ stabilization during the early phases of the RCRA Facility Investigation; (2) identify and characterize all sources of contamination; (3) define the nature, degree and extent of contamination; (4) define the rate of movement and direction of contamination flow; (5) characterize the potential pathways of contaminant migration; (6) identify actual or potential human and/or ecological receptors; and (7) support development of alternatives from which a corrective measure will be selected by DTSC. A specific schedule for implementation of all activities shall be included in the RFI Work Plan.

6.3 Respondent shall submit a RFI Report to DTSC for approval in accordance with DTSC-approved RFI Work Plan schedule. The RFI Report shall be developed in a manner consistent with the Scope of Work for a RCRA Facility Investigation contained in Attachment 6. If there is a phased investigation, separate RFI Report(s) and a report that summarizes the findings from all phases of the RFI must be submitted to DTSC. DTSC will review the RFI Report(s) and notify Respondent in writing of DTSC's approval or disapproval.

6.4 Concurrent with the submission of a RFI Work Plan, Respondent shall submit to DTSC a Health and Safety Plan in accordance with Attachment 4. If work plans for both an IM and RFI are required by this Consent Order, Respondent may submit a single Health and Safety Plan that addresses the combined IM and RFI activities.

-16-

A-1134

6.5  Respondent shall submit a RFI Summary Fact Sheet to DTSC that summarizes the findings from all phases of the RFI.  The RFI Summary Fact Sheet shall be submitted to DTSC in accordance with the schedule contained in the approved RFI Work Plan.  DTSC will review the RFI Summary Fact Sheet and notify Respondent in writing of DTSC's approval or disapproval, including any comments and/or modifications. When DTSC approves the RFI Summary Fact Sheet, Respondent shall mail the approved RFI Summary Fact Sheet to all individuals on the Facility mailing list established pursuant to 22 Cal. Code Reg. section 66271.9(c)(1)(D), within fifteen (15) calendar days of receipt of written approval.

6.6  Concurrent with the submittal of the RFI Work Plan, Respondent shall submit to DTSC a Risk Assessment Workplan for the Facility.  Respondent shall submit to DTSC a Risk Assessment Report in accordance with the DTSC-approved Risk Assessment Workplan schedule.

### 7.0. CORRECTIVE MEASURES STUDY (CMS)

7.1  Respondent shall prepare a Corrective Measures Study if contaminant concentrations exceed the health-based action levels established by the Risk Assessment Report and/or if DTSC determines that the contaminant releases pose a potential threat to human health and/or the environment.

7.2  Within sixty (60) calendar days of DTSC's approval of the RFI Report or of Respondent's receipt of a written request from DTSC, Respondent shall submit a CMS Work plan to DTSC.  The CMS Work plan is subject to approval by DTSC and shall be developed in a manner consistent with the Scope of Work for a Corrective Measures Study contained in Attachment 7.

7.3  The CMS Work Plan shall detail the methodology for developing and evaluating potential corrective measures to remedy any

-17-

contamination at the Facility.  The CMS Work plan shall identify the
potential corrective measures, including any innovative technologies,
that may be used for the containment, treatment, remediation, and/or
disposal of contamination.

7.4  Respondent shall prepare treatability studies for all
potential corrective measures that involve treatment except where
Respondent can demonstrate to DTSC's satisfaction that they are not
needed.  The CMS Work Plan shall include, at a minimum, a summary of the
proposed treatability study including a conceptual design, a schedule
for submitting a treatability study work plan, or Respondent's
justification for not proposing a treatability study.

7.5  Respondent shall submit a CMS Report to DTSC for
approval in accordance with DTSC-approved CMS Work plan schedule.  The
CMS Report shall be developed in a manner consistent with the Scope of
Work for a Corrective Measures Study contained in Attachment 7.  DTSC
will review the CMS Report and notify Respondent in writing of DTSC's
approval or disapproval.

## 8.0  REMEDY SELECTION

8.1  DTSC will provide the public with an opportunity to
review and comment on the final draft of the CMS Report, DTSC's proposed
corrective measures for the Facility, and DTSC's justification for
selection of such corrective measures.

8.2  Following the public comment period, DTSC may select
final corrective measures or may require Respondent to revise the CMS
Report and/or perform additional corrective measures studies.

8.3  DTSC will notify Respondent of the final corrective
measures selected by DTSC in the Final Decision and Response to
Comments.  The notification will include DTSC's reasons for selecting
the corrective measures.

-18-

9.0  CORRECTIVE MEASURES IMPLEMENTATION (CMI).

9.1  Within sixty (60) calendar days of Respondent's receipt of notification of DTSC's selection of the corrective measures, Respondent shall submit to DTSC a Corrective Measures Implementation (CMI) Work Plan.  The CMI Work Plan is subject to approval by DTSC and shall be developed in a manner consistent with the Scope of Work for Corrective Measures Implementation contained in Attachment 8.

9.2  Concurrent with the submission of a CMI Work Plan, Respondent shall submit to DTSC a Health and Safety Plan in accordance with Attachment 2.

9.3  The CMI program shall be designed to facilitate the design, construction, operation, maintenance, and monitoring of corrective measures at the Facility.  In accordance with the schedule contained in the approved CMI Work Plan, Respondent shall submit to DTSC the documents listed below.  These documents shall be developed in a manner consistent with the Scope of Work for Corrective Measures Implementation contained in Attachment 8.

- o  Operation and Maintenance Plan
- o  Draft Plans and Specifications
- o  Final Plans and Specifications
- o  Construction Work plan
- o  Construction Completion Report
- o  Corrective Measures Completion Report

9.4  DTSC will review all required CMI documents and notify Respondent in writing of DTSC's approval or disapproval.

9.5  As directed by DTSC, Respondent shall establish a financial assurance mechanism for Corrective Measures Implementation including operation and maintenance activities.  The financial assurance mechanisms may include a performance or surety bond, liability

insurance, an escrow performance guarantee account, a trust fund, financial test, or corporate guarantee as described in Title 22 CCR section 66265.143 or any other mechanism acceptable to DTSC. The mechanism shall be established to allow DTSC access to the funds to undertake Corrective Measures Implementation tasks if Respondent is unable or unwilling to undertake the required actions.

### 10.0 CALIFORNIA ENVIRONMENTAL QUALITY ACT

10.1 DTSC must comply with the California Environmental Quality Act (CEQA) insofar as activities required by this Consent Order are projects subject to CEQA. Respondent shall provide all information necessary to facilitate any CEQA analysis. DTSC will make an initial determination regarding applicability of CEQA. If the activities are not exempt from CEQA, DTSC will conduct an Initial Study. Based on the results of the Initial Study, DTSC will determine if a Negative Declaration or an Environmental Impact Report (EIR) should be prepared. DTSC will prepare and process any such Negative Declaration. However, should DTSC determine that an EIR is necessary, such EIR would be prepared under separate agreement between DTSC and Respondent.

### 11.0 DTSC APPROVAL

11.1 Respondent shall revise any work plan, report, specification, or schedule in accordance with DTSC's written comments. Respondent shall submit to DTSC any revised documents by the due date specified by DTSC. Revised submittals are subject to DTSC's approval or disapproval.

11.2 Upon receipt of DTSC's written approval, Respondent shall commence work and implement any approved work plan in accordance with the schedule and provisions contained therein.

11.3 Any Department-approved work plan, report, specification, or schedule required by this Consent Order shall be

-20-

deemed incorporated into this Order.

       11.4   Verbal advice, suggestions, or comments given by DTSC representatives will not constitute an official approval or decision.

12.0   <u>SUBMITTALS</u>

       12.1   Beginning with the first full month following the effective date of this Consent Order, Respondent shall provide DTSC with bi-monthly progress reports of corrective action activities conducted pursuant to this Consent Order.  Progress reports are due on the 10th day of the month when reports are due.  The progress reports shall conform to the Scope of Work for Progress Reports contained in Attachment 9.  DTSC may adjust the frequency of progress reporting to be consistent with site-specific activities.

       12.2   Any report or other document submitted by Respondent pursuant to this Consent Order shall be signed and certified by the project coordinator, a responsible corporate officer, or a duly authorized representative.

       12.3   The certification required above, shall be in the following form:

> I certify that the information contained in or accompanying this submittal is true, accurate, and complete.  As to those portions of this submittal for which I cannot personally verify the accuracy, I certify that this submittal and all attachments were prepared at my direction in accordance with procedures designed to assure that qualified personnel properly gathered and evaluated the information submitted.

> Signature: _____
> Name: _____
> Title: _____
> Date: _____

       12.4   Respondent shall provide three copies of all documents, including but not limited to, work plans, reports, and correspondence of fifteen (15) pages or longer.  Submittals specifically exempted from this copy requirement are all progress reports and

-21-

correspondence of less than 15 pages, of which one copy is required.

12.5  Unless otherwise specified, all reports, correspondence, approvals, disapprovals, notices, or other submissions relating to this Consent Order shall be in writing and shall be sent to the current Project Coordinators.

### 13.0  PROPOSED CONTRACTOR/CONSULTANT

13.1  All work performed pursuant to this Consent Order shall be under the direction and supervision of a professional engineer or registered geologist, registered in California, with expertise in hazardous waste site cleanup.  Respondent's contractor or consultant shall have the technical expertise sufficient to fulfill his or her responsibilities.  Within forty-five (45) days of the effective date of this Consent Order, Respondent shall notify the DTSC Project Coordinator in writing of the name, title, and qualifications of the professional engineer or registered geologist and of any contractors or consultants and their personnel to be used in carrying out the requirements of this Order.

### 14.0  ADDITIONAL WORK

14.1  DTSC may determine or Respondent may propose that certain tasks, including investigatory work, engineering evaluation, or procedure/methodology modifications, are necessary in addition to, or in lieu of, the tasks and deliverables included in any part of DTSC-approved work plans.  DTSC shall request in writing that Respondent perform the additional work and shall specify the basis and reasons for DTSC's determination that the additional work is necessary.  Within sixty (60) days after the receipt of such determination, Respondent may confer with DTSC to discuss additional work that DTSC has requested.  If required by DTSC, Respondent shall submit a work plan for the additional work.  Such work plan shall be submitted to DTSC within thirty (30)

calendar days of receipt of DTSC's determination or according to
alternate schedule established by DTSC.  Upon approval of a work plan,
Respondent shall implement it in accordance with the provisions and
schedule contained therein.  The need for, and disputes concerning,
additional work are subject to the dispute resolution procedures
specified in this Consent Order.

### 15.0   QUALITY ASSURANCE

15.1  All sampling and analyses performed by Respondent
under this Consent Order shall follow applicable Department and U.S. EPA
guidance for sampling and analysis.  Work plans shall contain quality
assurance/quality control and chain-of-custody procedures for all
sampling, monitoring, and analytical activities.  Any deviations from
the approved work plans must be approved by DTSC prior to
implementation, must be documented, including reasons for the
deviations, and must be reported in the applicable report (e.g., RFI
Report).

15.2  The names, addresses, and telephone numbers of the
California State certified analytical laboratories Respondent proposes
to use must be specified in the applicable work plans.

15.3  All work plans required under this Consent Order shall
include data quality objectives for each data collection activity to
ensure that data of known and appropriate quality are obtained and that
data are sufficient to support their intended uses.

15.4  Respondent shall monitor to ensure that high quality
data are obtained by its consultant or contract laboratories.
Respondent shall ensure that laboratories used by Respondent for
analysis perform such analysis according to the latest approved edition
of "Test Methods for Evaluating Solid Waste, (SW-846)", or other methods
deemed satisfactory to DTSC.  If methods other than U.S. EPA methods are

to be used, Respondent shall specify all such protocols in the applicable work plan (e.g., RFI Work Plan). DTSC may reject any data that do not meet the requirements of the approved work plan, USEPA analytical methods, or quality assurance/quality control procedures, and may require re-sampling and analysis.

15.5  Respondent shall ensure that the laboratories used by Respondent for analyses have a quality assurance/quality control program certified through the California State Department of Health Services Environmental Laboratory Accreditation Program (ELAP). DTSC may conduct a performance and quality assurance/quality control audit of the laboratories chosen by Respondent before, during, or after sample analyses. Upon request by DTSC, Respondent shall have its selected laboratory perform analyses of samples provided by DTSC to demonstrate laboratory performance. If the audit reveals deficiencies in a laboratory's performance or quality assurance/quality control procedures, re-sampling and analysis may be required.

16.0  SAMPLING AND DATA/DOCUMENT AVAILABILITY

16.1  Respondent shall submit to DTSC upon request the results of all sampling and/or tests or other data generated by its employees, agents, consultants, or contractors pursuant to this Consent Order.

16.2  Notwithstanding any other provisions of this Consent Order, DTSC retains all of its information gathering and inspection authority and rights, including enforcement actions related thereto, under the H&SC, and any other state or federal statutes or regulations.

16.3  Respondent shall notify DTSC in writing at least seven (7) calendar days prior to beginning each separate phase of field work approved under any work plan required by this Consent Order. If Respondent believes it must commence emergency field activities without

-24-

delay, Respondent may seek emergency telephone authorization from the DTSC Project Coordinator or, if the Project Coordinator is unavailable, his/her Branch Chief, to commence such activities immediately.

16.4  At the request of DTSC, Respondent shall provide or allow DTSC or its authorized representative to take split or duplicate samples of all samples collected by Respondent pursuant to this Consent Order.  Similarly, at the request of Respondent, DTSC shall allow Respondent or its authorized representative to take split or duplicate samples of all samples collected by DTSC under this Consent Order.

### 17.0  ACCESS

17.1  Subject to the Facility's security and safety procedures, Respondent shall provide DTSC and its representatives access at all reasonable times to the Facility and any other property to which access is required for implementation of this Consent Order and shall permit such persons to inspect and copy all records, files, photographs, documents, including all sampling and monitoring data, that pertain to work undertaken pursuant to this Consent Order and that are within the possession or under the control of Respondent or its contractors or consultants.

17.2  To the extent that work being performed pursuant to this Consent Order must be done beyond the Facility property boundary, Respondent shall use its best efforts to obtain access agreements necessary to complete work required by this Consent Order from the present owners of such property within thirty (30) calendar days of approval of any work plan for which access is required.  Best efforts as used in this paragraph shall include, at a minimum, a letter by certified mail from Respondent to the present owners of such property requesting an agreement to permit Respondent and DTSC and its authorized representatives access to such property and offering the payment by

-25-

A-1143

Respondent of reasonable sums of money in consideration of granting access. Any such access agreement shall provide for access to DTSC and its representatives. Respondent shall provide DTSC's Project Coordinator with a copy of any access agreements. In the event that an agreement for access is not obtained within thirty (30) calendar days of approval of any work plan for which access is required, or of the date that the need for access becomes known to Respondent, Respondent shall notify DTSC in writing within fourteen (14) calendar days thereafter regarding both the efforts undertaken to obtain access and its failure to obtain such agreements. DTSC may, at its discretion, assist Respondent in obtaining access.

17.3  Nothing in this section limits or otherwise affects DTSC's right of access and entry pursuant to any applicable state or federal law or regulation.

17.4  Nothing in this Consent Order shall be construed to limit or otherwise affect Respondent's liability and obligation to perform corrective action including corrective action beyond the Facility boundary.

18.0  RECORD PRESERVATION

18.1  Respondent shall retain, during the implementation of this Consent Order and for a minimum of six (6) years thereafter, all data, records, and documents that relate in any way to the implementation of this Consent Order or to hazardous waste management and/or disposal at the Facility. Respondent shall notify DTSC in writing ninety (90) calendar days prior to the destruction of any such records, and shall provide DTSC with the opportunity to take possession of any such records. Such written notification shall reference the effective date, caption, and docket number of this Consent Order and shall be addressed to:

-26-

Jose Kou, Chief
Southern California Permitting Branch
Department of Toxic Substances Control
1011 North Grandview Avenue
Glendale, CA 91201

18.2   If Respondent retains or employs any agent,
consultant, or contractor for the purpose of complying with the
requirements of this Consent Order, Respondent will require any such
agents, consultants, or contractors to provide Respondent a copy of all
documents produced pursuant to this Consent Order.

18.3   All documents pertaining to this Consent Order shall
be stored in a central location at the Facility to afford ease of access
by DTSC and its representatives.

### 19.0  DISPUTE RESOLUTION

19.1 The parties agree to use their best efforts to resolve
all disputes informally. The parties agree that the procedures contained
in this section are the required administrative procedures for resolving
disputes arising under this Consent Order.  If the Respondent fails to
follow the procedures contained in this section, it shall have waived
its right to further contest the disputed issue.  Respondent reserves
its legal rights to contest or defend against any final decision
rendered by DTSC under this paragraph.  Disputes regarding DTSC's
billings shall follow the procedures set forth in paragraph 19.4.

19.2   Respondent shall first seek resolution with DTSC's
assigned project manager and unit chief.  If the issue is not resolved
after review by the unit chief, the Respondent shall seek resolution
with the DTSC's branch chief by presenting in a letter the issues in
dispute, the legal or other basis for Respondent's position, and the
remedy sought.  The branch chief shall issue a written decision with an
explanation for the decision within thirty (30) business days after
receipt of the letter from the Respondent.  The branch chief's decision

-27-

shall constitute DTSC's final administrative decision on the issues in dispute.

19.3 If Respondent disputes a DTSC billing, or any part thereof, Respondent shall notify DTSC's assigned project manager and attempt to informally resolve the dispute with DTSC's project manager and branch chief. If Respondent desires to formally request dispute resolution in writing within forty five (45) business days of the date of the billing in dispute. The written request shall describe all issues in dispute and shall set forth the reasons for the dispute, both factual and legal. If the dispute pertains only to a portion of the costs included in the invoice, Respondent shall pay all costs which are undisputed in accordance with paragraphs 23.1 through 23.7. The filing of a notice of dispute pursuant to this Section shall not stay the accrual of interest on any unpaid costs pending resolution of the dispute. The written request shall be sent to:

> Special Assistant for Cost Recovery and Reimbursement Policy
> Department of Toxic Substances Control
> P.O. Box 806
> Sacramento, CA 95812-0806

A copy of the written request for dispute resolution shall also be sent to the person designated by DTSC to receive submittals under this Consent Order. A final decision on the billing dispute will be rendered by the Special Assistant for Cost Recovery and Reimbursement Policy or other DTSC designee.

19.4 The existence of a dispute shall not excuse, stay, or suspend any other compliance obligation or deadline required pursuant to this Consent Order.

## 20.0  RESERVATION OF RIGHTS

20.1 DTSC reserves all of its statutory and regulatory

powers, authorities, rights, and remedies, both legal and equitable, which may pertain to Respondent's failure to comply with any of the requirements of this Consent Order. Correspondingly, Respondent reserves all of its statutory and administrative rights, defenses and remedies, both legal and equitable, as they may arise under this Consent Order. This Consent Order shall not be construed as a covenant not to sue, release, waiver, or limitation on any rights, remedies, powers, defenses or authorities, civil or criminal or administrative, that DTSC or Respondent may have under any laws, regulations or common law.

20.2 DTSC reserves the right to disapprove of work performed by Respondent pursuant to this Consent Order and to request that Respondent perform additional tasks.

20.3 DTSC reserves the right to perform any portion of the work consented to herein or any additional site characterization, feasibility study, and/or remedial actions it deems necessary to protect human health and/or the environment. DTSC may exercise its authority under any applicable state or federal law or regulation to undertake response actions at any time. DTSC reserves its right to seek reimbursement from Respondent for costs incurred by the State of California with respect to such actions. DTSC will notify Respondent in writing as soon as practicable regarding the decision to perform any work described in this section.

20.4 If DTSC determines that activities in compliance or noncompliance with this Consent Order have caused or may cause a release of hazardous waste constituents, or a threat to human health and/or the environment, or that Respondent is not capable of undertaking any of the work required, DTSC may order Respondent to stop further implementation of this Consent Order for such period of time as DTSC determines may be needed to abate such release or threat. The deadlines for any actions

-29-

required of Respondent under this Consent Order affected by the order shall be extended to take into account DTSC's actions.

20.5  This Consent Order is not intended to be nor shall it be construed to be a permit.  The parties acknowledge and agree that DTSC's approval of any work plan, plan, and/or specification does not constitute a warranty or representation that the work plans, plans, and/or specifications will achieve the required cleanup or performance standards. Compliance by Respondent with the terms of this Consent Order shall not relieve Respondent of its obligations to comply with the H&SC or any other applicable local, state or federal law regulation.

## 21.0  OTHER CLAIMS

21.1  Except as provided in this Consent Order, nothing in this Consent Order shall constitute or be construed as a release from any claim, cause of action, or demand in law or equity against any person, firm, partnership, or corporation for any liability it may have arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous constituents, hazardous wastes, pollutants, or contaminants found at, taken to, or taken or migrating from the Facility. Respondent waives any claims or demands for compensation or payment from the State California arising out of any activity performed or expense incurred by Respondent pursuant to this Consent Order.

## 22.0  OTHER APPLICABLE LAWS

22.1  All actions required to be taken pursuant to this Consent Order shall be undertaken in accordance with the requirements of local, state, and federal laws and regulations. Respondent shall obtain or cause its representatives to obtain all permits and approvals necessary under such laws  and regulations.

-30-

## 23.0  REIMBURSEMENT OF DTSC'S COSTS

23.1  Respondent shall pay all of DTSC's costs incurred in the implementation of this Consent Order. Such costs shall include DTSC's costs incurred in the preparation of this Consent Order prior to the date it is signed.

23.2  An estimate of DTSC's costs is attached as Exhibit A showing the amount of $167,938.00. It is understood by the parties that the amount in Exhibit A is only an estimate for those activities shown in Exhibit A for the first calendar year after the effective date of this Consent Order, and may differ from the actual costs incurred by DTSC in overseeing those activities. DTSC will provide additional cost estimates for the subsequent phases of work as the work progresses.

23.3  Respondent shall make an advance payment to DTSC in the amount of $40,000.00 within thirty (30) calendar days of the effective date of this Consent Order. If the advance payment exceeds DTSC's costs, DTSC will refund the balance within one hundred twenty (120) calendar days after the execution of the Acknowledgment of Satisfaction (Acknowledgment) pursuant to Paragraph 26 of this Consent Order.

23.4  After the advance payment, DTSC will provide Respondent with a billing statement at least quarterly, which will include the name of the employee, identification of the activity, the amount of time spent on each activity, and the hourly rate charged. If Respondent does not pay an invoice within sixty (60) calendar days, the amount is subject to interest as provided in HSC section 25360.1.

23.5  DTSC will retain all cost records associated with the work performed under the Consent Order as required by state law. DTSC will make all documents which support DTSC's cost determination available for inspection upon Respondent's request, as provided by the Public Records Act.

-31-

23.6  Any dispute concerning costs pursuant to this Consent Order is subject to the Dispute Resolution provision of this Consent Order. DTSC reserves its right to recover unpaid costs under applicable state and federal laws.

23.7  All payments shall be made within thirty (30) calendar days of the date of the billing statement by check payable to the Department of Toxic Substances Control and shall be sent to:

Accounting Unit

Department of Toxic Substances Control

P.O. Box 806

Sacramento, California 95812-0806

All checks shall reference the name of the Facility, Respondent=s name and address, and the docket number of this Consent Order. Copies of all checks and letters transmitting such checks shall be sent simultaneously to DTSC's project coordinator.

### 24.0 MODIFICATION

24.1  This Consent Order may be modified by mutual agreement of the parties. Any agreed modifications shall be in writing, shall be signed by both parties, shall have as their effective date the date on which they are signed by DTSC, and shall be deemed incorporated into this Consent Order.

24.2  Any requests for revision of an approved work plan requirement must be in writing. Such requests must be timely and provide justification for any proposed work plan revision. DTSC has no obligation to approve such requests, but if it does, such approval will be in writing and signed by the Chief, Southern California Permitting Branch, Department of Toxic Substances Control, Region or his or her designee. Any approved work plan modification shall be incorporated by reference into this Consent Order.

-32-

A-1150

## 25.0 SEVERABILITY

25.1  The requirements of this Consent Order are severable, and Respondent shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

## 26.0  TERMINATION AND SATISFACTION

26.1  The provisions of this Consent Order shall be deemed satisfied upon the execution by both parties of an Acknowledgment of Satisfaction (Acknowledgment). DTSC will prepare the Acknowledgment for Respondent's signature. The Acknowledgment will be executed when Respondent has demonstrated completion of the work required under this Consent Order and full payment of DTSC's costs incurred under this Consent Order. The Acknowledgment will affirm Respondent's continuing obligation to preserve all records after the rest of the Consent Order is satisfactorily completed.

## 27.0  COUNTERPARTS

27.1 This Consent Order may be executed and delivered in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, but such counterparts shall together constitute one and the same document.

## 28.0 FULL AND COMPLETE AGREEMENTS

28.1  This Consent Order contains all of the covenants and agreements between DTSC and Respondent with respect to the subject matter of this Consent Order. Each Party to this Consent Order acknowledges that no representations, inducements, promises, or agreements have been made by or on the behalf of any party except those covenants and agreements embodied in this Consent Order.

## 29.0  CHANGE IN OWNERSHIP

29.1  No change in ownership or corporate or partnership status relating to the Facility shall in any way alter Respondent's

-33-

responsibility under this Consent Order.  No conveyance of title, easement, or other interest in the Facility, or a portion of the Facility, shall affect Respondent's obligations under this Consent Order.  However, DTSC may consent to the transfer of such obligations to a third party, and DTSC shall not unreasonably withhold its consent. Respondent shall be responsible for and liable for any failure to carry out all activities required of Respondent by the terms and conditions of this Consent Order, regardless of Respondent's use of employees, agents, contractors, or consultants to perform any such tasks.

### 30.0   NOTICE TO CONTRACTORS AND SUCCESSORS

30.1  Respondent shall provide a copy of this Consent Order to all contractors, laboratories, and consultants retained to conduct or monitor any portion of the work performed pursuant to this Consent Order and shall condition all such contracts on compliance with the terms of this Consent Order.  Respondent shall give written notice of this Consent Order to any successor in interest prior to transfer of ownership or operation of the Facility and shall notify DTSC at least seven (7)calendar days prior to such transfer.

### 31.0   SUBMITTAL SUMMARY

31.1  Below is a summary of the major reporting requirements contained in this Consent Order.  The summary is provided as a general guide and does not contain all requirements.  Please refer to the specific language of this Consent Order for all the requirements.

| Section | Action | Due Date |
|---|---|---|
| 4.2 | Implement approved work plans | In accordance with schedules contained in approved work plans |
| 5.1 | Designate Project Coordinator and notify DTSC in writing | 14 days from effective date of Order |
| 5.3 | Notify DTSC orally of | 24 hours after |

-34-

| | | potential threats to human<br>health | discovery |
|---|---|---|---|
| 5.3 | | Notify DTSC in writing<br>of potential threats to human<br>health | 15 days after<br>discovery |
| 5.2<br>5.6<br>5.7 | | Submit Current Conditions Report<br>Health and Safety Plan,<br>Community Profile | 90 days from<br>effective date<br>of Order |
| 6.1<br>6.4<br>6.6 | | Submit revised RFI Work Plan,<br>Health and Safety Plan<br>Health and Safety Plan | 90 days from receipt<br>of DTSC comments |
| 7.2 | | Submit CMS Work Plan | 60 days after DTSC's<br>approval of RFI Report |
| 9.1 | | Submit CMI Work Plan | 60 days from receipt of<br>notification of<br>DTSC selection of<br>corrective measure(s) |
| 12.1 | | Submit first Progress Report | 10th day of<br>the month following the<br>effective date of Order |
| 12.1 | | Submit Progress Reports | Every two months |
| 13.1 | | Notify DTSC in<br>writing of contractors<br>to carry out terms of<br>Order | 45 days from<br>effective date<br>of Order |
| 16.3 | | Notify DTSC of initiation<br>of field work | 7 days before each<br>phase of field work |

## 32.0 EFFECTIVE DATE

32.1  The effective date of this Consent Order shall be the date on which this Consent Order is signed by all parties.  Except as otherwise specified, days mean calendar days.

//

//

//

//

//

//

-35-

A-1153

## 32.0 SIGNATORIES

33.1  Each undersigned representative certifies that he or she is fully authorized to enter this Consent Order.

IT IS SO AGREED AND ORDERED:

EXIDE CORPORATION

Date:  2-18-02

*Philp F. Milazzo*
Print name and title

DEPARTMENT OF TOXIC SUBSTANCES CONTROL

Date:  2/25/02

Jose Kou, Chief, Southern CA
Print name and title      Peara Huy Branch

-36-



DESIGNATED WASTE, MANAGEMENT AREAS

GNE TECHNOLOGIES INC. - VERNON, CA

FIGURE 1

-3a-



MANAGEMENT AREA NO. 1
WEST YARD

GNB TECHNOLOGIES INC. - VERNON, CA -

FIGURE 2

A-1156



FIGURE 3

GNB TECHNOLOGIES INC. - VERNON, CA - JULY 1999

MANAGEMENT AREA NO. 2
SOUTHEAST YARD

-3r-



MANAGEMENT AREA NO. 3
RETENTION POND

FIGURE 4

-3c-

A-1158



MANAGEMENT AREA NO. 4
NORTH EAST YARD

GNB TECHNOLOGIES INC. - VERNON, CA

FIGURE 5

-3e-

A-1159

EXHIBIT   A

I.     RFI Workplan Review

Project Manager reviews the Current Conditions Report, RFI Workplan, Health and Safety Plan, prepares and issues a Notice of Deficiency (NOD); reviews and approves revised RFI Workplan, and Current Condition Report; coordinates with Public Participation staff in the preparation of a Public Involvement Plan (PIP) or RFI Summary Fact Sheet.

| COST ESTIMATE FOR REVIEW AND APPROVAL OF RFI WORK PLAN | | | |
|---|---|---|---|
| | HOURS | HOURLY RATE   +<br>INDIRECT  @ 191.68% | AMOUNT |
| Project Manager - HSE | 200 | $122.00 | $24,400.00 |
| Supervisor - SHSEG I | 120 | $134.00 | $16,080.00 |
| Geologist - HSEG | 80 | $116.00 | $9,280.00 |
| Sup. Geologist- SHSEG I | 24 | $134.00 | $3,216.00 |
| Asso. Industrial Hygienist | 32 | $115.00 | $3,680.00 |
| Sup. Industrial Hygienist | 16 | $131.00 | $2,096.00 |
| Public Partici. Specialist | 40 | $103.00 | $4,120.00 |
| Public Partici. Supervisor | 16 | $118.00 | $1,888.00 |
| Word Processing Tech. | 24 | $57.00 | $1,368.00 |
| SUBTOTAL | 552 | | $66,128.00 |

1

II.   RFI Oversight

Project Manager visits the facility to take split samples, and review progress reports.

| COST ESTIMATE FOR RFI OVERSIGHT | | | |
|---|---|---|---|
| | HOURS | HOURLY RATE + INDIRECT @ 191.68% | AMOUNT |
| Project Manager - HSE | 80 | $122.00 | $9,760.00 |
| Supervisor - SHSEG I | 32 | $134.00 | $4,288.00 |
| Geologist - HSEG | 32 | $116.00 | $3,712.00 |
| Sup. Geologist- SHSEG I | 16 | $134.00 | $2,144.00 |
| Asso. Industrial Hygienist | 16 | $115.00 | $1,840.00 |
| Sup. Industrial Hygienist | 8 | $131.00 | $1,048.00 |
| Word Processing Tech. | 24 | $57.00 | $1,368.00 |
| SUBTOTAL | 208 | | $24,160.00 |

III.   RFI Report Review/Approval

Project Manager reviews RFI Report, issues NOD, reviews/ approves revised RFI Report and determines whether Corrective Measure Study (CMS), Interim Measure (IM), or no further action is warranted.

| COST ESTIMATE FOR REVIEW AND APPROVAL OF RFI REPORT | | | |
|---|---|---|---|
| | HOURS | HOURLY RATE   +<br>INDIRECT  @ 196.54% | AMOUNT |
| Project Manager - HSE | 120 | $122.00 | $14,640.00 |
| Supervisor - SHSEG I | 60 | $134.00 | $8,040.00 |
| Geologist - HSEG | 32 | $116.00 | $3,712.00 |
| Sup. Geologist- SHSEG I | 16 | $134.00 | $2,144.00 |
| Asso. Industrial Hygienist | 24 | $115.00 | $2,760.00 |
| Sup. Industrial Hygienist | 8 | $131.00 | $1,048.00 |
| Public Partici. Specialist | 32 | $103.00 | $3,296.00 |
| Public Partici. Supervisor | 16 | $118.00 | $1,888.00 |
| Word Processing Tech. | 24 | $57.00 | $1,368.00 |
| SUBTOTAL | 332 | | $38,896.00 |

SUMMARY

| I.  RFI Workplan Review | $ | 66,128.00 |
|---|---|---|
| II.  RFI Oversight | $ | 24,160.00 |
| III.  RFI Report Review/Approval | $ | 38,896.00 |
| SUBTOTAL | $ | 129,184.00 |
| 10% Project Management | $ | 12,918.00 |
| 20% Contingency | $ | 25,836.00 |
| TOTAL ESTIMATED COST | $ | 167,938.00 |

3

A-1162

 *Integrated Environmental Solutions*

ATTACHMENT I

3607 Roberts Drive  3.5433-1
Suite 100
Atlanta, GA 30350
Telephone: 770-641-9756
Fax: 770-642-0257

September 6, 2001

Mr. Liang Chiang, P.E.
Hazardous Substance Engineer
California Environmental Protection Agency
Department of Toxic Substances Control
Region 3/Facility Management Branch
1011 N. Grandview Avenue
Glendale, California 91201

Re:  Contents of the Corrective Action Consent Order Required Current Conditions Report
     Exide Technologies' Vernon, California Facility
     EPA ID No. CAD 097 854 541

Dear Liang:

Per our discussions on July 18, 2001 about the contents of the Current Conditions Report (CCR) required as part of the Corrective Action Consent Order (CACO) with Exide Technologies' Vernon, California facility, I wanted to verify that the streamlined approach that Exide proposes to use to address the CCR requirement is satisfactory to the Department of Toxic Substances Control (DTSC). This letter serves as an agreement that the approach is sufficient to meet this requirement of the CACO. As we discussed, the language in the CACO has been agreed upon by Exide and DTSC, and is ready for signature once agreement is reached on the contents of the CCR. From our conversation, I understand that DTSC does not necessarily expect that the CCR will strictly follow the outline given in the CACO appendix.

Exide appreciates the opportunity to provide an alternative approach for preparing the CCR rather than strictly following the outline presented in the appendix of the CACO. Exide's streamlined approach for preparation of the CCR will include the following:

- A facility description that includes past and current operations;
- A facility history that includes ownership, operational, and regulatory history;
- A description of the past and current waste streams (solid and hazardous) generated at the facility;
- A description of all past waste management units and current permitted units, including any units or activities that were identified in negotiating cost recovery allocations with the prior owner/operator;
- The history of any spills and discharges at the facility;
- A brief description of surface drainage, surface water hydrology, geology, and hydrogeology;
- A detailed description of the facility groundwater monitoring system that includes a summary of the monitor well construction details, historical analytical data, and concentration maps;

RECEIVED

SEP 17 2001

Thomas J.P. McHenry

I:\WPATL\WP-Docs\PUBLIC\490-01\0906.chia.08L.doc

Mr. Liang Chiang, P.E.
California Environmental Protection Agency
September 6, 2001
Page 2

- A brief description of previous investigations conducted at the facility with a presentation of the available data;
- A brief summary of the physical properties of the contaminants detected at the facility;
- A conceptual model of potential contamination migration;
- A description of all corrective measures conducted at the facility; and
- An assessment of the data needs to be addressed in the revised RCRA Facility Investigation (RFI) Work Plan.

The objective of this approach is to provide DTSC with all of the available information needed to facilitate the review of the previously submitted RFI Work Plan, thus providing comments for the revised RFI Work Plan as required by the CACO. Exide understands that the information omitted from the CCR outline in the CACO to prepare the streamlined CCR needs to be incorporated into the revised RFI Work Plan, which will be submitted after receiving and incorporating DTSC comments.

Exide would appreciate DTSC's approval of this streamlined approach so that the CACO can be signed and the corrective action process initiated.

Please call me if you have any comments or questions concerning the contents of this letter.

Sincerely,

Jeffery A. Pierce, P.E.
Senior Project Manager

JAP:smr

cc:   Fred Ganster – Exide Technologies, Reading, Pennsylvania
      Tom McHenry – Gibson, Dunn & Crutcher
      Tom Wideman – Exide Technologies, Vernon, California
      Russell Kemp – RMT, Inc., Atlanta, Georgia
      Central Files

I:\WPATL\WP-Docs\PUBLIC\490-01\0906.Chia.08L.doc

**RMT** integrated Environmental Solutions

8607 Roberts Drive
Suite 100
Atlanta, GA 30350
Telephone: 770-641-9756
Fax: 770-642-0257

ATTACHMENT 2

October 2, 2001

DEPART...

OCT 0 4 2001

RECEIVED

Mr. Liang Chiang, P.E.
Hazardous Substance Engineer
California Environmental Protection Agency
Department of Toxic Substances Control
Region 3/Facility Management Branch
1011 N. Grandview Avenue
Glendale, California 91201

Re:   Contents of the Corrective Action Consent Order Required Current Conditions Report
Exide Technologies' Vernon, California Facility
EPA ID No. CAD 097 854 541

Dear Liang:

RMT, Inc. is pleased to submit this letter to confirm the approval by Department of Toxic
Substances Control (DTSC) of the proposed content of the Current Conditions Report (CCR)
required as part of the Corrective Action Consent Order with Exide Technologies' Vernon,
California facility. The approval was given for the streamline approach detailed in the
September 6, 2001 letter from RMT to DTSC with the inclusion of a study of all previously
permitted units that were taken out of service and whether they are being formally closed with
a certification report.

If DTSC has any additional comments concerning the streamlined approach, please contact me
within 14 days or we will assume that the proposed approach with the added item has been
approved.

Sincerely,

Jeffery A. Pierce, P.E.
Senior Project Manager

JAP:smr

cc:   Tom McHenry – Gibson Dunn & Crutcher
Tom Wideman – Exide Technologies
Fred Ganster – Exide Technologies
Central Files

ATTACHMENT  3

SCOPE OF WORK FOR INTERIM MEASURES IMPLEMENTATION

PURPOSE

Interim measures are actions to control and/or eliminate releases
of hazardous waste and/or hazardous constituents from a facility
prior to the implementation of a final corrective measure.
Interim measures must be used whenever possible to achieve the
goal of stabilization which is to control or abate threats to
human health and/or the environment, and to prevent or minimize
the spread of contaminants while long-term corrective action
alternatives are being evaluated.

SCOPE

The documents required for Interim Measures (IM) are, unless the
Department of Toxic Substances Control (Department) specifies
otherwise, an IM Workplan, an Operation and Maintenance Plan and
IM Plans and Specifications.  The scope of work (SOW) for each
document is specified below.  The SOWs are intended to be
flexible documents capable of addressing both simple and complex
site situations.  If the Owner/Operator or Respondent can
justify, to the satisfaction of the Department, that a plan or
portions thereof are not needed in the given site specific
situation, then the Department may waive that requirement.

The Department may require the Owner/Operator or Respondent to
conduct additional studies beyond what is discussed in the SOWs
in order to support the IM program.  The Owner/Operator or
Respondent will furnish all personnel, materials and services
necessary to conduct the additional tasks.

A.   Interim Measures Workplan

The Owner/Operator or Respondent shall prepare an IM
Workplan that evaluates interim measure options and clearly
describes the proposed interim measure, the key components
or elements that are needed, describes the designer's vision
of the interim measure in the form of conceptual drawings
and schematics, and includes procedures and schedules for
implementing the interim measure(s).  The IM Workplan must
be approved by the Department prior to implementation.  The
IM Workplan must, at a minimum, include the following
elements:

1

A-1166

1.   Introduction/Purpose

Describe the purpose of the document and provide a summary of the project.

2.   Conceptual Model of Contaminant Migration

It is important to know where the contaminants are and to understand how they are moving before an adequate interim measure can be developed.  To address this critical question, the Owner/Operator or Respondent must present a conceptual model of the site and contaminant migration.  The conceptual model consists of a working hypothesis of how the contaminants may move from the release source to the receptor population.  The conceptual model is developed by looking at the applicable physical parameters (e.g., water solubility, density, Henry's Law Constant, etc.) for each contaminant and assessing how the contaminant may migrate given the existing site conditions (geologic features, depth to groundwater, etc.).  Describe the phase (water, soil, gas, non-aqueous) and location where contaminants are likely to be found.  This analysis may have already been done as part of earlier work (e.g., Current Conditions Report).  If this is the case, then provide a summary of the conceptual model with a reference to the earlier document.

3.   Evaluation of Interim Measure Alternatives

List, describe and evaluate interim measure alternatives that have the potential to stabilize the facility.  Propose interim measures for implementation and provide rationale for the selection.  Document the reasons for excluding any interim measure alternatives.

4.   Description of Interim Measures

Qualitatively describe what the proposed interim measure is supposed to do and how it will function at the facility.

5.   Data Sufficiency

Review existing data needed to support the design effort and establish whether or not there are sufficient accurate data available for this purpose.  The Owner/Operator or Respondent must summarize the assessment findings and specify any additional data needed to complete the interim measure design.  The Department may require or the Owner/Operator or

2

Respondent may propose that sampling and analysis plans
and/or treatability study workplans be developed to
obtain the additional data.  Submittal times for any
new sampling and analysis plans and/or treatability
study workplans must be included in the project
schedule.

6.    Project Management

Describe the levels of authority and responsibility
(include organization chart), lines of communication
and a description of the qualifications of key
personnel who will direct the interim measure design
and implementation effort (including contractor
personnel).

7.    Project Schedule

The project schedule must specify all significant steps
in the process, when any key documents (e.g., plans and
specifications, operation and maintenance plan) are to
be submitted to the Department and when the interim
measure is to be implemented.

8.    Design Basis

Discuss the process and methods used to design all
major components of the interim measure.  Discuss the
significant assumptions made and possible sources of
error.  Provide justification for the assumptions.

9.    Conceptual Process/Schematic Diagrams.

10.   Site plan showing preliminary plant layout and/or
treatment area.

11.   Tables listing number and type of major components with
approximate dimensions.

12.   Tables giving preliminary mass balances.

13.   Site safety and security provisions (e.g., fences, fire
control, etc.).

14.   Waste Management Practices

Describe the wastes generated by the construction of
the interim measure and how they will be managed.  Also
discuss drainage and indicate how rainwater runoff will
be managed.

3

15.   Required Permits

List and describe the permits needed to construct the
interim measure.  Indicate on the project schedule when
the permit applications will be submitted to the
applicable agencies and an estimate of the permit
issuance date.

16.   Sampling and monitoring activities may be needed for
design and during construction of the interim measure.
If sampling activities are necessary, the IM Workplan
must include a complete sampling and analysis section
which specifies the following information:
  a.   Description and purpose of monitoring tasks;
  b.   Data quality objectives;
  c.   Analytical test methods and detection limits;
  d.   Name of analytical laboratory;
  e.   Laboratory quality control (include laboratory
       QA/QC procedures in appendices)
  f.   Sample collection procedures and equipment;
  g.   Field quality control procedures:
       o    duplicates (10% of all field samples)
       o    blanks (field, equipment, etc.)
       o    equipment calibration and maintenance
       o    equipment decontamination
       o    sample containers
       o    sample preservation
       o    sample holding times (must be specified)
       o    sample packaging and shipment
       o    sample documentation (field notebooks, sample
            labeling, etc);
  h.   Criteria for data acceptance and rejection; and
  i.   Schedule of monitoring frequency.

The Owner/Operator or Respondent shall follow all
Department and USEPA guidance for sampling and
analysis.  The Department may request that the sampling
and analysis section be a separate document.

17.   Appendices including:

Design Data - Tabulations of significant data used in
the design effort;

Equations - List and describe the source of major
equations used in the design process;

Sample Calculations - Present and explain one example
calculation for significant calculations; and

Laboratory or Field Test Results.

4

B.   Interim Measures Operation and Maintenance Plan

The Owner/Operator or Respondent shall prepare an Interim
Measures Operation and Maintenance (O&M) Plan that includes
a strategy and procedures for performing operations,
maintenance, and monitoring of the interim measure(s).  An
Interim Measures Operation and Maintenance Plan shall be
submitted to the Department simultaneously with the  Plans
and Specifications.  The O&M plan shall, at a minimum,
include the following elements:

1.   Purpose/Approach

Describe the purpose of the document and provide a
summary of the project.

2.   Project Management

Describe the levels of authority and responsibility
(include organization chart), lines of communication
and a description of the qualifications of key
personnel who will operate and maintain the interim
measure(s) (including contractor personnel).

3.   System Description

Describe the interim measure and identify significant
equipment.

4.   Personnel Training

Describe the training process for O&M personnel.  The
Owner/Operator or Respondent shall prepare, and include
in the technical specifications governing treatment
systems, contractor requirements for providing:
appropriate service visits by experienced personnel to
supervise the installation, adjustment, start up and
operation of the treatment systems, and training
covering appropriate operational procedures once the
start-up has been successfully accomplished.

5.   Start-Up Procedures

Describe system start-up procedures including any
operational testing.

6.   Operation and Maintenance Procedures

Describe normal operation and maintenance procedures
including:

a.   Description of tasks for operation;

5

b.  Description of tasks for maintenance;
c.  Description of prescribed treatment or operation condition, and
d.  Schedule showing frequency of each O&M task.

7.  Replacement schedule for equipment and installed components.

8.  Waste Management Practices

Describe the wastes generated by operation of the interim measure and how they will be managed.  Also discuss drainage and indicate how rainwater runoff will be managed.

9.  Sampling and monitoring activities may be needed for effective operation and maintenance of the interim measure.  If sampling activities are necessary, the O&M plan must include a complete sampling and analysis section which specifies the following information:

a.  Description and purpose of monitoring tasks;
b.  Data quality objectives;
c.  Analytical test methods and detection limits;
d.  Name of analytical laboratory;
e.  Laboratory quality control (include laboratory QA/QC procedures in appendices)
f.  Sample collection procedures and equipment;
g.  Field quality control procedures:
    o  duplicates (10% of all field samples)
    o  blanks (field, equipment, etc.)
    o  equipment calibration and maintenance
    o  equipment decontamination
    o  sample containers
    o  sample preservation
    o  sample holding times (must be specified)
    o  sample packaging and shipment
    o  sample documentation (field notebooks, sample labeling, etc);
h.  Criteria for data acceptance and rejection; and
i.  Schedule of monitoring frequency.


The Owner/Operator or Respondent shall follow all Department and USEPA guidance for sampling and analysis.  The Department may request that the sampling and analysis section be a separate document.

10.  O&M Contingency Procedures:

a.  Procedures to address system breakdowns and operational problems including a list of redundant

6

and emergency back-up equipment and procedures;

b.  Should the interim measure suffer complete
    failure, specify alternate procedures to prevent
    release or threatened releases of hazardous
    substances, pollutants or contaminants which may
    endanger public health and/or the environment or
    exceed cleanup standards; and

c.  The O&M Plan must specify that, in the event of a
    major breakdown and/or complete failure of the
    interim measure (includes emergency situations),
    the Owner/Operator or Respondent will orally
    notify the Department within 24 hours of the event
    and will notify the Department in writing within
    72 hours of the event.  The written notification
    must, at a minimum, specify what happened, what
    response action is being taken and/or is planned,
    and any potential impacts on human health and the
    environment.

11.  Data Management and Documentation Requirements

Describe how analytical data and results will be
evaluated, documented and managed, including
development of an analytical database.  State the
criteria that will be used by the project team to
review and determine the quality of data.

The O&M Plan shall specify that the Owner/Operator or
Respondent collect and maintain the following
information:

a.  Progress Report Information

    o   Work Accomplishments (e.g., performance
        levels achieved, hours of treatment
        operation, treated and/or excavated volumes,
        concentration of contaminants in treated
        and/or excavated volumes, nature and volume
        of wastes generated, etc.).

    o   Record of significant activities (e.g.,
        sampling events, inspections, problems
        encountered, action taken to rectify
        problems, etc.).

b.  Monitoring and laboratory data;
c.  Records of operating costs; and
d.  Personnel, maintenance and inspection records.

7

A-1172

The Department may require that the Owner/Operator or Respondent submit additional reports that evaluate the effectiveness of the interim measure in meeting the stabilization goal.

C.   IM Plans and Specifications

[Note - The Owner/Operator or Respondent may propose or the Department may require the submittal of other draft plans and specifications at different points in the design process.]

The Owner/Operator or Respondent shall prepare Plans and Specifications for the interim measure that are based on the conceptual design but include additional detail. The Plans and Specifications shall be submitted to the Department simultaneously with the Operation and Maintenance Plan. The design package must include drawings and specifications needed to construct the interim measure. Depending on the nature of the interim measure, many different types of drawings and specifications may be needed. Some of the elements that may be required are:

o   General Site Plans
o   Process Flow Diagrams
o   Mechanical Drawings
o   Electrical Drawings
o   Structural Drawings
o   Piping and Instrumentation Diagrams
o   Excavation and Earthwork Drawings
o   Equipment Lists
o   Site Preparation and Field Work Standards
o   Preliminary Specifications for Equipment and Material

General correlation between drawings and technical specifications is a basic requirement of any set of working construction plans and specifications. Before submitting the project specifications to the Department, the Owner/Operator or Respondent shall:

a.   Proofread the specifications for accuracy and consistency with the conceptual design; and

b.   Coordinate and cross-check the specifications and drawings.

8

ATTACHMENT 4

SCOPE OF WORK FOR HEALTH AND SAFETY PLAN

The Department of Toxic Substances Control (Department) may require that the Owner/Operator or Respondent prepare a Health and Safety Plan for any corrective action field activity (e.g., soil or ground water sampling, drilling, construction, operation and maintenance of a treatment system, etc.).  The Health and Safety Plan must, at a minimum, include the following elements:

1.   Objectives

Describe the goals and objectives of the Health and Safety Plan (must apply to on-site personnel and visitors).  The Health and Safety Plan must be consistent with the facility Contingency Plan, OSHA Regulations, NIOSH Occupational Safety and Health Guidance Manual for Hazardous Waste Site Activities (1985), all state and local regulations and other Department guidance as provided.

2.   Hazard Assessment

List and describe the potentially hazardous substances that could be encountered by field personnel during field activities.

Discuss the following:

o    Inhalation Hazards
o    Dermal Exposure
o    Ingestion Hazards
o    Physical Hazards
o    Overall Hazard Rating

Include a table that, at a minimum, lists:  Known Contaminants, Highest Observed Concentration, Media, Symptoms/Effects of Acute Exposure.

3.   Personal Protection/Monitoring Equipment

For each field task, describe personal protection levels and identify all monitoring equipment.

Describe any action levels and corresponding response actions (i.e., when will levels of safety be upgraded).

Describe decontamination procedures and areas.

. 1

4.    Site Organization and Emergency Contacts

List and identify all contacts (include phone numbers).
Identify the nearest hospital and provide a regional map
showing the shortest route from the facility to the
hospital.  Describe site emergency procedures and any site
safety organizations.  Include evacuation procedures for
neighbors (where applicable).

Include a facility Map showing emergency station locations
(first aid, eye wash areas, etc.).

2

A-1175

ATTACHMENT 5

Community Profile

The following items should be included in the Community Profile:

SITE DESCRIPTION

- Description of proposed project.

- Map.

- Description of the site/facility location.

- Description of the surrounding land uses and environmental resources (including proximity to residential housing, schools, churches, etc.).

- Visibility of the site to neighbors.

- Demographics of community in which the site is located (e.g., socioeconomic level, ethnic composition, specific language considerations, etc.). This information may be found in local libraries (e.g., census records).

LOCAL INTEREST

- Contacts with community members - any inquiries from community members, groups, organizations, etc. (include names, phone numbers, and addresses on the key contact list).

- Community interactions - any current meetings, events, presentations, etc.

- Media coverage - any newspaper, magazine, television, etc., coverage.

- Government contacts - city and county staff, state and local elected officials.

KEY CONTACT LIST

- Names, addresses, and phone numbers of city manager, city/county planning department staff, local elected officials, and other community members with whom previous contact has been made.

PAST PUBLIC INVOLVEMENT ACTIVITIES

- Any ad hoc committees, community meetings, workshops, letters, newsletters, etc., about the site or similar activity.

-1-

## KEY ISSUES AND CONCERNS

- o Any specific concerns/issues raised by the community regarding the site/facility or any activities performed on the site/facility.

- o Any anticipated concerns/issues regarding the site/facility.

- o Any general environmental concerns/issues in the community.

PP Review _____      Date_____

-2-

A-1177

# **TAB 20**

**Declaration of Eric Fraske in Support of Debtors' Abandonment
of the Vernon Non-Performing Property Pursuant to the Amended
Plan, dated October 13, 2020 [Bankr. D.I. 952] *excluding exhibits**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re                                                           :          Chapter 11

                                                                :

EXIDE HOLDINGS, INC., *et al.*,                                 :          Case No. 20–11157 (CSS)

                                                                :

Debtors.[1]                                                     :          (Jointly Administered)

                                                                :

------------------------------------------------------------ x

### DECLARATION OF ERIC FRASKE IN SUPPORT
### OF DEBTORS' ABANDONMENT OF THE VERNON
### NON-PERFORMING PROPERTY PURSUANT TO THE AMENDED PLAN

I, Eric Fraske, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Senior Consultant and Engineer at Alta Environmental, Inc. ("**Alta**"), a full-service environmental consulting firm specializing in remediation, air quality, water resources, environmental health and safety compliance, and environmental engineering services. I have held this position from June 2016 through the present.  As a Senior Consultant and Engineer, I have managed and executed a variety of environmental compliance, investigations, and remediation projects for numerous private and public clients.  Prior to my employment at Alta, from June 2004 through May 2016, I was an Environmental Services Manager at Professional Service Industries, Inc., a consulting and engineering firm that specializes in, among other services, environmental consulting, engineering, and testing.  In October 2014, I was promoted to

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

Branch Manager and served in that capacity through May 2016.  I graduated from Michigan State University in 2004 with a Bachelor of Science in Civil Engineering.

2.      On December 28, 2017, Alta was retained by Exide Technologies, LLC ("**Exide**" and, together with Exide Holdings, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, the "**Debtors**") to provide staffing for the Resident Engineer position during Phase 1 closure pursuant to, and as defined in, Exide's December 8, 2016 Final Closure Plan (the "**Closure Plan**") at its inactive battery recycling facility located at 2717 South Indiana Street in Vernon, California, Los Angeles County (the "**Vernon NPP**" or the "**Site**").   Since the commencement of Alta's closure work at the Vernon NPP, I have served as Resident Engineer, of which my obligations are daily, full time on-site observation and documentation of closure activities conducted at the Site, collection of soil vapor and soil samples, and closure report preparation.  Following Exide's declaration of *force majeure* due to the COVID-19 pandemic in March 2020, I remain present on site at least once per week, and I have continued to assist with all ongoing essential maintenance, surveillance, and repair operations performed by the skeleton team that remains at the Site.

3.      I submit this declaration (the "**Declaration**") in support of Debtors' abandonment of the Vernon NPP pursuant to the Amended Plan,[2] as further described in the Confirmation Brief.  In my capacity as Resident Engineer at the Vernon NPP site, I am knowledgeable and familiar with the day-to-day remediation, maintenance, and inspection operations ongoing at the Vernon NPP, and have a detailed understanding of the current physical and environmental conditions at the Site.

---

[2]      Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the Disclosure Statement, or the Abandonment Brief, filed contemporaneously herewith, as applicable.

4.      Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my on-site duties and experience at the Vernon NPP, my review of relevant documents and other information as part of my duties and responsibilities as a Senior Consultant and Engineer at Alta and as a Resident Engineer on-site at the Vernon NPP, or my opinion based upon my familiarity with the remediation, maintenance, and inspection operations ongoing at the Vernon NPP.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Site Background

5.      The Vernon NPP is an inactive lead-acid battery recycling facility, which Exide acquired in September 2000 and where it conducted recycling operations until March 2014. The facility's operations began in 1922, and it was modernized and expanded in 1982.  In 1981, under the Resource Conservation and Recovery Act ("**RCRA**"), the facility was granted "interim status," which allows it to continue to operate pending DTSC review and a final permitting decision.  In 2002, Exide was operating under "interim status" and also implementing corrective action activities for lead and arsenic contamination pursuant to a 2002 Corrective Action Consent Order (the "**CACO**") with DTSC to address contamination that existed prior to Exide's acquisition of the Site.  The CACO is attached as Ex. 1 to the *Declaration of Roy Messing in Support of Debtors' Abandonment of the Vernon Non-Performing Property Pursuant to the Amended Plan* (the **"Messing Declaration"**), filed contemporaneously herewith.  In early 2014, Exide submitted a revised RCRA Hazardous Waste Facility Permit application to the DTSC.  In November 2014, during Exide's second Chapter 11 bankruptcy, Exide and the DTSC entered into the 2014 Stipulation and Order (the "**2014 Order**"), which resolved disputes concerning Exide's on- and off-site corrective action obligations under the CACO, its permit application and corresponding

closure and post closure plan requirements, and funding of financial assurances for the closure and post closure plan. The 2014 Order is attached as Ex. 2 to the Messing Declaration. In February 2015, the DTSC informed Exide of its intent to proceed with permit denial proceedings for Exide's RCRA Hazardous Waste Facility Permit application.

6.      In March 2015, Exide entered into a non-prosecution agreement (the "**NPA**") with the U.S. Department of Justice and the DTSC in which Exide agreed to withdraw its RCRA permit application and permanently close the Vernon NPP facility by proposing and implementing a closure plan. The NPA is attached as Ex. 3 to the Messing Declaration. Accordingly, also in March 2015, Exide and the DTSC entered into the 2015 Amended Stipulation and Order (the "**2015 Amended Order**"), which required Exide to submit a closure plan to describe how the facility would be remediated, deconstructed, and closed. The 2015 Amended Order is attached as Ex. 4 to the Messing Declaration.

7.      Exide and the DTSC subsequently entered into the 2016 Second Amended Stipulation and Order (the "**2016 Amended Order**"), which resolved a dispute over off-site corrective action expenditures and updated party contact information. The 2016 Amended Order is attached as Ex. 5 to the Messing Declaration. On December 8, 2016, the DTSC approved Exide's Closure Plan, which addresses decontamination, deconstruction, and disposal of equipment and structures utilized in hazardous waste management at the Site. The Closure Plan is attached as Ex. 6 to the Messing Declaration.

### Pre- and Post-*Force Majeure* Closure Operations

8.      Beginning in December 2017, and up until March 2020, in coordination with other consultants and contractors on site, I performed the assigned duties of the Resident Engineer during Phase 1 closure, as defined in the Closure Plan. For each day in which closure

activities took place—typically four days per week—I was present on site full-time. Phase 1 closure has involved inventory removal, hazardous waste management unit decontamination and removal, soil and soil vapor sampling, and decontamination and deconstruction of the main containment building on site. Certain units, including the surface impoundment/stormwater pond, pump sump, and stormwater management system (as defined in the Closure Plan) have remained operational throughout closure activities. Throughout Phase 1 closure, the California Department of Toxic Substances Control ("**DTSC**") retained its own third-party consultant, Parsons Corporation, that was stationed on site observing and documenting operations on all days in which closure activities took place. Additionally, representatives from the DTSC itself inspected the Site once per week. As Resident Engineer at the Site, I personally escorted DTSC representatives during their weekly Site inspections, provided them with various daily compliance and inspection documentation, and answered their questions about ongoing operations at the Site. As of December 31, 2019, Exide has completed decontamination and deconstruction of 37 separate RCRA units (structures or individual pieces of equipment) at the Site, conducted multiple rounds of soil, soil vapor, and groundwater sampling, and has completed the first of three segments of demolition of the main containment building on site.

9.       As of March 2020, following Exide's declaration of a *force majeure* with respect to closure operations at the Site, Phase 1 closure demolition and deconstruction activities have been postponed, and a skeleton team of consultants and contractors have remained on site to carry out essential maintenance, surveillance, and repair functions to maintain stability at the Site. Correspondences between Exide and DTSC regarding Exide's declaration of a *force majeure* and describing Exide's reduced closure activities during the COVID-19 pandemic are attached as Exhibits 7-12 to the Messing Declaration. During this period, tasks on-site were reduced to

RLF1 24139316V.1

inspection of critical site features (particularly the FEU (as defined below), scaffolding, and mobile equipment), maintaining electrical supply, daily ambient air sampling for lead and arsenic, and conservation of the on-site industrial wastewater treatment system.  DTSC representatives have continued to inspect the Site once per week during this period, but Parsons Corporation no longer sits on site daily or observes on-site operations.

10.     In light of the reduced operations at the Site, I now sit on site one day per week, which coincides with the DTSC's weekly visit to the Site so that I can continue to escort them during their weekly inspection, provide documentation as requested, and answer their questions about the ongoing operations at the Site.  In my weekly interactions with the DTSC at the Site, no representatives of the DTSC have formally requested or ordered any additional or time sensitive work, nor a resumption of pre-*force majeure* closure activities at the Site.

## Current Site Condition

11.     As of the date of this Declaration, the Vernon NPP is fenced and secured, and based on daily ambient air testing around the perimeter of the Site and daily inspections and maintenance of critical features at the Site, there are no uncontrolled releases of any hazardous materials or unsecured or exposed waste materials.  The fencing surrounding the Vernon NPP is secure and stable.  Only one building on-site—the containment building—is currently in the deconstruction process, and the current mid-demolition segment of the building has been fully secured with scaffolding and a Full Enclosure Unit ("**FEU**") – a tent-like structure utilized for preventing lead dust circulation beyond the demolition site.  The scaffolding and FEU are maintained and inspected daily by on-site contractors, and monitored by a series of perimeter manometers, which measure and confirm that required levels of negative air pressure within the FEU are maintained.  True and correct copies of the most recent inspection reports for the FEU,

attached hereto as **<u>Exhibit 1</u>**, show that the FEU is currently in good working order.  This is further confirmed by the most recent differential pressure logs, true and correct copies of which are attached hereto as **<u>Exhibit 2</u>**, which show that current appropriate levels of negative air pressure are present within the FEU.  The baghouses located within the containment building—which filter air within the FEU and collect dust—are currently operating and serve as a secondary preventative measure in addition to the FEU enclosing the demolition site.   Additionally, three on-site employees conduct daily inspection and maintenance of the baghouses, stormwater collection system, surface impoundment pond, and wastewater treatment plant.  Perimeter ambient air samplers operate 24 hours a day and are stationed at various points around the entire perimeter of the Site.  Daily perimeter air samples are collected and analyzed by Exide's contractor, Almega, for lead and arsenic.  Daily inspection and compliance reports are completed to ensure orderly operations and management of all ongoing activities at the Site.

12.    Since commencement of closure activities pursuant to the Closure Plan through the date of this Declaration—including throughout the COVID-19 pandemic, the reduced task load on-site as of March 2020, and the few times in which inspections of the FEU identified a breach in the tent requiring repair—no ambient air samples taken at the Vernon NPP have exceeded state-sanctioned permissible levels of lead or arsenic due to any on-site occurrences.  The most recent ambient air samples, true and correct copies of which are attached hereto as **<u>Exhibit 3</u>**, confirm that this is still the case.  In the few instances in which there were tears in the FEU, the manometers promptly alerted the on-site staff of the breach in the tent material, and the FEU was promptly inspected and repaired.  The daily samples collected from the perimeter air samplers did not detect levels of lead or arsenic above permitted levels at the Site during any of the brief periods between when the FEU was damaged and when it was repaired.  In the past couple of months, the

portions of the FEU identified for refurbishment—including a section that suffered a tear in June 2020—have been reinforced and layered with new protective materials.

13.     Every inch of the Site is paved or covered by a building, so no bare dirt is exposed and soil is contained.  Additionally, since commencement of the Debtors' chapter 11 cases, there has been no stormwater runoff anywhere outside of the Site's perimeter.  The Site is graded to ensure that all stormwater flows to the on-site stormwater collection system and then is discharged to the surface impoundment pond, which is currently empty and has been thoroughly cleaned.  Additionally, because current operations at the Site are not generating any wastewater, the wastewater treatment plant remains functional as needed but not currently in operation.  The entire Site is fully secured and contained so as to eliminate any threat of uncontrolled releases of lead- or arsenic-contaminated materials, dust, or soil.

14.     I am aware of the DTSC's July 3, 2020 letter to Exide and accompanying Interim Measures Order regarding Exide's declaration of *force majeure*, which are attached as Exhibits 10 and 11, respectively, to the Messing Declaration.  I personally escorted the DTSC representatives who conducted the dust sampling referenced in this correspondence when they collected it in November 2019.  All seven samples taken during the DTSC's sample collection were taken at indoor or covered locations on the Site.  Neither the limited ongoing work at the Site nor any variances in weather conditions are disturbing the dust at these seven locations or causing it to escape its respective structures.  If any lead- or arsenic-contaminated dust were to have been subject to an uncontrolled release requiring immediate action, the ambient concentrations of lead or arsenic, in excess of permitted levels, would have been measured in perimeter air samplers.

15.     Since closure activities commenced at the Site in 2017, the daily perimeter air samplers have never revealed lead or arsenic concentrations in excess of permitted levels as a

result of any on-site occurrences.  In fact, the only time any sample collected from an on-site air sampler detected concentration of lead or arsenic above permitted levels was with respect to arsenic levels on September 7 and 8, 2018 due to a large structure fire at a nearby, unaffiliated off-site location.  The South Coast Air Quality Management District investigated this incident and determined that there were no violations at the Vernon site.

16.     During the DTSC's weekly inspections of the Site since July 3, 2020, its representatives have never mentioned the July 3, 2020 Interim Measures Order, have never requested or ordered that action be taken with respect to the dust referenced in the Interim Measures Order, and they have never conducted any abatement activities themselves with respect to this dust.

**Post-Abandonment Transition of Vernon NPP Closure Operations to the DTSC**

17.     As noted above, the Site is stable and secured, and nothing on the Site presents any imminent threat to public health and safety.  This is the case even if there were a several-week time gap between Exide's abandonment and the DTSC's takeover of closure operation oversight.  Post-abandonment by the Debtors, and upon either the DTSC's assumption of the Debtors' contract with Alta or by new agreement, Alta is available and willing to continue to conduct closure operations at the Site.  Based on my conversations with representatives from the other consulting firms and contractors performing remediation and maintenance at the Vernon NPP, all other consultants and contractors affiliated with the Vernon NPP's closure operations most likely would also be willing to continue their respective work streams at the Site—including taking over Exide employees' current limited on-site maintenance work—should the DTSC assume existing work contracts or reach new agreements with them.  It is my understanding that

the DTSC has already commenced these conversations with certain contractors during its previous preparations for the Vernon NPP's transfer to an environmental trust.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 12, 2020

_/s/ Eric Fraske_____
Eric Fraske

Senior Consultant and Engineer
Alta Environmental, Inc.

# **<u>TAB 21</u>**

**Declaration of Dr. Gina M. Solomon in Support of the California
Department of Toxic Substances Control's Objections to Debtors'
Second Amended Joint Chapter 11 Plan [Bankr. D.I. 965]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| EXIDE HOLDINGS, INC., *et al.*,[1] | Case No. 20-11157 (CSS) |
| Debtors. | Jointly Administered |

**DECLARATION OF DR. GINA M. SOLOMON IN SUPPORT OF THE
CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S
OBJECTIONS TO DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN**

I, Dr. Gina Solomon, hereby declare as follows:

**I.    SCOPE OF OPINION**

1.    All the opinions stated in this declaration are stated to a reasonable degree of scientific certainty. I reserve the right to discuss general concepts within the fields of toxicology, exposure assessment, statistics and epidemiology to provide context for the opinions discussed in this report. All of the opinions stated in this declaration are my own and do not represent those of the Public Health Institute or the University of California San Francisco.

**II.    QUALIFICATIONS AND BACKGROUND**

2.    I am a medical doctor trained and certified in the field of occupational and environmental medicine. As an expert in occupational and environmental medicine, I have broad expertise in toxicology, epidemiology, statistics, exposure assessment, and risk assessment. My particular training specializes in critically evaluating multiple types of scientific information, determining the overall weight of the scientific evidence, and translating the scientific evidence into health recommendations, diagnoses, and treatments of specific patients. Attached is a true

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

and correct copy of my curriculum vitae, which describes my education, training, professional experience and publications.

3.      I received a bachelor's degree from Brown University magna cum laude, Phi Beta Kappa, in 1986, a doctorate in medicine from Yale University in 1991, and a master's degree in public health from Harvard University in 1994. I also completed a Fellowship in occupational and environmental medicine at the Harvard School of Public Health in 1996. My training included graduate-level courses in toxicology, epidemiology, pharmacology, exposure science, statistics, and risk assessment. I obtained board certification in both internal medicine and occupational and environmental medicine, and I am licensed to practice medicine in California.

4.      My post-graduate training at Harvard in occupational and environmental medicine included learning to critically review research studies to integrate multiple pieces of scientific evidence, including multiple epidemiologic and toxicologic studies of varying scientific quality. The purpose of the training was to learn to provide the best overall information for patients, communities, and agencies that are trying to make health- and science-based decisions.

5.      I joined the clinical faculty at the University of California San Francisco (UCSF) in 1998 as an Assistant Clinical Professor. I was promoted to Associate Clinical Professor in 2006 and to full Clinical Professor in 2011. In 2003, I co-founded the UCSF Pediatric Environmental Health Specialty Unit (PEHSU), a program designed to educate doctors, nurses, and the general public about pediatric environmental health. Along with a clinical practice, the PEHSU provides advice to the U.S. Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Environmental Protection Agency (EPA), California Department of Public Health, and other government agencies in situations where children are potentially exposed to environmental toxicants.

6.      From 2008 to 2012, I was the Director of the UCSF residency program in occupational and environmental medicine. In that position, I was responsible for educating physicians on how to critically evaluate and integrate information on chemical exposures and hazards, in order to provide scientifically-based guidance for patients, communities, and agencies. I taught classes on risk assessment, exposure assessment, risk communication, and toxicology. Since 2012, I have continued to teach classes in environmental health, toxicology and risk communication at both UCSF and at the U.C. Berkeley School of Public Health.

7.      In 2012, I was appointed by Governor Edmund G. Brown, Jr to the position of Deputy Secretary for Science and Health at the California Environmental Protection Agency (CalEPA). In that role, I was the scientific advisor to Secretary Matthew Rodriquez on all issues related to toxic chemicals and health. The Secretary turned to me for advice when there was controversy over specific research studies, disagreement about the conclusions from a body of scientific information, or uncertainty in an exposure assessment or risk assessment. I served until early 2018 in this position, frequently immersing myself in the details of the science on specific issues, including the health effects of lead at the former Exide battery manufacturing site and in the soils of the surrounding neighborhood.

8.      I have served *pro bono* on numerous scientific advisory committees. I served from 2011-2016 on the Chartered Executive Committee of the U.S. EPA Science Advisory Board (SAB). Before that time, I served on numerous sub-committees of the SAB, including the Drinking Water Committee from 2004-2010. I currently serve on the U.S. EPA Board of Scientific Counselors subcommittee on Chemical Safety for Sustainability and Human Health Risk Assessment, where I continue to provide advice to the agency on their environmental health research programs.

9.      I have served on multiple boards and committees of the National Academy of Sciences (NAS). In 2019, I completed six years of service on the NAS Board on Environmental Studies and Toxicology. Because of my recognized expertise in toxicology, exposure assessment, and risk assessment, I was appointed to the Committee on Toxicity Testing and Assessment of Environmental Agents, and the Committee on Human and Environmental Exposure Science in the 21st Century. In 2012, I received a Certificate of Appreciation for Outstanding Service from the NAS for my years of work on multiple committees. I continue to serve on the NAS Committee on Emerging Science for Environmental Health Decision-Making.

10.      I have published over 60 peer-reviewed scientific papers in major environmental health and medical journals. I have also written chapters on environmental health for leading textbooks. I regularly present my work at scientific conferences. I have been selected by the editors as a peer-reviewer for many well-regarded scientific journals, including: American Journal of Epidemiology; American Journal of Preventive Medicine; Environmental Health Perspectives; Environmental Science and Technology; Environmental Research; International Journal of Occupational and Environmental Health; Journal of the American Medical Association (JAMA); and Journal of Occupational and Environmental Medicine, to name a few.

11.      Currently, I am a Principal Investigator at the Public Health Institute, a large California-based non-profit research and education organization. I have research funding from the California Breast Cancer Research Program, the National Institute of Environmental Health Sciences, and the Centers for Disease Control and Prevention to investigate exposure to environmental chemicals that are potentially associated with cancer and other health conditions.

12.      Within the past five years, I have served once as an expert for the defense in a legal case and twice as an expert for the plaintiff. In 2019 I provided a declaration for the defense

in California Chamber of Commerce v. Xavier Becerra in the U.S. District Court for the Eastern

District of California. My declaration related to the scientific evidence that acrylamide causes

cancer. Also in 2019, I testified at trial in Larry Lee v. Amazon.com, Inc., in Alameda County

Superior Court. This case involved the sale of skin lightening creams containing high levels of

mercury. In 2017, I testified at trial in People of the State of California Ex. Rel. California Air

Resources Board v. BP West Coast Products LLC, in Contra Costa County Superior Court. This

was the penalty phase of an enforcement action against a petroleum company for selling gasoline

in California that did not comply with state standards for volatile organic compounds.

**III.   HEALTH EFFECTS OF LEAD**

13.     Lead (Pb) has been known for over a century to be a multi-system poison.

Exposures that were relatively common in the workplace decades ago were observed to cause

anemia, abdominal cramps, seizures, and severe kidney damage in previously healthy adults.

Since the 1980's, it has become clear that Pb also causes subtle health effects at levels far below

those that cause the obvious health effects listed above. Even trace levels of lead exposure are

toxic to the human body, causing increased blood pressure, triggering cardiovascular and kidney

disease, and impairing neurologic function.

14.     Due to the clear evidence of harm to human health from even small amounts of

lead, the Centers for Disease Control and Prevention (CDC) has the stated goal "to **prevent**

childhood lead exposure before any harm occurs" (emphasis in original). The CDC further states:

"No safe blood lead level in children has been identified. Even low levels of lead in blood have

been shown to affect IQ, the ability to pay attention, and academic achievement. The good news

is that childhood lead poisoning is 100% preventable. Preventing childhood lead exposure is

cost-effective." (CDC, 2019)

15.     The CDC discusses a 2017 report from the Health Impact Project that concludes: "[A] federal investment of $80 billion would prevent all U.S. children born in 2018 from having any detectable levels of lead in their blood. This investment has an estimated $83.9 billion in societal benefits, which represents a 5% return on investment. If it cost less than $80 billion to remove lead from the environment, then the cost-benefit ratio would be greater. Additionally, permanently removing lead hazards from the environment would benefit future birth cohorts, and savings would continue to grow over time."

16.     In 2012, the United States National Toxicology Program (NTP) reported that even relatively low levels of exposure to lead are strongly associated with intellectual deficits, diminished academic abilities, attention deficit, and problem behaviors in children. The American Academy of Pediatrics (AAP) issued a 2016 statement recommending action to prevent childhood lead exposure. The AAP statement emphasized: "Lead can cause spontaneous abortion, low birth weight, and reduced growth in children," "inattention, impulsivity, aggression, and hyperactivity," and "conduct disorder, delinquency, and criminal behaviors." (AAP, 2016)

17.     Pb is a metal that historically did not occur in the soil or surface layers of the earth. Studies of lead deposited in ice shows that in pre-industrial times, lead was almost nonexistent in the atmosphere, and that humans had almost no exposure to this material. Levels in ice cores rose by about 300-fold from the middle ages through the 1970's, showing a massive increase in human exposures to this toxic material.

18.     Lead exposures in the general population have declined significantly since the 1970's in the United States, but elevated levels of exposure still exist in some populations, such as those that live in areas near contaminated sites. Lead at contaminated sites adheres to soil, and

can blow in the air for significant distances, contaminating properties, and being tracked indoors where it can contaminate floors and carpets where children play.

19.     In a study of over 14,000 adults in the United States published in the prestigious journal *Lancet Public Health*, lead was found to be a major contributor to cardiovascular disease mortality, and overall doubled the risk of dying of ischaemic heart disease ("heart attack"). The researchers concluded that Pb is responsible for 256,000 deaths a year from cardiovascular disease and 185,000 deaths a year from ischaemic heart disease in the U.S. each year (Lanphear, 2018).

20.     Researchers at the National Institutes of Health (NIH) Molecular Toxicology Research Laboratory conducted a review of the scientific evidence linking lead to neurological damage. The conclusion was that Pb damages multiple critical parts of the brain, including the prefrontal cerebral cortex, hippocampus, and cerebellum. Pb also has genotoxic effects, especially in the brain, bone marrow, liver, and lung cells. The genetic damage to brain cells can cause damage to the developing brain in children, as well as damage to the adult brain, predisposing to neurodegenerative diseases including Alzheimer's disease (Sanders, 2009).

21.     Children are the population at greatest risk from exposure to Pb. Large studies performed on children across the United States have found no evidence of a safe level of exposure to lead (Canfield, 2003). These studies have found that lead exposure reduces intelligence quotient (IQ), interferes with the ability to learn, delays language development, and increases the risk of attention deficit-hyperactivity disorder (ADHD). A study of nearly 10,000 children nationwide published in the *National Medical Journal* found that children in poverty are at much greater risk of adverse neurological effects from exposure to Pb. Children from low-income families exhibited 12.2% lower total cognitive test scores, 9.6% smaller cortical

volumes, and 8.2% smaller cortical surface areas than children from higher income families also

exposed to lead (Marshall, 2020).


    I declare under penalty of perjury that the foregoing is true and correct.

Signed in San Francisco, California, on October 13, 2020.


_____

                    Gina Solomon, M.D., M.P.H.

**References:**

American Academy of Pediatrics (AAP) Council on Environmental Health. Prevention of Childhood Lead Toxicity. Pediatrics. 2016 Jul;138(1):e20161493.

Centers for Disease Control and Prevention (CDC). Lead Poisoning Prevention. National Center for Environmental Health, Division of Environmental Health Science and Practice. https://www.cdc.gov/nceh/lead/prevention/default.htm, July 30, 2019

Canfield RL, Henderson CR Jr, Cory-Slechta DA, Cox C, Jusko TA, Lanphear BP. Intellectual impairment in children with blood lead concentrations below 10 microg per deciliter. N Engl J Med. 2003 Apr 17;348(16):1517-26.

Lanphear BP, Rauch S, Auinger P, Allen RW, Hornung RW. Low-level lead exposure and mortality in US adults: a population-based cohort study. Lancet Public Health. 2018 Apr;3(4):e177-e184. doi: 10.1016/S2468-2667(18)30025-2. Epub 2018 Mar 12.

Marshall AT, Betts S, Kan EC, McConnell R, Lanphear BP, Sowell ER. Association of lead-exposure risk and family income with childhood brain outcomes. Nat Med. 2020 Jan;26(1):91-97. doi: 10.1038/s41591-019-0713-y.

National Toxicology Program, U.S. Department of Health and Human Services. NTP Monograph on Health Effects of Low-Level Lead. https://ntp.niehs.nih.gov/ntp/ohat/lead/final/monographhealtheffectslowlevellead_newissn_508.pdf, June 13, 2012.

Sanders T, Liu Y, Buchner V, Tchounwou PB. Neurotoxic effects and biomarkers of lead exposure: a review. Rev Environ Health. 2009 Jan-Mar;24(1):15-45.

10/13/2020

# GINA M. SOLOMON  M.D., M.P.H.

Public Health Institute
555 12th Street, 10th Floor
Oakland, CA 94607
415-747-7628

---

**Principal Investigator**                                    **February 2018 - Present**
**Public Health Institute**
**Oakland, CA**

- Conducting a 3-year research project on drinking water contaminants across California, and a 2-year project monitoring for drinking water contaminants in the area affected by the 2018 Camp fire.
- Conducting research projects on community environmental and health resilience, hormone residues in beef and potential risk of breast cancer, and air pollution and COVID-19 morbidity and mortality in California.
- Serving on advisory committees of the National Academies of Science, U.S. EPA, the Bay Area Air Quality Management District, and the California Breast Cancer Research Program.
- Conducted a research project evaluating the California Green Chemistry Initiative; published a report and a scientific paper; presented the findings at a joint hearing of the California legislature.
- Convened a range of environmental, health, environmental justice, and labor groups to develop consensus recommendations for California Governor Gavin Newsom on environmental health and justice.

**Deputy Secretary for Science and Health**               **May 2012 - January 2018**
**California Environmental Protection Agency (CalEPA)**
**Sacramento, CA**

- Appointed by Governor Jerry Brown as science advisor to the Secretary; provided advice and information on issues related to toxicology, health, and risk assessment; oversaw activities related to chemical contaminants in drinking water; coordinated California's response to domoic acid contamination in shellfish.
- Coordinated science-policy activities across agencies and departments, including with Health and Human Services Agency, California Department of Food and Agriculture, the Office of Emergency Services, and the Governor's office.
- Reviewed scientific reports and other documents produced by CalEPA Boards, Departments, and Office.
- Represented CalEPA with stakeholders, other organizations, and the public.
- Oversaw Agency-wide external peer review activities; chaired the Peer Review Working Group; identified and recruited qualified candidates for appointment to scientific panels within CalEPA.
- Coordinated CalEPA's responses to Federal chemical policy under the Toxic Substances Control Act; led CalEPA's work on refinery safety.

**Clinical Professor of Medicine**                          **March 2011 - Present**
**University of California San Francisco (UCSF)**
**San Francisco, CA**

- Volunteer faculty appointment initially as Assistant Clinical Professor (1998), promoted to Associate Clinical Professor (2006) and Clinical Professor (2011).
- Precept residents in clinic to enhance their learning and evaluate their performance.
- Teach courses in climate change and health, toxicology, and risk communication, and guest lecture to medical and nursing students and residents.
- Serve on the Residency Advisory Committee, Program Evaluation Committee, and interview committee for the occupational medicine residency program.

Gina M. Solomon, M.D., M.P.H.                                                  10/13/2020
                                            2

**Director, Occupational and Environmental Medicine Residency          June 2008 - May 2012
University of California San Francisco
San Francisco, CA**
- Directed all aspects of a nationally preeminent residency training program in occupational and environmental medicine.
- Evaluated the curriculum and made changes to address gaps and weaknesses. Enhanced the program's focus on environmental medicine and health policy. Restructured aspects of the program to meet new training requirements.
- Represented the residency program within the UCSF system and at national meetings of residency program directors. Ensured compliance with all UCSF, national graduate medical education, and medical board requirements.
- Successfully managed a site-visit and reaccreditation process by the Accreditation Council for Graduate Medical Education (ACGME), the national certifying organization for graduate physician training programs.

**Associate Director, Pediatric Environmental Health Specialty Unit    August 2003 – June 2008
University of California San Francisco
San Francisco, CA**
- Worked with a pediatrician to establish a new UCSF program designed to educate doctors, nurses, and the general public about pediatric environmental health.
- Established a clinical consultation practice for children potentially affected by environmental contaminants.
- Provided support to the Agency for Toxic Substances and Disease Registry (ATSDR), U.S. EPA, and other agencies, in situations where children were exposed to environmental toxicants in their communities.
- Assessed the risk to individual children or communities associated with issues such as: mercury in imported face creams, heavy metals associated with air emissions from a steel manufacturing facility, perchloroethylene vapor intrusion at a day care center, and methanol contamination in drinking water.

**Senior Scientist                                                     May 1996 - May 2012
Natural Resources Defense Council
San Francisco, CA**
- Planned and directed the overall work of the NRDC Health Program on the West Coast. Managed a team of scientists, attorneys and policy experts. Worked across a large organization to coordinate legislative, communications, fundraising, and inter-programmatic efforts.
- Directed and oversaw the production of exposure science studies and risk assessments with policy impact, focusing on risks to children and on endocrine disrupting chemicals. Designed and conducted studies of diesel exhaust inside school buses; residues of pesticides on dog fur; air, water, and soil contamination after Hurricane Katrina; and mercury releases to air and water from cement kilns and abandoned mines.
- Represented NRDC with government agencies, elected officials, community groups and the media. Served as a high-profile scientific spokesperson in Congressional hearings and major media appearances.

Consultant                                                             1996 - 1997
Massachusetts Division of Industrial Accidents, Boston, MA

Fellow, Occupational and Environmental Medicine,                       1993 - 1996
Harvard School of Public Health, Boston, MA

Clinical Instructor in Medicine                                        1991 - 1995
Harvard University School of Medicine, Boston, MA

Gina M. Solomon, M.D., M.P.H.                                          10/13/2020

3

## EDUCATION

Master of Public Health                                    August 1993 - May 1994
Harvard School of Public Health, Boston, MA

Doctor of Medicine                                         July 1987 - June 1991
Yale School of Medicine, New Haven, CA

Bachelor of Arts, Comparative Literature, Magna cum Laude   September 1982 - May 1986
Brown University, Providence, RI

## CERTIFICATION AND LICENSING

National Board of Medical Examiners, 7/92
American Board of Internal Medicine, 8/95, Recertified 5/05
American Board of Preventive Medicine, 2/98, Recertified 12/08, Recertified 01/18
California Medical License number: G 083110 (unrestricted)
Faculty privileges at UCSF Medical Center and at Zuckerberg San Francisco General Hospital

## PROFESSIONAL ACTIVITIES

Scientific Peer Reviewer, Micro- and nano-plastics in our environment: Understanding exposures and impacts on human health, European Commission SC1-BHC-36-2020.

Scientific Peer Reviewer, Agence National de la Recherche (French National Research Agency), 2020

Planning Committee, Workshop on Emerging Technologies to Advance Research and Decisions on the Environmental Health Effects of Microplastics. *National Academy of Sciences,* 2019

Invited Participant WHO Science Division Workshop on Expert Groups, *World Health Organization*, 2019

Environmental Health Policy Advisor, *U.C. Davis Environmental Health Sciences Core Center*, 2019 - present

Strategy Advisor, *California Breast Cancer Research Program,* 2019-2022

Member, Advisory Council, *Bay Area Air Quality Management District*, 2018 – present

Member, Committee on Emerging Science for Environmental Health Decisionmaking, *National Academy of Sciences*, 2016-2022

Member, Committee on the Hazards of Organohalogen Flame Retardants. *National Academy of Sciences*, 2018-2019

Member, President's Global Climate Leadership Council, *U.C. Office of the President*, 2018 - 2019

Member, Chemical Safety for Sustainability/Human and Environmental Risk Assessment Subcommittee, Board of Scientific Counselors, *U.S. Environmental Protection Agency*, 2017-2020

Member, Board on Environmental Studies and Toxicology, *National Academy of Sciences*, 2013-2019

Vice-Chair, Chemical Safety for Sustainability Subcommittee, Board of Scientific Counselors, *U.S. Environmental Protection Agency, 2014-2017*

Board of Scientific Counselors Executive Committee, *U.S. Environmental Protection Agency, 2014-2017*

Gina M. Solomon, M.D., M.P.H.                                          10/13/2020
4

Science Advisory Board, Chartered Executive Committee, *U.S. Environmental Protection Agency, 2011-2017*

Course Director, *UCSF Med 170.01/Epi 170.16 Environmental Health*, 1998-1999, 2002-2004, 2008-2010, 2014

Editorial Review Board, *Environmental Health Perspectives, 2010 – present*

Scientific Guidance Panel, *California Environmental Contaminant Biomonitoring Program, 2007- 2012*

Tracking Implementation Advisory Group, *California Department of Public Health, 2006 - 2012*

Board of Directors, *San Francisco Bay Area Physicians for Social Responsibility, 2000 – 2012*

Committee on Human and Environmental Exposure Science in the 21st Century, *National Research Council, 2010 – 2012*

Board of Scientific Counselors, *National Toxicology Program*, 2008 – 2011

California Climate Adaptation Advisory Panel, *California Governor's Office*, 2010

Science Advisory Board Drinking Water Committee, *U.S. Environmental Protection Agency, 2004- 2010*

Science Advisory Board Acrylamide Panel, *U.S. Environmental Protection Agency, 2007 – 2008*

Reviewer, *American Academy for the Advancement of Sciences* LSDF 09-01: Innovative research programs to improve health and health care, 2009

Committee on Toxicity Testing and Assessment of Environmental Agents, *National Research Council, 2004 - 2007*

Childhood Lead Poisoning Prevention Expert Advisory Committee, *California Department of Health Services, 2004 - 2006*

Scientific Advisory Group, Environmental Epidemiology and Biomonitoring, *CA Dept of Health Services, 2000-2004*

SB702 Expert Working Group on Public Health Tracking, *California Department of Health Services, 2002 - 2004*

Science Advisory Board Trichloroethylene Panel, *U.S. Environmental Protection Agency, 2002*

Strategic Advisory Committee, *National Center for Environmental Health, Centers for Disease Control and Prevention (CDC), 2001 - 2002*

Endocrine Disruptor Screening and Testing Advisory Committee, *U.S. EPA, 1996 - 1998*

Board of Directors, *Consortium for Environmental Education in Medicine, 1998 - 2000*

Pesticides and Environmental Education for Health Providers Committee, *National Environmental Education & Training Foundation, 1998 - 2000*

Peer Reviewer: *American Family Physician; American Journal of Public Health; American Journal of Epidemiology; American Journal of Preventive Medicine; Canadian Medical Association Journal; Chemosphere; Climatic Change; Environmental Health Perspectives; Environmental Science and Technology; Environmental Research; Environmental Geochemistry and Health; Environmental Pollution; European Journal of Clinical Nutrition; Indoor Air; International Journal of Occupational and Environmental Health; Journal of the American Medical Association (JAMA); Journal of Epidemiology and Community Health; Journal of Occupational and Environmental Medicine; PLoS Biology; PLoS One; Reproductive Toxicology; Tobacco Control.*

## AWARDS AND RECOGNITION

Gina M. Solomon, M.D., M.P.H.                                                    10/13/2020

5

Member, Sigma XI Scientific Research Honor Society, 2020

Certificate of Recognition, City of Los Angeles, 2016

Certificate of Recognition, California State Assembly, 2016

Humanitarian Award, California Safe Schools, 2016

James G. Wilson Publication Award, *Teratology Society, 2016*

Essential Core Teaching Award (Elective), *University of California San Francisco, 2015*

Faculty Sustainability Award, *University of California San Francisco, 2015*

Elected Fellow, *Collegium Ramazzini, 2014*

Certificate of Appreciation for Outstanding Service, *The National Academies*, 2012

Damu Smith Environmental Achievement Award, *American Public Health Association, 2012*

Appreciation of Services, U.S. Dept of Health and Human Services, 2011

Doerenkamp-Zbinden Honour Award, *Doerenkamp-Zbinden Foundation Switzerland*, 2009

Recognition Award, *Johns Hopkins University Center for Alternatives to Animal Testing, 2009*

Certificate of Appreciation, *Center for Community Action and Environmental Justice, 2007*

Certificate of Appreciation, *California Safe Schools, 2004*

Clean Air Award for Research, *American Lung Association of the Bay Area, 2004*

Ten Women's Health Pioneers, *The Green Guide, 2004*

Environmental Heroes Award, *Breast Cancer Fund, 2002*

Will Solimene Award in Medical Writing, *American Medical Writers Association, 2000*

Occupational Physicians Scholarship Fund Award, *1993, 1995*

Farr Scholarship Award, *Yale Medical School, 1988, 1989*

Phi Beta Kappa, *Rhode Island Chapter, 1986*

## CURRENT RESEARCH SUPPORT

6/1/2019 - 5/31/2021:  California Breast Cancer Research Program (25UB-1202, PI: Gina Solomon, MD, MPH) *Tapwater Analysis Project (TAP): Testing Chemicals in Water in California.*

9/1/2019 – 8/31/2021: National Institute for Environmental Health Sciences (R21ES-031501, PI: Gina Solomon, MD, MPH) *Fire and Water: Investigating Drinking Water Contamination in Paradise, California after the Camp Fire.*

12/01/19 – 11/30/2024: Cigna California Community Investment Grant (#56578319, PI: Gina Solomon, MD, MPH) *The Community Resilience Project: Conducting Assessments and Building Capacity to Improve Health.*
2/1/2020 – 1/31/2021: Environment Now (PI: Gina Solomon, MD, MPH) *Tapwater Analysis Project (TAP): Testing Chemicals in Water in California.*

8/1/2017 – 7/31/2022: Centers for Disease Control and Prevention (#5U38EH00095, PI: Paul English, PhD) *National Environmental Public Health Tracking Program – Network Implementation.*

Gina M. Solomon, M.D., M.P.H.                                              10/13/2020

6

6/1/2020 - 5/31/2022: California Breast Cancer Research Program (#B26PB1982, PI: Gina Solomon, MD, MPH)
*Hormones And Meat: does Beef Under-Regulation Generate Estrogenic Residues? (HAMBURGER)*

## SCIENTIFIC PUBLICATIONS

https://www.ncbi.nlm.nih.gov/myncbi/gina.solomon.1/bibliography/public/

1.  Garzon-Galvis C, Richardson M, Solomon G. Tracking Environmental and Health Disparities to Strengthen Resilience Before the Next Crisis. Enviro Justice Published Online:9 Sep 2020. https://doi.org/10.1089/env.2020.0025.

2.  Solomon G, Morales D. Benzene Contamination in Drinking Water: A Surprise Complication from Wildfires. San Francisco Marin Medicine, 92(6): 12-15, 2019. https://issuu.com/sfmedsociety/docs/1sfm-med-nov-dec2019pages_12b4e1f59606fd/1?e=3533752/74620561.

3.  Ginsberg JL, Fedinick KP, Solomon G, Elliot KC, Vandenberg JJ, Barone S, Bucher JR. New Toxicology Tools and the Emerging Paradigm Shift in Environmental Health Decision-Making. Environ Health Perspect 127(12). https://doi.org/10.1289/EHP4745.

4.  Solomon G. Climate Change and Human Health. In: Ramanathan V, Aines R, Auffhammer M, et al. 2019. Bending the Curve: Climate Change Solutions. Location: Regents of the University of California. https://escholarship.org/uc/item/6kr8p5rq.

5.  Luderer U, Eskenazi B, Hauser R, Korach K, McHale C, Moran F, Solomon G, Udagawa O, Zhang L, Zlatnik M, Zeise L, Smith MS. Key Characteristics of Female Reproductive Toxicants: A Framework for Organizing and Evaluating Mechanistic Data in Hazard Assessment. Environ Health Perspect 127(7). https://doi.org/10.1289/EHP4971

6.  Solomon G, Reynolds P, Hoang A. The California Safer Consumer Products Program: Evaluating Implementation of a Novel Chemical Policy Strategy. New Solutions 29(2):224-241, 2019. https://doi.org/10.1177/1048291119850105.

7.  Iyer N, Pham N, Sandy M, Marty M, Solomon G, Zeise L. An Integrated Approach Using Publicly Available Resources for Identifying and Characterizing Chemicals of Potential Toxicity Concern: Proof-of-Concept Exercise with Chemicals. Toxicological Sciences kfz017:1-11, 2019. https://doi.org/10.1093/toxsci/kfz017

8.  McHale C, Osborne G, Morello-Frosch R, Salmon A, Sandy M, Solomon G, Zhang L, Smith M, Zeise L. Assessing health risks from multiple environmental stressors: Moving from G × E to I × E. Mutation Research/Reviews in Mutation Research 775: 11-20, 2017. https://doi.org/10.1016/j.mrrev.2017.11.003

9.  Krowech G, Plummer L, Hoover S, Sandy M, Zeise L, Solomon G. Identifying Chemical Groups for Biomonitoring. Environ Health Perspect 124(12): A219-226, 2016. DOI:10.1289/EHP537.

10. Forman, F, Solomon, G, Morello-Frosch, R and Pezzoli, K. Chapter 8. Bending the Curve and Closing the Gap: Climate Justice and Public Health. Collabra, 2(1): 22, 2016, pp. 1–17, DOI: http://dx.doi.org/10.1525/collabra.67.

11. Solomon GM, Faust JB, Morello-Frosch, R, Zeise, L. Integrating environmental justice into public health: approaches for understanding cumulative impacts. Front Public Health Serv Sys Res 5(5):9–14, 2016. DOI: https://doi.org/10.13023/FPHSSR.0505.02.

Gina M. Solomon, M.D., M.P.H.                                    10/13/2020

7

12. Pham N, Iyer S, Hackett E, Lock BH, Sandy M, Zeise L, Solomon G, Marty M. Using ToxCast to Explore Chemical Activities and Hazard Traits: A Case Study with the Chemical Class ortho-Phthalates. Toxicological Sciences Toxicol Sci. 151(2):286-301, 2016. doi: 10.1093/toxsci/kfw049.

13. Solomon G, Morello-Frosch R, Zeise L, Faust J. Cumulative Environmental Impacts: Science and Policy to Protect Communities. Annual Review of Public Health 37: 14.1-14.14, 2016.

14. Silva M, Pham N, Lewis C, Iyer S, Kwok E, Solomon G, and Zeise L. A Comparison of ToxCast Test Results with In Vivo and Other In Vitro Endpoints for Neuro, Endocrine, and Developmental Toxicities: A Case Study Using Endosulfan and Methidathion. Birth Defects Research (Part B) 0:1–19, 2015.

15. Schwarzman MR, Ackerman JM, Dairkee SH, Fenton SE, Johnson D. Navarro KM, Osborne G, Rudel RA, Solomon GM, Zeise L, Janssen S. Screening for Chemical Contributions to Breast Cancer Risk: A Case Study for Chemical Safety Evaluation. Environ Health Perspect 123(12):1255-64, 2015. DOI:10.1289/ehp.1408337

16. Schettler T, Janssen S, Sass J, Solomon G, Woodruff T. Assessing Toxin Risk: Improvements Needed to Protect Human Health from Chemicals. San Francisco Medicine 85(5): 26-7, 2012.

17. Copan L, Ujihara A, Jones C, Das R, Kreutzer R, Roisman R, Haas RA, Perez G, Moezzi B, Miller MD, Solomon G, Ryals R, Vitale L, Davis MR, Rogow M, LePrell RV, Flammia D, Bradshaw D, MacLaurin KE, Davis SF, Watson J, Achter A, Myrick-West A, Holstege CP, Norwood VF, Bender TJ. Mercury Exposure Among Household Users and Nonusers of Skin-Lightening Creams Produced in Mexico — California and Virginia, 2010. Morbidity and Mortality Weekly Report (MMWR) 61(02):33-36, 2012.

18. Rotkin-Ellman M, Wong KK, Solomon GM. Seafood Contamination after the BP Gulf Oil Spill and Risks to Vulnerable Populations: A Critique of the FDA Risk Assessment. Environ Health Perspect 120:157–161, 2012. http://dx.doi.org/10.1289/ehp.1103695.

19. Knowlton K, Rotkin-Ellman M, Geballe L, Max W, Solomon G. Six Climate Change–Related Events in the United States Accounted For About $14 Billion in Lost Lives and Health Costs. Health Affairs 30(11): 1-10. 2011.

20. Solomon G, Huddle A, Silbergeld EK, Herman J. Chapter 8. Manganese in Gasoline: Are We Repeating History?  In: Clapp R (Ed.). From Critical Science to Solutions: The Best of Scientific Solutions. Baywood Publishing Inc., 2011. ISBN: 978-0-89503-404-5.

21. Rotkin-Ellman M, Navarro KM, Solomon GM. Gulf Oil Spill Air Quality Monitoring: Lessons Learned to Improve Emergency Response. Environ Sci Technol. 44(22):8365-6, 2010.

22. Solomon G, Janssen SJ. Health Effects of the Gulf Oil Spill. Journal of the American Medical Association 304(10):1118-9, 2010.

23. Solomon G, Janssen SJ. Communicating with Patients and the Public About Environmental Exposures and Reproductive Risk. In: Woodruff TJ, Janssen SJ, Guillette LJ, Giudice LC (eds), Environmental Impacts on Reproductive Health and Fertility. Cambridge Press, Cambridge, UK, 2010.

24. Rotkin-Ellman M, Solomon G, Gonzales CR, Agwaramgbo L, Mielke HW. Arsenic Contamination in New Orleans Soil: Temporal Changes Associated with Flooding. Environmental Research, 110(1):19-25, 2010.

25. Krewski D, Acosta D Jr, Andersen M, Anderson H, Bailar JC 3rd, Boekelheide K, Brent R, Charnley G, Cheung VG, Green S Jr, Kelsey KT, Kerkvliet NI, Li AA, McCray L, Meyer O, Patterson RD, Pennie W, Scala RA, Solomon GM, Stephens M, Yager J, Zeise L. Toxicity Testing in the 21st Century: A Vision and a Strategy. Toxicol Environ Health B Crit Rev. 13(2-4):51-138, 2010.

Gina M. Solomon, M.D., M.P.H.                                          10/13/2020
8

26. Solomon G, Huang A, Godsel R. Contaminants in the Air and Soil in New Orleans After the Flood: Opportunities and Limitations for Community Empowerment, In: Bullard R, Wright B (eds). Race, Place, and Environmental Justice After Hurricane Katrina. Westview Press, Boulder, CO, 2009.

27. Solomon G. Physicians' Duty to Be Aware of and Report Environmental Toxins. Virtual Mentor, 11(6):434-442, 2009. http://virtualmentor.ama-assn.org/2009/06/ccas2-0906.html.

28. Knowlton K, Rotkin-Ellman M, King G, Margolis HG, Smith D, Solomon G, Trent R, English P. The 2006 California Heat Wave: Impacts on Hospitalizations and Emergency Department Visits Environ Health Perspect, 117: 61-67, 2009.  http://www.ehponline.org/members/2008/11594/11594.pdf.

29. Woodruff T, Zeise L, Axelrad D, Guyton KZ, Janssen S, Miller, M, Miller G, Schwartz J, Alexeef G, Anderson H, Birnbaum L, Bois F, Cogliano J, Crofton K, Euling SY, Foster P, Germolec D, Ginsberg G, Gray E, Hattis D, Kyle A, Leubke R, Luster M, Portier C, Rice D, Solomon G, Steinmaus C, Vandenberg J, Zoeller T. Meeting Report: Moving Upstream: Evaluating Adverse Upstream Endpoints for Improved Risk Assessment and Decision Making. Environ Health Perspect, 116:1568–1575, 2008. http://www.ehponline.org/members/2008/11516/11516.pdf.

30. Humphreys EH, Janssen S, Heil A, Hiatt P, Solomon G, Miller MD. Outcomes of the California Ban on Pharmaceutical Lindane: Clinical and Ecologic Impacts. Environ Health Perspect, 116:297-302, 2008. doi:10.1289/ehp.10668.

31. Humphries E, Solomon G. Helping Your Patients Manage Asthma: Focus on the Source. Medscape, http://www.medscape.com/viewarticle/572573.

32. Solomon GM, Janssen S. Talking with patients and the public about endocrine disrupting chemicals. In: Endocrine-disrupting Chemicals: From Basic Research to Clinical Practice. Ed. Andrea C. Gore. Part of "Contemporary Endocrinology," series editor P. Michael Conn, Humana Press, Totowa, NJ, 2007.

33. Karr C, Solomon GM, Brock-Utne A. Health effects of common home, lawn and garden pesticides. Ped Clin N Am 54(1):63-80, 2007.

34. Thundiyil J, Solomon GM, Miller MD. Transgenerational exposures: Persistent chemical pollutants in the environment and breast milk. Ped Clin N Am 54(1):81-101, 2007.

35. Solomon GM, Hjelmroos-Koski M, Rotkin-Ellman M, Hammond K. Air quality in New Orleans, Louisiana after flooding: Mold, endotoxin, and particulate matter, October - November 2005. Environ Health Perspect 114(9):1381-1386, 2006.

36. Solomon GM, LaDou J, Wesseling C. Environmental Exposures and Controls, in LaDou (Ed.) Occupational and Environmental Medicine. Fourth Ed. Appleton and Lange, Stamford CT, 2006.

37. McDaniel P., Solomon G, Malone RE. The ethics of industry experimentation using employees: The case of taste-testing pesticide-treated tobacco. Am J Public Health 96(1):37-46, 2006.

38. McDaniel PA, Solomon G, Malone RE. The Tobacco Industry and Pesticide Regulations: Case Studies from Tobacco Industry Archives. Environ Health Perspect 113(12):1659-1665, 2005.

39. Bailey D, Solomon G. Pollution Prevention at Ports: Clearing the Air. Environ Impact Assess Review 24:749-774, 2004.

40. Solomon G, Humphreys E, Miller M. Asthma and the Environment: Connecting the Dots: what role do environmental exposures play in the rising prevalence and severity of asthma? Contemp Pediatrics 21(8), 2004.

Gina M. Solomon, M.D., M.P.H.                                           10/13/2020
9

41. Solomon GM, Hawes A, Quintero A, Widess E. Approaches to Occupational and Environmental Law in: Rosenstock L and Cullen M. (Eds.) Textbook of Clinical Occupational and Environmental Medicine, Second Edition. WB Saunders/Mosby/Churchill Livingstone, Philadelphia, 2004.

42. Solomon GM, LaDou J, Jackson RJ. Environmental Exposures and Controls, in LaDou (Ed.) Occupational and Environmental Medicine. Third Ed. Appleton and Lange, Stamford CT, 2003.

43. Solomon GM, Balmes J. Health Effects of Diesel Exhaust. Clinics in Occup & Environ Med 3:61-80, 2003.

44. Miller M, Solomon G. Environmental Risk Communication for the Pediatrician. Pediatrics 112:211-221, 2003.

45. Miller M, Solomon G. Pesticides, in: Etzel RA and Balk SJ (Eds). Handbook of Pediatric Environmental Health, Second Ed. American Academy of Pediatrics, Elk Grove Village, IL, 2003.

46. Solomon GM. Rare and Common Diseases in Environmental Health. San Francisco Medicine 75(9):14-16, 2002.

47. Solomon GM, Huddle AM. Low levels of persistent organic pollutants raise concerns for future generations. J of Epi and Commun Health. 56(11):826-827, 2002.

48. Solomon GM and Schettler T. Endocrine Disruption. In McCally M. (Ed.) Life Support: The Environment and Human Health. MIT Press, Cambridge MA, 2002.

49. Solomon GM, Weiss P. Chemical Contaminants in Breast Milk: Time Trends and Regional Variability. Environ Health Perspect 110(6): A339-A347, 2002.

50. Pandya RJ, Solomon GM, Kinner A, Balmes JR. Diesel Exhaust and Asthma: Potential Hypotheses and Molecular Mechanisms of Action, Environ Health Perspect 110(suppl 1):103-112, 2002.

51. Chaisson C, Solomon G. Children's Exposure to Toxic Chemicals – Modeling their World to Quantify the Risks. Neurotoxicology 22:563-565, 2001.

52. Solomon GM, Schettler T.  Emerging Issues in Environmental Health: Endocrine Disruption. Canadian Med Assn Journal 163(11): 1471-1476, 2000.

53. Solomon GM. Hormones, Chemicals, and Public Policy. Chem and Engineering News, 78(32): 66-67, 2000.

54. Schettler T, Solomon GM, Valenti M, and Huddle AM. Generations at Risk: Reproductive Health and the Environment. Massachusetts Institute of Technology Press, Boston, June 1999.

55. Milton DK, Solomon GM, Rossiello RA, Herrick RF.  Risk and Incidence of Asthma Attributable to Occupational Exposure among HMO Members. Am J Ind Med 33(1):1-10, 1998.

56. Solomon GM. Reproductive Toxins: A Growing Concern at Work and in the Community. J Occ Env Med 39:105-107, 1997.

57.  Solomon GM, Huddle AM, Silbergeld EK, Herman D. Manganese in Gasoline: Are We Repeating History? New Solutions 7(2):17-25, 1997.

58.  Frumkin H, Solomon GM.  Manganese in the U.S. Gasoline Supply. Am J Ind Med 31:107-115, 1997.

59.  Solomon GM, Morse E, Garbo M, Milton DK.  Stillbirth after Occupational Exposure to N-Methyl-2-Pyrrolidone: A case report and review of the literature. J Occ Env Med 38:705-713, 1996.

Gina M. Solomon, M.D., M.P.H.                                    10/13/2020

10

60. Esswein E, Trout D, Hales T, Brown R, Solomon GM. Exposures and Health Effects: An Evaluation of Workers at a Sodium Azide Production Facility. Am J Ind Med 30:343-350, 1996.

61. Parker J, Solomon GM.  Decades of Deceit: The History of Bay State Smelting. New Solutions 5:80-89, 1995.

## REPORTS

1. National Academies of Sciences, Engineering, and Medicine. 2019. A Class Approach to Hazard Assessment of Organohalogen Flame Retardants. Washington, DC: The National Academies Press. https://doi.org/10.17226/25412.

2. Solomon G, Reynolds P, Hoang A. California's Green Chemistry Initiative at Age 10: An Evaluation of its Progress and Promise. Public Health Institute, Oakland, CA, 2018. http://www.phi.org/resources/?resource=california-green-chemistry-report

3. National Research Council. Exposure Science in the 21st Century: A Vision and a Strategy. Washington, DC: The National Academies Press. 2012. doi:https://doi.org/10.17226/13507.

4. Knowlton K, Solomon G, Rotkin-Ellman M. Fever Pitch: Mosquito-Borne Dengue Fever Threat Spreading in the Americas. Natural Resources Defense Council, New York, NY, 2009. http://www.nrdc.org/health/dengue/files/dengue.pdf.

5. Rotkin-Ellman M, Solomon G. Poisons on Pets II: Toxic Chemicals in Flea and Tick Collars. Natural Resources Defense Council, New York, NY, 2009. http://www.nrdc.org/health/poisonsonpets/files/poisonsonpets.pdf.

6. Rotkin-Ellman M, Quirindongo M, Sass J, Solomon G. Deepest Cuts: Repairing Health Monitoring Programs Slashed Under the Bush Administration. Natural Resources Defense Council, New York, NY, 2008. http://www.nrdc.org/health/deepestcuts/deepestcuts.pdf.

7. Wall M, Rotkin-Ellman M, Solomon G. An Uneven Shield: The Record of Enforcement and Violations Under California's Environmental, Health and Workplace Safety Laws. Natural Resources Defense Council, New York, NY, 2008. http://www.nrdc.org/legislation/shield/shield.pdf.

8. NRC (National Research Council). 2007. Toxicity Testing in the 21st Century: A Vision and a Strategy. Washington, DC: National Academies Press. Available: http://www.nap.edu/catalog.php?record_id=11970

9. Knowlton K, Rotkin-Ellman M, Solomon GM. Sneezing and Wheezing: How global warming could increase ragweed allergies, air pollution, and asthma. Natural Resources Defense Council, New York, NY, 2007. http://www.nrdc.org/globalWarming/sneezing/sneezing.pdf.

10. Cohen A, Janssen S, Solomon GM. Clearing the Air: Hidden Hazards in Air Fresheners. Natural Resources Defense Council, New York, NY, 2007. http://www.nrdc.org/health/home/airfresheners/airfresheners.pdf

11. Solomon GM, Nance E, Janssen S, White WB, Olson E. Drinking water quality in New Orleans: June-October 2006. Natural Resources Defense Council, New York, NY, January 2007. http://www.nrdc.org/health/effects/katrinadata/water.pdf.

12. Solomon GM, Rotkin-Ellman M. Contaminants in New Orleans Sediment: An Analysis of EPA Data. Natural Resources Defense Council, New York, NY, February 2006. http://www.nrdc.org/health/effects/katrinadata/sedimentepa.pdf.

Gina M. Solomon, M.D., M.P.H.                                                    10/13/2020

11

13. SB 702 Expert Working Group. Strategies for Establishing an Environmental Health Surveillance System in California. California Policy Research Center, U.C. Office of the President, 16(2), 2004. www.ucop.edu/cprc/ehssrpt.pdf.

14. Solomon GM, Campbell TR, Feuer GR, Masters J, Samkian A, Paul KA. No Breathing in the Aisles: Diesel Exhaust Inside School Buses. Natural Resources Defense Council, New York, NY, 2001. http://www.nrdc.org/air/transportation/schoolbus/schoolbus.pdf.

15. Solomon G, Ogunseitan OA, Kirsch J. Pesticides and Human Health: A Resource for Health Care Professionals. Physicians for Social Responsibility, San Francisco, CA, 2000. http://www.psrla.org/pahk.pdf

16. Solomon GM, Mott L. Trouble on the Farm: Growing up with Pesticides in Agricultural Communities. Natural Resources Defense Council, New York, NY, 1998. http://www.nrdc.org/health/kids/farm/farminx.asp.


## PUBLISHED ABSTRACTS

1. Young T, Wong L, Alaimo C, Solomon G. Nontarget Analysis of Drinking Water Samples from Wildfire Impacted Homes. International Society for Exposure Sciences Annual Meeting, Sept 2020.

2. Solomon G, Hurley S, Reynolds P, English P. Fire and Water: Investigating Benzene Contamination in Drinking Water After California Wildfires. International Society for Exposure Sciences Annual Meeting, Sept 2020.

3. Solomon G, Sutton R, Claude J, Coffin S, Zarus G. Microplastics and Human Exposure: Understanding Measurement Challenges and Data Gaps. International Society for Exposure Sciences Annual Meeting, Sept 2020.

4. Iyer S, Pham N, Marty M, Sandy M, Solomon G, Zeise L. A Multiple Database Approach for Identifying Chemicals That Affect Cancer Pathways. In: The Toxicologist: Supplement to Toxicological Sciences, 150(1), Society of Toxicology, March 2016. Abstract no. 2030.

5. Pham N, Iyer S, Marty M, Sandy M, Solomon G, Zeise L. Considering Possible Mechanisms of Toxicity for Phthalates on California's Proposition 65 List Using Bioseek Data from ToxCast. In: The Toxicologist: Supplement to Toxicological Sciences, 150(1), Society of Toxicology, March 2016. Abstract no. 3540.

6. Solomon G, Zeise L, Morello-Frosch R, Faust J. Cumulative Impacts: Approaches to Environmental Justice. Collegium Ramazzini Plenary Sessions, Carpi, Italy, October 2015.

7. Faust J, August L, Prasad S, Zeise L, Solomon G. Cumulative Impacts Mapping: The California Communities Environmental Health Screening Tool. Collegium Ramazzini Plenary Sessions, Carpi, Italy, October 2015.

8. Navarro K, Janssen S, Solomon G. Exposure to hormone disrupting chemicals from food. 139th APHA Annual Meeting and Exposition, November 2011.

9. Wong K, Rotkin-Ellman M, Solomon G. Flaws in FDA assessment of Gulf Coast seafood following the BP oil spill. 139th APHA Annual Meeting and Exposition, November 2011.

10. Rotkin-Ellman M, Sass J, Solomon G. Pesticide Residues on Food: FDA's Flawed Monitoring Program. 139th APHA Annual Meeting and Exposition, November 2011.

11. Knowlton K, Solomon G, Chavarria G. Preparing for the Health Impacts of Climate Change: Science and Societal Strategies. AAAS Annual Meeting Abstract, 2008.

Gina M. Solomon, M.D., M.P.H.                                    10/13/2020

                                    12

12. Solomon G. Through the Cacophony: Enabling Improved Public Health. Abstracts: ISEE 20th Annual Conference, Pasadena, California, October 12-16, 2008: Plenary Sessions. Epidemiology 19(6):S14, 2008. doi: 10.1097/01.ede.0000339549.57375.9d

13. Janssen S, Solomon G, Chavarria G. Measuring Human Exposures to Hormone-Disruptors: Scientific Tools for Global Health. AAAS Annual Meeting Abstract # 090-096, 2008.

14. Rotkin-Ellman M, Solomon G. Soil Contamination in New Orleans: Arsenic and Lead Before and After Katrina. APHA Annual Meeting Abstract #163091, 2007.

15. McDaniel P, Malone R, Solomon GM. The Tobacco Industry and Pesticide Regulations. Society for Research on Nicotine and Tobacco, 10th Annual Scientific Sessions, 2004.

16. Solomon GM. Mercury and other Persistent Fish Pollutants: Risks to the Fetus and Child. APHA Annual Meeting Abstracts, 2003

17. Solomon GM. Endocrine Disruptors and Current Science Policy Developments. APHA Annual Meeting Abstracts, 4185, 2000.

18. Solomon GM. Special Risks to Children in Agricultural Settings. Neurotoxicology, 2000.

19. Solomon GM, Mott L.  Disproportionate Exposures and Susceptibility:  Pesticide risks to farm children. Neurotoxicology 20:1, 1999.

20. Solomon GM, Schettler T, Huddle A, Valenti M.  Endocrine Disruptors: A lens on low dose health effects. Epidemiology 9(4): S54, 1998.

21. Solomon  GM, Huddle AM, Schettler T, Valenti M.  The Tradition of Statistical Significance: An impediment to prudent public health?  Epidemiology 9(4): S75, 1998.

22. Solomon GM.  Protecting Human Health From Endocrine Disruptors: Are toxicology and risk assessment up to the challenge? APHA Annual Meeting Abstracts, 2024, 1998.

23. Solomon GM. The Reproductive and Developmental Effects of Organic Solvents: The dilemma of identifying a culprit.  APHA Annual Meeting Abstracts, 10, 1996.

24. Solomon GM, Milton DK.  The Occupational Asthma Incidence Study: A pilot project.  APHA Annual Meeting Abstracts, 177, 1996.

25. Garbo M, Milton D, Morse EP, Solomon G.  From DBCP to NMP: Have we progressed?  APHA Annual Meeting Abstracts, 408, 1996.


## SELECTED PRESENTATIONS

**Legislative Testimony and Briefings:**

California's Green Chemistry Initiative at Age 10
Joint hearing of the CA Senate Environmental Quality and Assembly Environ Safety and Toxic Materials Committees, 2/12/2019

Cancer Clusters and the Environment
*Hearing of the U.S. Senate Committee on Environment and Public Works, 3/29/2011*

Health Hazards of Methyl Iodide

Gina M. Solomon, M.D., M.P.H.                                                10/13/2020

13

Joint hearing of the CA Assembly Health and Environ Safety and Toxic Materials Committees, *2/22/2011*

Reproductive Health and the Environment
*Pew Charitable Trusts Congressional Briefing, 6/11/2010*

Health Effects of the Gulf Oil Spill
*Hearing of the U.S. House Committee on Energy and Commerce, 6/10/2010*

Protecting Children from Environmental Threats
*Hearing of the U.S. Senate Committee on Environment and Public Works, 3/17/2010*

Endocrine Disrupting Chemicals in Drinking Water
*Hearing of the U.S. House Committee on Energy and Commerce, 2/25/2010*

Biomonitoring: A Tool for Public Health Policy
*American Chemistry Society Congressional Briefing, 3/2009*

Health Risks to Children and Communities from Recent EPA Decisions on Air and Water Quality
*Hearing of the U.S. Senate Committee on Environment and Public Works, 2/2007*

Biomonitoring for Health Surveillance
*CA Assembly Health Committee, 6/20/2006*

**Selected Recent Scientific and Educational Presentations:**

Reproductive Toxicology
UCSF School of Medicine/School of Nursing, 2/2020

Fire and Water: Benzene Contamination in Drinking Water after Wildfire
California Department of Public Health Research Seminar, 2/2020
UC Davis Leila Morris Symposium, 1/2020

Risk Assessment
UC Berkeley School of Public Health, 1/2020

Climate Change and Health
Modesto Junior College Institute Day Keynote, 1/2020
Western Occupational Health Conference, 9/2018

Risk and Crisis Communication
UCSF School of Medicine, 11/2019

Developing and Communicating Decision-Relevant Science
California Conference of Directors of Environmental Health Keynote, 10/2019

Emerging Issues in Environmental Health
American Chemical Society, Women Chemists meeting, 2/2018
UCSF Continuing Medical Education Course, 3/2017

Changing World, Changing Practice: Challenges and Opportunities in Environmental Health
Western Occupational Health Conference, 9/2017

Climate Change and Health Equity: Telling the Story With Data
Health Departments Webinar Series, 8/2017

[Full list of presentations available upon request]

13

Gina M. Solomon, M.D., M.P.H.                                    10/13/2020

14

**Recent Media Appearances**

Von Kaenel C. Paradise water testing wrapping up more than a year after contamination first confirmed. Chico Enterprise Record, Feb 29, 2020. https://www.chicoer.com/2020/02/29/paradise-water-testing-wrapping-up-more-than-a-year-after-contamination-first-confirmed/.

Solomon G. Q&A: Why California Is Banning Chlorpyrifos, A Widely Used Pesticide. US News and World Report, January 23, 2020. https://www.usnews.com/news/best-states/articles/2020-01-23/reasons-why-california-is-banning-chlorpyrifos-a-widely-used-pesticide

Sterman J, Brauer A. Pesticide that could impact children's health is still widely used in many states. Sinclair Broadcast Group, January 16, 2020. https://wjla.com/news/spotlight-on-america/pesticide-that-could-impact-childrens-health-is-still-widely-used-in-many-states

Petersen M. Paradise Residents Unsure If Their Water Is Safe. KQED, Nov 29, 2019. (Story starts at about 3:27). https://www.kqed.org/news/11789036/homeowners-in-fire-prone-areas-struggle-to-hold-onto-their-insurance

Von Kaenel C. Preliminary findings show that harmful contaminants in burn scar plumbing are rare. Chico Enterprise Record, Nov 19, 2019. https://www.chicoer.com/2019/11/19/preliminary-findings-show-that-harmful-contaminants-in-burn-scar-plumbing-are-rare/

Petersen M. Paradise residents still can't drink the water. KQED, Sept 30, 2019. https://www.kqed.org/science/1948232/paradise-residents-still-cant-drink-the-water.

Von Kaenel C. UC San Francisco researcher gets grant to study water contamination after Camp Fire. Chico Enterprise Record and Oroville Register, Sept. 7, 2019. https://www.chicoer.com/2019/09/07/ucsf-researcher-gets-grant-to-study-water-contamination-after-camp-fire/.

Dooley E. Hidden Danger in Water Confronts California Wildfire Survivors. Bloomberg News, Sept 3, 2019. https://news.bloomberglaw.com/environment-and-energy/hidden-danger-in-water-confronts-california-wildfire-survivors.

California to block food pesticide that Trump's EPA saved from nationwide ban, Bob Egelko, San Francisco Chronicle, May 8, 2019. https://www.sfchronicle.com/science/article/California-moves-to-ban-pesticide-widely-used-by-13829656.php?psid=4QHKF

California to ban controversial pesticide blamed for harming child brain development, CBC News, May 8, 2019. https://www.cbsnews.com/news/california-bans-chlorpyrifos-pesticide-agriculture-state-child-brain-development/

California Moves to Ban Chlorpyrifos, Widely Used Pesticide, Brian Melley, Associated Press, May 8, 2019 https://www.kqed.org/science/1941369/california-moves-to-ban-chlorpyrifos-widely-used-pesticide

After the fire: Blazes pose hidden threat to the West's drinking water, Kaitlin Sullivan, NBC News, Jan 5, 2019. https://www.nbcnews.com/news/us-news/after-fire-blazes-pose-hidden-threat-west-s-drinking-water-n954806

In California, Houses Burned. So Did the Toxic Chemicals They Contained. Sarah Maslin Nir, New York Times, Nov 29, 2018. https://www.nytimes.com/2018/11/29/us/california-fire-chemicals.html

# **<u>TAB 22</u>**

**Stipulation Regarding the California Department of Toxic
Substances Control's Rule 30(b)(6) Deposition Notice to Debtors
[Bankr. D.I. 976]**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| EXIDE HOLDINGS, INC., *et al.*,[1] | Case No. 20-11157 (CSS) |
| Debtors. | Jointly Administered |

## STIPULATION REGARDING THE CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL'S RULE 30(b)(6) DEPOSITION NOTICE TO DEBTORS

This Stipulation, entered into by and between Debtors, on the one hand, and the California Department of Toxic Substances Control ("DTSC"), on the other, is made with reference to the following facts and recitals:

**WHEREAS**, on October 5, 2020, DTSC served Debtors with a Notice of Oral Deposition of Debtors' Designated Representative(s) under Federal Rule of Civil Procedure 30(b)(6) (the "Notice");

**WHEREAS**, Debtors proposed stipulating to certain facts in lieu of designating a representative to testify on certain topics set forth in Exhibit A to the Notice;

**WHEREAS**, Debtors and DTSC have agreed to stipulate to certain facts that DTSC contends are relevant to its objection to Debtors' Amended Joint Chapter 11 Plan (the "Plan") and its objection to Debtors' proposed abandonment of the Vernon Non-Performing Property (as defined in the Plan).

**NOW, THEREFORE**, Debtors and DTSC hereby stipulate and agree as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

1.  Debtors are currently spending approximately $750,000 per month at the Vernon Non-Performing Property on measures to prevent the release of lead and other Constituents of Concern ("COCs") into the surrounding communities, including utility costs.  This includes payroll and benefits, utilities, and third-party vendors.

2.  According to line items on invoices from third-party vendor American Integrated Services, Inc., Debtors are currently spending approximately $ $126,000 per month to rent and $90,000 per month to maintain the full enclosure unit ("FEU") and negative air pressure pumps currently in place at the Vernon Non-Performing Property.

3.  Debtors have not completed Phase 1 of the Closure Plan for the Vernon Non-Performing Property.

4.  Debtors had no role in establishing, and did not know the basis for, the Plan's allocation of funding for Debtors' environmental liabilities at the Non-Performing Properties (as defined in the Plan), including the allocation for the Vernon Non-Performing Property.

5.  Debtors will not offer any direct testimony or submit any evidence concerning the Plan's allocation of funding for Debtors environmental liabilities at the Non-Performing Properties, including the allocation for the Vernon Non Performing Property.

6.  Following a reasonable investigation, Debtors are not aware of any calculation that Debtors or their agents or representatives have performed since 2014 regarding their potential liabilities for offsite remediation in connection with the Vernon Non-Performing Property, except for Geosyntec's draft Residential

RCRA Facility Investigation, dated June 13, 2019, which concluded that Debtors

had no such liabilities (a conclusion that DTSC has rejected).

Dated:  October 14, 2020
         New York, New York

                                      By: /s/ Matthew Hinker

Xavier Becerra                        Nancy Mitchell
Attorney General of California        Matthew Hinker
Edward H. Ochoa                       O'Melveny & Myers LLP
Senior Assistant Attorney General     7 Times Square
                                      New York, NY 10036
James R. Potter                       Telephone: (212) 326-2000
California Department of Justice       mhinker@omm.com
Office of the Attorney General        nmitchell@omm.com
Public Rights Division
Environment Section                   Peter Friedman
300 S. Spring Street                  O'Melveny & Myers LLP
Los Angeles, CA 90013                 1625 Eye Street, NW
james.potter@doj.ca.gov               Washington, DC 20006
                                      Tel: (202) 383-5300
Anthony A. Austin                     pfriedman@omm.com
Heather C. Leslie
California Department of Justice
Office of the Attorney General
Public Rights Division
Environment Section
1300 I Street, Suite 125
Sacramento, CA 95814
Tel: 916-210-7832
anthony.austin@doj.ca.gov
heather.leslie@doj.ca.gov

*Attorneys for the California Department of Toxic Substances Control*

Dated: October 14, 2020
        New York, New York

                         */s/ Jared R. Friedmann*
                         _____

                         WEIL, GOTSHAL & MANGES LLP
                         Ray C. Schrock, P.C. (admitted *pro hac vice*)
                         Sunny Singh (admitted *pro hac vice*)
                         Jared R. Friedmann (admitted (*pro hac vice*)
                         767 Fifth Avenue
                         New York, New York 10153
                         Telephone:  (212) 310-8000
                         Facsimile:  (212) 310-8007

                         -and-

                         RICHARDS, LAYTON & FINGER, P.A.
                         Daniel J. DeFranceschi (No. 2732)
                         Zachary I. Shapiro (No. 5103)
                         One Rodney Square
                         920 N. King Street
                         Wilmington, Delaware 19801
                         Telephone: (302) 651-7700
                         Facsimile:  (302) 651-7701

                         *Attorneys for Debtors*
                         *and Debtors in Possession*

# **<u>TAB 23</u>**

**Order Confirming Fourth Amended Joint Chapter 11 Plan of
Exide Holdings, Inc. and its Affiliated Debtors [Bankr. D.I. 998]
*excluding Exhibit A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------- x
                                                    :

In re                                :       **Chapter 11**

                                                    :

**EXIDE HOLDINGS, INC.,** *et al.,*       :       **Case No. 20–11157 (CSS)**

                                                      :

                   Debtors.[1]                  :       **(Jointly Administered)**

                                                      :

                                                      :       **Re: Docket No. 977**

------------------------------------------------------------- x

## ORDER CONFIRMING FOURTH AMENDED JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

Upon the filing by Exide Holdings, Inc. and its affiliated debtors (collectively, the "**Debtors**") in the above captioned chapter 11 cases ("**Chapter 11 Cases**"), as "proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), of the *Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, dated October 14, 2020 (Docket No. 977) (as amended, modified, or supplemented in accordance with its terms, the "**Plan**"), which is attached hereto as **Exhibit A**;[2] and the Court having approved the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, dated August 14, 2020 (Docket No. 743) (the "**Disclosure Statement**") on a conditional basis and the solicitation procedures related to the Plan, and the Debtors having complied with the solicitation and notice requirements of the *Order (I) Conditionally Approving the Disclosure Statement, (II)*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311).  The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2]     Capitalized terms used in this order (the "**Order**") but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below) or as the context otherwise requires.

*Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling a Combined Hearing, (IV) Establishing Notice and Objection Procedures for Final Approval of Disclosure Statement and Confirmation of Plan, and (V) Granting Related Relief* (Docket No. 745) (the "**Disclosure Statement Order**"), see *Affidavit/Declaration of Mailing of Craig Johnson Regarding Solicitation Materials of Service* (Docket No. 793); and the Court having considered the record in these Chapter 11 Cases, the compromises and settlements and transactions embodied in and contemplated by the Plan, the briefs and arguments regarding confirmation of the Plan, the evidence in support of the Plan adduced at the Confirmation Hearing (defined below), and a hearing on confirmation of the Plan having been held on October 15, 2020 and October 16, 2020 (the "**Confirmation Hearing**"); and the Court having issued a bench ruling at the conclusion of the Confirmation Hearing; and after due deliberation; for the reasons stated by the Court at the Confirmation Hearing,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **Jurisdiction and Venue.**  This Court has jurisdiction over the Chapter 11 Cases, the sale of Acquired Assets owned by the Debtors (the "**Europe/ROW Assets**"), and the Assumed Liabilities of the Debtors, in accordance with the Europe/ROW Purchase Agreement (the "**Europe/ROW Sale Transaction**"), as well as over the transfer of Environmental Trust Assets, the Vernon Environmental Trust Assets, the GUC Trust Assets and the Frisco Assets, pursuant to 28 U.S.C. §§ 157 and 1334.

B.    **Core Proceedings.** This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

C.    **Burden of Proof.** The Plan satisfies the requirements for confirmation of section 1129 of the Bankruptcy Code by a preponderance of evidence.

D.  **Adequacy of Disclosure Statement.**  The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and is approved on a final basis.

E.  **Solicitation.** The Plan was solicited in good faith and in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order.  The Debtors participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Disclosure Statement Order, in the solicitation, offer, issuance, sale, and/or purchase of the assets and securities offered under the Plan, and therefore are entitled to the protections of section 1125(e) of the Bankruptcy Code.

F.  **Good Faith.** The Plan has been proposed in good faith and not by any means forbidden by law.  In so finding, the Court has considered the totality of the circumstances of the Chapter 11 Cases.  The Plan is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies.

G.  **The Trustees**.  Based upon a review of the record, each of the Superpriority Notes Trustee and the Exchange Priority and First Lien Notes Trustee diligently and in good faith, discharged its duties and obligations pursuant to the Superpriority Notes Indenture and Exchange Priority and First Lien Notes Indenture and all ancillary and related documents and otherwise conducted itself with respect to all matters in any way related to the claims of the holders of the Superpriority Notes, Exchange Priority Notes and First Lien Notes with the same degree of care and skill that a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs. Accordingly, the Superpriority Notes Trustee and the Exchange Priority and First Lien Notes Trustee have each discharged its duties fully in

accordance with the Superpriority Notes Indenture and Exchange Priority and First Lien Notes Indenture, as applicable and all ancillary and related documents.

H.      **Section 1129(b).** The Plan does not "unfairly discriminate" and is "fair and equitable" with respect to the Classes that are Impaired and are deemed to reject the Plan in accordance with section 1129(b) of the Bankruptcy Code.

I.      **Releases**.

(i)      The releases contained in Section 10.5 of the Plan (the "**Debtor Release**") are an essential component of the Plan and appropriate.  Good and valid justification has been demonstrated in support of the Debtor Release.  The Subcommittee was appointed by the Special Committee to, among other things, independently evaluate any claims arising out of certain prepetition affiliate transactions of the Debtors that are proposed to be released under the Plan. The Subcommittee has properly concluded that the Debtor Release is appropriate and supported by adequate consideration provided by the Consenting Creditors and the Transferred Entities, as applicable, in exchange for such releases.  The Subcommittee coordinated with the Creditors' Committee during the course of their investigation, and the Creditors' Committee independently came to similar conclusions as the Subcommittee with regards to those certain prepetition affiliate transactions.  Further, the Debtors provided information regarding the Subcommittee's investigation to the Global Settlement Parties and, after agreeing to carve the Global Settlement Parties from the releases under Section 10.6 of the Plan, none of the Global Settlement Parties, nor any other party in interest, other than the California DTSC, has opposed the Debtor Release. Accordingly, the releases contained in Section 10.5 of the Plan: (a) are in exchange for the good and valuable consideration provided by the Released Parties; (b) are a good faith settlement and compromise of the Claims released by the Debtors pursuant to Section 10.5 of the Plan; (c) are in

the best interests of the Debtors and all holders of Claims and Interests; (d) are fair, equitable, and reasonable; (e) were given and made after due notice and opportunity for a hearing; (f) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code; and (g) confer substantial benefits on the Debtors' Estates.  Moreover, the failure to implement the Debtor Release would seriously jeopardize the Debtors' ability to confirm and implement the Plan, including consummation of the Global Settlement.

(ii)     The releases contained in Section 10.6 of the Plan (the "**Third Party Release**") are appropriate.  Parties subject to the Third Party Release were duly informed of the Third Party Release and given the opportunity to opt out or object.  The Confirmation Notice (as defined below) sent to all holders of Claims and Interests expressly included in bold and capitalized font the terms of the Third Party Release, as set forth in Section 10.6 of the Plan.  The Ballots sent to all holders of Claims entitled to vote on the Plan included the Third Party Release in the same manner as the Confirmation Notice and set forth the procedures for opting out of the Third Party Release if such holders did not want to be bound thereby. The Third Party Release was emphasized with bold and capitalized font in the Plan, the Disclosure Statement, the Ballots, and the Confirmation Notice.

(iii)     The Third Party Release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release, except as otherwise set

forth in the Plan.  The Third Party Release was a core negotiation point in connection with the Restructuring Support Agreement and the Consenting Creditors would not have agreed to support the Plan without the Third Party Release.  As such, the Third Party Release is an integral part of the Plan and was critical in incentivizing the Debtors' and the Debtors' stakeholders to negotiate a Plan that maximizes value for the Debtors' stakeholders and resolves complex and substantial liabilities.  The Third Party Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases.

(iv)     Moreover, the Released Parties – including the Consenting Creditors and the Transferred Entities – have made a substantial contribution in exchange for the Third Party Release.  Among other things: (i) the Consenting Creditors negotiated a Restructuring Support Agreement with the Debtors under which the Consenting Creditors submitted a credit bid for the Europe/ROW Assets and participated in a robust bidding process pursuant to the Bidding Procedures, and, upon being selected as the successful bidder, agreed to enter into the Europe/ROW Purchase Agreement and consummate the Sale Transactions, (ii) the Plan has been unanimously accepted and approved by holders of Superpriority Notes Guarantee Claims, Exchange Priority Notes Claims, and First Lien Notes Claims, (iii) the Transferred Entities, at the direction of, and pursuant to a loan made by, the Consenting Creditors and in accordance with the Global Settlement, contributed (v) the Environmental Global Settlement Payment to the Environmental Response Trust; (w) if applicable, the Vernon Global Settlement Payment to the Vernon Environmental Response Trust; (x) the Frisco Global Settlement Payment to TCEQ, and (y) the GUC Global Settlement Payment to the GUC Trust, and (z) the PBGC Settlement Payment to the PBGC, (iv) the Consenting Creditors have agreed, pursuant to the Plan and upon the occurrence of the Effective Date, to waive (x) all of their Liens on or against the Non-

Performing Properties and (y) any Claims, Interests, or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims, and (v) certain of the Consenting Creditors, in their capacities as DIP Lenders, extended a portion of the critical and necessary postpetition financing to the Debtors' businesses during the Chapter 11 Cases by funding the DIP Facility.

(v)     The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the releases provided for in Sections 10.5 and 10.6 of the Plan. Accordingly, based upon the record of the Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Confirmation Hearing, the releases set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law and are approved.

J.     **Exculpation.**   The exculpation provided by Section 10.7 of the Plan for the benefit of the Exculpated Parties is appropriately tailored to the circumstances of these Chapter 11 Cases.   Notwithstanding the provisions of Section 10.7 of the Plan, Related Parties of Exculpated Parties are only exculpated under Section 10.7 of the Plan to the extent such Related Party is a fiduciary.

K.     **Notice and Opportunity to Object.**   As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the Plan, the Confirmation Hearing, the Global Settlement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, the Europe/ROW Sale Transaction, and the Europe/ROW Purchase Agreement, has been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and entities.

L.      **Business Justification.**      The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes and justifications for this Court to approve (i) the credit bid made by the Exchange Priority and First Lien Notes Trustee and assigned to the Buyer pursuant to the Europe/ROW Purchase Agreement, (ii) the transfer to the Buyer of the Acquired Assets owned by the Debtors and the assumption by the Buyer (or its designee) of the Assumed Liabilities of the Debtors in accordance with the Europe/ROW Purchase Agreement and the related Transaction Agreements, (iii) the actions contemplated by the Alternative Acquisition Structure, and (iv) the transfer of the Environmental Trust Assets, the Vernon Environmental Trust Assets (if applicable), the GUC Trust Assets and the Frisco Assets owned by the Debtors to the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust and the Frisco CDC, respectively, pursuant to sections 1123(a)(5), 1123(b) and 1141(c) of the Bankruptcy Code.  The Debtors' entry into and performance under the Europe/ROW Purchase Agreement and the Global Settlement Documents: (x) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (y) provide value to, and are beneficial to, the Debtors' Estates, and are in the best interests of the Debtors and their Estates, creditors and other parties in interest; and (z) are reasonable and appropriate under the circumstances.

M.      **Opportunity to Object.**      In compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and the Bidding Procedures Order, a fair and reasonable opportunity to object or be heard with respect to the Plan, the Global Settlement, the Global Settlement Documents, the Europe/ROW Sale Transaction, and the Europe/ROW Purchase Agreement, has been afforded to all interested Persons.

N.      **Best Interests.**  The actions represented to have been taken, or to be taken, by the Debtors, the Global Settlement Parties, the Trustees and the Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their Estates, creditors, and other parties in interest.  Approval of the Global Settlement, the Global Settlement Documents, the Europe/ROW Purchase Agreement, the Alternative Transaction Structure, the Europe/ROW Sale Transaction and all other features of the Plan, including the Releases, are in the best interests of the Debtors, their creditors, their Estates and all other parties in interest.

O.      **Prompt Consummation.**      The Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Global Settlement, the Global Settlement Documents, and all other features of the Plan must be approved and, subject to paragraph 45 of this Order, consummated as promptly as practicable in order to preserve the value of the Europe/ROW Assets and the viability of the business to which the Europe/ROW Assets relate as a going concern, the orderly administration of the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), and the GUC Trust, and to minimize administrative expenses of the Debtors and maximize recoveries to the Debtors' creditors.

P.      **Corporate Authority.**  Each applicable Debtor (i) has full organizational power and authority to execute the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Global Settlement Documents, and all other documents contemplated thereby, and the Europe/ROW Sale Transaction, the Global Settlement, and all other features of the Plan, as applicable, have been duly and validly authorized by all necessary organizational action of each applicable Debtor, (ii) has all of the organizational power and authority necessary to consummate the transactions contemplated by the Europe/ROW Purchase Agreement, the related

Transaction Agreements, the Global Settlement Documents, and all other documents contemplated thereby, (iii) has taken all organizational action necessary to authorize and approve the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Global Settlement Documents, and all other documents contemplated thereby and the consummation by the Debtors of the Europe/ROW Sale Transaction and the Global Settlement, and (iv) needs no consents or approvals, other than those expressly provided for in the Europe/ROW Purchase Agreement, the related Transaction Agreements, or the Global Settlement Documents, from any other person to consummate the Europe/ROW Sale Transaction and the terms of the Global Settlement.

### **Global Settlement Agreement**

Q. **Good-Faith Settlement Negotiations.** Following the appointment of the Creditors' Committee and the entry of the *Order Governing Settlement Procedures with Governmental Agencies Relating to Non-Performing Properties* (Docket No. 242), and concurrently with the Debtors' postpetition marketing process, the Debtors engaged in good-faith and arm's-length negotiations with the Global Settlement Parties that culminated in the acceptance of the Mediators' Proposal by the Debtors, the Ad Hoc Group, the Creditors' Committee, and the Environmental Sureties, and attorneys representing the Settling Governmental Authorities, and California Department of Toxic Substances Control participated in the mediation. The attorneys for the California Department of Toxic Substances Control, agreed to recommend to their client that it accept the Mediators' Proposal.  The California Department of Toxic Substances Control did not accept or become a party to the Global Settlement.

R.    **Resolution of Disputes.** The Global Settlement resolves all issues and disputes relating to: (i) the abandonment of the Debtors' Non-Performing Properties (other than the Vernon Non-Performing Property); (ii) the Europe/ROW Sale Transaction; (iii) the Americas Sale Transaction and use of proceeds realized therefrom; (iv) claims related to the prepetition transactions that were the subject of the investigation by the Subcommittee and concurrently evaluated by the Creditors' Committee and certain other Global Settlement Parties; and (v) certain other issues and disputes.  The terms of the Global Settlement are incorporated in the Plan.

S.    **Global Settlement is Fair and Equitable.**  The Global Settlement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, was negotiated in good faith and at arm's length and is an essential element of the Plan.  The Global Settlement is fair, equitable, and in the best interest of the Debtors, the Debtors' Estates, the Debtors' creditors, and all parties in interest, and satisfies the standards for approval under Bankruptcy Rule 9019.  The Environmental Settlement Agreement is fair, reasonable, and consistent with environmental law as harmonized with bankruptcy law.

### Sale and/or Transfer of Assets of the Debtors

T.    **Title to the Europe/ROW Assets**.  The Europe/ROW Assets owned by the Debtors, including, for the avoidance of doubt, the Transferred Equity Interests owned by Exide Technologies, LLC, which will be transferred prior to the Europe/ROW Closing in accordance with the Alternative Transaction Structure, constitute property of Debtors' Estates and good title is presently vested with the Debtors' within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owner of the Europe/ROW Assets owned by the

Debtors, with all rights, title and interests to such Europe/ROW Assets, and no other person has any ownership right, title, or interests therein.

U.      **Title to the Environmental Trust Assets**.   The Environmental Trust Assets owned by the Debtors constitute property of Debtors' Estates and good title is presently vested with the Debtors within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owner of the Environmental Trust Assets owned by the Debtors, with all rights, title and interests to such Environmental Trust Assets, and except as otherwise provided in the Environmental Settlement Agreement, no other person has any ownership right, title, or interests therein.

V.      **Title to the Frisco Assets**.  The Frisco Assets owned by the Debtors constitute property of Debtors' Estates and good title is presently vested with the Debtors within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owner of the Frisco Assets owned by the Debtors, with all rights, title and interests to such Frisco Assets, and except as otherwise provided in the Frisco Settlement Agreement, no other person has any ownership right, title, or interests therein.

W.      **Title to the Vernon Environmental Trust Assets**.  The Vernon Environmental Trust Assets owned by the Debtors constitute property of Debtors' Estates and good title is presently vested with the Debtors' within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owner of the Vernon Environmental Trust Assets owned by the Debtors, with all rights, title and interests to such Vernon Environmental Trust Assets, and no other person has any ownership right, title, or interests therein.

X.      **Extensive Efforts by Debtors.**  As of the Commencement Date and for a period of more than 16 months preceding the Commencement Date, the Debtors, with the assistance of

their counsel and other advisors, evaluated strategic alternatives including extensive marketing efforts for both the Americas Assets and the Europe/ROW Assets.  The Debtors have presented credible evidence that they explored various strategic alternatives for the Debtors' businesses over an extended period of time and communicated with numerous parties regarding, among other potential transactions, a possible sale of all or substantially all of the Debtors' assets.  The Europe/ROW Sale Transaction is the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' Estates for the benefit of creditors.

Y.      **Compliance with Bidding Procedures.**      The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders.  The Bidding Procedures afforded adequate notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Europe/ROW Assets.  The Debtors, the Buyer and their respective advisors have complied with the Bidding Procedures and the Bidding Procedures Order in all respects.

Z.      **Adequate Marketing; Highest or Best Offer.**      Other than the Europe/ROW Purchase Agreement, no Qualified Bids for the Europe/ROW Assets were received by the Debtors before the Bid Deadline.  The Debtors cancelled the Auction for the Europe/ROW Assets owned by the Debtors in accordance with the Bidding Procedures Order and, on July 23, 2020, caused the *Notice of Successful Bidders for Americas Assets and Europe/ROW Assets* (Docket No. 591) to be filed with the Court identifying the Buyer as the Successful Bidder of the Europe/ROW Assets owned by the Debtors in accordance with the Bidding Procedures.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Confirmation Hearing, and (ii) the representations of counsel made on the record at the Confirmation Hearing, (a) the Debtors and their advisors have adequately marketed the Europe/ROW Assets owned by

the Debtors and conducted the sale process in compliance with the Bidding Procedures and Bidding Procedures Order; (b) a full, fair, and reasonable opportunity was given to all Persons to make a higher or better offer to purchase the Europe/ROW Assets; (c) no Person, other than the Buyer, timely submitted a Qualified Bid in accordance with the Bidding Procedures Order; (d) the Buyer submitted the highest and best bid for the Europe/ROW Assets owned by the Debtors and was designated as the Successful Bidder; (e) the consideration provided by the Buyer under the Europe/ROW Purchase Agreement constitutes the highest and best offer for the Europe/ROW Assets owned by the Debtors; (f) the consideration provided by the Buyer for the Europe/ROW Assets owned by the Debtors under the Europe/ROW Purchase Agreement is fair and reasonable consideration for the Europe/ROW Assets owned by the Debtors and constitutes reasonably equivalent value under the Bankruptcy Code, (g) the consideration provided by the Buyer for the Europe/ROW Assets owned by the Debtors under the Europe/ROW Purchase Agreement provides reasonably equivalent value and constitutes fair consideration under the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the Uniform Voidable Transactions Act, (h) taking into consideration all relevant factors and circumstances, the Europe/ROW Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapters 7 or 11 of the Bankruptcy Code; (i) no other Person has offered to purchase the Europe/ROW Assets owned by the Debtors for greater economic or non-economic value to the Debtors or their Estates; and (j) the Debtors' determination that the Europe/ROW Sale Transaction and the Europe/ROW Purchase Agreement constitutes the highest and best offer for the Europe/ROW Assets owned by the Debtors constitutes a valid, sound and reasonable exercise of the Debtors' independent business judgment.

AA.    **Good Faith; No Collusion**.   The Europe/ROW Purchase Agreement and all aspects of the Europe/ROW Sale Transaction and the Alternative Transaction Structure were negotiated, proposed, and entered into by the Debtors and the Buyer and each of their management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers, equity holders and representatives, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Buyer has proceeded in good faith in all respects in that, among other things: (i) the Buyer has recognized that the Debtors were free to deal with any Person in connection with the marketing and sale of the Europe/ROW Assets; (ii) the Buyer has complied with the applicable provisions of the Bidding Procedures Order in all respects; (iii) the Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Buyer under the Europe/ROW Purchase Agreement, the related Transaction Agreements, and all other material agreements or arrangements entered into by the Buyer and the Debtors in connection with the Europe/ROW Sale Transaction have been disclosed and are reasonable and appropriate.  Neither the Debtors nor the Buyer, nor any affiliate of the Buyer, have engaged in collusion or fraud.  Specifically, the Buyer has not acted in a collusive manner with any Person or entity.   The Trustees have acted in good faith in all respects.

BB.    **Free and Clear Transfers.**   Except as expressly provided for in the Plan, the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement, or the Frisco Settlement Agreement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code (i) all property of the Debtors' Estates constituting the Europe/ROW Assets under the Europe/ROW Purchase Agreement (which, for the avoidance of doubt, includes the Transferred Equity Interests provided under <u>Schedule A</u> of the Europe/ROW Purchase

Agreement) shall vest free and clear in the Buyer (whether transferred directly or indirectly by the Debtors to the Buyer in accordance with the Alternative Transaction Structure), *provided*, that the foregoing shall not impair or otherwise affect any defensive rights of recoupment under applicable nonbankruptcy law; (ii) all property of the Debtors' Estates constituting the GUC Trust Assets shall vest free and clear in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear in the Environmental Response Trust; (iv) if transferred in accordance with the Plan, all property of the Debtors' Estates constituting Vernon Environmental Trust Assets shall vest free and clear in the Vernon Environmental Response Trust; (v) all property of the Debtors' Estates constituting Frisco Assets shall vest free and clear in the Frisco CDC pursuant to the Frisco Settlement Agreement; and (vi) all remaining property of the Debtors' Estates shall vest free and clear in the Wind-Down Estates (such transferred and vested property, the "**Transferred Debtor Property"**).   The term "free and clear" shall mean that such Transferred Debtor Property is transferred and shall vest free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other claims or interests of any kind or nature whatsoever against the Transferred Debtor Property, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions,

RLF1 24168773v.1

obligations, demands, guaranties, rights, contractual commitments, restrictions (including, but not limited to, the deed restrictions described and set forth in the Frisco Settlement Agreement), product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, and any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or  non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Transferred Debtor Property, or the operation of any of the Debtors' businesses before the Effective Date (collectively, the "**Claims**"), *provided, however,* Transferred Debtor Property that is real property located in the United States shall not transfer free and clear of any existing *in rem* obligations that do not secure the payment of Claims (such as easements or deed restrictions), and as to any Transferred Debtor Property in which a governmental unit holds an interest that is subject to regulatory requirements under a governmental grant or award, including but not limited to, 10 C.F.R. 600.321, such Transferred Debtor Property (which, for the avoidance of doubt, shall not include the Europe/ROW Assets)

shall not transfer free and clear of such governmental unit interest, except as set forth in the Frisco Settlement Agreement.

CC.    All Persons having Claims of any kind or nature whatsoever against the Debtors or the Transferred Debtor Property shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Transferred Debtor Property, the Buyer, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, the Frisco Governmental Authorities, or any of their respective Affiliates or any of their respective property, successors or assigns, as an alleged successor or on any other ground, except as permitted by the Plan.

DD.    **Necessity of Free and Clear Transfer.** (i) The Buyer would not have entered into the Europe/ROW Purchase Agreement and would not consummate the value maximizing transaction contemplated thereby, and (ii) the Global Settlement Parties would not have entered into the Global Settlement, if the Claims against the Debtors or the Transferred Debtor Property were not discharged or, if the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco Governmental Authorities, would, or in the future could be, liable for any such Claims, that are not expressly assumed.

EE.    **Necessity of Order.**  The Buyer would not have entered into the Europe/ROW Purchase Agreement, and the Buyer and Trustees would not consummate the Europe/ROW Sale Transaction and the Global Settlement Parties would not have entered into the Global Settlement and consummate the Global Settlement, without all of the relief provided for in this Order, including that the transfer of the Transferred Debtor Property free and clear of all Claims,

Interests, Liens, and encumbrances, including rights or Claims based upon successor or transferee liability.

<strong><u>Treatment of Assumed Contracts</u></strong>

FF.    **<u>Notice and Opportunity to Object to Cure Costs</u>.**   As evidenced by the affidavits and certificates of service and publication notice previously filed with the Court, due, proper, timely, adequate, and sufficient notice of the *Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* (Docket No. 353); *Second Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* (Docket No. 647); and the Revised Assumption Schedule for the Europe/ROW Transaction and the Assumption Schedule for the Environmental Response Trust, attached as <u>Exhibit A-1</u> to the *Notice of Filing of Second Plan Supplement* (Docket No. 825) and <u>Exhibit A-1</u> to the *Notice of Filing of Third Plan Supplement* (Docket No. 939)(collectively, the "**Cure and Assumption Notices**"), have been provided in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and Bidding Procedures Order to all interested Persons and entities.

GG.    **<u>Cure Notice</u>**.   As evidenced by the affidavits of service filed with the Court, the Debtors have served, prior to the Confirmation Hearing, the Cure and Assumption Notices on each non-Debtor counterparty to the Assumed Contracts (each, a "**Counterparty**" and collectively, the "**Counterparties**"), which provided notice of the Debtors' intent to potentially assign such Assumed Contracts (to the extent the Assumed Contract is an executory contract or lease) and notice of the related proposed Cure Costs upon each respective Counterparty.   The service of the Cure and Assumption Notices were timely, good, sufficient and appropriate under

the circumstances and no further notice need be given with respect to the Cure Costs for the assumption of the Assumed Contracts.  All Counterparties to the Assumed Contracts have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Cure Notice and to the assumption of the Assumed Contracts in accordance with the Bidding Procedures Order.

HH.    **Assignment of Assumed Contracts.**  It is an exercise of the Debtors' reasonable and sound business judgment to assign the assumed contracts in connection with the consummation of the Europe/ROW Sale Transaction and the Global Settlement (the "**Assumed Contracts**"), and the assignment of the Assumed Contracts is in the best interests of the Debtors and their Estates.

II.    **Cure/Adequate Assurance.**    **T**he Debtors, the Buyer, the Environmental Response Trust, and/or the Frisco Governmental Authorities (except TCEQ) have cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.  Unless otherwise agreed to by the parties, the Cure Costs set forth in the Cure Notice are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assumed Contracts.  The Buyer's, the Environmental Response Trust's, or the Frisco Governmental Authorities' (except TCEQ) promise to perform the obligations under the Assumed Contracts, as applicable, after the Effective Date shall constitute adequate assurance of future performance of, and under, the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  All Counterparties who did not timely file an objection to the assumption of the Assumed Contracts in accordance with the Plan, the Plan Supplement, and the Cure and Assumption Notices are deemed to consent to

the assumption by the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), of their respective Assumed Contract.  The Court finds that with respect to all such Assumed Contracts the payment of the Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 1123(b)(2) and 365(b) of the Bankruptcy Code have been satisfied for the assumption by the Debtors of each of the Assumed Contracts.

JJ.    **Valid and Binding Contract.**   The Europe/ROW Purchase Agreement, the related Transaction Agreements and the Global Settlement Documents are valid and binding contracts among the Debtors, the Buyer, the Trustees, and the Global Settlement Parties, as applicable, and shall be enforceable pursuant to their respective terms.  The Europe/ROW Purchase Agreement, the related Transaction Agreements, and the Global Settlement Documents were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtors, the Buyer, the Trustees, nor any of the Global Settlement Parties is, or will be, entering into the Europe/ROW Purchase Agreement or the Global Settlement, and transactions contemplated therein, as applicable, fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Global Settlement and the Global Settlement Documents, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and

any chapter 7 or chapter 11 trustee appointed in the Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

KK.   **Unenforceability of Anti-Assignment Provisions.**   Anti-assignment provisions in any Assumed Contract assumed by the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), as applicable—including any provisions requiring rating agency confirmation, "no downgrade" letters, any other third party consent, or of the type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code—shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

LL.   **Abandonment of Vernon Non-Performing Property.** The findings of fact and conclusions of law set forth on **Schedule 1** to this Order as to the abandonment of the Vernon Non-Performing Property are incorporated herein by reference in their entirety. Such findings and conclusions shall govern the abandonment of the Vernon Non-Performing Property to the extent Vernon Non-Performing is abandoned in accordance with the terms of the Plan and this Order.

MM.   **PBGC Settlement.**   The PBGC Settlement Payment has been negotiated in good faith and is fair and reasonable.

NN.   **Final Order.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

RLF1 24168773v.1

**FURTHER, IT IS HEREBY ORDERED THAT:**

**<u>Final Approval of Disclosure Statement</u>**

1.      The Disclosure Statement: (i) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (ii) is approved on a final basis.

**<u>Confirmation of the Plan</u>**

2.      The Plan is confirmed as set forth herein.

3.      The findings of fact and conclusions of law listed above, as well as any additional findings of fact and conclusions of law announced by this Court at the Confirmation Hearing, are hereby incorporated into this Confirmation Order.

4.      Any and all objections to the approval and entry of this Order, the approval of the Plan, the Global Settlement, the Europe/ROW Sale Transaction, including any objections to Cure Amounts or adequate assurance of future performance, the assumption and/or assumption and assignment of executory contracts and unexpired leases, or any terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement or the Frisco Settlement Agreement that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

5.      The documents contained in the Plan Supplement, including the final Environmental Settlement Agreement, final Frisco Settlement Agreement, and the final Europe/ROW Purchase Agreement are integral to the Plan and <u>are approved in their entirety</u>. The Debtors, the Plan Administrator, the GUC Trustee, the Environmental Trustee, the Vernon Environmental Trustee, the Buyer, the Trustees, and each Global Settlement Party (as applicable)

are authorized to take all actions required under the Plan, the Plan Supplement, and the Europe/ROW Purchase Agreement, including the Alternative Transaction Structure, to effectuate the Plan, the Global Settlement embodied therein, and the transactions contemplated therein.

6.      The terms and provisions of the Plan, including the terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement and the Frisco Settlement Agreement, and the exhibits thereto, are incorporated herein by reference and are an integral part of this Order.  The terms of the Plan, the documents contained in the Plan Supplement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, the Europe/ROW Purchase Agreement, and all exhibits and other relevant and necessary documents related thereto or contemplated thereby shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Debtors, their Estates and their creditors, the Transferred Entities, any affected third parties, all holders of equity interests in the Debtors, all holders of any Claims, whether known or unknown, against the Debtors, any holders of Claims against, or on all or any portion of the Acquired Assets owned by the Debtors, including, but not limited to, all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and each of their respective affiliates, successors and assigns.

7.      **Cancellation of Superpriority Notes and Discharge of Debtor Guarantee Claims.**  Prior to the Europe/ROW Closing, the Consenting Creditors shall contribute the Superpriority Notes, together with all of the outstanding Claims arising thereunder and under the Superpriority Notes Indenture to the Europe/ROW Purchaser in exchange for preferred equity

interests of the Europe/ROW Purchaser.  After the Europe/ROW Closing, the Europe/ROW

Purchaser and the Superpriority Noteholders shall deliver, or be deemed to deliver, all of the

Superpriority Notes to Exide International for cancellation and the Superpriority Notes shall be

cancelled.  At the Europe/ROW Closing, and without limiting the above, and without any further

action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or

further order of the Bankruptcy Court: (i) the Superpriority Notes Guarantee Claims against the

Debtors shall be deemed fully satisfied, and the Guarantees granted by the Debtors shall be

released, and discharged, (ii) any liens or security interests granted by the Debtors under the

Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed

terminated, released, discharged and without further effect, and (iii) all existing defaults by the

Debtors under the Superpriority Notes Indenture shall be waived.  The Superpriority Notes

Indenture and Superpriority Security Documents and all outstanding Claims arising under the

Superpriority Notes Indenture shall be cancelled and terminated and the Superpriority Notes

Indenture Trustee shall be released and discharged of all obligations thereunder in accordance

with a supplemental indenture and executed by Exide International, Exide Holdings, and the

Superpriority Notes Trustee in accordance with the Superpriority Notes Indenture.  For the

avoidance of doubt, and in accordance with the Superpriority Notes Indenture, Exide

International shall immediately deliver, or be deemed to deliver and surrender, all of the

Superpriority Notes upon receipt thereof to the Superpriority Notes Trustee for cancellation.

8.    **Cancellation of Existing Securities and Agreements**.  Except for the purpose of

evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale

Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities,

and other evidence of debt issued, including, but not limited to, the Exchange Priority and First

Lien Notes Indenture and the Legacy Notes Indentures and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors and all guarantors thereunder, shall be deemed fully satisfied, released, and discharged. For the avoidance of doubt, but subject to <u>Section 5.16(b)</u> of the Plan, on the Effective Date, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall be deemed terminated and cancelled and the Exchange Priority and First Lien Notes Trustee and Legacy Notes Trustee shall be discharged and released without any further action, and the Debtors' Estates will have no further claims against any non-Debtors on account of any guarantee obligations under the Exchange Priority and First Lien Notes Indenture.

9.      The Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall continue in effect to the extent necessary to: (i) allow the Plan Administrator, Exchange Priority and First Lien Notes Trustee, or Legacy Notes Trustee, as applicable, to make distributions under the Plan; (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction; (iii) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien, First Lien Trustee Charging Lien, and Legacy Notes Charging Lien, as applicable; (iv) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture or the Legacy Notes Indentures, as applicable; (v) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to exercise their rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable; (vi) permit the

RLF1 24168773v.1

Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in section 5.16 of the Plan.  For the avoidance of doubt, all indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date, and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.  Subsequent to the performance by the Exchange Priority and First Lien Notes Trustee of its obligations pursuant to the Plan, the Exchange Priority and First Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Exchange Priority and First Lien Notes Indenture and shall be discharged.

10.     Any failure of this Order to specifically include or refer to any particular article, section, or provision of the Plan, the documents contained in the Plan Supplement, including the Environmental Settlement Agreement and the Frisco Settlement Agreement, the Europe/ROW Purchase Agreement, the Alternative Transaction Structure, the GUC Trust Agreement, or any exhibit or document related thereto, or contemplated thereby, does not, and shall not be, deemed to diminish or impair the effectiveness or enforceability of such article, section, or provision; it being the intention of the Court that all such documents are approved in their entirety.

11.     Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept for filing and/or recording any and all documents, mortgages and

instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan, the Global Settlement embodied therein, and this Order.

12.     Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be effective immediately on the Effective Date without further order or action by the Court or any other Entity: (a) Releases by the Debtors (Section 10.5); (b) Releases by Holders of Claims and Interests (Section 10.6)); (c) Exculpation (Section 10.7); and (d) Injunction (Section 10.3).  Additionally, (i) the Mutual Releases under Section 12.22 of the Europe/ROW Purchase Agreement, and (ii) the Covenants Not to Sue and Reservation of Rights contained in Article IX of the Environmental Settlement Agreement and Article VIII of the Frisco Settlement Agreement are heavily negotiated and integral conditions of the Global Settlement and are hereby approved and will be effective immediately on the Effective Date without further order or action by the Court or any of the parties to such release or covenant not to sue.

13.     The Debtors shall cause to be served a notice (the "**Confirmation Notice**") of the entry of this Order and the Administrative Expense Claims Bar Date (as defined herein) upon: (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC (the "**Claims and Noticing Agent**"), and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter.  The Debtors shall cause the Confirmation Notice to be published in the national editions of *The New York Times* and *USA Today* no later than five (5) business days after the entry of this Order, or as soon as practicable thereafter.

## The Global Settlement

14.     The compromises and settlements set forth in the Plan, including, but not limited

to, the Global Settlement, are approved and will be effective immediately and binding on all

parties in interest on the Effective Date.  The following changes are made to the Environmental

Settlement Agreement by agreement of the parties thereto:

     **a.**    Westchester shall make its required contributions under Paragraphs 9 and 60 not

              later than ten business days after the Effective Date.

     **b.**    The Environmental Trustee and Vernon Environmental Trustee shall be the

              entities appointed by this Order in Paragraphs 15 and 19 hereof.

     **c.**    The provisions regarding "Vernon Net Excess Funding" in paragraph 78 are

              modified to read as follows: ". . . The Vernon Environmental Trustee shall

              distribute the Vernon Net Excess Funding in the following manner and order:

              First, the Vernon Environmental Trustee shall retain from such Net Excess

              Funding an amount equal to the Vernon Settlement Payment or other payments

              that were initially transferred to the Vernon Environmental Trust Account

              pursuant to Paragraph 58. Then, second, the Vernon Environmental Trustee shall

              transfer any remaining Net Excess Funding to Westchester until Westchester has

              received the full penal sum of the Vernon Bond.  Then, finally, the Vernon

              Environmental Trustee shall, as instructed in writing by CADTSC, transfer any

              remaining Vernon Net Excess Funding to the California Toxic Substances Control

              Account."

15.     **Environmental Response Trust.**    The formation, rights, powers, duties,

structure, obligations and other matters pertaining to the Environmental Response Trust shall be

governed by the Plan, the Environmental Settlement Agreement and the Environmental Trust

Agreement.  Exide Environmental Response Corporation is appointed as the Environmental Trustee of the Environmental Response Trust.

16.     On the Effective Date, the Environmental Trust Assets shall be transferred by the Debtors or the Transferred Entities, as applicable (and deemed transferred), to the Environmental Response Trust free and clear (as defined in paragraph BB hereto) of all Claims, Interests, Liens, and encumbrances, including rights or Claims based upon successor or transferee liability, without the need for any Entity to take any further action or obtain approval.  Thereupon, the Debtors shall have no interest in the Environmental Trust Assets or the Environmental Response Trust.

17.     Westchester shall make all required contributions to the Environmental Response Trust or for the Reading Battery and Reading Residential, PA Designated Site to the Commonwealth of Pennsylvania, for deposit into the Pennsylvania Solid Waste Abatement Fund, in accordance with the Environmental Settlement Documents, provided that notwithstanding anything in the Environmental Settlement Documents, such contribution shall be made not later than ten business days after the Effective Date.

18.     For the avoidance of doubt, except to the extent that a holder of an Allowed Environmental NPP Claim agrees to less favorable treatment of such Claim or otherwise, in full and final satisfaction and release of, and exchange for, such Allowed Environmental NPP Claim, each holder of an Allowed Environmental NPP Claim shall receive and be subject to the treatment as provided under Section 4.8(b) of the Plan; provided, that the foregoing shall not affect any defensive rights of set-off or recoupment of any of the Settling Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, the GUC Trust, or GUC Trustee.

19.     **Vernon Environmental Response Trust.**  If the Vernon Trust Condition and the Payment Condition set forth in the Plan have been satisfied, the Vernon Environmental Response Trust will be created and the formation, rights, powers, duties, structure, obligations and other matters pertaining to the Vernon Environmental Response Trust shall be governed by the Plan, the Environmental Settlement Agreement and the Vernon Environmental Trust Agreement, and the Vernon Environmental Response Corporation is appointed as the Vernon Environmental Trustee of the Vernon Environmental Response Trust..

20.     On the Effective Date, to the extent provided for in the Plan, and subject to paragraph 50 below, the Vernon Environmental Trust Assets shall be transferred by the Debtors or the Transferred Entities, as applicable (and deemed transferred), to the Vernon Environmental Response Trust free and clear of all Claims, without the need for any Entity to take any further action or obtain approval and Westchester shall make all required contributions to the existing standby trust for the Vernon, CA NPP, in accordance with the Environmental Settlement Documents, provided that notwithstanding anything in the Environmental Settlement Documents such contributions shall be made not later than ten business days after the Effective Date. Thereupon, the Debtors shall have no interest in the Vernon Environmental Trust Assets or the Vernon Environmental Response Trust.

21.     **GUC Trust.**  The formation, rights, powers, duties, structure, obligations and other matters pertaining to the GUC Trust shall be governed by the Plan and the GUC Trust Agreement.  For the avoidance of doubt, the GUC Trustee is entitled to rely upon the accuracy and validity of the Debtors Books and Records (as defined in the GUC Trust Agreement) in connection with all GUC Trust activity.

22.     On the Effective Date, the GUC Trust Assets shall be transferred by the Debtors or the Transferred Entities, as applicable (and deemed transferred), to the GUC Trust free and clear (as defined in paragraph BB) of all Claims, Interests, Liens, and encumbrances, including rights or claims based upon successor liability, without the need for any Entity to take any further action or obtain approval.  Thereupon, the Debtors shall have no interest in the GUC Trust Assets or the GUC Trust.

23.     Upon the Effective Date, the GUC Trust is authorized and empowered, without further approval of this Court or any other party, to take such actions and to perform such acts as may be necessary, desirable or appropriate to implement the issuance of each class of GUC Trust Beneficial Interests in accordance with the Plan and the GUC Trust Agreement, and to execute and deliver all agreements, documents, securities, instruments and certificates relating thereto. All GUC Trust Beneficial Interests issued by the GUC Trust pursuant to the provisions of the Plan and the GUC Trust Agreement shall be deemed to be duly authorized, validly issued, fully paid and non-assessable.

24.     To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate

transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### The Sale or Transfer of Transferred Debtor Property

25.    **Fair Purchase Price**.  The consideration provided by the Buyer pursuant to the credit bid submitted by the Exchange Priority and First Lien Trustee and assigned to the Buyer under the Europe/ROW Purchase Agreement and the Global Settlement Parties under the Global Settlement is fair and reasonable and constitutes: (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and the Uniform Voidable Transactions Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

26.    **Consummation of the Europe/ROW Sale Transaction and the Global Settlement.**  The Debtors, their affiliates and their respective officers, employees and agents, are authorized to: (a) execute and deliver, and empowered to perform under, consummate, and implement, the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement, the Global Settlement Documents, and all additional instruments and documents that the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco Governmental Authorities, as applicable, deem necessary or

appropriate to implement the Europe/ROW Purchase Agreement, the related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement, or the Global Settlement Documents, (b) effectuate the sale and/or transfer of the Transferred Debtor Property, and (c) take all further actions as may be reasonably required for the purpose of issuing, assigning, transferring, granting, and conveying to, and conferring on (as applicable), the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust or the Frisco CDC, the Transferred Debtor Property, as applicable, and assumption of the Assumed Liabilities of the Debtors by the Buyer, or otherwise in accordance with the Alternative Acquisition Structure, or as may be necessary or appropriate or consistent with the performance of the parties' obligations under the Europe/ROW Purchase Agreement, related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement, the Global Settlement Documents, the Plan, and this Order.  All instruments and documents entered into in connection therewith shall be deemed authorized without further order of the Court.  The Trustees are authorized, empowered and directed to take all actions necessary and required to implement and consummate the Plan and Europe/ROW Purchase Agreement, the related Transaction Agreements, the Alternative Transaction Structure, the Global Settlement and the Global Settlement Documents.

27.     **Debtors' Cooperation**.  To the extent required by the Europe/ROW Purchase Agreement or the Global Settlement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, and the Frisco CDC, in assuring that all Persons that are presently, or on the Effective Date may be, in possession of some or all of the Europe/ROW Assets, the Environmental Trust Assets, the Vernon Environmental Trust Assets

(if applicable), the GUC Trust Assets or the Frisco Assets, as applicable, will surrender possession of such assets to either (i) the Debtors before the Effective Date or (ii) the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco CDC, as applicable, on or after the Effective Date.  In the event any Person, on or after the Effective Date, is in possession of some or all of the Transferred Debtor Property that is to be transferred to the Buyer (or its designee), the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust or the Frisco CDC, as applicable, and such parties have not received or taken possession of such assets, then the Buyer (or its designee), the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust or the Frisco CDC, as applicable, may seek to compel the turnover or transfer of the assets pursuant to an adversary proceeding.

28.    **Direction to Release Liens.**  As of the Effective Date, any creditors and any holder of a Lien, including rights or Claims based on any successor or transferee liability, is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien on or against the Transferred Debtor Property, if any, as such Lien may have been recorded or may otherwise exist.  If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Liens or Claims against the Transferred Debtor Property shall not have delivered to the Debtors prior to the Effective Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Liens and Claims (collectively, the "**Release Documents**") the Person has with respect to the Debtors or the Transferred Debtor Property: (i) the Debtors, the Buyer or the applicable Transferred Entity, the Environmental Response Trust, the Vernon Environmental Response

Trust (if applicable), the GUC Trust, and the Frisco CDC, as applicable, are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Transferred Debtor Property; (ii) the Buyer or the Transferred Entity, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco CDC, as applicable, is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and Liens against the Transferred Debtor Property; and (iii) the Buyer, the Environmental Trustee, the Vernon Environmental Trustee (if applicable), the GUC Trustee or the Frisco CDC may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Liens and Claims with respect to the Transferred Debtor Property, other than liabilities expressly assumed under the Europe/ROW Purchase Agreement or the Global Settlement Documents; provided that, notwithstanding anything in this Order, the Europe/ROW Purchase Agreement or the Global Settlement Documents to the contrary, the provisions of this Order shall be self-executing, and the Debtors, the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust (if applicable), the GUC Trust, or the Frisco Governmental Authorities shall not be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.

29.    **Direction to Government Agencies.**  This Order is, and shall be, binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrar of patents, trademarks, or other intellectual property, administrative agencies, governmental departments,

secretaries of state, federal, state, county and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "**Recording Officers**").  Each and every Recording Officer is authorized, from and after the Effective Date, to strike all recorded Claims, Interests, Liens, or other encumbrances in, on or against the Transferred Debtor Property, as applicable, from their records, official or otherwise without further order of the Court or act of any party.  A certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims recorded prior to the date of this Order.  All Recording Officers are hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Europe/ROW Purchase Agreement and the Global Settlement, and to accept and rely on this Order as the sole and sufficient evidence of the transfer of the Europe/ROW Assets to, and the assumption of the Assumed Liabilities of the Debtors by, the Buyer, and the transfer of the Environmental Trust Assets, the Vernon Environmental Trust Assets (if applicable), the GUC Trust Assets, and the Frisco Assets (and any related assumed contracts assumed by any of the foregoing) to the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, and the Frisco CDC, respectively.

30.    **No Discriminatory Treatment.**  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of any of the Europe/ROW Assets, the Environmental Trust Assets, the Vernon Environmental Trust Assets, the GUC Trust Assets, and the Frisco Assets on account of the filing or pendency of the Chapter 11 Cases or the

consummation of the transactions contemplated by the Europe/ROW Purchase Agreement and the Global Settlement Documents.

31.      **Transfer of Transferred Debtor Property Free and Clear**.  Pursuant to section 1141(c) of the Bankruptcy Code, all Persons are forever prohibited and enjoined from taking any action against the Buyer, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, or the Frisco CDC (or any of their respective property, Affiliates, successors and assigns) based on any Claims, Interests, Liens, and other encumbrances (other than Assumed Liabilities of the Debtor) to the extent such Claims are released or prohibited pursuant to the terms of the Plan or this Order; provided that the foregoing restriction shall not prevent any party from appealing this Order in accordance with applicable law or opposing any appeal of this Order.

32.      **No Successor or Other Derivative Liability**.  The Buyer, the Trustees, the Consenting Creditors, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, and the Frisco Governmental Authorities, and each of their respective successors and assigns, shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and such entities shall not have assumed, nor are in any way responsible for, any liability or obligation of the Debtors or the Debtors' Estates, except as expressly provided for in the Europe/ROW Purchase Agreement or the Global Settlement Documents.  Except as expressly set forth in the Europe/ROW Purchase

Agreement or the Global Settlement Documents, the Buyer, the Consenting Creditors, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, and the Frisco Governmental Authorities, and each of their respective successors and assigns, shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Europe/ROW Assets, the Environmental Trust Assets, the Vernon Environmental Trust Assets, the GUC Trust Assets, or the Frisco Assets prior to the Effective Date.

33.      Except as expressly set forth herein or in the Europe/ROW Purchase Agreement and the Global Settlement Documents, the Buyer, the Consenting Creditors, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, and the Frisco Governmental Authorities, and each of their respective successors, Affiliates, and assigns shall have no liability for any Claim against the Debtors, including Claims arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of, or related to, any of the Debtors or any of the Debtors' affiliates or predecessors, or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and

any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to:  (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) any bulk sales or similar laws; (S) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (T) any common law doctrine of

*de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of, or related to, successor liability.

34.     Except as expressly set forth herein or in the Plan, the Plan Administrator and New Board, and each of their respective successors and assigns, shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their Estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective Estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and such entities have not assumed nor are in any way responsible for any liability or obligation of the Debtors or the Debtors' Estates, including any obligations of the Debtors or the Debtors' Estates arising out of, or related to, the Non-Performing Properties or the Canada Non-Performing Property.  For the avoidance of doubt, the Plan Administrator and the New Board shall have no liability under federal, state and provincial environmental laws, including the federal Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), with respect to any of the Non-Performing Properties or the Canada Non-Performing Property for liabilities or obligations of the Debtors or the Debtors' Estates arising prior to the Effective Date.

35.     On the Effective Date, the Debtors will transfer USD $1,500,000.00 as the Canada NPP Risk Management Measures Funds to a segregated account that shall be available for the exclusive purpose of the environmental risk management of the Canada Non-Performing Property.

36.     **Assumption of Assumed Contracts.**  Pursuant to sections 1123(b)(2) and 365 of the Bankruptcy Code and subject to, and conditioned upon the confirmation of the Plan, the Debtors are hereby authorized to assign the Assumed Contracts to the Buyer (or otherwise in accordance with the Alternative Acquisition Structure) and the Environmental Response Trust, as set forth in the Cure and Assumption Notices.  With respect to each of the Assumed Contracts, in accordance with the provisions of the Plan, the Europe/ROW Purchase Agreement and the Global Settlement Documents, the Debtors, the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), as applicable, has cured or will cure before the Effective Date, or have provided adequate assurance of the prompt cure after the Effective Date of, any monetary default required to be cured with respect to the Assumed Contracts under sections 1123(b)(2) and  365(b)(1) of the Bankruptcy Code, and the Buyer, the Environmental Response Trust, or the Frisco Governmental Authorities (except TCEQ), as applicable, has provided adequate assurance of future performance under the Assumed Contracts in satisfaction of sections 1123(b)(2), 365(b), and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparty to such Assumed Contracts.

37.     The Debtors served all Counterparties to the Assumed Contracts with the Cure Notices and the deadline to object to the Cure Costs and adequate assurance of future performance has passed.  Accordingly, unless an objection to the proposed Cure Costs or adequate assurance information was filed and served before the applicable deadline, each Counterparty to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors, the Buyer, the Environmental Response Trust, the Frisco Governmental Authorities (except TCEQ), each of their respective successors or assigns, or the

RLF1 24168773v.1

property of any of them, any default existing as of the date of the Confirmation Hearing if such default was not raised or asserted prior to, or at, the Confirmation Hearing.

38.     All of the requirements of sections 1123(b)(2), 365(b), and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption of the Assumed Contracts.

39.     To the extent a Counterparty to an Assumed Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Cure and Assumption Notices and any such Counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates (subject to adjustment for subsequent payment or invoices coming due after the date of the Assumption Notice).

40.     Except as otherwise specifically provided for by order of this Court, upon the assumption of the Assumed Contracts under the provisions of this Order, no default shall exist under any Assumed Contracts, and no Counterparty to any Assumed Contracts shall be permitted to declare a default by any Debtor, the Transferred Entities, the Environmental Response Trust, the GUC Trust, the Frisco Governmental Authorities (except TCEQ), or the Buyer or otherwise take action against such parties (or any of their respective property, successors and assigns) as a result of any of the Debtors' financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assumed Contract.  The failure of the Debtors, the Transferred Entities, the Buyer, the Environmental Response Trust, the GUC Trust, or the Frisco Governmental Authorities (except TCEQ) to enforce at any time one or more terms or conditions of any Assumed Contract, as applicable, shall not be a waiver of such terms or conditions, or of

43

the Debtors', the Transferred Entities', the Buyer's, the Environmental Response Trust's, the GUC Trust's, or the Frisco Governmental Authorities' (except TCEQ) rights to enforce every term and condition of the Assumed Contract.

41.     **Rejection of Executory Contracts and Unexpired Leases**.   All executory contracts and unexpired leases of real property of the Debtors that are not Assumed Contracts as of the Effective Date are rejected, *provided, that,* the Debtors' contract with American Integrated Services, Inc. ("**AIS**") shall be rejected on October 30, 2020 and the Debtors shall make all payments thereunder for services rendered by AIS through October 30, 2020.

42.     **No Avoidance of Europe/ROW Purchase Agreement or Global Settlement Documents**.   Neither the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, nor the Frisco Governmental Authorities have engaged in any conduct that would cause or permit the Europe/ROW Purchase Agreement or the Global Settlement Documents, as applicable, to be avoided or costs or damages to be imposed.   Accordingly, the Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Alternative Transaction Structure, the Global Settlement and the Global Settlement Documents shall not be avoidable under chapter 5 of the Bankruptcy Code or any similar or related state or federal statutes and common law, and no party shall be entitled to any damages or other recovery under the Bankruptcy Code with respect to the Europe/ROW Purchase Agreement, the Europe/ROW Sale Transaction, the Alternative Acquisition Structure, the Global Settlement or the Global Settlement Documents.

43.     **Modification of Europe/ROW Purchase Agreement or Global Settlement**. The Europe/ROW Purchase Agreement, the related Transaction Agreements, the Global Settlement Documents, and documents or other instruments executed in connection therewith,

RLF1 24168773v.1

may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided, that other than such changes as are required to effect the Alternative Acquisition Structure, any such modification, amendment or supplement does not materially change the terms of the Europe/ROW Purchase Agreement, related Transaction Agreements, Global Settlement Documents, and documents or other instruments or have any adverse effect on the Debtors' Estates, provided, further that advance notice and consent of the parties to such amended documents, consistent with the terms of such documents, shall be properly obtained.

44. To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, and the Global Settlement embodied therein, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to, or by, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

RLF1 24168773v.1

45.     **No Stay of Order.**  This Order shall be effective immediately on October 23, 2020, and the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, the GUC Trustee, and the Frisco Governmental Authorities are authorized to close the Europe/ROW Sale Transaction and Global Settlement, as applicable, immediately upon the effectiveness of this Order.  Time is of the essence in closing the Europe/ROW Sale Transaction and the Global Settlement in accordance with the terms of the Europe/ROW Purchase Agreement, the Alternative Transaction Structure, and the Global Settlement Documents, and the Debtors, the Buyer, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the GUC Trust, and the Frisco Governmental Authorities intend to close the Europe/ROW Sale Transaction and Global Settlement, as applicable, as soon as practicable, subject to the terms of this Order.

## Canada Non-Performing Property

46.     On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Risk Management Measures Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; provided, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount necessary to implement environmental risk management measures and/or abandonment of the Canada Non-Performing Property. The Debtors are authorized to transfer title to, or proceeds from, the Canada Non-Performing Property to the Canada MOE or its designee.  For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Risk Management Measures Funds deposited for use by the Canada MOE.

47.     Upon the implementation of environmental risk management measures, any excess Canada NPP Risk Management Measures Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

48.     In the event the Canada NPP Risk Management Measures Funds are not sufficient to cover the cost of implementing the environmental risk management measures at the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

<strong>Columbus Non-Performing Property</strong>

49.     As required by the Environmental Settlement Agreement, and pursuant to sections 105(a), 365 and 554(a) of the Bankruptcy Code, on the Effective Date, in accordance with the Columbus NPP Termination Documents and subject to the satisfaction or waiver of all applicable closing conditions under the Columbus NPP Termination Documents: (A) Exide Technologies' lease and the bond purchase agreement related to the Columbus Non-Performing Property, including any security documentation related thereto, shall terminate; (B) Exide Technologies shall be deemed to have abandoned the revenue bonds issued in connection with the development of the Columbus Non-Performing Property and no further payments shall be due thereunder; (C) the Columbus Development Authority shall quitclaim its interest in the Columbus Non-Performing Property to Exide Technologies; and (D) the Debtors and the Columbus Development Authority shall take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

<strong>Abandonment of the Vernon Non-Performing Property</strong>

50.     The findings of fact and conclusions of law set forth on <strong><u>Schedule 1</u></strong> to this Order as to the abandonment of the Vernon Non-Performing Property are incorporated herein by reference in their entirety. Such findings and conclusions shall govern the abandonment of the

Vernon Non-Performing Property to the extent Vernon Non-Performing is abandoned in accordance with the terms of the Plan and this Order.

**PBGC Settlement and Westchester Resolution**

51.     The settlement with the PBGC, the Westchester resolution and Westchester Catch-up Payments incorporated in the Plan and described at the Confirmation Hearing are approved.

**Payment of Administrative Expense Claims and Priority Claims**

52.     The Plan Administrator and Wind Down Estates shall not pay any Administrative Expense Claims, Priority Tax Claims or Priority Non-Tax Claims other than Permitted Claims (as defined below) (a) unless and until (a) the Plan Administrator establishes a reserve sufficient to pay all Allowed Administrative Expense Claims and all Disputed Administrative Expense Claims should such Disputed Administrative Expense Claims become Allowed or (b) with Court approval subject to hearing and at least 30 days' notice to all affected creditors.  Following the Effective Date, to the extent the assets of the Wind Down Estates are insufficient to pay all Allowed Administrative Claims in full, the Consenting Creditors, Transferred Entities and Battery BidCo, LLC agree to share ratably with all other Allowed Administrative Expense Claims in the remaining assets of the Wind Down Estates; provided that the rights of all other parties in interest shall be fully preserved.  The Plan Administrator and Wind Down Estates will provide regular updates and reporting to the GUC Trust, GUC Trustee, Consenting Creditors, Transferred Entities and Battery BidCo, LLC, regarding the status, amount, and allocation of Disputed Administrative Expense Claims.  "Permitted Claims" means: (i) amounts necessary for the Debtors to consummate the Plan and fulfill their obligations under the Global Settlement Agreement in an aggregate amount not to exceed $4.0 million (of the estimated $15 million of

the "Total Claims" identified by the Debtors in paragraph 45 of the Declaration of Roy Messing, the Debtors' Chief Restructuring Officer, in Support of Confirmation of the Amended Plan); (ii) any operating expenses estimated to be approximately $1.1 million by the Debtors through October 23, 2020; (iii) professional fees and expenses of the Debtors' estates or of the Consenting Creditors or other secured creditors required to be paid in accordance with the Final DIP Order, which are estimated by the Debtors to be approximately $2.3 million through October 23, 2020; (iv) post-Effective Date wind down expenses of the Plan Administrator and Wind Down Estates, which are estimated by the Debtors to be $3.5 million for a 6-month period; and (v) any success fees of Houlihan Lokey or CMD in the estimated amount of $5.2 million in the aggregate that are required to be paid by the Debtors on the Effective Date pursuant to the Europe/ROW Purchase Agreement, but are subject to reimbursement pursuant to the Europe/ROW Purchase Agreement by the Transferred Entities (or their designee) to the extent the payment of such investment banking fees result in a shortfall in the Debtors' ability to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims up to the total amount of such banking fees.  Any amounts required to be reimbursed by the Transferred Entities pursuant to clause (v) of the foregoing shall not be subject to any offset, setoff or reduction.  For the avoidance of doubt, the estimated amounts set forth in clauses (ii), (iii) and (iv) shall not constitute caps or maximum amounts permitted to be paid by the Debtors or the Wind Down Estates.

**Administrative Expense Claims Bar Date**

53.     Except as otherwise provided for in the *Final Order (I) Authorizing the debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (Docket No. 350) (the "**DIP Order**"), the orders approving the bar date (Docket

No. 373) or the Plan, requests for payment of Administrative Expense Claims (other than Fee Claims and DIP Claims, or claims of ordinary course professionals under the *Order Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business* (Docket No. 385), must be filed with the Bankruptcy Court, and served on the Debtors or Plan Administrator (as the case may be), and the GUC Trustee, the Claims and Noticing Agent, and the U.S. Trustee within thirty-five (35) days from the date of service of notice of the entry of this Order (the "**Administrative Expense Claims Bar Date**").  Such proof of Administrative Expense Claim must include at a minimum:  (a) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (b) the name of the holder of the Administrative Expense Claim; (c) the asserted amount of the Administrative Expense Claim;  (d) the basis of the Administrative Expense Claim; and (e) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF, FOR ANY REASON, ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

## Release and Exculpation Provisions

54.    All injunctions, releases, and exculpation provisions set forth in the Plan, including but not limited to those contained in Sections 10.3, 10.5, 10.6 and 10.7 of the Plan, are approved and shall be effective and binding on all persons and entities, to the extent provided therein, and as if fully set forth herein.

**Miscellaneous**

55.     Nothing in the Plan or this Confirmation Order shall override any rights or protections provided under the DIP Order to the DIP Agent or DIP Lenders (each as defined in the DIP Order).

56.     Notwithstanding any provisions to the contrary in the Plan, the Definitive Documents or this Order, all setoff and recoupment rights of MDSA, LLC ("**Mighty**") under the Spent Battery Sales – Lead Purchase Agreement dated September 1, 2019 between Mighty and Debtor Exide Technologies, LLC are fully preserved.

57.     Notwithstanding anything to the contrary in this Order, no contract between the Debtors and Oracle America, Inc., successor in interest to Hyperion Solutions Corporation, J.D. Edwards and PeopleSoft, Inc., ("**Oracle**") will be assumed and/or assigned without (1) Oracle's prior written consent; and (2) cure of any default under such contract provided, however, that the Debtors' and Oracles' rights to seek determination by this Court as to whether Oracle's consent is required to assign any such contract is fully preserved. Oracle's consent to any such assumption and assignment may be conditioned, upon other things, on the execution by the Debtors (or a successor) and the assignee of mutually agreeable assignment documentation. In addition, no provision of this Order or any transition services agreement authorized thereby shall authorize: (1) the transfer of any Oracle license agreement to a third party; or (2) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use or license splitting, absent either: (i) Oracle's express prior written consent or (ii) a determination by this Court that Oracle's consent is not required.

58.     Contracts between the Debtors and Oracle shall remain outstanding and in place between the Debtors and Oracle for a period of no less than three months subsequent to the

Effective Date, or until such earlier date at which the Debtors assign such contracts, with Oracle's consent, and any and all cure costs are paid.

59.     The Plan, including, without limitation, Section 10.6, shall not release, waive, nor discharge the Buyer and the Transferred Entities from any right, Claim, or Cause of Action in favor of Daramic, LLC, based on, or relating to, or in any manner arising from, in whole or in part, prepetition amounts or obligations not to exceed $100,000 in the aggregate, or postpetition amounts or obligations owed to Daramic, LLC by Exide Holding Europe S.A.S.; Exide International Holding Netherlands B.V.; Exide Technologies GmbH; Exide Technologies S.A.S.; Exide Technologies Operations GmbH & Co. KG; Exide Technologies S.r.l.; Exide Technologies Limited; Exide Technologies S.A.; Exide Technologies, Lda; Exide Technologies S.L.U., under that certain Amended and Restated Supply Agreement, dated January 1, 2015, by and between Exide Technologies LLC and its Affiliates, on the one hand, and Daramic, LLC and its Affiliates, on the other (or any subsequent supply agreement among such Transferred Entities and Daramic, LLC); including, but not limited to, amounts or obligations such Transferred Entities owe Daramic, LLC for goods sold, ordered, or to be ordered. For the avoidance of doubt, nothing in the Plan shall enjoin or be deemed to enjoin Daramic, LLC from prosecuting any of the foregoing Claims or Causes of Action against the Transferred Entities.

60.     Notwithstanding anything in the Plan or this Order to the contrary: (i) the Mississippi Department of Revenue's (the "**MDOR**") setoff rights under section 553 of the Bankruptcy Code and recoupment rights are preserved; (ii) the MDOR shall not be required to file any proofs of claims or requests for payment in the Chapter 11 Cases for any Administrative Claims for the liabilities described in section 503(b)(1)(B) and (C) of the Bankruptcy Code, (iii) the Debtors or the Plan Administrator, as applicable, shall timely submit returns and remit

payment, including penalties and interest, for all taxes due or coming, as required under applicable Mississippi state law,  and, should the Debtors, or Plan Administrator, as applicable, fail to so timely file and pay, MDOR may proceed with Mississippi state law remedies for collection of any amounts due and/or seek such relief as may be available from the Court; (iv) to the extent the MDOR's Priority Tax Claims, if any, are not paid in full in cash on the Effective Date, such Priority Tax Claims shall, at a minimum, be paid by regular, quarterly installment payments in cash over a period not to exceed five years after the date of the order for relief under section 301 of the Bankruptcy Code, all as required section 1129(a)(9)(C) of the Bankruptcy Code, along with non-bankruptcy interest in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code and Mississippi state law, as applicable; (v) the Chapter 11 Cases shall have no effect on the MDOR's rights as to non-Debtor third parties; (vi) the statutorily mandated treatment of MDOR's Allowed Priority Tax Claims and/or any liabilities to MDOR described in section 503(b)(1)(B) and (C) of the Bankruptcy Code shall not be considered a settlement or compromise; (vii) the MDOR may timely amend any Proof of Claim against any Debtor after the Effective Date or the Bar Date, whichever is later, with respect to (a) a pending audit, or (b) an audit that may be performed, with respect to any pre or post-petition tax return; and (c) following the filing of a tax return, and (viii) in the event of a default in payment of Priority Tax Claims of the MDOR, the MDOR shall send written notice of default to the Debtors or the Plan Administrator, as applicable, to the following mailing addresses: (i) Ankura Consulting Group, 2000 K Street NW, 12th Floor, Washington, D.C., 20006, Attention: Scott A. Rinaldi, with a copy to (ii) 14231 Riverdowns South Drive, Midlothian, VA, 23113, Attention: Scott A. Rinaldi. If such default is not cured within 10 business days after such notice of default is mailed, the

MDOR may (a) proceed with Mississippi state law remedies for collection of any amounts due and/or (b) seek such relief as may be available from the Court.

61.    Notwithstanding anything contained in the Plan or this Order to the contrary, neither the Plan nor this Order releases any of the Debtors' current or former directors and officers from direct claims brought by Victor Koelsch or bars such claims in any way, subject to all defenses or counterclaims that the Debtors' officers and directors may have.  Any claims brought by Victor Koelsch against the Debtors' current or former directors and officers must be independent from, and not included in, the GUC Trust Causes of Action.  Without limiting or expanding the foregoing, and for the sake of clarification, direct claims by Victor Koelsch against current or former officers and directors of Debtors, arising from or related to the acts, omissions, facts, or circumstances at issue in JAMS Arbitration No. 1440006167, are independent from, and not included in, the GUC Trust Causes of Action.

62.    Notwithstanding anything contrary in this Order or the Plan, nothing in this Order or the Plan impairs or otherwise affects the defensive setoff or recoupment rights and defenses of Robert Bosch LLC in connection with the timely filed objection preserving such rights or defenses (Docket No. 632), and Robert Bosch LLC retains all such setoff and recoupment rights and defenses following the Effective Date.

63.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, AIS shall not be bound by the releases set forth in Section 10.6 of the Plan, nor shall AIS be bound by any similar or equivalent third party release set forth in this Confirmation Order.  In addition, nothing in Section 10.7 of the Plan or any similar or equivalent provision of this Confirmation Order shall diminish, limit, impair or affect any AIS Administrative Expense Claim under Section 2.1 of the Plan.  Nothing in the Plan, the Confirmation Order or the Plan

Supplement shall convey any property of AIS that is located at the Vernon Non-Performing Property or elsewhere, and all property of AIS shall remain property of AIS.

64.     The License Agreement dated as of October 20, 2000, between Exide Technologies, LLC, and Infor (US), Inc. ("**Infor**"), as successor to Future Three, Inc., as amended from time to time, for the AutoRelease AutoScan software (the "**Infor Software**") shall be deemed rejected as of the date of entry of this Order.  Within five (5) days of the date of entry of this Order, the Debtors shall (i) remove all copies of the Infor Software and any portions thereof from assets of the Debtors and cease accessing and using any hosted Infor Software; (ii) destroy all copies of the Infor Software contained in the Debtors' assets and related documentation and delete all access codes; and (iii) certify to Infor in writing that the Debtors have complied with the foregoing subparagraphs (i) and (ii).  Any claim of Infor seeking payment with respect to the License Agreement or the Infor Software shall be filed within thirty (30) days of the date of entry of this Order. Infor shall be deemed to have opted out of the granting of any releases under section 10.6 of the Plan.  Notwithstanding anything to the contrary contained in this Order, in the Plan or in any document filed or prepared in connection therewith, Infor shall retain all rights against all non-Debtors and third parties.

65.     Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Order will be effective and enforceable immediately on October 23, 2020.

66.     Subject to the occurrence of the Effective Date, on and after the entry of this Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holders' respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

67.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder.

**Dated: October 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>SCHEDULE 1</u>**

**Abandonment of the Vernon Non-Performing Property**

**IT IS HEREBY DETERMINED THAT:**

A.      The bases for the relief requested herein are sections 105(a), 554, and 1129(b)(6) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

B.      Section 554 allows a debtor, after notice and a hearing "to abandon any property of the estate that is burdensome or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). "In abandoning property under § 554, the debtor need only demonstrate that it has exercised sound business judgment in making the determination to abandon." *In re Contract Research Sols., Inc.*, No. 12-11004 KJC, 2013 WL 1910286, at \*4 (Bankr. D. Del. May 1, 2013) (citations omitted). This requires a showing that the debtor made (1) a business judgment; (2) in good faith; (3) upon some reasonable basis; and (4) within its authority.  *See In re Truong*, 557 B.R. 326, 340 (Bankr. D.N.J. Aug. 30, 2016) (citing *In re Slack*, B.R. 282, 284 (Bankr. D.N.J. 2003)).

C.      For the reasons set forth on the record at the Confirmation Hearing, the Debtors determined in a proper exercise of their sound business judgment that the costs of continued remediation of the Vernon Non-Performing Property would outweigh any benefit to the Debtors' estates and that the Vernon Non-Performing Property is burdensome as the cost of continued remediation outweighs the benefits.  Moreover, the Debtors are completing the wind down of their operations, and bearing the costs associated with continued remediation would hinder such wind down and prevent the consummation of the Amended Plan.  For the reasons set forth on the record at the Confirmation hearing, the abandonment of the Vernon Non-Performing Property

does not create an imminent and identifiable threat to human health and safety.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    In the event that the Vernon Trust Condition is not satisfied:

   a.  The Debtors are authorized, but not directed, to abandon the Vernon Non-Performing Property as of October 30, 2020 (the "**Abandonment Date**"), including certain equipment, fixtures, improvements, furniture and other de minimis personal property located at and associated with the Vernon-Non Performing Property. Debtors shall ensure the continuation of all safety and lead-dust-containment and suppression measures Debtors have been undertaking since the petition filing date continue, and are funded, to and through October 30, 2020; and

   b.  DTSC shall be permitted to assert any Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, or Other Secured Claim, in accordance with the Confirmation Order or any other order of the Court

2.    On the Abandonment Date, the Vernon Non-Performing Property shall no longer be subject to the automatic stay of section 362 and shall be deemed abandoned to Exide Technologies, LLC, free and clear of all Liens, other than Liens granted pursuant to Section 4.8(b) of the Plan in favor of the California DTSC.

3.    On and after the Abandonment Date, the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property except to the extent a Vernon NPP Claim is Allowed as an Environmental NPP Claim.   The Environmental Response Trust shall have no liability whatsoever with respect

2

to the Vernon Non-Performing Property.

4.      On and after the Effective Date, (i) the State of California or any of its agencies, the United States Environmental Protection Agency, and their respective employees, contractors, or other designees, shall have unconditional access to the Vernon Non-Performing Property for the performance or oversight of, or other actions with respect to, Vernon Environmental Actions at or in connection with the Vernon Non-Performing Property, and furthermore Exide Technologies, LLC shall be deemed for all purposes to have consented to such access and (ii) Exide Technologies, LLC shall be deemed to have consented to the transfer of its utility accounts, and provision of statements and invoices, and regulatory permits, to the State of California or its designee upon the request to the relevant utility providers and permit issuance agencies by the State of California or its designee.

5.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

6.      Proper, timely, adequate, and sufficient notice of the relief granted hereby has been provided in accordance with the Bankruptcy Code, the Bankruptcy Procedure, and the Local Rules, and no other or further notice shall be required.

3

# TAB 23(a)

**Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc.
and its Affiliated Debtors [Bankr. D.I. 998-2], attached as Exhibit A to the
Confirmation Order**

**<u>Exhibit A</u>**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
-------------------------------------------------------- x
                                                         :
In re                                                    :        Chapter 11
                                                         :
EXIDE HOLDINGS, INC., et al.,                            :        Case No. 20–11157 (CSS)
                                                         :
          Debtors.¹                                      :        (Jointly Administered)
                                                         :
-------------------------------------------------------- x
```

**FOURTH AMENDED JOINT CHAPTER 11 PLAN OF**
**EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS**


**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Sunny Singh
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Zachary I. Shapiro
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701


*Attorneys for Debtors*
*and Debtors in Possession*


Dated: October 14, 2020
        Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

# TABLE OF CONTENTS

SECTION 1.   DEFINITIONS AND INTERPRETATION. ..............................................................1

SECTION 2.   ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.................................21

   2.1.   Administrative Expense Claims.............................................................................21
   2.2.   Fee Claims. ............................................................................................................21
   2.3.   Priority Tax Claims................................................................................................21
   2.4.   DIP Claims..............................................................................................................22
   2.5.   Restructuring Expenses..........................................................................................22
   2.6.   Trustees Fees...........................................................................................................22

SECTION 3.   CLASSIFICATION OF CLAIMS AND INTERESTS. ......................................23

   3.1.   Classification in General........................................................................................23
   3.2.   Grouping of Debtors for Convenience Only..........................................................23
   3.3.   Summary of Classification......................................................................................23
   3.4.   Special Provision Governing Unimpaired Claims. ................................................24
   3.5.   Elimination of Vacant Classes. ..............................................................................24
   3.6.   Voting Classes; Presumed Acceptance by Non-Voting Classes.............................24
   3.7.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
          Code .......................................................................................................................24

SECTION 4.   TREATMENT OF CLAIMS AND INTERESTS. ..............................................25

   4.1.   Priority Non-Tax Claims (Class 1). .......................................................................25
   4.2.   Other Secured Claims (Class 2)..............................................................................25
   4.3.   ABL Claims (Class 3).............................................................................................25
   4.4.   Superpriority Notes Guarantee Claims (Class 4)...................................................26
   4.5.   Exchange Priority Notes Claims (Class 5)..............................................................27
   4.6.   First Lien Notes Claims (Class 6)............................................................................27
   4.7.   General Unsecured Claims (Class 7). ....................................................................28
   4.8.   Environmental NPP Claims (Class 8).....................................................................28
   4.9.   Intercompany Claims (Class 9)...............................................................................29
   4.10.  Intercompany Interests (Class 10)...........................................................................29
   4.11.  Holdings Equity Interests (Class 11). .....................................................................30
   4.12.  Subordinated Securities Claims (Class 12)..............................................................30

SECTION 5.   MEANS FOR IMPLEMENTATION. .................................................................31

   5.1.   Europe/ROW Sale Transaction...............................................................................31
   5.2.   Compromise and Settlement of Claims, Interests, and Controversies ...................31
   5.3.   Settlement with PBGC............................................................................................37
   5.4.   The GUC Trust. ......................................................................................................37
   5.5.   The Environmental Response Trust.........................................................................39
   5.6.   The Vernon Environmental Response Trust............................................................40
   5.7.   Canada Non-Performing Property. .........................................................................40
   5.8.   Plan Administrator...................................................................................................41
   5.9.   Corporate Action.....................................................................................................43
   5.10.  Withholding and Reporting Requirements. ............................................................43
   5.11.  Exemption From Certain Transfer Taxes. ..............................................................44
   5.12.  Effectuating Documents; Further Transactions. .....................................................44
   5.13.  Preservation of Rights of Action.............................................................................45

## TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| 5.14. | Certificate of Incorporation and By-Laws. | 46 |
| 5.15. | Stock Trading Restrictions. | 46 |
| 5.16. | Cancellation of Superpriority Notes and Release and Discharge of Debtor Guarantee Claims. | 46 |
| 5.17. | Cancellation of Existing Securities and Agreements | 46 |
| 5.18. | Subordinated Claims. | 47 |
| 5.19. | Nonconsensual Confirmation. | 47 |
| 5.20. | Closing of Chapter 11 Cases. | 47 |
| 5.21. | Notice of Effective Date. | 47 |
| 5.22. | Corporate Form. | 48 |
| 5.23. | Separability. | 48 |

| | | |
|---|---|---|
| SECTION 6. | DISTRIBUTIONS. | 48 |
| 6.1. | Distributions Generally. | 48 |
| 6.2. | Distribution Record Date. | 48 |
| 6.3. | Date of Distributions. | 48 |
| 6.4. | Disbursing Agent. | 49 |
| 6.5. | Rights and Powers of Disbursing Agent. | 49 |
| 6.6. | Expenses of Disbursing Agent. | 49 |
| 6.7. | No Postpetition Interest on Claims. | 50 |
| 6.8. | Delivery of Distributions. | 50 |
| 6.9. | Distributions after Effective Date. | 51 |
| 6.10. | Unclaimed Property. | 51 |
| 6.11. | Time Bar to Cash Payments. | 51 |
| 6.12. | Manner of Payment under Plan. | 51 |
| 6.13. | Satisfaction of Claims. | 51 |
| 6.14. | Minimum Cash Distributions. | 51 |
| 6.15. | Setoffs and Recoupments. | 52 |
| 6.16. | Allocation of Distributions between Principal and Interest. | 52 |
| 6.17. | No Distribution in Excess of Amount of Allowed Claim. | 52 |

| | | |
|---|---|---|
| SECTION 7. | PROCEDURES FOR DISPUTED CLAIMS. | 52 |
| 7.1. | Objections to Claims. | 52 |
| 7.2. | Resolution of Disputed Claims. | 52 |
| 7.3. | Payments and Distributions with Respect to Disputed Claims. | 53 |
| 7.4. | Distributions after Allowance. | 53 |
| 7.5. | Estimation of Claims. | 53 |
| 7.6. | No Distributions Pending Allowance. | 53 |
| 7.7. | Claim Resolution Procedures Cumulative. | 53 |
| 7.8. | Interest. | 54 |
| 7.9. | Insured Claims. | 54 |

| | | |
|---|---|---|
| SECTION 8. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 54 |
| 8.1. | Rejection of Executory Contracts and Unexpired Leases. | 54 |
| 8.2. | Determination of Assumption Disputes and Deemed Consent. | 54 |
| 8.3. | Rejection Damages Claims. | 56 |
| 8.4. | Insurance Policies. | 56 |
| 8.5. | Intellectual Property Licenses and Agreements. | 57 |
| 8.6. | Tax Agreements. | 57 |
| 8.7. | Standby Environmental Trust Agreement. | 57 |
| 8.8. | Assignment. | 58 |

## TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| 8.9. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 58 |
| 8.10. | Reservation of Rights | 58 |
| **SECTION 9.** | **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.** | **59** |
| 9.1. | Conditions Precedent to the Effective Date. | 59 |
| 9.2. | Waiver of Conditions Precedent. | 60 |
| 9.3. | Effect of Failure of Conditions to Effective Date. | 60 |
| **SECTION 10.** | **EFFECT OF CONFIRMATION.** | **61** |
| 10.1. | Vesting of Assets. | 61 |
| 10.2. | Term of Injunctions or Stays. | 61 |
| 10.3. | Injunction. | 62 |
| 10.4. | Binding Effect. | 63 |
| 10.5. | Releases by the Debtors. | 63 |
| 10.6. | Releases By Holders of Claims and Interests. | 63 |
| 10.7. | Exculpation. | 65 |
| 10.8. | Waiver of Statutory Limitation on Releases. | 65 |
| 10.9. | Solicitation of the Plan. | 66 |
| 10.10. | Corporate Action. | 66 |
| **SECTION 11.** | **RETENTION OF JURISDICTION.** | **66** |
| 11.1. | Retention of Jurisdiction. | 66 |
| 11.2. | Courts of Competent Jurisdiction. | 68 |
| **SECTION 12.** | **MISCELLANEOUS PROVISIONS.** | **68** |
| 12.1. | Payment of Statutory Fees. | 68 |
| 12.2. | Substantial Consummation. | 68 |
| 12.3. | Dissolution of Creditors' Committee. | 68 |
| 12.4. | Amendments. | 69 |
| 12.5. | Revocation or Withdrawal of the Plan. | 69 |
| 12.6. | Severability of Plan Provisions upon Confirmation. | 69 |
| 12.7. | Governing Law. | 70 |
| 12.8. | Time. | 70 |
| 12.9. | Additional Documents | 70 |
| 12.10. | Immediate Binding Effect. | 70 |
| 12.11. | Successors and Assigns. | 70 |
| 12.12. | Entire Agreement. | 70 |
| 12.13. | Notices. | 71 |

**Schedule 1**:    Settling Governmental Authorities
**Schedule 2**:    Non-Performing Properties
**Schedule 3**:    Transferred Entities

Each of the Debtors proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A.  **Definitions.**

1.1    ***2020 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Exide Technologies, as issuer, and U.S. Bank National Association, as trustee, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.2    ***2022 Legacy First Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, the guarantor parties thereto, and U.S. Bank National Association, as trustee, dated as of May 24, 2017, as amended, supplemented or otherwise modified from time to time.

1.3    ***ABL Agents*** means Bank of America, N.A., as administrative agent, and Bank of America, N.A., PNC Bank, National Association, and Bank of Montreal, as co-collateral agents, under the ABL Credit Agreement, and their permitted successors and assigns.

1.4    ***ABL Claim*** means a Claim arising under the ABL Credit Agreement.

1.5    ***ABL Credit Agreement*** means that certain ABL Credit Agreement by and among, inter alia, Exide Technologies, Exide Technologies Canada Corporation, Exide Technologies (Transportation) Limited, GNB Industrial Power (UK) Limited, Exide Holding Netherlands B.V., the ABL Agents, and the ABL Lenders, dated as of April 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.6    ***ABL Lenders*** means "Lenders" as defined in the ABL Credit Agreement.

1.7    ***Acquired Assets*** means, collectively, the Transferred Equity Interests and the Transferred Assets.

1.8    ***Administrative Expense Claim*** means any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors;  (b) Restructuring Expenses; (c) Trustees Fees; and (d) any Claim Allowed under section 503(b)(9) of the Bankruptcy Code.

1.9    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.10    ***Allowed*** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order; (b) that is not identified in the Schedules as contingent, unliquidated, or disputed; (c) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors, GUC Trustee or Plan Administrator, as applicable; (d) as to which the liability of the Debtors or GUC Trust, as applicable, and

the amount thereof are determined by a Final Order of a court of competent jurisdiction; or (e) expressly allowed hereunder; *provided, however,* that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Plan Administrator and the GUC Trustee shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

1.11     ***Alternative Transaction Structure*** means the implementation steps necessary to consummate the Europe/ROW Sale Transaction pursuant to the Europe/ROW Purchaser's election under Section 2.08 of the Europe/ROW Purchase Agreement.  The Europe/ROW Purchaser made such election in accordance with the Europe/ROW Purchase Agreement and the Debtors filed the Alternative Transaction Structure, which may be amended in accordance with the Europe/ROW Purchase Agreement, with the Plan Supplement at Docket No. 821.

1.12     ***Americas Closing*** means "Closing" as defined in the Americas Purchase Agreement.

1.13     ***Americas Purchase Agreement*** means that certain Stock and Asset Purchase Agreement by and among Exide Technologies, Battery BidCo LLC, and Atlas Capital Resources III LP, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.14     ***Americas Sale Order*** means the *Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on August 6, 2020 (Docket No. 690).

1.15     ***Americas Sale Transaction*** means the transaction to be effectuated pursuant to the Americas Purchase Agreement.

1.16     ***Aspen*** means, collectively, Aspen American Insurance Company, and Aspen Specialty Insurance Company, solely in their capacity as providers of surety insurance to the Debtors pursuant the Aspen Surety Bond Agreements.

1.17     ***Aspen Surety Bond Agreements*** means the applicable agreements governing the surety bond obligations of Aspen to the Debtors with respect to the Frisco Non-Performing Property.

1.18     ***Asset*** means all of the rights, title, and interests of a Debtor in, and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property.

1.19     ***Assumed Liabilities*** means "Assumed Liabilities" as defined in the Europe/ROW Purchase Agreement.

1.20     ***Assumption Dispute*** means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.21     ***Assumption Schedule*** means the schedule of executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Europe/ROW Purchaser, the Environmental

2

Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities, as applicable, pursuant to the Plan and included in the Plan Supplement at Docket No. 821 and Docket No. 939, as may be amended, modified, or supplemented from time to time.

       1.22    ***Avoidance Actions*** means any action commenced or that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

       1.23    ***Ballot*** means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

       1.24    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

       1.25    ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

       1.26    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

       1.27    ***Bidding Procedures*** means the procedures governing the auction and sale process relating to any potential Sale Transaction, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

       1.28    ***Bidding Procedures Order*** means that certain *Order (I) Approving (A) Bidding Procedures for Sales of Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Authorizing Designation of Additional Stalking Horse Bidders, (D) Scheduling Auction for and Hearing to Approve Sales of Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (F) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment, and (G) Granting Related Relief*, entered by the Bankruptcy Court in the Chapter 11 Cases on June 19, 2020 (Docket No. 344).

       1.29    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

       1.30    ***California DTSC*** means the California Department of Toxic Substances Control.

       1.31    ***Canada MOE*** means the Ontario Ministry of the Environment, Conservation and Parks.

       1.32    ***Canada Non-Performing Property*** means the Debtors' non-performing property located in Fort Erie, Ontario, Canada.  For the purposes of the Plan, such property shall not be deemed to be a "Non-Performing Property" as such term is used herein.

1.33    ***Canada NPP Claim*** means any civil Claim or Cause of Action by the Canada MOE against the Debtors under Environmental Laws (including Environmental Laws of Canada) with respect to the Canada Non-Performing Property.

1.34    ***Canada NPP Risk Management Measures Funds*** means the Cash deposit, in an amount to be determined by the Debtors in consultation with the Requisite Noteholders, to be made by the Debtors for the environmental risk management of the Canada Non-Performing Property.

1.35    ***Cash*** means legal tender of the United States of America.

1.36    ***Cause of Action*** means any action, Claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).   Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or any other Avoidance Actions, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any claims under any state law or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.37    ***Challenge Deadline*** means "Challenge Deadline" as defined in the DIP Order.

1.38    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on May 19, 2020, and styled *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS).

1.39    ***City of Frisco*** means the City of Frisco, Texas.

1.40    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.41    ***Class*** means any group of Claims or Interests classified as set forth in <u>Section 3</u> of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.42    ***Columbus Development Authority*** means the Development Authority of Columbus, Georgia.

1.43    ***Columbus Non-Performing Property*** means the Non-Performing Property located at 3639 Joy Road, Columbus, Georgia.

1.44    ***Columbus NPP Termination Documents*** means that certain Agreement Regarding Termination Documents, by and between Exide Technologies and the Columbus Development Authority, dated as of September 9, 2020, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.  The Columbus NPP Termination Documents were filed with the Plan Supplement at Docket No. 821.

1.45     ***Commencement Date*** means the date on which the Debtors commenced the Chapter 11 Cases.

1.46     ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.47     ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.48     ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.49     ***Confirmation Order*** means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.50     ***Consenting Creditors*** means each of the holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that are party to the RSA together with their respective successors and permitted assigns and any subsequent holders of Superpriority Notes, Exchange Priority Notes, or First Lien Notes that become party to the RSA in accordance with the terms of the RSA.

1.51     ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.52     ***Cure Amount*** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary pursuant to section 365(b)(1)(A) of the Bankruptcy Code to permit the Debtors to assume such executory contract or unexpired lease.

1.53     ***D&O Policy*** means any insurance policy that covers, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

1.54     ***Debtors*** means Exide Holdings, Inc.; Exide Technologies, LLC; Exide Delaware LLC; Dixie Metals Company; and Refined Metals Corporation.

1.55     ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.56     ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to the Europe/ROW Sale Transaction and the Global Settlement, including, but not limited to: (a) the Plan; (b) the Disclosure Statement; (c) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; (f) the GUC Trust Agreement; and (g) the Environmental Settlement Documents.

1.57     ***DIP Agent*** means "DIP Agent" as defined in the DIP Order.

1.58     ***DIP Claim*** means any Claim of the DIP Lenders or DIP Agent arising under the DIP Loan Documents or the DIP Order.  For the avoidance of doubt, DIP Claims includes all DIP Obligations.

1.59    *DIP Facility* means "DIP Facility" as defined in the DIP Order.

1.60    *DIP Lenders* means "DIP Lenders" as defined in the DIP Order.

1.61    *DIP Loan Documents* means "DIP Loan Documents" as defined in the DIP Order.

1.62    *DIP Motion* means the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay, and (F) Schedule a Final Hearing and (II) Related Relief* (Docket No.26).

1.63    *DIP Obligations* means "DIP Obligations" as defined in the DIP Order.

1.64    *DIP Order* means the final order approving the DIP Motion (Docket No. 350).

1.65    *Disallowed* means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.66    *Disbursing Agent* means the Plan Administrator; *provided*, that with respect to distributions to holders of Allowed General Unsecured Claims, the GUC Trustee shall be the "Disbursing Agent" and distribute the GUC Trust Assets as and when provided for in the GUC Trust Agreement.

1.67    *Disclosure Statement* means the disclosure statement filed by the Debtors in support of the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (as may be amended, supplemented, or modified from time to time).

1.68    *Disputed* means with respect to a Claim or Interest, that (a) is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code; or (b) the Debtors or any parties in interest have interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtors, or any parties in interest, dispute only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtors, or any parties in interest, do not dispute, and Disputed as to the balance of such Claim.

1.69    *Distribution* means payment or distribution of consideration to holders of Allowed Claims pursuant to this Plan.

1.70    *Distribution Date* means a date or dates as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.71    *Distribution Record Date* means the Effective Date of the Plan or such other date as determined by (a) the GUC Trustee with respect to General Unsecured Claims, (b) the Plan Administrator with the consent of the Requisite Noteholders and applicable Trustee with respect to the Superpriority Notes, Exchange Priority Notes, and First Lien Notes, or (c) the Plan Administrator with respect to all other Allowed Claims.  For the avoidance of doubt, the Distribution Record Date shall not apply to holders of public securities.

1.72    *DTC* means the Depositary Trust Company or any successor securities clearing agency.

1.73    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in <u>Section 9</u> hereof have been satisfied or waived in accordance with the terms of the Plan.

1.74    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.75    ***Environmental Global Settlement Payment*** means the $7,412,477 Cash payment to be made to the Environmental Response Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement with respect to the Transferred Non-Performing Properties.

1.76    ***Environmental Laws*** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (a) pollution, (b) the protection or regulation of human health, natural resources, or the environment, (c) the management of hazardous materials, or (d) the release of hazardous materials into the environment.

1.77    ***Environmental NPP Claim*** means any Transferred NPP Claim, Vernon NPP Claim, or Frisco NPP Claim.  For the avoidance of doubt, all Environmental NPP Claims are unsecured Claims against a Debtor and are not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.78    ***Environmental Response Trust*** means the trust established pursuant to the Environmental Trust Agreements and the Environmental Settlement Agreement with respect to the Transferred Non-Performing Properties.

1.79    ***Environmental Settlement Agreement*** means that certain Consent Decree and Settlement Agreement Regarding the Non-Performing Properties, among the Debtors, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, each of the Settling Governmental Authorities, and Westchester relating to the Non-Performing Properties, substantially in the form of the version dated September 22, 2020 and filed at Docket No. 869, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.80    ***Environmental Settlement Documents*** means the Environmental Settlement Agreement, the Environmental Trust Agreements, the Vernon Environmental Trust Agreement, and any other documents or instruments required by such documents.

1.81    ***Environmental Sureties*** means, collectively, Westchester and Aspen.

1.82    ***Environmental Trust Agreements*** means one or more trust agreements by and among the Debtors, the Settling Governmental Authorities, the Transferred Entities, and the Environmental Trustee, in form and substance as agreed to by such parties and filed with the Court and consistent with the Environmental Settlement Agreement and <u>Section 5</u> of the Plan.

1.83    ***Environmental Trust Assets*** shall, pursuant to the Global Settlement, consist of (a) the Environmental Global Settlement Payment, (b) the contributions by Westchester in accordance with the terms of the Environmental Trust Agreements with respect to the Transferred Non-Performing Properties, (c) the Transferred Non-Performing Properties or any proceeds thereof to the extent a Transferred Non-Performing Property is sold prior to the Effective Date, and (d) the Environmental Trust Causes of Action.

1.84    ***Environmental Trust Beneficial Interests*** means the beneficial interests in the Environmental Response Trust.

1.85    ***Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to any Transferred Non-Performing Property.

1.86    ***Environmental Trustee*** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Environmental Response Trust, and any successor thereto in accordance with the Environmental Trust Agreements.

1.87    ***ERISA*** means the Employee Retirement Income Security Act of 1974, title 29 of the United States Code.

1.88    ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.89    ***Europe/ROW Closing*** means "Closing" as defined in the Europe/ROW Purchase Agreement.

1.90    ***Europe/ROW Purchase Agreement*** means that certain Stock and Asset Purchase Agreement, by and between Exide Holdings, Inc., the other seller parties, and the Europe/ROW Purchaser, together with any and all related agreements and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time.

1.91    ***Europe/ROW Purchaser*** means Energy Technologies Holdings LLC.

1.92    ***Europe/ROW Sale Transaction*** means the sale of the Acquired Assets to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement.

1.93    ***European Bridge Notes*** means the notes issued pursuant to the European Bridge Notes Indenture.

1.94    ***European Bridge Notes Indenture*** means that certain indenture, to be entered into by and between non-Debtor Exide International Holdings LP, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee and collateral agent, documenting the terms of an interim financing facility in accordance with the Europe/ROW Purchase Agreement, the proceeds of which may be used to fund, among other things, the Global Settlement Payments by the Transferred Entities.

1.95    ***Exchange Priority and First Lien Notes Indenture*** means that certain indenture, by and among Exide Technologies, as issuer, the guarantor parties thereto, and the Exchange Priority and First Lien Notes Trustee, dated as of June 25, 2019, as amended, supplemented or otherwise modified from time to time.

1.96    ***Exchange Priority and First Lien Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Exchange Priority and First Lien Notes Indenture.

1.97    ***Exchange Priority Notes*** means the 11% Exchange Priority Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.98   ***Exchange Priority Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and First Lien Notes Indenture, against distributions to be made to the holders of the Exchange Priority Notes under this Plan or otherwise, for payment of any Exchange Priority Notes Indenture Trustee Fees.

1.99   ***Exchange Priority Notes Claim*** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the Exchange Priority Notes issued thereunder.

1.100   ***Exchange Priority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the Exchange Priority Notes.

1.101   ***Exculpated Parties*** means collectively: (a) the Debtors, (b) the Wind-Down Estates, (c) the Plan Administrator, (d) the Creditors' Committee and each of its members in their capacity as such, (e) the GUC Trust, (f) the GUC Trustee, (g) the Trustees, and (h) with respect to each of the foregoing Persons or Entities in clauses (a) through (h), all of their Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided herein.

1.102   ***Exide International*** means non-Debtor Exide International Holdings, LP.

1.103   ***Exide Technologies*** means Exide Technologies, LLC.

1.104   ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.105   ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and is in full force and effect, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.106   ***First Lien Notes*** means the 11% First Lien Senior Secured Notes due 2024 issued pursuant to the Exchange Priority and First Lien Notes Indenture.

1.107   ***First Lien Notes Charging Lien*** means any Lien or other priority in payment to which the Exchange Priority and First Lien Notes Trustee is entitled, pursuant to the Exchange Priority and

First Lien Notes Indenture, against distributions to be made to the holders of the First Lien Notes under this Plan or otherwise, for payment of any First Lien Notes Indenture Trustee Fees.

1.108   ***First Lien Notes Claim*** means a Claim arising under the Exchange Priority and First Lien Notes Indenture relating to the First Lien Notes issued thereunder.

1.109   ***First Lien Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Exchange Priority and First Lien Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Exchange Priority and First Lien Notes Indenture with respect to the First Lien Notes.

1.110   ***Former Officers and Directors*** means any Person that served in a capacity as an officer or director of any of the Debtors, other than those (a) Persons that were officers or directors of the Debtors immediately prior to the Americas Closing or (b) Persons that are officers or directors of the Debtors immediately prior to the Effective Date.

1.111   ***Frisco Assets*** shall, pursuant to the Global Settlement, consist of:  (a) the Frisco Global Settlement Payment, (b) the contributions by Aspen in accordance with the Frisco Settlement Agreement, and (c) the Frisco Non-Performing Property.

1.112   ***Frisco CDC*** means the Frisco Community Development Corporation.

1.113   ***Frisco Global Settlement Payment*** means the $100,000 Cash payment to be made to TCEQ by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.114   ***Frisco Governmental Authority*** means each of (a) TCEQ, (b) the City of Frisco, and (c) the Frisco CDC.

1.115   ***Frisco Non-Performing Property*** means the Non-Performing Property located at 7471 South Fifth Street, Frisco, Texas.

1.116   ***Frisco NPP Claim*** means any civil Claim or Cause of Action by the Frisco Governmental Authorities against the Debtors under Environmental Laws with respect to or arising out of the Frisco Non-Performing Property.

1.117   ***Frisco Settlement Agreement*** means that certain Consent Decree and Settlement Agreement Regarding the Non-Performing Exide Frisco Site, by and among the Debtors, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Frisco Governmental Authorities, and Aspen relating to the Frisco Non-Performing Property, substantially in the form of the version dated September 10, 2020 and filed with the Plan Supplement at Docket No. 821, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.118   ***General Unsecured Claim*** means any unsecured Claim against any Debtor, other than an Intercompany Claim or an Environmental NPP Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.  The Legacy Notes Claims shall constitute General Unsecured Claims against Holdings.  For the avoidance of doubt, Environmental NPP Claims shall not constitute General Unsecured Claims.

10

1.119 ***Global Settlement*** shall have the meaning ascribed to such term in <u>Section 5.2(a)</u> of the Plan.

1.120 ***Global Settlement Documents*** means the Plan, the Definitive Documents contained in the Plan Supplement comprising the Global Settlement, and the Environmental Settlement Documents, each of which shall be acceptable in form and substance to each of the Global Settlement Parties. For the avoidance of doubt, the Global Settlement Parties acknowledge and agree that the Plan is acceptable, subject to any consent rights contained in <u>Section 12.4</u> hereof.

1.121 ***Global Settlement Party*** means each of the Debtors, the Consenting Creditors, the Creditors' Committee, the Settling Governmental Authorities, and the Environmental Sureties.

1.122 ***Global Settlement Payments*** means, collectively, the Environmental Global Settlement Payment, the Vernon Global Settlement Payment (subject to the satisfaction of the Payment Condition), the Frisco Global Settlement Payment, and the GUC Global Settlement Payment.

1.123 ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code; *provided*, that for the avoidance of doubt, the term "Governmental Unit" shall not include the PBGC.

1.124 ***GUC Global Settlement Payment*** means the $2,400,000 Cash payment to be made to the GUC Trust by the Transferred Entities on the Effective Date pursuant to the Global Settlement.

1.125 ***GUC Trust*** means the trust established under the Plan in accordance with the GUC Trust Agreement.

1.126 ***GUC Trust Agreement*** means that certain General Unsecured Creditors' Trust Agreement to be entered into by the Debtors, the GUC Trustee, the Requisite Noteholders, and the Creditors' Committee, substantially in the form of the version dated September 10, 2020 and filed with the Plan Supplement at Docket No. 821, the final version of which shall be in form and substance as agreed to by such parties and filed with the Bankruptcy Court prior to the Effective Date.

1.127 ***GUC Trust Assets*** shall, pursuant to the Global Settlement, consist of: (a) the GUC Global Settlement Payment, and (b) the GUC Trust Causes of Action.

1.128 ***GUC Trust Beneficial A Interests*** means beneficial interests in the GUC Trust entitling the respective holder to its Pro Rata share of the GUC Trust Assets in accordance with the GUC Trust Agreement.

1.129 ***GUC Trust Beneficial B Interests*** means beneficial interests in the GUC Trust entitling the respective holder to its Pro Rata share of the GUC Trust Assets after the GUC Trust has distributed Cash to holders of Allowed General Unsecured Claims in an aggregate amount equal to the GUC Global Settlement Payment.

1.130 ***GUC Trust Causes of Action*** means (a) all Avoidance Actions, (b) Causes of Action of the Debtors against Former Officers and Directors, and (c) Causes of Action of the Debtors arising under commercial tort law; *provided*, that GUC Trust Causes of Action shall exclude (a) all Avoidance Actions or Causes of Action against any Released Party, Exculpated Party, ABL Lender, or ABL Agent, (b) the Environmental Trust Causes of Action, (c) the Vernon Environmental Trust Causes of Action, (d) any Causes of Action settled pursuant to the Global Settlement, and (e) any other Causes of Actions of the Debtors, including those arising under sections 542 or 549 of the Bankruptcy Code.

1.131    ***GUC Trustee*** means the Person or Entity selected by the Creditors' Committee to serve as the trustee of the GUC Trust, and any successor thereto in accordance with the GUC Trust Agreement.

1.132    ***Holdings*** means Exide Holdings, Inc.

1.133    ***Holdings Equity Interests*** means all Interests in Holdings, including Holdings Stock and any options, warrants or rights to acquire any such Interests.

1.134    ***Holdings Stock*** means all common stock and preferred stock in Holdings.

1.135    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.136    ***Insured Claim*** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

1.137    ***Intercompany Claim*** means a Claim against any Debtor by another Debtor or non-Debtor Affiliate of such other Debtor.

1.138    ***Intercompany Interest*** means an Interest in a Debtor other than a Holdings Equity Interest.

1.139    ***Intercreditor Agreement*** means that certain Amended and Restated Intercreditor Agreement, by and between the ABL Agents and U.S. Bank, in its separate capacities as trustee and collateral agent under each of the Superpriority Notes Indenture, the Exchange Priority and First Lien Notes Indenture, and the 2020 Legacy First Lien Notes Indenture, dated June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.140    ***Interest*** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date.

1.141    ***June 2019 Financing*** means the new money investment and debt exchange of existing debt by the Debtors' lender group completed in June 2019, as described in Article III of the Disclosure Statement.

1.142    ***Legacy Notes*** means the 3.79% Second Lien Deferred Payment Notes due 2022, the 11% First Lien Senior Secured Notes due 2020, and the 11% First Lien Senior Secured Notes due 2022 issued pursuant to the Legacy Notes Indentures.

1.143    ***Legacy Notes Charging Lien*** means any Lien or other priority in payment to which the Legacy Notes Trustee is entitled, pursuant to the Legacy Notes Indentures, against distributions to be made to the holders of the Legacy Notes Claims under this Plan or otherwise, for payment of any Legacy Notes Indenture Trustee Fees.

1.144   ***Legacy Notes Indentures*** means, collectively, the (a) Legacy Second Lien Notes Indenture, (b) the 2020 Legacy First Lien Notes Indenture, and (c) the 2022 Legacy First Lien Notes Indenture.

1.145   ***Legacy Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Legacy Notes Trustee, whether prior to or after the Commencement Date, and whether prior to or after the consummation of the Plan, under the Legacy Notes Indentures.

1.146   ***Legacy Notes Trustee*** means Delaware Trust Company, in its capacity as successor trustee and collateral agent under the Legacy Notes Indentures.

1.147   ***Legacy Second Lien Notes Indenture*** means that certain indenture, by and between Holdings, as issuer, and U.S. Bank National Association, as trustee, dated as of June 30, 2015, as amended, supplemented or otherwise modified from time to time.

1.148   ***Legacy Notes Claims*** means Claims arising under any of the Legacy Notes Indentures.

1.149   ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.150   ***Net Cash Proceeds*** means (a) all Cash of the Debtors realized from their business or Wind-Down operations or the Sale Transaction Proceeds *less* (b) the amount of Cash (i) necessary to pay holders of Allowed (or reserve for Disputed) Administrative Expense Claims, Fee Claims, Restructuring Expenses, Trustees Fees, Priority Tax Claims, DIP Claims, ABL Claims, Priority Non-Tax Claims, and Other Secured Claims; (ii) estimated and reserved by the Debtors or the Plan Administrator with the reasonable consent of the Requisite Noteholders to adequately fund the Wind-Down; (iii) necessary to satisfy any Statutory Fees required to be paid in accordance with the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court; and (iv) necessary to satisfy the Debtors' obligations under the Europe/ROW Purchase Agreement and the Global Settlement (including the turnover to the Environmental Response Trust or the Vernon Environmental Response Trust of any sale proceeds of the Transferred Non-Performing Properties or the Vernon Non-Performing Property, as applicable, received prior to the Effective Date or the Global Settlement Payments, to the extent received by the Debtors from the Transferred Entities pursuant to Section 5.2(h) hereof).

1.151   ***New Board*** means the new board of directors of Holdings on and after the Effective Date.

1.152   ***Non-Performing Properties*** means the properties set forth on Schedule 2 attached hereto.

1.153   ***Notes Deficiency Claims*** means the deficiency Claims on account of indebtedness under the Superpriority Notes Indenture or the Exchange Priority and First Lien Notes Indenture under section 506(a) of the Bankruptcy Code.

1.154   ***Optimization*** means the internal reorganization of the Debtors completed in December 2019, as described in Article III of the Disclosure Statement, that was the subject of the investigation by the sub-committee of the special committee of the Debtors' board of directors.

13

1.155   ***Other Secured Claim*** means a Secured Claim, other than (a) the ABL Claims, (b) the Superpriority Notes Guarantee Claims, (c) the Exchange Priority Notes Claims, (d) the First Lien Notes Claims, and (e) the DIP Claims.

1.156   ***Payment Condition*** means the approval by the Bankruptcy Court of the release by the California state governmental agencies, including the California DTSC, set forth in Section 10.6 in favor of the Europe ROW Purchaser, the Transferred Entities, and the Consenting Creditors.

1.157   ***PBGC*** means the Pension Benefit Guaranty Corporation.

1.158   ***PBGC Claims*** means all Claims of the PBGC, including any UBL Claim or any Claim for plan termination premiums under section 4006 of ERISA, against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14) based upon or relating to the Pension Plan or any agreements relating thereto.

1.159   ***PBGC Settlement Payment*** means the $6,000,000 Cash payment to be made to the PBGC by the Transferred Entities on the Effective Date pursuant to Section 5.3 of the Plan.

1.160   ***Pension Plan*** means the following Pension Plan as to which Holdings was the plan sponsor, as such term is defined in ERISA Section 3(16)(B):  Exide Technologies Retirement Plan.

1.161   ***Permitted Liens*** means "Permitted Liens" as defined in the Europe/ROW Purchase Agreement.

1.162   ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other Entity.

1.163   ***Plan*** means this joint chapter 11 plan, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 12.4 herein.

1.164   ***Plan Administrator*** means the person or entity selected by the Debtors charged with overseeing the tasks outlined in Section 5.8 of this Plan, or any successor appointed by the New Board. The identity of the Plan Administrator shall be filed with the Bankruptcy Court prior to the Confirmation Hearing.

1.165   ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, forms or term sheets of applicable documents, schedules and exhibits to the Plan to be filed with the Court, including, but not limited to, the following: (a) Assumption Schedule, (b) GUC Trust Agreement, (c) Environmental Settlement Agreement, (d) Environmental Trust Agreements, (e) Frisco Settlement Agreement, (f) Vernon Environmental Trust Agreement, and (g) Columbus NPP Termination Documents.  The first Plan Supplement was filed at least seven (7) days prior to the deadline to objection to confirmation of the Plan; *provided*, that through the Effective Date, the Debtors shall have the right to amend any documents contained in, and exhibits to, any Plan Supplement subject to the requirements of Section 12.4 of the Plan and except that the Debtors shall not have the right to amend any Environmental Settlement Document without the consent of the Settling Governmental Authorities.

1.166   ***Postpetition Accounts Payable*** means any postpetition Cure Amount due or accrued on account of any executory contract or unexpired lease designated for assignment and assumption to the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco

14

Governmental Authorities (other than TCEQ) pursuant to the Environmental Settlement Documents or the Frisco Settlement Agreement, as applicable.

1.167 ***Prerequisite Condition*** has the meaning set forth in Section 9.1(k) hereof.

1.168 ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.169 ***Priority Tax Claim*** means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.170 ***Pro Rata*** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

1.171 ***Professional Fee Escrow Account*** means "Professional Fee Escrow Account" as defined in the DIP Order.

1.172 ***Proof of Claim*** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.173 ***Related Parties*** means with respect to any Exculpated Party or Released Party: (a) such Entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, (b) all of their respective current and former officers, directors, principals, stockholders (and any fund managers, fiduciaries or other agents of stockholders with any involvement with the Debtors), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, solely to the extent such persons and entities acted on the behalf of the Released Parties in connection with the matters as to which exculpation or releases are provided in the Plan, and (c) such persons' respective heirs, executors, estates, servants and nominees; *provided*, that the Former Officers and Directors of the Debtors shall not be "Related Parties."

1.174 ***Released Parties*** means collectively: (a) the Debtors, (b) each of the Consenting Creditors, (c) the Trustees, (d) the Europe/ROW Purchaser, (e) the Transferred Entities, (f) each of the DIP Lenders and the DIP Agent, (g) the Creditors' Committee and each of its members in their capacity as such, and with respect to each of the foregoing entities in clauses (a) through (g), such Entities' respective Related Parties.

1.175 ***Releasing Parties*** has the meaning set forth in Section 10.6 hereof.

1.176 ***Requisite Noteholders*** means, collectively, as of date of determination, Consenting Creditors who collectively hold at least two-thirds of the aggregate outstanding principal amount of each of (a) the Exchange Priority Notes held by all Consenting Creditors at such time, (b) the First Lien Notes held by all Consenting Creditors at such time, and (c) the Superpriority Notes held by all Consenting Creditors at such time. For the avoidance of doubt, the term "Requisite Noteholders" as used herein shall not hold the same meaning as the same or similar terms contained in the Exchange Priority and First Lien Notes Indenture or the Superpriority Notes Indenture.

15

1.177   ***Restructuring Expenses*** means the reasonable and documented fees, costs, and expenses of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) Young Conaway Stargatt & Taylor LLP, and (c) CMD Global Advisors, LLC.

1.178   ***RSA*** means that certain Restructuring Support Agreement, dated as of May 18, 2020, by and among the Debtors and the Consenting Creditors, as the same may be amended, supplemented, or modified from time to time in accordance with its terms.

1.179   ***Sale Transaction*** means any transaction or series of transactions pursuant to one or more of (a) the Americas Sale Transaction, (b) the Europe/ROW Sale Transaction, (c) the Wind-Down, or (d) any other sale of Assets (other than the sale of any Non-Performing Property) of any of the Debtors prior to the Effective Date.

1.180   ***Sale Transaction Proceeds*** means the net cash proceeds received by the Debtors, the Plan Administrator, or the Wind-Down Estates, as applicable, pursuant one or more of the Sale Transactions.

1.181   ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.182   ***Secured Claim*** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in this Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

1.183   ***Settling Governmental Authorities*** means the Persons and Entities listed on Schedule 1 attached hereto, and each of their respective successors.

1.184   ***Single Share*** has the meaning set forth in Section 4.11(b) hereof.

1.185   ***Standby Environmental Trust Agreement*** means those certain Trust Agreements between certain of the Debtors, as grantor, U.S. Bank National Association, as trustee, and the applicable regulatory agency pursuant to which an environmental standby trust was established to provide financial assurances that funds will be available when needed for closure, post closure, or corrective action of the facility.

1.186   ***Standby Environmental Trust Trustee*** means U.S. Bank National Association, as trustee under each of the Standby Environmental Trust Agreement.

1.187   ***Statutory Fees*** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

1.188   ***Subordinated Securities Claim*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.189   ***Subsequent Condition*** has the meaning set forth in Section 9.1(k) hereof.

1.190   ***Successful Bid*** has the meaning set forth in the Bidding Procedures Order.

16

1.191   ***Superpriority Note Documents*** means "Note Documents" as defined in the Superpriority Notes Indenture.

1.192   ***Superpriority Notes*** means the 10.75% Superpriority Lien Senior Secured Notes due 2021 issued pursuant to the Superpriority Notes Indenture.

1.193   ***Superpriority Notes Charging Lien*** means any Lien or other priority in payment to which the Superpriority Notes Trustee is entitled, pursuant to the Superpriority Notes Indenture, against distributions to be made to the holders of the Superpriority Notes under this Plan or otherwise, for payment of any Superpriority Notes Indenture Trustee Fees.

1.194   ***Superpriority Notes Guarantee Claim*** means a Secured Claim arising under the Superpriority Notes Indenture against Debtors Holdings and Exide Technologies, as guarantors.

1.195   ***Superpriority Notes Indenture*** means that certain indenture, by and among Exide International, as issuer, the guarantor parties thereto, and the Superpriority Notes Trustee, dated as of June 17, 2019, as amended, supplemented or otherwise modified from time to time.

1.196   ***Superpriority Notes Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and claims for indemnity, subrogation, and contribution including, without limitation, attorneys' fees, financial advisors' fees, and agents' fees, expenses and disbursements, incurred by or owed to the Superpriority Notes Trustee, whether prior to or after the Petition Date, and whether prior to or after the consummation of the Plan, under the Superpriority Notes Indenture with respect to the Superpriority Notes.

1.197   ***Superpriority Notes Trustee*** means U.S. Bank National Association, in its capacity as trustee and collateral agent under the Superpriority Notes Indenture.

1.198   ***Superpriority Security Documents*** means "Security Documents" as defined in the Superpriority Notes Indenture.

1.199   ***Tax Code*** means the Internal Revenue Code of 1986, as amended,

1.200   ***TCEQ means*** the Texas Commission on Environmental Quality.

1.201   ***Transferred Assets*** has the meaning set forth in the Europe/ROW Purchase Agreement.

1.202   ***Transferred Entities*** means "Transferred Entities" as defined in the Europe/ROW Purchase Agreement and listed on Schedule 3 hereto, including their respective successors and assigns.

1.203   ***Transferred Equity Interests*** means "Transferred Equity Interests" as defined in the Europe/ROW Purchase Agreement.

1.204   ***Transferred Non-Performing Properties*** means (a) the Non-Performing Properties (other than the Vernon Non-Performing Property and the Frisco Non-Performing Property) and (b) the related personal property and equipment transferred to the Environmental Response Trust on the Effective Date pursuant to the Environmental Settlement Agreement.

1.205    ***Transferred NPP Claim*** means any civil Claim or Cause of Action by the Settling Governmental Authorities against the Debtors under Environmental Laws with respect to, or arising out of, the Transferred Non-Performing Properties.

1.206    ***Treasury Regulation*** means the final, temporary and proposed regulations promulgated under the Tax Code.

1.207    ***Trustees*** means, collectively, (a) the Superpriority Notes Trustee, and (b) the Exchange Priority and First Lien Notes Trustee.

1.208    ***Trustees Charging Liens*** means, collectively, (a) the Superpriority Notes Charging Lien (b) the Exchange Priority Notes Charging Lien, (c) the First Lien Notes Charging Lien, and (d) the Legacy Notes Charging Lien.

1.209    ***Trustees Fees*** means, collectively, (a) the Superpriority Notes Indenture Trustee Fees, (b) the Exchange Priority Notes Indenture Trustee Fees, and (c) the First Lien Notes Indenture Trustee Fees.

1.210    ***UBL Claim*** means any and all Claims of the PBGC for the "unfunded benefit liabilities" together with interest of the Pension Plan under ERISA Section 4062(b)(1)(A) against Holdings or Exide Technologies or any member of each entity's "controlled group" as that term is defined in ERISA section 4001(a)(14).

1.211    ***Unexpired Lease*** means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.212    ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.213    ***Vernon Environmental Response Trust*** means the trust established pursuant to the Vernon Environmental Trust Agreement and the Environmental Settlement Agreement with respect to the Vernon Non-Performing Property, in accordance with the Environmental Settlement Agreement.

1.214    ***Vernon Environmental Trust Agreement*** means the trust agreement by and among the Debtors, the United States on behalf of the U.S. Environmental Protection Agency, the Transferred Entities, and the Vernon Environmental Trustee, in form and substance as agreed to by such parties and filed with the Court and consistent with the Environmental Settlement Agreement and Section 5 of the Plan.

1.215    ***Vernon Environmental Trust Assets*** shall, pursuant to the Global Settlement and Section 5.2(e) hereof, consist of (a) the Vernon Global Settlement Payment, (b) the Vernon Non-Performing Property or any proceeds thereof to the extent the Vernon Non-Performing Property is sold prior to the Effective Date, and (c) the Vernon Environmental Trust Causes of Action.

1.216    ***Vernon Environmental Trust Beneficial Interests*** means the beneficial interests in the Vernon Environmental Response Trust.

1.217    ***Vernon Environmental Trust Cause of Action*** means any Claim, debt, right or Cause of Action of the Debtors against any Person or Entity that is not a Released Party or an Exculpated Party, including an insurer, relating to any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed

restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under Environmental Laws with respect to the Vernon Non-Performing Property.

1.218   ***Vernon Environmental Trustee*** means the Person or Entity approved by the Bankruptcy Court to serve as the trustee of the Vernon Environmental Response Trust, and any successor thereto in accordance with the Vernon Environmental Trust Agreement.

1.219   ***Vernon Global Settlement Payment*** means the $2,587,523 Cash payment to be made to the Vernon Environmental Response Trust or the Vernon Standby Trust in accordance with the Environmental Settlement Agreement, by the Transferred Entities on the Effective Date pursuant to the Global Settlement if the Payment Condition is satisfied.

1.220   ***Vernon Non-Performing Property*** means the Debtors' non-performing property located at 2700 S. Indian Street, Los Angeles, California and the related personal property and equipment transferred to the Vernon Environmental Response Trust on the Effective Date pursuant to the Environmental Settlement Agreement.

1.221   ***Vernon NPP Claim*** means any civil Claim or Cause of Action against the Debtors under Environmental Laws with respect to or arising out of the Vernon Non-Performing Property.

1.222   ***Vernon Standby Trust*** means the Closure/Postclosure Trust established by the Debtors in 2013 for the benefit of the California DTSC relating to remediation of the Vernon Non-Performing Property.

1.223   ***Vernon Trust Condition*** means that the Vernon Environmental Trustee and the California DTSC reach a mutual, written agreement on or before the Effective Date that provides covenants not to sue or equivalent protections for the parties to the Vernon Environmental Trust Agreement from the California DTSC that are substantively identical to the covenants not to sue set forth in Paragraph 45.c.i of the Environmental Settlement Agreement being granted by the Settling Governmental Authorities (other than the Frisco Governmental Authorities) to the parties to the Environmental Trust Agreements.

1.224   ***Voting Deadline*** means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

1.225   ***Westchester*** means Westchester Fire Insurance Company, in its capacity as provider of surety insurance pursuant the Westchester Surety Bond Agreements.

1.226   ***Westchester Catch-up Payments*** means the distributions that would have been made to Westchester on account of its Allowed General Unsecured Claim had it received GUC Trust Beneficial A Interests, which shall instead be made by reallocating the first dollars of distribution, if any, to be made to PBGC on account of PBGC's GUC Trust Beneficial A Interests after the GUC Trust has distributed Cash to holders of Allowed General Unsecured Claims in an aggregate amount equal to the GUC Global Settlement Payment.

1.227   ***Westchester Surety Bond Agreements*** means the applicable agreements governing the surety bond obligations of Westchester to the Debtors with respect to the Non-Performing Properties.

1.228   ***Wind-Down*** means, following the Effective Date, the process to sell, abandon, wind down, dissolve, liquidate or distribute any remaining assets of the Debtors' Estates in accordance with the Plan.

1.229  ***Wind-Down Budget*** means an amount to be agreed between the Debtors and the Requisite Noteholders for the purpose of effectuating the Wind-Down.

1.230  ***Wind-Down Estates*** means the Debtors, or any successor thereto, by merger, consolidation or otherwise, pursuant to and under the Plan on or after the Effective Date; *provided*, that Wind-Down Estates shall not include the Environmental Response Trust, the Vernon Environmental Response Trust, or the GUC Trust.

B.  **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.  **Controlling Document.**

In the event of an inconsistency between the Plan and any other document, the terms of the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

D.  **Certain Consent Rights.**

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Requisite Noteholders as set forth in the RSA with respect to the form and substance of the Plan, the Plan Supplement, and any other Definitive Document, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1 hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

SECTION 2.     **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.     *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such other date or terms as may be mutually agreed upon between the holder of such an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator, as applicable.

2.2.     *Fee Claims.*

(a)     All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, and (b) shall be paid in full from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Plan Administrator, as applicable.  The Plan Administrator and the GUC Trustee are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors or the Creditors' Committee, as applicable, and the Debtors or the Plan Administrator, as applicable, shall separately escrow such estimated amounts in the Professional Fee Escrow Account (less any amounts already reserved for such professional in the Professional Fee Escrow Account) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Fee Claim does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim.  When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Wind-Down Estates and the Plan Administrator without any further action or order of the Bankruptcy Court.

(c)     For the avoidance of doubt, paragraph 23 of the DIP Order shall continue to apply to the Professional Fee Escrow Account and Fee Claims.

2.3.     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed

Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date.

### 2.4. *DIP Claims*

Unless indefeasibly paid in full in Cash prior to the Effective Date, the DIP Claims shall be deemed Allowed in the full amount of the DIP Obligations, and each holder of a DIP Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such DIP Claim, Cash in an amount equal to such Claim on the Effective Date. Upon the indefeasible payment in full in Cash of all DIP Claims, all Liens and security interests granted pursuant to the DIP Loan Documents shall be deemed cancelled and shall be of no further force and effect, and each DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

### 2.5. *Restructuring Expenses*

During the period commencing on the Commencement Date through the Effective Date, the Debtors have, and will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Plan Administrator shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. For the avoidance of doubt, any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) business days of receiving an invoice.

### 2.6. *Trustees Fees*

On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan, including the closing of the Europe/ROW Sale Transaction), the Debtors or Plan Administrator shall pay in Cash all reasonable unpaid documented Trustees Fees without application or approval of the Bankruptcy Court and without a reduction to recoveries of the holders of the Superpriority Notes, Exchange Priority Notes or First Lien Notes, as applicable. For the avoidance of doubt, nothing herein affects each Trustees' right to exercise its Trustees Charging Lien against distributions to the holders of the Superpriority Notes, Exchange Priority Notes, or First Lien Notes, as applicable. Any Trustees Fees invoiced after the Effective Date shall be paid promptly by the Plan Administrator, but no later than ten (10) business days after receiving an invoice.

The Trustees shall provide the Debtors, the Consenting Creditors, and the Creditors' Committee with an estimate of the Trustees Fees no later than five (5) business days prior to the Effective Date. If the Debtors dispute any requested Trustee Fees, the Debtors or Plan Administer shall (i) pay the undisputed portion of Trustees Fees, and (ii) notify the applicable Trustee of such dispute within two (2) days after presentment of the invoices by the Trustees. Upon such notification, the applicable Trustee may assert its Trustees Charging Lien to pay the disputed portion of its Trustees Fees or submit such dispute for resolution by the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable indenture. Nothing herein shall be deemed to impair, waive, discharge or negatively impact any Trustees Charging Lien.

SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    ***Classification in General.***

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.    ***Grouping of Debtors for Convenience Only.***

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan.  Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor.  Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  Except as provided in Section 5 of this Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

3.3.    ***Summary of Classification.***

The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.5.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | ABL Claims | Unimpaired | No (Presumed to accept) |
| 4 | Superpriority Notes Guarantee Claims | Impaired | Yes |
| 5 | Exchange Priority Notes Claims | Impaired | Yes |
| 6 | First Lien Notes Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | No (Deemed to reject) |
| 8 | Environmental NPP Claims | Impaired | No (Deemed to reject) |
| 9 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 10 | Intercompany Interests | Impaired | No (Deemed to reject) |
| 11 | Holdings Equity Interests | Impaired | No (Deemed to reject) |
| 12 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |

3.4.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.7.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Section 12 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

SECTION 4.     **TREATMENT OF CLAIMS AND INTERESTS.**

      4.1.     ***Priority Non-Tax Claims (Class 1).***

            (a)     *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

            (b)     *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

            (c)     *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

      4.2.     ***Other Secured Claims (Class 2).***

            (a)     *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

            (b)     *Treatment*:

                (i)     Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

                (ii)     Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

            (c)     *Voting*:  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

      4.3.     ***ABL Claims (Class 3)***

            (a)     *Classification*:  Class 3 consists of the ABL Claims.

(b)     *Allowance*:  The ABL Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $101,939,274.01 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the ABL Credit Agreement.

(c)     *Treatment*:

(i)     In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed ABL Claim, each holder thereof shall receive Cash until all holders of Allowed ABL Claims are satisfied in full, taking into account any amounts paid to the holders of Allowed ABL Claims pursuant to the Americas Sale Order.

(ii)     The Challenge Deadline relating to the ABL Credit Agreement and ABL Agent shall be deemed irrevocably expired (A) with respect to the Creditors' Committee as of the date of the entry of the Americas Sale Order, (B) with respect to the Settling Governmental Authorities, on the Effective Date, and (C) with respect to all other Persons and Entities, on August 27, 2020.  For the avoidance of doubt, any reservation of rights relating to the ABL Credit Agreement and the ABL Agent, including paragraphs 37 to 41 of the Americas Sale Order, shall be deemed expired on the foregoing dates with respect to the foregoing parties, as applicable.

(d)     *Voting*:  Class 3 is Unimpaired, and the holders of ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of ABL Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such ABL Claims.

4.4.     ***Superpriority Notes Guarantee Claims (Class 4).***

(a)     *Classification*: Class 4 consists of Superpriority Notes Guarantee Claims against the Debtors.

(b)     *Allowance*:  The Superpriority Notes Guarantee Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $152,512,500 (plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Superpriority Notes Indenture) and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)     *Treatment*: Following the Europe/ROW Closing, the Superpriority Notes and all of the outstanding Claims arising thereunder (including, for the avoidance of doubt, the Superpriority Notes Guarantee Claims) shall be contributed by the Consenting Creditors to the Europe/ROW Purchaser in accordance with the Europe/ROW Purchase Agreement.  At the Europe/ROW Closing, the Europe/ROW Purchaser shall contribute the Superpriority Notes to Exide International and the Superpriority Notes shall be cancelled.  At the Europe/ROW Closing and without limiting the above, and without any further action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or further order of the Bankruptcy Court, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied, released, and discharged, and (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed terminated, released, discharged and without further effect.

(d)     *Voting*:  Class 4 is Impaired, and the holders of the Superpriority Notes Guarantee Claims are entitled to vote to accept or reject the Plan.

4.5. ***Exchange Priority Notes Claims (Class 5).***

(a)     *Classification*: Class 5 consists of Exchange Priority Notes Claims against the Debtors.

(b)     *Allowance*:   The Exchange Priority Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $390,000,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed Exchange Priority Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for Allowed Exchange Priority Notes Claims, each holder thereof shall receive (i) at the Europe/ROW Closing, its Pro Rata share of the consideration contemplated by <u>Section 5.1(a)</u> of the Plan in exchange for an aggregate amount of $70,000,000 of Exchange Priority Notes Claims, and (ii) for all remaining Allowed Exchange Priority Notes Claims, Net Cash Proceeds after all Allowed ABL Claims are satisfied in full in Cash, until all Allowed Exchange Priority Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)     *Voting*:  Class 5 is Impaired, and the holders of the Exchange Priority Notes Claims are entitled to vote to accept or reject the Plan.

4.6. ***First Lien Notes Claims (Class 6).***

(a)     *Classification*:  Class 6 consists of First Lien Notes Claims against the Debtors.

(b)     *Allowance*:   The First Lien Notes Claims are permanently Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $161,023,000 plus all accrued but unpaid interest, costs, fees, and expenses then outstanding under the Exchange Priority and First Lien Notes Indenture and such Claims against the Debtors shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Allowed First Lien Notes Claim, each holder thereof shall receive its Pro Rata share of Net Cash Proceeds after all Allowed ABL Claims and Allowed Exchange Priority Notes Claims are satisfied in full in accordance with the Plan, until all Allowed First Lien Notes Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(d)     *Voting*:  Class 6 is Impaired, and the holders of the First Lien Notes Claims are entitled to vote to accept or reject the Plan.

4.7.     *General Unsecured Claims (Class 7).*

(a)     *Classification*:  Class 7 consists of General Unsecured Claims against the Debtors.

(b)     *Treatment*:

(i)     Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction and release of, and in exchange for, such Allowed General Unsecured Claim, each holder thereof shall receive its Pro Rata share of (A) the GUC Trust Beneficial A Interests, and (B) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which shall be shared on a Pro Rata basis with the holders of Allowed Environmental NPP Claims, until all Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted.

(ii)     All Notes Deficiency Claims shall not receive distributions in accordance with this Section 4.7(b) and such Claims are waived for all purposes, including for voting and for distributions pursuant to and in accordance with this Section 4.7(b).

(iii)     In lieu of the treatment provided in Section 4.7(b)(i), Westchester shall receive, in full and final satisfaction and release of, and in exchange for, all of its Allowed General Unsecured Claims (which shall be in a fixed amount of $30,000,000) (A) its Pro Rata share of (1) GUC Trust Beneficial B Interests, and (2) Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which beneficial interests shall be shared on a Pro Rata basis with the holders of Allowed Environmental NPP Claims in accordance with Section 4.8(b)(ii), until all such Allowed General Unsecured Claims are satisfied in full in Cash or such Net Cash Proceeds are exhausted, and (B) the Westchester Catch-up Payments.

(c)     *Voting*:  Class 7 is Impaired, and the holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.8.     *Environmental NPP Claims (Class 8).*

(a)     *Classification*:  Class 8 consists of Environmental NPP Claims against the Debtors.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Environmental NPP Claim agrees to less favorable treatment of such Claim or otherwise, in full and final satisfaction and release of, and in exchange for, such Allowed Environmental NPP Claim, each holder of an Allowed Environmental NPP Claim shall receive:

(i)     (A) if such holder is a Global Settlement Party, then such holder shall be a beneficiary of the Environmental Trust Beneficial Interests and/or the Vernon Environmental Trust Beneficial Interests, as applicable under the Environmental Settlement Documents; (B) if such holder is not a Global Settlement Party and the Payment Condition is satisfied as to such holder but the Vernon Trust Condition is not satisfied, then the Non-Performing Property relating to such holder's Environmental NPP Claim shall be abandoned, and the relevant Global Settlement Payment shall be made, in each case in accordance with Section 5.2(e)(ii) of the Plan; (C) if such holder is not a Global Settlement Party and the

28

Payment Condition is not satisfied as to such holder, the Non-Performing Property relating to such holder's Environmental NPP Claim shall be abandoned in accordance with <u>Section 5.2(e)(iii)</u> of the Plan, and such holder shall receive a first priority Lien against such Non-Performing Property to secure its Environmental NPP Claim; or (D) if such holder is not a Global Settlement Party and the Payment Condition is satisfied as to such holder and the Vernon Trust Condition is satisfied, then such holder shall be a beneficiary of the Vernon Environmental Trust Beneficial Interests in accordance with the Environmental Settlement Documents;

(ii)     its Pro Rata share of GUC Trust Beneficial B Interests;

(iii)     Net Cash Proceeds after the ABL Claims, Exchange Priority Notes Claims, and First Lien Notes Claims are satisfied in full in accordance with the Plan, which shall be shared on a Pro Rata basis with holders of Allowed General Unsecured Claims, until all Allowed Environmental NPP Claim are satisfied in full in Cash or such Net Cash Proceeds are exhausted; and

(iv)     Notwithstanding anything to the contrary, the foregoing shall not affect any defensive rights of set-off or recoupment of any holder of an Environmental NPP Claim against any Claims asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee, as applicable.

(c)     *Voting*: Class 8 is Impaired, and the holders of Environmental NPP Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Environmental NPP Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Environmental NPP Claims.

4.9.     ***Intercompany Claims (Class 9).***

(a)     *Classification*:  Class 9 consists of Intercompany Claims against the Debtors.

(b)     *Treatment*:  On or after the Effective Date, all Intercompany Claims will be cancelled and not entitled to distribution or any recovery under the Plan.

(c)     *Voting*: Class 9 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

4.10.     ***Intercompany Interests (Class 10).***

(a)     *Classification*:  Class 10 consists of Intercompany Interests in the Debtors.

(b)     *Treatment*:  All Intercompany Interests in a subsidiary Debtor shall be cancelled if and when such Debtor is dissolved in accordance with <u>Section 5.8(f)</u> of the Plan.  Each holder of an Intercompany Interest in a subsidiary Debtor shall neither receive nor retain any property of the estate or direct interest in property of the estate of such Debtor on account of such Intercompany Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in such Debtor may receive its Pro Rata Share of any remaining assets in the Debtor.

(c)    *Voting*:  Class 10 is Impaired, and the holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.11.    ***Holdings Equity Interests (Class 11).***

(a)    *Classification*: Class 11 consists of Holdings Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of Holdings Equity Interests agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for Holdings Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all Holdings Equity Interests shall be cancelled and one share of Holdings common stock (the "***Single Share***") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Holdings Stock consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of a Holdings Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such Holdings Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a Holdings Stock may receive its share of any remaining assets of Holdings consistent with such holder's rights of payment existing immediately prior to the Commencement Date unless otherwise determined by the Plan Administrator, on the date that Holdings' Chapter 11 Case is closed in accordance with <u>Section 5.16</u> of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates; and (iii) the continuing rights of former holders of Holdings Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)    *Voting*:  Class 11 is Impaired, and the holders of Holdings Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Holdings Equity Interests are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Holdings Equity Interests.

4.12.    ***Subordinated Securities Claims (Class 12).***

(a)    *Classification*:  Class 12 consists of Subordinated Securities Claims against the Debtors.

(b)    *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 12 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Subordinated Securities Claims.

SECTION 5.   **MEANS FOR IMPLEMENTATION.**

      5.1.   ***Europe/ROW Sale Transaction.***

          (a)   *Europe/ROW Sale Transaction*.   On or prior to the Effective Date, in accordance with the Europe/ROW Purchase Agreement, the following will occur, subject to the satisfaction or waiver of all applicable closing conditions under the Europe/ROW Purchase Agreement:

          (i)   pursuant to sections 1123, 1141(b) and 1141(c) of the Bankruptcy Code, all Acquired Assets shall be transferred to, and the Acquired Assets owned by the Debtors shall vest free and clear of all Liens (other than Permitted Liens), Claims, charges, interests, or other encumbrances, in the Europe/ROW Purchaser or such other entity as set forth in the Europe/ROW Purchase Agreement, and all Assumed Liabilities shall be assumed by the Europe/ROW Purchaser or such other entity designated by the Europe/ROW Purchaser in accordance with the terms of the Europe/ROW Purchase Agreement;

          (ii)   all other transactions as are necessary to consummate the Europe/ROW Sale Transaction in accordance with the Alternative Transaction Structure; and

          (iii)   the releases provided for in Section 12.22 of the Europe/ROW Purchase Agreement shall become effective and binding on the parties thereto.

          (b)   *Sources of Consideration for Plan Distribution.*

      The Debtors and the Plan Administrator, as applicable, shall fund Distributions under this Plan with the aggregate consideration comprised of (i) the Sale Transaction Proceeds, (ii) Cash on hand, and (iii) the Global Settlement Payments.

      5.2.   ***Compromise and Settlement of Claims, Interests, and Controversies***

          (a)   The provisions of the Plan, including treatment provided for hereunder for General Unsecured Claims and Environmental NPP Claims, and the Global Settlement Documents incorporate and reflect a proposed compromise and settlement of various issues and disputes related to the Debtors (the "***Global Settlement***").   Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan, the Global Settlement, and any documents related to the Europe/ROW Sale Transaction, shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of an Environmental NPP Claim  may have with respect to any such Claim or any Distribution to be made on account of any such Claim and are also in consideration of the significant value provided to the Estates by the Consenting Creditors, the Europe/ROW Purchaser and the Transferred Entities.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

          (b)   The terms of the Global Settlement shall become effective and binding upon all parties, including the Global Settlement Parties and the Transferred Entities, automatically upon the Effective Date without the need for any further action or Bankruptcy Court approval.

          (c)   *GUC Trust.*   The GUC Trust shall be established in accordance with the GUC Trust Agreement and the GUC Trust Assets shall be deemed to have been contributed to the GUC Trust free and clear of all Liens, charges, encumbrances, and Interests for the benefit of the holders of

Allowed General Unsecured Claims and Allowed Environmental NPP Claims. Solely for purposes of distributions from the GUC Trust: (i) all GUC Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other; (ii) all unsecured guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim or Environmental NPP Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors and the GUC Trust; and (iii) each and every General Unsecured Claim and Environmental NPP Claim filed or to be filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim or Environmental NPP Claims, as applicable, against and obligation of the consolidated Debtors and the GUC Trust. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Wind-Down Estates or modify or affect the requirements of section 553 of the Bankruptcy Code for purposes of effectuating a setoff against the Debtors, the Wind-Down Estates or the GUC Trust, as applicable. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or Environmental NPP Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim or Environmental NPP Claim subordinated in accordance with any contractual rights or equitable principles.

(d)      *Environmental Response Trust.*

(i)      The Environmental Response Trust shall be established in accordance with the Environmental Settlement Documents and the Environmental Trust Assets shall be transferred to the Environmental Response Trust free and clear of all Liens, charges, encumbrances, and Interests. The Environmental Global Settlement Payment shall be paid by the Transferred Entities to the Environmental Response Trust in accordance with the terms of the Environmental Settlement Agreement and shall not be subject to satisfaction of the Payment Condition. The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, the Settling Governmental Authorities shall not assert any Transferred NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. All Transferred NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan.

(ii)      Prior to the Effective Date, the Debtors shall not sell or transfer any of the Transferred Non-Performing Properties without the prior written consent of the Settling Governmental Authorities with jurisdiction or oversight over such Transferred Non-Performing Property; *provided*, that in the event the Debtors sell or otherwise transfer a Transferred Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of such Transferred Non-Performing Property, all proceeds of such sale shall be contributed to the Environmental Response Trust on the Effective Date in lieu of such Transferred Non-Performing Property. For the avoidance of doubt, the sale of a Transferred Non-Performing Property pursuant to this Section 5.2(d)(ii) shall not affect the respective rights of the Settling Governmental Authorities or the Environmental Sureties relating to such Transferred Non-Performing Property.

(iii)      Westchester shall make all required contributions to the Environmental Response Trust in accordance with the Environmental Settlement Documents.

(e)      *Vernon Environmental Response Trust.*

(i)      If the Payment Condition and the Vernon Trust Condition are satisfied:

32

A-1312

(A)     the Vernon Environmental Response Trust shall be established in accordance with the Environmental Settlement Documents and the Vernon Environmental Trust Assets shall be transferred to the Vernon Environmental Response Trust free and clear of all Liens, charges, encumbrances, and Interests.  The Environmental Settlement Agreement contains covenants not to sue and releases which are incorporated herein. For the avoidance of doubt, any Vernon NPP Claims against the Debtors shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim.  All Vernon NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan;

(B)     the Vernon Global Settlement Payment shall be paid by the Transferred Entities to the Vernon Environmental Response Trust in accordance with the terms of the Environmental Settlement Agreement;

(C)     prior to the Effective Date, the Debtors shall not sell or transfer the Vernon Non-Performing Property without the prior written consent of the Settling Governmental Authorities with jurisdiction or oversight over the Vernon Non-Performing Property; *provided*, that in the event the Debtors sell or otherwise transfer the Vernon Non-Performing Property with the consent of the Settling Governmental Authorities with jurisdiction or oversight of the Vernon Non-Performing Property, all proceeds of such sale shall be contributed to the Vernon Environmental Response Trust on the Effective Date in lieu of the Vernon Non-Performing Property.  For the avoidance of doubt, the sale of the Vernon Non-Performing Property pursuant to this Section 5.2(e)(i)(C) shall not affect the respective rights of the Settling Governmental Authorities with jurisdiction over the Vernon Non-Performing Property or the Environmental Sureties relating to the Vernon Non-Performing Property; and

(D)     Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents.

(ii)     If the Payment Condition is satisfied, but the Vernon Trust Condition is *not* satisfied:

(A)     pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens;

(B)     the Vernon Environmental Trust Assets shall not be transferred to the Vernon Environmental Response Trust;

(C)     the Vernon Global Settlement Payment shall be paid by the Transferred Entities to the Vernon Standby Trust in accordance with the terms of the Environmental Settlement Agreement;

(D)     the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property, except to the extent that a Vernon NPP Claim is

33

Allowed as an Environmental NPP Claim.  For the avoidance of doubt, any Vernon NPP Claim shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, following the abandonment of the Vernon Non-Performing Property; and

(E)     Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents.

(iii)     If the Payment Condition is *not* satisfied:

(A)     pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, the Vernon Non-Performing Property shall be deemed abandoned to Exide Technologies, LLC on the Effective Date, free and clear of all Liens, other than any Liens granted pursuant to Section 4.8(b) of the Plan;

(B)     the Vernon Environmental Trust Assets shall not be transferred to the Vernon Environmental Response Trust;

(C)     the Vernon Global Settlement Payment shall not be payable by the Transferred Entities;

(D)     Westchester shall make all required contributions to the Vernon Standby Trust in accordance with the Environmental Settlement Documents; and

(E)     the Debtors, the Wind-Down Estates, and the GUC Trust shall have no further payment obligations whatsoever with regards to the Vernon Non-Performing Property except to the extent a Vernon NPP Claim is Allowed as an Environmental NPP Claim.  For the avoidance of doubt, any Vernon NPP Claim shall be Disallowed to the extent asserted as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim, following the abandonment of the Vernon Non-Performing Property.

(f)     *Frisco Settlement Agreement*.

(i)     The Frisco Assets shall be transferred to the Frisco Governmental Authorities pursuant to the terms of the Frisco Settlement Agreement and free and clear of all Liens. The Frisco Settlement Agreement contains covenants not to sue and releases which are incorporated herein.  For the avoidance of doubt, the Frisco Governmental Authorities shall not assert any Frisco NPP Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, an Other Secured Claim, or a General Unsecured Claim; *provided*, that the foregoing shall not affect any defensive rights set-off or recoupment of any of the Frisco Governmental Authorities against any Claim asserted by the Debtors, Wind-Down Estates, Plan Administrator, or GUC Trustee.  All Frisco NPP Claims shall be treated as Environmental NPP Claims in Class 8 of the Plan.

(ii)     The Frisco Governmental Authorities (other than TCEQ) shall make all required payments to Aspen in accordance with the Frisco Settlement Agreement.

(iii)     Aspen shall make all required payments to TCEQ in accordance with the Frisco Settlement Agreement.

34

(g)     *Consenting Creditors*.

(i)     Certain Consenting Creditors shall purchase the European Bridge Notes issued pursuant to the terms of the European Bridge Notes Indenture in an aggregate amount equal to at least $12,500,000.

(ii)     On the Effective Date, the Exchange Priority and First Lien Notes Trustee, at the direction of the Requisite Noteholders, shall be deemed to have waived (A) all Liens on or against the Non-Performing Properties, including with respect to any proceeds of the sale of any Non-Performing Properties and (B) any Claims, Interests or Causes of Action against the GUC Trust or the GUC Trust Assets, including any Notes Deficiency Claims or any other General Unsecured Claims.

(iii)     The Trustees and Consenting Creditors shall take all actions required or necessary under the Superpriority Notes Indentures and the Exchange Priority and First Lien Notes Indenture to effectuate the Europe/ROW Sale Transaction in accordance with the terms of the Plan and the Europe/ROW Purchase Agreement.

(h)     *Transferred Entities*.  On the Effective Date, the Transferred Entities shall pay (i) the GUC Global Settlement Payment to the GUC Trust, (ii) the Environmental Global Settlement Payment to the Environmental Response Trust (which, for the avoidance of doubt, shall not be subject to satisfaction of the Payment Condition), (iii) the Frisco Global Settlement Payment to TCEQ, and (iv) subject to the satisfaction of the Payment Condition, the Vernon Global Settlement Payment to the Vernon Environmental Response Trust in accordance with the Environmental Settlement Agreement; *provided*, that for each of the contributions contemplated in the foregoing clauses (i) through (iv), the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors in partial satisfaction of outstanding intercompany payables owed by the Transferred Entities to the Debtors and, following such Cash payment, on the Effective Date, the Debtors shall make the contributions to the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust (only if the Payment Condition is satisfied), or TCEQ, as applicable.

(i)     *Environmental Sureties*.

(i)     On the Effective Date, the Environmental Sureties shall be deemed to waive all Claims (including Administrative Expense Claims, Priority Non-Tax Claims, or General Unsecured Claims), Interests, or Causes of Action against the Debtors, the Wind-Down Estates, the Plan Administrator, the GUC Trust or the GUC Trust Assets other than (A) any Other Secured Claims that Westchester may hold on account of cash collateral in the amount of $5,000,000 (plus any accrued interest or dividends thereon) posted by the Debtors with respect to the Westchester Surety Bond Agreements, and (B) the General Unsecured Claim of Westchester in the fixed amount of $30,000,000, which shall be treated in accordance with Section 4.7(b)(iii) of the Plan.

(ii)     Upon the sale of any Non-Performing Property that is covered by the Westchester Surety Bond Agreement, Westchester's rights under the Westchester Surety Bond Agreements shall be governed by the Environmental Settlement Documents.

(j)     *Other Provisions of the Global Settlement*.

(i)     As a condition precedent to consummation of the Global Settlement, (A) the Global Settlement Parties (other than the Settling Governmental Authorities) shall not object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede approval of the Disclosure Statement, the confirmation or consummation

35

of the Plan or approval of the Global Settlement, and (B) the Settling Governmental Authorities shall not oppose any term or provision of the Plan, Disclosure Statement, or Global Settlement, in each case, subject to the rights of the Global Settlement Parties, including the Settling Governmental Authorities, with respect to amendments to the Plan as set forth in <u>Section 12.4</u> of the Plan.

(ii)     The Global Settlement Parties agree to exchange releases or covenants not to sue as set forth in <u>Section 10</u> of the Plan or as provided in the Environmental Settlement Agreement or the Frisco Settlement Agreement.

(iii)     The Debtors shall not designate any additional properties as Non-Performing Properties, without the prior written consent of the Settling Governmental Authorities.

(iv)     The terms of the Global Settlement (A) shall not affect any rights the Settling Governmental Authorities or the Frisco Governmental Authorities may have against any purchaser of any of the Debtors' Assets that is not a Global Settlement Party, and (B) are without prejudice to any (x) Claims other than Transferred NPP Claims held by the Settling Governmental Authorities or Frisco NPP Claims held by the Frisco Governmental Authorities, as applicable, and (y) any Claim, Interest, or Cause of Action of any Governmental Unit that is not a Settling Governmental Authority or Frisco Governmental Authority.

(v)     Each of the state Settling Governmental Authorities has acknowledged that it is the primary state governmental agency in its state with responsibility for enforcing Environmental Laws applicable to the Non-Performing Properties located within its jurisdiction.  The U.S. Environmental Protection Agency has acknowledged that it is the primary federal governmental agency with responsibility for enforcing federal Environmental Laws applicable to the Non-Performing Properties.

(vi)     All pending or potential discovery and litigation by any Global Settlement Party against any other Global Settlement Party related to the Chapter 11 Cases or any of the transactions related thereto shall be subject to a standstill and shall be deemed withdrawn upon the Effective Date.

(vii)     The GUC Trust Agreement, the Environmental Settlement Documents, the Frisco Settlement Agreement, and any other documentation required to effectuate the Global Settlement shall be solely for the benefit of the Global Settlement Parties and, for the avoidance of doubt, no third-parties shall be beneficiaries of the Global Settlement or any such documents.

(viii)     The Superpriority Notes Indenture and the Exchange Priority and First Lien Notes Indenture shall be deemed amended and modified to the extent necessary to allow, permit and effectuate the transactions contemplated by the Plan and the Europe/ROW Sale Transaction.

(k)     *Columbus Non-Performing Property Transaction.*

(i)     To facilitate the transfer of the Columbus Non-Performing Property to the Environmental Response Trust, as required by the Environmental Settlement Agreement, and pursuant to sections 105(a), 365 and 554(a) of the Bankruptcy Code, on the Effective Date, in accordance with the Columbus NPP Termination Documents and subject to the satisfaction or waiver of all applicable closing conditions under the Columbus NPP Termination Documents:

(A)     Exide Technologies' lease and the bond purchase agreement related to the Columbus Non-Performing Property, including any security documentation related thereto, shall terminate;

36

(B)      Exide Technologies shall be deemed to have abandoned the revenue bonds issued in connection with the development of the Columbus Non-Performing Property and no further payments shall be due thereunder;

(C)      the Columbus Development Authority shall quitclaim its interest in the parcel located at the Columbus Non-Performing Property to Exide Technologies; and

(D)      the Debtors and the Columbus Development Authority shall take all other actions necessary to consummate the transactions contemplated by the Columbus NPP Termination Documents.

5.3.    ***Settlement with PBGC.***

(a)      On the Effective Date:

(i)      the Transferred Entities shall pay the PBGC Settlement Payment to the PBGC; *provided*, that the Transferred Entities may instead, at their election, transfer Cash in an amount equal to the amount of such contribution to the Debtors, which the Debtors shall thereafter transfer to PBGC. For the avoidance of doubt, receipt of the PBGC Settlement Payment shall not preclude PBGC from being treated as a holder of a General Unsecured Claim (Class 7) pursuant to Section 4.7 of the Plan; and

(ii)      PBGC consents to the releases contained in Section 10.6 of the Plan in favor of the parties identified in Section 10.6(f) of the Plan.

(b)      PBGC shall not assert any PBGC Claims against the Debtors as an Administrative Expense Claim, a Priority Tax-Claim, a Priority Non-Tax Claim, or an Other Secured Claim. To the extent Allowed, all PBGC Claims shall be treated as General Unsecured Claims in Class 7 of the Plan.

(c)      PBGC expressly consents to Section 4.7(b)(iii) of the Plan and the Westchester Catch-up Payments incorporated therein.

(d)      Notwithstanding any provision to the contrary in the Plan, the Disclosure Statement, the Confirmation Order, or any other document filed in these Chapter 11 Cases, nothing shall in any way be construed to discharge, release, limit, or relieve any person or entity from any liability or responsibility under sections 401-414 of ERISA with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan, the Disclosure Statement, the Confirmation Order, or any other document filed in these Chapter 11 Cases.

5.4.    ***The GUC Trust.***

(a)      *Execution of GUC Trust Agreement.* On the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the Requisite Noteholders, and the GUC Trustee, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims. This Section 5.4 sets forth certain of the rights, duties, and obligations of the GUC Trustee. In the event of any conflict between the terms of this Section 5.3 and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.

(b)     *Purpose of GUC Trust*.  The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan with respect to the GUC Trust Assets, General Unsecured Claims, and Environmental NPP Claims, including, but not limited to, resolving outstanding Disputed General Unsecured Claims and Disputed Environmental NPP Claims and making distributions to holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims in accordance with the Plan.

(c)     *GUC Trust Assets*.  The GUC Trust shall consist of the GUC Trust Assets.

(d)     *GUC Trustee*.  The GUC Trustee shall be responsible to manage the day-to-day operations of the GUC Trust.

(e)     *Role of GUC Trustee*.  In furtherance of, and consistent with, the purposes of the GUC Trust and the Plan, the GUC Trustee shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims and Allowed Environmental NPP Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims and Disputed Environmental NPP Claims, and (v) have the power and authority to perform such other functions as are provided for in the Plan and the GUC Trust Agreement.  In all circumstances, the GUC Trustee shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor.  The investment powers of the GUC Trustee are limited to powers to invest in demand and time deposits in banks or savings institutions, or temporary investment such as short-term certificates of deposit or U.S. Treasury bills.

(f)     *Preservation of Privilege*.  The Debtors and the GUC Trust shall enter into a common interest agreement whereby the Debtors will be able to share documents, information or communications (whether written or oral) relating to the GUC Trust Assets.  The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications.  The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege.  All privileges shall remain in the control of the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, and the Debtors, the Wind-Down Estates, or the Plan Administrator, as applicable, retain the right to waive their own privileges.

(g)     *Transferability of GUC Trust Beneficial Interests*.  GUC Trust Beneficial Interests shall not be certificated and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law, or as and to the extent determined by the GUC Trustee.

(h)     *Costs and Expenses of GUC Trustee*.  The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trustee and its retained professionals, shall be paid exclusively from the GUC Trust Assets.

(i)     *Retention of Professionals by GUC Trustee*.  The GUC Trustee may retain and reasonably compensate counsel and other professionals, which may include, but is not limited to, Creditors' Committee professionals, to assist in their duties as GUC Trustee on such terms as the GUC Trustee deems appropriate without Bankruptcy Court approval.

(j)     *U.S. Federal Income Tax Treatment of GUC Trust*.  In furtherance of this Section 5.3 of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the

38

meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims and Environmental NPP Claims, consistent with the terms of the Plan; (ii) the holders of General Unsecured Claims and Environmental NPP Claims shall be treated as the beneficiaries and grantors of the GUC Trust; (iii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims and Environmental NPP Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, holders of and Environmental NPP Claims, and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the GUC Trust Assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims and Environmental NPP Claims, followed by the deemed transfer of such GUC Trust Assets to the GUC Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (vi) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the GUC Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims and Environmental NPP Claims based on their respective interests in the GUC Trust, including the holders of General Unsecured Claims and Environmental NPP Claims holding Disputed Claims, in such manner as the GUC Trustee deems reasonable and appropriate; and (viii) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  If a "disputed ownership fund" election is made for all or any portion of the GUC Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders of General Unsecured Claims and Environmental NPP Claims, and the GUC Trustee), and solely with respect to the impacts assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

(k)     *Expedited Determination*.  The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(l)     *Dissolution*.  The GUC Trustee and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims and Disputed Environmental NPP Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, and (iii) all distributions required to be made by the GUC Trustee under the Plan and the GUC Trust Agreement have been made, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims and Disputed Environmental NPP Claims.

5.5.     ***The Environmental Response Trust.***

(a)     *Execution of Environmental Trust Agreements*.  On or before the Effective Date, the Environmental Trust Agreements, substantially in the form attached to the Environmental

Settlement Agreement, shall be executed, and all other necessary steps to be taken to establish the Environmental Response Trust and the Environmental Trust Beneficial Interests shall be authorized.

(b)     *Environmental Trust Assets*.  The Environmental Response Trust shall consist of the Environmental Trust Assets.  On or before the Effective Date, the Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Environmental Response Trust as specified and in the amounts provided in the Environmental Settlement Documents.

(c)     *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against a Non-Performing Property shall be irrevocably cancelled on the Effective Date.  Any person holding a Lien against a Non-Performing Property shall take any action reasonably requested by the Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Environmental Trustee.

5.6.     ***The Vernon Environmental Response Trust.***

Subject to the satisfaction of the Payment Condition and the Vernon Trust Condition:

(a)     *Execution of Vernon Environmental Trust Agreement*.  On or before the Effective Date, the Vernon Environmental Trust Agreement, substantially in the form attached to the Environmental Settlement Agreement, shall be executed, and all other necessary steps to be taken to establish the Vernon Environmental Response Trust and the Vernon Environmental Trust Beneficial Interests shall be authorized.

(b)     *Vernon Environmental Trust Assets*.   The Vernon Environmental Response Trust shall consist of the Vernon Environmental Trust Assets.  On or before the Effective Date, the Vernon Environmental Trustee shall create, and the Global Settlement Parties shall make contributions to, accounts held by or within the Vernon Environmental Response Trust as specified and in the amounts provided in the Plan and the Environmental Settlement Documents.

(c)     *Cancellation of Liens*.  All Liens except Liens of Settling Governmental Authorities, if any, against the Vernon Non-Performing Property shall be irrevocably cancelled on the Effective Date.  Any person holding a Lien against the Vernon Non-Performing Property shall take any action reasonably requested by the Vernon Environmental Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be reasonably requested by the Vernon Environmental Trustee.

5.7.     ***Canada Non-Performing Property.***

(a)     On or before the Effective Date, the Debtors shall (i) deposit Cash in an amount equal to the Canada NPP Risk Management Measures Funds into an escrow account, and (ii) engage in negotiations with the Canada MOE with respect to the abandonment of the Canada Non-Performing Property; *provided*, that to the extent the parties cannot agree, the Debtors may seek a determination by the Bankruptcy Court of the appropriate amount necessary to implement environmental risk management measures and/or abandonment of the Canada Non-Performing Property.  The Debtors are authorized to transfer title to or proceeds from the Canada Non-Performing Property to the Canada MOE or its designee.  For the avoidance of doubt, the aggregate amount of Allowed Canada NPP Claims shall be reduced by the amount of Canada NPP Risk Management Measures Funds deposited for use by the Canada MOE.

(b)     Upon the implementation of environmental risk management measures, any excess Canada NPP Risk Management Measures Funds shall revert to the Wind-Down Estates and shall be available for distribution by the Plan Administrator in accordance with the Plan.

(c)     In the event the Canada NPP Risk Management Measures Funds are not sufficient to cover the cost of implementing the environmental risk management measures at the Canada Non-Performing Property, any remaining Canada NPP Claims shall be treated as General Unsecured Claims in accordance with the Plan.

5.8.     *Plan Administrator.*

(a)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan.

(b)     *Authority*.  Subject to Section 5.8(c) of this Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors, other than with respect to General Unsecured Claims and Environmental NPP Claims (for the avoidance of doubt, the GUC Trustee shall be responsible for objecting to, reconciling, or settling General Unsecured Claims and Environmental NPP Claims asserted against the GUC Trust);

(ii)     make Distributions to holders of Allowed Claims in accordance with this Plan, other than with respect to Allowed General Unsecured Claims;

(iii)     exercise its reasonable business judgment to direct and control the Wind-Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)     other than GUC Trust Causes of Action, the Environmental Trust Causes of Action, the Vernon Environmental Trust Causes of Action, or any Causes of Action released by the Debtors pursuant to the Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates, other than with respect to the GUC Trust Assets;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     maintain the books and records and accounts of the Debtors;

41

(viii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(ix)    following the Effective Date, pay all Restructuring Expenses in Cash in accordance with Section 2.5 of this Plan;

(x)    following the Effective Date, pay all Trustees Fees in Cash in accordance with Section 2.6 of the Plan.

(xi)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xii)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xiii)    pay statutory fees in accordance with Section 12.1 of the Plan;

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan; and

(xv)    close the Chapter 11 Cases, subject to the reasonable consent of the GUC Trustee.

(c)    *Boards of Directors and Officers.*

(i)    The officers and directors of the Debtors existing prior to the Effective Date shall be relieved of any and all duties with the respect to the Debtors as of the Effective Date.

(ii)    Upon the Effective Date, the New Board shall consist of one or more directors selected by the Debtors and the Requisite Noteholders, which shall be announced by notice filed with the Bankruptcy Court prior to the Confirmation Hearing.

(iii)    Upon the Effective Date, the new governance structure of Holdings will be set forth in the Amended Organizational Documents.

(iv)    The New Board shall, among other things, oversee and direct the Plan Administrator (solely in its capacity as the Plan Administrator and not in his capacity as the custodian of the Single Share) and the administration of the Wind-Down Estates in accordance with the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish, in consultation with the Requisite Noteholders and the Plan Administrator, such procedures and protocols as it deems necessary to carry out its duties and as are otherwise acceptable to the Requisite Noteholders.

(d)    *Wind-Down*.  After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind-Down according to the Wind-Down Budget without any further

approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Wind-Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(e)     *Indemnification*.  Each of the Wind-Down Estates shall indemnify and hold harmless the New Board and the Plan Administrator solely in their capacities as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or the New Board's bad faith, gross negligence, willful misconduct or criminal conduct.

(f)     *Dissolution*.  After the Effective Date, the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of this Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Wind-Down Estate) and complete the winding up of such Wind-Down Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Wind-Down Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Wind-Down Estate.  The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Wind-Down Estate as a corporate entity in good standing until such time as such Wind-Down Estate is dissolved or merged out of existence in accordance with the Plan.

        5.9.     ***Corporate Action.***

        Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

        5.10.     ***Withholding and Reporting Requirements.***

        (a)     *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)     *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, Wind-Down Estates, GUC Trustee or such other Person designated by the Plan Administrator, Wind-Down Estates or GUC Trustee (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Plan Administrator.  If such request is made by the Plan Administrator, Wind-Down Estates, or such other Person designated by the Plan Administrator or Wind-Down Estates and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Wind-Down Estate and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the applicable Wind-Down Estate and their  respective property.  If such request is made by the GUC Trustee or such other Entity designated by the GUC Trustee and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the GUC Trust and any Claim in respect of such distribution shall be forever barred from assertion against the GUC Trustee or the GUC Trust, or the property of each of them.

5.11.    ***Exemption From Certain Transfer Taxes.***

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including any transfers to or by the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.12.    ***Effectuating Documents; Further Transactions.***

(a)     On or as soon as practicable after the Effective Date, the Plan Administrator shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, and the Global Settlement, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate.

44

(b)      Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of, the Wind-Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)      The Debtors shall be authorized to implement the Sale Transactions and the Global Settlement (including the creation of the GUC Trust, the Environmental Response Trust, and, if necessary, the Vernon Environmental Response Trust) in the manner most tax efficient to the Wind-Down Estates, the Environmental Response Trust, and the Vernon Environmental Response Trust, and consistent with the Environmental Settlement Documents.

(d)      All matters provided for herein involving the corporate structure of the Debtors or the Wind-Down Estates, to the extent applicable, or any corporate or related action required by the Debtors or the Wind-Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind-Down Estates.

### 5.13.   *Preservation of Rights of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred or settled pursuant to this Plan (including pursuant to the Global Settlement, Environmental Settlement Documents, and the Frisco Settlement Agreement), the Confirmation Order, or by another Bankruptcy Court order (including the Americas Sale Order) or transferred to the Europe/ROW Purchaser pursuant to the Europe/ROW Purchase Agreement or the Americas Sale Transaction, the Debtors reserve any and all Causes of Action. On and after the Effective Date, the Plan Administrator may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Plan Administrator, or the GUC Trustee, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to this Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator or the GUC Trustee, as applicable, may determine is in the best interest of the Debtors and their Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of this Plan itself shall be resolved only by Confirmation of this Plan itself.

5.14.  *Certificate of Incorporation and By-Laws.*

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of this Plan.  Such amended organizational documents (if any) shall be filed with the Bankruptcy Court in advance of the Effective Date.

5.15.  *Stock Trading Restrictions*

The restrictions imposed by the *Interim Order Establishing Notification Procedures And Approving Restrictions On Certain Transfers Of Interests In The Debtors* (Docket No. 113), as the same may be amended from time to time, shall remain effective and binding through the closing of the Chapter 11 Cases.

5.16.  *Cancellation of Superpriority Notes and Release and Discharge of Debtor Guarantee Claims.*

Prior to the Europe/ROW Closing, the Consenting Creditors shall contribute the Superpriority Notes, together with all of the outstanding Claims arising thereunder and under the Superpriority Notes Indenture to the Europe/ROW Purchaser in exchange for preferred equity interests of the Europe/ROW Purchaser.  After the Europe/ROW Closing, the Europe/ROW Purchaser shall deliver, or be deemed to deliver, all of the Superpriority Notes to Exide International for cancellation and the Superpriority Notes shall be cancelled. At the Europe/ROW Closing and without limiting the above, and without any further action by the Consenting Creditors, the Europe/ROW Purchaser or any other party or person or further order of the Bankruptcy Court, (i) the Superpriority Notes Guarantee Claims against the Debtors shall be deemed fully satisfied and the Guarantees granted by the Debtors shall be  released and discharged, (ii) any liens or security interests granted by the Debtors under the Superpriority Notes Indenture and the Superpriority Security Documents shall be deemed terminated, released, discharged and without further effect, and (iii) all existing defaults by the Debtors under the Superpriority Notes Indenture shall be waived.

The Superpriority Notes Indenture and Superpriority Security Documents and all outstanding Claims arising under the Superpriority Notes Indenture shall be cancelled and terminated and the Superpriority Notes Indenture Trustee shall be released and discharged of all obligations thereunder un accordance with a supplemental indenture executed by Exide International, Exide Holdings, and the Superpriority Notes Trustee in accordance with the Superpriority Notes Indenture.   For the avoidance of doubt, and in in accordance with the Superpriority Notes Indenture, Exide International shall immediately deliver or be deemed to deliver and surrender all of the Superpriority Notes upon receipt thereof to the Superpriority Notes Trustee for cancellation.

5.17.  *Cancellation of Existing Securities and Agreements*

(a)  Except for the purpose of evidencing a right to a distribution under the Plan, effectuating the Europe/ROW Sale Transaction and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, including, but not limited to, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.  For the avoidance of doubt, but subject to Section 5.17(b) below, on the Effective Date, the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall be deemed terminated and cancelled and the Exchange

46

Priority and First Lien Notes Trustee and Legacy Notes Trustee shall be discharged and released without any further action.

                (b)      The Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures shall continue in effect to the extent necessary to (i) allow the Plan Administrator, Exchange Priority and First Lien Notes Trustee, or Legacy Notes Trustee, as applicable, to make distributions under the Plan, (ii) allow the Exchange Priority and First Lien Trustee to effectuate the Europe/ROW Sale Transaction (iii) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to assert the applicable Exchange Priority Trustee Charging Lien, First Lien Trustee Charging Lien, and Legacy Notes Charging Lien, as applicable; (iv) allow the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement it may have under the Exchange Priority and First Lien Notes Indenture or the Legacy Notes Indentures, as applicable; (v) to exercise its rights and obligations at the direction of the Requisite Noteholders relating to the interests of its holders under the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable; (vi) permit the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee to perform any functions that are necessary to effectuate the powers outlined in this <u>Section 5.17</u>.  For the avoidance of doubt, all indemnification obligations and expense reimbursement obligations of the Debtors arising under the Exchange Priority and First Lien Notes Indenture in favor of the Exchange Priority and First Lien Notes Trustee, or its directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors, shall survive, remain in full force and effect, and be enforceable against the Plan Administrator on and after the Effective Date and shall be enforceable through, among other things, the exercise of the applicable Exchange Priority Trustee Charging Lien and First Lien Trustee Charging Lien.

        5.18.    ***Subordinated Claims.***

        The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator or the GUC Trustee, as applicable, to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

        5.19.    ***Nonconsensual Confirmation.***

        The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject, or are deemed to reject, the Plan.

        5.20.    ***Closing of Chapter 11 Cases.***

        After an Estate has been fully administered, the applicable Wind-Down Estate or Plan Administrator shall, subject to the reasonable consent of the GUC Trustee, seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

        5.21.    ***Notice of Effective Date.***

        As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

47

5.22.    *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of this Plan and applicable law.

5.23.    *Separability.*

Notwithstanding the combination of the separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

SECTION 6.    **DISTRIBUTIONS**.

6.1.    *Distributions Generally.*

Except as otherwise provided in the Plan and the GUC Trust Agreement, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtors, the Plan Administrator or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or assumption obligations, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.  The Distribution Record Date shall not apply to the DIP Claims and the ABL Claims, the holders of which shall receive a distribution in accordance with Section 2 or Section 4 of the Plan, respectively, to the extent not previously satisfied.

6.3.    *Date of Distributions.*

(a)    Except as otherwise provided in the Plan and in the GUC Trust Agreement, any distributions and deliveries to be made under the Plan shall be made on or about the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Section 4 of the Plan; *provided*, that the Plan Administrator or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    (i) Prior to any distributions of Net Cash Proceeds, the Plan Administrator, shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Priority Non-Tax Claims, and Disputed Priority Tax Claims, and (ii) prior to any distributions by the GUC Trust to the holders of either GUC Trust Beneficial A Interests or GUC Trust

48

Beneficial B Interests, the GUC Trustee shall reserve an amount sufficient to pay holders of Disputed General Unsecured Claims and Disputed Environmental NPP Claims, as applicable, in each case, the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. After the resolution of a Disputed Administrative Expense Claim, Disputed Secured Claim, Disputed Priority Non-Tax Claim, and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved on account of such Disputed Claim that is Disallowed or does not become an Allowed Claim as Net Cash Proceeds.

### 6.4. *Disbursing Agent.*

Other than as contemplated in Section 6.2 of the Plan, all distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the books and records of the Debtors or the Wind Down Estates, as applicable,. The Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 5.7 of the Plan.

### 6.5. *Rights and Powers of Disbursing Agent.*

(a)     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)     A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.6. *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash; *provided*, that the fees and expenses incurred by the GUC Trustee shall be paid solely from the GUC Trust Assets in accordance with the GUC Trust Agreement.

6.7.    *No Postpetition Interest on Claims.*

Except as otherwise provided in the Plan, the Confirmation Order, the DIP Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.    *Delivery of Distributions.*

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors.  In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 5.7 of the Plan.

(b)    Notwithstanding the foregoing, the following shall apply to holders of Exchange Priority Notes Claims, First Lien Notes Claims,  Legacy Notes Claims, and DIP Claims, respectively:

(i)    all distributions of Cash on account of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims, if any, shall be deposited with the Exchange Priority and First Lien Notes Trustee and Legacy Notes Trustee, as applicable, for distribution to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims in accordance with the terms of the Exchange Priority and First Lien Notes Indenture and the Legacy Notes Indentures, as applicable.  All distributions other than of Cash on account of Exchange Priority Notes Claims, First Lien Notes Claims, or Legacy Notes Claims, if any, may, with the consent of the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee, as applicable, be made by the Disbursing Agent directly to holders of Exchange Priority Notes Claims, First Lien Notes Claims, and Legacy Notes Claims in accordance with the terms of the Plan, the Exchange Priority and First Lien Notes Indenture, and the Legacy Notes Indentures; *provided*, that until such distributions are made, the Trustees Charging Liens shall attach to the property to be distributed in the same manner as if such distributions were made through the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee, as applicable.  To the extent the Exchange Priority and First Lien Notes Trustee or the Legacy Notes Trustee effectuates, or is requested to effectuate, any distributions hereunder, the Exchange Priority and First Lien Notes Trustee and the Legacy Notes Trustee, as applicable, shall be deemed a "Disbursing Agent" for purposes of the Plan.  As to any holder of an Exchange Priority Notes Claim, First Lien Notes Claim, or Legacy Notes Claim that is held in the name of or by a nominee of DTC, the Disbursing Agent shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable after the Effective Date.

(ii)    All distributions on account of DIP Claims, if any, shall be deposited with the DIP Agent for distribution to holders of DIP Claims in accordance with the terms of the

50

DIP Loan Documents.  To the extent the DIP Agent effectuates, or is requested to effectuate, any distributions hereunder, the DIP Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

### 6.9.    *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 6.10.    *Unclaimed Property.*

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors, Wind-Down Estates or the GUC Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors, Wind-Down Estates or GUC Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Wind-Down Estates or GUC Trust, as applicable, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Estates (or GUC Trust in the case of checks issued by the GUC Trust), and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 6.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors, the Plan Administrator or the GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction  of, and exchange for, such Allowed Claims.

### 6.14.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to this Section 6.15, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

51

6.15.   *Setoffs and Recoupments.*

The Debtors, Wind-Down Estates, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Wind-Down Estates, or GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

6.16.   *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law (as reasonably determined by the Wind-Down Estates or the GUC Trust, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.17.   *No Distribution in Excess of Amount of Allowed Claim.*

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

SECTION 7.   **PROCEDURES FOR DISPUTED CLAIMS.**

7.1.   *Objections to Claims.*

The Plan Administrator, on behalf of each of the Wind-Down Estates, shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive authority to object to all General Unsecured Claims.  After the Effective Date, the Plan Administrator or the GUC Trustee, as applicable, shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Any objections to proofs of Claim shall be served and filed on or before the later of (a) one hundred eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.

7.2.   *Resolution of Disputed Claims.*

On and after the Effective Date, (a) the Plan Administrator, on behalf of each of the Wind-Down Estates, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims; and (b) upon the creation of the GUC Trust, the GUC Trustee shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims and Environmental NPP Claims without approval of the Bankruptcy Court.  The Debtors, Wind-Down Estates, Plan Administrator and GUC Trustee, as applicable, shall cooperate with respect to any objections to Claims that seek to convert a type of Claim to another type of Claim as to which a different party or parties may compromise, settle, otherwise resolve, or withdraw objections, and, in each case, the rights and defenses of the Debtors, Wind-Down Estates, Plan Administrator or the GUC Trustee, as applicable, to any such objections are fully preserved.

7.3.     ***Payments and Distributions with Respect to Disputed Claims.***

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.4.     ***Distributions after Allowance.***

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan or the GUC Trust Agreement, as applicable, without interest, as provided in Section 7.8 of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

7.5.     ***Estimation of Claims.***

The (a) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), as applicable, may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims; and (b) GUC Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed General Unsecured Claims or Disputed Environmental NPP Claims.  The (I) Debtors or Plan Administrator (on behalf of each of the Wind-Down Estates), with respect to the Claims set forth in clause (a) of this Section 7.5; and (II) GUC Trustee, with respect to General Unsecured Claims or Environmental NPP Claims, in each case, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Plan Administrator or GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

7.6.     ***No Distributions Pending Allowance.***

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.7.     ***Claim Resolution Procedures Cumulative.***

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.8.    *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in <u>Section 6.7</u> of the Plan.

7.9.    *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies; *provided*, that this requirement shall not apply to Settling Governmental Authorities.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such satisfaction, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

SECTION 8.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

8.1.    *Rejection of Executory Contracts and Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in <u>Section 8.4</u> of the Plan; or (v) is identified for assumption on the Assumption Schedule included in the Plan Supplement.  The Debtors shall confer with the Settling Governmental Authorities, the Environmental Trustee, or the Frisco Governmental Authorities, as applicable, and exchange information and reasonably cooperate to determine the appropriate disposition of any contracts or unexpired leases that relate to the Non-Performing Properties and take appropriate action relating thereto.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Europe/ROW Purchaser or Wind-Down Estates, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Europe/ROW Purchaser or Wind-Down Estates, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

8.2.    *Determination of Assumption Disputes and Deemed Consent.*

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Europe/ROW Purchase Agreement, the Environmental Settlement Agreement, or the Frisco Settlement Agreement, as applicable, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

54

(b)      The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Wind-Down Estate, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Wind-Down Estates, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)      If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided*, that the Debtors or Wind-Down Estates, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)      To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Transferred Entities shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party; *provided, further,* that solely with respect to executory contracts and unexpired leases designated to be assumed and assigned to the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), the Debtors shall be responsible to pay the Postpetition Accounts Payable.  The Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities (other than TCEQ), as applicable, may agree to be responsible for all other Cure Amounts, in each case in an amount as is determined to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party; *provided*, that in the absence of such agreement, the executory contract or unexpired lease relating to such Cure Amounts shall be deemed rejected under the Plan.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)      To the extent an Assumption Dispute relates solely to the Postpetition Accounts Payable, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that pursuant to the Environmental Settlement Agreement or the Frisco Settlement Agreement, as applicable, the Debtors shall

be responsible to pay the determined amount of such Postpetition Accounts Payable to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Wind-Down Estates, as applicable, may settle any dispute regarding the Postpetition Accounts Payable or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court

(f)   Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### 8.3.   *Rejection Damages Claims.*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 7 (General Unsecured Claims).  A proof of such Claim must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Wind-Down Estates, or the GUC Trust, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

### 8.4.   *Insurance Policies.*

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (i) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and Wind-Down Estates, or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and

56

in accordance with the terms of the insurance policies; and (d) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by <u>Section 7.9</u> of this Plan.

8.5.     ***Intellectual Property Licenses and Agreements.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed assumed by the Debtors and the Wind-Down Estates and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with <u>Section 8.1</u> of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind-Down Estates and the Europe/ROW Purchaser, as applicable, and the Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.6.     ***Tax Agreements.***

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, any tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall, to the extent the Debtors determine (in their sole discretion) such agreements are beneficial to the Debtors, be assumed by the Debtors, Wind-Down Estates, and Europe/ROW Purchaser, as applicable and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with <u>Section 8.1</u> of the Plan.  Unless otherwise noted hereunder, all other tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Wind-Down Estates or Europe/ROW Purchaser, as applicable, and Wind-Down Estates and Europe/ROW Purchaser, as applicable, may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.7.     ***Standby Environmental Trust Agreement.***

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, each Standby Environmental Trust Agreement and underlying trust shall be reinstated and in full force and effect in accordance with its terms.  As soon as practicable after the Effective Date, the Debtors or Plan Administrator, as applicable, shall reimburse and pay each Standby Environmental Trust Trustee any outstanding fees, costs, expenses, and charges, including attorney and professional fees and expenses due and owing under or as provided under such Standby Environmental Trust Agreement; provided, that such reimbursement or payment shall not exceed $50,000 in the aggregate for fees of the Standby Environmental Trust Trustee and $100,000 in the aggregate for attorney and professional fees.

Notwithstanding the foregoing, nothing in the Plan shall waive impede or effect the right of the Standby Environmental Trust Trustee to seek payment, reimbursement or indemnification from the assets and properties of the relevant environmental standby trust as provided under the applicable Standby Environmental Trust Agreement.

8.8.     *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

8.9.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.10.    *Reservation of Rights.*

(a)     The Debtors may amend the Assumption Schedule and any cure notice until five (5) Business Days immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)     Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or Wind-Down Estates, or their respective affiliates have any liability thereunder.

(c)     Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and Wind Down Estates, under any executory or non-executory contract or any unexpired or expired lease.

(d)     Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Wind-Down Estates, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

58

SECTION 9.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

      9.1.    ***Conditions Precedent to the Effective Date.***

      The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

      (a)    the Definitive Documents shall be consistent with the RSA and otherwise approved by the Requisite Noteholders consistent with their respective consent and approval rights as set forth in Section 4 of the RSA;

      (b)    the RSA shall not have been terminated and shall remain in full force and effect in accordance with its terms;

      (c)    the Definitive Documents shall be consistent with the Global Settlement and, to the extent the terms of a Definitive Document adversely affect the Global Settlement or treatment of the Settling Governmental Authorities thereunder, are otherwise approved by the Settling Governmental Authorities;

      (d)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

      (e)    the Debtors shall not have (i) filed, supported or consented to any motion, application, adversary proceeding, or cause of action (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Exchange Priority Notes Claims, the First Lien Notes Claims, the Superpriority Notes Guarantee Claims, or the DIP Claims, (B) otherwise seeking to impose liability upon or enjoin the Consenting Creditors, the Transferred Entities or the DIP Lenders; or (ii) supported any third party seeking standing to bring such application, adversary proceeding or cause of action;

      (f)    the Debtors shall have paid or caused to be paid in Cash all Restructuring Expenses and Trustees Fees invoiced no later than one Business Day prior to the Effective Date;

      (g)    all governmental approvals, including Bankruptcy Court approval, necessary to consummate the Plan and the transactions contemplated hereby shall have been obtained or otherwise waived;

      (h)    (i) the Debtors (or any Person or Entity on behalf of the Debtors or their Estates with proper standing) shall not have filed a motion, application or adversary proceeding (or supported or failed to timely object to such a filing) (A) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization, designation or subordination of, the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims, or (B) limiting the Europe/ROW Purchaser's or the Trustees' right to implement the Europe/ROW Sale Transaction, or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) shall not have entered a Final Order providing relief against the interests of Consenting Creditors or the Trustees with respect to any of the foregoing Causes of Action or proceedings, including, but not limited to, (x) invalidating, avoiding, disallowing, recharacterizing, designating, subordinating, or limiting the enforceability of any of the Superpriority Notes Guarantee Claims, the Exchange Priority Notes Claims, the First Lien Notes Claims, or the DIP Claims or (y) limiting the Consenting Creditors' or the Trustees' right to implement the Europe/ROW Sale Transaction;

59

(i)      (A) all agreements necessary to implement the Plan, including the Europe/ROW Sale Transaction, the Global Settlement, the Environmental Settlement Documents, the Frisco Settlement Agreement, and the Columbus NPP Termination Documents shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; *provided*, that approval of the Environmental Settlement Documents may not be waived without the consent of each of the Settling Governmental Authorities party thereto, and (B) the Debtors, the Consenting Creditors, and the Transferred Entities shall have complied with all of their respective obligations under the Environmental Settlement Documents except to the extent such obligations are expressly provided in the Environmental Settlement Documents to occur after the Effective Date;

(j)      all releases or covenants not to sue contained in the Environmental Settlement Agreement and the Frisco Settlement Agreement shall be in form and substance acceptable to the Requisite Noteholders;

(k)      notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided*, that to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.2.      *Waiver of Conditions Precedent.*

(a)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent in Section 9.1 of the Plan other than the conditions set forth in Sections 9.1(c) and (i) may be waived in writing by the Debtors with the prior written consent of the Requisite Noteholders (and the Creditors' Committee with respect to the terms of the Global Settlement) without leave of or order of the Bankruptcy Court and such consent not to be unreasonably withheld. If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.19 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur as to such Debtors. Notwithstanding anything to the contrary herein, any condition precedent pertaining to the Global Settlement (including those set forth in Sections 9.1(c) and (i)) shall not be waived without the prior written consent of each of the Global Settlement Parties.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.3.      *Effect of Failure of Conditions to Effective Date.*

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered or if the Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained

60

herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

SECTION 10.   **EFFECT OF CONFIRMATION.**

      10.1.   ***Vesting of Assets.***

      On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i) all property of the Debtors' Estates acquired by the Europe/ROW Purchaser under the Europe/ROW Purchase Agreement shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Europe/ROW Purchaser; (ii) all property of the Debtors' Estates constituting GUC Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the GUC Trust; (iii) all property of the Debtors' Estates constituting Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Environmental Response Trust; (iv) subject to Section 5.2(e), all property of the Debtors' Estates constituting Vernon Environmental Trust Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Vernon Environmental Response Trust; (v) all property of the Debtors' Estates constituting Frisco Assets shall vest free and clear of all Claims, Liens, encumbrances, charges and other interests in the Frisco CDC pursuant to the Frisco Settlement Agreement; and (vi) all remaining property of the Debtors' Estates shall vest in the Wind-Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other Interests, subject to treatment of Other Secured Claims under the Plan.  Notwithstanding any provisions in the Plan, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC shall take the Transferred Non-Performing Properties, the Vernon Non-Performing Property (unless abandoned pursuant to Section 5.2(e)), and the Frisco Non-Performing Property, as applicable, subject to the obligations set forth in the Environmental Settlement Documents and the Frisco Settlement Agreement, as applicable.  On and after the Effective Date, the Wind-Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Wind-Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind-Down Estates may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

      10.2.   ***Term of Injunctions or Stays.***

      Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.3.   *Injunction.*

      (a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

      (b)    **Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, the Frisco CDC, as applicable, or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Consenting Creditors, the Transferred Entities, the Trustees, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, and the Transferred Entities; or the property of any of the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind-Down Estates, and the GUC Trust or the property of any of the Debtors, the Wind-Down Estates, the Trustees, the Consenting Creditors, the Europe/ROW Purchaser, the Transferred Entities, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, or against property or interests in property of any of the Debtors, the Wind-Down Estates, and the GUC Trust except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

      (c)    **By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this <u>Section 10.3</u>.**

      (d)    **The injunctions in this <u>Section 10.3</u> shall extend to any successors of the Debtors, including the Wind-Down Estates, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, and the Frisco CDC, as applicable, and their respective property and interests in property.**

(e)     **Notwithstanding the foregoing, nothing in this <u>Section 10.3</u> shall enjoin the assertion of a defensive right of recoupment.**

10.4.   *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

10.5.   *Releases by the Debtors.*

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Estates, and the Wind-Down Estates, in each case, on behalf of themselves and their respective successors (including the Frisco CDC, the Environmental Response Trust, the Vernon Environmental Response Trust, and the GUC Trust, as applicable), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors, the Estates, or the Wind-Down Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the Pension Plan, the European Bridge Notes, the Optimization, the June 2019 Financing, any Environmental Law, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including the Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, the Definitive Documents, the Europe/ROW Sale Transaction or the Global Settlement.**

10.6.   *Releases By Holders of Claims and Interests.*

**As of the Effective Date, except (A) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date and (B) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective**

63

Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by each of the following (each such Person or Entity, a "*Releasing Party*" and, collectively, the "*Releasing Parties*"):

    (a)      the Consenting Creditors;

    (b)      the Creditors' Committee and each of its members in their capacity as such,

    (c)      all holders of Claims who vote to accept the Plan;

    (d)      all holders of Claims who are deemed to accept the Plan;

    (e)      all holders of Claims entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan but, in either case, do not opt out of granting the releases set forth in this Section 10.6;

    (f)      solely with respect to (i) the Europe/ROW Purchaser, the Transferred Entities, and the Consenting Creditors, all holders of General Unsecured Claims and Environmental NPP Claims, and (ii) the Trustees, all California state governmental agencies, including the California DTSC, that have jurisdiction regarding the enforcement of Environmental Laws; and

    (g)      with respect to any Person or Entity in the foregoing clauses (a) through (f), such entity's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, managed or controlled by such Entity and all Persons entitled to assert Claims through or on behalf of such Persons or Entities solely with respect to the matters for which the Releasing Parties are providing releases to the extent such Person or Entity would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (f);

    in each case, from any and all Claims and Causes of Action (including, without limitation, any PBGC Claims and Canada NPP Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law, equity, or otherwise, that entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the pre- and post-petition marketing and sale process, the Europe/ROW Sale Transaction, the DIP Facility, the European Bridge Notes, the Pension Plan, the Optimization, the June 2019 Financing, any Environmental Law, the Global Settlement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, the Plan (including any Plan Supplement), the DIP Loan Documents or any related agreements (including the Definitive Documents), instruments, and other documents relating thereto, or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release (i) the Released Parties from willful misconduct or intentional fraud as determined by a Final Order; or (ii) any obligation of any party under the Plan or any document, instrument, or agreement executed to

implement the Plan, the Europe/ROW Sale Transaction, or the Global Settlement.  Except as otherwise set forth in subsection (g) of this **Section 10.6**, the Persons and Entities in (a) through (h) of this **Section 10.6** shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this **Section 10.6** against each of the Released Parties.

Notwithstanding anything to the contrary in this **Section 10.6**,  Governmental Units (other than any California state governmental agency, including the California DTSC, that has jurisdiction regarding the enforcement of Environmental Laws) are not Releasing Parties under the Plan and are not providing a release or covenant not to sue except as provided in the Environmental Settlement Documents or other separate settlement document with a Governmental Unit.

For the avoidance of doubt,  the scope of any releases by provided by any California state governmental agency that has jurisdiction regarding the enforcement of Environmental Laws, including the California DTSC, pursuant to this **Section 10.6** of the Plan shall not be construed or deemed to be any broader than the scope of the covenants not to sue set forth in paragraph 45(b) of the Environmental Settlement Agreement provided by the Settling Governmental Agencies.

      10.7.    *Exculpation.*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim arising between the Commencement Date and the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the RSA, the Europe/ROW Sale Transaction, as applicable, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Loan Documents; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence, or willful misconduct, as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth herein does not bar the obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

      10.8.    *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER SECTION 10 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF

KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 10</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 10.9. *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have previously solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under this Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

### 10.10. *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

## SECTION 11.   **RETENTION OF JURISDICTION.**

### 11.1. *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or

Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)     to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

(e)     to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     to hear and determine all proceedings, if any, to approve Fee Claims, Restructuring Expenses, and Trustees Fees;

(i)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, Europe/ROW Sale Transaction, any other Sale Transactions, the Global Settlement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)     to hear, adjudicate, decide, or resolve any and all matters related to Section 10 of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)     to resolve disputes concerning Disputed Claims or the administration thereof;

(o)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     to enter one or more final decrees closing the Chapter 11 Cases;

(q)     to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(s)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors, the GUC Trust, the Environmental Response Trust, the Vernon Environmental Response Trust, or the Frisco Governmental Authorities relating to the Frisco Non-Performing Property, pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 11.2.   *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### SECTION 12.   **MISCELLANEOUS PROVISIONS.**

### 12.1.   *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### 12.2.   *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.   *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

12.4.    *Amendments.*

(a)    *Plan Modifications*.  Subject to (i) the terms of the RSA and all consent rights contained therein, and (ii) the consent of the Global Settlement Parties with respect to any amendment to the Global Settlement, including the Environmental Settlement Documents, or other provisions of the Plan or Definitive Documents that impact the Global Settlement (including any amendment to the definition of Settling Governmental Authorities or Schedule 1 to this Plan), (i) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Noteholders (and the Global Settlement Parties, solely as it pertains to the Global Settlement), the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Subject to the terms of the RSA and, solely with respect to the terms of the Global Settlement, subject to the consent of the Global Settlement Parties, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that any change to the Environmental Settlement Documents may not be made without the written consent of the parties thereto.

12.5.    ***Revocation or Withdrawal of the Plan.***

Subject to the terms of the RSA, the Global Settlement, the Environmental Settlement Documents and the Europe/ROW Purchase Agreement, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw this Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

12.6.    ***Severability of Plan Provisions upon Confirmation.***

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the written consent of the Requisite Noteholders (and the Global Settlement Parties with respect to the Global Settlement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected,

impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Wind-Down Estate (as the case may be); and (3) nonseverable and mutually dependent.

### 12.7.  *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

### 12.8.  *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.9.  *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest are authorized to prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

### 12.10.  *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind-Down Estates, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

### 12.11.  *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

### 12.12.  *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.   *Notices.*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Debtors or the Plan Administrator:

> Exide Holdings, Inc.
> 13000 Deerfield Parkway
> Building 200
> Milton, GA 30004
> Attention: Roy Messing, Chief Restructuring Officer
> Telephone: (678) 566-9000
>
>    - and –
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attn:   Ray C. Schrock, P.C.
>           Sunny Singh
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007

(ii) if to the Requisite Noteholders:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attn:   Alice Belisle Eaton, Esq.
>           Robert Britton, Esq.
> Telephone: (212) 373-3000
> Facsimile: (212) 757-3990

(iii) if to the Creditors' Committee:

> Lowenstein Sandler LLP
> 1251 Avenue of the Americas
> New York, New York 10020
> Attn:   Robert Hirsh, Esq.
>           Eric Chafetz, Esq.
>           Michael Kaplan, Esq.
> Telephone: (212) 262-6700
> Facsimile: (212) 262-7402

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized

to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  October 14, 2020

By:      */s/ Roy Messing*_____
         Name: Roy Messing
         Title: Chief Restructuring Officer

**EXIDE HOLDINGS, INC.**
**EXIDE TECHNOLOGIES, LLC**
**EXIDE DELAWARE LLC**
**DIXIE METALS COMPANY**
**REFINED METALS COMPANY**

Case 20-11157-CSS    Doc 998-2    Filed 10/16/20    Page 78 of 82

**Schedule 1**

**Settling Governmental Authorities**

1. U.S. Environmental Protection Agency
2. State of Florida Department of Environmental Protection
3. Georgia Environmental Protection Division of the Department of Natural Resources
4. Indiana Department of Environmental Management
5. Commonwealth of Pennsylvania Department of Environmental Protection
6. South Carolina Department of Health and Environmental Control
7. Tennessee Attorney General & Reporter
8. Texas Commission on Environmental Quality
9. City of Frisco, Texas
10. Frisco Community Development Corporation
11. Illinois Environmental Protection Agency
12. Louisiana Department of Environmental Quality
13. Mississippi Department of Environmental Quality

## Schedule 2

**Non-Performing Properties**

1. Baton Rouge Smelter
   2400 Brooklawn Drive
   Baton Rouge, Louisiana 70807

2. Bristol Former Battery Plant
   364 Exide Drive
   Bristol, Tennessee 30094

3. Columbus Battery Plant & Smelter
   3639 Joy Road
   Columbus, Georgia 31906

4. Dallas Smelter (Dixie Metals)
   3030 McGowan Street
   Dallas, Texas 75203

5. Florence Battery
   250 Ellis Street
   Florence, Mississippi 39073

6. Florence Surplus Property
   Olivia Slimon Drive
   Florence, Mississippi 39073

7. Florence (Expander)
   407 Briarhill Road
   Florence, Mississippi 39073

8. Frankfort Battery Plant
   555 Hoke Avenue
   Frankfort, Indiana 46041

9. Frisco Smelter
   7471 Old 5th Street
   Frisco, Texas 75034

10. Greer Surplus Lots
    101 Bent Creek Drive
    103 Bent Creek Drive
    100 Bowers Circle
    110 Bowers Circle
    112 Bowers Circle
    210 Bent Creek Drive
    212 Bent Creek Drive
    106 Sylvan Drive
    108 Sylvan Drive

207 Bent Creek Drive
209 Bent Creek Drive
110 Sylvan Drive
101 Bowers Circle
107 Bowers Circle
111 Bowers Circle
203 Bent Creek Drive
107 Bent Creek Drive
105 Bent Creek Drive
208 Bent Creek Drive
Greer, South Carolina 29650

11. Greer Battery Plant
    109 Chick Springs Road
    Greer, South Carolina 29650

12. Hamburg Battery Plant
    280 Grand Street
    Hamburg, Pennsylvania 19526

13. Heflin Smelter
    6952 SR-531
    Heflin, Louisiana 71039

14. Kankakee Battery Plant
    2475 West Station Street
    Kankakee, Illinois 60901

15. Logansport Battery Plant
    303 Water Street
    Logansport, Indiana 46947

16. Memphis Surplus Lots (17)
    Mallory and Castex Avenues
    Memphis, Tennessee 38109

17. Memphis Smelter
    257 W. Mallory Avenue
    Memphis, Tennessee 38109

18. Oley Property
    Bull Road
    Oley, Pennsylvania 19560

19. Reading Residential/Vacant Property
    145-147 Spring Valley Rd
    143 Spring Valley Rd
    127 Spring Valley Rd
    129 Spring Valley Rd
    131 Spring Valley Rd
    258 Spring Valley Rd

2

A-1355

260 Spring Valley Rd
Vacant Land - Isabelle Ct & Josephine Drive
Reading, Pennsylvania 19605

20. Reading Recycling Plant
3000 Montrose Avenue
Reading, Pennsylvania 19605

21. Tampa  Smelter
3507 S. 50th Street
Tampa, Florida 33619

22. Vernon Smelter
2700 S. Indiana Street
Los Angeles, California 90023

**Schedule 3**

**Transferred Entities**

1.  Exide International Holdings LP
2.  Exide International Holdings GP LLC
3.  Exide Holding Europe S.A.S.
4.  Exide Technologies (Shanghai) Company Limited
5.  Exide Australia Pty Limited Australia
6.  Exide Technologies GmbH
7.  Exide Technologies BVBA
8.  Exide Technologies A/S
9.  Exide Technologies Oy
10. Exide Technologies S.A.S.
11. Exide Technologies GmbH (includes a Switzerland branch)
12. Exide Technologies Operations GmbH & Co. KG
13. HAGEN Batterie AG
14. GNB Technologies (China) Limited
15. GNB Technologies (India) Private Limited
16. Tudor India Private Limited
17. Exide Technologies S.r.l.
18. Coöperatie Exide Europe U.A.
19. Exide Global Holding Netherlands C.V.
20. Exide Holding Netherlands B.V.
21. Exide Technologies B.V.
22. Exide Technologies Limited
23. Exide Technologies AS
24. Exide Technologies S.A.
25. Exide Technologies SSC sp. z o.o.
26. Exide Technologies, Lda.
27. Exide Technologies Recycling II, Lda.
28. G.V.B. – Gestão e Valorização de Baterias, Lda.
29. Exide Technologies LLC
30. Exide Singapore Pte Limited
31. Exide Holding Asia Pte Limited
32. Exide Technologies Recycling S.L.U.
33. Exide Technologies S.L.U.
34. Exide Transportation Holding Europe S.L.U.
35. Exide Technologies AB
36. GNB Batteries Trading MEA LLC
37. CMP Batteries Pension Limited
38. Euro Exide Corporation Limited
39. Exide Technologies (Transportation) Limited
40. GNB Industrial Power (UK) Limited
41. EH International, LLC
42. Exide International Holding Netherlands B.V.

# __TAB 24__

**Notice of Appeal [Bankr. D.I. 1000]**

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EXIDE HOLDINGS, INC., *et al*., | Case No. 20-11157 (CSS) |
| Debtors.[1] | Jointly Administered |

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that the California Department of Toxic Substances Control ("DTSC"), a creditor in the above-captioned chapter 11 cases, hereby appeal to the United States District Court for the District of Delaware under 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8003(a) from the order of the United States Bankruptcy Court for the District of Delaware entitled *Order Confirming Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, dated October 16, 2020 [ECF No. 998] (the "Confirmation Order").[2]  A copy of the Confirmation Order is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the names of all parties to the Confirmation Order appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors*, dated October 14, 2020 [ECF No. 977].

| Party | Attorneys |
|-------|-----------|
| **Appellants**<br><br>The California Department of Toxic Substances Control | **O'MELVENY & MYERS LLP**<br><br>Nancy A. Mitchell<br>Matthew L. Hinker<br>7 Times Square<br>New York, NY 10036<br>Tel:  212-326-2000<br><br>Peter Friedman<br>1625 Eye Street, NW<br>Washington, DC  20006<br>Tel:  202-383-5300<br><br>-and-<br><br>**CALIFORNIA DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY GENERAL**<br>**Public Rights Division**<br>**Environment Section**<br><br>Xavier Becerra (Attorney General of California)<br>Edward H. Ochoa (Senior Assistant Attorney General)<br>James R. Potter<br>300 S. Spring Street<br>Los Angeles, CA 90013<br>Tel:  213-269-6000<br><br>Anthony A. Austin<br>Heather C. Leslie<br>Office of the Attorney General<br>California Department of Justice<br>1300 I Street, 15th Floor,<br>Sacramento, CA  95814<br>Direct:  916-210-7245 |
| **Appellees**<br><br>Debtors | **WEIL, GOTSHAL & MANGES LLP**<br><br>Ray C. Schrock, P.C.<br>Sunny Singh<br>767 Fifth Avenue<br>New York, NY  10153<br>Tel:  212-310-8000 |

2

| Party | Attorneys |
|---|---|
| | -and- |
| | **RICHARDS, LAYTON & FINGER, P.A.** |
| | Daniel J. DeFranceschi<br>Zachary I. Shapiro<br>One Rodney Square<br>920 N. King Street<br>Wilmington, DE  19801<br>Tel: 302-651-7700 |
| **Interested Party**<br><br>United States Trustee | **OFFICE OF THE UNITED STATES TRUSTEE**<br>Linda J. Casey<br>844 King Street, Suite 2207<br>Wilmington, DE 19801<br>Tel:  302-573-6539 |
| **Interested Party**<br><br>Creditors' Committee | **LOWENSTEIN SANDLER LLP**<br>Robert Hirsh<br>Eric Chafetz<br>Michael Kaplan<br>1251 Avenue of the Americas<br>New York, NY  10020<br>Tel:  212-262-6700 |
| **Interested Party**<br><br>Requisite Noteholders | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>Alice Belisle Eaton<br>Robert Britton<br>1285 Avenue of the Americas<br>New York, NY  10019<br>Tel:  212-373-3000 |
| **Interested Party**<br><br>Trustee under the Indentures | **ARENT FOX LLP**<br>Andrew Silfen<br>Jordana L. Renert<br>1301 Avenue of the Americas<br>New York, NY  10019<br>Tel:  212-484-3900 |

A-1360

Dated:  October 18, 2020                    Respectfully submitted,

                                            */s/ Peter Friedman*
                                            NANCY A. MITCHELL
                                            nmitchell@omm.com
                                            MATTHEW L. HINKER
                                            mhinker@omm.com
                                            **O'MELVENY & MYERS LLP**
                                            7 Times Square
                                            New York, NY 10036
                                            Telephone:  (212) 326-2000
                                            Facsimile:   (212) 326-2061

                                            PETER FRIEDMAN
                                            pfriedman@omm.com
                                            **O'MELVENY & MYERS LLP**
                                            1625 Eye Street, NW
                                            Washington, DC  20006
                                            Telephone:  (202) 383-5300
                                            Facsimile:   (202) 383-5414

                                            -and-

                                            JAMES R. POTTER
                                            james.potter@doj.ca.gov
                                            California Department of Justice
                                            Office of the Attorney General
                                            Public Rights Division
                                            Environment Section
                                            300 S. Spring Street
                                            Los Angeles, CA 90013

                                            ANTHONY A. AUSTIN
                                            anthony.austin@doj.ca.gov
                                            HEATHER C. LESLIE
                                            heather.leslie@doj.ca.gov
                                            California Department of Justice
                                            Office of the Attorney General
                                            Public Rights Division
                                            Environment Section
                                            1300 I Street, Suite 125
                                            Sacramento, CA 95814
                                            Tel.: 213-369-6326

                                            XAVIER BECERRA
                                            Attorney General of California

4

EDWARD H. OCHOA
Senior Assistant Attorney General

*Counsel to Appellant California
Department of Toxic Substances Control*

# **TAB 25**

**Supplemental Ruling [Bankr. D.I. 1003]**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

<table>
<tr>
<td>

**CHRISTOPHER S. SONTCHI**
**CHIEF JUDGE**

</td>
<td>

**824 N. MARKET STREET**
**WILMINGTON, DELAWARE**
**(302) 252-2888**

</td>
</tr>
</table>

October 19, 2020

<u>**VIA CM/ECF**</u>
To: All Counsel of Record

      Re: <u>Exide Holdings, Inc., *et al.*</u>, Case No. 20-11157 (CSS)

Dear Counsel,

      Pursuant to D.Del. L.R. 8003-2, I am writing to clarify and to supplement my bench ruling of October 16, confirming the Debtors' Fourth Amended Plan and authorizing the protentional abandonment of the Vernon, California site.  Due to the exigent nature of the issues before the Court my ruling was incomplete.  In addition, after two very full days of testimony and argument I was very tired, and my ruling was too glib.  I deeply regret this and the false impression my ruling may have given as to my appreciation of the issues before me.

      I am aware of Exide's legal and moral responsibility to remediate the environmental damage it caused.  I am also aware that the health and safety of the community has been harmed by Exide's pollution and that there is a very real risk of harm in the future.  The issue before the Court was not whether Exide should pay its debt nor whether the Vernon site and the other environmental sites throughout the country are dangerous to the public.

      Exide should pay its debts, but it cannot.  There is simply no available money to do so.  Under the governing law, any money available is subject to senior, secured liens that are superior to Exide's environmental obligations.  I lack the power to override that law.  Nonetheless, the secured lenders are voluntarily contributing a portion of their collateral to the Debtors' administrative and unsecured creditors in exchange for a release.  It is perhaps a drop of water in the sea, but it is all that is available.  This means that the cost of remediating the site will fall on the State of California and, ultimately, its taxpayers.  That is neither fair nor avoidable.  Governments exist to serve and to protect their citizens.  Governments are not free – they rely on taxes.  While every effort should be made to have polluters pay to clean up their pollution, if that is not possible it must fall to the government to do so.  Abandonment is the only realistic outcome that is consistent with the law.

A-1363

Case 20-11157-CSS      Doc 1003      Filed 10/19/20      Page 2 of 2

October 19, 2020
Page Two

   In addition, there is no question that the Vernon site is dangerous and exposure to lead is highly dangerous.  The issue is not whether the lead at Vernon is dangerous – it is.  The question is whether abandonment of the site presents an imminent danger – it does not.  The evidence overwhelmingly established that the site is constantly monitored, and the dangerous polluted areas are contained.  The evidence also established that the contractors currently in place are ready, willing, and able to continue their work, provided they are paid.  That payment must come from California.  The Court ordered that the abandonment would occur, if at all, on October 30, 2020.  This leave California ample time to arrange for the orderly transfer of responsibility over the site.

   Finally, it is important to note that the Vernon site is not the Debtors' only environmental site.  There are sites in 9 other states and the state and federal agencies responsible for those sites support the settlement contained in the 4th Amended Plan as the best, realistic alternative.

   The Court reiterates its ruling of October 16 and offers this letter as a clarification and supplement to that ruling.

         Very truly yours,

         Christopher S. Sontchi
         Chief United States Bankruptcy Judge

CSS/cas