# **TAB 26**

**Oct. 15, 2020 Transcript of Oral Hearing [D.I. 6-1]**

# In the Matter Of:

EXIDE HOLDINGS, INC, et al.,

---

Bankruptcy Hearing

October 15, 2020

---

*Wilcox & Fetzer*
*1330 King Street*
*Wilmington, DE 19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone: 302-655-0477. fax: 302-655-0497*



WILCOX & FETZER
A Lexitas Company

<pre>
 1            IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE DISTRICT OF DELAWARE
 2

 3   In re:                      )Chapter 11
                                 )
 4   EXIDE HOLDINGS, INC.,       )20-11157 (CSS)
     et al.,                     )
 5                               )
                  Debtors.       )
 6

 7

 8

                       Wilmington, Delaware
 9                     Thursday, October 15, 2020
                       11:03 a.m.
10                     Via CourtCall

11

12   BEFORE:

13       THE HONORABLE CHRISTOPHER S. SONTCHI,
         United States Bankruptcy Court Judge
14

15

16

17

18

19

20                     WILCOX & FETZER
            Registered Professional Reporters
21      1330 King Street - Wilmington, Delaware 19801
                      (302) 655-0477
22                     www.wilfet.com

23

24
</pre>

```
 1    APPEARANCES:

 2            RICHARDS LAYTON & FINGER
              BY:  DANIEL DeFRANCESCHI, ESQ.
 3                 ZACHARY I. SHAPIRO, ESQ.

 4                      -and-

 5            WEIL, GOTSHAL & MANGES LLP
              BY:  SUNNY SINGH, ESQ.
 6                 PAUL R. GENENDER, ESQ.
                   JARED R. FRIEDMANN, ESQ.
 7                 For the Debtors

 8            O'MELVENY & MYERS LLP
              BY:  DANIEL L. CANTOR, ESQ.
 9                 GRANT COPE, ESQ.
                   For California Department of
10                 Toxic Substances Control

11            UNITED STATES DEPARTMENT OF JUSTICE
              BY:  ALAN S. TENENBAUM, ESQ.
12                 For the Environmental
                   Protection Agency
13
              PAUL, WEISS, RIFKIND, WHARTON &
14            GARRISON LLP
              BY:  ROBERT A. BRITTON, ESQ.
15                 For the Ad Hoc Group of Note
                   Holders
16
              STATE OF TEXAS
17            OFFICE OF THE ATTORNEY GENERAL
              BY:  JASON B. BINFORD, ESQ.
18                  For the Texas Commission
                    On Environmental Quality
19

20

21    (For all appearances, see Telephonic Appearance
      Schedule)
22

23

24
```



```
1                    -    -    -

2                TABLE OF CONTENTS

3                    -    -    -

4                                              PAGE
```

5   Introduction by Judge Sontchi . . . . . . . .   7

6   Mr. Sunny Singh, Updates  . . . . . . . . . .  10

7   Mr. Dan McGuire . . . . . . . . . . . . . .  19

8   Mr. Vincente Murrell  . . . . . . . . . . .  23

9   Mr. Michael Collins   . . . . . . . . . . .  25

10  Mr. Gary Bressler   . . . . . . . . . . . .  25

11  Mr. Sunny Singh  . . . . . . . . . . . . .  26

12  Mr. Alan Tenenbaum . . . . . . . . . . . .  29

13  Mr. Sunny Singh . . . . . . . . . . . . . .  32

14  Mr. Brett Fallon  . . . . . . . . . . . . .  32

15  Mr. Sunny Singh/Entering Declarations . . . . .  34

16     Declaration of Craig Johnson ECF-940  . . . .  36

17     Declaration of Christopher Robinson ECF-945 .  37

18     Declaration of William Peluchiwski ECF-948  .  38

19     Declaration of Jason Feintuch ECF-966   . . .  40

20  Testimony of Roy Messing:

21     Examination by Mr. Friedman . . . . . . . .  44

22     Examination by Mr. Friedmann  . . . . . . .  82

23     Examination by Mr. Kaplan . . . . . . . . .  88

24     Examination by Mr. Friedman . . . . . . . .  90



1   Testimony of Harvey Tepner:

2      Examination by Mr. Genender . . . . . . . .  95

3      Examination by Mr. Cantor . . . . . . . . . 104

4      Examination by Mr. Genender . . . . . . . . 114

5   Testimony of Eric Fraske:

6      Examination by Mr. Friedmann . . . . . . . 120

7      Examination by Mr. Elias . . . . . . . . . 136

8      Examination by Mr. Friedmann . . . . . . . 162

9      Examination by Mr. Elias . . . . . . . . . 168

10  Testimony of Grant Cope:

11     Examination by Mr. Elias . . . . . . . . . 173

12     Examination by Mr. Friedmann . . . . . . . 188

13     Examination by Mr. Elias . . . . . . . . . 217

14     Examination by Mr. Friedmann . . . . . . . 220

15  Testimony of Perry Myers:

16     Examination by Mr. Elias . . . . . . . . . 225

17  Testimony of Dr. Gina Solomon:

18     Examination by Mr. Elias . . . . . . . . . 231

19  Remarks by Mr. Singh . . . . . . . . . . . . 251

20  Remarks by Mr. Friedmann . . . . . . . . . . 252

21  Certificate of Reporter . . . . . . . . . . . 255

22

23

24



```
1              UNIDENTIFIED SPEAKER:  Recording

2         has begun, and we are now live.

3              THE COURT:  Good morning, counsel.

4         This is Judge Sontchi.  There are only 16

5         people on this meeting, which strikes me as

6         odd.  Does anyone have any difficulty getting

7         co-counsel on the Zoom meeting?

8              MR. SINGH:  Yes, Your Honor, good

9         morning.

10             THE COURT:  Mr. Friedmann.  I'm not

11        even seeing --

12             MR. SINGH:  This is Mr. Singh, Your

13        Honor.

14             THE COURT:  Sorry.  Sorry,

15        Mr. Singh.

16             MR. SINGH:  Oh, I'm sorry, Mr.

17        Friedmann.  I think he was going to say the

18        same thing, that we all appear to be in a

19        waiting area, or at least I am, that says the

20        host will let you in soon.

21             MRS. RYAN:  That's correct.  This

22        is Mrs. Ryan from the State of Texas.  I'm in

23        the same room.

24             THE COURT:  That's very odd,
```



1     because some people are, and I'm not seeing

2     you in the waiting room.

3               UNIDENTIFIED SPEAKER:  Should we

4     try to leave, Your Honor, and rejoin to see

5     if that works?

6               THE COURT:  Hold on.  Wait a

7     minute.  It's showing me 53 participants, but

8     I'm not seeing anybody in the waiting room.

9     Hang on.  Everybody is stuck in the waiting

10    room.  That's really weird.

11              Well, I see you all here in the

12    waiting room.  All right.  Let me try this.

13              There we go.  Operator error.  Not

14    the way to start the hearing.  All right.

15    Let's see.  I see Mr. Friedman.  I see

16    Mr. Singh.  Hopefully, that will solve the

17    problem.

18              Is there anyone on the call who is

19    still trying to get in that's on the

20    telephone who still can't get in?  Mr.

21    Martinez is coming now.

22              UNIDENTIFIED SPEAKER:  Let me see

23    if this is having problems still.

24              UNIDENTIFIED SPEAKER:  Your Honor,



1       it just blanks off after awhile.

2                THE COURT:  I have never had this

3       problem before.  I am very sorry.  I don't

4       even know where to find you.

5                Okay.  I am disabling the waiting

6       room, so everybody should be able to just pop

7       right in.  If you are still in the waiting

8       room, un-connect and try to reconnect.

9                All right.  I think, while that's

10      going on, we can get started, since we

11      have -- to say that we have a lot to do and

12      very little time to do it is an

13      understatement.

14               So, Mr. Singh, can I turn -- oh,

15      let me go through the ground rules first.  I

16      apologize.

17               All right.  Well, again, I

18      apologize for the -- this is literally the

19      first time I have had a problem with Zoom in

20      seven months, so I'm very sorry.

21               Welcome.  We are obviously

22      proceeding remotely for the confirmation

23      hearing in Exide.  All the audio is by

24      CourtCall.  Your Zoom audio has been



1    disabled.  And your ability to un-mute

2    your -- some audio has also been disabled.

3            Always with CourtCall it's very

4    important that you mute your phone when you

5    are not speaking and try to remember to

6    un-mute your phone when you are speaking.

7            It's very important, especially if

8    you are on a speakerphone, a cell phone, even

9    a computer type phone.  We get a lot of -- we

10   get a lot of static, so try to remember to

11   mute your phone.  With so many people on the

12   call, 55, it is important.

13           Thank you for participating by

14   Zoom.  Please feel free to black out your

15   screens when you are not participating.

16   However, I do require that you have your

17   screen active when you are addressing the

18   Court or if you are a witness, while you are

19   having your declaration moved into evidence,

20   and certainly, of course, while you are being

21   examined, you need to have your video on

22   and -- I am getting some -- I'm getting some

23   background noise, which means somebody does

24   not have themselves muted.  So try to



1        remember to do that.

2                  If we have disruptions, we will

3        have to sort of see how to deal with it.

4        Having disabled the waiting room, I have

5        actually taken away my first line of defense

6        against disruptions.  So, once everybody gets

7        on, I may reactivate it.

8                  But if I do have problems, I will

9        do my best to resolve them.  If I can't

10       resolve them, we will terminate the Zoom

11       call, but we will continue on with an audio

12       call, even if that means hearing witnesses

13       via audio, because it will be an emergent

14       situation, and I will deem that more

15       important than being able to see the

16       witnesses.

17                 In order to eliminate disruptions,

18       I generally don't allow people in after the

19       first ten minutes.  I'm going to be more

20       liberal with that, given the problems we have

21       had this morning.

22                 Of course, if you do drop off, you

23       will be put back on as long as I recognize

24       you.  If you are having trouble getting on,



1      rather than disrupting the hearing, please

2      e-mail either Ms. Szymanski or Ms. Gadson, my

3      two assistants.  Their e-mail addresses are

4      on the website.  Many of you probably already

5      have them memorized by heart.  And they will

6      get an instant message to me, and I will do

7      what I can to alleviate the situation.

8                   That's it for the dos and don'ts

9      and the apologies.  And now I will turn it

10     over to Mr. Singh.

11                  MR. SINGH:  Thank you, Your Honor.

12     Good morning.  Sunny Singh, Weil Gotshal on

13     behalf of the debtors.  Your Honor, can you

14     hear me okay?

15                  THE COURT:  Yes.

16                  MR. SINGH:  Okay.  Thank you.  Your

17     Honor, I am joined by my partners, Paul

18     Genender and Jared Friedmann, who will also

19     be presenting today with me.

20                  And we are very pleased, Your

21     Honor, to report to you today on the Debtors'

22     Request for Confirmation of our Amended

23     Chapter 11 Plan.

24                  Judge, what I thought I would do is



1       to start off with giving you an update and

2       the parties in interest with an update of

3       where things stand and where we are.  And

4       then having conferred with Mr. Friedman on

5       behalf of California, I think we would

6       probably not even need, or we would agree

7       that we don't really need opening statements,

8       unless Your Honor would like them, and just

9       get right into the evidence.

10              THE COURT:  That's perfect,

11      actually, yes.  I did read the brief.  It

12      took me awhile.

13              MR. SINGH:  I was going to say,

14      Your Honor, I think we have inundated you

15      with enough paper to know all the issues, so

16      --

17              Okay.  So, Your Honor, with that,

18      why don't I start with the updates, then, for

19      the Court.

20              The good news, Your Honor, is that

21      we have tied up all of the loose ends in the

22      global settlement and purchase agreement.

23      The Is have been dotted; the Ts have been

24      crossed.  Although, we are all lawyers, so



1    I'm not sure we'll be done until Your Honor

2    either enters the order or doesn't, but we

3    are working on that.

4              And we have filed with the Court an

5    amended credit purchase agreement.  We have

6    also filed the Frisco and Aspen settlement

7    agreement.  That's all done and finalized.

8              As I will explain a bit more, Your

9    Honor, the West Chester objection has been

10   resolved, and those issues are addressed

11   through the amended plan.  And as I noted,

12   Judge, we did file another amended plan with

13   some clean-up changes overnight.

14             Your Honor, the first update with

15   respect to the objections, other than

16   California, we are resolved with all of them.

17   And I will start with Atlas, or the U.S.

18   Fire, I should say, Your Honor, represented

19   by Winston and Strawn.

20             That objection focused on

21   feasibility and the payment of administrative

22   claims.  The U.S. buyer had a working capital

23   claim under the purchase agreement that they

24   have asserted.  And they wanted to make sure



1        that that claim can be satisfied in full.

2                  There was also a timing issue

3        related to that, Your Honor, and a concern re

4        that, you know, if money starts to go out the

5        door on the effective date, claims that are

6        reconciled later could be prejudiced because

7        that reconciliation takes a little bit

8        longer.

9                  So, Your Honor, we have clarified

10       and agreed to some language in a revised

11       confirmation order, since Your Honor approved

12       confirmation.  We are still working on the

13       language with other parties.  This language

14       is resolved.

15                 But, essentially, the concept is as

16       follows, Your Honor:  All of the parties'

17       rights with respect to the merits of the

18       claim are fully preserved.  But in

19       Mr. Messing's declaration where we discussed

20       the categories of payments and claims that

21       would have to be made, and ultimately we end

22       up with a projected excess of $14.8 million

23       before the Atlas claim.

24                 We also gave a range on that, but



1        I'm just going through the chart, Your Honor,

2        where we had about 14.8.

3                While we have agreed with Atlas and

4        the noteholders, creditors' committee, et

5        cetera, the parties in interest have all

6        signed off, is that with a few exceptions

7        that I will explain in a moment,

8        administrative and priority claims will not

9        be paid pursuant to the plan until we know

10       that there is enough funds to either pay them

11       or reserve for allowed or disputed

12       administrative expense claims.

13               Essentially, Your Honor, the

14       administrative claims bar date will have to

15       pass, you know, the claims will come in, the

16       plan administrator will wind down stable

17       enough to see what there is, and making sure

18       that we have got sufficient assets before we

19       can make a distribution to reserve.

20               Frankly, Your Honor, that's how the

21       plan operated and worked anyway, but we had

22       no problem stipulating to that with the U.S.

23       buyer and the other parties, with a couple

24       of -- and the following payments that we will



1    be permitted to make, Your Honor.

2            First, all wind-down related

3    expenses through the effective date and post

4    effective date wind-down expenses would be

5    permitted.  That's estimated, Your Honor, in

6    Mr. Messing's declaration of $6.7 million.

7    Importantly, that's not a cap.  That's just

8    an estimate.

9            The next amount is a cap.  Amounts

10   necessary for the debtors to consummate the

11   plan and fulfill their obligations under the

12   global settlement will not exceed an

13   aggregate amount of $4 million.

14           So, Your Honor, in Mr. Messing's

15   declaration he estimated claims of about

16   $15 million administrative, and priority

17   claims will be permitted to pay 4 million of

18   that.  And the rest would have to wait.

19           And the 4 million are really

20   effective-day payments.  They include $1.5

21   million that's been provided in the plan and

22   proposed confirmation order for the Fort Erie

23   remediation work in Canada, $1.6 million of

24   estimated property taxes for the NPV



1      Properties, which, under the environmental

2      settlement agreement, the debtors agreed we

3      would escrow, because that will be our share

4      of the taxes that we would have to pay, or

5      the maximum of our share, I should say,

6      200,000 or so -- I'm sorry, Your Honor.

7              THE COURT:  It's not me.  I don't

8      know where that is coming from.

9              MR. SINGH:  Oh, sorry, Judge.

10             THE COURT:  Please mute your

11     phones, everybody.  Please mute your phones.

12             MR. SINGH:  Sorry.  I thought you

13     had a question.

14             Your Honor, then the other payments

15     that are being permitted is as it relates to

16     our retiree settlement of about $200,000.

17     And then there will be a few other payments

18     that we have to still work through.

19             But the cap there, Your Honor, is

20     $4 million as to what I refer to as effective

21     date or plan implementation related payments.

22             In addition, Judge, one of the

23     amendments that we have in -- or

24     clarifications, I should say, that we have in



1      the purchase agreement with the credit bid is

2      that there are fees of Houlihan Lokey and

3      CMD, investment banking success fees that

4      relate to the Europe side of the house.

5              So there is estate fees that they

6      have earned that, you know, final fee apps

7      will have to be filed.  Professional fees are

8      in escrow.

9              But in relation to the credit bid

10     for being retained in connection with work

11     for non-debtors, those fees, Judge, that will

12     be paid at close by the debtors are estimated

13     to be about $5.2 million.  But we have

14     agreed, and it's documented in the credit bid

15     amendment that, to the extent there is ever

16     later a shortfall on administrative expense

17     claims, the transferred entities would

18     reimburse the estate up to the amount of 5.2,

19     up to the amount that was paid.

20              And so, Your Honor, those fees

21     would go out the door, but we have got the

22     reimbursement right that's already built into

23     the purchase agreement and the plan.

24              In addition, Judge, the



1      noteholders, the U.S. buyer, and the

2      transferred entities have also agreed that if

3      there is a shortfall later in administrative

4      expense claims, they would agree to radical

5      treatment.

6              Nothing binds other parties in

7      interest, Judge, and we are not seeking any

8      modification of what the plan says.  This is

9      truly a just-in-case, and this relates to

10     just these three parties as to what they are

11     going to be willing to do.

12             So other parties, and the language

13     will make clear, all rights are preserved.

14     We coordinated on that with the creditors'

15     committee, who rightfully wanted to make sure

16     that we were not binding any other creditor.

17     Of course, we are not.  And so that language

18     will be clear.

19             And, Your Honor, again, we think

20     the evidence will show that we will have

21     enough money to pay all administrative

22     creditors.  This is a just-in-case type

23     provision that you will see in the plan -- or

24     excuse me -- in the confirmation order.



```
1              Your Honor, that summarizes the

2       resolution with Atlas, the U.S. buyer.  Maybe

3       I will pause there to see if you have any

4       questions.  And, of course, their counsel is

5       on the line, in case they wanted to add

6       anything.

7              THE COURT:  I have no questions.

8       Atlas, do you wish to be heard?

9              MR. MCGUIRE:  Your Honor, it's Dan

10      McGuire for the U.S. buyer.  Mr. Singh has

11      accurately described the resolution of the

12      claim, so I won't take up any more of your

13      time on it.  Thank you.

14              THE COURT:  You are welcome,

15      Mr. McGuire.

16              MR. SINGH:  Thank you, Your Honor.

17      Your Honor, next, as I reported at the last

18      status conference, we have resolved potential

19      objection by the PBGC to the plan, including

20      the releases in Section 10.6 of the plan.

21              The plan, as amended, excuse me,

22      now provides that the transferred entities,

23      through a loan from the consenting creditors,

24      will pay $6 million to the PBGC on the
```



1     effective date in exchange for that release

2     and the resolution of any control group

3     liability or control group claims they may

4     have against the transferred entities.

5              Your Honor, the PBGC will have

6     their general unsecured claim.  They have

7     also agreed that, you know, they are not

8     going to assert anything as an administrative

9     or priority claim.

10             That unsecured claim amount will be

11    resolved by the GUC trustee under the plan

12    mechanic.  The general unsecured trustee has

13    responsibility for handling general unsecured

14    claims, so they will deal with the PBGC on

15    that.

16             And, Your Honor, PBGC settlement

17    also helped resolve and sort of relates to

18    West Chester.  The West Chester objection to

19    the plan has been resolved.

20             And the way that we have handled

21    that, Your Honor, is West Chester has agreed

22    that it will not participate in the first

23    $2.4 million, you know, what we refer to as

24    the GUC Beneficial A interest that entitles



1     parties to participate in that first

2     2.4 million.

3             West Chester won't participate in

4     those amounts in the first instance.  They

5     will get Beneficial B interest, which

6     entitles them to share in anything in excess

7     of $2.4 million that's distributed.

8             But West Chester will have a

9     catch-up right.  And the way that that

10    catch-up right would work is that if there

11    are ever proceeds distributed in excess of

12    the first 2.4 million, then West Chester is

13    entitled to receive the amount it would have

14    received, had it been an allowed claim that

15    got the GUC Beneficial lay interest.

16            So the claim is being allowed, I

17    think in the approximate amount of

18    $30 million.  And so whatever distribution

19    they would have gotten, had they participated

20    in GUC A, they would be entitled to get.

21            And that money, Your Honor, will

22    come from a reallocation of the PGBC's

23    distribution for the Beneficial B interest.

24            So I will give you an example,



1         because I'm using a lot of defined terms.

2         So, for example, Your Honor, if West Chester

3         would have received, hypothetically

4         speaking -- the numbers will be what they

5         are -- say $200,000 as its pro rata share of

6         that $2.4 million, if the GUC trust makes a

7         distribution in excess of the $2.4 million,

8         then West Chester is entitled to a

9         reallocation from the PBGC of the first

10        dollars that would have gone to the PBGC up

11        to $200,000 from that excess of 2.4.

12                 And, thereafter, the PBGC and West

13        Chester, you know, continue to participate in

14        any further distributions from the GUC trust.

15                 This way it doesn't affect, Your

16        Honor, any other creditor.  It's simply a

17        solution between the PBGC and West Chester.

18                 So, Your Honor, that's the

19        resolution of both the West Chester objection

20        and the PBGC objection or issues with the

21        plan.

22                 I believe they now both support

23        confirmation of the plan.  And I will pause

24        there in case Your Honor has any questions or



1      if the PBGC or West Chester would like to be

2      heard, Your Honor.

3                THE COURT:  Does either West

4      Chester or the PBGC wish to be heard?

5                MR. MURRELL:  Yes.  Good morning,

6      Your Honor.  Vincente Matias Murrell on

7      behalf of the Pension Benefit Guaranty

8      Corporation, Your Honor.

9                Your Honor, Mr. Singh announced

10     PBGC has reached a settlement, and PBGC is

11     pleased to support the Debtors' Plan.

12               After lengthy negotiations, Your

13     Honor, with the ad hoc group of noteholders,

14     PBGC was able to reach settlement as

15     described, you know, in Section 5.3 of the

16     plan.

17               Briefly, at a high level, Your

18     Honor, you know, as Mr. Singh described, PBGC

19     is consenting to the release -- to the

20     releases contained in Section 10.3F of the

21     third amended -- of the fourth amended plan

22     at this point.  Sorry.  There has been a

23     number of amendments, Your Honor.

24               PBGC will receive on the plan's



1       effective date the PBGC settlement payment of

2       $6 million.

3                    Furthermore, Your Honor, to pave

4       the way toward a broader resolution of this

5       complex case, PBGC agreed to modify its

6       recoveries from the GUC trust in favor of

7       West Chester, as Mr. Singh described.

8                    So, you know, so I think, Your

9       Honor, it's a good, you know, I think, in

10      sum, I think it's a good situation for all

11      parties involved.

12                   Your Honor, I would like to note --

13      on a personal note, Your Honor, I would like

14      to say that I would like to thank Mr. Singh

15      and his team at Weil, as well as Mr. Safrets

16      (ph) and Hurst (ph) and Antiva Lowensteid

17      (ph) for their help in getting this

18      settlement done and this case to

19      confirmation.

20                   As you know, Your Honor, it's been

21      a pretty arduous process.  So my personal

22      thanks to all involved on behalf of the PBGC.

23                   THE COURT:  Thank you, sir.  West

24      Chester?  It's usually Mr. Bressler, but I



Bankruptcy Hearing - October 15, 2020          25

```
1        don't see him on the line.
2                MR. COLLINS:  Yes.  Hi, Your Honor.
3        Michael Collins on behalf of --
4                THE COURT:  Oh, it's Michael
5        Collins today?
6                MR. COLLINS:  -- West Chester, yep,
7        Fire Insurance Company.  And Mr. Singh did
8        accurately state how we have resolved it.
9                And similar to PBGC, I would like
10       to thank really the PBGC as well as Mr. Singh
11       and his team to finally get this here.  It
12       has been a long process, obviously, with West
13       Chester, and hasn't been easy.  But I think
14       we have all worked well to get to a
15       resolution, so I appreciate their efforts.
16               THE COURT:  Thank you, Mr. Collins.
17       Good to see you again.  We're seeing a lot of
18       each other lately.
19               MR. COLLINS:  Yes.
20               MR. BRESSLER:  Your Honor, Gary
21       Bressler.  I am here as Mr. Collins' Delaware
22       counsel.
23               THE COURT:  Oh.
24               MR. BRESSLER:  I am on the video,
```



1    but maybe -- there are a lot of people on the

2    video, so you may not have seen me.  But

3    thank you.

4              THE COURT:  I do see you,

5    Mr. Bressler.  Good to see you, as well.  All

6    right, Mr. Singh.

7              MR. SINGH:  Okay.  Thank you, Your

8    Honor.  Your Honor, next an update for you on

9    the retiree settlement.

10             I'm pleased to report that, you

11   know, we do have a settlement in principle

12   with the retirees and are putting some final

13   touches on a stipulation that we will file

14   with the Court that resolves those issues.

15             So, you know, Your Honor,

16   immediately after the appointment of the

17   non-union representatives, Judge

18   Richterschmidt (Ph) and Mr. Degrote, we

19   worked with them and sort of coordinated the

20   efforts with the union representatives to

21   work out a fair solution for the company's

22   220 or so retirees with respect to retiree

23   health care.

24             Your Honor, essentially what we



1    have agreed is that medical benefits will

2    continue to be paid through December 31st,

3    and we will also provide death benefits on a

4    $2,000 per individual basis through that same

5    date.

6              Notices will go out to the parties,

7    Your Honor, and we will try to facilitate,

8    you know, any information and whatever we can

9    here to make sure that there is not undue

10   hardship from this challenging situation of a

11   liquidation of the debtors and retires.

12             The total cost, Judge, is about

13   $200,000 to the estate to continue that.  And

14   I would like to, you know, note that the

15   appointed representatives, we really

16   appreciate their effort in jumping in and

17   working with us cooperatively, as well as the

18   union representatives throughout this,

19   throughout this process, Your Honor.

20             So that's the retiree settlement

21   that you will see a stipulation, hopefully,

22   hopefully today or the next day or so on file

23   with the Court.

24             THE COURT:  Okay.



```
 1              MR. SINGH:  Your Honor, the other
 2      piece, I just wanted to give you an update.
 3      The last union, most of the union contracts
 4      were dealt with as part of the U.S. sale.  We
 5      are still working with the United
 6      Steelworkers, who have employees represented
 7      at Vernon and Redding.
 8              We are in the process and have made
 9      very good progress on negotiating the
10      termination benefits, you know, severance, et
11      cetera; and we are pretty close to being
12      done, we think, Your Honor.
13              So, as soon as that is resolved, I
14      expect we will also be able to file a
15      stipulation with the Court with respect to
16      those benefits.  It only covers about ten
17      employees in Vernon and not too many at
18      Redding, but we are working to resolve those
19      issues and work with the unions on that.
20              I think that's it for the updates,
21      Judge, at least from me.  I did want to give
22      Mr. Tenenbaum an opportunity to update the
23      Court on the DOJ public comm -- excuse me --
24      comment period and meeting that occurred on
```



1     Tuesday, so Your Honor has the latest on what

2     occurred there.  So I will cede the virtual

3     podium to Mr. Tenenbaum.

4               THE COURT:  Okay.  Mr. Tenenbaum,

5     good morning.

6               MR. TENENBAUM:  Your Honor, can you

7     hear me okay?

8               THE COURT:  Yes, sir.

9               MR. TENENBAUM:  Good.  Alan

10     Tenenbaum from the Department of Justice for

11     the United States on behalf of the EPA.

12               By way of update for the Court on

13     our public comment process and the public

14     meeting that we held, we did receive over

15     1,000 negative comments in writing on the

16     settlement.

17               We also received approximately 125

18     oral statements at the public meeting on

19     Tuesday, which was by conference call.

20               These came from California

21     congressional representatives, legislators,

22     mayors, other officials, citizen groups, and

23     then as well as just ordinary citizens.

24               The public meeting on Tuesday



1    lasted for five hours.  It had to be by

2    conference call on account of the COVID-19

3    restrictions on in-person meetings in

4    California.

5           The comments and statements

6    generally expressed concern about any

7    abandonment of the Vernon facility, and also

8    that debtors should be held to greater

9    accountability for the situation in

10   California.

11          Several of them were heartfelt,

12   emotional accounts of the impact of lead

13   contamination on the community near the

14   facility.

15          Yesterday we filed our response and

16   reaction to the comments.  We wish to

17   emphasize that we take all of them very

18   seriously, and they were all very seriously

19   considered by us.

20          Our filing yesterday indicates that

21   we believe that the proposed bankruptcy,

22   inability to pay settlement, actually is

23   trying to minimize the possibility of

24   abandonment through the creation of one or



1       more environmental response trusts, and that

2       any limits on funding are a result of

3       debtors' poor financial situation.

4              We view abandonment only as a last

5       resort.  We also wish to emphasize that we

6       have listened to and considered all of the

7       comments and statements very carefully.  And

8       the concerns raised, we have considered them

9       very seriously.

10             As we noted in our filing, the

11      settlement does not purport to deal with

12      personal injury issues that were raised or

13      affect anyone's rights in that respect in any

14      way.

15             The agreement seeks to avoid

16      further adverse environmental impacts on the

17      community due to the possibility of the

18      environmental response trust, which can use

19      potentially up to 29 or more million dollars

20      for additional on-site remediation and help

21      prevent further discharges of hazardous

22      substances into the community.

23             The creation of such a Vernon

24      environmental response trust would allow for



1        the continuation of monitoring systems meant

2        to protect the neighboring communities going

3        forward and avoid the potentially chaotic

4        transition that may occur if the Vernon

5        facility were to be abandoned.

6               Your Honor, I would like to reserve

7        any more detailed discussion to, if

8        necessary, to later today, because I don't

9        want to delay the presentation of evidence,

10        unless Your Honor has any questions for me at

11        this point.

12               THE COURT:  I do not.  Thank you

13        very much.

14               MR. TENENBAUM:  Thank you.

15               MR. SINGH:  Thank you,

16        Mr. Tenenbaum.  Thank you, Your Honor.  Your

17        Honor, I think that gets us through the

18        updates and to the main event.  And, as I

19        mentioned, Your Honor, the only object --

20               MR. FALLON:  Your Honor.

21               MR. SINGH:  I'm sorry.

22               MR. FALLON:  Your Honor, Brett

23        Fallon for American Integrated Services.  May

24        I be heard briefly, since I didn't hear our



1    objection addressed?

2              THE COURT:  Yes, Mr. Fallon.

3              MR. FALLON:  Your Honor, American

4    Integrated Services maintains and monitors

5    the full enclosure unit on the Vernon

6    non-producing property 24 hours a day, seven

7    days a week.

8              I think the testimony today will be

9    uncontested that the FEU, as it's called both

10   prior to and throughout the case, have

11   protected the surrounding communities from

12   dangerous lead at the site.

13             Under our contract with the debtor,

14   our obligation is to provide those services

15   up through and including the effective date.

16   However, at the eleventh hour, the debtor had

17   indicated it's going to reject that contract.

18             And, Your Honor, we certainly

19   understand the debtors' latitude in whether

20   to assume or reject a contract.

21             However, there are public interest

22   exceptions.  And everyone must understand

23   that when the contract is rejected and the

24   effective date occurs, our obligations are



1      concluded, the FEU goes away, and there will

2      be no barrier between the dangerous lead at

3      the Vernon site and the surrounding

4      community.

5                  So, Your Honor, we do have a

6      pending objection to the rejection of that

7      contract.

8                  THE COURT:  All right, Mr. Fallon.

9      Thank you.

10                 MR. SINGH:  I apologize, Your

11     Honor.  Sunny Singh on the record.  I thought

12     Mr. Fallon's objection had been resolved.

13                 I think what I would suggest, Your

14     Honor, is why don't we get through the

15     evidence, we will talk to Mr. Fallon and see

16     if we can address his concerns.

17                 My understanding is that the trust

18     is going to negotiate direct -- or the

19     trustee, I should say, is going to negotiate

20     directly with Mr. Fallon's clients to allow

21     their work to continue.

22                 But I think we don't need to take

23     up Your Honor's time with that.  Why don't we

24     speak to him, or I will ask a member of my



```
 1    team to speak to him or somebody on his team

 2    to see if we can just resolve that as the

 3    other matters of the hearing continue.

 4           THE COURT:  Okay.

 5           MR. SINGH:  Okay.  Thanks, Judge.

 6    So I think now we can get on with the

 7    evidence.

 8           And so, Your Honor, there are -- we

 9    have seven witnesses, and the DTSC has three.

10    What I was going to do, we have agreed, at

11    least between us and the DTSC, that the first

12    four witnesses, Your Honor, that we don't

13    expect any cross examination.

14           So I will take the easy ones,

15    Judge -- hopefully, they remain easy -- and

16    present them to you now in that order.  And

17    then I will turn it over to Mr. Friedmann or

18    Mr. Genender, as the case may be.

19           So, Your Honor, first is the voting

20    certification by Mr. Craig Johnson of Prime

21    Clerk filed at ECF-940.  I believe he is on

22    the line, although I don't see exactly where

23    he is on the Zoom.  There he is.  He is

24    waving, Your Honor.
```



1              And so, Your Honor, if I can ask, I

2      would like to move his declaration into

3      evidence, Your Honor.

4              THE COURT:  Is there any objection

5      to the admission of Mr. Johnson's declaration

6      into evidence?  All right.  I hear none.

7      It's admitted without objection.

8              Does anyone wish to cross examine

9      Mr. Johnson?  Okay.  I hear no one.  I have

10     no questions.

11             So, Mr. Johnson, you are excused.

12             MR. SINGH:  Thank you, Your Honor.

13     Your Honor, next the debtors have the

14     declaration of Christopher Robinson of Ankura

15     filed at ECF-945.

16             Mr. Robinson is on the phone and

17     available for live cross.  Your Honor, I

18     would note that Mr. Robinson's declaration

19     goes to the issue of the merits of the Atlas

20     working capital claim.

21             That's been resolved, so we are not

22     asking Your Honor to take this into account

23     for any prejudicial reason in the future, but

24     it also does go to feasibility of the plan;



```
1     and so that's why we would like to admit the

2     evidence.

3              So, Your Honor, that's at ECF-945.

4     And Mr. Robinson is on the phone.  I would

5     like to move his declaration into evidence

6     for that purpose.

7              THE COURT:  All right.  Does

8     anyone -- or excuse me.  Is there any

9     objection to the admission of Mr. Robinson's

10    declaration?  Okay.  I hear none.  It's

11    admitted without objection.

12             Does anyone wish to cross examine

13    Mr. Robinson?  All right.  I hear none.  And

14    I have no questions.  So, Mr. Robinson, you

15    are free to go, as well.

16             MR. SINGH:  Thank you, Your Honor.

17    Next we have the debtors' declaration of

18    Mr. William Peluchiwski of Houlihan Lokey,

19    its investment banker.

20             Mr. Peluchiwski's declaration is

21    filed at ECF-948.  He is available.  And he

22    is on the line available for live cross

23    examination, Your Honor.  I would like to

24    move his declaration into evidence.
```



1           THE COURT:  Any objection to the

2    admission of Mr. Pelu -- Peluchiwski's

3    declaration?  Sorry.  I feel your pain.  I

4    can't tell you how many people have

5    mispronounced Sontchi over the last 53 years.

6           Any objection to the admission of

7    his declaration?  Okay.  I hear none.  It's

8    admitted without objection.

9           And just for the record, I see the

10   witness is present and visible to the Court.

11          Does anyone wish to cross examine

12   the witness?  Okay.  I see none.  I hear

13   no -- well, I hear none -- I have no

14   questions, and I hear no one wanting to cross

15   examine.

16          What was the number of the docket

17   item for that declaration?

18          MR. SINGH:  That's ECF-948, Your

19   Honor.

20          THE COURT:  948.  Okay.  Okay.

21   Thank you, sir.  You are excused.

22          MR. PELUCHIWSKI:  Thank you, Your

23   Honor, appreciate it.

24          MR. SINGH:  Thank you.  Thank you,



1      Judge.  Next we have of the declaration of

2      Mr. Jason Feintuch, also of Houlihan Lokey.

3             His declaration is filed at

4      ECF-966.  Mr. Feintuch is on the phone and

5      available for live cross examination.  He is

6      also on video, Your Honor.  I move his

7      declaration into evidence.

8             THE COURT:  I don't see him on my

9      list.

10            MR. SINGH:  I apologize, Your

11     Honor.  Mr. Feintuch's, it should be on the

12     amended agenda that was filed after the

13     initial declarations were filed on Monday.

14            THE COURT:  Where does he -- where

15     does he work?

16            MR. SINGH:  Houlihan Lokey.

17            THE COURT:  Oh, okay.  Well, I

18     found it on the agenda, but it didn't make it

19     to the witness list, which is fine.

20            MR. SINGH:  Apologies, Judge.

21            THE COURT:  Okay.  Any objection to

22     the admission of Mr. Feintuch's declaration?

23     And where is he?  Wave, if you would, for me,

24     sir.  There you are.  Thank you.



1               All right.  I hear no objection.

2       It's admitted without objection.  The witness

3       is available on Zoom and visible to the

4       Court.

5               Does anybody wish to cross examine

6       the witness?  Okay.  I hear none.  I have no

7       questions.

8               You are excused, sir.  Thank you.

9               MR. SINGH:  Thank you, Your Honor.

10      I am then going to turn it over to my

11      partner, Jared Friedmann, to present the next

12      witness.

13              THE COURT:  Okay.

14              MR. FRIEDMANN:  Thank you.  Good

15      morning, Your Honor.  Jared Friedmann from

16      Weil Gotshal on behalf of debtors.

17              With your permission, the next

18      witness we would like to proffer is Roy

19      Messing.  Mr. Messing put in two

20      declarations.  The first is at ECF-944.  The

21      second is at ECF-950.

22              Mr. Messing is on the phone line

23      and on Zoom.  And we would ask that you

24      please admit both of those declarations,



1       including the exhibits attached to the

2       declaration at ECF-950 into evidence.

3                   MR. FRIEDMAN:  No objection, Your

4       Honor.  It's the other Mr. Friedman.  No

5       objection.  I will be cross examining the

6       witness.

7                   THE COURT:  Okay.  Thank you,

8       Mr. Friedman.  I am not seeing him, though,

9       on Zoom.  Mr. Messing, can you wave?  Oh,

10      there he is.  Found him.  Thank you.  This is

11      like a game or something, Where's Waldo.

12                  Okay.  Well, just so we're clear,

13      so, Mr. Friedman, the other Mr. Friedman --

14      this can be confusing -- you do not object to

15      the admission of both 944 and 950; is that

16      correct?

17                  MR. FRIEDMAN:  That is correct,

18      Your Honor.  That's correct.

19                  THE COURT:  Okay.  Those two are

20      admitted without objection.  And you wish to

21      cross examine.

22                  So, Mr. Messing, Ms. Murin is going

23      to swear you in, hopefully.

24                  MS. MURIN:  Yes.  I'm sorry.  I had



1          to un-mute my phone, Your Honor.

2                    THE COURT:  No problem.

3                         -    -    -

4                    ROY MESSING,

5          the deponent herein, having first

6          been duly sworn on oath, was

7          examined and testified as follows:

8                    THE COURT:  Okay.  Mr. Messing,

9     before we get started, just a few

10    instructions.

11                   I understand you are in your home

12    in Ridgefield, Connecticut; is that true?

13                   MR. MESSING:  Yes.

14                   THE COURT:  Okay.  Are you alone in

15    the room, sir?

16                   MR. MESSING:  Yes.

17                   THE COURT:  You don't have the dog

18    with you this time?  I think you had the dog

19    last time.

20                   MR. MESSING:  I did.  I don't, sir.

21                   THE COURT:  Okay.  He is allowed.

22    All right.  Sir, during your examination, I

23    am going to direct you not to read any text

24    messages or e-mails that you might receive



1          during your examination, including any

2          breaks, until you are completely finished.

3                    Also, if you are going to refer to

4          any documents, either paper or

5          electronically, that's fine, but you have to

6          let us know what you are looking at if you

7          are doing so, so everyone has full notice of

8          what's going on.

9                    So it is okay to look at them on

10         the computer, but not in e-mail and not in

11         text messages.  Okay?

12                   And during the breaks you are not

13         going to be allowed to discuss your testimony

14         with any -- testimony with any person.

15                   All right.  With that, we will get

16         started.

17                   MR. FRIEDMAN:  Your Honor, I don't

18         know if I'm going to use documents.  But may

19         I have permission, if I need to, to share my

20         screen?

21                   THE COURT:  Yes.  Let me do that.

22         Just give me a moment.  You have that

23         permission.

24                   MR. FRIEDMAN:  Thank you.  And,



1    Your Honor, may I also move into evidence

2    Mr. Messing's first-day declaration, which I

3    know we listed as an exhibit on the exhibit

4    witness list.  But we believe that, for

5    purposes of completion, that should be

6    considered as part of the evidentiary record

7    of confirmation.

8                    THE COURT:  Any objection?

9                    MR. FRIEDMAN:  No objection, Your

10   Honor.

11                   THE COURT:  All right.  It's

12   admitted.

13                   MR. FRIEDMANN:  Thank you, Your

14   Honor.

15                        -    -    -

16                   EXAMINATION

17                        -    -    -

18   BY MR. FRIEDMAN:

19       Q.   Good morning, Mr. Messing.

20   Mr. Messing, do you have a copy, just so I know,

21   of your deposition yesterday with you?

22       A.   I do.

23       Q.   Okay.  Thank you.  We have not

24   received a final transcript yet, but we do have



1    a rough version.

2              You are the chief restructuring

3    officer of Exide Holdings; is that right?

4         A.    Yes.

5         Q.    And how many times have you served as

6    a chief restructuring officer of a company

7    before?

8         A.    Um, five or six.

9         Q.    Okay.  And how many Chapter 11 cases

10   have you been involved in in your career?

11        A.    Um, I don't know the exact number.

12   More than those five or six.

13        Q.    Okay.  Do you know if it's more than

14   ten?

15        A.    I believe more than ten, yes.

16        Q.    Okay.  Is part of your job at Ancora

17   in this case to monitor the debtors' budgeting

18   during these Chapter 11 cases?

19        A.    Yes.

20        Q.    Does that include budgeting for

21   professional fees?

22        A.    Yes.

23        Q.    And what is the professional fee

24   budget in this case, Mr. Messing?



1        A.   Um, my recollection is the initial

2    budget submitted at the time of the filing for

3    the initial 13-week period was approximately

4    $20 million.

5        Q.   Okay.  Has that budget ever been

6    updated since then?

7        A.   That budget is updated regularly.

8        Q.   Okay.  And what's the most recurrent

9    projection for professional fee spending?

10        A.   Um, again, from memory, my

11    recollection is through effective date, um, it's

12    in the neighborhood of fifty, five-O, million

13    dollars.

14        Q.   Okay.  And does that include success

15    fee -- does that number include potential

16    success fees for professionals in connection

17    with confirmation of a Chapter 11 plan, sir?

18        A.   I believe it does, yes.

19        Q.   Okay.  And does that include a success

20    fee for the unsecured creditors' committee

21    financial advisor?

22        A.   If I'm correct that it includes

23    success fees, it would include the success fees

24    for the financial advisor to the creditors'



1   committee, yes.

2        Q.   Okay.  And how much is that success

3   fee to the best of your knowledge, sir?

4        A.   To the best of my recollection, that

5   success fee for -- D. Riley is the firm -- is $1

6   million dollars.

7        Q.   $1 million.  And what's the -- do you

8   remember yesterday testifying, that you said it

9   was $1.8 million?

10       A.   I remember testifying yesterday that I

11  was unsure as to whether it was a million or a

12  million eight.  I believe it's a million.

13       Q.   Okay.  And what other entities are

14  going to receive success fees upon consummation

15  of a Chapter 11 plan, sir?

16       A.   Um, the other professionals that

17  receive fees associated with the conclusion of

18  the transactions and the effective date of the

19  plan would be Houlihan Lokey and CMD, to the

20  best of my recollection.

21       Q.   Okay.  How much are those?

22       A.   Um, I think I would say -- I believe,

23  um, CMD is probably -- if I'm correct that D.

24  Riley is a million, CMD, then, I believe, would



1    be the million eight.

2            The remaining Houlihan fee associated

3    with the closing of a Europe Rest of The World

4    transaction, I believe, is 3.8.

5        Q.   Thank you, Mr. Messing.

6            Mr. Messing, there was a subcommittee

7    of the debtors' independent committee that you

8    worked with in evaluating the releases granted

9    under this Chapter 11 plan; is that right?

10       A.   There is a subcommittee to the special

11   committee that was formed for the purpose of

12   conducting an investigation of the 2019

13   financing transaction and the authorization

14   transaction.

15           I did not work on the investigation,

16   but I did interface with Mr. Tepner, who is the

17   sole member of that subcommittee.

18       Q.   Okay.  And it's your testimony that,

19   based on that investigation, third-party

20   releases under this Chapter 11 plan are

21   appropriate; right?

22       A.   Um, I believe, based on that

23   investigation, estate releases are appropriate.

24       Q.   Uh-huh.  And what about third-party



1    releases?  Did the investigation play any role

2    in your conclusion that the third-party releases

3    were appropriate?

4          A.   I don't think so.  The investigation,

5    as I say, looked at the June 2019 financing

6    transaction and the December optimization

7    transaction, and looked at whether there were

8    any valuable, valuable and colorable claims for

9    the estate.

10              It did look further at whether, um,

11   whether unsecured creditors were harmed by

12   either or both of those transactions, which are

13   also considered estate claims.

14              I guess, Mr. Friedman, to the extent

15   of breach of fiduciary duty claims could be

16   other than estate claim, I don't know that it

17   would be.  That could apply to third-party

18   claim.

19              But that, to me, to my recollection,

20   that was the scope of the investigation's

21   consideration of the existence or potential

22   value of available claims, those three

23   categories, which I understand to be estate

24   claims.



1        Q.   So did the subcommittee look at

2    whether any, um, whether there were claims

3    against any parties who might be co-liable for

4    environmental liabilities of Exide?

5        A.   I don't recall.

6        Q.   Do you know if -- do you have any

7    knowledge that it did?

8        A.   I don't recall whether it did or not.

9        Q.   Okay.  So you don't -- you, yourself,

10   have no knowledge that it did; is that correct?

11            MR. FRIEDMANN:  Objection, Your

12      Honor.  Asked and answered.

13            THE COURT:  Mr. Friedman, he

14      answered the question.  He doesn't remember

15      whether it did or didn't.

16   BY MR. FRIEDMAN:

17       Q.   To your knowledge, did the special

18   committee examine whether there were

19   environmental claims against any former officers

20   or directors of Exide, that Exide held?

21       A.   To my knowledge, the special committee

22   did not investigate the existence of third-party

23   claims.

24            In my role at CRO and in Ankura's role



WILCOX & FETZER
(302) 655-0477  |  WWW.WILFET.COM

1    in this case, in the course of preparing

2    schedules and statements, we certainly looked as

3    to whether there were existing claims.  And to

4    my recollection, there were not.

5         Q.   Did you evaluate whether there were

6    any potential claims?  Did you or Ankura

7    evaluate whether the debtors had any potential

8    claims against third parties for environmental

9    liabilities?

10        A.   Um, to the best of my recollection, we

11   didn't investigate any specific potential

12   claims.

13        Q.   Did you investigate, in general,

14   environmental claims?

15        A.   Mr. Friedman, can I ask you to repeat

16   or clarify the question?

17        Q.   You said you didn't have any

18   specific -- that you didn't investigate any

19   specific claims.

20             Did you identify or investigate any

21   specific environmental claims against third

22   parties the estates might hold?

23             MR. FRIEDMANN:  Objection, Your

24      Honor.  Asked and answered.



```
1              THE COURT:  Overruled.
2              MR. MESSING:  I'm sorry.  I will
3         have to ask you to repeat it one more time.
4       BY MR. FRIEDMAN:
5           Q.   Did you or Ankura investigate any
6       specific or -- specific or general claims that
7       the debtors might hold against third parties
8       relating to environmental liabilities?
9           A.   Not to the best of my recollection,
10      no.
11          Q.   Okay.  So you can't put a value on any
12      possible claims that the debtors might hold
13      against third parties for environmental claims;
14      is that correct?
15          A.   That's correct.
16          Q.   Okay.  Did you evaluate whether any
17      third parties might have claims against other
18      third parties for environmental liabilities in
19      connection with Exide's operations?
20          A.   I don't recall specific investigation
21      of those potential claims.
22          Q.   Okay.  So specifically DTSC, did you
23      ever evaluate what potential claims DTSC might
24      have against third parties for environmental
```



1    claims related to Exide?

2         A.    Not specifically.  And I would like to

3    be clear that the reason I keep saying "not

4    specifically," and the reason I say no in answer

5    to your question using the term evaluation,

6    whether we evaluated it, the answer is, to the

7    best of my recollection, we didn't evaluate any

8    specific claims.

9              There were certainly discussions as to

10   whether there could be third-party claims

11   against, um, against other -- against other

12   third parties, not estate parties.  But it was

13   not an evaluation or investigation of those

14   potential claims.

15        Q.   Okay.  Specifically, you have no

16   knowledge of whether DTSC might have claims

17   against parties that are being released under

18   this Chapter 11 plan; is that correct?

19        A.   I don't have knowledge of the

20   existence of or nature of a specific claim.

21             I certainly am aware that, in crafting

22   the global settlement, this was a concern of the

23   released parties, that they not be left subject

24   to any such potential claims.



1            I just am not aware of the existence

2       of a claim or what the nature of that specific

3       claim would be.

4            Q.   Okay.  So you can't say whether or not

5       DTSC is giving up any value by being forced to

6       grant the release to the consenting creditors,

7       can you?

8            A.   No.

9            Q.   Mr. Messing, you said you have been a

10      CRO, I think, five or six times.  In that

11      context, have you negotiated DIP credit

12      agreements before, sir, on behalf of the debtor?

13           A.   Yes.

14           Q.   Have you ever done it on behalf of

15      secured lenders?

16           A.   Yes.

17           Q.   Would you agree with me that it is not

18      unusual for a DIP credit agreement to have

19      what's known as a carve-out in it?

20           A.   I would agree with that, yes, it's not

21      unusual.

22           Q.   Would you also agree with me that it's

23      not unusual that a DIP credit agreement contains

24      provisions where a debtor or a creditors'



```
1     committee can use purported collateral to

2     conduct an investigation against secured

3     lenders?

4          A.   I agree that would not be unusual.

5          Q.   Okay.  How many DIP credit agreements

6     have you seen that didn't have that feature,

7     sir?

8          A.   I don't recall.  I don't specifically

9     recall one that didn't.

10         Q.   So you can't name a single one?

11         A.   That's correct.

12         Q.   Okay.  When I talk about the

13    consenting creditors, do you know who they are,

14    sir?

15         A.   Um, I know who they are as a general

16    body.  I don't, from memory, know each and every

17    one.

18         Q.   Okay.  Do you agree with me that, as

19    of the commencement date, that the consenting

20    creditors held about 90 percent of the super

21    priority notes?

22         A.   I don't recall the exact number, but I

23    do recall it's in that neighborhood.  That's

24    directionally correct.
```



1       Q.   Okay.  And that was it directionally

2    correct that they held about 80 percent of the

3    exchange priority notes, sir?

4       A.   I believe so, yes.

5       Q.   And about 76 percent of the first lien

6    notes, Mr. Messing?  Does that sound

7    directionally correct?

8       A.   I believe so, yes.

9       Q.   And did the consenting creditors hold

10   a substantial amount of equity in the debtors?

11      A.   Yes.

12      Q.   Okay.  Did they -- do you know did

13   they also own equity in non-debtor affiliates of

14   the debtors?

15      A.   I believe so, yes.

16      Q.   Okay.  Do you know whether those

17   creditors, consenting creditors as equity

18   holders, had the right to choose who served on

19   Exide's board of directors?

20      A.   I don't recall.  I'm not sure I knew.

21      Q.   Okay.  So you are an officer of the

22   company; right?

23      A.   I am an officer of the company, yes.

24      Q.   And it's your testimony that you don't



1   know who had the authority to appoint board

2   members to a company you served as an officer

3   of?

4          A.   Um, I became an officer of the company

5   when -- after the special committee had been

6   appointed.

7               I know the purpose of the special

8   committee, and I know the members, the

9   constitution of the special committee.

10         Q.   All right.  Do you know who had the

11  authority to remove special committee members?

12         A.   I don't.

13         Q.   Okay.  Do you know who had the

14  authority to hire and fire Ankura ultimately?

15         A.   The special committee.

16         Q.   Okay.  And do you know -- but you

17  don't know whether the board of directors could

18  have authorized a special committee to fire

19  Ankura, do you?

20         A.   I do not know, no.  I don't believe

21  so.  I think -- my understanding is the

22  authorities of the board were delegated to the

23  special committee.

24         Q.   You don't know whether that could have



1    been revoked?

2         A.   I don't know.  I don't recall.

3         Q.   Okay.  Okay.  DTSC is classified in

4    class eight of the plan; is that correct?

5         A.   Yes.

6         Q.   Okay.  You don't know what percentage

7    of the total claims in class eight DTSC holds,

8    do you?

9         A.   I do not.

10        Q.   Under the plan, DTSC would receive a

11   distribution of about $2.6 million; right?

12        A.   Yes.

13        Q.   And you can't tell me whether or not

14   this represents DTSC's pro rata share of

15   distribution of environmental claims in its

16   class, can you?

17        A.   I'm sorry.  Can you ask the question

18   again, please?

19        Q.   You can't tell me if that $2.6 million

20   is the equivalent of a pro -- is the equivalent

21   of DTSC's pro rata share of distributions in its

22   class, can you?

23        A.   No, I can't.

24        Q.   Okay.  Do you know what size claims



```
 1    DTSC intends on asserting against the debtors?
 2         A.   I don't.
 3         Q.   Do you know whether DTSC intends on
 4    asserting any administrative priority claims in
 5    this case?
 6         A.   I don't know.
 7         Q.   The administrative bar date hasn't
 8    passed yet, has it?
 9         A.   It has not.
10         Q.   Okay.  Are you aware that the plan
11    says that DTSC's administrative claims will be
12    automatically disallowed?
13         A.   Yes.
14         Q.   Do you have any factual basis before
15    you at the moment to disallow DTSC's
16    administrative claims, Mr. Messing?
17         A.   I don't.
18         Q.   So you don't know whether, in fact,
19    DTSC might have incurred administrative claims
20    in this Chapter 11 case, do you?
21         A.   I don't at this point in time, no.
22         Q.   Okay.  And DTSC hasn't consented to
23    not having its admin claims paid, has it, to the
24    best of your knowledge, sir?
```



1        A.   Not to the best of my knowledge, no.

2        Q.   Okay.  And, in fact, DTSC never signed

3    any settlement agreement; is that correct, sir?

4        A.   I don't know specifically whether any

5    documents were signed as part of the global

6    settlement.

7             I do understand that the global

8    settlement reach was supported by the DTSC but

9    was subject to final approval by the State of

10   California.

11       Q.   Okay.  And you were always aware that

12   it was subject to final approval; right, sir?

13       A.   Yes.  I have lost Mr. Friedman.  I

14   hear you, but I have lost your video.  Oh, there

15   you are.  Yes.

16       Q.   Okay.  And you know that that was

17   never reached, correct, that final approval?

18       A.   Correct.  Yes.  I understand that.

19       Q.   The debtors have concluded the Vernon

20   property is of inconsequential value.  Isn't

21   that right, Mr. Messing?

22       A.   To the estate, that's correct.

23       Q.   And that's the basis for its aband --

24   its purported abandonment, right, it just



1    doesn't have value to the estate?

2         A.   It doesn't have value to the estate,

3    and the estate don't have the wherewithal to

4    continue to maintain it.

5         Q.   And have the secured credit -- do you

6    know who currently has liens on the Exide

7    property -- I'm sorry -- on the Vernon property?

8         A.   My understanding is that it's the

9    noteholders.

10        Q.   The noteholders?  I'm sorry.  I

11   apologize for talking over you.  Were you

12   finished, Mr. Messing?

13        A.   I clarified my answer -- I added to my

14   answer when I said noteholders, that it's the

15   secured lenders.

16        Q.   Okay.  Have the secured lenders ever

17   told you that they see value in their lien?

18        A.   That's not been communicated to me

19   directly by the secured lenders, no.

20        Q.   Okay.  Has anybody made a firm

21   irrevocable offer to buy the Vernon property

22   from the debtors?

23        A.   Um, not to my knowledge.  We began a

24   sales process in the course of which we received



1      indications of interest but not firm irrevocable

2      offers.

3           Q.   And you understand that those

4      indications of interest for however much value

5      they were, were contingent on the Vernon

6      property being environmentally remediated; isn't

7      that right, sir?

8           A.   That's my understanding, yes.

9           Q.   How much did the debtors project they

10     would have to spend to environmentally remediate

11     the Vernon property?  Was it $70 million,

12     $75 million?  Does that sound right?

13          A.   Mr. Friedman, I believe I answered --

14     I'm not sure I answered this question correctly

15     in my deposition yesterday, so I do want to try

16     again.

17               Um, the $75 million number is

18     something that I did cite yesterday in my

19     deposition.  The $75 million number, to the best

20     of my recollection, is a reporting by Exide

21     management of the projected total, um, total

22     project-related costs associated with the

23     completion of phase one from the inception of

24     the closure plan in 2017.



1          Since the inception of the closure

2     plan in 2017, I believe the debtors' report that

3     they have sent on direct project-related costs

4     in the neighborhood of $46 million.

5          I believe it was 12 million the first

6     year, 16 million the second year, and 18 million

7     the third fiscal year -- each of those were

8     fiscal years -- for a total of $46 million,

9     which means on the basis of that initial or that

10    most recent projection that I saw of 75 million,

11    that there would have been approximately

12    $29 million left of project-related spent

13    complete closure one, phase one of the closure

14    plan.

15         Q.   What about additional phases, sir?

16    How much is left to fund additional phases?

17         A.   I don't know.  To my knowledge, there

18    is only one additional phase in the closure

19    plan, which is phase two.  And I don't believe,

20    or I certainly don't recall seeing a specific

21    estimate for phase two closure costs, or phase

22    two completion costs.

23         Q.   So, now, that, sir, is inconsistent

24    with your first-day declaration, isn't it?  In



1    your first-day declaration you said that the

2    company had spent $166 million on operating and

3    remediation costs at the Vernon facility alone

4    and expects to spend -- expects to spend $254

5    million.  Isn't that correct, sir?  Do you

6    remember that?

7         A.   I do remember that statement in my

8    first-day declaration, yes.

9         Q.   Okay.  And so $254 million minus 166

10   is actually $84 million in additional spending;

11   correct?

12        A.   It is correct that 256 minus 166 is

13   84, yes.

14        Q.   Okay.  So are you telling me that

15   today your testimony is that that $84 million

16   number is wrong?

17        A.   Um, no.  I don't know the answer.  And

18   I will explain why.

19             So the information provided to me and

20   the basis for my statement in the first-day

21   declaration was that there was a balance of

22   $84 million left to spend in the remediation of

23   the Vernon property.

24             Um, the $75 million number, as I just



WILCOX & FETZER
(302) 655-0477  |  WWW.WILFET.COM

A-1429

1   explained, is project-related costs only from

2   Fiscal Year '23 forward and only for the balance

3   of phase one of the closure plan.

4          So I don't know.  It's certainly

5   correct that, on the basis of the information

6   provided to me in the first-day declaration,

7   that the total -- the total remaining spend was

8   $84 million.

9          It may be apples and oranges is my

10  point exactly, Mr. Friedman, in that I don't

11  know for certain what was included in that

12  number and what was not included in the

13  $75 million number.

14         The $75 million number is project

15  costs only.

16         My understanding is that the

17  $254 million number is phase one and phase two

18  and is not just project related, but it's

19  operating related and legal -- projected legal

20  expenses, as well.

21         So, looking forward, I don't know that

22  the 84 represents the best estimate of a

23  completion cost, a pure completion cost for

24  phase one and phase two.



1        Q.   Okay.   Do you have a specific amount

2    of -- a specific dollar figure for how much

3    Exide believes needs to be spent on remediation

4    costs at Vernon going forward?

5        A.   Um, I don't.  Um, I don't.  Because

6    those various estimates contained other

7    components than -- well, in the case of the

8    $254 million, my understanding is that estimate

9    would have contained costs that were not

10   specifically remediation related.

11            And in the case of the $75 million

12   estimate, one, point one is that some of that

13   money will be spent already, so it doesn't

14   represent what's left to be spent; and, point

15   two, it's project related and doesn't include

16   other expenses.

17       Q.   Okay.  So the answer is you don't

18   actually have a specific number; correct?

19       A.   That's correct.

20       Q.   Okay.

21       A.   What I have reported to you are the

22   numbers that I am aware of to the best of my

23   knowledge.

24       Q.   Mr. Messing, you know there are surety



WILCOX & FETZER
(302) 655-0477  |  WWW.WILFET.COM

A-1431

```
1    bonds available to DTSC related to Vernon;
2    right?
3         A.   That's my understanding, yes.
4         Q.   Okay.  You don't know whether or not a
5    plan has to be confirmed or this plan has to be
6    confirmed for DTSC to access those funds, do
7    you?
8         A.   I don't know with certainty.  I
9    believe -- I believe that DTSC would have --
10   that DTSC could have access to those funds even
11   if a plan is not confirmed.
12        Q.   Okay.  Do you know that there is a
13   $15 million in a standby trust to be used at
14   Vernon?
15        A.   That's my understanding, yes.
16        Q.   Okay.  Do you know whether this plan
17   has to be confirmed for DTSC to have access to
18   that money?
19        A.   I don't believe so, no.
20        Q.   Okay.  And there is $3 million in a
21   trust to address off-site harm; right?
22        A.   That's my understanding, yes.
23        Q.   And this plan doesn't have to be
24   confirmed for DTSC to get access to that money;
```



1    right?

2         A.   I don't believe so, no.

3         Q.   Okay.  And you don't know what DTSC

4    has obligated funds under any of those three

5    forms of consideration to spend on already;

6    isn't that right, sir?

7         A.   I do not know.

8         Q.   So you don't know whether DTSC could

9    use that money for any specific purpose; right?

10        A.   My understanding would be DTSC would

11   have access to those funds.

12        Q.   But you don't know for what purpose,

13   though?

14        A.   I don't know -- I'm not sure I

15   understand the question, Mr. Friedman.

16        Q.   You know what?  You probably don't

17   understand it because it wasn't a great

18   question.  I will withdraw the question or leave

19   it unanswered.

20             Mr. Messing, one of the purported

21   benefits of the plan is to avoid loss of jobs in

22   Europe slash Rest of The World; right?

23        A.   Yes.

24        Q.   If there was a successful cash bidder



1    for that, for the Europe Rest of The World

2    assets, that could avoid liquidation of those

3    entities, correct, and preserve jobs?

4        A.   Um, I'm not sure I understand the

5    hypothetical.  If the plan is not -- if the plan

6    is not approved, the debtors don't have

7    sufficient resources to pivot to another --

8    another plan, if what you are asking is whether

9    we could simply go back to a 363 sale and seek a

10   cash bidder to take those assets.

11       Q.   I'm asking if a cash bidder had been

12   found before that was acceptable, somebody else

13   could have bought those assets and purchased --

14   and kept those jobs in place; correct?

15       A.   I mean, we ran an open process.  You

16   know, we sought, you know, the best and highest

17   bids.  We received only the one qualified

18   bidder, which was the credit bid.  If we

19   received a better bid, that would have been a

20   better solution.

21       Q.   Well, is it your testimony that the

22   plan is not confirmed today; for example, that

23   everybody who is employed in Europe Rest of The

24   World will lose their jobs?



1          A.   No.   My testimony is --

2          Q.   What about tomorrow?  If the plan

3     isn't confirmed tomorrow, will they lose their

4     jobs?

5               THE COURT:  Mr. Friedman, he wasn't

6          finished.  Mr. Messing, you may continue.

7               MR. MESSING:  Thank you, Your

8          Honor.  The balance of my answer was that it

9          doesn't mean with certainty that the

10         employees in Europe and Rest of The World

11         would lose their jobs, but it would create

12         that risk and jeopardy.

13    BY MR. FRIEDMANN:

14         Q.   Okay.  Have the winning bidders told

15    you that they will cease to support the European

16    rest of the world assets if the plan is not

17    confirmed today?

18         A.   They have not told me that, no.

19         Q.   Were there other expressions of

20    interest in connection with the option from

21    parties other than the credit, the ultimate

22    winning bidder?

23         A.   Yes.

24         Q.   Okay.  Mr. Messing, assume for me --



1     assume for a moment that the debtors are going

2     to abandon the property at issue here, the

3     Vernon property.

4               To whom are they abandoning the

5     property, in your understanding?

6          A.   My understanding is that the

7     abandonment would be to Exide Technologies LLC.

8          Q.   Okay.  Who owns Exide Technologies

9     LLC?

10         A.   Um, Exide Technologies LLC, um, to the

11    best of my recollection of the corporate org

12    structure is wholly owned by Exide Holdings Inc.

13         Q.   Okay.  Does somebody work at Exide

14    Holdings Inc?  Is there like an employee of it

15    that you know of?

16         A.   Um, it has no employees.  I'm just an

17    officer, remaining officer.

18         Q.   Okay.  So, if people have questions

19    after abandonment about how to get on the

20    property, do they call you, Mr. Messing?

21         A.   Um, they wouldn't call me.  I would no

22    longer be an officer.

23         Q.   So who do they call?

24         A.   Um, I don't know the answer to that



1    question.

2        Q.   Does Exide Technologies LLC have any

3    resources to, for example, pay any vendors on

4    site post abandonment, Mr. Messing?

5        A.   No.

6        Q.   Okay.  So who would somebody call if

7    they wanted to get on the property to make sure

8    they weren't trespassing in an abandonment

9    situation?

10       A.   I don't know.  My understanding in an

11   abandonment situation is that the property,

12   while abandoned, Exide Technologies LLC becomes,

13   um, the responsibility of the State of

14   California.

15       Q.   Okay.  So do you know are the utility

16   bills just magically switched over to the State

17   of California after abandonment?

18       A.   I don't know that, but the State of

19   California could continue to pay utility bills.

20       Q.   How do you know that?  Would the State

21   of California just have a -- like automatically

22   have a contract in your understanding with the

23   utilities, sir?

24       A.   I don't understand what the contract



1      would be.  But my understanding is that upon

2      abandonment, the services that are being

3      provided by third parties, including utilities

4      to the Vernon property, could be continued if

5      California wishes for them to continue.

6           Q.   Okay.  So it just becomes the State of

7      California's burden at that point financially?

8      Is that what you are telling me?

9           A.   That's my understanding, yes.

10          Q.   Okay.  And are the debtors making any

11     financial contribution to that directly in the

12     abandonment scenario?

13          A.   Um, it depends on the abandonment

14     scenario.  My understanding is that if the -- if

15     the -- if the payment -- if a payment condition

16     is satisfied, um, and the Vernon trust condition

17     is satisfied, they, of course, receive the

18     $2.6 million.

19               Mr. Friedman, can I reference my

20     declaration on this point to answer your

21     question?

22          Q.   Yes, but I -- if you don't mind me

23     just clarifying, I don't understand that to be

24     an abandonment.  Do you, sir?



1      A.   Well, the property is abandoned if the

2    payment plan is not -- if the payment condition

3    is not satisfied.

4           If the mutual leases are not granted,

5    the property is abandoned.  And then the

6    question is whether the Vernon trust condition

7    is satisfied.

8           If the payment condition is satisfied,

9    and the Vernon trust condition is not satisfied,

10    um, then the $2.6 million doesn't go to the

11    Vernon trust, but it goes to the standby trust.

12           If the payment condition is not

13    satisfied and the Vernon condition is not

14    satisfied, to the best of my recollection, um,

15    there is not, um -- there is not a conveyance of

16    any portion of the global settlement to

17    California.

18           And if that was your question under

19    that circumstance of abandonment, there would be

20    no funds coming from the debtor estate or the

21    settling, you know, the settling parties to the

22    State of California.

23      Q.   Okay.  Thank you.  That clarifies

24    things for me.



1              So in that circumstance, in the latter

2      circumstance -- do you know what the FEU is?

3          A.   I do.

4          Q.   Okay.  And are you aware that there is

5      a possibility that the people who maintain the

6      FEU and own it might just remove it upon

7      abandonment?

8          A.   I'm -- I'm aware that the FEU is

9      provided by and maintained by a third-party

10     vendor called AIS.  Um, and I'm aware that upon

11     abandonment, um, the debtors will no longer be

12     responsible for or able to continue to engage

13     AIS to perform those responsibilities.

14             I don't specifically recall in the

15     agreement, you know, what their rights are for

16     removal, um, so I'm afraid I'm not able to

17     answer your question in its entirety.

18         Q.   Okay.  Do you know what would

19     happen -- so would environmental safety

20     conditions at the Vernon site be worse if the

21     FEU is removed?

22         A.   Yes.  I mean, it's my understanding

23     it's been an important principle of the conduct

24     of the debtors during this case to maintain a



1    condition at the Vernon site that prevented any

2    imminent harm.

3           The FEU is one of the critical --

4    critical components of that condition to prevent

5    harm.

6           So, yes, if the FEU were not there,

7    there would not be the ability to main -- to

8    maintain negative pressure around the

9    partially -- well, completely demolished but not

10   completely cleaned up building that the FEU

11   contains.

12      Q.   Mr. Messing, is it your understanding

13   that DTSC is obligated to give a -- (telephone

14   ringing in background)  Apologies, Your Honor,

15   for the background noise.

16           It's your understanding this DTSC is

17   required to give a third-party release to the

18   consenting creditors under this plan, correct,

19   or the court is required to order it?  Is that

20   correct?

21      A.   It is.  And in the alternative, if it

22   is not, then the property under the plan is

23   abandoned.

24      Q.   Okay.  Do you know whether other



WILCOX & FETZER
(302) 655-0477 | WWW.WILFET.COM

1    entities in California are also being obligated

2    to grant releases to the consenting creditors?

3         A.   My understanding is that the

4    non-consensual third-party release is applied to

5    all environmental agencies in California.

6         Q.   Okay.  Can you identify what those

7    are, sir?

8         A.   Um, I can't, but I understand there

9    were multiple environmental agencies in

10   California, and that's the purpose of the

11   release being constructed in that way.

12        Q.   Do you know what rights those other

13   agencies might be -- might have against third

14   parties?

15        A.   Without the release?  I don't know

16   exactly what rights they are giving up.  It's a

17   general release, is my understanding.

18        Q.   Okay.  Do you know if other states are

19   being required to have all their environmental

20   agencies give releases?

21        A.   I don't believe the other states all

22   who have agreed to the global settlement are

23   required under that settlement to have those

24   releases applied to all agencies.



1          It is my understanding that those

2     other states all have single responsible

3     agencies, and they are all subject -- they are

4     all granting the consensual release, the broader

5     consensual release.

6          Q.   Okay.  And do you understand that the

7     releases in this case that are being demanded

8     cover claims related to human health?

9          A.   Um, I understand these are, um, broad

10    releases of any claims that could be brought by

11    the releasing party.

12         Q.   And does that include claims regarding

13    human health, sir?

14         A.   I don't know specifically.  If that's

15    a claim that could be brought by a California

16    environmental agency, then the answer would be

17    yes.  If it's not, then no.

18         Q.   Okay.  Do you know that the plan

19    definition of environmental laws covers claims

20    regarding human health?

21         A.   I don't recall that specifically, no.

22         Q.   So did you not know that when you

23    approved the third-party releases, Mr. Messing?

24         A.   I don't recall that.  I --



```
1                    MR. FRIEDMAN:  I can see Your Honor
2        puzzling, so let me just try to make it
3        clear.
4                    THE COURT:  It's a double -- It's a
5        double negative.
6                    MR. FRIEDMAN:  Yes.
7    BY MR. FRIEDMAN:
8        Q.   So I will restate the question to ask
9    when you approved the third-party releases, were
10   you aware that they covered claims regarding
11   human health?
12                   MR. FRIEDMANN:  Object to form,
13       Your Honor.  It mischaracterizes the plain
14       language of the plan.
15                   THE COURT:  Overruled.  He can
16       answer to the extent he can.
17                   MR. MESSING:  Please repeat the
18       question, Mr. Friedman.
19                   MR. FRIEDMAN:  Yes.
20   BY MR. FRIEDMAN:
21       Q.   So when you testified in your
22   declaration in favor of third-party release --
23   the Court granting third-party releases, were
24   you aware of whether the third-party releases
```



1    covered claims relating to human health?

2         A.   Um, to the best of my recollection, my

3    understanding at the time and my understanding

4    now is that the claims, the releases are --

5    third-party -- non-consensual third-party

6    releases are granted by all of the California

7    environmental agencies.

8              I don't know specifically whether

9    that -- I don't know if it's at the time or now

10   whether that specifically includes, um, a claim

11   brought by an agency, um, that's a human health

12   claim in nature.

13             MR. FRIEDMAN:  Okay.  Your Honor,

14      may I just have a minute to go on -- to stop

15      video so nobody has to see me going through

16      my papers?

17             THE COURT:  All right.  Yes, that's

18      fine.  Thank you.

19   BY MR. FRIEDMAN:

20        Q.   Mr. Messing, I just have one

21   additional question, sir.  I hope it's one

22   additional question.

23             Are you aware or do you have knowledge

24   of California governing -- California law



1   governing government contracts?  Do you have any

2   specialized knowledge in that area?

3          A.   I do not.

4          Q.   Okay.  So you don't know what

5   contracting regulations DTSC might have and how

6   quickly it might be able to enter into contracts

7   with parties with respect to Vernon once the

8   debtors have abandoned that property; is that

9   correct?

10         A.   I don't.  With respect to specific

11  California regulation, I don't.

12         Q.   Okay.  Did you ever make any inquiry

13  into that issue?

14         A.   No.  My understanding is that the

15  discussions have already started between

16  California and the third-party vendors that are

17  providing services to the site.

18             I have not been told, nor did I

19  investigate, any regulatory restrictions on

20  their ability to execute contracts of those

21  sorts.

22         Q.   Okay.  So you accident know whether,

23  on the day of abandonment, whether the

24  Department of Toxic Substance Control Services



```
 1    will be able to immediately enter into

 2    contracts, for example, to keep the FEU in

 3    place?  You just -- you don't know the answer to

 4    that; is that correct?

 5         A.   I don't know whether they can or they

 6    can't.

 7              MR. FRIEDMAN:  Okay.  I have

 8       nothing further, Your Honor.

 9              THE COURT:  Thank you.  Does anyone

10       else?  I don't believe so, but does anyone

11       else wish to cross examine Mr. Messing?

12              Okay.  Any redirect, Mr. Friedmann?

13              MR. FRIEDMANN:  Yes, Your Honor,

14       please.

15                    -   -   -

16                    EXAMINATION

17                    -   -   -

18    BY MR. FRIEDMANN:

19         Q.   Mr. Messing, to the best of your

20    knowledge, have the debtors made all payments,

21    all admin payments necessary to comply with law

22    related to the Vernon site to date?

23         A.   Yes, absolutely.  I mean, it's been a

24    focus, as I said to Mr. Friedman, it's been a
```



1      focus of mine and of the debtors from the

2      inception of the cases to continue all the

3      activities at the site that prevent imminent

4      harm to the environment or the community.

5          Q.   And as of today, has DTSC asserted an

6      administrative claim?

7          A.   Not that I am aware of, no.

8          Q.   To the extent that DTSC may have an

9      administrative claim, would they have all of the

10     information necessary by today to be able to

11     assert that claim?

12             MR. FRIEDMAN:  Your Honor, I

13        object.  That calls for speculation.

14             THE COURT:  Well, to the best of

15        your knowledge, Mr. Messing.  If you can't

16        answer, you can't answer, but if you have any

17        knowledge, you can.  Don't speculate.

18             MR. MESSING:  Um, well, then, I

19        can't answer the question.  I don't know.

20     BY MR. FRIEDMANN:

21         Q.   Mr. Messing, have the noteholders

22     given you any indication or any assurance that,

23     in the event that the plan is not confirmed

24     today, that they would nevertheless continue



1    supporting the debtors?

2         A.   They have given me no indication they

3    would continue supporting the debtors if the

4    plan is not confirmed.

5         Q.   Mr. Messing, there was some discussion

6    earlier about some of the financial assurances

7    for Vernon, including the standby trust and the

8    surety bonds.

9              Can you explain, from your perspective

10   as a CRO, what the purpose of those financial

11   assurances are?

12        A.   Yeah.  My understanding is the purpose

13   of the surety bonds is to provide financial

14   assurance, in this case to the State of

15   California and the DTSC, such that if the

16   debtors are not able to meet their obligations

17   to perform the required services, that the

18   surety bonds have been posted and the funds are

19   available to the state to take over that

20   responsibility and use those funds to

21   complete -- to complete those activities, in

22   this case the remediation, the cleanup and

23   remediation of the Vernon property.

24        Q.   Mr. Messing, who has paid for the --



1   who has paid the premiums for those surety

2   bonds?

3          A.   The debtors.

4          Q.   And the monies that are in the standby

5   trust, where does that money come from?

6          A.   Um, my understanding, the standby

7   trust, to my understanding, was created out of

8   the last bankruptcy and was funded out of the

9   estate at that time.

10         Q.   There were some questions you were

11  asked, Mr. Messing, you may recall about sort of

12  this hypothetical parade of horribles that might

13  happen the day after abandonment.

14              Do you have any reason to believe that

15  if abandonment were to occur, that AIS the very

16  next day would go and remove the FEU tents and

17  allow all of the lead dusk being contained by

18  that into the atmosphere?

19         A.   No.  To the contrary, as I said to

20  Mr. Friedman, it's my understanding that AIS is

21  already in discussions with the State of

22  California about continuity.  And I understand

23  that AIS is --

24              MR. FRIEDMAN:  Your Honor, I object



1      to the answer.  It's being given on the basis

2      of hearsay.

3                  THE COURT:  Let him finish the

4      answer, and then I will consider your

5      objection as one to strike.

6                  Mr. Messing, can you continue, or

7      you can start over, however you want to.

8                  MR. MESSING:  No, that's fine.  The

9      remainder of my response is simply to say

10     that I also understand that AIS has an

11     interest in being able to continue this

12     sizable contract that they have in this case,

13     to maintain the hackie of the Vernon

14     property.

15                 THE COURT:  Okay.  And the

16     objection is hearsay; correct?

17                 MR. FRIEDMAN:  Yes, Your Honor.

18                 THE COURT:  Response?

19                 MR. FRIEDMANN:  Your Honor, first

20     of all, to the extent that it states on what

21     he learned from DTSC, it would be a party

22     admission.  And, otherwise, it's not being

23     asserted for the truth of the matter; it's

24     just going to subsequent actions.



```
1                    THE COURT:  All right.  Well, I
2          will allow it to be extenuated from DTSA, but
3          I agree that it's not really based that
4          that's true or not true.  It's simply the
5          fact, which might be a hearsay fact that is
6          the basis for his decision, and the decision
7          is the fact.  So I will overrule the
8          objection.
9                    MR. FRIEDMANN:  Thank you, Your
10         Honor.
11     BY MR. FRIEDMANN:
12         Q.   Mr. Messing, you talked a little bit
13     earlier about what the special subcommittee was
14     asked to investigate.
15                    Has anyone, including DTSC, ever
16     articulated to you any claim that could be made
17     by DTSC that would merit investigation that was
18     not investigated?
19         A.   No.
20                    MR. FRIEDMANN:  I have nothing
21         further, Your Honor.  Thank you.
22                    THE COURT:  All right.  Thank you,
23         Mr. Messing.
24                    MR. KAPLAN:  Your Honor -- Your
```



1      Honor -- Your Honor, may I -- Michael Kaplan

2      on behalf of the committee.  I was hoping we

3      could ask a couple of questions in redirect

4      as proponents of the plan, as well.

5                  THE COURT:  Okay.

6                  MR. KAPLAN:  Briefly, Your Honor.

7                       -   -   -

8                  EXAMINATION

9                       -   -   -

10   BY MR. KAPLAN:

11      Q.   Mr. Messing, do you recall being asked

12   some questions about the professional fee budget

13   in this case by Mr. Friedmann?

14      A.   I do.

15      Q.   And I believe you testified, just to

16   move it along, it went from 20 million initially

17   to somewhere around 50 million; correct?

18      A.   Correct.

19      Q.   Sitting here today, can you tell the

20   Court how much of the increase occurred after

21   DTSC withdrew from the global settlement?

22      A.   I don't think I can tell the Court the

23   exact number.  I mean, certainly, we have been

24   increasing our estimates, professional fees, in



1    the last few weeks as a result of all of the

2    activity that had to take place, one, to

3    preserve in some fashion, you know, the original

4    global settlement with the remaining parties

5    that were left and willing and anxious to

6    settle, and, two, in trying to respond to the

7    objections raised by the DTSC.

8              So it most certainly has increased,

9    Mr. Kaplan.  I don't recall the exact number.

10        Q.   And it has also, you would agree with

11   me, sir, it increased in the past week as we

12   have been actively litigating confirmation;

13   correct?

14        A.   Yes.  Absolutely, yes.

15        Q.   And last question, sir:  Had the

16   global settlements stayed intact, none of this

17   litigation would have occurred; correct?

18        A.   I don't -- I don't believe so, not at

19   all, no.

20              MR. KAPLAN:  That's all I had, Your

21      Honor.  Thank you for the in.

22              THE COURT:  Okay.  I apologize

23      Mr. Kaplan.  I wasn't aware you wanted to ask

24      questions, which is just fine.



```
 1                  Does anyone else wish to redirect?
 2          We are not going to do recross, if that's
 3          what you were about to ask.
 4                  MR. FRIEDMAN:  Your Honor, there
 5          was an issue raised on redirect that is, I
 6          think, incomplete and doesn't give a full
 7          picture that I can address in two questions
 8          with Mr. Messing.
 9                  THE COURT:  Okay.  Now, I need two.
10          I will allow two.
11                       -   -   -
12                       EXAMINATION
13                       -   -   -
14      BY MR. FRIEDMAN:
15          Q.  Mr. Messing, are you aware that the
16      funds in the standby trust were placed there so
17      that Exide would not be prosecuted for felonies
18      that it committed before 2013?
19          A.  I -- I'm not -- I don't have specific
20      knowledge of the exact conditions of the standby
21      trust, no.
22          Q.  Okay.  And you don't know, sir,
23      whether the West Chester policy was put in place
24      in order for the debtors to be able to continue
```



```
1     operating Vernon and make profits in the Vernon

2     facility, do you?

3          A.   I'm sorry.  Could you please repeat or

4     perhaps clarify the question?

5                MR. FRIEDMAN:  May I, Your Honor?

6                THE COURT:  Yes.

7                MR. FRIEDMAN:  That makes it more

8        than two.

9                THE COURT:  Yes, you may.

10    BY MR. FRIEDMAN:

11         Q.   You don't know whether Exide obtained

12    any benefits from providing the West Chester

13    policy prem -- for paying the West Chester

14    policy premiums; is that correct?  It didn't do

15    it gratuitously; right?  It provided them for a

16    reason?

17         A.   My understanding is that surety bonds

18    are obtained because they are required in this

19    case to operate.

20               MR. FRIEDMAN:  Okay.  Thank you,

21       Your Honor.  I have nothing further.

22               THE COURT:  Any redirect on those

23       two questions?

24               MR. FRIEDMANN:  No, thank you, Your
```



```
 1        Honor.

 2                    THE COURT:  Okay.  All right.

 3        Mr. Messing, you are free to go.  You can

 4        check your texts, check your e-mail, say

 5        hello to your dog, whatever you want to do.

 6        Thank you very much.

 7                    MR. MESSING:  Thank you.

 8                    THE COURT:  Who is the next

 9        witness?

10                    MR. GENENDER:  Your Honor --

11                    THE COURT:  Yes.

12                    MR. GENENDER:  -- Paul Genender,

13        Weil Gotshal and Manges for the debtors.  Can

14        you hear me okay?

15                    THE COURT:  Yes, sir.

16                    MR. GENENDER:  Our next witness is

17        Harvey Tepner, Your Honor.

18                    THE COURT:  Okay.  We are going to

19        take a short recess, and then we will -- we

20        have been going a little while.  And then we

21        will turn to Mr. Tepner, so say five minutes

22        or so.  Thank you.

23            (A recess was taken.)

24                    THE COURT:  And I believe the next
```



1     witness is Mr. Harvey Tepner; is that

2     correct?

3              MR. GENENDER:  Yes, Your Honor.

4              THE COURT:  All right.  Ms. Marin,

5     would you please swear in the witness?

6              THE CLERK:  Yes, Your Honor.

7                    -   -   -

8              HARVEY TEPNER,

9        the deponent herein, having first

10       been duly sworn on oath, was

11       examined and testified as follows:

12             MR. GENENDER:  Your Honor.

13             THE COURT:  Yes, go ahead,

14    Mr. Genender.

15             MR. GENENDER:  Thank you, Your

16    Honor.  Paul Genender, Weil Gotshal and

17    Manges for the debtors.  We do have

18    Mr. Tepner has submitted a declaration at

19    ECF-946, and I would like to put on a short

20    direct examination in addition to that, as

21    well.

22             THE COURT:  All right.  Well, let's

23    start with the declaration.  Is there any

24    objection to the admission of the



1        declaration?  Okay.  It's admitted without

2        objection.

3                  Is there any objection to the use

4        of a proffer?  Okay.  You may proceed with

5        the proffer.

6                  MR. GENENDER:  Your Honor, I was

7        going to do it in question and answer form if

8        that's okay.

9                  THE COURT:  Oh, well, that's an

10       examination.

11                 MR. GENENDER:  Yes.  I misspoke,

12       Judge.  I'm sorry.  I'm going to do some Q

13       and A in addition to the declaration is what

14       I should have said the first time.

15                 THE COURT:  All right.  We are

16       going to start.  Before we start, let me give

17       Mr. Tepner a few points.  Mr. Tepner, where

18       are you located today, sir?

19                 MR. TEPNER:  I'm in my office in

20       New York, in my home office in New York City.

21                 THE COURT:  Okay.  Are you alone in

22       the room, sir?

23                 MR. TEPNER:  I am alone in the

24       room.



```
 1              THE COURT:  Okay.  Terrific.  You
 2       may have heard earlier I need to instruct you
 3       not to read any text messages or e-mails
 4       during your examination, including any
 5       breaks.
 6              If you refer to any documents,
 7       either paper copy or on your screen, you need
 8       to let the Court and the participants know
 9       what you are looking at so that we can make
10       sure everything is okay and follow along.
11              Do you understand those
12       instructions?
13              MR. TEPNER:  Yes, Your Honor.
14              THE COURT:  All right.
15       Mr. Genender, you can proceed.
16              MR. GENENDER:  Thank you, Your
17       Honor.
18                    -   -   -
19                  EXAMINATION
20                    -   -   -
21    BY MR. GENENDER:
22       Q.   Mr. Tepner, just logistically, I
23    understand your phone is to your right, and the
24    camera is to your left; is that right?
```



1     A.   That's correct.  So I might

2  occasionally go like this to make sure I'm heard

3  better.

4             MR. GENENDER:   Okay.  Thank you

5     very much.  I just wanted the Court to be

6     aware that that was the reason that he might

7     be moving.

8  BY MR. GENENDER:

9     Q.   Mr. Tepner, to your knowledge, has any

10  party complained that there were matters that

11  the restructuring subcommittee should have

12  investigated but did not?

13    A.   No.

14    Q.   More specifically, Mr. Tepner, to your

15  knowledge, has the State of California or the

16  DTSC ever indicated that there were other

17  matters that should have been investigated by

18  the subcommittee that were not?

19    A.   No.

20    Q.   The claims that the restructuring

21  subcommittee investigated, who did those claims

22  belong to?

23    A.   They would be claims of the estate.

24    Q.   Did the restructuring subcommittee



1    that you were the sole member of, did it

2    investigate any claim that any individual

3    creditor might have?

4         A.   No.

5         Q.   Did it investigate any direct claim,

6    for example, that the State of California might

7    have?

8         A.   No.

9         Q.   Did your subcommittee do anything to

10   prevent the State of California or the DTSC from

11   pursuing its own investigation of any claims it

12   might have?

13        A.   No, nothing to prevent that.

14        Q.   Are you aware of any complaint by any

15   party as to the thoroughness, scope, or quality

16   of the subcommittee's investigation?

17        A.   No, sir.

18        Q.   To your knowledge, was there

19   coordination between --

20             UNIDENTIFIED SPEAKER:  Christina,

21     in the jeans I wore yesterday, I believe my

22     cash is in -- okay.  Very good.  Okay.  I'm

23     sorry.

24             THE COURT:  I don't know who that



1          is about what jeans you wore yesterday and

2          your cash.  Mute your phones, people.  It's

3          not difficult.

4                   The only people who should not have

5          their phone muted are me -- and I usually

6          have mine muted -- the witness, and the

7          person examining the witness.

8                   Even someone who needs to object

9          can do so by turning their phone on.  So

10         please mute your phones.  Go ahead, sir.

11    BY MR. GENENDER:

12         Q.   Thank you, Your Honor.  Mr. Tepner, to

13    your knowledge, was there coordination between

14    your subcommittee and the UCC with respect to

15    the investigation?

16         A.   Yes, sir.  There was good

17    coordination.

18         Q.   Were findings of the UCC's

19    investigation and your subcommittee's

20    investigation shared between the two?

21         A.   Yes.  All the findings were shared.

22         Q.   Are you aware of any material

23    disagreements as to the conclusions reached

24    between your committee and the UCC?



1        A.   I am not aware of any disagreements

2    between the UCC and the subcommittee.

3        Q.   Mr. Tepner, did you rely on certain

4    work done by Houlihan Lokey with respect to the

5    optimization transaction?

6        A.   Yes, I did.

7        Q.   And is some of that work referenced in

8    Mr. Feintuch's testimony that was admitted this

9    morning?

10       A.   Yes, it is.

11       Q.   Did you consider, Mr. Tepner, whether

12   unsecured creditors were damaged or harmed by

13   any of the matters the subcommittee

14   investigated?

15       A.   Yes, I did.

16       Q.   What was your conclusion in that

17   regard, the conclusion of the subcommittee's

18   investigation?

19       A.   The subcommittee's conclusion is that

20   there was no harm to unsecured creditors, and

21   there were no claims or any claims that could

22   have anything other than possibly really de

23   minimis value.

24       Q.   Mr. Tepner, are you aware of any



1    evidence that would indicate whether any of the

2    transactions that were investigated by your

3    committee were undertaken to harm or did harm

4    the State of California or to avoid

5    environmental liabilities?

6         A.   There was no conclusion I came to that

7    they were designed to harm the State of

8    California or hurt any environmental

9    liabilities.

10        Q.   Mr. Tepner, did you rely on

11   information provided by Mr. Messing with respect

12   to the value provided to the debtors' estate in

13   connection with the debtors' releases?

14        A.   Yes, I did.

15        Q.   In connection with the debtor

16   releases, did you consider the parties who were

17   receiving the releases?

18        A.   Yes, I did.

19        Q.   Did you reach a conclusion as to

20   whether the debtors' estate had valuable claims

21   against those parties being released?

22        A.   Yes, I did.

23        Q.   What were those -- what was that

24   conclusion?



1    A.    There were no claims or no claims of

2    anything of any substantial value.  If anything,

3    at best, maybe de minimis value.  There were

4    really no claims.

5    Q.    Did any of the parties who are

6    receiving those debtor releases, are they

7    providing any valuable consideration to the

8    debtors' estate in connection with the plan?

9    A.    Yes, they are.

10    Q.    And can you give an example?

11    A.    Sure.  I would like to reference the

12    declaration of Mr. Messing, which it's all

13    spelled out in his Paragraph 32.

14          They provided $18.5 million in cash.

15    They agreed -- they agreed to release their

16    claims on abandoned property and non-performing

17    properties.

18          They provided incredible support by

19    putting in a bid to acquire the European and

20    rest of the world assets.

21          They waived any deficiency claims.

22          And they canceled approximately

23    $160 million of principal obligations under the

24    super priority note.



1        Q.   And just for the record, Mr. Tepner,

2   the "they" you referred to is who?

3        A.   Is the noteholders, the consenting

4   creditors, often used in both contexts in these

5   hearings.

6        Q.   Mr. Tepner, who approved the debtor

7   releases?

8        A.   The special committee of the board of

9   directors.

10       Q.   And you are a member of that special

11  committee?

12       A.   Yes, sir.

13       Q.   And are you an independent director?

14       A.   Yes, sir.

15       Q.   And is the special committee composed

16  of other independent directors?

17       A.   Yes, sir.

18       Q.   Is the special committee composed of

19  only independent directors?

20       A.   Yes.  We are all independent

21  directors.

22       Q.   Mr. Tepner, if you found -- if your

23  investigates found that there were valuable

24  claims that the estate had against the



1   noteholders, would you be sitting here in favor

2   of providing the debtor releases under the

3   current plan?

4        A.   No, sir, I would have sought to

5   extract value for the value of those claims,

6   which probably would have resulted in a

7   different outcome or a different plan of the

8   organization.

9        Q.   Mr. Tepner, did the noteholders in any

10   way influence or interfere with the

11   subcommittee's investigation --

12        A.   No, sir.

13        Q.   -- as referenced in your testimony?

14        A.   No, sir, not at all.

15        Q.   Mr. Tepner, you are -- Mr. Tepner, did

16   anyone, whether at the debtors' or otherwise,

17   pressure you to reach a certain result in

18   connection with the subcommittee's

19   investigation?

20        A.   No, sir, not at all.

21        Q.   Were you told you might be removed as

22   a director if the investigation turned out a

23   certain way?

24        A.   Nope, not at all.



1          MR. GENENDER:  Those are the

2     questions I have.  Thank you, Your Honor.

3          THE COURT:  You are welcome.  Thank

4     you very much.  Any cross?

5          MR. CANTOR:  Good morning, Your

6     Honor.  Daniel Cantor from O'Melveny and

7     Myers on behalf of DTSC.  I have just got

8     some very brief questions for Mr. Tepner.

9          THE COURT:  Okay, Mr. Cantor.

10          MR. CANTOR:  Thank you.

11                -   -   -

12              EXAMINATION

13                -   -   -

14   BY MR. CANTOR:

15     Q.   Mr. Tepner, am I correct that the only

16   transactions that the subcommittee analyzed were

17   the June 2019 financing and the optimization

18   transaction?

19     A.   That is correct.

20     Q.   And so neither you nor your financial

21   advisors looked at the company's 2017

22   refinancing transaction, did you?

23     A.   We did not.

24     Q.   And you didn't look at any



1    transactions arising out of the company's

2    previous bankruptcy in 2013, did you?

3         A.   We did not.

4         Q.   Now, the mandate of the special

5    committee was not limited to the two 2019

6    transactions, was it?

7         A.   The focus was on those two

8    transactions.  But if we had found something

9    that had us go elsewhere, as I instructed my

10   counsel, my advisors, if you find something that

11   might be a claim or something we should pursue,

12   let's go where the evidence leads.

13        Q.   Okay.  But you just told me that you

14   didn't look at the 2017 refinancing or anything

15   arising out of the 23 bankruptcy -- the 2013

16   bankruptcy, even though that would have been

17   within the scope of the special committee's

18   man -- excuse me -- the subcommittee's mandate;

19   isn't that right?

20        A.   Not to be argumentative, but I think

21   that might be a theoretical question.

22        Q.   I'm sorry, sir.  Maybe I misunderstood

23   you.  Didn't you just tell me that neither you

24   nor your financial advisors looked at either the



1    2017 refinancing or the 2013 bankruptcy?

2         A.   Correct.

3         Q.   Okay.  And I thought you also told me,

4    but please correct me if I'm wrong, that the

5    mandate of the subcommittee was not limited to

6    looking at the 2019 transactions; isn't that

7    right?

8         A.   See, I don't, I just don't recall the

9    charging mandate right in front of me.

10        Q.   Okay.

11        A.   But if you look at the 2019, the two

12   2019 transactions, if anything had come to our

13   attention that said look elsewhere, look

14   further, we would have followed that path, but

15   we did not look at the 2017 transactions.

16        Q.   Okay.  And I don't want to make this

17   any more -- any more difficult than it has to

18   be.

19             Do you have any reason to doubt that,

20   in fact, the subcommittee had the authority to

21   look at transactions other than the 2019

22   transactions?

23        A.   I would have to take a look at our

24   charging mandate to do that.



1          But if something came out of our 2019

2     examination, I believe we would have had the

3     authority to do it, but I'm not sure -- I'm not

4     sure of the original charging mandate.  I would

5     have to look at it again.

6          Q.   And whose decision was it to focus on

7     the 2019 transactions as opposed to any other

8     transactions?

9          A.   I believe it was based upon the advice

10    of counsel is my best recollection.

11         Q.   Okay.  Now, if I understood your

12    declaration and the testimony that you gave on

13    direct -- excuse me -- sorry -- here this

14    morning, you determined that there were claims

15    that the debtors could assert arising out of the

16    2019 transactions; right?

17         A.   I don't think that's a -- that's the

18    right characterization.

19              UNIDENTIFIED SPEAKER:  I'm going to

20       object.  That misstates the testimony, Your

21       Honor.

22    BY MR. CANTOR:

23         Q.   Well, then let me not refer back to

24    the testimony.  You did, in fact, in your work



1    as the subcommittee, determine that there were

2    claims that the debtors could assert arising out

3    of the 2019 transactions; correct?

4           A.    There were potential or theoretical

5    claims that various -- that parties might be

6    able to assert.

7           Q.    Okay.  And as to the unsecured

8    creditors, your conclusion was that they

9    suffered no damages; correct?

10          A.    Correct.

11          Q.    And so you weren't saying that no

12   wrongdoing had occurred, just that it hadn't,

13   whatever had occurred, hadn't damaged the

14   unsecured creditors?  Do I have that right?

15          A.    Could you repeat the question again,

16   please?

17          Q.    Sure.  In concluding that the

18   unsecured creditors suffered no damages, you

19   weren't saying that there had been no wrongdoing

20   with respect to the unsecured creditors, that

21   they didn't have claims.  You were just saying

22   that, in your conclusion, that they hadn't been

23   damaged; right?

24          A.    I said they hadn't been damaged.



1      Q.   Okay.  And what was the basis for

2    saying that the unsecured creditors had suffered

3    no damages?

4      A.   We looked at the transactions.  We

5    looked at the flow of funds.  We looked at the

6    debt and the debt changes.  We looked at cash

7    contributions.  We looked at debt relief.

8           And we looked at all the factors of

9    before and after and determined that unsecured

10   creditors were not harmed by the transactions.

11   Arguably, they might have been elevated by the

12   transactions.

13     Q.   Now, in reaching that conclusion, you

14   were talking about the unsecured creditors as a

15   group; correct?

16     A.   Correct.

17     Q.   Okay.  So you didn't conclude that

18   none of the creditors had been damaged, just

19   that they weren't damaged in the aggregate; is

20   that correct?

21     A.   Generally, I think that's correct.

22     Q.   Now, do you have your declaration

23   handy?

24     A.   Yes, sir, I do.



1           MR. CANTOR:  Your Honor, I'm happy

2    to bring it up, subject to my own

3    technological limitations, if it would help

4    Your Honor, but I'm not sure that it's

5    100 percent necessary, but whatever would be

6    best for Your Honor, obviously.

7           THE COURT:  I don't think that's

8    necessary unless we get into a situation

9    where you have to parse through the language.

10   But let me make you a host, just so if we do

11   have to do it, you will just be able to share

12   your screen.  But I just got to find you

13   here.  You are way at the bottom.  You need

14   to pay for a better seat next time.

15          MR. CANTOR:  (Laughter)  On my own

16   screen, I'm right at the top.  I don't know

17   how --

18          THE COURT:  I know.  Okay.  You are

19   good to go, sir.

20          MR. CANTOR:  Okay.  Like I said,

21   I'm not sure it's necessary, so maybe rather

22   than take a chance on me blowing the whole

23   thing up.

24



1    BY MR. CANTOR:

2         Q.   Really, Mr. Tepner, if you could look

3    at Paragraph 16 of your declaration?

4         A.   Yep.

5         Q.   And if you see -- I'm looking for --

6    the last two sentences of Paragraph 16, do you

7    see there that you refer to different types of

8    claims that the subcommittee investigated with

9    respect to the June 2019 financing and the

10   optimization?  Do you see that?

11        A.   The sentence starting with, "The

12   subcommittee determined"?

13        Q.   And I believe the sentence before

14   that, as well, sir.

15        A.   The subcommittee -- one starts, "The

16   subcommittee's investigation."

17        Q.   Right, if you read from there to the

18   end of the paragraph.

19        A.   Yep, I see that.

20        Q.   Okay.  So let me ask my question -- my

21   question again just so we are clear.  Those

22   sentences refer to different types of claims

23   that the subcommittee investigated with respect

24   to the June 2019 financing and the optimization;



1     is that right?

2          A.   Yes, that's correct.

3          Q.   And those refer to potential claims by

4     the debtors; correct?

5          A.   By the -- yes.

6          Q.   And the subcommittee didn't

7     investigate whether the debtors had

8     environmental claims against the consenting

9     creditors; is that correct?

10         A.   Just to make sure I understand the

11    question, could you repeat it one more time,

12    please?

13         Q.   Sure.  The debtors did not

14    investigate -- excuse me.  The subcommittee did

15    not investigate whether the debtors had

16    environmental claims against the consenting

17    creditors; is that correct?

18         A.   We did not do that specific

19    investigation.

20         Q.   Okay.  And the subcommittee never

21    specifically analyzed whether DTSC might have

22    the kinds of claims that are described in

23    Paragraph 16 with respect to the June 2019

24    financing, did it?



1       A.   We never did that specifically, no.

2       Q.   And the subcommittee never

3   specifically analyzed whether the DTSC might

4   have the kind of claims described in Paragraph

5   16 with respect to the optimization, did it?

6       A.   No.

7       Q.   And the subcommittee never looked at

8   whether the optimization had any impact on the

9   debtors' environmental liabilities, did you?

10      A.   We didn't specifically look at that.

11      Q.   And the subcommittee never

12  specifically analyzed whether the DTSC suffered

13  any damages as a result of those transactions,

14  did it?

15      A.   We never looked at that specifically,

16  no.

17      Q.   Mr. Tepner, do you currently have any

18  earned income other than what you earned from

19  being a member of this and other boards of

20  directors?

21      A.   For this year, I don't believe I do.

22          MR. CANTOR:  Thank you.  I have no

23     further questions.

24          THE COURT:  All right.  Does anyone



1      else wish to cross examine the witness?

2      Okay.  I hear none.  Does anyone wish to

3      redirect the witness?

4              MR. GENENDER:  Your Honor, Paul

5      Genender for the debtors very briefly.

6                  -   -   -

7                  EXAMINATION

8                  -   -   -

9  BY MR. GENENDER:

10     Q.   Mr. Tepner, are you aware that the UCC

11  looked at claims beyond or transactions beyond

12  those that the subcommittee looked at?

13     A.   I don't have a recollection of that,

14  but it wouldn't surprise me.

15     Q.   Okay.  So if the UCC had looked at

16  transactions other -- in addition to the note

17  exchange and the optimization from twenty --

18  those two from 2019, were you aware that anyone

19  found -- that they found any wrongdoing or any

20  claims that should have been brought?

21     A.   Nothing was brought --

22              MR. CANTOR:  Objection, Your Honor.

23              THE COURT:  Yeah, Mr. Genender, he

24     just said he didn't know.  How can you ask a



1      follow-up question?  You wouldn't have a

2      basis.

3                  MR. GENENDER:  Understood, Your

4      Honor.  I will withdraw it on that ground.  I

5      will leave that for Mr. Kaplan to deal with.

6      Okay?  And, with that, you know, I have no

7      further redirect?

8                  THE COURT:  All right.  Thank you.

9      Anyone else wish to redirect the witness?

10     All right.  Mr. Cantor, I assume no recross?

11                 MR. CANTOR:  No, Your Honor.  Thank

12     you very much.

13                 THE COURT:  Okay.  Thank you very

14     much.  Mr. Tepner, you are excused.  You may

15     continue your life and watch -- or see video

16     or whatever, read texts, get e-mail, et

17     cetera.

18                 MR. TEPNER:  Thank you, Your Honor.

19                 THE COURT:  You are welcome.  This

20     would be a good time, I think -- well, let's

21     see.  The last debtor witness is Mr. Fraske?

22     Is that correct?

23                 MR. FRIEDMANN:  Your Honor, this is

24     Jared Friedmann.  It's Fraske.



```
1            THE COURT:  Fraske?  Do we know how

2    long -- that will certainly take more than a

3    few minutes, I expect.

4            MR. FRIEDMANN:  Your Honor, Jared

5    Friedmann for the debtors.  I do have a live

6    direct for him, as well.  Plus, I understand

7    there is going to be cross.  So I think it's

8    fair to say it's going to take more than a

9    few minutes.

10           THE COURT:  Okay.  If this is okay,

11   let's break for lunch, then, for half an

12   hour.  It's 1:15 eastern.  We will reconvene

13   at 1:45 and push through for the rest of the

14   day.

15           I know that's early for the West

16   Coast people, but it's late for the East

17   Coast people, so everybody is unhappy.

18           And you are not on the stand yet,

19   Mr. Fraske, so you are not in the hockey box

20   for talking to anybody about the case, so you

21   are free to discuss as normal.  All right.

22   We will take a break for half an hour.

23           MR. FRIEDMANN:  Thank you, Your

24   Honor.
```



1        (A recess was taken.)

2              THE COURT:  Okay.  I think we

3    need -- there is Mr. Cantor, all right, and

4    Mr. Friedmann, maybe the other Mr. Friedman.

5              MR. FRIEDMAN:  The other

6    Mr. Friedman is here, Your Honor.  Mr. Elias

7    for our client is going to handle the cross

8    examination of the next witness.

9              THE COURT:  Oh, okay.  Thank you.

10   All right.  If the debtors are ready to go,

11   we can go ahead.

12             MR. FRIEDMANN:  Yes, Your Honor,

13   thank you.  Jared Friedmann again from Weil

14   Gotshal for the debtors.  Your Honor, our

15   next witness is Eric Fraske.

16             Mr. Fraske submitted a declaration

17   at ECF-952.  And with the Court's permission,

18   we would like to, first of all, admit his

19   declaration into evidence with one change.

20   To avoid an argument with DTSC over a hearsay

21   issue, we would strike the last two sentences

22   of Paragraph 17 of Mr. Fraske's declaration.

23             THE COURT:  All right.  Is there

24   any objection to the admission of the



WILCOX & FETZER
(302) 655-0477 | WWW.WILFET.COM

1     declaration, Docket 952, with the last two

2     sentences of Paragraph 17 stricken?

3              MR. ELIAS:  Your Honor, Brad Elias

4     from O'Melveny on behalf of DTSC.  With that

5     change, we have no objection.

6              THE COURT:  Okay.  Thank you.  It's

7     admitted without objection.

8              MR. FRIEDMANN:  Then, with Your

9     Honor's permission, we would like to do a

10    short live direct of Mr. Fraske.

11             THE COURT:  All right.  Thanks.

12    Just give me a minute, then.  Ms. Murin,

13    would you please swear in Mr. Fraske.

14             THE CLERK:  Yes, Your Honor.

15                  -   -   -

16             ERIC FRASKE,

17        the deponent herein, having first

18        been duly sworn on oath, was

19        examined and testified as follows:

20                  -   -   -

21             THE COURT:  Okay.  Thank you,

22    Mr. Fraske.  Just a couple instructions,

23    which you may have already heard.  First of

24    all, where are you located today, sir?



```
 1              MR. FRASKE:  I'm in my office in
 2       Long Beach, California.
 3              THE COURT:  Okay.  Are you alone in
 4       the room, sir?
 5              MR. FRIEDMANN:  I am.
 6              THE COURT:  Okay.  I'm going to
 7       instruct you to, A, stay alone; and, B, to
 8       not read any text messages or e-mail messages
 9       you might receive either while you are
10       testifying or during any breaks until you are
11       all finished.
12              And, in addition, if you look at
13       something, whether it's a paper or on your
14       computer, that's fine.  You just need to
15       direct us and let us know and identify what
16       it is you are looking at.
17              Do you understand these
18       instructions?
19              MR. FRIEDMANN:  I do.
20              THE COURT:  All right.  Very good.
21       You may proceed, counsel.
22              MR. FRIEDMANN:  Thank you, Your
23       Honor.
24                     -   -   -
```



1                       EXAMINATION

2                     -    -    -

3    BY MR. FRIEDMANN:

4         Q.   Good afternoon, Mr. Fraske.

5         A.   Hello.

6         Q.   Or good morning for you, actually;

7    right?

8         A.   Yes.

9         Q.   Mr. Fraske, can you begin by letting

10   the Court know who you are employed by?

11        A.   I'm employed by Alta Environmental.

12        Q.   And what is that?

13        A.   Alta Environmental is an environmental

14   consulting firm doing industrial hygiene,

15   environmental health and safety, site assessment

16   remediation, and stormwater consulting.

17        Q.   And what is your job title there?

18        A.   I am a Senior Engineer Project Manager

19   III.

20        Q.   Okay.  And Mr. Fraske, briefly what is

21   your educational background?

22        A.   I have a bachelor's degree in civil

23   engineering from Michigan State University.

24        Q.   Okay.  And how long have you been



1    practicing in the field of engineering?

2         A.   Sixteen years.

3         Q.   And are you a licensed engineer?

4         A.   I am a licensed California civil

5    professional engineer.

6         Q.   Mr. Fraske, what, if any, work do you

7    do in connection with the Vernon site?

8         A.   Since fall of 2017, I have served in

9    the role of resident engineer during the phase

10   one closure of the Exide Vernon facility.

11        Q.   And is fall of 2017 when that phase

12   one closure began?

13        A.   Correct.  Fall into winter, correct.

14        Q.   Okay.  And with what level of

15   frequency have you actually been at the Vernon

16   site?

17        A.   During closure activities, I was there

18   every day during closure activities, typically

19   Monday through Thursday when active closure work

20   was being done.

21             After the force majeure was declared,

22   I went to about once a week to the site for the

23   weekly DTSC visits.

24        Q.   Okay.  Can you describe what your role



1    is at the Vernon site?

2          A.    During closure when it was active, my

3    job was to observe and document the closure

4    activities with respect to the closure plan and

5    closure implementation plan, to conduct sampling

6    soil and soil vapor and dust sampling in part of

7    the closure plan, and to coordinate and escort

8    DTSC personnel and their third-party oversight

9    during their site visits during closure.

10         Q.    How often does DTSC make these site

11   visits?

12         A.    Weekly.

13         Q.    Okay.  And you said you escort them on

14   their site visits.  What do you mean by that?

15         A.    I walk with them when they arrive on

16   site.  When they are walking through the site, I

17   walk with them.

18            If they ask for inspection records or

19   documents or things like that, I get it for

20   them.

21            And just basically escort them around

22   the property.

23         Q.    And has that aspect of your job been

24   the same since the beginning of the closure back



WILCOX & FETZER
(302) 655-0477  |  WWW.WILFET.COM

A-1487

1    in fall of 2017?

2         A.   That's correct.

3         Q.   Okay.  By the way, Mr. Fraske, how

4    recently has DTSC been on site for one of these

5    site inspections?

6         A.   The last site inspection was on

7    Tuesday of this week.

8         Q.   Okay.  Mr. Fraske, are you familiar

9    with someone at DTSC named Grant Cope, C-O-P-E?

10        A.   I'm familiar, yes.

11        Q.   Who is he?

12        A.   Um, I don't have his title off the top

13   of my head, but I know he is senior management

14   in DTSC.

15        Q.   Have you ever met Mr. Cope?

16        A.   Not in person, no.

17        Q.   Is he not one of the people from DTSC

18   who has come on these site visits over the last

19   several years?

20        A.   Since my participation in the project,

21   no.

22        Q.   Okay.  So, as far as you know, has

23   Mr. Cope ever been present at the Vernon site

24   since closure began in the fall of 2017?



1          A.   Not to my knowledge.

2          Q.   Okay.  So, Mr. Fraske, when DTSC comes

3     on site to do these weekly inspections, what do

4     they wear while they are inspecting the outside

5     premises of the site?

6          A.   They wear many traditional -- I will

7     call it construction-level PPE, which consists

8     of steel-toed boots, long pants, a long shirt,

9     long-sleeved shirt, a safety vest, a reflective

10    safety vest, safety glasses, and a hardhat.

11         Q.   How about when -- well, does DTSC also

12    inspect the inside of the buildings?

13         A.   The, yes, the enclosure building, when

14    we go in them, we suit up, including DTSC suits

15    up in a full-body Tyvek suit with a powered

16    air-purifying respirator, hard hat, and natron

17    gloves.

18         Q.   So they wear a respirator when they go

19    into the building, but they don't wear a

20    respirator while they are walking around the

21    premises?

22         A.   That's correct.

23         Q.   How about at the visit just this past

24    Tuesday when DTSC was there for a site



1    inspection and they were walking around the

2    outside of the premises?  Were any of them

3    wearing a respirator?

4         A.   They were not.  Just a cloth mask in

5    conjunction with COVID-19 criteria.

6         Q.   Okay.  And prior to the COVID-19

7    requirement to wear masks, did they wear any

8    kind of face coverings during these outside

9    inspections?

10        A.   Not on exterior work, no.

11        Q.   Okay.  Why is it necessary for them to

12   wear a respirator inside of the containment

13   building but not while they are touring the

14   outside?

15        A.   Inside the containment building, there

16   is known to be dust containing high levels of

17   lead and arsenic.

18             And when closure activities are

19   ongoing, active demolition, that dust will get

20   stirred up into the air, and it would not be

21   safe to breathe without a respirator filtering.

22             Um, there are no dust-generating

23   activities like demolition or things like that

24   occurring outside of the buildings or outside of



1    the full containment, so the risk of, you know,

2    respiratory dust is minimal and not required

3    for -- the respiratory protection is not

4    required.

5         Q.   And to what extent are you testing

6    that air outside of the containment building to

7    ensure that the air is, in fact, safe and

8    breathable?

9         A.   There are daily perimeter dust samples

10   that occur at the fence line.

11             And then on occasion -- on regular

12   occasion, personal air monitors have been worn

13   by closure staff, DTSC staff, and many

14   contractors, Exide staff, to measure personal

15   exposure.

16        Q.   Okay.  And Mr. Fraske, since the force

17   majeure had been declared in March, and the site

18   focused just now on maintenance and containment,

19   correct, not remediation anymore?

20        A.   Correct.

21        Q.   Since that happened through the latest

22   results you have of this air testing, have there

23   been any incidents of elevated levels of either

24   lead or arsenic in the air outside of the



1    containment building?

2        A.   We have not had any exceedances of

3    lead or arsenic in the perimeter air sample

4    monitoring above our permitted levels since --

5    well, yeah, since the force majeure.  Correct.

6        Q.   Okay.  Mr. Fraske, have you observed

7    anything in your role there at the Vernon site

8    to indicate whether DTSC has taken any steps to

9    prepare for a possible abandonment of the Vernon

10   site?

11       A.   Um, throughout the summer they have

12   engaged Exide, as well as their contractors, for

13   information pertaining to costs of both closure

14   activities and I'd say daily maintenance, you

15   know, daily expenditures of power bills and

16   things like that.

17            They have reached out directly to some

18   contractors.

19            Um, they have signed a new closure

20   project manager, who is on the site on Tuesday.

21            And they have at least reached out to

22   an emergency contractor to inquire about

23   contracting closure services to start up again.

24       Q.   And how do you know that, Mr. Fraske?



1            MR. ELIAS:  This was the exact

2       hearsay that was strucken from his

3       declaration, Your Honor.

4            He testified in his declaration

5       that he heard this from other construction

6       workers on the site.

7            It's not based on any personal

8       knowledge or any statements by the DTSC that

9       would be a party admission; it's just pure

10      hearsay.

11           MR. FRIEDMANN:  Your Honor, having

12      heard -- my very next question was going to

13      be how do you know this was to establish his

14      personal knowledge, which was not in the

15      declaration, but he will provide right now.

16           So if you will permit him to answer

17      the next question, and if that doesn't

18      satisfy everyone, then we can go back and

19      consider striking the other testimony, would

20      be my suggestion.

21           THE COURT:  We will do that.

22           MR. FRIEDMANN:  Thank you.

23      BY MR. FRIEDMANN:

24      Q.   Mr. Fraske, the question that I asked



1    was how do you know that DTSC has reached out to

2    these, for example, emergency contractors in the

3    event that the abandonment is approved?

4         A.   Um, I have discussed this with at

5    least one DTSC personnel earlier last week.  And

6    then a representative of one of those emergency

7    contractors reached out to me on Friday

8    requesting pricing for the resident engineer

9    services so that it could be included in his

10   proposal on -- he needed it by Monday of this

11   week.

12              MR. FRIEDMANN:  Thank you.

13              THE COURT:  Mr. Elias?

14              MR. ELIAS:  I mean, we would ask

15       that the witness clarify whether he is

16       testifying that everything that was in his

17       prior answer was conveyed to him by the

18       unidentified DTSC person he claims to have

19       spoken to last week.

20              We have no idea what was in that

21       conversation.  He gave a lot of information

22       in his prior answer.

23              MR. FRIEDMANN:  Your Honor,

24       Mr. Elias is welcome to cross examine



1    Mr. Fraske to get more details on all of

2    that, but --

3              THE COURT:  I'm satisfied.

4    Overruled.  You can certainly explore on

5    cross.

6              MR. FRIEDMANN:  Thank you, Your

7    Honor.

8  BY MR. FRIEDMANN:

9    Q.   Mr. Fraske, how about the company you

10 work for, Alta, is it prepared to continue

11 closure work at the Vernon site if Exide is

12 abandoned?

13   A.   Yes, if requested by either the DTSC,

14 another contractor, or a trustee, we would -- we

15 are prepared to engage our services and resume

16 work.

17   Q.   Do you have any reason to believe that

18 there would be any delay or -- strike that.

19              Is there any reason why Alta would,

20 for some period of time, stop doing work at

21 Vernon if Exide was able to abandon the

22 property?

23              MR. ELIAS:  Objection, Your Honor.

24              THE COURT:  Basis?



1              MR. FRIEDMANN:  Well, let me strike

2        it.  It was a bad question, Your Honor.  Let

3        me actually rephrase it, because I think I

4        confused the witness, as well, which was not

5        my intent.

6    BY MR. FRIEDMANN:

7        Q.   Mr. Fraske, in the event that the

8    Vernon property is allowed to be abandoned per

9    the Court at the hearing, is there any reason

10   why Alta would not continue to provide support

11   at the Vernon site following an abandonment

12   ruling today?

13       A.   We would continue to provide our

14   services if contracted, yes.

15       Q.   Okay.  What if it were going to take a

16   week or two for those contracts to be worked

17   out?  Would Alta say, "Look, we're not doing any

18   work until we have that contract in hand," or

19   would Alta continue to work while that was being

20   worked out?

21       A.   I'm not sure we would do our --

22              MR. ELIAS:  Objection.

23        Speculation.

24              THE COURT:  I can't understand a



1        word you are saying.

2                    MR. ELIAS:  Objection, Your Honor.

3        Calls for inspection.  Lack of foundation.

4                    THE COURT:  Response?

5                    MR. FRIEDMANN:  Yeah, Your Honor,

6        earlier there was actually specu -- there was

7        a question asking for speculation when

8        Mr. Messing was testifying as to whether or

9        not, if we abandoned all of the, the next

10       day, all of the various vendors, including

11       AIS, we'd go and take down their tents and

12       would refuse to show up.

13                   I'm asking Mr. Fraske, as the

14       resident engineer at Vernon, if there was an

15       abandonment ruling today, but they had not

16       yet worked out an agreement going forward

17       with DTSC, if he still would intend to

18       continue his job and care for the Vernon site

19       while that agreement was being worked out.

20                   THE COURT:  I will allow it.  I

21       will allow it.

22                   MR. ELIAS:  Thank you.

23                   THE WITNESS:  Am I allowed to

24       answer that?



1          THE COURT:  Yes.

2          MR. FRASKE:  I would.  I would

3     prefer to continue my services while we

4     worked something out.

5          It would be up, obviously, to my

6     supervisors with regards to the contracting

7     process what they would authorize.

8          But I would, and I think from our

9     past involvement in the project, we would

10     like to continue.

11  BY MR. FRIEDMANN:

12     Q.   If, for some reason, Mr. Fraske, there

13  was some delay, and for some reason let's say

14  nobody was able to go to the site for two weeks

15  after abandonment while DTSC got in touch with

16  the electric company and worked out contracts

17  and all these kind of things.

18          What would happen to that site?  Could

19  it sit there for two weeks without there being a

20  threat to health and safety, or would that be a

21  big problem?

22          MR. ELIAS:  Objection, Your Honor.

23     Lack of foundation.  He is basically asking

24     for expert testimony.



1          MR. FRIEDMANN:  Your Honor, he is

2      the resident engineer at the site.

3          THE COURT:  I disagree.  Overruled.

4      It's factual.

5  BY MR. FRIEDMANN:

6      Q.   Mr. Fraske, if you understood the

7  question, you can go ahead and answer it.

8      A.   Okay.  As the condition of the site is

9  right now, yes, I think up to two weeks we would

10 be okay, it would be okay.

11     Q.   With no one doing anything there, you

12 are saying?

13     A.   Correct.

14         MR. FRIEDMANN:  Okay.  Thank you

15     Your Honor I have no further questions.

16         THE COURT:  Does anyone supporting

17     the motion wish to direct the witness?  Okay.

18     Cross?  Any cross?

19         MR. ELIAS:  Yes, Your Honor.  Thank

20     you.  Just two quick housekeeping matters.

21     First, we have entered into a stipulation

22     with the debtors for certain facts that we

23     would like moved into evidence that we may

24     use during the cross examination today.



1        That's ECF Number 976.

2                    THE COURT:  Any objection?

3                    MR. FRIEDMANN:  No, Your Honor.

4        These are, in fact, facts that we have

5        stipulated to.

6                    THE COURT:  All right.  Admitted

7        without objection.

8                    MR. ELIAS:  And then, Your Honor, I

9        may want to show Mr. Fraske portions of his

10       deposition transcript from Monday, so if I

11       could have the ability to potentially share

12       my screen with him, that would be helpful.

13                   We have also delivered a copy of

14       that deposition transcript to the Court,

15       which is DTSC Exhibit 4 in the binders that

16       were delivered.  I don't know if you have

17       those or not.

18                   THE COURT:  We got them yesterday,

19       yes.  I have made you a co-host so you can

20       share your screen as necessary.

21                   MR. ELIAS:  Thank you, Your Honor.

22       I will attempt to avoid the need, hopefully.

23                          -   -   -

24                        EXAMINATION



1                        -   -   -

2    BY MR. ELIAS:

3         Q.   Good afternoon, Mr. Fraske.  It's good

4    to see you again here today.

5         A.   Good afternoon.

6         Q.   You testified a few minutes ago that

7    the work on the closure plan at the Vernon site

8    was halted in March of 2020; correct?

9         A.   Correct.

10        Q.   And the work that's been going on at

11   the site since March of 2020 has been limited

12   only to the maintenance activities that are

13   designed to contain the hazardous substances at

14   the site; correct?

15        A.   Correct.

16        Q.   And as I think you mentioned a moment

17   ago, those substances include high levels of

18   lead as well as arsenic, and there is also

19   volatile organic compounds there, such as

20   trichloroethylene; correct?

21        A.   Correct.  The trichloroethylene is in

22   the subsurface.  The lead and arsenic is in dust

23   form and subsurface materials.

24        Q.   For this containment work that's been



1    going on since March, there is typically about

2    nine or the ten people at the Vernon site every

3    day; correct?

4         A.   That is correct.

5         Q.   There is usually about four Exide

6    employees there every day, including two

7    managers for the wastewater operations, the

8    environmental health and safety technician, and

9    then the site manager, as well?

10        A.   That is correct.

11        Q.   And the contractor, AIS, they

12   typically have two or three employees on the

13   site every day, as well?

14        A.   Correct.

15        Q.   And the scaffolding company, they have

16   -- they had a two-person crew there five days a

17   week; is that right?

18        A.   That is correct.

19        Q.   And you are there one day a week,

20   as well; correct?

21        A.   That is correct.

22        Q.   Now, Mr. Friedmann asked you a few

23   moments ago about the containment building at

24   the Vernon site.  Are you familiar with that



1    building?

2         A.   I am, yes.

3         Q.   This is the structure where Exide

4    conducted its main recycling and lead processing

5    operations before the plant was shuttered;

6    correct?

7         A.   Correct.

8         Q.   And you are aware that there has been

9    testing done that has shown high levels of lead

10   and other toxic substances within the

11   containment building, as I believe you confirmed

12   a few minutes ago; correct?

13        A.   Correct.

14        Q.   And under the closure plan before it

15   was halted, the main containment building was

16   going to be deconstructed in three segments; is

17   that right?

18        A.   That is correct.

19        Q.   And the deconstruction of the western

20   segment, which was segment one, that was

21   completed in 2019; correct?

22        A.   That is correct.

23        Q.   And the deconstruction of segment two

24   was still ongoing when Exide halted all of the



1     closure activities in March of 2020; correct?

2          A.   Correct.

3          Q.   The roof and the walls of segment two

4     have been mostly removed; correct?

5          A.   That is correct.

6          Q.   And in order, because there is no roof

7     and because there is no walls, in order to

8     prevent the lead dust and the other toxic

9     substances from leaving the site, Exide has

10    essentially been required to put up what you

11    have described as the giant tent over segment

12    two; correct?

13         A.   That is correct.

14         Q.   And the tent is covering the

15    disassembled portion of the building?  Do I have

16    that right?

17         A.   That's correct.

18         Q.   And it's often referred to as the FEU,

19    or the full enclosure unit?

20         A.   That is correct.

21         Q.   And you testified a few moments ago

22    that when you enter the FEU, when anyone enters

23    the FEU, they wear an full Tyvek suit and a

24    respirator; is that accurate?



1        A.   That is correct.

2        Q.   And you would agree that if the FEU

3    was not there today, any hazardous substances

4    that are in this segment of the containment

5    building, they would just be exposed to the

6    elements and would be out in the open; correct?

7        A.   Correct.

8        Q.   And the FEU was designed to be a

9    temporary structure for segment two of the

10   closure plan; correct?

11       A.   Correct.

12       Q.   It wasn't designed -- no one ever

13   contemplated that this would be a permanent

14   structure on the site to protect segment two

15   indefinitely; right?

16       A.   That is correct.

17       Q.   And the lifespan of the FEU is subject

18   to a lot of factors, a lot of variables,

19   including the weather, including the sunlight;

20   right?

21       A.   That is correct.

22       Q.   And you don't know the usable lifespan

23   of the FEU at the Vernon site; correct?

24       A.   Correct.



1      Q.   But you do know that while the FEU is

2   up, it requires a lot of daily maintenance;

3   right?

4      A.   It requires, yes, inspection and

5   repair as needed.

6      Q.   There is a two-man crew there from the

7   gasoline contractor that does inspection and

8   repairs five days a week; right?

9      A.   That is correct.

10      Q.   And you do daily drone flights around

11   the FEU to check the walls and the roof for

12   tears; correct?

13      A.   That is correct.

14      Q.   And there is three or four people

15   involved on a daily basis in inspecting the FEU

16   and checking it for any damage; right?

17      A.   The FEU is inspected by the two-person

18   scaffolding crew and then the drone pilot, so

19   yeah, I guess it's three.

20      Q.   And even though there is these efforts

21   going on, the FEU is still susceptible to damage

22   from the sun; correct?

23      A.   Correct.

24      Q.   And it's susceptible to damage from



1    high winds; correct?

2         A.   That is correct.

3         Q.   In fact, there have been multiple

4    major tears in the FEU since it was installed in

5    2017, originally over segment one and now in

6    segment two; correct?

7         A.   Correct.

8         Q.   There was a major tear in December of

9    2019 caused by high winds?

10        A.   Correct.

11        Q.   And violations were issued for that

12   tear by the DTSC and the South Coast Air Quality

13   Management District; is that right?

14        A.   Correct.

15        Q.   And there was a major tear again in

16   earlier, actually, in February of 2019, that was

17   also caused by a high-wind event; right?

18        A.   I don't remember the exact date of

19   that one of February.  I know there have been --

20   there has been another tear, yes.  I don't

21   remember the date.

22        Q.   But you do remember there was a second

23   significant tear caused by high winds that

24   needed to be repaired; correct?



1          A.    Correct.

2          Q.    Even if you don't remember the exact

3     date?

4          A.    Correct.

5          Q.    And those tears were repaired

6     relatively quickly; correct?

7          A.    That is correct.

8          Q.    And that's because Exide has staff and

9     monitoring equipment on the site that detected

10    the tears immediately, and the staff that were

11    on the site took the steps they needed to take

12    to fix those major tears right away; correct?

13         A.    Correct.

14         Q.    And they avoided -- they avoided a

15    catastrophic failure of the FEU?

16         A.    Correct.

17         Q.    Now, since December 2019, there have

18    been numerous other tears of varying sizes;

19    correct?

20         A.    Correct.

21         Q.    And going back to segment one, by the

22    end of segment one, you were experiencing a

23    couple of tears a day that were a foot or a

24    couple of feet long that needed to be fixed



1    every day at the time; correct?

2         A.   Correct.

3         Q.   And it was important to stop those

4    tears when they were only a foot or two long,

5    because the risk was that they were going to get

6    much bigger if they were left unfixed; correct?

7         A.   Correct.

8         Q.   And you have switched materials now,

9    and you have started to reinforce the FEU with a

10   different fabric; correct?

11        A.   Correct.  The FEU-2 was covered in a

12   different material than the FEU-1.  Correct.

13        Q.   But even with the change in materials,

14   you still had a weekly issue with the seams

15   coming loose and needing to be retaped and

16   reinforced; right?

17        A.   On some isolated areas, correct.

18        Q.   But that's a weekly issue, you had

19   testified; correct?

20        A.   Correct.

21        Q.   Now, in addition to the FEU, you are

22   also required to operate air pollution control

23   equipment at the Vernon site; correct?

24        A.   Correct.



1       Q.   And you have referred to that

2    equipment as the baghouses; is that right?

3       A.   That is correct.

4       Q.   The baghouses are essentially giant

5    air filters that suck in the air from the FEU.

6    Do I have that right?

7       A.   That is correct.

8       Q.   And there is four of them?

9       A.   There are four operating right now.

10   Correct.

11      Q.   And each of those four baghouses has

12   hundreds of bags inside of it that collect the

13   toxic dust and pull it out of the FEU; correct?

14      A.   Bags or canisters, yes.

15      Q.   And the baghouses are essentially

16   designed to work with the FEU to create negative

17   pressure inside the unit that prevent any dust

18   from escaping; right?

19      A.   That is correct.

20      Q.   Now, the baghouse, the bags in the

21   baghouses, the dust collection bags, those can

22   break; correct?

23      A.   Correct.

24      Q.   And to prevent that or to guard



1      against it, you have detection equipment in the

2      baghouses that would alert the on-site Exide

3      staff members to the fact that there had been a

4      breach of that system; correct?

5          A.   That is correct.

6          Q.   So someone, if that happens, someone

7      would go into the baghouses and presumably

8      replace any broken bags; correct?

9          A.   That is correct.

10         Q.   And there is three staff members on

11     site who are responsible for maintaining and

12     inspecting all of the components of the

13     emissions control equipment; correct?

14         A.   That is correct.

15         Q.   As a backup to this emissions control

16     equipment, you also operate ambient air monitors

17     on the perimeter of the property that operate 24

18     hours a day; correct?

19         A.   That is correct.

20         Q.   And they analyze the air for lead and

21     arsenic?

22         A.   Correct.

23         Q.   And there is manometers -- do I have

24     that term right -- on the perimeter of the FEU



1    that monitor the pressure and would alert staff

2    if there is a drop?

3         A.   Correct.  Manometer.  There is nine

4    manometers around the full-containment building,

5    correct.

6         Q.   And those manometers act --

7              THE COURT:  I'm sorry.  I'm sorry.

8      What's that word?  I didn't get it.

9              MR. ELIAS:  Manometer.

10              MR. FRASKE:  Manometer.

11              THE COURT:  What is that?

12              MR. FRASKE:  It's a pressure gauge,

13      so it measures the differential pressure

14      between inside and outside.

15              THE COURT:  Okay.  Okay.  Thank

16      you.  Sorry.  I'm not a scientist or an

17      engineer.  Actually, I like to tell my

18      kids -- they give me a hard time because they

19      are both really good at science.  I said I

20      have a STEM degree.  I have a degree in

21      political science, perhaps the most difficult

22      of the scientists, just like half the people

23      on this call, I expect.  All right.  Enough

24      of the comedy.



1    BY MR. ELIAS:

2         Q.   And those manometers or, as you put

3    it, the pressure gauges, those have actually

4    alerted the Exide staff in the past to at least

5    one of the two major tears; correct?

6         A.   Correct.

7         Q.   Exide is also required to conduct

8    dust-suppression activities on this site;

9    correct?

10        A.   Correct.

11        Q.   There is employees who drive a water

12   truck around the site twice a day to wet

13   everything down and stop the dust from leaving

14   the site; correct?

15        A.   Correct.

16        Q.   And Mr. Friedmann had asked you about

17   site visits by DTSC, you know, during the past

18   year.

19             During the time of all those site

20   visits, were these dust-suppression activities

21   going on at the site?

22        A.   Yes.

23        Q.   And it's important to stop the

24   fugitive dust from escaping the site, because it



1    contains lead and other pollutants; correct?

2         A.   Correct.

3         Q.   And you are aware, for example, that

4    the lead dust at the Vernon plant is not only in

5    the buildings, as Mr. Friedmann seems to

6    suggest, but it's also on the sidewalks;

7    correct?

8         A.   Correct.  Lead dust has been detected

9    on the sidewalks.

10        Q.   And you also agree that there is lead

11   dust from the Vernon plant that has migrated off

12   site to the areas surrounding the plant;

13   correct?

14        A.   Correct.

15        Q.   And by spraying down the dust,

16   capturing it in the water treatment plant, you

17   can stop it from escaping into the surrounding

18   communities; correct?

19        A.   Correct.

20        Q.   And if you didn't do that, if you

21   didn't water it down, if you didn't treat it,

22   the dust that's on the sidewalks and that's on

23   other places on the site could be blown into the

24   surrounding communities; correct?



1          A.    Correct.

2          Q.    Now, I mentioned a moment ago the

3     wastewater treatment plant.  Exide is required

4     to operate that at the site; correct?

5          A.    Correct.

6          Q.    And the purpose of that plant is to

7     collect both the wastewater that we talked about

8     a moment ago from the dust-suppression efforts,

9     as well as any rainwater that reaches the site,

10    and you treat it for lead and other toxic

11    substances before you discharge it into the

12    public Los Angeles sewer system; correct?

13         A.    Um, before it goes into the sanitary

14    sewer system, correct.

15         Q.    And that system, the wastewater

16    treatment system, it is inspected daily by two

17    of the Exide employees at the site?

18         A.    Correct.

19         Q.    Do those employees also need to turn

20    on the system to initiate the treatment process,

21    and then they need to actively discharge the

22    treated water into this sewer; correct?

23         A.    That is my understanding, yes.

24         Q.    And the water treatment plant has a



1    large collecting pool on the site where the

2    rainwater and the dust suppression water can be

3    held; correct?

4         A.   Yes.  If there is enough of it, yes.

5         Q.   And if the wastewater treatment system

6    is not activated and there was an overflow from

7    that collecting pool, the contaminated water

8    could enter the surrounding sidewalks and the

9    streets and make its way into the Los Angeles

10   River; correct?

11        A.   Correct.

12        Q.   We have talked about, you know, the

13   lead dust on the site today.  Are you aware of

14   the DTSC's modified screening level for dust in

15   industrial soil?

16        A.   I am.

17        Q.   And do you know offhand what that

18   screening level is?

19        A.   320 milligrams per kilogram.

20        Q.   And that screening level is used by

21   the DTSC to determine whether a cleanup is

22   required because a site presents a health risk;

23   correct?

24        A.   Correct.



1        Q.   And you are also aware, based on

2    documents you have reviewed, that testing at the

3    Vernon plant in April of 2020 showed lead

4    concentrations in the dust was as high as

5    48,800 milligrams per kilogram; correct?

6        A.   I'm sorry.  The date of the testing

7    was what?

8        Q.   April 2020.

9        A.   I'm aware of dust sampling that was

10   done in November, but I -- yeah, I'm not aware

11   of any April 2020 dust samples.  I'm sorry.  Let

12   me back those up.

13            I'm aware of end of '19 data that I

14   think might have been analyzed in April, but, or

15   collected, dust collected in the fall of 2019,

16   but maybe not analyzed until the spring of 2020.

17            Is that what you are referring to?

18       Q.   Yes.  So you are aware that when the

19   test results came back, it showed that the

20   dust -- that the concentration of lead in the

21   dust was 48,800 milligrams per kilogram;

22   correct?

23       A.   Correct.

24       Q.   And that's about 150 times -- that's a



1    lead concentration that is 150 times the

2    screening level that the DTSC uses to look for

3    health risks; correct?

4         A.    That is correct.

5         Q.    You agree that concentrations of lead

6    at that level present a serious health risk;

7    correct?

8         A.    Correct.

9         Q.    But you have testified during your

10   deposition in this case that these lead levels,

11   150 times higher than the screening level, that

12   they don't present an immediate threat because

13   they are unlikely to cause an immediate loss of

14   life or a serious injury.

15             Do you recall giving that testimony?

16        A.    I recall.  And that's based on, I will

17   call it, an exposure out of where that material

18   is located and how often it's contacted or how

19   easy it is to actually come across that material

20   during the -- during daily activities.

21        Q.    Well, I want to understand your use of

22   the term "immediate threat."

23             When you use the term "immediate

24   threat," are you talking about a threat that



1    would cause an immediate loss of life or a

2    serious injury?

3         A.   Yes.

4         Q.   Okay.  And you have also testified

5    that these levels of lead, 150 times higher than

6    the screening level, do not present an immediate

7    threat, because they were detected in areas of

8    the Vernon site that you do not believe are

9    often accessed by construction workers; correct?

10        A.   Correct.  And they are interior.

11        Q.   But there is certainly the opportunity

12   to --

13             THE COURT:  I'm sorry.  I'm sorry.

14      What was that at the end, Mr. Fraske?

15             MR. FRASKE:  And they are on

16      interior locations, like within a building.

17             THE COURT:  Okay.  Thank you.

18             MR. FRASKE:  They are contained.

19             THE COURT:  You may go ahead,

20      Mr. Elias.

21             MR. ELIAS:  Thank you, Your Honor.

22   BY MR. ELIAS:

23        Q.   But, Mr. Fraske, you agree there is

24   certainly the opportunity for construction



1    workers from the various companies to go into

2    any of these areas from which these samples were

3    collected without your knowledge, because you

4    are there one day a week; correct?

5         A.    It is possible.

6         Q.    And you would agree that just walking

7    into a room in many cases is enough to disturb

8    the dust in that room to some extent; correct?

9         A.    To some extent, depending on which

10   room you were in, correct, and the location of

11   the dust.

12        Q.    And it's perfectly reasonable to

13   assume that construction workers who are walking

14   into these locations without respirators are at

15   least disturbing the dust to some extent, as you

16   put it; correct?

17        A.    Correct.

18        Q.    And if they are not wearing

19   respirators, and you testified they were not,

20   there is a high likelihood that they are going

21   to be inhaling dust with lead levels that are

22   upwards of 100 times the California screening

23   level; correct?

24        A.    I don't know what concentration would



1    be in the air once it was stirred up, but yes.

2    They could be exposed to lead in air.

3         Q.   Now, you are aware that Exide is

4    seeking to potentially abandon the Vernon site

5    as part of this bankruptcy; correct?

6         A.   Correct.

7         Q.   And do you agree that the health and

8    safety measures that Exide has been required to

9    implement, have implemented at the Vernon plant,

10   are important to have in place; correct?

11        A.   Correct.

12        Q.   Do you understand that Exide is

13   currently spending a lot of money every month to

14   keep all of the measures we have discussed today

15   for protecting the health and safety of workers

16   and residents?  It's expensive; right?

17        A.   I don't know how much they spend, but

18   yes, I know it's expensive.

19        Q.   Are you aware that Exide signed a

20   stipulation stating that they are spending

21   approximately $750,000 per month on these safety

22   measures?

23        A.   I'm not aware of that document.

24        Q.   But would that -- would a number that



1    high surprise you for given the activities and

2    the equipment that are present at the site?

3         A.   No.  Since we are renting the tent,

4    no.

5         Q.   And, as we have discussed today, many

6    of the -- much of the equipment and the measures

7    that are in place at the site today, they

8    require a significant amount of daily

9    maintenance; correct?

10        A.   Yes.  Inspection, at least.

11        Q.   And if Exide abandons the property,

12   there will be no one from Exide to maintain and

13   continue running that equipment; correct?

14        A.   Correct.

15        Q.   There would be no one from Exide to

16   change the bags in the baghouses; correct?

17        A.   Correct.

18        Q.   No one from Exide to make sure the

19   electricity was on; correct?

20        A.   Correct.

21        Q.   No one from Exide to make sure the

22   fans in the baghouses are running?

23        A.   Correct.

24        Q.   No one to activate or maintain the



1    wastewater protection system?

2         A.   Correct.

3         Q.   And no one to repair any tears that

4    occurred in the FEU; correct?

5         A.   Correct.

6         Q.   Exide has stated over and over that

7    they have spent a lot of money and time focusing

8    on these safety issues since declaring the force

9    majeure.

10             The reason they have done that is they

11   recognize that, without these safety measures,

12   that would pose a threat to the community if the

13   plant was simply abandoned and left open to the

14   elements; correct?

15        A.   Correct.

16        Q.   Now, you have, in your declaration,

17   you have testified that a site -- and this is a

18   quote, quote from Paragraph 17, "This site is

19   stable and secured, and nothing on the site

20   presents any imminent threat to public health

21   and safety.  This is the case even if there was

22   a several-week time gap between Exide's

23   abandonment and the DTSC's takeover of closure

24   operations oversight."



1              Is that your testimony in this case,

2      Mr. Fraske?

3          A.   Yes.   That was my declaration.

4          Q.   And let's be perfectly clear.   That

5      testimony is premised on the assumption that the

6      FEU stays up; correct?

7          A.   That is correct.

8          Q.   You would not offer that testimony if

9      you knew that the tent was going to be removed;

10     correct?

11         A.   That is correct.

12         Q.   And you are not aware of any

13     commitment by anyone to keep the tent up post

14     abandonment if DTSC is not agreeing to pay for

15     it or if someone else is not agreeing to pay for

16     it; correct?

17         A.   Correct.

18         Q.   You are not aware of any commitment by

19     Exide's electric company to continue supplying

20     electricity post abandonment; correct?

21         A.   Correct.

22         Q.   And without power, the baghouses and

23     the negative pressure system in the FEU can't

24     operate; correct?



1          A.    That is correct.

2          Q.    And there is no way to treat the

3    wastewater at the site; correct?

4          A.    That is correct.

5          Q.    So the contaminated wastewater would

6    build up in the collecting pool, and there would

7    be no way to treat it; correct?

8          A.    That is correct.

9          Q.    And at some point, if it got high

10   enough, it would overflow onto the local

11   sidewalks and the streets and potentially even

12   the rivers; correct?

13         A.    That is correct.

14         Q.    If Exide abandoned the site, the

15   perimeter air monitors would come down, because

16   Exide is the one who is paying for those;

17   correct?

18         A.    Corr -- the ones owned and operated --

19   or the ones used by Exide, that would happen.

20   The ones operated by AQMD would continue to

21   operate.

22         Q.    You mentioned this during your

23   deposition, as well.  There is two air monitors

24   to the north of the plant, the northeast and the



1    northwest of the plant, that are operated by a

2    regulator in California; correct?

3        A.   Yeah.  And I will clarify that.  It's

4    northeast of the plant, and then I would say due

5    west of kind of the central portion of the

6    plant.

7        Q.   But you are not aware of any air

8    monitors to the south or the east or the

9    southeast that would continue to monitor any

10   releases from the property; correct?

11       A.   Correct.

12       Q.   So -- oh, and the dust-suppression

13   efforts, the spraying down of the sidewalks and

14   the asphalt and the collection of that toxic

15   water in the wastewater treatment point, that

16   would stop if Exide abandoned the site; correct?

17       A.   Correct.

18       Q.   And any fugitive lead dust would be

19   free to migrate off the cite, just as you

20   testified earlier that it has in the past;

21   correct?

22       A.   Correct.

23       Q.   Are you familiar with the effects of

24   even low-level lead exposure on humans?



1        A.   I am to some extent, yes.  I am not a

2   toxicologist, however.

3        Q.   Have you read Dr. Solomon's

4   declaration?

5        A.   I have not.

6        Q.   Do you believe that families living

7   near the abandoned Vernon site would be safe if

8   none of the current safeguards were in place?

9        A.   If none of them were in place?

10       Q.   None of them were in place.

11       A.   In the long run, it would pose a

12   threat.

13              MR. ELIAS:  I have nothing else,

14      Your Honor.  Thank you.

15              THE COURT:  Thank you.  Any

16      redirect by the debtor?

17              MR. FRIEDMANN:  Yes, Your Honor,

18      please, briefly.

19                    -    -    -

20                  EXAMINATION

21                    -    -    -

22   BY MR. FRIEDMANN:

23       Q.   Mr. Fraske, you were asked about

24   certain tears in the FEU over the period of the



1    phase one closure.  Do you recall that, those

2    questions?

3         A.   Yes.

4         Q.   And I believe Mr. Elias referred to

5    some of them as significant tears.  Do you

6    remember that?

7         A.   Correct.  Yes.

8         Q.   And some of them, I guess, were less

9    significant tears?

10        A.   Yeah.  Um, I mean, there were some

11   what I would call significant tears that

12   resulted in measurable losses of negative

13   pressure, and those were incidences where Exide

14   received, um, received notices of violation.

15        Um, a small tear of -- a tear or a

16   seam separation of, you know, a couple of feet

17   or, you know, several feet, even, if it's a

18   narrow enough one or small enough, it won't

19   cause a measurable drop -- excuse me -- in

20   negative pressure; so I would call that less

21   significant.

22        Q.   And these smaller tears, what are we

23   talking about to repair those?

24        A.   Duct tape or specialized -- basically



1    tape just over the -- over the seam.

2         Q.   So when you talked about how there

3    have to be some weekly tears that are addressed,

4    the non-significant ones, those are the kind

5    that just need some tape to patch them up?

6         A.   That's correct.

7         Q.   Okay.  With respect to those tears --

8    and I want you to include in your answer even

9    the significant tears, the biggest ones that you

10   have had so far -- when you have those big

11   tears, to what extent, if at all, did the daily

12   samples that were collected from the perimeter

13   air samplers detect levels of lead or arsenic

14   that were above the permitted levels of the site

15   in the period of time between when that tear

16   occurred and when it was finally repaired?

17        A.   At no point have we exceeded the

18   permitted lead or arsenic levels.

19        Q.   Even when you had those significant

20   tears?

21        A.   Correct.

22        Q.   Okay.  Mr. Fraske, you were asked

23   about all of the different things that are

24   currently going on at the operations.  I'm not



1    going to run through the whole list.

2          But, for example, all of the

3    monitoring of the tent and the weekly checking

4    and the fixing it, and the spraying the water on

5    the ground and checking all the water systems.

6          Do you remember that whole list of

7    items that Mr. Elias ran you through that are

8    currently being done?

9          A.   Yes.

10         Q.   If Exide were to abandon the property

11   and DTSC were to take over control of the

12   operations, are those the kind of things that

13   you would recommend that DTSC continue?

14         A.   Yes.

15         Q.   And are any of those things so unique

16   to Exide that DTSC would not be able to come in

17   and hire consultants to be able to do the exact

18   same things that currently are being done and

19   paid for by Exide?

20         A.   I don't think so.

21         Q.   You were asked also about -- I believe

22   first Mr. Elias referred to it as an April 2020

23   dust sample, but then I think you corrected it

24   and said that that dust sample was actually



```
 1    collected back in November of 2020 --

 2    November 2019?  Excuse me.

 3         A.   Correct.  I believe it was, yeah,

 4    November of 2019.

 5         Q.   Okay.  And then it was tested in April

 6    of 2020?  Is that what you were explaining?

 7         A.   That was my understanding based on the

 8    report, yes.

 9         Q.   Do you know why the dust would have

10    been collected in November of 2019 but not

11    tested until April of 2020?

12         A.   I do not.

13         Q.   Who was responsible for testing that?

14    Was that an Exide responsibility, or was it a

15    DTSC responsibility?

16         A.   It was a DTSC responsibility.

17         Q.   Okay.  And you mentioned that the dust

18    was collected inside.  How do you know that?

19         A.   I was with the DTSC sampling crew

20    during the sampling.

21         Q.   Okay.  And was this dust that was

22    collected from like the floor where you walk in

23    where someone might come in contact with it?

24         A.   It was predominantly from areas like
```



1    windowsills, shelves, rafters of buildings, um,

2    and then stairs in the basements of two

3    buildings.

4         Q.   Okay.  When employees who work at the

5    Vernon facility go into areas that are known to

6    have -- indoor areas that are known to have high

7    content of lead, what do they wear?

8         A.   Um, field personnel or anyone at the

9    Exide plant, the plant workers or the

10   contractors, have a uniform that stays at the

11   plant.

12        And so it's clothes that specially,

13   you know, a jumpsuit or something that stays on

14   site or is professionally laundered so that it

15   does not -- it does not travel home with them.

16        MR. FRIEDMANN:  Okay.  I have

17   nothing else, Your Honor.  Thank you.

18        THE COURT:  Any further redirect?

19        MR. ELIAS:  Your Honor, I just have

20   one -- I have just one or two handful of

21   recross, if you will.

22        THE COURT:  Hang on.  Let me ask

23   first if anyone else wishes to redirect, I

24   guess specifically the committee.



1          MR. KAPLAN:  No, Your Honor, not on

2     behalf of the committee.

3          THE COURT:  Thank you.  How many

4     questions, Mr. Elias?  I generally don't

5     allow recross, so I'm being very generous,

6     but I'm going to limit you.  How many

7     questions do you have?

8          MR. ELIAS:  Two questions, Your

9     Honor.

10         THE COURT:  All right.  Well, I'll

11    give you a little wiggle room, but let's keep

12    it short.

13               -   -   -

14              EXAMINATION

15               -   -   -

16    BY MR. ELIAS:

17    Q.   I just wanted to follow-up,

18    Mr. Fraske, on Mr. Friedmann's question about

19    the major tears and the lack of the perimeter

20    air monitors being activated or detecting any

21    lead or arsenic.

22         You have touted in your declaration

23    the fact that those tears were quickly addressed

24    and quickly fixed because you had people on the



1    site that were ready to do that; correct?

2         A.   Correct.

3         Q.   And you have no idea what would have

4    been released if those significant tears were

5    not promptly fixed.  It's very well possible

6    that the air monitors on the perimeter would

7    have been activated; correct?

8         A.   I don't know.  It's possible, but yes,

9    I don't know to what extent.

10        Q.   And there could have been a

11   catastrophic failure; correct?

12        A.   A couple of the tears, maybe, a couple

13   others occurred on outer perimeter walls, so I

14   think that's less likely.

15             MR. ELIAS:  Thank you, Your Honor.

16      I appreciate the opportunity to ask those

17      questions.

18             THE COURT:  You're welcome,

19      Mr. Elias.  Any redirect on that,

20      Mr. Friedmann?

21             MR. FRIEDMANN:  No, thank you, Your

22      Honor.

23             THE COURT:  Okay.  Mr. Fraske,

24      thank you for your testimony today.  And you



1       are free to go.  And you are free to look at

2       text messages, e-mails, et cetera and reenter

3       the real world.  So thank you.

4              MR. FRASKE:  Thank you, Your Honor.

5              THE COURT:  And I think that leaves

6       us -- well, that might be it for the debtor,

7       actually.

8              MR. FRIEDMANN:  Yes, Your Honor,

9       Mr. Fraske was our final witness.  So, with

10      that evidence in, Your Honor, the debtors

11      rest.

12             THE COURT:  All right.  Terrific.

13      What are we going to do -- well, what's next?

14      From California, I take it, has three

15      witnesses?

16             UNIDENTIFIED SPEAKER:  Yes, Your

17      Honor.

18             THE COURT:  And who is first?

19             UNIDENTIFIED SPEAKER:  DTSC calls

20      Grant Cope first, Your Honor.

21             THE COURT:  Okay, let's just -- you

22      know, it's been an hour.  Let's just take a

23      very short recess.  I can stretch out my

24      back, which that's why I'm grimacing, if



1    anybody is worried.  It's not what you are

2    saying; it's what I am feeling.

3              So we will take just three or four

4    minutes, five minutes, and then we will get

5    on with Mr. Cope.  All right?  Short recess.

6         (A recess was taken.)

7              THE COURT:  That was longer than

8    five minutes.  I'm sorry.  So we have

9    Mr. Cope, I believe.  Ms. Murin, would you

10   please swear in Mr. Cope?

11             THE CLERK:  Yes, Your Honor.

12                  -   -   -

13             GRANT COPE,

14      the deponent herein, having first

15      been duly sworn on oath, was

16      examined and testified as follows:

17                  -   -   -

18             THE COURT:  All right.  Mr. Cope,

19   you may have heard this before, but I will

20   give it anyway.  Welcome.  Thank you for

21   participating today.  Excuse me.  All right.

22   Where are you located, sir?

23             MR. COPE:  I'm located in

24   Sacramento, California, Your Honor.



```
1              THE COURT:  Okay.  Are you alone in
2       the room, sir?
3              MR. COPE:  I am.
4              THE COURT:  I will instruct you to
5       stay alone, please.  Also, I'm going to
6       instruct you to not read any text messages or
7       e-mail messages while you are being -- while
8       your testimony is going forward, including
9       during any breaks, until you're released by
10      the Court.
11             If you look at any documents either
12      on paper or on your computer, you need to let
13      us know that you are looking at.
14             You really shouldn't look at
15      anything unless directed, but if there is
16      something you need to look at, just ask
17      permission and tell us what you're looking
18      at, and we'll give you the okay, probably, on
19      that.  Do you understand?
20             MR. COPE:  Yes, sir.
21             THE COURT:  Okay.  Very good.  Turn
22      it over to counsel.
23             MR. ELIAS:  Thank you, Your Honor.
24      Mr. Cope has prepared a declaration which was
```



1      submitted without objection.  It's ECF Number

2      917-1.  We would move that into evidence,

3      Your Honor.

4                  THE COURT:  Any objection?

5                  MR. FRIEDMANN:  No, Your Honor.

6      Thank you.

7                  THE COURT:  All right.  Submitted

8      without objection.

9                  MR. ELIAS:  And with your

10     permission, I would -- we would like to do a

11     short direct examination of Mr. Cope.

12                 THE COURT:  That's fine.  Go ahead.

13                        -   -   -

14                        EXAMINATION

15                        -   -   -

16     BY MR. ELIAS:

17         Q.   Mr. Cope, who is your current

18     employer?

19         A.   The Department of Toxic Substances

20     Control.

21         Q.   And how long have you been with the

22     Department?

23         A.   In an active capacity, I began last

24     March.  I was appointed to a permanent position



1    in September.  I have really overseen DTSC at

2    (inaudible) though, since December of 2013 when

3    I was with the agency that oversees DTSC.

4         Q.   And what is your current title at

5    DTSC?

6         A.   Deputy Director for the Site

7    Mitigation and Restoration Program.

8         Q.   And what are your responsibilities as

9    deputy director?

10        A.   To oversee the cleanup program.

11        Q.   Is Exide's Vernon property one of the

12   properties that you oversee?

13        A.   It is.

14        Q.   And when did you first start

15   supervising the cleanup at Vernon?

16        A.   In an acting capacity, really in

17   twenty -- last year in 2019.

18        Q.   And what was the status of the work at

19   the site when you became deputy director?

20        A.   Exide was conducting closure work and

21   undertaking investigations related to on-site

22   corrective action investigations.  So they were

23   doing (inaudible) and then preparing to do

24   cleanup.



1     Q.   And what's your understanding of why

2     corrective action was needed?

3     A.   Corrective action is a requirement

4     under both Federal and State law.  It's there to

5     ensure that contamination that remains as a

6     result of managing hazardous waste is addressed

7     in a safe fashion.

8     Q.   And what type of contamination have

9     you been dealing with at the Vernon site?

10    A.   Well, the Vernon was obviously a lead

11    acid battery recycling facility that operated

12    for decades.

13         It created a significant amount of

14    contamination, including heavy metals such as

15    lead and arsenic, both within the production

16    facility, themselves, but also throughout the

17    site.

18    Q.   Has the status of the work at the

19    Vernon site changed since you first took over a

20    supervisory role?

21    A.   Yes.

22    Q.   How has it changed?

23    A.   Um, the most prominently in March of

24    this year, Exide declared force majeure.  In



1    light of COVID, we took a look at the operations

2    that were occurring as part of the closure

3    process.

4              We first assessed whether they were

5    something that could be done safely.  We were

6    doing this with (inaudible) across the state at

7    that time, because we had varying levels of

8    activities at different sites.

9              We determined that it could be done

10   safely and that it was still a requirement.

11   And, therefore, we asked them to continue.

12        Q.   How did Exide respond when you asked

13   them to continue the work?

14        A.   They refused.

15        Q.   And have they restarted the work at

16   anytime since March of 2020?

17        A.    No.  We, in fact, ordered them to

18   restart, and they still objected to restarting

19   the activities.

20             We determined that this work was an

21   essential activity under state law to continue

22   during the pandemic outbreak.

23             Shortly after we ordered them to

24   continue to do the work, they filed for



1    bankruptcy.

2         Q.   How much time and attention has the

3    Vernon site generally required from you and your

4    staff?

5         A.   It's a significant amount of time.

6    It's one of the more high-profile sites across

7    the state.  It's, you know, it's operating right

8    after a battery facility over several decades in

9    a heavily populated area.  And so that does

10   garner a tremendous amount of attention.

11        Q.   What type of public attention has it

12   received?

13        A.   Well, um, so I'm a public servant, so

14   I first think about the people who I'm entrusted

15   with, you know, using state authority to

16   protect.

17             You know, there are religious leaders.

18   There are university professors.  Obviously,

19   major media outlets.  There are public health

20   officials, local and state-elected officials,

21   federal officials.

22             Um, most importantly, there are these

23   families who live and work around the facility

24   have kids.  And, you know, they are



1    significantly fearful for having that facility

2    still there.

3        Q.   I would like to ask you, Mr. Cope,

4    about a statement in the Paragraph 29 of the

5    declaration.

6            You have stated that DTC -- DTSC has

7    determined that the Vernon plant poses an

8    imminent and identifiable risk of harm.

9            What did you mean when you used the

10   phrase "imminent and the identifiable risk of

11   harm" in your declaration?

12       A.   Well, we have to determine if the

13   conditions at the site represent an imminent and

14   identifiable risk to the health of people who

15   are either on site or who have to work around

16   the site.

17           Importantly, that doesn't require us

18   to, you know, wait to make that determination

19   until people have already been poisoned.  That

20   would be a really serious, you know, breach of

21   not just publicly, but our responsibility as

22   public servants.

23           So what it means is we have got to

24   take a look at the identified conditions, the



1    (inaudible) risks, do (inaudible), and then make

2    a determination based on those site conditions.

3         Q.   What is the basis, the factual basis,

4    for your statement that the Vernon plant or your

5    conclusion that the Vernon plant poses an

6    imminent risk of harm?

7         A.   So the facility, itself, the

8    production facility, for example, has a

9    tremendous amount of contamination that still

10   resides in a half-demolished structure.  That

11   structure is enclosed by a temporary tenting

12   system.

13             More importantly, the tenting system

14   has, as was referenced earlier, got significant

15   holes, openings, really, the size of cars and

16   trucks.  I mean, these are significant openings.

17             And when you take a look at the level

18   of contamination in the actual facility, itself,

19   and then understand that we have an opening,

20   particularly in the other basin where you can

21   have Santa Ana winds that blow, you know, in

22   excess of 40 miles an?

23             Hour.  The last thing that you want is

24   an opening in that temporary enclosure, because



1    then you can have a direct release from having

2    this waste under the tent to the exterior.

3              There is also contamination at other

4    areas of the site that needs to be allayed.  If

5    it's not, it represents, once again, a threat of

6    a direct exposure path line to people either on

7    site or located off site, people who may have to

8    work around the facility.

9              There is an operating wastewater

10   treatment facility.  Because of the hazardous

11   waste on the site itself, all that wastewater

12   has to be treated in order for it to be

13   discharged legally.

14             If it's not treated, then it could be

15   releasing hazardous waste in violation of law,

16   but, more important, in a way that could

17   threaten public health.

18        Q.   You go on to say in that same sentence

19   that Exide's proposed abandonment would

20   substantially increase that risk.  What is the

21   basis for that testimony?

22        A.   So this is, once again, a heavily

23   contaminated site.  We rely on responsible

24   parties to follow the law and do the work that's



1    required to keep a site safe, secure, and to

2    conduct cleanups.

3              Without that, in this case in

4    particular, we have no guarantee that the needed

5    work will occur.

6              We have no guarantee that if a rip

7    does open up again in the temporary structure,

8    that it will be repaired.

9              And we have no guarantee that if the

10   wastewater treatment facility breaks down, that

11   it will be repaired.

12             We are in the business of protecting

13   public health.  And we generally require an

14   order so that we know people can be held

15   accountable for undertaking the actions, or a

16   contract where we, once again, can hold people

17   accountable for taking the actions.

18             In this case, there is no

19   responsibility of care, and we don't have that

20   commitment.

21        Q.   What would be the affect from a public

22   safety perspective if the FEU went away upon

23   abandonment?

24        A.   That would be a significant loss of



1    protection at the facility.  It would open up

2    one of the more heavily contaminated areas on

3    the facility, itself, I mean on the site

4    itself -- pardon me -- and it would open it up

5    to the elements.

6             You know, it would increase the amount

7    of contamination that could be transported on

8    site as well as off site, through the rain,

9    through rain events.  It would be a significant

10   detriment to public health protections.

11        Q.   Mr. Fraske testified earlier that he

12   had heard that there may be active negotiations

13   between DTSC and AIS, the contractor for the

14   FEU.  Are you aware of any active negotiations

15   with the FEU contractor right now?

16        A.   With the possibility of abandonment,

17   we are doing everything we can to prepare for

18   the worst case.

19             We have reached out to different

20   contractors to get cost estimates on the things

21   that we foresee to be necessary in light of

22   abandonment.

23             We haven't gotten all the cost

24   estimates that we have asked for from



1    contractors.

2          We are currently going through those

3    estimates to determine, you know, how we would

4    kind of begin the contracting process.

5          So, yeah, we have reached out to

6    contractors, because that's generally the first

7    thing you want to do in constructing a contract.

8          But we have no -- we have no

9    contractual relationship with any contractor.

10   We have no guarantee that people will be there

11   to do the work.

12        Q.   And let me just clarify that last

13   sentence.  Mr. Fraske seemed to suggest that

14   some contractors may be willing to voluntarily

15   stay on the site.

16          Has that been your experience?  Have

17   contractors offered to continue to work there

18   voluntarily without a contract in place?

19        A.   Um, I'm aware that AIS has asked us to

20   assume Exide's contract.  As a state agency, we

21   have a chance to assume some of the contract.

22          What we are trying to do is, once

23   again, get into a situation we can as quickly as

24   possible to develop a contractual relationship



1    with somebody so that we know the site

2    activities that are needed, that they will go

3    on.

4         Q.   I would like to ask you about a

5    statement in Paragraph 41 of your declaration

6    where you state that, "Completing the phase one

7    closure work with certain corrective action

8    tasks is an essential part of mitigating the

9    imminent risk of harm at and from the Vernon

10   plant."

11          Can you describe how completing that

12   work, you know, would mitigate the imminent risk

13   of harm?

14        A.   Yes.  A phase one closure is pretty --

15   it's very complex with a very straightforward

16   concept.

17          With the permitted facilities that are

18   still on site, you essentially take everything

19   down and demolish it to grade, to ground level.

20          In doing that, you, you know, remove

21   all the contaminated material, make sure it has

22   been exposed of in an appropriate landfill

23   facility.  That is the extension of phase one

24   closure.



1          That, however, is only really the

2    beginning of the process.  There are other

3    phases of closing that would need to occur and

4    other work at areas that are not permitted

5    facilities on site in order to ensure the

6    facility, itself, no longer represents that

7    immediate risk.

8          Q.   And has DTSC prepared an estimate of

9    the costs of mitigating the imminent harm by

10   completing this work?

11         A.   Yes.

12         Q.   And what is that estimate?

13         A.   It's roughly $17 million.  It's what

14   we call a safe and stable configuration.

15         Q.   And what would be the difference

16   between -- let me withdraw that question.

17         According to Exide, DTSC may receive

18   about 26 million in financial assurance after

19   the abandonment.

20         If DTSC receives those funds, would

21   they be sufficient to cover the costs of

22   mitigating the risks of imminent harm at the

23   site?

24         A.   No.



1        Q.    And why not?

2        A.    Because in order for a closure -- a

3    stable closure just takes care of the top of the

4    buildings.

5            With a safe and stable configuration,

6    what you want to do is you want to take care of

7    the other conditions on the site that create the

8    risks that we are concerned about.

9            And so, for example, underneath the

10   permitted facilities there are sub-basins.

11   Those basins are tremendously contaminated.

12           Unless we address the threat

13   represented by those sub-basins, they could

14   become essentially, you know, filled with water,

15   contaminated water that seeps into the ground.

16   That would allow the contamination to spread,

17   worsening the conditions on the site.

18           We also have buildings that weren't

19   permanent.  So they were part of the operation,

20   but not necessarily permanent facilities.  Those

21   structures are contaminated.  They have high

22   levels of heavy metals.

23           And, you know, the structures aren't

24   kind of something that you would consider to be



1    a safe, um, a safe structure.  They have holes

2    in walls.  They have gaps, large gaps between

3    where the walls should meet the roof but does

4    not.  They are missing windows.

5            This all allows winds to flow through

6    those structures, stir up dust, and essentially

7    allow for ongoing releases, uncontrolled

8    releases of hazardous waste.

9            There is also just contamination on

10   site as a result of operations.  All of that

11   needs to be addressed, or it represents an

12   ongoing threat.

13            MR. ELIAS:  Mr. Cope, thank you for

14      your time today.  Your Honor, I have no

15      further questions for this witness.

16            THE COURT:  Thank you very much.

17      Cross?

18            MR. FRIEDMANN:  Thank you, Your

19      Honor.  Jared Friedmann from Weil Gotshal on

20      behalf of debtors.

21                    -   -   -

22                  EXAMINATION

23                    -   -   -

24



1    BY MR. FRIEDMANN:

2        Q.   Good afternoon, Mr. Cope.

3        A.   Good afternoon.

4        Q.   Mr. Cope, were you on the line before

5    when Mr. Fraske was testifying?

6        A.   I'm really bad with names.  The

7    gentleman just before me?

8        Q.   Correct.

9        A.   Yes, I was.

10       Q.   The engineer who works for Alta?

11       A.   Yeah, I was on the line.

12       Q.   Okay.  And do you recall Judge

13   Sontchi's joke about the fact that, whereas he

14   is an engineer, most of the lawyers on the call

15   are lawyers with Poli Sci degrees?

16       A.   Yes.

17       Q.   You are one of us, aren't you?  You're

18   also a lawyer with a Poli Sci degree?

19       A.   I am.  I am.

20       Q.   Okay.  You are not an engineer of any

21   type, are you?

22       A.   No.  I really spent most of my

23   professional life working on environmental laws,

24   so I spent more than roughly two decades working



1     on superfund and hazardous substance control

2     laws.

3            So I have got a, you know, a

4     tremendous amount of experience in terms of the

5     regulatory structure, in terms of the

6     requirements that apply to the affected

7     facilities, but I'm definitely not a

8     toxicologist or a geologist or an engineer.

9        Q.   Okay.  Great.

10       A.   But they are on the staff.

11       Q.   All right.  Thank you, Mr. Cope.  You

12    also heard Mr. Fraske testify about the fact

13    that during phase one closure, DTSC has

14    regularly sent inspectors to Vernon; correct?

15       A.   Yes.

16       Q.   And prior to when Exide declared the

17    force majeure, DTSC actually had inspectors on

18    site several days a week at Vernon; correct?

19       A.   Correct, yes.

20       Q.   But as of March 2020, once the force

21    majeure was declared, DTSC has only had

22    inspectors there once a week; correct?

23       A.   I don't know the exact weekly

24    occurrence.  I know that they were directed to



1      be at the site to ensure that operations were

2      ongoing.

3              Obviously, with less work going on at

4      the site, you know, there is less, you know,

5      potential need for oversight of kind of

6      particular actions, but we want to make sure

7      that the site remediation occurs.

8          Q.   Okay.  And when you say less

9      operations ongoing, you are referring to the

10     fact that, whereas prior to the force majeure

11     declaration, there was remediation going on, but

12     after the force majeure, the work at the site

13     was focused really just on maintenance and

14     containment; correct?

15         A.   Yeah.  They weren't demolishing the

16     structure.  That's right.

17         Q.   Okay.  And that now, this limiting the

18     activities to just maintenance and containment,

19     that's been going on for about seven months or

20     so; is that fair?

21         A.   Seven, eight months, yeah.

22         Q.   Okay.  You, yourself, have never been

23     one of the individuals from DTSC to actually

24     personally inspect the site; is that correct?



1        A.   You have to actually undergo

2    specialized training to go onto one of these

3    sites.

4             And I'm an attorney.  I'm not an

5    engineer.  So I haven't, you know, undertaken

6    those types of trainings.  So no.

7        Q.   So you have never been to the Vernon

8    site at all, then?

9        A.   Yeah, I have --

10       Q.   I'm sorry to talk over you.

11       A.   That's okay.  No, I have driven around

12   it to know where it is.  You know, I have

13   visited the community.

14            But in terms of on site, no, I haven't

15   been on site.  Once again, I need to go through

16   specialized training for that.

17       Q.   Okay.  You attached to your

18   declaration a July 3, 2020 letter from DTSC to

19   Exide; right?  I'm referring to Exhibit 6.

20       A.   Exhibit 6.  Yeah.  Yes.

21       Q.   Okay.  And that letter was sent

22   July 3rd, so that was about, give or take, three

23   and a half months after the force majeure had

24   been declared, and so the activities of the site



1    were limited to just maintenance and

2    containment?

3        A.   That time is about right.  Correct.

4        Q.   Okay.  And that letter that you sent

5    advised of an identifal -- I'm sorry -- excuse

6    me -- advised of an identifiable immediate and

7    potentially -- and potential threat to human

8    health and the environment from accumulated dust

9    at various locations throughout the Exide

10   facility; is that right?

11       A.   Your Honor, I'm not looking at the

12   letter now, so I don't know the exact words.

13       Q.   I'm sorry.  Why don't we take it -- do

14   you have a copy of your declaration with you?

15       A.   I do.  But I think that that captures

16   more than the basic thrust of the letter, so

17   yeah.

18       Q.   I would rather it be specific and not

19   you take my generalizations.

20       A.   Okay.

21       Q.   So why don't you pull out -- it's the

22   corrected Exhibit 6 that was submitted.

23       A.   Yes.

24       Q.   If you have that, we can look at it



1    together.

2         A.   Yeah.  So "identifiable immediate and

3    potential threat."

4         Q.   Yes.  It's the very first sentence of

5    Exhibit 6.  You say, "The Department of Toxic

6    Substances Control, DTSC, has determined that

7    there is an identifiable immediate and potential

8    threat to human health and the environment from

9    accumulated dust at various locations throughout

10   Exide's Technology's facility located in

11   Vernon."

12        A.   That's correct.

13        Q.   Okay.  And this letter also instructed

14   Exide, if you look at page two, to submit a

15   interim measures work plan within 30 days;

16   correct?  So maybe not too immediate if you

17   didn't need the work plan for 30 days; right?

18        A.   Oh, so the work plan is -- it's not

19   just a, you know, go and do more vacuuming, for

20   example.

21             We actually require them to provide us

22   with fairly detailed instructions on what they

23   are going to do.  So if you share that, what

24   they're doing, it will actually, you know, help



1   us identify with public health on site, but

2   offsite.

3       Q.   I understand.  But my point is that

4   the identifiable immediate and potential threat

5   to human health and the environment that you

6   were identifying wasn't that immediate, because

7   it was okay to take the time to put together at

8   thorough plan for 30 days before presenting that

9   to DTSC; correct?

10      A.   Oh, I see what you mean.  And, you

11  know, if you give a company two days to turn on

12  a plan, you're going to get two days' worth of

13  work.

14           So, yeah, you're right.  You

15  absolutely need to provide enough time to a

16  company to give you a good answer and not to say

17  here's kind of my best guess at what I'm going

18  to do.  It's not just a single step to say

19  here's an interim work plan.

20      Q.   Got it.  And the dust that was at

21  various locations that you are referring to in

22  this first sentence, that's the dust that was

23  collected by DTSC back in December of 2019;

24  correct?



1          A.   Um, I don't know the exact date of the

2     collect.  I apologize.  Oh, the sample dates?

3     I'm sorry.  Judge, I'm looking at the --

4          Q.   Yeah.  So just turn to the fourth page

5     of the letter.

6          A.   I apologize.

7          Q.   The left-hand column, it says sample

8     date?

9          A.   Yep.  Yep.

10         Q.   And they were all collected on the

11    same date; correct?

12         A.   Yes.

13         Q.   And that date was November 21, 2019?

14         A.   That's correct.

15         Q.   And I know I keep asking you these

16    questions, which are short because you got to

17    count the number of months.  But these samples

18    were collected about eight-and-a-half months

19    before you sent the letter to Exide saying that,

20    "In light of these samples that we collected in

21    November of 2019, we have identified an

22    immediate and potential threat to human health

23    and the environment."  Is that correct?

24         A.   That's correct.  That's the date of



 1    which the samples were collected.

 2        Q.   Okay.  And, in fact, you had the

 3    results of that testing as early as April of

 4    2020; correct?

 5        A.   Um, let me look through this document

 6    to see when we received the samples, because

 7    they obviously go through an analysis.

 8        Q.   If you look at the bottom of --

 9        A.   Yeah.

10        Q.   -- page -- I think it's -- you got it?

11        A.   It's, yeah, April.

12        Q.   Okay.  By the way, do you know why it

13    took from November until April to analyze these

14    dust samples that were taken back in November?

15        A.   I don't.  I know the laboratories get

16    backed up.  You know, it often -- we often

17    basically are using the same laboratories for a

18    lot of sampling.

19             But I don't know, in this particular

20    instance, know why.

21        Q.   This wasn't put on the high-priority

22    list to get done immediately?

23        A.   Oh, sampling at a site is definitely a

24    priority.  And so I don't think that they didn't



1    do anything with the samples.  But, if the

2    question is why did the analysis take that long,

3    I don't know.

4         Q.   Okay.  And, again, you have the

5    results by April of 2020, but you didn't write

6    to Exide to say that there was this immediate

7    threat until July 3rd; correct?

8         A.   With the samples in April, that's

9    correct.  And I don't -- we didn't write to

10   Exide?  Is that the question?  I apologize.

11        Q.   Yeah.  The July 3rd letter that we are

12   looking at, Exhibit 6, this is when you were

13   advising Exide of the fact that you had taken

14   this dust sample in November of 2019, gotten

15   back results in April of 2020, and now on

16   July 3rd you are saying, based on these dust

17   samples, it was DTSC's view that there is an

18   identifable -- I keep saying that --

19   identifiable immediate and potential threat to

20   human health and the environment; correct?  I'm

21   sorry.  I couldn't hear you, Mr. Cope.

22        A.   That's correct.

23        Q.   Okay.  Thank you.

24             A few days later on July 8th, by the



1    way, Exide, through its counsel, responded and

2    told you that they disagreed with your

3    assessment; correct?

4          A.   Correct.

5          Q.   And DTSC never responded to that

6    July 8th correspondence, did it?

7          A.   I don't know if there were other

8    verbal communications or not.

9          Q.   Were there any written communications?

10         A.   I don't know if there were other

11   verbal, written, or, you know, communications

12   back and forth between staff.  I, you know, I

13   don't know.

14         Q.   But there are no communications

15   following that July 8th response from Exide

16   that you are aware of, at least?

17         A.   That's correct.  I'm not.  I can't say

18   if there were verbal or written communications.

19         Q.   Okay.  And I think you testified

20   during your direct examination that,

21   notwithstanding the demand that Exide provide an

22   interim measures work plan within 30 days, that

23   Exide didn't do that; correct?

24         A.   Um, no.  No.



1          Q.   But Exide was never ordered to do

2     anything else by DTSC, were they?

3          A.   Um, we ordered them to start back up

4     closure activities.

5          Q.   On July 3rd; correct?  And on

6     July 8th -- and on July 8th, Exide said we are

7     not gonna do that?

8                    THE COURT:  Sorry.  Sorry.

9        Mr. Cope, you're nodding a lot.  That won't

10       come up on the transcript.  All right?  Yes,

11       no, maybe, whatever.  Something has to be

12       spoken.  Thank you.

13                   MR. COPE:  Yes.

14                   MR. FRIEDMANN:  Thank you, Your

15       Honor.

16    BY MR. FRIEDMANN:

17         Q.   So I just want to be clear.  On

18    July 3rd, you asked for this interim measures

19    work plan.  You asked them to -- there was, I

20    think, a separate letter which also said go back

21    to doing the remediation, we reject your force

22    majeure claim.

23              July 8th, the debtors, or Exide, say

24    no, we disagree.



1          And after July 8th, that was it.

2     There was no more -- no other orders came from

3     DTSC; correct?

4          A.   Well, so under the 2014 stipulation

5     and order, there is a dispute resolution process

6     that, you know, basically provides due process

7     to the people who are subject to your order.

8          So that dispute resolution process

9     would be the next step, because Exide disagreed

10    with our order, that we would have to undertake.

11         Q.   Did you take any steps to start that

12    process?

13         A.   Um, yeah.  We were in communication,

14    like I said.  After, shortly after we ordered

15    them, they went and filed for bankruptcy.

16         Q.   You are going backwards now, Mr. Cope.

17    I want to go forward.

18         A.   Okay.

19         Q.   On July 3rd you send a letter saying

20    we want this interim measures order; correct?

21         A.   Yes.

22         Q.   On July 8th, debtors' counsel responds

23    and says, we disagree, we don't think there is

24    an immediate threat, and we are not going to do



1     that.

2               My question is, going forward from

3     July 8th to the present, am I correct that DTSC

4     did not issue any other orders to the debtors

5     during that period of time?

6          A.   Under the 2014 stipulation and order,

7     you are supposed to go into a dispute resolution

8     process.

9               We have already ordered them to do it.

10    Issuing another order on which we already

11    disagree, we are just going to get more

12    disagreement.

13         Q.   So the answer to my question is that

14    there were no further orders from DTSC after the

15    July 8th response that you got from Exide saying

16    we disagree, we don't think there is an --

17              MR. ELIAS:  Objection, Your Honor.

18       Asked and answered.  He answered the

19       question.

20              THE COURT:  Not yet.  I'm waiting.

21              MR. COPE:  We didn't issue an

22       order, because we already issued an order.

23    BY MR. FRIEDMANN:

24         Q.   Okay.  So the answer to my question is



1    no, there was nothing further that came in after

2    July 8th; correct?

3         A.   That is inaccurate.  There is a

4    dispute resolution process that is required

5    under the 2014 stipulation order between DTSC

6    and Exide.

7         Q.   I understand that, Mr. Cope.  And the

8    reason I keep asking the same question is I'm

9    trying to ask a simple question but, for some

10   reason, you don't want to answer it, which is

11   just:  July 3rd, the letter comes out from DTSC

12   to Exide, and it says that you have 30 days to

13   give us this interim measures order; correct?

14        A.   Correct.

15        Q.   Interim measures plan.  Excuse me.

16             Exide e-mails you back through counsel

17   on July 8th and says, "We disagree with you, and

18   we're not going to do that."  Correct?

19        A.   I know that there was a response, and

20   it was we are not going to do that.

21        Q.   Okay.  And after July 8th, my question

22   is from July 8th and today, October 15th, 2020,

23   DTSC did not issue any other orders to Exide to

24   do anything; correct?



1           MR. ELIAS:  Objection.  Objection.

2      Asked and answered.

3           THE COURT:  No.  No.  He will not

4      answer the question.  I don't know why.  No.

5           MR. COPE:  Your Honor, I will say

6      very clearly, we issued one order.  They said

7      no.  And then we didn't issue any other

8      orders, because under the 2014 stipulation

9      and order, the process that is afforded to

10     Exide is due process, is to go to the dispute

11     resolution process.

12          So no, we didn't issue another

13     order, because we had already issued an

14     order, they had objected.  And, therefore,

15     they had certain rights under that

16     stipulation and order.

17          THE COURT:  Okay.

18          MR. FRIEDMANN:  Okay, I think we

19     have gotten the point, Your Honor.  I don't

20     want to beat a dead horse here.

21          MR. ELIAS:  That's a very

22     responsive answer.  He answered the question

23     three times.  He said there was no other

24     order because we already issued an order.



1              THE COURT:  Mr. Elias?

2              MR. ELIAS:  He said that three

3     times.

4              THE COURT:  Mr. Elias, I don't know

5     who you are arguing with.  If you're arguing

6     with me, I have already ruled.  If you're

7     arguing with counsel, it's inappropriate.

8              I have already ruled that we've

9     moved on.  So there is nothing for you to say

10     here.

11              MR. ELIAS:  Thank you, Your Honor.

12     BY MR. FRIEDMANN:

13     Q.  Now, Mr. Cope, are you familiar with

14     the corrective action consent order which I

15     think is called -- we call it CACO.  I don't

16     know if you call it that, as well.

17     A.  Yes.

18     Q.  Okay.  And that's actually attached as

19     Exhibit 1 to your declaration; correct?

20     A.  Um, it might be.  It's not on the

21     documents that I have, so I apologize.

22     Q.  Do you have your declaration, the

23     actual declaration?

24     A.  Yes.



1        Q.   Can you go to paragraph eight of that?

2        A.   Yes.

3        Q.   And it says in February 2002, DTSC

4    issued a corrective action consent order, the

5    CACO, to Exide.

6             It then continues, "Under the CACO,

7    Exide is required to, inter alia, undertake

8    corrective action of and investigate releases at

9    and from the Vernon plant.  A true and correct

10   copy of the CACO is attached as Appendix 2 to

11   the non-prosecution agreement.  See Exhibit 1."

12             Is that referring to Exhibit 1 of your

13   declaration?

14       A.   So I have -- I do not see Exhibit 1,

15   at least in what I have in front of me right

16   now.

17       Q.   Okay.  Well, why don't I move on with

18   some questions.  And if we need to get the

19   document, we will get that to you.

20       A.   Okay.

21       Q.   You are familiar with CACO, though;

22   correct?

23       A.   Yes.

24       Q.   You must you be, because you attach it



1    to your declaration, right?  Silly question?

2         A.   Yes.

3         Q.   Okay.  Am I correct that under CACO,

4    DTSC has the right to take any actions at the

5    Vernon site that DTSC deems necessary to protect

6    human health and/or the environment?

7         A.   That's the general granting authority.

8    That's correct.

9         Q.   Section 20.3, you require it says

10   that; right?

11        A.   Like I said, I don't have it in front

12   of me, but yes, that's the general granting

13   authority.

14        Q.   Okay.  And, in fact, CACO also says

15   that DTSC can seek reimbursement from Exide for

16   costs that DTSC incurs with respect to taking

17   any of those actions; right?

18        A.   That's correct.

19        Q.   Okay.  So my question is,

20   notwithstanding that DTSC claims back on

21   July 3rd that there was an identifiable

22   immediate and potential threat to human health

23   and the environment, and that Exide refused to

24   submit the interim measures work plan that you



1    had demanded, and told you it was just going to

2    limit its activities to just maintenance and

3    containment and not remediation, am I correct

4    that DTSC still never exercised that right under

5    CACO to take the actions that it believed was

6    necessary to protect human health and the

7    environment?

8           A.   When you say us, do you mean us

9    literally going on and doing the work for Exide?

10   I'm just --

11          Q.   Yeah.

12          A.   We did not go on site to Exide's

13   facility and do the work.

14          Q.   Okay.  I assume that because DTSC did

15   not, itself, go on site to do any of the work,

16   it also did not send any bills seeking for

17   reimbursement for work that it did; correct?

18          A.   We have a tremendous amount of

19   reimbursements that we are seeking from Exide.

20          Q.   That were done during this period

21   between July 3rd and --

22          A.   No.  For ongoing oversight.  You know,

23   they had objected to certain reimbursements that

24   we had requested for our oversight work.  And



1    they were going through the process -- it's a

2    long process -- once again, they have got due

3    process rights -- of trying to get their

4    reimbursements paid.

5          Q.   Are you talking about pre-petition

6    claims?

7          A.   That, I don't know.

8          Q.   Okay.  So there is one thing that DTSC

9    has done since July 3rd with respect to its

10   claim that there was an identifiable immediate

11   and potential threat to human health and the

12   environment.  It did it just this past Monday;

13   right?

14         A.   Are you referring to the

15   determination?

16         Q.   Do you know what DTSC did this past

17   Monday?

18         A.   That's what I am asking you.  Are you

19   referring to the determination?

20         Q.   Yes.  On Monday, three days before

21   this hearing, DTSC issued an imminent and

22   substantial endangerment determination; correct?

23         A.   Correct.

24         Q.   And that was the first thing that's



1   done since back on July 3rd when it claimed that

2   there was an identifiable immediate and

3   potential threat to human health and the

4   environment; correct?

5       A.   That's correct.  We began to create

6   that document when Exide refused to potentially

7   undertake the actions that we had ordered them

8   to do.

9           Because the determination, once it's

10  issued, allows for, you know, certain

11  authorities that we can use to try and help get

12  work started.

13      Q.   And the determination that was made in

14  this document that you issued on Monday was

15  that, "Based on the foregoing findings of fact

16  and conclusions of law, DTSC hereby determines

17  that there may be imminent and substantial

18  endangerment to the public health or welfare or

19  to the environment because of a release or

20  threatened release of hazardous substance at the

21  site."  Is that correct?

22      A.   That's correct.

23      Q.   Okay.  You discuss on direct

24  examination that in light of, you know, the



1    possibility that the Vernon site may end up

2    being abandoned, that DTSC is taking certain

3    steps to make sure that it's prepared in the

4    event that that happens; correct?

5         A.   Right.

6         Q.   All right.  Certainly, if the Court

7    determines that the debtors can abandon the

8    Vernon site, DTSC is not just going to sit back

9    and see what happens; right?

10        A.   It's an emergency situation, so --

11        Q.   Right.

12        A.   -- we are working long into the night

13   to try and figure out what to do.

14        Q.   And DTSC's first obligation is to

15   protect the citizens of California; correct?

16        A.   Absolutely.

17        Q.   So it wouldn't sit back, if AIS says,

18   "Look, we don't have a contract yet, so we are

19   going to go in on Monday and take down our

20   tent," DTSC is not going to sit back and just

21   let them do that, are they?

22        A.   So, if they chose to do that, I would

23   have to talk with counsel to see what authority,

24   if any, we would have to stop them.



1    Q.   Right.  And you are going to do

2   everything you can to stop them.  You're not

3   going to let all that dust that's being

4   contained right now by that tent just go into

5   the environment; right?

6    A.   We wouldn't be letting any dust that's

7   contaminated go into the environment.

8    Q.   Okay.  I just want to know.  Can the

9   people of California be sure that in the event

10   that this court allows abandonment, that DTSC is

11   going to do everything it possibly can to make

12   sure that not -- that not a single drop of dust

13   escapes from that property, that DTSC is going

14   to get everything in place to protect the people

15   of California?

16    A.   The people of California can be

17   100 percent certain that this presents an

18   emergency situation, and we are doing everything

19   that we can, 100 percent, everything that we can

20   to protect them.

21    Q.   Okay.  And that you will continue to

22   do that even if the property is abandoned;

23   correct?

24    A.   100 percent.



WILCOX & FETZER
(302) 655-0477  |  WWW.WILFET.COM

A-1576

1        Q.    Okay.  And, Mr. Cope, are you aware of

2     the financial assurances that are available to

3     DTSC to be able to utilize, to operate the

4     maintenance, containment, even remediation at

5     the site in the event that the, um, that Exide

6     abandons the site?

7        A.    Yes.

8        Q.    Okay.  And are you aware that there is

9     at least $26 million available in a surety bond

10    in a trust?

11       A.    Yes.

12       Q.    And that there is potentially another

13    $2.6 million available to California, should it

14    choose to participate?

15       A.    Um, I'm not aware of the exact amount.

16    I know that we have objected to the plan.  But

17    I'm aware that there is additional funds.

18       Q.    Okay.  And if California -- or DTSC

19    had available to it that $26 million, that would

20    allow it, at a minimum, to be able to maintain

21    and contain the site for some period of time;

22    correct?

23       A.    So $26 million would not allow us to

24    keep the site in a safe and stable condition.



1          Q.    Forever.

2          A.    Period.

3          Q.    Right.  Would you be able to -- would

4     you be able to keep it in a safe condition for a

5     couple of months for $26 million?

6          A.    $26 million will not allow us to keep

7     the site in a safe and stable condition.  There

8     are various areas of contamination on the site

9     right now that need to be addressed.

10               So if your question is will

11    $26 million, once again, allow DTSC to keep the

12    site from any threat of an immediately

13    identifiable risk, no.  We need more money than

14    that to address the risks on the site.

15         Q.    Let me ask you a different question,

16    Mr. Cope:

17               Would the $26 million allow DTSC to be

18    able to conduct all the activities that are

19    going on on the site right now for at least

20    a period of time until DTSC could come up a

21    long-term plan for how to address remediation

22    issues?

23         A.    If we can get into contract.  The

24    quicker we can get into contract, obviously, the



1    better.  Because the burn rate on the -- the

2    amount of money that we have got to extend on a

3    monthly basis just to maintain the site is a

4    lot.

5              And, you know, every month that we go

6    without starting closure is burning away money

7    that needs -- that's really needed to complete

8    closure.

9              So, yeah, it's kind of a, you know,

10   how do you, you know, situations you find

11   yourself in.  We need to get into contract as

12   quickly as possible.  We have got a limited

13   amount of money.  The longer it takes to get

14   into contract, the less money we have to

15   actually accomplish the work.

16        Q.   I understand, Mr. Cope.  But the

17   testimony at this hearing is that it's costing

18   about $750,000 a month right now to maintain the

19   site and contain the lead and other toxins on

20   the site right now; correct?

21        A.   Um, it's seven or $800,000 a month,

22   yeah.

23        Q.   Let's even go with -- we will round up

24   to $800,000 -- all right? -- which I think is



1    the number that you had guesstimated in your

2    declaration; right?

3         A.   Seven -- yeah, it's right around

4    there.

5         Q.   Okay.  You could, with $26 million,

6    you could at least maintain the site and contain

7    the threat for several years before you would

8    run out of money; correct?

9         A.   Um, you would use a half-demolished

10   structure contaminated with hazardous waste

11   without any way of containing what's inside it,

12   because you would have burned all your money

13   just maintaining the site.  I mean, you could do

14   that, but it wouldn't make -- it wouldn't make

15   sense.  It would need --

16        Q.   Yeah.

17        A.   I'm sorry.

18        Q.   Mr. Cope, I'm not suggesting this is a

19   long-term plan.  I'm saying that if it's going

20   to take, as you said before, if you get, you

21   know, a plan, you ask for it in two days, you're

22   going to get a two days' worth of work plan.

23             I understand that it may take six

24   months for DTSC to figure out here is how we're



1    going to deal with this site.

2            I'm just asking you if with

3    $26 million, you will have enough money to take

4    the six months, think through a plan that's

5    going to make sense for California, for the

6    people of California, long term for how to deal

7    with this site.

8            With the $26 million, is that enough

9    money for six months to at least continue

10   maintaining and containing a site that right now

11   is costing $800,000 a month to do just that?

12       A.   The exact burn rate, I would have to

13   defer to other people.  $26 million would allow

14   us to continue to maintain the current

15   activities at the site while we, you know,

16   continue to do our level best to come up with

17   those firm commitments that we need in order to

18   ensure the work is going to get done.

19           MR. FRIEDMANN:  All right.  Thank

20      you, Mr. Cope.  I have no further questions,

21      Your Honor.

22           THE COURT:  Any other cross?  Okay.

23      Redirect?

24           MR. ELIAS:  Yes, Your Honor.  Thank



1      you.

2                      -   -   -

3                   EXAMINATION

4                      -   -   -

5    BY MR. ELIAS:

6        Q.   Mr. Cope, I wanted to ask you about

7    the July 3rd letter that Mr. Friedmann

8    questioned you about at length.

9             And he pointed you to the first

10   sentence of that letter that says that DTSC has

11   determined that there is an identifiable,

12   immediate, and potential threat to human health

13   and the environment from accumulated dust at

14   various locations throughout the Exide

15   Technologies facility in Vernon.

16            Is that the official finding of DTSC

17   as of July 3, 2020?

18       A.   Um, so we found conditions at the site

19   that needed to be addressed, that needed to be

20   remediated in order to protect those, you know,

21   on-site workers and potential off-site

22   individuals.  So that's why we ordered them to

23   perform interim measures.

24       Q.   Well, what I am trying to get at,



1    Mr. Cope, is did the fact that there was -- did

2    the fact that there was a six-month delay in the

3    test results in any way reduce the accuracy of

4    this statement?

5         A.   No.

6         Q.   And is this still the official

7    determination that DTSC made on July 3, 2020,

8    that there was an identifiable, immediate, and

9    potential threat after you did get those test

10   results?

11        A.   Yeah.  That is -- that determination

12   still stands.

13        Q.   Okay.  Mr. Friedmann also asked you

14   about a letter -- I'm sorry -- a release from

15   the DTSC this past week finding that there was

16   an imminent and substantial endangerment at the

17   Vernon site.  Do you recall those questions?

18        A.   Yes.

19        Q.   And he, in particular, he asked you

20   about a statement in Section 3.0, the

21   conclusions of law, that says the actual release

22   of a hazardous substance at the site may present

23   an imminent and substantial endangerment to the

24   public health or welfare or to the environment.



1              Where does the language in that

2     paragraph, "may present an imminent threat,"

3     come from?

4          A.    From state hazardous waste control

5     law.

6          Q.    That language tracks the state law; is

7     that correct?

8          A.    "May present."  That's right.  That's

9     essentially the legal determination that we have

10    to make in order to issue that determination.

11         Q.    And, finally, Mr. Friedmann asked you

12    about whether the $26 million the DTSC could

13    receive after the confirmation would allow you

14    to continue operations for six months.  Do you

15    recall that?

16         A.    I do.

17         Q.    Even if you were to receive that

18    money, is there any guarantee that the

19    abandonment process -- that DTSC could have a

20    smooth transition in terms of taking over

21    management at the site if it was simply

22    abandoned on the effective date by Exide?

23         A.    Well, this, again, it does present an

24    emergency situation.  State contracting law, you



1    can't compel somebody to get into contract with

2    you.

3              A contract is still, you know, it's an

4    agreement between two parties.  There will

5    probably be several contracts to be entered

6    into.

7              All of that takes time.  All of that

8    takes negotiation.  All of that takes looking

9    into sub parties.

10             MR. ELIAS:  Nothing further, Your

11       Honor.  Thank you.

12             MR. FRIEDMANN:  Your Honor, if I

13       could do a one-question recross.  And the

14       only reason is just to clarify something

15       where -- and really for the benefit of DTSC,

16       because I asked about a different section of

17       the order that got issued on Monday than he

18       was just asked about.

19             THE COURT:  Okay.

20             MR. FRIEDMANN:  And, again, it's my

21       fault for not pointing you to the other

22       paragraph numbers.  I apologize to Mr. Elias

23       and Mr. Cope.

24             What I was reading to you when I



1     read the conclusion -- this is the imminent

2     and substantial endangerment determination

3     that was issued this past Monday, Mr. Cope --

4     I was actually reading 4.2, the ultimate

5     determination, not anything from the

6     conclusions of law.

7              So it was 4.2 where I had read to

8     you where it said, "Based on the foregoing

9     findings of fact and conclusions of law, DTSC

10    hereby determines that there may be an

11    imminent and substantial endangerment to the

12    public health or welfare or to the

13    environment because of the release or

14    threatened release of the hazardous

15    substances at the site."

16             That was the determination that

17    DTSC made; correct?

18             MR. COPE:  That's right.  That's

19    the minimal determination we need to make

20    under state law to issue that determination.

21    That's correct.

22             MR. FRIEDMANN:  Thank you.  Nothing

23    further, Your Honor.

24             THE COURT:  Thank you.  Mr. Elias,



```
1     do you want to follow up on that?

2                MR. ELIAS:  Nothing further, Your

3     Honor.  Thank you.

4                THE COURT:  Okay.  Thank you.

5     Mr. Cope, you are released.  You may reenter

6     the world of text messages and e-mails and

7     human companionship.  Thank you for your

8     testimony today.

9                MR. COPE:  Thank you very much,

10    Your Honor.

11               THE COURT:  Okay.  What's next?

12               MR. ELIAS:  Your Honor, DTSC calls

13    Perry Myers.

14               THE COURT:  Okay.  Yeah, let's keep

15    going.  Mr. Myers, where are you?  Oh, there

16    you are.  Thank you, sir.  Ms. Murin, will

17    you please swear in the witness?

18               THE CLERK:  Yes, Your Honor.

19                    -   -   -

20                  PERRY MYERS,

21       the deponent herein, having first

22       been duly sworn on oath, was

23       examined and testified as follows:

24                    -   -   -
```



1              THE COURT:  All right.  Mr. Myers,

2       good afternoon, even in California, if that's

3       where you are.  Let me ask you first, where

4       are you, sir?

5              MR. MYERS:  I'm in my home office

6       in Fair Oaks, California.

7              THE COURT:  Are you alone in the

8       room, sir?

9              MR. MYERS:  I am.

10              THE COURT:  All right.  I instruct

11       you to please remain alone during the

12       entirety of your examination.

13              Of course, if we take any breaks,

14       you can go out and see the rest of your

15       house.  But please stay alone while you are

16       testifying.

17              I'm also going to instruct you

18       please do not read any e-mails or text

19       messages while you are testifying, including

20       any breaks, and not to discuss the merits of

21       your testimony with any person until you are

22       completely done testifying.

23              Do you understand those

24       instructions?



```
1                    MR. MYERS:  Yes, sir.

2                    THE COURT:  Okay.  Very good.

3           Let's get started.

4                    MR. ELIAS:  Thank you, Your Honor.

5                            -   -   -

6                         EXAMINATION

7                            -   -   -

8      BY MR. ELIAS:

9           Q.   Mr. Myers, who is your current

10     employer?

11          A.   The Department of Toxic Substances

12     Control.

13                   MR. ELIAS:  Actually, Your Honor, I

14          just realized, before I do a short direct

15          with Mr. Myers, we would like to move his

16          declaration into evidence.  It's ECF Number

17          917-8.

18                   THE COURT:  Any objection?

19                   MR. FRIEDMANN:  Your Honor, no

20          objection.  And if it would make it easier

21          for the proceedings, we would be happy just

22          to have this declaration entered without any

23          cross examination.

24                   THE COURT:  All right.  Well,
```



```
 1       that's up to Mr. Elias, of course, whether he

 2       wants to ask any direct.

 3                 MR. ELIAS:  Your Honor, we would

 4       like to have Mr. Myers at least introduce

 5       himself to the Court and give his background,

 6       but we won't do a lengthy direct on the

 7       substance, given Mr. Friedmann's statement.

 8                 THE COURT:  Okay.

 9                      -   -   -

10                 EXAMINATION

11                      -   -   -

12  BY MR. ELIAS:

13       Q.   Mr. Myers, who is your current

14  employer?

15       A.   The Department of Toxic Substances

16  Control.

17       Q.   And what is your title?

18       A.   I am a Supervising Hazardous

19  Substances Engineer I.  I supervise six

20  engineers.

21       Q.   And do you have an engineering degree?

22       A.   I do.  I have an engineering degree, a

23  bachelor's of science in mechanical engineering.

24       Q.   And do you have any professional
```



1    licenses?

2          A.   I am a California professionally

3    licensed mechanical engineer, as well as a

4    licensed civil engineer.

5          Q.   And can you walk us through the

6    positions that you have held at DTSC?

7          A.   I have been with DTSC for 20 years

8    now.  I spent four years in our hazardous waste

9    management program in the standardized

10   permitting unit working on closure of

11   standardized permitted facilities.

12              I then switched over to the Site

13   Mitigation and Restoration Program in 2004 and

14   spent six years there as a project manager

15   overseeing site clean-ups similar to what we are

16   doing here and other sites.

17              And then in 2010 I was promoted to

18   senior engineer in the Engineering and Special

19   Projects Office.  We call it SPO, because we

20   like acronyms.

21              And SPO's purpose is we are the

22   in-house engineering consultants for the

23   department.  And, while there, I provided

24   engineering consultation on a variety of



1    different sites for nine years.  And then I was

2    promoted to supervisor a year ago.

3          Q.   And in your role at SPO, were you

4    recently asked to calculate certain costs in

5    connection with work to be performed at the

6    Vernon property?

7          A.   I was.

8          Q.   And is the analysis that you did set

9    forth in the declaration you submitted in this

10   case?

11         A.   Yes, sir.

12         Q.   And the result of your analysis was

13   that it would cost approximately $72 million to

14   mitigate the risks of imminent harm at the

15   Vernon site; correct?

16         A.   Yes, sir, to create what we call the

17   stable site configuration.

18         Q.   And what is the difference between the

19   stable site configuration and the current

20   configuration of the Vernon site, if any?

21         A.   Longevity and sustainability.

22              For the most part, the stable site

23   configuration is much more of a passive

24   condition and does not present the risk.



1           The current configuration of the site,

2      as previously has been discussed by numerous

3      people, takes a lot of activity and a quick

4      reaction force to maintain protectiveness.

5           Q.   Can you give some specific examples of

6      the type of things that would be different under

7      your stable configuration scenario for which you

8      have estimated the costs and the current

9      configuration?

10          A.   The cost estimate includes finishing

11     the phase one enclosure activities, which is

12     essentially tearing down the rest of the

13     building under the FEU, the removal of the FEU,

14     grading of the site to improve stormwater

15     collection and management, removal of other

16     buildings and units on the site, and covering

17     the site to basically entomb the toxic

18     substances that will remain.

19               MR. ELIAS:  Mr. Myers, thank you

20          very much for your time and for your

21          declaration.  Your Honor, we have nothing

22          else for this witness.

23               THE COURT:  All right.  Any cross,

24          Mr. Friedmann?



```
1              MR. FRIEDMANN:  No, thank you, Your

2       Honor.

3              THE COURT:  Okay.  Any other party

4       wish to cross examine this witness?

5              You are done, then.  I have no

6       questions.  Mr. Myers, thank you for your

7       time.  You are released back to the real

8       world.  Thank you.

9              MR. MYERS:  Thank you, sir.

10             THE COURT:  I think the last one is

11      Dr. Solomon; is that correct?

12             MR. ELIAS:  Yes, Your Honor.

13             THE COURT:  Okay.  Let's get her on

14      the stand.  Ms. Murin, will you please swear

15      in Dr. Solomon?

16             THE CLERK:  Yes.

17                   -   -   -

18             DR. GINA SOLOMON,

19         the deponent herein, having first

20         been duly sworn on oath, was

21         examined and testified as follows:

22                   -   -   -

23             THE COURT:  All right.  Mr. Elias.

24             MR. ELIAS:  Your Honor, we would
```



1          like to move Dr. Solomon's declaration into

2          evidence.  It's ECF Number 965.

3                    THE COURT:  Any objection?

4                    MR. FRIEDMANN:  No, Your Honor.  I

5          will make my same offer, which is that we

6          don't intend to cross Dr. Solomon, so if they

7          would like to just submit the declaration as

8          direct evidence, we could probably finish up

9          the evidence.

10                   THE COURT:  All right.

11                   MR. ELIAS:  We would like to do a

12         direct examination.

13                   THE COURT:  Okay.

14                   MR. ELIAS:  Your Honor, we would

15         like to do a direct examination.  Thank you.

16                   THE COURT:  All right.  Well, the

17         declaration, 965, is admitted without

18         objection.  And you can examine the witness.

19                   Of course, Mr. Friedmann, you are

20         more than welcome to change your mind based

21         on the examination.

22                   MR. FRIEDMANN:  Thank you, Your

23         Honor.

24                        -   -   -



```
 1                    EXAMINATION

 2                 -    -    -

 3    BY MR. ELIAS:

 4         Q.   Good afternoon, Dr. Solomon.

 5         A.   Good afternoon.

 6              THE COURT:  Oh, wait.  I'm sorry.

 7    I'm losing my mind.  It's late in the day.  I

 8    have to instruct the witness.  I apologize,

 9    Mr. Elias and Dr. Solomon.

10              Dr. Solomon, you may have heard

11    some of this previously.  Where are you

12    located today, ma'am?

13              DR. SOLOMON:  I'm in San Francisco,

14    California, in my home.

15              THE COURT:  Okay.  Are you alone in

16    the room?

17              DR. SOLOMON:  Yes.

18              THE COURT:  Okay.  I'm instructing

19    you to stay alone in the room until your

20    testimony is finished, please.

21              I'm also going to instruct you not

22    to read any text messages or e-mails while

23    you are being examined, including any breaks

24    we might take, and not to discuss the
```



1    substance of your testimony with any person

2    until we are all finished, including any

3    breaks.

4              Do you understand those

5    instructions?

6              DR. SOLOMON:  I do.

7              THE COURT:  Okay.  Thank you,

8    Doctor.  Mr. Elias, you can proceed.  Sorry

9    about that.

10             MR. ELIAS:  Thank you, Your Honor.

11   BY MR. ELIAS:

12        Q.   Dr. Solomon, can you please describe

13   your medical training and specialization?

14        A.   I am board certified in internal

15   medicine.  And then I subspecialized in

16   preventive medicine and occupational and

17   environmental medicine.

18             As part of the latter training, that

19   involved a master's in public health in addition

20   to the M.D. degree and two residency programs

21   during those training years.

22        Q.   And do you hold any medical licenses?

23        A.   I do.  I'm board certified to practice

24   occupational environmental medicine, and then



1  I'm licensed in the State of California to

2  practice clinical medicine.

3       Q.   And who is your current employer,

4  Dr. Solomon?

5       A.   I am a principal investigator at the

6  Public Health Institute in Oakland, California.

7  I'm also a clinical professor of medicine at the

8  University of California, San Francisco.

9       Q.   What is your role at the Public Health

10  Institute?

11       A.   I'm a researcher.

12       Q.   Role -- I'm sorry.

13       A.   I'm a researcher.  So I write grants

14  and study environmental and public health issues

15  ranging from air quality, health practices of

16  air pollution, such as wildfire smoke, to

17  drinking water contaminants and other issues

18  in -- that affect human health.

19            So I mostly spend my time doing

20  research and writing papers.  But, also, I'm

21  involved clinically in teaching at UCSF.

22       Q.   During your career, have you published

23  any research?

24       A.   Yes.  I have published more than 60



```
1    papers and about a dozen book chapters, reports.

2    I have presented at scientific conferences on a

3    regular basis.

4             So, yes, I have.  I have published

5    many peer review papers, including some on heavy

6    metals, including lead.

7        Q.    You have attached to your declaration

8    your CV.  Is the experience and information

9    reflected on your CV accurate to the best of

10   your knowledge?

11       A.    Yes.

12       Q.    And during your career as a medical

13   doctor, have you developed any expertise

14   regarding the effect of lead on human health?

15       A.    Yes, I have.  One of the things that I

16   did at UCSF during my career there is I

17   cofounded the UCSF Pediatric Environmental

18   Health Specialty Unit.

19            And working in close collaboration

20   with pediatricians, we evaluated children and

21   entire families that were exposed to

22   environmental hazards.

23            And so I have personally treated

24   children and adults suffering from the effects
```



```
 1    of lead.
 2         Q.   Is there a body of medical literature
 3    addressing the human effects of lead?
 4         A.   There is a massive amount of
 5    scientific information and literature on lead
 6    and the effects in animals, the effects in
 7    humans.
 8              There are studies of literally tens of
 9    thousands of children and adults in the U.S. and
10    around the world that have suffered from both
11    high-level and low-level health effects from
12    lead.
13         Q.   And do you have a general familiarity
14    with that literature?
15         A.   I do.
16         Q.   And did you review any of it in
17    connection with preparing your declaration in
18    this case?
19         A.   Yes, I did.  I -- the literature --
20    new studies come out constantly, and so it's
21    always important to take a look and see what has
22    emerged in recent years, in recent months.
23              And so I did a literature review in
24    preparation for this case to update my knowledge
```



1    of the current data.

2        Q.   And when preparing your declarations

3    and the opinions in it, did you rely on

4    scientific research and information that are

5    widely relied on in your field?

6              RECORDING:  At the tone, please

7       record your message.  When you have finished

8       recording, you may hang up or press one for

9       more options.

10             DR. SOLOMON:  I'm not sure what

11      that was.  Can you still hear me?

12             THE COURT:  Yes, we can hear you.

13      These things happen.  It's okay.

14             DR. SOLOMON:  Okay.

15             THE COURT:  I can't remember if

16      there was a pending question, though.  It

17      totally distracted me.  Mr. Elias, I know he

18      is having the issues I have all the time with

19      those damned things.

20             DR. SOLOMON:  I understand.

21             THE COURT:  As an aside,

22      Dr. Solomon, having lived with a spouse going

23      through one residency, I have particular

24      admiration for your masochism in going



1      through two residencies.

2                  DR. SOLOMON:  It's an ordeal, um,

3      and, you know, but it also is a really

4      important life-changing experience, I have

5      found.  So I hope you -- sometimes it's

6      harder on the spouse than on the person who

7      is doing it.

8                  THE COURT:  Oh, I'm going to say

9      that to her tonight!  (Laughter)

10                 DR. SOLOMON:  (Laughter)  Well,

11     it's true.  There is a lot of burden that

12     transfers.

13                 THE COURT:  It's a burden on

14     everyone.  Thank you.  Okay.  Are we okay

15     Mr. Elias?  Oh, we lost him altogether.  Did

16     we lose you altogether?

17                 DR. SOLOMON:  It looks like he may

18     be trying to rejoin.

19                 THE COURT:  All right.  Well, let's

20     take a short recess, then, five minutes while

21     Mr. Elias gets everything sorted away.  Not a

22     problem.  We do the best we can with

23     technology.  And don't go anywhere.  We will

24     just be back in five minutes.



```
 1              DR. SOLOMON:  Okay.

 2              MR. PETER FRIEDMAN:  I will let him

 3       know, Your Honor.  It's Peter Friedman.  I

 4       will let Mr. Elias know.

 5              MR. ELIAS:  I had technical

 6       difficulties.  We knew it was going to happen

 7       at some point.  I'm just sorry it was me.

 8              UNIDENTIFIED SPEAKER:  I know.  I

 9       know.  Well, the good thing is that in each

10       situation, you know that every single person

11       who is on the call or on the hearing has also

12       had it happen to them at some point.  So

13       everybody gets it.

14              MR. ELIAS:  I do appreciate that.

15              UNIDENTIFIED SPEAKER:  There was a

16       time where I would be embarrassed if one of

17       my kids would come into the room during a,

18       you know, a call.  I don't even press mute

19       anymore.

20              THE COURT:  Are you back with us?

21              MR. ELIAS:  I am, Your Honor.  I

22       apologize for the technical difficulties.

23              THE COURT:  Not a problem.  We have

24       Dr. Solomon, so you may proceed.
```



Bankruptcy Hearing - October 15, 2020                    239

1               MR. ELIAS:  Thank you, Your Honor.

2       BY MR. ELIAS:

3           Q.   I believe, Dr. Solomon, that before I

4       got cut off, I had asked you whether, when

5       preparing your declaration, you relied on

6       scientific research and information that's

7       widely relied on in your field?

8           A.   Yes, I did.  So I looked first to some

9       of the government agencies such as the Centers

10      for Disease Control and Prevention, the National

11      Institutes of Health, National Toxicology

12      Program.

13              I also looked to the most prestigious

14      medical journals, including the New England

15      Journal of Medicine, Journal of the American

16      Medical Association, The Lancet, and the Journal

17      of Pediatrics, which is the Journal of the

18      American Academy of Pediatrics, as well as the

19      journals that are published by the National

20      Institutes of Health.

21              So those are the places I typically

22      look first for the most important studies.

23              MR. ELIAS:  Thank you, Dr. Solomon.

24          Your Honor, at this time we tender



WILCOX & FETZER
(302) 655-0477 | WWW.WILFET.COM

1      Dr. Solomon as an expert on the health

2      effects of lead exposure on human health.

3                  THE COURT:  Any objection?  Do you

4      wish to voir dire?

5                  MR. FRIEDMANN:  No, thank you, Your

6      Honor.

7                  THE COURT:  Okay.

8                  MR. ELIAS:  Thank you, Your Honor.

9   BY MR. ELIAS:

10      Q.   Dr. Solomon, is there a consensus

11   within the medical community on the overall

12   health effects of lead on humans?

13      A.   Yes, there is.

14      Q.   And what is that consensus?

15      A.   That the consensus is that there is no

16   safe level of exposure to lead, that lead at

17   even extremely low levels has adverse effects on

18   the health of both adults and children, but

19   especially children; that lead is a poison that

20   affects multiple organ systems, including the

21   brain, the cardiovascular system, the kidney,

22   the bone marrow, among others; the peripheral

23   nervous system.  It also affects reproductive

24   function.



```
 1              So it is well known and well
 2      established to be extremely hazardous to health.
 3          Q.   What type of health problems or
 4      specific health problems have low levels of lead
 5      been associated with, low levels of lead
 6      exposure?
 7          A.   In adults, low levels of lead in
 8      studies of -- these are studies of, you know,
 9      each study has thousands, in some cases 10,000
10      adults, and these are prospective cohort
11      studies; so the strongest studies that there
12      are, many of them done by -- through the Centers
13      for Disease Control's National Health and
14      Nutrition Examination Survey.
15              These studies have consistently shown
16      that even low trace levels of lead adversely
17      affect kidney function in subtle ways, resulting
18      in reduced kidney function as people age.  And
19      since the kidney is involved with controlling
20      blood pressure, there is an increased risk of
21      hypertension.
22              There also is an increased risk of
23      cardiovascular disease, including death, from
24      ischemic heart disease, so basically from heart
```



1    attacks that are associated with lead.

2            And it can be quantified.  The

3    estimates are, you know, happen, you know, half

4    a million deaths a year attributable to current

5    background lead exposures, even in areas that

6    are not, you know, right in the middle of a lead

7    hotspot.

8            The other issue with lead in adults is

9    that chronic lifelong lead exposure, because

10   lead does build up over time in our bodies, it

11   does affect the brain.

12           And so there is now increasing

13   evidence of neurodegenerative diseases,

14   including Alzheimer's, dementia, associated with

15   or, you know, the risk is increased by exposure

16   to lead.

17           And that's really only in adults.  But

18   the effects in children are even more

19   significant.

20      Q.   Well, you went to my next question.

21   My next question, Dr. Solomon, was going to be

22   what are -- what are the known health effects of

23   low-level lead exposure on children?

24      A.   Children are particularly vulnerable



1    to lead because their brains are undergoing

2    development.

3          So their neurons literally are, you

4    know, migrating and dividing and maturing in the

5    different parts of the brain.

6          And lead interferes with that process,

7    both by interfering with the genetic code, and

8    also because it very effectively mimmicks

9    calcium, which is one of the things that neurons

10   need in order to communicate with each other.

11         And so in children the effects are

12   primarily on neurological function deficits in

13   intelligence quotient for IQ, difficulty

14   learning, delays learning languages, including

15   English, delays in executive function.

16         And what I mean by executive function

17   is it's sort of our ability to keep mental lists

18   and to keep track of multiple things that are

19   going on on a day-to-day basis in our lives.

20         People who have deficits in executive

21   function are particularly hampered because they,

22   you know, they have trouble keeping track of

23   things and meeting deadlines and so forth.

24         The other issues with lead relate to



1    behavioral changes.  And the research in that

2    area has really been growing in recent years

3    with now what is considered quite a clear

4    association with attention deficit hyperactivity

5    disorder, shortened attention span in general,

6    which makes learning even more difficult.

7             And difficulty -- well, damage to the

8    frontal lobe of the brain, which interferes with

9    impulse control.  And so that kind of damage

10   makes kids more susceptible to violent

11   outbursts, to tru -- you know, truancy.

12            There is associations even with

13   inability to graduate from high school and with

14   increased rates of incarceration.

15            So it's really a lifelong burden for

16   children because of this vulnerability of the

17   developing brain.

18       Q.   You testified a moment ago,

19   Dr. Solomon, that there currently is no safe

20   level of lead.  Has that always been the

21   scientific consensus?

22       A.   No.  It really has emerged over the

23   decades.  I mean, lead has been known to be a

24   poison for centuries, quite literally.



1          But the effects were thought to be

2     manifested at the higher acute levels when

3     people would, you know, become immediately ill

4     with seizures and with high-level lead exposures

5     and die from lead encephalopathy.

6          But the research studies now have

7     shown these lower-level effects.

8          And, you know, just to put this into

9     context, lead is not naturally occurring in the

10    environment.  It occurs in the deeper levels of

11    the earth's crust.  So it needed to be mined,

12    brought to the surface, and used in order to

13    result in human exposure.

14         So when you look, for example, at

15    historic scores, you find that historic humans

16    were not exposed to lead and that, as

17    industrialization occurred, now really all of us

18    are exposed to lead, some people significantly

19    more so than others.

20    Q.   What can the human body do, if

21    anything, to detoxify or expel lead?

22    A.   Our bodies aren't well designed to

23    detoxify lead.  It's not something that humans,

24    you know, in the distant past were exposed to,



1   so we don't have clear like enzyme systems.

2          Lead also is an element, and so it

3   can't be broken down.

4          It also, since -- well, I don't want

5   to get too far into the chemistry, but it does

6   mimic calcium very significantly.  Our bodies

7   confuse it with calcium, which is an essential

8   nutrient and is important for all kinds of

9   functions in our bodies.

10          And so what that means is that

11   although there is some that is excreted through

12   the kidneys, greatly to the detriment of the

13   kidney, which is damaged in the process, but a

14   lot of it is sequestered in the bones and then

15   sort of comes in and out of our bones during our

16   lifetime.

17          For example, during pregnancy women

18   remobilize calcium from their bones to feed the

19   fetus, and lead is also remobilized during that

20   time.

21          And so it is a life -- you know, once

22   you are exposed to lead, it is something you

23   carry with you for a lifetime.

24          Q.   And, Dr. Solomon, have you ever



1    studied how children are exposed to lead?

2         A.   Yes.  Oh, yes, of course.  This is

3    something that I observed on an expert committee

4    on that topic.

5              In the mid two-thousands, the

6    California Department of Health Services

7    convened a committee on childhood lead poisoning

8    to advise on how children are exposed to lead.

9              There was an argument at that time

10   that the main source of lead was household

11   paint, and that other sources of lead were not,

12   especially lead endured in soil and dust, were

13   not as important as paint.

14             And so our expert committee studied

15   that issue for two years, and we issued a

16   report.

17        Q.   And what were the conclusions in that

18   report regarding the sources of lead

19   contamination in children?

20        A.   The committee reached a consensus that

21   exposures to lead from soil and dust are

22   extremely significant.

23             There is actually even -- this report

24   was almost 15 years ago.  And then I, you know,



1    looked to see what the literature showed now,

2    and it's much, much stronger.

3              What it showed is that because

4    children engage in hand-to-mouth activity and --

5    (coughing) -- excuse me -- which means that

6    they -- let me take a sip of water.  Thank you.

7              Children often use their hands for

8    touching, touching the ground, touching the

9    soil, and touching the floors indoors.  And they

10   also pick things up and put those things in

11   their mouth.  Sorry.  I have a tickle.

12             And so what you see is a pattern where

13   dust from the -- from any contaminated sources

14   blows around neighborhoods.  That dust then, if

15   it ends up on the sidewalk, anybody walking down

16   the sidewalk picks up a small amount of that

17   dust on their shoes.

18             If they walk into the house and don't

19   immediately remove their shoes -- I know some

20   people do that, but many people don't -- and

21   they walk across the floor, walk across the

22   carpet, that dust settles onto the carpets, and

23   it tends to sort of adhere.

24             And so even after vacuuming, it can



```
 1    end up remaining in the carpets.  And if a
 2    child, a toddler is playing on that carpet, they
 3    will crawl around, put their hands in their
 4    mouth, and get a significant dose of lead in
 5    exactly that way.
 6            And so that's been well established as
 7    a way, a primary way that children are exposed
 8    to lead.
 9            MR. ELIAS:  Dr. Solomon, I want to
10       thank you for taking the time to come testify
11       today.  Your Honor, I have no further
12       questions for the witness.
13            THE COURT:  Thank you.  Any cross?
14            MR. FRIEDMANN:  No, thank you, Your
15       Honor.
16            THE COURT:  All right.  Thank you,
17       Dr. Solomon.  You know, you are released back
18       to the real world.  Thank you for your time
19       today.
20            DR. SOLOMON:  Thank you.
21            THE COURT:  Okay.  I believe that
22       that's the evidence.  Do we have to get
23       the -- any physical exhibits into play?
24            MR. FRIEDMANN:  Your Honor, Jared
```



1    Friedmann from Weil Gotshal.  I believe, at

2    least from our side, all of the exhibits were

3    already attached to the declarations that

4    were admitted into evidence.

5            And I spoke to my colleagues at

6    O'Melveny in advance.  I think we have agreed

7    that any exhibits that were attached to a

8    declaration, we have no objection on either

9    side of those all being going into evidence

10   rather than having to individually mark them

11   all, if that's all right with Your Honor.

12           THE COURT:  I'm okay as long as

13   it's all right with your opponents.

14   Mr. Elias or whoever is in charge over there,

15   is that okay?

16           UNIDENTIFIED SPEAKER:  Well, I'm

17   not in charge, but I did feel --

18           UNIDENTIFIED SPEAKER:  Yes, Your

19   Honor.

20           UNIDENTIFIED SPEAKER:  -- I did

21   deal with it this year.

22           THE COURT:  All right.  Thank you,

23   Mr --

24           MR. PETER FRIEDMAN:  Your Honor,



```
1        Peter Friedman.  What they said.
2               THE COURT:  Okay.  It's a
3        committee.  All right.  Very good.
4               So what's the plan going forward,
5        Mr. Singh?  It's kind of late.
6               MR. SINGH:  Your Honor, I don't
7        know how long the O'Melveny team thinks they
8        need for closing.
9               But what I would suggest, Your
10       Honor, is, you know, if they don't think they
11       are going to go too long, if they want to
12       make closing remarks, deal with the issues of
13       evidence and obviously, you know, objections
14       to the plan and the abandonment, and then,
15       you know, we would propose to then respond.
16               Mr. Friedmann and I will probably
17       split up.  You know, he will deal with
18       abandonment issues; I will deal with the
19       1129.  And then I think other parties want to
20       be heard.
21               I don't think I have a lot of
22       remarks, Your Honor, but I would just reserve
23       in case Mr -- in case the O'Melveny team
24       raises issues.
```



1          Ideally, we would love to finish it

2     tonight; but, obviously, it's all subject to

3     Your Honor's availability.

4          THE COURT:  Well, I have got about

5     a little -- well, we have got about an hour

6     and a half before I just start to lose

7     function, frankly, executive function, as

8     Dr. Solomon would say.  Let's -- yes.  Sorry.

9          MR. FRIEDMANN:  I didn't mean to

10    interrupt, Your Honor.  I'm sorry.

11         THE COURT:  No, that's okay,

12    Mr. Friedmann.  I'm thinking aloud anyway.

13         MR. FRIEDMANN:  Um, I promise it's

14    not for the purpose of delay, but I probably

15    will be, I think right now, at least 45

16    minutes.

17         I would be grateful if we could

18    start tomorrow morning, if people think that

19    that will overload the schedule, so I can

20    also -- you know, there was a substantial

21    amount of testimony today to digest.

22         But I leave it to the Court's

23    discretion, obviously, as to when they would

24    like to start.



1              THE COURT:  First of all, I just

2       want to say that I compliment everybody on

3       the most efficient presentation of evidence I

4       have ever had in a contested matter.

5              The fact that we got through ten

6       witnesses, even though many of them weren't

7       crossed, is truly extraordinary.  So thank

8       you for your professionalism.

9              And I think, when I saw the witness

10      list, I didn't think there was any way we

11      would get through that today.  So well done.

12             I would prefer -- I have some time

13      in the morning.  Frankly, I would prefer to

14      start fresh tomorrow morning with the

15      objections, the response, anything anyone

16      else has to say, and just push through.

17             I'd prefer to start at ten.  I have

18      a meeting at nine.  I know that's seven on

19      the West Coast.  I don't know if that's a

20      problem for some of you, but -- and then I

21      really, I have all morning we can devote to

22      this.  I will be fresh.  Frankly, I will be

23      more receptive to your arguments if I'm fresh

24      than if I'm a little tired at the end of the



1        day.

2                    So is there any objection to going

3        that way?  I understand you are in a hurry,

4        Mr. Singh, so I'm not --

5                    MR. SINGH:  No, Your Honor,

6        absolutely not.

7                    THE COURT:  We will get it done

8        tomorrow.

9                    MR. SINGH:  Absolutely not, Your

10       Honor.

11                   THE COURT:  We will finish

12       tomorrow, no question.  All right.  Let's

13       reconvene at 10 a.m. Eastern tomorrow.  And

14       we will start with -- we will start with

15       California, and then we will go from there.

16                   All right?  Thank you very much,

17       everybody.  We are adjourned.

18                   UNIDENTIFIED SPEAKERS:  Thank you,

19       Your Honor.

20

21

22

23

24



```
 1                       CERTIFICATE
 2           I, Lorena J. Hartnett, a Notary Public and
 3   Registered Professional Reporter, do hereby certify
 4   that the foregoing record, Pages 1 to 252 inclusive,
 5   is a true and accurate transcript, to the best of my
 6   ability, of an electronic recording in the
 7   above-captioned matter.
 8           The said proceeding was recorded by
 9   another party and then reduced to typewriting under
10   my direction.  I was not present at said proceeding
11   and am transcribing only that which is audible by
12   means of audio recording.
13           I further certify that I am not a relative,
14   employee, or attorney of any of the parties or a
15   relative or employee of either counsel, and that I
16   am in no way interested directly or indirectly in
17   this action.
18           IN WITNESS WHEREOF, I have hereunto set my
19   hand and affixed my seal of office on this 18th day
20   of October 2020.
21
22
23           Lorena J. Hartnett, RPR
24
```



Bankruptcy Hearing - October 15, 2020

**$**

**$1**  47:5,7

**$1.5**  15:20

**$1.6**  15:23

**$1.8**  47:9

**$14.8**  13:22

**$15**  15:16 67:13

**$160**  101:23

**$166**  64:2

**$17**  185:13

**$18.5**  101:14

**$2,000**  27:4

**$2.4**  20:23 21:7 22:6,7

**$2.6**  58:11,19 73:18 74:10 212:13

**$20**  46:4

**$200,000**  16:16 22:5,11 27:13

**$254**  64:4,9 65:17 66:8

**$26**  212:9,19,23 213:5,6,11,17 215:5 216:3,8,13 219:12

**$29**  63:12

**$3**  67:20

**$30**  21:18

**$4**  15:13 16:20

**$46**  63:4,8

**$5.2**  17:13

**$6**  19:24 24:2

**$6.7**  15:6

**$70**  62:11

**$72**  227:13

**$75**  62:12,17,19 64:24 65:13,14 66:11

**$750,000**  156:21 214:18

**$800,000**  214:21,24 216:11

**$84**  64:10,15,22 65:8

**1**

**1**  204:19 205:11,12,14

**1,000**  29:15

**10**  254:13

**10,000**  241:9

**10.3F**  23:20

**10.6**  19:20

**100**  110:5 155:22 211:17,19,24

**11**  10:23 45:9,18 46:17 47:15 48:9,20 53:18 59:20

**1129**  251:19

**12**  63:5

**125**  29:17

**13-week**  46:3

**14.8**  14:2

**15**  247:24

**150**  152:24 153:1,11 154:5

**15th**  202:22

**16**  5:4 63:6 111:3,6 112:23 113:5

**166**  64:9,12

**17**  117:22 118:2 158:18

**18**  63:6

**19**  152:13

**1:15**  116:12

**1:45**  116:13

**2**

**2**  205:10

**2.4**  21:2,12 22:11

**20**  88:16 226:7

**20.3**  206:9

**200,000**  16:6

**2002**  205:3

**2004**  226:13

**2010**  226:17

**2013**  90:18 105:2,15 106:1 174:2

**2014**  200:4 201:6 202:5 203:8

**2017**  62:24 63:2 104:21 105:14 106:1,15 121:8,11 123:1,24 142:5

**2019**  48:12 49:5 104:17 105:5 106:6, 11,12,21 107:1,7,16 108:3 111:9,24

**112**:23 114:18 138:21 142:9,16 143:17 152:15 166:2,4,10 174:17 194:23 195:13,21 197:14

**2020**  136:8,11 139:1 152:3,8,11,16 165:22 166:1,6,11 176:16 189:20 191:18 196:4 197:5,15 202:22 217:17 218:7

**21**  195:13

**220**  26:22

**23**  65:2 105:15

**24**  33:6 146:17

**256**  64:12

**26**  185:18

**29**  31:19 178:4

**3**

**3**  191:18 217:17 218:7

**3.0**  218:20

**3.8**  48:4

**30**  193:15,17 194:8 198:22 202:12

**31st**  27:2

**32**  101:13

**320**  151:19

**363**  69:9

**3rd**  191:22 197:7,11,16 199:5,18 200:19 202:11 206:21 207:21 208:9 209:1 217:7

**4**

**4**  15:17,19 135:15

**4.2**  221:4,7

**40**  179:22

**41**  184:5

**45**  252:15

**48,800**  152:5,21

**5**

**5.2**  17:18

**5.3**  23:15

**50**  88:17



Bankruptcy Hearing - October 15, 2020

**53** 6:7 38:5

**55** 8:12

---

**6**

**6** 191:19,20 192:22 193:5 197:12

**60** 233:24

---

**7**

**75** 63:10

**76** 56:5

---

**8**

**80** 56:2

**84** 64:13 65:22

**8th** 197:24 198:6,15 199:6,23 200:1,22 201:3,15 202:2,17,21,22

---

**9**

**90** 55:20

**917-1** 173:2

**917-8** 224:17

**944** 41:15

**948** 38:20

**950** 41:15

**952** 118:1

**965** 230:2,17

**976** 135:1

---

**A**

**a.m.** 254:13

**aband** 60:23

**abandon** 71:2 130:21 156:4 165:10 210:7

**abandoned** 32:5 72:12 74:1,5 76:23 81:8 101:16 130:12 131:8 132:9 158:13 160:14 161:16 162:7 210:2 211:22 219:22

**abandoning** 71:4

**abandonment** 30:7,24 31:4 60:24

**abandons** 157:11 212:6

**ability** 8:1 76:7 81:20 135:11 243:17

**absolutely** 82:23 89:14 194:15 210:16 254:6,9

**Academy** 239:18

**acceptable** 69:12

**access** 67:6,10,17,24 68:11

**accessed** 154:9

**accident** 81:22

**accomplish** 214:15

**account** 30:2 36:22

**accountability** 30:9

**accountable** 181:15,17

**accounts** 30:12

**accumulated** 192:8 193:9 217:13

**accuracy** 218:3

**accurate** 139:24 234:9

**accurately** 19:11 25:8

**acid** 175:11

**acquire** 101:19

**acronyms** 226:20

**act** 147:6

**acting** 174:16

**action** 174:22 175:2,3 184:7 204:14 205:4,8

**actions** 86:24 181:15,17 190:6 206:4,17 207:5 209:7

**activate** 157:24

**activated** 151:6 168:20 169:7

**active** 8:17 121:19 122:2 125:19 173:23 182:12,14

**actively** 89:12 150:21

**activities** 83:3 84:21 121:17,18 122:4 125:18,23 127:14 136:12 139:1 148:8,20 153:20 157:1 176:8,19 184:2 190:18 191:24 199:4 207:2 213:18 216:15 228:11

71:7,19 72:4,8,11,17 73:2,12,13,24 74:19 75:7,11 81:23 85:13,15 127:9 129:3 131:11 132:15 133:15 158:23 159:14,20 180:19 181:23 182:16,22 185:19 211:10 219:19 251:14,18

**activity** 89:2 176:21 228:3 248:4

**actual** 179:18 204:23 218:21

**acute** 245:2

**ad** 23:13

**add** 19:5

**added** 61:13

**addition** 16:22 17:24 93:20 94:13 114:16 119:12 144:21 232:19

**additional** 31:20 63:15,16,18 64:10 80:21,22 212:17

**address** 34:16 67:21 90:7 186:12 213:14,21

**addressed** 12:10 33:1 164:3 168:23 175:6 187:11 213:9 217:19

**addresses** 10:3

**addressing** 8:17 235:3

**adhere** 248:23

**adjourned** 254:17

**admin** 59:23 82:21

**administrative** 12:21 14:8,12,14 15:16 17:16 18:3,21 20:8 59:4,7,11, 16,19 83:6,9

**administrator** 14:16

**admiration** 236:24

**admission** 36:5 37:9 38:2,6 39:22 41:15 86:22 93:24 117:24 128:9

**admit** 37:1 40:24 117:18

**admitted** 36:7 37:11 38:8 40:2 41:20 44:12 94:1 99:8 118:7 135:6 230:17 250:4

**adults** 234:24 235:9 240:18 241:7,10 242:8,17

**advance** 250:6

**adverse** 31:16 240:17

**adversely** 241:16

**advice** 107:9

**advise** 247:8

**advised** 192:5,6

**advising** 197:13

**advisor** 46:21,24

**advisors** 104:21 105:10,24



Bankruptcy Hearing - October 15, 2020

**affect** 22:15 31:13 181:21 233:18
241:17 242:11

**affected** 189:6

**affects** 240:20,23

**affiliates** 56:13

**afforded** 203:9

**afraid** 75:16

**afternoon** 120:4 136:3,5 188:2,3
223:2 231:4,5

**age** 241:18

**agencies** 77:5,9,13,20,24 78:3 80:7
239:9

**agency** 78:16 80:11 174:3 183:20

**agenda** 39:12,18

**aggregate** 15:13 109:19

**agree** 11:6 18:4 54:17,20,22 55:4,18
87:3 89:10 140:2 149:10 153:5
154:23 155:6 156:7

**agreed** 13:10 14:3 16:2 17:14 18:2
20:7,21 24:5 27:1 35:10 77:22 101:15
250:6

**agreeing** 159:14,15

**agreement** 11:22 12:5,7,23 16:2
17:1,23 31:15 54:18,23 60:3 75:15
132:16,19 205:11 220:4

**agreements** 54:12 55:5

**ahead** 93:13 98:10 117:11 134:7
154:19 173:12

**air** 125:20 126:6,7,12,22,24 127:3
142:12 144:22 145:5 146:16,20
156:1,2 160:15,23 161:7 164:13
168:20 169:6 233:15,16

**air-purifying** 124:16

**AIS** 75:10,13 85:15,20,23 86:10
132:11 137:11 182:13 183:19 210:17

**Alan** 29:9

**alert** 146:2 147:1

**alerted** 148:4

**alia** 205:7

**allayed** 180:4

**alleviate** 10:7

**allowed** 14:11 21:14,16 42:21 43:13
131:8 132:23

**aloud** 252:12

**Alta** 120:11,13 130:10,19 131:10,17,
19 188:10

**alternative** 76:21

**altogether** 237:15,16

**Alzheimer's** 242:14

**ambient** 146:16

**amended** 10:22 12:5,11,12 19:21
23:21 39:12

**amendment** 17:15

**amendments** 16:23 23:23

**American** 32:23 33:3 239:15,18

**amount** 15:9,13 17:18,19 20:10
21:13,17 56:10 66:1 157:8 175:13
177:5,10 179:9 182:6 189:4 207:18
212:15 214:2,13 235:4 248:16 252:21

**amounts** 15:9 21:4

**Ana** 179:21

**analysis** 196:7 197:2 227:8,12

**analyze** 146:20 196:13

**analyzed** 104:16 112:21 113:3,12
152:14,16

**Ancora** 45:16

**and/or** 206:6

**Angeles** 150:12 151:9

**animals** 235:6

**Ankura** 36:14 51:6 52:5 57:14,19

**Ankura's** 50:24

**announced** 23:9

**Antiva** 24:16

**anxious** 89:5

**anymore** 126:19 238:19

**anyone's** 31:13

**anytime** 176:16

**apologies** 10:9 39:20 76:14

**apologize** 7:16,18 34:10 39:10 61:11
89:22 195:2,6 197:10 204:21 220:22
231:8 238:22

**Appendix** 205:10

**apples** 65:9

**applied** 77:4,24

**apply** 49:17 189:6

**appoint** 57:1

**appointed** 27:15 57:6 173:24

**appointment** 26:16

**approval** 60:9,12,17

**approved** 13:11 69:6 78:23 79:9
102:6 129:3

**approximate** 21:17

**approximately** 29:17 46:3 63:11
101:22 156:21 227:13

**apps** 17:6

**April** 152:3,8,11,14 165:22 166:5,11
196:3,11,13 197:5,8,15

**AQMD** 160:20

**arduous** 24:21

**area** 5:19 81:2 177:9 244:2

**areas** 144:17 149:12 154:7 155:2
166:24 167:5,6 180:4 182:2 185:4
213:8 242:5

**Arguably** 109:11

**arguing** 204:5,7

**argument** 117:20 247:9

**argumentative** 105:20

**arguments** 253:23

**arising** 105:1,15 107:15 108:2

**arrive** 122:15

**arsenic** 125:17 126:24 127:3 136:18,
22 146:21 164:13,18 168:21 175:15

**articulated** 87:16

**aspect** 122:23

**Aspen** 12:6

**asphalt** 161:14

**assert** 20:8 83:11 107:15 108:2,6

**asserted** 12:24 83:5 86:23

**asserting** 59:1,4

**assessed** 176:4

**assessment** 120:15 198:3

**assets** 14:18 69:2,10,13 70:16
101:20



Bankruptcy Hearing - October 15, 2020

**assistants** 10:3

**association** 239:16 244:4

**associations** 244:12

**assume** 33:20 70:24 71:1 115:10 155:13 183:20,21 207:14

**assumption** 159:5

**assurance** 83:22 84:14 185:18

**assurances** 84:6,11 212:2

**Atlas** 12:17 13:23 14:3 19:2,8 36:19

**atmosphere** 85:18

**attach** 205:24

**attached** 41:1 191:17 204:18 205:10 234:7 250:3,7

**attacks** 242:1

**attempt** 135:22

**attention** 106:13 177:2,10,11 244:4, 5

**attorney** 191:4

**attributable** 242:4

**audio** 7:23,24 8:2 9:11,13

**authorities** 57:22 209:11

**authority** 57:1,11,14 106:20 107:3 177:15 206:7,13 210:23

**authorization** 48:13

**authorize** 133:7

**authorized** 57:18

**automatically** 59:12 72:21

**availability** 252:3

**avoid** 31:15 32:3 68:21 69:2 100:4 117:20 135:22

**avoided** 143:14

**aware** 53:21 54:1 59:10 60:11 66:22 75:4,8,10 79:10,24 80:23 83:7 89:23 90:15 96:6 97:14 98:22 99:1,24 114:10,18 138:8 149:3 151:13 152:1, 9,10,13,18 156:3,19,23 159:12,18 161:7 182:14 183:19 198:16 212:1,8, 15,17

**awhile** 7:1 11:12

---

**B**

---

**bachelor's** 120:22 225:23

**back** 9:23 69:9 107:23 122:24 128:18 143:21 152:12,19 166:1 170:24 194:23 196:14 197:15 198:12 199:3, 20 202:16 206:20 209:1 210:8,17,20 229:7 237:24 238:20 249:17

**backed** 196:16

**background** 8:23 76:14,15 120:21 225:5 242:5

**backup** 146:15

**backwards** 200:16

**bad** 131:2 188:6

**baghouse** 145:20

**baghouses** 145:2,4,11,15,21 146:2, 7 157:16,22 159:22

**bags** 145:12,14,20,21 146:8 157:16

**balance** 64:21 65:2 70:8

**banker** 37:19

**banking** 17:3

**bankruptcy** 30:21 85:8 105:2,15,16 106:1 156:5 177:1 200:15

**bar** 14:14 59:7

**barrier** 34:2

**based** 48:19,22 87:3 107:9 128:7 152:1 153:16 166:7 179:2 197:16 209:15 221:8 230:20

**basements** 167:2

**basic** 192:16

**basically** 122:21 133:23 163:24 196:17 200:6 228:17 241:24

**basin** 179:20

**basins** 186:11

**basis** 27:4 59:14 60:23 63:9 64:20 65:5 86:1 87:6 109:1 115:2 130:24 141:15 179:3 180:21 214:3 234:3 243:19

**battery** 175:11 177:8

**Beach** 119:2

**beat** 203:20

**began** 61:23 121:12 123:24 173:23 209:5

**begin** 120:9 183:4

**beginning** 122:24 185:2

**begun** 5:2

**behalf** 10:13 11:5 23:7 24:22 25:3 29:11 40:16 54:12,14 88:2 104:7 118:4 168:2 187:20

**behavioral** 244:1

**believed** 207:5

**believes** 66:3

**belong** 96:22

**Beneficial** 20:24 21:5,15,23

**benefit** 23:7 220:15

**benefits** 27:1,3 28:10,16 68:21 91:12

**bid** 17:1,9,14 69:18,19 101:19

**bidder** 68:24 69:10,11,18 70:22

**bidders** 70:14

**bids** 69:17

**big** 133:21 164:10

**bigger** 144:6

**biggest** 164:9

**bills** 72:16,19 127:15 207:16

**binders** 135:15

**binding** 18:16

**binds** 18:6

**bit** 12:8 13:7 87:12

**black** 8:14

**blanks** 7:1

**blood** 241:20

**blow** 179:21

**blowing** 110:22

**blown** 149:23

**blows** 248:14

**board** 56:19 57:1,17,22 102:8 232:14,23

**boards** 113:19

**bodies** 242:10 245:22 246:6,9

**body** 55:16 235:2 245:20

**bond** 212:9

**bonds** 67:1 84:8,13,18 85:2 91:17

**bone** 240:22

**bones** 246:14,15,18



Bankruptcy Hearing - October 15, 2020

**book** 234:1

**boots** 124:8

**bottom** 110:13 196:8

**bought** 69:13

**box** 116:19

**Brad** 118:3

**brain** 240:21 242:11 243:5 244:8,17

**brains** 243:1

**breach** 49:15 146:4 178:20

**break** 116:11,22 145:22

**breaks** 43:2,12 95:5 119:10 172:9 181:10 223:13,20 231:23 232:3

**breathable** 126:8

**breathe** 125:21

**Bressler** 24:24 25:20,21,24 26:5

**Brett** 32:22

**briefly** 23:17 32:24 88:6 114:5 120:20 162:18

**bring** 110:2

**broad** 78:9

**broader** 24:4 78:4

**broken** 146:8 246:3

**brought** 78:10,15 80:11 114:20,21 245:12

**budget** 45:24 46:2,5,7 88:12

**budgeting** 45:17,20

**build** 160:6 242:10

**building** 76:10 124:13,19 125:13,15 126:6 127:1 137:23 138:1,11,15 139:15 140:5 147:4 154:16 228:13

**buildings** 124:12 125:24 149:5 167:1,3 186:4,18 228:16

**built** 17:22

**burden** 73:7 237:11,13 244:15

**burn** 214:1 216:12

**burned** 215:12

**burning** 214:6

**business** 181:12

**buy** 61:21

**buyer** 12:22 14:23 18:1 19:2,10

## C

**C-O-P-E** 123:9

**CACO** 204:15 205:5,6,10,21 206:3, 14 207:5

**calcium** 243:9 246:6,7,18

**calculate** 227:4

**California** 11:5 12:16 29:20 30:4,10 60:10 72:14,17,19,21 73:5 74:17,22 77:1,5,10 78:15 80:6,24 81:11,16 84:15 85:22 96:15 97:6,10 100:4,8 119:2 121:4 155:22 161:2 170:14 171:24 210:15 211:9,15,16 212:13,18 216:5,6 223:2,6 226:2 231:14 233:1, 6,8 247:6 254:15

**California's** 73:7

**call** 6:18 8:12 9:11,12 29:19 30:2 71:20,21,23 72:6 124:7 147:23 153:17 163:11,20 185:14 188:14 204:15,16 226:19 227:16 238:11,18

**called** 33:9 75:10 204:15

**calls** 83:13 132:3 170:19 222:12

**camera** 95:24

**Canada** 15:23

**canceled** 101:22

**canisters** 145:14

**Cantor** 104:5,6,9,10,14 107:22 110:1,15,20 111:1 113:22 114:22 115:10,11 117:3

**cap** 15:7,9 16:19

**capacity** 173:23 174:16

**capital** 12:22 36:20

**captures** 192:15

**capturing** 149:16

**cardiovascular** 240:21 241:23

**care** 26:23 132:18 181:19 186:3,6

**career** 45:10 233:22 234:12,16

**carefully** 31:7

**carpet** 248:22 249:2

**carpets** 248:22 249:1

**carry** 246:23

**cars** 179:15

**carve-out** 54:19

**case** 19:5 22:24 24:5,18 33:10 35:18 45:17,24 51:1 59:5,20 66:7,11 75:24 78:7 84:14,22 86:12 88:13 91:19 116:20 153:10 158:21 159:1 181:3,18 182:18 227:10 235:18,24 251:23

**cases** 45:9,18 83:2 155:7 241:9

**cash** 68:24 69:10,11 97:22 98:2 101:14 109:6

**catastrophic** 143:15 169:11

**catch-up** 21:9,10

**categories** 13:20 49:23

**caused** 142:9,17,23

**cease** 70:15

**cede** 29:2

**cell** 8:8

**Centers** 239:9 241:12

**central** 161:5

**centuries** 244:24

**certainty** 67:8 70:9

**certification** 35:20

**certified** 232:14,23

**cetera** 14:5 28:11 115:17 170:2

**challenging** 27:10

**chance** 122 183:21

**change** 117:19 118:5 144:13 157:16 230:20

**changed** 175:19,22

**chaotic** 32:3

**Chapter** 10:23 45:9,18 46:17 47:15 48:9,20 53:18 59:20

**chapters** 234:1

**characterization** 107:18

**charge** 250:14,17

**charging** 106:9,24 107:4

**chart** 14:1

**check** 92:4 141:11

**checking** 141:16 165:3,5

**chemistry** 246:5

**Chester** 12:9 20:18,21 21:3,8,12 22:2,8,13,17,19 23:1,4 24:7,24 25:6,



Bankruptcy Hearing - October 15, 2020

13 90:23 91:12,13

**chief** 45:2,6

**child** 249:2

**childhood** 247:7

**children** 234:20,24 235:9 240:18,19 242:18,23,24 243:11 244:16 247:1,8, 19 248:4,7 249:7

**choose** 56:18 212:14

**chose** 210:22

**Christina** 97:20

**Christopher** 36:14

**chronic** 242:9

**circumstance** 74:19 75:1,2

**cite** 62:18 161:19

**citizen** 29:22

**citizens** 29:23 210:15

**City** 94:20

**civil** 120:22 121:4 226:4

**claim** 12:23 13:1,18,23 19:12 20:6,9, 10 21:14,16 36:20 49:16,18 53:20 54:2,3 78:15 80:10,12 83:6,9,11 87:16 97:2,5 105:11 199:22 208:10

**claimed** 209:1

**claims** 12:22 13:5,20 14:8,12,14,15 15:15,17 17:17 18:4 20:3,14 49:8,13, 15,22,24 50:2,19,23 51:3,6,8,12,14, 19,21 52:6,12,13,17,21,23 53:1,8,10, 14,16,24 58:7,15,24 59:4,11,16,19,23 78:8,10,12,19 79:10 80:1,4 96:20,21, 23 97:11 99:21 100:20 101:1,4,16,21 102:24 103:5 107:14 108:2,5,21 111:8,22 112:3,8,16,22 113:4 114:11, 20 129:18 206:20 208:6

**clarifications** 16:24

**clarified** 13:9 61:13

**clarifies** 74:23

**clarify** 51:16 91:4 129:15 161:3 183:12 220:14

**clarifying** 73:23

**class** 58:4,7,16,22

**classified** 58:3

**clean-up** 12:13

**clean-ups** 226:15

**cleaned** 76:10

**cleanup** 84:22 151:21 174:10,15,24

**cleanups** 181:2

**clear** 18:13,18 41:12 53:3 79:3 111:21 159:4 199:17 244:3 246:1

**Clerk** 35:21 93:6 118:14 171:11 222:18 229:16

**client** 117:7

**clients** 34:20

**clinical** 233:2,7

**clinically** 233:21

**close** ~~17:12 28:11~~ 234:19

**closing** 48:3 185:3 251:8,12

**closure** 62:24 63:1,13,18,21 65:3 121:10,12,17,18,19 122:2,3,4,5,7,9, 24 123:24 125:18 126:13 127:13,19, 23 130:11 136:7 138:14 139:1 140:10 158:23 163:1 174:20 176:2 184:7,14, 24 186:2,3 189:13 199:4 214:6,8 226:10

**cloth** 125:4

**clothes** 167:12

**CMD** 17:3 47:19,23,24

**co-counsel** 5:7

**co-host** 135:19

**co-liable** 50:3

**Coast** 116:16,17 142:12 253:19

**code** 243:7

**cofounded** 234:17

**cohort** 241:10

**collaboration** 234:19

**collateral** 55:1

**colleagues** 250:5

**collect** 145:12 150:7 195:2

**collected** 152:15 155:3 164:12 166:1,10,18,22 194:23 195:10,18,20 196:1

**collecting** 151:1,7 160:6

**collection** 145:21 161:14 228:15

**Collins** 25:2,3,5,6,16,19

**Collins'** 25:21

**colorable** 49:8

**column** 195:7

**comedy** 147:24

**comm** 28:23

**commencement** 55:19

**comment** 28:24 29:13

**comments** 29:15 30:5,16 31:7

**commitment** 159:13,18 181:20

**commitments** 216:17

**committed** 90:18

**committee** 14:4 18:15 46:20 47:1 48:7,11 50:18,21 55:1 57:5,8,9,11,15, 18,23 88:2 98:24 100:3 102:8,11,15, 18 105:5 167:24 168:2 247:3,7,14,20 251:3

**committee's** 105:17

**communicate** 243:10

**communicated** 61:18

**communication** 200:13

**communications** 198:8,9,11,14,18

**communities** 32:2 33:11 149:18,24

**community** 30:13 31:17,22 34:4 83:4 158:12 191:13 240:11

**companies** 155:1

**companionship** 222:7

**company** 25:7 45:6 56:22,23 57:2,4 64:2 130:9 133:16 137:15 159:19 194:11,16

**company's** 26:21 104:21 105:1

**compel** 220:1

**complained** 96:10

**complaint** 97:14

**complete** 63:13 84:21 214:7

**completed** 138:21

**completely** 43:2 76:9,10 223:22

**completing** 184:6,11 185:10

**completion** 44:5 62:23 63:22 65:23

**complex** 24:5 184:15

**compliment** 253:2

**comply** 82:21



Bankruptcy Hearing - October 15, 2020

**components** 66:7 76:4 146:12

**composed** 102:15,18

**compounds** 136:19

**computer** 8:9 43:10 119:14 172:12

**concentration** 152:20 153:1 155:24

**concentrations** 152:4 153:5

**concept** 13:15 184:16

**concern** 13:3 30:6 53:22

**concerned** 186:8

**concerns** 31:8 34:16

**conclude** 109:17

**concluded** 34:1 60:19

**concluding** 108:17

**conclusion** 47:17 49:2 99:16,17,19 100:6,19,24 108:8,22 109:13 179:5 221:1

**conclusions** 98:23 209:16 218:21 221:6,9 247:17

**condition** 73:15,16 74:2,6,8,9,12,13 76:1,4 134:8 212:24 213:4,7 227:24

**conditions** 75:20 90:20 178:13,24 179:2 186:7,17 217:18

**conduct** 55:2 75:23 122:5 148:7 181:2 213:18

**conducted** 138:4

**conducting** 48:12 174:20

**conference** 19:18 29:19 30:2

**conferences** 234:2

**conferred** 11:4

**configuration** 185:14 186:5 227:17, 19,20,23 228:1,7,9

**confirmation** 7:22 10:22 13:11,12 15:22 18:24 22:23 24:19 44:7 46:17 89:12 219:13

**confirmed** 67:5,6,11,17,24 69:22 70:3,17 83:23 84:4 138:11

**confuse** 246:7

**confused** 131:4

**confusing** 41:14

**congressional** 29:21

**conjunction** 125:5

**Connecticut** 42:12

**connection** 17:10 46:16 52:19 70:20 100:13,15 101:8 103:18 121:7 227:5 235:17

**consensual** 78:4,5

**consensus** 240:10,14,15 244:21 247:20

**consent** 204:14 205:4

**consented** 59:22

**consenting** 19:23 23:19 54:6 55:13, 19 56:9,17 76:18 77:2 102:3 112:8,16

**consideration** 49:21 68:5 101:7

**considered** 30:19 31:6,8 44:6 49:13 244:3

**consistently** 241:15

**consists** 124:7

**constantly** 235:20

**constitution** 57:9

**constructed** 77:11

**constructing** 183:7

**construction** 128:5 154:9,24 155:13

**construction-level** 124:7

**consultants** 165:17 226:22

**consultation** 226:24

**consulting** 120:14,16

**consummate** 15:10

**consummation** 47:14

**contact** 166:23

**contacted** 153:18

**contained** 23:20 66:6,9 85:17 154:18 211:4

**containment** 125:12,15 126:1,6,18 127:1 136:24 137:23 138:11,15 140:4 190:14,18 192:2 207:3 212:4

**contaminants** 233:17

**contaminated** 151:7 160:5 180:23 182:2 184:21 186:11,15,21 211:7 215:10 248:13

**contamination** 30:13 175:5,8,14 179:9,18 180:3 182:7 186:16 187:9 213:8 247:19

**contemplated** 140:13

**content** 167:7

**contested** 253:4

**context** 54:11 245:9

**contexts** 102:4

**contingent** 62:5

**continuation** 32:1

**continue** 9:11 22:13 27:2,13 34:21 35:3 61:4 70:6 72:19 73:5 75:12 83:2, 24 84:3 86:6,11 90:24 115:15 130:10 131:10,13,19 132:18 133:3,10 157:13 159:19 160:20 161:9 165:13 176:11, 13,21,24 183:17 211:21 216:9,14,16 219:14

**continued** 73:4

**continues** 205:6

**continuity** 85:22

**contract** 33:13,17,20,23 34:7 72:22, 24 86:12 131:18 181:16 183:7,18,20, 21 210:18 213:23,24 214:11,14 220:1,3

**contracted** 131:14

**contracting** 81:5 127:23 133:6 183:4 219:24

**contractor** 127:22 130:14 137:11 141:7 182:13,15 183:9

**contractors** 126:14 127:12,18 129:2,7 167:10 182:20 183:1,6,14,17

**contracts** 28:3 81:1,6,20 82:2 131:16 133:16 220:5

**contractual** 183:9,24

**contrary** 85:19

**contribution** 73:11

**contributions** 109:7

**control** 20:2,3 81:24 144:22 146:13, 15 165:11 173:20 189:1 193:6 219:4 224:12 225:16 239:10 244:9

**Control's** 241:13

**controlling** 241:19

**convened** 247:7

**conversation** 129:21

**conveyance** 74:15

**conveyed** 129:17

**cooperatively** 27:17



WILCOX & FETZER          Index: components–cooperatively
(302) 655-0477 | WWW.WILFET.COM

Bankruptcy Hearing - October 15, 2020

**coordinate** 122:7

**coordinated** 18:14 26:19

**coordination** 97:19 98:13,17

**Cope** 123:9,15,23 170:20 171:5,9,10, 13,18,23 172:3,20,24 173:11,17 178:3 187:13 188:2,4 189:11 197:21 199:9,13 200:16 201:21 202:7 203:5 204:13 212:1 213:16 214:16 215:18 216:20 217:6 218:1 220:23 221:3,18 222:5,9

**copy** 44:20 95:7 135:13 192:14 205:10

**corporate** 71:11

**Corporation** 23:8

**Corr** 160:18

**correct** 5:21 41:16,17,18 46:22 47:23 50:10 52:14,15 53:18 55:11,24 56:2,7 58:4 60:3,17,18,22 64:5,11,12 65:5 66:18,19 69:3,14 76:18,20 81:9 82:4 86:16 88:17,18 89:13,17 91:14 93:2 96:1 104:15,19 106:2,4 108:3,9, 10 109:15,16,20,21 112:2,4,9,17 115:22 121:13 123:2 124:22 126:19, 20 127:5 134:13 136:8,9,14,15,20,21 137:3,4,10,14,18,20,21 138:6,7,12, 13,18,21,22 139:1,2,4,5,12,13,17,20 140:1,6,7,10,11,16,21,23,24 141:9, 12,13,22,23 142:1,2,6,7,10,14,24 143:1,4,6,7,12,13,16,19,20 144:1,2,6, 7,10,11,12,17,19,20,23,24 145:3,7, 10,13,19,22,23 146:4,5,8,9,13,14,18, 19,22 147:3,5 148:5,6,9,10,14,15 149:1,2,7,8,13,14,18,19,24 150:1,4,5, 12,14,18,22 151:3,10,11,23,24 152:5, 22,23 153:3,4,7,8 154:9,10 155:4,8, 10,16,17,23 156:5,6,10,11 157:9,13, 14,16,17,19,20,23 158:2,4,5,14,15 159:6,7,10,11,16,17,20,21,24 160:1, 3,4,7,8,12,13,17 161:2,10,11,16,17, 21,22 163:7 164:6,21 166:3 169:1,2, 7,11 188:8 189:14,18,19,22 190:14, 24 192:3 193:12,16 194:9,24 195:11, 14,23,24 196:4 197:7,9,20,22 198:3, 4,17,23 199:5 200:3,20 201:3 202:2, 13,14,18,24 204:19 205:9,22 206:3,8, 18 207:3,17 208:22,23 209:4,5,21,22 210:4,15 211:23 212:22 214:20 215:8 219:7 221:17,21 227:15 229:11

**corrected** 165:23 192:22

**corrective** 174:22 175:2,3 184:7 204:14 205:4,8

**correctly** 62:14

**correspondence** 198:6

**cost** 27:12 65:23 182:20,23 227:13 228:10

**costing** 214:17 216:11

**costs** 62:22 63:3,21,22 64:3 65:1,15 66:4,9 127:13 185:9,21 206:16 227:4 228:8

**coughing** 248:5

**counsel** 5:3 19:4 25:22 105:10 107:10 119:21 172:22 198:1 200:22 202:16 204:7 210:23

**count** 195:17

**couple** 14:23 88:3 118:22 143:23,24 163:16 169:12 213:5

**court** 5:3,10,14,24 6:6 7:2 8:18 10:15 11:10,19 12:4 16:7,10 19:7,14 23:3 24:23 25:4,16,23 26:4,14 27:23,24 28:15,23 29:4,8,12 32:12 33:2 34:8 35:4 36:4 37:7 38:1,10,20 39:8,14,17, 21 40:4,13 41:7,19 42:2,8,14,17,21 43:21 44:8,11 50:13 52:1 70:5 76:19 79:4,15,23 80:17 82:9 83:14 86:3,15, 18 87:1,22 88:5,20,22 89:22 90:9 91:6,9,22 92:2,8,11,15,18,24 93:4,13, 22 94:9,15,21 95:1,8,14 96:5 97:24 104:3,9 110:7,18 113:24 114:23 115:8,13,19 116:1,10 117:2,9,23 118:6,11,21 119:3,6,20 120:10 128:21 129:13 130:3,24 131:9,24 132:4,20 133:1 134:3,16 135:2,6,14, 18 147:7,11,15 154:13,17,19 162:15 167:18,22 168:3,10 169:18,23 170:5, 12,18,21 171:7,18 172:1,4,10,21 173:4,7,12 187:16 199:8 201:20 203:3,17 204:1,4 210:6 211:10 216:22 220:19 221:24 222:4,11,14 223:1,7,10 224:2,18,24 225:5,8 228:23 229:3,10,13,23 230:3,10,13, 16 231:6,15,18 232:7 236:12,15,21 237:8,13,19 238:20,23 240:3,7 249:13,16,21 250:12,22 251:2 252:4, 11 253:1 254:7,11

**Court's** 117:17 252:22

**Courtcall** 7:24 8:3

**cover** 78:8 185:21

**covered** 79:10 80:1 144:11

**covering** 139:14 228:16

**coverings** 125:8

**covers** 28:16 78:19

**COVID** 176:1

**COVID-19** 30:2 125:5,6

**crafting** 53:21

**Craig** 35:20

**crawl** 249:3

**create** 70:11 145:16 186:7 209:5 227:16

**created** 85:7 175:13

**creation** 30:24 31:23

**credit** 12:5 17:1,9,14 54:11,18,23 55:5 61:5 69:18 70:21

**creditor** 18:16 22:16 97:3

**creditors** 18:22 19:23 49:11 54:6 55:13,20 56:9,17 76:18 77:2 99:12,20 102:4 108:8,14,18,20 109:2,10,14,18 112:9,17

**creditors'** 14:4 18:14 46:20,24 54:24

**crew** 137:16 141:6,18 166:19

**criteria** 125:5

**critical** 76:3,4

**CRO** 50:24 54:10 84:10

**cross** 35:13 36:8,17 37:12,22 38:11, 14 39:5 40:5 41:5,21 82:11 104:4 114:1 116:7 117:7 129:24 130:5 134:18,24 187:17 216:22 224:23 228:23 229:4 230:6 249:13

**crossed** 11:24 253:7

**crust** 245:11

**current** 103:3 162:8 173:17 174:4 216:14 224:9 225:13 227:19 228:1,8 233:3 236:1 242:4

**cut** 239:4

**CV** 234:8,9

---

## D

**daily** 126:9 127:14,15 141:2,10,15 150:16 153:20 157:8 164:11

**damage** 141:16,21,24 244:7,9

**damaged** 99:12 108:13,23,24 109:18,19 246:13

**damages** 108:9,18 109:3 113:13



Bankruptcy Hearing - October 15, 2020

**damned** 236:19

**Dan** 19:9

**dangerous** 33:12 34:2

**Daniel** 104:6

**data** 152:13 236:1

**date** 13:5 14:14 15:3,4 16:21 20:1 24:1 27:5 33:15,24 46:11 47:18 55:19 59:7 82:22 142:18,21 143:3 152:6 195:1,8,11,13,24 219:22

**dates** 195:2

**day** 27:22 33:6 81:23 85:13,16 116:14 121:18 132:10 137:3,6,13,19 143:23 144:1 146:18 148:12 155:4 231:7 254:1

**day-to-day** 243:19

**days** 33:7 137:16 141:8 189:18 193:15,17 194:8,11 197:24 198:22 202:12 208:20 215:21

**days'** 194:12 215:22

**de** 99:22 101:3

**dead** 203:20

**deadlines** 243:23

**deal** 9:3 20:14 31:11 115:5 216:1,6 250:21 251:12,17,18

**dealing** 175:9

**dealt** 28:4

**death** 27:3 241:23

**deaths** 242:4

**debt** 109:6,7

**debtor** 33:13,16 54:12,24 74:20 100:15 101:6 102:6 103:2 115:21 162:16 170:6

**debtors** 10:13 15:10 16:2 17:12 27:11 30:8 36:13 40:16 51:7 52:7,12 56:10,14 59:1 60:19 61:22 62:9 69:6 71:1 73:10 75:11,24 81:8 82:20 83:1 84:1,3,16 85:3 90:24 92:13 93:17 107:15 108:2 112:4,7,13,15 114:5 116:5 117:10,14 134:22 170:10 187:20 199:23 201:4 210:7

**debtors'** 10:21 23:11 31:3 33:19 37:17 45:17 48:7 63:2 100:12,13,20 101:8 103:16 113:9 200:22

**decades** 175:12 177:8 188:24 244:23

**December** 27:2 49:6 142:8 143:17 174:2 194:23

**decision** 87:6 107:6

**declaration** 8:19 13:19 15:6,15 36:2, 5,14,18 37:5,10,17,20,24 38:3,7,17 39:1,3,7,22 41:2 44:2 63:24 64:1,8,21 65:6 73:20 79:22 93:18,23 94:1,13 101:12 107:12 109:22 111:3 117:16, 19,22 118:1 128:3,4,15 158:16 159:3 162:4 168:22 172:24 178:5,11 184:5 190:11 191:18 192:14 204:19,22,23 205:13 206:1 215:2 224:16,22 227:9 228:21 230:1,7,17 234:7 235:17 239:5 250:8

**declarations** 39:13 40:20,24 236:2 250:3

**declared** 121:21 126:17 175:24 189:16,21 191:24

**declaring** 158:8

**deconstructed** 138:16

**deconstruction** 138:19,23

**deem** 9:14

**deems** 206:5

**deeper** 245:10

**defense** 9:5

**defer** 216:13

**deficiency** 101:21

**deficit** 244:4

**deficits** 243:12,20

**defined** 22:1

**definition** 78:19

**degree** 120:22 147:20 188:18 225:21,22 232:20

**degrees** 188:15

**Degrote** 26:18

**Delaware** 25:21

**delay** 32:9 130:18 133:13 218:2 252:14

**delays** 243:14,15

**delegated** 57:22

**delivered** 135:13,16

**demand** 198:21

**demanded** 78:7 207:1

**dementia** 242:14

**demolish** 184:19

**demolished** 76:9

**demolishing** 190:15

**demolition** 125:19,23

**department** 29:10 81:24 173:19,22 193:5 224:11 225:15 226:23 247:6

**depending** 155:9

**depends** 73:13

**deponent** 42:5 93:9 118:17 171:14 222:21 229:19

**deposition** 44:21 62:15,19 135:10, 14 153:10 160:23

**deputy** 174:6,9,19

**describe** 121:24 184:11 232:12

**designed** 100:7 136:13 140:8,12 145:16 245:22

**detailed** 32:7 193:22

**details** 130:1

**detect** 164:13

**detected** 143:9 149:8 154:7

**detecting** 168:20

**detection** 146:1

**determination** 178:18 179:2 208:15, 19,22 209:9,13 218:7,11 219:9,10 221:2,5,16,19,20

**determine** 108:1 151:21 178:12 183:3

**determined** 107:14 109:9 111:12 176:9,20 178:7 193:6 217:11

**determines** 209:16 210:7 221:10

**detoxify** 245:21,23

**detriment** 182:10 246:12

**develop** 183:24

**developed** 234:13

**developing** 244:17

**development** 243:2

**devote** 253:21

**die** 245:5

**difference** 185:15 227:18



Bankruptcy Hearing - October 15, 2020

**differential** 147:13

**difficult** 98:3 106:17 147:21 244:6

**difficulties** 238:6,22

**difficulty** 5:6 243:13 244:7

**digest** 252:21

**DIP** 54:11,18,23 55:5

**dire** 240:4

**direct** 34:18 42:23 63:3 93:20 97:5 107:13 116:6 118:10 119:15 134:17 173:11 180:1,6 198:20 209:23 224:14 225:2,6 230:8,12,15

**directed** 172:15 189:24

**directionally** 55:24 56:1,7

**directly** 34:20 61:19 73:11 127:17

**director** 102:13 103:22 174:6,9,19

**directors** 50:20 56:19 57:17 102:9, 16,19,21 113:20

**disabled** 8:1,2 9:4

**disabling** 7:5

**disagree** 134:3 199:24 200:23 201:11,16 202:17

**disagreed** 198:2 200:9

**disagreement** 201:12

**disagreements** 98:23 99:1

**disallow** 59:15

**disallowed** 59:12

**disassembled** 139:15

**discharge** 150:11,21

**discharged** 180:13

**discharges** 31:21

**discretion** 252:23

**discuss** 43:13 116:21 209:23 223:20 231:24

**discussed** 13:19 129:4 156:14 157:5 228:2

**discussion** 32:7 84:5

**discussions** 53:9 81:15 85:21

**disease** 239:10 241:13,23,24

**diseases** 242:13

**disorder** 244:5

**dispute** 200:5,8 201:7 202:4 203:10

**disputed** 14:11

**disrupting** 10:1

**disruptions** 9:2,6,17

**distant** 245:24

**distracted** 236:17

**distributed** 21:7,11

**distribution** 14:19 21:18,23 22:7 58:11,15

**distributions** 22:14 58:21

**District** 142:13

**disturb** 155:7

**disturbing** 155:15

**dividing** 243:4

**docket** 38:16 118:1

**doctor** 232:8 234:13

**document** 122:3 156:23 196:5 205:19 209:6,14

**documented** 17:14

**documents** 43:4,18 60:5 95:6 122:19 152:2 172:11 204:21

**dog** 42:17,18 92:5

**DOJ** 28:23

**dollar** 66:2

**dollars** 22:10 31:19 46:13 47:6

**don'ts** 10:8

**door** 13:5 17:21

**dos** 10:8

**dose** 249:4

**dotted** 11:23

**double** 79:4,5

**doubt** 106:19

**dozen** 234:1

**drinking** 233:17

**drive** 148:11

**driven** 191:11

**drone** 141:10,18

**drop** 9:22 147:2 163:19 211:12

**DTC** 178:6

**DTSA** 87:2

**DTSC** 35:9,11 52:22,23 53:16 54:5 58:3,7,10 59:1,3,19,22 60:2,8 67:1,6, 9,10,17,24 68:3,8,10 76:13,16 81:5 83:5,8 84:15 86:21 87:15,17 88:21 89:7 96:16 97:10 104:7 112:21 113:3, 12 117:20 118:4 121:23 122:8,10 123:4,9,14,17 124:2,11,14,24 126:13 127:8 128:8 129:1,5,18 130:13 132:17 133:15 135:15 142:12 148:17 151:21 153:2 159:14 165:11,13,16 166:15,16,19 170:19 174:1,3,5 178:6 182:13 185:8,17,20 189:13,17,21 190:23 191:18 193:6 194:9,23 198:5 199:2 200:3 201:3,14 202:5,11,23 205:3 206:4,5,15,16,20 207:4,14 208:8,16,21 209:16 210:2,8,20 211:10,13 212:3,18 213:11,17,20 215:24 217:10,16 218:7,15 219:12,19 220:15 221:9,17 222:12 226:6,7

**DTSC's** 58:14,21 59:11,15 151:14 183:23 197:17 210:14

**Duct** 163:24

**due** 31:17 161:4 200:6 203:10 208:2

**duly** 42:6 93:10 118:18 171:15 222:22 229:20

**dusk** 85:17

**dust** 122:6 125:16,19 126:2,9 136:22 139:8 145:13,17,21 148:13,24 149:4, 8,11,15,22 151:2,13,14 152:4,9,11, 15,20,21 155:8,11,15,21 161:18 165:23,24 166:9,17,21 187:6 192:8 193:9 194:20,22 196:14 197:14,16 211:3,6,12 217:13 247:12,21 248:13, 14,17,22

**dust-generating** 125:22

**dust-suppression** 148:8,20 150:8 161:12

**duty** 49:15

---

E

---

**e-mail** 10:2,3 43:10 92:4 115:16 119:8 172:7

**e-mails** 42:24 95:3 170:2 202:16 222:6 223:18 231:22

**earlier** 84:6 87:13 95:2 129:5 132:6 142:16 161:20 179:14 182:11

**early** 116:15 196:3



Bankruptcy Hearing - October 15, 2020

**earned** 17:6 113:18

**earth's** 245:11

**easier** 224:20

**east** 116:16 161:8

**eastern** 116:12 254:13

**easy** 25:13 35:14,15 153:19

**ECF** 135:1 173:1 224:16 230:2

**ECF-940** 35:21

**ECF-944** 40:20

**ECF-945** 36:15 37:3

**ECF-946** 93:19

**ECF-948** 37:21 38:18

**ECF-950** 40:21 41:2

**ECF-952** 117:17

**ECF-966** 39:4

**educational** 120:21

**effect** 234:14

**effective** 13:5 15:3,4 16:20 20:1 24:1 33:15,24 46:11 47:18 219:22

**effective-day** 15:20

**effectively** 243:8

**effects** 161:23 234:24 235:3,6,11 240:2,12,17 242:18,22 243:11 245:1, 7

**efficient** 253:3

**effort** 27:16

**efforts** 25:15 26:20 141:20 150:8 161:13

**eight-and-a-half** 195:18

**electric** 133:16 159:19

**electricity** 157:19 159:20

**electronically** 43:5

**element** 246:2

**elements** 140:6 158:14 182:5

**elevated** 109:11 126:23

**eleventh** 33:16

**Elias** 117:6 118:3 128:1 129:13,14,24 130:23 131:22 132:2,22 133:22 134:19 135:8,21 136:2 147:9 148:1 154:20,21,22 162:13 163:4 165:7,22 167:19 168:4,8,16 169:15,19 172:23

173:9,16 187:13 201:17 203:1,21 204:1,2,4,11 216:24 217:5 220:10,22 221:24 222:2,12 224:4,8,13 225:1,3, 12 228:19 229:12,23,24 230:11,14 231:3,9 232:8,10,11 236:17 237:15, 21 238:4,5,14,21 239:1,2,23 240:8,9 249:9 250:14

**eliminate** 9:17

**embarrassed** 238:16

**emerged** 235:22 244:22

**emergency** 127:22 129:2,6 210:10 211:18 219:24

**emergent** 9:13

**emissions** 146:13,15

**emotional** 30:12

**emphasize** 30:17 31:5

**employed** 69:23 120:10,11

**employee** 71:14

**employees** 28:6,17 70:10 71:16 137:6,12 148:11 150:17,19 167:4

**employer** 173:18 224:10 225:14 233:3

**encephalopathy** 245:5

**enclosed** 179:11

**enclosure** 33:5 124:13 139:19 179:24 228:11

**end** 13:21 111:18 143:22 152:13 154:14 210:1 249:1 253:24

**endangerment** 208:22 209:18 218:16,23 221:2,11

**ends** 11:21 248:15

**endured** 247:12

**engage** 75:12 130:15 248:4

**engaged** 127:12

**engineer** 120:18 121:3,5,9 129:8 132:14 134:2 147:17 188:10,14,20 189:8 191:5 225:19 226:3,4,18

**engineering** 120:23 121:1 225:21, 22,23 226:18,22,24

**engineers** 225:20

**England** 239:14

**English** 243:15

**ensure** 126:7 175:5 185:5 190:1

216:18

**enter** 81:6 82:1 139:22 151:8

**entered** 134:21 220:5 224:22

**enters** 12:2 139:22

**entire** 234:21

**entirety** 75:17 223:12

**entities** 17:17 18:2 19:22 20:4 47:13 69:3 77:1

**entitled** 21:13,20 22:8

**entitles** 20:24 21:6

**entomb** 228:17

**entrusted** 177:14

**environment** 83:4 192:8 193:8 194:5 195:23 197:20 206:6,23 207:7 208:12 209:4,19 211:5,7 217:13 218:24 221:13 245:10

**environmental** 16:1 31:1,16,18,24 50:4,19 51:8,14,21 52:8,13,18,24 58:15 75:19 77:5,9,19 78:16,19 80:7 100:5,8 112:8,16 113:9 120:11,13,15 137:8 188:23 232:17,24 233:14 234:17,22

**environmentally** 62:6,10

**enzyme** 246:1

**EPA** 29:11

**equipment** 143:9 144:23 145:2 146:1,13,16 157:2,6,13

**equity** 56:10,13,17

**equivalent** 58:20

**Eric** 117:15 118:16

**Erie** 15:22

**error** 6:13

**escapes** 211:13

**escaping** 145:18 148:24 149:17

**escort** 122:7,13,21

**escrow** 16:3 17:8

**essential** 176:21 184:8 246:7

**essentially** 13:15 14:13 26:24 139:10 145:4,15 184:18 186:14 187:6 219:9 228:12

**establish** 128:13

**established** 241:2 249:6



Bankruptcy Hearing - October 15, 2020

**estate** 17:5,18 27:13 48:23 49:9,13, 16,23 53:12 60:22 61:1,2,3 74:20 85:9 96:23 100:12,20 101:8 102:24

**estates** 51:22

**estimate** 15:8 63:21 65:22 66:8,12 185:8,12 228:10

**estimated** 15:5,15,24 17:12 228:8

**estimates** 66:6 88:24 182:20,24 183:3 242:3

**Europe** 17:4 48:3 68:22 69:1,23 70:10

**European** 70:15 101:19

**evaluate** 51:5,7 52:16,23 53:7

**evaluated** 53:6 234:20

**evaluating** 48:8

**evaluation** 53:5,13

**event** 32:18 83:23 129:3 131:7 142:17 210:4 211:9 212:5

**events** 182:9

**evidence** 8:19 11:9 18:20 32:9 34:15 35:7 36:3,6 37:2,5,24 39:7 41:2 44:1 100:1 105:12 117:19 134:23 170:10 173:2 224:16 230:2,8,9 242:13 249:22 250:4,9 251:13 253:3

**evidentiary** 44:6

**exact** 45:11 55:22 88:23 89:9 90:20 128:1 142:18 143:2 165:17 189:23 192:12 195:1 212:15 216:12

**examination** 35:13 37:23 39:5 42:22 43:1 44:16 82:16 88:8 90:12 93:20 94:10 95:4,19 104:12 107:2 114:7 117:8 120:1 134:24 135:24 162:20 168:14 173:11,14 187:22 198:20 209:24 217:3 223:12 224:6,23 225:10 230:12,15,21 231:1 241:14

**examine** 36:8 37:12 38:11,15 40:5 41:21 50:18 82:11 114:1 129:24 229:4 230:18

**examined** 8:21 42:7 93:11 118:19 171:16 222:23 229:21 231:23

**examining** 41:5 98:7

**examples** 228:5

**exceed** 15:12

**exceedances** 127:2

**exceeded** 164:17

**exceptions** 14:6 33:22

**excess** 13:22 21:6,11 22:7,11 179:22

**exchange** 20:1 56:3 114:17

**excreted** 246:11

**excuse** 18:24 19:21 28:23 37:8 105:18 107:13 112:14 163:19 166:2 171:21 192:5 202:15 248:5

**excused** 36:11 38:21 40:8 115:14

**execute** 81:20

**executive** 243:15,16,20 252:7

**exercised** 207:4

**exhibit** ~~44:3 135:15~~ 191:19,20 192:22 193:5 197:12 204:19 205:11, 12,14

**exhibits** 41:1 249:23 250:2,7

**Exide** 7:23 45:3 50:4,20 53:1 61:6 62:20 66:3 71:7,8,10,12,13 72:2,12 90:17 91:11 121:10 126:14 127:12 130:11,21 137:5 138:3,24 139:9 143:8 146:2 148:4,7 150:3,17 156:3, 8,12,19 157:11,12,15,18,21 158:6 160:14,16,19 161:16 163:13 165:10, 16,19 166:14 167:9 174:20 175:24 176:12 185:17 189:16 191:19 192:9 193:14 195:19 197:6,10,13 198:1,15, 21,23 199:1,6,23 200:9 201:15 202:6, 12,16,23 203:10 205:5,7 206:15,23 207:9,19 209:6 212:5 217:14 219:22

**Exide's** 52:19 56:19 158:22 159:19 174:11 180:19 183:20 193:10 207:12

**existence** 49:21 50:22 53:20 54:1

**existing** 51:3

**expect** 28:14 35:13 116:3 147:23

**expects** 64:4

**expel** 245:21

**expenditures** 127:15

**expense** 14:12 17:16 18:4

**expenses** 15:3,4 65:20 66:16

**expensive** 156:16,18

**experience** 183:16 189:4 234:8 237:4

**experiencing** 143:22

**expert** 133:24 240:1 247:3,14

**expertise** 234:13

**explain** 12:8 14:7 64:18 84:9

**explained** 65:1

**explaining** 166:6

**explore** 130:4

**exposed** 140:5 156:2 184:22 234:21 245:16,18,24 246:22 247:1,8 249:7

**exposure** 126:15 153:17 161:24 180:6 240:2,16 241:6 242:9,15,23 245:13

**exposures** 242:5 245:4 247:21

**expressed** 30:6

**expressions** 70:19

**extend** 214:2

**extension** 184:23

**extent** 17:15 49:14 79:16 83:8 86:20 126:5 155:8,9,15 162:1 164:11 169:9

**extenuated** 87:2

**exterior** 125:10 180:2

**extract** 103:5

**extraordinary** 253:7

**extremely** 240:17 241:2 247:22

---

**F**

**fabric** 144:10

**face** 125:8

**facilitate** 27:7

**facilities** 184:17 185:5 186:10,20 189:7 226:11

**facility** 30:7,14 32:5 64:3 91:2 121:10 167:5 175:11,16 177:8,23 178:1 179:7,8,18 180:8,10 181:10 182:1,3 184:23 185:6 192:10 193:10 207:13 217:15

**fact** 59:18 60:2 87:5,7 106:20 107:24 126:7 135:4 142:3 146:3 168:23 176:17 188:13 189:12 190:10 196:2 197:13 206:14 209:15 218:1,2 221:9 253:5

**factors** 109:8 140:18

**facts** 134:22 135:4

**factual** 59:14 134:4 179:3

**failure** 143:15 169:11



Bankruptcy Hearing - October 15, 2020

**fair** 26:21 116:8 190:20 223:6

**fairly** 193:22

**fall** 121:8,11,13 123:1,24 152:15

**Fallon** 32:20,22,23 33:2,3 34:8,15

**Fallon's** 34:12,20

**familiar** 123:8,10 137:24 161:23 204:13 205:21

**familiarity** 235:13

**families** 162:6 177:23 234:21

**fans** 157:22

**fashion** 89:3 175:7

**fault** 220:21

**favor** 24:6 79:22 103:1

**fearful** 178:1

**feasibility** 12:21 36:24

**feature** 55:6

**February** 142:16,19 205:3

**federal** 175:4 177:21

**fee** 17:6 45:23 46:9,15,20 47:3,5 48:2 88:12

**feed** 246:18

**feel** 8:14 38:3 250:17

**feeling** 171:2

**fees** 17:2,3,5,7,11,20 45:21 46:16,23 47:14,17 88:24

**feet** 143:24 163:16,17

**Feintuch** 39:2,4

**Feintuch's** 39:11,22 99:8

**felonies** 90:17

**fence** 126:10

**fetus** 246:19

**FEU** 33:9 34:1 75:2,6,8,21 76:3,6,10 82:2 85:16 139:18,22,23 140:2,8,17, 23 141:1,11,15,17,21 142:4 143:15 144:9,21 145:5,13,16 146:24 158:4 159:6,23 162:24 181:22 182:14,15 228:13

**FEU-1** 144:12

**FEU-2** 144:11

**fiduciary** 49:15

**field** 121:1 167:8 236:5 239:7

**fifty** 46:12

**figure** 66:2 210:13 215:24

**file** 12:12 26:13 27:22 28:14

**filed** 12:4,6 17:7 30:15 35:21 36:15 37:21 39:3,12,13 176:24 200:15

**filing** 30:20 31:10 46:2

**filled** 186:14

**filtering** 125:21

**filters** 145:5

**final** 17:6 26:12 44:24 60:9,12,17 170:9   Bankruptcy Hearing - October 15, 2020

**finalized** 12:7

**finally** 25:11 164:16 219:11

**financial** 31:3 46:21,24 73:11 84:6, 10,13 104:20 105:24 185:18 212:2

**financially** 73:7

**financing** 48:13 49:5 104:17 111:9, 24 112:24

**find** 7:4 105:10 110:12 214:10 245:15

**finding** 217:16 218:15

**findings** 98:18,21 209:15 221:9

**fine** 39:19 43:5 80:18 86:8 89:24 119:14 173:12

**finish** 86:3 230:8 252:1 254:11

**finished** 43:2 61:12 70:6 119:11 231:20 232:2 236:7

**finishing** 228:10

**fire** 12:18 25:7 57:14,18

**firm** 47:5 61:20 62:1 120:14 216:17

**first-day** 44:2 63:24 64:1,8,20 65:6

**fiscal** 63:7,8 65:2

**five-o** 46:12

**fix** 143:12

**fixed** 143:24 168:24 169:5

**fixing** 165:4

**flights** 141:10

**floor** 166:22 248:21

**floors** 248:9

**flow** 109:5 187:5

**focus** 82:24 83:1 105:7 107:6

**focused** 12:20 126:18 190:13

**focusing** 158:7

**follow** 95:10 180:24 222:1

**follow-up** 115:1 168:17

**foot** 143:23 144:4

**force** 121:21 126:16 127:5 158:8 175:24 189:17,20 190:10,12 191:23 199:21 228:4

**forced** 54:5

**foregoing** 209:15 221:8

**foresee** 182:21

**Forever** 213:1

**form** 79:12 94:7 136:23

**formed** 48:11

**forms** 68:5

**Fort** 15:22

**forward** 32:3 65:2,21 66:4 132:16 172:8 200:17 201:2 251:4

**found** 39:18 41:10 69:12 102:22,23 105:8 114:19 217:18 237:5

**foundation** 132:3 133:23

**fourth** 23:21 195:4

**Francisco** 231:13 233:8

**frankly** 14:20 252:7 253:13,22

**Fraske** 115:21,24 116:1,19 117:15, 16 118:10,13,16,22 119:1 120:4,9,20 121:6 123:3,8 124:2 126:16 127:6,24 128:24 130:1,9 131:7 132:13 133:2, 12 134:6 135:9 136:3 147:10,12 154:14,15,18,23 159:2 162:23 164:22 168:18 169:23 170:4,9 182:11 183:13 188:5 189:12

**Fraske's** 117:22

**free** 8:14 37:15 92:3 116:21 161:19 170:1

**frequency** 121:15

**fresh** 253:14,22,23

**Friday** 129:7

**Friedman** 6:15 11:4 41:3,4,8,13,17 43:17,24 44:9,18 49:14 50:13,16 51:15 52:4 60:13 62:13 65:10 68:15 70:5 73:19 79:1,6,7,18,19,20 80:13,



Bankruptcy Hearing - October 15, 2020

19 82:7,24 83:12 85:20,24 86:17 90:4,14 91:5,7,10,20 117:4,5,6 238:2,3 250:24 251:1

**Friedmann** 5:10,17 10:18 35:17 40:11,14,15 44:13 50:11 51:23 70:13 79:12 82:12,13,18 83:20 86:19 87:9, 11,20 88:13 91:24 115:23,24 116:4,5, 23 117:4,12,13 118:8 119:5,19,22 120:3 128:11,22,23 129:12,23 130:6, 8 131:1,6 132:5 133:11 134:1,5,14 135:3 137:22 148:16 149:5 162:17,22 167:16 169:20,21 170:8 173:5 187:18,19 188:1 199:14,16 201:23 203:18 204:12 216:19 217:7 218:13 219:11 220:12,20 221:22 224:19 228:24 229:1 230:4,19,22 240:5 249:14,24 250:1 251:16 252:9,12,13

**Friedmann's** 168:18 225:7

**Frisco** 12:6

**front** 106:9 205:15 206:11

**frontal** 244:8

**fugitive** 148:24 161:18

**fulfill** 15:11

**full** 13:1 33:5 43:7 90:6 126:1 139:19, 23

**full-body** 124:15

**full-containment** 147:4

**fully** 13:18

**function** 240:24 241:17,18 243:12, 15,16,21 252:7

**functions** 246:9

**fund** 63:16

**funded** 85:8

**funding** 31:2

**funds** 14:10 67:6,10 68:4,11 74:20 84:18,20 90:16 109:5 185:20 212:17

**future** 36:23

---

**G**

**Gadson** 10:2

**game** 41:11

**gap** 158:22

**gaps** 187:2

**garner** 177:10

**Gary** 25:20

**gasoline** 141:7

**gauge** 147:12

**gauges** 148:3

**gave** 13:24 107:12 129:21

**Genender** 10:18 35:18 92:10,12,16 93:3,12,14,15,16 94:6,11 95:15,16,21 96:4,8 98:11 104:1 114:4,5,9,23 115:3

**general** 20:6,12,13 51:13 52:6 55:15 77:17 206:7,12 235:13 244:5

**generalizations** 192:19

**generally** 9:18 30:6 109:21 168:4 177:3 181:13 183:6

**generous** 168:5

**genetic** 243:7

**gentleman** 188:7

**geologist** 189:8

**giant** 139:11 145:4

**GINA** 229:18

**give** 21:24 28:2,21 43:22 76:13,17 77:20 90:6 94:16 101:10 118:12 147:18 168:11,171:20 172:18 191:22 194:11,16 202:13 225:5 228:5

**giving** 11:1 54:5 77:16 153:15

**glasses** 124:10

**global** 11:22 15:12 53:22 60:5,7 74:16 77:22 88:21 89:4,16

**gloves** 124:17

**good** 5:3,8 10:12 11:20 23:5 24:9,10 25:17 26:5 28:9 29:5,9 40:14 44:19 97:22 98:16 104:5 110:19 115:20 119:20 120:4,6 136:3,5 147:19 172:21 188:2,3 194:16 223:2 224:2 231:4,5 238:9 251:3

**Gotshal** 10:12 40:16 92:13 93:16 117:14 187:19 250:1

**governing** 80:24 81:1

**government** 81:1 239:9

**grade** 184:19

**grading** 228:14

**graduate** 244:13

**grant** 54:6 77:2 123:9 170:20 171:13

**granted** 48:8 74:4 80:6

**granting** 78:4 79:23 206:7,12

**grants** 233:13

**grateful** 252:17

**gratuitously** 91:15

**great** 68:17 189:9

**greater** 30:8

**greatly** 246:12

**grimacing** 170:24

**ground** 7:15 115:4 165:5 184:19 186:15 248:8

**group** 20:2,3 23:13 109:15

**groups** 29:22

**growing** 244:2

**guarantee** 181:4,6,9 183:10 219:18

**Guaranty** 23:7

**guard** 145:24

**GUC** 20:11,24 21:15,20 22:6,14 24:6

**guess** 49:14 141:19 163:8 167:24 194:17

**guesstimated** 215:1

---

**H**

**hackie** 86:13

**half** 116:11,22 147:22 191:23 242:3 252:6

**half-demolished** 179:10 215:9

**halted** 136:8 138:15,24

**hampered** 243:21

**hand** 131:18

**hand-to-mouth** 248:4

**handful** 167:20

**handle** 117:7

**handled** 20:20

**handling** 20:13

**hands** 248:7 249:3

**handy** 109:23

**hang** 6:9 167:22 236:8



Bankruptcy Hearing - October 15, 2020

**happen** 75:19 85:13 133:18 160:19 236:13 238:6,12 242:3

**happened** 126:21

**happy** 110:1 224:21

**hard** 124:16 147:18

**harder** 237:6

**hardhat** 124:10

**hardship** 27:10

**harm** 67:21 76:2,5 83:4 99:20 100:3, 7 178:8,11 179:6 184:9,13 185:9,22 227:14

**harmed** 49:11 99:12 109:10

**Harvey** 92:17 93:1,8

**hat** 124:16

**hazardous** 31:21 136:13 140:3 175:6 180:10,15 187:8 189:1 209:20 215:10 218:22 219:4 221:14 225:18 226:8 241:2

**hazards** 234:22

**head** 123:13

**health** 26:23 78:8,13,20 79:11 80:1, 11 120:15 133:20 137:8 151:22 153:3,6 156:7,15 158:20 177:19 178:14 180:17 181:13 182:10 192:8 193:8 194:1,5 195:22 197:20 206:6, 22 207:6 208:11 209:3,18 217:12 218:24 221:12 232:19 233:6,9,14,15, 18 234:14,18 235:11 239:11,20 240:1,2,12,18 241:2,3,4,13 242:22 247:6

**hear** 10:14 29:7 32:24 36:6,9 37:10, 13 38:7,12,13,14 40:1,6 60:14 92:14 114:2 197:21 236:11,12

**heard** 19:8 23:2,4 32:24 95:2 96:2 118:23 128:5,12 171:19 182:12 189:12 231:10 251:20

**hearing** 6:14 7:23 9:12 10:1 35:3 131:9 208:21 214:17 238:11

**hearings** 102:5

**hearsay** 86:2,16 87:5 117:20 128:2, 10

**heart** 10:5 241:24

**heartfelt** 30:11

**heavily** 177:9 180:22 182:2

**heavy** 175:14 186:22 234:5

**held** 29:14 30:8 50:20 55:20 56:2 151:3 181:14 226:6

**helped** 20:17

**helpful** 135:12

**high** 23:17 125:16 136:17 138:9 142:1,9,23 152:4 155:20 157:1 160:9 167:6 186:21 244:13

**high-level** 235:11 245:4

**high-priority** 196:21

**high-profile** 177:6

**high-wind** 142:17

**higher** 153:11 154:5 245:2

**highest** 69:16

**hire** 57:14 165:17

**historic** 245:15

**hoc** 23:13

**hockey** 116:19

**hold** 6:6 51:22 52:7,12 56:9 181:16 232:22

**holders** 56:18

**Holdings** 45:3 71:12,14

**holds** 58:7

**holes** 179:15 187:1

**home** 42:11 94:20 167:15 223:5 231:14

**Honor** 5:8,13 6:4,24 10:11,13,17,21 11:8,14,17,20 12:1,9,14,18 13:3,9,11, 16 14:1,13,20 15:1,5,14 16:6,14,19 17:20 18:19 19:1,9,16,17 20:5,16,21 21:21 22:2,16,18,24 23:2,6,8,9,13,18, 23 24:3,9,12,13,20 25:2,20 26:8,15, 24 27:7,19 28:1,12 29:1,6 32:6,10,16, 17,19,20,22 33:3,18 34:5,11,14 35:8, 12,19,24 36:1,3,12,13,17,22 37:3,16, 23 38:19,23 39:6,11 40:9,15 41:4,18 42:1 43:17 44:1,10,14 50:12 51:24 70:8 76:14 79:1,13 80:13 82:8,13 83:12 85:24 86:17,19 87:10,21,24 88:1,6 89:21 90:4 91:5,21 92:1,10,17 93:3,6,12,16 94:6 95:13,17 98:12 104:2,6 107:21 110:1,4,6 114:4,22 115:4,11,18,23 116:4,24 117:6,12,14 118:3,14 119:23 128:3,11 129:23 130:7,23 131:2 132:2,5 133:22 134:1, 15,19 135:3,8,21 154:21 162:14,17 167:17,19 168:1,9 169:15,22 170:4,8, 10,17,20 171:11,24 172:23 173:3,5

187:14,19 192:11 199:15 201:17 203:5,19 204:11 216:21,24 220:11,12 221:23 222:3,10,12,18 224:4,13,19 225:3 228:21 229:2,12,24 230:4,14, 23 232:10 238:3,21 239:1,24 240:6,8 249:11,15,24 250:11,19,24 251:6,10, 22 252:10 254:5,10,19

**Honor's** 34:23 118:9 252:3

**hope** 80:21 237:5

**hoping** 88:2

**horribles** 85:12

**horse** 203:20

**host** 5:20 110:10

**hotspot** 242:7

**Houlihan** 17:2 37:18 39:2,16 47:19 48:2 99:4

**hour** 33:16 116:12,22 170:22 179:23 252:5

**hours** 30:1 33:6 146:18

**house** 17:4 223:15 248:18

**household** 247:10

**housekeeping** 134:20

**human** 78:8,13,20 79:11 80:1,11 192:7 193:8 194:5 195:22 197:20 206:6,22 207:6 208:11 209:3 217:12 222:7 233:18 234:14 235:3 240:2 245:13,20

**humans** 161:24 235:7 240:12 245:15,23

**hundreds** 145:12

**hurry** 254:3

**Hurst** 24:16

**hurt** 100:8

**hygiene** 120:14

**hyperactivity** 244:4

**hypertension** 241:21

**hypothetical** 69:5 85:12

**hypothetically** 22:3

---

**I**

---

**idea** 129:20 169:3

**Ideally** 252:1



Bankruptcy Hearing - October 15, 2020

**identifable** 197:18

**identifal** 192:5

**identifiable** 178:8,10,14 192:6
193:2,7 194:4 197:19 206:21 208:10
209:2 213:13 217:11 218:8

**identified** 178:24 195:21

**identify** 51:20 77:6 119:15 194:1

**identifying** 194:6

**III** 120:19

**ill** 245:3

**immediately** 26:16 82:1 143:10
196:22 213:12 245:3 248:19

**imminent** 76:2 83:3 158:20 178:8,
10,13 179:6 184:9,12 185:9,22
208:21 209:17 218:16,23 219:2
221:1,11 227:14

**impact** 30:12 113:8

**impacts** 31:16

**implement** 156:9

**implementation** 16:21 122:5

**implemented** 156:9

**important** 8:4,7,12 9:15 75:23 144:3
148:23 156:10 180:16 235:21 237:4
239:22 246:8 247:13

**importantly** 15:7 177:22 178:17
179:13

**improve** 228:14

**impulse** 244:9

**in-house** 226:22

**in-person** 30:3

**inability** 30:22 244:13

**inaccurate** 202:3

**inappropriate** 204:7

**inaudible** 174:2,23 176:6 179:1

**incarceration** 244:14

**inception** 62:23 63:1 83:2

**incidences** 163:13

**incidents** 126:23

**include** 15:20 45:20 46:14,15,19,23
66:15 78:12 136:17 164:8

**included** 65:11,12 129:9

**includes** 46:22 80:10 228:10

**including** 19:19 33:15 41:1 43:1
73:3 84:7 87:15 95:4 124:14 132:10
137:6 140:19 172:8 175:14 223:19
231:23 232:2 234:5,6 239:14 240:20
241:23 242:14 243:14

**income** 113:18

**incomplete** 90:6

**inconsequential** 60:20

**inconsistent** 63:23

**increase** 88:20 180:20 182:6

**increased** 89:8,11 241:20,22 242:15
244:14 Bankruptcy Hearing - October 15, 2020

**increasing** 88:24 242:12

**incredible** 101:18

**incurred** 59:19

**incurs** 206:16

**indefinitely** 140:15

**independent** 48:7 102:13,16,19,20

**indication** 83:22 84:2

**indications** 62:1,4

**individual** 27:4 97:2

**individually** 250:10

**individuals** 190:23 217:22

**indoor** 167:6

**indoors** 248:9

**industrial** 120:14 151:15

**industrialization** 245:17

**influence** 103:10

**information** 27:8 64:19 65:5 83:10
100:11 127:13 129:21 234:8 235:5
236:4 239:6

**inhaling** 155:21

**initial** 39:13 46:1,3 63:9

**initially** 88:16

**initiate** 150:20

**injury** 31:12 153:14 154:2

**inquire** 127:22

**inquiry** 81:12

**inside** 124:12 125:12,15 145:12,17
147:14 166:18 215:11

**inspect** 124:12 190:24

**inspected** 141:17 150:16

**inspecting** 124:4 141:15 146:12

**inspection** 122:18 123:6 125:1
132:3 141:4,7 157:10

**inspections** 123:5 124:3 125:9

**inspectors** 189:14,17,22

**installed** 142:4

**instance** 21:4 196:20

**instant** 10:6

**Institute** 233:6,10

**Institutes** 239:11,20

**instruct** 95:2 119:7 172:4,6 223:10,
17 231:8,21

**instructed** 105:9 193:13

**instructing** 231:18

**instructions** 42:10 95:12 118:22
119:18 193:22 223:24 232:5

**Insurance** 25:7

**intact** 89:16

**Integrated** 32:23 33:4

**intelligence** 243:13

**intend** 132:17 230:6

**intends** 59:1,3

**intent** 131:5

**inter** 205:7

**interest** 11:2 14:5 18:7 20:24 21:5,
15,23 33:21 62:1,4 70:20 86:11

**interface** 48:16

**interfere** 103:10

**interferes** 243:6 244:8

**interfering** 243:7

**interim** 193:15 194:19 198:22 199:18
200:20 202:13,15 206:24 217:23

**interior** 154:10,16

**internal** 232:14

**interrupt** 252:10

**introduce** 225:4

**inundated** 11:14



Bankruptcy Hearing - October 15, 2020

**investigate** 50:22 51:11,13,18,20 52:5 81:19 87:14 97:2,5 112:7,14,15 205:8

**investigated** 87:18 96:12,17,21 99:14 100:2 111:8,23

**investigates** 102:23

**investigation** 48:12,15,19,23 49:1,4 52:20 53:13 55:2 87:17 97:11,16 98:15,19,20 99:18 103:11,19,22 111:16 112:19

**investigation's** 49:20

**investigations** 174:21,22

**investigator** 233:5

**investment** 17:3 37:19

**involved** 24:11,22 45:10 141:15 232:19 233:21 241:19

**involvement** 133:9

**IQ** 243:13

**irrevocable** 61:21 62:1

**ischemic** 241:24

**isolated** 144:17

**issue** 13:2 36:19 71:2 81:13 90:5 117:21 144:14,18 201:4,21 202:23 203:7,12 219:10 221:20 242:8 247:15

**issued** 142:11 201:22 203:6,13,24 205:4 208:21 209:10,14 220:17 221:3 247:15

**issues** 11:15 12:10 22:20 26:14 28:19 31:12 158:8 213:22 233:14,17 236:18 243:24 251:12,18,24

**Issuing** 201:10

**item** 38:17

**items** 165:7

---

**J**

**Jared** 10:18 40:11,15 115:24 116:4 117:13 187:19 249:24

**Jason** 39:2

**jeans** 97:21 98:1

**jeopardy** 70:12

**job** 45:16 120:17 122:3,23 132:18

**jobs** 68:21 69:3,14,24 70:4,11

**Johnson** 35:20 36:9,11

**Johnson's** 36:5

**joined** 10:17

**joke** 188:13

**Journal** 239:15,16,17

**journals** 239:14,19

**Judge** 5:4 10:24 12:12 16:9,22 17:11,24 18:7 26:17 27:12 28:21 35:5,15 39:1,20 94:12 188:12 195:3

**July** 191:18,22 197:7,11,16,24 198:6, 15 199:5,6,18,23 200:1,19,22 201:3, 15 202:2,11,17,21,22 206:21 207:21 208:9 209:1 217:7,17 218:7

**jumping** 27:16

**jumpsuit** 167:13

**June** 49:5 104:17 111:9,24 112:23

**just-in-case** 18:9,22

**Justice** 29:10

---

**K**

**Kaplan** 87:24 88:1,6,10 89:9,20,23 115:5 168:1

**keeping** 243:22

**kidney** 240:21 241:17,18,19 246:13

**kidneys** 246:12

**kids** 147:18 177:24 238:17 244:10

**kilogram** 151:19 152:5,21

**kind** 113:4 125:8 133:17 161:5 164:4 165:12 183:4 186:24 190:5 194:17 214:9 244:9 251:5

**kinds** 112:22 246:8

**knew** 56:20 159:9 238:6

**knowledge** 47:3 50:7,10,17,21 53:16,19 59:24 60:1 61:23 63:17 66:23 80:23 81:2 82:20 83:15,17 90:20 96:9,15 97:18 98:13 124:1 128:8,14 155:3 234:10 235:24

---

**L**

**laboratories** 196:15,17

**lack** 132:3 133:23 168:19

**Lancet** 239:16

**landfill** 184:22

**language** 13:10,13 18:12,17 79:14 110:9 219:1,6

**languages** 243:14

**large** 151:1 187:2

**lasted** 30:1

**late** 116:16 231:7 251:5

**latest** 29:1 126:21

**latitude** 33:19

**Laughter** 110:15 237:9,10

**laundered** 167:14

**law** 80:24 82:21 175:4 176:21 180:15, 24 209:16 218:21 219:5,6,24 221:6,9, 20

**laws** 78:19 188:23 189:2

**lawyer** 188:18

**lawyers** 11:24 188:14,15

**lay** 21:15

**lead** 30:12 33:12 34:2 85:17 125:17 126:24 127:3 136:18,22 138:4,9 139:8 146:20 149:1,4,8,10 150:10 151:13 152:3,20 153:1,5,10 154:5 155:21 156:2 161:18,24 164:13,18 167:7 168:21 175:10,15 214:19 234:6,14 235:1,3,5,12 240:2,12,16,19 241:4,5,7,16 242:1,5,6,8,9,10,16,23 243:1,6,24 244:20,23 245:4,5,9,16, 18,21,23 246:2,19,22 247:1,7,8,10, 11,12,18,21 249:4,8

**leaders** 177:17

**leads** 105:12

**learned** 86:21

**learning** 243:14 244:6

**leases** 74:4

**leave** 6:4 68:18 115:5 252:22

**leaves** 170:5

**leaving** 139:9 148:13

**left** 53:23 63:12,16 64:22 66:14 89:5 95:24 144:6 158:13

**left-hand** 195:7

**legal** 65:19 219:9

---



Bankruptcy Hearing - October 15, 2020

**legally** 180:13

**legislators** 29:21

**lenders** 54:15 55:3 61:15,16,19

**length** 217:8

**lengthy** 23:12 225:6

**let all** 211:3

**letter** 191:18,21 192:4,12,16 193:13 195:5,19 197:11 199:20 200:19 202:11 217:7,10 218:14

**letting** 120:9 211:6

**level** 23:17 121:14 151:14,18,20 153:2,6,11 154:6 155:23 179:17 184:19 216:16 240:16 244:20

**levels** 125:16 126:23 127:4 136:17 138:9 153:10 154:5 155:21 164:13, 14,18 176:7 186:22 240:17 241:4,5,7, 16 245:2,10

**liabilities** 50:4 51:9 52:8,18 100:5,9 113:9

**liability** 20:3

**liberal** 9:20

**licensed** 121:3,4 226:3,4 233:1

**licenses** 226:1 232:22

**lien** 56:5 61:17

**liens** 61:6

**life** 115:15 153:14 154:1 188:23 246:21

**life-changing** 237:4

**lifelong** 242:9 244:15

**lifespan** 140:17,22

**lifetime** 246:16,23

**light** 176:1 182:21 195:20 209:24

**likelihood** 155:20

**limit** 168:6 207:2

**limitations** 110:3

**limited** 105:5 106:5 136:11 192:1 214:12

**limiting** 190:17

**limits** 31:2

**liquidation** 27:11 69:2

**list** 39:9,19 44:4 165:1,6 196:22 253:10

**listed** 44:3

**listened** 31:6

**lists** 243:17

**literally** 7:18 207:9 235:8 243:3 244:24

**literature** 235:2,5,14,19,23 248:1

**litigating** 89:12

**litigation** 89:17

**live** 5:2 36:17 37:22 39:5 116:5 118:10 177:23

**lived** 236:22

**lives** 243:19

**living** 162:6

**LLC** 71:7,9,10 72:2,12

**loan** 19:23

**lobe** 244:8

**local** 160:10 177:20

**located** 94:18 118:24 153:18 171:22, 23 180:7 193:10 231:12

**location** 155:10

**locations** 154:16 155:14 192:9 193:9 194:21,217:14

**logistically** 95:22

**Lokey** 17:2 37:18 39:2,16 47:19 99:4

**long** 9:23 25:12 116:2 119:2 120:24 124:8 143:24 144:4 162:11 173:21 197:2 208:2 210:12 216:6 250:12 251:7,11

**long-sleeved** 124:9

**long-term** 213:21 215:19

**longer** 13:8 71:22 75:11 171:7 185:6 214:13

**Longevity** 227:21

**looked** 49:5,7 51:2 104:21 105:24 109:4,5,6,7,8 113:7,15 114:11,12,15 239:8,13 248:1

**loose** 11:21 144:15

**Los** 150:12 151:9

**lose** 69:24 70:3,11 237:16 252:6

**losing** 231:7

**loss** 68:21 153:13 154:1 181:24

**losses** 163:12

**lost** 60:13,14 237:15

**lot** 7:11 8:9,10 22:1 25:17 26:1 129:21 140:18 141:2 156:13 158:7 196:18 199:9 214:4 228:3 237:11 246:14 251:21

**love** 252:1

**low** 240:17 241:4,5,7,16

**low-level** 161:24 235:11 242:23

**Lowensteid** 24:16

**lower-level** 245:7

**lunch** 116:11

**M**

**M.D.** 232:20

**made** 13:21 28:8 61:20 82:20 87:16 135:19 209:13 218:7 221:17

**magically** 72:16

**main** 32:18 76:7 138:4,15 247:10

**maintain** 61:4 75:5,24 76:8 86:13 157:12,24 212:20 214:3,18 215:6 216:14 228:4

**maintained** 75:9

**maintaining** 146:11 215:13 216:10

**maintains** 33:4

**maintenance** 126:18 127:14 136:12 141:2 157:9 190:13,18 192:1 207:2 212:4

**majeure** 121:21 126:17 127:5 158:9 175:24 189:17,21 190:10,12 191:23 199:22

**major** 142:4,8,15 143:12 148:5 168:19 177:19

**make** 12:24 14:19 15:1 18:13,15 27:9 39:18 72:7 79:2 81:12 91:1 95:9 96:2 106:16 110:10 112:10 122:10 151:9 157:18,21 178:18 179:1 184:21 190:6 210:3 211:11 215:14 216:5 219:10 221:19 224:20 230:5 251:12

**makes** 22:6 91:7 244:6,10

**making** 14:17 73:10

**man** 105:18

**management** 62:21 123:13 142:13 219:21 226:9 228:15



Bankruptcy Hearing - October 15, 2020

manager 120:18 127:20 137:9 226:14

managers 137:7

managing 175:6

mandate 105:4,18 106:5,9,24 107:4

Manges 92:13 93:17

manifested 245:2

Manometer 147:3,9,10

manometers 146:23 147:4,6 148:2

March 126:17 136:8,11 137:1 139:1 173:24 175:23 176:16 189:20

Marin 93:4

mark 250:10

marrow 240:22

Martinez 6:21

mask 125:4

masks 125:7

masochism 236:24

massive 235:4

master's 232:19

material 98:22 144:12 153:17,19 184:21

materials 136:23 144:8,13

Matias 23:6

matter 86:23 253:4

matters 35:3 96:10,17 99:13 134:20

maturing 243:4

maximum 16:5

mayors 29:22

Mcguire 19:9,10,15

means 8:23 9:12 63:9 178:23 246:10 248:5

meant 32:1

measurable 163:12,19

measure 126:14

measures 147:13 156:8,14,22 157:6 158:11 193:15 198:22 199:18 200:20 202:13,15 206:24 217:23

mechanic 20:12

mechanical 225:23 226:3

media 177:19

medical 27:1 232:13,22 234:12 235:2 239:14,16 240:11

medicine 232:15,16,17,24 233:2,7 239:15

meet 84:16 187:3

meeting 5:5,7 28:24 29:14,18,24 243:23 253:18

meetings 30:3

member 34:24 48:17 97:1 102:10 113:19

members 57:2,8,11 146:3,10

memorized 10:5

memory 46:10 55:16

mental 243:17

mentioned 32:19 136:16 150:2 160:22 166:17

merit 87:17

merits 13:17 36:19 223:20

message 10:6 236:7

messages 42:24 43:11 95:3 119:8 170:2 172:6,7 222:6 223:19 231:22

Messing 40:19,22 41:9,22 42:4,8,13, 16,20 44:19,20 45:24 48:5,6 52:2 54:9 56:6 59:16 60:21 61:12 66:24 68:20 70:6,7,24 71:20 72:4 76:12 78:23 79:17 80:20 82:11,19 83:15,18, 21 84:5,24 85:11 86:6,8 87:12,23 88:11 90:8,15 92:3,7 100:11 101:12 132:8

Messing's 13:19 15:6,14 44:2

met 123:15

metals 175:14 186:22 234:6

Michael 25:3,4 88:1

Michigan 120:23

mid 247:5

middle 242:6

migrate 161:19

migrated 149:11

migrating 243:4

miles 179:22

milligrams 151:19 152:5,21

million 13:22 15:6,13,16,17,19,21,23 16:20 17:13 19:24 20:23 21:2,7,12,18 22:6,7 24:2 31:19 46:4,12 47:6,7,9, 11,12,24 48:1 58:11,19 62:11,12,17, 19 63:4,5,6,8,10,12 64:2,5,9,10,15, 22,24 65:8,13,14,17 66:8,11 67:13,20 73:18 74:10 88:16,17 101:14,23 185:13,18 212:9,13,19,23 213:5,6,11, 17 215:5 216:3,8,13 219:12 227:13 242:4

mimic 246:6

mimmicks 243:8

mind 73:22 230:20 231:7

mine 83:1 98:6

mined 245:11

minimal 126:2 221:19

minimis 99:23 101:3

minimize 30:23

minimum 212:20

minus 64:9,12

minute 6:7 80:14 118:12

minutes 9:19 92:21 116:3,9 136:6 138:12 171:4,8 237:20,24 252:16

mischaracterizes 79:13

mispronounced 38:5

missing 187:4

misspoke 94:11

misstates 107:20

misunderstood 105:22

mitigate 184:12 227:14

mitigating 184:8 185:9,22

Mitigation 174:7 226:13

modification 18:8

modified 151:14

modify 24:5

moment 14:7 43:22 59:15 71:1 136:16 150:2,8 244:18

moments 137:23 139:21

Monday 39:13 121:19 129:10 135:10 208:12,17,20 209:14 210:19 220:17 221:3

money 13:4 18:21 21:21 66:13 67:18,24 68:9 85:5 156:13 158:7



Bankruptcy Hearing - October 15, 2020

213:13 214:2,6,13,14 215:8,12 216:3,
9 219:18

**monies** 85:4

**monitor** 45:17 147:1 161:9

**monitoring** 32:1 127:4 143:9 165:3

**monitors** 33:4 126:12 146:16
160:15,23 161:8 168:20 169:6

**month** 156:13,21 214:5,18,21 216:11

**monthly** 214:3

**months** 7:20 190:19,21 191:23
195:17,18 213:5 215:24 216:4,9
219:14 235:22

**morning** 5:3,9 9:21 10:12 23:5 29:5
40:15 44:19 99:9 104:5 107:14 120:6
252:18 253:13,14,21

**motion** 134:17

**mouth** 248:11 249:4

**move** 36:2 37:5,24 39:6 44:1 88:16
173:2 205:17 224:15 230:1

**moved** 8:19 134:23 204:9

**moving** 96:7

**multiple** 77:9 142:3 240:20 243:18

**Murin** 41:22,24 118:12 171:9 222:16
229:14

**Murrell** 23:5,6

**mute** 8:4,11 16:10,11 98:2,10 238:18

**muted** 8:24 98:5,6

**mutual** 74:4

**Myers** 104:7 222:13,15,20 223:1,5,9
224:1,9,15 225:4,13 228:19 229:6,9

---

**N**

**named** 123:9

**names** 188:6

**narrow** 163:18

**National** 239:10,11,19 241:13

**natron** 124:16

**naturally** 245:9

**nature** 53:20 54:2 80:12

**necessarily** 186:20

**needed** 129:10 141:5 142:24 143:11,

24 175:2 181:4 184:2 214:7 217:19
245:11

**needing** 144:15

**negative** 29:15 76:8 79:5 145:16
159:23 163:12,20

**negotiate** 34:18,19

**negotiated** 54:11

**negotiating** 28:9

**negotiation** 220:8

**negotiations** 23:12 182:12,14

**neighborhood** 46:12 55:23 63:4

~~neighborhoods~~ 248:14

**neighboring** 32:2

**nervous** 240:23

**neurodegenerative** 242:13

**neurological** 243:12

**neurons** 243:3,9

**news** 11:20

**night** 210:12

**nodding** 199:9

**noise** 8:23 76:15

**non-consensual** 77:4 80:5

**non-debtor** 56:13

**non-debtors** 17:11

**non-performing** 101:16

**non-producing** 33:6

**non-prosecution** 205:11

**non-significant** 164:4

**non-union** 26:17

**normal** 116:21

**north** 160:24

**northeast** 160:24 161:4

**northwest** 161:1

**note** 24:12,13 27:14 36:18 101:24
114:16

**noted** 12:11 31:10

**noteholders** 14:4 18:1 23:13 61:9,
10,14 83:21 102:3 103:1,9

**notes** 55:21 56:3,6

**notice** 43:7

**notices** 27:6 163:14

**notwithstanding** 198:21 206:20

**November** 152:10 166:1,2,4,10
195:13,21 196:13,14 197:14

**NPV** 15:24

**number** 23:23 38:16 45:11 46:15
55:22 62:17,19 64:16,24 65:12,13,14,
17 66:18 88:23 89:9 135:1 156:24
173:1 195:17 215:1 224:16 230:2

**numbers** 22:4 66:22 220:22

**numerous** 143:18 228:2

**nutrient** 246:8

**Nutrition** 241:14

---

**O**

**O'MELVENY** 104:6 118:4 250:6
251:7,23

**Oakland** 233:6

**Oaks** 223:6

**oath** 42:6 93:10 118:18 171:15
222:22 229:20

**object** 32:19 41:14 79:12 83:13
85:24 98:8 107:20

**objected** 176:18 203:14 207:23
212:16

**objection** 12:9,20 19:19 20:18
22:19,20 33:1 34:6,12 36:4,7 37:9,11
38:1,6,8 39:21 40:1,2 41:3,5,20 44:8,
9 50:11 51:23 86:5,16 87:8 93:24
94:2,3 114:22 117:24 118:5,7 130:23
131:22 132:2 133:22 135:2,7 173:1,4,
8 201:17 203:1 224:18,20 230:3,18
240:3 250:8 254:2

**objections** 12:15 89:7 251:13
253:15

**obligated** 68:4 76:13 77:1

**obligation** 33:14 210:14

**obligations** 15:11 33:24 84:16
101:23

**observe** 122:3

**observed** 127:6 247:3

**obtained** 91:11,18



Bankruptcy Hearing - October 15, 2020

occasion  126:11,12

occasionally  96:2

occupational  232:16,24

occur  32:4 85:15 126:10 181:5 185:3

occurred  28:24 29:2 88:20 89:17
  108:12,13 158:4 164:16 169:13
  245:17

occurrence  189:24

occurring  125:24 176:2 245:9

occurs  33:24 190:7 245:10

October  202:22

odd  5:6,24

off-site  67:21 217:21

offer  61:21 159:8 230:5

offered  183:17

offers  62:2

offhand  151:17

office  94:19,20 119:1 223:5 226:19

officer  45:3,6 56:21,23 57:2,4 71:17,
  22

officers  50:19

official  217:16 218:6

officials  29:22 177:20,21

offsite  194:2

on-site  31:20 146:2 174:21 217:21

one-question  220:13

ongoing  125:19 138:24 187:7,12
  190:2,9 207:22

open  69:15 140:6 158:13 181:7
  182:1,4

opening  11:7 179:19,24

openings  179:15,16

operate  91:19 144:22 146:16,17
  150:4 159:24 160:21 212:3

operated  14:21 160:18,20 161:1
  175:11

operating  64:2 65:19 91:1 145:9
  177:7 180:9

operation  186:19

operations  52:19 137:7 138:5
  158:24 164:24 165:12 176:1 187:10

190:1,9 219:14

Operator  6:13

opinions  236:3

opponents  250:13

opportunity  28:22 154:11,24 169:16

opposed  107:7

optimization  49:6 99:5 104:17
  111:10,24 113:5,8 114:17

option  70:20

options  236:9

oral  29:18

oranges  65:9

ordeal  237:2

order  9:17 12:2 13:11 15:22 18:24
  35:16 76:19 90:24 139:6,7 180:12
  181:14 185:5 186:2 200:5,7,10,20
  201:6,10,22 202:5,13,20,6,9,13,14,
  16,24 204:14 205:4 216:17 217:20
  219:10 220:17 243:10 245:12

ordered  176:17,23 199:1,3 200:14
  201:9 209:7 217:22

orders  200:2 201:4,14 202:23 203:8

ordinary  29:23

org  71:11

organ  240:20

organic  136:19

organization  103:8

original  89:3 107:4

originally  142:5

outbreak  176:22

outbursts  244:11

outcome  103:7

outer  169:13

outlets  177:19

overflow  151:6 160:10

overload  252:19

overnight  12:13

overrule  87:7

Overruled  52:1 79:15 130:4 134:3

oversee  174:10,12

overseeing  226:15

overseen  174:1

oversees  174:3

oversight  122:8 158:24 190:5
  207:22,24

owned  71:12 160:18

owns  71:8

### P

paid  14:9 17:12,19 27:2 59:23 84:24
  85:1 165:19 208:4

pain  38:3

paint  247:11,13

pandemic  176:22

pants  124:8

paper  11:15 43:4 95:7 119:13 172:12

papers  80:16 233:20 234:1,5

parade  85:12

paragraph  101:13 111:3,6,18
  112:23 113:4 117:22 118:2 158:18
  178:4 184:5 205:1 219:2 220:22

pardon  182:4

parse  110:9

part  28:4 44:6 45:16 60:5 122:6
  156:5 176:2 184:8 186:19 227:22
  232:18

partially  76:9

participants  6:7 95:8

participate  20:22 21:1,3 22:13
  212:14

participated  21:19

participating  8:13,15 171:21

participation  123:20

parties  11:2 13:13 14:5,23 18:6,10,
  12 21:1 24:11 27:6 50:3 51:8,22 52:7,
  13,17,18,24 53:12,17,23 70:21 73:3
  74:21 77:14 81:7 89:4 100:16,21
  101:5 108:5 180:24 220:4,9 251:19

parties'  13:16

partner  40:11

partners  10:17



Bankruptcy Hearing - October 15, 2020

parts 243:5

party 78:11 86:21 96:10 97:15 128:9 229:3

pass 14:15

passed 59:8

passive 227:23

past 89:11 124:23 133:9 148:4,17 161:20 208:12,16 218:15 221:3 245:24

patch 164:5

path 106:14 180:6

pattern 248:12

Paul 10:17 92:12 93:16 114:4

pause 19:3 22:23

pave 24:3

pay 14:10 15:17 16:4 18:21 19:24 30:22 72:3,19 110:14 159:14,15

paying 91:13 160:16

payment 12:21 24:1 73:15 74:2,8,12

payments 13:20 14:24 15:20 16:14, 17,21 82:20,21

PBGC 19:19,24 20:5,14,16 22:9,10, 12,17,20 23:1,4,10,14,18,24 24:1,5, 22 25:9,10

Pediatric 234:17

pediatricians 234:20

Pediatrics 239:17,18

peer 234:5

Pelu 38:2

Peluchiwski 37:18 38:22

Peluchiwski's 37:20 38:2

pending 34:6 236:16

Pension 23:7

people 5:5 6:1 8:11 9:18 26:1 38:4 71:18 75:5 98:2,4 116:16,17 123:17 137:2 141:14 147:22 168:24 177:14 178:14,19 180:6,7 181:14,16 183:10 200:7 211:9,14,16 216:6,13 228:3 241:18 243:20 245:3,18 248:20 252:18

percent 55:20 56:2,5 110:5 211:17, 19,24

percentage 58:6

perfect 11:10

perfectly 155:12 159:4

perform 75:13 84:17 217:23

performed 227:5

perimeter 126:9 127:3 146:17,24 160:15 164:12 168:19 169:6,13

period 28:24 46:3 130:20 162:24 164:15 201:5 207:20 212:21 213:2,20

peripheral 240:22

permanent 140:13 173:24 186:19,20

permission 40:17 43:19,23 117:17 118:9 172:17 173:10

permit 128:16

permitted 15:1,5,17 16:15 127:4 164:14,18 184:17 185:4 186:10 226:11

permitting 226:10

Perry 222:13,20

person 43:14 98:7 123:16 129:18 223:21 232:1 237:6 238:10

personal 24:13,21 31:12 126:12,14 128:7,14

personally 190:24 234:23

personnel 122:8 129:5 167:8

perspective 84:9 181:22

pertaining 127:13

Peter 238:2,3 250:24 251:1

PGBC's 21:22

ph 24:16,17 26:18

phase 62:23 63:13,18,19,21 65:3,17, 24 121:9,11 163:1 184:6,14,23 189:13 228:11

phases 63:15,16 185:3

phone 8:4,6,8,9,11 36:16 37:4 39:4 40:22 42:1 95:23 98:5,9

phones 16:11 98:2,10

phrase 178:10

physical 249:23

pick 248:10

picks 248:16

picture 90:7

piece 28:2

pilot 141:18

pivot 69:7

place 69:14 82:3 89:2 90:23 156:10 157:7 162:8,9,10 183:18 211:14

places 149:23 239:21

plain 79:13

plan 10:23 12:11,12 14:9,16,21 15:11,21 16:21 17:23 18:8,23 19:19, 20,21 20:11,19 22:21,23 23:11,16,21 36:24 46:17 47:15,19 48:9,20 53:18 58:4,10 59:10 62:24 63:2,14,19 65:3 67:5,11,16,23 68:21 69:5,8,22 70:2, 16 74:2 76:18,22 78:18 79:14 83:23 84:4 88:4 101:8 103:3,7 122:4,5,7 136:7 138:14 140:10 193:15,17,18 194:8,12,19 198:22 199:19 202:15 206:24 212:16 213:21 215:19,21,22 216:4 251:4,14

plan's 23:24

plant 138:5 149:4,11,12,16 150:3,6, 24 152:3 156:9 158:13 160:24 161:1, 4,6 167:9,11 178:7 179:4,5 184:10 205:9

play 49:1 249:23

playing 249:2

pleased 10:20 23:11 26:10

podium 29:3

point 23:22 32:11 59:21 65:10 66:12, 14 73:7,20 160:9 161:15 164:17 194:3 203:19 238:7,12

pointed 217:9

pointing 220:21

points 94:17

poison 240:19 244:24

poisoned 178:19

poisoning 247:7

Poli 188:15,18

policy 90:23 91:13,14

political 147:21

pollutants 149:1

pollution 144:22 233:16



Bankruptcy Hearing - October 15, 2020

**pool** 151:1,7 160:6

**poor** 31:3

**pop** 7:6

**populated** 177:9

**portion** 74:16 139:15 161:5

**portions** 135:9

**pose** 158:12 162:11

**poses** 178:7 179:5

**position** 173:24

**positions** 226:6

**possibility** 30:23 31:17 75:5 182:16 210:1

**possibly** 99:22 211:11

**post** 15:3 72:4 159:13,20

**posted** 84:18

**potential** 19:18 46:15 49:21 51:6,7, 11 52:21,23 53:14,24 108:4 112:3 190:5 192:7 193:3,7 194:4 195:22 197:19 206:22 208:11 209:3 217:12, 21 218:9

**potentially** 31:19 32:3 135:11 156:4 160:11 192:7 209:6 212:12

**power** 127:15 159:22

**powered** 124:15

**PPE** 124:7

**practice** 232:23 233:2

**practices** 233:15

**practicing** 121:1

**pre-petition** 208:5

**predominantly** 166:24

**prefer** 133:3 253:12,13,17

**pregnancy** 246:17

**prejudiced** 13:6

**prejudicial** 36:23

**prem** 91:13

**premised** 159:5

**premises** 124:5,21 125:2

**premiums** 85:1 91:14

**preparation** 235:24

**prepare** 127:9 182:17

**prepared** 130:10,15 172:24 185:8 210:3

**preparing** 51:1 174:23 235:17 236:2 239:5

**present** 35:16 38:10 40:11 123:23 153:6,12 154:6 157:2 201:3 218:22 219:2,8,23 227:24

**presentation** 32:9 253:3

**presented** 234:2

**presenting** 10:19 194:8

**presents** 151:22 158:20 211:17

**preserve** 69:3 89:3

**preserved** 13:18 18:13

**press** 236:8 238:18

**pressure** 76:8 103:17 145:17 147:1, 12,13 148:3 159:23 163:13,20 241:20

**prestigious** 239:13

**pretty** 24:21 28:11 184:14

**prevent** 31:21 76:4 83:3 97:10,13 139:8 145:17,24

**prevented** 76:1

**Prevention** 239:10

**preventive** 232:16

**previous** 105:2

**previously** 228:2 231:11

**pricing** 129:8

**primarily** 243:12

**primary** 249:7

**Prime** 35:20

**principal** 101:23 233:5

**principle** 26:11 75:23

**prior** 33:10 125:6 129:17,22 189:16 190:10

**priority** 14:8 15:16 20:9 55:21 56:3 59:4 101:24 196:24

**pro** 22:5 58:14,20,21

**problem** 6:17 7:3,19 14:22 42:2 133:21 237:22 238:23 253:20

**problems** 6:23 9:8,20 241:3,4

**proceed** 94:4 95:15 119:21 232:8 238:24

**proceeding** 7:22

**proceedings** 224:21

**proceeds** 21:11

**process** 24:21 25:12 27:19 28:8 29:13 61:24 69:15 133:7 150:20 176:3 183:4 185:2 200:5,6,8,12 201:8 202:4 203:9,10,11 208:1,2,3 219:19 243:6 246:13

**processing** 138:4

**production** 175:15 179:8

**professional** 17:7 45:21,23 46:9 88:12,24 121:5 188:23 225:24

**professionalism** 253:8

**professionally** 167:14 226:2

**professionals** 46:16 47:16

**professor** 233:7

**professors** 177:18

**proffer** 40:18 94:4,5

**profits** 91:1

**program** 174:7,10 226:9,13 239:12

**programs** 232:20

**progress** 28:9

**project** 62:9 65:14,18 66:15 120:18 123:20 127:20 133:9 226:14

**project-related** 62:22 63:3,12 65:1

**projected** 13:22 62:21 65:19

**projection** 46:9 63:10

**Projects** 226:19

**prominently** 175:23

**promise** 252:13

**promoted** 226:17 227:2

**promptly** 169:5

**properties** 16:1 101:17 174:12

**property** 15:24 33:6 60:20 61:7,21 62:6,11 64:23 71:2,3,5,20 72:7,11 73:4 74:1,5 76:22 81:8 84:23 86:14 101:16 122:22 130:22 131:8 146:17 157:11 161:10 165:10 174:11 211:13, 22 227:6

**proponents** 88:4

**proposal** 129:10



Bankruptcy Hearing - October 15, 2020

**propose** 251:15

**proposed** 15:22 30:21 180:19

**prosecuted** 90:17

**prospective** 241:10

**protect** 32:2 140:14 177:16 206:5 207:6 210:15 211:14,20 217:20

**protected** 33:11

**protecting** 156:15 181:12

**protection** 126:3 158:1 182:1

**protections** 182:10

**protectiveness** 228:4

**provide** 27:3 33:14 84:13 128:15 131:10,13 193:21 194:15 198:21

**provided** 15:21 64:19 65:6 73:3 75:9 91:15 100:11,12 101:14,18 226:23

**providing** 81:17 91:12 101:7 103:2

**provision** 18:23

**provisions** 54:24

**public** 28:23 29:13,18,24 33:21 150:12 158:20 177:11,13,19 178:22 180:17 181:13,21 182:10 194:1 209:18 218:24 221:12 232:19 233:6, 9,14

**publicly** 178:21

**published** 233:22,24 234:4 239:19

**pull** 145:13 192:21

**purchase** 11:22 12:5,23 17:1,23

**purchased** 69:13

**pure** 65:23 128:9

**purport** 31:11

**purported** 55:1 60:24 68:20

**purpose** 37:6 48:11 57:7 68:9,12 77:10 84:10,12 150:6 226:21 252:14

**purposes** 44:5

**pursuant** 14:9

**pursue** 105:11

**pursuing** 97:11

**push** 116:13 253:16

**put** 9:23 40:19 52:11 90:23 93:19 139:10 148:2 155:16 194:7 196:21 245:8 248:10 249:3

**putting** 26:12 101:19

**puzzling** 79:2

---

### Q

**qualified** 69:17

**quality** 97:15 142:12 233:15

**quantified** 242:2

**question** 16:13 50:14 51:16 53:5 58:17 62:14 68:15,18 72:1 73:21 74:6,18 75:17 79:8,18 80:21,22 83:19 89:15 91:4 94:7 105:21 108:15 111:20,21 112:11 115:1 128:12,17,24 131:2 132:7 134:7 168:18 185:16 197:2,10 201:2,13,19,24 202:8,9,21 203:4,22 206:1,19 213:10,15 236:16 242:20,21 254:12

**questioned** 217:8

**questions** 19:4,7 22:24 32:10 36:10 37:14 38:14 40:7 71:18 85:10 88:3,12 89:24 90:7 91:23 104:2,8 113:23 134:15 163:2 168:4,7,8 169:17 187:15 195:16 205:18 216:20 218:17 229:6 249:12

**quick** 134:20 228:3

**quicker** 213:24

**quickly** 81:6 143:6 168:23,24 183:23 214:12

**quote** 158:18

**quotient** 243:13

---

### R

**radical** 18:4

**rafters** 167:1

**rain** 182:8,9

**rainwater** 150:9 151:2

**raised** 31:8,12 89:7 90:5

**raises** 251:24

**ran** 69:15 165:7

**range** 13:24

**ranging** 233:15

**rata** 22:5 58:14,21

**rate** 214:1 216:12

**rates** 244:14

**reach** 23:14 60:8 100:19 103:17

**reached** 23:10 60:17 98:23 127:17, 21 129:1,7 182:19 183:5 247:20

**reaches** 150:9

**reaching** 109:13

**reaction** 30:16 228:4

**reactivate** 9:7

**read** 11:11 42:23 95:3 111:17 115:16 119:8 162:3 172:6 221:1,7 223:18 231:22

**reading** 220:24 221:4

**ready** 117:10 169:1

**real** 170:3 229:7 249:18

**realized** 224:14

**reallocation** 21:22 22:9

**reason** 36:23 53:3,4 85:14 91:16 96:6 106:19 130:17,19 131:9 133:12, 13 158:10 202:8,10 220:14

**reasonable** 155:12

**recall** 50:5,8 52:20 55:8,9,22,23 56:20 58:2 63:20 75:14 78:21,24 85:11 88:11 89:9 106:8 153:15,16 163:1 188:12 218:17 219:15

**receive** 21:13 23:24 29:14 42:24 47:14,17 58:10 73:17 119:9 185:17 219:13,17

**received** 21:14 22:3 29:17 44:24 61:24 69:17,19 163:14 177:12 196:6

**receives** 185:20

**receiving** 100:17 101:6

**recent** 63:10 235:22 244:2

**recently** 123:4 227:4

**receptive** 253:23

**recess** 92:19,23 117:1 170:23 171:5, 6 237:20

**recognize** 9:23 158:11

**recollection** 46:1,11 47:4,20 49:19 51:4,10 52:9 53:7 62:20 71:11 74:14 80:2 107:10 114:13

**recommend** 165:13

**reconciled** 13:6

---



Bankruptcy Hearing - October 15, 2020

reconciliation 13:7

reconnect 7:8

reconvene 116:12 254:13

record 34:11 38:9 44:6 102:1 236:7

recording 5:1 236:6,8

records 122:18

recoveries 24:6

recross 90:2 115:10 167:21 168:5
220:13

recurrent 46:8

recycling 138:4 175:11

Redding 28:7,18

redirect 82:12 88:3 90:1,5 91:22
114:3 115:7,9 162:16 167:18,23
169:19 216:23

reduce 218:3

reduced 241:18

reenter 170:2 222:5

refer 16:20 20:23 43:3 95:6 107:23
111:7,22 112:3

reference 73:19 101:11

referenced 99:7 103:13 179:14

referred 102:2 139:18 145:1 163:4
165:22

referring 152:17 190:9 191:19
194:21 205:12 208:14,19

refinancing 104:22 105:14 106:1

reflected 234:9

reflective 124:9

refuse 132:12

refused 176:14 206:23 209:6

regard 99:17

regular 126:11 234:3

regularly 46:7 189:14

regulation 81:11

regulations 81:5

regulator 161:2

regulatory 81:19 189:5

reimburse 17:18

reimbursement 17:22 206:15

207:17

reimbursements 207:19,23 208:4

reinforce 144:9

reinforced 144:16

reject 33:17,20 199:21

rejected 33:23

rejection 34:6

rejoin 6:4 237:18

relate 17:4 243:24

related 13:3 15:2 16:21 53:1 65:18,
19 66:10,15 67:1 78:8 82:22 174:21

relates 16:15 18:9 20:17

relating 52:8 80:1

relation 17:9

relationship 183:9,24

release 20:1 23:19 54:6 76:17 77:4,
11,15,17 78:4,5 79:22 101:15 180:1
209:19,20 218:14,21 221:13,14

released 53:17,23 100:21 169:4
172:9 222:5 229:7 249:17

releases 19:20 23:20 48:8,20,23
49:1,2 77:2,20,24 78:7,10,23 79:9,23,
24 80:4,6 100:13,16,17 101:6 102:7
103:2 161:10 187:7,8 205:8

releasing 78:11 180:15

relied 236:5 239:5,7

relief 109:7

religious 177:17

rely 99:3 100:10 180:23 236:3

remain 35:15 223:11 228:18

remainder 86:9

remaining 48:2 65:7 71:17 89:4
249:1

remains 175:5

remarks 251:12,22

remediate 62:10

remediated 62:6 217:20

remediation 15:23 31:20 64:3,22
66:3,10 84:22,23 120:16 126:19
190:7,11 199:21 207:3 212:4 213:21

remember 8:5,10 9:1 47:8,10 50:14
64:6,7 142:18,21,22 143:2 163:6

165:6 236:15

remobilize 246:18

remobilized 246:19

remotely 7:22

removal 75:16 228:13,15

remove 57:11 75:6 85:16 184:20
248:19

removed 75:21 103:21 139:4 159:9

renting 157:3

repair 141:5 158:3 163:23

repaired 142:24 143:5 164:16 181:8,
11

repairs 141:8

repeat 51:15 52:3 79:17 91:3 108:15
112:11

rephrase 131:3

replace 146:8

report 10:21 26:10 63:2 166:8
247:16,18,23

reported 19:17 66:21

reporting 62:20

reports 234:1

represent 66:14 178:13

representative 129:6

representatives 26:17,20 27:15,18
29:21

represented 12:18 28:6 186:13

represents 58:14 65:22 180:5 185:6
187:11

reproductive 240:23

Request 10:22

requested 130:13 207:24

requesting 129:8

require 8:16 157:8 178:17 181:13
193:21 206:9

required 76:17,19 77:19,23 84:17
91:18 126:2,4 139:10 144:22 148:7
150:3 151:22 156:8 177:3 181:1
202:4 205:7

requirement 125:7 175:3 176:10

requirements 189:6



Bankruptcy Hearing - October 15, 2020

**requires** 141:2,4

**research** 233:20,23 236:4 239:6 244:1 245:6

**researcher** 233:11,13

**reserve** 14:11,19 32:6 251:22

**residencies** 237:1

**residency** 232:20 236:23

**resident** 121:9 129:8 132:14 134:2

**residents** 156:16

**resides** 179:10

**resolution** 19:2,11 20:2 22:19 24:4 25:15 200:5,8 201:7 202:4 203:11

**resolve** 9:9,10 20:17 28:18 35:2

**resolved** 12:10,16 13:14 19:18 20:11,19 25:8 28:13 34:12 36:21

**resolves** 26:14

**resort** 31:5

**resources** 69:7 72:3

**respect** 12:15 13:17 26:22 28:15 31:13 81:7,10 98:14 99:4 100:11 108:20 111:9,23 112:23 113:5 122:4 164:7 206:16 208:9

**respirator** 124:16,18,20 125:3,12,21 139:24

**respirators** 155:14,19

**respiratory** 126:2,3

**respond** 89:6 176:12 251:15

**responded** 198:1,5

**responds** 200:22

**response** 30:15 31:1,18,24 86:9,18 132:4 198:15 201:15 202:19 253:15

**responsibilities** 75:13 174:8

**responsibility** 20:13 72:13 84:20 166:14,15,16 178:21 181:19

**responsible** 75:12 78:2 146:11 166:13 180:23

**responsive** 203:22

**rest** 15:18 48:3 68:22 69:1,23 70:10, 16 101:20 116:13 170:11 223:14 228:12

**restart** 176:18

**restarted** 176:15

**restarting** 176:18

**restate** 79:8

**Restoration** 174:7 226:13

**restrictions** 30:3 81:19

**restructuring** 45:2,6 96:11,20,24

**result** 31:2 89:1 103:17 113:13 175:6 187:10 227:12 245:13

**resulted** 103:6 163:12

**resulting** 241:17

**results** 126:22 152:19 196:3 197:5, 15 218:3,10

~~resume~~ ~~130:15~~ October 15, 2020

**retained** 17:10

**retaped** 144:15

**retiree** 16:16 26:9,22 27:20

**retirees** 26:12,22

**retires** 27:11

**review** 234:5 235:16,23

**reviewed** 152:2

**revised** 13:10

**revoked** 58:1

**Richterschmidt** 26:18

**Ridgefield** 42:12

**rightfully** 18:15

**rights** 13:17 18:13 31:13 75:15 77:12,16 203:15 208:3

**Riley** 47:5,24

**ringing** 76:14

**rip** 181:6

**risk** 70:12 126:1 144:5 151:22 153:6 178:8,10,14 179:6 180:20 184:9,12 185:7 213:13 227:24 241:20,22 242:15

**risks** 153:3 179:1 185:22 186:8 213:14 227:14

**River** 151:10

**rivers** 160:12

**Robinson** 36:14,16 37:4,13,14

**Robinson's** 36:18 37:9

**role** 49:1 50:24 121:9,24 127:7 175:20 227:3 233:9,12

**roof** 139:3,6 141:11 187:3

**room** 5:23 6:2,8,10,12 7:6,8 9:4 42:15 94:22,24 119:4 155:7,8,10 168:11 172:2 223:8 231:16,19 238:17

**rough** 45:1

**roughly** 185:13 188:24

**round** 214:23

**Roy** 40:18 42:4

**ruled** 204:6,8

**rules** 7:15

**ruling** 131:12 132:15

**run** 162:11 165:1 215:8

**running** 157:13,22

**Ryan** 5:21,22

---

**S**

**Sacramento** 171:24

**safe** 125:21 126:7 162:7 175:7 181:1 185:14 186:5 187:1 212:24 213:4,7 240:16 244:19

**safeguards** 162:8

**safely** 176:5,10

**safety** 75:19 120:15 124:9,10 133:20 137:8 156:8,15,21 158:8,11,21 181:22

**Safrets** 24:15

**sale** 28:4 69:9

**sales** 61:24

**sample** 127:3 165:23,24 195:2,7 197:14

**samplers** 164:13

**samples** 126:9 152:11 155:2 164:12 195:17,20 196:1,6,14 197:1,8,17

**sampling** 122:5,6 152:9 166:19,20 196:18,23

**San** 231:13 233:8

**sanitary** 150:13

**Santa** 179:21

**satisfied** 13:1 73:16,17 74:3,7,8,9, 13,14 130:3

**satisfy** 128:18



Bankruptcy Hearing - October 15, 2020

**scaffolding** 137:15 141:18

**scenario** 73:12,14 228:7

**schedule** 252:19

**schedules** 51:2

**school** 244:13

**Sci** 188:15,18

**science** 147:19,21 225:23

**scientific** 234:2 235:5 236:4 239:6 244:21

**scientist** 147:16

**scientists** 147:22

**scope** 49:20 97:15 105:17

**scores** 245:15

**screen** 8:17 43:20 95:7 110:12,16 135:12,20

**screening** 151:14,18,20 153:2,11 154:6 155:22

**screens** 8:15

**seam** 163:16 164:1

**seams** 144:14

**seat** 110:14

**section** 19:20 23:15,20 206:9 218:20 220:16

**secure** 181:1

**secured** 54:15 55:2 61:5,15,16,19 158:19

**seek** 69:9 206:15

**seeking** 18:7 156:4 207:16,19

**seeks** 31:15

**seeps** 186:15

**segment** 138:20,23 139:3,11 140:4, 9,14 142:5,6 143:21,22

**segments** 138:16

**seizures** 245:4

**send** 200:19 207:16

**senior** 120:18 123:13 226:18

**sense** 215:15 216:5

**sentence** 111:11,13 180:18 183:13 193:4 194:22 217:10

**sentences** 111:6,22 117:21 118:2

**separate** 199:20

**separation** 163:16

**September** 174:1

**sequestered** 246:14

**servant** 177:13

**servants** 178:22

**served** 45:5 56:18 57:2 121:8

**services** 32:23 33:4,14 73:2 81:17, 24 84:17 127:23 129:9 130:15 131:14 133:3 247:6

**set** 227:8

**settle** 89:6

**settlement** 11:22 12:6 15:12 16:2,16 20:16 23:10,14 24:1,18 26:9,11 27:20 29:16 30:22 31:11 53:22 60:3,6,8 74:16 77:22,23 88:21 89:4

**settlements** 89:16

**settles** 248:22

**settling** 74:21

**several-week** 158:22

**severance** 28:10

**sewer** 150:12,14,22

**share** 16:3,5 21:6 22:5 43:19 58:14, 21 110:11 135:11,20 193:23

**shared** 98:20,21

**shelves** 167:1

**shirt** 124:8,9

**shoes** 248:17,19

**short** 92:19 93:19 118:10 168:12 170:23 171:5 173:11 195:16 224:14 237:20

**shortened** 244:5

**shortfall** 17:16 18:3

**shortly** 176:23 200:14

**show** 18:20 132:12 135:9

**showed** 152:3,19 248:1,3

**showing** 6:7

**shown** 138:9 241:15 245:7

**shuttered** 138:5

**side** 17:4 250:2,9

**sidewalk** 248:15,16

**sidewalks** 149:6,9,22 151:8 160:11 161:13

**signed** 14:6 60:2,5 127:19 156:19

**significant** 142:23 157:8 163:5,9,11, 21 164:9,19 169:4 175:13 177:5 179:14,16 181:24 182:9 242:19 247:22 249:4

**significantly** 178:1 245:18 246:6

**Silly** 206:1

**similar** 25:9 226:15

**simple** 202:9

**simply** 22:16 69:9 86:9 87:4 158:13 219:21

**Singh** 5:8,12,15,16 6:16 7:14 10:10, 11,12,16 11:13 16:9,12 19:10,16 23:9,18 24:7,14 25:7,10 26:6,7 28:1 32:15,21 34:10,11 35:5 36:12 37:16 38:18,24 39:10,16,20 40:9 251:5,6 254:4,5,9

**single** 55:10 78:2 194:18 211:12 238:10

**sip** 248:6

**sir** 24:23 29:8 38:21 39:24 40:8 42:15,20,22 46:17 47:3,15 54:12 55:7,14 56:3 59:24 60:3,12 62:7 63:15,23 64:5 68:6 72:23 73:24 77:7 78:13 80:21 89:11,15 90:22 92:15 94:18,22 97:17 98:10,16 102:12,14, 17 103:4,12,14,20 105:22 109:24 110:19 111:14 118:24 119:4 171:22 172:2,20 222:16 223:4,8 224:1 227:11,16 229:9

**sit** 133:19 210:8,17,20

**site** 33:12 34:3 72:4 75:20 76:1 81:17 82:22 83:3 120:15 121:7,16,22 122:1, 9,10,14,16 123:4,5,6,18,23 124:3,5, 24 126:17 127:7,10,20 128:6 130:11 131:11 132:18 133:14,18 134:2,8 136:7,11,14 137:2,9,13,24 139:9 140:14,23 143:9,11 144:23 146:11 148:8,12,14,17,19,21,24 149:12,23 150:4,9,17 151:1,13,22 154:8 156:4 157:2,7 158:17,18,19 160:3,14 161:16 162:7 164:14 167:14 169:1 174:6,19 175:9,17,19 177:3 178:13, 15,16 179:2 180:4,7,11,23 181:1 182:3,8 183:15 184:1,18 185:5,23 186:7,17 187:10 189:18 190:1,4,7,12, 24 191:8,14,15,24 194:1 196:23



Bankruptcy Hearing - October 15, 2020

206:5 207:12,15 209:21 210:1,8 212:5,6,21,24 213:7,8,12,14,19 214:3,19,20 215:6,13 216:1,7,10,15 217:18 218:17,22 219:21 221:15 226:12,15 227:15,17,19,20,22 228:1, 14,16,17

**sites** 176:8 177:6 191:3 226:16 227:1

**sitting** 88:19 103:1

**situation** 9:14 10:7 24:10 27:10 30:9 31:3 72:9,11 110:8 183:23 210:10 211:18 219:24 238:10

**situations** 214:10

**six-month** 218:2

**Sixteen** 121:2

**sizable** 86:12

**size** 58:24 179:15

**sizes** 143:18

**slash** 68:22

**small** 163:15,18 248:16

**smaller** 163:22

**smoke** 233:16

**smooth** 219:20

**soil** 122:6 151:15 247:12,21 248:9

**sole** 48:17 97:1

**Solomon** 229:11,15,18 230:6 231:4, 9,10,13,17 232:6,12 233:4 236:10,14, 20,22 237:2,10,17 238:1,24 239:3,23 240:1,10 242:21 244:19 246:24 249:9,17,20 252:8

**Solomon's** 162:3 230:1

**solution** 22:17 26:21 69:20

**solve** 6:16

**Sontchi** 5:4 38:5

**Sontchi's** 188:13

**sort** 9:3 20:17 26:19 85:11 243:17 246:15 248:23

**sorted** 237:21

**sorts** 81:21

**sought** 69:16 103:4

**sound** 56:6 62:12

**source** 247:10

**sources** 247:11,18 248:13

**south** 142:12 161:8

**southeast** 161:9

**span** 244:5

**speak** 34:24 35:1

**SPEAKER** 5:1 6:3,22,24 97:20 107:19 170:16,19 238:8,15 250:16, 18,20

**speakerphone** 8:8

**SPEAKERS** 254:18

**speaking** 8:5,6 22:4

**special** 48:10 50:17,21 57:5,7,9,11, 15,18,23 87:13 102:8,10,15,18 105:4, 17 226:18

**specialization** 232:13

**specialized** 81:2 163:24 191:2,16

**specially** 167:12

**Specialty** 234:18

**specific** 51:11,18,19,21 52:6,20 53:8,20 54:2 63:20 66:1,2,18 68:9 81:10 90:19 112:18 192:18 228:5 241:4

**specifically** 52:22 53:2,4,15 55:8 60:4 66:10 75:14 78:14,21 80:8,10 96:14 112:21 113:1,3,10,12,15 167:24

**specu** 132:6

**speculate** 83:17

**speculation** 83:13 131:23 132:7

**spelled** 101:13

**spend** 62:10 64:4,22 65:7 68:5 156:17 233:19

**spending** 46:9 64:10 156:13,20

**spent** 63:12 64:2 66:3,13,14 158:7 188:22,24 226:8,14

**split** 251:17

**SPO** 226:19 227:3

**SPO's** 226:21

**spoke** 250:5

**spoken** 129:19 199:12

**spouse** 236:22 237:6

**spraying** 149:15 161:13 165:4

**spread** 186:16

**spring** 152:16

**stable** 14:16 158:19 185:14 186:3,5 212:24 213:7 227:17,19,22 228:7

**staff** 126:13,14 143:8,10 146:3,10 147:1 148:4 177:4 189:10 198:12

**stairs** 167:2

**stand** 11:3 116:18 229:14

**standardized** 226:9,11

**standby** 67:13 74:11 84:7 85:4,6 90:16,20

**stands** 218:12

**start** 6:14 11:1,18 12:17 86:7 93:23 94:16 127:23 174:14 199:3 200:11 252:6,18,24 253:14,17 254:14

**started** 7:10 42:9 43:16 81:15 144:9 209:12 224:3

**starting** 111:11 214:6

**starts** 13:4 111:15

**state** 5:22 25:8 60:9 72:13,16,18,20 73:6 74:22 84:14,19 85:21 96:15 97:6,10 100:4,7 120:23 175:4 176:6, 21 177:7,15 183:20 184:6 219:4,6,24 221:20 233:1

**state-elected** 177:20

**stated** 158:6 178:6

**statement** 64:7,20 178:4 179:4 184:5 218:4,20 225:7

**statements** 11:7 29:18 30:5 31:7 51:2 128:8

**states** 29:11 77:18,21 78:2 86:20

**static** 8:10

**stating** 156:20

**status** 19:18 174:18 175:18

**stay** 119:7 172:5 183:15 223:15 231:19

**stayed** 89:16

**stays** 159:6 167:10,13

**steel-toed** 124:8

**Steelworkers** 28:6

**STEM** 147:20

**step** 194:18 200:9

**steps** 127:8 143:11 200:11 210:3



Bankruptcy Hearing - October 15, 2020

**stipulated** 135:5

**stipulating** 14:22

**stipulation** 26:13 27:21 28:15 134:21 156:20 200:4 201:6 202:5 203:8,16

**stir** 187:6

**stirred** 125:20 156:1

**stop** 80:14 130:20 144:3 148:13,23 149:17 161:16 210:24 211:2

**stormwater** 120:16 228:14

**straightforward** 184:15

**Strawn** 12:19

**streets** 151:9 160:11

**stretch** 170:23

**stricken** 118:2

**strike** 86:5 117:21 130:18 131:1

**strikes** 5:5

**striking** 128:19

**stronger** 248:2

**strongest** 241:11

**strucken** 128:2

**structure** 71:12 138:3 140:9,14 179:10,11 181:7 187:1 189:5 190:16 215:10

**structures** 186:21,23 187:6

**stuck** 6:9

**studied** 247:1,14

**studies** 235:8,20 239:22 241:8,11,15 245:6

**study** 233:14 241:9

**sub-basins** 186:10,13

**subcommittee** 48:6,10,17 50:1 87:13 96:11,18,21,24 97:9 98:14 99:2,13 104:16 106:5,20 108:1 111:8, 12,15,23 112:6,14,20 113:2,7,11 114:12

**subcommittee's** 97:16 98:19 99:17, 19 103:11,18 105:18 111:16

**subject** 53:23 60:9,12 78:3 110:2 140:17 200:7 252:2

**submit** 193:14 206:24 230:7

**submitted** 46:2 93:18 117:16 173:1,

7 192:22 227:9

**subsequent** 86:24

**subspecialized** 232:15

**substance** 81:24 189:1 209:20 218:22 225:7 232:1

**substances** 31:22 136:13,17 138:10 139:9 140:3 150:11 173:19 193:6 221:15 224:11 225:15,19 228:18

**substantial** 56:10 101:2 208:22 209:17 218:16,23 221:2,11 252:20

**substantially** 180:20

**subsurface** 136:22,23

**subtle** 241:17

**success** 17:3 46:14,16,19,23 47:2,5, 14

**successful** 68:24

**suck** 145:5

**suffered** 108:9,18 109:2 113:12 235:10

**suffering** 234:24

**sufficient** 14:18 69:7 185:21

**suggest** 34:13 149:6 183:13 251:9

**suggesting** 215:18

**suggestion** 128:20

**suit** 124:14,15 139:23

**suits** 124:14

**sum** 24:10

**summarizes** 19:1

**summer** 127:11

**sun** 141:22

**sunlight** 140:19

**Sunny** 10:12 34:11

**super** 55:20 101:24

**superfund** 189:1

**supervise** 225:19

**supervising** 174:15 225:18

**supervisor** 227:2

**supervisors** 133:6

**supervisory** 175:20

**supplying** 159:19

**support** 22:22 23:11 70:15 101:18 131:10

**supported** 60:8

**supporting** 84:1,3 134:16

**supposed** 201:7

**suppression** 151:2

**surety** 66:24 84:8,13,18 85:1 91:17 212:9

**surface** 245:12

**surprise** 114:14 157:1

**surrounding** 33:11 34:3 149:12,17, 24 151:8

**Survey** 241:14

**susceptible** 141:21,24 244:10

**sustainability** 227:21

**swear** 41:23 93:5 118:13 171:10 222:17 229:14

**switched** 72:16 144:8 226:12

**sworn** 42:6 93:10 118:18 171:15 222:22 229:20

**system** 146:4 150:12,14,15,16,20 151:5 158:1 159:23 179:12,13 240:21,23

**systems** 32:1 165:5 240:20 246:1

**Szymanski** 10:2

---

**T**

**takeover** 158:23

**takes** 13:7 186:3 214:13 220:7,8 228:3

**taking** 181:17 206:16 210:2 219:20 249:10

**talk** 34:15 55:12 191:10 210:23

**talked** 87:12 150:7 151:12 164:2

**talking** 61:11 109:14 116:20 153:24 163:23 208:5

**tape** 163:24 164:1,5

**tasks** 184:8

**taxes** 15:24 16:4

**teaching** 233:21

**team** 24:15 25:11 35:1 251:7,23



Bankruptcy Hearing - October 15, 2020

**tear** 142:8,12,15,20,23 163:15 164:15

**tearing** 228:12

**tears** 141:12 142:4 143:5,10,12,18, 23 144:4 148:5 158:3 162:24 163:5,9, 11,22 164:3,7,9,11,20 168:19,23 169:4,12

**technical** 238:5,22

**technician** 137:8

**technological** 110:3

**Technologies** 71:7,8,10 72:2,12 217:15

**technology** 237:23

**Technology's** 193:10

**telephone** 6:20 76:13

**telling** 64:14 73:8

**temporary** 140:9 179:11,24 181:7

**ten** 9:19 28:16 45:14,15 137:2 253:5, 17

**tender** 239:24

**Tenenbaum** 28:22 29:3,4,6,9,10 32:14,16

**tens** 235:8

**tent** 139:11,14 157:3 159:9,13 165:3 180:2 210:20 211:4

**tenting** 179:11,13

**tents** 85:16 132:11

**Tepner** 48:16 92:17,21 93:1,8,18 94:17,19,23 95:13,22 96:9,14 98:12 99:3,11,24 100:10 102:1,6,22 103:9, 15 104:8,15 111:2 113:17 114:10 115:14,18

**term** 53:5 146:24 153:22,23 216:6

**terminate** 9:10

**termination** 28:10

**terms** 22:1 189:4,5 191:14 219:20

**Terrific** 95:1 170:12

**test** 152:19 218:3,9

**tested** 166:5,11

**testified** 42:7 79:21 88:15 93:11 118:19 128:4 136:6 139:21 144:19 153:9 154:4 155:19 158:17 161:20 171:16 182:11 198:19 222:23 229:21 244:18

**testify** 189:12 249:10

**testifying** 47:8,10 119:10 129:16 132:8 188:5 223:16,19,22

**testimony** 33:8 43:13,14 48:18 56:24 64:15 69:21 70:1 99:8 103:13 107:12,20,24 128:19 133:24 153:15 159:1,5,8 169:24 172:8 180:21 214:17 222:8 223:21 231:20 232:1 252:21

**testing** 126:5,22 138:9 152:2,6 166:13 196:3

**Texas** 5:22

**text** 42:23 43:11 95:3 119:8 170:2 172:6 222:6 223:18 231:22

**texts** 92:4 115:16

**theoretical** 105:21 108:4

**thing** 5:18 110:23 179:23 183:7 208:8,24 238:9

**things** 11:3 74:24 122:19 125:23 127:16 133:17 164:23 165:12,15,18 182:20 228:6 234:15 236:13,19 243:9,18,23 248:10

**thinking** 252:12

**thinks** 251:7

**third-party** 48:19,24 49:2,17 50:22 53:10 75:9 76:17 77:4 78:23 79:9,22, 23,24 80:5 81:16 122:8

**thoroughness** 97:15

**thought** 10:24 16:12 34:11 106:3 245:1

**thousands** 235:9 241:9

**threat** 133:20 153:12,22,24 154:7 158:12,20 162:12 180:5 186:12 187:12 192:7 193:3,8 194:4 195:22 197:7,19 200:24 206:22 208:11 209:3 213:12 215:7 217:12 218:9 219:2

**threaten** 180:17

**threatened** 209:20 221:14

**thrust** 192:16

**Thursday** 121:19

**tickle** 248:11

**tied** 11:21

**time** 7:12,19 19:13 34:23 42:18,19 46:2 52:3 59:21 80:3,9 85:9 94:14 110:14 112:11 115:20 130:20 144:1

147:18 148:19 158:7,22 164:15 176:7 177:2,5 187:14 192:3 194:7,15 201:5 212:21 213:20 220:7 228:20 229:7 233:19 236:18 238:16 239:24 242:10 246:20 247:9 249:10,18 253:12

**times** 45:5 54:10 152:24 153:1,11 154:5 155:22 203:23 204:3

**timing** 13:2

**tired** 253:24

**title** 120:17 123:12 174:4 225:17

**today** 10:19,21 25:5 27:22 32:8 33:8 64:15 69:22 70:17 83:5,10,24 88:19 94:18 118:24 131:12 132:15 134:24 136:4 140:3 151:13 156:14 157:5,7 169:24 171:21 187:14 202:22 222:8 231:12 249:11,19 252:21 253:11

**toddler** 249:2

**told** 61:17 70:14,18 81:18 103:21 105:13 106:3 198:2 207:1

**tomorrow** 70:2,3 252:18 253:14 254:8,12,13

**tone** 236:6

**tonight** 237:9 252:2

**top** 110:16 123:12 186:3

**topic** 247:4

**total** 27:12 58:7 62:21 63:8 65:7

**totally** 236:17

**touch** 133:15

**touches** 26:13

**touching** 248:8,9

**touring** 125:13

**touted** 168:22

**toxic** 81:24 138:10 139:8 145:13 150:10 161:14 173:19 193:5 224:11 225:15 228:17

**toxicologist** 162:2 189:8

**Toxicology** 239:11

**toxins** 214:19

**trace** 241:16

**track** 243:18,22

**tracks** 219:6

**traditional** 124:6



Bankruptcy Hearing - October 15, 2020

**training** 191:2,16 232:13,18,21

**trainings** 191:6

**transaction** 48:4,13,14 49:6,7 99:5 104:18,22

**transactions** 47:18 49:12 100:2 104:16 105:1,6,8 106:6,12,15,21,22 107:7,8,16 108:3 109:4,10,12 113:13 114:11,16

**transcript** 44:24 135:10,14 199:10

**transferred** 17:17 18:2 19:22 20:4

**transfers** 237:12

**transition** 32:4 219:20

**transported** 182:7

**travel** 167:15

**treat** 149:21 150:10 160:2,7

**treated** 150:22 180:12,14 234:23

**treatment** 18:5 149:16 150:3,16,20, 24 151:5 161:15 180:10 181:10

**tremendous** 177:10 179:9 189:4 207:18

**tremendously** 186:11

**trespassing** 72:8

**trichloroethylene** 136:20,21

**trouble** 9:24 243:22

**tru** 244:11

**truancy** 244:11

**truck** 148:12

**trucks** 179:16

**true** 42:12 87:4 205:9 237:11

**trust** 22:6,14 24:6 31:18,24 34:17 67:13,21 73:16 74:6,9,11 84:7 85:5,7 90:16,21 212:10

**trustee** 20:11,12 34:19 130:14

**trusts** 31:1

**truth** 86:23

**Ts** 11:23

**Tuesday** 29:1,19,24 123:7 124:24 127:20

**turn** 7:14 10:9 35:17 40:10 92:21 150:19 172:21 194:11 195:4

**turned** 103:22

**turning** 98:9

**twenty** 114:17 174:17

**two-man** 141:6

**two-person** 137:16 141:17

**two-thousands** 247:5

**type** 8:9 14:12 175:8 177:11 188:21 228:6 241:3

**types** 111:7,22 191:6

**typically** 121:18 137:1,12 239:21

**Tyvek** 124:15 139:23

Bankruptcy Hearing - October 15, 2020 **U**

**U.S.** 12:17,22 14:22 18:1 19:2,10 234:4 235:9

**UCC** 98:14,24 99:2 114:10,15

**UCC's** 98:18

**UCSF** 233:21 234:16,17

**Uh-huh** 48:24

**ultimate** 70:21 221:4

**ultimately** 13:21 57:14

**un-connect** 7:8

**un-mute** 8:1,6 42:1

**unanswered** 68:19

**uncontested** 33:9

**uncontrolled** 187:7

**undergo** 191:1

**undergoing** 243:1

**underneath** 186:9

**understand** 33:19,22 42:11 49:23 60:7,18 62:3 68:15,17 69:4 72:24 73:23 77:8 78:6,9 85:22 86:10 95:11, 23 112:10 116:6 119:17 131:24 153:21 156:12 172:19 179:19 194:3 202:7 214:16 215:23 223:23 232:4 236:20 254:3

**understanding** 34:17 57:21 61:8 62:8 65:16 66:8 67:3,15,22 68:10 71:5,6 72:10,22 73:1,9,14 75:22 76:12,16 77:3,17 78:1 80:3 81:14 84:12 85:6,7,20 91:17 150:23 166:7 175:1

**understatement** 7:13

**understood** 107:11 115:3 134:6

**undertake** 200:10 205:7 209:7

**undertaken** 100:3 191:5

**undertaking** 174:21 181:15

**undue** 27:9

**unfixed** 144:6

**unhappy** 116:17

**unidentified** 5:1 6:3,22,24 97:20 107:19 129:18 170:16,19 238:8,15 250:16,18,20 254:18

**uniform** 167:10

**union** 26:20 27:18 28:3

**unions** 28:19

**unique** 165:15

**unit** 33:5 139:19 145:17 226:10 234:18

**United** 28:5 29:11

**units** 228:16

**university** 120:23 177:18 233:8

**unsecured** 20:6,10,12,13 46:20 49:11 99:12,20 108:7,14,18,20 109:2, 9,14

**unsure** 47:11

**unusual** 54:18,21,23 55:4

**update** 11:1,2 12:14 26:8 28:2,22 29:12 235:24

**updated** 46:6,7

**updates** 11:18 28:20 32:18

**upwards** 155:22

**usable** 140:22

**utilities** 72:23 73:3

**utility** 72:15,19

**utilize** 212:3

**V**

**vacuuming** 193:19 248:24

**valuable** 49:8 100:20 101:7 102:23

**vapor** 122:6

**variables** 140:18

**variety** 226:24



Bankruptcy Hearing - October 15, 2020

**varying** 143:18 176:7

**vendor** 75:10

**vendors** 72:3 81:16 132:10

**verbal** 198:8,11,18

**Vernon** 28:7,17 30:7 31:23 32:4 33:5 34:3 60:19 61:7,21 62:5,11 64:3,23 66:4 67:1,14 71:3 73:4,16 74:6,9,11, 13 75:20 76:1 81:7 82:22 84:7,23 86:13 91:1 121:7,10,15 122:1 123:23 127:7,9 130:11,21 131:8,11 132:14, 18 136:7 137:2,24 140:23 144:23 149:4,11 152:3 154:8 156:4,9 162:7 167:5 174:11,15 175:9,10,19 177:3 178:7 179:4,5 184:9 189:14,18 191:7 193:11 205:9 206:5 210:1,8 217:15 218:17 227:6,15,20

**version** 45:1

**vest** 124:9,10

**video** 8:21 25:24 26:2 39:6 60:14 80:15 115:15

**view** 31:4 197:17

**Vincente** 23:6

**violation** 163:14 180:15

**violations** 142:11

**violent** 244:10

**virtual** 29:2

**visible** 38:10 40:3

**visit** 124:23

**visited** 191:13

**visits** 121:23 122:9,11,14 123:18 148:17,20

**voir** 240:4

**volatile** 136:19

**voluntarily** 183:14,18

**voting** 35:19

**vulnerability** 244:16

**vulnerable** 242:24

---

## W

**wait** 6:6 15:18 178:18 231:6

**waiting** 5:19 6:2,8,9,12 7:5,7 9:4 201:20

**waived** 101:21

**Waldo** 41:11

**walk** 122:15,17 166:22 226:5 248:18, 21

**walking** 122:16 124:20 125:1 155:6, 13 248:15

**walls** 139:3,7 141:11 169:13 187:2,3

**wanted** 12:24 18:15 19:5 28:2 72:7 89:23 96:5 168:17 217:6

**wanting** 38:14

**waste** 175:6 180:2,11,15 187:8 215:10 219:4 226:8

**wastewater** 137:7 150:3,7,15 151:5 158:1 160:3,5 161:15 180:9,11 181:10

**watch** 115:15

**water** 148:11 149:16,21 150:22,24 151:2,7 161:15 165:4,5 186:14,15 233:17 248:6

**wave** 39:23 41:9

**waving** 35:24

**ways** 241:17

**wear** 124:4,6,18,19 125:7,12 139:23 167:7

**wearing** 125:3 155:18

**weather** 140:19

**website** 10:4

**week** 33:7 89:11 121:22 123:7 129:5, 11,19 131:16 137:17,19 141:8 155:4 189:18,22 218:15

**weekly** 121:23 122:12 124:3 144:14, 18 164:3 165:3 189:23

**weeks** 89:1 133:14,19 134:9

**Weil** 10:12 24:15 40:16 92:13 93:16 117:13 187:19 250:1

**weird** 6:10

**welfare** 209:18 218:24 221:12

**west** 12:9 20:18,21 21:3,8,12 22:2,8, 12,17,19 23:1,3 24:7,23 25:6,12 90:23 91:12,13 116:15 161:5 253:19

**western** 138:19

**wet** 148:12

**wherewithal** 61:3

**wholly** 71:12

**widely** 236:5 239:7

**wiggle** 168:11

**wildfire** 233:16

**William** 37:18

**wind** 14:16

**wind-down** 15:2,4

**windows** 187:4

**windowsills** 167:1

**winds** 142:1,9,23 179:21 187:5

**winning** 70:14,22

**Winston** 12:19

**winter** 121:13

**wishes** 73:5 167:23

**withdraw** 68:18 115:4 185:16

**withdrew** 88:21

**witnesses** 9:12,16 35:9,12 170:15 253:6

**women** 246:17

**word** 132:1 147:8

**words** 192:12

**wore** 97:21 98:1

**work** 15:23 16:18 17:10 21:10 26:21 28:19 34:21 39:15 48:15 71:13 99:4,7 107:24 121:6,19 125:10 130:10,11, 16,20 131:18,19 136:7,10,24 145:16 167:4 174:18,20 175:18 176:13,15, 20,24 177:23 178:15 180:8,24 181:5 183:11,17 184:7,12 185:4,10 190:3, 12 193:15,17,18 194:13,19 198:22 199:19 206:24 207:9,13,15,17,24 209:12 214:15 215:22 216:18 227:5

**worked** 14:21 25:14 26:19 48:8 131:16,20 132:16,19 133:4,16

**workers** 128:6 154:9 155:1,13 156:15 167:9 217:21

**working** 12:3,22 13:12 27:17 28:5,18 36:20 188:23,24 210:12 226:10 234:19

**works** 6:5 188:10

**world** 48:3 68:22 69:1,24 70:10,16 101:20 170:3 222:6 229:8 235:10 249:18



Bankruptcy Hearing - October 15, 2020

**worn** 126:12

**worried** 171:1

**worse** 75:20

**worsening** 186:17

**worst** 182:18

**worth** 194:12 215:22

**write** 197:5,9 233:13

**writing** 29:15 233:20

**written** 198:9,11,18

**wrong** 64:16 106:4

**wrongdoing** 108:12,19 114:19

---

**Y**

**year** 63:6,7 65:2 113:21 148:18
174:17 175:24 227:2 242:4 250:21

**years** 38:5 63:8 121:2 123:19 215:7
226:7,8,14 227:1 232:21 235:22
244:2 247:15,24

**yesterday** 30:15,20 44:21 47:8,10
62:15,18 97:21 98:1 135:18

**York** 94:20

---

**Z**

**Zoom** 5:7 7:19,24 8:14 9:10 35:23
40:3,23 41:9

