# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| EXIDE HOLDINGS, INC., *et al.*, | : | Case No. 20-11157 (CSS) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |

------------------------------------------------------- x

|  |  |  |
|---|---|---|
| CALIFORNIA DEPARTMENT OF | : |  |
| TOXIC SUBSTANCES CONTROL, | : |  |
|  | : | On Appeal from the |
| Appellant,[2] | : | U.S. Bankruptcy Court for the |
|  | : | District of Delaware |
| v. | : |  |
|  | : | Civil Action No. 20-1402 (RGA) |
| EXIDE HOLDINGS, INC., *et al.*, | : |  |
|  | : |  |
| Appellees. | : |  |

------------------------------------------------------- x

## APPELLEES' BRIEF IN OPPOSITION TO APPEAL FROM ORDER CONFIRMING FOURTH AMENDED JOINT CHAPTER 11 PLAN OF EXIDE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311).  The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

[2] The California Department of Toxic Substances Control is referred to herein as "DTSC."

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Email:  defranceschi@rlf.com
        shapiro@rlf.com

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Jared R. Friedmann (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Aaron J. Curtis (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Email:  ray.schrock@weil.com
        paul.genender@weil.com
        jared.friedmann@weil.com
        sunny.singh@weil.com
        aaron.curtis@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (admitted *pro hac vice*)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:  (214) 746-7700
Email:  paul.genender@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Zachary D. Tripp (*pro hac vice* pending)
2001 M Street, NW, Suite 600
Washington, D.C. 20036
Telephone:  (201) 682-7000
Email:  zack.tripp@weil.com

Dated: January 22, 2021
        Wilmington, Delaware

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Bankruptcy Procedure 8012, Exide Holdings, Inc. and its affiliates in the above-captioned chapter 11 cases (collectively, "Exide," the "Debtors," or "Appellees") respectfully submit these corporate disclosure statements:

1.      Pursuant to the *Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors* (the "Plan"),[3] all existing shares of common stock of Exide Holdings, Inc. have been cancelled and replaced by one share of common stock held by the Plan Administrator in trust as custodian for the benefit of the former holders of such common stock.

2.      Exide Holdings, Inc. directly owns 100% of the membership interests of Exide Technologies, LLC.

3.      Exide Technologies, LLC directly owns 100% of the equity interests in Dixie Metals Company.

4.      Exide Technologies, LLC directly owns 100% of the equity interests in Refined Metals Corporation.

5.      Exide Technologies, LLC directly owns 100% of the membership interests in Exide Delaware LLC.

---

[3] The Plan was attached as <u>Exhibit A</u> to the *Order Confirming Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and Its Affiliated Debtors*, ECF No. 998 (the "Confirmation Order").   References to "ECF No." are to docket items in the Bankruptcy Court proceedings, whereas references to "D.I." are to docket items in this appeal.

i

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................1

STATEMENT OF THE ISSUES................................................................3

STANDARD OF REVIEW .......................................................................4

STATEMENT OF THE CASE ...................................................................5

    A.    The Exide Bankruptcy and Plan Negotiations..............................5

        1.    Appellees Marketed and Sold Most of Their Businesses................5

        2.    The Parties Achieved a Global Settlement, but DTSC Withdrew at the Last Minute ..........................................6

        3.    Appellees Adapted the Plan to Account for DTSC's Last-Minute Withdrawal, and DTSC Objected to the Plan ....................7

    B.    The Bankruptcy Court's Confirmation Order.................................9

    C.    This Court Denied DTSC's Emergency Stay Motion...............................12

    D.    Events Since Denial of the Stay.........................................14

        1.    The Vernon Site Was Transferred to the Vernon Trust, Which Promptly Restarted Remediation and Demolition............14

        2.    Numerous Other Transactions Occurred in Reliance on the Plan's Confirmation ..........................................16

SUMMARY OF ARGUMENT....................................................................19

ARGUMENT ....................................................................................23

I.    THE COURT SHOULD DISMISS THIS APPEAL AS MOOT AND EQUITABLY MOOT....................................................................23

    A.    DTSC's Challenge to the Authorization of Possible Abandonment Is Moot Because Abandonment Is No Longer a Possibility ...................23

    B.    The Entire Appeal Is Equitably Moot.........................................26

        1.    Granting the Relief DTSC Seeks Would Fatally Scramble the Plan ..........................................29

        2.    Granting the Relief DTSC Seeks Would Significantly Harm the Public, the Environment, and Third Parties Who Have Justifiably Relied on Plan Confirmation ..........................................34

        3.    DTSC Has Already Received Meaningful Appellate Review........37

II.   THE BANKRUPTCY COURT PROPERLY CONFIRMED THE
      PLAN.................................................................................................38

      A.   The Bankruptcy Court Properly Authorized Abandonment as
           One Possible Outcome ..............................................................39

           1.   The Record Showed that Abandonment Poses No
                Imminent Threat to Public Health and Safety.................40

           2.   DTSC Cannot Show that the Bankruptcy Court Erred.................42

           3.   DTSC Mischaracterizes the Undisputed Record Evidence...........45

      B.   The Bankruptcy Court Properly Approved Third-Party Releases
           and an Injunction......................................................................48

           1.   The Bankruptcy Court Properly Approved the Limited
                Third-Party Releases in Exchange for the Settlement
                Payments and Other Contributions ..................................49

           2.   The Debtor Release Was a Critical Component of the Plan.........54

           3.   The Injunction Was Necessary to Effectuate the Releases...........56

      C.   The Bankruptcy Court Properly Found that Appellees Proposed
           the Plan in Good Faith ..............................................................57

      D.   The Bankruptcy Court Properly Found that the Plan Does Not
           Unfairly Discriminate ...............................................................59

CONCLUSION ..............................................................................................62

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Abengoa Bioenergy Biomass of Kan., LLC v. Kozel,*
 958 F.3d 949 (10th Cir. 2020) ........................................................................33

*In re Adelphia Commc'ns Corp.,*
 367 B.R. 84 (S.D.N.Y. 2007) ..................................................................... 30, 33

*In re Allied Nev. Gold Corp.,*
 565 B.R. 75 (D. Del. 2016), *aff'd*, 725 F. App'x 144 (3d Cir. 2018) ........................37

*In re Allied Nev. Gold. Corp.,*
 569 B.R. 213 (D. Del. 2017), *aff'd*, 725 F. App'x 144 (3d Cir. 2018) ..........................5

*Already, LLC v. Nike, Inc.,*
 568 U.S. 85 (2013) ..........................................................................................23

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.,*
 197 F.3d 76 (3d Cir. 1999) .................................................................................4

*Anderson v. City of Bessemer City,*
 470 U.S. 564 (1985) ..........................................................................48, 51, 55

*In re Arcapita Bank B.S.C.(c),*
 No. 13-CV-5755 (SAS), 2014 WL 46552 (S.D.N.Y. Jan. 6, 2014) ...........................33

*Begier v. IRS,*
 496 U.S. 53 (1990) ..........................................................................................60

*In re BGI, Inc.,*
 772 F.3d 102 (2d Cir. 2014) .......................................................................... 33, 34

*City of Los Angeles v. Lyons,*
 461 U.S. 95 (1983) ..........................................................................................25

*Clapper v. Amnesty Int'l USA,*
 588 U.S. 398 (2013) ..............................................................................2, 23, 26

*Coca-Cola Bottling Co. v. Coca-Cola Co.,*
 769 F. Supp. 671 (D. Del. 1991), *aff'd*, 988 F.2d 414 (3d Cir. 1992) ..........................30

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000) ................................................................. 48, 50

*In re Cont'l Airlines*,
91 F.3d 553 (3d Cir. 1996) (en banc) ...........................................................27

*In re Crystal Oil Co.*,
854 F.2d 79 (5th Cir. 1988) .........................................................................32

*In re Dana Corp.*,
412 B.R. 53 (S.D.N.Y. 2008) .......................................................................60

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*,
336 F.3d 211 (3d Cir. 2003) .........................................................................23

*Geyer v. Ingersoll Publ'ns Co.*,
621 A.2d 784 (Del. Ch. 1992) ......................................................................53

*In re Glob. Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011) (en banc) ..........................................................48

*In re Guterl Special Steel Corp.*,
316 B.R. 843 (Bankr. W.D. Pa. 2004) ...........................................................46

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) .................................................................. 54, 57

*In re Medford Crossings N., LLC*,
No. 07-CV-25115, 2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011) ........................51

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991) ...........................................................................4

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
474 U.S. 494 (1986) ...........................................................................*passim*

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019) .................................................................. 32, 59

*N.J. Dep't of Envtl. Prot. v. N. Am. Prods. Acquisition Corp.*,
137 B.R. 8 (D.N.J. 1992) ..............................................................................40

*In re Smith-Douglass, Inc.*,
856 F.2d 12 (4th Cir. 1988) ..........................................................................40

v

*In re Spansion,*
426 B.R. 114 (Bankr. D. Del. 2010) ........................................................................ 50, 54

*In re Spansion Inc.,*
No. 10-CV-369 (RBK), 2011 WL 3420441 (D. Del. Aug. 4, 2011) ......................... 33

*In re Specialty Equip. Cos.,*
3 F.3d 1043 (7th Cir. 1993) ..................................................................................... 32

*In re Trans World Airlines, Inc.,*
No. 01-CV-0056 (PJW), 2002 WL 500569 (D. Del. Mar. 26, 2002) ....................... 36

*In re Tribune Media Co.,*
799 F.3d 272 (3d Cir. 2015) ............................................................................ *passim*

*In re U.S. Fidelis, Inc.,*
481 B.R. 503 (Bankr. E.D. Mo. 2012) ..................................................................... 52

*In re Unidigital, Inc.,*
262 B.R. 283 (Bankr. D. Del. 2001) ........................................................................ 40

*In re W.R. Grace & Co.,*
475 B.R. 34 (D. Del. 2012), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729
F.3d 332 (3d Cir. 2013) ........................................................................................... 57

*In re W.R. Grace & Co.,*
729 F.3d 311 (3d Cir. 2013) ................................................................................ 60, 62

*In re Wash. Mut., Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................. 48, 54, 60

*In re Zenith Elecs. Corp.,*
241 B.R. 92 (Bankr. D. Del. 1999) ....................................................................... 54, 55

## Statutes

11 U.S.C. § 554 ......................................................................................................... 39

11 U.S.C. § 1101 ....................................................................................................... 27

11 U.S.C. § 1123 .................................................................................................. 54, 60

11 U.S.C. §1129(a)(3) ................................................................................................ 57

42 U.S.C. § 9601(20) ............................................................................................. 53

42 U.S.C. § 9607(a) .............................................................................................. 53

Cal. Health & Safety Code § 25323.5 ................................................................ 53

RLF1 24677079v.1

## <u>PRELIMINARY STATEMENT</u>

This Court already rejected most of DTSC's arguments in response to its request for a stay pending appeal, concluding that DTSC was unlikely to succeed on the merits. Specifically, this Court rejected DTSC's core contention that the bankruptcy court improperly authorized abandonment of the Vernon site as one possible outcome under the Plan.  This Court determined that the record evidence supported the Bankruptcy Court's findings that the Vernon property was stable and that the Plan included funding for an orderly transition and long-term maintenance.  The Court also found no error in the Bankruptcy Court's findings that the third-party releases were "a sine qua non of the plan."  Oct. 22 Hr'g Tr. 74:11–13.  And this Court explained that a stay "ha[d] the potential to upset the global settlement affecting 16 other contaminated non-performing properties,"[4] which would have "increase[d] significantly" the risk that those sites would become abandoned.  *Id.* at 79:22–80:7.

On appeal, DTSC largely rehashes its prior arguments and has provided no sound basis for this Court to reach a different conclusion.  The only real difference is that this case has since become moot.  As DTSC concedes, after this Court denied a stay, the Plan was substantially consummated in reliance on the Confirmation Order. The case is equitably moot because the myriad transactions that have been

---

[4] The non-performing properties are idled manufacturing facilities and other ancillary sites that were owned by Exide.

RLF1 24677079v.1

consummated could not be unwound without scrambling the Plan, harming countless third parties, and increasing environmental risks.  Indeed, DTSC's challenge to the possibility that the Debtors would abandon the Vernon site is now *entirely* moot, as that is no longer even a possibility.  Within minutes of this Court's order denying the stay, DTSC agreed to participate in the Vernon Environmental Response Trust (the "Vernon Trust"), which now owns and operates the Vernon property.

