## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EXIDE HOLDINGS, INC., *et al.*,<br><br>        Debtors.[1] | Chapter 11<br><br>Case No. 20-11157 (CSS)<br><br>Jointly Administered |
| CALIFORNIA DEPARTMENT OF<br>TOXIC SUBSTANCES CONTROL,<br><br>        Appellant,<br><br> v.<br><br>EXIDE HOLDINGS, INC., *et al.*,<br><br>        Appellees. | On Appeal from the U.S.<br>Bankruptcy Court for the<br>District of Delaware<br><br>Civil Action No.<br>1:20-cv-01402-RGA |

---

### APPELLANT'S REPLY BRIEF
### IN SUPPORT OF APPEAL FROM BANKRUPTCY COURT
### ORDER CONFIRMING DEBTORS' PLAN OF REORGANIZATION

---

**O'MELVENY & MYERS LLP**
Nancy A. Mitchell
Matthew L. Hinker (No. 5348)
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
Email: nmitchell@omm.com
   mhinker@omm.com

**CHIPMAN BROWN CICERO & COLE, LLP**
Paul D. Brown (No. 3903)
Gregory E. Stuhlman (No. 4765)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: brown@chipmanbrown.com
   stuhlman@chipmanbrown.com

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are Exide Holdings, Inc. (5504), Exide Technologies, LLC (2730), Exide Delaware LLC (9341), Dixie Metals Company (0199), and Refined Metals Corporation (9311). The Debtors' mailing address is 13000 Deerfield Parkway, Building 200, Milton, Georgia 30004.

**O'MELVENY & MYERS LLP**
Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Tel:     (202) 383-5300
Fax:     (202) 383-5414
Email:  pfriedman@omm.com

**CALIFORNIA DEPARTMENT OF
JUSTICE OFFICE OF THE
ATTORNEY GENERAL**
Xavier Becerra
ATTORNEY GENERAL OF CALIFORNIA
David Zonana
SENIOR ASSISTANT ATTORNEY GENERAL

Anthony A. Austin
DEPUTY ATTORNEY GENERAL
1300 I Street, Suite 125
Sacramento, CA 95814
Tel:     (916) 210-7245
Email:  anthony.austin@doj.ca.gov

*Counsel to Appellant*
*California Department of Toxic Substances Control*

February 26, 2020

ii

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ...................................................................................................... 5

    I.    THE BANKRUPTCY COURT ERRED IN AUTHORIZING
        THE VERNON PLANT'S ABANDONMENT. ................................. 5

        A.    DTSC's Challenge to the Bankruptcy Court's
               Abandonment Determination Is Not Constitutionally
               Moot. ....................................................................................... 5

        B.    The Bankruptcy Court Misapplied the Legal Standard
               under *Midlantic*. .................................................................... 8

        C.    The Bankruptcy Court's Factual Findings on
               Abandonment Were Clearly Erroneous. ................................. 12

    II.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT
        THE PLAN WAS PROPOSED IN GOOD FAITH. ......................... 15

    III.    THE BANKRUPTCY COURT ERRED BY APPROVING
        OVERBROAD RELEASE AND INJUNCTION
        PROVISIONS. ................................................................................. 17

        A.    The Bankruptcy Court Inappropriately Approved Non-
               Consensual Releases. ............................................................. 17

        B.    The Bankruptcy Court Erred in Approving Overly Broad
               Exide Releases. ...................................................................... 21

        C.    The Bankruptcy Court Erred in Approving the Plan's
               Injunction Provisions, Which Are Overly Broad and
               Impermissibly Operate as a Discharge of Exide and Third
               Parties. ................................................................................... 25

    IV.    THE PLAN FAILS TO PROVIDE THE SAME TREATMENT
        FOR EACH CLAIM OR INTEREST WITHIN A
        PARTICULAR CLASS IN VIOLATION OF BANKRUPTCY
        CODE SECTION 1123(a)(4). ........................................................ 25

    V.    THIS APPEAL IS NOT EQUITABLY MOOT. ............................. 28

        A.    Equitable Mootness Should Not Be Applied Where
               Critical Public Safety and Health Issues Are at Stake. ............ 28

**TABLE OF CONTENTS**
**(continued)**

Page

B.      Exide and EPA Cannot Overcome the Strong
        Presumption Against Applying Equitable Mootness in
        this Case. ................................................................................29

        1.      The Relief Sought Would Not "Fatally Scramble"
                the Plan. ........................................................................29

        2.      The Relief Sought Would Not Harm Third Parties
                Who Justifiably Relied on the Confirmation Order. .....32

CONCLUSION ..........................................................................................33

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Already, LLC. v. Nike, Inc.*,
   568 U.S. 85 (2013)................................................................5

*Beem v. Ferguson (In re Ferguson)*,
   683 Fed.Appx. 924 (11th Cir. 2017)...............................................6, 8

*Berg Chilling Sys., Inc. v. Hull Corp.*,
   369 F.3d 745 (3d Cir. 2004)......................................................23

*Guerrero-Lasprilla v. Barr*,
   140 S.Ct. 1062 (2020)...........................................................11

*In re Cont'l Airlines*,
   203 F.3d 203 (3d Cir. 2000)...................................................20, 32

*In re HomeBanc Mortgage Corp.*,
   945 F.3d 801 (3d Cir. 2019).....................................................21

*In re Medford Crossings N., LLC*,
   Case No. 07-25115, 2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011)................19

*In re Nickels Midway Pier, LLC*,
   Case No. 03-49462, 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010).............19

*In re One2One Commc'ns, LLC*,
   805 F.3d 428 (3d Cir. 2015).....................................................34

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)...................................................26, 32

*In re Semcrude, L.P.*,
   728 F.3d 314 (3d Cir. 2013)...................................................30, 33

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010).............................................26

*In re Tribune Media Co.*,
   799 F.3d 272 (3d Cir. 2015).....................................................31

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re U.S. Fidelis, Inc.*,
    481 B.R. 503 (Bankr. E.D. Mo. 2012)........................................................19, 20

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013)........................................................27, 28

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012)........................................................5

*Maytag Corp. v. Navistar Intern. Transp. Corp.*,
    219 F.3d 587 (7th Cir. 2000) ........................................................34

*Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*,
    474 U.S. 494 (1986)........................................................1, 10

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
    139 S.Ct. 1652 (2019)........................................................5, 6, 7

*Nordhoff Inv., Inc. v. Zenith Elecs. Corp.*,
    258 F.3d 180 (3d Cir. 2001)........................................................35

*United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*,
    315 F.3d 217 (3d Cir. 2003)........................................................32

