## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| EXIDE HOLDINGS, INC., *et al.*, | : | Case No. 20-11157-CSS |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

| | | |
|---|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC | : | |
| SUBSTANCES CONTROL, | : | |
| | : | Civ. No. 20-1402-RGA |
| Appellant, | : | |
| v. | : | |
| | : | |
| EXIDE HOLDINGS, INC., *et al.,* | : | |
| | : | |
| Appellees. | : | |


## <u>OPINION</u>

Nancy A. Mitchell, Matthew L. Hinker, O'Melveny & Myers LLP, New York, NY; Peter Friedman, O'Melveny & Myers LLP, Washington, DC; Paul D. Brown, Gregory E. Stuhlman, Chipman Brown Cicero & Cole, LLP, Wilmington, DE; Xavier Becerra, Edward H. Ochoa, Anthony A. Austin, Heather C. Leslie, California Department of Justice Office of the Attorney General, attorneys for appellant the California Department of Toxic Substances Control.

Ray C. Schrock, Jared R. Friedmann, Sunny Singh, Aaron J. Curtis, Weil, Gotshal & Manges LLP, New York, NY; Paul R. Genender, Weil, Gotshal & Manges LLP, Dallas, TX; Zachary D. Tripp, Weil, Gotshal & Manges LLP, Washington, DC; Daniel J. DeFranceschi, Zachary I. Shapiro, Richards, Layton & Finger, P.A., Wilmington, DE, attorneys for appellees Exide Holdings, Inc. and affiliates.

Bruce S. Gelber, Alan S. Tenenbaum, Eric D. Albert, U.S. Department of Justice, Washington, DC; Matthew C. Indrisano, U.S. Department of Justice Environment and Natural Resources Division Environmental Enforcement Section, Washington, DC; James D. Freeman, U.S. Department of Justice, Denver, CO, attorneys for appellee the United States on behalf of the U.S. Environmental Protection Agency.

July *26*, 2021

*Richard G. Andrews*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before the Court is an appeal (D.I. 1) by the California Department of Toxic Substances Control ("DTSC") with respect to the Bankruptcy Court's *Order Confirming Fourth Amended Joint Chapter 11 Plan of Exide Holdings, Inc. and its Affiliated Debtors* ("Exide" or "Debtors"), dated October 16, 2020 (B.D.I. 998) (A-1217)[1] ("Confirmation Order"). The merits of the appeal are fully briefed. (D.I. 45, 54, 59, 62).[2] Both the Debtors and the United States on behalf of the U.S. Environmental Protection Agency ("EPA," and together with the Debtors, "Appellees") assert that the appeal must be dismissed on the basis of equitable mootness and that DTSC's additional arguments are without merit. For the reasons set forth below, while the appeal meets the criteria for equitable mootness, I can readily resolve the merits of the appeal against the appealing party, so the Confirmation Order is affirmed.

**I.    BACKGROUND**

**A.    The Parties and the Chapter 11 Cases**

Exide owned and operated a battery recycling facility in Vernon, California. Although the Vernon plant ceased operations in 2015, the site remains highly contaminated, requiring constant monitoring and containment to assure that hazardous substances are not released into the environment. DTSC is a California regulatory agency with authority to protect California's people and environment from harmful effects of toxic substances by restoring contaminated

---

[1] The docket of the Chapter 11 cases, captioned *In re Exide Holdings, Inc., et al.,* No. 20-11157 (CSS) (Bankr. D. Del.), is cited herein as "B.D.I. __." The appendix (D.I. 46-51) filed in support of DTSC's amended opening brief is cited herein as "A__." Transcripts of the confirmation hearing held before the Bankruptcy Court on October 15, 2020 (A1365) and October 16, 2020 (A1654) are cited herein as "10/15/20 Tr. __" and "10/16/20 Tr. __," respectively.

[2] I did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

resources, enforcing hazardous waste laws, reducing hazardous waste generation, and encouraging the manufacture of chemically safer products. Cal. Health & Safety Code §§ 25100 *et seq.*, 25300 *et seq.*, 58000 *et seq.* DTSC implements and enforces these laws, as well as laws concerning the cleanup of releases or threatened releases of hazardous substance.

By early 2020, Exide's business was in jeopardy and facing mounting environmental remediation expenses, rising costs, and operational inefficiencies, which were exacerbated by the COVID-19 pandemic. (B.D.I. 14 ¶¶ 11, 30). On May 19, 2020, Exide commenced a chapter 11 case. (*Id.* ¶ 3). Prior to the bankruptcy filing, Exide conducted a marketing and sale process for substantially all of its Americas and Europe and rest-of-world ("Europe/ROW") businesses, with remaining assets that Exide was unable to sell to be either liquidated or abandoned. (*Id.* ¶¶ 12–13; B.D.I. 948 ("Peluchiwski Confirmation Decl.") ¶¶ 8, 9). Debtors sold their Americas business to an affiliate of Atlas Capital Resources III LP ("Americas Buyer"), and the Bankruptcy Court approved the sale. (B.D.I. 690). An ad hoc group of noteholders ("Consenting Creditors") submitted a credit bid for the Europe/ROW business for $559.4 million. (D.I. 17-1 ("Peluchiwski Stay Decl.") ¶ 7). Debtors did not receive any other qualified bids despite their efforts to obtain them. (Peluchiwski Confirmation Decl. ¶ 17). A special committee reviewed and accepted the bid, determining that it would generate the most value for Debtors' stakeholders and was a better option than liquidation. (*Id.* ¶ 18).

**B.    Global Settlement and Plan**

On a parallel track, and to reduce the risk that sixteen other contaminated sites in ten states would be abandoned in the course of the bankruptcy proceedings, Debtors sought authorization to engage in negotiations, including mediation, with various environmental agencies to achieve a consensual solution for the orderly transition of these non-performing properties ("NPPs") and to proceed on an expedited timeline for the contested abandonment of the NPPs if negotiations were

3

unsuccessful. (B.D.I. 37 ("Settlement Procedures Motion") ¶ 3). Debtors' motion emphasized, "at the end of these chapter 11 cases, the Debtors will not be in business, and as such, they will no longer be able to retain and support the ongoing maintenance and remediation of [the NPPs]." (*Id.* ¶ 2). On June 9, 2020, the Bankruptcy Court entered a Settlement Procedures Order (B.D.I. 242) appointing five mediators.

On July 28, 2020, after nearly two months of negotiations, the parties achieved preliminary acceptance of the mediators' proposal for a global settlement that would be part of a plan of liquidation. All government agencies, including DTSC, agreed to recommend and pursue approval of the global settlement. (*See* B.D.I. 622, 636). The global settlement provided, among other things, for the creation of an environmental remediation trust ("ERT"). The Consenting Creditors and certain Exide entities that would be transferred in the Europe/ROW sale ("Transferred Entities") would then fund the ERT with settlement payments of approximately $10 million. (B.D.I. 942 ¶ 19). Based on an allocation structure, approximately $2.6 million of settlement payments would be allocable to the Vernon site, in addition to more than $26 million in available financial assurances that Debtors put into place long before the settlement. (*Id.* ¶¶ 21, 200; *see* B.D.I. 973 ¶¶ 24, 34). On August 14, 2020, the Debtors filed their proposed plan and disclosure statement (B.D.I. 742, 743), and a confirmation hearing was set for September 25, 2020 (B.D.I. 745 at 11).

On September 15, 2020, DTSC notified Exide that the California Governor's office had rejected the global settlement. (B.D.I. 942 ¶ 22). To avoid widespread abandonment of the NPPs, the parties worked to amend the global settlement and plan in a way that would achieve the same results, albeit without requiring (but leaving the option open for) DTSC's participation.

On September 23, 2020, Exide filed an amended version of the plan, which provided, among other things, that: (a) if certain non-consensual releases were approved, DTSC would still

receive the benefit of the $2.6 million that otherwise would have been provided to the Vernon site under the global settlement, regardless of whether the Vernon site was abandoned or transferred to a trust; (b) DTSC could enter into an agreement with the environmental trustee providing covenants not to sue, and if it did so, in addition to the $2.6 million, Exide would transfer the Vernon property to an environmental remediation trust ("Vernon ERT") and the property would be managed by a trustee; and (c) if DTSC did not sign the agreement with the environmental trustee, or if the non-consensual releases were not approved by the Bankruptcy Court, Exide would abandon the Vernon property pursuant to § 554(a) of the Bankruptcy Code. (*See* B.D.I. 871; B.D.I. 944 ¶ 20).  Regardless of which option it chose, DTSC would also receive the $26 million in financial assurances that had been funded in advance. (*Id.*; 10/16/20 Tr. 174:14–18; B.D.I. 973 ¶ 46).  The Bankruptcy Court adjourned the confirmation hearing from September 25, 2020 to October 15, 2020 to allow DTSC additional time to take discovery.  On October 7, 2020, DTSC objected to the plan on the basis that abandonment of the Vernon site and the non-consensual third-party releases were impermissible. (B.D.I. 917).