As a result, there is no actual or imminent risk that the Debtors will abandon the Vernon property.  In fact, as a practical matter, the only way they could abandon the property is if *DTSC succeeds in its own appeal*, which would require this Court to order the unraveling of every action that has taken place in reliance on the Confirmation Order. Such an order would force the Debtors back to the brink of a chapter 7 liquidation and place all eighteen non-performing properties in limbo, risking environmental hazards nationwide.[5]  But it is well-settled that litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty Int'l USA*, 588 U.S. 398, 416 (2013). DTSC cannot manufacture a live controversy by using this appeal to create the very dangers that it supposedly is seeking to avoid, but that are otherwise entirely in the past.

---

[5] The Confirmation Order lists twenty-two non-performing properties, but the U.S. government and environmental trustee often group a few neighboring sites together for a total of eighteen (including Vernon and Frisco).

2

DTSC's remaining challenges to the Plan are similarly baseless. DTSC would like to keep all of the benefits it received under the Plan—the Vernon Trust that is managing and remediating the Vernon property and the $29 million that is funding those efforts—while forcing the other parties to contribute more money and give up the releases they received under the Plan. But that relief would be manifestly inequitable (and impractical, as there is no legal basis to compel third parties to contribute more money to the Trust). Accordingly, this Court should dismiss the appeal as moot or, at a minimum, affirm.

## STATEMENT OF THE ISSUES

1.     Whether DTSC's challenge to the possibility of abandonment is moot now that DTSC consented to transfer the Vernon property to a trust and eliminated the possibility that the Debtors would abandon the property.

2.     Whether DTSC's appeal is equitably moot where the Plan has been substantially consummated and could not be unwound without significant harm to the public, the environment, and countless third parties that relied on the Confirmation Order.

3.     Whether the Bankruptcy Court clearly erred in finding that abandonment of the Vernon site posed no imminent and identifiable threat to public health and safety where undisputed evidence showed that the hazardous material was securely contained and approximately $29 million was available to continue securing the site.

3

4.      Whether the Bankruptcy Court clearly erred in finding the Plan's releases and injunctions necessary and fair where record evidence showed that the releases and injunctions were essential to the Plan and that the released parties had made substantial contributions.

5.      Whether the Bankruptcy Court clearly erred in finding that the Plan was proposed in good faith where record evidence showed that the Plan was the result of extensive, arm's length negotiations and premised on a proposal from a team of five mediators.

6.      Whether the Bankruptcy Court erred in concluding that the Plan does not unfairly discriminate against DTSC where all holders of environmental claims were given the same opportunity to participate in the Global Settlement.

## STANDARD OF REVIEW

On appeal, courts apply "a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions." *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).  Courts must accept the Bankruptcy Court's "finding of historical or narrative facts unless clearly erroneous, but exercise 'plenary review of the [Bankruptcy] Court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'"  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991). Factual findings "shall not be set aside" unless the reviewing court is left with the

"definite and firm conviction that a mistake has been committed." *In re Allied Nev. Gold. Corp.*, 569 B.R. 213, 221 (D. Del. 2017), *aff'd*, 725 F. App'x 144 (3d Cir. 2018).

## STATEMENT OF THE CASE

### A.    *The Exide Bankruptcy and Plan Negotiations*

Exide was once one of the world's largest producers and recyclers of lead-acid and lithium-ion batteries, with operations worldwide. *See* First Day Declaration ¶ 7, ECF No. 14. By early 2020, however, Exide's business was quickly running out of liquidity in the face of mounting environmental remediation expenses, rising costs, and operational inefficiencies, which were exacerbated by the COVID-19 pandemic. *Id.* ¶¶ 11, 30. Exide commenced these chapter 11 cases on May 19, 2020. *Id.* ¶ 3. Appellees conducted a marketing and sale process for substantially all of their Americas and Europe and rest-of-world ("Europe/ROW") businesses, with the remainder of the assets that Appellees were unable to sell to be liquidated or abandoned. *Id.* ¶¶ 12–13.

### 1.    *Appellees Marketed and Sold Most of Their Businesses*

Appellees began marketing their businesses as a going concern before filing for bankruptcy. Peluchiwski Confirmation Decl. ¶¶ 8, 9, ECF No. 948. Appellees ultimately sold their Americas business to an affiliate of Atlas Capital Resources III LP (the "Americas Buyer"), and the Bankruptcy Court approved the sale. Americas Sale Order, ECF No. 690. After extensive negotiations, an ad hoc group of Appellees' noteholders (the "Consenting Creditors") submitted a credit bid for the Europe/ROW business for $559.4 million. Peluchiwski Stay Decl., D.I. 17-1, ¶ 7. Despite their efforts,

5

Appellees did not receive any other qualified bids.  Peluchiwski Confirmation Decl. ¶ 17.  A special committee reviewed and accepted the bid, determining that it would generate the most value for Appellees' stakeholders and was a better option than liquidation.  *Id.* ¶ 18.

> 2.  *The Parties Achieved a Global Settlement, but DTSC Withdrew at the Last Minute*

On a parallel track, in their first day motions, Appellees sought authorization to engage in negotiations, including mediation, with various environmental agencies to achieve a consensual solution for the orderly transition of the non-performing properties (and to proceed on an expedited timeline for the contested abandonment of the non-performing properties if negotiations were unsuccessful).  *See* Settlement Procedures Motion ¶ 3, ECF No. 37.  Appellees' motion emphasized that, "at the end of these chapter 11 cases, the Debtors will not be in business, and as such, they will no longer be able to retain and support the ongoing maintenance and remediation of [those properties]."  *Id.* ¶ 2.  On June 9, 2020, the Bankruptcy Court granted Appellees' motion and appointed five mediators, including four retired federal judges, one of whom DTSC selected unilaterally.  Settlement Procedures Order, ECF No. 242.

On July 28, 2020, after nearly two months of negotiations, the parties achieved what previously had seemed impossible:  a global settlement.  *All parties* preliminarily accepted the mediators' proposal and all government agencies, including DTSC, agreed to recommend and pursue approval of the settlement.  *See* Mediators' Final Certificate,

ECF Nos. 622, 636.  The Global Settlement provided, among other things, for the creation of environmental remediation trusts.  The Consenting Creditors and certain Exide entities that would be transferred in the Europe/ROW sale (the "Transferred Entities") would then fund those trusts with settlement payments of approximately $10 million.  Debtors' Confirmation Mem. ¶ 19, ECF No. 942.  Based on an allocation structure DTSC and the other agencies devised, approximately $2.6 million of settlement payments would be allocable to the Vernon property, in addition to more than $26 million in available financial assurances Appellees put into place long before the settlement.  *Id.* ¶¶ 21, 201; *see* DOJ Global Settlement Support Notice ¶¶ 24, 34, ECF No. 973.

Unfortunately, on September 15, 2020, with the confirmation hearing fast approaching, DTSC notified Appellees that it was withdrawing from the Global Settlement because the California Governor's office had rejected it.  Debtors' Confirmation Mem. ¶ 22.

### 3. *Appellees Adapted the Plan to Account for DTSC's Last-Minute Withdrawal, and DTSC Objected to the Plan*

After DTSC's abrupt withdrawal, the other parties to the Global Settlement quickly worked to stitch the pieces back together.  To avoid widespread abandonment of the non-performing properties, the parties reconstructed the environmental settlement and the Plan in a way that would achieve the same results, albeit without requiring (but leaving the option open for) DTSC's participation.

On September 23, 2020, Appellees filed an amended version of the Plan, which provided, among other things, that:  (a) if the non-consensual releases were approved, DTSC still would receive the benefit of the $2.6 million that otherwise would have been provided to the Vernon site under the Global Settlement, regardless of whether the property was abandoned or transferred to a trust; (b) DTSC could enter into an agreement with the environmental trustee providing covenants not to sue, and if it did so, in addition to the $2.6 million, Appellees would transfer the Vernon property to the Vernon Trust and the property would be managed by a trustee; and (c) if DTSC did not sign the agreement with the environmental trustee, or if the non-consensual releases were not approved by the Bankruptcy Court, Appellees would abandon the Vernon property pursuant to section 554(a) of the Bankruptcy Code.  *See* Second Amended Plan, ECF No. 871; Messing Confirmation Decl. ¶ 20, ECF No. 944.  Whatever option it chose, DTSC also would receive the $26 million in financial assurances that Appellees had funded in advance.  *See* Second Amended Plan; Oct. 16 Hr'g Tr. 174:14–18; DOJ Global Settlement Support Notice ¶ 46.

That same day, in response to DTSC's request for additional time to take discovery—purportedly necessitated by its last-minute withdrawal—the Bankruptcy Court adjourned the confirmation hearing to October 15, 2020, despite the substantial costs the delay would impose on the Debtors' estates.  Sept. 23 Hr'g Tr. 13:10–14:23, 18:22–19:20, 30:3–6, 32:1–22.  On October 7, 2020, DTSC filed its objection to the Plan, claiming, among other things, that abandonment of the Vernon property and the

non-consensual third-party releases were impermissible.  *See* DTSC Obj. to Plan, ECF No. 917.

### B.     The Bankruptcy Court's Confirmation Order

On October 15 and 16, the Bankruptcy Court held a confirmation hearing, which included a full day of live witness testimony presented by both Appellees and DTSC and several hours of oral argument the following day.

Eric Fraske, an experienced on-site engineer whom the court found to be "extremely competent, very persuasive, and a very honest and forthright witness," Oct. 16 Hr'g Tr. 176:5–7, testified that the main industrial building on the Vernon site—the portion with the most elevated lead and arsenic levels—was fully contained by a tent-like structure called a Full Enclosure Unit ("FEU"), and that Exide's on-site contractors "maintained and inspected" the structure "daily," Oct. 15 Hr'g Tr. 125:15–126:4, 137:22–139:20; Fraske Decl. ¶ 11, ECF No. 952.   Mr. Fraske testified that he "intend[ed] to continue [his] job and care for the Vernon site" while the site transitioned to the Vernon Trust or DTSC, and he explained that the site would pose no "threat to health and safety" even if "nobody was able to go to the site for two weeks" to perform maintenance and inspections.  Oct. 15 Hr'g Tr.131:7–14, 132:13–134:10; *see also* Fraske Decl. ¶¶ 11–13, 17.   The Debtors' Chief Restructuring Officer, Roy Messing, also testified that "over $26 million [in financial assurances] would be made available to DTSC to continue maintenance efforts and restart the remediation efforts at the [Vernon] site." *See* Messing Abandonment Decl. ¶ 30, ECF No. 950.

9

The court found that DTSC's witness, Grant Cope, was "evasive," "not . . . particularly persuasive," and did not have "any real insight" into "the actual facts on the ground." Oct. 16 Hr'g Tr. 176: 12–19.   During cross-examination, Mr. Cope conceded that $26 million would "allow [DTSC] to continue to maintain the current activities at the site" at least until the agency was able to develop a long-term remediation plan. Oct. 15 Hr'g Tr. 216:13–18.   Finally, Dr. Gina Solomon of the Public Health Institute testified about lead's toxicity and effects on human health.   *Id.* at 232:12–249:8.   She offered no opinions specific to the Vernon site.

After considering the testimony, evidence, and arguments, the Bankruptcy Court confirmed the Plan.   Oct. 16 Hr'g Tr. 170:16–19.   First, the court approved abandonment of the Vernon property as an alternative and found that abandonment posed "no identifiable imminent threat to the public's safety or to health or humans' general safety."   *Id.* at 179:18–23.   The court explained that the high concentrations of lead on the Vernon site are contained to areas that are secure and "[o]therwise, people are walking the exterior of the site without respirators."   *Id.* at 177:19–178:5.   The court underscored that "there are funds available immediately under the plan and under the preexisting set-asides [via $26 million in financial assurances] to fund remediation, or at least preservation of safety at the site for quite some time."   *Id.* at 174:14–18.   The court also adopted Appellees' voluntary proposal that the property would not be abandoned for two weeks (*i.e.*, no sooner than October 30, 2020), to provide time to transition responsibility to DTSC without any gap in oversight.   *Id.* at 179:2–23, 184:5–20.