## Statutes

11 U.S.C. § 1129(a)(7)........................................................22

2016 Cal. Stat. Ch. 10 (AB 118)........................................................21

2019 Cal. Stat. Ch. 23 (Budget Act of 2019) ........................................................21

2020 Cal. Stat. Ch. 6 (Budget Act of 2020)........................................................21

## Treatises

13B Wright & Miller § 3533.2.2 ........................................................7

vi

Appellant California Department of Toxic Substances Control ("DTSC") respectfully submits this reply brief in response to the opposition briefs filed by Exide [D.I. 54] (the "Exide Brief") and the United States of America, on behalf of the Environmental Protection Agency ("EPA") [D.I. 59] (the "EPA Brief"), in further support of *Appellant's Amended Brief in Support of Appeal from Bankruptcy Court Order Confirming Debtors' Plan of Reorganization* [D.I. 45] (the "DTSC Brief").[1]

## PRELIMINARY STATEMENT

As DTSC previously established, the Bankruptcy Court improperly confirmed a chapter 11 plan that permitted Exide to abandon the Vernon Plant.  That error rested on the fact that, even though the Vernon Plant presented an imminent and identifiable public health risk, DTSC was prepared to step in to prevent the risk from ripening into actual human harm.  Accordingly, the Bankruptcy Court found—and neither Exide nor EPA refute—that whenever a government exists to backstop a debtor's environmental destruction, the debtor has no further obligations to ensure that its abandoned properties no longer pose an imminent risk of harm to the public. That holding is inconsistent with the Supreme Court's decision in *Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

---

[1] Capitalized terms not otherwise defined herein have the meaning given to them in the DTSC Brief.  Unless otherwise noted, all internal citations, quotations, and alternations are omitted.

As explained in DTSC's opening brief, the uncontroverted evidence showed that $73.7 million is required to avoid the imminent and identifiable health risks associated with lead contamination at the Vernon Plant.   However, Exide was authorized to abandon the Vernon Plant without providing anywhere near that amount.  Appellees' briefs do not meaningfully dispute this, instead arguing that the Bankruptcy Court's limited conditions to abandonment—namely, $29 million in funding and a two-week extension of Exide's contractual obligations with a critical vendor to transition the site to the Vernon Trust—were sufficient to protect public health and safety.  But the Bankruptcy Court never analyzed how much protection the $29 million would provide, apparently satisfied that DTSC could step in if the Vernon Trust's funding was insufficient.   Unless this Court agrees with the Bankruptcy Court's interpretation of *Midlantic*—which effectively would read *Midlantic* out of existence given that responsible governments will always intervene to protect the public—the Confirmation Order must be found unlawful and then modified.

Exide and EPA cannot use mootness to shield the impropriety of the Bankruptcy Court's *Midlantic* interpretation.  The relief DTSC seeks—reallocation of value existing at (or derived from) the Transferred Entities to neutralize the Vernon Plant's imminent and identifiable health risk, and elimination of improper Plan releases—can be granted while leaving the rest of the Plan undisturbed.  Neither

2

Exide nor EPA can carry their heavy burden of demonstrating that DTSC's appeal would "fatally scramble" the Plan given the limited relief that DTSC seeks.  Exide and EPA baldly assert that modifications to the Confirmation Order would inevitably lead to the unwinding of all transactions contemplated under the Plan, Exide's liquidation under chapter 7, and the abandonment of all Non-Performing Properties. But doomsday speculation, devoid of factual support, is insufficient to satisfy Exide's burden of proof.  In addition, the abandonment issue is not constitutionally moot because abandonment was the Plan's lynchpin.  DTSC chose the Plan's trust option to avoid abandonment—a false choice the Bankruptcy Court forced on it. Had the Bankruptcy Court properly applied *Midlantic*, DTSC would never have faced such a choice.

Exide's Plan improperly leveraged abandonment to compel DTSC to accept a Global Settlement it had previously rejected.  Exide specifically revised the Plan to force DTSC into a Hobson's choice in which (i) all outcomes would tax public resources for the creditors' benefit because the Plan's grossly insufficient funding for the Vernon Plant required DTSC intervention, and (ii) the choice most protective of public health and safety (*i.e.*, transfer to the Vernon Trust) would tee up the very mootness argument Exide asserts here.  This Plan structure is inconsistent with the Bankruptcy Code because it does not require Exide to pay its fair share and it non-consensually releases numerous third parties from potential liability.  Because Exide

3

failed to comply with the good faith requirement of Section 1129(a)(3), the Confirmation Order's approval of the Vernon Trust Condition and Payment Condition, requiring approval of abandonment and the Non-Consensual Releases, was unlawful and must be modified.

The Bankruptcy Court also approved other Plan provisions in violation of the Bankruptcy Code, requiring modifications to the Confirmation Order. Neither Exide nor EPA can show why this case is extraordinary compared to other industrial bankruptcies with environmental liabilities or that the Plan contributions were sufficient to warrant the Non-Consensual Releases under *Continental*. Exide also fails to demonstrate that any of the *Zenith* factors support the Exide Releases. And the Bankruptcy Court made no factual findings that the Plan's injunction provisions are necessary or fair. In addition, Exide does not dispute that other Class 8 claimants developed the distribution scheme (which is not a claims-based pro rata allocation) to procure preferential treatment for themselves and punish DTSC for not agreeing to the Global Settlement. Accordingly, the Bankruptcy Court's approval of the releases, injunctions, and unfair treatment of DTSC's Class 8 claims was unlawful and the Confirmation Order must be modified.

4

**ARGUMENT**

## I. THE BANKRUPTCY COURT ERRED IN AUTHORIZING THE VERNON PLANT'S ABANDONMENT.

### A. DTSC's Challenge to the Bankruptcy Court's Abandonment Determination Is Not Constitutionally Moot.

A case is constitutionally moot only when a case or controversy no longer exists and the court cannot grant "any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Constitutional mootness is limited to situations where "the issues presented are no longer live[,] the parties lack a legally cognizable interest in the outcome . . . [or] the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC. v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (alterations added). But it does not apply "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation." *Knox*, 567 U.S. at 307–08 (2012) (alterations added); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1660 (2019) ("Such claims, if at all plausible, ensure a live controversy."). "If there is any chance of money changing hands, [the appellant's] suit remains live," even if "[u]ltimate recovery on that demand may be uncertain or even unlikely for any number of reasons." *Id.*. For example, an appeal is not moot where a party appeals a bankruptcy confirmation order on the basis that the chapter 11 plan was unlawful and an alternative plan could have resulted in more favorable treatment. *See, e.g., Beem v. Ferguson (In re Ferguson)*, 683 Fed.Appx. 924, 927–

28 (11th Cir. 2017). Because this appeal continues to present numerous issues related to the Bankruptcy Court's improper authority to confirm the Plan, which significantly undermined DTSC's rights and obligations related to the Vernon Plant, it is not moot.