## C. Confirmation Hearing

On October 15 and 16, 2020, the Bankruptcy Court held a confirmation hearing, including live witness testimony and several hours of oral argument.  Among the witnesses presented, Eric Fraske, an experienced on-site engineer, testified that the main industrial building on the Vernon site—the portion with the most elevated lead and arsenic levels—was fully contained by a tent-like structure called a Full Enclosure Unit ("FEU"), and that Exide's on-site contractors "maintained and inspected" the structure "daily." (10/15/20 Tr. at 125:15–126:4, 137:22–139:20; B.D.I. 952 ("Fraske Decl.") ¶ 11).  Mr. Fraske further testified that he "intend[ed] to continue [his] job and care for the Vernon site" while the site transitioned to the Vernon ERT or to DTSC, and he explained that the site would pose no "threat to health and safety" even if "nobody was able to

5

go to the site for two weeks" to perform maintenance and inspections. (10/15/20 Tr. 131:7–14, 132:13–134:10; *see also* Fraske Decl. ¶¶ 11–13, 17). The Bankruptcy Court found Mr. Fraske to be "extremely competent, very persuasive, and a very honest and forthright witness." (10/16/20 Tr. 176:5–7). The Debtors' CRO, Roy Messing, testified that "over $26 million [in financial assurances] would be made available to DTSC to continue maintenance efforts and restart the remediation efforts at the [Vernon] site." (*See* B.D.I. 950 ("Messing Abandonment Decl.") ¶ 30).

DTSC's witness, Grant Cope, conceded during cross-examination that $26 million would "allow [DTSC] to continue to maintain the current activities at the site" at least until the agency was able to develop a long-term remediation plan. (10/15/20 Tr. 216:13–18). Dr. Gina Solomon of the Public Health Institute testified about lead's toxicity and effects on human health, but offered no opinions specific to the Vernon site. (*Id.* at 232:12–249:8).

### D. Confirmation Order and Supplemental Letter Ruling

The Bankruptcy Court confirmed the plan. (10/16/20 Tr. 170:16–19; A1217). First, the Bankruptcy Court approved abandonment of the Vernon site as an alternative and found that abandonment posed "no identifiable imminent threat to the public's safety or to health or humans' general safety." (*Id.* at 179:18–23). The Bankruptcy Court noted that the high concentrations of lead on the Vernon site are contained to areas that are secure and "[o]therwise, people are walking the exterior of the site without respirators." (*Id.* at 177:19–178:5). The Bankruptcy Court further noted, "there are funds available immediately under the plan and under the preexisting set-asides [via $26 million in financial assurances] to fund remediation, or at least preservation of safety at the site for quite some time." (*Id.* at 174:14–18). The Bankruptcy Court also adopted Debtors' voluntary proposal that the property would not be abandoned for two weeks (*i.e.*, no sooner than October 30, 2020) to provide time to transition responsibility to DTSC without any gap in oversight. (*Id.* at 179:2–23, 184:5–20). On October 19, 2020, the Bankruptcy Court issued a

6

supplemental letter (B.D.I. 1003) (A1363) ("Supplemental Ruling") clarifying the gravity and

difficulty of the situation:

> The issue is not whether the lead at Vernon is dangerous—it is. The question is whether
> abandonment of the site presents an imminent danger—it does not. The evidence
> overwhelmingly established that the site is constantly monitored, and the dangerous
> polluted areas are contained. The evidence also established that the contractors currently
> in place are ready, willing, and able to continue their work, provided they are paid.

The Bankruptcy Court also recognized that although "Exide should pay its debts . . . it cannot.

There is simply no available money to do so." (*Id.*) The Bankruptcy Court further observed that

"the abandonment would occur, if at all, on October 30, 2020," which gave DTSC "ample time to

arrange for the orderly transfer of responsibility over the site." (*Id.*) The Bankruptcy Court also

emphasized that Vernon "is not the Debtors' only environmental site. There are sites in 9 other

states and the state and federal agencies responsible for those sites support the settlement

contained in the 4th Amended Plan as the best, realistic alternative." (*Id.*)

Regarding the non-consensual third-party releases, the Bankruptcy Court explained that (i)

this is an "unprecedented" and "extraordinary case" that "requires extraordinary measures"; (ii)

the releases are a "sine qua non of the plan"; and (iii) the releases are "fair, equitable, and

reasonable." (10/16/20 Tr. 181:9–182:1; Confirmation Order ¶ I (iii)–(iv)). The Bankruptcy

Court further explained that there is "a lot of value being provided in exchange for receipt of the

releases." (10/16/20 Tr. 181:18–20). Specifically, the Consenting Creditors and Transferred

Entities—who will receive the protections afforded by the non-consensual third-party releases—

made critical and substantial contributions to the plan, which were contingent upon the continued

effectiveness of those benefits and the finality afforded by the plan and Confirmation Order.

(Confirmation Order ¶ I(iii)–(iv)). Accordingly, the plan (B.D.I. 998-2) (A126) was confirmed,

and the Bankruptcy Court granted a seven-day stay to allow DTSC to appeal and to seek a stay of

the Confirmation Order. (10/16/20 Tr. 185:4–7).

## G.      Appeal and Denial of Stay Pending Appeal

On October 18, 2020, DTSC filed a notice of appeal.  (D.I. 1).  On October 19, 2020, DTSC filed an emergency motion for a stay pending the appeal.  (D.I. 4).  Following oral argument on October 22, 2020 (D.I. 32), I denied the request for stay pending appeal (*id*. at 66:4-14; D.I. 30).  Thereafter, DTSC provided the trustee with covenants not to sue, the Vernon ERT was established, and abandonment of the Vernon site was completely avoided.  (*See* D.I. 55 ("Singh Decl.") ¶¶ 2-3).  Nevertheless, DTSC has filed this appeal because it argues that the plan presented it with a "Hobson's choice" —either accept the intolerable abandonment of the Vernon site or agree to the Vernon site's transfer to the underfunded Vernon ERT—and such a plan should not have been confirmed.

## II.      JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).  In reviewing the bankruptcy court's determinations, this Court "review[s] the bankruptcy court's legal determinations *de novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *See In re Trans World Airlines, Inc*., 145 F.3d 124, 130 (3d Cir. 1998).

## III.      PARTIES' CONTENTIONS

Exide argues that the appeal should be dismissed on the basis of equitable mootness. Acting in reliance on the Confirmation Order, Exide and its stakeholders substantially consummated the plan.  Unwinding confirmation, Exide argues, would significantly increase environmental risks at the Vernon site and other contaminated sites nationwide by transferring title to those properties back to an entity on the brink of liquidation.  Exide further asserts that it would be impractical and inequitable to undermine the settled expectations of every party in the bankruptcy proceeding and their counterparties, including the environmental regulators in ten

8

states and the United States government, especially when DTSC's primary objection is to abandonment that will never happen anyway. EPA agrees that remanding this case for further proceedings would fatally scramble the plan and threatens the global settlement that protects against the potential abandonment of the NPPs.

DTSC does not dispute that the plan has been substantially consummated, but argues that modifying the Confirmation Order would not "fatally scramble" the plan or harm third parties who justifiably relied on it. Because the plan is a liquidation of Exide's assets, as opposed to a reorganization, DTSC argues, there have been no dramatic changes to the lender or equity base that cannot be "undone after the Effective Date." The plan transactions—such as the Europe/ROW Sale Transaction and funding of various trusts related to the global settlement— could remain intact, DTSC further argues, because narrower relief is possible including: (a) narrowing/eliminating the plan's releases and injunction as they apply to DTSC, and (b) allocating additional funding to "clean up" the Vernon site.