10

On October 19, 2020, the Bankruptcy Court issued a supplemental letter ruling that clarified its understanding of the gravity and difficulty of the situation:

> The issue is not whether the lead at Vernon is dangerous—it is. The question is whether abandonment of the site presents an imminent danger—it does not. The evidence overwhelmingly established that the site is constantly monitored, and the dangerous polluted areas are contained. The evidence also established that the contractors currently in place are ready, willing, and able to continue their work, provided they are paid.

Suppl. Letter Ruling, ECF No. 1003. The court also recognized that although "Exide should pay its debts . . . it cannot. There is simply no available money to do so." *Id.* The court observed that "the abandonment would occur, if at all, on October 30, 2020," which gave DTSC "ample time to arrange for the orderly transfer of responsibility over the site." *Id.* The court also emphasized that Vernon "is not the Debtors' only environmental site. There are sites in 9 other states and the state and federal agencies responsible for those sites support the settlement contained in the 4th Amended Plan as the best, realistic alternative." *Id.*

Regarding the non-consensual third-party releases, the Bankruptcy Court explained that (i) this is an "unprecedented" and "extraordinary case" that "requires extraordinary measures"; (ii) the releases are a "sine qua non of the plan, and it has to happen for the plan to get together"; and (iii) the releases are "fair, equitable, and reasonable." Oct. 16 Hr'g Tr. 181:9–182:1; Confirmation Order ¶ I (iii)–(iv), ECF No. 998. The court also explained that there is "a lot of value being provided in exchange for receipt of the releases." Oct. 16 Hr'g Tr. 181:18–20. Specifically, the Consenting

Creditors and Transferred Entities—who will receive the protections afforded by the non-consensual third-party releases—made critical and substantial contributions to the Plan, which were contingent upon the continued effectiveness of those benefits and finality afforded by the Plan and Confirmation Order.  Confirmation Order ¶ I(iii)–(iv). Those contributions included: (a) funding $18.5 million in settlement payments; (b) consenting to the use of cash collateral; (c) contributing a significant portion of the debtor-in-possession financing capital; (d) purchasing Appellees' Europe/ROW business when there were no other qualified bidders; (e) waiving deficiency claims against Appellees; (f) releasing their liens on Appellees' non-performing properties to facilitate the Global Settlement and provide additional value to the environmental agencies, including DTSC; and (g) canceling Appellees' guarantee of $155.9 million of principal obligations under the Superpriority Notes Indenture.  *Id.*; Messing Confirmation Decl. ¶ 32, ECF No. 944.

The court granted a seven-day stay to allow DTSC to appeal and seek a stay of the Confirmation Order.  Oct. 16 Hr'g Tr. 185:4–7.

## C.    *This Court Denied DTSC's Emergency Stay Motion*

On October 19, 2020, DTSC appealed and filed an emergency motion for a stay pending appeal.  *See* Notice of Appeal, D.I. 1; Emergency Stay Motion, D.I. 4.  On October 22, 2020, after considering briefing and oral argument, this Court denied DTSC's motion for a stay.  Oct. 22 Hr'g Tr., D.I. 32, at 66:4–14.

This Court concluded that "[t]he evidence presented at the confirmation hearing supports the bankruptcy court's determinations . . . that the Vernon site is constantly monitored and that dangerous polluted areas are contained." *Id.* at 71:17–23. The Court emphasized that "approximately $29 million" was "immediately available" that DTSC could use "to pay for onsite or offsite remediation efforts." *Id.* at 72:3–12. Moreover, DTSC's "own evidence" showed that "completing the phase one closure without the removal of buildings and the cap, which would mitigate the imminent risk of harm from the Vernon site, will cost $27,325,298, less than the amount of funds that are available to [DTSC]." *Id.* at 72:13–19. The Court acknowledged that $29 million "is insufficient to fully remediate the site," but explained that DTSC's position would "supplant [the] requirements of *Midlantic* with long-term obligations . . . prior to abandonment," which was "not the standard set forth in *Midlantic*." *Id.* at 72:19–73:2.

Turning to the third-party releases, this Court determined that such releases can be used in chapter 11 liquidation plans, not just traditional reorganization plans. *Id.* at 76:13–19. The Court also noted that this Plan "presents a combination of reorganization through the [Europe/ROW sale] and a liquidation." *Id.* at 77:4–6. The Court explained, "[s]uch releases are appropriate where there's fear there's [no] real likelihood of accomplishing the goals of the chapter 11 without it." *Id.* at 76:19–22. The Bankruptcy Court had found "that the releases were necessary to the plan's success and feasibility" and "a sine qua non of the plan." *Id.* at 76:22–77:1. This Court noted that DTSC "points to no specific error in this finding." *Id.* at 77:2–4.

13

This Court also explained that "[b]ecause the released parties permitted the debtors to access cash collateral and the debtor-in-possession financing, the debtors were able to keep their businesses running, effectuating an orderly sale of those businesses as a going concern, avoiding shutting down facilities and ultimately saving thousands of jobs." *Id.* at 77:9–16.  If the Plan were stayed, however, there would be "no guarantee that the consenting creditors [would] continue to provide funding for the agreement or keeping the cases in Chapter 11.  The debtors have no operating assets remaining . . . and no unencumbered assets to pledge to obtain additional financing." *Id.* at 79:14–22.

This Court stressed that "[t]he stay has the potential to upset the global settlement affecting 16 other contaminated non-performing properties throughout the country," some of which "do not have financial assurance, and the only funding source for cleanup and remediation comes from the settlement." *Id.* at 79:22–80:5.  This Court explained that, "[i]f a stay is imposed, the risk of abandonment increases significantly for those sites." *Id.* at 80:5–7.  Accordingly, this Court denied DTSC's request for a stay. *Id.* at 80:18–21.

### D.     Events Since Denial of the Stay

#### 1.     The Vernon Site Was Transferred to the Vernon Trust, Which Promptly Restarted Remediation and Demolition

Merely minutes after this Court's stay decision, DTSC emailed Appellees' counsel an executed agreement providing the Vernon Trust with covenants not to sue.

14

*Declaration of Sunny Singh in Support of Appellees' Brief*, Ex. A, filed herewith.  On October 26, 2020 (the "Effective Date"), in reliance on that agreement and the Confirmation Order, Exide transferred title, ownership, and environmental obligations for the site directly to the Vernon Trust and thereby avoided abandonment. *See Declaration of Roberto Puga, P.G.* ¶ 6, filed herewith [hereinafter Puga Decl.].

Since taking over the Vernon property, the Trust has diligently worked to maintain and remediate it.  After consultation with applicable regulators, the environmental trustee developed a 14-month plan and budget for decontaminating the site and demolishing the main industrial structures, with a goal of completing the decontamination process and allowing the property to be put to beneficial reuse. *Id.* ¶ 10.  The trustee estimates that the $29 million currently available to the Vernon Trust will allow it to complete the 14-month plan and maintain the site through the end of 2022. *Id.* ¶ 19.  The trustee has developed a plan to obtain additional funds beyond the $29 million already available—including through a potential sale of the property—which would enable the Vernon Trust to deconstruct all of the ancillary buildings on the site. *Id.*  Contractors restarted remediation work in mid-November, and a crew of thirty to forty workers has been working daily to remediate the site.  *Id.* ¶ 12.  Contractors have continued to perform daily maintenance, including daily inspections, dust monitoring and sample collection, spraying down the site, and collecting and treating washwater. *Id.* ¶ 15.

15

The Vernon Trust received the $2.6 million settlement payment that the Plan allocated to the Vernon site, and DTSC has transferred to the Trust approximately $6 million of the $26 million in financial assurances that Appellees secured for the site. *Id.* ¶¶ 16–18. The Trust has received invoices totaling approximately $1.4 million for planning, operations, maintenance, and remediation work. *Id.* ¶ 16. Based on the current pace of work, the decontamination of the Vernon site and deconstruction of the industrial structures are expected to be completed by the end of 2021. *Id.* ¶ 14.

2. *Numerous Other Transactions Occurred in Reliance on the Plan's Confirmation*

On the Effective Date, Appellees also transferred the non-performing property in Frisco, Texas, to the agreed-upon governmental agency and transferred the sixteen other non-performing properties to the environmental response trust (the "Exide Trust") (completing the transfer of all eighteen properties). *Id.* ¶ 21; *Declaration of Roy Messing in Support of Appellees' Brief* ¶ 6, filed herewith [hereinafter Messing Decl.]. Since then, the Exide Trust has performed significant work at the properties in reliance on the confirmation, including negotiating and assuming contracts with numerous contractors who maintain and service the properties, creating plans and budgets for remediating and transitioning them, and continuing regular maintenance to ensure that they remain safe and secure. Puga Decl. ¶¶ 22–24. On the Effective Date, the Exide Trust received the approximately $7.4 million settlement payment that was allocated to the non-performing properties outside California and received approximately $23.6

16

million in financial assurances. *Id.* ¶¶ 30–31. To date, the Exide Trust has spent approximately $900,000 on planning, operations, maintenance, and remediation of the non-performing properties outside California. *Id.*

In consultation with the Exide Trust's advisors and applicable regulators, the trustee determined that the best strategy for safely and efficiently transitioning the non-performing properties is selling them to buyers who are willing to assume the environmental liabilities. *Id.* ¶ 25. The Exide Trust has been working to market and sell those properties; has closed the sale of one; and the buyer has assumed all related environmental liabilities and remediation efforts for that property. *Id.* ¶¶ 25–26. The Trust has also signed an agreement to sell a second non-performing property; is close to reaching agreements for the sale of two others; and has been negotiating a packaged sale of ten more. *Id.* ¶¶ 26–29.

On or after the Effective Date, Appellees and the other parties implemented numerous other transactions in reliance on the confirmed Plan. The Consenting Creditors issued $36 million in bridge financing notes to the Europe/ROW business to support its continued operations and provide funding for the settlements. Messing Decl. ¶ 5. Using the proceeds of the bridge financing, the Transferred Entities then made approximately $18.5 million in settlement payments to various parties, including (a) the above-mentioned $2.6 million to the Vernon Trust and $7.4 million to the Exide Trust, (b) $100,000 to the Texas Commission on Environmental Quality, (c) $2.4 million to the general unsecured creditors trust (the "GUC Trust"), and (d) $6.0 million

17

to the PBGC.  *Id.*  Appellees transferred the GUC Trust Causes of Action to the GUC Trust.  *Id.* ¶ 7.

Appellees also consummated the sale of the Europe/ROW business by transferring the business to the Europe/ROW Purchaser.  *Id.* ¶ 8.  In exchange, the Consenting Creditors forgave $70 million of Exchange Priority Notes and canceled Appellees' $155.9 million guarantee of Superpriority Notes.  *Id.* ¶ 9.  The Consenting Creditors released their liens on the non-performing properties and any sale proceeds thereof.  *Id.*  The Europe/ROW Purchaser took over management of Appellees' former Europe/ROW business and the remaining Exide employees.  *Id.* ¶ 10.

The Plan Administrator is managing the sale or liquidation of the estates' remaining assets and the distribution process for holders of administrative expense, secured, and priority claims.  *Declaration of Scott A. Rinaldi in Support of Appellees' Brief* ¶ 2, filed herewith [hereinafter Rinaldi Decl.].  The Plan Administrator has begun evaluating all filed administrative, secured, and priority claims.  Rinaldi Decl. ¶ 6.  The wind-down estates and their advisors also settled the Americas Buyer's claim regarding the working capital adjustment Exide owed in connection with the Americas sale, and on January 21, 2021, the estates made a payment of approximately $8.1 million to the Americas Buyer.  *Id.* ¶ 7.

Finally, the wind-down estates have been implementing other wind-down activities in reliance on the Confirmation Order, including:  (a) collecting approximately $11 million of cash collateral from insurance providers; (b) selling *de minimis* assets;

18

(c) entering into agreements to sell tax credits; (d) agreeing to pay certain premiums and benefits for Exide's retired employees; (e) agreeing to pay approximately $100,000 as part of a settlement concerning collective bargaining agreements; (f) paying approximately $1.7 million in wind-down expenses; (e) paying approximately $700,000 in pre-Effective Date operating expenses; (f) placing approximately $1.4 million into escrow for the wind-down estates' share of certain taxes relating to the non-performing properties; and (h) segregating approximately $1.5 million for the Canadian non-performing property. *Id.* ¶ 5.