Exide misses the point by asserting that DTSC's agreement to the Plan option that transferred the Vernon Plant to the Vernon Trust as of the Effective Date mooted the risk that DTSC "might have had to take over responsibility for the site upon abandonment." Exide Br. at 23. The central issue here is whether the Confirmation Order was lawful. *See* DTSC Br. at 21. Exide does not dispute that, as explained in DTSC's opening brief, "[a]bsent authorization to abandon the Vernon Plant, the Plan was not confirmable." *Id.* Indeed, Exide concedes that the Vernon Trust Condition—which required pre-approval to abandon the Vernon Plant—was a "sine qua non" of the Plan. *See* Exide Br. at 28.

But Exide wholly ignores that once the Bankruptcy Court authorized (improperly) the Vernon Plant's abandonment, all Plan options allowed Exide to jettison an imminently dangerous property despite marshalling only $29 million out of the nearly $74 million needed to make it safe. Thus, Exide's assertion that DTSC was not harmed by the Bankruptcy Court's decision to authorize abandonment rests on the unfounded assumption that the trust option ameliorated abandonment's consequences. It did not. Other than ease of administration, there was virtually no

difference between the trust and abandonment options.  DTSC simply chose the option that provided a modicum of additional protection to the people of California (*i.e.*, easier and faster administration) rather than allowing the Bankruptcy Court's erroneous decision to further endanger public health and safety.  In *Tempnology*, the Supreme Court made clear that an appellant is permitted to make its own "choice" to mitigate post-judgment damages without giving up its appellate claim.  139 S.Ct. at 1660–61 (citing 13B Wright & Miller § 3533.2.2, at 852 ("[C]ompliance [with a judicial decision] does not moot [a case] if it remains possible to undo the effects of compliance").

Exide's suggestion, and the Bankruptcy Court's determination, that the property's transfer to the Vernon Trust wholly eliminates the imminent and identifiable risk to public health and safety is wrong, grossly perverts *Midlantic* (as discussed in Section I.B. below), and presents a live controversy for this Court to decide.

Exide and EPA effectively concede there is a live controversy by vigorously asserting that the equitable mootness doctrine applies here.  As the Eleventh Circuit recently noted, "the prerequisites for equitable mootness tend to show that there are very real concrete interests in the outcome of the litigation.  The very fact that it could be so imprudent to disturb the Plan is a testament to the fact that there is indeed a live controversy." *In re Ferguson*, 683 Fed.Appx. at 927.  That is clearly the case

7

here.  The contention that a ruling in DTSC's favor would have a substantial impact on all parties by "fatally scrambling the Plan and causing significant harm to the public, the environment, and numerous third parties" (Exide Br. at 38) demonstrates that the Bankruptcy Court's abandonment determination concretely affects every party involved in Exide's reorganization and, thus, the abandonment issue is most definitely not moot.

The harm caused by the improper abandonment approval is also redressable. Although Exide claims that a successful appeal's only result would be to "send[] Exide back to the brink of liquidation," *see* Exide Br. at 25, other alternatives are undeniably available.  For example, the Plan can be modified to render inapplicable to DTSC (and other California state environmental agencies the Plan purports to bind) the releases that were consensual as to everyone but DTSC and to require the parties that benefited from the Plan's confirmation (*i.e.*, the Consenting Creditors and Transferred Entities) to provide adequate funding to meet the *Midlantic* standard.

## B.    The Bankruptcy Court Misapplied the Legal Standard under *Midlantic*.

Exide and EPA do not dispute that an essential element of the abandonment determination was the Bankruptcy Court's belief that, post-abandonment, DTSC would take steps to maintain the Vernon Plant in its then-current condition, which was allegedly "safe" only if indefinitely and closely monitored and actively and

8

mechanically sealed (continually running air pumps, drone flyovers, etc.) at a cost of $700,000 per month. *See* DTSC Br. at 26-27; *See also* Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 179:8–23 (A-1833); Supplemental Ruling, at 1 (A-1363) (finding that the Vernon Plant's abandonment would not present an imminent risk of harm to public health because "[g]overnments exist to serve and to protect their citizens" and safety regulators would address the risk). Indeed, EPA concedes that without the post-abandonment maintenance of the property "abandonment would violate [*Midlantic*]." EPA Br. at 12. But, as demonstrated in DTSC's opening brief, *Midlantic* does not permit a debtor to justify abandonment based on the expectation that a governmental actor will step in post-abandonment to remediate any harmful conditions. *See* DTSC Br. at 28–29.

Exide and EPA correctly note that *Midlantic* allows a Bankruptcy Court to "formulat[e] conditions" for abandonment that "adequately protect the public's health and safety." *Midlantic*, 474 U.S. at 494–95; EPA Br. at 16; Exide Br. at 42. But that did not happen here. All the Bankruptcy Court did was provide two weeks of transition time before Exide could fully jettison responsibility for this dangerous site and thrust its burdens onto DTSC or the Vernon Trust. *See* Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 179:2–7 (A-1833). The Bankruptcy Court did not require Exide or anyone else to actually protect public health and safety. Instead, it simply assumed that DTSC would fill the void: "California considers [the Vernon Plant] to

9

be dangerous . . . . But if [DTSC is] unable to transfer this property in the next two weeks, it's because of their own bureaucracy or their own inability to act; it's not because of anything the debtors have done."  Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 179:9–17 (A-1833).

As a result, the Bankruptcy Court got the standard exactly backwards: *Midlantic* requires Exide—not DTSC—to ensure the Vernon Plant is safe enough for abandonment.  To require otherwise would render *Midlantic* meaningless as every debtor would cry poverty and rely on its state regulators to remediate the threats to public health and safety they caused, thereby creating a perverse incentive to circumvent environmental laws rather than "harmonize" them with the Bankruptcy Code.  What *Midlantic* requires is that a debtor leave a site—either directly, or by creating and providing adequate funding for a caretaker entity—in a *passive state* (*i.e.*, not requiring meaningful ongoing human and mechanical intervention) that does not pose an imminent and identifiable health risk to the public.

Contrary to Exide's assertion that the Bankruptcy Court made a factual determination that should be reviewed only for clear error, *see* Exide Br. at 40, the issue here is whether the Bankruptcy Court was correct in legally concluding that *Midlantic* is satisfied if the state or federal government will step in to protect citizens from an otherwise imminent and identifiable risk of harm.  That improper legal

10

conclusion is subject to *de novo* review.  *See Guerrero-Lasprilla v. Barr*, 140 S.Ct. 1062, 1069 (2020) (*de novo* review applies to question that "primarily requires courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard.").