With respect to the merits, DTSC's core contention is that the Bankruptcy Court improperly authorized abandonment of the Vernon site as one possible outcome under the plan. DTSC argues that, despite an identifiable threat to public health and safety, the Bankruptcy Court authorized abandonment of the Vernon site as an option rather than requiring Exide to first remedy the threat. (*See* 10/16/20 Tr. 179:18–23) (A-1833). In doing so, DTSC argues, the Bankruptcy Court misinterpreted and misapplied the Supreme Court's holding in *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986). According to DTSC, the Bankruptcy Court further erred in approving the plan because it: (i) improperly approved non-consensual releases; (ii) improperly approved releases by Exide in favor of parties that provided little or no contribution to the plan; (iii) included improper and overly broad injunctions and discharges; and (iv) did not provide equal treatment for each claim in its class.

9

Having chosen the plan's other option and avoided abandonment of the Vernon site, Exide argues, DTSC's challenge to the plan no longer presents a live case or controversy. If I do reach the merits of the appeal, Exide argues that I should affirm the Confirmation Order in its entirety as the Bankruptcy Court properly authorized abandonment as an alternative. EPA agrees. According to EPA, DTSC's argument that the plan is inconsistent with governing precedent is without merit, and the appeal should be denied. Both Appellees contend that the evidentiary record provides ample support for the Bankruptcy Court's determinations that the releases and injunctions in the plan were necessary, fair, and satisfied the standard for approval. The Bankruptcy Court did not clearly err in finding that Debtors proposed the plan in good faith, Exide argues, as extensive evidence showed that the plan was premised on the court-appointed mediators' settlement proposal after extensive arm's length negotiations in a global settlement overwhelmingly supported by all key stakeholders. The Bankruptcy Court correctly concluded that the plan does not unfairly discriminate against DTSC, Appellees assert, because the plan treated DTSC no better and no worse than other holders of environmental claims.

## IV.   ANALYSIS

### A.   The Appeal Meets the Criteria for Equitable Mootness

"'Equitable mootness' is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will undermine the finality and reliability of consummated plans of reorganization." *In re Tribune Media Co.,* 799 F.3d 272, 277 (3d Cir. 2015). A court assesses equitable mootness through the application of "prudential" considerations that address "concerns unique to bankruptcy proceedings." *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012). The Third Circuit has described the analytical steps under the doctrine as asking: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in

10

the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *In re Nuverra Environmental Solutions, Inc.*, 834 F. App'x 729, 733 (3d Cir. 2021) (quoting *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015)). Appellees "bear[] the burden of overcoming the strong presumption that appeals from confirmation orders of reorganization plans – even those not only approved by confirmation but implemented thereafter (called 'substantial consummation' or simply 'consummation') – need to be decided." *Tribune Media*, 799 F.3d at 278.

### 1.    The Plan Has Been Substantially Consummated

The Bankruptcy Code defines "substantial consummation" to mean:

(A)    transfer of all or substantially all of the property proposed by the plan to be transferred;

(B)    assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C)    commencement of distribution under the plan.

11 U.S.C. § 1101(2). DTSC does not dispute that the plan has been substantially consummated (D.I. 45 at 5). The record supports a finding that all of the relevant property has been transferred, Exide's successors have assumed management of the businesses and other property, and distributions have begun.[3] 11 U.S.C. § 1101. The "foremost consideration" under the equitable

---

[3] Following denial of the motion for stay pending appeal, DTSC executed the agreement providing the Vernon ERT with covenants not to sue. (*See* Singh Decl. ¶¶ 2-3). On October 26, 2020 ("Effective Date"), Exide transferred title, ownership, and environmental obligations for the Vernon site directly to the Vernon ERT and thereby avoided abandonment. (*See* D.I. 56 ("Puga Decl.") ¶ 6). The Vernon ERT has worked to maintain and remediate it, including consulting with regulators to develop a 14-month plan and budget for decontaminating the site. (*Id.* ¶ 10). The trustee estimates that the $29 million currently available to the Vernon ERT will allow it to complete a 14-month plan and maintain the site through the end of 2022. (*Id.* ¶ 19). The trustee has a plan to obtain additional funds, including through a potential sale of the property, which would enable the Vernon ERT to deconstruct all the ancillary buildings on the site. (*Id*). Remediation restarted in mid-November and the Vernon ERT continues to perform maintenance, including daily inspections, dust monitoring, sample collection, spraying down the site, and collecting and treating washwater. (*Id.* ¶¶ 12,15). The Vernon ERT received the $2.6 million

mootness doctrine has been satisfied. *In re Cont'l Airlines*, 91 F.3d 553, 561 (3d Cir. 1996).

      **2.**    **Modifying the Plan (i) to Narrow/Eliminate DTSC Release and (ii) to Allocate Additional Consideration to the Vernon Site**

      Once it is established that substantial consummation has occurred, the next step is to "look

to whether granting relief will require undoing the plan as opposed to modifying it in a manner

---

payment allocated under the plan, and DTSC has transferred to the Vernon ERT approximately $6 million of the $26 million in financial assurances for the site. (*Id.* ¶¶ 16–18). Based on the current pace, decontamination of the Vernon site and deconstruction of the industrial structures are expected to be completed by the end of 2021. (*Id.* ¶ 14).

      On the Effective Date, Exide transferred all sixteen NPPs to the ERT. (*Id.* ¶ 21; D.I. 57 ("Messing Decl.") ¶ 6). Since then, the ERT performed significant work at the sites, including negotiating/assuming contracts to maintain/service the sites, creating plans/budgets to remediate/transition them, and continuing regular maintenance to ensure safety. (Puga Decl. ¶¶ 22–24). On the Effective Date, the ERT received the $7.4 million settlement allocated to NPPs outside California and $23.6 million in financial assurances. (*Id.* ¶¶ 30–31).

      In consultation with the ERT's advisors and applicable regulators, the trustee determined that the best strategy for safely and efficiently transitioning the NPPs is selling them to buyers willing to assume the environmental liabilities. (*Id.* ¶ 25). The ERT has been marketing and selling those properties. As of January 2021, the ERT has closed the sale of at least one NPP, with the buyer assuming all environmental liabilities and remediation efforts for that property (*id.* ¶¶ 25–26) and has begun negotiating the sale of ten more NPPs (*id.* ¶¶ 26–29).

      Following the Effective Date, Exide implemented various other transactions in reliance on the plan. The Consenting Creditors issued $36 million in bridge financing notes to the Europe/ROW business to support its continued operations and provide funding for the settlements (Messing Decl. ¶ 5), and using the proceeds of the bridge financing, the Transferred Entities made approximately $18.5 million in settlement payments, including (a) the above-mentioned $2.6 million to the Vernon ERT and $7.4 million to the ERT, (b) $100,000 to the Texas Commission on Environmental Quality, (c) $2.4 million to the general unsecured creditors trust ("GUC Trust"), and (d) $6 million to the Pension Benefit Guaranty Corporation. (*Id*). Exide has transferred causes of action to the GUC Trust. (*Id.* ¶ 7). Exide has consummated the sale of the Europe/ROW business and transferred the business. (*Id.* ¶ 8). In exchange, Consenting Creditors forgave $70 million of priority notes and canceled Exide's $155.9 million guarantee of superpriority notes. (*Id.* ¶ 9). The Consenting Creditors released liens on the NPPs and any sale proceeds thereof. (*Id*). The Europe/ROW Purchaser took over management of the former Europe/ROW business and remaining Exide employees. (*Id.* ¶ 10).

      Finally, the plan administrator is managing the sale or liquidation of the estates' remaining assets and the distribution process for holders of administrative expense, secured, and priority claims. (D.I. 58 ("Rinaldi Decl.") ¶ 2). The plan administrator is reconciling administrative, secured, and priority claims. (*Id.* ¶ 6). On January 21, 2021, the estates made a payment of approximately $8.1 million to the Americas Buyer regarding a working capital adjustment. (*Id.* ¶ 7). The wind-down estates are implementing other wind-down activities in reliance on the Confirmation Order.

that does not cause its collapse." *In re SemCrude L.P.*, 728 F.3d 314, 321 (3d Cir. 2013). A court "should also consider the extent that a successful appeal, by altering the plan or otherwise, will harm third parties who have acted reasonably in reliance on the finality of plan confirmation." *Id.* The Third Circuit instructs that the "starting point is the relief an appellant specifically asks for." *Tribune*, 799 F.3d at 278. According to DTSC, relief on appeal does not require wholesale reversal of the Confirmation Order; rather, narrower relief may "redress DTSC's concerns." (D.I. 45 at 5, 64). In considering available relief, my "starting point" is DTSC's specific request to modify the plan (i) to narrow or eliminate the releases and injunction applicable to DTSC, and (ii) to direct allocation of an "additional $43 million," which DTSC argues is required under *Midlantic* "to mitigate the imminent risk of harm at and from the Vernon Plant." (D.I. 62 at 31).