## SUMMARY OF ARGUMENT

This Court should dismiss this appeal as moot because the possibility of abandonment no longer presents a live case or controversy, and the entire case is equitably moot because this Court could not invalidate the Plan without unwinding countless transactions conducted in reliance on the Confirmation Order, which would pointlessly cause significant harm to Appellees, third parties, and the public. At a minimum, this Court should affirm the Bankruptcy Court's confirmation of the Plan for essentially the same reasons this Court denied the stay pending appeal.

I.A.    DTSC's challenge to the once-hypothetical possibility of abandonment in the Plan is now moot under Article III.  The Plan provided that the Vernon site would be transferred to the Vernon Trust—and would not be abandoned—if DTSC executed the agreement with the environmental trustee providing covenants not to sue, which DTSC did immediately after this Court denied the stay.  Abandonment previously was

a possibility under the Plan, but now there is no longer any possibility that the Debtors will abandon the site.  DTSC's challenge to something that will never occur—and thus cannot injure it—no longer presents a live case or controversy.

B.     More broadly, DTSC's entire appeal of the Confirmation Order should be dismissed as equitably moot.  Acting in reliance on the Confirmation Order and this Court's denial of a stay, Exide and its stakeholders substantially consummated the Plan. DTSC's appeal, if accepted, would fatally scramble the Plan, call into question the validity of each and every transaction undertaken in reliance on the Plan, and send Appellees back to the drawing board and an all-but-certain chapter 7 liquidation.  It would be impractical and inequitable to grant such extraordinary relief and undermine the settled expectations of every party in the bankruptcy proceeding and their counterparties, including the environmental regulators in ten other states and the United States government, especially when DTSC's primary objection is to something (abandonment by the Debtors) that will never happen anyway.   Unwinding confirmation would significantly *increase* environmental risks at Vernon and other sites nationwide by transferring title to those properties back to an entity on the brink of liquidation.

II.     If this Court reaches the merits of DTSC's appeal, this Court should affirm the Bankruptcy Court's ruling in its entirety, largely for the reasons this Court already gave when denying DTSC's motion for a stay pending appeal.

20

A.     At the outset, although it is now irrelevant because the Debtors did not abandon the site, the Bankruptcy Court properly authorized abandonment as an alternative.  Record evidence clearly showed that the site's heavily contaminated areas were fully contained, that contractors regularly maintained and monitored the site to ensure that it remained safe and secure, and that those efforts ensured there was no imminent threat to human health or the environment.  The record also showed that approximately $29 million was available to continue paying contractors and other expenses.  Thus, the Bankruptcy Court's factual findings that the abandonment option under the Plan would not pose risks of imminent harm to the public were correct, and surely not clearly erroneous.

B.     The evidentiary record also amply supported the Bankruptcy Court's determinations that the releases and injunctions in the Plan were necessary, fair, and satisfied the standard for approval.  Appellees and the creditors' committee each conducted thorough and independent investigations that came to the same conclusion that the consideration provided in exchange for the estate releases was fair and reasonable.  The limited releases provided to the non-Debtor released parties were a "sine qua non" of the Plan because those parties made substantial contributions that enabled Appellees to keep their businesses running, effectuate an orderly sale of those businesses as a going concern, avoid shutting down facilities, and save thousands of jobs.  In addition, the released parties contributed $18.5 million in settlement payments, allowing Appellees to, *inter alia*, transition their contaminated properties to

21

environmental response trusts in an orderly manner without resorting to costly litigation that would have forced Appellees into a disastrous chapter 7 liquidation.  In exchange, the Plan provided releases and injunctions that protected the contributing parties from subsequent litigation.  Based on these facts, the Bankruptcy Court properly concluded that the releases and injunctions were essential to the Plan and fair to all parties.

C.     The Bankruptcy Court did not clearly err in finding that Appellees proposed the Plan in good faith.  Extensive evidence showed that the Plan was premised on the court-appointed mediators' settlement proposal after lengthy arm's length negotiations.  The Global Settlement was overwhelmingly supported by all key stakeholders.  When DTSC pulled its support at the last minute, Appellees and the other stakeholders scrambled to save the Global Settlement and the Plan and ultimately made modest adjustments to the Plan to account for DTSC's withdrawal while still giving DTSC the option to opt back into the Global Settlement.  DTSC's claims that Appellees sought to strong-arm DTSC into rejoining the Global Settlement are unsupported.

D.     The Bankruptcy Court correctly concluded that the Plan does not unfairly discriminate against DTSC.  The Plan treated DTSC no better and no worse than other holders of environmental claims:  Each was given the same opportunity to participate in the Global Settlement or face possible abandonment.  The fact that DTSC selected a different option than other regulators does not make the Plan discriminatory.

22

## ARGUMENT

### I.   THE COURT SHOULD DISMISS THIS APPEAL AS MOOT AND EQUITABLY MOOT

#### A.   *DTSC's Challenge to the Authorization of Possible Abandonment Is Moot Because Abandonment Is No Longer a Possibility*

"In our system of government, courts have no business deciding legal disputes or expounding on law in the absence of . . . a case or controversy." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (citation omitted).  Under Article III, "'an actual controversy' must exist . . . through 'all stages' of the litigation," *id.* at 90–91 (citation omitted), and the alleged injury must be "actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling," *Clapper*, 568 U.S. at 409 (citation omitted).  Developments that "eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief" render a case moot. *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir. 2003) (citation omitted).

DTSC's challenge to the once-real possibility of abandonment is now moot because there is no actual or imminent possibility that the Debtors will abandon the site.  DTSC signed the agreement providing covenants not to sue the environmental trustee, allowing Appellees to transfer the site to the Vernon Trust.  *See* Puga Decl. ¶ 6. Appellees thus did not abandon the Vernon site and will not abandon it in the future (much less imminently).

Because the Vernon Trust now owns and maintains the site, the alleged harm DTSC warned could occur upon abandonment never happened.   Pursuant to the Trust's plan, set forth above, contractors have continued to perform safety measures that DTSC claimed would "cease immediately upon abandonment," such as "dust suppression and air monitoring," "water treatment," and daily inspections.  Appellant's Am. Br., D.I. 45, at 33–34; Puga Decl. ¶ 15.   There has been "no stoppage of containment efforts."   Appellant's Am. Br. 33; Puga Decl. ¶ 7.   And government regulators did not have to "assume management responsibilities" over the Vernon property, Appellant's Am. Br. 31, because the Vernon Trust is managing the property using funds from the settlement and financial assurances, Puga Decl. ¶¶ 7, 16–18.

Notably, DTSC identifies no concrete injury to it arising from the fact that the Vernon Trust (rather than Exide) is now managing the property.  DTSC's objection is that *DTSC itself* might have had to take over responsibility for the site upon abandonment, but that possibility now is no longer actual or imminent.  And if anything, the Trust is better positioned to maintain and remediate the site than Appellees were because the Trust has access to $26 million in financial assurances that were unavailable to Appellees (and expects to complete decontamination of the site and demolition of the industrial buildings by yearend).   By contrast, Appellees were on the brink of insolvency.

DTSC fares no better by seeking to characterize the Plan as presenting it with a "Hobson's choice."  Appellant's Am. Br. 4.  Again, the propriety of that choice is no

24

longer a live case or controversy because DTSC has already made its choice, will not face such a choice again, and identifies no ongoing harm arising from having once been presented with that choice in the past. There simply is no "real and immediate threat" that DTSC is "likely to suffer future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

DTSC's description of the Plan as presenting it with a "Hobson's choice" also is fundamentally inapt. The underlying problem—that Appellees lacked the funds to maintain the property—preexisted the bankruptcy and was independent of anything the Bankruptcy Court ordered. The Plan thus did not create the problem; it provided two options for *ameliorating* those preexisting risks, namely, (1) participate in the Trust, and have it maintain the property; or (2) abandon the property, but with an ongoing mitigation plan and millions of dollars of funding to prevent imminent environmental harm. Having agreed to participate in the Trust, DTSC can no longer complain that it would have been injured if DTSC instead had selected the abandonment option. That possibility is in the past and will never recur, DTSC has identified no ongoing harm that it suffers because it was once presented with that choice, and an order from this Court reversing confirmation of the Plan could not provide DTSC any redress.

Indeed, redressability cuts sharply against DTSC. At this point, the only way Exide could abandon the Vernon property is if *DTSC succeeds on appeal* and this Court unwinds the Plan, removes the property from the Vernon Trust, and sends Exide back to the brink of liquidation. If that were to occur, DTSC might once again face the

25

possibility that Exide will abandon the property, a possibility that is otherwise a thing of the past.  But parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper*, 568 U.S. at 416.  DTSC thus cannot manufacture a live controversy by taking an appeal that, if successful, might create the very injury DTSC is supposedly seeking to avoid but that otherwise is no longer actual or imminent: Article III empowers courts to redress injuries, not to create them.  Quite simply, the propriety of abandonment is no longer a live controversy in this case, and this Court should dismiss DTSC's challenge to abandonment as moot, obviating the need to reach the merits of the issue.[6]

### B.     The Entire Appeal Is Equitably Moot

This appeal also should be dismissed in its entirety as equitably moot, particularly given that the Debtors will not abandon the Vernon site.  "Equitable mootness" is an abstention doctrine under which "an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization."  *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015).  The court dismisses the appeal "when, even though effective relief could conceivably be fashioned, implementation of that relief

---

[6] For similar reasons, any error in approving abandonment would be harmless and therefore would provide no basis for vacating or reversing the Confirmation Order.  *See* Fed. R. Bankr. P. 9005; Fed. R. Civ. P. 61.

would be inequitable." *In re Cont'l Airlines*, 91 F.3d 553, 558 (3d Cir. 1996) (en banc) (citation omitted). "Equitable mootness assures [a debtors'] stakeholders that a plan confirmation order is reliable and that they may make financial decisions based [thereon] without fear that an appellate court will wipe out or interfere with their deal." *Tribune*, 799 F.3d at 280. The inquiry has two steps: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *Id.* at 278.

"DTSC does not dispute that the Plan has been substantially consummated." Appellant's Am. Br. 62. As detailed above, all of the relevant property has been transferred, Exide's successors have assumed management of the businesses and other property, and the distributions have begun. 11 U.S.C. § 1101; *see also Cont'l Airlines*, 91 F.3d at 561. Therefore, the "foremost consideration" under the equitable mootness doctrine has been satisfied. *Cont'l Airlines*, 91 F.3d at 560.

Nonetheless, DTSC maintains that relief on appeal "would neither fatally scramble the plan nor significantly harm the interests of third parties who have justifiably relied on plan confirmation." Appellant's Am. Br. 62 (quoting *Tribune*, 799 F.3d at 278). But DTSC does not—and cannot—deny that unwinding the confirmation of the Plan would cause precisely those harms. Countless transactions have occurred in reliance on the Plan and this Court's order denying a stay pending appeal. *See supra* Statement of the Case, Section D. And even if this Court could somehow unwind all

those transactions, invalidating the Plan would undo the framework for the other contaminated non-performing properties nationwide, thus exacerbating the risk to the public and the environment.

Recognizing that this inevitable result is fatal to its appeal, DTSC pivots away from its original request that this Court completely vacate the Confirmation Order, *see* Appellant's Br., D.I. 36, at 55, and now asks the Court to grant "narrower relief" by holding that (a) "the Plan's improper releases and injunctions were too broad and must be narrowed or eliminated," and (b) "*Midlantic* requires additional funding to address the contamination at the Vernon Plant before abandonment," Appellant's Am. Br. 64. But this Court cannot pick and choose by altering just those aspects of the Plan while leaving everything else unchanged.  As this Court previously recognized in denying the stay, and as the Bankruptcy Court determined when confirming the Plan, the trust conditions and the third-party releases are a "sine qua non of the plan."  Oct. 22 Hr'g Tr. 74:11–13; Oct. 16 Hr'g Tr. 181:9–182:1.  Modifying those conditions and releases would fatally scramble the Plan, significantly harm third parties who have justifiably relied on the Confirmation Order, and cause the very same environmental harms that this Court sought to avoid in denying a stay.  Moreover, because there is no longer any possibility the Debtors will abandon the Vernon site, inflicting those harms now would be pointless.