In addition, Exide's suggestion that abandonment was inevitable absent a global settlement among the environmental regulators and, therefore, DTSC should be content that the Plan provided an additional $2.59 million from the Consenting Creditors, is a red herring.[2]  *See* Exide Br. at 44.  *Midlantic* does **not** permit abandonment simply because "more funding" (here, only $2.59 million) is available under a chapter 11 plan than in liquidation.  The key inquiry under *Midlantic* is what the funding *actually buys* in terms of harm avoidance—an inquiry the Bankruptcy Court never made.  *Midlantic*'s basic premise is that a debtor cannot abandon a dangerous property unless and until *the debtor* has sufficiently eliminated—or provided sufficient funding to eliminate—all imminent and identifiable public health risks.  It does not empower the Bankruptcy Court to balance the amount required to ensure public health and safety against the debtor's alleged burden in providing those funds.  Because the evidence established that Exide needed a greater contribution from other creditors to achieve remediation here (*i.e.*, $45 million), *Midlantic*

---

[2] The remaining $26 million of the total $29 million Plan contribution are funds Exide deposited with DTSC years ago as a condition of prior operating permits, and was available to DTSC regardless of the result of these Chapter 11 Cases.

required the Plan to provide that funding before permitting abandonment.  At a minimum, this Court should remand to the Bankruptcy Court to determine whether $29 million sufficiently reduced the Vernon Plant's public health risk to comply with *Midlantic's* requirement that a dangerous site be left in a safe, passive state.

### C.     The Bankruptcy Court's Factual Findings on Abandonment Were Clearly Erroneous.

Even if it were proper for the Bankruptcy Court to rely on DTSC to ensure that "the current situation is maintained," Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 179:1–2 (A-1833), DTSC has demonstrated that the Bankruptcy Court's conclusion that there was no imminent and identifiable threat to public health and safety from abandoning the Vernon Plan was clearly erroneous.

There is no dispute that the Vernon Plant poses an identifiable threat to public health and safety.  As the Bankruptcy Court itself acknowledged (albeit in its Supplemental Ruling), "the Vernon site is dangerous and exposure to lead is highly dangerous."  Supplemental Ruling, at 2 (A-1364).  The issue is whether the threat to public health and safety posed by a dangerous level of lead contamination at the Vernon Plant was sufficiently *imminent* to prevent abandonment.

While the Bankruptcy Court relied on Mr. Fraske's declaration and direct testimony to conclude that any lead contamination was contained within the FEU, it ignored the numerous admissions Mr. Fraske made on cross-examination (as

detailed in DTSC's opening brief) that completely contradicted its conclusion. *See* DTSC Br. at 34–35. This contradictory testimony includes admissions that:

- Even on-site vigilance and regular maintenance of the FEU is insufficient to contain the lead. *See* Oct. 15, 2020 Hrg. Tr. (Eric Fraske), at 151:12–156:2 (A-1516).

- Seven locations *outside the FEU* have lead levels up to 150 times higher than permissible. *See id.* at 152:18–153:8 (A-1517).

- These dangerous locations are not secured and can be accessed by construction workers or others. *See id.* at 154:23–155:5 (A-1519).

- Workers at these unsecured locations could disrupt the dust and inhale the heavily contaminated lead dust. *See id.* at 155:6–156:2 (A-1520).

Exide's assertion that the court "weighed" Mr. Fraske's contradictory testimony before reaching its conclusion is unsupported by anything the Bankruptcy Court said at the Confirmation Hearing or in its Supplemental Ruling. And, if the Bankruptcy Court did actually consider Mr. Fraske's admissions, then it was clearly erroneous for the Bankruptcy Court not to recognize that the testimony demonstrated that the Vernon Plant presented an imminent and identifiable threat to public health and safety.

EPA contends that abandonment was appropriate because the Plan provided sufficient funds to "protect[] public health and safety from imminent and identifiable

13

harm." For the reasons discussed in Section I.B. above, EPA's assertion is simply wrong and unsupported by the evidence. Perry Myers, a DTSC Supervising Hazardous Substances Engineer, submitted a declaration at the Confirmation Hearing stating that it would "cost approximately $72 million to mitigate the imminent risk of harm at and from the Vernon Plant." Myers Decl. at ¶ 2 (A-907). Mr. Myers was not cross-examined at the Confirmation Hearing, and no evidence was submitted to challenge, much less refute, his testimony.

Nonetheless, in its opposition brief, EPA now argues that its own analysis of Myers Declaration Exhibit 1 supposedly establishes that "completing Phase 1 closure and mitigating the imminent risk of harm at and from the Vernon Plant will cost $27,325,298"—which conveniently and conspicuously happens to be less than the $29 million available to the Vernon Trust under the Plan. EPA Br. at 20. But this "testimony" does not come from a knowledgeable lay or expert witness; it comes from EPA's lawyers in an appeal brief, which is incompetent and inadmissible evidence. Moreover, it is a self-defeating admission that (i) *Midlantic* required the Bankruptcy Court to evaluate the harm avoidance work the $29 million would fund, and (ii) the Bankruptcy Court did not do so.

EPA's argument is also incorrect. EPA asserts, without evidentiary support, that $44.7 million of the costs listed on Exhibit 1 "are meant to sustain the Vernon Plant on a longer term basis and . . . are [not] connected to imminent and identifiable

14

harms." EPA Br. at 20. But the Myers Declaration made clear that all the tasks listed on Exhibit 1, whose total costs he estimated at $72 million, "are an essential part of mitigating the imminent risk of harm at and from the Plant." Accordingly, the record shows that the Vernon Plant itself presents an imminent danger to public health and safety, and the Bankruptcy Court's contrary conclusion was clearly erroneous because it was based on DTSC's anticipated intervention, which is irrelevant under *Midlantic*.[3]

## II.   THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE PLAN WAS PROPOSED IN GOOD FAITH.

DTSC's opening brief demonstrated that the Plan was not proposed in good faith because (i) it is inconsistent with the Bankruptcy Code's objectives, and (ii) it includes coercive and intentionally punitive provisions designed to compel DTSC to accept a settlement it had previously rejected. *See* DTSC Br. at 35–39. Exide and EPA do not seriously contest either of DTSC's arguments. In fact, they both admit that, after DTSC rejected the proposed settlement, the Plan was drafted to achieve

---

[3] Exide also relies on several statements made by this Court in its October 22, 2020 stay decision to support its assertion that there was no error in the Bankruptcy Court's analysis. *See* Exide Br. at 41–42. But this Court's stay ruling is neither binding nor preclusive of this appeal's outcome. Importantly, as of the October 22, 2020 stay hearing, this Court did not yet have the full Bankruptcy Court record before it. *See* Bankr. D.I. 1145 (corrected designation of items for record on appeal, dated December 21, 2020); Appendix Volumes I-VI [D.I. 46–51]. This Court's first impressions of the record at the stay stage should not predetermine the outcome of this appeal now that it has the entire factual record to consider.

precisely the same result as the global settlement—not only as to other Plan participants, but as to DTSC. *See* Exide Br. at 58 ("The salvaged Plan allowed DTSC to receive the same settlement payment it would have received under the initial plan . . . ."); EPA Br. at 22 ("The Plan includes the same benefits called for in the Mediators' Proposal and afforded DTSC options providing similar benefits . . . .").