As to DTSC's request that I modify the plan to narrow or eliminate the releases and injunction which apply to DTSC, Exide argues that this Court cannot pick and choose by altering just those aspects of the plan while leaving everything else unchanged. (D.I. 54 at 28). In this particular case, I agree. The Bankruptcy Court determined that the trust conditions and the third-party releases are the "sine qua non of the plan." (10/16/20 Hr'g Tr. 181:9–182:1). The Consenting Creditors' agreement to pay $12.5 million for the NPPs and general unsecured claims was conditioned on receiving full releases from the beneficiaries. Without that $12.5 million and the Consenting Creditors' credit bid for the Europe/ROW business, the global settlement and plan would have fallen apart. I agree that narrowing or eliminating the releases and injunctions would upend the global settlement that was "a central issue in the formulation of a plan of reorganization." *Tribune*, 799 F.3d at 280.

As to DTSC's request that I modify the plan to allocate an "additional $43 million" in order "to mitigate the imminent risk of harm at and from the Vernon Plant" (D.I. 62 at 31), DTSC posits that "there are numerous ways this could happen," but, in terms of real options, suggests

only that I might "fashion a remedy that reallocates value from the Transferred Entities or Consenting Creditors to the satisfaction of environmental claims." (D.I. 45 at 64; D.I. 62 at 31). The Consenting Creditors, however, had no obligation to put *any* money into the settlement, as Exide points out, and the Bankruptcy Court could not force third-party creditors to make settlement payments over their objections. *See, e.g., Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) ("Courts do not rewrite contracts to include terms not assented to by the parties") *aff'd*, 988 F.2d 414 (3d Cir. 1992); *id.* citing *Glantz Contracting Co. v. General Electric Co.*, 379 So.2d 912, 916 (Miss. 1980) ("Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence");*Adelphia Commc'ns*, 367 B.R. at 97 (relief requested "would rewrite the terms of the bargain, which is beyond the power of the Court"). Moreover, the Consenting Creditors have not received any cash distributions under the plan, and Exide does not anticipate having any funds left to make distributions to the Consenting Creditors after satisfying administrative, secured, and priority claims. (Rinaldi Decl. ¶ 8). Even if the entire plan were unwound, the Bankruptcy Court could not force the Consenting Creditors to disgorge distributions and give those funds to DTSC because the Consenting Creditors have not received any distributions. Requiring the Consenting Creditors or Transferred Entities to make additional payments to DTSC would "circumvent the bankruptcy process and give [DTSC] by judicial fiat what it could not achieve by consensus within Chapter 11 proceedings." *Tribune*, 799 F.3d at 281.

The Third Circuit further instructs that "even when a court applies the doctrine of equitable mootness, it does so with a scalpel rather than an axe. To that end, a court may fashion whatever relief is practicable instead of declining review simply because full relief is not available." *Tribune,* 799 F.3d at 278 (internal citations and quotations omitted). As Exide correctly points out, the Court is not able to provide more funding for the Vernon site as a precondition to

14

abandonment because abandonment is not going to occur. And as to other possible sources of

funding, I see none. I cannot order Debtors to provide the additional funding when they have no

funds to spare. (D.I. 54 at 29). Debtors project to have adequate funds to satisfy only allowed

administrative, secured, and priority claims and wind-down expenses as required under the plan.

(Rinaldi Decl. ¶¶ 8–10). If Debtors were required to provide additional funding for the Vernon

site, they would need to divert funds reserved for administrative, secured, and priority creditors

(whose claims must be satisfied in full under the plan and the Bankruptcy Code). I agree that,

"Reallocating those funds to keep them in reserve for the no-longer-existent possibility that the

Vernon property might be abandoned would pointlessly leave Debtors unable to satisfy their

obligations under the Plan to pay administrative, other secured, and priority claims, to the

detriment of approximately 280 administrative, secured, and priority creditors who relied on such

treatment in supporting or not opposing the Plan." (*Id.* ¶ 9).[4]  EPA agrees, adding that no evidence

was adduced to contradict Debtors' position that they "simply do not have the financial or human

resources to pivot to anything but a chapter 7 liquidation if the amended plan is not confirmed."

(B.D.I. 871 ¶ 15). It seems a foregone conclusion that any remand of this case would result in a

conversion to chapter 7, and conversion would threaten the protections to public health and safety

accomplished through the plan, including those provided to DTSC to date. Even assuming DTSC

is successful on appeal, it is unclear what other practicable relief I may grant at this point.

**B.      The Confirmation Order Is Affirmed**

---

[4] As Exide points out, it has no ability to "reallocate" funds by taking funds from administrative, secured, and priority creditors and allocating them to DTSC. *See In re Paragon Offshore plc*, 597 B.R. 748, 762 (D. Del. 2019) (holding disgorgement would "violat[e] the absolute priority rule" and be "inequitable and not practicable" because there was "no relief that could be layered onto the existing Plan consistent with governing law"); *In re Adelphia Commc'ns Corp.*, 367 B.R. 84, 97 (S.D.N.Y. 2007) (finding "selective disgorgement from cherry-picked creditors as opposed to ordering disgorgement from all creditors . . . is inequitable").

I find the appeal meets the criteria for equitable mootness, but I can "readily resolve the merits of [the] appeal against the appealing party." *Tribune*, 799 F.3d at 278. So I hold that the Confirmation Order is affirmed.

### 1.   The Abandonment Issue Does Not Present a Live Case or Controversy

Exide argues that while abandonment previously was a possibility under the plan, there is no longer any possibility that Debtors will abandon the site. The plan provided that the Vernon site would be transferred to the Vernon ERT—and would not be abandoned—if DTSC executed the agreement with the environmental trustee providing covenants not to sue, which DTSC did immediately after I denied the stay. Thus, DTSC's challenge to something that will never occur—and thus cannot injure it—no longer presents a live case or controversy. I agree.

Under Article III, "'an actual controversy' must exist . . . through 'all stages' of the litigation," *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 90-91 (2013), and the alleged injury must be "actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Developments that "eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief" render a case moot. *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.,* 336 F.3d 211, 216 (3d Cir. 2003) (citation omitted). DTSC's challenge to the possibility of abandonment is now moot because there is no actual or imminent possibility that the Debtors will abandon the Vernon site. DTSC signed the agreement providing covenants not to sue the environmental trustee, allowing Debtors to transfer the site to the Vernon ERT. (*See* Puga Decl. ¶ 6). Debtors thus did not abandon the Vernon site and will not abandon it in the future (much less imminently). Because the Vernon ERT now owns and maintains the site, the alleged harm DTSC warned could occur upon abandonment never happened. Pursuant to the trustee's plan, contractors have continued to perform safety measures that DTSC claimed would

16

"cease immediately upon abandonment," such as "dust suppression and air monitoring," "water treatment," and daily inspections. (D.I. 45 at 33–34; Puga Decl. ¶ 15). There has been "no stoppage of containment efforts." (D.I. 45 at 33; Puga Decl. ¶ 7). Government regulators did not have to "assume management responsibilities" over the Vernon site (D.I. 45 at 31) as the Vernon ERT is managing the property using funds from the settlement and financial assurances. (Puga Decl. ¶¶ 7, 16–18). DTSC identifies no concrete injury to it arising from the fact that the Vernon ERT (rather than Exide) is now managing the property. DTSC's objection is that DTSC itself might have had to take over responsibility for the site upon abandonment, but that possibility is no longer actual or imminent.

As the EPA correctly points out, DTSC fares no better by seeking to characterize the plan as presenting it with a "Hobson's choice." (D.I. 45 at 4). Having agreed to participate in the Vernon ERT, DTSC can no longer complain that it would have been injured if it had selected the abandonment option instead. That possibility is in the past and will never recur, DTSC has identified no ongoing harm that it suffers because it was once presented with that choice, and an order from this Court reversing confirmation of the plan could not provide DTSC any redress.