1.    *Granting the Relief DTSC Seeks Would Fatally Scramble the Plan*

This Court cannot grant the relief DTSC requests without fatally scrambling the Plan. *First*, Appellees are unable to provide more funding for the Vernon site as a precondition to abandonment because abandonment is not going to happen, so that would be money for nothing—and Appellees do not have money to spare.   Although Appellees project to have adequate funds to satisfy allowed administrative, secured, and priority claims and wind-down expenses as required under the Plan, it is highly unlikely that Appellees will have any funds available after paying those expenses.   Rinaldi Decl. ¶¶ 8–10.   Thus, if Appellees were required to provide additional funding for the Vernon site, Appellees would need to divert funds that are reserved for administrative, secured, and priority creditors whose claims must be satisfied in full under the Plan and the Bankruptcy Code.   Reallocating those funds to keep them in reserve for the no-longer-existent possibility that the Vernon property might be abandoned would pointlessly leave Appellees unable to satisfy their obligations under the Plan to pay administrative, other secured, and priority claims, to the detriment of approximately 280 administrative, secured, and priority creditors who relied on such treatment in supporting or not opposing the Plan.   *Id.* ¶ 9.

Moreover, Appellees could not even reallocate funding in that way.   Appellees cannot simply take funds from their administrative, secured, and priority creditors and provide those funds to DTSC.   *In re Paragon Offshore plc*, 597 B.R. 748, 762 (D. Del. 2019) (holding that disgorgement would "violat[e] the absolute priority rule" and be

"inequitable and not practicable" because there was "no relief that could be layered onto the existing Plan consistent with governing law"); *In re Adelphia Commc'ns Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007) (finding "selective disgorgement from cherry-picked creditors as opposed to ordering disgorgement from all creditors . . . is inequitable").

DTSC asserts that this Court "could fashion a remedy that reallocates value from the Transferred Entities or Consenting Creditors to the satisfaction of environmental claims." Appellant's Am. Br. 64. But the Consenting Creditors had no obligation to put *any* money on the table. The Bankruptcy Court had no authority to force third-party creditors to make settlement payments over their objections. *See, e.g.*, *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) ("Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence."), *aff'd*, 988 F.2d 414 (3d Cir. 1992); *Adelphia Commc'ns*, 367 B.R. at 97 (relief requested "would rewrite the terms of the bargain, which is beyond the power of the Court"). Requiring the Consenting Creditors or Transferred Entities to make additional payments to DTSC would "circumvent the bankruptcy process and give [DTSC] by judicial fiat what it could not achieve by consensus within Chapter 11 proceedings." *Tribune*, 799 F.3d at 281.

Furthermore, the Consenting Creditors have not received any cash distributions under the Plan, and Appellees do not anticipate that they will have any cash left to make distributions to the Consenting Creditors after satisfying administrative, other secured, and priority claims. Rinaldi Decl. ¶ 8. Therefore, even if the entire Plan were unwound,

30

the Bankruptcy Court could not force the Consenting Creditors to disgorge distributions and give those funds to DTSC because the Consenting Creditors have not received any.  The Consenting Creditors acquired the Europe/ROW business based on their credit bid, thereby forgiving hundreds of millions of dollars of secured debt. Peluchiwski Stay Decl. ¶¶ 7–8.  Therefore, if the Europe/ROW sale was unwound, the Consenting Creditors would not be obligated to pay back any money to Appellees' estates.  Instead, Appellees would once again be liable for the debt that the Consenting Creditors previously forgave, putting Appellees back on the precipice of liquidation.

*Second*, narrowing or eliminating the releases and injunctions would upend the Global Settlement that was "a central issue in the formulation of a plan of reorganization."  *Tribune*, 799 F.3d at 280.  As this Court recognized, the third-party releases were a "sine qua non of the plan" that "ha[d] to happen for the plan to get together."  Oct. 22 Hr'g Tr. 74:11–13.  The Consenting Creditors' agreement to pay $12.5 million for the non-performing properties and general unsecured claims[7] was conditioned on receiving full releases from the beneficiaries.  Without that $12.5 million and the Consenting Creditors' credit bid for the Europe/ROW business, the Global Settlement and Plan would have fallen apart.

This Court cannot deprive the Consenting Creditors "of the benefits [they] bargained for without giving [them] a chance to reevaluate the concessions [they] made

---

[7] They later agreed to contribute an additional $6 million to settle the PBGC's claims.

to get them." *In re Crystal Oil Co.*, 854 F.2d 79, 81 (5th Cir. 1988).  Such relief "would amount to imposing a different plan of reorganization on the parties."  *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993).  Because rescinding the releases "would effectively undermine the [Global] Settlement (along with the transactions entered in reliance on it)," this Court would have to unwind the Global Settlement entirely and "recall the entire Plan for a redo."  *Tribune*, 799 F.3d at 281; *accord In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 142 (3d Cir. 2019) (allowing suits barred by settlement would "knock the props out from under the authorization for every transaction that has taken place, thus scrambling this substantially consummated plan and upsetting third parties' reliance on it").  That would require returning the eighteen non-performing properties back to Appellees' estates, returning $18.5 million in settlement payments to the Consenting Creditors and Transferred Entities, and nullifying the Europe/ROW sale that was consummated in reliance on the Plan.

By asking this Court to narrow or eliminate the third-party releases and injunctions without giving the released parties anything in return, DTSC seeks to have its cake and eat it too.  DTSC seeks to keep all of the benefits—having the Vernon Trust manage and remediate the Vernon property and the $2.6 million payment that the Consenting Creditors contributed—while stripping the Consenting Creditors of the consideration they received in return.  But it would be "inequitable to let [DTSC] retain the benefits of the settlement and still have the right to sue."  *See Millennium*, 945 F.3d at 144.

32

Quite simply, no partial remedy is available.  The Plan must stand or fall as a whole, and invalidating the Plan would leave Appellees with no choice but to pursue a chapter 7 liquidation.  *See, e.g., Adelphia Commc'ns*, 367 B.R. at 96 (dismissing appeal of chapter 11 liquidation plan where relief on appeal would "create an unmanageable, uncontrollable situation"); *In re Arcapita Bank B.S.C.(c)*, No. 13-CV-5755 (SAS), 2014 WL 46552, at *6 (S.D.N.Y. Jan. 6, 2014) (dismissing appeal where "Debtors' carefully negotiated Plan—while ultimately effecting a liquidation of the Debtors and the creation of indefinitely operating reorganized debtors—yielded greater benefits than a hypothetical chapter 7 liquidation"); *In re Spansion Inc.*, No. 10-CV-369 (RBK), 2011 WL 3420441, at *7–8 (D. Del. Aug. 4, 2011) (dismissing appeal because relief sought "would doubtless result in the need to negotiate a new plan").

Finally, DTSC's contention that "undoing the Plan here will not collapse a value-maximizing reorganization," Appellant's Am. Br. 63, is simply wrong.  As this Court previously recognized, the Plan involved "a combination" of a reorganization and a liquidation.  Oct. 22 Hr'g Tr. 77:6–8.  And as illustrated above, granting DTSC relief on appeal would require unwinding all of the transactions that occurred as part of that hybrid Plan.  Moreover, courts have consistently held that appeals from chapter 11 liquidation proceedings can become equitably moot.  *E.g., In re BGI, Inc.*, 772 F.3d 102, 107–09 & n.10 (2d Cir. 2014) (collecting cases); *Abengoa Bioenergy Biomass of Kan., LLC v. Kozel*, 958 F.3d 949, 956–57 (10th Cir. 2020) (same).  "In such a liquidation, affected parties may have devoted months of time and resources toward developing an

33

acceptable plan; creditors with urgent needs may have been stayed from accessing assets and funds to which they are entitled; and extensive judicial resources may have been consumed." *BGI, Inc.*, 772 F.3d at 108.  Such reliance interests weigh heavily against "tardy disruption of a duly developed, confirmed, and substantially consummated plan." *Id.* at 108–09.

> 2.   *Granting the Relief DTSC Seeks Would Significantly Harm the Public, the Environment, and Third Parties Who Have Justifiably Relied on Plan Confirmation*

This Court already has explained that merely delaying the Plan's implementation "has the potential to upset the global settlement affecting 16 other contaminated non-performing properties throughout the country" and to cause "substantial injury to other parties interested in the proceeding."  Oct. 22 Hr'g Tr. 79:3–5, 79:22–80:1.  Reversing confirmation would be worse.

First, invalidating the Global Settlement would have "serious negative financial, environmental, and real-world consequences" for environmental regulators and the public at large in eleven states and threaten "the public's health around the country."  DOJ Stay Br., D.I. 14, at 15.  The parties would be forced somehow to revert title and management of the non-performing properties back to Appellees' estates, return the settlement payments and financial assurances to the relevant payors, including amounts that have already been spent on work performed, and unwind the sales of non-performing properties that the environmental trustee has already negotiated and

executed with third-party buyers.  Simply put, there is no practical ability to unravel all of the transactions that have occurred since the Effective Date.

The environmental trustee already has completed extensive work and spent approximately $2.3 million since the non-performing properties were transferred.  *See supra* Statement of the Case, Section D.  All of that work would have to be put on hold because Appellees do not have the resources, workforce, and infrastructure to continue the work themselves.  Rinaldi Decl. ¶ 10.  And Appellees would not have access to the $26 million in financial assurances because those funds are only available for the benefit of DTSC.  Ceasing maintenance and remediation efforts would *increase* risks of environmental contamination and risks to public health and safety at those sites.  Puga Decl. ¶ 32.  The same public interests that DTSC claims to be defending thus would be imperiled if DTSC were to prevail on appeal.

To undo the Global Settlement, the Court also would need to force the parties to unwind all of the other transfers and transactions consummated in reliance on the Plan.  In the likely event that Appellees ended up in a chapter 7 liquidation, Appellees' unsecured creditors—including DTSC and the environmental regulators in other jurisdictions—would almost certainly receive no recovery at all.  Rinaldi Decl. ¶ 11; Messing Decl. ¶¶ 11, 14.  Environmental regulators would be forced to clean up the sites within their jurisdictions without *any* of the funding provided to the environmental trusts under the Global Settlement.  Rinaldi Decl. ¶ 11.  That would be manifestly unjust and contrary to the public interest.

Granting the relief DTSC seeks also would require this Court to unwind the Europe/ROW sale, which occurred in reliance on the confirmed Plan, causing instability in the reorganized Europe/ROW business.   Appellees commenced the chapter 11 cases, in part, to facilitate a going concern and value-maximizing sale of their Europe/ROW business, which was ultimately consummated following a court-approved, public, and transparent sale process.   Unwinding the Europe/ROW sale would undo those efforts and harm numerous third parties, including thousands of customers, vendors, and other counterparties who continue to transact with the company.   Any contract assigned to or assumed by the Europe/ROW Purchaser would also revert back to Appellees.   Messing Decl. ¶ 13.   That change would cause widespread operational confusion and likely result in a complete loss of confidence by customers, suppliers, and other counterparties.   *Id.*   In addition, invalidating the Plan would put at risk thousands of jobs preserved through the Europe/ROW sale.   *Id.*; *see In re Trans World Airlines, Inc.*, No. 01-CV-0056 (PJW), 2002 WL 500569, at *2 (D. Del. Mar. 26, 2002) (appeal requesting vacatur of plan confirmation order was equitably moot where it would affect the debtors' 20,000 employees and many customers).

Undoing the Europe/ROW sale also would cancel the significant amount of debt forgiveness that Appellees received in that deal.   *See supra* Statement of the Case, Section D.2.   If the Europe/ROW sale were unwound and Appellees were once again liable for the forgiven debt, the Consenting Creditors and other secured noteholders would have priority over distributions under any replacement plan, which would almost certainly

36

leave junior creditors, including the environmental regulators, with no recovery at all. Messing Decl. ¶ 14.

Finally, the Plan Administrator has been winding down Appellees' estates, selling assets, paying expenses, and making distributions.  *See* Statement of the Case, Section D.2.  Every one of those transactions would have to be unwound, and the transactional counterparties would be forced to divest cash payments and assets, rendering months of work futile and undoing numerous actions that Appellees' many stakeholders took in reliance on the Plan's confirmation.  Rinaldi Decl. ¶ 5; *see In re Allied Nev. Gold Corp.*, 565 B.R. 75, 86 (D. Del. 2016) (concluding that public policy favors leaving the consummated plan undisturbed "given the number of parties involved in the negotiation, approval, and substantial consummation of the amended plan"), *aff'd*, 725 F. App'x 144 (3d Cir. 2018).  This is a quintessential case for equitable mootness:  The Plan has been substantially consummated and there is no going back without causing significant harm to the Debtors, the parties, third parties, and the public— consequences which far outweigh any ongoing impact on DTSC.