The circular argument that the settlement was a fair deal because the other parties to the settlement found it fair falls far short of establishing good faith. And it is irrelevant whether the settlement grew out of a mediators' proposal, or DTSC received the same payment under the Plan that it would have received under the settlement. DTSC rejected that settlement. Both Exide and EPA continue to emphasize DTSC's "last-minute about-face" and "withdrawal" from the global settlement agreement, but (as Exide admits) DTSC's attorneys only ever "agreed to recommend the settlement to those with authority" and DTSC never signed on to the agreement. Exide Br. at 58; EPA Br. at 22. Instead of negotiating in good faith towards a consensual arrangement, Exide improperly amended the Initial Plan without DTSC's approval in violation of express language in Section 12.4(a) of the Initial Plan (*see* DTSC Br. at 17), and crafted a plan that weaponized abandonment to compel DTSC's submission to the rejected settlement. These actions clearly

demonstrate that the Plan was not proposed in good faith and, thus, should not have been approved under Section 1129(a)(3).

### III.   THE BANKRUPTCY COURT ERRED BY APPROVING OVERBROAD RELEASE AND INJUNCTION PROVISIONS.

#### A.   The Bankruptcy Court Inappropriately Approved Non-Consensual Releases.

Although Exide refers to the Plan as a "hybrid" involving "a combination of a reorganization and a liquidation" (Exide Br. at 33), neither Exide nor EPA dispute that Exide's stated intention for its Chapter 11 Cases always has been to liquidate. *See* Exide Br. at 5 (noting that Exide commenced its Chapter 11 Cases to sell certain of its assets "with the remainder of assets that [Exide was] unable to sell to be liquidated or abandoned"), 18 ("The Plan Administrator is managing the sale or liquidation of the estates' remaining assets and the distribution process for holders of administrative expense, secured, and priority claims."); EPA Br. at 15 (noting that the Global Settlement and Plan were designed to "maximize the protections afforded to the public in light of a liquidating debtor with substantial environmental liabilities throughout the country."); *see also* DTSC Br. at 41.   Rather, they assert that a liquidating plan of reorganization can provide for the Non-Consensual Releases. *See* Exide Br. at 51–52; EPA Br. at 26–27.

But Exide and EPA mistakenly rely on a single, decade-old bankruptcy court decision from another district that barely mentions the issue, cites no precedent for

its holding, and ultimately rejects the third-party releases because, as is the case here, there was inadequate consideration received in exchange for the releases. *See In re Medford Crossings N., LLC*, Case No. 07-25115, 2011 WL 182815, at *18 (Bankr. D.N.J. Jan. 20, 2011). In fact, the bankruptcy court in *Medford Crossings* denied third-party releases even though (i) the contributions were conditioned on obtaining releases, such that the plan could not succeed without them, (ii) the contributions provided unsecured creditors with substantially more under the plan than in a chapter 7 liquidation, and (iii) the plan effectuated a global resolution. *See id.* at *19. Moreover, eight months before *Medford Crossings*, the same bankruptcy judge rejected third-party releases because there was no relationship between the releases and the reorganization when "the Plan provides for liquidation, which can be successfully accomplished whether or not [the Plan sponsor] is released from third parties' claims." *In re Nickels Midway Pier, LLC*, Case No. 03-49462, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010).[4]

Exide and EPA also ignore that Third Circuit law requires "specific factual findings" to support the conclusion that DTSC received adequate compensation for

---

[4] Exide's reliance on *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012), is also unavailing. Like *Medford Crossings*, this case is from outside this district, cites no precedent for its holding, and recognizes that the non-debtor financial contribution must still be sufficiently substantial before such releases can be approved. *Id.*

its released claims. *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000). The Bankruptcy Court's one-sentence conclusion that there is "a lot of value being provided in exchange for receipt of the releases" is clearly not a specific factual finding.[5] Oct. 16, 2020 Hrg. Tr. (Court Ruling), at 181:18–20 (A-1835). And while Exide and EPA criticize DTSC for valuing its claims at more than $100 million, they do not (and cannot) point to any evidence supporting the Bankruptcy Court's conclusion that DTSC was adequately compensated for the Non-Consensual Releases.[6] The Bankruptcy Court should have made basic inquiries regarding (a) the scope of claims and parties covered by the requested releases, (b) the amount of

---

[5] Exide also asserts that DTSC has mischaracterized the scope of the Non-Consensual Releases because they only apply to the Consenting Creditors, Transferred Entities, Europe/ROW Purchaser, and the indenture trustee for the notes, who allegedly provided $18.5 million in settlements and other non-monetary consideration. *See* Exide Br. at 48–49. But Exide ignores DTSC's assertion that only a limited subset of these parties provided *de minimis* consideration ($2.59 million) for the benefit of DTSC, while others provided no financial contribution at all. *See* DTSC Br. at 43–47. Even if the limited contributions were sufficient—and they were not—related parties that have not each provided a financial contribution cannot benefit from third-party releases under *Continental*.

[6] The Myers Declaration establishes that it will take over $72 million just to make the Vernon Plant safe, not actually totally clean. Over the last five years, the California legislature has appropriated approximately $251 million to clean up the off-site contamination (mostly residential) caused by the Vernon Plant's emissions. *See* 2016 Cal. Stat. Ch. 10 (AB 118); 2019 Cal. Stat. Ch. 23 (Budget Act of 2019); 2020 Cal. Stat. Ch. 6 (Budget Act of 2020). Accordingly, it will take over three times the amount established by the Myers Declaration (and perhaps more) to fully clean up the contamination caused by the Vernon Plant. And those costs are already being shouldered by California.

liability the released parties could be subject to under applicable laws absent the releases, and (c) whether $2.59 million was adequate compensation for releasing such liability. That the Bankruptcy Court failed to do so is reversible error.

Recognizing the weakness of the Bankruptcy Court's conclusion that this is an "extraordinary case," Exide attempts to shield it from scrutiny by calling it a factual finding subject to the clearly erroneous standard. *See* Exide Br. at 51. But the "extraordinary case" determination is clearly an "ultimate fact" because it involves a "determination . . . [that] necessarily flows from consideration of an array of underlying basic facts"—*i.e.*, do the facts of this case rise to the level of "extraordinary" under *Continental*. *In re HomeBanc Mortgage Corp.*, 945 F.3d 801, 811 (3d Cir. 2019). This determination is subject to *de novo* review. *See id.* (holding that an ultimate fact receives plenary review).