### 2.   The Conditions Contained in the Plan Satisfy the *Midlantic* Standard for Abandonment

Even assuming abandonment issue was not mooted,[5] the conditions contained in the plan satisfy the standard for abandonment under *Midlantic*. Under § 554 of the Bankruptcy Code, a court ordinarily can authorize the abandonment of property that is "burdensome to the estate." 11 U.S.C. § 554. The Supreme Court has recognized a "narrow" exception to that power, concluding

---

[5] If abandonment were the only issue in this appeal, I would dismiss the appeal as moot. But there are numerous other issues, and I have appellate jurisdiction over the case. I expect DTSC will exercise its right to appeal to the Third Circuit. Since the Third Circuit might not agree with the mootness ruling, I also consider the abandonment issue on the merits.

that a bankruptcy court cannot "authorize an abandonment without formulating conditions that

will adequately protect the public's health and safety." *Midlantic*, 474 U.S. at 502, 507 & n.9.

That exception "does not encompass a speculative or indeterminate future violation of [health or

safety] laws that may stem from abandonment." *Id.* at 507 n.9.  It is only limited by "laws or

regulations" that are "reasonably calculated to protect the public health or safety from imminent

and identifiable harm." *Id.*  Thus, courts disallow abandonment only where both (i) the

abandonment itself poses "an imminent and identifiable harm to the public health or safety" and

(ii) the debtor is "attempting to abandon property in contravention of state or local laws or

regulations designed to protect the public. " *In re Unidigital, Inc.*, 262 B.R. 283, 286–87 (Bankr.

D. Del. 2001) (citing numerous cases).

        DTSC argues that absent authorization to abandon the Vernon site, the plan was not

confirmable, and the Bankruptcy Court erred in authorizing abandonment based on a

misapplication of *Midlantic*.  According to DTSC, the undisputed record demonstrates that the

Vernon site posed an imminent and identifiable harm to the public health and safety, and, under

*Midlantic*, "a trustee may not abandon property in contravention of a state statute or regulation that

is reasonably designed to protect the public health or safety from identified hazards." 474 U.S. at

507.  Debtors agree that the Vernon site is contaminated and that, without appropriate safeguards,

it poses imminent and identifiable threats to human health and safety.  However, in challenging

the Bankruptcy Court's confirmation of the plan, Debtors argue, DTSC has ignored the protections

and conditions the plan placed on the abandonment option, "conditions that will adequately

protect the public's health and safety." *Midlantic*, 474 U.S. at 506-07.  I agree.

**a.  Determination that the Vernon Site Unlikely Posed Imminent Threat to Public Health and Safety Is Not Clearly Erroneous**

A bankruptcy court's determination of whether there is an "imminent threat" is a case-

18

specific factual inquiry reviewed for clear error. *See In re Smith-Douglass, Inc.*, 856 F.2d 12, 16 (4th Cir. 1988). Based on the record, I see no clear error. The resident engineer at the Vernon site testified during his live direct and cross-examinations at the confirmation hearing that the site was secure and unlikely to pose an imminent threat to the public. (*See* 10/16/20 Tr. 176:5–7; 10/15/20 Tr. 120:18–121:23, 126:21–127:5, 131:7–14, 133:12–134:13). Evidence established that the contractors currently in place were able to continue their work, provided they were paid. (*See* Suppl. Ruling at 2). Mr. Fraske testified that, if abandonment occurred, he would continue to maintain the site while the parties "worked something out." (10/15/20 Tr. 132:13–133:10). DTSC's own witness, Mr. Cope, testified that DTSC was already in communication with various vendors, including the operator of the FEU, about continuing work, had obtained estimates from certain vendors, had conducted preliminary contract negotiations, and was "doing everything we can, 100 percent, everything that we can to protect [the people of California]." (*Id.* at 182:11–184:3, 211:16–20). The plan provided $29 million[6] in immediately available funding, which would pay for onsite or offsite remediation efforts and enable contractors to continue working. (10/16/20 Tr. 174:14–18). DTSC's own evidence showed that completing "phase one" closure without removing buildings and installing a cover would cost $27,325,298—less than the funds available to DTSC under the plan. (*See* Exh. 1 (B.D.I. 917-9) to B.D.I. 917-8 ("Myers Decl.")). The Confirmation Order extended Debtors' contractual obligations with a critical vendor through October 30, 2020 (Suppl. Ruling at 2), and this extension allowed for the orderly transfer of responsibility and continuation of protections for the public's health and safety at the Vernon site. I find no clear error in the Bankruptcy Court's determination that, based on these conditions, the Vernon site posed no imminent threat to public health and safety.

_____

[6] That is, the $26 million in financial assurances and the $2.6 million provided by the global settlement.

According to DTSC, the Bankruptcy Court's analysis misconstrues *Midlantic's* first factor, which addresses whether the property itself—in a static state—presents an imminent and identifiable risk of harm to public health and safety. According to DTSC, "[a]llowing a debtor to abandon property because government agencies exist and will take action to address threats to public health and safety is contrary to the Supreme Court's clear directive," and "*Midlantic* requires additional funding to clean up the Vernon Plant before abandonment would be appropriate." (D.I. 45 at 6, 25). I agree with Exide that DTSC is attacking a strawman. The Bankruptcy Court did not authorize abandonment and simply leave DTSC to pick up the pieces with nothing more than $2.6 million. DTSC fails to mention the ongoing efforts to maintain the site, the additional $26 million in financial assurances available to DTSC, the two-week transition period, and DTSC's ability to avoid abandonment entirely by participating in the Vernon ERT. (10/16/20 Tr. 179:2–7). The Bankruptcy Court only allowed abandonment as an alternative after finding no threat of "imminent and identifiable harm" to the public and "formulating conditions that will adequately protect the public's health and safety." *Midlantic*, 474 U.S. at 507 & n.9. Moreover, the Bankruptcy Court's conclusion that governments may sometimes have to step in where there is no identifiable imminent danger to the public is not inconsistent with *Midlantic*. DTSC's position—that abandonment is impermissible if it requires a government to take any action in response—would replace *Midlantic's* narrow exception with a requirement that bankrupt parties must assume "long-term obligations" and eliminate all long-term risks before abandonment. This is not the standard set forth in *Midlantic*.

The plan provides for: (i) the unimpeded access to $26.5 million in financial assurances available to the DTSC; (ii) contribution of another $2,587,523 by the Consenting Creditors for the exclusive benefit of the Vernon site; (iii) the possibility of the establishment of the Vernon ERT; and (iv) the grant of a first-position lien on the Vernon site in favor of DTSC. (*See* B.D.I. 869-1 at

Section XII; B.D.I. 998-2 at Section 5.2(e) and Sch. 1). These protections stand in stark contrast to the facts in *Midlantic* where the trustee "was not required to take even relatively minor steps to reduce imminent danger," and whose conduct "aggravated already existing dangers." *Midlantic*, 474 U.S. at 499 n.3. I find no clear error in the Bankruptcy Court's determination that plan conditions would avoid a chaotic abandonment and will adequately protect the public's health and safety.

### b.    The Record Supports the Bankruptcy Court's Findings

DTSC argues that the Bankruptcy Court made factual findings unsupported or contradicted by the evidence and takes issue with observations made in the Bankruptcy Court's bench ruling. (*See* D.I. 45 at 31-35). According to DTSC, the evidentiary record did not establish that the existing containment efforts eliminated the risk of exposure of surrounding communities. (D.I. 45 a 21). Rather, DTSC argues, the record shows that (i) even lead contamination "contained" at low levels poses serious adverse health effects, (ii) the Vernon site's most highly polluted areas were only contained by a temporary structure that experienced several failures during the chapter 11 cases, and (iii) the areas outside of the FEU contained high concentrations of lead and required daily maintenance to prevent further migration of those chemicals into the neighborhood and water supplies.

Mr. Fraske, the only witness with first-hand knowledge about the Vernon site, testified, "the Site is stable and secured, and nothing on the Site presents any imminent threat to public health and safety." (Fraske Decl. ¶ 17; *see also* 10/15/20 Tr. 120:18–121:23, 126:21–127:5, 131:7–14, 133:12–134:13). Mr. Fraske further testified that the property would remain stable and secured "even if there were a several-week time gap between Exide's abandonment and the DTSC's takeover of closure operation oversight." (Fraske Decl. ¶ 17; *see also* 10/15/20 Tr. 133:12–134:13). The Bankruptcy Court's analysis took into account the credibility of the

witnesses.  Specifically, the Bankruptcy Court found that Mr. Fraske had credibly testified at the confirmation hearing that the site was secure and unlikely to pose an imminent threat to the public. (*See* 10/16/20 Tr. 176:5–7; 10/15/20 Tr. 120:18–121:23, 126:21–127:5, 131:7–14, 133:12–134:13).  By contrast, the Bankruptcy Court found that the testimony DTSC offered on the issue was "not . . . particularly persuasive" because DTSC's principal witness, Mr. Cope, was "evasive" and "doesn't have any real insight" into "the actual facts on the ground."  (10/16/20 Tr. 176:12–19.9).