### 3.    *DTSC Has Already Received Meaningful Appellate Review*

DTSC asserts that "dismissal would rubber stamp" a Plan that Appellees supposedly "ramm[ed]" through "without any meaningful opportunity for appellate review."  Appellant's Am. Br. 61.  Nonsense.  DTSC has already had full and fair opportunity to be heard—including via appellate review in this Court.  The Bankruptcy Court adjourned the confirmation hearing by three weeks to allow DTSC to conduct

discovery and file its confirmation objection. *See* Sept. 23 Hr'g Tr. 5:9–14, 30:3–6, 32:1–22. After a two-day confirmation hearing with live testimony from six witnesses, the Bankruptcy Court overruled DTSC's objection but stayed the Confirmation Order for a week to allow DTSC to request a stay pending appeal. Oct. 16 Hr'g Tr. 170:17–19, 185:4–7.

At the stay stage, this Court reviewed the briefing and the Bankruptcy Court's decisions, and heard oral argument, before denying DTSC's stay request, concluding that DTSC had failed to show that it was likely to succeed on appeal. Oct. 22 Hr'g Tr. 4:12–21, 80:18–21. This Court's prior ruling was no "rubber stamp." The Court carefully considered—and rejected—the arguments that DTSC now raises. It simply is untrue that the released parties and other third parties "could not justifiably rely on the Plan because they knew that DTSC had . . . promptly appealed." Appellant's Am. Br. 67. This Court denied DTSC's stay request and DTSC did not appeal that decision. Third parties justifiably relied on the finality of this Court's decision to deny the stay, which ensured that the confirmed Plan would be put fully into operation.

DTSC cannot succeed on appeal without fatally scrambling the Plan and causing significant harm to the public, the environment, and numerous third parties. This Court should dismiss DTSC's appeal as equitably moot.

## II.   THE BANKRUPTCY COURT PROPERLY CONFIRMED THE PLAN

If this Court reaches the merits of DTSC's appeal, it should affirm. DTSC's challenges to the possibility of abandonment and the third-party releases fail for the

same reasons that this Court identified in denying the request for a stay pending appeal. DTSC now asserts two additional theories it did not raise when seeking a stay: that the Plan was not proposed in good faith and that the Plan unfairly discriminates between creditors. But these new theories are equally meritless.

### A.   The Bankruptcy Court Properly Authorized Abandonment as One Possible Outcome

In addition to being moot, the Bankruptcy Court's decision to approve abandonment of the Vernon site was supported by careful reasoning and an overwhelming evidentiary record. Under 11 U.S.C. § 554, a bankruptcy court ordinarily can authorize the abandonment of property that is "burdensome to the estate." But the Supreme Court has crafted a "narrow" atextual exception to that power, concluding that a bankruptcy court cannot "authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 502, 507 & n.9 (1986); *see also* Oct. 22 Hr'g Tr. 70:19–71:3 (stay decision). That exception "does not encompass a speculative or indeterminate future violation of [health or safety] laws that may stem from abandonment." *Midlantic*, 474 U.S. at 507 n.9. It is only limited by "laws or regulations" that are "reasonably calculated to protect the public health or safety from *imminent and identifiable harm*." *Id.* (emphasis added). Thus, courts disallow abandonment only where *both* (i) the abandonment itself poses "an imminent and identifiable harm to the public health or safety" and (ii) the debtor is "attempting to abandon property in

contravention of state or local laws or regulations designed to protect the public." *In re Unidigital, Inc.*, 262 B.R. 283, 286–87 (Bankr. D. Del. 2001); *accord In re Smith-Douglass, Inc.*, 856 F.2d 12, 16 (4th Cir. 1988); *N.J. Dep't of Envtl. Prot. v. N. Am. Prods. Acquisition Corp.*, 137 B.R. 8, 12 (D.N.J. 1992).

A bankruptcy court's determination of whether there is an "imminent threat" is a case-specific factual inquiry reviewed for clear error. *See Smith-Douglass, Inc.*, 856 F.2d at 16. Here, there is no error, much less a clear error.

### 1. *The Record Showed that Abandonment Poses No Imminent Threat to Public Health and Safety*

This Court already has determined that the record amply supports the Bankruptcy Court's findings that the Plan did not pose an *imminent* threat of harm to public health and safety. *See* Oct. 16 Hr'g Tr. 175:16–24. As this Court explained, "[t]he bankruptcy court found that the resident engineer at the Vernon site credibly testified during his live direct and cross-examinations at the confirmation hearing that the site was secure and unlikely posed an imminent threat to the public." Oct. 22 Hr'g Tr. 71:4–9; *see* Oct. 16 Hr'g Tr. 176:5–7; Oct. 15 Hr'g Tr. 120:18–121:23, 126:21–127:5, 131:7–14, 133:12–134:13.

In denying the stay, this Court determined that the evidence "established that the contractors currently in place [were] able to continue their work, provided they [were] paid." Oct. 22 Hr'g Tr. 71:24–72:3; *see also* Suppl. Letter Ruling at 2. This conclusion was supported by testimony from the site's resident engineer, Mr. Fraske (an employee

40

of Alta Environmental), who testified that, if abandonment occurred, he would continue to maintain the site while the parties "worked something out." Oct. 15 Hr'g Tr. 132:13–133:10. And DTSC's own witness, Mr. Cope, testified that DTSC was already in communications with various vendors, including the operator of the FEU, about continuing work at Vernon, had obtained estimates from certain vendors, had conducted preliminary contract negotiations, and was "doing everything we can, 100 percent, everything that we can to protect [the people of California]." *Id.* at 182:11–184:3, 211:16–20.

This Court stressed that there was "approximately $29 million in immediately available funding," which would "pay for onsite or offsite remediation efforts" and enable the contractors to continue working. Oct. 22 Hr'g Tr. 72:3–12; *see also* Oct. 16 Hr'g Tr. 174:14–18. And as this Court pointed out, DTSC's own evidence showed that "completing the phase one closure" without removing buildings and installing a cover would "cost $27,325,298, less than the amount of funds that [were] available" to DTSC under the Plan. Oct. 22 Hr'g Tr. 72:13–19; *see also* Myers Decl., Ex. 1, ECF No. 917-9.

After carefully considering the evidence, this Court concluded that the Bankruptcy Court had not permitted Exide to "abandon a property in violation of [a] state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." Oct. 22 Hr'g Tr. 70:14–19. Rather, the Bankruptcy Court "fashioned a pre-abandonment condition that the debtors [could] not abandon the Vernon site prior to October 30, 2020, to ensure a smooth transition of remediation

41

oversight between the debtors and [DTSC]."  Oct. 22 Hr'g Tr. 71:9–14.  In short, the Bankruptcy Court followed *Midlantic* and only authorized abandonment as an alternative after formulating conditions to protect public health and safety.

Latching onto a passing comment in the Bankruptcy Court's ruling, DTSC argues that the court viewed *Midlantic* as a mere "gloss on abandonment."  Appellant's Am. Br. 24.  But the court made clear that it understood *Midlantic* is controlling law. Oct. 16 Hr'g Tr. 173:6–18 ("When the Supreme Court says something, that's what I follow."); *see also id.* at 174:5–9 ("I'm just relying on the plain meaning of what the Supreme Court said [in *Midlantic*], and ultimately, it's a factual inquiry as to whether the evidence applied to that Supreme Court standard is satisfied.").  At the stay stage, this Court found no error in the Bankruptcy Court's analysis, *see* Oct. 22 Hr'g Tr. 70:10– 73:7, and nothing has changed since then.

### 2.   *DTSC Cannot Show that the Bankruptcy Court Erred*

DTSC argues that "[a]llowing a debtor to abandon property because government agencies exist and will take action to address threats to public health and safety is contrary to the Supreme Court's clear directive," and "*Midlantic* requires additional funding to clean up the Vernon Plant before abandonment would be appropriate." Appellant's Am. Br. 6, 25.  As this Court recognized in denying the stay, DTSC is attacking a strawman.  The Bankruptcy Court did not authorize abandonment and simply leave DTSC to pick up the pieces with nothing more than $2.6 million.  DTSC fails to mention the ongoing efforts to maintain the site, the additional ***$26 million*** in

42

financial assurances available to DTSC, the two-week transition period, and DTSC's ability to avoid abandonment entirely by participating in the Vernon Trust. Oct. 16 Hr'g Tr. 179:2–7. The court only allowed abandonment as an alternative after finding no threat of "imminent and identifiable harm" to the public and "formulating conditions that will adequately protect the public's health and safety." *Midlantic*, 474 U.S. at 507 & n.9. And now, DTSC has selected the trust option, ensuring that the public health and safety is protected.

The Bankruptcy Court's conclusion that governments may sometimes have to step in where there is no identifiable imminent danger to the public is fully consistent with *Midlantic*. *Id.* at 507 n.9. As this Court acknowledged, DTSC's position—that abandonment is impermissible if it requires a government to take any action in response—would replace *Midlantic*'s narrow exception with a requirement that bankrupt parties assume "long-term obligations" and must eliminate all long-term risks before abandoning a property. Oct. 22 Hr'g Tr. 72:19–73:1. "This is not the standard set forth in *Midlantic*." *Id.* at 73:1–7.[8]

---

[8] DTSC notes that, "in *Midlantic* itself, the Supreme Court held that abandonment was improper even though state regulators expected to—and did—intervene upon abandonment." Appellant's Am. Br. 28. But the Supreme Court never indicated that abandonment was improper simply *because* state regulators had to step in. *See Midlantic*, 474 U.S. at 501–09 & n.9. Unlike in *Midlantic* where dangerous property was abruptly foisted on the state, the Plan here involved detailed protections to ensure a smooth, orderly, and safe transition supported by substantial long-term funding for maintenance and remediation if abandonment were to occur—and it never did.

43

Moreover, as explained above, the Plan did not put DTSC to a "Hobson's choice." Appellant's Am. Br. 4; *see supra* Section I.A. Even before the bankruptcy, Appellees had "no available money" to continue maintaining the non-performing properties. *See* Suppl. Letter Ruling at 1. Accordingly, Appellees emphasized from the outset of these cases that "abandonment of these environmental sites was something that was going to happen in the alternative if a deal couldn't be reached." Oct. 9 Hr'g Tr. 17:15–20. Appellees presented the same choice to all of the environmental regulators. Every other regulator chose to settle and avoid potential abandonment. But DTSC chose to reject settlement, forcing Appellees to put abandonment back on the table. As the Bankruptcy Court said to DTSC, "[o]f course they were going to abandon once you opted out of the agreement." *Id.* at 18:1–3.

After scrambling to save the Plan, DTSC was left with two lawful and valid choices, which were the best real-world options given the difficult circumstances and the risk of liquidation. *See supra* Section I.A. Both options were better than the status quo before confirmation because both provided $29 million to remediate the Vernon site and avoid any threat of harm to health or safety. Now, DTSC is complaining that it did not have a *third* option: transferring the Vernon property to the Vernon Trust with a larger voluntary contribution from the Consenting Creditors. But neither Appellees nor the Bankruptcy Court had any authority to compel the Consenting Creditors (who themselves had massive claims against Appellees' estates) to contribute more money for Vernon. *See supra* Section I.B.1.

44

3.  *DTSC Mischaracterizes the Undisputed Record Evidence*

DTSC is flat wrong to assert that "the undisputed record demonstrates that the Vernon Plant poses an imminent and identifiable harm to the public health and safety of surrounding communities."  Appellant's Am. Br. 21.  Mr. Fraske, the only witness with first-hand knowledge about the Vernon site, testified that "the Site is stable and secured, and nothing on the Site presents any imminent threat to public health and safety."  Fraske Decl. ¶ 17; *see also* Oct. 15 Hr'g Tr. 120:18–121:23, 126:21–127:5, 131:7–14, 133:12–134:13.  He further testified that the property would remain stable and secured "even if there were a several-week time gap between Exide's abandonment and the DTSC's takeover of closure operation oversight."  Fraske Decl. ¶ 17; *see also* Oct. 15 Hr'g Tr. 133:12–134:13.