Like the Bankruptcy Court, Exide fails to explain why this case is extraordinary. Exide simply describes the case as involving "complex environmental issues" with "limited financial resources available for remediation" without comparing it to other bankruptcy cases involving industrial companies with environmental liabilities. Exide Br. at 51. Exide cites only to a brief comment from EPA counsel's oral argument at the Confirmation Hearing. *See id.* Obviously, counsel's arguments are no substitute for the Bankruptcy Court's own factual analysis.

For its part, EPA does not invoke the clearly erroneous standard.  But EPA still makes no effort to compare Exide to other industrial company bankruptcies facing substantial environmental liabilities.  Instead, both Exide and EPA contend that this case is extraordinary because Exide's only alternative is a chapter 7 liquidation.  That is hardly extraordinary.  Liquidation is the alternative in *every* chapter 11 case.  In fact, the Bankruptcy Code requires application of the "best interests of the creditors" test before approving a chapter 11 plan to ensure that impaired claims receive at least equivalent treatment as "if the debtor were liquidated under chapter 7." *See* 11 U.S.C. § 1129(a)(7).  Because liquidation looms over every chapter 11 debtor, it cannot make a case extraordinary to justify otherwise impermissible plan provisions, such as the Non-Consensual Releases.

Because neither Exide nor EPA attempt to make any connection between this case's supposedly extraordinary nature and the need for the Non-Consensual Releases, this Court must modify the Confirmation Order to allow DTSC the option to opt out of the Non-Consensual Releases.

### B.  The Bankruptcy Court Erred in Approving Overly Broad Exide Releases.

Exide once again seeks refuge in the clearly erroneous standard to insulate the Bankruptcy Court's cursory analysis of the releases under Section 10.5 of the Plan (collectively, the "Exide Releases").  But findings that are contrary to the actual evidence at the confirmation hearing are, in fact, clearly erroneous.  *See Berg*

21

*Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754-56 (3d Cir. 2004) (holding that district court's factual findings were clearly erroneous where devoid of evidentiary support and any rational relationship to evidence). In addition, the Bankruptcy Court's failure to consider all five *Zenith* factors further undermines its ruling. Exide's opposition brief likewise fails to demonstrate that any of these factors are satisfied.

*Zenith* **Factor 1: Identity of Interest**. While Exide claims an identity of interest with the Released Parties because they all "shared a common goal of seeing that the Plan succeed," Exide Br. at 55, it does not argue that a suit against the Released Parties will deplete the estate's resources. The Bankruptcy Court never addressed whether the Exide Releases were necessary to avoid depletion of the estate's resources. They are not because, even with the Exide Releases, Exide will deplete all of its resources by liquidating its assets under the Plan.

*Zenith* **Factor 2: Substantial Contribution**. The Bankruptcy Court summarily concluded that the Exide Releases "confer substantial benefits on the Debtors' Estates," Confirmation Order at 5 (A-1221), but it did not address whether they provide a substantial contribution to the *Plan*. Exide similarly misses the point, arguing that the Released Parties allegedly "made substantial contributions throughout the chapter 11 cases," but not to the Plan itself. Exide Br. at 55. Exide also does not challenge DTSC's showing that the Released Parties' contribution to

the Plan was *de minimis* in light of DTSC's substantial environmental claims.  *See* DTSC Br. at 47.

 *Zenith* **Factor 3:  Necessity of Releases to Reorganization**.  The Bankruptcy Court's conclusion that the Exide Releases were necessary to the reorganization is a *non sequitur* because (as discussed *supra* at 18–19) Exide is liquidating, not reorganizing.  Rather than discuss the evidence supporting the necessity of the Exide Releases (presumably because there is none), Exide merely parrots the Bankruptcy Court's erroneous conclusion.  *See* Exide Br. at 54–55.

 *Zenith* **Factor 4:  Overwhelming Acceptance of the Plan**.  Exide echoes the Bankruptcy Court's conclusion that "an overwhelming majority of [Exide's] creditors supported the Plan and releases."  Exide Br. at 56.  But this conclusion, once again, misses the point.  It ignores DTSC's contention that only the beneficiaries of the releases (*i.e.*, the Released Parties) and their affiliates had the opportunity to vote in favor of the Plan.  *See* DTSC Br. at 48.  All other classes were deemed to have rejected the Plan.  It is difficult to see how the Exide Releases had "overwhelming support" when the only classes entitled to vote benefitted from those releases.

 *Zenith* **Factor 5:  Payment of All or Substantially All Claims**.  Exide also does not contend—and the Bankruptcy Court did not conclude—that the Plan pays

substantially all claims of Exide's creditors and interest holders.  Accordingly, this *Zenith* factor was entirely ignored by both Exide and the Bankruptcy Court.

Notably, Exide attempts to further sidestep the *Zenith* factors by arguing that "the [Exide] Release was a valid exercise of [Exide's] business judgment."  Exide Br. at 55.  But the cases Exide cites do not suggest, much less hold, that a debtor's exercise of business judgment renders irrelevant the *Zenith* factors.  For example, *In re Spansion, Inc.* holds that a debtor may exercise its business judgment in determining whether to release its claims against third parties, but must still "consider[ ] the specific facts and equities of each case," which includes applying the *Zenith* factors.  426 B.R. 114, 142 (Bankr. D. Del. 2010).  Similarly, the Third Circuit in *In re PWS Holding Corp.* applied a "business enterprise method" to evaluate the debtor's released claims by considering factors nearly identical to those presented in *Zenith*, such as "evidence of a causal relationship" (*i.e.*, identity of interest) and the provision of "the greatest possible addition to the bankruptcy estate" (*i.e.*, a substantial contribution). 228 F.3d 224, 242 (3d Cir. 2000).  And notably, both cases involved a debtor's reorganization, not a liquidation.  Here, there is no reorganized enterprise whose "business judgment" deserves deference.

**C.     The Bankruptcy Court Erred in Approving the Plan's Injunction Provisions, Which Are Overly Broad and Impermissibly Operate as a Discharge of Exide and Third Parties.**

Exide does not dispute that, as demonstrated in DTSC's opening brief, (i) the Bankruptcy Court made no factual findings concerning the Plan's injunction provisions, (ii) the injunction provisions effect an improper discharge of Exide and other non-debtor third parties not entitled to such protection, and (iii) there is no record evidence demonstrating that the injunction provisions are necessary or fair. *See* DTSC Br. at 48–51.  This alone is sufficient reason for this Court to modify the Plan's injunction provisions.

Exide's opposition brief ignores the procedural deficiencies that led to the injunction provisions' approval and argues, simply and summarily, that those provisions were necessary and fair because certain creditors demanded them.  *See* Exide Br. at 56–57. This *post hoc* attempt to justify the injunction provisions is devoid of any analysis or evidence and should be rejected.