DTSC notes that Dr. Solomon testified that "even low levels of lead exposure have serious health effects," and argues that "the lead at present levels at the site poses major health risks." (D.I. 45 at 31).  But that testimony ignores that the lead at the Vernon site is contained, maintained, and managed.  *Midlantic* does not impose "a *per se* principle" that "*any* detectable amount of . . . contamination, no matter its intensity, . . . poses an imminent threat to public health and safety."  *In re Guterl Special Steel Corp.*, 316 B.R. 843, 858–59 (Bankr. W.D. Pa. 2004) (permitting abandonment of site containing radioactive waste).  If that were the rule, "virtually every site in our environment would pose an imminent threat to public health and safety."  *Id.*  The Bankruptcy Court acknowledged that "the Vernon site is dangerous and exposure to lead is highly dangerous," but found that abandonment as an option under the proposed plan would not pose an imminent threat of public harm because "[t]he evidence overwhelmingly established that the site is constantly monitored, and the dangerous polluted areas are contained."  (Suppl. Ruling at 2). Those findings are consistent with *Midlantic* and supported by the record.

DTSC asks me to second-guess the Bankruptcy Court's factual findings that "the polluted areas are contained" and that "areas outside the FEU are safe."  (D.I. 45 at 32–35).  The evidence presented at the confirmation hearing, however, supports the Bankruptcy Court's determinations that the Vernon site is constantly monitored and that dangerous polluted areas are contained.  Mr.

Fraske testified that the portions of the site with high lead levels were "fully secured," on-site

contractors "maintained and inspected" the FEU "daily," DTSC's own inspectors did not wear

respirators outside the FEU, and daily perimeter air samples had not shown lead above permissible

levels since closure activities commenced in 2017, even when there were tears in the FEU that

required repair. (Fraske Decl. ¶¶ 11–13, 15, 17; 10/15/20 Tr. 120:4–134:13). DTSC points out

that Mr. Fraske testified that the FEU needs to be reinforced regularly, there are sometimes tears in

the FEU that need repair, and surface dust has to be sprayed down. (D.I. 45 at 33–34). The

Bankruptcy Court, however, weighed that testimony against all of the other record evidence and

ultimately found that the lead was fully contained. These findings are not clearly erroneous.

Finally, DTSC relies on the Myers Declaration in support of its argument that it would take

$72 million to mitigate the imminent risk of harm at and from the Vernon site, which in DTSC's

view, should have been required under the plan to satisfy the requirements of *Midlantic* and in

order to complete actions prior to abandonment such as building removal, foundation removal, and

an asphalt cap. DTSC introduced evidence of an approved "closure plan" for the Vernon site.

(*See* B.D.I. 917-5). An approved closure plan establishes the process for closure of "any

hazardous waste management unit, for example a surface impoundment or containment building

that the facility used to treat, store, or dispose of hazardous waste." (*See* B.D.I. 917-1 ("Cope

Decl.") at ¶ 41). DTSC also introduced evidence that the cost to complete "Phase I" closure and

complete corrective actions, which are an essential part of mitigating the imminent risk of harm at

and from the Vernon site, is less than $29 million. (Myers Decl. Ex. 1 at Lines 1.0, 6A, and 6B).

According to DTSC's own testimony, the Closure Plan has three stages:

> (1) "Phase One" closure work to remove all hazardous waste from all regulated hazardous
> waste units, to remove all such units and to demolish to grade all buildings related to such
> hazardous waste units; (2) "Phase Two" contingent closure work to address unforeseen
> circumstances that arise during closure or additional activities that are required to complete
> or certify final facility closure, including removal of contaminated soil beneath the

23

equipment, buildings, structures and pavement; and (3) "Phase Three" post-closure and contingent post-closure work to implement long-term inspections, monitoring and maintenance.

(B.D.I. 917-1 at ¶ 12). Mr. Myers opines that "[c]ompleting Phase 1 closure and certain corrective action tasks are an essential part of mitigating the imminent risk of harm at and from the [Vernon] Plant." (*See* B.D.I. 917-9 at ¶ 2). Based on the evidence presented by DTSC, completing Phase 1 of the closure plan and mitigating the imminent risk of harm at and from the Vernon site will cost $27,325,298—which is less than the amount of funds available to DTSC under the plan following entry of the Confirmation Order.[7] Whereas Mr. Myers estimates additional costs of $44.7 million meant to sustain the Vernon site on a long term basis, he does not explain how these expenses are connected to imminent and identifiable harms (*see* B.D.I. 917-9 at Ex. 1, Line 3), and *Midlantic* does not reach "speculative or indeterminate future" violations. *Midlantic*, 474 U.S. at 507 n.9.

DTSC's litigation position supplants the requirements of *Midlantic* with long-term obligations. Although the evidence establishes that the Vernon site is highly contaminated and requires appropriate safeguards to protect against imminent and identifiable threats to health and the environment, it also establishes support for the Bankruptcy Court's conclusion that the plan meets *Midlantic*'s requirements by establishing conditions that would adequately protect the public's health and safety—including the unimpeded access of up to $29 million to use towards completing Phase 1 of the DTSC-approved closure plan. I find no clear error in the Bankruptcy Court's authorization of abandonment as an option under the plan based on the specific facts and circumstances of this case.

**3.      The Good Faith Finding Is Supported by the Record**

---

[7] The cost estimate attached as Exhibit 1 to the Myers Declaration identifies the cost to complete "Phase 1 Closure – Complete Segments 2, 3 and remainder of tasks in 12/8/2016 Closure Plan and Phase 2 Elements as needed for Stable Config. Scenario" as $12,907,568. (*See* B.D.I. 917-9 at Ex. 1, Line 1.0). Site operations for the estimated time necessary to complete the Phase 1 implementation amount to another $14,417,730.13. (*See* B.D.I. 917-9 at Ex. 1, Lines 6A and 6B).

24

The Bankruptcy Court found that the plan had been "proposed in good faith" and was "the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies." (Confirmation Order ¶ F).  DTSC argues that the Bankruptcy Court erred in holding that the plan was proposed in good faith pursuant to § 1129(a)(3).  (*See* D.I. 45 at 35-38). According to DTSC, the proposal and solicitation of the initial version of the plan was premised on all parties agreeing to the proposed settlement.  Following DTSC's rejection of the settlement, however, the plan was intentionally restructured to force the settlement on DTSC.

As DTSC correctly points out, § 1129(a)(3) of the Bankruptcy Code requires a debtor to show that the plan has been proposed in good faith and not by any means forbidden by law.  The good-faith determination is "a factual inquiry into a totality of the circumstances surrounding the plan's proposal," and "bankruptcy courts are in the best position to ascertain the good faith of the parties' proposals." *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729 F.3d 332 (3d Cir. 2013). "[D]eterminations of fact pertaining to good faith are reviewed for clear error." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000).

A plan is proposed in good faith only if it will "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004) (citation omitted).  "[T]he Bankruptcy Code's objectives include: giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) (internal citations and quotations omitted).  Courts have also considered whether the plan "(1) fosters a result consistent with the Code's objectives, (2) the plan has been proposed with honesty and good intentions ... and (3) there was fundamental fairness in dealing with the creditors." *In re Genesis Health*

*Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001).

According to DTSC, Exide's lack of good faith is evidenced by the plan's "coercive provisions," which were engineered "to compel DTSC to elect treatment under the plan identical to the terms of a settlement DTSC previously rejected." (D.I. 45 at 36). "Exide's hurried proposal of a plan contingent on the abandonment of a property that presented clear imminent and identifiable threats to the public safety and designed to coerce action from DTSC is not a plan proposed in good faith." *Id.* DTSC asserts that Exide "engineered" a Plan "to force DTSC to accept the very settlement it rejected" and "ramm[ed] an unlawful Plan through the confirmation process." (D.I. 45 at 38, 61). But DTSC cites no evidence from the record, and its argument gives short shrift to the entirely consensual settlement and plan process as a whole which preceded DTSC's decision to reject the very settlement it negotiated.