As noted above, the Bankruptcy Court's analysis took into account the credibility of the witnesses.  Specifically, the Bankruptcy Court found that Mr. Fraske had credibly testified during his live direct and cross-examinations at the confirmation hearing that the site was secure and unlikely to pose an imminent threat to the public.  *See* Oct. 16 Hr'g Tr. 176:5–7; Oct. 15 Hr'g Tr. 120:18–121:23, 126:21–127:5, 131:7–14, 133:12–134:13.  By contrast, the Bankruptcy Court found that the testimony DTSC offered on the issue was "not . . . particularly persuasive" because DTSC's principal witness, Mr.

45

Cope, was "evasive" and "doesn't have any real insight" into "the actual facts on the ground."  Oct. 16 Hr'g Tr. 176:12–19.[9]

DTSC notes that Dr. Solomon testified that "even low levels of lead exposure have serious health effects," and argues that "the lead at present levels at the site poses major health risks."  Appellant's Am. Br. 31.  But that ignores that the lead at the site is contained, maintained, and managed.  *Midlantic* does not impose "a *per se* principle" that "any detectable amount of . . . contamination, no matter its intensity, . . . poses an imminent threat to public health and safety."  *In re Guterl Special Steel Corp.*, 316 B.R. 843, 858–59 (Bankr. W.D. Pa. 2004) (permitting abandonment of site containing radioactive waste).  If that were the rule, "virtually every site in our environment would pose an imminent threat to public health and safety."  *Id.*  The Bankruptcy Court acknowledged that "the Vernon site is dangerous and exposure to lead is highly dangerous," but found that abandonment as proposed under the Plan would not pose an imminent threat of public harm because "[t]he evidence overwhelmingly established that the site is constantly monitored, and the dangerous polluted areas are contained."  Suppl. Letter Ruling at 2.  Those findings were consistent with *Midlantic* and the record, and again, this Court did not disturb them at the stay stage.

---

[9] During cross examination, Mr. Cope testified that, despite its authority to do so, DTSC *took no action whatsoever* to come on site and address the levels of lead dust that it has claimed since July 3, 2020, pose an "immediate" threat to public health.  *See* Oct. 15 Hr'g Tr. 206:19–207:13.  This is tell-tale evidence that DTSC itself did not actually believe the existing state of the site posed any imminent threat to public safety.

Finally, DTSC asks this Court to second-guess the Bankruptcy Court's factual findings that "the polluted areas are contained" and that "areas outside the FEU are safe." Appellant's Am. Br. 32–35. As this Court already explained, however, "[t]he evidence presented at the confirmation hearing supports the bankruptcy court's determinations . . . that the Vernon site is constantly monitored and that dangerous polluted areas are contained." Oct. 22 Hr'g Tr. 71:17–23. DTSC points out that Mr. Fraske testified that the FEU needs to be reinforced regularly, there are sometimes tears in the FEU that need repair, and surface dust has to be sprayed down. Appellant's Am. Br. 33–34.[10] But the Bankruptcy Court weighed that testimony against all of the other record evidence and ultimately found that the lead was fully contained. Mr. Fraske also testified that the portions of the site with high lead levels were "fully secured," on-site contractors "maintained and inspected" the FEU "daily," DTSC's own inspectors did not wear respirators outside the FEU, and daily perimeter air samples had not shown lead above permissible levels since closure activities commenced in 2017, even when there were tears in the FEU that required repair. Fraske Decl. ¶¶ 11–13, 15, 17; Oct. 15 Hr'g Tr. 120:4–134:13.

---

[10] DTSC also mischaracterizes the record by stating that "[u]ndisputed evidence established that dust collected from seven locations at the Vernon Plant—*outside the FEU*—showed" elevated lead levels. Appellant's Am. Br. 34. In fact, Mr. Fraske testified that DTSC took the samples DTSC cites from "interior locations" that were "contained," and explained that he was with the sampling crew inside the FEU when they collected the samples. Oct. 15 Hr'g Tr. 152:18–153:4, 154:4–18, 166:17–167:3.

47

DTSC cannot overcome the Bankruptcy Court's detailed findings, including with respect to the credibility of the witnesses, and the vast evidentiary record showing a lack of imminent threat to public health or safety. Those determinations were correct, and certainly not clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). And regardless, any error would be harmless because DTSC no longer faces any risk of abandonment.

### B.   The Bankruptcy Court Properly Approved Third-Party Releases and an Injunction

DTSC also takes issue with three Plan provisions that are central to the Global Settlement and implementing the Plan:   (A) the non-consensual third-party releases; (B) the releases granted by the Debtors in Section 10.5 of the Plan (the "Debtor Release"); and (C) the injunction provisions in Section 10.3 of the Plan. "Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *In re Wash. Mut., Inc.*, 442 B.R. 314, 345 (Bankr. D. Del. 2011). Courts review the approval of releases and injunctions for clear error. *See In re Cont'l Airlines*, 203 F.3d 203, 217 (3d Cir. 2000) (conducting detailed case-specific factual inquiry); *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (en banc) (same).

As an initial matter, Appellees must correct DTSC's mischaracterizations of the releases at issue. First, the non-consensual third-party releases that bar DTSC from bringing suit only protect the Consenting Creditors and a small subset of their related

48

parties (*i.e.*, the Transferred Entities, the Europe/ROW Purchaser, and the indenture trustee for the notes).  Plan § 10.6(f).[11]  These parties made various contributions to enable DTSC to benefit from the Plan and the Vernon Trust, including contributing $18.5 million in settlements, consenting to the use of cash collateral and debtor-in-possession financing, purchasing the Europe/ROW business and canceling debt in connection therewith, waiving deficiency claims, and releasing liens on the Appellees' non-performing properties.  *See* Confirmation Order ¶ I(iii)–(iv).

Second, the Debtor Release only applies to estate claims *held by the Debtors*, not direct claims held by DTSC or claims against the Debtors.  Plan § 10.5.  DTSC attempts to confuse this Court by suggesting that the Debtor Release somehow prevents DTSC from "pursu[ing] environmental claims against the Released Parties."  Appellant's Am. Br. 47.  That is untrue.  The Debtor Release applies to a broader group of released parties than the third-party release, but it does not prevent DTSC from bringing whatever direct claims it may have against those additional parties.

    1.    *The Bankruptcy Court Properly Approved the Limited Third-Party Releases in Exchange for the Settlement Payments and Other Contributions*

When considering whether to grant non-consensual releases, courts in this Circuit must assess "fairness, necessity to the reorganization, and specific factual

---

[11]  In fact, DTSC released a smaller group of parties than the other governmental regulators, who also provided covenants not to sue Appellees, their related parties, and a broader group of the Consenting Creditors' related parties.

49

findings to support these conclusions." *Cont'l Airlines*, 203 F.3d at 214.  Courts in this

District have looked to whether:

> (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors received reasonable compensation in exchange for the release.

*In re Spansion*, 426 B.R. 114, 144 (Bankr. D. Del. 2010).

This Court previously recognized that "[t]he record supports the finding that

consenting creditors and transferred entities who will benefit from the plan releases

have made or will make critical and substantial contributions to the plan."  Oct. 22 Hr'g

Tr. 75:6–76:1, 77:9–16 (listing released parties' contributions); *see also supra* Statement of

the Case, Section B.  DTSC and other environmental regulators received considerable

compensation from the released parties to promote the safe and orderly transition of

contaminated sites.  *See* Confirmation Order ¶ I(iv).  The non-consensual third-party

releases were the consideration that DTSC provided in exchange for the benefit of the

settlement payments and other contributions.

DTSC has no answer.  DTSC acknowledges that the settlement payments were

"consideration" for the third-party releases, but dismisses the payments as

"inadequate."  Appellant's Am. Br. 42.  As this Court explained, however, "[t]he mere

fact that [DTSC] believes the consideration too low . . . does not meet the exacting

standard for reversing the bankruptcy court's finding of fact on the clear error

standard." Oct. 22 Hr'g Tr. 76:3–7; *see also Anderson*, 470 U.S. at 573–74. Simply put, $12.5 million was the amount that the five mediators—including four former federal judges—recommended and that the parties agreed to in the Global Settlement. *See* Messing Confirmation Decl. ¶ 23; Clarification to Mediators' Final Certificate ¶ 4, ECF No. 636. DTSC's own representatives also initially agreed, before the Governor's Office did an about-face. *See* DOJ Global Settlement Support Notice ¶¶ 14–15.

DTSC asserts that this was not an "extraordinary case." Appellant's Am. Br. 44. But the Bankruptcy Court found that this case was "really . . . unprecedented" because of the complex environmental issues and the limited financial resources available for remediation. *See* Oct. 16 Hr'g Tr. 181:9–17 (crediting Mr. Tenenbaum's analysis of why this case was extraordinary); *see also id.* 120:20–121:4 (Mr. Tenenbaum explaining that "in my 32 years at the Department of Justice, this is about the most unusual circumstance I've ever encountered"). DTSC cannot show that this factual finding was clearly erroneous.

DTSC further contends that "non-consensual third-party releases are, by definition, not necessary for reorganization" when there is a liquidation. Appellant's Am. Br. 41. But this Court has (correctly) explained that "a traditional reorganization of a going-concern business is not a mandatory precondition for non-consensual releases. Chapter 11 liquidation plans also qualify for such relief." Oct. 22 Hr'g Tr. 76:13–19; *see also e.g.*, *In re Medford Crossings N., LLC*, No. 07-CV-25115, 2011 WL 182815, at *18 (Bankr. D.N.J. Jan. 20, 2011) (rejecting argument that a liquidating plan

is *per se* ineligible for third-party releases and injunctions); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) (similar).   Moreover, as this Court previously emphasized, "this case did not involve [a] Chapter 7 liquidation."   Oct. 22 Hr'g Tr. 77:4–5.   The Plan involved "a combination" of a reorganization through the Europe/ROW sale and the transfers of the non-performing properties to environmental trusts and a liquidation of Appellees' remaining assets.   *Id.* at 77:5–8; *see also* Oct. 16 Hr'g Tr. 169:3–12.   The released parties' contributions (and the third-party releases) were necessary to that hybrid process.

Lastly, DTSC's argument that Appellees' investigation "did not include environmental claims," Appellant's Am. Br. 45 (emphasis omitted), is a red herring. Appellees had no obligation to investigate claims that third parties might have against other third parties, and DTSC has pointed to no authority suggesting otherwise.   If DTSC wanted to know what claims it might have against the released parties, it could have investigated itself.   DTSC received thousands of documents from Appellees and the Consenting Creditors and access to Appellees' personnel to investigate its claims against the released parties.   Yet, to this day, DTSC has never identified any such claims. Notably, DTSC has identified claims against other third parties it alleges are liable for the contamination at the Vernon property, and brought a case against them in December 2020.   *See* Complaint, *Cal. Dep't of Toxic Substances Control v. NL Indus., Inc.*, No. 2:20-CV-11293 (C.D. Cal. Dec. 14, 2020).

52

In any event, DTSC has no plausible claims against the limited set of parties who received the third-party releases.  Most state and federal environmental laws impose liability for environmental contamination on (1) the party that caused the contamination, (2) the current owner or operator, or (3) the owner or operator at the time the contamination occurred.  *See, e.g.*, 42 U.S.C. § 9607(a); Cal. Health & Safety Code § 25323.5.  The Consenting Creditors and Transferred Entities do not fall into any of those categories.  Federal law also includes a specific exemption that shields lenders from liability for contamination on real property collateral, provided that the lender does not "participat[e] in the management" of the facility.   42 U.S.C. § 9601(20)(F), (20)(G)(ii).  No evidence showed that any of the Consenting Creditors participated in the management of Appellees' facilities.  Furthermore, a shareholder can only be held liable for the corporation's acts where the shareholder exercises so much control over the corporation that the "subsidiary is in fact a mere instrumentality or alter ego of its owner."  *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992). Again, there was no evidence that would warrant veil piercing.

As this Court previously recognized, the Bankruptcy Court did not clearly err in finding that the non-consensual third-party releases were fair and necessary:  They were a critical condition to secure funding for maintenance of the site, and DTSC gave up little or nothing in return.

53

2.     *The Debtor Release Was a Critical Component of the Plan*

Under Bankruptcy Code § 1123(b)(3)(A), a debtor acting as debtor-in-possession may release its own claims against third parties "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *Spansion*, 426 B.R. at 143.[12] Such a debtor release is appropriate where, as here, a debtor concludes in its business judgment that any claims it might have against third parties are only marginally viable and unlikely to have significant value.  *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (approving release by debtor of potential claims because the claims were "of only marginal viability" and not worth pursuing).