**IV.    THE PLAN FAILS TO PROVIDE THE SAME TREATMENT FOR EACH CLAIM OR INTEREST WITHIN A PARTICULAR CLASS IN VIOLATION OF BANKRUPTCY CODE SECTION 1123(a)(4).**

Exide continues to incorrectly assert that DTSC's option to accept the Global Settlement demonstrates that DTSC was treated the same as other Class 8 claimants, arguing that it is permissible under Bankruptcy Code section 1123(a)(4) to provide favorable treatment to "a creditor who agrees to settle instead of litigating."  *See*

Exide Br. at 60.   Exide's assertion that DTSC had the "same opportunity for recovery" as other creditors ignores that even under the Global Settlement, DTSC would have received less favorable treatment than other settling parties.   Exide Br. at 60 (quoting *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)).   The Plan provides different and less favorable treatment to members of Class 8 based on whether the claimant is a Global Settlement Party.   *See* DTSC Br. at 53.   If DTSC is not a Global Settlement Party, it receives nothing while all other Class 8 claimants share in the $7.4 million Environmental Global Settlement Payment.   *See id.* DTSC's decision to reject that unfair result does not mean it was offered equal treatment because (at best), DTSC would only receive 25.8% of the total Plan consideration for Environmental NPP Claims, which is not a claims-based pro rata distribution.   *Id.*

Exide's reliance on *W.R. Grace & Co.* actually undercuts its arguments.   In that case, the Third Circuit considered whether differing trust distribution procedures for an asbestos-related Section 524(g) trust resulted in differing treatment for various claimants.   *See W.R. Grace & Co.*, 729 F.3d at 327–330.   The Third Circuit held that, where all similarly situated claimants have the same opportunity to participate in the trust, "differences in the timing of distributions and other procedural variations" alone do not violate Section 1123(a)(4).   *Id.* at 327.   Distribution timing and procedural variations are a far cry from giving DTSC the option to accept a

26

fully-baked Global Settlement that failed to provide pro rata treatment among the participants.

Exide and EPA both assert that the allocation of settlement consideration was fair and non-discriminatory, but neither deny that a Class 8 claimant (the United States Department of Justice), not Exide, developed the Plan's allocation to enrich itself while punishing DTSC for rejecting the Global Settlement. *See* DTSC Br. at 54. That was improper. There is no indication that the Bankruptcy Court ever analyzed the allocation to determine that it was fair and non-discriminatory to DTSC. And it is irrelevant whether the Global Settlement Parties considered other factors when devising the allocation—such as surety funding (*see* Exide Br. at 61)— because the Bankruptcy Code has a straightforward requirement that similarly situated creditors must receive pro rata distributions from Exide, and Class 8 creditors are not treated similarly under the Plan.

Exide's only justification for the Plan's releases treating California differently is to repeat its assertion that each of the other state regulators have "primary" responsibility for enforcing environmental laws. *See* Exide Br. at 61–62. But Exide does not—and likely cannot—argue that those regulators are the *only* agencies in their respective states that regulate the Non-Performing Properties. Despite Exide's claim that the release provisions were intended to "ensure that the releases were equal in effect," *id.* at 61, the releases' terms seek to cover all possible California

state environmental agencies while not covering all similar agencies in other states. This attempt to saddle California with broader releases than other states violates the equal treatment requirements of Section 1123(a)(4).

## V.   THIS APPEAL IS NOT EQUITABLY MOOT.

### A.   Equitable Mootness Should Not Be Applied Where Critical Public Safety and Health Issues Are at Stake.

DTSC's opening brief demonstrated that equitable mootness is a narrow doctrine that should be the "rare exception and not the rule," applied only after "most carefully" considering the implications to avoid a "perverse outcome." DTSC Br. at 56–60 (quoting *In re Semcrude, L.P.*, 728 F.3d 314 (3d Cir. 2013)). The doctrine is particularly inapplicable where, as here, the issues on appeal involve competing bankruptcy and non-bankruptcy law public policies and implicate public health, safety, and welfare. *See* DTSC Br. at 58–59.

Exide and EPA have no meaningful substantive response to these points. They rely instead on weak procedural arguments. EPA claims that the Court should ignore the merits here because DTSC did not appeal this Court's denial of DTSC's emergency stay motion. *See* EPA Br. at 10. But a stay is not required for appellate review and, in this case, it would have been impractical for DTSC to make a third attempt at obtaining a stay. *See* DTSC Br. at 61. Exide contends that DTSC has already received meaningful appellate review before this Court. *See* Exide Br. at 37–38. But, respectfully, this Court's ruling on an emergency stay motion following

28

expedited briefing and argument is not equivalent to a carefully considered appeal following full briefing and argument.

**B.     Exide and EPA Cannot Overcome the Strong Presumption Against Applying Equitable Mootness in this Case.**

1.     *The Relief Sought Would Not "Fatally Scramble" the Plan.*

Exide and EPA cannot carry their heavy burden of demonstrating that DTSC's appeal would "fatally scramble" the Plan given the limited relief that DTSC seeks. Exide encourages the Court to ignore the narrow path DTSC proposes by claiming that "the Court cannot pick and choose" which parts of the Plan will be altered. Exide Br. at 28.  But this assertion is unsupported by case law and, in fact, is contrary to the Third Circuit's admonishment that equitable mootness should be applied "with a scalpel rather than an axe." *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015). EPA argues that "[t]here is no scalpel sharp enough to salvage the relief requested without severing the underpinning of the entire Plan and [Global Settlement]."  EPA Br. at 11.  This argument ignores the repeated instances where the Third Circuit has rejected equitable mootness in cases involving challenges to release or indemnification provisions and used its scalpel to strike those provisions without unwinding other portions of the plan. *See, e.g., United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 228 (3d Cir. 2003); *In re PWS Holding Corp.*, 228 F.3d 224, 236–37 (3d Cir. 2000); *Cont'l Airlines*, 203 F.3d at 210.  This is precisely what DTSC requests the Court do here.

29

Exide's fallback argument is that "no partial remedy is available" because "[t]he Plan must stand or fall as a whole." Exide Br. at 33. This essentially amounts to a position that, if a debtor can devise a plan with both permissible and impermissible parts that it asserts are inextricably linked and then successfully rush to implement it, any legally impermissible elements of that plan (such as overbroad and unwarranted releases) can avoid appellate review. That position mocks the carefully crafted boundaries that the Bankruptcy Code and the courts have instilled in our restructuring system to ensure a fair and just chapter 11 plan process. Using mootness as an excuse to ignore unlawful plan provisions would remove the doctrine entirely from its "equitable" roots.