To address the threats posed by the Debtors' contaminated properties, the plan avoids a contested abandonment process by incorporating the global settlement, which establishes an ERT for the sixteen NPPs and a separate ERT for the Vernon site. Extensive evidence showed that the plan was premised on the court-appointed mediators' settlement proposal after lengthy arm's length negotiations. The global settlement was overwhelmingly supported by all key stakeholders—including the creditors' committee, ten state environmental regulators, and the U.S. government—and was fully consistent with the objectives of chapter 11. (*See* B.D.I. 973 ¶ 1). DTSC itself participated throughout the mediation process, agreed to recommend the settlement to those with authority, and participated in drafting the settlement documents—until just ten days before the original confirmation hearing date. (B.D.I. 944 ¶¶ 18, 21, 22, 50, 140). When DTSC pulled its support, Exide and the other key stakeholders scrambled to save the global settlement, ultimately adjusting the proposed plan to account for DTSC's withdrawal while still giving DTSC the option to opt back into the global settlement.

26

Moreover, the amended proposed plan allowed DTSC to receive the same settlement payment it would have received under the initial plan, provided that the Bankruptcy Court approved the consideration for the settlement payment (*i.e.,* the third-party releases). DTSC's contention that this structure was meant "to force DTSC to accept (or at least not contest) the Non-Consensual Releases" (D.I. 45 at 38), is not supported by the record. Unsurprisingly, the third parties were unwilling to make settlement payments to DTSC unless they received some assurance that DTSC would not sue them afterwards. And DTSC's contention that the plan conditioned DTSC's treatment on "a condition outside DTSC's control"— *i.e.*, the Bankruptcy Court's approval of the non-consensual third-party releases—misses the mark. As Exide points out, non-consensual releases are by definition always outside a non-consenting party's control. The Third Circuit, however, has instructed that third-party releases may be permissible when they are "integral to the restructuring" and fair. *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 137–40 (3d Cir. 2019). The plan's inclusion of such releases alone does not undermine a finding of good faith.

The record demonstrates that the plan was proposed in good faith as a way to preserve the proposal made by the mediators, and I see no error in the Bankruptcy Court's finding.

### 4.   The Plan Releases and Injunction Are Proper

DTSC appeals three plan provisions that Exide asserts are central to the global settlement and implementing the plan: (a) the non-consensual third-party releases; (b) the releases granted by the Debtors in Section 10.5 of the Plan (the "Debtor Release"); and (c) the injunction provisions in Section 10.3 of the Plan. "Determining the fairness of a plan which includes the release of non-debtors requires the consideration of numerous factors and the conclusion is often dictated by the specific facts of the case." *In re Wash. Mut., Inc.*, 442 B.R. 314, 345 (Bankr. D. Del. 2011). Courts review the approval of releases and injunctions for clear error. *Cf. In re Cont'l Airlines*,

27

203 F.3d 203, 217 (3d Cir. 2000) (conducting detailed case-specific factual inquiry).

As an initial matter, as Exide correctly points out, DTSC has misapprehended the scope of the third-party releases and the Debtor Release.  First, the non-consensual third-party releases that bar DTSC from bringing suit only protect the Consenting Creditors and a subset of their related parties (*i.e.*, the Transferred Entities, the Europe/ROW Purchaser, and the indenture trustee for the notes).  (Plan § 10.6(f)).[8]  These parties made various contributions to enable DTSC to benefit from the plan and the Vernon ERT, including contributing $18.5 million in settlements, consenting to use of cash collateral and debtor-in-possession financing, purchasing the Europe/ROW business and canceling debt in connection therewith, waiving deficiency claims, and releasing liens on NPPs.  (*See* Confirmation Order ¶ I(iii)–(iv)).  Second, the Debtor Release only applies to estate claims held by the Debtors, not direct claims held by DTSC or claims against the Debtors.  (Plan § 10.5).  DTSC suggests that the Debtor Release somehow prevents it from "pursu[ing] environmental claims against the Released Parties."  (D.I. 45 at 47).  While the Debtor Release applies to a broader group of released parties than the third-party releases, it does not prevent DTSC from bringing any direct claims it may have against those additional parties.

### a.    Third Party Releases

To grant non-consensual releases, a court must assess "fairness, necessity to the reorganization, and [make] specific factual findings to support these conclusions."  *Cont'l Airlines*, 203 F.3d at 214.  These considerations might include whether:  "(i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to

---

[8] DTSC released a smaller group of parties than the other governmental regulators, who also provided covenants not to sue Debtors, their related parties, and a broader group of the Consenting Creditors' related parties.

make the plan feasible; and (iv) the release is fair to the non-consenting creditors, *i.e.* whether the non-consenting creditors received reasonable compensation in exchange for the release." *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010).

The finding that the Consenting Creditors and Transferred Entities—who will receive the protections afforded by the non-consensual third-party releases—made critical and substantial contributions to the plan is supported by the record. (Confirmation Order ¶ I(iii)–(iv)). Those contributions included: (a) funding $18.5 million in settlement payments; (b) consenting to the use of cash collateral; (c) contributing a significant portion of the debtor-in-possession financing capital; (d) purchasing Debtors' Europe/ROW business when there were no other qualified bidders; (e) waiving deficiency claims against Debtors; (f) releasing their liens on Debtors' NPPs to facilitate the global settlement and provide additional value to the environmental agencies, including DTSC; and (g) canceling Debtors' guarantee of $155.9 million of principal obligations under a superpriority notes indenture. (B.D.I. 944 ¶ 32).

DTSC acknowledges that the settlement payments were "consideration" for the third-party releases, but dismisses the payments as "inadequate." (D.I. 45 at 42). The mere fact that DTSC believes the consideration too low does not meet the exacting standard for reversing the Bankruptcy Court's finding of fact on the clear error standard. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). And, as the record demonstrates, $12.5 million was the amount that the five mediators recommended and that the parties agree to in the global settlement. (*See* B.D.I. 944 ¶ 23; B.D.I. 636 ¶ 4).

DTSC further contends that "non-consensual third-party releases are, by definition, not necessary for reorganization" when there is a liquidation. (D.I. 45 at 41). This case was not a chapter 7 liquidation, and a traditional reorganization of a going-concern business is not a mandatory precondition for non-consensual releases; chapter 11 liquidation plans may also qualify

for such relief. *See In re Medford Crossings N., LLC*, 2011 WL 182815, at \*18 (Bankr. D.N.J. Jan. 20, 2011) (rejecting argument that a liquidating plan is *per se* ineligible for third-party releases and injunctions); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012) (similar). Here, the plan involved a combination of a reorganization through the Europe/ROW sale, transfers of the NPPs to ERTs, and a liquidation of Debtors' remaining assets. The released parties' contributions (and third-party releases) were necessary to the process.

DTSC further asserts that this was not an "extraordinary case" that justifies the grant of third-party releases. (D.I. 45 at 44). The Bankruptcy Court found that this case was "really . . . unprecedented" because of the complex environmental issues and the limited financial resources available for remediation. (10/16/20 Tr. 181:9–17 (crediting Mr. Tenenbaum's analysis of why this case was extraordinary); *id.* 120:20–121:4 (Mr. Tenenbaum explaining that "in my 32 years at the Department of Justice, this is about the most unusual circumstance I've ever encountered")). DTSC has failed to show that the Court's conclusion was clearly erroneous. Finally, I agree with Exide that DTSC's argument that Debtors' investigation "did not include environmental claims" is a red herring. (D.I. 45 at 45). Debtors had no obligation to investigate claims that third parties might have against other third parties, and DTSC cites no authority supporting this argument.

The unique facts and circumstance of this case support the Bankruptcy Court's finding that a third party release was sine qua non for the Consenting Creditors to voluntarily contribute funds necessary for the consummation of the plan. The Bankruptcy Court used the appropriate standard for determining that the third-party releases were justified, and the Bankruptcy Court's findings are not clearly erroneous.