The Bankruptcy Court found that the Debtor Release was "an essential component of the Plan and appropriate" because, among other things, (i) an independent subcommittee investigated potential claims and "properly concluded that the Debtor Release is appropriate and supported by adequate consideration provided by the Consenting Creditors and the Transferred Entities," (ii) no "party in interest, other than the California DTSC, has opposed the Debtor Release," (iii) the Debtor Release was "integral to the agreements among the various parties in interest," and (iv) "the failure to implement the Debtor Release would seriously jeopardize the

---

[12] When evaluating a debtor's release of claims, bankruptcy courts in this District sometimes consider the factors listed in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).  These factors, however, "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *Wash. Mut.*, 442 B.R. at 346.

Debtors' ability to confirm and implement the Plan, including consummation of the Global Settlement."  Confirmation Order ¶ I(i).

DTSC asks this Court to reweigh the record evidence, but review on appeal is limited to determining whether those findings were clearly erroneous.  *See Anderson*, 470 U.S. at 573–74.  Moreover, undisputed evidence shows that the Debtor Release was a valid exercise of Appellees' business judgment.  An independent subcommittee of the board oversaw a nearly four-month investigation into the Debtors' potential claims against third parties.  Tepner Decl. ¶ 10, ECF No. 946.  The creditors' committee also conducted its own investigation.  *Id.* ¶ 12.  After their investigations, neither the subcommittee nor the creditors' committee identified any valuable, colorable claims.  *Id.* ¶¶ 15–16.  The subcommittee also considered the significant value that the Debtors would receive under the Global Settlement and, against that backdrop, concluded that the Debtor Release was appropriate and fair.  *Id.* ¶¶ 18–19.

Applying the *Zenith* factors, the evidence amply demonstrates that the Debtor Release was fair, reasonable, and in the best interests of the estate.  *See Zenith*, 241 B.R. at 110.  First, Appellees and the released parties shared an identity of interest because they shared a common goal of "seeing that the Plan succeed."  *Id.*  Second, the released parties made substantial contributions throughout the chapter 11 cases.  As this Court already explained, "the debtors were able to keep their businesses running, effectuating an orderly sale of those businesses as a going concern, avoiding shutting down facilities and ultimately sav[ing] thousands of jobs," because of the released parties'

55

contributions.  Oct. 22 Hr'g Tr. 75:6–76:1, 77:9–16.  Third, the Debtor Release was essential to the Plan's success.  The released parties were willing to make substantial contributions to the Plan only in exchange for the releases; without them, the Plan would have fallen apart.  Fourth, an overwhelming majority of Appellees' creditors supported the Plan and releases.  All creditors had the opportunity to object to the Plan and the releases, yet DTSC was the ***only*** creditor to do so.  Confirmation Order ¶ I(i).  The Bankruptcy Court did not clearly err in crediting this evidence.

### 3.    *The Injunction Was Necessary to Effectuate the Releases*

DTSC's arguments about the suit injunction in Section 10.3 of the Plan—a standard provision enjoining the parties from commencing litigation against the released parties with respect to claims or causes of action addressed by the Plan—also lack merit.  The injunction simply implements the release and exculpation provisions by preventing parties from bringing claims that have already been released.  *See* Plan § 10.3.  The injunction also permits parties to return to the Bankruptcy Court and seek permission to pursue claims that might otherwise be barred by the Plan.  *Id.* (enjoining suits "[e]xcept as expressly provided in . . . a separate order of the Bankruptcy Court").

Without this injunction, DTSC or some other third party could circumvent the releases and the carefully crafted and extensively negotiated structure of the Plan more broadly:  DTSC could still initiate a meritless lawsuit against the released parties and force them to incur the expenses of defending themselves until the action could be dismissed.  Appellees' creditors were unwilling to provide so much—purchase the

Europe/ROW business, allow Appellees to access cash collateral and debtor-in-possession financing, and contribute $18.5 million—without knowing that they would not later be sued. *See* Confirmation Order ¶ I(iii)–(iv). Accordingly, the injunction provision was necessary to the Plan and provided fair protection in exchange for significant contributions by the released parties.

### C.   The Bankruptcy Court Properly Found that Appellees Proposed the Plan in Good Faith

DTSC now argues that the Plan was not confirmable because Appellees did not propose it in "good faith" as required by the Code. *See* 11 U.S.C. §1129(a)(3). DTSC did not even raise that argument at the stay stage, and it is plainly baseless. The good-faith determination is "a factual inquiry into a totality of the circumstances surrounding the plan's proposal," and "bankruptcy courts are in the best position to ascertain the good faith of the parties' proposals." *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729 F.3d 332 (3d Cir. 2013). "[D]eterminations of fact pertaining to good faith are reviewed for clear error." *PWS Holding*, 228 F.3d at 242.

The Bankruptcy Court found that the Plan had been "proposed in good faith" and was "the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies." Confirmation Order ¶ F, ECF No. 998. The Global Settlement was premised on the proposal of five court-appointed mediators and the product of months of arm's length negotiations. *See* Mediators' Final

Certificate, ECF Nos. 622, 636. The Plan and Global Settlement were accepted by every single major constituency, including the creditors' committee, ten state environmental regulators, and the U.S. government—fully consistent with the objectives of chapter 11. *See* DOJ Global Settlement Support Notice ¶ 1. Even DTSC participated throughout the mediation process, agreed to recommend the settlement to those with authority, and participated in drafting the settlement documents—until just ten days before the original confirmation hearing date. Confirmation Mem. ¶¶ 18, 21, 22, 50, 140.

Citing no record evidence, DTSC asserts that Appellees "engineered" a Plan "to force DTSC to accept the very settlement it rejected" and "ramm[ed] an unlawful Plan through the confirmation process." Appellant's Am. Br. 38, 61. Quite the opposite. DTSC overlooks the entire Plan process—all consensual—leading up to its unilateral decision to pull out of the Plan it had negotiated and recommended. And even after that last-minute about-face, Appellees and the other governmental agencies quickly adjusted to avert the looming risk of a chapter 7 liquidation. The salvaged Plan allowed DTSC to receive the same settlement payment it would have received under the initial plan, provided that the Bankruptcy Court approved the consideration for the settlement payment (*i.e.*, the third-party releases). DTSC's contention that this structure was meant "to force DTSC to accept (or at least not contest) the Non-Consensual Releases," Appellant's Am. Br. 38, is belied by the record. The third parties were unwilling to

make settlement payments to DTSC unless they received some assurance that DTSC would not sue them afterwards.  It's as simple as that.

DTSC was also given a full and fair opportunity to be heard.  As noted above, the Bankruptcy Court delayed the confirmation hearing by three weeks to allow DTSC to take discovery.  Sept. 23 Hr'g Tr. 5:9–14, 30:3–6, 32:1–22.  Appellees produced approximately 20,000 documents and made all witnesses available for deposition as noticed, all on an expedited basis.  *See* Oct. 9 Hr'g Tr. 3:21–5:17; 10:13–11:4.  The court then held a two-day hearing, with a full day of live testimony from six witnesses and a second day devoted to oral argument.  DTSC thereafter obtained review in this Court, which considered but denied DTSC's motion for a stay.

DTSC's contention that the Plan conditioned DTSC's treatment on "a condition outside DTSC's control"—the Bankruptcy Court's approval of the Non-Consensual Releases—is irrelevant.  Appellant's Am. Br. 38.  By definition, non-consensual third-party releases are always outside a non-consenting party's control.  But the Third Circuit has instructed that non-consensual third-party releases are permissible when they are "integral to the restructuring" and fair, as here.  *Millennium*, 945 F.3d at 137–40.  Ample evidence supports the Bankruptcy Court's findings on good faith.

### D.    The Bankruptcy Court Properly Found that the Plan Does Not Unfairly Discriminate

The Bankruptcy Court also was correct in concluding that the Plan "provide[s] the same treatment for each claim or interest of a particular class."  11 U.S.C.

§ 1123(a)(4). The Plan offered the same opportunity to all holders of Class 8 claims: accept the Global Settlement or reject it and face the prospect of abandonment. That is sufficient under § 1123(a)(4). "[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). "What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id.* Accordingly, "[p]roviding different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4)." *Wash. Mut.*, 442 B.R. at 355–56; *accord In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("[T]he fact that some claimants have settled while others have not does not, by itself, indicate unequal treatment.").

DTSC argues that it "will not receive equal treatment from the Global Settlement Payments allocated to Class 8 because the distributions will not be pro rata among all Class 8 members." Appellant's Am. Br. 55. It is true that "creditors of equal priority should receive pro rata shares of *the debtor's property*" under the Bankruptcy Code. *Begier v. IRS*, 496 U.S. 53, 58 (1990) (emphasis added). But here, the $10 million payments transferred to the environmental trusts were not "the debtors' property." They were settlement payments (or in the case of the Vernon property, a substantial contribution) by the Consenting Creditors and Transferred Entities. Nothing in the Bankruptcy Code requires a *third party* to make settlement payments or provide substantial contributions to similarly situated creditors in equal or pro-rated amounts.

60

More importantly, the proposed allocation was fair and not discriminatory. Numerous factors were relevant to determining the value of DTSC's claim, including the $26 million in financial assurances that the Vernon property received, which exceeded the financial assurances available for all the other properties combined. DOJ Global Settlement Support Notice ¶¶ 17, 46. Recognizing these complexities, the environmental regulators, including DTSC, devised a method of allocating the $10 million settlement payment that would better account for the multitude of factors involved. Debtors' Confirmation Mem. ¶¶ 21, 201; *see* DOJ Global Settlement Support Notice ¶ 34. For each of the non-performing properties, the allocation took into account: (1) the estimated total cleanup costs; (2) the availability of financial assurances; (3) the estimated value of the property after cleanup; and (4) the degree of litigation risk for the property under *Midlantic*. Oct. 16 Hr'g Tr. 107:22–108:18.[13]

Finally, contrary to DTSC's assertions, the releases' applicability to all California regulatory agencies with authority to enforce environmental laws, as opposed to just DTSC, does not make them unequal. The whole point of that provision was to ensure that the releases were equal in effect. In California, unlike other states involved,

---

[13] DTSC relies on Mr. Cope's testimony to assert that its claim is "worth in excess of $100 million." Appellant's Am. Br. 43. But the Bankruptcy Court found that Mr. Cope "doesn't have any real insight" into "the actual facts on the ground." Oct. 16 Hr'g Tr. 176:12–19. And because the other regulators did not even file their claims until after confirmation, the record on appeal does not include any credible evidence about the size of DTSC's claim relative to other members of its class.

environmental authority is dispersed across multiple state agencies.  Moreover, every other state regulator—except DTSC—represented that it is "the primary state governmental agency in its state with responsibility for enforcing Environmental Laws applicable to the Non-Performing Properties located within its jurisdiction."  Plan § 5.2(j)(v).  Therefore, if the releases applied only to DTSC, then their effect would be *narrower* in California because any other California agency could bring the very actions that the releases were meant to prohibit.  The equal treatment in fact (rather than just in name) readily satisfies the Bankruptcy Code, which "does not require precise equality, only approximate equality."  *W.R. Grace*, 729 F.3d at 327.  The Bankruptcy Court properly acknowledged this reality when it approved the Plan, and there is no basis for disturbing that finding on appeal.

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss DTSC's appeal or, at a minimum, affirm the Bankruptcy Court's order confirming the Plan.

RLF1 24677079v.1

Dated:  January 22, 2021
         Wilmington, Delaware

/s/ Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Paul R. Genender (admitted *pro hac vice*)
Jared R. Friedmann (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Zachary D. Tripp (*pro hac vice* pending)
Aaron J. Curtis (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Appellees*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 8015(h) of the Federal Rules of Bankruptcy Procedure, the undersigned hereby certifies that:

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) as modified by the *Order* granting the *Appellant's Unopposed Motion for Leave to File Briefs Containing Words Exceeding the Limits Enumerated in Rule 8015 of the Federal Rules of Bankruptcy Procedure, With Respect to Appeal From Bankruptcy Court Order Confirming Debtors' Plan of Reorganization*, D.I. 43 & 44, because the brief contains 15,300 words as determined by the word-count function of Microsoft Word, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.


Dated:  January 22, 2021

*/s/ Zachary I. Shapiro*
Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701