There are numerous key aspects of the Plan, including the Europe/ROW Sale Transaction and the Global Settlement that would *not* need to be unwound simply because the releases and injunctions are modified so as not to apply to DTSC, and more funds are made available for use at the Vernon Plant to satisfy the *Midlantic* abandonment standard. *See* DTSC Br. at 64. Exide's assertion that the Released Parties would never agree to any modifications at this point is pure speculation. Even if it were true that the releases were a "sine qua non of the plan" during negotiations, that does not mean that the Released Parties would invariably walk away from the benefits they stand to receive under a modified Plan. And given that Exide and the Consenting Creditors were not legally entitled to the Plan's releases

30

because they were not necessary to effect a chapter 11 liquidation (*see supra* at 18–19), those releases cannot be a "sine qua non" of any plan.

Exide's argument against reallocating value from other creditors to remediate the imminent and identifiable public health risks at the Vernon Plant is likewise backwards-looking and speculative.[7]  It does not matter whether creditors would have agreed to a different plan previously, the question is whether any necessary modifications at this point are "almost certain to produce a perverse outcome." *Semcrude*, 728 F.3d at 320.  Exide cannot meet this standard.

Indeed, it will not take a massive capital infusion to permit Exide to comply with its *Midlantic* obligations. Based on the unopposed, unrefuted Myers Declaration, it will take an additional $43 million "to mitigate the imminent risk of harm at and from the Vernon Plant." Myers Decl. at ¶ 2 (A-907).  There are numerous ways this could happen, including by requiring the reallocation of value existing at (or derived from) the Transferred Entities to clean up the Vernon Plant. This remedy is precisely the sort of relief that courts regularly order in bankruptcy

---

[7] Exide pejoratively characterizes the relief DTSC seeks as "[r]equiring the Consenting Creditors or Transferred Entities to make additional payments to DTSC." Exide Br. at 30.  That is false.  Any additional funds (from any creditor) would go to Exide (and presumably then to the Vernon Trust) to enable compliance with its obligations under *Midlantic*.

and other cases.[8]  *See In re One2One Commc'ns, LLC*, 805 F.3d 428, 452 (3d Cir. 2015) (noting that "as long as any remedy, including monetary relief, is available, an appellant's claims are not moot in any proper sense of the term"); *Maytag Corp. v. Navistar Intern. Transp. Corp.*, 219 F.3d 587, 591–92 (7th Cir. 2000) (formulating relief to require a bankruptcy successor to contribute toward debtor's environmental cleanup costs that were caused prior to the bankruptcy case).

### 2. *The Relief Sought Would Not Harm Third Parties Who Justifiably Relied on the Confirmation Order.*

The opposition briefs focus on whether a successful appeal of the Confirmation Order would harm third parties without even addressing, much less demonstrating, whether those third parties could reasonably rely on it. Exide and EPA do not, and cannot, dispute that the non-debtor third parties plowed forward with funding and consummating the Plan despite DTSC's position that certain provisions were unlawful and DTSC's clear intention to appeal the Confirmation Order. This is the sort of conduct then-Judge Alito had in mind when he warned that equitable mootness "can easily be used as a weapon to prevent any appellate review of bankruptcy orders confirming reorganization plans." *Nordhoff Inv., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 192 (3d Cir. 2001) (concurring).

---

[8] The reasonable remedy of requiring additional funding is a far cry from EPA's bald, speculative, alarmist, and binary claim that anything other than fully upholding the Confirmation Order inevitably will lead to a chapter 7 liquidation. *See* EPA Br. at 11.

Even if third parties had reasonably relied on the Confirmation Order, Exide and EPA presume that a ruling for DTSC would inevitably lead to the unwinding of all transactions contemplated under the Plan, Exide's liquidation under chapter 7, and the abandonment of all Non-Performing Properties. But as demonstrated above, such scare tactics are unwarranted and baseless in light of the limited relief DTSC seeks through this appeal.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court improperly approved a Plan that (i) permitted the abandonment of a property that poses an imminent and identifiable harm to public health; (ii) was not proposed in good faith; (iii) included overly broad releases and injunctions; and (iv) permitted disparate treatment of Class 8 claims. This appeal is not constitutionally moot because the Bankruptcy Court improperly applied *Midlantic* by failing to scrutinize the sufficiency of the Plan contributions to eliminate the imminent public health threat at the Vernon Plant, knowing that DTSC would intervene to protect the public in any case. Thus, the Plan was unconfirmable by its own terms. Neither is this appeal equitably moot because modifying the Confirmation Order would not "fatally scramble" the Plan; it would only eliminate unlawful provisions upon which third parties could not justifiably rely and were not necessary to effectuate Exide's liquidation.

Therefore, DTSC respectfully submits that this Court should modify the Confirmation Order to make the Plan compliant with applicable law.

Dated: February 26, 2020

Respectfully submitted,

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Gregory E. Stuhlman*
Paul D. Brown (No. 3903)
Gregory E. Stuhlman (No. 4765)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:  (302) 295-0191
Email:  brown@chipmanbrown.com
              stuhlman@chipmanbrown.com

-and-

**O'MELVENY & MYERS LLP**
Nancy A. Mitchell
Matthew L. Hinker (No. 5348)
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061
Email:  nmitchell@omm.com
              mhinker@omm.com

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006
Telephone:  (202) 383-5300
Facsimile:   (202) 383-5414
Email:  pfriedman@omm.com

-and-

34

**CALIFORNIA DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY GENERAL**

Xavier Becerra
ATTORNEY GENERAL OF CALIFORNIA
David Zonana
SENIOR ASSISTANT ATTORNEY GENERAL

Anthony A. Austin
DEPUTY ATTORNEY GENERAL
1300 I Street, Suite 125
Sacramento, CA 95814
Telephone:   (916) 210-7245
Email:  anthony.austin@doj.ca.gov

*Counsel to Appellant
California Department of
Toxic Substances Control*

35

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 8015(h) of the Federal Rules of Bankruptcy Procedure, the undersigned hereby certifies that:

1.     This document complies with the type-volume limit of Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure—as modified by this Court's order approving *Appellant's Unopposed Motion for Leave to File Briefs Containing Words Exceeding the Limits Enumerated in Rule 8015 of the Federal Rules of Bankruptcy Procedure*, dated December 16, 2020 [D.I. 43 & 44]—because, excluding the parts of the document exempted by Rule 8015(g) of the Federal Rules of Bankruptcy Procedure, this document contains 7,972 words, as determined by the word-count function of Microsoft Word 2016.

2.     This document complies with the typeface requirements of Rule 8015(a)(5) of the Federal Rules of Bankruptcy Procedure and the type-style requirements of Rule 8015(a)(6) of the Federal Rules of Bankruptcy Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: February 26, 2020

 */s/ Gregory E. Stuhlman*
Gregory E. Stuhlman
Counsel to Appellant