### b.    Debtor Release

Section 10.5 of the plan released estate claims held by the Debtors. Under Bankruptcy Code § 1123(b)(3)(A), a debtor acting as debtor-in-possession may release its own claims against

third parties "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *Spansion*, 426 B.R. at 143. When evaluating a debtor's release of claims, bankruptcy courts sometimes consider the factors listed in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), including: (i) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (ii) a substantial contribution to the plan by the non-debtor; (iii) the necessity of the release to the reorganization; (iv) the overwhelming acceptance of the plan and release by creditors and interest holders; and (v) the payment of all or substantially all of the claims of the creditors and interest holders under the plan. The factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *Wash. Mut.*, 442 B.R. at 346. According to DTSC, approval of the Debtor Release was an abuse of discretion because it does not satisfy any of the *Zenith* factors. (D.I. 45 at 46-47).

Exide argues that such a release is appropriate where a debtor concludes in its business judgment that any claims it might have against third parties are only marginally viable and unlikely to have significant value. *See PWS Holding*, 228 F.3d at 242 (approving release by debtor of potential claims where claims were "of only marginal viability" and not worth pursuing). Applying the *Zenith* factors, Exide argues, ample evidence shows that the Debtor Release was fair, reasonable, and in the best interests of the estate. *See Zenith*, 241 B.R. at 110.

I agree with Exide. The Bankruptcy Court found that the Debtor Release was "an essential component of the Plan and appropriate" because, among other things, (i) an independent subcommittee investigated potential claims and "properly concluded that the Debtor Release is appropriate and supported by adequate consideration provided by the Consenting Creditors and the Transferred Entities," (ii) no "party in interest, other than the California DTSC, has opposed the Debtor Release," (iii) the Debtor Release was "integral to the agreements among the various

31

parties in interest," and (iv) "the failure to implement the Debtor Release would seriously

jeopardize the Debtors' ability to confirm and implement the Plan, including consummation of the

Global Settlement." (Confirmation Order ¶ I(i)).  DTSC argues that released parties provided only

a "de minimis" contribution, the plan was not "overwhelmingly" accepted, and the contribution to

general unsecured creditors was "meager."  DTSC essentially asks me to reweigh the record

evidence (*id.* at 45-48), but review on appeal is limited to determining whether the Bankruptcy

Court's findings were clearly erroneous. *See Anderson,* 470 U.S. at 573–74.

Moreover, undisputed evidence shows that the Debtor Release was a valid exercise of the

Debtors' business judgment.  An independent subcommittee of the board oversaw a nearly four-

month investigation into the Debtors' potential claims against third parties.  (B.D.I. 946 ¶ 10).

The creditors' committee also conducted its own investigation.  (*Id.* ¶ 12).  After their

investigations, neither the subcommittee nor the creditors' committee identified any valuable,

colorable claims.  (*Id.* ¶¶ 15–16).  The subcommittee also considered the significant value that the

Debtors would receive under the global settlement and, against that backdrop, concluded that the

Debtor Release was appropriate and fair.  (*Id.* ¶¶ 18–19).

### c.  Plan Injunction

I find DTSC's arguments regarding the injunction contained in Section 10.3 of the plan

unavailing.  The injunction is a standard provision enjoining the parties from commencing

litigation against the released parties with respect to claims or causes of action addressed by the

plan.  The injunction simply implements the release and exculpation provisions by preventing

parties from bringing claims that have already been released.  (*See* B.D.I. 998-2 at § 10.3).  The

injunction also permits parties to return to the Bankruptcy Court and seek permission to pursue

claims that might otherwise be barred by the plan.  (*Id.* (enjoining suits "[e]xcept as expressly

provided in . . . a separate order of the Bankruptcy Court")).  Without this injunction, DTSC or

some other third party could circumvent the releases and the extensively negotiated structure of the plan. Creditors would not have been willing to purchase the Europe/ROW business, allow Exide to access cash collateral and debtor-in-possession financing, and contribute $18.5 million without knowing that they would not later be sued. (*See* Confirmation Order ¶ I(iii)–(iv)). The injunction provision was necessary to the plan and provided fair protection in exchange for significant contributions by the released parties.

### 5. The Bankruptcy Court Properly Found that the Plan Does Not Discriminate

Section 1123(a)(4) of the Bankruptcy Code requires that a chapter 11 plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). DTSC relies on an estimate for remediation costs over the next five years that was included in Debtors' first day declaration as evidence that DTSC was unfairly treated in the allocation of Class 8 claims. DTSC contends it should have received a pro rata distribution based on the estimate. (*See* D.I. 45 at 54 n.10). EPA counters that the allocation of consideration among the government agencies was based on several relevant factors, not just total estimated remediation costs. Exide argues that treatment the Bankruptcy Code "does not require precise equality, only approximate equality," *W.R. Grace*, 729 F.3d at 327, and that the proposed allocation was fair and not discriminatory. (D.I. 54 at 59–62). I agree with Appellees.

The plan offered the same opportunity to all holders of Class 8 claims: accept the global settlement or reject it and face the prospect of abandonment. "[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery." *W.R. Grace*, 729 F.3d at 327. "What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id.* Accordingly,

33

"[p]roviding different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4)." *Wash. Mut.,* 442 B.R. at 355–56; *accord, In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("[T]he fact that some claimants have settled while others have not does not, by itself, indicate unequal treatment."). DTSC is correct that "creditors of equal priority should receive pro rata shares of the debtor's property" under the Bankruptcy Code. *Begier v. IRS*, 496 U.S. 53, 58 (1990). Here, however, the $10 million payments transferred to the ERTs were not the Debtors' property. Rather, they were settlement payments (or in the case of the Vernon site, a substantial contribution) by the Consenting Creditors and Transferred Entities. Nothing in the Bankruptcy Code requires a third party to make settlement payments or provide substantial contributions to similarly situated creditors in equal or prorated amounts.

The record supports a finding that the proposed allocation of the $10 million was fair and not discriminatory. The NPPs were in various stages of investigation and cleanup of environmental contamination caused by the former operations of the Debtors, and the record supports that allocation among the government agencies was based on several relevant factors, not just total estimated remediation costs. (*See* B.D.I. 973 ¶¶ 17, 20, 46). The allocation considered the availability of approximately $24 million in surety bond or other financial assurance proceeds under the global settlement that was incorporated into the plan, as available surety funding varied among the individual sites. The allocation also considered the value of the NPPs free and clear of liens from other creditors of the Debtors—given the Consenting Creditors' waiver of their liens on these properties, the individual value reduced the allocation to each respective site. Another factor considered was the degree of litigation risk to avoid abandonment on account of imminent and identifiable harms—an important consideration for the payments provided by the Consenting Creditors in order to have a confirmable plan. Recognizing these complexities, the environmental agencies, including DTSC, devised a method of allocating the $10 million settlement that would

34

better account for the various factors involved. (*See* 10/16/20 Tr. 107:22–108:18 (for each of the NPPs, the allocation took into account: (1) the estimated total cleanup costs; (2) the availability of financial assurances; (3) the estimated value of the property after cleanup; and (4) the degree of litigation risk for the property under *Midlantic*); B.D.I. 942 ¶¶ 21, 201; B.D.I. 973 ¶ 34). DTSC relies on Mr. Cope's testimony to assert that its claim is "worth in excess of $100 million." (D.I. 54 at 43). Other government agencies did not file their claims until after the plan was confirmed, so the record does not include any evidence regarding the size of DTSC's claim relative to other class members.

Finally, DTSC argues that the releases contained in the plan treat California differently. The non-consensual releases apply to "all California state governmental agencies that ... have jurisdiction regarding the enforcement of Environmental Laws" (B.D.I. 998-2 § 10.6(f)) but only to other state agencies that identified themselves as the agencies with the principal responsibility for regulating the NPPs. (D.I. 45 at 55-56). According to Exide, the point of this provision was to ensure that the releases were equal *in effect*. I agree. In California, unlike other states involved in the settlement, environmental authority is dispersed across multiple state agencies. Moreover, every other state regulator involved in the global settlement—except DTSC—represented that it is "the primary state governmental agency in its state with responsibility for enforcing Environmental Laws applicable to the [NPPs] located within its jurisdiction." (B.D.I. 998-2 § 5.2(j)(v)). If the releases applied only to DTSC, their effect would be *narrower* in California because any other California agency could bring the very actions that the releases were meant to prohibit. DTSC has failed to carry its burden of establishing that it was unfairly discriminated against.

## V.   CONCLUSION

I will affirm the Confirmation Order for the reasons set forth herein. In my opinion, the

appeal meets the criteria for equitable mootness, but I do not rely on that theory.  A separate order

will be entered.